# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Allan Chiocca,** )<br><br>        **Plaintiff** )<br><br>**v.** )<br><br>**The Town of Rockland, Deirdre Hall,**<br>**Edward Kimball, Larry Ryan,**<br>**Michael Mullen Jr., Michael O'Loughlin,**<br>**Richard Penney and Kara Nyman,**<br><br>        **Defendants** ) | **C.A. No. 1:19-cv-10482-WGY** |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS OMNIBUS MOTION TO COMPEL DEFENDANTS TO RESPOND TO DISCOVERY

Plaintiff Allan Chiocca, the former Town Administrator for the Town of Rockland ("Town") alleges that his supervisor, Defendant Deidre Hall, a member of the Town's board of selectmen and former candidate for state representative, pressured him into engaging in unwanted sexual conduct after threatening to vote against an extension of his employment contract. In the weeks that followed, Hall and the then-chairman of the Town's board of selectmen—and her paramour—Defendant Edward Kimball, concocted a lie that painted Mr. Chiocca as a sexual predator. They told this irreparably damaging lie to anyone who would listen, including their fellow board members. After an investigation the Town commissioned cleared Mr. Chiocca and recommended his immediate reinstatement, the other Selectboard members Defendants Larry Ryan, Michael Mullen, and Michael O'Loughlin agreed to terminate Mr. Chiocca instead, or as Ryan put it, "AMF," (adios my friend). Declaration of Adam Shafran, ¶ 4, Exhibit A, pp. 13:6. (hereinafter, "Shafran Decl., ¶ __"). Within hours of Mr. Chiocca's complaint to the Massachusetts Commission Against Discrimination ("MCAD"), Ryan, Mullen, O'Loughlin, Penney, and Nyman

(collectively the "Town Collective" and together with Hall and Kimball, the "Individual Defendants") effectively fired Mr. Chiocca.

Mr. Chiocca has faithfully pursued discovery but has not received a faithful response.[1] Communications between Kimball and Hall about their affair are being withheld as irrelevant. Communications between the Individual Defendants, Hall's husband and Kimball, and Hall and her doctor are being withheld as privileged or attorney work product even though no attorneys are involved. Documents and communications about Kimball's work on Hall's campaign are being withheld as irrelevant even though someone involved in her campaign made a social media post calling Mr. Chiocca a sexual predator. Communications between Kimball and his public relations firm are being withheld or redacted as irrelevant, even though the firm advised Kimball about what to say—or what not to say to avoid strengthening Mr. Chiocca's case. Hall refuses to answer an interrogatory from October 2019 because, her counsel claims, she is not obligated to review the information necessary to answer it. And, all Individual Defendants have refused to produce documents concerning their net worth on grounds that the requests are premature and irrelevant until liability is determined, even though the Court has not bifurcated discovery and they are plainly relevant to Mr. Chiocca's punitive damages claim.

Because Rule 26 permits Mr. Chiocca that discovery, he asks the Court to order the Individual Defendants to produce the requested information within fourteen days of its order.

## SUMMARY OF THE CASE

The complaint, counterclaims, and cross claims underlying this Motion all revolve around the events leading up to and following Hall's May 1, 2018 *quid pro quo* sexual harassment of Mr. Chiocca (referred to throughout the case as, the "Incident"). Compl., ¶¶ 50, 79-109 (describing

---

[1] A true and accurate copy of each Individual Defendant's objections and responses to the relevant discovery requests are attached hereto as Exhibits A – G.

the Incident).[2]   Shafran Decl., ¶ 5, Exhibit B.   The circumstances of that sexual harassment, subsequent false allegations of criminal wrongdoing, and the Defendants' conscious disregard of Plaintiff's rights, establish a *prima facie* case for liability and the basis for an award of punitive damages against all Defendants.

## RELEVANT FACTS

This case unfolds in two stages.   The first concerns how Hall sexually harassed Mr. Chiocca during the height of the "Me too" movement and how Kimball reacted when he learned of the Incident.   The second concerns all Defendants' outrageous retaliatory and otherwise vindictive conduct towards Mr. Chiocca thereafter.

### I.   The First Stage: Hall, Kimball, and Kimball's Investigation:

Hall is the indisputable protagonist in this case.   Before, at the time of, and for a short time following the Incident, Hall was the Vice Chairman of the Town's Board of Selectmen and one of Mr. Chiocca's supervisors.   Compl., ¶ 3 & 24.   At the time of the Incident, Hall was also a candidate for State Representative.   Compl., at ¶ 26.

Hall often shares the stage with Kimball.   Before, at the time of, and for a short time following the Incident, Kimball was Chairman of the Town's Board of Selectmen and also one of Mr. Chiocca's supervisors.   Compl., ¶ 4.   Mr. Kimball helped Hall campaign for state representative until she withdrew from the race after news of the Incident became public.   Shafran Decl., ¶ 6 at Exhibit C.

In the months leading up to the Incident, during March and April 2018 at minimum, Hall and Kimball engaged in an extramarital affair.   *See* Compl., ¶ 27; Shafran Decl., ¶ 6 at Exhibit C.

---

[2] In all, Mr. Chiocca has 37 claims against the Defendants in the aggregate, Kimball has one counterclaim against Chiocca, Hall has six counterclaims against Chiocca, and Chiocca has two crossclaims against the Town.

Kimball became aware of the Incident on May 17, 2018, when Hall told him that, after having two drinks, she blacked out and, the next morning, Mr. Chiocca thanked her for the "birthday present."  Compl., ¶ 162.  That was all Hall revealed.

On that information, Kimball launched a private investigation. He first viewed security camera footage from Town Hall, later met and corresponded with Hall, and eventually texted with Hall's husband. Compl., ¶¶ 164-169. During the latter conversation, Mr. Hall told Kimball that, according to Hall, Mr. Chiocca said to Hall on the night of the Incident, "the way we do things around here is, I ask for a contract, you give me a blowjob, and I get the contract." *Id.*, ¶ 169.

The next morning, May 18th, Kimball texted Hall, reminding her not to talk with Mr. Chiocca.  Shafran Decl., ¶ 7, Exhibit D.  Once at work, Kimball embellished on what Hall had said when he told Town counsel, John Clifford, that Mr. Chiocca had done something inappropriate to Hall.  A little over two weeks later, Kimball suspended Mr. Chiocca due to "allegations" of improper conduct toward Hall that had, in reality, never been alleged.  Compl., ¶ 179.

As news of the Incident spread, Hall repeated Kimball's lie to members of the Rockland Democratic Town Committee and during a televised Board of Selectmen meeting, claiming that Mr. Chiocca had engaged in sexual misconduct towards her.  Shafran Decl., ¶ 8, at Exhibit E; Compl., ¶ 195.  Someone would post a similar statement on the "Committee to Elect Deidre Hall" Facebook page.  *Id.* at ¶ 9, Exhibit F.  As a result of the Incident, Hall withdrew from the race. *Id*.

## II.    The Second Stage:  The Town's Investigation and the Aftermath:

In June 2018, the Town hired Attorney Regina Ryan of Discrimination and Harassment Solutions, LLC ("DHS") to investigate the Incident.  Compl., ¶ 200.  Hall and Kimball went to great lengths to interfere with the investigation.  Perhaps most extreme was the lawsuit Hall initiated to suppress disclosure of surveillance tapes from the night of the Incident.  In support, Hall submitted an affidavit by Kimball—filed in his role as Chair of the Town's Board of

Selectmen—that insinuated additional wrongdoing by Mr. Chiocca. *Id.* at ¶¶ 202, 203, 208, 209. After the Town issued a statement asserting that Kimball's affidavit was false, Hall dismissed her frivolous lawsuit. *Id*. at ¶¶ 210-212. Kimball tried to undermine the Town's investigation a second time during a June 19th Board of Selectmen meeting by calling it a "sham" on live television.

Meanwhile, Kimball tried to keep his own affairs in order. Social media commentary about the Hall/Kimball affair was driving Kimball's wife "crazy." *See* Shafran Decl., ¶ 10, Exhibit G. To "control the message," Kimball enlisted the help of a public relations expert, C.J. Chapman, of Pilgrim Strategies, LLC. *Id*. Mr. Chapman advised Kimball against saying certain things in a public statement because they would help Mr. Chiocca's case. *Id.* at ¶ 11, Exhibit H.

Despite their efforts, Hall and Kimball could not derail the investigation. Attorney Regina Ryan of DHS issued the Town's investigative report on July 2, 2018; it exonerated Mr. Chiocca, questioned Kimball's truthfulness, found that Hall sexually harassed Mr. Chiocca, and recommended the Town immediately reinstate Mr. Chiocca. *See* Shafran Decl., ¶ 5, Exhibit B. A week later, the Town's Board unequivocally adopted the report in-full. *See* Compl., ¶¶ 233, 234, 242, 251, 252. Hall resigned from the Board, and Kimball would not take part in Town business again before resigning in July 2018.

The other individual defendants wasted no time picking up where Hall and Kimball left off. During an executive session meeting the next week, the Board met "to take disciplinary action against Mr. Chiocca . . ." Compl., ¶ 244. But without Hall or Kimball, Ryan, O'Loughlin, and Mullen could not terminate Mr. Chiocca, as they hoped to do. *Id.* at ¶ 262. They agreed, however, to ignore the DHS report, disregard its recommendation to reinstate Mr. Chiocca, and to convince any new board member into voting to terminate Mr. Chiocca. *Id.* at ¶ 264, 271. Ryan was quite explicit: " [W]hy are we even meeting until we get a fourth person? And then we'll fire him."

Shafran Decl., ¶ 4, at Exhibit A, pp. 6:3-5, 7:23-8:6.  Ryan later referred to Mr. Chiocca as "dead wood," assured reporters that he would be fired, and implied that Mr. Chiocca was the perpetrator of wrongdoing. Compl*.*, at ¶ 273, 287, 288.

Around that same time, O'Loughlin used the "Rockland Hub" Facebook page to spread rumors that Mr. Chiocca had lied to the investigator, notwithstanding there being nothing to substantiate that statement. *Id.* at ¶¶ 277, 278. By November 2018, O'Loughlin acted as though Mr. Chiocca's position was already "vacant."  *Id.* at ¶ 298.

Mr. Chiocca filed an administrative complaint with the MCAD on November 20, 2018. Compl., ¶ 300. Within hours the Town Collective—Penney and Nyman having been recently elected—voted to keep Mr. Chiocca on administrative leave until the end of his contract, and not to renew it. *Id.* at ¶ 303.  Mr. Chiocca contends that they each read (and ignored) the DHS report when they so voted. That disbelief, Mr. Chiocca contends, arises from their view that Mr. Chiocca, a male, cannot be a victim of sexual harassment.

## ARGUMENT

Non-privileged material that "that is relevant to any party's claim or claim or defense" and which is "proportional to the needs of the case" is discoverable pursuant to Rule 26. Fed. R. Civ. P. 26(b); *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  Rule 26 must be "construed broadly" by this Court so as "to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Energy Power (Shenzhen) Co. v. Wang*, No. 13-cv-11348, 2014 WL 4687784, at *2 (D. Mass. Sept. 17, 2014) (quoting *Oppenheimer Fund*, 437 U.S. at 351). "District courts exercise broad discretion to manage discovery matters." *Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003).  When a defendant resists discovery, like here, that party bears "the burden of

showing some sufficient reason why discovery should not be allowed." *Katz v. Liberty Powers Corp. LLC*, No. 18-cv-10506-ADB 2020 WL 3492469, at *2 (D. Mass. June 26, 2020).

## I.    <u>Requests for Financial Information (As to All Individual Defendants):</u>

Under Massachusetts law, Chapter 151B, § 4, a jury may award Mr. Chiocca punitive damages if he shows the Defendants' wrongdoing was "outrageous and egregious." *Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 110 (2009) (punitive damages available pursuant to Chapter 151B, § 4 if "the defendant's behavior [is] particularly outrageous or egregious"); *see Gyulakian v. Lexus of Watertown Inc., et al*, 475 Mass. 290 (2016).  In § 1983 actions, a jury may award punitive damages when the defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Bisbal-Ramos v. Mayaguez*, 467 F.3d 16, 25 (1st Cir. 2006) (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).  Mr. Chiocca strongly sets forth facts sufficient to meet both standards as to all Defendants.

Because a jury will ultimately decide whether to award Mr. Chiocca punitive damages from each Defendant, and in what amount, the Federal Rules permit Mr. Chiocca to prepare that case by **discovering** information about the Individual Defendants' finances.[3]  That was the goal of Mr. Chiocca's Second Requests for the Production of Documents ("Second Requests").

For simplicity's sake, Mr. Chiocca summarizes his Second Requests to the extent they seek financial information from each Individual Defendant.  He requests:

- current statements showing the present monetary value of personal or business bank accounts; retirement accounts; and investment accounts (Request Nos. 1-3)[4];

---

[3] The Town has agreed to produce documents sufficient for Mr. Chiocca to present his case for punitive damages. Notwithstanding its production, the Town maintains its objection that Mr Chiocca has requested such documents prematurely.  Accordingly, this Motion only asks to compel the Individual Defendants' compliance.

[4] Because Mr. Chiocca's requests to the Town Collective followed his requests to the Town, the request numbers herein are inaccurate as to them.  The substance of the requests, however, are the same as to Hall and Kimball.

- documents sufficient to identify business interests owned and the monetary value of those interests (Request No. 4) as well as documents and communications about those businesses' financial health for the years 2017-2021 (Request No. 5);

- documents sufficient to identify trusts benefitting the defendant and the monetary value of that interest (Request No. 6) as well as documents and communications about the trusts' financial health for the years 2017-2021 (Request No. 7);

- documents sufficient to identify real estate owned and its value (Request Nos. 8-9);

- documents sufficient to identify the value of "assets," which Mr. Chiocca defined to mean "automobiles, boats, planes, helicopters, recreational vehicles, artwork, books or manuscripts, bonds, jewelry, coins, precious metals, or collectibles with a value of more than $1,000.00, and cash of any value" (Request No. 10);

- historical information concerning the end-of-year value of their personal and business bank accounts, retirement plans, investments, real estate, or other assets worth more than $1,000.00 from the years 2017-2021 (Request Nos. 11-15); and

- state and federal tax returns for the years 2017-2021 (Request No. 16).

Each Individual Defendant responded with an array of virtually-identical boilerplate objections.[5]

Hall agreed, however, to produce her federal tax returns for the years 2017 through 2021. Kimball, quite bewilderingly, agreed to produce documents relevant to **his claim for damages**, but withheld all documents responsive to Mr. Chiocca's financial requests. The Town Collective refused to produce any documents. *See* Exhibits C, D, & E.

Pursuant to Local Rule 7.1, counsel to Mr. Chiocca met and conferred with each Defendant's counsel. On May 12th, counsel conferred with the counsel to the Town Collective. On May 14th, with counsel to Hall, and Kimball's counsel on June 11th. Declaration of Eric Walz, ¶¶ 4-6 (hereinafter, "Walz Decl., ¶ __").

---

[5] Hall objected to the financial requests as (i) harassing, unduly burdensome, overly broad; (ii) an invasion of privacy; (iii) not reasonably limited in time or scope; (iv) irrelevant; (v) disproportional; and (vi) premature. Exhibit C. She further objects to request nos. 10 and 15 as "unintelligible as to the meaning of 'assets'" even though Mr. Chiocca's precisely defined "assets." *Id*. Kimball objected that the financial are (i) impermissible, premature, and harassing asset discovery; and (ii) disproportional to the needs of the case. Exhibit D. The Town Collective objected to the requests as (i) irrelevant; (ii) an invasion of privacy; and (iii) premature. Exhibit E.

What came out of each conference was a disagreement that the Second Requests were premature, and an offer of compromise. Mr. Chiocca's counsel offered to withdraw his request for financial documents if the Individual Defendants agreed to answer a single interrogatory. Walz Decl., ¶ 7. The interrogatory would require each to fill out a table stating (i) whether s/he had a particular asset (bank account, retirement account, beneficial interest in a trust, real estate, etc.); (ii) if so, the value of those assets; and (iii) how s/he arrived at that value. *Id.*, ¶ 8. Mr. Chiocca's counsel also reserved the right to request documents relevant to particular assets if questions arose as to its existence or value. *Id*. All Individual Defendants rejected that offer. *Id.*, ¶ 9.

In response to the Individual Defendants' choice to force this discovery fight, Mr. Chiocca asks the Court to overrule each of their objections.

**A. The Requests are Not Premature:**

The Individual Defendants' main objection is that Mr. Chiocca's request for financial discovery is "premature." It is not. In employment cases with a punitive damage component like this one, the majority of federal courts permit pre-liability discovery into a person or entity's financial status. *See, e.g. Tingle v. Herbert et al*, Civ. No. 15-626-JDW-EWD, 2017 WL 2335646, at *4 (M.D. La. May 30, 2017) (compelling individual defendant to produce five (5) years' of tax returns); *Zielke v. Vision Hospitality Grp., Inc.*, Civ. No. 1:14-cv-362-SKL, 2015 WL 9876950, at *3 (E.D. Tenn. Nov. 3, 2015) (compelling company to produce financial statements and tax returns); *Munoz v. Manhattan Club Timeshare Assoc'n Inc.*, Civ. No. 11-cv-7037, 2012 WL 479429, at *2 (S.D.N.Y. Feb. 8, 2012) (compelling production of statement of net worth).

Even though, at trial, it will be Defendants' burden to *disprove* a financial ability to pay, Mr. Chiocca is permitted to prepare his case in opposition to that effort. *See Horney v. Westfield Gage Co., Inc.*, 77 Fed.Appx. 24, at *8 (1st Cir. 2003) (reversing decision dismissing punitive

damages claim in discrimination and harassment lawsuit where defendant did not disprove financial ability to pay); *Love v. Lord Nathan Rest Home, Inc.*, Civ. No. 06-30021-MP, 2007 WL 9799830, at *1 (D. Mass. Apr. 3, 2007). In *Katz v. Liberty Power Corp.*, the Honorable Judge Burroughs compelled the production of documents showing net worth, dividend payments and other business disbursements, and liens and loans. Civ. No. 18-cv-10506, 2020 WL 3492469, at *5-7 (D. Mass. June 26, 2020). In *Boniface, et al. v. Viliena*, another punitive damages case, Judge Burroughs compelled an individual defendant to answer an interrogatory that sought the identity of "real property, bank accounts, trusts, or other assets in which [he] had a legal or beneficial interest." No. 17-cv-10477, Dkt. No. 107 (April 1, 2020).

The Individual Defendants' conduct militates in favor of overruling their prematurity objection too. In the six case management, scheduling, and status conferences that preceded this Motion, no Individual Defendant suggested that the Court should bifurcate liability issues from damages. *See* Dkt. 47 (completion of "all fact discovery" by May 1, 2020); Dkt. 53 (same); Dkt. 103 (all discovery "conclude by December 18, 2020"); Dkt. 108 (all discovery "conclude by March 19, 2021); Dkt. 109 (all discovery "conclude by July 19, 2021); Dkt. 110 (all discovery "conclude by November 19, 2021). Even now, more than four months after Mr. Chiocca served his Second Requests, no Defendant has moved to bifurcate liability issues from damages. Defendants should not be permitted to leave Mr. Chiocca's discovery efforts in limbo. *See e.g. Aramark Management, LLC v. Borgquist et al*, Civ. No. 8:18-cv-01888, 2020 WL 9217993, at *5 (C.D. Cal. August 31, 2020) ("Plaintiff will have no opportunity to conduct net worth discovery after 'liability is established' by the jury" where the parties agreed discovery does not need to be phased); *Alvarez v. Aldi (Texas) LLC*, Civ. No. 3:13-cv-4122, at *3 (N.D. Texas July 22, 2014) (granting net worth discovery where bifurcation not ordered).

**B.  The Individual Defendants' Other Objections are Meritless:**

The Individual Defendants raise two other objections worth a brief mention: proportionality and privacy.[6]  Neither justifies denying this Motion.

As drafted, Mr. Chiocca's Second Request does not seek mounds of financial information. He uses four types of requests.

Eight of the sixteen financial requests seek information concerning **current** net worth.[7] For each of these categories, the Individual Defendants will have to produce no more than a handful of documents.  To date, no Individual Defendant has demonstrated why it would prove difficult to comply with these requests.  *See* Exhibits C, D, & E.

Seven requests seek information relevant to the Individual Defendants' **historical or changing** net worth.[8]  These too are proportional, and federal courts often grant such historical discovery when sought in relation to a punitive damages claim.  *See Tingle*, 2017 WL 2335646, at *4. And, again, no Individual Defendant has attempted to demonstrate a burden or suggested a willingness to produce documents for **any** period.  Exhibits C, D, & E.

One request, no. 16, seeks each Individual Defendants' **tax returns** for the period 2017 through 2021. Hall is the only individual defendant who agreed to produce this information. No one else demonstrated why their refusal was justified. Exhibits C, D, & E.

---

[6] Hall and Kimball object on relevance grounds as well, which should clearly be overruled where the financial information is relevant to punitive damages.  Hall's boilerplate objection as to time and scope are nonsensical insofar as they are aimed at requests for Hall's current financial records. And, courts permit discovery of historical financial information in punitive damages cases.  *See Tingle*, 2017 WL 2335646, at *4.

[7] **Current** account statements from each of the individual defendant's personal and business bank accounts (request no. 1), retirement accounts (request no. 2), and investment accounts (request no. 3); and then documents sufficient to identify any businesses owned, in whole or in part, by the individual defendants (request no. 4), the beneficial value of any trusts (request no. 6), any real estate owned (request no. 8) and any mortgages or security interests encumbering that real estate (request no. 9), and any "assets" owned by the individual defendants (request no. 10).

[8] **Historical**, end-of-year value of the individual defendants' business interests (request no. 5), trust interests (request no. 7), personal or business bank accounts (request no. 11), retirement accounts (request no. 12), and investment accounts (request no. 13), as well as the identity of any real estate (request no. 14) or "assets" purchased or sold during that period (request no. 15) for the period 2017-2021.

And two requests, nos. 5 and 7, request in part communications concerning the financial health of businesses owned (request no. 5) or trusts benefitting (request no. 7) the Individual Defendants. Exhibits C, D, & E.  These requests are designed to obtain documents that would show whether the Individual Defendants have intentionally diverted certain beneficial interests during the course of this case.  To the extent the Individual Defendants argue that these requests are too burdensome, it begs the question:  how many communications show them diverting assets so as to make this request too burdensome?

Finally, the Individual Defendants' privacy objection can be swiftly rejected.  Exhibits C, D, & E.  Courts routinely reject privacy-based objections when those concerns can be assuaged by confidentiality agreements.  *See Blue Cross Blue Shield of Rhode Island v. Korsen*, Civ. No. 09-317L, 2011 WL 13365760, at *1 n.1 (D.R.I. June 23, 2011) (compelling production of financial information despite privacy objection where confidentiality agreement protected interests). The Parties agreed to, and this Court entered, a confidentiality agreement prohibiting dissemination of any Individual Defendants' financial information.  Stipulation and Protective Order, Dkt. 93.

## II.     Other Outstanding Discovery Matters (As to Defendants Kimball and Hall)

Mr. Chiocca must ask this Court to address other, particularized discovery violations pertaining to Hall and Kimball.

### A.  Hall's and Kimball's Inappropriate Privilege Designations.

Kimball seeks to withhold from production documents and communications between him and the other Individual Defendants concerning this case (First Request, Nos. 14-19) on grounds that those communications are privileged.[9]  Exhibit B.  Hall similarly withholds communications

---

[9] Kimball's counsel represented during the parties' Rule 7.1 conference that some communications with other individual defendants would be produced by June 30th, while those the deemed privileged would be withheld and a privilege log supplied shortly thereafter.  On June 30th, Kimball's counsel contacted Plaintiff's counsel to notify him

between her husband and Kimball about a third-party's declaration on grounds that the communication is (or communications are) protected from disclosure as attorney work product (First Request, No. 16).  Finally, Hall refuses to produce unredacted copies of several pages of her voluminous medical records because the records "discuss[] information requested by counsel and information related to the case" and are protected by "Attorney-Client/Work Product/doctor-patient/therapist/patient" [sic] privileges (First Request, No. 31).[10]  Exhibit A.

"The party invoking a recognized privilege has the burden of establishing, not only the existence of that privilege, but also that the established privilege was not waived." *Cavallaro v. United States*, 153 F.Supp.2d 52, 56 (D.Mass. 2001), *aff'd* 284 F.3d 236 (1st Cir. 2002). Similarly, "[t]he party seeking work product protection has the burden of establishing its applicability." *In re Grand Jury Subpoena*, 220 F.R.D. 130, 141 (D. Mass. 2004).

Communications between co-defendants or between a defendant and a third party are not privileged.  The joint-defense or "common interest" privilege "is not an independent privilege protecting all communications between codefendants."  *Woods Hole Oceanagraphic Institute v. ATS Specialized, Inc.*, Civ. No. 1:17-12301-NMG, 2020 WL 9741335, at *4 (D. Mass. May 11, 2020).  It derives from the attorney-client privilege and requires that the communication be between the party and another party's attorney, or between two parties' attorneys.  *U.S. v. Bay*

---

that the intended production would be delayed until the end of the week, and that the privilege log will not be produced there with.  Mr. Chiocca cannot wait to bring this motion until Kimball finally produces this information.

[10] In *Riley v. Mass. State Police*, 2017 U.S. Dist. LEXIS 226866, *9 (D. Mass 2017), this Court found that the patient-therapist privilege is waived when a party alleges "severe" emotional distress and/or brings a tort claim for emotional distress.  Hall seeks compensatory and punitive damages because of what she classifies as "severe emotional distress" and has brought a claim for Intentional Infliction of Emotional Distress. The *Riley* decision is consistent with other District Court decisions on the matter.  *See e.g. Ricciardi v. Sylvester Sheet Metal Corp*, 1995 U.S. Dist. LEXIS 5029, *10-12 (D. N.H. 1995) (citing *Ferrell v. Glen-Gery Brick*, 678 F. Supp. 111, 112-13 (E.D.Pa. 1987); *Everly v. United Parcel Services, Inc.*, No. 89 C 1712, 1991 U.S. Dist. LEXIS 1255, at * 2 (N.D. Ill. Feb. 4, 1991) ("Plaintiff has placed her mental condition in controversy by specifically alleging in her sexual discrimination complaint a count on an intentional infliction of emotional distress.").  And, Hall's selective redactions should be denied where she produced hundreds of pages of psychological records without claiming the patient-therapist privilege as to the vast majority.

*State Ambulance and Hosp. Rental Serv., Inc.*, 874 F.2d 20, 28 (1st Cir. 1989).  And, even in those cases, a party withholding documents must prove the existence of a common interest.  *See id.*  The communications Hall and Kimball have withheld have never qualified as privileged communications, and do not become privileged simply because they each hired a lawyer.  *See Charvat v. Valente*,.  Civ. No. 12-cv-5746, 82 F.Supp.3d 713, 717-18 (N.D. Ill. 2015) (concluding that no privilege or work-product rule justified the withholding of "communications between co-defendants that pertain to the [telemarketing violations and business relationships at issue in that case]" or "communications between the parties directly" when lawyers are absent from the conversation).  To the extent any privilege existed, it was waived.

Reliance on the work-product doctrine is misplaced as well.  The work product doctrine protects (1) documents or other things, (2) prepared in anticipation of litigation, (3) by or for a party or a party's representative. Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495 (1947).  The purpose of the doctrine is to protect counsel's legal strategies and opinions, not to operate as a discovery-proof bunker for unfettered communication by or among co-defendants.  And, with respect to Hall's medical records, those records were made by her treating therapists and medical providers for <u>treatment purposes</u>.  The work-product doctrine does not apply to "'[m]aterials assembled in the ordinary course of business . . . or for other nonlitigation purposes[.]'" *Mass. Inst. of Tech.*, 957 F. Supp. at 305 (quoting Fed. R. Civ. P. 26(b)(3) advisory committee's note).  And, even if it did, disclosure to a third party that substantially increases the likelihood that protected information would be revealed to an adversary forfeits work product protection. *See FDIC v. Nash,* 1998 U.S. Dist. LEXIS 23520, *13-17 (D.N.H. 1998).  By disclosing the information to her physician, knowing that the records would be subpoenaed, Hall waived any protections she had.

**B.  Hall's and Kimball's Refusal to Produce Other Relevant Discovery:**

Both Defendants refuse to produce other documents (or portions thereof), deeming them irrelevant or non-responsive.

      i.      <u>The Hall/Kimball Affair (First Request, No. 14):</u>

Kimball refuses to produce communications between him and Hall concerning their affair on relevance grounds. That affair plays a key role in several events in this matter.  Hall and Kimball attempted to cover up their affair, leading the Town's board to remove Kimball from his role as Chair. The undisclosed affair impacted the Town's investigation and the resulting report.  Mr. Chiocca should be permitted to prepare for any challenge to the legitimacy of the DHS investigation and the report's findings based on the affair.  In addition, Mr. Chiocca should be permitted to demonstrate that the affair influenced Kimball's decision to investigate the Incident and then accuse Mr. Chiocca of sexually assaulting Hall.

      ii.     <u>Kimball's Work on Hall's Campaign (First Request, No. 31):</u>

Kimball also refuses to turn over documents and communications concerning his work on Hall's campaign on relevance grounds.  The few text messages Kimball has produced thus far indicate that he (and his wife) theorize that Hall quit campaigning for State Representative **because of** the Incident. Shafran Decl, ¶ 6 Exhibit B. Those beliefs, alone, make documents and communications about Kimball's campaign work relevant.

      iii.   <u>Hall's Communications with Pilgrim Strategies (Second Request No. 17):</u>

Hall refuses to produce communications between her and Kimball's public relations firm Pilgrim Strategies, LLC.  As further discussed below, Kimball's publicist, C.J. Chapman, convinced Kimball not to make a statement concerning the Town's investigation because the statement would help Mr. Chiocca's case. Her lengthy and boilerplate objections are

unpersuasive.[11] Exhibit C. Hall has not demonstrated why she should not be compelled to turn over clearly relevant documents

    iv.    <u>Hall's Communications with Woodward & Curran, Inc. (Second Request, No. 18):</u>

Plaintiff seeks communications between Hall and employees of Woodward & Curran, Inc. in order to demonstrate a pattern of Hall's misconduct and her misuse of positions of power.  In addition to her usual objections, Hall objects to producing these communications "to the extent documents are not in her possession, custody, or control and/or are equally accessible to" Mr. Chiocca.  Exhibit C.  If such documents are not in Hall's possession, custody, or control, she can say so as Plaintiff's counsel has repeatedly asked Hall's counsel to do.  And, baldly asserting that documents are "equally accessible" to Mr. Chiocca is not only untrue, it is not a proper objection in this context.  While, occasionally, courts permit such an objection when seeking public records, Mr. Chiocca is not aware of any court that requires a plaintiff to subpoena records from a private third-party before compelling a party to produce requested records that are in her possession.

    v.    <u>Hall's Communications with John Sullivan (Second Request, No. 19):</u>

Plaintiff also seeks communications between Hall and Mr. Sullivan to demonstrate a pattern of Hall's misconduct and her misuse of positions of power.  Hall refuses to produce them, however, relying on every possible objection imaginable, and for good measure, then layers on a claim of attorney-client privilege because she was previously employed as an attorney for the Town of Quincy.  Exhibit C.  Mr. Chiocca seeks personal e-mail communications between Hall and Mr. Sullivan.[12] There is no reason to believe that privileged communications are in her personal e-mail account, and Hall has not listed any communications on her privilege log.  And,

---

[11] Specifically, that the request is harassing, unduly burdensome, overly broad, an invasion of privacy, not reasonably limited in time or scope, and is irrelevant and disproportional to the needs of the case. Exhibit C.
[12] Mr. Chiocca already subpoenaed and received documents from Hall's Town of Quincy work account.

even if some communications are privileged, Hall should designate them as such in collaboration with the Town of Quincy.   Hall is not justified in completely refusing to produce personal communications between her and Mr. Sullivan.

### C.  Hall's and Kimball's Improper Redactions:

Hall and Kimball improperly redact portions of responsive documents by claiming that the redactions are of "irrelevant" or "non-responsive" portions of otherwise responsive documents. These redactions appear to be extremely relevant and responsive. Kimball's look like this:



Shafran Decl., ¶ 10, Exhibit G.  This example, between Kimball and his public relations expert C.J. Chapman, relate to a public statement Kimball makes about the Town's investigation. In a separate chain messages between Kimball and Delshaune Flipp in which thirty-two messages are redacted, there is a June 17, 2018 sequence in which Kimball redacts three consecutive messages

from Ms. Flipp, then Kimball says, "She's sleeping, the fixer said I should not make that statement, may appear as a double standard." Shafran Decl., ¶ 11, Exhibit H. Ms. Flipp's initial reply is also redacted, then she writes "double standard," to which Kimball responds, "Said would make Allan's side stronger and possibly piss her side off even though circumstances are very different." *Id*. The content surrounding Kimball's redactions give the impression that the redacted messages are very relevant to the proposed statement that would have supported Mr. Chiocca's case, a situation made worse because Kimball did not produced the statement, either.[13]

It is difficult to imagine a situation in which partially-redacted responsive documents would look *more* suspicious than Kimball makes his texts with Mr. Chapman and Ms. Flipp appear. Yet, Hall's self-serving redactions manage to do so.

Hall redacts significant portions of two journal entries[14] claiming those portions are not responsive. Surrounding the redactions in one of the journal entries is perhaps the most relevant of any evidence: Hall's recollection about the night of the Incident.[15] Yet, in the middle of those recollections, black squares appear. In a second, Hall describes her reaction to news coverage of the Incident. There, too, Hall has applied redactions. This is remarkable. Set aside for the moment that no rule permits a party to redact unresponsive portions of responsive documents. From a practical perspective, is it reasonable to believe that Hall suddenly shifted—mid paragraph—the focus of her journal entry from the Incident to a topic so far removed that it is reasonable to redact those portions of the entry as unresponsive? It is not. And, if the redactions were not suspicious enough already, Hall's counsel refuses to allow Mr. Chiocca to verify that the redacted information

---

[13] Counsel for Kimball represented that she produced all responsive documents and communications involving Mr. Chapman.

[14] Because Hall's counsel designated these documents as "Confidential – Litigation Counsel Only"—a classification not contemplated by the Court's Protective Order—Mr. Chiocca does not attach the journal entry as an exhibit to this Motion.

[15] Bates numbered D-Hall00004948-4950 and 4954.

is, in fact, unresponsive even though they will do just that with respect to purportedly non-responsive medical records.[16]  Unredacted copies of Hall's journal entries should be produced.

### D. Hall's and Kimball's Deficient Interrogatory Answers

Rounding out Kimball's discovery violations are interrogatory answers that fail to comply with Rule 33(d) of the Federal Rules of Civil Procedure and Local Rule 33.1(b).  Specifically, Kimball's responses to interrogatory nos. 10 ("I further incorporate herein the documents I will produce"), 12 ("Any written communications concerning the Investigation will be produced . . . and I incorporate those documents herein"), and 13 ("Any non-privileged written communications that I had will be produced . . . and are incorporated herein pursuant to Fed. R. Civ. P. 33(d)"). Exhibit G.  In order to answer an interrogatory by reference to documents, Kimball must identify the documents so as to "permit [Mr. Chiocca] to locate and identify the records and to ascertain the answer as readily as [Kimball]."  Local Rule 33.1(b).  Kimball has not done so.

And, finally, Hall refuses to fully answer Interrogatory Nos. 13 and 16—both of which request information that would require Hall to read DHS's supplemental investigation report—a report explicitly created to consider whether Hall's allegedly recalled memories about the night of the Incident impacted DHS's original findings that Hall sexually harassed Mr. Chiocca.  Shafran Decl., ¶ 5, Exhibit B. Even though Mr. Chiocca's interrogatories have been outstanding for more than two years, Hall has evaded her obligation to give a full and complete answer by refusing to read the supplemental report which, she claims, she has no obligation to read.  *See* Exhibit F.  That position does not comport with Rule 33, which obligates a party "to make an inquiry and obtain information to answer the interrogatories which would include obtaining the information to fully

---

[16] On July 9th, Mr. Chiocca's counsel will view in person unredacted copies of medical records that Hall also produced in redacted form, claiming the redacted information was not responsive to Mr. Chiocca's requests.  In light of that agreement, while Mr. Chiocca contends that those redactions are improper, he does not presently move to compel the production of those documents, but may do so in the near future if he ultimately disagrees with Hall's position.

and completely answer the interrogatories . . . ." *Upstate Shredding, LLC v. Ne. Ferrous, Inc.*, Civ.
No. 3:12-CV-1015, 2016 WL 865299, at *8 (N.D.N.Y. Mar. 2, 2016); *Zanowic v. Reno*, Civ. No.
97-CV-5292, 2000 WL 1376251, at *3 n.1 (S.D.N.Y. Sept. 25, 2000) ("In responding to
interrogatories . . . a party is under a duty to make a reasonable inquiry concerning the information
sought in the interrogatories, and a party's failure to describe his efforts to obtain the information
sought . . . renders his responses insufficient.").  Nor does it comport with the spirit of discovery,
the intent of which is to reduce the risk of surprise at trial.  8A Charles Alan Wright, Arthur R.
Miller & Richard L. Marcus, Federal Practice and Procedure § 2162, at 217 (2d ed. 1994).  The
supplemental report is at the heart of this case, is in the hands of her attorneys, and Hall should be
required to read it so as to give full and complete answers to Mr. Chiocca's interrogatories.  *Smith
v. Howe Military School*, Civ. No. 3:96-CV-790RM, 1998 WL 175875, at *2 (N.D. Ind. Feb. 27,
1998) ("The plaintiff must respond to the interrogatory fully and completely, supplying all
information within her knowledge, possession, or control, including information available through
her attorneys, investigators, agents, or representatives, and any information obtainable by her
through reasonable inquiry.").

## CONCLUSION

The Individual Defendants have avoided their discovery obligations long enough.  Further
delays in their productions will severely prejudice Mr. Chiocca's case, and so he asks this Court
to order them to produce the documents requested herein, and to otherwise cure their defective
discovery responses, within fourteen (14) days of an order allowing this Motion.

Respectfully submitted,
Allan Chiocca

By his attorney,

*/s/ Adam J. Shafran*

20

Adam J. Shafran, BBO#670460
Eric J. Walz, BBO#687720
*ashafran@rflawyers.com*
*ewalz@rflawyers.com*
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
617-723-7700
617-227-0313 (fax)

*/s/ Samantha C. Halem*
Samantha C. Halem BBO#649624
Kelly A. Hoffman BBO#673409
*shalem@marshallhalem.com*
*khoffman@marshallhalem.com*
Marshall Halem LLC
27 Mica Lane, Suite 102
Wellesley, MA  02481
Phone:  (781) 235-4855

## CERTIFICATE OF SERVICE

I, Eric J. Walz, do hereby certify that this document filed through the ECF system shall be sent electronically to the registered participants as identified on the Notice of Electronic Filing on July 1, 2021.

*/s/ Eric J. Walz*_____
Eric J. Walz