UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLAN CHIOCCA,<br>        Plaintiff, | )<br>) |
| | ) |
| VS. | ) C.A. NO. 1:19-cv-10482-WGY |
| | ) |
| TOWN OF ROCKLAND, DEIRDRE<br>HALL, EDWARD KIMBALL, LARRY<br>RYAN, MICHAEL MULLEN, JR.,<br>MICHAEL O'LOUGHLILN, RICHARD<br>PENNY and KARA NYMAN,<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) |

**OPPOSITION OF DEFENDANTS TO PLAINTIFF'S OMNIBUS MOTION TO
COMPEL DEFENDANTS TO RESPOND TO DISCOVERY**

### i.    Introduction

In this matter, the Plaintiff Allan Chiocca has served 251 requests for production on the

Town of Rockland and the members of its Board of Selection whom he decided to sue ("the Town

Defendants"), 73 requests for production upon Defendant Edward Kimball ("Mr. Kimball"), and

76 requests for production upon Defendant Deirdre Hall ("Ms. Hall").  The requests represent a

frenetic attempt to kick up enough sand so that this Court and ultimately the jury might not realize

that Mr. Chiocca's claims against each and every Defendant are entirely without merit and were

brought in a calculating attempt to avoid responsibility for his having taken advantage of a young

attorney and mother who aspired to a life of public service and who, as a first term selectwoman

of the Town, sat with him, distraught and inebriated, one evening.  He would like to divert attention

from the fact that it was he would ply her with alcohol and then, instead of taking a woman who

he has acknowledged was "distraught" and "unsteady" on her feet home, he took her to Town Hall,

ushered her into his office, poured her more wine and then stood over her as was required – over

a long period of time – to service him sexually.  He would later tell others it was just "a blow job"

and that he wanted it all to go away. But when he was accused of inappropriate conduct, he tried to circle the wagons (even going so far as calling a senior woman on his staff to allege falsely that he could not have done anything wrong because he cannot get aroused without Viagra). He then decided to make up an entirely incredible story where he – an experienced Town Administrator in his 60s who was fond of referring to himself as the Puppet Master who easily could manipulate Rockland's Board of Selectmen – just *had* to allow a distraught and highly inebriated young first term Selectwoman to give him a "blow job."

 The actual facts in this case – and the record already developed – are highly inconvenient for the cause of Plaintiff Chiocca. It is perhaps understandable that he wants to avoid what is central to the case and kick up enough sand that perhaps the jury will not notice the failure of his claims and his defenses.

For the reasons set forth below, the Defendants join together in asking this Court not to indulge the Plaintiff as he seeks information that is not relevant to the claims or defenses at issue, in the first instance, is not proportionate to the needs of the case and is, in some circumstances, charitably quite premature. They respectfully ask the Court to deny Mr. Chiocca's motion in full.

## FACTUAL BACKGROUND

### A. The Parties

The Plaintiff, Alan Chiocca, served as Town Administrator for the Town of Rockland from June 2008 until May 2018, and he was employed by the Town until his final contract expired on June 30, 2019. Mr. Chiocca ran the day-to-day operations of the Town.

Mr. Chiocca saw members of the public and certainly the Board of Selectmen as people he was to control and, where necessary, manipulate. He disparaged them as people who did not understand their roles and he called himself the Puppet Master, referring proudly to his ability make the Board of Selectmen do as he wanted. As a senior female member of his team put it, he

2

had a large sense of self and believed in his ability to control things.  He told her – point blank – that it was his way or the highway.  He also indulged an atmosphere in Town Hall where women were demeaned.  He would laugh at the inappropriate comments of others and tolerate comments about women's appearances.  Indeed, he created and confirmed a workplace where he himself deemed it acceptable to talk about seeing "hot young women" chasing around older men, like himself, conduct that one senior female member of Mr. Chiocca's staff has testified made her uncomfortable.

Mr. Chiocca was the Town administrator responsible for enforcing the Town's sexual harassment policy. Id., ¶ 11.  Despite what senior women in this workplace have described, Mr. Chiocca never saw a single circumstance that warranted any action under that policy.

Mr. Chiocca is also someone who managed to hold onto his position notwithstanding the fact that he has a shadow social media presence where he takes an alias for himself – even though he is in his 60s – which likens him to the bad boy character played by the late John Baluchi in Animal House.  (Chiocca Tr., 18:1-19:20).

Defendant and Plaintiff-In-Counterclaim, Deirdre Hall, began her public service for the Town of Rockland as a member of Board of Selectmen ("BOS") in April 2017.   The Board has five members and Ms. Hall was one of two junior members starting in her first term.   Hall Counterclm. ¶ 1.  She is the mother of three school-aged children, a lawyer and the first person in her family to achieve a four-year college education.  She is also someone who has – for her whole adult life – worked to manage the impact of a prior trauma.  She suffers from various medical conditions, which she had managed through medication and sheer grit quite admirably to go on with her education and her dreams of public service.  She had high hopes for her public service

but in July of 2018, after the assault at issue here, Ms. Hall withdrew from public life.  She now lives out of state and works the early morning shift for Shaws Supermarket.

During the relevant period, Mr. Kimball also served on the BOS as Chairman.  Ms. Hall and Mr. Kimball's developed a friendship which briefly became physical, and it is this relationship that Chiocca appears to put on trial.

### B.  The Events At Issue

In or around the spring of 2018, Mr. Chiocca and the Board began discussing a potential raise and contract extension on Mr. Chiocca's contract. See Hall ¶ 9. At the time, several members expressed dissatisfaction with Mr. Chiocca's job performance. See Hall ¶ 10. Ms. Hall was only one of five votes.  Hall ¶¶ 6-7.

Also in the Spring of 2018, it is uncontested and stipulated, that for a brief period of time – around March to April 2018 – Mr. Kimball and Ms. Hall, both married, moved from working together professionally to developing a meaningful friendship which, at some point, became intimate.  It is also uncontested that, at the of end April of 2018, Mr. Kimball ended their physical relationship and that the two remained caring professional colleagues and friends thereafter.

Following the monthly meeting on May, 1, 2018, Mr. Chiocca asked Ms. Hall to join him for a drink at a local pub, the Rockland Bar & Grill ("RBG"). See Hall ¶ 15.  Members of the Board often gathered there after meetings.  She joined him at the bar, where he had ordered her a glass of wine.  Within a short period of time, Ms. Hall consumed four glasses of wine.  She only remembers drinking and ordering the third.  But after four drinks, Mr. Chiocca closed out one tab and opened another.  He ordered himself wings and her shrimp.  He ordered her *another* glass of wine. Chiocca Tr., 451:13-454:18. During this time, Ms. Hall received unsettling news.  The brief intimate relationship she and Mr. Kimball had allowed themselves to fall into had become known

to Mr. Kimball's wife.  During the evening, Ms. Hall divulged this information to Mr. Chiocca. Id., 443:16-19.   Mr. Chiocca has described Ms. Hall – as he plied her with liquor over the course of the evening – as "distraught" and admittedly "unsteady" on her feet later that night.  (Chiocca Tr., 471:19-21; 585:4-8).

But none of this deterred Mr. Chiocca or made him think that he should just get this young new board member home.  Instead, within minutes of closing out the first check, Mr. Chiocca opened a new check and ordered another drink for Ms. Hall. Id., 455:23-456:25. After, he drove her to another bar and then ultimately used his own key and his own passcode to enter Town Hall, always steady on his feet and often in front of Ms. Hall (if not holding her up or touching on the shoulder).[1]  When she asked to go home, he suggested another glass of wine and that he might be willing to keep her intimate relationship with Mr. Kimball quiet in exchange for a "blow job and a contract."

Although he saw her with an unsteady gait and surveillance video displays a woman who cannot stand up without swaying back and forth and stumbling, Mr. Chiocca did not take this young new board member, whom he knew was drunk and distraught, home.[2]  Instead, he opened up his office and left her there.  He went back to his car – where *he says* he got his cell phone. (Chiocca Tr. 216:10-12).  He did not call anyone to suggest that he needed help to get out of an

---

[1] Mr. Chiocca now admits that Ms. Hall followed him into Town Hall on both occasions that they entered Town Hall, Mr. Chiocca was able to unlock Town Hall and enter his code to the building without incident, Ms. Hall stumbled and had an unstable gait.  (Id., 204:4-7; 584:7-12, 579:23-580:15; 585:4-8; 591:3-8; 592:5-9). Mr. Chiocca acknowledges he can be seen touching Ms. Hall at multiple points in the surveillance video. (587:22-589:4; 590:9-11).

[2] At any point this night, Mr. Chiocca could have gotten up and left (Chiocca Tr., 178:5-20, 184:15-20), drove Ms. Hall home (Id., 191:20-192:10, 199:10-23), or called or texted anyone for help, including the police.  (Id., 216:10-25; 217:21-218:18; 223:1-4; 220:2-10; 240:1-241:6). But Mr. Chiocca, who was not intoxicated, (Id., 171:5-11, 204:8-9), did not avail himself of these lifelines.

awkward situation; he did not drive off. Instead, he walked purposefully back into his office to accomplish his own goals.

When he came back into his office, Ms. Hall was sitting with her head on the conference table. He poured her another glass of wine. (Chiocca Tr., 235:14-236:6). Ms. Hall repeatedly expressed her concern about others learning about her intimate relationship with Mr. Kimball, and Mr. Chiocca responded something along the lines of "Back during my days in the legislature, this situation would have been taken care of with a blowjob and a contract." He then placed himself over Ms. Hall and forced her to service him by giving him oral sex. See Hall Counterclm., ¶ 39; Chiocca Tr. 242:21-24 (admitting that he was stood over her at the time). After an hour of requiring her repeatedly to service him, he was done. He told a drunk, distraught and unsteady Ms. Hall to "pull her shit together," then dropped her off at her car to get herself home. See Hall Counterclm., ¶¶s 41, 45-46 (Chiocca Tr., 246:2-7).[3]

Ms. Hall blacked out and repressed much of what had occurred that evening. Over the course of the days to follow, there were clues however: Mr. Chiocca thanked her for his "birthday present." She remembered his saying something about her giving a good "blow job" and she had a sense that something terrible had happened. When she spoke to Mr. Chiocca, something else occurred: He became aware that she did not know exactly what he had done, leaving him free to recast the evening and deal with the irritation he felt having to deal with her on the Board.[4] He jokingly indicated to Ms. Hall that she had pursued him that evening. Ms. Hall felt degraded and

---

[3] Mr. Chiocca did not initially make a complaint, and in fact, disposed of the wine bottle opened in his office that night without thinking that he had a complaint of sexual harassment. (Id., 407:14-408:9).

[4] Mr. Chiocca had derisively called Ms. Hall a "dyke" when speaking about her with his own staff. He had also called another Board member – a man – "the girl on the Board" suggesting that he was weak, too emotional, and ineffectual. We note that also referred to his wife in ways that were negatively stereotyping when he spoke of her around Town Hall.

disturbed as she tried to piece together what had occurred, certain that she had never initiated any sexual contact with Mr. Chiocca.

On the evening of May 17, 2018, Ms. Hall reported to Mr. Kimball that "something happened" between Mr. Chiocca and her on the night of May 1, 2018 at the Town Hall, following an evening of drinking at the Rockland Bar and Grill. Kimball Counterclm., ¶ 8. Mr. Kimball was then informed by Ms. Hall's husband that he had been told that Mr. Chiocca had proposed dealing with Ms. Hall's requests for discretion about her relationship with Mr. Kimball by "giving him a blowjob and a contract." Mr. Kimball did as he was required to do; he took the information seriously, as a report of a potential sexual assault, and he immediately reached out to Town Counsel to make sure that matters proceeded consistent with the Town's sexual harassment policy. Id., ¶ 11.

On May 18, as directed by Town Counsel, Mr. Kimball met with Mr. Chiocca. Town Counsel was also present. Mr. Chiocca admitted to receiving oral sex from Ms. Hall. Id., ¶¶s 21, 24-27, 29. He said repeatedly that it was "just a blowjob" and that he "just want[ed] this to go away" and offered to "retire, take leave, or do whatever" and quietly resign. Id., ¶¶s 31-33. He also expressed his desire to be paid until July 2018 so that he could make his 10-year anniversary date. Id., ¶ 32.

That evening, Mr. Chiocca called a senior member of his team, a woman. He was "drunk as a skunk," she has testified. He told her that she would hear terrible things about him but it was really Ms. Hall's fault. He went on about his own sexual abilities, talking about his need to take Viagra to have sex with his wife on the weekends.[5] This member of his team had heard nothing

---

[5] It bears note that Mr. Chiocca has relied heavily on the notion that he purportedly told Ms. Hall that he was not "her guy" because he has a medical condition that prevents him from arousal without the assistance of a pill. He explained to anyone who would listen – including his senior

about the goings on at Town Hall on the night of May 1 and was shaken by the woefully inappropriate comments of her boss that night. This behavior, certainly, she has testified, made it difficult for her to imagine Mr. Chiocca's return to his position and her feeling at all comfortable working for him again.

Ultimately, Mr. Chiocca went on vacation following the meeting while the Town investigated and those involved agreed to sign a non-disclosure agreement. Kimball Counterclm., ¶¶s 34, 36. On May 29, 2018, at a BOS meeting, the BOS voted to place Mr. Chiocca on administrative leave and retain Regina Ryan, Esq. Of Discrimination and Harassment Solutions LLC, to conduct an independent investigation into the incident. Id., ¶¶s 43-44.

### C. Mr. Chiocca's Disclosure of Confidential Material

On July 2, 2018, Regina Ryan – having ignored evidence contrary to her conclusions -- issued a report ("Report") and provided it to Attorney Clifford. Id., ¶¶s 45-46. Mr. Chiocca, Ms. Hall and Mr. Kimball asked to see it. Through counsel, the Town asserted that the document was "a confidential personnel record and includes sensitive information about all parties and the report itself should not be released without the consent or approval of the Town." Id., ¶¶ 50, 52. The report contained (heavily disputed) findings not only about the incident on May 1, 2018, but findings about the intimate relationship between Mr. Kimball and Ms. Hall, and findings that were also personal to Mrs. Kimball and the Kimball's marriage that were not relevant to the incident involving Ms. Hall and Mr. Chiocca on May 1st. Id., ¶¶s 53-55. The report also included highly sensitive information regarding Ms. Hall and her family. ¶¶s 82-83.

---

female supervisee – that this condition meant that he *physically could not have* done what is alleged. Yet he has admitted that this is false. He has admitted having an interest in pornography and in getting aroused – without assistance – when looking at it. (Chiocca Tr., 232:2-6; 233:4-7; 234:9-17). Mr. Chiocca also admitted that he got aroused on the night in question without taking any medication. (Chiocca Tr., 230:12-25; 243:2-4; 243:24-244:5).

With provisos regarding the confidentiality of the report understood by all parties and with the document itself stamped "CONFIDENTIAL," the Town's Counsel provided the document to the parties' counsel. Mr. Chiocca – who had been responsible for airing the details of the incident and speaking of his own sexual abilities – violated the understanding and, through counsel who is representing him still in this matter, he swiftly caused the release of the entire Report to media, distributing the Kimballs' and Halls' deeply private information for public consumption. (Chiocca Tr., 551:21-552:21; 553:4-24). The only matters that were redacted in the released report related to Mr. Chiocca's private information. Hall Counterclm., ¶¶s 82-83. Kimball Countrclm., Id., ¶ 62. As a result, Ms. Hall and Mr. Kimball were the focus of ridicule and harassment for months in the Town of Rockland and beyond. Kimball Counterclm., ¶ 63; Hall Counterclm. ¶¶s 83-86). Both Mr. Kimball and Ms. Hall suffered widespread humiliation and harm to their reputation, lost business opportunities, emotional distress, and substantial economic harm. Kimball Counterclm., ¶¶s 66-67; Hall Counterclm., ¶¶s 83-86. Ms. Hall was became deeply distressed and was eventually hospitalized. Hall Counterclm ¶ 77.

Ms. Hall and Mr. Kimball resigned from the BOS and Mr. Chiocca was given the opportunity to serve out the remainder of his contract on paid administrative leave. The BOS voted not to extend his contract.

### D.  Relevant Procedural History

Mr. Chiocca removed his Charge from the MCAD and filed his complaint in federal court on March 14, 2019.

On August 30, 2019, Mr. Kimball filed his Answer and Counterclaim against Mr. Chiocca for public disclosure of private facts concerning Mr. Kimball and his family by way of disseminating Attorney Ryan's clearly marked, "Confidential" investigatory report to various

media outlets, including social media and news outlets. See Kimball Counterclm., ¶¶69-71.  Ms. Hall also filed six counterclaims against Mr. Chiocca, including: sexual harassment, assault and battery, invasion of privacy and public disclosure of facts, defamation, tortious interference with advantageous relations, and intentional infliction of emotional distress.

The Parties continue to engage in written discovery,[6] which include Mr. Chiocca's 400 document requests served to the Defendants, along with additional third-party subpoenas. Defendants collectively have produced over twenty-thousand pages of documents responsive to Mr. Chiocca's document requests and in some instances, have advised that supplemental production is forthcoming.

## ii.    Argument

## I.    Chiocca's Second Requests Are Facially Overbroad, Unduly Burdensome, and Disproportionate.

Chiocca seeks to downplay the sheer breadth of his requests by only "summariz[ing] his Second Requests" and focusing on sixteen specific requests. [Doc. 121 at 7-8]. Of course, Chiocca's Motion does not seek an order compelling production only as to Requests 1-16, but also the other 113 additional requests propounded on the Town defendants, the 18 additional requests propounded on Kimball, and the 20 additional requests propounded on Hall.[7] This Court should not condone such discovery tactics.  By their very nature, the discovery requests are clearly overly broad and disproportionate to the needs of this case and, to the extent they seek discovery of assets prior to judgment, are premature.

---

[6] Ms. Hall filed an Assented-to-Motion To Stay on February 28, 2020 until May 27, 2020 due to Ms. Hall's medical condition. Further, some discovery efforts have taken additional time due to the COVID-19 pandemic and emergency orders issued by state and local government.
[7] This is on top of the 132 requests already propounded on the Town defendants, the 55 requests already propounded on Kimball, and the 56 requests already propounded on Hall.

10

**A. Chiocca's Second Request for Production of Documents is Premature to the Extent they Seek Discovery Over Assets Prior to Judgment.**

The facts in this case, respectfully, make it highly improbable that a verdict will ever enter in the favor of this Plaintiff. Given his admissions on the record, it is particularly advisable, the Defendants submit, to move forward cautiously with intrusive asset discovery that is, in any event, not called for as a matter of law at this juncture.

Contrary to Chiocca's unsupported assertion,[8] federal courts are split (even within districts when determining whether to permit pre-trial discovery of financial information even where a punitive damages claim has been asserted. See, e.g., John Does I–VI v. Yogi, 110 F.R.D. 629, 633 (D. D.C.1986); Davis v. Ross, 107 F.R.D. 326, 327–28 (S.D. N.Y. 1985); Chenoweth v. Schaaf, 98 F.R.D. 587, 589–90 (W.D.Pa.1983); Rupe v. Fourman, 532 F.Supp. 344, 350–51 (S.D. Ohio 1981). Moreover, the cases cited by Chiocca provide him no purchase, as there does not appear to have been an objection in Love, Boniface, or Katz as to the asset-discovery's prematurity. See Love v. Lord Nathan Rest Home, Inc., Civ. No. 06-30021-MP, 2007 WL 9799830, at *1 (D. Mass. Apr. 3, 2007) (Ponsor, J. (no discussion whatsoever of the basis for objection); Boniface, et al. v. Viliena, No. 17-cv-10477, Dkt. No. 107 (April 1, 2020) (Burroughs, J.) (referred to in Katz with no explanation for opposition/objection); Katz v. Liberty Power Corp., LLC, U.S. Dist. Ct., No. 18-cv-10506, 2020 WL 3492469, at *5 (D. Mass. June 26, 2020) (Burroughs, J.) (objection only on grounds that requests were "irrelevant and that securing the documents would be unduly burdensome and disproportionate to their use in th[e] litigation"). For the reasons set forth herein, this court should find that pre-trial asset discovery is impermissible at this juncture.

---

[8] Chiocca nakedly asserts that "the majority of federal courts" support his position. [Doc 121 at 9]. But he only cites three district court decisions (hardly a majority), none of which purport to have conducted anything approaching a nation-wide survey.

**B. Chiocca's Second Request for Production of Documents is Facially Overbroad, Unduly Burdensome, and Disproportionate**.

It cannot be readily disputed that Chiocca's requests are facially overly broad, unduly burdensome, and disproportionate to the needs of this case. For instance, Chiocca's Second Request directed toward the individual Town defendants Ryan, Mullen, O'Loughlin, Penny, and Nyman contains a startling 87 separate requests[9] (in addition to the *132 separate requests already propounded upon them* as a part of Chiocca's First Request). The requests run the gamut from every individual Town defendants' current bank statements, retirement accounts, investment accounts, documents evidencing ownership in business entities, "documents and communications concerning" any business entity's "financial health" from 2017-2021, mortgages, end of year account statements for 2017-2021, and all state and federal tax returns for 2017-2021. There is nothing narrowly tailored about this shot-gun approach, and the true purpose behind these requests is clearly to harass the defendants and artificially inflate the costs of discovery to leverage settlement.

Indeed, the very case that Chiocca relies upon does not support his position. Instead, Judge Burroughs in <u>Katz</u> expressly declined to order the production of '[a]ll documents necessary to determine' Defendants' net worth, 'including monthly statements for all depository accounts." She alternatively ordered "the parties to meet and confer so that Defendants may provide an honest and accurate representation of their current net worth in the least intrusive means available, with the goal of determining the plausibility of punitive . . . damages." <u>Id</u>. at *5-7. Rather than allowing wholesale discovery into every aspect of a defendant's finances, courts more typically require that discovery requests be narrowly tailored and seek only those documents necessary and by the least

---

[9] The total number of requests is 119. However, 32 of that 119 were specifically directed to the Town and not the individual Town defendants.

intrusive means available. See, e.g., Katz, supra. Moreover, as to the requests seeking tax returns,[10] courts have been largely hesitant to order production of tax returns given the inherent privacy intrusion. See, e.g., Pedraza v. Holiday Housewares, Inc., 203 F.R.D. 40, 43 (D. Mass. 2001) (Gorton, J.) (declining to permit discovery over tax returns where sought to "inform the jury's consideration of punitive damages"); United States v. Bonanno Organized Crime Fam. of La Cosa Nostra, 119 F.R.D. 625, 627 (E.D.N.Y. 1988) (collecting cases).

Finally, as to Request No. 5 and 7 seeking communications ostensibly showing "whether the Individual Defendants have intentionally diverted certain beneficial interest during the course of this case[,]" such a request is founded solely upon Chiocca's fanciful speculation. It is well-established that "[d]iscovery is not 'a fishing expedition'; parties must disclose some relevant factual basis for their claim before requested discovery will be allowed." Milazzo v. Sentry Ins., 856 F.2d 321, 322 (1st Cir. 1988). There is no relevant factual basis for Chiocca's insinuation—made for the first time in his Motion—that any of the individual defendants diverted any of their assets during the course of litigation.

As true in Katz, counsel for all parties conducted various Local Rule 7.1 conferences in an attempt to limit the scope of Chiocca's overly broad requests by agreeing to submit an interrogatory from each defendant identifying their current net worth. But Chiocca's counsel would only agree to this alternative if he could reserve the right to propound his overly broad and disproportionate requests again at some later point. Chiocca cannot have his cake and eat it too.

---

[10] Request 16 as to Hall and Kimball, and 50, 67, 84, 101 & 118 as to the Town defendants.

II.    **Ms. Hall Made Modest and Appropriate Redactions and Otherwise Disclosed a Significant Number of Medical Records Related to Her Case.**

Ms. Hall has produced hundreds of pages of confidential and sensitive medical records. In these pages, Ms. Hall made eleven (11) brief redactions to avoid disclosure of an attorney-client communication made within another confidential setting between a medical provider and a patient.

The Supreme Court, in Jaffee v. Redmond, 518 U.S. 1, 9-10 (1996) held "Like the spousal and attorney-client privileges, the psychotherapist-patient privilege is rooted in the imperative need for confidence and trust." "Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears…..the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." Id. at 10. The Court recognized that the privilege "serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." Id. at 11.

A. **This Court should adopt the "narrow" view and sustain a claim of privilege**

Plaintiff argues, on pages 13 and 14 of his brief, that Ms. Hall should have no claim of privilege over redacted materials in her previously disclosed therapy records. Plaintiff argues any communications made by Ms. Hall to her therapist discussing her litigation or litigation strategy, are a waiver of the attorney-client privilege and seems to argue Ms. Hall has no right to redact information in her therapy records.

Plaintiff relies heavily, albeit via footnote 10, upon Riley v. Mass. State Police, 2017 U.S. Dist. LEXIS 226866, at *9 (D. Mass 2017) in asserting that a claim of severe emotional distress or separate tort claim automatically negates any claim of privilege in therapy records. Plaintiff's assertions about Riley are problematic and inaccurate.

14

In <u>Riley</u>, the plaintiff, a police officer, sued under Title VII and the holding of the Court (Boal, J.) never discusses any specific state law claims the Court has exercised pendant or supplemental jurisdiction over. The Court noted that within the District of Massachusetts there is a split of authority over how and when to hold a waiver of privilege over therapy records.[11]  The Court discussed that there are three (3) different approaches employed by federal judges in Massachusetts in analyzing a waiver of the "therapy privilege" and adopts the third ("middle ground") approach where the privilege is intact absent a separate tort claim or a claim of severe emotional distress. Plaintiff's footnote discussion fails to mention that the Court recognized that its own holding was not the "law of the land" in Massachusetts federal courts nor was it even the "majority" view.

The Court noted: "Some courts, including another judge in this district, have taken a 'narrow approach,' holding that a plaintiff must use the privileged communication at issue as evidence before he waives the privilege." <u>Riley</u>, <u>supra</u> at *9 (Internal citations omitted). Under a "narrow" approach, Ms. Hall would be allowed to provide records and claim privilege as to any portions that she believes are beyond the general requirements of discovery.

### B. State Law Rules Prohibit Disclosure

The Federal Rules of Evidence 501 provides that:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. ***However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law***.

---

[11] The Court held at *10 that Plaintiff is typically only required to provide dates of service, costs of treatment and the name of the treater.

Federal courts adopt federal rules of evidence even where there are supplemental state law claims. See Downeast Ventures, Ltd. V. Wash. County, 450 F.Supp.2d 106 (D. Maine, 2006). However, where the state law claims dominate the cause of action and the state evidentiary rule is so bound up in the state law that use of federal rules preclude the effect of the state law, federal courts have applied state privilege claims. See id. at n. 3.

In the present action, the federal rules of evidence do not contain any guidance of law on privilege of therapy records and the only federal guidance on this issue is a very recent Supreme Court decision that offered little guidance to federal courts. Ms. Hall has not asserted a single federal cause of action and her claims are brought under state law. Massachusetts, unlike the federal rules, has codified the evidentiary rules governing the privilege of therapy records and should be used to evaluate her claims of privilege.

Mass. Gen. Laws, ch. 233, § 20B protects Ms. Hall's records from total disclosure. Like the holding in Jaffee, supra, the Commonwealth recognizes a privilege may be asserted where a patient sees a licensed psychotherapist for the purpose of treatment. M.G. L. ch. 233, § 20B provides, in relevant part:

> Except as hereinafter provided, in any court proceeding and in any proceeding preliminary thereto, and in legislative and administrative proceedings, a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition.

While the statute lists several exemptions, the only one of these exceptions that could remotely apply here is identified in subsection (c) regarding when "[i]n any proceeding … which the patient introduces his mental or emotional condition as an element of his claim or defense." However, this exemption also requires "the judge or presiding officer finds that it is more important to the interests of

justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected."[12]

In the present action, although Ms. Hall has disclosed and may rely upon her medical records to show (1) that she sought treatment as result of what occurred between her and Mr. Chiocca and (2) that she treated extensively and (3) the cost of those treatments, it is unlikely that what she said to her treatment provider about her discussions with her attorneys about her legal strategy, unless it was admission of dishonesty or an admission of fraud, would be in the "interests of justice" that would require the disclosure of all communications between her and her therapist regarding the underlying privileged communications between her and her attorneys. Accordingly, Ms. Hall respectfully requests that her objection to the disclosure of eleven (11) redacted lines out of the hundreds of pages of medical records be sustained and Mr. Chiocca's motion to compel on this topic be denied.

### III. Chiocca's Second Set of Requests for Production[13] Directed to Ms. Hall are Overly Broad and Beyond the Scope of Discovery Permitted by the Federal Rules.

Pursuant to Fed. R. Civ. P. 26(b):

Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

---

[12] The cases that have analyzed this section are dominated by decisions in criminal matters.

[13] Chiocca moves to compel a document under his Request No. 16 in his first set of requests for production directed to Ms. Hall. This issue is moot. Mr. Chiocca's challenge to the redaction made by Ms. Hall to a document, the substance of which she claimed was not responsive to any request directed towards her need not further be reviewed by the Court because counsel for Hall has identified the document for Chiocca's counsel within Mr. Kimball's disclosure of documents. Therefore, regardless of whether the Court were to sustain or overrule Ms. Hall's objection, Mr. Chiocca's counsel is already within possession of the document.

Simply put, Mr. Chiocca's requests, without limitation, are neither relevant to his claim or defense nor proportional to the needs of the case. Request Nos. 17, 18, and 19 of Mr. Chiocca's second set of requests for production directed to Ms. Hall requests all communications with Pilgrim Strategies, LLC; Woodard & Curran Inc.[14]; and John Sullivan from the City of Quincy, respectively, between January 1, 2017 to the present. (Chiocca Exhibit C, pp. 10-11). The requests are not limited in scope, and Chiocca's counsel has not demonstrated how any and all communication with these individuals or entities within the span of approximately four years could be relevant to the litigation or proportional to the needs of the case. None of the individuals identified in these requests for production are employees or Rockland or were otherwise involved in the allegations of Mr. Chiocca's complaint. Counsel for Hall therefore have objected on the basis that these requests are overbroad and neither relevant nor proportional to the needs of the case. Nevertheless, counsel for Hall requested that Chiocca's counsel narrow the scope,[15] for example, to any communications involving Mr. Chiocca or the event of May 1-2, 2018, or the investigation of the event of May 1-2, 2018.[16] Mr. Chiocca's counsel did not accept this proposal.[17] Further, counsel for Chiocca indicated that they could not accept this proposal because they are entitled to explore the relationships Ms. Hall had with other men.[18] In other words, they want to

---

[14] Upon information and belief, Woodard and Curran was a contractor or vendor of the City of Quincy. Accordingly, to the extent Ms. Hall had communications with them via email on the City of Quincy's servers, such documents are not within her possession, and in fact, were already subpoenaed by Chiocca's counsel. Tens of thousands of emails were provided. Accordingly, Ms. Hall objected to the request to the extent the documents are not within her possession, custody, or control and/or are equally accessible to the Plaintiff.

[15] This correspondence as made via email on June 30, 2021.

[16] This was communicated verbally via telephone on or about July 8, 2021.

[17] For the first time, Chiocca appears to limit his request to personal email communications between Mr. Hall and Mr. Sullivan. (Chiocca Mot. to Compel, p. 16).

[18] Chiocca's counsel now cloaks this reason in an argument that they want to "demonstrate a pattern of Hall's misconduct and her misuse of positions of power."

engage in a fishing expedition which, in addition to being overly broad and neither relevant nor proportional to the needs of the case, constitutes harassment and an invasion of Ms. Hall's privacy.

Despite an agreement not being reached and Chiocca's counsel refusal to narrow the scope of the requests, Ms. Hall is in the process preparing supplemental responses to disclose any communications responsive to Requests No. 17, 18, and 19 that are related to Mr. Chiocca or the event of May 1-2, 2018, or the investigation of the event of May 1-2, 2018.[19] Chiocca's motion to compel further communications identified in Requests 17-19 should otherwise be denied.

## IV.    Hall's Redacted Notes Pages Extend Beyond the Scope of Rule 26.

Ms. Hall kept notes around the time relevant to this lawsuit, and those that were related to the allegations of the complaint and counterclaim have been disclosed. Counsel for Hall have indicated that not all of her notes are responsive, relevant, or proportional to the needs of the case. Counsel for Chiocca have not had further discussion with counsel for Hall about the subject of the redacted notes,[20] and rather, they simply speculate that they must be responsive because of the placement of responsive notes and redactions. These notes consist of writings regarding her brief intimate relationship with Mr. Kimball, which is not in dispute. The intimate details of that relationship are neither relevant nor proportional to the needs of the case, and thus, Hall should not be compelled to produce them.

## V.    Ms. Hall Has Fully Answered Interrogatory No. 13.

Interrogatory No. 13 asked Ms. Hall to "State the name, address, and phone number of all individuals with whom you had Communication(s) concerning the Ryan Report or Supplemental

---

[19] Counsel for Hall are diligently preparing this production; however, the parties conducted four days of depositions in the last two weeks, which required significant preparation. Further, lead defense counsel for Hall is on vacation from July 25 through August 2, 2021, and accordingly, pursuant to Fed. R. Civ. P. 26(e), the disclosure will be made in a timely manner upon her return and in consultation with co-counsel.
[20] Chiocca's counsel requested to view unredacted copies of the notes, and Hall's counsel denied such request.

Report, or any portion thereof, including in your answer your best recollection as to when any such Communication(s) took place (specifying the date and time of any such Communication(s)) to the greatest extent possible), and a general summary of what was said and by whom. This interrogatory is intended to include any verbal or written Communication(s)." Even though at the time of her answers, Ms. Hall had not reviewed the Supplemental Report, Ms. Hall stated in her answer who she communicated with about the supplemental report. (Chiocca Exh. F, p. 17). Ms. Hall's counsel is unable to see how or why Chiocca's counsel believes that Ms. Hall has not fully responded to Interrogatory No. 13.

**VI.**    **Ms. Hall Continues in Good Faith to Work Towards Completing Her Discovery Obligations Relating to Interrogatory No. 16.**

Interrogatory No. 16 asks Ms. Hall to "state whether you dispute any portion of the Supplemental Report and specific reason for each such dispute." In response, Ms. Hall stated, inter alia:

> Subject to and without waiving the foregoing objections, Ms. Hall states that she has not had an opportunity to review the Supplemental Report in its entirety in light of the fact that it is subject to the parties' Stipulation and Protective Order which precludes parties from retaining a copy of the report and requires the parties to review the Supplemental Report in the presence of counsel. Due to Ms. Hall's health conditions which were grounds for the stay in this case, as well as the pandemic, Ms. Hall cannot respond to this interrogatory at this time but will seasonably supplement her response when she is in a position to review the Supplemental Report carefully and completely in the presence of counsel, as required by the Stipulation.

Ms. Hall's first opportunity to review the Supplemental Report, in light of her health conditions, as well as the pandemic and the parties' Stipulation and Protective Order, was in-person in the presence of her counsel during the week of July 19, 2021. Now that Ms. Hall has reviewed the report, she has every intention of supplementing her response to Interrogatory No. 16 in a timely manner as required by the Fed. R. of Civ. P. 26(e).

Furthermore, Ms. Hall did not withhold her efforts to complete discovery. Rather, she was candid and open about her medical conditions and other reasons preventing her from reviewing the report. Finally, there is no conduct contrary to the spirit of discovery because Chiocca's counsel deposed Ms. Hall on July 22, 2021, which will be continued on another future date, during which time, counsel for Hall did not limit any questioning as it relates to the Supplemental Report, or investigation relating to the same, unless Chiocca's counsel inquired about privileged attorney-client communications or disqualified marital statements.

**VII.    Mr. Kimball's Privilege Designation Is Appropriate**

Generally, the purpose of the common interests doctrine is to allow: 1) parties to share information with each other where they share a common legal interest; 2) parties to share information with an attorney for another party who shares the same legal interest; or 3) attorneys facing a common litigation opponent to exchange privileged communications or work product to prepare a common defense. See Regents of the University of California, 101 F.3d at 1389; Gulf Islands Leasing, 2003 U.S. Dist. LEXIS 8842 at *14; Ken's Foods, Inc., 213 F.R.D. at 93.

The doctrine also applies to communications protected by the work-product rule. See In re Grand Jury Subpoenas, 902 F.2d 244, 249 (4th Cir. 1990). Such communications will be protected where parties share a "sufficiently similar interest" in a litigated or non-litigated matter. See Restatement (Third) of the Law Governing Lawyers § 76(1) (2000); Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc., 449 Mass. 609, 618, (2007).

Mr. Kimball has agreed to produce all communications with individual Defendants regarding Mr. Chiocca and the incident on May 1, 2018. He has not withheld any communications with the Individual Defendants based on privilege, with exception of various communication with Ms. Hall and continues to evaluate the remaining communications with Ms.

21

Hall in good faith.[21]  To that end, Mr. Kimball has objected to and withheld certain communications with Ms. Hall based on the parties' common interest and joint defense privilege.

These communications took place prior to litigation with the anticipation of litigation and at the onset of litigation. Ms. Hall and Mr. Kimball share a common interest in that they are not only co-defendants, but much of their legal strategy likely impacts the other and they share many of the same objectives. Further, Ms. Hall provided legal advice at various capacities leading up to litigation.

The principles of common interest doctrine and attorney-client privilege protect these communications between Mr. Kimball and Ms. Hall. See Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc., 449 Mass. 609, 618, (2007) ("when courts consider whether parties share a common legal interest, the determination should focus on the ... general purpose for which the communication is shared, rather than on the relationship of the parties.").

## VIII.  Rule 26 Does Not Permit Mr. Chiocca Unfettered Access to Private Conversations That Are Irrelevant And Not Reasonably Calculated To Lead To Admissible Evidence

This Court should not countenance Mr. Chiocca's contention that he should be allowed to invade irrelevant, private and personal information which has nothing to do with the issues in this case and is not reasonably calculated to lead to the discovery of admissible evidence. Putting aside the clear lack of proportionality here, there is simply no dispute in this case about the fact that Mr. Kimball and Ms. Hall had an affair, the dates of their affair, and who they told about it, plaintiff's efforts to seek the salacious details their affair is beyond the pale and is nothing more than a bad faith and improper effort to abuse discovery as a means or instrument to embarrass, humiliate and harass. See Rule 26. See Fed. R. Civ. P. 26(c)(1) (the court may "protect a party or person

---

[21] Any remaining non privileged communications will be produced by August 6, 2021.

from annoyance, embarrassment, oppression, or undue burden or expense."); see also <u>Paylan v. Teitelbaum</u>, 798 F. App'x 458, 465 (11th Cir. 2020) (finding the lower court did not abuse its discretion in granting a protective order barring discovery that was "going to be intrusive into people's lives."). Additionally, courts routinely reject "fishing expeditions" with issues of overbreadth and lack proportionality, as they run contrary to the requirements of Rule 26. See <u>Buckner v. City of Victoria</u>, No. CIV. A. V-08-09, 2008 WL 4057929, at *5 (S.D. Tex. Aug. 26, 2008) (rejecting party's attempt to solicit a "significant amount of files" that are "invasive," stating, "[t]his Court simply will not sanction a fishing expedition"); <u>St. John v. Napolitano</u>, 274 F.R.D. 12, 16 (D.D.C. 2011) ("'[A]lthough Rule 26(c) contains no specific reference to privacy or to other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule.'").

The Court only need review Mr. Chiocca requests to see their outrageous nature. As a few examples only, Mr. Chiocca seeks counseling records related to Mr. Kimball and his wife's efforts to repair their marriage[22], documents reflecting that Mr. Kimball was an alleged victim of "sexual propriety," documents concerning Mr. and Mrs. Hall's relationship without limitation, and any arrests or charges Mr. Kimball has within the past ten (10) years with no good faith basis for even making this request. Such requests are precisely the type of abusive discovery the Rules are designed to prevent. Here, Mr. Kimball is accused of conducting a somehow improper 4-day (2 of which were a weekend) investigation of Mr. Chiocca after receiving a credible report that he had possibly sexually assaulted Ms. Hall. Mr. Chiocca's requests have nothing to do with this topic and likewise have nothing to do with Mr. Kimball's limited counterclaim.

---

[22] Plaintiff eventually retracted this request after an exchange of several discovery letters.

Importantly, Mr. Chiocca and his counsel have already proven that they cannot be trusted with private or confidential information. Despite clear direction from the BOS and Town Counsel, Attorney Clifford, Mr. Chiocca and his lawyer released an entire confidential report to social media and news outlets (facilitated by his attorney) containing sensitive information about Defendants' families and personal affairs that had no relevance as to whether Mr. Chiocca sexually assaulted the only female BOS member. He certainly is not "entitled" to a "fishing expedition". See St. John v. Napolitano, 274 F.R.D. 12, 16 (D.D.C. 2011).

**A. Mr. Chiocca is Not Entitled to Hall/Kimball Communication Regarding the Affair (First Request, No. 14)**

For the reasons stated above, the details of Ms. Hall and Mr. Kimball's affair were never and still are not relevant to the claims and counterclaims of this case or reasonably calculated to lead to the discovery of admissible evidence. Again, it is an undisputed fact that the two had a romantic relationship. Any discovery request or inquiry into the salacious details of their relationship is invasive and nothing more than another attempt to embarrass and harass Ms. Hall and Mr. Kimball. These bad faith efforts must be rejected. See Buckner v. City of Victoria, No. CIV. A. V-08-09, 2008 WL 4057929, at *5 (S.D. Tex. Aug. 26, 2008).

Mr. Chiocca argues for access to communications between Ms. Hall and Mr. Kimball because the affair allegedly "impacted" the Town's investigation and resulting report. Somehow, providing such communications would prepare for Defendants' challenge of the legitimacy of the report. Aside from counsel's shifting rationale for needing access to such communications, this argument is flawed in that the affair should have never been included in the report to begin with, as indicated by the scope of the report.[23] No amount of WhatsApp or texts messages about the

---

[23] On page 2 of Regina Ryan's Investigative Report, under the "Scope of Investigation" section, it states that Ms. Ryan was tasked with investigating an allegation that the Town Administrator,

affair can rectify the objectives set forth by the Town and investigator, and the investigator's failure to fully execute those objectives with integrity. Ms. Ryan's outrageous findings of the report, justified by way of misstating the testimonies of several witnesses, the disregard of key evidence in her possession and purposeful exclusion of such evidence from the report; and failure to follow up on disclosed information central to the investigation, are all probative of the illegitimacy of the report. The communication concerning an unrelated affair is not.

**B. Mr. Kimball's Work On Ms. Hall's Campaign is Not Relevant (First Request, No. 31)**

Mr. Chiocca's Document Request 31 is demonstrative of the type of overbreadth discouraged by courts. See e.g. Buckner v. City of Victoria, No. CIV. A. V-08-09, 2008 WL 4057929, at *5 (S.D. Tex. Aug. 26, 2008).

Request 31 seeks "[a]ll [d]ocuments concerning as [sic] services [Mr. Kimball] performed related to Deirdre Hall's candidacy or campaign for the office of Representative to the Massachusetts General Court." In Mr. Chiocca's January 28, 2021 letter to Mr. Kimball, Mr. Chiocca appeared to revise his request to require "the circumstances of Ms. Hall's decisions to withdraw her candidacy," but then argued Request 31 may provide evidence of bias towards Mr. Chiocca. These are two separate requests with two entirely different objectives. Notwithstanding the fact that Mr. Kimball requested clarification as to Mr. Chiocca's shifting requirements for Request 31, and Mr. Chiocca declined to do so, it remains that Mr. Kimball's involvement in Ms. Hall's campaign adds nothing, is not probative of any bias, and is not proportional. Mr. Kimball and Ms. Hall's personal relationship has been disclosed and undisputed. Further, Mr. Kimball

---

Allan Chiocca engaged in inappropriate behavior towards BOS member, Dierdre Hall and the potential quid pro quo sexual harassment brought by Mr. Chiocca against Ms. Hall, both originating the night of May 1, 2018.

has already agreed to produce non-privileged communications between he and Ms. Hall pertaining to the May 1 incident and Mr. Chiocca.

**C. Mr. Kimball's Redactions Are Proper Under Rule 26**

Mr. Kimball's redactions of nonresponsive portions of communications are proper. See e.g. Hebert v. Vantage Travel Serv., Inc., No. CV 17-10922-DJC, 2019 WL 2514729, at *2 (D. Mass. June 18, 2019) (Dein, U.S.M.J.) (allowing the redaction of meeting notes containing "confidential business and financial information that is not relevant to the instant litigation"); Miller v. Target Corp., No. 1:15-CV-10721-IT, 2017 WL 74276, at *1 (D. Mass. Jan. 6, 2017) (allowing redaction of documents to avoid disclosure of irrelevant material); Hebert v. Vantage Travel Serv., Inc., No. CV 17-10922-DJC, 2019 WL 2514729, at *1 (D. Mass. June 18, 2019) (Dein, U.S.M.J.) (finds that the defendant may redact portions of the unproduced documents that contain irrelevant confidential information).

In response to Mr. Chiocca's overly broad requests for all communication with all Defendants and several third parties [see Requests No. 15-27], Mr. Kimball produced communications with the individuals that in any way concerned Mr. Chiocca or the events of or related to May 1st. Mr. Kimball redacted nonresponsive portions of communications that are outside of that scope, because Rule 26 does not require Mr. Kimball to provide unfettered access to every and all personal communications that he shared with family members and friends. See Buckner v. City of Victoria, No. CIV. A. V-08-09, 2008 WL 4057929, at *5 (S.D. Tex. Aug. 26, 2008). Contrary to Mr. Chiocca's baseless assertion that every text message must somehow be discoverable if just one or a series of text messages is discoverable fails to recognize human nature and the fact that it is common for people to switch topics and jump from one discussion to another throughout a conversation thread. There is nothing "suspicious" about redacting

nonresponsive conversations within a text thread any more than it is redacting any other document or email in an email thread.

Mr. Chiocca is fishing and doing so improperly. He specifically takes issue with Mr. Kimball's redactions of his communication with two, third-party, close friends: Mr. C.J. Chapman and Delshaune Flipp. Due to Mr. Chapman and Mr. Kimball's preexisting friendship, he agreed to assist Mr. Kimball concerning the public relations fallout as a result of Mr. Chiocca's irresponsible distribution of the Report. Mr. Kimball has agreed to and has provided responsive communications between the two concerning Mr. Chiocca and the incident on May 1st. [24] Due to the broader nature of their relationship, there are communications that include nonresponsive topics woven throughout each text message thread. Rule 26 does not entitle Mr. Chiocca to such nonresponsive messages just because other text messages are responsive.

Mr. Chiocca also points to the number of redacted text messages between Mr. Kimball and Ms. Flipp. Ms. Flipp has been a close family friend of the Kimballs for years and communicates with Mr. Kimball nearly on a regular basis about all sorts of matters. The request that Mr. Kimball provide all of these messages is abusive, wildly overbroad and disproportionate to the issues in this case.

## IX.    Mr. Kimball Will Supplement Interrogatories and Production

Mr. Kimball Kimball will update his answers to indicate which bates numbers of produced documents are responsive to interrogatory numbers 10, 12, and 13 to comply with Local Rule 33.1 (b) by August 6. Additionally, all remaining documents in Mr. Kimball's possession will be produced by August 6.

---

[24] Additionally, Mr. Kimball notes that Mr. Chiocca erroneously stated that Mr. Kimball "refused" to provide a draft of his statement of resignation. He did not. Mr. Kimball has already produced his statement of resignation, marked Kimball000258, as part of his first production.

### iii.    Conclusion

**WHEREFORE**, the Defendants most respectfully request that this Honorable Court

**<u>DENY</u>** Chiocca's Motion to Compel.

Respectfully submitted,

Defendants,

LARRY RYAN, MICHAEL MULLEN, JR.,
MICHAEL O'LOUGHLIN, RICHARD
PENNEY
AND KARA NYMAN,
By their Attorneys,

**PIERCE DAVIS & PERRITANO** LLP

*/s/ Jason W. Crotty*
_____
Jason W. Crotty, BBO #656313
Justin L. Amos, BBO #697232
10 Post Office Square, Suite 1100
Boston, MA 02109
(617) 350-0950
jcrotty@piercedavis.com
jamos@piercedavis.com

Defendant

DIERDRE HALL

By her attorney,

**ROSE KALLOR, LLP**

*/s/ Cindy M. Cieslak*
_____
Cindy M. Cieslak, BBO #685498
750 Main Street – Suite 309
Hartford, CT 06103
(860) 361-7995
ccieslak@rosekallor.com

**BURNS & LEVINSON**

By          /s/ Ellen J. Zucker
_____
Ellen J. Zucker, Esq.
ezucker@burnslev.com
Neerja Sharma, Esq.
nsharma@burnslev.com
Burns & Levinson LLP
125 High Street
Boston, MA 02110
(617) 345-3000
(617) 345-3299 (fax)
Defendant

EDWARD KIMBALL

By his attorneys,

**TODD & WELD, LLP**

*/s/ Howard M. Cooper*

_____
Howard M. Cooper, BBO #543842

Tara D. Dunn, BBO # 699329
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
tdunn@toddweld.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on July 23, 2021.

*/s/ Tara D. Dunn*

_____

Tara D. Dunn, Esq.

4836-2136-7027.1