UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLAN CHIOCCA,<br>    Plaintiff,<br><br>VS.<br><br>TOWN OF ROCKLAND, DEIRDRE<br>HALL, EDWARD KIMBALL, LARRY<br>RYAN, MICHAEL MULLEN, JR.,<br>MICHAEL O'LOUGHLIN, RICHARD<br>PENNY and KARA NYMAN,<br>    Defendants | )<br>)<br>)<br>) C.A. NO. 1:19-cv-10482-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HALL'S MOTION TO QUASH PLAINTIFF'S SUBPOENA DIRECTED TO MASSACHUSETTS STATE POLICE**

**I.     INTRODUCTION**

In this matter, the Plaintiff and Counterclaim Defendant, Allan Chiocca has issued a subpoena directed to the Massachusetts State Police in order to obtain confidential police records in a fishing expedition designed to humiliate and victimize Deirdre Hall.

Mr. Chiocca, who claims he was forced to stand over Ms. Hall as she serviced him orally, persists in his overbroad campaign of harassment and humiliation by using discovery requests as the instrument.  As the record now makes clear, Mr. Chiocca is no victim here. A long time Town Administrator, in his 60s, who was fond of calling himself a Puppet Master and saw himself as someone who could manipulate his volunteer Board of Selectman, took advantage of a first term Town of Rockland Selectwoman, a young attorney and mother who aspired to a life of public service. He sat with her one evening after a BOS meeting and, well aware that she was "distraught," plied her with alcohol, and then, instead of taking her home, he took her to Town Hall, ushered her into his office, poured her more wine and then stood over her as she was required to service him sexually. When he realized how little she remembered of the evening, after telling people

initially that it was just "a blow job" and that he wanted it all to go away, he decided that he could try to turn the tables on her. So, when he was accused of inappropriate conduct, he tried to circle the wagons (even going so far as calling a senior woman on his staff to allege falsely that he could not have done anything wrong because he cannot get aroused without medication). He then went on the offensive, making up an entirely incredible story where he just had to allow a distraught and highly inebriated young first-term Selectwoman to give him a "blow job." The actual facts in this case – and the record already developed – are highly inconvenient for the Plaintiff and it is perhaps understandable that he wants to avoid what is central to the case and look for intrusive discovery to assist him.

For the reasons set forth below, Ms. Hall moves this Court to Quash the subpoena, which seeks "all interview notes, witness statements, and reports created by Massachusetts State Police relative to allegations raised by Deirdre Hall against Allan Chiocca from May 1, 2018, through present." (Exh. A).

## II. RELEVANT ALLEGATIONS AND BRIEF PROCEDURAL HISTORY

### A. The Parties

The Plaintiff, Allan Chiocca, served as Town Administrator for the Town of Rockland from June 2008 until May 2018, and he was employed by the Town until his final contract expired on June 30, 2019.  Mr. Chiocca ran the day-to-day operations of the Town.

Mr. Chiocca saw members of the public and certainly the Board of Selectmen as people he was to control and, where necessary, manipulate.  He disparaged them as people who did not understand their roles and he allowed himself to be referred to as a puppeteer, who had the ability to make the Board of Selectmen do as he wanted. (Birmingham Tr., 11:18-22, Exh. B). As a senior female member of his team put it, he had a large sense of self and believed in his ability to control things. He told her – point blank – that it was his way or the highway. (Id., 116:1-15). He also

indulged an atmosphere in Town Hall where women were demeaned. He would laugh at the inappropriate comments of others and tolerate comments about women's appearances. Indeed, he created and confirmed a workplace where he himself deemed it acceptable to talk about seeing "hot young women" chasing around older men, like himself, conduct that one senior female member of Mr. Chiocca's staff has testified made her uncomfortable. (Id., p. 19:10-15).

Mr. Chiocca was the Town Administrator responsible for enforcing the Town's sexual harassment policy. (Chiocca Tr., 394:3-6; 395:1-11; 398:1-25, Exh. C). Despite what senior women in this workplace have described, Mr. Chiocca never saw a single circumstance that warranted any action under that policy. (Id., 387:12- 17; 506:9-13).

Mr. Chiocca is also someone who managed to hold onto his position notwithstanding the fact that he has a shadow social media presence where he takes an alias for himself – even though he is in his 60s – which likens him to the bad boy character played by the late John Belushi in Animal House. (Chiocca Tr., 18:1-19:20). He has admitted that this Facebook page includes pictures of random women and that it represents his "alter-ego." (Id., 21:7-13; 346:2-24).

Defendant and Plaintiff-In-Counterclaim, Deirdre Hall, began her public service for the Town of Rockland as a member of Board of Selectmen ("BOS") in April 2017. Hall Counterclm., ¶ 1. The Board has five members and Ms. Hall was one of two junior members starting in her first term. Hall Counterclm., ¶ 7. She is the mother of three school-aged children, a lawyer and the first person in her family to achieve a four-year college education. She is also someone who has – for her whole adult life – worked to manage the impact of a prior sexual trauma. She suffers from various medical conditions, which she had managed through medication and sheer grit – quite admirably – to go on with her education and her dreams of public service. She had high hopes for her public service, but in July of 2018, after the assault at issue here, Ms. Hall withdrew from

public life. She now lives out of state and no longer works in government.

During the relevant period, Mr. Kimball also served on the BOS as Chairman.

### B.      The Events At Issue

In or around the spring of 2018, Mr. Chiocca and the Board began discussing a potential raise and contract extension on Mr. Chiocca's contract. *See* Hall Counterclm., ¶ 9. At the time, several members expressed dissatisfaction with Mr. Chiocca's job performance. See Id., ¶ 10. However, Ms. Hall was only one of five votes. Id., ¶¶ 6-7. Nevertheless, Mr. Chiocca had a retirement countdown and planned to retire on June 30, 2019.  (Deposition of Susan Ide, 12:22-25, 13:6-10, Exh. D).

Following the Board of Selectmen's monthly meeting on May 1, 2018, Mr. Chiocca asked Ms. Hall to join him for a drink at a local pub, the Rockland Bar & Grill ("RBG"). See Id.,¶ 15. Members of the Board often gathered there after meetings. See Id., ¶ 15. She joined him at a high top table in the bar. He had already ordered her a glass of wine. See Id., ¶ 17. Within a short period of time, Ms. Hall consumed four glasses of wine. She only remembers drinking two and then ordering the third. (Deirdre Hall Deposition Tr., 164:5-7, Exh. E). But after four drinks, Mr. Chiocca closed out one tab and opened another. (Chiocca Tr., 451:13-456:14, Exh. C). He ordered himself wings and her shrimp. (Id., 189:22-191:2) Mr. Chiocca – on his second tab for the evening – also ordered Ms. Hall another glass of wine. (Id., 456:23-457:25). Over the course of the evening, Ms. Hall had received unsettling news. The brief intimate relationship she and Mr. Kimball had allowed themselves to fall into had become known to Mr. Kimball's wife. it appears that, at some point during the evening, Ms. Hall divulged this information to Mr. Chiocca. (Id., 443:16-19). Mr. Chiocca has described Ms. Hall – as he plied her with liquor– as "distraught" and then as "unsteady" on her feet later that night. (Id., 196:7-10; 222:5-8; 471:19-21; 585:4-8). But none of this deterred Mr. Chiocca or made him think that he should just get this young new board member

4

home. (Id., 199:17-20; 200:19-201:2). Instead, after getting her a fifth glass of wine, Mr. Chiocca ushered Ms. Hall into his truck and drove her to another bar. He says that she wanted to use the facilities; but he admits that he did not at that point drive Ms. Hall a little over a mile from the first location to her home. Instead, he sat with her in his parked vehicle at a second bar. (Id., 195:1-19).

Ultimately, he took Ms. Hall to Town Hall. He walked in front of her as they approached. She was "unsteady" in her gait. (Chiocca Tr., 585:4-8; 591:3-15). He was not. Kimball Counterclm., ¶ 17. He then used his own key and his own passcode to enter the building.[1] When she asked to go home, he suggested another glass of wine and that he might be willing to keep her intimate relationship with Mr. Kimball quiet in exchange for a "blow job and a contract." (Hall's Response to Chiocca Interrog. No. 8, pp. 9-10, attached hereto as Exh. F). Although the surveillance video displays a woman who cannot stand up without swaying back and forth and shows her repeatedly stumbling, after Ms. Hall used the facilities at Town Hall, Mr. Chiocca did not take her home.[2] Instead, he decided to open up his office (a place in Town Hall where videos will not record what occurs) and usher her inside. He then went back to his car, where he says he got his cell phone. (Chiocca Tr., 216:10-12). He did not call anyone to suggest that he needed help to get out of an awkward situation; he did not drive off. (Id., 207:5-208:3; 211:10- 13). Instead, he walked purposefully back into his office to accomplish his own goals. When he returned, Ms. Hall was sitting with her head on the table. Hall Counterclm., ¶ 28. He poured her another glass of wine.

---

[1] Mr. Chiocca now admits that Ms. Hall followed him into Town Hall on both occasions that they entered Town Hall, Mr. Chiocca was able to unlock Town Hall and enter his code to the building without incident, Ms. Hall stumbled and had an unstable gait. (Chiocca Tr., 204:4-7; 584:7-12; 585:4-8; 591:3-8; 592:5-9). Mr. Chiocca acknowledges he can be seen touching Ms. Hall at multiple points in the surveillance video. (Id., 587:22-589:4; 590:9-11).

[2] At any point this night, Mr. Chiocca could have gotten up and left. (Chiocca Tr., 178:5-20, 184:15-20). He could have driven Ms. Hall home. (Id., 191:20-192:10, 199:10-23). Or he could have called his dear friend, the Chief of Police for the Town, or anyone else. (Id., 216:10-25; 217:21-218:18; 223:1-4; 220:2-10; 241:1-6). But Mr. Chiocca, who was not intoxicated, (id., 171:7-11, 204:8-9), did not avail himself of any of these options. For good reason: It was he who had designs that evening, looking forward to taking advantage of a young Selectwoman who clearly was not in a position to resist.

(Chiocca Tr., 235:14-236:6). When Ms. Hall repeatedly expressed concern about others learning about her intimate relationship with Mr. Kimball, Mr. Chiocca responded something along the lines of this: "Back during my days in the legislature, this situation would have been taken care of with a blowjob and a contract." Hall Counterclm., ¶ 36. He then placed himself over Ms. Hall and forced her to service him by giving him oral sex. See Hall Counterclm., ¶ 39; (Chiocca Tr., 242:21-24) (admitting that he was standing over Ms. Hall has she serviced him sexually). After an hour of requiring her repeatedly to service him, he was done. He told a drunk, distraught and unsteady Ms. Hall to "pull her shit together," and he then dropped her off at her car to get herself home. See Hall Counterclm., ¶¶ 41, 45-46; (Chiocca Tr., 246:2-7). At no time during the evening did Mr. Chiocca believe it to be his responsibility to take Ms. Hall home. (Chiocca Tr., 222:9-25).

Mr. Chiocca did not initially make a complaint, and in fact, disposed of the wine bottle opened in his office that night without thinking that he had a complaint of sexual harassment. (Chiocca Tr. 407:7-408:9). Ms. Hall did not remember much of what had occurred that evening. Over the course of the days to follow, there were clues however: When she spoke to Mr. Chiocca, he thanked her for his "birthday present." Hall Counterclm., ¶ 53. She remembered his saying something about her giving a good "blow job" and she had a sense that something terrible had happened. Kimball Counterclm., ¶ 8; Hall Counterclm., ¶ 36; (Hall's Response to Chiocca Interrog. No. 17, pp. 22-23, Exh. G).

But Ms. Hall's sense of what occurred sharpened over time, and she felt degraded and disturbed, certain that she had never initiated any sexual contact with Mr. Chiocca.

On the evening of May 17, 2018, Ms. Hall reported to Mr. Kimball that "something happened" between Mr. Chiocca and her on the night of May 1, 2018, at the Town Hall, following an evening of drinking at the Rockland Bar and Grill. Kimball Counterclm., ¶ 8. Mr. Kimball was

then informed by Ms. Hall's husband that he had been told that Mr. Chiocca had proposed dealing with Ms. Hall's requests for discretion about her relationship with Mr. Kimball by "giving him a blowjob and a contract." Mr. Kimball did as he was required to do; he took the information seriously, as a report of a potential sexual assault, reviewed the video footage from the evening in question – which showed a purposeful Mr. Chiocca and a clearly inebriated Ms. Hall, and he then reached out to Town Counsel to make sure that matters proceeded consistent with the Town's sexual harassment policy. Id., ¶¶ 11, 25-26.

On May 18, 2018, as directed by Town Counsel, Mr. Kimball met with Mr. Chiocca. Town Counsel was also present. Id., ¶ 28. Mr. Chiocca admitted to receiving oral sex from Ms. Hall. Id., ¶ 29. He said repeatedly that it was "just a blowjob," that he "just want[ed] this to go away;" he offered to "retire, take leave, or do whatever" and quietly resign. Id., ¶¶ 31-33. He also expressed his desire to be paid until July 2018 so that he could make his 10-year anniversary date. Id., ¶ 32.

That evening, Mr. Chiocca got "drunk as a skunk," and himself started spreading the word of what had happened around town – and among those who worked for him. For instance, he called a woman who served as a senior member of his team and told her that she would hear terrible things about him, but it wasn't true. He purported to deny what she would hear, as he went on about his own sexual abilities, talking about his need to take medication to engage in sexual relations. This has been established as a medical excuse that is not only awkward, but also false.[3]

---

[3] It bears note that Mr. Chiocca has relied heavily on the notion that he purportedly told Ms. Hall that he was not "her guy" because he has a medical condition that prevents him from arousal without the assistance of a pill. He explained to anyone who would listen – including his senior female supervisee – that this condition meant that he *physically could not have* done what is alleged. Yet he has admitted that this is false. He has admitted having an interest in pornography and in getting aroused – without assistance – when looking at it. (Chiocca Tr., 232:2-6; 233:4-7; 234:9-17). Mr. Chiocca also admitted that he got aroused on the night in question without taking any medication. (Chiocca Tr., 230:12-25; 243:2-4; 243:23-244:5).

Ultimately, Mr. Chiocca went on vacation following the meeting while the Town investigated and those involved agreed to sign a non-disclosure agreement. Kimball Counterclm., ¶¶ 34, 36. On May 29, 2018, at a BOS meeting, the BOS voted to place Mr. Chiocca on administrative leave and retain Regina Ryan, Esq. of Discrimination and Harassment Solutions LLC, to conduct an independent investigation into the incident. Id., ¶¶ 43-44.

### C. Mr. Chiocca's Public Release of Confidential Personnel Information

On July 2, 2018, Regina Ryan – who did not have all information material to the investigation which could have impacted the outcome of the investigation – issued a report ("Report") and provided it to Attorney Clifford. Id., ¶¶ 45-46. Mr. Chiocca, Ms. Hall and Mr. Kimball asked to see it. Through counsel, the Town asserted that the document was "a confidential personnel record and includes sensitive information about all parties and the report itself should not be released without the consent or approval of the Town." Id., ¶ 50. The report contained (heavily disputed) findings not only about the incident on May 1, 2018, but findings about the intimate relationship between Mr. Kimball and Ms. Hall, and findings that were also personal to Mrs. Kimball and the Kimball's marriage that were not relevant to the incident involving Ms. Hall and Mr. Chiocca on May 1st. Id., ¶¶ 51-55. The report also included highly sensitive information regarding Ms. Hall and her family. Hall Counterclm., ¶¶ 82- 83.

With provisos regarding the confidentiality of the report understood by all parties and with the document itself stamped "CONFIDENTIAL," the Town's Counsel provided the document to the parties' counsel. Mr. Chiocca – who was already responsible for airing the details of the incident and speaking of his own sexual abilities – violated the understanding and, through counsel who is representing him still in this matter, swiftly caused the release of the entire Report to the media, distributing the Kimballs' and Halls' deeply private information for public consumption. (Chiocca Tr., 551:21-552:21; 553:4-24). The only matters that were redacted in the released report

8

related to Mr. Chiocca's private information. Hall Counterclm., ¶¶ 82-83. Kimball Countrclm., Id., ¶ 62; 69-72. As a result, Ms. Hall and Mr. Kimball were the focus of ridicule and harassment for months in the Town of Rockland and beyond. Kimball Counterclm., ¶ 63; Hall Counterclm., ¶¶ 83-86. Both Mr. Kimball and Ms. Hall suffered widespread humiliation and harm to their reputation, lost business opportunities, emotional distress, and substantial economic harm. Kimball Counterclm., ¶¶ 66-67; Hall Counterclm., ¶¶ 83-86. Ms. Hall became deeply distressed and was eventually hospitalized. Hall Counterclm ¶ 77.

Ms. Hall and Mr. Kimball resigned from the BOS and Mr. Chiocca was given the opportunity to serve out the remainder of his contract on paid administrative leave. The BOS voted not to extend his contract.

### D. Relevant Procedural History

Mr. Chiocca removed his Charge from the MCAD and filed his complaint in federal court on March 14, 2019. On August 30, 2019, Mr. Kimball filed his Answer and Counterclaim against Mr. Chiocca for public disclosure of private facts concerning Mr. Kimball and his family by way of disseminating Attorney Ryan's clearly marked, "Confidential" investigatory report to various media outlets, including social media and news outlets. See Kimball Counterclm., ¶¶ 69-71. Ms. Hall also filed six counterclaims against Mr. Chiocca, including: sexual harassment, assault and battery, invasion of privacy and public disclosure of facts, defamation, tortious interference with advantageous relations, and intentional infliction of emotional distress.

The Parties have engaged in extensive discovery, and indeed, Mr. Chiocca has had sufficient opportunity to obtain all relevant information that is proportional to the needs of the case. Mr. Chiocca has served 22 interrogatories on Ms. Hall, 22 interrogatories on Mr. Kimball, and 25 interrogatories on the remaining Town Defendants. Furthermore, Mr. Chiocca served 400 document requests across Defendants, along with additional third-party subpoenas to Attorney

Regina Ryan, various cell service providers, and Facebook. Defendants collectively have produced over twenty-thousand pages of documents responsive to Mr. Chiocca's document requests.

Moreover, there have been numerous depositions in this matter: Mr. Chiocca (3 days), Ms. Hall (2 days), Mr. Kimball (2 days), Defendant Larry Ryan, Defendant Michael O'Loughlin, Defendant Michael Mullen, Defendant Kara Nyman, Defendant Richard Penney, Attorney Regina Ryan, Attorney John Clifford (Town counsel), Marcia Birmingham (Town Employee), Susan Ide (Town Employee), and Stacia Callahan (Town employee). Mr. Chiocca has also noticed the Town's 30(b)(6) deposition.

Despite voluminous discovery into the events at issue, including Ms. Hall's memory of the night in question, Mr. Chiocca now seeks to obtain confidential documents held by the Massachusetts State Police, including "all interview notes, witness statements, and reports created by Massachusetts State Police relative to allegations raised by Deirdre Hall against Allan Chiocca from May 1, 2018, through present."

Ms. Hall, accepting that she was again a victim of a trauma, complained to the State Police regarding the events of May 1-2, 2018. The State Police elected not to pursue criminal charges. However, at this point, the report of the investigation by Regina Ryan had already been made public by Mr. Chiocca's publication (by his own counsel). See Doc. 141. Yet, Ms. Ryan did not have all of the information which has been established by the record in this case, which may have impacted her findings.

Despite the explicit sanctity of sexual assault records, Mr. Chiocca, at the 11th hour of fact discovery, seeks to violate that sanctity on a fishing expedition, as exhibited by the overly broad request that seeks: "all interview notes, witness statements, and reports created by Massachusetts

State Police relative to allegations raised by Deirdre Hall against Allan Chiocca from May 1, 2018, through present."

### III.   LEGAL ARGUMENT

#### A.   Standard of Review

"Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information." *Bingham v. Supervalu Inc.*, No. 13-11690-FDS, 2014 U.S. Dist. LEXIS 199626, 2014 WL 12792917, at *2 (D. Mass. May 28, 2014) (quoting *Cartel Asset Mgmt. v. Ocwen Fin. Cor*p., No. 01-cv-01644-REB-CBS, 2010 U.S. Dist. LEXIS 17857, 2010 WL 502721, *9 (D. Colo. Feb. 8, 2010)). Third-party subpoenas issued in civil cases pending in federal court are governed by Fed. R. Civ. P. 45. See Fed. R. Civ. P. 45. "A Rule 45 subpoena must fall within the scope of proper discovery under Fed. R. Civ. P. 26(b)(1)." *Green v. Cosby*, 152 F. Supp. 3d 31, 34 (D. Mass. 2015), *modified on reconsideration*, 160 F. Supp. 3d 431 (D. Mass. 2016) (quoting *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, MDL No. 13-2419, 2013 U.S. Dist. LEXIS 161652, 2013 WL 6058483, at *4 (D. Mass. Nov. 13, 2013)). Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that:

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). "Fed. R. Civ. P. 26(b)(1)(i) generally permits liberal discovery of relevant information." *Baker v. Liggett Grp., Inc.*, 132 F.R.D. 123, 125 (D. Mass. 1990). "Because 'discovery itself is designed to help define and clarify the issues,' the limits set forth in Rule 26

must be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'" *Bingham*, 2014 U.S. Dist. LEXIS 199626, 2014 WL 12792917, at *2 (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978)).

The scope of discovery is not unlimited, however. *See* Fed. R. Civ. P. 26(b)(2)(C). The court is required to restrict discovery if it determines the request to be "unreasonably cumulative or duplicative, or [if the information] can be obtained from some other source that is more convenient, less burdensome, or less expensive" or if the request is outside the scope of discovery permitted by Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C)(i), (iii). Discovery is outside the scope of Rule 26(b)(1) if it is privileged, not relevant to the claim or defense of any party, or disproportional "to the needs of the case." Fed. R. Civ. P. 26(b)(1). Because Rule 26 governs Rule 45 subpoenas, these restrictions apply. A third party may move to quash or modify the subpoena pursuant to Rule 45(d)(3). *See* Fed. R. Civ. P. 45(d)(3). "Generally, the party moving to quash a subpoena bears the burden of persuasion." *Bingham*, 2014 U.S. Dist. LEXIS 199626, 2014 WL 12792917, at *2 (citing *Demers v. LaMontagne*, No. Civ.A. 98-10768-REK, 1999 U.S. Dist. LEXIS 17500, 1999 WL 1627978, at * 2 (D. Mass. May 5, 1999)).

### B. Chiocca's Subpoena Directed to the Massachusetts State Police is Facially Overbroad and Disproportionate.

It cannot be readily disputed that Chiocca's request is facially overly broad and disproportionate to the needs of this case. It is well-established that "[d]iscovery is not 'a fishing expedition;' parties must disclose some relevant factual basis for their claim before requested discovery will be allowed." *Milazzo v. Sentry Ins.*, 856 F.2d 321, 322 (1st Cir. 1988). Here, nothing suggests that Ms. Hall gave any statement to the Police that is inconsistent with anything she has provided in her written discovery responses or testified to under oath, or that Mr. Chiocca has

12

otherwise been able to obtain through the voluminous discovery already conducted. The subpoena itself seeks interview notes, witness statements, and reports all of which constitute inadmissible hearsay within hearsay, and the subpoena's compliance date is the date on which the parties have agreed fact witness depositions shall conclude.

### C. The Records Subject to the Subpoena are Confidential and Should not be Disclosed in Connection with this Litigation.

This Court has already addressed a similar issue when it sustained Ms. Hall's Objection to Mr. Chiocca's Motion to Compel redacted portions of her psychotherapy records, under a similar argument—that the records sought are sacrosanct and should be protected absent a compelling reason.

The Federal Rules of Evidence 501 provides that:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. ***However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law***.

Federal courts adopt federal rules of evidence even where there are supplemental state law claims. *See Downeast Ventures, Ltd. V. Wash. County*, 450 F.Supp.2d 106 (D. Maine, 2006). However, where the state law claims dominate the cause of action and the state evidentiary rule is so bound up in the state law that use of federal rules preclude the effect of the state law, federal courts have applied state privilege claims. *See id.* at n.3.

Here, many of Mr. Chiocca's causes of action and all of Ms. Hall's causes of action are brought under state law. The Commonwealth has codified the rules governing the use of sexual assault records and should be used to evaluate her claims of privilege.

Chapter 41, Section 97D of Massachusetts General Laws provides:

***All reports of rape and sexual assault or attempts to commit such offenses … and all communications between police officers and victims of such offenses or abuse shall not be public reports and shall be maintained by the police departments in a manner that shall assure their confidentiality***; provided, however, that all such reports shall be accessible at all reasonable times, upon written request, to: (i) the victim, the victim's attorney, others specifically authorized by the victim to obtain such information, prosecutors and (ii) victim-witness advocates as defined in section 1 of chapter 258B, domestic violence victims' counselors as defined in section 20K of chapter 233, sexual assault counselors as defined in section 20J of chapter 233, if such access is necessary in the performance of their duties; and provided further, that all such reports shall be accessible at all reasonable times, upon written, telephonic, facsimile or electronic mail request to law enforcement officers, district attorneys or assistant district attorneys and all persons authorized to admit persons to bail pursuant to section 57 of chapter 276. Communications between police officers and victims of said offenses and abuse may also be shared with the forgoing named persons if such access is necessary in the performance of their duties. A violation of this section shall be punished by imprisonment for not more than 1 year or by a fine of not more than $1,000, or both such fine and imprisonment.

It is true that some courts have held the Statute itself does not act as a "bar" on discovery of such records in connection with civil suits, but the cases that have examined this issue have agreed that "[t]he privacy concerns of the victims of sexual abuse, however, are significant." *E.g.*, *Roman Catholic Bishop v. Travelers Cas. & Sur. Co*., 23 Mass. L. Rep. 532, 535 (Mass. Super. Ct. 2008).

In the present action, as far as the undersigned can tell, the federal rules of evidence, as well as corresponding state and federal case law do not contain any guidance in this particular instance where criminal records of sexual assault complaints where the person who filed the complaint is later sued in federal court (as opposed to where the victim-complainant then initiates the suit themselves), and the only federal guidance stems from the normal rules of discovery. Although Ms. Hall has counterclaims in the instant litigation, she did not initiate the litigation, and

14

was rather called upon to defend herself and repair her reputation after Mr. Chiocca publicly smeared it.[4]

Furthermore, Ms. Hall's complaint to the State Police was not her first complaint, and there seems to be no other reason that Mr. Chiocca seeks the records of the State Police at this late in discovery other than to see if Ms. Hall's allegations differ from the allegations to which she already testified under oath. Under state law, evidence of subsequent complaints is generally inadmissible,[5] *Commonwealth v. Dargon*, 457 Mass. 387, 399-400 (2010), and a claim of fabrication alone is insufficient to open the door to the admission of multiple complaints. *Commonwealth v. Parent*, 465 Mass. 395, 403-04 (2013).

As was the case with the redacted portions of Ms. Hall's medical records, where this Court sustained Ms. Hall's Objection to Chiocca's Motion to Compel (Doc. 136), there are privacy rights in play that need to be overcome by a compelling showing that Mr. Chiocca needs the required materials in order to advance his case. Mr. Chiocca cannot meet this showing. Simply put, there is no valid basis for an exception to the general rule deeming the records sought as confidential. Nevertheless, Mr. Chiocca seeks access to records the Massachusetts Legislature clearly earmarked as exempt from public disclosure to protect the privacy rights of persons who avail themselves of the police resulting from a sexual assault. In other words, public policy disfavors

---

[4] Compare *Messier v. Bledsoe*, No. 97-6560-G, 1998 Mass. Super. LEXIS 294 (Mass. Super. Ct. March 27, 1998) and *Doe v. Lyons*, No. 96-0341, 1996 Mass. Super. LEXIS 97, at *24 (Mass.Super.Ct. Dec. 23, 1996), nonbinding Massachusetts Superior Court decisions, where Court recognized privacy rights, but concluded there would be no chilling effect because victim commenced lawsuit.

[5] Indeed, this rule exists to protect the accused, such as Mr. Chiocca in this instance. *Commonwealth v. Parent*, 465 Mass. 395, 403 (2013) ("The testimony of multiple complaint witnesses likely serves no additional corroborative purpose and may unfairly enhance a complainant's credibility as well as prejudice the defendant by repeating for the jury the often horrific details of an alleged crime. Law enforcement officials, as well as investigatory, medical, or social work professionals, may testify to the complaint only where they are in fact the first to have heard of the assault, and not where they have been told of the alleged crime after previous complaints or after an official report. The testimony elicited, for all practical purposes, constituted a second complaint from Maxine that the defendant had sexually assaulted her." (internal citations omitted)).

disclosure of the requested records because such release could have a chilling effect on victims coming forward and participating in law enforcement efforts.

Mr. Chiocca deposed Ms. Hall, an officer of the court, for two days. To the extent that the State Police's records may be probative, despite constituting inadmissible hearsay, Ms. Hall's privacy rights far outweigh Mr. Chiocca's request as any questions about this case can and have already been asked of Ms. Hall under oath.

Ms. Hall has not indicated any intention of relying upon State Police records given that the standard for a criminal investigation is far different than the civil standards. Accordingly, violating the sanctity of these confidential records on a fishing expedition is something this Court should disavow.

Finally, while Ms. Hall does not have the records in her possession, there is a possibility and likelihood that whatever records were maintained by the State Police have other claims of privilege that would otherwise make the records confidential (potentially information related to spousal communications, treatment from a hospital or therapist, or attorney-client privileged communications, as well as any communications between the State Police and the District Attorney which would be subject to a deliberative process privilege).

## CONCLUSION

WHEREFORE, Ms. Hall most respectfully requests that this Honorable Court **GRANT** the Motion to Quash.

<div style="text-align: right;">
DEFENDANT,<br>
DEIRDRE HALL<br><br>
By    /s/ Cindy M. Cieslak<br>
Cindy M. Cieslak (BBO # 685498)<br>
Rose Kallor, LLP<br>
750 Main Street, Suite 309<br>
Hartford, CT 06103<br>
(860) 361-7999<br>
(860) 270-0710 (fax)<br>
ccieslak@rosekallor.com
</div>

## **LOCAL RULES 7.1 AND 37.1 CERTIFICATE OF CONFERRAL**

The undersigned has complied with Local Rules 7.1 and 37.1 as follows:

1. On Thursday, October 14, 2021, at 8:42 p.m., the undersigned emailed Attorney Shafran requesting a Local Rule 7.1 conference and indicating an intent to move to quash the subpoena at issue herein.

2. On Friday, October 15, 2021, the undersigned and Attorney Shafran spoke on the phone. While counsel agreed that should Ms. Hall's motion to quash be denied and the document produced, such documents would be subject to the parties' stipulation and protective order (Doc. 93), the parties were unable to reach a resolution as to the subpoena and ultimate disclosure of the requested documents to Mr. Chiocca's counsel.

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on October 19, 2021.

Adam J. Shafran, Esq.
Jonathon D. Friedmann, Esq.
Eric J. Walz, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109

Samantha C. Halem, Esq.
Marshall Halem LLC
27 Mica Lane, Suite 102
Wellesley, MA 02481

John J. Davis, Esq.
Jason W. Crotty, Esq.
Justin L. Amos, Esq.
Pierce, Davis & Perritano, LLP
10 Post Office Square
Suite 1100N
Boston, MA 02109

Ellen J. Zucker., Esq.
Neerja Sharma, Esq.
Burns & Levinson LLP
125 High Street
Boston, MA 02110

Howard Cooper, Esq.
Tara Dunn, Esq.
Todd & Weld LLP
One Federal Street
Boston, MA 02110

*/s/ Cindy M. Cieslak*
Cindy M. Cieslak