# EXHIBIT C

```
1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4         _____
                                          )
5    ALLAN CHIOCCA,                       )
                                          )
6              Plaintiff                  )
                                          )
7    vs.                                  )   C.A. No. 1:19-CV-10482-WGY
                                          )
8                                         )
     THE TOWN OF ROCKLAND, DEIDRE HALL,   )
9    EDWARD KIMBALL, LARRY RYAN, MICHAEL  )
     MULLEN, JR., MICHAEL O'LOUGHLIN,     )
10   RICHARD PENNEY AND KARA NYMAN,       )
                                          )
11             Defendants                 )
                                          )
12   ------------------------------------

13

14                    DAY 1

15    VIDEOTAPED DEPOSITION OF ALLAN R. CHIOCCA

16            MONDAY, JULY 12, 2021

17             10:19 a.m. - 4:51 p.m.

18              BURNS & LEVINSON LLP

19

20

21

22

23   Reported by:  Sandra A. Deschaine, CSR, RPR,

24   CLR, CRA

25   Job No. 33185
```

```
 1          A.    The only Facebook account that I

 2    believe I've used in that time frame is one

 3    is what I've called an alter ego, so to

 4    speak, but Vinny Blutarsky.

 5          Q.    Okay.

 6          A.    And that is --

 7          Q.    Done?

 8          A.    No.   Primarily just because it's a

 9    small number of people.

10          Q.    Have you provided the -- your

11    Facebook postings from Vinny Blutarsky to

12    your counsel?

13                MS. HALEM:   Objection.

14          A.    I do not recall doing that.

15    BY MS. ZUCKER:

16          Q.    Okay.   Have you, in answering

17    interrogatories about your presence on social

18    media, have you confessed that you call

19    yourself Vinny Blutarsky on Facebook?

20                MS. HALEM:   Objection.

21          A.    In answering what?

22    BY MS. ZUCKER:

23          Q.    In answering interrogatories.

24    Asking about your social media accounts, have

25    you --
```

1      A.   I have never kept it a secret.

2      Q.   Okay.  Who is -- what is

3  Blutarsky?

4      A.   It's a made up name probably going

5  back to a poster I had in college.

6      Q.   And it references Animal House,

7  right?

8      A.   Yes.

9      Q.   Okay.  And who in Animal House

10 does it reference, this alter ego of yours?

11     A.   It's a poster that we had on the

12 wall at my -- if you want to call it man

13 cave, of the lead character in that -- what

14 was his name, Bluto.

15     Q.   Bluto.  Yeah.  So you have an

16 alter ego Facebook page that's driven from a

17 person you had in a man cave when you were

18 younger; is that right?  Do I understand that

19 correctly?

20     A.   Yes.

21     Q.   Okay.  And if I understand it

22 correctly, you've got posts there on that,

23 among others, of you standing -- of you

24 sitting shirtless at a reception desk.  Do

25 you remember that post?

1    BY MS. ZUCKER:

2         Q.    You don't remember that picture,

3    okay.

4              What about a picture of a young

5    woman on a bed?

6         A.    No.

7         Q.    But you -- that's your alter ego

8    Facebook account, right?

9              MS. HALEM:   Objection.

10   BY MS. ZUCKER:

11        Q.    Vinny Blutarsky?

12        A.    Vinny Blutarsky is a name I use on

13   Facebook with family and friends.

14        Q.    Okay.  Do you remember writing

15   about searching for the Fountain of Youth in

16   your alter ego Facebook account?

17        A.    No.

18        Q.    Speaking of the Fountain of Youth,

19   you do not have any diagnosed medical

20   condition that requires Cialis, do you?

21        A.    I told my doctor there was an

22   issue, and my doctor prescribed Cialis.

23        Q.    You don't ever list it in any of

24   your medical records, from 2015 to today, as

25   a medical condition, do you?

1  night you got pulled over?

2      A.   I certainly had more the night I

3  got pulled over.

4      Q.   Okay.

5      A.   Five drinks over three hours.

6  Ultras, I believe, is within the chart.

7      Q.   All right.  So are you worried

8  with five drinks in three hours that you

9  might be a little bit drunk and shouldn't get

10  behind the wheel?

11      A.   No.

12      Q.   Now, when you say there were two

13  bills, you mean there were two receipts?

14      A.   Yes.

15      Q.   Okay.  Now, at some point Ms. Hall

16  asked to use your phone, right?

17      A.   Yes.

18      Q.   Do you know why?

19      A.   I do now.  She wanted to call --

20      Q.   No, no -- let me --

21      A.   I'm sorry.

22      Q.   At the -- let me -- at the time

23  what did she tell you?

24      A.   I don't remember exactly what she

25  told me.

1          MS. HALEM:  Objection.

2     A.   I would say no, and certainly

3 never intentionally.

4 BY MS. ZUCKER:

5     Q.   Okay.  Now, if you were

6 uncomfortable that evening, you could have

7 gotten up and left, right?  Right then and

8 there?

9     A.   God, I wish I did.

10    Q.   Pardon?

11    A.   I wish I did.

12    Q.   And you could have, correct?

13    A.   I imagine I could have.

14    Q.   Okay.  And you didn't?

15    A.   I did not.

16    Q.   And when she spoke to you, as you

17 allege -- when she allegedly spoke to you

18 about, you know, her marriage, you stayed

19 put, didn't you?

20    A.   I did.

21    Q.   And you continued to drink, didn't

22 you?

23    A.   Well, I had the few beers that I

24 said I had.

25    Q.   Well, I think you said five?

1   And somewhere on the second wine she -- it

2   seemed weird, but she rubbed my leg, you

3   know, with her foot.  And I'm -- you know,

4   maybe we're too close.  I slide.  And then,

5   you know, she continued.  She's talking about

6   all this stuff, and I just said, you know,

7   I'm not your guy.

8          Q.   Okay.

9          A.   I'm not...

10         Q.   And was this "I'm not your guy"

11  thing happening before or after you closed

12  out that first tab and opened a second one?

13         A.   I think it was happening before

14  the first tab was closed out.

15         Q.   Okay.  All right.  And when you

16  closed out the tab, you could have gotten up

17  and left?

18         A.   Yes.

19         Q.   And you chose to stay?

20         A.   I stayed.

21         Q.   Okay.  And then -- and then what

22  happens next?  Do you have any conversation

23  with her other than you're now remembering

24  I'm not your guy?  Other than that, tell me

25  anything you said during those two, three

```
 1    BY MS. ZUCKER:

 2         Q.   Correct.

 3         A.   I want to be specific in what I

 4    said.

 5         Q.   I very much appreciate that.

 6         A.   -- but I don't remember the

 7    specific.

 8         Q.   Okay.

 9         A.   So, generally, that's what we

10    talked about, and we talked about that for a

11    while.

12         Q.   And what did you say,

13    participating in that conversation, beyond

14    what you have already told me?  Do you

15    remember anything else?

16         A.   I knew Ed wouldn't be happy.  I

17    wondered about -- no --

18              THE REPORTER:  I'm sorry.  I

19         wondered about?

20         A.   No.  I just -- specifically, no.

21    BY MS. ZUCKER:

22         Q.   Okay.  And so what did you order

23    for food after you closed out the tab and got

24    another tab?

25         A.   I believe the tab shows that we
```

```
 1    got shrimp skewers and chicken wings.
 2         Q.    Okay.   Who ordered -- who ate the
 3    chicken wings?
 4         A.    I do not remember.
 5         Q.    Who ate the --
 6         A.    I'm guessing I went for the
 7    chicken wings.
 8         Q.    -- shrimp skewers?
 9               So you didn't go for the shrimp?
10         A.    I'm guessing.
11         Q.    No, I'm not asking you to guess.
12    What do you remember about what you ate?
13         A.    You asked me -- well -- I
14    apologize.
15         Q.    What do you remember of what you
16    ate?  I'm not asking for your guess.  I'm
17    asking for a very specific memory.
18         A.    It must not have been that
19    memorable a meal.
20         Q.    So you don't remember what you
21    ate?
22         A.    No.
23         Q.    Do you remember how long it took
24    you?
25         A.    I have sometimes had bouts of
```

1    gout.  So I tend to avoid shrimp.  I'm

2    assuming I had the chicken.

3        Q.    Okay.  And how big was the chicken

4    plate?

5        A.    I think it's usually six wings.

6        Q.    Okay.  So you ate your six wings.

7    And what did you drink with that?  Another

8    couple of beers?

9        A.    I think one beer.

10        Q.    Okay.  So -- and at that point

11    food is gone; drink is gone.  Did you go

12    home?

13        A.    Wanted to.

14        Q.    Well, sir --

15        A.    Didn't.  She didn't want -- want

16    to go home.  She asked to drive around for a

17    while.

18        Q.    Let me ask you a question.

19        A.    I thought you did.

20        Q.    Did you have the ability to get up

21    and leave the bar and grill, go to your car

22    and go home?

23        A.    Yes.

24        Q.    You chose not to do that; isn't

25    that right?

1      A.    Yes.

2      Q.    You also had the ability, if she

3  couldn't drive, because she was too

4  inebriated, to take her home, correct?

5      A.    Or I could have called the --

6      Q.    Correct?

7      A.    Yes.

8      Q.    And you didn't do that either, did

9  you, sir?

10     A.    No.

11     Q.    And you understood that she was

12 inebriated at this point?

13     A.    No.

14     Q.    You didn't?

15     A.    No.

16     Q.    Okay.  And you then drove to the

17 Banner; am I right?

18     A.    We -- she did not want to go home.

19     Q.    I mean, where did you -- where did

20 you drive?

21          MS. HALEM:  I'm sorry.  No.

22     You've --

23 BY MS. ZUCKER:

24     Q.    I'm asking for your conduct.

25 We'll get -- we'll back up.

1         Q.    And at some point the two of you

2    park at the Banner, correct?

3         A.    Yes.

4         Q.    And you wanted to go in and get

5    another drink, didn't you?

6         A.    No.

7         Q.    Okay.  The Banner was still open,

8    wasn't it?

9         A.    I do not -- I think it was, but I

10   didn't want to go in.  I wanted to go home.

11        Q.    Well, sir, do you remember whether

12   or not the Banner was open at the time you

13   parked there?

14        A.    I believe it was.

15        Q.    Okay.  And --

16        A.    The lights were on.

17        Q.    Okay.  And did you intend to go

18   in?

19        A.    No.

20        Q.    You just somehow find your --

21   found your way to another bar that just

22   happened to be open so that you could sit

23   there?

24             MS.  HALEM:   Objection.

25   /

```
 1   BY MS. ZUCKER:

 2        Q.   Is that -- is that what you did?

 3        A.   If you let me answer.

 4        Q.   Is that what you did?  Yes or no.

 5        A.   We drove around and then we parked

 6   in a very public place.

 7        Q.   Okay.  And what did you do once

 8   you parked in that very public place?

 9        A.   Talked some more.  She was

10   distraught.  Did not want to go home.

11        Q.   Okay.

12        A.   She kept talking about almost the

13   same conversation that we had.  She was

14   rubbing my arm, rubbing my leg, and I told

15   her the same thing.  At one point, she said,

16   you know, I vote on your contract.  She --

17   over the course of the evening, on more than

18   one occasion, talked about, and I don't want

19   to use the phrase again, but that she liked

20   to and wanted to suck cock.

21        Q.   Okay.

22        A.   I apologize.

23        Q.   Okay.  And at any time, when you

24   were sitting there in the Banner, what did

25   you say back to her?  Did you say anything
```

1    Q.   If she needed to go to the

2  bathroom, let's get her home.  Isn't that --

3  wouldn't that have been a good way to end the

4  evening?

5    A.   If she wanted to go to -- if she

6  wanted to go home, I would have been happy to

7  take her there.

8    Q.   Well, sir, I'm asking you a

9  different question.

10       If she needed to go to the

11  bathroom so badly, you'll agree with me, that

12  was a great opportunity to say, you know

13  what, Deirdre, you're right down the road,

14  I'm going to drop you at home.

15       Did you do that?

16    A.   I did not do that.

17    Q.   Did you even propose taking her

18  home at that point?

19    A.   I do not remember that.  Nope --

20  no.

21    Q.   Well, sir, you didn't do that, did

22  you?

23    A.   I don't believe I did.

24    Q.   Okay.

25    A.   Her car was uptown.  Her car was

1   at the Rockland Bar & Grill.

2        Q.   Well, you'll agree with me, sir,

3   she could have gone back to her -- she

4   could've either walked or had her husband

5   drive her back to the bar and grill the next

6   morning, right?

7        A.   Sure.

8        Q.   Okay.  So when she's there and

9   she's saying, gosh, I got to go to the

10  bathroom --

11       A.   Right.

12       Q.   -- it's a great opportunity -- if,

13  in fact, this is what's going on -- for you

14  to say, you know what, we're real close to

15  your home, that's the nicest bathroom, let me

16  take you there.  And you did not do that, did

17  you?

18       A.   She did not ask to go there.

19       Q.   Well, sir, you didn't take the

20  opportunity to get her home, did you?  No.

21       A.   She didn't want to go there.

22       Q.   Sir, did you take --

23       A.   Did I?  No.

24       Q.   -- the opportunity to get her --

25       A.   No.

```
 1           Q.    -- home or not?  Yes or no?

 2           A.    No.

 3           Q.    Okay.  So now, instead of that,

 4      you go to town hall, right?

 5           A.    Yes.

 6           Q.    And when you arrive at town hall,

 7      why don't you park right up front?

 8           A.    Force of habit.  The closest

 9      parking for me is -- it's where I always

10      parked, I guess.  I always park at that spot

11      and go in.

12           Q.    You never park closer?

13           A.    No, it's kind of my spot.

14           Q.    Okay.  So you park in your spot

15      and you go around and open the door for her;

16      isn't that right?

17           A.    I do not remember.

18           Q.    Huh?

19           A.    I don't remember.

20           Q.    You don't remember what you did?

21           A.    I don't remember going around and

22      opening the door for her.

23           Q.    Okay.  All right.

24                 Now, before you went to town hall,

25      I think we've established that you didn't
```

```
 1         Q.    Okay.  And I'm not asking what was
 2    in your mind but --
 3         A.    Right.
 4         Q.    -- you're -- you were with it
 5    enough to remember what the codes were at
 6    town hall, right?
 7         A.    Sure.
 8         Q.    Yeah.  So you were not drunk?
 9         A.    Nope.
10         Q.    So you pushed the code so that you
11    could go in, right?  You go to the bathroom.
12    She comes out.  You see that she's a little
13    unsteady and she's got her hands in her
14    head [sic], right, at that time?
15              MS. HALEM:   Objection.
16    BY MS. ZUCKER:
17         Q.    Correct?
18         A.    I don't believe she was unsteady.
19    I know she was distraught.  She did not want
20    to go home and --
21         Q.    Okay.
22         A.    -- deal with her issue with Ed and
23    her husband.
24         Q.    Now, you didn't sit down right in
25    that public space to talk with her further so
```

```
 1              THE VIDEOGRAPHER:  Going off the
 2         record.  The time is 2:59.
 3    (Recess taken at 2:59 p.m. to 3:00 p.m.)
 4              THE VIDEOGRAPHER:  We're back on
 5         the record.  The time is 3:14.
 6              MS. ZUCKER:  Thank you.
 7    BY MS. ZUCKER:
 8         Q.   Before we get back into that
 9    evening, who is Charles Levin?  Do you know a
10    Charles Levin?
11         A.   Charlie Levin is my son-in-law and
12    it's John Levin it's Charlie charlie.  So are
13    you close to Charlie.
14         A.   He's my son-in-law.
15         Q.   Well, there's sons-in-law and
16    sons-in-law.
17              Are you close to him?
18         A.   Yeah, I don't see him often, but I
19    see him.
20         Q.   And do you remember having a
21    conversation with him the evening of May 1st?
22         A.   The evening of May 1st?  No.  Do I
23    remember if I had conversations with him,
24    yes.  The conversation on May 1st, I don't
25    remember.
```

```
 1          Q.   Do you remember getting any calls
 2    or making any calls in the late evening of
 3    May 1st?
 4          A.   Do I remember?  No.
 5          Q.   Now, it was -- fair to say that
 6    you don't remember asking Charlie, hey,
 7    Charlie, here's what I want you to do.  I
 8    want you to call my phone in a couple minutes
 9    to tell me there's an emergency so I can get
10    home?
11          A.   No.
12               MS. HALEM:  Objection.
13    BY MS. ZUCKER:
14          Q.   No.  You didn't do that, did you?
15          A.   No.
16          Q.   And you don't even remember that
17    you spoke to him that evening, right?
18          A.   Not specifically, no.
19          Q.   And you don't have any memory of
20    suggesting to him or to anyone else that
21    evening that you wanted their help sort of to
22    get you out of the awkward situation?
23          A.   No.
24          Q.   And you didn't tell Charlie that
25    evening that you were in any awkward
```

1   situation, did you?

2                MS. HALEM:  Objection.

3        A.   No.

4   BY MS. ZUCKER:

5        Q.   Have you looked at your phone

6   records from that night, sir?

7        A.   Recently, no.

8        Q.   Have you noted that there's a call

9   to Charlie Levin at 10:13 that evening?

10               MS. HALEM:  Objection.

11       A.   No.

12  BY MS. ZUCKER:

13       Q.   And you've got nothing to say to

14  us about what the contents of that, I think

15  it was six-minute, call was?

16       A.   No.

17       Q.   And I think my wonderful colleague

18  just corrected me.  It was a brief call.

19  It's a one-minute call.

20            You have nothing to suggest any

21  memory of what that one-minute call was

22  about?

23       A.   Did I make the call, or did he

24  make the call?  I have --

25       Q.   You don't have any memory one way

```
 1          Q.    Okay.  So fair to say, sir, that
 2   at no time during the evening of May 1st did
 3   you reach out to anybody to help you get out
 4   of this -- of a circumstance?
 5               MS. HALEM:  Objection.  I'm so
 6        sorry.  Did you say on the night of
 7        May 1st or you said after May 1st?
 8               MS. ZUCKER:  Yes.
 9   BY MS. ZUCKER:
10          Q.   On the night -- on -- at any time
11   the night of May 1, did you call anyone to
12   help you get out of the circumstance?
13          A.   No.
14          Q.   And it's fair to say, sir, isn't
15   it, that there were moments where you were
16   outside of Ms. Hall's presence, correct?
17          A.   I don't remember when, but...
18          Q.   Well, let's see.
19          A.   I thought --
20          Q.   After you put her in a place where
21   there were no cameras --
22          A.   I didn't put --
23          Q.   -- right, in your office --
24          A.   Excuse me.
25               MS. HALEM:  We're doing that thing
```

1        Q.    Okay.  I'm asking --

2        A.    Unless you use my phone as a

3    corkscrew.

4        Q.    Okay.  So you never said to

5    anybody that that was -- that it's possible

6    that it was a corkscrew?

7                MS. HALEM:  Objection.

8        A.    It was not.

9    BY MS. ZUCKER:

10       Q.    Okay.  So you go and get your

11   phone, right, from your car?

12       A.    Yes.

13       Q.    Okay.  When you get the phone from

14   the car, do you call -- you know, kind of

15   like playing lifeline, do you call some

16   family member -- I don't know, Charlie or

17   somebody else -- and say, look, I'm really in

18   a tight spot, what I want you to do is in

19   about five minutes call me and tell me

20   there's some emergency that I've got to get

21   out to?

22               Do you do that?

23                MS. HALEM:  Objection.

24       A.    No.

25   /

```
 1   BY MS. ZUCKER:

 2        Q.   Did you reach out to anyone to

 3   help you get out of this spot?

 4             MS. HALEM:  Objection.

 5        A.   No.

 6   BY MS. ZUCKER:

 7        Q.   Okay.  Instead you went in and you

 8   poured more wine, right?

 9        A.   At the direction of Ms. Hall.  She

10   wanted the bottle open.

11        Q.   And you have --

12        A.   She's my boss.

13        Q.   -- no capacity at this point --

14   you've lost all capacity to walk out?

15             MS. HALEM:  Objection.

16        A.   No.

17   BY MS. ZUCKER:

18        Q.   You haven't, right?  You could

19   still walk out?

20        A.   Yes.

21        Q.   And you could have gotten on the

22   phone and say, look, this woman, she's a

23   little awkward, she's obviously distraught --

24   that's the way you've been describing her --

25   and so I need to figure out how to get her
```

```
 1    home.

 2              You didn't look for anybody

 3    else --

 4         A.   I thought --

 5         Q.   -- to help you, did you?

 6         A.   I thought I had --

 7         Q.   Did you?  Did you?  Yes or no,

 8    sir.

 9         A.   I'm trying to answer your

10    question.

11         Q.   No, but did --

12         A.   Did I --

13              MS. HALEM:   Objection.   Let him

14    answer the question.

15              MS. ZUCKER:   No, well, I need him

16         to answer with what he did or did not

17         do.

18         A.   I did not.

19    BY MS. ZUCKER:

20         Q.   Okay.   And you also -- by the way,

21    I think you said that after you were arrested

22    2011, one of the people you called for a

23    lifeline and some advice in that circumstance

24    was John Clifford, right?

25         A.   I do not remember.   Probably in
```

```
 1    have your phone.

 2              Do you think of calling the chief

 3    of police and saying, geez, here I am, it's a

 4    really tough spot, what do I do?

 5         A.   No.

 6         Q.   Okay.  So you don't reach out to

 7    any of these confidantes of yours whom you

 8    called when you were in a bad spot in 2011,

 9    to say, hey, man, can you help; do you?

10         A.   No.

11         Q.   All right.  And you don't reach

12    out to Charlie, whom you were just in touch

13    with, your son-in-law?

14         A.   I don't remember the call.

15         Q.   Okay.  So instead, you decide to

16    go back in --

17         A.   What time was that call?  Can I

18    ask?

19         Q.   10:13.

20         A.   Okay.

21         Q.   Instead, you decide to go back in,

22    right?

23         A.   So at 10:13 we would have still

24    been at the Rockland Bar & Grill.

25         Q.   Oh, okay.
```

1    that night and ask them for help?

2         A.    You have my phone records.

3         Q.    Did you call any of them?

4         A.    No.

5         Q.    And you were aware, weren't you,

6    that, by your own description, Ms. Hall was

7    distraught that evening?

8         A.    Yes.

9         Q.    And you understand, don't you,

10   that, as the town administrator, you have

11   some responsibility to maintain the decorum

12   and reputation of your town, right?

13        A.    Yes.

14        Q.    And your responsibility to

15   maintain the decorum of that town -- of that

16   town, at no point led you to think I'd better

17   get her home?

18        A.    She was distraught --

19        Q.    No.  Yes or no.  Yes or no.

20        A.    I'd better get her --

21             MS. HALEM:  Objection.  Let him

22        answer the question.

23   BY MS. ZUCKER:

24        Q.    Yes.

25        A.    I'd better get her home?  No.

```
 1   that night and ask them for help?

 2        A.   You have my phone records.

 3        Q.   Did you call any of them?

 4        A.   No.

 5        Q.   And you were aware, weren't you,

 6   that, by your own description, Ms. Hall was

 7   distraught that evening?

 8        A.   Yes.

 9        Q.   And you understand, don't you,

10   that, as the town administrator, you have

11   some responsibility to maintain the decorum

12   and reputation of your town, right?

13        A.   Yes.

14        Q.   And your responsibility to

15   maintain the decorum of that town -- of that

16   town, at no point led you to think I'd better

17   get her home?

18        A.   She was distraught --

19        Q.   No.  Yes or no.  Yes or no.

20        A.   I'd better get her --

21             MS. HALEM:  Objection.  Let him

22        answer the question.

23   BY MS. ZUCKER:

24        Q.   Yes.

25        A.   I'd better get her home?  No.
```

1     Q.    Okay.  And by the way, I've asked

2   you if you reached out and called any of

3   these people.  Did you text anyone?

4     A.    I don't believe I did.

5     Q.    Did you send an email?

6     A.    No.

7     Q.    Because there was that time --

8   you're telling me, it was your phone, where

9   you went out to your car and you were all

10  alone and you could have texted somebody.

11  You could have done a lot of different

12  things, right?

13    A.    Who's up at midnight?  I guess.  I

14  don't know.  I wish --

15    Q.    You mean to tell me that you've

16  never texted any of your friends at midnight?

17    A.    I'm not usually up at midnight,

18  but...

19    Q.    Now, when you landed at town hall

20  and you did the emergency -- the code to get

21  you in, right, and you put Ms. Hall in your

22  office, right?

23    A.    I didn't put her anywhere.

24    Q.    Well, you ushered her in, didn't

25  you?

1  physically were able to maintain an erection,

2  weren't you?

3      A.  Not consistently, no.

4      Q.  Okay.  But sometimes?

5      A.  Hit or miss.

6      Q.  Okay.

7      A.  It's unfortunate to get old, I

8  tell you.

9      Q.  Okay.  So that was 2015.  2018, it

10 was the same, right?  Right?

11     A.  Yeah.

12     Q.  You still could sometimes get an

13 erection and climax, correct?

14     A.  Yes.

15     Q.  Okay.  Without any medical

16 intervention, correct?

17     A.  Hadn't really tried, but yeah, I

18 guess.

19     Q.  Okay.  Now -- so you wouldn't say

20 that it was impossible for you to get an

21 erection?

22     A.  No.

23     Q.  And you wouldn't say it was

24 impossible for you to climax, would you?

25     A.  No.

1    again?

2         Q.   Do you sometimes look at

3    pornography and without the aid of

4    medication, find it possible to get an

5    erection and climax?

6         A.   Yes.

7         Q.   Okay.  Did you ever look at

8    pornography while at work?

9         A.   No.

10        Q.   Did you ever look at it while on a

11   work trip?

12        A.   No.  Not -- no.

13        Q.   Now --

14        A.   I haven't had any work trips.

15        Q.   Now, the challenges -- I think you

16   said earlier, "we were having problems,"

17   right, and that's what led you to get the

18   Cialis, right?

19        A.   Yes.

20        Q.   The "we" was sex with your wife,

21   right?

22        A.   Yes.

23        Q.   All right.  And is it possible,

24   sir, that sex with somebody else would not --

25   would not have the same impediments?

ALLAN CHIOCCA vs TOWN OF ROCKLAND
Allan Chiocca July 12, 2021

Job 33185
Page 233

```
 1          A.    I wouldn't know.

 2          Q.    Well --

 3          A.    I've only been with my wife.

 4          Q.    Well, you've stared at pornography

 5    and been able to get an erection and climax,

 6    right?

 7          A.    Yeah.

 8          Q.    So the challenges were the

 9    challenges of a long-term relationship that

10    had stopped being quite so exciting, correct?

11                MS. HALEM:  Objection.

12          A.    I still find my wife exciting.

13    BY MS. ZUCKER:

14          Q.    But you need some medical

15    assistance --

16          A.    Yes.

17          Q.    -- with her that you don't always

18    when you're by yourself or staring at

19    pornography; is that fair?

20                MS. HALEM:  Objection.

21          A.    Yes.

22    BY MS. ZUCKER:

23          Q.    Okay.  So now when you -- have you

24    ever stared at women in a social setting and

25    found yourself with an erection?
```

```
 1        A.    No.
 2        Q.    Okay.
 3              MS. HALEM:   Objection as to time
 4        frame.
 5   BY MS. ZUCKER:
 6        Q.    Now --
 7              MS. ZUCKER:   Thank you.
 8   BY MS. ZUCKER:
 9        Q.    Now, in terms of your ability to
10   get an erection and climax, you were able to
11   do that staring at pornography without Cialis
12   in or around 2018; isn't that right?
13        A.    Yes.
14        Q.    And you were able to do that while
15   masturbating without Cialis; isn't that
16   right?
17        A.    Yes.
18        Q.    Okay.  Now, you and Ms. Hall are
19   in your office.
20              Where did you keep the corkscrew
21   in your office?
22        A.    There is a knife, could still be
23   there, in the top drawer that's a jackknife
24   with a couple of blades on it, and it's got a
25   corkscrew attachment.
```

1      Q.    Now, do you have a refrigerator in

2   your office?

3      A.    I had a -- I had what most people

4   refer to as a college refrigerator --

5      Q.    Okay.

6      A.    -- water and, you know, my lunch

7   for the day.

8      Q.    Okay.  And you had a habit of

9   having alcohol in there, right?

10      A.    No.

11      Q.    You didn't?

12      A.    No.

13      Q.    Never did?

14      A.    Never alcohol in there.  I

15   received the bottle of wine in question as a

16   gift, I believe, maybe even that day.  Marcy

17   had gone to Vermont, I think, over the

18   weekend and knows I like to have a Riesling

19   every once in a while.  That bottle, I

20   believe, was warm on top of the refrigerator,

21   and I had, leaving the office that day, not

22   taken it.

23      Q.    Okay.  So then you're in there and

24   you pour not only Ms. Hall another drink but

25   yourself too?

1       A.   I think we were having Dixie cups.

2       Q.   Okay.  So both of you were having

3  some -- something to drink.  You remember

4  that wine.  The wine spilled.  You don't

5  remember who spilled it?

6       A.   Right.

7       Q.   Okay.  The light --

8       A.   I remember pouring two; one

9  spilled.

10      Q.   Okay.  And you darkened the room,

11 didn't you?

12      A.   I darkened the room?

13      Q.   Well, the light wasn't on, right,

14 at some point?

15      A.   I don't think so.  I think the

16 light was on.

17      Q.   Do you remember, really, one way

18 or the other?

19      A.   No.  I think the light was on.

20      Q.   Okay.  And at some point you

21 lowered your drawers, right?

22      A.   At some point, she undid my belt

23 and unzippered my fly and pulled my pants

24 down.

25      Q.   At that time -- so you say she

 1   you never called any of your long-time

 2   associates at city hall to say, holy-moly,

 3   Deirdre Hall threatened my contract, did

 4   you?

 5            MS. HALEM:  Objection.

 6        A.   No, I did not.

 7   BY MS. ZUCKER:

 8        Q.   Okay.  And you didn't, in fact,

 9   tell anybody that the next day, did you?

10        A.   No.

11        Q.   You didn't say that for weeks, in

12   fact, did you?

13        A.   Say what?

14        Q.   That she had, quote, "threatened

15   your contract"?

16        A.   I didn't talk to anybody about

17   that evening.

18        Q.   Well, eventually you did, right?

19        A.   Eventually.

20        Q.   And you said it was just a blow

21   job and you wanted it all to go away, and

22   you'd like another year and then you'll

23   retire, right?

24            MS. HALEM:  Objection.

25        A.   No, that's not what -- there's

1    about three things that you're putting in

2    there, but no.

3    BY MS. ZUCKER:

4         Q.   The first time you spoke

5    without -- with John Clifford, did you tell

6    him that she had threatened your contract?

7    Yes or no?

8         A.   Yes.

9         Q.   Huh.  The first time you spoke

10   with Ed Kimball, did you tell him that she

11   had threatened your contract?

12        A.   I believe I did.  I think I told

13   them that she was the aggressor.  She was the

14   predator.  That she had threatened me.

15        Q.   I've asked you a different

16   question.

17             Did you say she had threatened my

18   contract?  Yes or no?  Those words.

19        A.   I believe I did.

20        Q.   Okay.  All right.

21             Now, back in the room -- so you're

22   standing over her and she gives you a blow

23   job, right?

24        A.   Yes.

25        Q.   Was it pleasurable?

1       A.    I didn't want to be there.

2       Q.    Was it pleasurable?  Did you

3  climax?

4       A.    I climaxed.

5       Q.    Okay.  And what happened next,

6  after you climaxed?

7       A.    She wanted me to pleasure her and

8  go orally on her.  I did not want to.  I made

9  a half-assed -- half-hearted, excuse me,

10  half-hearted couple of seconds and then tried

11  to stimulate her digitally.

12       Q.    And what happened after that?

13       A.    She didn't want me to stop.  I

14  stayed at it.

15       Q.    How long?

16       A.    I don't remember exactly.  You

17  know, we had talked for a while, but I know

18  we were in the office.  I think the tape

19  says, like, 10 to 2:00, but we talked for

20  some of that time.

21       Q.    Now --

22       A.    It was too long.

23       Q.    Okay.  Now, at some point you get

24  up, right?  And -- you had climaxed -- you

25  had a blow job, right?

1    A.   Yes.

2    Q.   And it was successful, correct?

3         MS. HALEM:   Objection.

4    A.   I imagine -- do we have a climax?

5  We had a climax.

6  BY MS. ZUCKER:

7    Q.   Okay.  When you say "we" --

8    A.   Well, she performed.

9    Q.   Okay.  And then what happened?

10 How did you get dressed again, sir?  What did

11 you do?

12   A.   I imagine I pulled up my pants --

13   Q.   I'm not asking what you imagine.

14 I'm asking what you remember.

15   A.   I don't remember specifically.

16   Q.   Okay.  So you don't remember.  So

17 you could have walked out with your pants

18 down by your -- by your knees, as far as you

19 know --

20   A.   We'll, you're asking -- well, I

21 obviously pulled them up when we came out the

22 door.  They weren't down by my knees.

23   Q.   Okay.  So you did that, right?

24   A.   Yes.

25   Q.   You pulled your pants up; you put

1   the office.  What happens next?

2        A.   At some point, I -- we went to the

3   truck.  I drove her to RB&G.  She wanted to

4   get a little kissy-face, I guess, for lack of

5   a better term.  I wanted to get out of there

6   and, you know, she went to her car and drove

7   home.

8        Q.   Okay.  Did you think of driving

9   her home?

10        A.   I know you keep playing on that.

11   No, she was not impaired.

12        Q.   Okay.  So your view was that she

13   was distraught but not impaired?

14        A.   Yes.

15        Q.   Okay.  Now -- now, at any time

16   during the evening did you commend her and

17   tell her she gives a good blow job?

18        A.   I do not remember saying that to

19   her.

20        Q.   Well, I'm not --

21        A.   No.

22        Q.   Are you sure that you did not say

23   that?

24        A.   I didn't want to be there,

25   Counsel --

```
 1    COMMONWEALTH OF MASSACHUSETTS

 2    BARNSTABLE, SS.

 3

 4          I, Sandra A. Deschaine, Registered
      Professional Reporter and Notary Public
 5    within and for the Commonwealth of
      Massachusetts at large, do hereby certify
 6    that the deposition of Allan R. Chiocca, in
      the matter of Allan Chiocca vs. Town of
 7    Rockland, et al., at the offices Burns &
      Levinson, 125 High Street, Boston,
 8    Massachusetts, on July 12, 2021, taken and
      transcribed by me; that the witness provided
 9    satisfactory evidence of identification as
      prescribed by Executive Order 455 (03-13)
10    issued by the Governor of the Commonwealth of
      Massachusetts; that the transcript produced
11    by me is a true record of the proceedings to
      the best of my ability; that I am neither
12    counsel for, related to, nor employed by any
      of the parties to the action in which this
13    deposition was taken, and further that I am
      not a relative or employee of any attorney or
14    counsel employed by the parties thereto, nor
      financially or otherwise interested in the
15    outcome of the action, on this 19th day of
      July 2021.

16

17

18

19

20    _____
               Sandra A. Deschaine
21
               Registered Professional Reporter
22

23

24
      My Commission Expires:
25    July 5, 2024
```

1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4    _____
                                      )
5    ALLAN CHIOCCA,                   )
                                      )
6              Plaintiff              )
                                      )
7    vs.                              )   C.A. No. 1:19-CV-10482-WGY
                                      )
8                                     )
     THE TOWN OF ROCKLAND, DEIDRE HALL, )
9    EDWARD KIMBALL, LARRY RYAN, MICHAEL )
     MULLEN, JR., MICHAEL O'LOUGHLIN, )
10   RICHARD PENNEY AND KARA NYMAN,   )
                                      )
11             Defendants             )
                                      )
12   ------------------------------------

13

14                    DAY 2

15   VIDEOTAPED DEPOSITION OF ALLAN R. CHIOCCA

16            TUESDAY, JULY 13, 2021

17            10:20 a.m. - 4:56 p.m.

18            BURNS & LEVINSON LLP

19

20

21

22

23   Reported by:  Sandra A. Deschaine, CSR, RPR,

24   CLR, CRA

25   Job No. 33186

```
 1        A.    Go ahead.
 2        Q.    Okay.  So, sir, is that why you
 3   have an alter ego where you -- where you sit
 4   shirtless with drinks?  Is that why you do
 5   that?
 6              MS. HALEM:  Objection.  What is --
 7        what why?
 8        A.    I have no idea what relationship
 9   that has to anything.  I did review some of
10   those pictures from 2011, I believe, from our
11   Costa Rican trip with my family.  I noticed
12   that you put a picture of me without a shirt
13   at a bar that's by the pool.  You didn't
14   include the one -- same picture with my
15   daughter standing right next to me.  I
16   noticed that.
17              You say pasties.  They're
18   certainly not pasties.  They're part of a
19   carnival at New Year's when there's a parade
20   going on down -- down the street in the town
21   of -- I believe it's Quepos, Q-u-e-p-o-s, I
22   believe, Costa Rica, when we were there
23   diving and doing -- you don't include
24   numerous pictures with my family.
25        Q.    Sir -- sir --
```

1  lawyers on your behalf in this case, right?

2      A.   Yes.

3      Q.   And as part of the me-too

4  movement, didn't you understand that it was

5  necessary and appropriate for you to

6  understand how sexual harassment would be

7  reported in the town?

8           MR. SHAFRAN:   Objection.

9  BY MR. COOPER:

10     Q.   Talking about at town hall.

11     A.   Yes.

12     Q.   Okay.   So prior to May 2018, did

13 you go back and read the Town of Rockland

14 personnel bylaw with the specific intent to

15 understand it because of the Me Too Movement?

16          Yes or no.

17     A.   No, we had no cause to.

18     Q.   Thank you.   You've answered my

19 question.

20     A.   Well, you asked for the truth --

21     Q.   And I take it --

22     A.   -- and the whole truth --

23     Q.   I take it --

24     A.   -- and I'm trying to tell you

25 that.

```
 1    personnel board at the Town of Rockland?

 2          A.    No.

 3          Q.    Now, that means that you, as the

 4    town administrator, was responsible for the

 5    administration of this bylaw, correct?

 6          A.    According to the bylaw, yes.

 7          Q.    Well, you knew that at the time,

 8    didn't you?

 9          A.    No.

10          Q.    Had you checked?

11          A.    I don't believe I had.

12          Q.    Did you care?

13          A.    Of course, I would care if it was

14    pertinent to anything, if we had an issue.

15          Q.    So if something came up about

16    sexual harassment in the workplace at town

17    hall, then you would care; is that right?

18          A.    I think if something came up with

19    any of this personnel bylaw.

20          Q.    Well, let me see if I can get you

21    to focus on my questions --

22          A.    Sick leave, vacations, yes.

23          Q.    Sir, I'm only asking you about

24    what I'm asking you about.

25          A.    I apologize.
```

```
 1          Q.   So if something came up in terms
 2     of an issue of sexual harassment at town
 3     hall, then you would care, correct?
 4          A.   Yes.
 5          Q.   And as part of caring, you would
 6     consult this document, right?
 7          A.   Yes.
 8          Q.   And, in fact, you were obligated
 9     to do so as part of your job
10     responsibilities, right?
11          A.   Yes.
12          Q.   Now, let's go to the third
13     paragraph on page 7 where it says "the town
14     administrator shall ensure."
15              Are you with me?
16              MR. SHAFRAN:  Page 7, did you say?
17              MR. COOPER:  I'm sorry.  It's the
18          seventh physical page which I have in my
19          notes.  It's got page 5.  Stay on
20          page 5.  My apologies.
21     BY MR. COOPER:
22          Q.   The town administrator shall
23     ensure.  Are you with me?
24          A.   Yes.
25          Q.   Shall means shall, right?
```

```
 1   was the goal of the Town of Rockland to

 2   promote a workplace that was free of sexual

 3   harassment?

 4          A.   Yes.

 5          Q.   And it was your job responsibility

 6   to enforce that goal, correct?

 7          A.   Yes.

 8          Q.   Skipping down to the next

 9   paragraph, did you also understand that

10   because Rockland takes allegations of sexual

11   harassment seriously, we will respond

12   promptly to complaints of sexual harassment.

13              It goes on, but I'm going to stop

14   there.

15              Have I read that portion of the

16   paragraph correctly?

17          A.   Yes.

18          Q.   And that was part of your

19   mandatory job responsibilities, to ensure

20   that would happen, correct?

21          A.   Yes.

22          Q.   And included in that, but not

23   limited to, is to respond promptly to

24   complaints of sexual harassment, right?

25          A.   Yes.
```

```
 1          A.    Yes.

 2          Q.    When did you do that?

 3          A.    The next morning.

 4          Q.    Where did you throw it out?

 5          A.    Probably right into the regular

 6     trash.

 7          Q.    So you didn't regard it as

 8     evidence of what had happened the evening

 9     before?

10          A.    No.

11          Q.    You didn't think it was important

12     to save it?

13          A.    I -- no.

14          Q.    Would you agree with me that you

15     put that wine bottle beyond anyone's ability

16     to analyze in this lawsuit by throwing it

17     out?

18          A.    Yes.

19          Q.    In other words, you're familiar,

20     for example -- and I don't mean to be

21     dramatic about this, but one could have

22     analyzed how much wine was left in the bottle

23     if there was, indeed, wine in there, correct?

24          A.    There had been -- yes, they could

25     have.  There had been no complaint.
```

1      Q.   Someone could have taken

2 fingerprints to see who's touched the bottle,

3 right?

4      A.   Yes.

5      Q.   Did you think at all about the

6 fact that you had a complaint for sexual

7 harassment, according to you, before you

8 threw the wine bottle out?

9      A.   No.

10      Q.   Okay.  Now, I think we've

11 established that there was no personnel board

12 and that you were the sexual harassment

13 officer to whom complaints of sexual

14 harassment were to be reported, right?

15      A.   Yes.

16      Q.   So if you weren't available to

17 promptly and thoroughly investigate a claim

18 of sexual harassment, who, in your mind, was

19 supposed to do it?

20      A.   There was no claim of sexual

21 harassment.  If it were not me and if it

22 were -- or in another situation, my first

23 call probably would have been to the

24 chairman --

25      Q.   Mr. Kimball?

1   Mr. Clifford were there to investigate the

2   allegation, right?

3       A.   Yes.

4       Q.   And that was an appropriate use of

5   their job responsibilities, correct?

6       A.   Yes.

7       Q.   In fact, what they did was in

8   complete compliance with the Town of Rockland

9   personnel bylaws, correct?

10           Of course, you hadn't read them at

11  the time, right?

12      A.   Well, I didn't recall them.  I do

13  think Ed has a conflict.

14      Q.   Let's address that.

15      A.   Okay.

16      Q.   On May 1st of 2018, Deirdre Hall

17  told you that she had had an affair with Ed

18  Kimball, correct?

19      A.   Yes.

20      Q.   And you knew from that moment

21  forward, and we'll get into some specifics

22  later, that, in fact, at least one person had

23  told you that there had been a romantic

24  relationship, including a sexual

25  relationship, and that Mr. Kimball had broken

1       A.   I don't think I produced them, is

2    what I'm telling you.

3       Q.   Okay.  Well, let's make the record

4    very clear.  Can you mark these as the next

5    two exhibits in order?

6    (Exhibit 8, Memo:  Attention Cindy Cieslak,

7     marked for identification.)

8    (Exhibit 9, Bates No. AC02428, Bills, marked

9     for identification.)

10             MS. HALEM:  Are they one exhibit?

11             MR. COOPER:  Nope.

12   BY MR. COOPER:

13       Q.   Handing you what's been marked as

14   Exhibit 8, which is a two-page document, and

15   Exhibit 9, which is a one-page document.

16             Would you agree with me that, in

17   combination, those are copies of the two

18   bills or tabs that you testified to

19   yesterday?

20       A.   Yes.

21       Q.   And let's take a look at Exhibit 8

22   first.  Is that your signature on the credit

23   card receipt?

24       A.   I tend to scribble.  Yes.

25       Q.   And it says that that credit card

```
 1    charge was printed as of 9:47 p.m. by a

 2    server who's identified as two bartender p.m.

 3    and an order 43612.

 4              Do you see that?

 5        A.   Yes.

 6        Q.   And if you look over to the right,

 7    it says four Michelob Ultra bottles, right?

 8        A.   Yes.

 9        Q.   And you drank those four bottles,

10    right?

11        A.   Yes.

12        Q.   And then it says four glass house

13    riesling?

14        A.   Riesling.

15        Q.   Riesling, which is a wine,

16    correct?

17        A.   Yes.

18        Q.   And those were consumed by

19    Ms. Hall, right?

20        A.   Yes.

21        Q.   And you paid for her drinks?

22        A.   Yes.

23        Q.   And there wasn't anyone else there

24    whose drinks you paid for, correct?

25        A.   I don't believe so, no.
```

```
1          Q.    Okay.  So when you told us
2     yesterday that you had picked up the tab for
3     everybody, did you mean to suggest that
4     anyone had been with you other than Ms. Hall?
5          A.    No.  When I was talking about
6     picking up the tab, that was -- on this
7     particular one, this was just me and
8     Ms. Hall.  I would say for everybody on
9     occasion, with the selectmen there, there
10    would be more everybodies.
11         Q.    But not that evening?
12         A.    No.
13         Q.    So if you look at the right-hand
14    column of Exhibit 8, do you see that it says
15    "5/1/18, 7:51 p.m."?
16         A.    Yes.
17         Q.    Would you agree with me that's
18    when your tab was opened?
19         A.    Yes.
20         Q.    And then, if we go back to the
21    left-hand column, it says 9:47 p.m., right?
22         A.    Yes.
23         Q.    And would you agree with me that
24    that's when your first tab was closed?
25         A.    Yes.
```

```
 1          Q.    And I take it -- again, this is
 2    probably another stupid question because it's
 3    obvious, but no one ordered any food during
 4    that time period, correct?
 5          A.    No.  It appears we were leaving.
 6          Q.    So you're agreeing with me, what
 7    this reflects is that at some period of time
 8    between 7:51 p.m. and 9:47 p.m., you were
 9    served four bottles of beer and Ms. Hall was
10    served four glasses of wine?
11          A.    Yes.
12          Q.    And that you observed her drinking
13    them, right?
14          A.    Yes.
15          Q.    And no one -- I shouldn't say no
16    one.  Neither of you was eating any food,
17    right?
18          A.    Yes.
19          Q.    So would you also agree with me,
20    and let's round up, that the time period
21    reflected here is about two hours?
22          A.    Yes.
23          Q.    Do you know how many glasses are
24    in a bottle of wine?
25          A.    No.
```

```
 1           Q.    Do you have any information about

 2      that at all?

 3           A.    Depends how big a glass you use, I

 4      guess.

 5           Q.    All right.  So what was the pour

 6      at the Rockland Bar & Grill at the time, if

 7      you can remember?  Was it 12 ounce?   16

 8      ounce?

 9           A.    I didn't drink the wines.

10           Q.    Did you make any observation about

11      the pour that Ms. Hall was given?

12           A.    I don't drink wine, no.

13           Q.    That's not my question.  My

14      question is, did you make any observation

15      about the amount of wine that was being

16      poured into Ms. Hall's glass or arrived

17      poured in her glass --

18                 THE REPORTER:  Or what?

19      BY MR. COOPER:

20           Q.    Or arrived having been poured in

21      her glass at all, that you can recall?

22           A.    No.

23           Q.    Now let's take a look at

24      Exhibit 9.  Starting with the left-hand

25      column -- this was a tab -- this is your
```

 1   signature, correct?

 2        A.   Yes.

 3        Q.   And this was a tab that was opened

 4   at 9:56 p.m., correct?

 5        A.   Yes.

 6        Q.   And closed at 10:59 p.m., right?

 7        A.   Yes.

 8        Q.   And so that means that there was

 9   at least a nine-minute conversation between

10   the tabs being -- excuse me -- nine-minute

11   period of time between your first tab being

12   closed and your second one being opened,

13   right?

14        A.   Yes.

15        Q.   Now, this reflects, as you said

16   yesterday, ordering some food, and I'm now

17   talking about Exhibit 9, right?

18        A.   We're on 9?

19        Q.   Yes, sir.  It reflects the chicken

20   wings and the skewer, right?

21        A.   Yes.

22        Q.   And it also reflects that you

23   bought and paid for Ms. Hall to have another

24   glass of wine, right?

25        A.   Yes.

```
 1          Q.   And for yourself to have another

 2    beer, right?

 3          A.   Yes.

 4          Q.   Now, you told us yesterday, I

 5    think it was in the morning, that after your

 6    experience being arrested for drunk driving

 7    in 2011, it was your view that four Ultras

 8    would not put you over the legal limit, and

 9    that that was a red line for you.  My words,

10    not yours.  Right?

11          A.   Yes.

12          Q.   So you made the decision to open

13    your tab and cross your red line, right?

14          A.   Yes.

15               MR. SHAFRAN:  Objection.

16    BY MR. COOPER:

17          Q.   And to drink that fifth beer,

18    right?

19          A.   Yes.

20          Q.   And to have -- and to pay for

21    Ms. Hall to have another glass of wine,

22    right?

23          A.   Yes.

24          Q.   Now, I want you to assume with me

25    that a typical pour of a glass of wine in a
```

1      Q.   Would it be a sign of someone

2   being weepy and distraught?

3           MR. SHAFRAN:   Objection.

4      A.   A sign -- would it --

5   BY MR. COOPER:

6      Q.   Of being intoxicated.

7      A.   Because they're weepy and

8   distraught?

9      Q.   Yes, sir.

10     A.   They could be weepy and

11  distraught.  I don't -- no.

12     Q.   Well, you have said a number of

13  times that you observed Ms. Hall on that

14  evening and in that early morning time

15  period, May 1st, May 2nd, 2018, to be

16  distraught, right?

17     A.   She was upset about being found

18  out of having the affair with Mr. Kimball.

19     Q.   The word you used multiple times

20  yesterday was distraught.

21     A.   Yes, I did.  I said distraught.

22     Q.   Was she crying?

23     A.   I don't recall her crying.

24     Q.   Was she teary?

25     A.   I don't recall her teary.

1        Q.    Would it refresh your memory if I

2   suggested that the incident involved Eric

3   allegedly making a crude sexual comment in

4   the presence of a female town employee?

5        A.    No.

6        Q.    Okay.  So you just have no memory

7   of something like that ever happening?

8        A.    No.

9        Q.    Was there ever, during your

10  tenure, prior to May 1, 2018, a complaint of

11  sexual harassment in the Town of Rockland

12  that came to your attention?

13       A.    No.

14       Q.    Did you ever form an

15  understanding -- let me say it differently.

16            Did you ever form a concern in

17  your mind regarding Eric Hart's conduct

18  towards females?

19       A.    I had -- there was one employee

20  who Eric started to, I believe, date or was

21  seen out to dinner or lunch, et cetera, and I

22  had some concerns, and that employee had

23  expressed to me no concern.

24       Q.    What were your concerns?

25       A.    It's just that it was someone

1   (Exhibit 19, Bates No. AC01020, email from

2   Jack Sullivan, dated 7/12/18, marked for

3   identification.)

4   BY MR. COOPER:

5       Q.   Showing you what the reporter has

6   marked as Exhibit 19.

7           Have you seen this document

8   before?

9       A.   I don't believe I have.

10      Q.   This document purports to be an

11  email from a Mr. Jack Sullivan at

12  Commonwealth Magazine to Mr. Shafran, which

13  read, "Hi Counsel, I'm Jack Sullivan with

14  Commonwealth Magazine.  I see the Ledger says

15  you gave them a copy of the investigation

16  report.  I'm wondering if you could send a

17  copy to us as well.  Thank you.  Jack

18  Sullivan."

19          Have I read that correctly?

20      A.   I believe so.

21      Q.   Now, did you authorize Mr. Shafran

22  to give a copy of Regina Ryan's investigative

23  report to the Patriot Ledger?

24      A.   I authored the release of the

25  report --

1           THE REPORTER:  Through?  Did you

2      say through my attorney?

3           THE WITNESS:  Yes.

4  BY MR. COOPER:

5      Q.   Just so it's clear, in terms of

6  the publication of the information in that

7  report, you put it out there in the media,

8  correct?

9           MR. SHAFRAN:  Are you asking

10     physically?

11          MR. COOPER:  I stand on my

12     question.

13          MR. SHAFRAN:  You can answer, if

14     you understand.

15     A.   I did not put it out in the media.

16  Through my attorney it was released to the

17  media.

18  BY MR. COOPER:

19     Q.   At your direction?

20     A.   I don't know if it was at my

21  direction, but with my approval.

22     Q.   Well, who made -- so it wasn't

23  your idea?

24     A.   I was taking advice, should you or

25  should you not do this, should you do this,

1    should you do that.

2         Q.    My question is very simple.

3         A.    My answer was.

4         Q.    Your team --

5         A.    Yes.

6         Q.    -- put the content of Regina

7    Ryan's report into the public domain through

8    the media, correct?

9         A.    Yes.

10        Q.    It's not something Mr. Kimball

11   did, did he?

12        A.    The contents of Regina Ryan, no.

13        Q.    It's not something Ms. Hall did?

14        A.    No.

15        Q.    Correct?

16        A.    Correct.

17        Q.    It's something that you

18   voluntarily authorized to be put out there,

19   correct?

20        A.    Yes.

21        Q.    And you'd agree with me that the

22   report was widely reported on in the media,

23   correct?

24        A.    Yes.

25        Q.    And it caused a sensational story,

1          and 32 seconds p.m. and hit play.

2     (Playing video.)

3               MR. COOPER:  Stop.

4               And we're stopping at 11:45 and 43

5          seconds p.m.

6     BY MR. COOPER:

7          Q.   It's your testimony that Ms. Hall

8     stumbled because of something having to do

9     with her heel?

10         A.   I would have no idea why she

11    stumbled, but it looks as though she had a

12    slight gait problem.

13         Q.   Okay.  Did you observe Ms. Hall

14    walking in that manner on the evening of

15    May 1, 2018, or early morning hours of May 2,

16    2018?

17         A.   No.

18         Q.   But you do agree that you just

19    watched her stumble, correct?

20         A.   Yes.  Not stumble or fall, but

21    yeah, twist --

22         Q.   Okay.  So you used the word

23    "stumble" and now you just said "not

24    stumble."

25         A.   Well, she didn't fall down, to be

1   clear.  I apologize, Counsel.  Stumbled.  I

2   don't want to leave the wrong connotation,

3   but everyone will see the film.

4          Q.   You just saw her stumble, right?

5          A.   There was an unsteady to her gait.

6          Q.   So you observed an unsteady gait

7   and a stumble; is that fair?

8          A.   Yes.

9               MR. COOPER:  And could we roll

10       forward, please?  Just hit play while I

11       get to my notes.

12               Could you fast forward, please, to

13       11:51 and no seconds?

14               Stop.

15               Go back.  I'm sorry.  I'm -- I am

16       misreading my own notes.

17               Why don't you just play there.

18   (Playing video.)

19               MS. CIESLAK:  Mr. Cooper, for the

20       record, can you identify where you're

21       hitting play from?

22               MR. COOPER:  Yes.  We are started

23       about 11:50 and, I don't know, 10

24       seconds, approximately.

25               MS. CIESLAK:   Thank you.

1      Q.   Your testimony is that you don't

2  see her swaying at all?

3      A.   I don't see the swaying.  I see

4  her standing.

5      Q.   Okay.  Let's go back.  Let's give

6  you a second shot.

7           MR. COOPER:  Go back a little

8      more.

9  (Playing video.)

10          MR. COOPER:  Stop.  Now hit play.

11  (Playing video.)

12          MR. COOPER:  Okay.  Stop.

13  BY MR. COOPER:

14      Q.   Is it your testimony that Ms. Hall

15  was not swaying?

16      A.   Yeah, she looks like she's

17  standing, just waiting for me to come out.

18      Q.   I just want to understand what

19  you --

20      A.   Yes.

21      Q.   -- think you're seeing.

22           When you walked out, what did you

23  do with your right hand?

24      A.   Touched her shoulder.  I was

25  walking out the door, I touched her shoulder,

1       Q.    Okay.  Now you have your hand on

2   her back again, right?

3       A.    Yeah, we're going down the stairs.

4   I hope.

5       Q.    Now you're standing at the top of

6   the stairs at 11:51 and 40 seconds, correct?

7       A.    Yes.

8       Q.    Now, the two of you are talking,

9   right?

10      A.    Yes.

11      Q.    And you're not shaking your head

12   no, are you?  Are you?

13      A.    It's a long way away.  It does not

14   look like I am.

15   (Playing video.)

16      Q.    Are you leaning against the top

17   railing?

18      A.    I think we both are, yes.

19   (Playing video.)

20      Q.    Would you agree that Ms. Hall has

21   her head hung down?

22      A.    At that moment, yes.

23          MR. COOPER:  Okay.  Go back.  Go

24      back.  Sorry.  Just a few seconds.

25              A little more.

```
 1                    Stop.   Now hit play.
 2                    MS. DUNN:   11:55:42.
 3    BY MR. COOPER:
 4         Q.   See right there.   Ms. Hall has her
 5    head hung down, and what do you do?   You put
 6    your hand on her, right?
 7                    MR. SHAFRAN:   Objection.
 8    BY MR. COOPER:
 9         Q.   You placed your right hand on her
10    left shoulder, correct?
11         A.   It appears as though I did, yes.
12         Q.   She was sad, wasn't she?
13         A.   She was sad?
14         Q.   Are you saying she wasn't?   She
15    wasn't crying?
16         A.   She was not crying there.   My
17    recollection --
18         Q.   Was she crying at any point in
19    time?
20         A.   -- and I was -- no.   I do not
21    remember her crying.
22         Q.   Why did you put your hand on her
23    shoulder?
24                    MR. SHAFRAN:   Objection.
25    BY MR. COOPER:
```

```
 1          Q.    Now we're at 11:58 and 50 seconds.

 2          A.    And coming back.

 3          Q.    And coming back.  Okay.

 4                Do you see Ms. Hall swaying and

 5     staggering?

 6          A.    I do -- well, here it looks like

 7     she, again, has a gait issue, but my back was

 8     to her.

 9          Q.    Let's go back.

10                So as you sit here today, you have

11     no trouble seeing that she has a gait issue

12     in her walking, correct?

13          A.    What is she, 6-foot-2 in heels?

14     Yeah.  Okay.  I've seen her have that problem

15     during regular meetings.  But yes.

16          Q.    As you sit here --

17                MR. COOPER:  Stop.  Stop.  I want

18          to get the exact time frame that we're

19          showing Mr. Chiocca.

20                11:58 and 53 seconds p.m.

21                MR. COOPER:  Hit play, please, and

22          I'll tell you when to stop.

23     (Playing video.)

24                MR. COOPER:  Stop.

25                Through 11:59 and 13 seconds p.m.
```

1   BY MR. COOPER:

2        Q.    We've just looked at that footage,

3   correct?

4        A.    Yes.

5        Q.    And did you see -- what did you

6   observe?

7        A.    On that video, she, again -- she

8   walked across and appeared to have a bit of a

9   gait issue.

10       Q.    In multiple steps, correct?

11             At one point, it looks like she's

12   going over, right?

13       A.    I didn't think so.

14       Q.    All right.  Is it your testimony

15   under oath that you never observed Ms. Hall

16   walking like we just saw her walking on the

17   evening of May 1st and early morning hours of

18   May 2nd?  Yes or no?

19       A.    Yes.

20       Q.    You never saw her walk that way?

21       A.    I did not.  On that evening I did

22   not notice a gait issue.

23       Q.    But you have no trouble noticing

24   it today; is that fair?

25       A.    That's fair.

1   COMMONWEALTH OF MASSACHUSETTS

2   BARNSTABLE, SS.

3

4        I, Sandra A. Deschaine, Registered
    Professional Reporter and Notary Public
5   within and for the Commonwealth of
    Massachusetts at large, do hereby certify
6   that the deposition of Allan R. Chiocca, Day
    2, in the matter of Allan Chiocca vs. Town of
7   Rockland, et al., at the offices Burns &
    Levinson, 125 High Street, Boston,
8   Massachusetts, on July 13, 2021, taken and
    transcribed by me; that the witness provided
9   satisfactory evidence of identification as
    prescribed by Executive Order 455 (03-13)
10  issued by the Governor of the Commonwealth of
    Massachusetts; that the transcript produced
11  by me is a true record of the proceedings to
    the best of my ability; that I am neither
12  counsel for, related to, nor employed by any
    of the parties to the action in which this
13  deposition was taken, and further that I am
    not a relative or employee of any attorney or
14  counsel employed by the parties thereto, nor
    financially or otherwise interested in the
15  outcome of the action, on this 19th day of
    July 2021.

16

17

18

19

20  _____

21       Sandra A. Deschaine

        Registered Professional Reporter
22

23

24

    My Commission Expires:
25  July 5, 2024