N

# In the Matter of:

*Allan Chiocca vs*

*Town of Rockland, et al.*

*John Clifford, Esq.*

*September 15, 2021*

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Page 3

```
 1       UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MASSACHUSETTS
 2
       CIVIL ACTION NO. 1:19-cv-10482-WGY
 3
   -------------------------------x
 4
   ALLAN CHIOCCA,
 5
           Plaintiff,
 6
      v.
 7
   TOWN OF ROCKLAND, DIERDRE HALL,
 8 EDWARD KIMBALL, LARRY RYAN,
   MICHAEL MULLEN, JR., MICHAEL
 9 O'LOUGHLIN, RICHARD PENNEY and
   KARA NYMAN,
10
           Defendants.
11
   -------------------------------x
12
13
14
           DEPOSITION OF JOHN CLIFFORD, ESQUIRE
15
             Conducted Remotely
16
             31 Schoosett Street
17
                Unit 405
18
            Pembroke, Massachusetts
19
             September 15, 2021
20
             9:09 a.m. to 1:18 p.m.
21
22
23
24 Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER
```

Page 2

```
 1      A P P E A R A N C E S
 2
 3  Jonathon D. Friedmann, Esquire
 4  Adam J. Shafran, Esquire
 5  RUDOLPH FRIEDMANN LLP
 6  92 State Street
 7  Boston, Massachusetts  02109
 8  617.723.7700
 9  jfriedmann@rflawyers.com
10  ashafran@rflawyers.com
11  (Present via videoconference.)
12     -and-
13  Samantha C. Halem, Esquire
14  MARSHALL HALEM LLC
15  27 Mica Lane
16  Suite 102
17  Wellesley, Massachusetts  02481
18  781.235.4855
19  shalem@marshallhalem.com
20  (Present via videoconference.)
21  COUNSEL FOR PLAINTIFF
22
23
24
```

Page 3

```
 1      A P P E A R A N C E S
 2        (continued)
 3
 4  Jason W. Crotty, Esquire
 5  PIERCE, DAVIS & PERRITANO, LLP
 6  10 Post Office Square, Suite 1100N
 7  Boston, MA  02109
 8  617.350.0950
 9  jcrotty@piercedavis.com
10  (Present via videoconference.)
11  COUNSEL FOR DEFENDANTS TOWN OF ROCKLAND,
12  LARRY RYAN, MICHAEL MULLEN, JR., MICHAEL
13  O'LOUGHLIN, RICHARD PENNEY AND KARA NYMAN
14
15  Ellen J. Zucker, Esquire
16  BURNS & LEVINSON, LLP
17  125 High Street
18  Boston, Massachusetts  02110
19  617.345.3000
20  ezucker@burnslev.com
21  (Present via videoconference.)
22  COUNSEL FOR COUNTERCLAIM PLAINTIFF
23  DEIRDRE HALL
24
```

Page 4

```
 1      A P P E A R A N C E S
 2        (continued)
 3
 4  Cindy Cieslak, Esquire
 5  ROSE KALLOR, LLP
 6  750 Main Street, Suite 1108-3
 7  Hartford, Connecticut  06103
 8  860.361.7999
 9  ccieslak@rosekallor.com
10  (Present via videoconference.)
11  COUNSEL FOR DEFENDANT DEIRDRE HALL
12
13  Howard M. Cooper, Esquire
14  Tara D. Dunn, Esquire
15  TODD & WELD LLP
16  One Federal Street, 27th Floor
17  Boston, Massachusetts  02110
18  617.720.2626
19  hcooper@toddweld.com
20  tdunn@toddweld.com
21  (Present via videoconference.)
22  COUNSEL FOR DEFENDANT EDWARD KIMBALL
23
24
```

Case 1:19-cv-10482-WGY   Document 161-14   Filed 11/15/21   Page 4 of 18

Allan Chiocca vs
Town of Rockland, et al.
John Clifford, Esq.
September 15, 2021

Page 5

1        A P P E A R A N C E S
2              (continued)
3
4    Jaime L. Kenny, Esquire
5    CLIFFORD & KENNY, LLP
6    31 Schoosett Street
7    Unit 405
8    Pembroke, Massachusetts  02359
9    781.924.5796
10   jaime@cliffordkennylaw.com
11       (Present via videoconference.)
12       COUNSEL FOR THE DEPONENT
13
14 Also Present:
15   Allan Chiocca
16       (Present via videoconference.)
17   Deirdre Hall
18       (Present via videoconference.)
19   Edward Kimball
20       (Present via videoconference.)
21
22
23
24

Page 6

1            I N D E X
2
3 DEPONENT:  JOHN CLIFFORD, ESQUIRE
4      (Present via videoconference.)
5
6 EXAMINATION                         PAGE
7 (BY ATTORNEY COOPER)               9,142
8 (BY ATTORNEY CROTTY)                  84
9 (BY ATTORNEY FRIEDMANN)               91
10
11          E X H I B I T S
12 NO.                                 PAGE
13 Exhibit 1  E-mail Chain, Thursday, July 12, 2018
14     at 10:15:47 AM Eastern Daylight Time,
15     AC00513 to AC00515             74
16 Exhibit 2  Investigation of Complaints Against
17     Deirdre Hall and Allan Chiocca, Findings
18     of Fact, Conclusions and Recommendations,
19     July 2, 2018 (29 pages)        79
20
21     (Original exhibits marked electronically
22      and retained with the transcript.)
23
24

Page 7

1          P R O C E E D I N G S
2
3        MADAM COURT REPORTER:  This is Laurie
4 Berg.  I am a Registered Professional Reporter and a
5 Certified Realtime Reporter with the National Court
6 Reporters Association, a Certified eDepoze Reporter,
7 as well as a Certified Court Reporter with the State
8 of New Hampshire.  I am a Notary Public in the State
9 of New Hampshire and the Commonwealth of
10 Massachusetts.
11        The attorneys participating in this
12 proceeding acknowledge that I am not physically
13 present in the proceeding room, nor am I physically
14 present with the witness, and that I will be reporting
15 this proceeding remotely via videoconference.
16        They further acknowledge that, in lieu of an
17 oath administered in person, the witness will verbally
18 declare his testimony in this matter under the penalty
19 of perjury.
20        The parties and their counsel consent to this
21 arrangement and waive any objections to this manner of
22 reporting the proceeding.
23        Will the attorneys now please indicate your
24 agreement by stating your name and your agreement on

Page 8

1 the record, after which I will swear in the witness
2 and we may begin.
3        MR. COOPER:  Morning.  Howard Cooper, we
4 agree on behalf of Edward Kimball.
5        MS. ZUCKER:  Ellen Zucker, agree on
6 behalf of Deirdre Hall, as Counterclaim Plaintiff.
7        MS. CIESLAK:  Cindy Cieslak, agree on
8 behalf of Deirdre Hall, as Defendant.
9        MR. CROTTY:  Jason Crotty, I agree on
10 behalf of the town defendants.
11        MR. FRIEDMANN:  Jonathon Friedmann, I
12 agree on behalf of Allan Chiocca.
13        MR. COOPER:  Counsel have stipulated that
14 all objections, except as to form, will be reserved to
15 the time of trial; motions to strike will, likewise,
16 be reserved to the time of trial.  The witness will
17 have an opportunity to read and sign his deposition
18 within 30 days of its completion and fill out an
19 errata sheet.  To the extent that a notary may be
20 required, that requirement is waived.
21        Does everybody agree to that --
22        MR. FRIEDMANN:  Agreed.
23        MR. COOPER:  -- including the witness?
24        MS. ZUCKER:  Agreed.

Page 29

1  guys.
2      You know, to the degree that they were going
3  back and forth with Allan, I didn't think it was
4  anything serious, although Allan did seem to take a
5  particular interest in one of them.
6     Q.  Did he say anything about it?
7     A.  Yeah, I think he was somewhat obsessed with
8  her.  You know, he was getting a real rise out of the
9  fact that she was really chatting him up.
10    Q.  And did you -- do you recall anything he said
11 to you in particular about her?
12    A.  Nothing in particular, no.
13    Q.  Now, at this point in April of 2018, you had
14 been friends with Mr. Chiocca for over a decade; is
15 that fair?
16    A.  That's correct.
17    Q.  And you had had an opp -- opportunity to
18 observe him and listen to him talk about women; is
19 that fair?
20    A.  Yes.
21    Q.  Did you regard Mr. Chiocca as a misogynist?
22        MR. FRIEDMANN:  Objection.
23    A.  At -- at times, yes, I felt that he could be
24 somewhat misogynistic.  There's no question.

Page 30

1     Q.  Mr. Clifford, you and I have met before,
2  haven't we?
3     A.  Yes.
4     Q.  We -- we met in your office a few weeks ago,
5  right?
6     A.  Mm-hmm.  Yes.
7     Q.  And I asked you the same questions that I'm
8  asking you right now, right?
9     A.  I -- I think the term "misogynistic" is
10 probably not as -- as clearly defined in my mind.
11    Q.  Okay.  But --
12    A.  I considered Allan's attitude towards
13 women -- Allan had a very, I'll call it, inflated
14 sense of self of how women perceived him and how women
15 would be attracted to him.  And I think that's how he
16 carried himself, that, to a degree, women of almost
17 any age were somewhat -- you know, that he was
18 irresistible to them, which -- I didn't see particular
19 incidents of him treating women disrespectfully, but
20 he definitely had a -- an attitude that he was, again,
21 somewhat irresistible to women.
22        So I think the term "misogynistic" is a
23 little bit -- may be too broadly defined, but that's
24 how I would categorize his behavior.

Page 31

1     Q.  Okay.  That is a word that you used --
2     A.  Correct.
3     Q.  -- when we met; is that right?
4     A.  I don't recall specifically.
5     Q.  Did you hear him make suggestive comments in
6  your presence about young women?
7     A.  I would say, particularly at the Masters,
8  what comes to mind is that, you know, the conversation
9  between him and one -- one of the young women got
10 pretty suggestive, pretty sexual.
11    Q.  What do you recall him saying?
12    A.  I -- I don't recall specifics.
13    Q.  Okay.  Did Mr. Chiocca tell you, during the
14 course of your decade-plus-long friendship, about his
15 conquests with other women?
16        MR. FRIEDMANN:  Objection.
17    A.  I don't recall him saying anything about
18 having extramarital affairs or anything along those
19 lines, so.
20        He always liked telling a story about how he
21 was at his daughter's college and he stayed overnight.
22 And, you know, a bunch of these young girls, they all
23 ended up crashing in the same room, and he got a big
24 kick out of the fact and bragged about the fact that

Page 32

1  all these young women were sleeping in the same room
2  as he was.
3     Q.  Are you aware of Mr. Chiocca's alter ego
4  of -- based on Bluto Blutarsky?
5     A.  Yes.
6     Q.  When did you first learn about that?
7     A.  The first time I was invited to his house, he
8  had apparently named the bar down in his basement as
9  -- as Bluto's Bar, named after the character Bluto
10 Blutarsky from Animal House.  And he actually had a --
11 you know, a little -- a habit or a practice of -- he
12 had these T-shirts made up with a picture of John
13 Belushi that he would give to women who came to his
14 house.
15    Q.  That he would give to who?
16    A.  To women that came to the house.
17    Q.  And what was your understanding of why he was
18 doing that?
19    A.  I think it was just, you know, part of what
20 he considered his persona.  Just -- I mean, I didn't
21 think there was anything overtly sexual or anything
22 along those lines to -- to that.
23    Q.  Did he ever explain to you why he had
24 admiration for Bluto Blutarsky?

Page 33

1    MR. FRIEDMANN: Objection.
2    A. No.
3    Q. Did you think it was unusual?
4    A. You know, I'd say it was somewhat consistent
5  with his -- you know, his overall -- the character he
6  liked to portray to keep as, you know, being a party
7  guy, kind of being the big shot, et cetera.
8    Q. So, on your -- based on your observations,
9  you observed him to be someone who thought he was a
10 big shot; is that right?
11   A. Yeah. Yes.
12   Q. Have you ever seen mist -- or strike that.
13 Withdrawn.
14        In that regard, did Mr. Chiocca, to your
15 observation, ever suggest to you that he was the
16 puppet master of the board in Rockland?
17   A. I don't think he ever expressed it in those
18 term -- in those terms. But I think he -- he felt
19 like he could certainly heavily influence some members
20 of the board.
21   Q. All right. Let me take the words, "puppet
22 master."
23        Did Mr. Chiocca express to you that he felt
24 that he could influence certain members of the board

Page 34

1  while he was town administrator?
2         MR. FRIEDMANN: Objection.
3    A. Yes.
4    Q. And which members of the board did you
5  understand he was referring to?
6    A. At that time, I think he felt like he had a
7  lot of influence over Michael Mullen, who was on the
8  board, Larry Ryan and Mike O'Loughlin. He had
9  expressed a -- a number of times he had expressed
10 concerns about Deirdre Hall and disagreements with
11 her. And -- and I don't think he ever thought that he
12 had that much control or influence over Mr. Kimball.
13   Q. What would he say about the members of the
14 board of selectpersons that he believed he had
15 influence over?
16        MR. FRIEDMANN: Objection.
17   A. He would say things to the effect that he
18 really believed that, you know, he could push through
19 whatever he considered important to him. And I think,
20 at that time, that was probably one of the bigger
21 problems; that it became much more about Allan's
22 agenda than the board's agenda.
23   Q. Did you ever observe anyone push Allan
24 Chiocca around?

Page 35

1    A. No.
2    Q. Is he the type of person, to your
3  observation, that anyone can push around?
4    A. No.
5    Q. Now, you mentioned that he expressed some
6  level of hostility towards Deirdre Hall.
7         Could you explain what you were referring to,
8  please?
9         MR. FRIEDMANN: Objection.
10   A. Ms. Hall had only recently come on the board.
11 And I think she had certainly -- and I think the term
12 is -- is misused in a lot of cases; she had an agenda
13 coming in, I think. And that's what -- elected
14 officials should have an agenda. They should have
15 things that they're seeking to accomplish.
16        But she came in and she was pretty
17 strong-willed. And she had worked in government
18 before, but she had things she wanted to see done.
19 And she also had concerns that people had expressed to
20 her that they had possibly -- possibly had been
21 mistreated by Mr. Chiocca. So she came in with some
22 pretty clear objectives and some things that she
23 wanted to accomplish. And Allan was at odds with her
24 almost right from the beginning.

Page 36

1    Q. So let's talk about prior to May 1, 2018.
2         Based upon your interactions with Ms. Hall,
3  you understood her to have very real concerns about
4  Mr. Chiocca; is that right?
5         MR. FRIEDMANN: Objection.
6    A. That's correct.
7    Q. And based upon your observations of
8  Mr. Chiocca, in your communications with him, he
9  didn't much care for Ms. Hall; is that fair?
10   A. That's correct.
11   Q. And the reason that he didn't much care for
12 Ms. Hall, as expressed to you, was that he didn't like
13 the fact that he couldn't manipulate her; is that --
14        MR. FRIEDMANN: Objection.
15        BY MR. COOPER:
16   Q. -- right?
17        MR. FRIEDMANN: Objection.
18   A. He didn't like the fact that he couldn't
19 control her, that she had her own ideas, that she had
20 some specific things that she wanted addressed, and --
21 and he disagreed with those.
22   Q. So I'd like to direct your attention to the
23 morning of May 1st, 2018.
24        As of that moment in time, could you have

Page 37

1 conceived, in your mind, any plausible basis for the
2 notion that Ms. Hall would voluntarily give
3 Mr. Chiocca a blow job?
4      MR. FRIEDMANN:  Objection.
5   A.  Not in any way, shape or form.
6   Q.  Now, I'd like to ask you about the status of
7 Mr. Chiocca's contract with the Town of Rockland as
8 town administrator as of May 1, 2018.
9      You understand I'm asking you that date and
10 prior.  Okay?
11   A.  Yes.  Yes.
12   Q.  Now, as of that date -- well, strike that.
13 Withdrawn.
14      Prior to that date, had you discussed with
15 Mr. Chiocca the matter of his contract?
16   A.  Yes.
17   Q.  And based upon your discussions, did you have
18 an understanding that Mr. Chiocca believed his
19 contract was a done deal?
20      MR. FRIEDMANN:  Objection.
21   A.  He -- he certainly believed it was a done
22 deal.
23   Q.  And he expressed that to you, correct?
24   A.  Correct.

Page 38

1   Q.  So, as of May 1, 2018, he had expressed no
2 concerns whatsoever about the renewal of his contract
3 to you, correct?
4   A.  He expressed no concerns that the board
5 wouldn't renew it.
6   Q.  And, in fact, he believed the opposite, that
7 it was in the bag, so to speak; is that right?
8   A.  That's --
9      MR. FRIEDMANN:  Objection.
10   A.  -- correct.
11   Q.  I'm sorry.  I couldn't hear your answer.
12   A.  That is correct.
13   Q.  Now, how far in advance before the end of a
14 contract would the town and the town administrator
15 typically begin renewal or extension negotiations --
16      (Noise interruption.)
17      MADAM COURT REPORTER:  I'm sorry, could
18 you please repeat that?  I didn't hear the end of the
19 question.
20      MR. COOPER:  Sure.
21      BY MR. COOPER:
22   Q.  In your experience, Attorney Clifford, how
23 far prior to the termination of an existing contract
24 would the town and the town administrator typically

Page 39

1 begin renewal or extension negotiations?
2   A.  It was very common -- it is very common in
3 that business to start discussions before you went to
4 the last year of a contract.
5   Q.  And had discussions with Mr. Chiocca started
6 as of May 1?
7   A.  It's my understanding he had some informal
8 discussions with the chair.  But, at the same time all
9 this was going on in the spring of 2018, Mr. Chiocca
10 was openly expressing hesitance about whether he
11 wanted another contract, whether he wanted to stay
12 there.  But he certainly believed it was a done deal
13 that he was going to get one.
14   Q.  Did he tell you that he thought he might
15 retire?
16   A.  Several times.  He discussed retirement
17 almost constantly.
18   Q.  With you?
19   A.  Yes, sir.
20   Q.  Did he say why he wanted to retire?
21   A.  He indicated that his wife was going to
22 retire and he was -- actually, she did retire in June
23 of 2018.  But I think he -- you know, he was also
24 expressing some fatigue with the business, and he was

Page 40

1 just ready to retire.  He talked a lot about going to
2 Florida where his brother has a year-round home.  So
3 he -- he talked quite a bit about retiring.
4   Q.  And when was it that Mr. Chiocca's wife
5 retired, to your memory?
6   A.  June of 2018.
7   Q.  Right around the same time period?
8   A.  Yes, sir.
9   Q.  Did he mention to you that his wife was going
10 to be retiring?
11   A.  Yes.
12   Q.  Now, Attorney Clifford, I'm going to ask you
13 first, based on your memory, when it was and how it
14 was that you first learned about anything having to do
15 with an incident at town hall between Ms. Hall and
16 Mr. Chiocca on May 1st of 2018.
17   A.  On Friday, May 18th of 2018, I was scheduled
18 to be in Rockland at 11 o'clock for bargaining with
19 the highway union.  I was on my way there.  In fact, I
20 think I was just pulling up when I received a call
21 from Ed Kimball, who told me that there had been some
22 sort of incident between Mr. Chiocca and Ms. Hall.
23 I'm not sure if he said it was exactly on May 1st, but
24 he did tell me it was a couple of weeks prior.  And

Page 41

1  that's when I first learned of it.
2    Q.  And this is a phone conversation with
3  Mr. Kimball where you're sitting in your car at the
4  parking lot of town hall in Rockland; is that right?
5    A.  That's correct.
6    Q.  Did Mr. Kimball tell you where he was?
7    A.  No, he did not.
8    Q.  Do you recall how long of a conversation it
9  was?
10   A.  It was probably at least ten minutes.
11 Mr. Kimball mentioned the fact and he -- he used the
12 term, you know, it's common practice to get, you know,
13 a blow job for a contract and -- you know, but he --
14 he indicated that Ms. Hall wasn't exactly sure what
15 had happened that night.  The -- the details were
16 pretty sketchy.
17       But, from the beginning of the conversation,
18 you know, to me, you know, the next steps are -- are
19 really automatic.  It's -- there's no debate, and I
20 talked with him about those next steps.
21   Q.  Before we get to the next steps, let's stay
22 on the conversation for a minute with Mr. Kimball.
23       First, was this a complete surprise to you?
24   A.  It was a complete shock to me.

Page 42

1    Q.  And had Mr. Chiocca, your close, personal
2  friend, said anything to you about this incident?
3       MR. FRIEDMANN:  Objection.
4    A.  No, nothing at all.
5    Q.  Well, you were close personal friends as --
6  as of that moment, weren't you?
7    A.  Yes.
8    Q.  And had you interacted him -- with him in the
9  preceding 17 days of May?
10   A.  I recall specifically that I was there on
11 May 2nd, 2018.  We had to do a recount for a school
12 committee race.  I was in the office.  I spoke with
13 Allan.  He never mentioned it.  Ms. Hall actually came
14 in sometime later and spoke to us briefly.  Mike
15 brought a couple of young associates to observe the
16 recount.  So she spoke to us briefly, but there was no
17 conversation about it.
18   Q.  Were you aware, at the time, that Mr. Chiocca
19 was the person designated within town hall to whom
20 reports of sexual harassment were to be made?
21   A.  He would be one of two; the HR person and
22 Mr. Chiocca.
23   Q.  Now, again, focusing on the conversation you
24 had with Mr. Kimball; first, you had known Mr. Kimball

Page 43

1  for a number of years at this point as well, correct?
2    A.  That's correct.
3    Q.  And, at that time, for several years he had
4  been the chair of the board of selectpersons, correct?
5    A.  That's correct.
6    Q.  And so I take it you interacted with him
7  frequently; is that right?
8    A.  I did.  I did.
9    Q.  And what --
10   A.  Ed was a --
11   Q.  -- did you think of --
12   A.  Ed was a very --
13   Q.  I'm sorry.
14   A.  -- Ed was a very active chair.  He was -- he
15 worked very hard at it, so we did have a lot of
16 communication.
17   Q.  And are you saying active in a positive way?
18   A.  Absolutely.  Ed was one of the best selectmen
19 I had worked with; very thoughtful, very evenhanded,
20 had a pretty good way of dealing with board disputes.
21 He worked hard on other issues, like the Southfield
22 Redevelopment.  Ed was a good selectman.
23   Q.  And, to your observation, was Mr. Kimball
24 someone who tried to get consensus amongst people and

Page 44

1  resolve disputes?
2    A.  Yes.
3    Q.  Did you ever know him to lash out at people?
4    A.  No.  That was not really his style.
5    Q.  Did you -- it sounds like you thought very
6  highly of him; is that right?
7    A.  I did.
8    Q.  Now, when Mr. Kimball called you, and you
9  picked up on your cell phone and you began talking,
10 did he sound concerned to you?
11   A.  He -- he was very concerned.  The facts he
12 described were that, you know, something improper had
13 happened to Ms. Hall.  That's pretty much how he was
14 characterizing the whole thing.
15   Q.  And that's how you understood what he was
16 telling you?
17   A.  Yes.
18   Q.  Do you recall anything else about that
19 discussion -- that ten-minute discussion that you
20 haven't testified to thus far?
21   A.  I said to Ed, we need to speak to Allan about
22 it, and if there's anything to this, he's going to
23 have to be put on paid administrative leave and we're
24 going to have to do an investigation.  And we agreed

Page 45

1  that we would meet there at 12:30.
2      Q.  That very day?
3      A.  That very day.
4      Q.  Okay.  And have you now exhausted your memory
5  about the conversation you had by phone with
6  Mr. Kimball at around 11 o'clock in the morning on
7  May 18th, 2018?
8      A.  Yes.
9      Q.  Now, what did you do when you got out of your
10 car?
11     A.  I went in -- normally, I would meet with
12 Allan before we went into bargaining, and the
13 collective bargaining would normally take place in the
14 conference room next to Allan's office.  Spoke with
15 Allan.  The HR person came in at that time, Stacy
16 Callahan.  I believe the highway superintendent, Dave
17 Taylor, also came in.  Allan decided not to sit in on
18 the bargaining, which was not a big deal.
19         So Ms. Callahan, Mr. Taylor and I went in and
20 we bargained with the highway union for about an hour,
21 hour and a half.
22     Q.  And that would take us to approximately
23 12:30?
24     A.  That's correct.

Page 46

1      Q.  Now, we'll get to what happened next in a
2  moment.
3          But during that hour-and-a-half period, did
4  Mr. Chiocca pull you aside to tell you anything?
5      A.  No.
6      Q.  Did he pull you aside to say that something
7  terrible had happened to him at town hall on May 1st?
8      A.  No.
9      Q.  Did you understand that he knew you would be
10 meeting with him and Mr. Kimball at 12:30?
11     A.  No --
12     Q.  You didn't --
13     A.  -- I didn't.
14     Q.  -- know one way or the other?
15     A.  No.
16     Q.  Okay.  Did you subsequently learn that
17 Mr. Kimball had already talked to Mr. Chiocca briefly
18 the evening before?
19         MR. FRIEDMANN:  Objection.
20     A.  I only found -- I only found that out
21 sometime later.  Certainly, not in the immediate --
22 that day or the immediate days that followed.  I
23 didn't know that he had a conversation with him
24 already.

Page 47

1      Q.  Now, at or about 12:30, did you meet with
2  Mr. Chiocca?
3      A.  Mr. Kimball and I both met with Mr. Chiocca.
4      Q.  And where did that meeting take place?
5      A.  In his office, Allan Chiocca's office.
6      Q.  Do you recall whether you were all sat down
7  at the conference table or anyone was standing up?
8      A.  I believe Mr. Kimball and I were seated.
9  Mr. Chiocca had a stand-up mechanism on his desk.  He
10 freq -- frequently stood at his desk, as opposed to
11 sat at his desk.  I think he was standing.
12     Q.  Now, I take it this was a pretty serious
13 meeting in your mind; is that right?
14     A.  Very serious.
15     Q.  You went into a room knowing that a friend of
16 yours was essentially being accused of a potential
17 sexual assault; is that right?
18     A.  I don't know if it was characterized as a
19 sexual assault.  Again, I think Mr. Kimball was decide
20 -- was fairly vague in talking about what happened,
21 but I -- I don't think it was -- he was being accused
22 of assault at that point.
23     Q.  Well, let me -- let me remove those words;
24 that he was being accused of having done something

Page 48

1  improper sexually to Ms. Hall; is that fair?
2      A.  That's correct.
3      Q.  Were you concerned for your friend?
4      A.  Sure.
5      Q.  Were you concerned for the town?
6      A.  Very definitely.
7      Q.  So, I take it, you must have listened very
8  carefully to the conversation that took place in that
9  room?
10     A.  I did.
11     Q.  Okay.  Before I ask you about the substance
12 of the conversation, let me just ask, how long did the
13 conversation, the meeting, last?
14     A.  Twenty to 30 minutes.  It wasn't that long.
15     Q.  When you saw Mr. Chiocca, what did you
16 observe about the expression on his face?
17     A.  I would say he was very stressed, very
18 anxious.
19     Q.  Okay.  Now, at any point in that meeting, did
20 Mr. Chiocca claim to you and Mr. Kimball that he had
21 somehow been the victim of Ms. Hall?
22     A.  No, he did not.
23     Q.  Did he ever say to you that Ms. Hall had
24 threatened his contract?

Page 49

1  A. No, he did not.
2  Q. Did he ever say to you and Mr. Kimball
3  anything about Ms. Hall somehow sexually harassing
4  him?
5  A. No, he did not.
6  Q. Did he use any words that even remotely
7  suggested such a thing?
8  A. He made comments to the effect that -- that
9  she was very aggressive, sexually.
10  Q. And how did you understand those comments to
11  mean -- what did you understand those comments to
12  mean?
13  A. That -- that she was probably somewhat
14  assertive, sexually. But, I mean, I will tell you, I
15  did not really -- I wasn't making any -- drawing any
16  conclusions one way or the other. One of the things
17  I've learned, having done this for a long time, is,
18  you know, the only thing -- the only rational step to
19  take, at that point, is to do an investigation --
20  Q. We'll --
21  A. -- which is what happened.
22  Q. -- I -- I promise you we'll get to that,
23  Mr. Clifford.
24  A. Mm-hmm.

Page 50

1  Q. At some point, did Mr. Chiocca -- and I'm not
2  limiting it to this meeting -- brag to you that he had
3  finished?
4  A. He did.
5  Q. And what did you understand that to mean?
6  A. That he had completed the sexual act, that he
7  had ejaculated.
8  Q. While Ms. Hall was giving him a blow job?
9  A. That's correct.
10  Q. And he was actually bragging about that to
11  you; is that right?
12  A. In -- in the context of what we were talking
13  about, I -- I couldn't come up with any other
14  explanation why he would say that, except to brag.
15  Q. Did he suggest to you, in substance, that
16  Ms. Hall had wanted him?
17  A. Yes.
18  Q. And was that consistent with some of the
19  comments you had heard him make about young women in
20  the past?
21  A. I would say yes, it was.
22  Q. Okay. Now, let me also ask you; did you take
23  any notes at this meeting?
24  A. No, I did not.

Page 51

1  Q. Did you observe whether Mr. Chiocca made any
2  notes at the meeting?
3  A. I don't believe he did.
4  Q. Or Mr. Kimball?
5  A. I don't believe he did either.
6  Q. Okay. Now, tell us, as best you can from
7  your memory, who said what to whom during the meeting.
8  And let's just take it beginning to end.
9  A. I -- I believe I initiated the conversation
10  by saying that Ms. Hall had reported to Mr. Kimball
11  that there had been some sort of inappropriate sexual
12  conduct in town hall between her and Mr. Chiocca. And
13  -- and I didn't have to get that far and he admitted
14  that it had, in fact, taken -- it had, in fact, taken
15  place.
16      He immediately -- his biggest concern was
17  that his wife, his family, would find out. He just
18  wanted the whole thing to go away. That was really
19  his overarching concern. All -- that was really the
20  -- the brunt of his settle -- his sentiment during
21  this period; that he wanted this thing to go away,
22  that he was embarrassed by it, and he was afraid his
23  family was going to find out.
24  Q. And he actually said that?

Page 52

1  A. Yes, sir.
2  Q. And have you completed your answer as to what
3  you recall being said at the meeting?
4  A. He indicated that he wanted the whole thing
5  to go away. And I said that -- you know, and he -- he
6  -- I think he talked about continuing to work, and I
7  said that that wouldn't be an option, that he -- that
8  he would have to probably go on paid administrative
9  leave.
10      But to put him on paid administrative leave,
11  we would have to convene a board -- a meeting of the
12  board of selectmen. He said -- I think it was his
13  suggestion that if he took time off, if he took
14  vacation. But he really -- he didn't push back on the
15  idea of getting out of there, but it was agreed that
16  he would take vacation and that -- until we decided
17  whether or not we were going forward with the -- an
18  investigation.
19      But it was made clear that the process for
20  any kind of an allegation like this was; we were going
21  to have to do an investigation.
22  Q. Now, what, if anything, did Mr. Kimball say,
23  to your recollection?
24  A. I don't -- I don't recall that -- that he

Page 53

1  said much.
2  Q.  So he let you take the lead?
3  A.  Yes, sir.
4  Q.  Do you recall -- or -- strike that.
5      Have you now exhausted your memory of the
6  conversation?
7  A.  We finished the conversation.  He said he was
8  going to go home.  He was going to take vacation
9  leave.  And I -- and I said, you know, we were going
10 to consult with the board and we'd be in touch.
11 Q.  And have you now finished?
12 A.  Yes.
13 Q.  I'm sorry.  Have you now exhausted your
14 memory of the conversation?
15 A.  Yes.  I -- I think I mentioned before, he did
16 make comments that she had been -- that she was
17 sexually aggressive.  I think he threw that in a
18 couple of times, but that's pretty much the brunt of
19 it.
20 Q.  Now, from that meeting, at the time of its
21 conclusion, did you understand that Mr. Chiocca had
22 confessed to doing something inappropriate and,
23 essentially, was looking for a way out so that his
24 wife wouldn't find out?

Page 54

1      MR. FRIEDMANN:  Objection.
2  A.  Yes.  That was my understanding.
3  Q.  And is that a fair summary of the meeting?
4  A.  Yes.
5      MR. COOPER:  Madam Reporter, I know you
6  need to take a break.  Why don't we pause here for
7  five or ten minutes and give you your break.
8      MADAM COURT REPORTER:  Thank so much,
9  sir.  I really appreciate it.
10     (Off the record at 10:06 a.m.)
11     (Recess taken.)
12     (Back on the record at 10:31 a.m.)
13     BY MR. COOPER:
14 Q.  Good morning again, Mr. Clifford -- Attorney
15 Clifford.
16     Going back to the meeting that took place
17 between you and Mr. Kimball and Mr. Chiocca in
18 Mr. Chiocca's office at town hall, do you recollect
19 that, before the meeting broke, there was discussion
20 of a way to keep everything confidential and
21 nonpublic?
22 A.  I don't --
23 Q.  Let me see if --
24 A.  -- I don't --

Page 55

1  Q.  -- let me see if I can --
2  A.  -- I don't recall that discussion.
3  Q.  Do you recall a discussion coming up about a
4  nondisclosure agreement?
5  A.  Before the meeting with Mr. Chiocca, no.
6  Q.  No, no, during the meeting with Mr. Chiocca.
7  A.  I don't recall that specifically discussed,
8  no.
9  Q.  Okay.  Do you recall it coming up at some
10 point that there would be a nondisclosure agreement?
11 A.  There was a lot of discussions about that
12 between the various attorneys.
13 Q.  And, at one point, was Mr. Kimball tasked to
14 inquire of Ms. Hall and her husband whether they would
15 be agreeable to that?
16 A.  I don't recall, specifically, that being
17 discussed.  At that point, everyone was represented by
18 counsel, so I don't believe that to be the case.
19 Q.  Okay.  Now, I'm going to read from -- you a
20 brief excerpt of Mr. Chiocca's deposition testimony in
21 this case given on July 12th of 2021.
22     MR. COOPER:  Counsel, it is at Page 242,
23 and I'm going to begin at Line 4 and read through
24 Line 8.

Page 56

1      BY MR. COOPER:
2  Q.  And, Mr. Clifford, I will represent to you
3  that the lawyer doing the questioning at this point
4  was Deirdre Hall's lawyer, Ellen Zucker, and she was
5  asking Mr. Chiocca about the same meeting I've just
6  asked you about.
7      So the question is by Ms. Zucker.  Question:
8  The first time you spoke without -- with -- with John
9  Clifford, did you tell him that she -- referring to
10 Deirdre Hall -- had threatened your contract?  Yes or
11 no?
12     Mr. Chiocca's answer:  Yes.
13     Was Mr. Chiocca being truthful in that
14 answer?
15     MR. FRIEDMANN:  Objection.
16 A.  I don't -- I don't recall that being said at
17 the meeting.  And -- and if it was said, I wouldn't
18 have believed it.
19 Q.  Well, you have no memory of that being said,
20 correct?
21 A.  No, sir.  No, sir.
22 Q.  And can you think of any basis, based upon
23 your participation in the meeting, that Mr. Chiocca
24 would swear to that under oath?

Page 61

1  A. I believe he called me sometime later -- he
2 called me sometime later that afternoon.
3  Q. And did he call you on your cell phone?
4  A. Yes, sir.
5  Q. And where were you?
6  A. I -- I believe I was driving. I think I was
7 driving into Boston that day.
8  Q. And do you know where he was?
9  A. No idea.
10  Q. And what did he say to you and what did you
11 say to him?
12  A. He really reiterated that his biggest concern
13 was that his family not find out and try to find a way
14 to make this thing -- the whole thing go away. I
15 believe it was in that conversation where he
16 acknowledged that he had completed the sexual act,
17 which struck me as strange. But that was really the
18 gist of the conversation, that he really wanted to
19 find a way for the -- for the whole thing to -- to go
20 away.
21  Q. How long of a conversation was this?
22  A. It would've been 15 or 20 minutes.
23  Q. And I understand you were driving, so I take
24 it you didn't take notes?

Page 62

1  A. That's correct.
2  Q. Was it just the two of you participating in
3 this conversation?
4  A. Yes.
5  Q. Now, in this conversation, did Mr. Chiocca
6 claim to you that he was somehow the victim of
7 Ms. Hall?
8  A. No, he did not.
9  Q. Did he claim to you that she had threatened
10 his contract?
11  A. No, he did not.
12  Q. Did he suggest to you that his receipt of a
13 blow job from Ms. Hall was -- was somehow, in any way,
14 shape or form, involuntary on his part?
15  A. No, he did not.
16  Q. And in this conversation, did he, in fact,
17 say to you, that he had, quote, finished, closed
18 quote?
19  A. Yes.
20  Q. Why would he say such a thing to you --
21      MR. FRIEDMANN: Objection.
22      MR. COOPER: I've gotta finish my
23 question, Jon.
24      MR. FRIEDMANN: Sorry.

Page 63

1      BY MR. COOPER:
2  Q. What did you understand he was communicating
3 to you when he told you that he had finished?
4  A. I -- I couldn't put it in any other context.
5 In essence, despite the disastrous nature of the
6 whole -- whole thing, that he was bragging. Because
7 he had --
8  Q. That's how it got back --
9  A. -- he had, in fact, talked about that he said
10 he had told her that, you know, he needed Cialis to be
11 able to get it up and that he -- something to the
12 effect of, I'm not your guy. But, you know, putting
13 -- adding that comment that -- that he had actually
14 finished, I mean, it -- you know, it certainly -- it
15 came across to me as he was bragging about it.
16  Q. He was delighting in it; is that fair?
17      MR. FRIEDMANN: Objection.
18  A. I -- I don't know if I would characterize
19 delight as being any part of the conversation, but I
20 think he was somewhat proud of that aspect of it.
21  Q. All right. So he was bragging to you, his
22 friend, who happens to be another guy, right?
23  A. Yes.
24  Q. What was your reaction when he said that?

Page 64

1  A. I -- I didn't really want to hear it. I
2 don't know that I had any reaction -- any specific
3 reaction.
4  Q. And I'm sorry if you've told us this already,
5 but about what time of the day was this phone
6 conversation?
7  A. I would probably say it was close to three
8 o'clock or something along those lines.
9  Q. And have you now exhausted your memory about
10 your call at approximately three o'clock with
11 Mr. Chiocca?
12  A. Yes.
13  Q. When did you next communicate with
14 Mr. Chiocca?
15  A. That Saturday morning.
16  Q. Do you know whether, between the three
17 o'clock call on Friday and Saturday morning, he had
18 tried to reach out to you?
19  A. I don't recall that he did.
20  Q. Okay. What time Saturday morning did you
21 communicate with Mr. Chiocca?
22  A. It was probably late morning and maybe even
23 early afternoon. It was after I had golfed.
24  Q. Was this in person or was this by phone?

Page 69

1 investigation. But that would've taken a board vote
2 at some point anyway.
3  Q. Okay. Now, what, if any, further
4 communication did you have with Mr. Chiocca directly
5 after the Saturday late-morning call?
6  A. On May 23rd, Wednesday, I was at the golf
7 course and -- and by that time, Megan Bridges,
8 Ms. Hall's attorney, at that point -- Mr. Shafran and
9 I had had a number of conversations, exchanged a
10 number of e-mails. And, by that Wednesday afternoon,
11 May 23rd, we believed that we had a deal in principle
12 to settle the whole matter and --
13  Q. Now, Mr. Clifford, I'm sorry to interrupt
14 you.
15  A. Okay.
16  Q. I will come back to this, but I neglected to
17 ask you --
18  A. Mm-hmm.
19  Q. -- some follow-up questions on the late
20 Saturday morning, May 19th, 2018, call.
21    Based upon the discussion that you had with
22 Mr. Chiocca, in which you discussed his hiring a
23 lawyer, did you understand that, as of that point, he
24 had not yet talked to a lawyer?

Page 70

1  A. Yes.
2  Q. By the way, did he tell you where he had been
3 the night before?
4  A. No, he did not.
5  Q. So, in the -- so this would've been the third
6 conversation that you had with Mr. Chiocca about this
7 matter before he talked to a lawyer; is that right?
8  A. That's correct.
9  Q. In this conversation, that Saturday late
10 morning, did Mr. Chiocca tell you that he was the
11 victim of Ms. Hall?
12  A. No, he did not.
13  Q. Did he tell you that she had threatened his
14 contract?
15  A. No, he did not.
16  Q. Did he tell you that -- anything about
17 Ms. Hall giving him a blow job had somehow been
18 coerced or involuntary on his part?
19  A. No, he did not.
20  Q. Now -- thank you, and I'm sorry for the
21 interruption. Let's go back to May 23rd.
22    And you were starting to say that, as of that
23 date, you believed there was an agreement in principle
24 to resolve the matter; is that right?

Page 71

1  A. That's correct.
2  Q. And what was the -- or strike that.
3    That was a agreement that you had negotiated
4 with Mr. Shafran, correct?
5  A. There were -- at that point, Ms. Hall's
6 attorney had communicated that she really wanted the
7 whole thing to go away. Mr. Shafran had a number of
8 conversations that he wanted to have the whole thing
9 go away and that Mr. Chiocca would be willing to leave
10 as part of a package. There was a lot of discussion
11 back and forth about nondisclosure agreements,
12 et cetera, and my -- non-disparagement.
13    My position was that the town could not sign
14 anything about non-disparagement, nondisclosure, with
15 any of the parties involved. But if they wanted to
16 negotiate those kinds of agreements with themselves
17 and then come back to the town and basically get --
18 negotiate releases from the town, then we could do
19 that. And that -- that structure was laid out in
20 pretty clear details between myself, Ms. Bridges --
21 Attorney Bridges and Attorney Shafran.
22  Q. Do you recall Mr. Shafran informing you by
23 e-mail, in substance, that you had a deal?
24  A. Yes, sir.

Page 72

1  Q. And that deal was for Mr. Chiocca to leave
2 his employment, correct?
3  A. Yes.
4  Q. For him to be paid a number of weeks; I
5 believe into September of 2018, correct?
6  A. That's correct.
7  Q. And for him to be able to work with
8 Mr. Kimball to fashion a public statement as to why he
9 was leaving, correct?
10  A. There was some back-and-forth on that.
11 Mr. -- I think Attorney Shafran had originally
12 requested, on behalf of Mr. Chiocca, that he'd be
13 allowed to come to a selectmen's meeting and do kind
14 of a farewell. I said that I did not think that that
15 was something that was going to be acceptable to the
16 board at that point.
17    At that point, you know, among the other
18 board members, not Ms. Hall, I think there was a lot
19 of frustration and anger with Mr. Chiocca. We hadn't
20 nailed down that part of it, but most of the details,
21 as of that Wednesday afternoon, were pretty much
22 finalized.
23  Q. Okay. And you believed you had a deal?
24  A. Yes, sir.

Page 73

1  Q. And, ultimately, the town engaged Regina
2  Ryan, correct?
3  A. We did, shortly after that. But just to keep
4  it chronologically, those --
5  Q. Well, I know I'm skipping ahead.
6  A. Yeah.
7  Q. I know I'm skipping ahead.
8  A. Okay.
9  Q. After May 23rd, at some point, the town
10 engaged Regina Ryan, correct?
11 A. Correct.
12 Q. And, again, so the record is clear, you never
13 sat for an interview with Ms. Ryan, correct?
14 A. That's correct.
15 Q. And she never asked to interview you,
16 correct?
17 A. That's correct.
18 Q. At some point, you received a draft report
19 entitled, "Investigation of Complaints Against Deirdre
20 Hall and Allan Chiocca - Findings of Fact, Conclusions
21 and Recommendations"; is that right?
22 A. Yes.
23 Q. And did that happen during or about the first
24 week of July of 2018?

Page 74

1  A. Yes.
2     MR. COOPER: I'm going to ask my
3  colleague, who is far more technically savvy than me,
4  Ms. Dunn, to bring up this document on the screen
5  share (indicating).
6     (Pause.)
7     MS. DUNN: (Complied.)
8     MR. COOPER: Has this been marked as an
9  exhibit already?
10    MS. DUNN: No, it has not.
11    MR. COOPER: Okay. So this is going to
12 be Attorney John Clifford Exhibit 1.
13    (Exhibit 1 marked for identification.)
14    MR. COOPER: Can everybody see that? I
15 know you can't see the whole thing, but is it, at
16 least, up on your screens?
17    THE DEPONENT: (Viewing exhibit.) I can
18 see that.
19    MR. COOPER: Okay. And could you just
20 scroll so he can see the whole thing?
21    MS. DUNN: (Complied.)
22    BY MR. COOPER:
23 Q. And, Mr. Clifford, take -- take a moment and
24 read it, and let me know when you're done, please.

Page 75

1  A. (Deponent viewing exhibit.)
2     MS. DUNN: This is July 12th, so you want
3  the July 6th, right?
4     MR. COOPER: I'm sorry, we have the wrong
5  one up. July -- I'm looking for one from July 6th,
6  2018.
7     MS. DUNN: All right. This one
8  (indicating).
9     BY MR. COOPER:
10 Q. Okay. So, if you could, read that e-mail and
11 let me know when you're done.
12    MR. COOPER: And, Tara, could you
13 collapse it a little bit? Because, at least on my
14 screen, it's partially blocked.
15    MS. DUNN: (Complied.)
16 A. (Deponent viewing exhibit.) I -- I finished
17 reading it.
18    MR. COOPER: Okay. As long as everyone
19 -- can everybody see it to their satisfaction?
20    (No response.)
21    MR. COOPER: Okay. Hearing no protest...
22    BY MR. COOPER:
23 Q. Now, by July 6th, 2018, at noon, you had
24 received a copy of Regina Ryan's draft report,

Page 76

1  correct?
2  A. Yes.
3  Q. And you sent it on that date, at 11:52 a.m.,
4  to Attorney Adam Shafran, correct?
5  A. Yes.
6  Q. And you accompanied it with an e-mail from
7  you, right?
8  A. Yes.
9  Q. And, among other things, you said that the
10 document, quote, is a confidential personnel record
11 and improper release or disclosure of that document
12 may result in an unwarranted invasion of privacy for
13 persons named in the document, closed quote.
14    Have I read that correctly?
15 A. (Deponent viewing exhibit.) Yes.
16 Q. And then, in the same paragraph, you go on to
17 say, quote, It -- referring to the report -- may not
18 be released or distributed without the permission of
19 the Rockland Board of Selectmen, closed quote.
20    Have I read that correctly?
21 A. (Deponent viewing exhibit.) It actually
22 says, "without the written permission of the Rockland
23 Board of Selectmen."
24 Q. I'm sorry if I misspoke. "Without the

Page 77

1 written permission of the Rockland Board of
2 Selectmen."
3     With that change, have I read it correctly?
4  A.  (Deponent viewing exhibit.)  That's correct.
5  Q.  And this was a -- was there any ambiguity in
6 the message you were delivering to Mr. Shafran --
7  A.  No.
8  Q.  -- at that time?
9  A.  No, there was not.
10  Q.  And -- and, at the time, Mr. Chiocca was
11 still employed in the Town of Rockland, correct?
12  A.  Yes.
13  Q.  And did you understand that Mr. Chiocca had
14 an obligation to follow the directions of the board of
15 selectpersons as communicated through town counsel at
16 that time?
17  A.  I believe he had an obligation to follow that
18 directive, yes.
19  Q.  And his failure to do so would be,
20 potentially, grounds for him to be disciplined or
21 fired, correct?
22  A.  Potentially, yes.
23  Q.  And this was a serious matter, the privacy of
24 this report, correct?

Page 78

1  A.  Yes.
2  Q.  And, in fact, there were legal issues
3 involved here about the confidentiality of personnel
4 records, correct?
5  A.  Yes.
6  Q.  Would you agree with me that there were also,
7 in your view, moral and personal issues involved here
8 about keeping sensitive personal information private?
9  A.  Yes.
10  Q.  In other words, there was decency involved
11 here as well, correct?
12  A.  Yes.
13  Q.  Now, you forwarded a hard copy of the report
14 --
15     MR. COOPER:  And, Ms. Dunn, if you can,
16 just bring that up and -- just the first page -- well,
17 bring the whole thing up, but put it on the first
18 page.
19     (Pause.)
20     MS. DUNN:  Oh, hold on.
21     MR. COOPER:  I think you need to --
22     MS. DUNN:  Sorry about that.  Stop
23 sharing.
24     MR. COOPER:  Yeah.  Sorry for the delay.

Page 79

1     MS. DUNN:  (Complied.)
2     MR. COOPER:  Here we go.
3     Can you go to the top of the page, just so we
4 can see it?
5     MS. DUNN:  (Complied.)
6     MR. COOPER:  So let's mark this as -- as
7 Exhibit 2, please.
8     And if I neglected to mark the prior
9 document, that should be Exhibit 1, okay, Madam
10 Reporter?
11     MADAM COURT REPORTER:  It's all set, sir.
12     MR. COOPER:  Okay.  Thank you.
13     (Exhibit 2 marked for identification.)
14     BY MR. COOPER:
15  Q.  And this is the front page of the document
16 that you forwarded to Mr. Shafran, right?
17  A.  (Deponent viewing exhibit.)  That's correct.
18  Q.  And I just want to note, the title of the
19 document is "Investigation of Complaints Against
20 Deirdre Hall and Allan Chiocca, Findings of Fact,
21 Conclusions and Recommendations."
22     Have I read that correctly?
23  A.  (Deponent viewing exhibit.)  That's correct.
24  Q.  And that's what Ms. Ryan was tasked to do, to

Page 80

1 investigate complaints against Deirdre Hall and Allan
2 Chiocca, right?
3  A.  That's correct.
4  Q.  She wasn't tasked to investigate Ed Kimball,
5 was she?
6  A.  No, she was not.
7  Q.  And Mr. Kimball was never told that he was
8 somehow the subject of an investigation, was he?
9  A.  I don't know if he was or he wasn't.
10  Q.  Well, you didn't tell him, right?
11  A.  No, I did not.
12  Q.  And you never told Ms. Ryan that she should
13 be investigating Ed Kimball, did you?
14  A.  No.
15  Q.  That was never approved by the board of
16 selectpersons, was it?
17  A.  Not explicitly, no.
18     MR. COOPER:  Now, could you scroll down
19 so we can see the logo and --
20     MS. DUNN:  (Complied.)
21     BY MR. COOPER:
22  Q.  I don't know whether you can see the whole
23 thing.  I'm just going to read it.
24     Did you place this logo on the report?

Page 81

1  A.  (Deponent viewing exhibit.)  Yes, I did.
2  Q.  And that logo --
3  A.  My staff -- my staff did, I should say.
4  Q.  Understood.  Your -- and that logo appears on
5  each and every page of the report, correct?
6  A.  Correct.
7  Q.  And, for the record, it reads, "Confidential
8  Personnel Record to Adam Shafran, Esq. representing
9  Allan Chiocca, not to be released or distributed
10  without the permission of the Rockland Board of
11  Selectmen."
12     Have I read that correctly?
13  A.  (Deponent viewing exhibit.)  Yes.
14  Q.  Was there anything ambiguous about what you
15  told Mr. Shafran?
16     MR. FRIEDMANN:  Objection.
17  A.  No.
18  Q.  And, in your view, had you made it crystal
19  clear to him, and through him to his client, that this
20  report was not to be released without the prior
21  written permission of the board of selectpersons in
22  Rockland?
23  A.  Yes.
24  Q.  Now, you are aware that Mr. Shafran and --

Page 82

1  authorized by Mr. Chiocca, in fact, released the
2  report to the media, correct?
3  A.  Yes.
4  Q.  Were you shocked by that?
5  A.  Yes.
6  Q.  Did you believe that it was in breach of the
7  warnings that you had provided to Mr. Shafran and,
8  through him, to Mr. Chiocca?
9     MR. FRIEDMANN:  Objection.
10  A.  Yes.
11  Q.  Did you think that it was an indecent thing
12  for them to do?
13     MR. FRIEDMANN:  Objection.
14  A.  Yes.
15  Q.  Did you believe it constituted an invasion of
16  privacy of, among others, Mr. Kimball, as you had
17  warned in your e-mail to Mr. Shafran of July 6th?
18     MR. FRIEDMANN:  Objection.
19  A.  I believed it could've been constituting
20  invasion of privacy for any of the people involved.
21  Q.  Including Mr. Kimball, correct?
22  A.  Yes.
23  Q.  Who was not the subject matter of Regina
24  Ryan's investigation, correct?

Page 83

1     I should say; who was not the subject of
2  Regina Ryan's investigation that had been authorized
3  by the town, correct?
4  A.  I want to be clear that Ms. Ryan was tasked
5  to investigate the incident.  And to the degree that
6  any person was involved in the incident, she would
7  normally investigate those persons as well, so.
8  Q.  That's not what I'm suggesting, sir.
9     This was not a investigation of complaints
10  against Ed Kimball, was it?
11  A.  Not -- not explicitly, no.
12     MR. COOPER:  Okay.  I have no further
13  questions.  Thank you.  I pass the witness.
14     Thank you, Mr. Clifford.
15     THE DEPONENT:  Thank you.
16     MR. CROTTY:  Can we take five and put us
17  in a breakout room before we --
18     MR. COOPER:  Sure.
19     MR. CROTTY:  -- before we go on?
20     MR. COOPER:  Sure.  And, Madam Reporter,
21  I timed this so that you could have your hourly break.
22     MADAM COURT REPORTER:  Thank you very
23  much.
24     (Off the record at 11:05 a.m.)

Page 84

1     (Recess taken.)
2     (Back on the record at 11:27 a.m.)
3
4     CROSS EXAMINATION
5     BY MR. CROTTY:
6  Q.  Attorney Clifford, it's Attorney Jason
7  Crotty.
8     How are you doing?
9  A.  Good, thank you.
10  Q.  I just have a -- a few questions for you.
11  I -- I promise I won't belabor it, and, pardon me in
12  advance, I'm going to jump around a little bit.
13     Let me ask you first, with respect to
14  Ms. Ryan -- Attorney Ryan's investigation, do you know
15  who provided the -- the list of individuals for her to
16  interview in the course of her investigation?
17  A.  I don't believe any such list was given to
18  her.
19  Q.  Do you know how she determined who to
20  interview or who not to interview?
21  A.  I -- I think she determines who, based on --
22  you know, she would speak to the complainant in a
23  normal situation.  This way, I -- would speak to the
24  complainant, speak to the employer, try to figure out

Page 137

1  I had ever heard it.  I have never heard that said
2  by --
3     Q.  Have you --
4     A.  -- Mr. Chiocca.
5     Q.  -- have you heard anybody make an allegation
6  that Mr. Chiocca has referred to Ms. Hall that way?
7     A.  I don't believe so.
8     Q.  If you had heard such a reference made by
9  Mr. Chiocca about Ms. Hall, would you have commenced
10 an investigation of it?
11    A.  I would've reported it to the board.
12    Q.  Okay.  With regard to the allegation that
13 Mr. Chiocca called Mr. Mullen "the girl," have you
14 ever heard that from Mr. Chiocca?
15    A.  No.
16    Q.  Have you ever heard it from any other source?
17    A.  Not until today, no.
18    Q.  Okay.  If you had, what steps would you have
19 taken, if any?
20    A.  I think I probably would've reported it to
21 the chair.
22    Q.  If you had been told that Mr. Chiocca was
23 undertaking sexual talk with other employees of the
24 city -- excuse me -- the Town of Rockland, what steps

Page 138

1  would you have undertaken?
2     A.  I definitely would've spoken to him about it,
3  and I may have also reported it to the chair as well.
4     Q.  Did such event ever occur?
5     A.  No.
6        MR. FRIEDMANN:  All right.  Why don't we
7  take a five-minute break and then I'll let you know if
8  I have any more questions.
9        MR. COOPER:  That's fine.
10       (Off the record at 12:33 p.m.)
11       (Recess taken.)
12       (Back on the record at 12:49 p.m.)
13       BY MR. FRIEDMANN:
14    Q.  Mr. Clifford, do you recall, on May 29, 2018,
15 the issuance of a notice of placement on paid
16 administrative leave?
17    A.  Yes.
18    Q.  That's with regard to Mr. Chiocca?
19    A.  Yes.
20    Q.  Let me read to you from that document.  It's
21 Bates-stamped AC00247.  The first paragraph, the last
22 sentence, "The alleged misconduct took place between
23 May 1, 2018 and May 2, 2018, however, the scope of
24 this investigation may include other conduct if

Page 139

1  discovered by the Town."
2        Do you recall that language in that -- that
3  notice?
4     A.  Yes.
5     Q.  Okay.  Were you the one that wrote this
6  notice?
7     A.  Yes.
8     Q.  And then you -- it was signed by Ed Kimball
9  as chairman of the board of selectmen for the Town of
10 Rockland, correct?
11    A.  Correct.
12    Q.  At any point in time, subsequent to
13 May 29, 2018, was there any other conduct discovered
14 by the town pursuant to which the scope of the
15 investigation was changed?
16       MR. CROTTY:  Objection.
17    A.  I'm not aware of any other conduct.
18    Q.  Okay.  Further down in the letter in the
19 fifth paragraph, the second sentence, "If further
20 disciplinary action up to and including termination is
21 found to be warranted according to the results of this
22 investigation, you will be notified as soon as
23 possible."
24       Do you recall that language?

Page 140

1        MS. ZUCKER:  Objection.
2     A.  I haven't looked at that document in some
3  time.
4     Q.  Okay.  Well, are you aware of whether any
5  time, subsequent to May 29, 2018, further disciplinary
6  action as a result of the investigation -- I'm sorry
7  -- let me start that over again.
8        Are you aware if a notice in writing of any
9  further disciplinary action against Mr. Chiocca was
10 issued by the town after May 29, 2018?
11    A.  I'm not aware of any.
12    Q.  Okay.  You are aware that, on
13 November 20, 2018, a further notice of placement on
14 paid administrative leave was issued by the town,
15 correct?
16    A.  I don't specifically recall that document.
17    Q.  Do -- do you recall that in -- on
18 November 20, 2018, there was a vote taken by the
19 selectmen to continue the administrative leave for
20 Mr. Chiocca to the -- until the end of his contract?
21    A.  I -- I don't recall a specific date.  I do
22 recall that vote, yes.
23    Q.  Okay.  But that was a vote that was taken
24 after the two new selectpeople -- persons were elected

Page 153

1  A.  Yes.
2  Q.  Okay.  And did she ask you any questions
3  about his attitudes towards women that you'd observed?
4  A.  No.
5       MR. COOPER:  I have nothing further.
6  Thank you again, Mr. -- Attorney Clifford.
7       THE DEPONENT:  Thank you.
8       MS. ZUCKER:  We have nothing further.
9       MR. SHAFRAN:  Let's hop in a breakout
10 room for just one second, Jon.
11      MR. FRIEDMANN:  Okay.  Jason, did you
12 have any further questions before we break?
13      MR. CROTTY:  I don't.
14      MR. FRIEDMANN:  Okay.
15      (Off the record at 1:06 p.m.)
16      (Recess taken.)
17      (Back on the record at 1:16 p.m.)
18      MS. ZUCKER:  I have no further questions
19 at this time.
20      MR. COOPER:  I have no further questions,
21 but I think I said that already.
22      MR. CROTTY:  Yeah, so I think we're done.
23      MS. ZUCKER:  Nor do we.  Thank you.
24      MR. COOPER:  Mr. Clifford and Jaime,

Page 154

1  thank you both.
2       THE DEPONENT:  Thank you.
3       MS. KENNY:  Thank you.
4       MADAM COURT REPORTER:  Please don't hang
5  up yet.  This is Laurie Berg, the court reporter.  I
6  need to do the orders and then I have a few spellings.
7       So I'm going to ask the attorneys to please
8  state what you'd like to order for your transcript,
9  meaning the form of the transcript, if the ten-day
10 turnaround time is okay and if you need anything
11 special like a rough.
12      And can we please start with Attorney Cooper?
13      MR. COOPER:  We would like the deposition
14 transcript, yes.  Is that the question?  I'm sorry.  I
15 wasn't paying attention.
16      (Laughter.)
17      MADAM COURT REPORTER:  I just want to
18 know how you wanted to receive it.
19      Does O'Brien & Levine already know how you
20 like your transcript?
21      MR. COOPER:  I think so.
22      MADAM COURT REPORTER:  That's fine.  Then
23 I will tell them you want your usual format.
24      MR. COOPER:  Okay.

Page 155

1       MADAM COURT REPORTER:  Okay.  So we'll go
2  next to Attorney Friedmann.
3       MR. COOPER:  By the way, I will be
4  responsible for forwarding it to you, Mr. Clifford,
5  for review.
6       THE DEPONENT:  Thank you.
7       MR. COOPER:  I'll send that through your
8  lawyer.
9       MS. HALEM:  It goes to me because I'm for
10 all of us.  Minuscript, electric, yes, we -- excuse
11 me, my brain's not working.  Yeah, we need a
12 transcript.  No rush, no nothing.  All fine.
13      MADAM COURT REPORTER:  Okay.  Attorney
14 Zucker?
15      MS. CIESLAK:  That will be me, and I -- I
16 just want a PDF copy, full size.
17      MADAM COURT REPORTER:  You've got it.
18      Okay.  And Attorney Crotty?
19      MR. CROTTY:  Yeah, I'll take a PDF as
20 well; full size.
21      (Deposition of JOHN CLIFFORD, ESQUIRE,
22 concluded at 1:18 p.m.)
23
24

Page 156

1  COMMONWEALTH OF MASSACHUSETTS
2  MIDDLESEX, SS.
3
4       I, Laurie J. Berg, Certified Court Reporter,
5  Registered Professional Reporter, Certified Realtime
6  Reporter, Certified LiveNote Reporter, Certified
7  eDepoze Reporter and Notary Public, in and for the
8  Commonwealth of Massachusetts, do hereby certify that
9  pursuant to appropriate notice of taking deposition,
10 there remotely appeared before me the following named
11 person, to wit:  JOHN CLIFFORD, ESQUIRE, who was by me
12 duly sworn; that he was thereupon examined upon his
13 oath and his examination reduced to writing by me; and
14 that the deposition is a true record of the testimony
15 given by the witness.
16      IN WITNESS WHEREOF, I have hereunto set my
17 hand and seal this 26th day of September, 2021.
18
19 My commission expires:
20 September 14, 2023
21
22              /s/ Laurie J. Berg
23      _____
24              Notary Public