## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**Allan Chiocca,**

        **Plaintiff**

        **v.**               **Civ. A. No.: 1:19–cv–10482–WGY**

**The Town of Rockland, Deirdre Hall,**
**Edward Kimball, Larry Ryan,**
**Michael Mullen Jr., Michael O'Loughlin,**
**Richard Penney, and Kara Nyman**

        **Defendants**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### PLAINTIFF ALLAN CHIOCCA'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE DEFENDANT THE TOWN OF ROCKLAND

### INTRODUCTION

In the spring of 2018, the Plaintiff Allan Chiocca ("Chiocca") was in his tenth year as Town Administrator for the Town of Rockland ("Town"). The Town is governed by an elected, five-member, volunteer Board of Selectmen ("Board"), which in the Spring of 2018 was comprised of the Chairman, Defendant Edward Kimball ("Kimball"), the Vice Chairman, Defendant Deirdre Hall ("Hall"), Defendant Larry Ryan ("Ryan"), Defendant Michael Mullen Jr. ("Mullen"), and Defendant Michael O'Loughlin ("O'Loughlin"). By the Board members' own admissions, Chiocca was a tremendously successful Town Administrator. That spring, Chiocca and the Board were engaged in discussions to extend his contract again. Although pen had not yet been formally put to paper, the Board was prepared to extend Chiocca's contract as requested. While these negotiations were ongoing, and unbeknownst to Chiocca, Kimball and Hall were engaged in an active romantic, physical affair.

On May 1, 2018, Kimball's wife found out and ordered him not to attend the Board's meeting scheduled for that evening. He did not and as a result Hall chaired the meeting. When Board meetings conclude, it was common for attendees to head over to local bar – the Rockland Bar and Grill ("RBG"). On that night, by happenstance, only Chiocca and Hall went. When they arrived, they ordered drinks and engaged in ordinary conversation. Shortly thereafter, Chiocca's life was changed forever. Hall received angry text messages from Kimball's wife, which caused Hall to become concerned about the impact that news of the affair would have on her then candidacy for State Representative. After taking a call outside with Kimball, Hall returned, and to Chiocca's shock, divulged her affair with Kimball to him. This revelation led to Hall talking more about her marriage, apparently feeling the need to tell Chiocca that she felt restricted in her marriage and did not want to be monogamous.

Knowing that Hall was his boss who would soon be voting on his contract, Chiocca stayed and listened. What began as commentary on her affair and views on marriage transformed into Hall's sexual pursuit of Chiocca. She began touching him and making sexually suggestive comments, which Chiocca attempted to respectfully rebuff by stating, "I'm not your guy." After about three hours at the RBG, Hall continued to plead with Chiocca for his company, making it clear to him that she did not want to return home to her husband. She asked if they could pass some additional time by driving around town. Knowing the request was coming from his boss, Chiocca obliged.

After driving for a bit, Chiocca eventually parked in the lot of another local pub. When he did, Hall continued her aggressive, sexual pursuit, describing to Chiocca the sexual conduct she wanted to engage in, while reminding him that she was his boss who would be voting on his contract extension. Chiocca continued his attempt to tell Hall that her demands were unwelcome,

again stating "I'm not your guy." Chiocca's concerns, however, about what actions she might take against his employment were front and center in his mind in light of her comments and his newfound knowledge that she was having an affair with Kimball, who would also be voting on his contract. Eventually in their conversation Hall told Chiocca that she needed to use the restroom but that she did not want to go into the bar where they were parked because she felt it was dirty. In what he thought would lead to the end of their evening, Chiocca offered to bring Hall to Rockland Town Hall so that she could use the facilities; and so they went.

They arrived, entered Town Hall, used the restrooms, and then left the building. As the two reached the top of the stairs that led to the parking lot, Hall, who was walking ahead of Chiocca, stopped, turned to face him, placed her body in front of his, and initiated further conversation. Again, Hall continued to aggressively pressure Chiocca to engage in sexual conduct, reiterating for the umpteenth time that evening that she was his supervisor who would be voting on his contract and raise. Ultimately, feeling pressure to oblige his supervisor and after making it clear to Hall that her advances were unwelcome, Chiocca capitulated and the two returned to his office in Town Hall and engaged in sexual conduct.

In the days that followed, Chiocca and Hall's behavior differed dramatically. Chiocca actively avoided Hall, while Hall repeatedly sought out Chiocca's presence. Eventually the Town became aware of the May 1, 2018 incident between Chiocca and Hall. From there, the Town placed Chiocca on so-called administrative leave in violation of his contractual rights, and a Town-commissioned independent investigation led by Attorney Regina Ryan ("Attorney Ryan") of Discrimination and Harassment Solutions, LLC ensued.

In no uncertain terms, the investigation fully exonerated Chiocca. Attorney Ryan's Report ("Ryan Report") determined, by a preponderance of the evidence, that Hall sexually

harassed Chiocca in violation of the Town's Discriminatory Harassment Policy and recommended that he be reinstated immediately from administrative leave. The Town, as detailed below, acknowledged and accepted the finding, but then brazenly retaliated against Chiocca by trumping up pretextual reasons to not renew his contract and keep him on administrative leave through the remainder of his contract term – a concept known as "organizational betrayal" that one of Chiocca's experts will explain at trial.

For now, Chiocca seeks summary judgment on two discreet claims for which he contends there are no material facts in dispute: 1) the Town has conceded that Chiocca was sexually harassed in violation of G.L. c. 151B, § 4(16A) for which it is strictly liable; and 2) the Town suspended Chiocca in violation of his employment contract.

## RELEVANT FACTS

Chiocca began his employment as Town Administrator for the Town of Rockland in March of 2008. Plaintiff's Statement of Undisputed Material Facts in Support of his Motion for Summary Judgment ("SOF") at ¶ 1. His most recent and operative contract with the Town was entered into on January 6, 2016 and was slated to run through June 30, 2019 ("2016 Contract"). *Id*. at ¶ 3. The Town understood that the 2016 Contract set forth the terms and conditions of Chiocca's employment and that it was not applicable to any other Town employee. *Id*. at ¶¶ 4-5.

The 2016 Contract contains a section governing the Town's right to suspend Chiocca. *Id*. at ¶ 6. It provides, "[e]mployer may suspended Employee for good cause, with pay and benefits, at any time during the term of this agreement, in accordance with Section 2.18(a) of the Rockland Town Charter (as amended by Chapter 58 of the Acts of 2005)". *Id*. Section 2.18(a) of the Town Charter sets forth a list of prerequisites the Town was required to follow if it desired to

suspend Chiocca.[1]  The Town understood that it had to follow these requirements if it wished to suspend Chiocca. *Id*. at ¶¶ 211-213.

The Town is governed by an elected and unpaid volunteer five-member Board of Selectmen. *Id*. at ¶ 8. In the spring of 2018, the Board was comprised of Kimball, Hall, Ryan, Mullen, and O'Loughlin. *Id*. at ¶ 16. As of May 1, 2018, Kimball was the Chairman of the Board and Hall was the Vice-Chairwoman. *Id*. at ¶¶ 17-18. Chiocca reported to the Board, and it oversaw all aspects of his employment, including but not limited to, hiring, firing contract negotiations, and performance evaluations. *Id*. at ¶¶ 21-23. As a member of the Board, Hall was one of Chiocca's supervisors. *Id*. at ¶ 24.

During the spring of 2018, the Board was actively reviewing Chiocca's request for a contract extension and raise – the first considered by Hall since her election to the Board in April 2017. *Id*. at ¶¶ 27-28. At this same time, Hall and Kimball were engaged in a physical and emotional affair. *Id*. at ¶ 30. On or around May 1, 2018, Kimball's wife discovered the affair. *Id*. at ¶ 32. As a result, Kimball did not attend the Board's May 1, 2018 meeting. *Id*. at ¶ 33. It was customary for Board meeting attendees to go out for food or drinks after their regular meeting, often at the Rockland Bar and Grill ("RBG"). *Id*. at ¶ 35. On the night of May 1, 2018, only Chiocca and Hall ended up going to the RBG. *Id*. at ¶ 36. After spending time at the RBG, Hall

---

[1] The Town Charter provides in relevant part: "The board of selectmen by affirmative vote of at least 4 members may suspend or remove the town administrator from office. If the board of selectmen affirmatively votes to suspend or remove the town's administrator, the board shall give at least 60 days' notice as to the effective date of his suspension or termination, or provide 60 days of severance pay, or a combination of both notice and severance pay equivalent to at least 60 days. At least 30 days before the proposed suspension or termination becomes effective the board of selectmen shall file a preliminary written resolution with the town clerk setting forth in detail the specific reason for the proposed suspension or termination. A copy of the resolution shall be delivered to the town administrator. The town administrator may within 10 days of service of the resolution, reply in writing to the resolution and may request a public hearing. If the town administrator so requests, the board of selectmen shall hold a public hearing not earlier than 20 days nor later than 30 days after the filing of the request. After the public hearing, if any, otherwise at the expiration of 30 days following the filing of the preliminary resolution, the selectmen may suspend or terminate the town administrator from duty." *Id*. at ¶ 7.

and Chiocca ended up and Rockland Town Hall where the two engaged in sexual conduct ("Incident"). *Id*. at ¶¶ 37-56.

On or about May 17 and 18, 2018, the Town learned of the Incident. *Id*. at ¶¶ 86-94. On May 29, 2018, the Board voted in executive session to retain Attorney Ryan to conduct an investigation into the Incident. *Id*. at ¶ 101. The Town understood that Attorney Ryan was tasked with investigating the following: "whether (1) Mr. Chiocca violated the town's sexual harassment policy by engaging in nonconsensual sexual activities with Ms. Hall during the May 1-2 incident and, if so, what discipline is recommended; and (2) whether Ms. Hall, as a supervisor of Mr. Chiocca, violated the town's sexual harassment policy by requesting sexual favors during the May 1-2 incident in exchange for actual or promised job benefits. *Id*. at ¶ 102.

At the same executive session, the Board also voted to place Chiocca on what it has referred to as "administrative leave." *Id*. at ¶ 104. Chiocca's placement on administrative leave was with pay and "effective immediately." *Id*. at ¶ 107-108. While on administrative leave, Chiocca was not permitted to perform any of his job responsibilities, was required to return all Town property in his possession and was not allowed on Town property. *Id*. at ¶¶ 109-111. When it placed Chiocca on administrative leave, the Town did not file a written resolution with the town clerk explaining its reasons for doing so. *Id*. at ¶ 106. As a result, Chiocca did not receive a copy of any resolution filed with the town clerk explaining the reasons for his placement on administrative leave. *Id*. Selectmen O'Loughlin believes there is "no real difference" between administrative leave and suspension. *Id*. at ¶ 113. Selectmen Ryan has no understanding of any difference between administrative leave and suspension. *Id*. at ¶ 112.

On July 2, 2018, Attorney Ryan completed her investigation and issued her investigative report. *Id*. at ¶ 147. In relevant part, the Ryan Report concluded:

> I find by a preponderance of the evidence that Ms. Hall was Mr. Chiocca's supervisor and she sought sexual relations in exchange for her vote on his contract extension and raise. As such, Ms. Hall sexually harassed Mr. Chiocca in violation of the Town's Sexual Harassment Policy on the night of the Incident.

*Id*. at ¶ 149.

Selectman O'Loughlin understands that the Ryan Report concluded that Chiocca was a victim of quid pro quo sexual harassment. *Id*. at ¶ 153. He publicly acknowledged that he would "support whatever the outcome [of the investigation] may be" and understood that Attorney Ryan concluded that Chiocca was "was threatened, his contract extensions, if he did not do everything that Ms. Hall asked him to do that night." *Id*. at ¶ 154. O'Loughlin testified that **he agrees with everything in the Ryan Report other than Attorney's Ryan's recommendation that Mr. Chiocca be returned to his job from administrative leave**. *Id*. at ¶ 155 (emphasis added). He believes Attorney Ryan was qualified to conduct the investigation and was not biased towards any party. *Id*. at ¶ 156. He voted in favor of retaining Attorney Ryan to conduct the investigation because he had no experience conducting investigations and felt it was important to retain someone who did. *Id*. at ¶ 157.

Selectman Ryan possesses no documents or information that would contradict the Ryan Report conclusion that Hall sexually harassed Chiocca in violation of the Town's Sexual Harassment policy. *Id*. at ¶ 158. Although Ryan has a hard time understanding that Chiocca was a victim of Hall's sexual harassment, **he does not dispute that conclusion**. *Id*. at ¶ 159 (emphasis added). Ryan also believes Attorney Ryan was qualified to conduct the investigation and was not biased towards any party. *Id*. at ¶ 160.

Selectman Mullen believes that the findings in the Ryan Report that Ms. Hall was the aggressor towards Chiocca speak for themselves and he intended to rely on that finding. *Id*. at ¶

161. **Mullen voted to accept the report in full because failure to do so "would be interfering with an outside investigation that we had engaged**." *Id*. at ¶ 162 (emphasis added). He also believes Attorney Ryan was qualified to conduct the investigation and was not biased towards any party. *Id*. at ¶ 163.

On July 10, 2018, the BOS held a Selectmen's meeting. *Id*. at ¶ 164. During the discussion which took place in executive session, Mullen stated, "I don't have any questions. I believe – I read the report, and **the information speaks for itself**, so – thank you." *Id*. at ¶ 172 (emphasis added). At the same executive session, Selectman Ryan stated:

> **The report does speak for itself**, but I would just to mention that, as you [Mr. Kimball] accused us all of covering up everything and then, quite frankly, the only person who covered anything up was you [Mr. Kimball], your affair with Ms. Hall, your – when you came to the meeting, your – when you heard that something happened.

*Id*. at ¶ 173 (emphasis added).

After Mullen and O'Loughlin's comments at the July 10, 2018 executive session, Attorney Clifford asked the Board if it "wish[ed] to vote to accept **the full investigative report** by Discrimination & Harassment Solutions?" Thereafter, **the Board voted to accept the report**. *Id*. at ¶ 175 (emphasis added). The Town testified that it does not possess any information to contradict the Ryan Report conclusion that Hall sexually harassed Chiocca in violation of the Town's Sexual Harassment policy. *Id*. at ¶ 151. The Board then voted to release to the public a summary portion of the Ryan Report's conclusions. *Id*. at ¶ 177. As a result, at the open session of the Board's July 10, 2018 meeting, which was in front of an audience in the Rockland High School auditorium and broadcast on live television, Attorney Ryan stated in relevant part:

> I substantiate Mr. Chiocca's allegation that on May 1st and 2nd, 2018, Ms. Hall used her position as a member of the Board of Selectmen, who was actively reviewing, and would soon be voting

8

on his request for contract extension and salary increase, to pressure him into engaging in sexual activities with her.

*Id*. at ¶ 179.

Following Attorney Ryan's announcement, Attorney Clifford stated, in relevant part,

"Mr. Chiocca was found not to have violated the Town's Discriminatory Harassment Policy . . .

." *Id*. at ¶ 181. Then Selectman Ryan stated, in relevant part, "Ms. Ryan read a report that sort of

exonerates Mr. Chiocca from the sexual activity aspect that he was the one who demanded it. . .

." *Id*. at ¶ 182. Selectmen Mullen then spoke and stated in relevant part,

> From the beginning of this whole process I've respected the independent investigation that this Board voted to launch at the end of May. I understood as I mentioned, the seriousness of it, and **I expected it to uncover the truth** in order for us to be able to address this situation in a fair, honest, and an appropriate manner. And I was shocked, frankly last month, when this investigation was referred to as a sham and its integrity called into question. I was just as appalled when members of this Board were accused of actually trying to cover up this issue. I mentioned a minute ago how seriously I've taken this whole situation, and these efforts to undermine the investigation were completely unacceptable, not only to me, but to all Rockland residents. **I believe with every conviction that I have** that this investigation was led by a professional and credible investigator, and that **we now have information we need to help address this situation and move Rockland move forward. I also believe that the investigation's findings speak for themselves and frankly those findings are disturbing**.

*Id*. at ¶ 183.

On July 17, 2018, the Board convened and held an executive session meeting. *Id*. at ¶ 199.

The executive session included the following exchange:

> Mr. Clifford: Mr. Chairman, as the board is aware, we received the investigation from Attorney Ryan, and Attorney Ryan's investigation and her report was specifically limited to whether or not there were violations of the town's discriminatory harassment policy, and it was determined as you're aware, that Mr. Chiocca had not violated that policy. There were, however, findings of fact that raised serious concerns as to other potential misconduct that may not have been a violation of that policy but may have been a

violation of other policies. In order for the board to take any action under Section 2.18 of the Charter, it requires a vote of four members. Mr. Chiocca has to receive 60 days' notice as to the effective date of suspension or termination. It requires 60 days severance in lieu of the notice period, at least 30 days prior to the effective date of the notice period of severance. You have to file a preliminary resolution with the town clerk and basically give Mr. Chiocca the opportunity for a hearing. He can ask within ten days of getting that notice for a hearing. Unfortunately, the terms of this particular situation, the entire process requires four votes from the Board of Selectmen. That language is not unusual. A lot of charters have that language requiring a super – majority of the Board of Selectmen because what is anticipated and what can happen is it becomes a political decision. A board changes three to two to different a way of thinking, and then it becomes an initiate to remove the town administrator. So the charter language is not unwise. It is not unusual. It is there for a reason. This entire situation where you would not have four members even available to vote is very unusual. So at this point, I'm recommending that the board take no action because legally there is no action that you can take at this time with regard to Mr. Chiocca's employment.

Mr. Ryan: You can't put him out in administrative leave without pay?

Mr. O'Loughlin: Or suspension?

Mr. Clifford: That is actually considered a suspension.[2] I should introduce Jason Crotty who was appointed by the town's insurer as insurance counsel, and I'm guessing that he would concur with my opinion, but that is considered punitive. You're taking disciplinary action without giving him the due process that's called for in the charter.

*Id*. at ¶ 200.

After the foregoing exchange, O'Loughlin stated:

In that investigation, it was determined that every act – **every action that he took that night was out of concern that he [sic] was threatening his contract**. So all of that got lumped in, so, in a sense, the report exonerated every action that he took that night.

---

[2] Attorney Clifford's assertion that putting Chiocca on "administrative leave" without pay would be considered a suspension is obviously wrong in light of the fact that the 2016 Contract expressly contemplates a suspension with pay. *Id.* at ¶ 6.

*Id*. at ¶ 201 (emphasis added).

Attorney Clifford then briefed the Board on the Ryan Report and stated that the "town potentially has serious exposure already" based on the fact that the Ryan Report concluded that Ms. Hall had violated the Town's sexual harassment policy in her interactions with Mr. Chiocca during the May 1, 2018 Incident. *Id*. at ¶ 202.

At the July 17, 2018 executive session, the Town took what it has described as "no action" against Mr. Chiocca's employment by keeping him on administrative leave. *Id*. at ¶ 203. Although the Town took the position that it took no action against Mr. Chiocca's employment on July 17, 2018, Mr. Chiocca was not permitted to exercise any function or authority as town administrator between May 29, 2018 and November 20, 2018. *Id*. at ¶ 204.

On November 20, 2018, the Board held a Selectmen's meeting. *Id*. at ¶ 208. During the open session, the Board voted to continue Mr. Chiocca on administrative leave through June 30, 2019, the end of the 2016 Contract term, and further voted not to extend Mr. Chiocca's employment contract with the Town. *Id*. at ¶ 209. The Town has acknowledged that it did not comply with any of the requirements in the Town Charter when it continued Chiocca on "administrative leave" at the November 20, 2018 Board meeting. *Id*. at ¶¶ 214-216.

## ARGUMENT

### A.  Legal Standard

"Summary judgment is appropriate when 'there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment as a matter of law.'" *Hayes v. Massachusetts Bay Transportation Authority*, 498 F.Supp.3d 224, 230 (D. Mass. 2020). "The moving party bears the initial burden of showing, at least, 'that there is an absence of evidence to support the nonmoving party's case.'" *Hayes*, 498 F.Supp.3d at 230-231 (quoting *Sands v.*

*Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,

325 (1986)). "If this is done, the burden shifts to the nonmoving party to show that a trier of fact

could reasonably find in her favor." *Id*. "An inquiring court is not obliged either 'to draw

unreasonable inferences or credit bald assertions [or] empty conclusions.'" *Hayes*, 498

F.Supp.3d at 231 (citing *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018)

(quoting *Caban Hernandez v. Phillips Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)). "The

mere existence of a scintilla of evidence in supporting of the [nonmoving party's] position will

be insufficient [to withstand summary judgment]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 252 (1986).

**B. Count One – The Town Has Admitted That Chiocca Was A Victim Of Quid Pro Quo Sexual Harassment In Violation Of G.L.c. 151B, § 4(16A) and § 4(1) For Which It Is Strictly Liable.**

Section 4(16A) of chapter 151B makes it unlawful for "an employer, personally or

through its agents, to sexually harass any employee." The statute defines the term "sexual

harassment," in relevant part, as follows:

> The term "sexual harassment" shall mean sexual advances,
> requests for sexual favors, and other verbal or physical conduct of
> a sexual nature when (a) submission to or rejection of such
> advances, requests or conduct is made either explicitly or
> implicitly a term or condition of employment or as a basis for
> employment decisions.

G.L. c. 151B, § 1.[3]

---

[3] Section 4(1) of chapter 151B makes it unlawful for "an employer, by himself or his agent, because of the . . . sex . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational classification." In turn, section one expressly provides that "discrimination on the basis of sex shall include, but not be limited to, sexual harassment." G.L. c. 151B, § 1. Sexual harassment, is, by definition, a form of sex discrimination. *See College-Town v. MCAD*, 400 Mass. 156 (1987) (construing chapter 151B's prohibition against discrimination based on sex to include prohibition of sexual harassment).

"Based on the legislative mandate that chapter 151B must be construed liberally to effectuate its purposes . . . the SJC has endorsed a rule that holds **employers strictly liable for supervisor harassment**." *Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005); citing *College-Town*, 400 Mass. at 165-167.

Here, while the alleged aggressor, Hall, may deny having sexually harassed Chiocca on the night in question, the Town, and its representatives have testified that they do not dispute Attorney Ryan's conclusion that Hall's conduct towards Chiocca constituted quid pro quo sexual harassment in violation of the Town's Discriminatory Harassment Policy.

As described above, the Town testified that it understood that Attorney Ryan was tasked with investigating, *inter alia*, "whether Ms. Hall, as a supervisor of Mr. Chiocca, violated the town's sexual harassment policy by requesting sexual favors during the incident in exchange for actual or promised job benefits." SOF at ¶ 102. The Town has acknowledged that it was aware of and understood that Attorney Ryan's investigation concluded as follows:

> I find by a preponderance of the evidence, that Ms. Hall was Mr. Chiocca's supervisor and she sought sexual relations in exchange for her vote on his contract extension and raise. As such, Ms. Hall sexually harassed Mr. Chiocca in violation of the town's sexual harassment policy on the night of the incident.

*Id*. at ¶ 152.[4]

On the July 10, 2018, the Board met in executive session to discuss the Ryan Report. *Id*. at ¶ 171. During that session, the Board voted to accept the Ryan Report in full without any qualifications. *Id*. at ¶ 175. During the same session, the Board voted to authorize Attorney Ryan

---

[4] Attorney Ryan's finding that Hall violated the Town's Discriminatory Harassment Policy by seeking sexual relations from Chiocca in exchange for her vote on his contract extension and raise is the definition of "sexual harassment" as that term is defined by G.L. c. 151, § 1 (i.e., a "request for sexual favors . . . when submission to or rejection of such . . . requests  . . . is made either explicitly or implicitly . . . a basis for employment decisions.").

to publicly announce her report's conclusions when the Board returned to open session. *Id*. at ¶

177. And when the Board returned to open session, Attorney Ryan announced:

> I substantiate Mr. Chiocca's allegation that on May 1st and 2nd,
> 2018, Ms. Hall used her position as a member of the Board of
> Selectmen, who was actively reviewing and would soon be voting
> on his request for contract extension and salary increase, to
> pressure him into engaging in sexual activities with her.

*Id*. at ¶ 179.[5]

Following Attorney Ryan's announcement, Selectmen Mullen gave a powerful speech to

the public. In no uncertain terms he stated, "I believe with every conviction that I have . . . that

we now have information we need to help address this situation and move Rockland forward[,

and] that the investigation's findings speak for themselves . . . ." *Id*. at ¶ 183.[6] Mullen testified

that it was important to him to make the aforementioned statement that he believed everything he

said when he said it and continues to believe it today. *Id*. at ¶ 184.

The following week the Board again met in executive session. *Id*. at ¶ 199. There,

Attorney Clifford briefed the Board on the Ryan Report and acknowledged that the "town

potentially has serious exposure already" based on the fact that the Ryan Report concluded that

Ms. Hall had violated the Town's sexual harassment policy in her interactions with Chiocca

during the May 1, 2018 Incident. *Id*. at ¶ 202.

---

[5] That the Town expressly authorized Attorney Ryan to announce publicly her conclusion that Hall violated the
Town's sexual harassment policy without providing the public with any qualification or statement indicating that the
Town disagreed with Attorney Ryan's conclusions speaks further to the Town's endorsement of her findings.

[6] Perhaps obvious because the phrase is so often used in common parlance, but when someone says something
"speaks for itself" it is a tacit acknowledgment that the speaker adopts the concept to such an extent that nothing
further need be said. *See U.S. v. Kelley*, 402 F.3d 39, 42 (1st Cir. 2005) (Court noting that it had "little to add to the
substantive analysis in the district court's opinion" because "the reasoning speaks for itself."). Indeed, the doctrine
of res ipsa loquitor literally translates to the "the thing speaks for itself." *Reilly v. Baker*, 63 Mass.App.Ct. 1122
(2005). It strains credulity to think that a person would ever describe something they disagree with as something that
"speaks for itself."

At deposition, the Town testified that it does not possess any information or facts to contradict Attorney Ryan's conclusion that Hall violated the Town's Discriminatory Harassment Policy in sexually harassing Chiocca. *Id*. at ¶ 151. Each of the three selectmen who had not recused themselves when the Town received the Ryan Report testified that they do not dispute the Ryan Report's finding that Chiocca was a victim of Hall's quid pro quo sexual harassment.

Mullen, the Selectmen who actually made the motion to accept the Ryan Report during the July 17, 2018 executive session, stated again at his deposition that the findings in the Ryan Report that Hall was the aggressor speak for themselves, *id*. at ¶ 161, and that the Ryan Report was accepted by the Town without any qualifications because accepting only certain portions of the report **"would be interfering with an outside investigation that we had engaged."** *Id*. at ¶ 162.

Selectmen O'Loughlin, the current Board Chairman, testified that he publicly acknowledged that he would "support whatever the outcome [of the investigation] may be, *id*. at ¶ 154, that he understood that Attorney Ryan concluded that Chiocca "was threatened, his contract extensions, if he did not (do) everything that Ms. Hall asked him to do that night," *id*., and that he **"agree[s] with everything in the investigation** other than [Attorney Ryan's] recommendation [that Chiocca be restored from administrative leave]. *Id*. at ¶ 155. Then, at the executive session of the Board's July 17, 2018 meeting, O'Loughlin articulated his understanding of the breadth of Attorney Ryan's findings:

> In that investigation, it was determined that every act – every action that he took that night was out of concern that he [sic] was threatening his contract. So all of that got lumped in, so, in a sense, the report exonerated every action that he took that night.

*Id*. at ¶ 201.

15

Although Selectmen Ryan testified that he has a hard time understanding the conclusion in the Ryan Report that Chiocca was a victim of Hall's quid pro quo sexual harassment, *id*. at ¶ 159, he acknowledged that he does not dispute the conclusion, *id*., and possesses no documents or information to contradict the conclusion. *Id*. at ¶ 158.

At bottom, there are countless admissions from the Town and its representatives acknowledging that they do not dispute Attorney Ryan's findings that Hall engaged in quid pro quo sexual harassment of Chiocca. That Hall may challenge her own liability does not insulate the Town from its admissions. G.L c. 151B, § 4(16A) imposes "vicarious[] liability [on the employer] for the acts of its agents – its supervisory personnel." *College-Town*, 400 Mass. at 165. Nothing precludes the Town from accepting its own vicarious liability, and the purpose of the statute is furthered by encouraging it. *See Katz v. Massachusetts Comm'n Against Discrimination*, 365 Mass. 357, 366 (1974) ("the clear purpose of G.L. c. 151B is to implement the right to equal treatment guaranteed to all citizens by the constitutions of the United States and the Commonwealth."). As Chiocca's employer, the Town can accept its liability wholly independent from Hall. The Town and its representatives have done exactly that. Their admissions, to quote Selectman Mullen, speak for themselves.

Chiocca is entitled to judgment on this claim prior to trial, and the jury ought to be told that while Hall disputes the allegations, the Town does not.

## C. Chiocca Count 24 – The Town's Placement And Continuance Of Mr. Chiocca On "Administrative Leave" Breached Both His Employment Agreement With The Town And The Town Charter.

In addition to statutory protections, Chiocca's employment was governed by the 2016 Contract. SOF at ¶ 3. That contract gave Chiocca certain protections in the event the Town sought to suspend him from his job. *Id*. at ¶ 6. As set forth above, the 2016 Contract provides

16

that Chiocca could only be suspended "in accordance with Section 2.18(a) of the Rockland Town

Charter (as amended by Chapter 58 of the Acts of 2005)". *Id*. The Town Charter in turn details

the prerequisites that the Town was contractually obligated to follow if it wished to suspend

Chiocca. *Id*. at ¶ 7. Specifically, the Town was required to:

> 1) make an affirmative vote to suspend Chiocca of at least four
>    members of the Board;
> 2) give the Town Administrator either 60-days notice as to the
>    effective date of his suspension or 60 days of severance pay, or
>    a combination of the two;
> 3) file a written resolution with the town clerk providing the
>    specific reasons for the suspension at least 30 days before it
>    becomes effective; and
> 4) deliver a copy of the resolution to the Town Administrator to
>    allow him to invoke his hearing rights.

*Id*.

To avoid following these requirements, it is undisputed that the Town styled Chiocca's

suspension as an "administrative leave" — a term that does not appear in the 2016 Contract. The

facts surrounding Chiocca's placement on "administrative leave" are undisputed. Specifically:

- the Town first placed Chiocca on what it has termed
  "administrative leave" on May 29, 2018 (*id. at* ¶ 104);
- after the Town received the Ryan Report in early July 2018, it
  did not restore Chiocca to his job (*id. at* ¶ 204);
- on November 20, 2018, the Town voted to keep Chiocca on
  "administrative leave" for the remainder of the 2016 Contract
  term (through June 30, 2019) (*id. at* ¶ 209);
- Chiocca was not permitted to perform any aspect of his job
  while on "administrative leave" (*id. at* ¶ 109);
- Chiocca was not allowed on Town property while on
  "administrative leave" (*id. at* ¶ 111);
- Chiocca was required to return all Town property once placed
  on "administrative leave" (*id. at* ¶ 110); and
- When the Town placed and continued Chiocca on
  "administrative leave," it neither filed a written resolution with
  the town clerk nor provided Chiocca with any writing
  explaining the specific reasons for his placement on
  "administrative leave" (*id. at* ¶¶ 214-216).

These undisputed facts demonstrate that Chiocca's so-called "administrative leave" was a suspension. The SJC has stated unambiguously – "[w]e see no legally cognizable difference between suspension with pay and paid administrative leave . . . ." *Campatelli v. Chief Justice of The Trial Court*, 468 Mass. 455, 457 n. 2 (2014).[7] The SJC is not alone. "Courts have referred to such a situation interchangeably as a 'suspension' and 'paid administrative.'" *U.S. ex rel. Herman v. Coloplast Corp.*, 295 F.Supp.3d 37, 39 n. 1 (D. Mass. 2018) (citing *Richardson v. Petasis*, 160 F.Supp.3d 88, 106 (D.D.C. 2015) (evaluating discrimination claim under Title VII framework and explaining that plaintiff was placed "on 'paid administrative leave (which can also be appropriately referred to as a suspension)"); *Scott v. Metropolitan Health Corp.*, 234 Fed. Appx. 341, 348 (6th Cir. 2007) (referring to paid leave as "a suspension with pay and full benefits").

Not only is there "no legally cognizable difference between suspension with pay and paid administrative," but the Selectmen who voted to place Chiocca on administrative leave have acknowledged that there is no difference. Selectmen O'Loughlin (who is the current Chairman of the board), acknowledged administrative leave and suspension are the same, testifying that there is "no real difference" between administrative leave and suspension. SOF at ¶ 113. Selectmen Ryan testified that he has no understanding of any difference between administrative leave and suspension. *Id*. at ¶ 112.

Accordingly, judgment should enter as to liability on Plaintiff's claim for breach of contract as a result of the Town's failure to comply with the process set forth under the Town Charter when it placed and continued Chicca on administrative leave.

---

[7] That Chiocca's "administrative leave" was with pay is of no consequence. The 2016 Contract provides that any suspension of Chiocca was to be with pay. SOF at ¶ 108.

## **CONCLUSION**

Wherefore, based on the foregoing, the Plaintiff respectfully requests that his motion is

**ALLOWED**.

Respectfully Submitted,
Plaintiff,
Allan Chiocca,

By his attorney(s),

/s/ Adam J. Shafran
Adam J. Shafran, Esq. (BBO 670460)
*ashafran@rflawyers.com*
Jonathon D. Friedmann, Esq. (BBO 180130)
*jfriedmann@rflawyers.com*
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
617–723–7700
617–227–0313 (fax)

## CERTIFICATE OF SERVICE

I, Adam J. Shafran, do hereby certify that this document filed through the ECF system shall be sent electronically to the registered participants as identified on the Notice of Electronic Filing on November 15, 2021

/s/ Adam J. Shafran
Adam J. Shafran