# **EXHIBIT AA**

# In The Matter Of:

*Allan Chiocca vs.*
*The Town of Rockland, et al.*

*Edward F. Kimball, Jr.*
*Vol. II*
*September 09, 2021*



**DORIS O. WONG ASSOCIATES, INC.**

COURT REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File KIMBALL_JR_Edward_Vol 2.v1*
*Min-U-Script® with Word Index*

1           MR. COOPER:  Can you tell me -- hold on --
2      how far down to go?
3           MS. HALEM:  Yeah.  When I get there, I'll
4      happily tell you when I'm there.
5           Page 48.
6           Tell me when you're there.
7           MR. COOPER:  We're there.
8      BY MS. HALEM:
9          Q.   Okay.  That's the first one you see in
10     yellow at 1:58 p.m.  Do you see that?  Is that your
11     cell phone number:  (617) 839-20 -- 2071?
12         A.   It is.
13         Q.   Okay.  So you are marked in this
14     document -- your cell phone number is marked yellow.
15     That's my code for your cell phone number.
16         A.   Okay.
17         Q.   So see on May 17th --
18         A.   Uh-huh.
19         Q.   -- do you see that you have several calls
20     with Deirdre Hall?
21         A.   Uh-huh.
22         Q.   Is that consistent with your testimony
23     earlier yesterday that you had an initial call?
24         A.   I said I had called her a couple of times,

1  yes.
2      Q.   And there's that long call at 10:49 p.m. --
3      A.   Uh-huh.
4      Q.   -- the 55-minute.
5         Do you see that?
6      A.   I do.
7      Q.   And that would have been after those texts
8  "call me," correct?  Does that sound about right
9  time-wise to you?
10     A.   It may have been.
11     Q.   Okay.  And your wife would have been
12 present for that phone call, right?
13     A.   I believe so, yes.
14     Q.   Okay.  And then when we look at May 18th,
15 we see the calls --
16     A.   Uh-huh.
17     Q.   -- start between you and Ms. Hall at 7:30
18 in the morning?
19     A.   Yep.
20     Q.   It's quick, but then -- there's a lot of
21 calls over the day.  We have one, two, three, four,
22 five, six, seven, eight --
23     A.   Uh-huh.
24     Q.   -- nine --

1        At that time?
2    A.  At that time, no.  I don't think I had any
3 power in the town of Rockland.
4        I mean, I lived in the town.  I grew up in
5 the town.  I've lived there for over 50 years.  Do I
6 know a lot of people?  Yeah.  But as far as power,
7 power for what?
8    Q.  Do you have influence over some of those
9 people?
10       MS. ZUCKER:  Objection.
11   A.  I don't believe I have --
12       MR. COOPER:  Objection.
13   A.  -- influence over anybody.
14   Q.  Okay.
15   A.  I mean, I think that was demonstrated when
16 the board ousted me as chairman.
17   Q.  These phone calls at your office --
18   A.  Yeah.
19   Q.  -- the long -- the long ones to your
20 office, is your wife present?  Does she work in your
21 office?
22   A.  Occasionally she works in the office.  She
23 may not have been present.  She may have been.
24   Q.  Do you remember specifically if she was?

54

1        As far as before or after an investigation,
2   in my mind, I didn't think an investigation was
3   really needed.  But obviously, we had an
4   investigation, and that's where we are.
5      Q.   Okay.  May 26th, 47 minutes.  We're in the
6   middle of the day.  Well, 11:00 a.m.
7           MR. COOPER:  Hold on.
8      Q.   Do you see that?
9           MR. COOPER:  Not yet.
10          MS. HALEM:  Page 58.
11          THE WITNESS:  Okay.
12          MR. COOPER:  Wait.  Wait.  I can't...
13          I see May 26, 47 minutes.
14          Is that where you are?
15          MS. HALEM:  That is exactly where I am.
16          MR. COOPER:  Okay.
17          THE WITNESS:  Okay.
18  BY MS. HALEM:
19     Q.   Do you remember anything about this
20  particular phone call?  Does this day stand out at
21  all?
22     A.   No, I don't.  I mean, that's -- I mean,
23  it's -- I guess the right way to say this is,
24  somebody just went through, in my opinion, a

58

1    Q.   Do you remember --
2    A.   I don't believe she voted on it, either,
3 because she has to be there to vote.  Or if she was
4 there, she would have abstained.
5         I mean, you would have to check the
6 executive session minutes.
7    Q.   Why would she have abstained?
8         MS. ZUCKER:  Objection.
9    A.   Why would she abstain?
10        MS. ZUCKER:  Objection.
11   Q.   Are you thinking, Mr. Kimball?  I'm not
12 sure.
13   A.   You already asked me, and I answered.  I
14 don't know.
15   Q.   Oh, I'm sorry.  I didn't hear you.
16   A.   I was just waiting for you to either
17 comprehend what I said or ask another question.
18   Q.   And that's why we had the silence.
19        On May 29th, you had two morning phone
20 calls with Ms. Hall:  One at 8:31 a.m. for 17
21 minutes, and then another at 8:48.
22   A.   We have to go there.  I'm not there yet.
23   Q.   My apologies.
24   A.   I'm not running the computer, so -- and if

1    A.   None, really.  Between now and then, the
2    10th?
3    Q.   Between May 18th, 2018 --
4    A.   Yeah.
5    Q.   -- and when you resigned from the board of
6    selectmen.
7    A.   I didn't -- I didn't vote on the report.
8    Q.   You didn't recuse yourself from that,
9    though.  You abstained, correct?
10   A.   Yes, I did.  I abstained.
11        I believe the executive records from that
12   evening would state that I said there was errors on
13   the report.
14   Q.   So you abstained from voting for the
15   report, not recused yourself.
16        MR. COOPER:  Objection.
17   Q.   Correct?
18   A.   I didn't vote for the report, if that's
19   what you're asking me.  I did not vote for the
20   report.
21   Q.   Did you vote against the report?
22   A.   I didn't vote at all.
23   Q.   You abstained?
24   A.   Abstained, recused.  What's the difference

1     A.    Why didn't I vote against it?
2     Q.    Yes.
3     A.    I suppose I could have, but that didn't
4  come to mind to me at the time, while I was sitting
5  in executive session.  So I didn't vote.
6     Q.    Did you make the decision to abstain from
7  that vote on the advice of anyone?  Or was that just
8  a decision you made yourself?
9     A.    No.  I think counsel was there with me that
10 time, but I didn't believe they indicated to me
11 either way.
12    Q.    I don't want to know what counsel told you.
13    A.    Okay.  Then you just asked me, and I just
14 told you so.
15    Q.    It could have been based on anybody's
16 advice.
17          My next question was were there any other
18 votes between that time period May 18th, 2018, and
19 when you resigned from the BOS that you abstained
20 from voting on?
21    A.    There were votes taken for meetings I
22 didn't attend, so I didn't vote on them.
23    Q.    That's not what I asked you.
24    A.    On the July 17th meeting, you know, the one

```
 1   for the discipline hearing that got moved from that
 2   date of July 10th to July 17th, I didn't attend that
 3   meeting.
 4        Q.   Okay.  I'm asking you about when you
 5   attended a meeting and chose not to vote but to
 6   abstain instead.
 7        A.   Oh, I believe there was another executive
 8   session meeting on or about June 13th where I
 9   abstained from the vote about what the town was
10   going to do about the affidavit that I had
11   submitted.
12        Q.   Okay.  Anything else?
13        A.   Nothing comes to mind at the moment.  I
14   mean, that I can think of.
15        Q.   Okay.  Did you vote to release the -- the
16   videotape to the public?
17        A.   We as a board voted to go through and
18   release a sanitized version of the report.
19        Q.   Not the report.  The tape.
20        A.   Hold on.  Let me finish.
21             We did that.  And we did vote to release
22   the tape, yes.
23        Q.   And did you also vote to release the -- to
24   issue the forensic report that talked about the tape
```

260

1  A.    I don't know what Allan Chiocca -- what I
2  think Allan Chiocca should have did, no.  I can only
3  tell you what Allan Chiocca said he did.  Okay?
4  So --
5      Q.    When you say:
6              "AC was not man enough to admit to
7          family and then realized his job was in
8          jeopardy" -- "was in jeopardy."
9          Excuse me.  I'm reading poorly.
10     A.    Yeah.
11     Q.    What were you trying to convey to Deli
12  Flipp there?
13     A.    I was trying to convey -- okay.  I believe
14  I was trying to convey that when I was informed by
15  Mr. Chiocca of what had happened, okay, that
16  Mr. Chiocca said, "It was only a blow job."  There
17  was nothing about "contract."  There was nothing
18  said about exchanging anything.  There was no victim
19  talk, okay?
20          And what I saw was I saw a person who was
21  looking for help, okay?  And we gave him a way to
22  exit his employment from the town.
23          And then I'll call it buyer's remorse.  I
24  think he woke up the next morning and realized that,

1   "Oh, what am I going to do?"  And hence why when he
2   had phoned me.  We had a conversation that Saturday.
3   He wanted to change the terms of the deal that was
4   struck in the presence of town counsel.  He wanted
5   to change that; that he wanted to go back to work
6   and work until September.
7           So what I say about that, maybe once he
8   realized what actually happened, that he didn't know
9   how to tell his wife or his family that, in fact, he
10  pursued Ms. Hall.  In fact, he took advantage of
11  Ms. Hall, who was intoxicated, by all measures I
12  could see on the tape, and he didn't want to man up
13  to that.  That's what I thought.  And that's what I
14  was trying to convey.
15      Q.   Do you know what you meant at the time when
16  you wrote to Deli Flipp:
17              "Should have been same as article,
18          BOTH consensual"?
19      A.   Again, what I said to you earlier, it may
20  have been the "Boston Magazine" article, so it might
21  be in reference to that.
22      Q.   What about the --
23      A.   I think -- well, you told me -- I asked you
24  if there was an attachment with it; you told me

1  Q. Is there anything else that they did
2  poorly --
3  A. Uh-huh.
4  Q. Is there anything else that you think they
5  did poorly after they got the report?
6      MR. CROTTY: Objection.
7  A. Yeah. I think there was some things said
8  poorly that night after we come out of executive
9  session. I mean, I was accused of having no
10 integrity, and I'm the only one who actually stood
11 up for someone who was sexually assaulted during
12 this whole thing. I'm the guy without integrity?
13 I'm the guy without morals because I had an affair?
14 But I guess that doesn't mean anything.
15      So I guess they wanted to shame me because
16 I stood up for somebody who was -- who was sexually
17 assaulted, and all that is is victim shaming, if you
18 ask me.
19 Q. Did the report say that Allan Chiocca
20 should be reinstated?
21     MR. CROTTY: Objection.
22 A. Ms. Ryan's conclusions were that
23 Mr. Chiocca should, I believe, be allowed to return
24 to work, if I'm not mistaken. And -- I don't know

1              And as I told you before, I didn't tell
2      anybody, not even my best friend.  And I regret that
3      I took the advice of town counsel and told my fellow
4      board members, okay?  Because all they did was use
5      this to push blame on me, because none of them had
6      any wherewithal to figure anything out.  Okay?
7              None of them had the integrity or the moral
8      capacity to even bring anything to somebody when
9      something was reported to them.  Okay?  They all
10     stuck their heads in the sand, and I'm the guy who's
11     being singled out because I reported it.  And I was
12     on the verge at that time of whether it was even a
13     whistleblower effect because I brought something
14     forward.  Okay?
15          Q.   Mr. Kimball --
16          A.   When you keep saying, "What did you do?
17     Why did you do this?"  I did what I thought was
18     right.  I thought what I did was -- in my heart was
19     the best interest for the town, and I still stand by
20     that.
21             Now, what I was told at that time, I was
22     told that Mr. Chiocca had, in fact, only gotten a
23     blow job.  He wanted help getting himself out of the
24     situation he got himself into.

344

1    COMMONWEALTH OF MASSACHUSETTS)
2    SUFFOLK, SS.                 )
3        I, Alexander K. Loos, RDR and Notary Public in
4    and for the Commonwealth of Massachusetts, do hereby
5    certify that there came before me on the 9th day of
6    September, 2021, at 9:34 a.m., the person
7    hereinbefore named, who was by me duly sworn to
8    testify to the truth and nothing but the truth of
9    his knowledge touching and concerning the matters in
10   controversy in this cause; that he was thereupon
11   examined upon his oath, and his examination reduced
12   to typewriting under my direction; and that the
13   deposition is a true record of the testimony given
14   by the witness.  I further certify that I am neither
15   attorney or counsel for, nor related to or employed
16   by, any attorney or counsel employed by the parties
17   hereto or financially interested in the action.
18
19       Under Federal Rule 30:
20           _X_ Reading and Signing was requested
21           ___ Reading and Signing was waived
22           ___ Reading and Signing was not requested
23
24       In witness whereof, I have hereunto set my hand

```
 1   and affixed my notarial seal this 27th day of
 2   September, 2021.
 3
 4   
 5   Notary Public
 6   Commission expires 5/5/28
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```