# In The Matter Of:

*Allan Chiocca vs.*
*The Town of Rockland, et al.*

---

*Edward F. Kimball, Jr.*
*Vol. I*
*September 8, 2021*

---



## DORIS O. WONG ASSOCIATES, INC.

C O U R T   R E P O R T E R S

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File KIMBALL_JR_Edward.txt*
*Min-U-Script® with Word Index*

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 25

1    I'm asking have you told people, outside
2  that one-time, that you believe that the town acting
3  against the investigator's investigation could be
4  seen as retaliatory towards Allan Chiocca?
5      MR. COOPER: Objection.
6  A.  I don't believe I've told anybody that
7  other than in executive session I asked that
8  question.
9  Q.  You believe that's the only time you've
10  made that remark?
11  A.  To the best of my knowledge, yes.
12  Q.  When you were producing documents in this
13  case, what did you do -- how did you go back
14  gathering the documents?  What did you do?
15      MR. COOPER: And you are not to disclose
16  any communications you had with counsel.
17      MS. HALEM: Agreed.
18  A.  I provided what was asked of me by counsel.
19  Q.  How did you search for the documents?  Did
20  you go on your computer?  Did you look at your
21  e-mails, your texts?
22  A.  I provided my passwords to my counsel, and
23  they did the searching.
24  Q.  So did you turn over your devices, your

Page 26

1  computers, your cell phones?
2  A.  Uh-huh.  I gave them all that.
3  Q.  So you didn't do any of the searches
4  yourself?
5  A.  I didn't do any of it, no.
6  Q.  Do you have any social media accounts?
7  A.  I do not.
8  Q.  No Twitter, no Facebook, to be clear,
9  nothing like that?
10  A.  No Twitter, no Facebook, no personal social
11  media.
12    When I ran for selectman back in 2010, my
13  campaign may have set up a Facebook page or
14  something for me, but it's been inactive since 2010.
15  My son does a page for our company, and that's it.
16  So...
17  Q.  A Facebook page or a web page?
18  A.  I believe he -- he might -- he might even
19  do some Facebook stuff with other clients, but
20  nothing that I monitor, nothing that I do.
21  Q.  You have no account, you have no sign-in,
22  you have nothing like that that you use?
23  A.  No, not at all.  I mean, I'm a dinosaur.  I
24  still have AOL.

Page 27

1  Q.  Okay.  You do communicate in a
2  non-dinosaur-like fashion with your cell phone using
3  texts, correct?
4  A.  I have communicated by text and by cell
5  phone with various people, yes.
6  Q.  Do you use any other apps other than the
7  regular messaging apps on your phone to communicate
8  with people?
9  A.  We had a WhatsApp at one point in time.
10  Q.  What do you mean, "we had a WhatsApp"?  You
11  used WhatsApp?
12  A.  I don't utilize it anymore.
13  Q.  So you did use WhatsApp?
14  A.  I did at one point, yes.
15  Q.  Is the application still on your phone?
16  A.  As far as I know, it is.  I haven't
17  checked.
18  Q.  Why did you start using WhatsApp?
19  A.  Why did I start using WhatsApp?
20  Q.  Yes.
21  A.  We were going away to Aruba, and it seemed
22  to be the only thing that would work when we was
23  going to go to Aruba with a couple of different
24  parties.

Page 28

1  Q.  And did you exclusively use WhatsApp in
2  Aruba?  Or did you ever use it in the United States?
3  A.  No.  I used it both in the United States
4  and Aruba.
5  Q.  Why would you have used it in the United
6  States if you no longer needed that?
7  A.  At the time I used it to communicate with
8  parties who were going to Aruba with us to make sure
9  it worked before we went.
10  Q.  And are those the only people you've ever
11  used WhatsApp with?
12  A.  No, those aren't the only people.  There's
13  been other people that pop up that I've used it.
14  Q.  And are you the one who initiates the
15  WhatsApp communication?  Or do they ask you for your
16  information?
17  A.  Did I what now?  Can you repeat that?
18  Q.  Why are you choosing to use WhatsApp as
19  opposed to using your regular texting app?
20  A.  No, there's no reference -- I mean,
21  typically I just use my regular texting app.
22  Q.  And when did you stop using WhatsApp?
23  A.  I don't know.  Probably after we got back
24  from Aruba sometime.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 29

1  Q.  Now, you said that you didn't search your
2  texts personally; you gave your cell phone to your
3  counsel.
4      Is that correct?
5  A.  I did.
6  Q.  And since May 17th of 2018 -- we're going
7  to use that date frequently today -- have you
8  deleted any texts between yourself and Allan
9  Chiocca?
10 A.  I have not.
11 Q.  And since May 17th, 2018, have you deleted
12 any texts between you and Deirdre Hall?
13 A.  Texts were deleted between myself and
14 Deirdre Hall probably prior to that.
15 Q.  Prior to May 17th?
16 A.  Yeah, I think so.
17 Q.  Have you deleted any texts since May 17th,
18 2018?
19 A.  Not that I recall, no.
20 Q.  And have you -- why did you delete and when
21 did you delete -- I'll ask them separately.
22     Why did you delete the texts with Deirdre
23 Hall prior to May 17th, 2018?
24 A.  I had a -- an affair with Deirdre Hall, and

Page 30

1  that affair had ended.  So I deleted a lot of
2  communication that I had had with Deirdre Hall as
3  part of my healing process with my wife.
4  Q.  Did someone instruct you to do that?
5  A.  No.  I did that -- I did that on my own
6  because it was something that I didn't want my wife
7  to see my texts with Ms. Hall at that time.
8  Q.  And since May 17th, 2018, you haven't
9  deleted any texts between yourself and Deirdre Hall,
10 so they're all still on your phone?
11 A.  As far as I know, everything was there.
12 Q.  Okay.
13 A.  I mean, my phone was blocked, so...
14 Q.  I don't understand.  What does that mean?
15 A.  My phone was blocked as part of the healing
16 process.
17     I've been going to marriage counseling with
18 my wife due to my indiscretion with Ms. Hall.  So
19 part of that process was that I don't communicate
20 with Ms. Hall, I don't do certain things.  Okay?
21 And we haven't texted, so I don't do that.
22 Q.  So currently Ms. Hall can't text you; it's
23 blocked --
24 A.  That's correct.

Page 31

1  Q.  -- on your phone?
2  A.  Correct.
3  Q.  So there would be no texts -- your wife
4  found out about the affair -- and we're jumping a
5  little bit here, and I apologize -- your you wife
6  found out about the affair when?
7  A.  I disclosed the affair to my wife when I
8  ended it.
9  Q.  Which was?
10 A.  On around the end of April, I believe.
11 Q.  Of 2018, correct?
12 A.  What's that?
13 Q.  Of 2018?
14 A.  2018.
15 Q.  Right?
16 A.  Yes.
17 Q.  So when did you start blocking Ms. Hall's
18 texts?
19 A.  I believe I started blocking Ms. Hall's
20 texts probably sometime the following month, maybe
21 the month after; sometime in there.
22 Q.  So sometime in May of 2018?
23 A.  Sometime in there.  Or it could have even
24 been early summer.  Sometime in that time period.

Page 32

1  Q.  Okay.
2  A.  She was still on the board.  We still were
3  communicating, you know, for town business, but we
4  were keeping it short and it wasn't personal.
5  Q.  Okay.  Did you use WhatsApp to communicate
6  with Deirdre Hall ever?
7  A.  I believe, yeah, I think I might have used
8  WhatsApp for Deirdre Hall at some point, yes.
9  Q.  And so if you had any of those messages,
10 you would have produced them?
11 A.  Yeah.  They would have been produced.
12 Q.  Have you, since May 17th, 2018, deleted any
13 texts between your wife, Dawn Kimball, and yourself?
14 A.  Not that I recall.
15 Q.  And since that same May 17th, 2018, date
16 have you deleted any texts between yourself and John
17 Llewellyn?
18 A.  No.
19 Q.  In your recent memory, do you have any
20 memory of having deleted any texts between yourself
21 and any individual other than Deirdre Hall?
22 A.  I mean, I delete texts from my phone from
23 clients, from my kids, from friends.
24 Q.  How about any current or former members of

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 53

1 Q. How many times were you reelected?
2 A. How many times?
3 Q. You said three times?
4 A. No. I asked the question, how many times I
5   was reelected?
6 Q. Yes.
7 A. I was reelected twice, but I served --
8   was in my third term before I resigned.
9 Q. And they're three-year terms, correct?
10 A. Correct.
11 Q. Can you describe for me the role of the
12   board of selectmen of the town of Rockland?
13 A. Did I what?
14 Q. Can you describe the role for me that the
15   board of selectmen serves in the town of Rockland?
16 A. Okay. Well, I believe the board of
17   selectmen of the town of Rockland is the governing
18   board of the town of Rockland. So what they do is
19   they set policies and procedures for the people of
20   Rockland, employees, and they set out the course of
21   action that Rockland's going to follow for the
22   residents.
23 Q. Okay. And when did you become chairman of
24   the board?

Page 54

1 A. I believe the first year was 2010. I was
2   just a regular sitting selectman, selectman member.
3   I believe the second year they nominated me to
4   vice-chair. And then after that, they nominated me
5   to be chair the year after that.
6 Q. So when was the -- do the math for me.
7      Was that 2013?
8 A. Well, 2010 to 2011, I was a regular guy,
9   like anyone else on the board. And then I became
10   vice-chair, which is really just a title. Then I
11   became chairman, which, again, was just a title.
12      I mean, I'm just one of five votes on the
13   board, Samantha. Chairman doesn't have much
14   difference.
15 Q. Okay. That's not what I was asking.
16      When did you become the chairman? Was it
17   2013?
18 A. It would have been 2012, I believe.
19      So the first year from -- it would have
20   been sometime in 2012.
21 Q. Okay. So you said that the chair has no
22   more authority than any other member.
23      Are you sticking with that?
24      MR. COOPER: Objection.

Page 55

1      MS. ZUCKER: Objection.
2 A. What I said was the chair has no more
3   authority on anything. We're just one vote -- we're
4   one of five.
5 Q. Does the chair set the agenda?
6 A. The chair typically sets the agenda.
7 Q. What other role does the chair play?
8      Does the chair set who is on what -- who
9   gets what liaison position or who's on what
10   committee?
11 A. The chair selects the liaison committees in
12   answer to your question.
13 Q. Okay.
14 A. The chair communicates any official
15   business back to the other members.
16      But the other members still are free to do
17   as they desire. We're all elected, I guess. We're
18   all elected, and we're all volunteers, so...
19 Q. But what specific role does the chair play?
20   What were your additional duties that you had extra?
21      MR. COOPER: Objection.
22 A. I wouldn't say them as "extra," but the
23   chair would typically get -- take the lead or get
24   out in front of any -- any items, and then the chair

Page 56

1   would then defer that to his board at that point.
2 Q. Does the chair often serve as the speaker
3   for the -- for the whole BOS, the person who signs
4   documents on behalf of the BOS, et cetera?
5 A. Typically the chair would sign documents on
6   behalf of the town. And other times I believe the
7   vice-chair would sign them on behalf of the town if
8   it was something that was requested by possibly a
9   bank or an insurance company for a bond or something
10   like that, I believe.
11 Q. Were --
12 A. So --
13 Q. Were these roles set out somewhere?
14 A. What's that?
15 Q. Were these roles --
16 A. Were the roles set out?
17 Q. Yes.
18 A. I don't think they're specifically set out
19   anywhere.
20 Q. So does it say somewhere that the
21   vice-chair takes the lead when it's a bank?
22 A. No, I don't think it says. Typically the
23   treasurer would come to us and say, "I need a
24   signature from whoever the vice-chair is for

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 61

1  indifference because we didn't really know one
2  another.
3  Q.  Okay.  What was it like immediately prior
4  to May 17th, 2018?
5     MS. ZUCKER: Objection.
6  A.  I think it was mixed.
7     I mean, there was things that myself and
8  Mr. Chiocca viewed the same way, and there was
9  things that we didn't view the same way.
10 Q.  Did you have a friendly relationship?
11    MS. ZUCKER: Objection.
12 A.  I try to be friendly with everybody I deal
13 with.  It's just my nature.  I always try -- I
14 always try to find common ground with everybody.
15 Q.  Did you -- would you describe yourself as
16 somebody who had a friendly relationship with Allan
17 Chiocca prior to May 17th, 2018?
18    MR. COOPER: Objection.
19 A.  It was cordial.
20    I mean, if you're asking if I went over to
21 his house and hung out?  The answer is no.
22    If you ask if I -- if I had conversation
23 with him or if we talked a little bit about personal
24 things, yeah.  I would say we had -- it was like a

Page 62

1  coworker relationship type of thing.
2  Q.  And would you socialize with him with other
3  work people?
4  A.  On occasion, yeah.
5  Q.  Did you consider yourself to be one of his
6  supervisors?
7     MS. ZUCKER: Objection.
8     MR. COOPER: Objection.
9  A.  Allan was there before I got on the board
10 of selectmen, so I really didn't look at -- look at
11 me as the supervisor.  It was more or less that was
12 his position, and kind of like when I got on the
13 board, maybe he inherited me as one of his
14 supervisors, or I inherited him as an employee, but
15 no different.
16 Q.  I'm not quite sure you got the question.
17    MR. COOPER: Wait for the next question.
18 Q.  Wait till I ask the question.
19    As a member of the board of selectmen, were
20 you one of Allan Chiocca's supervisors?
21    MR. COOPER: Objection.
22 A.  I was one of his supervisors, yes.
23 Q.  Was Deirdre Hall also one of his
24 supervisors?

Page 63

1  A.  As a board of selectmen member, yes.
2  Q.  When you resigned, was it an
3  acknowledgement that you had done something wrong to
4  justify your resignation?
5  A.  No.  I didn't do anything wrong.
6  Q.  So you don't believe that you did anything
7  wrong prior to your resignation?
8  A.  No, I don't.
9  Q.  So you resigned purely to focus on your
10 business?
11    MR. COOPER: Objection, that's not what he
12 said.
13 Q.  Okay.
14 A.  What I said was I resigned to focus on my
15 family, my wife and my children.
16 Q.  Did they want you to resign?
17    MS. ZUCKER: Objection.
18 A.  My children and my wife, for a long time,
19 thought that I put too much time into the community.
20 Q.  Do you regret any action you took related
21 to the Chiocca/Hall incident?
22    MS. ZUCKER: Objection.
23 A.  The only thing I regret is that it's still
24 going on.  And based on what I knew, I don't even

Page 64

1  know why we're all here.
2  Q.  Do you -- is there anything you would have
3  done differently knowing what you know sitting here
4  today?
5     MR. COOPER: Didn't you just ask him that
6  question?
7     MS. HALEM: I'm asking him a different way.
8  It's a different question.
9     MR. COOPER: It's asked and answered.
10    Go ahead and answer it again.
11 A.  I wouldn't do anything differently,
12 Samantha.
13 Q.  Okay.  Did you ever tell Allan Chiocca that
14 you were unhappy with his job performance?
15    MS. ZUCKER: Objection.
16 A.  We've had conversations in the past about
17 certain issues that Mr. Chiocca and I have disagreed
18 on.  Mr. Chiocca's very much aware of that as well.
19    Mr. Chiocca's response was always, "If you
20 get three votes, then we can take it up again."  So
21 if we differed on something, it was always by a vote
22 of the board if it was town business.
23 Q.  Was there anything related --
24    You'll agree with me that Mr. Chiocca can't

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 65

1  vote, right?
2      MS. ZUCKER: Objection.
3  A.  I agree that Mr. Chiocca can't vote.
4  Q.  Was there anything that you said to
5  Mr. Chiocca prior to May 17th, 2018, that you wanted
6  him to do differently in his job as the town
7  administrator? That you remember sitting here
8  today.
9  A.  As I remember sitting here today, myself
10  and Mr. Chiocca had various conversations about his
11  job, about things that I thought Rockland still
12  needed to do, things he thought Rockland still
13  needed to do. Okay?
14      If you talk about 2018, typically I know
15  there was some discord among some of the board
16  members and some of the items that Mr. Chiocca had
17  done, and you would have to ask them individually
18  what they were.
19      Myself, for the most part, I think at that
20  point in time there was some items that were over
21  the -- I guess buried, and I was looking more to see
22  what the board wanted to do than myself.
23  Q.  Had you formed an opinion as to whether you
24  were going to vote to renew his contract by May of

Page 66

1  2018, May 2nd of 2018?
2  A.  I think Mr. Chiocca knew that, for the most
3  part, that I was supportive of him in his role as
4  town administrator.
5      Mr. Chiocca had brought up the discussion
6  about his contract, and it was due to a healthcare
7  issue. And the healthcare issue was he wanted to
8  make sure his wife could join the town's health
9  coverage.
10      You have to understand at that point in
11  time Mr. Chiocca had a payment in lieu of healthcare
12  provision in his contract. After checking with town
13  counsel, it was determined that that wasn't going to
14  be in effect and, in fact, Mr. Chiocca could join
15  the town's health plan. I believe you get to join
16  the town's health plan, I believe there's two
17  different times a year that you can actually join.
18  So...
19  Q.  And you had no issue with that?
20  A.  What's that?
21  Q.  You had no issue with that?
22  A.  I was fine with that. That seemed to put
23  the -- the idea of this need to have a contract done
24  right away on the back burner, because his contract

Page 67

1  wasn't going to be up for another year-plus at that
2  point.
3  Q.  So you were not -- the BOS was not in the
4  process of looking at Allan Chiocca's contract on
5  May 15th, 2018?
6  A.  They were looking at it. But there was
7  no -- there was no -- it wasn't like this had to be
8  done on May 16th or May 15th. There was till ample
9  time.
10  Q.  Did you get communications from Attorney
11  Clifford that the process to renegotiate Allan
12  Chiocca's contract was beginning on May 15th, 2018?
13      MR. COOPER: Hold on.
14  A.  No.
15      MR. COOPER: Wait. Wait. Wait.
16      I look to Mr. Crotty with regard to any
17  privilege issues in connection with the town's
18  privilege here.
19      MR. CROTTY: Right.
20      So if you're -- Samantha, are you asking
21  him questions with respect to conversations he had
22  with -- with Attorney Clifford with respect to him
23  individually? Him as a member of the board?
24      MS. HALEM: No, no. It's the exhibit --

Page 68

1  we've used the exhibit. It's the e-mail May 15th --
2  the May 12th e-mail that we're going to discuss this
3  in executive session, Allan Chiocca's contract.
4      MR. CROTTY: Can you -- are you going to
5  ask him questions about the e-mail?
6      MS. HALEM: No. I'm just asking if he
7  remembers getting it.
8      MR. CROTTY: Okay. Well, if you want to
9  ask him if he remembers getting it, I don't have an
10  objection to that.
11      MS. HALEM: Okay. Thanks.
12  Q.  Mr. Kimball, do you remember getting that
13  e-mail?
14  A.  I do.
15  Q.  Do you remember talking about Mr. Chiocca's
16  contract in the May 15th executive session?
17  A.  I do.
18  Q.  And, generally speaking, were you
19  supportive of that contract in that meeting?
20      MS. ZUCKER: Objection.
21  A.  I'm going to say, I think the purpose of
22  that meeting was to try to air any of the issues
23  that may have been bothering any of the other board
24  members, and Mr. Chiocca was present for that

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 69

1  meeting as well, for a portion of that meeting, and
2  town counsel was as well.
3       And I believe they all had some varying
4  issues that they had brought up that evening.
5  Q.  Did you?
6  A.  Specifically -- specifically, you would
7  probably be better suited to ask them what they were
8  specifically, but I knew they all had different
9  things they were working on in town.  And some of
10  the things they had gone to Mr. Chiocca about in
11  those regards, Mr. Chiocca was less supportive of
12  them doing that, so they had those issues with
13  Mr. Chiocca himself.
14  Q.  Did you raise any issues, to your
15  recollection, at that meeting?
16       MR. CROTTY: Objection.
17  A.  To the best of my recollection, I didn't
18  raise too many issues.
19       I liken that meeting to me kind of being
20  the father figure and the three younger board
21  members being the children, if you will, of the
22  family.
23       When I look at this picture here, it
24  reminds me of the "Brady Bunch."  I'm sorry, but

Page 70

1  that's what I think when I see the screen with all
2  these pictures.
3  Q.  Me, too.
4  A.  It just seems that everybody had different
5  things that they were passionate about in town, and
6  they were all socially active.  So they were all
7  vying to -- to get support of their -- their voter
8  base and whatnot, and they -- they wanted to address
9  those.
10       But I don't think anybody was set to issue
11  a contract that evening, and I think -- I think the
12  desire was to establish policies and procedures for
13  Mr. Chiocca to follow.  That's always been his
14  contract, but, you know, I'll take the heat for
15  this.  I was lapse with that.
16       I mean, other board members weren't as
17  active on the board.  We've had board members that
18  would basically come in five minutes before a
19  meeting and whatever they were prepped or told to do
20  they did.  Then you had other board members who were
21  taking a more active role in the community.
22       So they were getting feedback from their
23  constituents, and they were bringing that feedback
24  back, you know, to the board of selectmen.  And they

Page 71

1  wanted to make sure that those things were going to
2  be addressed in the next contract.
3       And I think, to your point about the
4  e-mail, I think your e-mail actually said that, to
5  some degree.
6  Q.  Okay.  You -- you mentioned before when --
7  your affair with Deirdre Hall ended around
8  April 30th, I think you said?
9       MR. COOPER: Objection.
10  A.  No, I don't believe I said April 30th.
11  Q.  I'm sorry.
12  A.  I believe I said the end of April.
13  Q.  Okay.  My apologies.
14       And when did it begin?
15  A.  I think it began sometime in mid-March.
16  Q.  Okay.  How did the affair -- who
17  propositioned who?  How did it start?
18       MR. COOPER: Don't answer that question.
19       MS. ZUCKER: Objection.
20       MS. HALEM: Okay.
21       MR. COOPER: We have an order from Judge
22  Young specifically on this issue be as well, and I'm
23  surprised that you would ask questions on this
24  topic.

Page 72

1       MS. HALEM: Again, I don't agree with that
2  assessment, but let me ask you this:
3  Q.  Was it 100 percent consensual, the
4  relationship?
5       MR. COOPER: Don't answer that question.
6  A.  I'm instructed not to answer.
7  Q.  Okay.  I'm going to ask the question --
8       MR. COOPER: What is your good-faith basis
9  for asking that question?
10       MS. HALEM: I'm -- we're just going to do
11  this, because I don't want to have a debate with
12  you.  I don't think it's proper.
13       MR. COOPER: I'm asking you to put on the
14  record --
15       MS. HALEM: No.  Here's what I'm going to
16  do:
17       I'm going to ask the question --
18       MR. COOPER: No, no.  Hold on a second.
19       MS. HALEM: -- and you can instruct your
20  client not to answer.
21       MR. COOPER: I'm asking you what your
22  good-faith basis is for asking the question about
23  whether his relationship with Deirdre Hall was
24  100 percent consensual.  Do you have some

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

**Page 73**

1 information based upon which you think that that is
2 not --
3     MR. SHAFRAN: Just move on. Just move on.
4     BY MS. HALEM:
5 Q. How often were you seeing Deirdre Hall
6 during that six-week time period?
7     MS. ZUCKER: Objection. Objection.
8     MR. COOPER: Same objection.
9     Don't answer.
10 Q. Did either of you discuss during this time
11 period whether it was appropriate for two members of
12 the BOS to be having a romantic relationship?
13     MR. COOPER: You can answer that.
14 A. No.
15 Q. You didn't discuss it?
16 A. No.
17 Q. Did you ever -- were you ever concerned
18 during that time period that it might pose a
19 conflict of interest?
20 A. No.
21 Q. Did you ever consider disclosing it to your
22 fellow selectmen?
23 A. No.
24 Q. Did you end the affair?

**Page 74**

1 A. I did.
2 Q. Why?
3     MR. COOPER: Objection.
4     Don't answer that.
5     MS. ZUCKER: Objection.
6 Q. What was the nature of your relationship
7 with Deirdre Hall after the affair ended prior to
8 May 17th, 2018?
9 A. It returned to being colleagues.
10 Q. Did you work with Deirdre Hall on her
11 campaign during that time period?
12 A. No.
13 Q. Did you text with her?
14 A. We did about town business, yes.
15 Q. Solely about town business?
16 A. We checked in on one other to see how our
17 families were doing.
18 Q. Did you e-mail with her during this time
19 period?
20 A. There may have been some e-mails from then.
21     MS. ZUCKER: I'm going to -- Samantha, you
22 are treading up to the line of exactly what was not
23 allowed by the court. I think both Howard and I are
24 giving you latitude if you want to talk about the

**Page 75**

1 nexus between work and the relationship, and you've
2 done that. And anything beyond that the court said
3 you don't get. So --
4     MS. HALEM: I'm not on that topic, but
5 understood your thoughts on this. You don't need to
6 keep doing this.
7     MS. ZUCKER: We do, actually, because you
8 keep --
9     BY MS. HALEM:
10 Q. Did you talk on the phone with Deirdre Hall
11 during that time period between May 1st and
12 May 17th?
13     MS. ZUCKER: Objection.
14     You need to narrow your question to make it
15 clear what you're asking.
16     MR. COOPER: Are you including May 17th?
17     MS. HALEM: No. Between those dates.
18     MR. COOPER: Okay.
19     So she's asking you if you recall talking
20 on the phone between May 1st and May 16th, 2018.
21 A. I believe I may have had conversations with
22 Ms. Hall.
23 Q. Did your wife know that you were having
24 telephone and text communications with Deirdre Hall

**Page 76**

1 during this time period?
2     MS. ZUCKER: Objection. Objection.
3     MR. COOPER: Same objection.
4 A. She did.
5     MS. ZUCKER: Hold on.
6     THE WITNESS: Okay.
7     MS. ZUCKER: With respect to how he knows,
8 that is through oral communication --
9     MR. COOPER: He's answered the question.
10     What's the next question?
11     MS. HALEM: Thank you.
12 Q. When did your wife first learn you were
13 having an affair with Deirdre Hall?
14     MR. COOPER: Objection.
15     Don't answer that.
16 A. I'm instructed not to answer.
17 Q. When did your wife first contact Deirdre
18 Hall about the affair?
19     MR. COOPER: If you know.
20 A. I don't know.
21 Q. Have you seen the text messages between
22 your wife and Deirdre Hall on May 1st, 2018?
23 A. I believe I may have seen them, yes.
24 Q. How did your wife get Deirdre Hall's cell

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

**Page 77**

1  phone number?
2      MR. COOPER: Don't answer that if it
3  involves conversation between you and your wife.
4  **A.  I'm instructed not to answer.**
5  Q.  No, he did not instruct you not to answer.
6  He said don't do it if it involves a conversation,
7  and I agree with that.  But you could have texted
8  that to your wife.
9      MS. ZUCKER: Objection.
10      MR. COOPER: Is that a question?
11      MS. HALEM: Yes.  I would like the question
12  answered.
13      MR. COOPER: I object to form.  I'm not
14  sure there was a question in there.
15      MS. HALEM: There was.  It just got waylaid
16  through the debate.
17  Q.  How did your wife learn Deirdre Hall's cell
18  phone number?
19      MR. COOPER: Don't answer that if it
20  involves communications, oral communications with
21  your wife.
22  **A.  I'm instructed not to answer.**
23  Q.  I really don't like doing this,
24  Mr. Kimball.  That's not what he said.  He said only

---

**Page 78**

1  if it's that.
2      Is it that?  Is it because it involves a
3  conversation between you and your wife?
4      MR. COOPER: Why don't you just ask him the
5  question about whether, other than in oral
6  conversation with your --
7      MS. HALEM: Okay.  Excellent question.
8  Good idea, Howard.
9  Q.  Other than in communications with your
10  wife, do you know how Deirdre -- how your wife
11  learned Deirdre Hall's cell phone number?
12      MS. ZUCKER: Objection.
13  Q.  Is there another way?
14      MS. ZUCKER: Objection.
15  **A.  I don't know if there another way.  I**
16  **don't.**
17  Q.  Deirdre Hall told Regina Ryan that she was
18  in love with you.
19      Did she ever tell you this?
20      MR. COOPER: Don't answer that.  Objection.
21  **A.  I'm told not to answer that.**
22  Q.  Did you ever tell Deirdre Hall that you
23  loved her?
4      MS. ZUCKER: Objection.

---

**Page 79**

1      MR. COOPER: Don't answer that, objection.
2  **A.  I'm told not to answer that.**
3  Q.  Okay.
4      MR. COOPER: Again all based on Judge
5  Young's order.
6  Q.  Deirdre Hall told Regina Ryan that she was
7  still in love with you on June 22nd, 2018.
8      Did you know this?
9  **A.  I don't know what Ms. Hall told Ms. Ryan.**
10  Q.  Did she ever tell you that she was still in
11  love with you --
12      MR. COOPER: Don't answer that.
13  Q.  -- after June 22nd, 2018?
14      MR. COOPER: Don't answer that.
15  **A.  I'm instructed not to answer.**
16  Q.  Did anyone on the board of selectmen or
17  anyone involved in the town government know about
18  your affair with Deirdre Hall prior to May 1st,
19  2018?
20      MS. ZUCKER: Objection.
21  **A.  I don't know.**
22  Q.  Did they know from you telling them, or is
23  it possible they learned -- they would have learned
24  from Deirdre Hall?

---

**Page 80**

1      MS. ZUCKER: Objection.
2      MR. COOPER: Objection to the form of the
3  question.
4  **A.  Again, I answered.  I don't know.**
5  Q.  Do you have any --
6  **A.  Is the question "have you told anybody"?**
7  **The answer is no.**
8  Q.  Thank you.  That was going to be my next
9  question.
10      When did other members of the board of
11  selectmen find out about the affair?
12      MR. COOPER: Objection.
13  Q.  You can take them one by one.
14      Start with Larry Ryan.
15  **A.  I don't know when Larry Ryan found out.**
16  **You would have to ask Larry Ryan when he found out.**
17  Q.  Did you ever tell him?
18      MR. COOPER: Didn't you ask him whether he
19  told the board of selectmen?  And he said no.
20  Q.  I said prior to May 1st.
21  **A.  No.**
22      **So what are you asking, Samantha?**
23  Q.  My apologies if this was getting confusing.
24      Do you have any recollection of ever

---

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 93

1    Did I read that correctly?
2  A.  Again, you're asking me about a text my
3  wife sent to Ms. Hall.  You asked me about an oral
4  conversation that I may have had with my wife, and
5  my counsel instructed me not to answer.
6  Q.  I'm not --
7  A.  So I don't understand your question here.
8  Q.  I haven't asked a question.
9    My actual question was did I read that
10  accurately.
11  A.  Actually you stopped in the middle of the
12  sentence.
13  Q.  Okay.  Other than that, did I read it
14  accurately, Mr. Kimball?
15    MS. ZUCKER: Objection.
16  A.  The texts speak for themselves.  They're
17  from my wife to Ms. Hall.
18  Q.  This is not a hard question, Mr. Kimball.
19    Did I read it accurately?
20  A.  Did I what?
21  Q.  Did I read it accurately?
22    MS. ZUCKER: Objection.
23  A.  It appears you read it word for word.
24  Q.  Thank you.

Page 94

1    Does this comport with your understanding
2  of how you were supposed to interact with Deirdre
3  Hall during this time period?
4    MS. ZUCKER: Objection.
5    MR. COOPER: Objection, instruct you not to
6  answer.
7  A.  Again, I'm instructed not to answer.
8  Q.  Understood.
9    Did you follow those rules that are set
10  forth in the -- in this text message with Deirdre
11  Hall?
12    MR. COOPER: Objection, instruct you not to
13  answer.
14  A.  Not to answer again.
15  Q.  You didn't come to the regular --
16    MS. HALEM: You can take down the exhibit
17  so that I can see my screen better.
18    Thank you.
19  Q.  You didn't come to the regularly scheduled
20  BOS meeting the night of May 1st, correct?
21  A.  I did not.  I did not attend.
22  Q.  Why?
23  A.  I -- I decided to stay home because I had a
.4  family matter at home to attend to.

Page 95

1  Q.  What was that family matter that you had to
2  attend to?
3  A.  I was attending to my wife.
4  Q.  What was going on with your wife that you
5  needed to attend to?
6    MR. COOPER: Do not disclose any oral
7  communications between you and your wife if that's
8  the basis of your answer.
9  A.  Okay.
10  Q.  I wasn't asking about the oral
11  communications.
12    What was going on with your wife that you
13  felt you had to stay home?
14    MS. ZUCKER: Objection.  This is the --
15  this is precisely the territory that --
16    MR. COOPER: Yeah, same --
17  A.  Myself and my wife had a discussion.
18    MS. ZUCKER: Wait.
19  A.  Everything else I was instructed not to
20  answer, so I'm not going to answer.
21  Q.  So what you're saying is the reason you
22  stayed home that night was due to a discussion you
23  had with your wife?
24    MS. ZUCKER: Objection.

Page 96

1  A.  No, I didn't say that.
2  Q.  I'm not asking about the contents.
3  A.  I didn't say that at all.
4  Q.  So what was going on that you decided not
5  to go to the BOS meeting?
6    MS. ZUCKER: Objection, asked and answered
7  to the extent that that is allowed consistent with
8  Judge Young's order.
9  A.  My wife asked me not to attend.
10    MS. HALEM: We tried.
11  Q.  Did you tell anyone prior to the start of
12  the meeting that you weren't going to be there?
13  A.  I did.
14  Q.  Who?
15  A.  I texted Mr. Chiocca, I believe, and told
16  him I wasn't going to make it.  And I believe I
17  texted Ms. Hall and told her I wasn't going to be
18  making it; that she will be acting chairperson.
19  Q.  Okay.  Anyone else?
20  A.  Not that I recall.
21  Q.  Did you text either of them a reason as to
22  why you weren't going to be there?
23  A.  I did not.
24  Q.  Did you speak to either of them prior to

Doris O. Wong Associates, Inc.

Min-U-Script®

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 97

1  the meeting?
2  A.  I did not.
3  Q.  Did you tell anyone that you didn't go to
4  the BOS meeting that night because your wife was
5  feeling vulnerable and betrayed?
6  A.  No, I didn't tell anyone.
7      If you're taking a line from the -- that
8  report that Ms. Ryan, I believe, wrote --
9  Q.  That you admitted to in the position
10  statement.
11      MS. ZUCKER: Objection.
12  A.  No, I didn't say that.
13  Q.  So you never told that to anyone?
14      MS. ZUCKER: Objection.
15  A.  That particular line that you're alluding
16  to, Samantha, was in the report by Ms. Ryan.  I did
17  not say that.  I did not say that to Ms. Ryan.
18  Q.  Okay.  Did you say it to anyone else?
19  A.  Not that I'm aware of.
20  Q.  Did you say words to that effect?
21  A.  I don't know if it was those words,
22  exactly, but I think maybe Ms. Ryan may have asked
23  me why I didn't attend, and she may have asked me if
24  my wife was upset with me.

Page 98

1  Q.  And what would you have responded?
2      MS. ZUCKER: Objection.
3  A.  I think I would have responded at the time
4  that me and my wife were having -- there was some
5  emotions between me and my wife.  And that was it.
6  Q.  Okay.  Do many people go to the RBG after
7  board of selectmen meetings?
8  A.  Sometimes.  I mean, it's a public
9  restaurant.  So sometimes you get people that go
10  after they attend a meeting.  Before a meeting ends
11  some people, you know, say their -- their piece
12  before the board of selectmen and they may go up
13  there, and they may go to another establishment in
14  town.
15  Q.  Did you ever -- sorry.
16      Were you -- let me let you finish.
17  A.  Yeah.  That was it.  Go ahead.
18  Q.  Did you ever go to RBG after a BOS meeting?
19  A.  I have on occasion, yes.
20  Q.  Did other members of the BOS often gather
21  there afterwards?
22  A.  They did on occasion as well.
23  Q.  With Mr. Chiocca as well, and maybe people
24  who were presenting before the board?

Page 99

1  A.  Sometimes you'd have people who presented
2  before the board.  Sometimes it would be other
3  people in town who were on different boards and
4  committees who would be up there.  So it varied.  It
5  depended -- it depended on what was on the agenda.
6  Q.  The BOS meets twice a month, right, on
7  average?
8  A.  Typically the BOS would meet twice a month,
9  usually the first Tuesday and the third Tuesday.
10      When I initially got on the board, it was
11  Mondays, and we made a decision to move it to
12  Tuesdays because of all the holidays on Monday and
13  we were meeting on Tuesdays anyhow.  We just made it
14  simple.
15  Q.  How frequently would you go to RBG or some
16  other establishment in a social setting after those
17  BOS meetings?
18  A.  Sometimes I would attend; sometimes I
19  wouldn't.  It would depend if I needed to be up
20  early in next morning or not.
21      I'm in construction, so a lot of times I'd
22  have to be in the city of Boston by 6:00 a.m., which
23  means I'm up at 4:00 and out the door before 5:00.
24  So...

Page 100

1  Q.  On average how often would you go?
2  A.  50 percent of the time, maybe.
3      You know, it depends.
4  Q.  Would you drink alcohol?
5  A.  If I drank, I would probably drink maybe
6  one drink or maybe I would just get a soda water.
7  I'm not a big drinker.
8  Q.  When you did drink alcohol --
9  A.  I'm an eater, not a drinker.
10  Q.  When you drink alcohol, what kind do you
11  drink?
12  A.  I would either get a beer, probably a Bud
13  Lite, or a Coors Light, or sometimes I would -- I
14  would get a Tito's and soda water.  So...
15  Q.  Generally speaking, how many drinks would
16  you have in a given night?
17  A.  Maybe one.  I would nurse it.  Two if we
18  were there for any length of time.  That's about it.
19  I was never a big drinker.
20  Q.  Did you drive home --
21      Say it again.  I'm sorry, I cut you off.
22  A.  I said I was never a big drinker.  I'm
23  still not.
24  Q.  Did you drive home after?

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

Page 109

1    MR. COOPER: Let him finish, please.
2  A.  -- on the occasions that I was in the
3    presence of Mr. Chiocca, either he would leave
4    before I did, or I would leave before he did. So it
5    never -- it never grew to that at that point, at
6    least in my presence.
7  Q.  Okay. But sometimes he left before you?
8  A.  Sometimes he would leave before me.
9    Sometimes I would leave before him. Sometimes I
10   wouldn't go.
11 Q.  Did you ever go to RBG with Mr. O'Loughlin?
12 A.  On occasion I think Mr. O'Loughlin has been
13   up at RBG, yeah.
14 Q.  Does he go less frequently than the other
15   members of the BOS?
16   MR. COOPER: Objection.
17 A.  I don't know if he went less frequently,
18   but the times that I was there he was, you know,
19   probably less frequent than some of the other
20   members.
21 Q.  Did you see Mr. O'Loughlin drink alcohol at
22   RBG?
23 A.  I would think Mr. -- I mean, I would think
24   he would have a beer, as far as I would know. I

---

Page 110

1    mean, if we're up there in a big group, there's a
2    lot of people, a lot of tables. It's not a banquet
3    hall; it's little tables and a small restaurant.
4  Q.  Understood.
5    But do you have a present memory of seeing
6    Mr. O'Loughlin drink alcohol at RBG?
7  A.  I think he's drank alcohol while I've been
8    at RBG. Or I should say, you know, after a meeting
9    at RBG, yeah.
10 Q.  How about Mr. Mullen?
11 A.  I would say the same.
12 Q.  You've seen him go to RBG after a BOS
13   meeting?
14 A.  I don't know about the last meeting. I
15   didn't go to the last meeting.
16 Q.  No. I said have you seen him go. I said
17   it badly.
18   Have you seen him go to RBG after a BOS
19   meeting, any BOS meeting?
20 A.  On occasions Mr. Mullen would go.
21   And I think he had two young children at
22   home -- and I believe Mr. Shafran can appreciate
23   that that based on how we've got to know him
24   throughout this course.

---

Page 111

1    I don't miss those days, Allan -- Adam.
2    Sorry.
3    MR. SHAFRAN: No offense taken.
4    MS. HALEM: I do miss those days. It was a
5    lot simpler.
6    THE WITNESS: Uh-huh.
7    BY MS. HALEM:
8  Q.  Did you ever see Mr. Mullen consume alcohol
9    at RBG when he was there with you?
10 A.  I think Mr. Alcohol -- excuse me,
11   Mr. Mullen consumed alcohol as well.
12 Q.  Okay. Did you ever go with John Clifford
13   to RBG after a BOS meeting?
14 A.  Sometimes John Clifford would attend.
15 Q.  And did you ever see him drink alcohol at
16   RBG?
17 A.  I have. I believe John Clifford drank
18   alcohol as well.
19 Q.  Okay. Did you speak to Deirdre Hall on the
20   night of May 1st while she was at RBG?
21 A.  Did I what? I'm sorry.
22 Q.  Speak to Deirdre Hall on the night of
23   May 1st while she was at RBG on the telephone?
24 A.  I believe I called her, yes.

---

Page 112

1  Q.  Did you call her on her cell phone?
2  A.  I believe I did.
3  Q.  And what do you remember about that
4    conversation?
5  A.  I think I said she did a good job that
6    night.
7  Q.  Was that the total part of your
8    conversation?
9  A.  I don't know if it was the total part of my
10   conversation, but I think that I may have said not
11   to worry about my wife. And that was it.
12 Q.  That's the sole sentence you said on the
13   topic of your wife having sent texts?
14 A.  Yeah. I think so.
15 Q.  Did Deirdre Hall tell you that your wife
16   was texting her?
17 A.  I don't believe she did.
18 Q.  So how did you know your wife was texting
19   her?
20   MR. COOPER: Objection.
21 A.  Again, if I go back to --
22   MR. COOPER: Objection.
23 A.  -- a question which I'm instructed not to
24   answer, that would be it.

---

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 117

1  Q.  You can't ask me questions.
2  A.  Okay.  I'm sorry.  But you asked me.
3  Q.  I -- that's how it works.
4      The -- you mentioned earlier that you
5  told --
6      MR. COOPER:  Hold on.
7      Are you done with this?
8      THE WITNESS:  No.
9      MR. COOPER:  Okay.  Well, we can't see you,
10 so we're going to have to --
11     MS. HALEM:  Okay.  Then I won't ask the
12 question I was going to ask.  I'll stay where I am
13 just for one more second, and then I'll go back.
14 Q.  Do you understand Deirdre Hall could have
15 taken this sentence to mean that she was being
16 threatened?
17     MR. COOPER:  Objection.
18 A.  I don't know what she thought about that
19 sentence, okay?
20     And as I tried to answer before, I had a
21 discussion with my wife, which I can't tell you what
22 we talked about.  And obviously you see a text from
23 my wife to Ms. Hall, which I can't tell you how
24 Ms. Hall felt after receiving that, and I really

Page 118

1  can't say what my wife meant by it.
2  Q.  Did Ms. Hall ever tell you that she was
3  concerned that your wife was going to expose your
4  affair publicly?
5      MS. ZUCKER:  Objection.
6  A.  No.
7  Q.  Did she ever tell you that she was afraid
8  that your wife was threatening her?
9  A.  No.
10     MS. HALEM:  You can unshare, Adam.
11     THE WITNESS:  What's that?
12     MS. HALEM:  You can unshare the screen.
13     THE WITNESS:  Oh, I thought you said
14 "unfair."
15     MS. HALEM:  No.  It did kind of sound like
16 that.
17 Q.  You mentioned before that you told Deirdre
18 Hall that she did well that night.
19     Is that because you watched on TV?
20 A.  Yeah.  I watched the board of selectmen's
21 meetings.  I still watch them.
22 Q.  But is that why you told her you saw how
23 she performed the night of May 1st, even though you
24 weren't present?

Page 119

1  A.  Yeah.
2      And I think in the past when I wasn't
3  present, the former vice-chair I think was
4  Mr. Mullen, and I think I might have even done the
5  same thing for him, called or texted him when I
6  wasn't there and said he did a good job as well.
7  Q.  So do you remember if your call to Deirdre
8  Hall was before or after your wife's text of
9  8:33 p.m.?
10 A.  I don't know if it was before or after.
11     And again, based on a discussion I had with
12 my wife, which I was not -- which I was instructed
13 not to answer, I really can't put the timeline
14 together.
15 Q.  Do you have any memory as to what time of
16 day you called Deirdre Hall that night?
17 A.  I guess it was early evening, sometime --
18 sometime then.
19 Q.  It would have been after the BOS meeting,
20 yes?
21 A.  Yeah.  It would have been after the
22 meeting.
23 Q.  When did those meetings end?
24 A.  They varied.  Sometimes they end at 11:00.

Page 120

1  Sometimes they end at 10:00.  If we're lucky, we can
2  get out sometimes at 8:00.
3      I mean, typically they start at 7:00.
4  Sometimes they start at 6:00 if we have to meet
5  prior.
6      I mean, they varied.  Sometimes it's a long
7  night, an early night.  I don't know.
8      I mean, you asked me.
9  Q.  I know.
10 A.  There's no set time that they end.
11 Q.  I appreciate the recitation.  What I'm
12 asking is do you remember that night how long the
13 BOS meeting --
14     You were watching it live on TV?
15 A.  I believe it was a fairly short meeting,
16 maybe half hour, 45 minutes, somewhere in that time
17 frame.
18 Q.  So if it was a half hour, 45 minutes, when
19 would it have ended approximately --
20 A.  Well, if it started on time at 7:00 which
21 usually cable Dave, the WRPS guy is pretty strict
22 about the time getting going.  If it's a half hour,
23 it's 7:30.  If it's 45 minutes, 7:45, somewhere in
24 that time frame.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 121

1    And then some members would leave the
2  meeting and go in the office and have to sign
3  warrants if they didn't get early enough to sign
4  warrants.
5  Q.  Do you think they would have had --
6  Ms. Hall would have been back at the bar by
7    8:33 p.m.?
8  A.  I guess -- I guess she could be.  I don't
9  guess.  I mean, I don't know when she would be at
10  the bar.
11  Q.  I'm not asking you to speculate.
12    Okay?
13  A.  Okay.
14  Q.  On the morning of May 2nd, did you go see
15  Allan Chiocca?
16  A.  I may have been into the office to sign
17  warrants.
18  Q.  Do you remember telling him that you were
19  having an affair with Deirdre Hall?
20  A.  No, I didn't say that to Mr. Chiocca.
21  Q.  You never told Mr. Chiocca you were having
22  an affair with Deirdre Hall?
23  A.  No, I didn't.
24  Q.  Do you remember telling him anything about

Page 122

1  your relationship with Deirdre Hall?
2  A.  I do.
3  Q.  What did you tell him?
4  A.  It wasn't those words.
5  Q.  Okay.  Tell me what you said.
6  A.  I told him --
7    MR. COOPER:  And be clear on when you said
8  it.
9  A.  Okay.
10    And I believe it wasn't until a couple of
11  days later, by the way.  I don't believe it was on
12  May 2nd.  I believe it was on May 4th.
13  Q.  Okay.
14  A.  But I believe I told Mr. Chiocca that my
15  wife accused me of having an emotional affair with
16  Ms. Hall.
17  Q.  Anything else?
18  A.  No.  That was it.
19  Q.  And did you tell him you were having an
20  emotional affair with Ms. Hall?
21  A.  What's that?
22    No, I didn't say anything.  I just said --
23  you asked me what I told Mr. Chiocca about the
24  affair.  I told you.  I said, "My wife accused of

Page 123

1  having an emotional affair with Ms. Hall."
2    I didn't confide in Mr. Chiocca.  I didn't
3  say anything else.  That was it.
4    Now, Mr. Chiocca offered that maybe I
5  should step down from the board of selectmen, maybe
6  I should give up the chairmanship, and maybe that.
7    Now, if we fast forward, all the way
8  into -- you know, after the report come out and all
9  that stuff, then obviously, you know, it's in the
10  report that Ms. Hall had disclosed that we had an
11  affair, and she disclosed that to Mr. Chiocca that
12  evening.  But unbeknownst to me, I didn't know that
13  Mr. Chiocca was aware of it that evening when I told
14  him my wife accused me of an emotional affair.  It
15  was a private matter between me and my wife, okay?
16  And that's how I left it.  And I didn't say anything
17  more.
18  Q.  Why did you tell Mr. Chiocca, "My wife
19  accused me of having an emotional affair with
20  Deirdre Hall"?
21  A.  Because I was spending a lot of time with
22  Ms. Hall.  I was working on her campaign.  And
23  another friend of my wife who worked for town hall.
24  And I know my wife, from time to time, you know,

Page 124

1  would -- would share -- she was a close friend and
2  would share, you know, some things with her.  So...
3  Q.  So my question -- and I apologize; I
4  totally see how you interpreted it the way you did.
5  I'm asking why you went to Mr. Chiocca on May 4th
6  and gave him that information.
7  A.  He asked me why I didn't attend the meeting
8  that night.
9  Q.  Okay.  And so you responded, "Because my
10  wife thinks I'm having an emotional affair with
11  Deirdre Hall"?
12  A.  I responded that I needed to stay home that
13  evening.  My wife had asked me to, and then she had
14  accused me of having an affair with Ms. Hall,
15  emotional affair.
16  Q.  Okay.  And did you tell him whether it was
17  true that you were having an emotional affair with
18  Ms. Hall?
19  A.  No.  No, I never acknowledged that it was
20  true or anything.
21  Q.  Did you deny it was true?
22  A.  He didn't ask.  He didn't ask me if it was
23  true.  So I didn't deny anything.  I just told him
24  what my wife accused me of.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 125

1  Q.  And this friend that you mentioned at town
2  hall, who was that?
3  A.  The friend, a close friend of ours, okay,
4  her name was Delshaune Flipp.
5  Q.  And do you know if your wife had told
6  Delshaune Flipp that you were having an affair?
7  A.  I don't know what my wife told Delshaune
8  Flipp at the time.
9  Q.  Do you, sitting here at this time, know if
10  she had told Delshaune Flipp?
11     MR. COOPER:  Do not disclose any
12  conversations that you've had with your wife.
13  A.  Again, I'm told not to answer, so...
14  Q.  Sitting here today, do you know if
15  Delshaune Flipp knows you had an affair with Deirdre
16  Hall?
17  A.  Sitting here today, I think the entire
18  world knows I had an affair with Ms. Hall, thanks to
19  your client letting that report out.  I've had
20  people calling me as far away as out of state.  I've
21  had people call me from, you know, around the world
22  that I've known who have read about it.
23  Q.  Mr. Kimball --
24  A.  I think every --

Page 126

1     MR. COOPER:  Let him finish.
2  A.  I think everybody knows about it at this
3  point, Samantha.
4     So you ask the question, do I think
5  Delshaune Flipp knows about it?  Yeah, I think
6  every -- just about anybody knows about it at this
7  point.
8  Q.  Did she know about it before --
9  A.  That was not my doing.  That was not my
10  idea.
11  Q.  Do you know if Delshaune Flipp knew about
12  it before June 30th, 2018?
13  A.  Before June 30th?
14  Q.  Yeah.  Prior to the report coming out.
15  A.  I don't.
16  Q.  She never had a conversation with you in
17  that time period about that?
18  A.  I think -- June 30th?
19     Let me see.
20  Q.  Prior to the report coming out.  Why don't
21  I say it that --
22  A.  Let me go back.
23     I think a lot of people at town hall may
24  have suspected, whether they confirmed it or not,

Page 127

1  and that's because Mr. Ryan was going around town
2  hall telling everyone it was okay for Ed Kimball to
3  fuck Deirdre Hall, but not Allan Chiocca.
4     So if you worked at town hall --
5  Q.  Where did you hear that?
6  A.  Huh?
7  Q.  Where did you hear that?  Who did you hear
8  that from?
9  A.  You asked me prior to June 30th?
10  Q.  Yes.
11  A.  So the evening of June 19th, prior to the
12  board of selectmen's meeting, Mr. Ryan was going
13  around town hall telling people that statement I
14  just told you.
15     So people -- and again, at that point, I
16  had already disclosed, I believe, at the advice of
17  town counsel, to Mr. Ryan that I, in fact, had an
18  affair.  So I believe he spread some of that stuff
19  out there.
20     But whether it was confirmed or not is
21  another issue, because no one approached me.
22  Q.  So help me out.  I may have missed part of
23  what you said, and I apologize.  That's all on me.
24     Larry Ryan went around town hall and told

Page 128

1  people who worked in town hall that you were having
2  an affair --
3  A.  Larry Ryan --
4  Q.  -- with Deirdre Hall?
5  A.  Larry Ryan was spreading rumors and gossip
6  about myself.  Okay?
7     Now, whether people believed him or not, I
8  don't know.  Once the report was made public, okay,
9  by your client, then there was a whole different
10  ball game.
11  Q.  But didn't Larry Ryan know the truth
12  because you had told him the truth?
13     MS. ZUCKER:  Objection.
14  A.  I don't know what other people knew.  You
15  asked me about what the other people thought.  You
16  asked me anyone else.  You asked me about Delshaune
17  Flipp.
18  Q.  I'm focused on what you --
19     MR. COOPER:  Let him finish.
20  A.  You asked me about Delshaune Flipp, and I
21  tried to answer to the best of my recollection,
22  okay?
23     Now as far as me confiding in Ms. Delshaune
24  Flipp, no, I did not tell Delshaune Flipp.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 129

1     As far as my wife, again, those
2  communications I'm told not to answer.  As far as
3  other people at town hall, I told you what happened.
4  Q.  Help me out there.
5     On -- in the middle of June you told me you
6  told Larry Ryan that you were having an affair with
7  Deirdre Hall.
8     Did you say an emotional affair?  Did you
9  tell him you were having an actual affair?
10     MS. ZUCKER:  Objection, asked and answered.
11  A.  At the advice of town counsel at the time,
12  okay, I was advised by town counsel to inform my
13  other board members what, in fact, had actually
14  transpired.  Okay?  So I told them I had an affair
15  and it was over, which it was.  That was prior to
16  the June 19th meeting.
17  Q.  Got it.
18     So you told the other BOS members the
19  truth; that you had had that type of affair with
20  Deirdre Hall, correct?
21     MS. ZUCKER:  Objection.
22  A.  I told -- I told Larry Ryan, Mike Mullen,
23  Mr. O'Loughlin that I had both an emotional and
24  physical affair with Ms. Hall.

Page 130

1  Q.  Did you ever tell that to Allan Chiocca?
2  A.  No.  I only said emotional.
3  Q.  Okay.  But did you say that?  Or did you
4  relay to Mr. Chiocca as if it was an allegation from
5  your wife?
6  A.  I relayed that as an allegation from my
7  wife.
8  Q.  Okay.
9  A.  Unbeknownst to me, if we're fast forwarding
10  this three-year saga, okay, apparently Mr. Chiocca
11  was already aware of it.
12  Q.  And you presented it to Mr. Chiocca as it
13  was a concern of your wife's, correct?
14  A.  It was a concern of my wife, correct.
15  Q.  Okay.
16  A.  I was still serving on the board of
17  selectmen, okay?  And it was a private matter
18  between my wife and the Halls, and that was it.  And
19  I left it at that.
20  Q.  You felt that was an appropriate thing to
21  share with your subordinate?
22     MS. ZUCKER:  Objection.
23  A.  What's that?
24  Q.  You --

Page 131

1  A.  It was an accusation, okay?  He asked me
2  why I wasn't at the meeting.  I answered honestly.
3  That's what I told him.
4  Q.  Did you answer him honestly?  Was that what
5  your wife was afraid of?
6     MR. COOPER:  Objection.
7  Q.  Your wife knew the truth, right?
8  A.  What's that?
9     MS. ZUCKER:  Objection.
10  Q.  Did you answer Allan Chiocca's question
11  honestly?
12     MS. ZUCKER:  Objection.
13     MR. COOPER:  Objection.
14  A.  At the time, yeah, I did.
15  Q.  How so, since your wife did know the truth,
16  right, at that point?
17  A.  Because she had accused me of having an
18  emotional affair.
19  Q.  Hadn't she -- didn't she know at that point
20  that you had an actual affair with Ms. Hall?
21  A.  She did.
22     MS. ZUCKER:  Objection.
23  Q.  So what she was upset about on the night of
24  May 1st was not that she suspected you were having

Page 132

1  an emotional affair, correct?
2     MS. ZUCKER:  Objection.
3  A.  I don't know what she was fully upset
4  about.
5     Again, we had a discussion that night,
6  Samantha, I was instructed not to share with you.
7  If -- what do you want to know about me and my
8  wife's relationship?
9  Q.  I'm not asking you about your relationship.
10  I'll asking if you told the truth to Mr. Chiocca.
11  A.  I can't tell you what she thought.  I can
12  only tell you what I knew.
13  Q.  Mr. Kimball, I'm asking what you -- if you
14  told the truth to Allan Chiocca that the reason you
15  weren't at the meeting on May 1st was because your
16  wife suspected you were having an emotional affair
17  when the truth is your wife knew you were having an
18  actual affair, correct?
19     MS. ZUCKER:  Objection.
20  A.  My wife was --
21     MS. CIESLAK:  Objection.
22  A.  My wife knew I was having an affair.  The
23  affair had ended.  Okay?  That's simple.  It was a
24  personal matter.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

---

Page 137

1 was during the day.
2 Q. Was she waiting outside the building that
3 morning?
4 A. What's that?
5 Q. Was she waiting outside the building that
6 morning?
7 A. Not that I'm aware of.
8 Q. Do you remember what time of day you were
9 there?
10 A. I'm going to guess it was sometime -- if I
11 was -- I'm going to say --
12    MR. COOPER: Don't guess.
13 Q. Don't guess.
14    Morning or afternoon?
15 A. In the morning.
16 Q. Before --
17 A. Specific time, I don't know.
18 Q. Did you have a habit of coming to the town
19 hall at a particular time of day?
20 A. What's that?
21 Q. Did you have a habit of coming to town hall
22 at a particular time of day?
23 A. No, I don't have a routine.
24    I work for myself, Samantha. So my day,

---

Page 138

1 sometimes I get a break in the day. Sometimes I
2 don't come in for days. Sometimes I'm in every
3 couple of days. Sometimes I'm in daily. It depends
4 on what's going on.
5 Q. So at this point you don't know that Allan
6 Chiocca knows about your affair, May 4th?
7 A. I personally, I personally am not. I was
8 not aware of the fact that Mr. Chiocca --
9 Q. Knew?
10 A. -- knew about my affair.
11 Q. Because Deirdre Hall had told him?
12 A. Apparently that came out in this
13 investigative reporting.
14 Q. Who else knew about the affair at that
15 point, May 4th?
16 A. Who else?
17 Q. To your knowledge. To your knowledge.
18 A. To my knowledge?
19    I think Mr. Chiocca had the conversation
20 with -- you know, "What happened the other night"
21 type of thing.
22    And I had said that -- I believe I said,
23 "My wife accused me of having an emotional affair
24 with Deirdre Hall, and she was upset, and I stayed

---

Page 139

1 home." That was it.
2 Q. Okay. I don't want to interrupt you, but
3 sometimes you don't hear my question, I think,
4 correctly. It could be me.
5    My question is by May 4th --
6 A. Uh-huh.
7 Q. -- who knew you were having an -- you had
8 had an affair with Deirdre Hall?
9    So your wife knew, right?
10    Allan Chiocca --
11 A. My wife.
12 Q. -- knew, but you didn't know that.
13 A. I didn't know that.
14 Q. And Mr. Hall knew --
15    MR. COOPER: Let her -- wait for a
16 question.
17 Q. Let me finish.
18    Deirdre Hall knew. Chris Hall knew?
19 A. Okay.
20 Q. Did anyone else know, to your knowledge, at
21 this point?
22 A. To my knowledge, no.
23 Q. Okay. Had you told your family yet?
24 A. No.

---

Page 140

1 Q. Other than your wife?
2 A. No.
3 Q. Okay. So by the morning of May 4th, Allan
4 Chiocca has heard from two of his five bosses,
5 correct?
6    MR. COOPER: Objection.
7 Q. One has told him -- let me finish the
8 question. One has told him he's -- that she's
9 having an affair with a colleague; the other said
10 that --
11    MR. COOPER: Wait for her to finish.
12 Q. -- his wife suspects that he's having an
13 affair.
14    What do you think Allan Chiocca should have
15 done with that information?
16    MS. ZUCKER: Objection.
17    MR. COOPER: Objection.
18 A. I don't know what Allan should have done
19 with the information. Ask Allan.
20 Q. What would you have done if you were him in
21 that situation?
22    MR. COOPER: Objection.
23    MS. ZUCKER: Objection.
24 A. I don't know what I would have done. I

---

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 141

1    mean...
2  Q.   It's a quandary, right?
3  A.   What's that?
4  Q.   It's a quandary?
5      MR. COOPER: Objection.
6      MS. ZUCKER: Objection.
7  A.   You asked me what I would do when I said
8    that. I don't know what I would do in that
9    situation. I wasn't in that situation.
10 Q.   Who could he have reported it to?
11 A.   What's that? Who could he have reported it
12   to?
13 Q.   If he thought it was a conflict.
14 A.   What's to report?
15 Q.   If he thought it was a conflict, who could
16   he report it to?
17     MS. ZUCKER: Objection.
18 A.   I assume he could approach town counsel.
19 Q.   Okay.
20 A.   Maybe that's a question for Mr. Clifford.
21 Q.   So he should have gone to Mr. Clifford
22   about your affair?
23     MS. ZUCKER: Objection.
24     MR. COOPER: Objection.

Page 142

1     That's not what he said.
2  A.   You asked me a question who he could report
3    to, and I said possibly town counsel, John Clifford.
4  Q.   When did you tell Mr. Clifford that you had
5    had an affair with Deirdre Hall? If you did.
6  A.   When did I tell Mr. Clifford?
7  Q.   Yes.
8  A.   I believe Mr. Clifford was told after my
9    first interview with Ms. Ryan. When Ms. Ryan asked
10   me about it, I responded to Ms. Ryan that -- she
11   asked me the question, and I responded yes, I did.
12 Q.   Do you remember when your first interview
13   with Ms. Ryan was?
14 A.   I believe it was somewhere maybe around
15   June 12th, June 13th, maybe, somewhere in that time
16   frame.
17 Q.   Okay. So what did Ms. Ryan tell you to
18   tell Mr. Clifford?
19 A.   What's that?
20 Q.   Why did you decide to tell Mr. Clifford
21   that day --
22 A.   Why did I tell Mr. Clifford that day?
23   I think Mr. Clifford --
24     MR. COOPER: Let him finish please.

Page 143

1  Q.   I was correcting my question.
2  A.   Okay. Please state your question again
3    then, Samantha.
4  Q.   Did you tell Mr. Clifford that you had had
5    an affair with Deirdre Hall?
6  A.   Yes.
7  Q.   And what -- and why did you decide to do it
8    at that time?
9  A.   Why did I decide?
10     Because I've answered the question from
11   Regina Ryan. She asked about it.
12 Q.   Okay.
13 A.   I was a little shocked she asked me about
14   that, but I answered.
15 Q.   Why were you shocked she asked you about
16   it?
17 A.   Because not only did she ask me about the
18   affair, but she wanted to ask me in detail what my
19   sexual preferences were and what type of sex I had
20   with Ms. Hall, which I thought was, like, way off
21   the charts for any of this stuff, to be honest with
22   you. I was, like, "What's that have to do with what
23   happened?" It makes no sense to me.
24 Q.   Let's stick to --

Page 144

1  A.   You just asked me, and I just told you.
2  Q.   I -- I agree. I'm just trying to get --
3    like sort of focus so we don't have to be here all
4    day and tomorrow all day.
5  A.   We're here till 5:00. I'm here all day.
6    I'm committed here.
7  Q.   I'm trying to get us out, though, as
8    quickly as I can.
9      So on the day you spoke to Regina Ryan --
10 A.   Uh-huh.
11 Q.   -- that's the first time you knew that
12   Regina Ryan knew that there was a sexual
13   relationship between you and Ms. Hall, correct?
14     MR. COOPER: Objection.
15 A.   I don't know that. You would have to ask
16   Regina Ryan that.
17 Q.   Okay. But she --
18 A.   You asked me when I disclosed it to
19   Mr. Clifford, and I believe it was after my meeting
20   with Regina Ryan.
21     Although, you know, me looking back at all
22   this stuff these last few years, I would say
23   probably say that Mr. Clifford knew prior to that.
24 Q.   Why do say that?

Pages 141 - 144 (36)

Doris O. Wong Associates, Inc.

Min-U-Script®

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

---

Page 145

1  A.  It's just the hair on the back of my neck
2  sticking up saying that.
3  Q.  Now --
4  A.  I can't tell you.  I'm just thinking that
5  that's just how I think.
6  Q.  Anything he said to you or anything he sent
7  you that made you think that?
8  A.  Nothing specifically.  But, I mean, you
9  have to ask him when I told him or when he knew.
10 Q.  Okay.  Did he ever talk to you about it
11 before you disclosed it to him?
12 A.  No.  I don't think so.
13 Q.  Okay.  I'm going to show you another
14 document -- one second -- Number 388.  So I'm going
15 to put it in the chat.
16 A.  Uh-huh.
17     MS. HALEM:  And then we'll have --
18 Can you mark this as Exhibit 2, Alex?
19 (Document marked as Kimball
20 Exhibit 2 for identification)
21     THE REPORTER:  Okay.
22     MS. HALEM:  Thank you.
23     MR. SHAFRAN:  I'm waiting for it to load on
24 my computer.

---

Page 146

1     MS. HALEM:  No problem.
2     When you do get it to load, we're going to
3  go to 388, Kimball.  Like that's the Bates stamp
4  number, Adam.  And everyone else.
5     THE REPORTER:  If it's not loading, you
6  might want to click on it again.
7     MR. SHAFRAN:  Okay.
8     MS. HALEM:  It came up for me fine.
9     MR. SHAFRAN:  Here it comes.  Hold on.  Let
10 me go to the page.
11    MS. HALEM:  It's 388, like I said.
12    MR. SHAFRAN:  Yeah.  I'm going to it.
13    MS. HALEM:  Anyone else having an issue?
14    MR. SHAFRAN:  I'm going to share it, so
15 it's coming.
16    MS. HALEM:  Okay.
17    MR. SHAFRAN:  Sorry.
18    All right.  Here it comes.
19    Oops.  Wrong one.  Sorry.  Let me try that
20 again.
21    Here's 388.
22    MS. HALEM:  Okay.  Actually stay at the
23 bottom, if you could.
24    MR. SHAFRAN:  Okay.

---

Page 147

1     MS. HALEM:  Back where you were.
2  Q.  Mr. Kimball, do you see this is, like I
3  said, Kimball Page 388 in your production.
4     Have you seen this document before?
5  A.  I think I may have seen it way back when.
6  Q.  Okay.  It's a text message -- you tell me
7  if I'm right or wrong -- between your wife and you,
8  several text messages, correct?
9  A.  Yep.  Yeah.  That's it.
10 Q.  I'm just doing this to identify it for the
11 record, so bear with me.
12 A.  Uh-huh.
13 Q.  The date on these texts is May 4th, 2018;
14 is that correct?
15 A.  Yep.
16 Q.  Your wife texted you:
17     "Is it going okay?  I'm really
18 nervous."
19 A.  Can you just go to what's before and after?
20 Q.  Go ahead and read.
21     Okay.  It's a different page?
22     MR. SHAFRAN:  What's before is from two
23 days earlier.
24     MR. COOPER:  Okay.  Now let's go to what's

---

Page 148

1  after.
2     MR. SHAFRAN:  Eight days later.
3     MR. COOPER:  Okay.  Thank you.
4     MR. SHAFRAN:  Seven days later.
5     BY MS. HALEM:
6  Q.  And you respond:
7     "Yes.  Zoning meeting is over" -- I'm
8  assuming "MTG" is meeting.  "Now we are
9  talking in Allan's office about Operation
10 Containment.  I will tell you all about
11 once home."
12 A.  Uh-huh.
13 Q.  What's "Operation Containment"?
14 A.  I believe that was a conversation that's
15 with Ms. Hall, that I was meeting with Ms. Hall
16 after a meeting to discuss how we were going to, I
17 guess, work with one another, you know, after our
18 affair and as far as making sure that nobody found
19 out about it and we kept it personal and private.
20 Q.  Why are you in Allan's office having this
21 conversation?
22 A.  It's the board of selectmen's office.  We
23 all had the key to it.  It's the board of
24 selectmen's office.

---

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

---

Page 153

1  think?
2  A.  I don't know.  It looks that way, but I
3  don't know for sure.
4  Q.  Okay.  Do you know how she -- like what she
5  wants to have happen?
6     MR. COOPER: Do not disclose any
7  communication --
8  A.  I don't know.
9     MR. COOPER: -- with your wife --
10 A.  I don't know.
11    MR. COOPER: -- other than --
12 A.  I'm instructed not to answer.
13    MS. HALEM: Adam, can you scroll down a
14 little bit?
15 Q.  You respond:
16    "I know.  No easy answer."
17    And then your wife responds:
18    "I just hope she doesn't get her rep
19 spot.  I don't trust her, and I want this
20 last year of her life to have all been for
21 nothing."
22    Your wife seems angry.  Would you agree
23 with me?
24    MR. COOPER: Don't answer that.

---

Page 154

1  A.  I'm instructed not to answer.
2     MS. HALEM: He can't tell me his mental
3  impressions sitting here today of a text?
4     MR. COOPER: That he can answer.
5     THE WITNESS: I'm going to say this as
6  kindly as I can:
7     You've got to understand that my wife was a
8  woman who was recently informed that her husband had
9  had an affair.  It had ended, and my wife was upset
10 about it, as rightfully she should be.
11    BY MS. HALEM:
12 Q.  Okay.
13 A.  I hurt my wife, and I regret that.  But the
14 affair happened, and I can't take it back.  It
15 happened, so...
16 Q.  Okay.  You respond:
17    "Allan wants her to win" --
18    MR. SHAFRAN: I can't see.
19    Actually, Adam, can you scroll for a
20 second.  There's a continuation there.
21    THE WITNESS: I can't see it, either.
22    BY MS. HALEM:
23 Q.  Can you see it now?
24 A.  Yeah.  I'm just --

---

Page 155

1  Q.  "Allan wants her to win so she will leave
2  the board."
3     Is that true that -- did Allan tell you
4  that?
5  A.  I think that was a general consensus.
6  Q.  General consensus of whom?
7  A.  Of a lot of board members.  I think she --
8  she held Allan accountable, and I think Allan was
9  accustomed to -- to being in -- you know, doing
10 things the way he wanted to do it without anyone
11 questioning to him.
12    As I said to you before earlier, Samantha,
13 a lot of boards was inactive.  This was the first
14 time we actually had somebody on the board who was
15 taking an active role, and I think -- I think,
16 because of that, you know, that meant that people
17 had to be accountable.
18 Q.  You said it was a general consensus of the
19 board.
20    So the other members of the board didn't
21 want her on the board?
22 A.  No, I'm not saying that.
23    What I'm saying is -- you asked about the
24 statement, "Allan wants her to go."  So I would

---

Page 156

1  think that the other members of the board would
2  agree with that statement.
3  Q.  That they wanted her to not be on the
4  board?
5  A.  No.  That Allan wants her to go, because
6  Allan wants her off the board.
7     Okay.
8  Q.  Oh.  You're saying that the other members
9  of the BOS, yourself included, all agreed that Allan
10 wants her to win?
11 A.  Correct.  That's what -- that was what the
12 statement -- when I read the statement that said
13 "Allan" wants her to go, he "wants her to win so she
14 will leave the board," okay?  And you asked me why,
15 and I tried to explain why.  So...
16    Are you still there, Samantha?
17 Q.  Yeah.  I'm there.  I'm sorry I have to look
18 on my screen.  There's too many screens.
19 A.  I'm sorry.
20    MS. HALEM: Adam, can you scroll down for
21 me a little bit more, the next page.
22 Q.  So your wife responds:
23    "This whole situation is fucked up."
24    You respond, "Yup."

---

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 157

1       MS. HALEM: Keep scrolling.
2   Q.   I just -- she says:
3        "I just don't want her sucking you
4    back in."
5        Now --
6   A.   Again -- again --
7   Q.   Wait. Let me get to the question.
8   A.   Okay.
9        MR. COOPER: Wait for a question.
10  Q.   There is not one in front of you.
11       One second.
12       We are now at May 17th?
13  A.   Yep.
14  Q.   What has happened on May 17th that your
15   wife is concerned?
16  A.   What's the time of the text?
17       MS. ZUCKER: Objection.
18  Q.   The text is at 10:58 p.m.
19  A.   Okay.
20  Q.   So tell me what's going on that the
21   situation is "fucked up"?
22       MS. ZUCKER: Objection.
23  A.   Well, if you must, that's on May 17th,
24   correct?

Page 158

1   Q.   Yep.
2   A.   Okay. And that's at what time?
3   Q.   10:58?
4   A.   P.m.?
5        MS. CIESLAK: I just want to note for the
6    record that this says "UTC," which is coordinated
7    universal time.
8   A.   So it had --
9        MS. ZUCKER: Hold on. I didn't catch
10   Cindy's objection.
11       Before you start speaking, Ed, Cindy?
12       MS. CIESLAK: I just wanted to note for the
13   record that the time that's being represented it
14   says "UTC," which is coordinated universal time,
15   which is, it's my understanding, not eastern
16   standard time.
17       THE WITNESS: Which means what?
18       MR. COOPER: Don't rely on the time.
19       MS. HALEM: Well, don't rely also on
20   Cindy's assessment, which we don't know is accurate.
21       THE WITNESS: Okay.
22       MR. COOPER: Ask your question, please.
23       BY MS. HALEM:
24  Q.   What situation do you think your wife is

Page 159

1    referring to as "this whole situation is fucked up"
2    and she doesn't want you to get sucked back in?
3        MR. COOPER: Now answer that question
4    without disclosing oral communications with your
5    wife.
6        THE WITNESS: Okay.
7   A.   So at that point in time, Ms. Hall had
8    already called me earlier in the morning and
9    disclosed to me that she believed something
10   inappropriate had happened at town hall. That was
11   the morning of the 17th, okay? She was upset. I
12   could tell she was anxious. I could also sense that
13   she was asking me for help.
14       Okay?
15  Q.   Okay.
16  A.   She had told me that she couldn't remember
17   anything that night; that she believed she was
18   drunk, drinking, and can't remember anything. And
19   she believes it may have happened at town hall after
20   the board of selectmen's meeting.
21       And I said, "Okay." And my response was,
22   "I've got to process this."
23       And then we're talking about the 17th, so
24   leading up to these texts, the whole course of

Page 160

1    events that day, I went up to town hall, as everyone
2    knows. I spoke to Mr. Hart about videos. I again
3    spoke to Ms. Hall later in the day, still nothing
4    different other than the fact that she told me she
5    spoke to her husband when she got home and she said
6    she'd have her husband call me.
7        Later that night, her husband had called me
8    prior to this text, mentioned "blow jobs,"
9    "contracts." And I'm like, "Okay."
10       At that point, I think I texted
11   Mr. Chiocca. Mr. Chiocca called me. I informed
12   Mr. Chiocca that a board member's husband had called
13   me. Mr. Chiocca -- I think his response at that
14   time was, "Oh, fuck. The tapes at Rockland Bar and
15   Grill" -- "RBG," to be exact. And then me and wife,
16   according to this text, were thinking, "What the
17   hell happened?"
18       And me, it became apparently clear to me
19   that something of a sexual nature had happened based
20   on the discussion with Ms. Hall in the morning,
21   based on the fact that Mr. Hall had told me and then
22   what Mr. Chiocca had said about tapes at RBG. And I
23   had already seen the tapes at that point of
24   Mr. Chiocca and Ms. Hall coming into town hall.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 161

1  So, I mean, I've never encountered anything
2  like that. And quite honestly, I mean, that's what
3  it was all messed up about.
4  And I can't disclose the other
5  conversations, you know, that I had with my wife
6  that night. But, I mean, I can tell you I didn't
7  sleep a wink that night.
8  And obviously the next day I had tried to
9  speak with both Mr. -- Mr. -- I did speak with both
10 Mr. Hall and Ms. Hall, you know, to find out if I
11 could get any more information. And there was no
12 other information to me at that time.
13 So at that point I had contacted town
14 counsel, John Clifford, because something, in my
15 mind -- my mind something had happened between
16 Ms. Hall and Mr. Chiocca. I believe Ms. Hall might
17 have been sexually assaulted by Mr. Chiocca. That's
18 why I contacted town counsel.
19 Town counsel informed me that he would be
20 at town hall that morning anyhow; they were doing
21 union negotiations, and he would be there anyhow.
22 And I told him I was in Boston and I would be there
23 as soon as I could.
24 And when we got back to town hall, I got

Page 162

1  back to town hall that morning, confronted Allan,
2  talked to Allan, and Allan acknowledged and admitted
3  that -- you know, that something had happened
4  between Ms. Hall. He said, "It was only a blow
5  job."
6  And, you know, then, of course, you know,
7  things went into, we want to make this thing go
8  away, and he didn't want -- Mr. Clifford, I believe,
9  had said, "We will have to put you on" -- "on
10 leave." And he didn't want that to happen because
11 he didn't want a mark on his record, and he said
12 that he would leave and retire, resign, do
13 whatever -- whatever, "Just make sure I get paid to
14 the end of" -- "end of the year," and have him come
15 back on -- I believe it was the meeting we have on
16 June 5th, his anniversary meeting.
17 So that's what happened.
18 And prior to all that, it was like all the
19 events and all the emotion that night, and this text
20 from my wife, and yeah, I thought it was fucked up.
21 I thought the whole thing was screwed up.
22 I mean, I didn't know what to think. And
23 when I went to town hall and seen two of them, seen
24 them going in there, I could -- I mean, I could

Page 163

1  clearly see that, you know, Ms. Hall looked like she
2  was intoxicated. And, I mean, it looked like there
3  was the missing pieces on the tape to me.
4  I mean, at that point in time I didn't know
5  what to think. I mean, again, that's why I called
6  town counsel.
7  But to my wife's statements, yeah, we were
8  both in awe.
9  MR. COOPER: Are you done?
10 Q. So back this up a little bit.
11 A. Yeah.
12 Q. On May 17th --
13 MR. COOPER: Are you finished with your
14 answer, Mr. Kimball?
15 MS. HALEM: He said yes.
16 A. So when you say it was all -- all screwed
17 up, I mean, yeah. I mean, at that point in time
18 you've got to remember I had seen a video. I had a
19 copy of a video. I had spoken to Ms. Hall. I had
20 spoken to Mr. Hall, and I had a -- a brief
21 conversation with Mr. Chiocca, and all things were
22 like, "Wow. What just happened here?"
23 So...
24 Q. Mr. Kimball, on May 17th, at ten o'clock at

Page 164

1  night, you did not have any of that. All you had
2  was Deirdre Hall talking to you, correct?
3  A. No, I did not.
4  Chris Hall had talked to me that night, and
5  Mr. Clifford talked to me that night.
6  Q. You talked to Chris Hall on the night of
7  May 17th --
8  A. Yes.
9  Q. -- or on the morning of May 18th?
10 A. No. On the night of May 17th, and again on
11 the morning of May 18th.
12 Q. You had two conversations with Mr. Hall?
13 A. Yes, I did.
14 Q. So you think you had the conversation with
15 Mr. Hall after this text or before?
16 A. I spoke to Mr. Hall earlier in the evening
17 before this text from my wife.
18 Q. Okay. So if your interrogatories say that
19 you didn't speak to him until May 18th, there's an
20 error on your interrogatories?
21 A. In what now?
22 Q. Your interrogatory, your sworn statement in
23 this case about when you spoke to Mr. Hall.
24 A. I spoke to Mr. Hall initially on May 17th.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

**Page 165**

1 Q. Okay. Tell me the substance of that
2 conversation.
3      MR. COOPER: Just --
4 A. Again, on the night of May 17th, Mr. Hall
5 said to me that he wanted to know, what's -- about
6 "blow jobs" and "contracts."
7 Q. And that's your sworn statement today, that
8 that's when that conversation occurred?
9 A. To the best of my recollection.
10 Q. Got it.
11 A. That evening, Mr. Hall had contacted me,
12 told me what Ms. Hall had said to him after she got
13 home the evening of May 1st.
14 Q. Let's go back.
15      MR. COOPER: Are you done?
16 Q. I want to go over something you said.
17 A. So you asked me about the text from my wife
18 of May 17th.
19      Now, I can't answer about conversations I
20 had with my wife, but I'm trying to tell you that
21 all of these things put together that night, it was
22 fucked up, and I didn't know what to do at that
23 point.
24 Q. Okay. So you say that Ms. Hall, when you

---

**Page 166**

1 spoke to her on the 17th, what do you remember her
2 saying to you that day? You used the word
3 "inappropriate."
4      Did she use that word?
5 A. I don't believe she used the word
6 "inappropriate." I think she said something along
7 the lines of, "I believe something may have happened
8 to me at town hall after the meeting. I don't
9 remember it. I was drunk."
10      But she did say to me that Allan had
11 thanked her for her birthday present, and I asked
12 her what she got him. And she said she didn't get
13 him anything. So I was like, "Okay. What's that
14 mean?"
15 Q. She said that to you on the night of May
16 17th, or the morning, or whenever she spoke to you.
17 A. You keep -- listen --
18 Q. I need to focus on that one conversation.
19      MR. COOPER: Let him finish, please.
20      MS. HALEM: I need him to understand what
21 I'm asking him to focus on, because I think that may
22 be the problem.
23      I'm not asking for the whole story.
.4      MR. COOPER: Samantha, you told --

---

**Page 167**

1      MS. HALEM: I'm asking for the first
2 conversation, Howard.
3      MR. COOPER: Ed, wait one minute.
4      MS. HALEM: Let me finish my question.
5      MR. COOPER: Let her talk for a second;
6 then I'll say something; then you.
7 BY MS. HALEM:
8 Q. My entire focus right now, Mr. Kimball, is
9 on her initial call to you on May 17th. That's it.
10 That's the only thing I want to hear about right
11 now.
12      MR. COOPER: So ask your question.
13      MS. HALEM: Thank you.
14      THE WITNESS: Okay.
15 BY MS. HALEM:
16 Q. On May 17th, what time did Deirdre Hall
17 call you? Let's start there.
18 A. In the morning, I believe it was
19 midmorning, sometime between 9:00 -- 9:00 and
20 10:00-ish, somewhere in there.
21 Q. On your cell phone or on your work number?
22 A. On my cell phone, I believe. It may have
23 been on my work number. I mean, I was --
24      MR. COOPER: Let him finish.

---

**Page 168**

1      MS. HALEM: My apologies.
2 A. I have a home office. I happened to be
3 home working from the office that day.
4 Q. Okay.
5 A. I thought it may have been on my cell
6 phone. I can be wrong, but it may have been in my
7 office. But she called me that morning.
8 Q. Okay. How long was that conversation?
9 A. A few minutes, I would say. I mean...
10 Q. Was that the only conversation you had with
11 her about the May 1st incident that day?
12      MS. ZUCKER: Objection.
13 A. No, it was not.
14 Q. Okay. How many other times did you speak
15 to her that day about the May 1st incident?
16      And when I say "the May 1st incident" you
17 know what I'm talking about: The allegation that
18 something happened at town hall between May 1st at
19 night and the morning of May 2nd, correct?
20      MS. ZUCKER: Objection.
21 A. If that's -- if that's what you want to
22 call it.
23 Q. That's what I want to call it, yeah.
24 A. Okay. Then I believe she spoke with me a

---

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 169

1   number of times that day.
2   Q.   How many times?  Do you remember?
3   A.   I want to say I spoke in the morning to
4   her.  After I went to town hall and seen the tapes,
5   I called her to speak again to her.
6   Q.   Okay.
7   A.   Then we met in person.  And then I believe
8   we may have spoken -- we may have even spoken again
9   that evening, shortly, briefly.
10  Q.   That first conversation with you, you said
11  she said that "something happened to me."
12      Is that the words she used?
13  A.   I believe so.  Something happened to her,
14  yes.
15  Q.   And did she elaborate on that at all?
16  A.   What she told me was, she believed it was
17  at town hall.  She couldn't remember.  She had been
18  drinking, and she said that she thinks it happened
19  at town hall after the meeting with Allan.
20      Because she said that he had thanked her
21  for her birthday present.  And I said, "Well, what
22  did you get him?"  And she said, "I didn't get him
23  anything."
24      So I was, like --

Page 170

1   Q.   Was that in the initial conversation?
2   A.   Okay.  You've got to remember where I'm
3   coming from, too, Samantha.
4       Someone said something to me.  She's
5   anxious on the phone.  She's upset.  Okay?  So I'm
6   trying to comprehend what she's saying, what she
7   means.  And I understood it to mean that she was
8   asking for my help.
9   Q.   For what?  What did you understand her to
10  be asking for?
11  A.   To find out what may have happened to her.
12  Q.   How could you do that?
13  A.   I don't know how I could do that.  I said,
14  "Let me comprehend this."
15  Q.   Did she tell you what she wanted you to do?
16  A.   No, she did not tell me what she wanted me
17  to do.
18      She reported this incident to me, okay?
19  Q.   What exactly did she report to you about
20  the incident?  Did she say something sexual
21  happened?  Did she use the word "sexual"?
22      MS. ZUCKER:  Objection, asked and answered.
23  A.   I don't know if she specifically used the
24  word "sexual," okay?

Page 171

1   Q.   What led you to believe it was sexual?
2   A.   After I had seen the tapes and after
3   Mr. Hall had called me, then it led me to believe
4   that something sexual had happened at that point.
5   Q.   Prior to your seeing the tapes or speaking
6   to Mr. Hall, did you think it was something sexual?
7   A.   I didn't know what it was.
8   Q.   Okay.  Did she give you any indication of
9   what it was, what she thought it was?  Or did she
10  say -- let me finish -- did she say just that, "I
11  don't remember what happened," that "I was drunk,"
12  or words to that effect?
13  A.   She said she didn't remember exactly what
14  happened.  She had been drinking.  She believes it
15  happened at town hall.
16      And again, when she said that Mr. Chiocca
17  thanked her for the birthday present; and I had
18  asked her what she got him, and she said "nothing,"
19  I said, "Oh."  And I thought to myself, "What could
20  she give him if she didn't buy him anything?"
21  Q.   She said she didn't remember anything?
22  A.   That's right.
23  Q.   So she could have given him any number of
24  things?

Page 172

1   A.   She didn't give him a birthday present.
2   Q.   Maybe she did because she forgot?
3   A.   I don't know.  I'm just telling you what
4   the conversation was.
5       So I went down to town hall later that day.
6   I went into Eric Hart's office, who is our town
7   accountant, and he doubled as the IT guy.
8       I said to Eric Hart, "A resident had
9   approached me and told me that they might have seen
10  something happen at town hall the other night after
11  the board of selectmen's meeting.  Do the tapes
12  record" -- "do the tapes have that?"
13      And he goes, "Yeah.  Let me pull them up."
14  So he pulled them up.  I was only in there
15  briefly, okay?  Because at that time I was at town
16  hall with my wife.  I had left my wife in Allan's
17  office, and I went over to Eric's office.
18      And Eric said, "You're not going to believe
19  this," and lo and behold, on the screen was
20  Mr. Chiocca and Ms. Hall.  So I seen them coming
21  into town hall and going back.
22      Now, I had a meeting later that evening, I
23  believe.  I think it was a 6:00 p.m. meeting for the
24  school building committee that Mr. Hart would attend

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 173

1 as well. So I had asked him to make a copy of what
2 he had seen. I had asked him not to say anything to
3 anyone, because I didn't know what it meant. I was
4 actually dumbfounded at that point that something
5 actually was on tape on that evening.
6 So I have Ms. Hall told me something
7 happens -- may have happened. I have tapes.
8 I contact Ms. Hall. I never told her I had
9 seen the tapes. I met with her later that
10 afternoon, on the rail trail which is adjacent to
11 the senior center, so there's parking there. It's a
12 public trail. There's baseball games or practice
13 going on out back. The school uses it. It abuts
14 the -- the elementary school. So high school teams
15 use it for practice.
16 We walked down the rail trail. I tried to
17 find out what had transpired. Ms. Hall couldn't
18 remember anything. And I said, "Did you tell your
19 husband anything? Do you know anything?" Never
20 even alluded to the fact that I had seen the tapes.
21 And she said, "I said something to Chris.
22 Chris will give you a call after work."
23 I said, "Okay. I've got to get to a
24 meeting."

Page 174

1 So I went to the six o'clock meeting.
2 Mr. Hart gave me a thumb drive, I believe, which I
3 turned over to counsel. I had viewed the thumb
4 drive. It had other views that I didn't see in
5 Mr. Hart's office. I only seen a few things on the
6 screen in Mr. Hart's office because I had to get
7 back over, get my wife.
8 And then I had missed Mr. Hall's first
9 attempt to call me. I had called him back. I had
10 asked him what happened that night. He says,
11 "Deirdre came home. She was really drunk. I asked
12 her what happened, and he said to me something 'blow
13 jobs,' 'contracts.'"
14 And I'm, like, "What?"
15 And he said that was conversation that
16 Deirdre had with him, and she was with Allan
17 Chiocca.
18 I'm like, "Okay."
19 So after I hung up the phone from Chris
20 Hall, I texted Allan Chiocca, and Mr. Chiocca called
21 me back. I said, "I just had heard from a board
22 member's husband." There's only one female board
23 member. I think I said to him something along the
4 lines of, "What's this about 'blow jobs'?"

Page 175

1 And then he had said to me, "Oh, fuck. The
2 tapes at RBG."
3 And I said, "Well, I'll talk to you in the
4 morning. I've got to be in Boston early. I'll talk
5 to you after that."
6 He texted me in the morning early, said he
7 was there. I think I texted him back and said, you
8 know, I was in town.
9 I stayed up the whole night. I didn't
10 sleep a wink. I didn't know what to do. I was,
11 like, "What's going on here?"
12 I had talked to Chris Hall again that
13 morning on the way in to work. He is a teacher. He
14 had called or I had called him.
15 I asked him if he knew anything further.
16 There was no change.
17 I had a conversation with Deirdre. There
18 was no change.
19 I had taken a couple of screen shots of
20 what I had seen on the video. I sent them to
21 Deirdre, asked if it would jog her memory. I think
22 I had a conversation with her again. There was no
23 change.
24 At that point I called town counsel,

Page 176

1 because I didn't know what to do. I told town
2 counsel what happened.
3 Q. Okay.
4 A. And that was it.
5 Q. Mr. Kimball, I want to get you to lunch, so
6 I just want to ask you a few quick questions.
7 MR. COOPER: Well, it's ten past 1:00. Why
8 don't we take the lunch break?
9 MS. HALEM: No. It's 1:02, and we will
10 take it in a minute, but let's just ask a few quick
11 questions so we can get a little bit of information,
12 and then I promise you --
13 THE WITNESS: Are we breaking at 3:00 as
14 well?
15 MS. HALEM: Yes.
16 THE WITNESS: Listen. I live to eat. I've
17 got to eat something.
18 MS. HALEM: Mr. Kimball, I promise you.
19 Just stick to questions --
20 THE WITNESS: Okay.
21 MS. HALEM: -- don't give me a long answer,
22 and we should be fine.
23 THE WITNESS: I try not to give you a long
24 answer, but you asked me what happened that night.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 181

1    AFTERNOON SESSION
2        MS. HALEM: Mr. Kimball, I'm going to do
3    another document here. One second.
4        Bear with me.
5        THE REPORTER: Exhibit 3?
6        MS. HALEM: Yes, please. I'm sorry.
7        (Document marked as Kimball
8        Exhibit 3 for identification)
9        MS. HALEM: Adam, can you...
10       MR. SHAFRAN: Yeah.
11       MS. HALEM: Thank you.
12       What am I looking at?
13       MR. SHAFRAN: I'm trying. Sorry. Hold on.
14   Bear with me. I don't know why it's --
15       There we go. Is this better?
16       MS. HALEM: I can see it.
17       Is everyone else okay?
18   Q.  Mr. Kimball?
19   A.  There's a bar across it.
20       MR. SHAFRAN: You know, I'm sorry. I'm
21   trying to -- if I touch the mouse, the bar pops up.
22       MS. HALEM: So scroll down to Page 3, then?
23       MR. SHAFRAN: This one?
24       MS. HALEM: Yes.

Page 182

1    Q.  First of all -- well, maybe I shouldn't
2    have done that.
3        Mr. Kimball, do you recognize this
4    document?
5        MS. HALEM: And Adam, why don't you show
6    him the first page and the last page, or the page
7    where his signature is on the verification.
8    A.  Okay.
9    Q.  Is that your signature, sir?
10   A.  Yep.
11   Q.  Okay. Do you know what this document is?
12       MR. COOPER: Well, can you let him see --
13       MR. SHAFRAN: I'm going back to the first
14   page.
15       MS. HALEM: Yeah.
16   A.  It says it's my position statement.
17   Q.  Do you remember signing this?
18   A.  Yeah. I think so.
19   Q.  Okay. When -- did you read it before you
20   signed it?
21   A.  I believe so.
22   Q.  Is everything in the document true?
23   A.  I believe so.
24   Q.  Okay. Page 3, then.

Page 183

1        MR. COOPER: Well, you're entitled to look
2    at the entire document. So let's start with the
3    first page.
4        MS. HALEM: Whoa. Howard, we're just going
5    to go, and I'm going to ask some questions about
6    certain text. It's his document. He signed it.
7        MR. COOPER: Well, he's entitled to read a
8    document.
9        MS. HALEM: We're going to be here all day
10   if we sit here --
11       MR. COOPER: Okay.
12       MS. HALEM: -- and read every pleading.
13       This is a pleading in this case that he
14   signed. Your objection is noted, and your --
15       MR. COOPER: No, he's going to read the
16   document before he answers questions, if he wants
17   to. It's his document.
18       MR. SHAFRAN: Why don't we have a question?
19       MS. HALEM: Why don't we see what the
20   question is, if he can tell me --
21       MR. COOPER: That's fine. Ask your
22   question.
23       BY MS. HALEM:
24   Q.  So do you see under the header "Subsequent

Page 184

1    Events":
2        "On the morning of May 17th, 2018,
3    Ms. Hall called Mr. Kimball and told him,"
4    quote, "'something happened,'" end quote,
5    "at the town hall on the night of May 1,
6    2018, between she and Mr. Chiocca after
7    they had been out at the RBG for drinks."
8        Do you see that?
9    A.  I can see it.
10   Q.  Is that true?
11   A.  That she called me? Yeah.
12   Q.  That that's what she said, "something
13   happened" at the town hall on the night of May 1st?
14   Is that the close approximation of exactly what she
15   said?
16   A.  Yeah.
17       MS. CIESLAK: Objection.
18   Q.  You testified earlier that she had said the
19   words "to me."
20       Was this inaccurate when you wrote it?
21   A.  I didn't write it.
22   Q.  Okay. When you signed it?
23       MR. COOPER: Objection.
24       Hold on.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

---

**Page 185**

1 A.   As far as this document, this document was
2   written by counsel that I had at the time.
3      Okay?
4 Q.   Okay.
5 A.   I conveyed to them what happened.  This is
6   what they wrote.  I did sign it.  And something did
7   happen.
8 Q.   Okay.  And that's what she reported to you,
9   "something happened" at town hall on the night of
10   May 1st?
11      MS. ZUCKER:  Objection.
12      MR. COOPER:  Objection.
13 Q.   Right?
14 A.   Yeah.  Something happened.
15 Q.   Okay.  And this was the best of your
16   recollection at the time that you signed it?
17      MS. ZUCKER:  Objection.
18      MS. CIESLAK:  Objection.
19      MR. COOPER:  Objection.
20      Same objection.
21 A.   I did sign it.
22 Q.   And you reviewed -- if you go down just a
23   little bit further, the next paragraph, the last
24   line says:

---

**Page 186**

1      "A cursory review of the surveillance
2   footage showed Mr. Chiocca and Mrs. Hall
3   entering the town hall after hours."
4      Did I read that accurately?
5 A.   Yeah.  I reviewed it.  I've seen it.
6 Q.   So what did you review on that evening
7   that -- that footage, what exactly did you look at?
8   All the camera angles or just one?
9      MR. COOPER:  When?
10 A.   When?
11 Q.   At that time, on the 17th.
12 A.   The 17th?
13      I didn't see the other camera angles until
14   later that evening.
15 Q.   Okay.  So that's what I'm asking you.
16      On that first time --
17 A.   You didn't say that.  You didn't say that
18   to me.
19 Q.   My apologies.
20 A.   You didn't say that.
21 Q.   So your initial review of the tapes --
22 A.   Was in Mr. Hart's office.
23 Q.   And what did you review, specifically?
24 A.   I just seen the two people, Ms. Hall,

---

**Page 187**

1   Mr. Chiocca, coming into town hall.
2 Q.   That's all you saw is them coming in.
3      Did you watch them coming out?
4 A.   I was only there briefly.  Eric Hart was
5   the one who was controlling the video, not myself.
6      I looked at it on his computer screen at
7   his desk briefly.  I didn't sit in Eric's chair.
8   Eric was in his chair.  He was -- he was the one who
9   pulled up the video, not I.
10 Q.   How long were you there at that time
11   watching the video?  How long?
12      MR. COOPER:  Objection.
13 A.   I don't know, a minute or two maybe.  Not
14   long at all.
15 Q.   Was it just sufficient to verify that they
16   did come to town hall that night?
17 A.   That's what -- yeah.  They did come to town
18   hall.  Yes.
19 Q.   Did -- did you learn at that time what time
20   they had been at town hall?
21 A.   I believe there was a time stamp on it that
22   Eric had scrolled through.  I think he said they
23   came to town hall somewhere around, I think,
24   eleven o'clock range.  And he fast-forwarded, I

---

**Page 188**

1   think, and they left something around the
2   two o'clock range, somewhere around there, 2:00 a.m.
3 Q.   So you did see them leave as well?
4 A.   All I seen was Mr. Hart scroll through a
5   video.  I don't know if they left or came back.  I
6   have no idea.  I didn't see until -- you asked me
7   what I seen at town hall, how long they was there.
8   That's what I told you briefly.
9      Mr. Hart -- Mr. Hart had that.  I asked him
10   to make a copy for me.  He did.  He gave me the copy
11   later that evening.
12 Q.   Again let's stick to the questions that I'm
13   asking.
14      Okay?
15      MR. COOPER:  You -- whoa.  Whoa.  Whoa.
16      MS. HALEM:  Howard, it's not necessary.
17      MR. COOPER:  You're not --
18      BY MS. HALEM:
19 Q.   At the time that you came to --
20      MR. COOPER:  I object to the preamble.
21      Ask your next question.
22 Q.   At the time that you viewed the tapes the
23   first time you ever saw them, did you see both of
24   them entering and then exiting, or just them

---

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

Page 189

1    entering?
2         MS. ZUCKER: Objection as to form.
3    A.   When I first seen the tape that Mr. Hart
4    showed me, okay, from his desktop computer, I seen
5    them coming into town hall.  I went back around.  I
6    sat in front of Mr. Hart.  Again, Mr. Hart was
7    accessing the cameras, okay?
8         And then Mr. Hart said that they left town
9    hall around 2:00-ish.
10   Q.   Okay.
11   A.   I said, "Make me" -- "make me a drive, make
12   me a copy of that."
13   Q.   Did you see any of the other angles or just
14   the entry and exit from the building?
15   A.   I didn't see any other angles at that point
16   in time.
17   Q.   When did you --
18   A.   Mr. Hart --
19        Go ahead.
20   Q.   When did you see the other angles?
21   A.   Later that evening.
22   Q.   Okay.  When was that?  What time,
23   approximately?
24   A.   After I got home from the 6:00 p.m. school

---

Page 190

1    meeting, because I didn't get the drive from
2    Mr. Hart until that meeting.  I still attended the
3    meeting for the school building project.
4    Q.   So did you ask Mr. Hart to make -- when you
5    asked him to make you a thumb drive, did you ask him
6    to make all the different cameras or just the --
7    what did you ask?
8    A.   No, I didn't ask Mr. Hart anything about
9    other cameras.  Mr. Hart texted me, I believe, and
10   said, "Oh, you're not going to believe it.  There's
11   other angles.  I'll make you a copy."
12   Q.   So you watched it that night --
13        Can I finish, please?
14   A.   What's that?
15   Q.   Did he --
16        MR. COOPER: Finish your answer.
17   Q.   I think the floor is yours, Mr. Kimball.
18   A.   The floor is mine.
19        So your question was about the other angles
20   of the camera, I believe.
21        At that point in time when I was in
22   Mr. Hart's office, I had not seen them yet.
23   Q.   Okay.  But you watched them later that
24   night, correct?

---

Page 191

1    A.   Yes.
2    Q.   Did you watch those, all those different
3    angles from beginning to end later that night?
4    A.   I watched --
5         MS. ZUCKER: Objection.
6    A.   -- what Mr. Hart provided to me that
7    evening, yes.
8    Q.   That was after you had gone to the rail
9    trail; is that correct?
10   A.   That's right.
11        I went to the rail trail prior to my
12   meeting with Mr. Hart.  All I had known at that
13   point was that, in fact, Ms. Hall and Mr. Chiocca
14   had been at town hall, and there was a video that
15   they were at town hall.
16   Q.   But you had seen -- you had had some review
17   of the video by the time you went to the rail trail,
18   correct?
19   A.   I did.
20   Q.   I thought you just said you didn't, so --
21   A.   No, I didn't say that.
22        You asked me about the other camera angles.
23   I had not seen the other angles at that point I went
24   to the rail trail.

---

Page 192

1         All I had seen prior to going to the rail
2    trail was that, in fact, Ms. Hall and Mr. Chiocca
3    were at town hall after hours.  So it confirmed that
4    Ms. Hall and Mr. Chiocca was there, as she
5    suspected.  That's all.  I knew nothing more at that
6    point.
7         And I did not disclose that, by the way,
8    either, because I wanted to see if they knew any
9    more.  So I asked.
10   Q.   So you asked.
11        And in that initial call to you, you
12   testified earlier you thought she was asking for
13   help; is that correct?
14   A.   That's right.
15   Q.   What did she specifically ask you to do?
16   Or what did you understand her to be asking?
17        MR. COOPER: You know, you asked him this
18   exact question multiple times already.
19        MS. HALEM: Right.
20        MR. COOPER: I object.
21        Go ahead.
22   A.   Again, as I had said previously, it was my
23   assumption that something had happened to Ms. Hall
24   at town hall.  I assumed, based on her demeanor in

---

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 193

1  the conversation, okay, it was my assumption that
2  she was asking for help. I had pressed her to find
3  out what, in fact, happened, and there was the same
4  response that she couldn't remember multiple times.
5  I went through this earlier with you.
6      I did not disclose to Ms. Hall that I had
7  seen the videos. In fact, I didn't disclose to
8  Ms. Hall anything about the videos until the
9  following morning when I sent her a screen shot to
10 try to jog her memory.
11 Q.  Did you see anything on those videos any
12 time you watched them that shows sexual contact of
13 any kind?
14 A.  I didn't see anything on the videos at that
15 point in time.
16     When you're saying "that point in time,"
17 you mean before the rail trail?
18 Q.  No.
19 A.  When?
20 Q.  That day.
21 A.  That day.
22     So you mean the evening when I watched the
23 videos?
24 Q.  Yes.

Page 194

1  A.  In my opinion, I seen, we'll say, contact.
2  When I seen the video of Mr. Chiocca parking his
3  truck out back and putting his arm around Ms. Hall
4  to assist her out and up the stairway, I seen that
5  something could have been of maybe -- I wouldn't say
6  sexual, but something more than just a friend.
7  Q.  How so?
8  A.  That's my opinion. You asked me.
9  Q.  So I'm asking, at that point in time did
10 you see sexual contact between the two of them on
11 the tape?
12 A.  I didn't see sexual contact. What I seen
13 was something more than a friend, more than a
14 coworker helping someone out of their vehicle, more
15 than a coworker bringing someone up a set of stairs.
16 Q.  And what specifically did you see that you
17 thought was more than a friend?
18 A.  It looked like it was boyfriend and
19 girlfriend to me.
20 Q.  What did you visually see? I'm asking for
21 a description.
22 A.  I seen Mr. Chiocca go around and open the
23 door to his vehicle to assist Ms. Hall in getting
24 out.

Page 195

1  Q.  How did he assist her?
2  A.  First by opening the door. Because if you
3  look at the video, when he left, he didn't open the
4  door for her and help her back in the car.
5  Q.  Okay.
6  A.  So the first thing -- so you asked me about
7  the video. I compared from initially, when I seen
8  the video, to the end of the video. So when I said
9  it was a girlfriend/boyfriend experience, it
10 appeared that Mr. Chiocca was -- what's the right
11 word? I want to make sure I choose my word
12 properly -- that it was almost as if he was -- he
13 was trying to be a gentleman trying to be on a date.
14 A gentleman, okay? So he's going to open the door.
15 He's going to assist his date out and up and out.
16 Okay?
17     On the way back down, when he went to the
18 vehicle, at the end of the video, I didn't see that
19 same response.
20 Q.  Did he seem upset at the end of the video?
21 A.  He didn't seem upset to me. I mean, I seen
22 Mr. Chiocca exit and enter the building multiple
23 times.
24 Q.  But he wasn't being gentlemanly at the end

Page 196

1  of the video?
2  A.  I didn't think so. That was just my
3  interpretation.
4  Q.  Did you see him touch her when she was
5  getting out of the vehicle?
6  A.  Did I what?
7  Q.  Did you see him touch her when she was
8  getting out of the vehicle or just open the door?
9  A.  No. I think he touched her. I think he
10 put his arm around her. I think he helped her out.
11 Q.  So he's standing in front of the door.
12 She's in the vehicle.
13     What exactly does he do? He opens the door
14 and he's opening -- holding the door open. What
15 does he do then?
16 A.  I believe -- I haven't seen the video in
17 some time. I believe he offered his hand to her to
18 help her out.
19 Q.  It's a truck, right?
20 A.  It's a small truck, yes.
21 Q.  So she would have had to step down?
22 A.  No, not that size truck.
23 Q.  Okay. Adam --
24 A.  It's a Toyota Tacoma. It's not a very

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 197

1   large vehicle.
2   Q.   Okay.  But still you think he put his hand
3   out to help her down?  Not arm around her, right?
4   A.   What I seen is, to the best of my
5   recollection -- I have not seen the video since
6   2018, Samantha.  What I seen, to me, was somebody
7   acting as if they were helping their girlfriend out
8   of the vehicle.  That's what I seen.
9   Q.   Anything else you saw in the videos that
10  made you think it was sexual?
11      MR. COOPER: Ever?
12  Q.   Yeah.
13  A.   Well, the fact that Mr. Chiocca exited his
14  office with his tie undone, with his -- looked like
15  his shirt was in disarray.  The fact that before
16  going into his office, I seen what looked, appeared
17  to be Ms. Hall distressed, saying she wanted to go
18  home.
19  Q.   And did you tell Ms. Hall any of this that
20  day?
21  A.   No, I did not.
22  Q.   Did you tell --
23  A.   I -- what you keep forgetting, Samantha,
24  is, I didn't see all of this when I met Ms. Hall on

Page 198

1   the rail trail.  I seen this after I got home from
2   the meeting, after I went to the rail trail.
3   Q.   Did you tell her on May 18th?
4   A.   No, I did not.
5   Q.   Did you tell her at any time?
6   A.   Any time?
7      In the future I think we may have discussed
8   it at one point.
9   Q.   Do you remember when?
10  A.   I don't remember when.
11  Q.   Was it before or after you met with the
12  investigator?
13  A.   Oh, well after.  Well after.
14  Q.   Did you ever show her the tapes?
15  A.   I never showed her the tape.
16  Q.   Okay.  You sent her screen shots, right?
17  A.   I sent, I believe it was, four screen
18  shots.
19  Q.   And you texted those to her; is that right?
20  A.   By text.  Via text, yes.
21  Q.   And why did you do that?
22  A.   Because I was up all night, as I said
23  before, and I didn't know what to do.  And I knew
24  that if I had brought something forward, that I

Page 199

1   should be sure of what I bring forward.  And that's
2   what I did.
3   Q.   Were you sure --
4   A.   I've always done my homework.  I always try
5   to find facts.  I just don't take things at face
6   value.
7   Q.   So you were doing your own investigation?
8      MR. COOPER: Objection.
9   A.   What I was doing, it wasn't an
10  investigation.  I was trying to find out, okay, if
11  what Ms. Hall had told me, in fact, had maybe taken
12  place.
13  Q.   What had she told you happened?
14  A.   Something happened at town hall.
15  Q.   And you concluded something happened?
16  A.   That's --
17  Q.   Something happened at town hall.
18      But did you reach any conclusions at that
19  time on May 17th or 18th about what happened at town
20  hall?
21  A.   I did, but not with Ms. Hall.  I tried to
22  explain that earlier in my text with my wife when I
23  confirmed to my wife that things were fucked up.
24      Because after talking to Ms. Hall, after

Page 200

1   seeing the tapes, after talking to Mr. Hall, after
2   talking to Mr. Chiocca, yeah, things were very
3   fucked up for me that night, because it became quite
4   clear to me that something, in fact, of a sexual
5   nature probably did happen because everybody was
6   concerned about it.
7      Number two, I didn't know what to do about
8   it.  Okay?
9      So I slept on it.  Slept on it.  I tried to
10  go back to make sure any differences in what I was
11  told.  Nothing.
12      I finally contacted town counsel, John
13  Clifford, because I went to him for advice.
14  Something was reported to me.  I found out
15  something, in fact, may have happened.  I contacted
16  John Clifford.
17      Now, when John Clifford said that we would
18  meet Allan together, he would do it with me, we
19  would ask Allan what happened, we did.
20      So when we interviewed Allan, Allan said,
21  "It was only a blow job."  He wanted to make it all
22  go away.  So I assumed it was that was what it was.
23  Q.   You actually called Allan Chiocca before
24  you met with him, correct?

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 201

1 A. I called -- I texted Allan Chiocca and --
2 as I said to you earlier, okay, and asked him if he
3 could talk to me.
4     He called me back, and I had told him that
5 I had just had a very interesting conversation with
6 a board member's husband.
7     Now, as I said to you before, we only have
8 one female -- one female board member. And last I
9 knew, none of the other board members have a
10 husband. So obviously he knew I was talking about
11 Ms. Hall.
12 Q. And then -- and then you talked to
13 Mr. Clifford.
14     And what did you tell Mr. Clifford?
15 A. Exactly what happened.
16 Q. What did you tell him, exactly, what
17 happened? I'm asking for your present-day memory.
18 A. I told him that Ms. Hall had contacted me.
19 I told him that I had seen the tapes. I told him
20 what Mr. Hall had told me. I told him what Allan
21 had said.
22     And then he said we would talk to Allan in
23 the morning. He was going to be in town hall
24 anyhow. And that was it.

Page 202

1     And then, when we talked to Allan, Allan
2 conceded, said that, "It was only a blow job"; he
3 wanted to make it all go away, whatever he could do
4 to make it go away.
5     And, you know, the conversation went into
6 he didn't want anyone to know about it. The
7 conversation went into he wanted to exit his
8 employment with the town. The conversation went
9 into, "What would you do?"
10 I said, "It's not up to me. That's why I
11 brought town counsel."
12     Town counsel suggested taking -- town
13 counsel said to me we start an investigation. Allan
14 didn't want an investigation. Town counsel said he
15 would have to be put on paid leave. Allan didn't
16 want to go on paid leave.
17     So they said, "What about a nondisclosure
18 agreement?" That was not my idea. That was
19 Mr. Clifford's idea.
20 Q. Mr. Kimball --
21 A. So --
22 Q. -- did Deirdre Hall --
23     MR. COOPER: Are you done talking?
24     MS. HALEM: I thought he was done.

Page 203

1 A. So the idea of putting Allan on a voluntary
2 leave, Allan sent me an e-mail that day. He agreed
3 to go on a voluntary leave. Allan had agreed that
4 he would exit his employment. He only wanted to
5 come back on the June 5th meeting. He wanted to get
6 paid till the end of July, which John Clifford said
7 that's okay.
8     And then they talked about a nondisclosure.
9 They asked me if I would meet with Deirdre to see if
10 she would be open to a nondisclosure.
11 I agreed, which I did later. I met later
12 that evening with Ms. Hall.
13     But, I mean, I think what you're missing
14 here, Samantha, is somebody came to me, told me
15 something was wrong. I looked into it and, in fact,
16 determined something actually was wrong.
17 Confronted, talked to, interviewed -- whatever you
18 want to use the terminology -- to the person that
19 was said to have done this. They, in fact, said
20 they did do that. "It was only a blow job." And
21 then they said they wanted to make it go away.
22     I'm following the advice of town counsel.
23 I've never been in a situation like that before.
24 Q. Mr. Kimball, please try -- I understand you

Page 204

1 want to get out something, and I promise you we'll
2 get there.
3 A. I don't know what else -- I don't know what
4 else to get out.
5 Q. Try to answer the question.
6 A. He talked to me about the tapes.
7 Q. Right. Because that was the question I
8 wanted answered.
9     So we're not going to get out of here in
10 two days if we don't stick to the questions.
11 A. Well, that's okay. That's okay.
12 Q. Okay.
13 A. The this has been going on three years.
14 Q. Why not some more?
15 A. Another day or two is not going to make a
16 difference.
17 Q. In any event, did Ms. Hall ever tell you in
18 this time period, May 17th and 18th, that she was
19 sexually assaulted by Allan Chiocca?
20 A. No, Ms. Hall never said that.
21 Q. Thank you.
22     Did she say she was sexually harassed by
23 Allan Chiocca during that time frame?
24 A. She did not specifically say that she was

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 205

1   sexually harassed by Mr. Chiocca.
2       I might say, in the same time, at the
3   interview, he did not say any of that, either.
4   Q.   We're going to get to that in a second.
5       Did she tell you anything sexual happened
6   to her or with Mr. Chiocca that night on May 17th or
7   18th?
8   A.   She didn't tell me anything.  She had no
9   memory.
10  Q.   Okay.
11  A.   I pressed and I pressed, and she had no
12  memory.
13  Q.   In that meeting with Mr. Chiocca and
14  Mr. Clifford --
15  A.   Uh-huh.
16  Q.   -- did Mr. Chiocca use the word "predator"
17  to describe Ms. Hall?
18      MS. ZUCKER:  Objection.
19  A.   In that conversation, Mr. Chiocca used two
20  words.  He used the word "aggressor" and he used the
21  word "predator."  And I took that to mean that she
22  was aggressive; he was the predator.  Much like,
23  let's say, a big game hunter bagging his trophy.
24  Because he certainly, when I brought up the

Page 206

1   conversation about "blow jobs," "contracts," there
2   was none of that.  "It was only a blow job, and I
3   want to make it go away."
4   Q.   So can you tell me the second --
5       MR. COOPER:  Let's let him finish.
6   A.   When I left the meeting, I thought that's
7   what it was.  Nothing more.
8   Q.   Tell me the sentence you heard.
9       MR. SHAFRAN:  Objection.
10  A.   Sentence I heard?
11  Q.   Yeah.  The one you're describing with the
12  word "aggressor" and "predator" in it.
13      MR. COOPER:  Which sentence?
14      MS. HALEM:  The one with the words
15  "predator" and "aggressor."
16  A.   There was multiple sentences, multiple
17  conversations in that -- that meeting with
18  Mr. Chiocca and Mr. Clifford.
19  Q.   Tell me what --
20      MR. COOPER:  She's asking you who said what
21  to whom during the meeting, Ed.
22  Q.   Right.
23  A.   Mr. Chiocca.
24      MR. COOPER:  Take your time.

Page 207

1   A.   Mr. Clifford was in the room.
2   Q.   So tell me what was said.
3   A.   I just tried to tell you what was said.
4       Mr. Chiocca was standing behind his desk,
5   okay?  Mr. Chiocca -- Mr. Clifford said to me, "Ed
6   has to say something."
7       And I said, "All right.  I'm just going to
8   say it."
9       So I had told him what Mr. Hall had said,
10  something about "blow jobs" and "contracts."
11      And Mr. Chiocca said, "There's none of
12  that.  It was only a blow job."
13      And then the conversation changed into he
14  wanted to make it go away, all of that stuff.
15  Q.   I'm asking you about the part of the
16  conversation where you heard the words "predator"
17  and "aggressor."
18  A.   I heard that part, oh, after he -- I
19  believe it was after he had said he wanted to make
20  it go away.  He would do whatever he could.  He
21  didn't want his wife to find out about it.  He
22  wanted to just come back.
23      And then it was -- it was almost as if he
24  had said it in a way that was -- how should I say

Page 208

1   it -- almost like it was some sort of conquest to
2   me.  It was, like -- it wasn't like, "She did this
3   to me."  There was none of that.  There was no one
4   the victim.  There was none of that.
5       And when I left that meeting, I was
6   actually trying to find out if the Halls, Ms. Hall,
7   would go through and go on into a nondisclosure.
8   And I agreed to meet, and I did that, and then I
9   phoned them later, you know.
10  Q.   Did --
11  A.   I will say this:
12      During that same -- same meeting, after
13  Mr. Clifford left, Mr. Chiocca said to me -- at that
14  point my wife was at town hall.  She had come in.
15  And Mr. Chiocca said to me, in front of my wife, "I
16  was only consoling your girlfriend."  That's what he
17  said to me, and that still sticks out in my mind
18  clear as day.
19  Q.   Okay.  But what we didn't get is actually
20  when you heard Mr. Chiocca say the words "aggressor"
21  and "predator" in the sentence and in what context.
22      Can you summarize for me words that he
23  said?
24  A.   Okay.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

Page 213

1  thought about the context, in what context. Your
2  question was in what context, and I told you that.
3  Q.  No, actually I asked you if Mr. Chiocca
4  used the word "predator" to describe Mrs. Hall, and
5  you said he used it to describe himself, I believe.
6  A.  And I believe that's what he did.
7  Q.  Not what you wrote in the position
8  statement, though. There you admitted --
9     MR. COOPER: Did you write it?
10    THE WITNESS: What's that?
11    MS. ZUCKER: Objection.
12    MS. HALEM: And also you're coaching the
13  witness there, Mr. Cooper.
14    MR. COOPER: The question -- hold on a
15  second.
16    Your question that that is what he wrote in
17  the position statement, what basis do you have for
18  that, that his lawyers didn't write it?
19    MS. HALEM: Mr. --
20    MR. COOPER: What basis do you have?
21    MR. SHAFRAN: Why don't we use the word
22  "asserted" as opposed to write, asserted under the
23  pains and penalties of perjury.
24    MS. HALEM: That works.

---

Page 214

1     MR. COOPER: Ask him an intelligible
2  question, and I won't object.
3     MS. HALEM: I do not appreciate that one
4  bit --
5     MR. COOPER: Well, you're arguing.
6     MS. HALEM: -- Mr. Cooper.
7     MR. COOPER: You're simply arguing with the
8  witness.
9     MS. HALEM: I understand that when you --
10    MR. COOPER: You're asking him a question.
11    THE REPORTER: One at a time, please.
12    MS. HALEM: My apologies, Alex.
13  Q.  Mr. Kimball, when you signed the position
14  statement under oath, you had read it before you did
15  so, correct?
16  A.  I did.
17  Q.  And you distinguished at that time between
18  the words "aggressor" and "predator," correct?
19  A.  If that's what I signed, yes.
20  Q.  Okay. Moving on.
21    You've mentioned earlier that somebody
22  asked you to ask Ms. Hall if she would sign a
23  nondisclosure agreement.
24    Who was that?

---

Page 215

1  A.  That was Mr. Clifford and Mr. Chiocca in
2  that meeting I described moments ago to you.
3  Q.  Was that Mr. Chiocca's request or was that
4  Mr. Clifford's request?
5  A.  I believe it was a mutual request.
6  Q.  On what basis do you believe that?
7  A.  Because Mr. Clifford, and Mr. Chiocca, and
8  myself, had discussed this idea of a nondisclosure
9  agreement so that Allan would exit the town's
10  employment.
11  Q.  If at the time you believed that
12  Mr. Chiocca had done something inappropriate to
13  Ms. Hall that night, would you have advised her to
14  enter into a nondisclosure agreement?
15    MS. ZUCKER: Objection.
16  A.  It wasn't up to me to advise anybody, okay?
17  I'm not -- I'm not there to offer advice. Okay?
18  Q.  Did you then go --
19  A.  They asked --
20    MR. COOPER: Let him finish his answer.
21  A.  Can you let me finish, please.
22    They asked me if I would go and ask
23  Ms. Hall if she would be willing to enter into a
24  nondisclosure agreement.

---

Page 216

1     So --
2  Q.  And you --
3  A.  Can you let me finish, please.
4     So I set up a meeting for later that
5  evening at Reed's Pond. I went to the meeting. My
6  wife went to the meeting. Ms. Hall and her husband
7  went to the meeting. I asked, and she said she
8  would be.
9     So after I left the meeting, I contacted
10  Attorney Clifford and said that she was amenable to
11  going through and signing that, and I informed
12  Mr. Chiocca as well to let him know. And that was
13  it. To me it was over, and off we went.
14  Q.  So you thought it was appropriate for
15  Ms. Hall to sign a nondisclosure agreement at that
16  time?
17  A.  No. I didn't say that.
18    MR. COOPER: Objection.
19  A.  I didn't say that.
20    What I said was, would she be amenable to
21  entering into a nondisclosure agreement. That was
22  up to Ms. Hall and whoever to decide, not me. It's
23  not Ed Kimball. This is between Mr. Chiocca and
24  Ms. Hall. It was -- the nondisclosure agreement was

---

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

---

**Page 217**

1  nothing to do with me.

2  Q.  Did Ms. Hall ask you not to talk to

3  Mr. Chiocca?

4  A.  Did what?

5  Q.  Did Ms. Hall ask you not to talk to

6  Mr. Chiocca?

7  A.  She did.

8  Q.  And why didn't you listen to her?

9  A.  Because -- I didn't listen to her because I

10  was worried about other women at town hall.

11  Q.  Tell me about that.  Why were you worried

12  about the other women at town hall?

13  A.  Well, when someone tells you that there's

14  "blow jobs" and "contracts," okay, and then you

15  say -- you talk to someone else and someone else

16  says, "Oh, fuck.  The tapes at Rockland Bar and

17  Grill," your mind starts to go in different places.

18  And at that point in time, the board of

19  selectmen had given the town administrator authority

20  to do all contracts with town counsel and have the

21  contracts for all personnel at town hall and other

22  places.  So if it was somebody -- like let's say it

23  was Marcy Birmingham, for example.  Allan Chiocca

24  would negotiate the contract.  If it was Sue Ide, he

---

**Page 218**

1  would negotiate the contract.  If it was Stacie

2  Callahan, he would negotiate the contract on behalf

3  of the board of selectmen.  If it was somebody else,

4  other parties in town -- whether it's male or

5  female -- he would do it.

6  Q.  And --

7  A.  So I didn't know what had happened.

8  So I contacted John Clifford.  I did what I

9  thought was right in my heart and what was right for

10  the town.  All right?  That's what I did.

11  Q.  Did you -- remind me exactly what you think

12  Chris Hall told you Deirdre Hall told him that

13  night.

14  A.  As I told you before, Mr. Hall --

15  MS. ZUCKER:  Objection.

16  I'm sorry.  I was muted.

17  Objection.  This is so many times asked and

18  answered.

19  MS. HALEM:  I haven't heard the quote, but

20  thanks, Ellen.

21  MS. ZUCKER:  Excuse me.  I've been letting

22  these questions go and go and go, so, Samantha,

23  please don't be rude.

24  I would just ask you to let me state my

---

**Page 219**

1  objection on the record.

2  To the extent that you start going over and

3  over the same ground, I personally am going to

4  object to an extended period of time with this

5  witness who has been answering and answering and

6  answering the same questions over and over again.

7  MS. HALEM:  Right.

8  THE WITNESS:  When I spoke with Chris Hall,

9  he told me -- he wanted to know if the town

10  administrator, okay --

11  MR. COOPER:  Do you have the question?

12  THE WITNESS:  No.  I'm just --

13  MR. COOPER:  Do you want to take a break?

14  THE WITNESS:  Yeah.  Just a second.

15  MR. COOPER:  Let's go off the record.

16  THE REPORTER:  Go off the record?

17  MS. HALEM:  No.

18  THE REPORTER:  Okay.  Still on the record.

19  MS. HALEM:  We're staying on the record.

20  We can time the pause.

21  MR. COOPER:  Why don't you reask the

22  question if he doesn't have it.

23  BY MS. HALEM:

24  Q.  Do you not have the question, Mr. Kimball?

---

**Page 220**

1  I'm asking what Mr. Hall told you on the

2  phone that was said to him by his wife.

3  MR. COOPER:  Is your testimony any

4  different this time than the 15 that she's already

5  asked you?

6  A.  Mr. Hall had told me when Ms. Hall returned

7  home from being out with the town administrator, she

8  said something about "blow jobs" and "contracts."  I

9  went through, and I've told you that before, and

10  I've told you it again.

11  Q.  So that's the whole quote that you

12  remember?

13  MR. COOPER:  Can you at least not interrupt

14  him, please?

15  MS. HALEM:  No.  I've got to get through

16  this last --

17  MS. ZUCKER:  I'm sorry.  At this point

18  let's take a break.  We have an obviously tired

19  deponent who is sick and tired -- as am I -- of

20  listening to the same question asked 17 times.

21  Let's just take a break.

22  MS. HALEM:  We're going to take a break at

23  3:00 because we have a scheduled break at the time

24  for Cindy's phone call.  So I think it would be more

---

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 221

1 efficient if we just get through this line --
2   MR. COOPER: I thought you invited him at
3 the outset of this deposition to take a break if he
4 needed it.
5   MS. HALEM: And I want to finish my line of
6 questioning before --
7   MR. COOPER: Do you need a break,
8 Mr. Kimball?
9   MS. HALEM: We're going to finish the line
10 of questioning.
11   MR. COOPER: No. Let's take --
12   THE WITNESS: I would like to take a quick
13 five-minute break. I need to use the men's room.
14   MR. COOPER: Okay.
15   THE WITNESS: Thank you.
16   (Mr. Kimball and Mr. Cooper exit)
17   THE REPORTER: Off the record? Are we
18 going off the record?
19   MS. HALEM: I guess.
20   THE REPORTER: Okay.
21   (Recess taken)
22   MS. HALEM: This is going to be --
23 Alex, can you mark this as Number 4?
24

Page 222

1   (Document marked as Kimball
2   Exhibit 4 for identification)
3   MS. HALEM: Adam, can you do your magic,
4 show him the first page and the signature page?
5   MR. COOPER: We're not seeing anything if
6 you think we are.
7   MS. HALEM: I think he's working on it.
8 Adam, are you working on it?
9 Maybe he's not.
10 Are you going to put it on the screen?
11   THE REPORTER: I don't think he hears us.
12   MR. COOPER: You're on mute, Adam. I can't
13 hear what you're saying.
14 You're on mute. I don't know whether
15 you're -- Adam, you're on mute.
16   MS. HALEM: Adam, can you share this
17 exhibit with the screen?
18   THE REPORTER: I don't think he can hear
19 us.
20   MR. SHAFRAN: Can you hear me?
21   MS. HALEM: Yes, now we can.
22   MR. SHAFRAN: All right. It's the AirPods
23 I'm having trouble with.
24   MS. HALEM: Can you share this exhibit?

Page 223

1   MR. SHAFRAN: And Howard, tomorrow could
2 you get a computer tomorrow so your client can
3 scroll through documents because it will make it go
4 much easier.
5 Hold on. Hold on. I'm sorry.
6 Good?
7   MS. HALEM: Yes.
8 Can you show him the first page and the
9 last page, so you can see the signature.
10 Q. Is that your signature, Mr. Kimball?
11 A. It is.
12 Q. And can we go back to the first page.
13 A. "I, Edward Kimball..."
14 Q. So you see the title of this document is,
15 "Edward Kimball's Supplemental Answers to Allan
16 Chiocca's First Set of Interrogatories"?
17 A. Uh-huh.
18 Q. Do you remember reading these?
19 A. Back at the time, yeah.
20 Q. And you signed them because you believed
21 them to be true?
22 A. I did.
23 Q. Under the pains and penalties of perjury,
24 correct?

Page 224

1 A. I did.
2   MS. HALEM: Okay. Adam, can you go to
3 Page 10 for me.
4 Q. Can you look at where it says Paragraph --
5   MR. COOPER: If you're going to show him
6 something, you start with the question and let him
7 see the entire answer, please.
8   MS. HALEM: It's actually just relevant to
9 the testimony he said before. It has nothing to do
10 with the question.
11   MR. COOPER: Well, you're showing him the
12 end of an interrogatory answer. He's entitled to
13 see it.
14   MS. HALEM: And I super want to get Cindy
15 out for her break.
16 So why don't we try see if it works,
17 Howard.
18   MR. COOPER: Why don't you ask a question.
19   BY MS. HALEM:
20 Q. It says:
21 "... I met with Ms. Hall, Mr. Hall,
22 and my wife on May 18th, 2018, not
23 May 19th, 2018. The purpose of that
24 meeting, as I recall, was to discuss

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 225

1  Ms. Hall's willingness to enter into an NDA
2  with the plaintiff, and not discuss the
3  incident, nor to discuss Ms. Hall's and my
4  relationship in any fashion."
5  Did you believe the NDA was also about your
6  relationship, your affair with Ms. Hall?
7  A. No.
8  Q. So why does it say that here? Do you have
9  any recollection of that?
10 A. Because in Ms. Ryan's report, she said I
11 met with the Halls to keep my affair secret.
12 Q. So --
13 A. I didn't meet with the Halls for that. I
14 met with the Halls to do the NDA.
15 Q. Okay. So it wasn't -- the NDA was only
16 about --
17     MR. COOPER: Hold on a second.
18 A. You asked what that was, and that's what
19 this was.
20 Q. That's fine, if that's your answer.
21     MR. COOPER: Are you suggesting,
22 Samantha --
23     I object.
24     MS. HALEM: Great.

Page 226

1      MR. COOPER: You're completely
2  mischaracterizing the statement.
3      MS. HALEM: Okay.
4  Q. And at that meeting, Ms. Hall signified
5  that she was willing to enter into a
6  confidentiality -- an NDA, correct?
7  A. She said she was willing to enter into an
8  agreement, and she -- I said, "Get in touch with
9  Attorney John Clifford." That's what I was told to
10 do.
11 Q. And you did?
12 A. And I did.
13 Q. You gave that information -- I'm sorry.
14     Did you say you gave that information back
15 to Attorney Clifford?
16 A. I did, that evening, that same evening. I
17 believe Mr. Clifford told me he was going to be tied
18 up until 6:00 p.m., 6:30, something like that. And
19 then I called him immediately after that to say that
20 the Halls were willing and to get in touch with
21 them.
22 Q. Did you ever ask Ms. Hall why she waited to
23 talk to you about the incident?
24 A. I didn't ask Ms. Hall why she waited, and I

Page 227

1  was actually astonished to find out in one of our
2  executive sessions that she had confided in another
3  board of selectmen member.
4  Q. She never told you that?
5  A. No.
6  Q. And why were you astounded when you heard
7  that?
8  A. Because apparently he didn't act on it.
9  Q. You thought he should have?
10 A. If someone came to me and said they think
11 something happened to them, I would at least look
12 into it. I would think someone would care about
13 another person to at least look into something, and
14 that's what I did.
15 Q. Did you talk about that with Mr. Mullen,
16 ever?
17     MS. ZUCKER: Objection.
18 A. I didn't talk about it with Mr. Mullen. He
19 talked about it with the board.
20     My recollection is that he broke down in
21 tears. He thought that his inaction, a crime may
22 have been committed, and he didn't do anything about
23 it.
24 Q. Mr. Mullen told you that he thought a crime

Page 228

1  had been committed?
2      MR. COOPER: Objection.
3  A. That's what he told us in executive
4  session.
5      You asked me. I told you.
6  Q. Did you, in fact -- do you know if
7  Mr. Clifford, in fact, wrote the NDA agreement that
8  you had asked Deirdre Hall to sign?
9  A. I don't know. I don't believe there was
10 ever an NDA. There was none that came to fruition,
11 I believe.
12     MS. HALEM: Okay. Let's take the break
13 that Cindy asked for now.
14     (Recess taken)
15     MS. HALEM: And this is going to be
16 Exhibit 5.
17     (Document marked as Kimball
18 Exhibit 5 for identification)
19 BY MS. HALEM:
20 Q. Mr. Kimball, can you see this document? I
21 know it's very fuzzy.
22     Do you see it?
23 A. I did.
24 Q. I didn't hear you for some reason.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 233

```
 1  Q.  Did you think she might be lying to you
 2  about not remembering?
 3      MR. COOPER: He just said no.
 4      Objection.
 5  A.  Can you scroll back up, the other way,
 6  please.
 7  Q.  Up or down?
 8  A.  Okay.
 9  Q.  Good?
10  A.  So if you take the whole text in context,
11  Samantha, I am informing Ms. Hall that I was meeting
12  with Allan tomorrow.  If you go to the bottom of the
13  text, where Howard had stopped you, it was because I
14  was concerned about the town hall employees.
15      This was all based on the information I was
16  given by the Halls and by watching the videotape.
17  Q.  By Chris Hall?
18  A.  By Deirdre when she called me in the
19  morning, by Chris Hall when he talked to me, and
20  about what I viewed in the videotape.
21  Q.  Did Deirdre say anything to you that
22  made you concerned for the women at town hall?
23      MS. ZUCKER: Objection, asked and answered
24  and -- asked and answered.
```

Page 234

```
 1      MS. HALEM: Okay.  It's not an appropriate
 2  objection and, in any event, I did not ask that
 3  question before, I assure you.
 4  A.  What was the question again, Samantha.
 5  Q.  Did Deirdre Hall, not Chris hall, say
 6  anything that made you concerned for the safety of
 7  the women at town hall?
 8      MS. ZUCKER: Objection.
 9  A.  When I heard "blow jobs," "contracts," I
10  was alarmed, concerned.
11  Q.  Did Deirdre Hall use those words to you or
12  did Chris Hall use those words to you?
13  A.  Chris Hall, as I told you before, used the
14  words "blow job" and "contract."  I, when I heard
15  those from Chris Hall, didn't know if it applied to
16  Ms. Hall at the time or if it applied to other women
17  at town hall.
18  Q.  Did Deirdre Hall have a contract with the
19  town?
20  A.  Did Deirdre Hall what?
21  Q.  Have a contract with the town.
22      MS. ZUCKER: Objection.
23  A.  None of us have contracts with the town.
24  Q.  Okay.  And did any of the women of town
```

Page 235

```
 1  hall ever complain to you about Allan Chiocca prior
 2  to May 17th, about him behaving inappropriately to
 3  them sexually?
 4  A.  People complained all the time about Allan
 5  making comments that were inappropriate.  Whether
 6  they deemed to be sexually or not, I was not a party
 7  informed of that.  But there was many people in town
 8  who thought that Allan should -- should talk to
 9  residents and voters in a different tone, in a
10  different demeanor.
11  Q.  So let me ask the question again.
12      I'm asking you if any of the women at town
13  hall, the employees at town hall had ever told you
14  that Allan Chiocca behaved to them in a sexually
15  inappropriate manner.
16  A.  Prior to when?
17  Q.  May 17th, 2018.
18  A.  Not prior to May 17th.
19  Q.  That's the question.
20      Okay.  So you wanted Ms. Hall, looking at
21  these text messages, to tell you the truth.
22      Is that correct?
23  A.  I thought there was more to the story, so I
24  wanted to know what it was.
```

Page 236

```
 1  Q.  And she responds:
 2      "Okay.  Not in writing."
 3      Is that right?
 4  A.  That's what it says in front of me.
 5  Q.  And you respond:
 6      "I don't like being played."
 7  A.  That's what it says.
 8  Q.  Yes.  At that point did you feel you were
 9  being played by Ms. Hall?
10  A.  I didn't know what to think.
11  Q.  Why were you concerned that you might be
12  being played?
13  A.  Because I was told something may have
14  happened.  I went and I found -- saw some videotapes
15  that indicated that there was -- something, in fact,
16  did happen, although I didn't know what specifically
17  happened.  I didn't know that until the next day
18  when I was with John Clifford and Mr. Chiocca what
19  happened.
20      At this point in time I didn't know what
21  happened.
22  Q.  But you were concerned that Ms. Hall might
23  be not telling you the full truth, being "played,"
24  as you say?
```

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 237

1 A.  I've texted, "I don't like being played"
2 because I wanted to know more.  I pressed her
3 multiple times that day, as I've already told you,
4 and she didn't remember anything.
5 Q.  And then you did have a conversation with
6 her shortly after these texts, correct?
7 A.  I did.
8 Q.  And your wife was present for that phone
9 call?
10 A.  I believe so.
11 Q.  Was Ms. Hall on speaker?
12 A.  I believe I put it on speakerphone.
13 Q.  Okay.  Tell me what you remember about that
14 conversation.
15 A.  I had asked her again what happened
16 multiple times.
17 Q.  And did she give you --
18 A.  And she said she couldn't remember.
19 Q.  Did she give you any new information in
20 that call?
21 A.  There was no new information in that call.
22 And I -- I had -- I believe expressed a concern for
23 the women at town hall.
24     I mean, here I am.  I hear that there's

Page 238

1 "blow jobs," "contract."  The first thing that came
2 to my mind is Allan is negotiating, so it was Allan
3 asking for blow jobs in order to give someone a
4 contract.
5 Q.  Wasn't Allan the person getting the
6 contract in this scenario, vis-a-vis Deirdre Hall?
7 Wasn't Deirdre Hall --
8 A.  There was no contract --
9     MS. CIESLAK: Objection.
10 A.  -- in any of this scenario, okay?
11     Allan already had a contract.  He wasn't
12 getting a contract.  He already had a contract.
13     So when you say "getting a contract" --
14 Q.  Okay.
15 A.  -- there's a difference "getting" and
16 "having."
17     Allan was looking to renew his contract.
18 Or actually, I should say, redo his contract so he
19 could get an increase in salary.  He was already
20 under contract with the town through the end of
21 June 19th; and, as I told you before, it was all
22 about health care.
23     So I don't -- you know, once that was
24 resolved, it wasn't like this big, impending thing

Page 239

1 that Allan's going to walk out the door if we don't
2 give him a contract tomorrow.  We had more than
3 ample time.  We had 14 or 15 months.
4 Q.  Had you been involved in Allan's prior
5 contract negotiations?
6 A.  I have.
7 Q.  And did they all start about a year before
8 the contract ended?
9 A.  Typically what would happen was we tried to
10 start about a year before.  And if we could, we did.
11 Q.  Okay.  So that's what we were -- that's
12 what Allan was trying to accomplish, at least at
13 this time.  I don't know about the board, but that's
14 what Allan was trying to accomplish, correct?
15     MS. ZUCKER: Objection.
16 A.  Allan was always thinking about Allan.
17 Allan never thought about the board, so let's be
18 clear there.
19     Okay?
20 Q.  I'm asking --
21 A.  Allan -- if you must know, the contract
22 that Allan had, when that contract was made with
23 him, the current contract, he had told us, all the
24 people on the board, that that was his last

Page 240

1 contract.  He was going to retire.  He was going to
2 retire to Florida.  That was it.  His wife was
3 retiring.  He was all done.
4 Q.  But he had since told you he wanted a new
5 three-year contract?
6     MS. ZUCKER: Let him finish.
7 A.  What I was going to say was Allan then
8 expressed a desire to stick on for some more time
9 beyond his contract.  He had indicated that he went
10 to Florida, and he couldn't see himself down there
11 full time.
12     He knew his wife was retiring.  I believe
13 she was a teacher, and he wanted to make sure she
14 got on the health care, and he wanted to still
15 continue to work in Rockland.
16 Q.  I think we already established, though,
17 that the board had already started discussing Allan
18 Chiocca's performance in preparation for his
19 contract negotiations, correct, on May 15th?
20 A.  The board had already started to go through
21 and look at putting policies and procedures in
22 place, goals and objectives, if you will, that they
23 wanted for -- to apply to Allan's future contract
24 renewal.  It was just in the initial, early stages.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 241

1  This wasn't like this was the day before we're
2  signing the contract.  This was just the beginning.
3  Q.  So you -- you testified earlier that Chris
4  Hall, when he relayed the conversation he'd had with
5  his wife on May 1st --
6  A.  Uh-huh.
7  Q.  -- 2nd, I guess, at that point --
8  A.  Yeah.  Uh-huh.
9  Q.  -- saying to you something about
10  "contracts" and "blow jobs."
11      Can you put that sentence to me together
12  any better?  Maybe you don't remember, but what was
13  the sentence he said you?
14      MR. COOPER:  Objection, asked and answered
15  20 times.
16  A.  I believe the sentence was "blow jobs,"
17  "contracts," something to that effect, Samantha.
18  Q.  You can't put them together in a sentence?
19  Just --
20  A.  I just did.  That was my sentence,
21  Samantha.
22  Q.  So Chris Hall said to you, "Allan Chiocca
23  said to my wife, 'blow jobs,' 'contracts'"?
24  A.  That's what I got out of the conversation

Page 242

1  with Chris Hall.
2  Q.  Okay.
3  A.  You asked me to put it into a sentence.  I
4  just did.
5  Q.  And how did you internalize that to have
6  something to do with the contracts for the women at
7  town hall?  Tell me how you -- how you processed
8  that.
9      MS. ZUCKER:  Objection.
10  A.  How I thought that fast?
11  Q.  No, not -- no.  Sorry.
12      How you concluded that that meant that --
13  that there was a concern for the women at town hall
14  vis-a-vis Allan Chiocca.
15  A.  Okay.  So I think the way this works is at
16  that point in time, okay -- as I said before,
17  multiple times -- I got a call from Ms. Hall in the
18  morning.  I looked into what she had told me, and I,
19  in fact, verified that Mr. Chiocca and Ms. Hall
20  were, in fact, at town hall that evening.
21      I met Ms. Hall again later in the
22  afternoon.  I had asked her again what had happened.
23  She told me the same thing:  She couldn't remember;
24  that she was drunk, but she believes it happened at

Page 243

1  town hall.  And as I've told you, I think a handful
2  of times already during today's testimony, that her
3  story has not changed all the way through.
4      I did not tell her anything in the tapes,
5  and, in fact, I didn't see any more of the tapes
6  until later in the evening when I got home after the
7  Rockland building, school building meeting.  And
8  then I watched the tapes and seen more, and it was
9  clear to me that it appeared that Ms. Hall was
10  intoxicated.  Okay?  It appeared that something
11  wasn't right there.
12      So when her husband called me, I had missed
13  the call initially.  I called him back.  And he had
14  said that Deirdre had told him "blow job,"
15  "contract," something along that line.
16      And I went through -- and I hung up with
17  him, said I'd look into it.  I went through.  I
18  texted Mr. Chiocca, asked if he could talk.
19      Mr. Chiocca called me back.  I explained to
20  him I had just had a very, I guess, alarming or very
21  concerning conversation with a board member's
22  husband.  And, as I said before, we only had one
23  female member and all the other members do not have
24  husbands.

Page 244

1      So Mr. Chiocca at that point said, "Oh,
2  fuck.  The tapes at RBG."
3      I said that we would talk in the morning,
4  and that was it.  I don't know what I was going to
5  do.
6  Q.  Okay.
7  A.  I didn't know I was going to call town
8  counsel that night.  I didn't know what to do, and
9  I've said this numerous times.
10  Q.  Yeah, you keep repeating the same thing
11  that isn't a response to my question.
12  A.  You keep saying the same question,
13  Samantha.
14  Q.  No, I'm not.  I'm asking --
15      MR. COOPER:  Yes, you are, Samantha.  And
16  at this point you're harassing the witness.
17      MS. HALEM:  I promise you I am not.
18      MR. COOPER:  Either you go on to --
19      MS. HALEM:  I'm going to ask the same
20  question I just asked --
21      MR. COOPER:  No, you're not.
22      MS. HALEM:  -- and word it a little
23  differently.
24      MR. COOPER:  We're going to terminate the

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 245

1   deposition if you continue.
2        BY MS. HALEM:
3   Q.  How did you extrapolate --
4        MR. COOPER: You can't --
5        MS. HALEM: Please stop talking.
6        MR. COOPER: You've asked him that already.
7        MS. HALEM: And he didn't answer it.
8        MR. COOPER: Yes, he did.  20 times.
9        MS. HALEM: Let's try it one more time and
10  I'm going to word it different.
11       MR. COOPER: You may not like the fact that
12  he believed Ms. Hall had been victimized by
13  something.
14       MS. HALEM: That's not what I'm asking.
15  I'm asking about the women at town hall.
16       MR. COOPER: He's not going to change his
17  answer.
18       MS. HALEM: Let me see if I can get an
19  answer about the women of town hall.
20  Q.  What in what Chris Hall said to you about
21  his conversation with his wife that night made you
22  think that there was a risk to the women at town
23  hall?  Just that question.
24       MS. ZUCKER: Objection, asked and answered.

Page 246

1        MR. COOPER: Objection.
2   A.  Your previous question you had asked me
3   what I thought.  I told you what I thought.
4        And you asked me how I came to that
5   conclusion so quickly.  And I said it just came up.
6   I thought of it.
7   Q.  Okay.  And when Deirdre Hall said she
8   doesn't want to put something in writing to you, did
9   you find that suspicious?
10  A.  I didn't find anything suspicious.  I
11  didn't know what was happening and what to do.
12  That's why I contacted town counsel the next day.
13  I mean, here I am.  Someone comes to me,
14  tells me something happened.  I looked into it.  I
15  verified that something may have happened.  Somebody
16  else tells me something of a sexual nature.  I put
17  that together.
18       I talk to the person.  That person says,
19  "Oh, fuck.  The tapes at RBG."
20       So I start to put in context now what
21  Ms. Hall told me, what Mr. Hall told me, and then
22  what Mr. Chiocca told me.
23       And yeah, I couldn't figure it out.  So I
24  had a restless night.  I didn't sleep that night.

Page 247

1        I tried again to make sense of it by
2   contacting Ms. Hall, Mr. Hall again.  There was
3   still no change.
4        Then I called town counsel that morning,
5   and then he told me we should meet and talk to Allan
6   and ask him, and that's what we did.  I mean...
7   Q.  Mr. Kimball, you're free to read the rest
8   of this document, but I'm going to skip to Page 10.
9   A.  Okay.
10  Q.  Feel free to read it yourself.
11       Are you good?
12  A.  I'm reading it now.  It's a little cloudy
13  at the top.  It's like I have cataracts again.
14  Q.  I know.  It's horrible.
15  A.  Okay.  What's your question?
16  Q.  So do you see where it says:
17       "Please touch base with me one last
18       time before you head over there?  Do I need
19       to pull out of the state rep race?"
20       Do you see that?
21  A.  I do.
22  Q.  You responded to her, saying, "You need
23       help."
24       What did you --

Page 248

1   A.  I did.
2   Q.  -- mean?
3   A.  It wasn't my call whether she had to pull
4   out of the state rep race or not.  That wasn't my
5   call.
6   Q.  Why would she -- why do you -- did she tell
7   you why she thought she might have to pull out?
8   A.  She did not.  She did not.
9        It's what you're reading in the text.  I
10  had already -- at that point I was no longer
11  offering my help to her candidacy.
12  Q.  So when you said, "You need help," do
13  you -- are you saying that in a pejorative, negative
14  way?
15       MS. ZUCKER: Objection.
16  A.  I didn't say it any way.  It just says,
17  "You need help."
18  Q.  Who did you think she needed help from?
19       MS. ZUCKER: Objection.
20  A.  She asked the question, "Do I need to pull
21  out of the state rep race?"  I responded, "You need
22  help."
23       Okay?
24  Q.  And that's the full totality that you

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 257

1  Q.  Okay.  Do you have any other explanation
2  for why it's not in the text chain you produced?
3      MS. CIESLAK: Objection.
4      MR. COOPER: Objection.
5      MS. ZUCKER: Objection.
6  A.  I didn't produce anything.  I gave my phone
7  to my counsel.  They produced the documents, not me.
8  Q.  Do you have any explanation why it was no
9  longer on your phone when you gave it to your
10  counsel?
11      MS. CIESLAK: Other than what he's already
12  testified to earlier?
13  A.  I don't know.
14  Q.  I didn't hear a reason.
15  A.  There's no reason for me, if that's what
16  you're asking.
17  Q.  So it was on what Deirdre Hall produced to
18  Regina Ryan but not on what -- the phone that you
19  gave your --
20  A.  I can't -- I can't tell you what Ms. Hall
21  produced.  I can't tell you what Ms. Ryan produced.
22  I can only tell you I gave my phone and my passwords
23  to my counsel.  What they produced for you is
24  obviously what you have.

Page 258

1  Q.  And you have --
2  A.  That's all I can tell you.
3  Q.  And other than deleting the texts prior to
4  May 1st --
5      MR. COOPER: Wait.
6  Q.  -- between you and Deirdre Hall, you have
7  no memory of deleting --
8      MR. COOPER: Wait.  Wait.
9  Q.  -- any individual text?
10      MR. COOPER: Objection.
11      MS. CIESLAK: I want to object also to the
12  extent he hasn't already testified to this is what
13  you're saying, because there was a lot of testimony
14  about texts earlier.
15      MS. HALEM: I'm just wrapping up the
16  testimony, Cindy.
17      MR. COOPER: No, you're not.  You're asking
18  him a misleading question, and I object.
19  A.  As I said, I had said before, there were
20  things deleted, my texts between Ms. Hall and
21  myself, with regards to our prior relationship.
22  Okay?  And that was part of the healing process
23  between me and my wife for our marriage counseling.
24  Q.  And I believe you testified earlier those

Page 259

1  were pre-May 1st, correct?
2  A.  As far as I know, they were.
3      I mean, you asked me a question.  I told
4  you as far as I know.
5  Q.  So you preserved all texts between --
6  A.  And I believe Samantha -- I believe,
7  Samantha --
8      MS. ZUCKER: Samantha, asked and answered.
9  A.  I believe the question was May 17th,
10  May 4th.
11  Q.  I'm sorry.  Is what question?
12  A.  I believe the question you had asked me
13  about the texts being deleted was after May 17th.
14  Q.  No.  It was -- you said you deleted them
15  after your affair.
16      Do you want to change that?
17  A.  I did.
18      MR. COOPER: No.  Objection.
19      MS. ZUCKER: Samantha, that's -- that's
20  completely inaccurate.
21      MS. HALEM: I'm trying to clarify when he
22  thinks --
23      MR. COOPER: What do you want to clarify?
24

Page 260

1      BY MS. HALEM:
2  Q.  When do you think is the time period --
3      MS. HALEM: Adam, I can see your e-mail.
4      MR. SHAFRAN: Sorry.
5  Q.  When is the time period you remember going
6  back and deleting backwards?
7  A.  Probably sometime in early May.
8  Q.  Okay.
9  A.  Sometime there.
10      We were in marriage counseling.
11  Q.  Understood.
12      On May --
13      MS. HALEM: And you can unshare.
14      MR. SHAFRAN: Yep.  I got it.
15  Q.  On May 23rd, the press learns about the
16  relationship -- not the relationship.
17      Excuse me.
18  A.  Who?
19  Q.  About the incident on May 1st.
20      Is that correct?
21  A.  On when?
22  Q.  May 23rd, 2018.
23  A.  Who learns about it?
24  Q.  The press.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

**Page 261**

1 A.   The what?
2      I don't understand your question.  What are
3  you saying?
4  Q.   The media.
5      When does the story of May 1st --
6      MS. ZUCKER: Samantha, I know it's been a
7  long day, and Zoom is actually difficult, but you're
8  screaming, Samantha, which I think is getting in the
9  way of people hearing you.
10      So if you can not do that, it would be
11  helpful.
12      MS. HALEM: You can turn your volume down
13  if it's bothering you.
14      MS. ZUCKER: No, sir.  I think you should
15  probably.
16      MS. HALEM: Because I don't think that's a
17  correct characterization of what I'm doing, but I'm
18  trying to be heard, but that's okay.
19 Q.   Mr. Kimball --
20 A.   Yes.
21 Q.   -- when did this story break to the press?
22  Was it May 23rd, 2018?
23      MR. COOPER: What story?
24      MS. HALEM: The story of the May 1st

---

**Page 262**

1  incident.  I already said that.  I'm sorry.
2  A.   I believe it broke on Wednesday, May 23rd,
3  and I believe it was Fox News.
4  Q.   Do you know who leaked the story to them?
5  A.   I don't know who leaked the story.  I
6  assumed it was Allan or somebody he knew.
7  Q.   Why would you assume that?
8  A.   Because evidently the only one who was
9  telling people what had happened, according to
10  testimony earlier that I witnessed, was Mr. Chiocca
11  told some people on the 18th.  So I assumed some of
12  those people may have told people, or who knows?
13  I don't know.  I know it wasn't me.
14 Q.   Okay.  But you don't know who it was?
15 A.   No.
16      MR. COOPER: Objection.
17 A.   You asked me, and I said I made an
18  assumption.
19 Q.   At this point Allan had told some of the
20  women had town hall.
21      Had he told Delshaune Flipp?
22 A.   I haven't talked to Delshaune Flipp
23  about -- me physically.  And as I said she had a
24  relationship with my wife.

---

**Page 263**

1 Q.   And not you?
2 A.   So I can't tell you what she said or didn't
3  say.
4 Q.   I'm asking, did you tell her about the
5  incident of May 1st?
6      MR. COOPER: Didn't you ask that very
7  question this morning?
8 A.   I did not tell her.
9      MS. HALEM: No.  I asked about the
10  relationship.
11      MR. COOPER: I object.
12      You know, at this point --
13      MS. HALEM: It's a different question.  I
14  asked about the relationship between him and Deirdre
15  Hall.  We're not talking about the May 1st incident.
16 A.   Town hall is a very small place, Samantha.
17  It's not very big there.
18      I don't know if you've ever been there, but
19  it's probably about half the size of Howard's law
20  office here.  Okay?  There's two floors.  There's a
21  lot of people that go around.  They're in and out of
22  the selectmen's office all day.
23      Now, as far as me telling them, no.
24      As far them being aware an incident had

---

**Page 264**

1  happened, yeah, I believe they were aware an
2  incident had happened because reporters were
3  calling.  And apparently, according to an e-mail I
4  seen from John Clifford, somebody gave out the names
5  from town hall.
6      That was not me, so I don't know.
7 Q.   Didn't you show the video that you had
8  gotten from Eric Hart to Delshaune Flipp at your
9  house?
10 A.   Delshaune Flipp had watched the videos,
11  okay?  She did.
12 Q.   At your house?
13 A.   At my home.
14 Q.   So you showed them to her?
15 A.   I didn't show them to her.
16 Q.   Who did?
17 A.   I believe my wife may have showed them to
18  her.
19 Q.   So your wife had possession of those
20  videos?
21 A.   My wife watched the videos with me,
22  Samantha.
23 Q.   Okay.  But you're saying that she had the
24  thumb drive and she showed it to Delshaune Flipp?

---

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. I
September 8, 2021

Page 265

1  A.  The thumb drive -- Samantha, the thumb
2  drive was in my computer to access the videos.
3  Okay? I didn't put it in a safe. It was in my
4  computer.
5  Q.  Were you present when your wife showed it
6  to Delshaune Flipp?
7  A.  I may have been present at one point.
8  Q.  You knew your wife was doing that?
9  A.  Knew my wife was what? Showing Delshaune
10  Flipp?
11  Q.  Showing the video to Delshaune Flipp.
12  A.  My wife had viewed the videos with me, and
13  my wife had told me I should get help for Ms. Hall
14  because she looked intoxicated after my wife viewed
15  the videos as well.
16  Q.  That was not the question.
17  A.  Okay. But you asked about her viewing it.
18  Q.  So are you aware, because you were present
19  for part of the time, that your wife has showing the
20  video of the May 1st/May 2nd night to Delshaune
21  Flipp?
22  A.  I would say I would probably be somewhat
23  aware that she probably seen part of the video. I
24  don't know if she'd seen all of it.

Page 266

1  Q.  And that was prior to May 23rd, correct?
2  A.  I don't know if it was prior to May 23rd.
3  It may have been, but I don't know for sure.
4  Everything happened so fast.
5  Q.  Okay. Does Delshaune Flipp report to Allan
6  Chiocca?
7  A.  Delshaune Flipp, I believe, worked in the
8  board of health office at the time, and I think she
9  reported to her direct supervisor, which would have
10  been the board of health agent, Janice McCarthy at
11  the time.
12  Q.  Does that person report to Allan Chiocca?
13  A.  That person, I believe, reported to the
14  board, the board of health.
15  Q.  Is there any reason that Delshaune Flipp,
16  because of her job in town hall, had a reason to
17  view these videos?
18  A.  Not that I'm aware of.
19  Q.  Did you think it was inappropriate that
20  your wife was showing them to her?
21  A.  At the time I think everybody was in awe.
22  So I didn't think if anything was inappropriate.
23  If we're talking about May 23rd,
24  Mr. Chiocca had already said that he had done the

Page 267

1  act, so I don't know anything was inappropriate.
2  Q.  I'm -- was it public knowledge?
3  A.  On May 23rd? I'm trying to
4  Q.  Prior to May 23rd.
5  A.  Yeah.
6  Q.  Was it known outside of the people that
7  were directly told by the participants, to your
8  knowledge, what happened at town hall, or that
9  something happened at town hall on May 1st?
10  A.  I don't know outside the participants
11  who -- who told what, who seen what, who thought of
12  something.
13     I know that I informed the board of
14  selectmen. I know that Mr. Hart knew, because
15  Mr. Hart had the tape. He brought the tape up.
16     I don't know if anyone else from Mr. Hart's
17  office knew. I don't know if Mr. Hart, after I
18  left, went over and gave the tape or told
19  Mr. Chiocca the tape was available. I don't know
20  any of that. I have no idea --
21  Q.  Okay.
22  A.  -- who told who or who did what.
23  Q.  Do you know who Linda Cook is?
24  A.  I believe Linda Cook was a mutual friend

Page 268

1  of -- I believe of a friend of Ms. Hall, I think.
2  Q.  You said mutual.
3     Was she your friend, too?
4  A.  At one point I had talked to Linda off and
5  on.
6  Q.  Did she know about the relationship between
7  you and Ms. Hall?
8  A.  Initially, I don't believe so.
9  Q.  Did she know about it by, you know, May
10  17th?
11  A.  I don't know.
12  Q.  Did she know --
13  A.  She didn't hear about it from me.
14  Q.  Did you talk to her about it prior to the
15  report coming out?
16  A.  I don't believe so.
17  Q.  Do you know if she knew about the purported
18  incident on May 1st?
19  A.  I don't.
20     I think there was a lot of people, a lot of
21  gossip around town hall, a lot of gossip everywhere.
22  So I don't know.
23     The story broke, and from that point, you
24  know, there was news -- news vans in front of town

**In The Matter Of:**

*Allan Chiocca vs.*
*The Town of Rockland, et al.*

*Edward F. Kimball, Jr.*
*Vol. II*
*September 09, 2021*



# DORIS O. WONG
# ASSOCIATES, INC.

COURT REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File KIMBALL_JR_Edward_Vol 2.v1*
*Min-U-Script® with Word Index*

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

**Page 13**

1  Q.  What were you conveying to your wife you
2  would have done in this text?
3  A.  I don't know what I was conveying to her.
4  I was probably a little frustrated at that point
5  that I was placed in this whole situation.
6  Q.  Frustrated with whom?
7  A.  Everybody.
8  Q.  Can you be more specific?
9  I mean, the whole world?  Or Deirdre Hall?
10  MR. COOPER:  Objection.
11  A.  I said "everybody," meaning Ms. Hall and
12  Mr. Chiocca.
13  Q.  And at this point had Mr. Chiocca put you
14  in any particular position?
15  MR. COOPER:  Objection.
16  A.  As I had said prior --
17  MS. ZUCKER:  Objection.
18  A.  -- when I had spoke to Mr. Chiocca on the
19  phone and indicated that I had a conversation with
20  Mr. Hall, I got the inclination that something may
21  have happened when he said to me, "Oh, fuck.  The
22  tapes at Rockland Bar and Grill."
23  So as far as I was concerned, there was two
24  people that put me in an awkward situation, and I

**Page 14**

1  was discussing that with my wife.
2  Q.  Why did you not want Deirdre Hall to speak
3  to Allan Chiocca before you did?
4  A.  Because, as I said previously, Ms. Hall
5  never recalled what actually happened.  And I wanted
6  to ask Mr. Chiocca what happened, and I did that in
7  the presence of town counsel.  And that's where
8  Mr. Chiocca disclosed that it was only a blow job.
9  Q.  Deirdre Hall told Regina Ryan that you told
10  her that Allan Chiocca was trying to, quote,
11  "neutralize" her.
12  Do you remember doing that?
13  MR. COOPER:  Objection.
14  A.  I may have.  I think Allan likes to
15  neutralize everybody.
16  Q.  What does that mean to you?
17  A.  What it means to me?
18  Q.  Yes.
19  A.  If there's a particular issue ongoing that
20  Allan did not agree with one party or more who may
21  have a different viewpoint, he would always try to
22  go around that person or try to garner support for
23  his viewpoint.  And that's happened multiple times
24  throughout the course of my interaction with

**Page 15**

1  Mr. Chiocca during his tenure as town administrator
2  while I served on the board of selectmen.
3  Q.  Did you use this term in relation to
4  Ms. Hall coming to you about something happening on
5  May 1st?  Or was this prior to that?
6  MR. COOPER:  Objection.
7  A.  What was that again?
8  MS. ZUCKER:  Objection.
9  Q.  Did you say that Allan Chiocca was trying
10  to neutralize her in response to her reporting the
11  May 1st event to you?
12  MR. COOPER:  Objection.
13  A.  I don't know if I said it prior to her or
14  if it was after.
15  Q.  Okay.
16  A.  It may have been prior.  I mean, we had a
17  contentious issue going on at town hall, the school
18  payroll issue.
19  Q.  Okay.  So you don't remember?
20  A.  Well, what I'm saying is -- I said it may
21  be, or it may have happened before or it may have
22  happened after.
23  Q.  Okay.  Deirdre Hall also told Regina Ryan
24  that you were furious with her on May 17th and May

**Page 16**

1  18th.
2  Were you?
3  MS. ZUCKER:  Objection.
4  A.  I wasn't furious.
5  Q.  Okay.
6  A.  I was actually dumbfounded once I
7  determined that there was something that may have
8  happened at town hall.
9  Q.  When you met with her on the rail trail,
10  were you mad at her?
11  A.  No.
12  Q.  Were you furious?
13  A.  No.
14  Q.  Did you yell at her?
15  A.  No.
16  Q.  Did you -- Deirdre Hall also told Regina
17  Ryan that she was in fear physically that you were
18  going to do something to her.
19  Do you know what you could have done that
20  would have put her in that fear?
21  MR. COOPER:  Objection.
22  A.  There was nothing that I could have done,
23  and there was nothing in my mannerisms or nothing in
24  my actions with my walk down the rail trail with

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 21

1   MS. ZUCKER: Objection.
2 A.   Not that I recall.
3 Q.   Did she ever tell you you was sore
4   anywhere, talk about her -- her perineum? I don't
5   know how to say that, p-e-r-i-n-e-u-m.
6      MS. ZUCKER: Objection.
7 A.   Not that I can recall at this point in
8   time.
9 Q.   Do you remember telling that to Regina Ryan
10   that she had told you that on June 5th?
11 A.   I don't know if I told anyone what I had
12   heard or not heard at that time. I don't recall
13   that, if I said that to Regina Ryan. So it's
14   nothing that stands out to me.
15      MS. HALEM: Okay. I'm going to mark a new
16   exhibit. Give me one second to find the link.
17   Alex, is this 8?
18      THE REPORTER: Yes.
19      (Document marked as Kimball
20      Exhibit 8 for identification)
21      MS. HALEM: Can you pull these up for me?
22   Anybody having any issues?
23      MR. COOPER: Well, hold on.
24      MR. CROTTY: We're looking at phone bills.

Page 22

1      MS. HALEM: We are looking at phone bills.
2      MR. COOPER: It's not loading.
3      MS. HALEM: Can you click on it again?
4      THE WITNESS: Up above.
5      MR. COOPER: Up above.
6      THE WITNESS: Maybe there.
7      MS. HALEM: How's it going now?
8      MR. COOPER: Okay.
9      BY MS. HALEM:
10 Q.   Okay. I'm not going to ask you if you
11   recognize this document, because it wasn't produced
12   by you. I'm going to represent to you that this is
13   Deirdre Hall's phone records that produced that
14   are available in this case to you. They're a part
15   of the discovery. They're from the billing period
16   of December 24th, 2017 -- you see that on the second
17   page -- to January 23rd, 2018.
18      We're going to -- and I have marked them to
19   highlight the calls we're going to talk about, so
20   you're going to see highlighting. That's me. I
21   added that. We're going to go down for this
22   purpose, let's look at May 17th.
23      MS. ZUCKER: Objection to the preliminary.
24      MS. HALEM: Okay.

Page 23

1      MR. COOPER: Can you tell me -- hold on --
2   how far down to go?
3      MS. HALEM: Yeah. When I get there, I'll
4   happily tell you when I'm there.
5   Page 48.
6   Tell me when you're there.
7      MR. COOPER: We're there.
8      BY MS. HALEM:
9 Q.   Okay. That's the first one you see in
10   yellow at 1:58 p.m. Do you see that? Is that your
11   cell phone number: (617) 839-20 -- 2071?
12 A.   It is.
13 Q.   Okay. So you are marked in this
14   document -- your cell phone number is marked yellow.
15   That's my code for your cell phone number.
16 A.   Okay.
17 Q.   So see on May 17th --
18 A.   Uh-huh.
19 Q.   -- do you see that you have several calls
20   with Deirdre Hall?
21 A.   Uh-huh.
22 Q.   Is that consistent with your testimony
23   earlier yesterday that you had an initial call?
24 A.   I said I had called her a couple of times,

Page 24

1   yes.
2 Q.   And there's that long call at 10:49 p.m. --
3 A.   Uh-huh.
4 Q.   -- the 55-minute.
5   Do you see that?
6 A.   I do.
7 Q.   And that would have been after those texts
8   "call me," correct? Does that sound about right
9   time-wise to you?
10 A.   It may have been.
11 Q.   Okay. And your wife would have been
12   present for that phone call, right?
13 A.   I believe so, yes.
14 Q.   Okay. And then when we look at May 18th,
15   we see the calls --
16 A.   Uh-huh.
17 Q.   -- start between you and Ms. Hall at 7:30
18   in the morning?
19 A.   Yep.
20 Q.   It's quick, but then -- there's a lot of
21   calls over the day. We have one, two, three, four,
22   five, six, seven, eight --
23 A.   Uh-huh.
24 Q.   -- nine --

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

---

Page 25

1   A.  Yep.
2   Q.  -- 10, 11, 12 calls.
3   A.  Okay.
4   Q.  Okay.  And this is when the two of you were
5       sort of -- we talked about these conversations, do
6       you think?
7   A.  Yeah.  This is when I was asking if there
8       was any difference in what she had told me
9       previously.
10  Q.  And sometimes she's calling you, and
11      sometimes you're calling her?
12  A.  Yeah.  Sometimes I would miss a call; she
13      would try calling me.
14  Q.  Okay.  So on that day, it looks to me like
15      you spoke to her for well over two hours in total.
16      Does that jive with your memory?
17  A.  I don't know if that's what it adds up to.
18  Q.  Okay.  Let's keep going.
19      Do you -- so some of these phone calls --
20      like, for example now, remind me, May 18th was the
21      day you met with her on the rail trail?  Or was that
22      May 17th?
23      MS. ZUCKER:  Objection.
24  A.  I met with her May 17th.

---

Page 26

1   Q.  May 17th.
2       So on May 18th did you see her in person?
3   A.  No.
4   Q.  No?
5       So some of these calls are quite lengthy
6       calls, like May 18th, 2:28 p.m.
7       Had you already spoken to Allan at that
8       point?
9   A.  On what -- what time?
10  Q.  2:28 p.m.  It's a 47-minute phone call.
11      MR. COOPER:  Where do you -- 2:28?
12      Hold on.
13  A.  On May 18th.
14      MR. COOPER:  I've got to scroll down.
15  Q.  Yep.
16  A.  It wasn't on the screen.
17  Q.  No problem.
18      Do you see it now?
19  A.  2:28 p.m.?
20  Q.  Yes.
21  A.  Yeah.  I had already spoken to Allan, I
22      believe.
23  Q.  So are you reporting to her what Allan said
24      in the meeting?

---

Page 27

1   A.  No.  I had called to find out how she was
2       doing and if she would be amenable of going through
3       and meeting up to discuss the nondisclosure, as I
4       was instructed by town counsel.
5   Q.  So you were arranging the meetings between
6       you, Ms. Hall's husband, Ms. Hall and your wife?
7   A.  Yeah.
8   Q.  That's what you think that call is, right?
9   A.  I think that's what the majority of the
10      calls was, and I was making sure she was okay.
11  Q.  During that phone call, or that subsequent
12      in-person meeting, did you disclose to her what
13      Allan Chiocca had said with you and Mr. Clifford?
14  A.  I believe I may have.
15  Q.  So you told her that he had gotten oral sex
16      from her?
17  A.  I mean, that was the purpose of meeting for
18      the nondisclosure.
19  Q.  To inform her what he had said that day?
20  A.  I think you have to put it all together,
21      Samantha.
22      What had happened was she reported
23      something to me the day previously.  Okay?  I tried
24      multiple times to see if there was any difference in

---

Page 28

1   what she had told me.  There was not.
2       I then had told her that I was going to
3   contact, meet with Allan.  I didn't know what to do.
4   I contacted town counsel, okay?  When I had
5   that -- I met with Allan.  Allan obviously confessed
6   that he had done this, okay?  And then before the
7   end of the meeting with town counsel, John Clifford
8   and Mr. Chiocca, the idea was hatched to go through
9   and try to get a nondisclosure.  And they asked
10  me -- Mr. Clifford asked me if I would be willing to
11  call Ms. Hall and set that up.  And that's what I
12  did.
13  Q.  Did Mr. Clifford --
14  A.  And at the same time -- at the same time,
15  Samantha, okay, Deirdre Hall was a colleague of
16  mine, okay, who had reported something.  I had found
17  out what had actually happened, and I was trying to
18  make sure that she was okay.
19  Q.  And make sure she knew, because she had no
20  memory at this point?
21  Is that still true at this point?
22  A.  As far as I know.
23  Q.  So you had given her information she did
24  not have, correct?

---

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Page 33

1  then, because I can only answer the questions that
2  you've given to me. I don't know how long it's
3  going to take.
4  Q. Okay. I appreciate that. And if you're
5  fine coming back for a third day, then that's --
6  A. I can come back for four days. It don't --
7     MR. COOPER: He's not coming back for a
8  third day.
9     MS. HALEM: That's why I'm trying --
10    MR. COOPER: Please ask your next question.
11    MS. HALEM: I'm trying to say, "Listen to
12  the question; do your best."
13    MR. COOPER: You don't -- Samantha, please
14  don't lecture my client. Ask your next question.
15    MS. HALEM: I'm trying to facilitate our
16  getting through this a little bit faster than we
17  have been.
18    MR. COOPER: I'm not going to comment
19  further other than to say, please ask your next
20  question.
21    BY MS. HALEM:
22  Q. Mr. Kimball, how did Deirdre Hall verbally
23  respond to you telling her that she had given oral
24  sex to Allan Chiocca on the night of May 1st?

Page 34

1     MS. ZUCKER: Objection. Objection.
2  A. I -- I believe there was a lot of silence
3  in the phone calls.
4  Q. She did not --
5  A. I believe that there was a lot of time
6  taken in between that she was probably trying to
7  grasp what I had told her.
8  Q. Okay. Do you have any specific memory of
9  her saying anything at that time period?
10 A. Nothing really that stands out in my mind
11 today, no.
12 Q. We're going to scroll down on these phone
13 records.
14    Do you see May 21st, you're going to see
15 light blue, 6:06 a.m.?
16 A. What's light blue?
17 Q. Do you --
18 A. Yeah. That's my office number.
19 Q. Okay. And did you use that number
20 regularly to speak to Ms. Hall?
21 A. I don't know if it was regularly.
22 Occasionally, if I was in the office.
23 Q. Was your -- at this point in time was your
24 wife monitoring your cell phone?

Page 35

1     MS. ZUCKER: Objection.
2  A. Was my wife monitoring my cell phone?
3  Q. Yes.
4     MS. ZUCKER: Objection.
5  A. No. I don't think so.
6  Q. You don't think so.
7     And remind me, yesterday there was a text
8  message where your wife had set the parameters in
9  which you could communicate with Ms. Hall, that you
10 should only be doing BOS business.
11 A. Yeah.
12 Q. Okay. Were you complying with those rules?
13    MS. ZUCKER: Objection.
14 A. I believe so.
15 Q. Okay. So look at May 21st, 6:06 a.m.
16 There's a 48-minute --
17    MR. COOPER: Hold on. Time out one second.
18    MS. HALEM: Sure.
19    MR. COOPER: I need to have a conversation
20 about marital privilege with my client.
21    MS. HALEM: Do you want to go off the
22 record for a second and --
23    THE REPORTER: He went on mute.
24    MS. HALEM: I saw that.

Page 36

1     So we'll just put that on the record.
2     THE REPORTER: Off the record?
3     MS. HALEM: Yeah. We can go off the
4  record.
5     THE REPORTER: Off the record.
6     (Discussion off the record)
7     BY MS. HALEM:
8  Q. So, Mr. Kimball, do you remember this phone
9  call May 21st at 6:06 a.m.?
10 A. No, not specifically.
11 Q. Do you remember anything that was said at
12 that time? It was a 48-minute phone call.
13 A. I don't. It might have been about town
14 business. I'm not sure.
15 Q. May 21st, if you keep scrolling, you speak
16 to her later in the day for 36 minutes, and then May
17 22nd, 84 minutes all at 6:00 in the morning again.
18    Are these all about town business?
19    MS. ZUCKER: Objection.
20 A. I might have been making sure that she was
21 okay.
22 Q. For 84 minutes?
23 A. It could be.
24 Q. Okay. Were you friendly -- were these

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

---

Page 41

1 "Hey." We went back to being colleagues. We were
2 friends before that.
3 Q. Were you friends at this point, May 27th?
4 A. I think we were still working together as
5 far as what we had to do on the board. Yes.
6     And as far as friendly, yeah, I was
7 concerned about her and her family, and I believe
8 she was concerned about me and my family as well.
9 Q. On May 23rd, if you can scroll down to
10 that, at 6:47 a.m., you speak to Ms. Hall from your
11 office for 100 --
12 A. From my office for what?
13 Q. 116 minutes.
14     MS. ZUCKER: Objection.
15 A. What's that?
16 Q. You speak to Ms. Hall for 116 minutes at
17 6:47 a.m. on May 23rd.
18 A. Okay.
19 Q. Do you remember what you were discussing?
20 A. I don't. It could have been about life.
21 It could have been about anything.
22     I mean, at the time, you know, something
23 bad had happened to someone that I cared about, so I
24 was checking in to make sure she was okay.

---

Page 42

1 Sometimes you just talk about the weather, talk
2 about her kids, talk about my kids, talk about
3 anything. Anything to take her mind off of what may
4 have been happening to her.
5 Q. Okay. Okay.
6     And that's the day the press gets the
7 story, but that was later in the day.
8     Is that right?
9     MS. ZUCKER: Objection.
10 A. I don't know. I got a phone call from, I
11 believe it might have been Sue Ide, that Fox 25 was
12 outside town hall. And I didn't even know Fox 25's
13 number. They had called me after this had happened,
14 and I never returned their call. I believe they had
15 even left a card on my front door, but I think they
16 did that to a lot of people in town, so...
17 Q. Okay. So --
18 A. I don't know Fox 25.
19 Q. Scrolling down -- I didn't say you did.
20 What I --
21 A. But you said that was the day they came.
22     MR. COOPER: So let me just say again to
23 both of you, do your best to please talk one at a
24 time.

---

Page 43

1     THE WITNESS: Okay. Thank you.
2 I'm sorry. Go ahead.
3     BY MS. HALEM:
4 Q. Let's keep scrolling down here on May 23rd.
5 A. Uh-huh.
6 Q. You have a call at 3:31 for 39 minutes, and
7 then at 4:11 for nine minutes.
8     Do you remember those phone calls?
9 A. I don't. Honestly, I don't.
10 Q. Okay. Keep scrolling.
11     When you get to May 23rd, you're going to
12 skip over some pages. Now you're on Page 56.
13     Do you see some more calls on May 23rd,
14 9:52 p.m., 9:54?
15 A. Can you hold up for a second, Samantha?
16 Q. Sure.
17     What do you need to see?
18 A. I'm just looking. The screen's moving
19 here, so -- I'm just trying to look at the time
20 frame to see.
21     MR. COOPER: Hold on one second. I went
22 too far.
23     THE WITNESS: Before or after?
24     MR. COOPER: It's May 26.

---

Page 44

1     BY MS. HALEM:
2 Q. Do you know if the afternoon May 23rd ones
3 were after the story broke or before?
4     MR. COOPER: Hold on. We're not there yet.
5 A. That's what I'm trying to find.
6     MR. COOPER: Okay.
7 A. All right.
8     What time? May 24th? May 24th was
9 definitely after.
10 Q. No, no, no, no. May 23rd. I'm sorry.
11 3:31 p.m. and then 4:11 and --
12     MR. COOPER: Hold on. Hold on. You told
13 us to go after these numbers.
14 Q. I did. And I apologize. I'm just trying
15 to get our time frame here.
16     I'm asking you if you happen to know if the
17 story broke in the evening or prior to 3:00 p.m.
18     MS. ZUCKER: Objection.
19 A. I don't know when the story broke. I think
20 I was called by Sue Ide sometime before town hall
21 closed, I think. Town hall usually closes at 4:30,
22 so I think it was sometime between, I don't know,
23 possibly 3:00 and 4:00. Or I don't know when they
24 actually showed up. I wasn't there.

---

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

Page 45

1 Q. So perhaps in line with those calls,
2 perhaps?
3 A. I don't know if they did.
4 Q. Okay. So then let's look at May 24th at
5 5:59 a.m.
6 You're starting your morning again with
7 Ms. Hall for 64 minutes.
8 MR. COOPER: I object to the preliminary to
9 that question.
10 Q. Okay. Do you remember that phone call?
11 A. I'm not on it yet. I'm on -- I still see
12 May 23rd on my screen.
13 Q. So it's --
14 MR. COOPER: Hold on. Hold on. May 24.
15 I have May 24 at 5:59 a.m.
16 Is that what you're looking at?
17 MS. HALEM: Exactly. At the 64-minute
18 phone call first thing in the morning.
19 THE WITNESS: Okay.
20 BY MS. HALEM:
21 Q. And you are --
22 A. That's not really first thing in the
23 morning for me.
24 Q. It's not?

---

Page 46

1 A. I'm usually up at, like, 4:00. So that's
2 probably like, I don't know, a couple of hours into
3 when I'm already up working.
4 Q. And you're already in the office at 6:00 in
5 the morning?
6 A. Yeah. I have a home office. I told you
7 that yesterday.
8 Q. Oh, no. I don't think I caught that.
9 So is this phone in your house?
10 A. Yeah. It's in my home.
11 Q. So this phone number, the (781) 681-3573,
12 that's not in a separate office off property; that's
13 in your actual house?
14 MR. COOPER: Objection.
15 A. The office is in a below level of my home.
16 It's all office space.
17 Q. Interesting. Okay.
18 So do you have a physical office where your
19 business is located?
20 A. I did. I shared it with somebody. But I
21 no longer have that.
22 Q. In 2018, did you?
23 A. Occasionally I would go to Boston and share
24 an office. But, for the most part, I don't really

---

Page 47

1 need a -- if you will, a remote office. Most of my
2 stuff is done by phone calls or e-mails.
3 Q. Okay. So you can wake up and just go into
4 your office and use that instead of your home phone
5 or your cell phone?
6 A. From time to time, I could.
7 Q. So that day, May 24th, you have a few more
8 phone calls with Ms. Hall.
9 A. Okay.
10 Q. There's probably just a voicemail or
11 something 12:14 p.m. for one minute, May 24th. At
12 1:06 you have a 45-minute call.
13 Do you -- are you discussing with her the
14 fact -- the public story that's come out? Do you
15 remember?
16 A. I don't know --
17 MS. ZUCKER: Objection.
18 A. -- if I did or didn't.
19 I mean, it's probably -- I would probably
20 presume, if that's on the 24th after the story come
21 out, yeah. I probably was. I was probably asking
22 her how she was doing, how her family was, how her
23 husband was.
24 Q. Do you remember any of the specific

---

Page 48

1 contents of those phone calls?
2 A. Not particularly.
3 Like I said to you before, we talked about
4 a lot of different things. Some stuff was town
5 stuff. Some stuff was just to make sure she was
6 okay.
7 Q. Do you have any memory of making any
8 representations to her of things that you were going
9 to do to help her, anything like that, during this
10 time period?
11 A. None whatsoever.
12 Q. Okay. Do you have any recollection of her
13 saying that she was going to do anything in response
14 to the story becoming public?
15 A. No. I had no idea what she was going to
16 say or what she did.
17 And obviously I was surprised by everybody
18 else, that Mr. Chiocca had already known about my
19 affair, and I didn't realize that until after the
20 report come out.
21 Q. Did the two of you discuss how to frame
22 your responses publicly?
23 A. No.
24 Q. Okay. Did the two of you ever discuss how

---

Doris O. Wong Associates, Inc.

Min-U-Script®

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

---

**Page 49**

1  to keep your relationship, your prior affair, out of
2  the public eye?
3  A.  No.  We had already had a -- discussed that
4  we would have a working relationship, okay?  And
5  that's all it was.  But it doesn't mean I didn't
6  care about somebody who was going through something.
7  Q.  No.  I think you misunderstood my question.
8  A.  No, I didn't misunderstand it.
9       You asked me if we had a prior -- if we
10  discussed anything about keeping our relationship
11  private.  It was already -- it was already
12  determined that our relationship -- and I believed
13  that was when I had met with her on May 4th, if my
14  memory serves me right -- that we had discussed that
15  it was going to be kept between me, my wife, her and
16  her husband.
17  Q.  And --
18  A.  I didn't know at that time it had already
19  been disclosed, and I had told you that yesterday.
20  Q.  At this point, Mr. Kimball, did you know --
21  by "this point" I mean May 23rd, May 24th -- did you
22  know that Deirdre Hall had told Allan Chiocca that
23  you had had a sexual relationship with her?
24  A.  No, I did not know that at that time.

---

**Page 50**

1       MS. ZUCKER: Asked and answered.
2  Q.  When did you first learn that?
3  A.  When did you first learn that?
4  Q.  That she had disclosed that to him on the
5  night of May 1st.
6       MS. ZUCKER: Objection, asked and answered.
7  A.  I think it would have been when Regina
8  Ryan -- I think when Regina Ryan, it appeared she
9  might have said it or she might have asked me about
10  my relationship with Ms. Hall.  But I didn't know
11  where it came from, but I did answer her honestly
12  that I did have a relationship.
13  Q.  That would have been on June 13th; is that
14  right?
15  A.  Possibly, if that was the first time
16  Ms. Ryan interviewed.  I know she interviewed me
17  once at town hall, I believe once at the police
18  station, and I believe once by phone conference, I
19  think, at my attorney's office, that one.
20  Q.  So it never came up in your conversations
21  with Allan Chiocca prior to June 13th?
22  A.  No --
23       MR. COOPER: Objection.
24  A.  -- as I said to you yesterday --

---

**Page 51**

1       MS. ZUCKER: Objection.
2  A.  -- after Mr. Clifford had left, I was in
3  Mr. Chiocca's office, and he had said to me, "I was
4  only consoling your girlfriend."
5       I didn't think nothing of it at the time
6  because I think Mr. Chiocca used to say that Deirdre
7  was my girlfriend because we were going to the same,
8  I guess, meetings, going to, like, zoning or
9  conservation or planning, that type of thing.  So I
10  didn't really think nothing of it at the time.  But
11  apparently, as the report disclosed, he was aware of
12  that.
13  Q.  Okay.
14  A.  But I was not.
15  Q.  So going through these call records a
16  little bit more, on May 24th at 8:04 p.m. you talked
17  to her for 97 minutes from your office.
18  A.  I may have, yeah.  Sometimes I work late in
19  my office.  Sometimes I've got to get a bid out.  It
20  depends on how my day went.
21  Q.  Do you remember anything specific about
22  that particular conversation?
23  A.  I honestly, I don't.  As I said before, and
24  I think I've answered a few times, we talked a lot

---

**Page 52**

1  about a lot of different things.  Some things that
2  were happening in town.  Some things that may been
3  happening in town.  We talked about our families.
4  We talked to see how things were going with each
5  other, that type of thing.
6  Q.  Okay.  May 25th, 7:05 a.m., 76 minutes.
7  You're speaking to Ms. Hall.  Then, shortly after
8  you hung up, you speak to her again at 8:33 a.m. for
9  86 minutes.
10       These are very long phone calls.  You'll
11  agree with me, right?
12  A.  Yeah.  Anything's a long phone call.
13  Q.  Now, do you generally speak to people this
14  long on the phone?
15       MR. COOPER: Hold on.  Objection.
16  A.  Sometimes I do.  But when somebody -- when
17  somebody who just went through something, and I was
18  just with an ear sometimes, just listening.
19  Q.  Okay.
20  A.  I was trying to be compassionate.
21  Q.  You were serving that role in her life at
22  that point?
23  A.  I think so.  I think that, you know,
24  Ms. Hall trusted me.  And Ms. Hall, I think in her

---

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 53

1  testimony, said that -- I believe she said I made
2  her feel safe.  So I think at that time she was just
3  looking for someone to -- to, I guess -- I don't
4  want to say -- I guess she just wanted someone to
5  talk to.  So that's -- I mean, I don't know what
6  more I could tell you about the phone calls.  I
7  mean, there's nothing there.  It was just me making
8  sure she was okay.
9  Q.  Would -- do you think, based on your
10  current recollection, that you had more contact with
11  Ms. Hall from May 17th going forward through the
12  investigation, than you had with her between when
13  you ended the relationship and May 17?
14     MR. COOPER: Objection.
15  A.  Well, I think, as I tried to say to you
16  earlier, Samantha, prior to me having an
17  acknowledgement of what actually transpired between
18  the evening of May 17th to the morning of May 18th,
19  okay, that's when things came together that
20  something happened to her of a sexual nature.
21     After that, okay, did we talk more?  Yeah.
22  Absolutely.  Because I think she was he hurting and
23  she needed someone to talk to about anything.  So I
24  was just an ear.  I was just there to help.

Page 54

1     As far as before or after an investigation,
2  in my mind, I didn't think an investigation was
3  really needed.  But obviously, we had an
4  investigation, and that's where we are.
5  Q.  Okay.  May 26th, 47 minutes.  We're in the
6  middle of the day.  Well, 11:00 a.m.
7     MR. COOPER: Hold on.
8  Q.  Do you see that?
9     MR. COOPER: Not yet.
10     MS. HALEM: Page 58.
11     THE WITNESS: Okay.
12     MR. COOPER: Wait.  Wait.  I can't...
13  I see May 26, 47 minutes.
14  Is that where you are?
15     MS. HALEM: That is exactly where I am.
16     MR. COOPER: Okay.
17     THE WITNESS: Okay.
18     BY MS. HALEM:
19  Q.  Do you remember anything about this
20  particular phone call?  Does this day stand out at
21  all?
22  A.  No, I don't.  I mean, that's -- I mean,
23  it's -- I guess the right way to say this is,
24  somebody just went through, in my opinion, a

Page 55

1  traumatic experience; and that person just needed
2  someone to talk to.  And that's all it was, was
3  small talk.
4  Q.  At this point in time, though, what's going
5  on in town hall is that there's an effort to put
6  Allan Chiocca on administrative leave, correct?
7  A.  I don't know if there was an effort to put
8  Allan Chiocca on administrative leave.  As far as I
9  was concerned, Allan Chiocca wanted to resign,
10  retire, make it go away, make it all go away.  And,
11  like I said, Mr. Clifford put him on -- I guess he
12  said the idea was to come up so it wouldn't be a
13  mark on Allan's record.
14     So he took voluntary leave at this point,
15  and then I think the nondisclosure thing blew apart.
16  I think I even sent Mr. Clifford an e-mail, if I
17  remember right, once the news story broke, "Any
18  chance of this still happening?"  And Mr. Clifford
19  said, "Yeah, because they didn't name anyone."
20     So they were still trying to work on a
21  nondisclosure, as far as I knew, at that point.
22  Q.  Right.  But when we talked --
23  A.  In response to your question, as far as I
24  know, they're still working on a nondisclosure

Page 56

1  agreement.
2  Q.  Yes.  But at this point in time we
3  discussed yesterday there was an effort to put Allan
4  Chiocca on administrative leave, and then it was
5  decided to have a vote of the full board.
6  A.  No.  No.  I don't believe so.
7     I mean, at that point in time I think I
8  even -- I had suggested that Ms. Hall take a leave
9  until any of this -- any of this blew by, you know.
10  Q.  You suggested that to whom?
11  A.  I believe I suggested it to Ms. Hall at the
12  time that she should take a leave from the board
13  until things got sorted out.
14  Q.  Did she at this point?
15  A.  I don't know if it was at that point or
16  shortly thereafter.
17     I mean, specifically, all this stuff kind
18  of blends together to me right now.  If it's
19  day-by-day, I mean, let's go day-by-day and take
20  everything into a context that what texts did I
21  receive, who else did I talk to?  Was it just
22  Ms. Hall?  Did I talk to any other board members?
23  Did I talk to Mr. Clifford that day?
24     You're asking me about conversations that

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Page 57

1 happened three-plus years ago, and I don't even know
2 if they're even relevant at this point.
3 Q. Well, on May 29th, you signed a letter
4 putting Allan Chiocca on administrative leave,
5 correct?
6 A. As I said to you before, I signed a letter
7 on behalf of the board of selectmen as being the
8 chairman.
9 Q. That was the question.
10 A. If I wasn't the chairman, someone else
11 would have signed it as chairman.
12 Q. You signed it on May 29th?
13 A. I did sign it. The board took a vote. And
14 I already went through that with you.
15 Q. Yes.
16 A. And when we discussed the May 23rd letter,
17 I told you that was the advice of town counsel.
18 This isn't -- this wasn't my idea. This was town
19 counsel.
20 Q. You told me that Deirdre Hall did not
21 attend that emergency BOS meeting.
22 A. I do not believe she attended that
23 emergency meeting. To the best of my recollection,
24 I don't believe she did.

Page 58

1 Q. Do you remember --
2 A. I don't believe she voted on it, either,
3 because she has to be there to vote. Or if she was
4 there, she would have abstained.
5 I mean, you would have to check the
6 executive session minutes.
7 Q. Why would she have abstained?
8 MS. ZUCKER: Objection.
9 A. Why would she abstain?
10 MS. ZUCKER: Objection.
11 Q. Are you thinking, Mr. Kimball? I'm not
12 sure.
13 A. You already asked me, and I answered. I
14 don't know.
15 Q. Oh, I'm sorry. I didn't hear you.
16 A. I was just waiting for you to either
17 comprehend what I said or ask another question.
18 Q. And that's why we had the silence.
19 On May 29th, you had two morning phone
20 calls with Ms. Hall: One at 8:31 a.m. for 17
21 minutes, and then another at 8:48.
22 A. We have to go there. I'm not there yet.
23 Q. My apologies.
24 A. I'm not running the computer, so -- and if

Page 59

1 I was, I probably wouldn't get there at all.
2 Q. Very expensive tech assistant you have.
3 A. Yep.
4 MR. COOPER: I'm having some technical
5 issues.
6 May 29. May 29, 6:31 a.m.? Is that where
7 you are?
8 MS. HALEM: No. Well, let's see --
9 MR. COOPER: Excuse me, 8:31 a.m.
10 MS. HALEM: Yes, that's where I was.
11 Was there a call that I missed?
12 8:31, 8:48, and then, if you keep
13 scrolling, you'll see 1:12, 1:32, one for 13
14 minutes, one for 35 minutes.
15 Q. Do you remember when you signed the letter
16 for the administrative leave?
17 A. I don't know.
18 MR. COOPER: Hold on. I don't see a
19 112-minute call.
20 Q. I didn't say 112, did I? I think I said
21 one you -- one up -- 1:12, the time.
22 MR. COOPER: Okay. 1:12, the time.
23 Hold on.
24 A. I don't recall what -- if I signed it that

Page 60

1 meeting or if it was --
2 MR. COOPER: Wait.
3 A. -- sent to me in an e-mail.
4 MR. COOPER: Let me get there for a second.
5 May -- May 29th.
6 Okay. So there it is, May 29th, 1:12.
7 THE WITNESS: Okay. So what time is that
8 now?
9 MR. COOPER: 1:12 p.m.
10 THE WITNESS: 1:12. I don't think we met
11 at 1:12. I don't think we met at that point in
12 time.
13 BY MS. HALEM:
14 Q. So -- so these calls were prior to the
15 emergency BOS meeting?
16 A. They could have been, yeah. It looks that
17 way right now, looking at the date.
18 Q. Do you remember talking to her about the --
19 the move to put Allan Chiocca on administrative
20 leave that evening?
21 A. I don't remember that specifically.
22 Q. Okay.
23 A. And while I'm on the subject, Samantha,
24 Deirdre Hall was still a member of the board of

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

---

**Page 93**

1  world, and then that goes into -- who was the other
2  one -- Jeffrey Epstein and all kinds of things. So
3  it was all in the public.
4  Q.  Jeffrey Epstein is a little different,
5  right?
6  A.  Well, I guess. I don't know.
7      But I didn't write the article. I came
8  across the article. I forwarded it for information
9  purposes only; nothing more.
10 Q.  Did you discuss this article with Deirdre
11 Hall at all?
12 A.  No.
13 Q.  Can we -- let's go back and look at those
14 call records.
15 A.  Look at them.
16     MR. COOPER: Ed, wait for a question.
17     MS. HALEM: Can you get them back up for
18 me, though, Howard?
19     MR. COOPER: Working on it.
20     MS. HALEM: Let me know when you got it.
21     MR. COOPER: Okay.
22     What date?
23     MS. HALEM: May 30th, please.
24     MR. COOPER: Do you know what page you're

---

**Page 94**

1  looking at?
2      MS. HALEM: Yes. 60.
3  Q.  Do you see it yet?
4  A.  I do.
5  Q.  Oh, okay.
6      So on May 30th, at three o'clock -- 3:01,
7  excuse me --
8  A.  Okay.
9  Q.  -- you're speaking to Deirdre Hall for 49
10 minutes --
11 A.  Okay.
12 Q.  -- is that accurate?
13     Okay. Do you remember that call?
14 A.  Not specifically.
15     As I said to you before, you've asked me
16 the same question about all the phone calls. I was,
17 a lot of times, an ear just trying to have some
18 compassion for someone who went through something.
19 Q.  This was the date of her Facebook post.
20     Do you remember having that conversation
21 with her?
22 A.  No. No. I don't remember anything about a
23 Facebook post. Again, I'm not on social media.
24 Q.  I know.

---

**Page 95**

1  A.  Thank God I'm not on social media, if you
2  want to know the truth. All that stuff is rubbish.
3  Q.  On May 31st you speak to her again at
4      7:43 a.m. for 46 minutes.
5      MR. COOPER: Hold on. Hold on. Let him...
6  A.  Okay.
7  Q.  Do you see it?
8  A.  Yeah, I see it now.
9      So I spoke to her, yeah.
10 Q.  This was after you sent the article on
11 sexual harassment and voters.
12 A.  Okay. So --
13 Q.  Does this refresh your memory as to whether
14 or not you spoke to her about the article?
15 A.  No. It doesn't. I don't recall if I spoke
16 to her about the article.
17     As I said to you before, we spoke about a
18 lot of things. I mean, we had spoke about the
19 #MeToo environment back in I think February, or even
20 back in -- back when it first happened. I mean, it
21 was in the news.
22     I mean, what do you want me to say? I
23 mean, I don't know what it specifically said.
24     A lot of times, as I tried to tell you

---

**Page 96**

1  numerous times already about phone calls, it was
2  just someone with a compassionate ear.
3      Did I care about her? Yeah.
4      Was I worried that she went through a lot
5  of stuff? Yeah.
6      And was I trying to be there for her as a
7  good friend? Yeah.
8      That's what I was doing. And I would hope
9  that someone would do that if that ever happened to
10 somebody they knew or cared about.
11 Q.  Did your wife know you were having all
12 these phone calls with Deirdre Hall during this time
13 period?
14     MR. COOPER: Objection.
15 A.  I believe so. I mean, I made no secret
16 about any calls I had to my -- with my wife
17 regarding Ms. Hall.
18     And as far as my wife, I mean, if you
19 really must know -- you asked the question
20 yesterday, and it was my wife, after viewing the
21 videos, that said that I needed to help Ms. Hall.
22 And that's from a woman who, you know, who -- who
23 was just scorned by Ms. Hall.
24     So I don't know what you're getting to

---

Doris O. Wong Associates, Inc.

Min-U-Script®

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 117

1  meetings?
2  A.  No, I didn't know.  I don't know who met
3  first.  I don't know any of that.
4  Q.  You've never discussed with her what she
5  said to the independent investigator?
6  A.  No, I didn't talk to her about what she
7  said to the investigator.
8  Q.  You didn't know when she met with the
9  independent investigator?
10 A.  Again, I don't know when she met.  I wasn't
11 in charge of setting up the appointments.  I believe
12 the interim town administrator, Chief of Police John
13 Llewellyn, was doing that as well as Mr. Clifford,
14 not I.
15 Q.  During any of your phone calls with her
16 during this time period did she tell you when she
17 was meeting with the independent investigator?
18 A.  Not that I recall, Samantha.
19 Q.  And during --
20 A.  I had a hard enough time knowing when I was
21 going to meet with her.
22 Q.  And during any of these time -- during this
23 time period, do you recall her telling you anything
24 that occurred during the meetings with the

Page 118

1  investigator between her and the investigator?
2  A.  Not that I'm aware of and not that I recall
3  at this time, no.
4  Q.  At --
5  A.  That was three-plus years ago.  I mean...
6  It doesn't stick out in my mind as being
7  something that would be memorable.
8  Q.  Were you at the June 5th board of selectmen
9  meeting?
10 A.  I believe I was.
11 Q.  Was Deirdre Hall also present at that
12 meeting?
13 A.  I believe Ms. Hall was at that meeting.
14 Q.  Is that the -- the night that Deirdre Hall
15 announced that she was taking a leave of absence
16 from the board?
17 A.  I don't know.  It may have been.  You would
18 have to play the video from WRPS.  If you want to
19 bring that up, we can play it.
20 Q.  No.
21 A.  I mean, is it?
22 Maybe.  I don't know for sure.
23 Q.  Okay.
24 A.  Again, I wasn't part of her campaign at

Page 119

1  that point, so I -- the date that she dropped out of
2  the race is really irrelevant to me.  It has no
3  specific meaning.
4  Q.  That's -- no, I wasn't talking about the
5  date she --
6  A.  You just asked if she was -- the date she
7  dropped out of the race, that she's talking about
8  her campaign.
9  Q.  No.  I'm sorry.
10 I meant is that the day that she took a
11 leave of absence from the board of selectmen.
12 A.  I don't know.  She may have taken a leave
13 after that meeting.
14 Q.  That was relevant to you, right, whether or
15 not she was on the board of selectmen?  You were the
16 chair?
17 A.  Well, I was the chair, but there was also
18 concern from other members of the board.  So we
19 can't ask somebody to step down; we can't ask
20 anybody to resign.  Okay?
21 So what we did was the next best thing.  I
22 believe we asked her to take a leave until things
23 got sorted out.
24 Q.  So is it your testimony that you asked her

Page 120

1  to take a leave?
2  A.  It's not my testimony that I asked her to
3  take a leave.  I think the con -- the consensus was
4  that the board, you know, would probably function
5  better right now if she took a leave.
6  She didn't have to take a leave.  She could
7  have stayed on the board.  She chose to take a
8  board -- a leave.  And I don't know specifically
9  why, what weighed into all her decisionmaking, but
10 again, that's a question for Ms. Hall.
11 Q.  What's -- what is the evidence you have
12 that it was the consensus of the board that she
13 should take a leave?  Did somebody say something?
14 Was there a discussion at the board?
15 MS. ZUCKER: Objection.
16 A.  I think my board, at the time, was
17 concerned about everything going on around town
18 hall.
19 I mean, to be honest with you, my board was
20 very inactive and I think they didn't know what to
21 do, either, as much as I didn't really know how to
22 navigate through some of this stuff at the time.  So
23 they were doing what they were told by either other
24 people outside of the board, maybe town counsel,

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Page 121

1   maybe their spouse, maybe their friend.  I don't
2   know.  But everyone had a different take on it, I'm
3   sure.  Everyone had a different opinion.
4   Q.   But your testimony that there was a
5   consensus among the board that she should take a
6   leave of absence, what's that based on?
7        MS. ZUCKER: Objection.
8   A.   What was it based on?
9   Q.   Yes.
10  A.   I think it was based on the fact that this
11  was out in the public, and I think my board was
12  embarrassed by everything that was going on and all
13  the media attention and they didn't know how to deal
14  with it.
15       But again, I can't speak for my board.  I
16  can only speak how I felt.
17  Q.   Uh-huh.
18  A.   As far as I was concerned, Ms. Hall was
19  still a colleague, and she was still a board member.
20  So she was entitled to the same rights any of the
21  other board members were.
22  Q.   Did you suggest to her that she should take
23  a leave of absence or say anything to her on that
24  subject?

Page 122

1   A.   I think -- I think --
2        MS. ZUCKER: Objection.
3   A.   I think I may have sent her a text at one
4   point, you know, that it might be a good idea.  I
5   mean, but ultimately it's her decision, not mine.
6   Q.   So it was entirely voluntary on her part,
7   correct?
8   A.   I believe that at the end of the day it
9   would all be on her, yes.
10       As far as me asking her, or thinking it's
11  something that she could consider, yeah, I probably
12  did that.  If it were me, I might have done the same
13  thing.  But I also said I wouldn't resign, and I
14  ended up resigning.
15       So it depends on the day, depends on the
16  mood, depends on what's happening at home.  It
17  depends on how you feel.
18       So I don't know.  That was three years ago,
19  so I don't know why, when or what, how she did that.
20  Q.   On June 5th, at that meeting when she made
21  the announcement that she was going to step down,
22  did you discuss that with her before she made it?
23       MS. ZUCKER: Objection.
24  A.   No.  I believe from the June 5th meeting, I

Page 123

1   think I might have read a statement that, you know,
2   had come up about how we all have relationships in
3   town.  I think that was prior to the June 19th
4   meeting where I tried to -- you know, the infamous
5   meeting that, you know, got the most views on
6   YouTube; that meeting that I tried to do the same
7   thing and just turn it over to the police to get
8   everyone out of it because I thought that it's a
9   small community, everybody knows somebody.
10  Everybody hears one thing, it spreads.
11       I likened it to wildfire.  You know, you
12  get one spark, and it goes on a wildfire and a mob
13  mentality.  I think that's what was happening
14  through the town during the course of all of this.
15  Q.   Leading up to the June 5th meeting, though,
16  did you discuss with Deirdre Hall whether or not she
17  was going to take a leave of absence?
18  A.   I don't know if we discussed it, per se,
19  but she might have told me that, you know, she made
20  a decision and was going to take a leave.
21       But as far as me saying, "This is what you
22  should do" or not do, I was not guiding Deirdre Hall
23  to do anything.  Those are Deirdre Hall 's
24  decisions, not Ed Kimball's.

Page 124

1        I can give you another example, Samantha.
2   There was another board member that
3   happened, I believe, in 2016.  His name was
4   Mr. Korey Welch.  He got arrested at the
5   drive-through at McDonald's, fell asleep drunk, got
6   arrested with a loaded weapon in his waistband.
7   Okay?
8        And I had said, "Korey, if I were in your
9   position I would probably resign."  And he said,
10  "You know what, Ed?  I'm going to own it," and off
11  he went.  The next election cycle, Korey didn't make
12  it on the board again.
13       I can only offer things that I may do.
14  Whether they take that advice or not is entirely up
15  to the other party.
16  Q.   Did you offer that advice to Deirdre Hall?
17  A.   I believe I said I may have texted her and
18  said, "If it was me, I would have done" this.
19       But again, what she decided to do with it
20  ultimately and how she ends her campaign is not up
21  to Ed Kimball.  And it's not up to me she can't
22  serve on the board.  That's up to the public.
23  Q.   Okay.  On June 4th, if we're looking back
24  on these call records --

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 125

1     MS. HALEM: Page 62, Howard.
2  Q.  -- at 8:12 a.m. phone call for 26 minutes.
3     And then we're just going to scroll a
4  little further.
5     On June 5th at 6:56 a.m., there's a
6  34-minute phone call, and then if you --
7  A.  MR. COOPER: Hold on a second.  Ed, just
8  wait.  Wait.
9  Q.  You remember yellow is also you.  Yellow is
10 your cell phone.
11    MR. COOPER: Just wait.
12 A.  You've got to bring it up.  He didn't bring
13 it up yet.
14 Q.  Oh, I'm sorry.
15    MS. HALEM: Are you there yet, Howard?
16    MR. COOPER: Working on it.
17    And what page?
18    MS. HALEM: 62, starting there.
19    MR. COOPER: Okay.  And what entry?
20    MS. HALEM: June 4th.
21    MR. COOPER: Okay.
22    MS. HALEM: 26-minute phone call at 8:12 --
23    MR. COOPER: Right.
24    MS. HALEM: -- a.m.

Page 126

1     MR. COOPER: Hold on.  We're not there.
2     THE WITNESS: We've got to go the other
3  way, I think.
4     MR. COOPER: Other --
5     THE WITNESS: I think so, in June --
6  June 4th, is that the one?
7     BY MS. HALEM:
8  Q.  Exactly.
9  A.  Excuse me.
10 Q.  I'd like you to scroll down to June 5th at
11 6:56 a.m., a 34-minute call.
12 A.  Okay.
13 Q.  And then on June 5th -- you're also yellow,
14 not just light blue.
15    So that's your cell phone number, correct,
16 (617) --
17 A.  Yeah.  I was probably out of the office.
18 Q.  So there's a one-minute call and then, at
19    3:30, a 13-minute call.
20 A.  Uh-huh.
21 Q.  And at 10:08 p.m. there's a five-minute
22 call.
23 A.  Okay.
24 Q.  Okay.

Page 127

1  A.  As I've already --
2     MR. COOPER: Wait for a question.
3  Q.  So on June 5th you spoke to Deirdre Hall
4  for a total of 53 minutes, right?
5  A.  Okay.
6  Q.  You spoke four times that day.
7  A.  Okay.
8  Q.  You don't remember if you spoke to her
9  about her -- the decision to -- to step down from
10 the BOS --
11 A.  I don't recall.
12 Q.  -- before it happened?
13 A.  I don't recall specifically speaking about
14 that.  I may have said whatever she decides I would
15 support either way.
16    But as far as anything else, some of it
17 could have been about the upcoming meeting.  Some of
18 it could have been about having the ear that I said
19 to you before repeatedly.  I mean, I've had contact
20 with Deirdre Hall.  I never denied that.  So...
21 Q.  Did you know that she was going to make a
22 statement at the June 5th meeting saying that she
23 had accused Allan Chiocca of engaging in
24 inappropriate behavior?

Page 128

1  A.  I didn't know what she was going to say
2  to -- to the public.  Okay?  If a board member wants
3  to say something to the public, they have the floor,
4  whether that's Ms. Hall, Mr. Ryan, Mr. Mullen or
5  Mr. O'Loughlin.  Everybody has an opportunity to
6  speak.  I can never deny any board member from
7  speaking before the body.  Okay?
8     MR. COOPER: Are we done with this?
9     MS. HALEM: Nope.
10 Q.  On --
11    MR. COOPER: Because I just wanted to be
12 clear, when you ask us to put exhibits up, he cannot
13 see you, or anyone else for that matter.
14    MS. HALEM: Is that okay with you?  I mean,
15 that's --
16    MR. COOPER: Well, I don't know how else to
17 deal with it.  I think he is entitled to see you,
18 but when you -- when there's a delay, he has no idea
19 what you're doing.
20    MS. HALEM: Alex, isn't there a way to pin
21 the video to the screen?
22    THE REPORTER: Can we talk about it off the
23 record?
24    MS. HALEM: Honestly --

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Page 129

1    **MR. COOPER:** Let's just keep going.
2    **MS. HALEM:** I don't know.
3    **MR. COOPER:** We're finishing this today, so
4    let's keep going.
5    **MS. HALEM:** I don't want to waste time with
6    technology problems that Todd & Weld is having.
7    **MR. COOPER:** Whoa, whoa, whoa.
8    **MR. SHAFRAN:** Let's just go --
9    **MR. COOPER:** Todd & Weld is not having
10   technical problems.  You didn't send us an advanced
11   set of documents --
12   **MS. HALEM:** Nobody does --
13   **MR. COOPER:** -- so we would have the
14   proposed exhibits.
15   **MS. HALEM:** Nobody does that.
16   **MR. COOPER:** This is on you.
17   **MS. HALEM:** I know you haven't been to some
18   of the other depositions, Howard, but this is how
19   we've done it for every deposition.
20   **MR. COOPER:** Samantha, you chose to do it
21   this way.  It takes time to go to the link.  It
22   takes time to load.  There's a lot more easier ways
23   that this could have been done, so do not criticize
24   my firm, or me.  Whatever delay is going on here is

Page 130

1    on you.
2        And I'm not going to debate it with you, so
3    ask your next question, please.
4        **BY MS. HALEM:**
5    Q.  Looking at that same exhibit, Exhibit 8,
6    June 6, 6:59 a.m., you're speaking to Deirdre Hall
7    for 71 minutes.
8    A.  Okay.
9    Q.  You have another call with her on June 6th
10   at 8:55 a.m. for two minutes.
11   A.  Okay.
12   Q.  June 7th, you're speaking to her for ten
13   minutes.
14       We're going to keep --
15   A.  Okay.
16   Q.  Okay.  Do you see all these calls?
17   A.  Yeah.  I can see the calls.
18   Q.  Okay.
19   A.  I can also see she had lots of other calls
20   with other people, too.
21   Q.  She does.
22       Did you also meet with her in person during
23   any of this -- during this time period, early
24   June 2018?

Page 131

1    **MS. ZUCKER:** Objection.
2    **MR. COOPER:** You mean other than at board
3    meetings?
4    **MS. HALEM:** Well, she takes a leave of
5    absence on June 5th.
6    Q.  But yes, other than board meetings.
7    A.  What's the dates?
8    Q.  Early June 2018.
9    A.  Early June after she left the board?
10   A.  No.  Before.
11   A.  Before?
12       Then I would have met with her before she
13   left the board.  I would have seen her in some other
14   meetings.
15   Q.  Meeting with her unrelated to the BOS?
16   A.  Well, we go to other board meetings that
17   are unrelated to the BOS.
18   Q.  Do you have --
19   A.  Not just the board of selectmen meeting.
20   We may attend a different meeting, the zoning
21   meeting, for example.  Or we may attend a
22   conservation meeting.  You may go to a school
23   committee meeting.  You may go to -- it was various
24   meetings throughout town, different boards.

Page 132

1        So we could see one another at one of those
2    meetings.
3    Q.  Do you have any social interactions with
4    Deirdre Hall unrelated to any town business during
5    that time period?
6        **MR. COOPER:** Well, I object and instruct
7    him not to answer.
8        **MS. HALEM:** About when he had social
9    interactions with Deirdre Hall during the time
10   period of the investigation?
11       **MR. COOPER:** What relevance does that
12   possibly have?
13       **MS. HALEM:** We're in the middle of an
14   independent investigation, and two of the primary
15   witnesses --
16       **MR. COOPER:** If you want to ask him if he
17   had any contact with her about the investigation or
18   discussed the investigation --
19       **MS. HALEM:** I can ask him if he had any
20   contact with her.
21       **MR. COOPER:** Have at it.
22       **BY MS. HALEM:**
23   Q.  Mr. Kimball, did you have any contact with
24   Deirdre Hall during the time period of the

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 133

1  investigation in person?
2     MR. COOPER: About the investigation?
3     MS. HALEM: No.  Unrelated to the board of
4  selectmen's business.
5     MR. COOPER: About the investigation?
6  Objection.
7     MS. HALEM: No, that's my --
8     MR. COOPER: Okay.  Then I instruct.  You
9  have a ruling from Judge Young --
10    MS. HALEM: I disagree with your analysis.
11    MR. COOPER: -- that prevents you --
12    Well, then, take it up with the court.
13  We're relying on a ruling that completely rejected
14  your professed need to go into the details.
15    MS. HALEM: Howard, if you would like to --
16    MS. SHAFRAN: Hold on.
17    I just want to -- Howard, I want to
18  understand, for the record, it's your position that
19  we can't ask Ed if he met with Deirdre while the
20  investigation was pending?  We can't ask that
21  question.
22    MR. COOPER: You can ask him the question
23  if he met with Deirdre having anything to do with
24  discussions about the investigation.

Page 134

1     But in terms of their personal lives --
2     MR. SHAFRAN: That's not what I said.
3  That's not what I asked, Howard.
4     MR. COOPER: Okay.
5     MR. SHAFRAN: My question was not -- hold
6  on.  I want to understand your position.
7     My question was not -- well, I want to
8  understand his position and how you interpret the
9  rules.
10    MR. COOPER: Well, Adam, I don't know why
11  you're talking when the rule has been one lawyer
12  from each side will talk here.  I'm happy to listen
13  to anything that you want to say because I respect
14  you, but I don't want to be double teamed here.
15    MS. SHAFRAN: Okay.  That's fine.
16    MR. COOPER: So take a position.
17    MR. SHAFRAN: My question is not can we ask
18  Mr. Kimball, "Did you meet with Deirdre to discuss
19  personal issues or anything like that."  My question
20  is is it your position that we can't say, "Did you
21  meet with Deirdre during the investigation,"
22  categorically.
23    MR. COOPER: He can answer that "yes" or
24  "no."

Page 135

1     MR. SHAFRAN: Okay.  So let's do that.
2     MS. HALEM: Unrelated to BOS business?
3     MR. SHAFRAN: No, just generally, did you.
4     BY MS. HALEM:
5  Q.  Did you meet with Deirdre Hall during that
6     time -- that early June time period?
7  A.  I did.
8  Q.  And can you describe those meetings for me?
9     MR. COOPER: Only if they have something to
10  do with the subject matter of the investigation or
11  Mr. Chiocca's assault upon her.
12    MS. HALEM: I object.
13    MS. SHAFRAN: That's ridiculous coaching.
14    MS. HALEM: Yeah, ridiculous.
15    MR. COOPER: Well, you know what?  You need
16  to read what you wrote and requested from the court,
17  which you were denied.
18    MR. SHAFRAN: Why don't we ask that
19  question.
20    MR. COOPER: I cannot possibly envision
21  that you would continue to try to invade my client's
22  privacy about an affair that has been admitted and
23  is all about -- anything having relevance has
24  already been established.

Page 136

1     MS. HALEM: He testified the affair's over.
2  I'm not asking him about the affair.
3     MR. COOPER: And their relationship.  And
4  their relationship, personal relationship
5  thereafter.
6     If it has anything to do with the
7  investigation or town business, have at it.  But in
8  terms of any meetings that were during this time
9  period that didn't relate to the investigation, it's
10  just not relevant, and the court has said so.
11    MR. SHAFRAN: I disagree.
12    But go ahead, Samantha.
13    BY MS. HALEM:
14  Q.  Did you ever have a conversation with
15  Deirdre Hall about the investigation during this
16  time period?
17    MR. COOPER: Okay.  Asked and answered.
18    Go ahead.  Answer it again.
19  A.  No.
20  Q.  Scrolling down through the phone records,
21  you talked to Deirdre Hall on June 11th for 63
22  minutes at 10:00 a.m.
23    MR. COOPER: Okay.  Hold on.
24    I now have to go back and get it back on

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

---

Page 137

1  the screen. And I say that without criticizing
2  anybody or holding anyone responsible.
3      MR. SHAFRAN: Howard, if you click the link
4  on Samantha's box, on the arrows that should say
5  "pin," if you click that, it should pin her face to
6  every time you look at a document.
7      MR. COOPER: Adam, with all due respect, I
8  don't -- what you're telling me has no meaning. I
9  can see where it says "Exhibit 8," and there's a
10  link, and that's what I'm clicking on.
11     MR. SHAFRAN: You've expressed a concern
12  about not being able to see her. I'm just trying to
13  help you with that.
14     MR. COOPER: Okay. I thought you were
15  referring to the document.
16     MS. HALEM: Nope.
17     MR. SHAFRAN: No.
18     MR. COOPER: What page are we going to in
19  Exhibit 8?
20     MS. HALEM: 67.
21     Well, actually, that's not true. 66, then
22  67.
23     MR. COOPER: 67.
24     MS. HALEM: Are you there?

Page 138

1      MR. COOPER: Almost.
2      We are on 66.
3      June 11th?
4      MS. HALEM: Yes.
5      MR. COOPER: Okay. We're there.
6      MS. HALEM:
7  Q.  63-minute phone call, 10:06 a.m.
8      Scroll down on June 12th, which is the next
9      page. There's a 25-minute phone call at 9:28 a.m.
10     On June 13th, at 6:19 a.m., you have a
11     52-minute phone call with Ms. Hall.
12  A.  Okay.
13  Q.  That's the day you met with Regina Ryan,
14     isn't it?
15  A.  What time was that?
16  Q.  You talked to her at -- at 6:19 in the
17     morning.
18  A.  Yeah, it was.
19  Q.  So shortly thereafter you met with Regina
20     Ryan about this matter, the investigation?
21  A.  I think I met with Regina Ryan, like --
22     yeah, maybe later that afternoon, possibly.
23  Q.  And so leading up to that meeting with
24     Regina Ryan you had three lengthy phone calls with

Page 139

1  Deirdre Hall, and it's your testimony that you did
2  not discuss the investigation or what you were going
3  to tell the investigator during that time period?
4  A.  As I repeatedly said, okay, I had many
5  phone calls in the course of this entire thing, and
6  there's probably many more here as well.
7      I was a compassionate ear to Ms. Hall.
8  Some of the phone calls discussed business with the
9  town. Some of the phone calls discussed our
10  families. Some of the phone calls discussed the
11  weather. Some of the phone calls just discussed
12  wanting to, you know, hope that everything here
13  would return to normal at some point.
14     There was never anything specifically,
15  other than trying to be compassionate over what --
16  something that happened to someone that I had cared
17  about, and I tried to tell you that numerous times.
18     And during the course of this whole thing,
19  I had conversations with other people as well. But
20  you're not pointing that out. I had numerous
21  conversations with other board members as well.
22  Q.  And in those conversations with other board
23  members, did they ever talk to you about staying
24  away from the parties that were the focus of the

Page 140

1  investigation, Allan Chiocca and Deirdre Hall? Did
2  you ever discuss that with them?
3  A.  No.
4  Q.  So you never had conversations or texts or
5  communications with other members of the BOS?
6  A.  I've had communications with other members
7  of the BOS. I've had e-mails from other members of
8  the BOS who said we should do this or we should do
9  that.
10     But, unfortunately, other members weren't
11  the ones who were contacted. Other members weren't
12  the ones who sat in with Mr. Chiocca. Other members
13  weren't the ones that kept deferring the issue to me
14  with Mr. Clifford, okay?
15     So when you put all that together, you
16  just -- say you pinpoint one phone call on a
17  specific day. It's not the same thing, Samantha.
18  Q.  Did you ever discuss with town counsel, or
19  any of the other members of the BOS, whether it
20  would be inappropriate for you to continue to have
21  these conversations with Deirdre Hall?
22  A.  About --
23     MR. COOPER: Hold on.
24  A.  No.

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Page 161

1 that was confirmed.
2    My own belief is that he knew prior to
3 that. That's a question for him, not a question for
4 me. But as far as this whole thing, I think that
5 was bad advice that I took from Mr. -- Mr. Clifford
6 at the time. And I think that was evident at the
7 June 19th meeting.
8 Q. When Larry -- you told me yesterday that
9 Larry Ryan went around town hall and told people
10 about your affair.
11    Do you know who he told?
12    MR. CROTTY: Objection. That
13 mischaracterizes his testimony.
14    MS. HALEM: My apologies.
15 Q. What exactly did you testify to about what
16 Larry Ryan did with the information you gave him?
17 A. What I said, the evening of June 19th,
18 okay, I come into the town, town offices, all right?
19 You asked a little bit about the meeting, the
20 infamous meeting. Okay?
21    So if you want to know what my demeanor was
22 before I sat down on the chair at the meeting, I
23 walked into the board of selectmen's office only to
24 find that my name was no longer on the warrants and

Page 162

1 that Mr. Ryan's name was there as the new chair. I
2 was further informed that Mr. Ryan was gossiping
3 around town hall, and I think the gossip that I
4 referenced was, "It's okay for Ed to fuck Deirdre,
5 but it's not okay for Allan." Okay? And that was
6 gossip around town hall.
7    So it was upsetting to me that I took the
8 advice of John Clifford at that point and had
9 previously told these board members in confidence
10 what had happened, and then, in fact, they were
11 going around town hall spreading things and doing
12 things.
13    So there's a big difference between having
14 that, at the end of the day, in a small town versus
15 having it on "Boston Magazine" or having it on the
16 news or having it going worldwide.
17    So as far as that, no, I was not happy
18 going into that meeting. My demeanor was very much
19 upsetting before I got into the meeting.
20 Q. Do you have an understanding --
21 A. And -- and hold on a sec.
22 Q. Okay.
23 A. And, okay, you asked what Mr. Ryan was
24 doing. And obviously Mr. Ryan was upset, because he

Page 163

1 was led to believe that Mr. Kimball was going to
2 resign that night and he didn't. So I think I used
3 the reference Larry took his ball and went home that
4 night because he was upset that he didn't get his
5 way that night.
6    So again, there was a lot of contention
7 going back and forth. We could all say that we all
8 made mistakes, but I can tell you honestly my best
9 interest was always the town. My best interest in
10 my heart was do what was right for everybody, and
11 that's what I tried to do.
12    And taking a text from my wife who was
13 emotional and trying to tell me "what does it mean"
14 and "what does that read into it," there's nothing.
15 It's from a woman who was upset. My wife and I have
16 been together for 38 years, okay, going on 39,
17 Samantha. I have five grown children. Okay? We
18 have a business together. Okay?
19    Do we have ups and downs like every couple?
20 Yeah. But, you know what? As much as I'm not proud
21 about this affair, I don't regret it. It happened.
22 It gave me an opportunity reconnect with my wife,
23 and for that I'll be ever grateful to Ms. Hall for
24 that because it gave me a restart with my wife.

Page 164

1 Okay?
2    And as far as this preposterous stuff
3 you're trying to spin that I'm this and I'm that,
4 I'm not a saint, but I took something that was
5 brought to me. I tried to do the right thing by
6 bringing it up the ladder. That's what I did.
7    Somebody told me that, "I did that. I want
8 it to go away." I believed them. And then the
9 story changes.
10    So I don't know. I mean, I don't even know
11 why we're here. I know I say that many times,
12 because your questions have been repetitive, and
13 it's still the same response for me. I did what I
14 thought was right. That's it.
15 Q. Do you know who Larry Ryan told about your
16 affair at town hall?
17 A. I don't know specifically.
18 Q. Is it your conclusion that it was generally
19 known at town hall that you had an affair with
20 Deirdre Hall?
21    MR. COOPER: Hold on, Ed. Ed, wait.
22 Objection.
23 A. I don't know who was told at town hall. I
24 don't know -- and as I said before. It's a small

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 189

1  e-mail stating that he was talking to counsel
2  about -- or indicated talking to counsel about
3  something along that line.
4  Q.  Is your text to Larry Ryan not accurate?
5  A.  No.  I said, as of this morning, there's
6  been no reports of any crime.  That was as of this
7  morning.
8  Q.  Okay.
9  A.  This was in the afternoon.  I don't know
10  anything that happened after that.
11  Q.  Did Chris Hall tell you what he was going
12  to go to the police about?
13  A.  No.  He just said he was -- they were
14  contemplating going to the police.
15  Q.  Did you ask him?
16  A.  No.
17     He asked me specifically about what was
18  holding up the nondisclosure, and I said, "I don't
19  know.  I'm not part of that."
20  Q.  So --
21  A.  "I'll make a phone call and ask."
22     And I did, and John Clifford said he would
23  get in touch with the parties.
24     That was it.

Page 190

1  Q.  Okay.  I'm going to give you a new exhibit.
2  One second.
3     Tell me when you have it, Howard.
4     Can we mark this?  I'm sorry.  Is --
5  MR. COOPER:  Yeah.
6  THE REPORTER:  13.
7     (Document marked as Kimball
8  Exhibit 13 for identification)
9  MS. HALEM:  Do you have it, Howard?
10  MR. COOPER:  Yeah.  Yes.  The Massachusetts
11  Conservative Movement?
12  MS. HALEM:  Yes.
13  MR. COOPER:  Okay.
14  BY MS. HALEM:
15  Q.  Have you ever seen this screen shot before,
16  Mr. Kimball?
17  A.  It may have been sent to me by somebody.
18  Q.  Okay.  So this is dated June 15th.
19  MR. COOPER:  Well, the screen is shot is
20  dated June 15th.  I don't know when the text came.
21  When did the text come?
22  MS. HALEM:  Sure.
23     This isn't a text, actually.  This is
24  just --

Page 191

1  THE WITNESS:  A screen shot, right.
2  MS. HALEM:  -- a screen shot.
3  THE WITNESS:  A screen shot's typically
4  sent by text, right?
5  BY MS. HALEM:
6  Q.  They could just be photos on your phone,
7  but it doesn't -- that's not relevant to what we're
8  talking about here.
9     The date on the phone --
10  A.  You're asking me if I seen it and mentioned
11  date, and I said it's a screen shot.
12     So what's the date of the screen shot?
13  Q.  I didn't ask you when you saw it.  I asked
14  if you had seen it, and then I said it's dated
15  June 15th, the post on social media.
16  A.  Okay.
17  Q.  Somebody --
18  A.  I believe somebody had sent it to me.
19  Q.  Okay.  Do you remember when they sent it to
20  you?
21  A.  I don't specifically.  I'm going to say
22  that if it was dated June 15th, sometime after
23  June 15th.  That's why I asked you if you knew when
24  it was sent.

Page 192

1  Q.  Do you know if it was around June 15th?
2  A.  I honestly don't know without seeing the
3  screen shot --
4  Q.  Okay.
5  A.  -- and what else came with it and by whom.
6  Q.  So what it says is that:
7     "Word on the Rockland streets is" --
8     "streets is that town administrator Allan
9  Chiocca wasn't the only one having sex with
10  Selectman Deirdre Hall.  Selectman Ed
11  Kimball was sleeping with her, too."
12  A.  Yeah.  It looks like Dan Ryan, who is Larry
13  Ryan's son, when you scroll down, maybe made those
14  comments.  So that, I guess, would be Mr. Ryan --
15  Q.  Okay.
16  A.  -- you know.
17  Q.  This was posted on Facebook, correct?
18  A.  Yeah.  And there's a reply there.
19     Didn't I just see a Dan Ryan somewhere
20  along there?
21  Q.  Feel free to read.  I'm not going to ask
22  you any questions about the comments, but I just
23  wanted you to have the full picture of the document.
24     You were aware that someone posted that you

Allan Chiocca vs.
The Town of Rockland, et al.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Page 193

1 were having an affair with Deirdre Hall on -- around
2 June 15th?
3 A. Someone posted a rumor -- somebody posted a
4 rumor that I had an affair with Deirdre Hall.
5 Q. Okay.
6 A. Is this the gospel here we're looking at?
7    What are we looking at?
8 Q. We're looking at a post that was on
9 Facebook on June 15th.
10 A. Okay. We're looking at a post on Facebook.
11 Okay.
12 Q. That's it.
13 A. And all these people, I don't know -- I
14 can't recognize any of these people.
15    So who are they?
16 Q. Okay. But at this point you'll agree
17 with me --
18 A. Because I'm not on Facebook, so I don't
19 know what the context of it was about or how it
20 started. All I seen was the Dan Ryan there on
21 June 19th, and it says I have no integrity. I'm an
22 embarrassment to our town.
23    "What makes him think he's any better
24 than the other two? Own your mistake and

Page 194

1    move on."
2 Q. Okay.
3 A. So that's what that says.
4 Q. At this point had you publicly owned your
5 mistake?
6 A. No. I think this was after the June 19th
7 meeting when Dan's father ran off with the ball.
8 Q. This is June 15th.
9 A. It says June 19th at the top there, doesn't
10 it?
11 Q. No.
12 A. The Dan Ryan comment.
13 Q. I'm not talking about Dan Ryan's comment.
14 I'm talking about when this went out onto Facebook.
15 It was June 15th, 2018.
16 A. I don't know how something could go out,
17 Samantha, that's dated June 19th four days earlier.
18 Unless there was something wrong with the internet
19 that I don't know about.
20 Q. You mean the comments. The comments would
21 have been post --
22 A. You just asked that -- you just asked me
23 about the comments. I'm looking at the comment
24 right now. It says June 19th.

Page 195

1 Q. I promise you I did not ask you about the
2 comments. I only asked you about the post.
3 A. Then what did you ask me about, Samantha.
4 Q. Where it says "Massachusetts Conservative
5 Movement," it says June 15th.
6 A. Okay.
7 Q. So that's --
8 A. I said I don't know when I seen that.
9 Q. Got it.
10 A. Somebody sent it to me.
11    If you could show me the screen shot, when
12 it was sent to me, I can verify when I seen it. It
13 may have been right after it was sent, for all I
14 know. I don't know.
15 Q. I don't have that. I don't have that
16 because you didn't --
17 A. Then you're asking me to answer a question
18 I can't give you a full response on because --
19 Q. I promise --
20 A. -- because if -- yes, I seen it, and yes,
21 it's after June 15th. When? I don't know when.
22 Q. Okay. Was it before the report came out?
23 A. I don't know. It may have been. I mean, I
24 don't know.

Page 196

1 Q. Okay.
2 A. I'm not on Facebook. I'm not one to go
3 look on Facebook. I never -- I never gave
4 Facebook -- you know what? I don't even look at
5 Facebook. I could care less about Facebook. That's
6 why I don't have a Facebook page.
7 Q. Let's go -- sorry.
8 A. I'm just saying. I -- you're asking me
9 when. I would have to know when or whomever sent it
10 to me. It could have been any number of people may
11 have sent it to me.
12 Q. Do you have any idea who made that post?
13 A. What, the one I'm looking at now, the one
14 that says Dan Ryan?
15    It looks like Dan Ryan, unless that's a
16 pseudonym for anybody.
17 Q. No. The actual one from Massachusetts
18 Conservative Coalition.
19 A. I personally don't know who made it, no.
20    MS. HALEM: Okay.
21    Howard, can you --
22    THE WITNESS: I don't even know -- I don't
23 even know who is the person who runs that site.
24    MS. HALEM: Okay.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

**Page 197**

1 THE WITNESS: What site are we even looking
2 at? On Facebook?
3 MS. HALEM: We're going to finish with
4 this.
5 So let's go to Page 70 on Exhibit 12, which
6 is Kimball 517.
7 MR. COOPER: All right.
8 MS. HALEM: Actually, I take that back.
9 69, which is Kimball 516.
10 Tell me when you're there, Howard.
11 MR. COOPER: Almost.
12 Go ahead.
13 BY MS. HALEM:
14 Q. So in the middle of this page, these are
15 again texts with Larry Ryan. There's a June 15th
16 text from Larry Ryan to you that just says "Ed,"
17 dot, dot, dot, dot, dot -- lots of dots, question
18 mark.
19 A. Yeah.
20 Q. You respond to him saying:
21 "False rumors. Have fingerprints of
22 our infamous TA, in my opinion."
23 MR. COOPER: Hold on.
24 Page 69?

**Page 198**

1 MS. HALEM: Yes.
2 THE WITNESS: Okay.
3 MR. COOPER: And.
4 MS. HALEM: Bottom of the page.
5 MR. COOPER: Bottom.
6 MS. HALEM: Third text up, "Ed."
7 THE WITNESS: Question mark.
8 BY MS. HALEM:
9 Q. "False rumors, have fingerprints of our
10 infamous TA, in my opinion."
11 A. Uh-huh.
12 Q. What are you responding to there?
13 A. I believe there was somebody that sent me
14 previously something on or about June 15th that
15 basically said I was going to resign. I think that
16 came from -- I think the individual's name was Brian
17 White had posted that.
18 Q. Was this in connection at all to -- at this
19 point does Larry Ryan know you had an affair with
20 Deirdre Hall?
21 A. I don't know if it was at that point or --
22 what time is it in the day? Eight o'clock.
23 Q. 7:55, almost eight o'clock.
24 Yes, you're right.

**Page 199**

1 A. Okay. Possibly.
2 I mean, I don't know if I had told him on
3 the 15th or the 16th. It was -- it was before the
4 June 19th meeting, I know that.
5 Q. Okay.
6 A. Sometime in that time period.
7 Q. Let's go to the next page. He says to you:
8 "I don't know if you will survive
9 this."
10 A. Well, that might be what it is.
11 Q. It's talking about --
12 A. Maybe it was posts about a rumor that --
13 that you just alluded to on or about the June 15th
14 thing prior. It could be. I don't know.
15 Q. So do you think Larry Ryan had heard rumors
16 about the affair before you told him officially?
17 A. I'm sure Larry Ryan may have heard rumors.
18 I mean, obviously, I mean, I think in the testimony
19 Mr. O'Loughlin gave in one of these things, he
20 alluded to the fact that Allan had known by then.
21 I don't know who Allan had told.
22 Obviously, I don't know who else Ms. Hall may have
23 told.
24 I can tell you I didn't even tell my best

**Page 200**

1 friend. That's how guarded I was about it.
2 Q. Okay. But you told Larry Ryan that it was
3 false --
4 MR. COOPER: Objection.
5 Q. -- correct?
6 A. What was false?
7 Q. "False rumors, have fingerprints of our
8 infamous TA, in" your "opinion"?
9 A. Yeah.
10 MR. COOPER: Objection.
11 A. That may have been alluding to a post I
12 just told you about, about saying I was resigning.
13 I think that happened around the same time period,
14 June 15th.
15 Q. Or it may have been in response to Larry
16 Ryan asking you if you were having an affair with
17 Deirdre Hall?
18 MR. COOPER: Objection.
19 A. No, I don't believe so.
20 Q. What's the basis of your not believing so?
21 A. The fact that you haven't shown me the
22 other piece of clip from the June 15th.
23 Q. You didn't produce it, so I don't know.
24 A. I don't know. Somebody has it. I

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 221

1     Anything else?
2        MS. ZUCKER: Objection.
3   A.  I believe it's the same blackmail.
4        And as I said, you asked me if I was
5   certain it was by Clifford, and further, no, I'm not
6   100 percent certain.  But I believe it was.
7   Q.  Okay.  Back to Exhibit 2.  This time we're
8   going to 22.  Actually 21.
9        MR. COOPER: Page 21?
10       MS. HALEM: Are you there?
11       THE WITNESS: Not yet.
12       MR. COOPER: Not yet.
13       It's not sticking.
14       I'll try it this way.
15       Okay.
16       BY MS. HALEM:
17  Q.  Okay.  Can you read 21 and 22 to yourself,
18  quickly.  Tell me when you've finished.
19  A.  Okay.
20  Q.  So again, same time period, June 15th,
21  2018.
22  A.  Uh-huh.
23       It's actually 2019, I believe, right?
24  Q.  No.

Page 223

1   Q.  21 and 22.
2   A.  Oh, 21.
3        MR. COOPER: Okay.  There's 21.
4   A.  Okay.
5        What am I looking at now, Samantha?
6   Q.  You can read it yourself, but just make
7   sure you're reading texts between yourself and CJ
8   Chapman.
9        Yes?
10  A.  They look like it.
11  Q.  Okay.
12  A.  Okay.
13  Q.  And CJ Chapman, just to make sure I have it
14  on the record -- I don't remember -- he's the PR
15  person that you hired from Pilgrim Strategies?
16  A.  He's the PR person that I had hired, and
17  then he was engaged as part my legal defense with
18  Mr. Harnais and Mr. Palmucci.  So he was part of the
19  legal defense, yes.
20  Q.  Okay.
21       This 6/15/2018 discussion that you're
22  having --
23  A.  Yes.
24  Q.  -- this is the same -- motivated by the

Page 222

1   A.  That's what it says on the top.  February
2   of 2019 on that page.
3   Q.  Oh, no.
4        What I need you to look at is 21:
5        "FYI, I was told the motion would be
6        withdrawn today by her attorney."
7        Are we on the same --
8   A.  We're on Page 21, and that's what it's
9   saying.
10  Q.  Okay.  Where do you see 2019?
11       MR. COOPER: On Page 21?
12  A.  I see on Page 21.
13  Q.  Are you on Exhibit 2?  Are these texts with
14  CJ Chapman?
15  A.  No.  This a text to my son, Ryan, I
16  believe.
17  Q.  You're on the wrong page, guys, with --
18  A.  So you're in a different exhibit now?
19  Q.  Yeah.  Exhibit 2.  I said that.
20  A.  Oh, okay.
21  Q.  Sorry.
22       Are you there?
23  A.  We're almost there.
24       Page 22 you said?

Page 224

1   same thing that we've talked about a couple of times
2   now with these other texts:
3        That Deirdre Hall telephoned you and told
4   you something regarding having to withdraw her case,
5   her civil case to get the tapes not released, right?
6   A.  Yeah.  I believe so.
7        Part of that, and it might have been even a
8   Facebook post, that was out there that I said about
9   resigning, if you read into it.
10  Q.  And also the fact that people were talking
11  about rumors of you two having an affair, correct?
12  A.  Yeah.  People talk.  I mean, it's a small
13  town.
14  Q.  Got it.
15  A.  You've got to remember, this is well into
16  the whole thing, you know.
17  Q.  On Page 22, you said:
18       "I just sent you an e-mail of a draft
19       statement."
20       Do you see that?  That's below the
21  attachment.
22  A.  Okay.
23  Q.  "Please" let me know your thoughts.
24       "Thanks."

Doris O. Wong Associates, Inc.

Min-U-Script®

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 229

1  agreements that were sent to the town from Adam
2  Shafran. They're just drafts.
3  Q.  On June 16th you were planning on
4  announcing at a BOS meeting or to the press that you
5  were having an affair with Ms. Hall.
6     Is that right?
7  A.  On June 15th?
8  Q.  16th.
9  A.  16th.
10 Q.  That's the date of this e-mail to CJ
11 Chapman, right?
12 A.  I had wrote that, yes.
13 Q.  And in this draft statement --
14 A.  Uh-huh.
15 Q.  -- if you go down to the fourth paragraph:
16 A.  Yep.
17 Q.  "There are people involved who will not go
18 public with what they know about the
19 incident in question. I did not see any of
20 the keyboard cowboys asking me for
21 clarification on any of these events.
22 Instead they have fabricated their own
23 version."
24 A.  Yeah. Like mob mentality.

Page 230

1  Q.  And you're referring to the rumors about
2  your affair with Ms. Hall?
3  A.  I'm referring to everything that was out
4  there at that time, about everything.
5  Q.  And --
6  A.  Just not my affair. The whole entire
7  thing.
8  Q.  But that was one of the things that was out
9  there at that time, the keyboard cowboys --
10 A.  There was a rumor out there.
11 Q.  Okay.
12 A.  You showed me that before --
13 Q.  Right.
14 A.  -- a couple of exhibits ago. I think it
15 was June 15th.
16    And you asked me when I saw it, and I said
17 it had to be after June 15th, so...
18 Q.  The paragraph above, you write:
19    "Unfortunately parties involved and
20 some people in the employ of the town
21 planned to use this as leverage to
22 neutralize me."
23 A.  Yeah.
24 Q.  What -- what town employees are you -- do

Page 231

1  you think want to neutralize you?
2  A.  I think I've answered that question
3  already. I said previously that I -- I guess it's
4  in my mind, okay, somebody went through. An
5  allegation was presented. An allegation was
6  substantiated, and then it turned to try to shame
7  that person because they had a previous relationship
8  with me. So it was almost like I was becoming the
9  scapegoat, in my opinion, because I had had a
10 previous affair, a previous consensual relationship
11 with Ms. Hall.
12    So then when Ms. Hall and Mr. Chiocca, the
13 incident took place and Mr. Chiocca acknowledged
14 what had happened, that it was only a blow job, then
15 it became -- well, let's start shaming Ms. Hall so
16 we can have no credibility. And hey, we get a
17 twofer for that. We get to shame Ed Kimball, too.
18    And so I guess that was my sentiment back
19 then, if you really must know. So I think it was in
20 an effort to have people out there shame a person,
21 okay, who brought something forward. That was my
22 opinion.
23 Q.  Why --
24 A.  And I was determined at that point to try

Page 232

1  to stick around and help a good friend. And
2  obviously it didn't happen, and here we are again.
3     And it seems that my reputation's been
4  destroyed. It seems that the other two parties'
5  reputations are in question, and we're spending all
6  kinds of money, in my opinion, because one guy
7  couldn't say what he did to his wife.
8  Q.  Okay.
9  A.  You asked. I'm telling you what my
10 sentiment was when I was writing that.
11 Q.  Understood.
12 A.  I was trying to be kind when I wrote it. I
13 tried to address everything.
14    And then I was advised by the PR guy not to
15 send that, and I didn't. He rewrote it, and I used
16 pretty much what he wrote before for the basis of my
17 resignation letter, I think a few weeks later.
18 Q.  A few weeks later, right.
19    So you decided not to -- to go public at
20 this --
21 A.  I decided not to use this version. It was
22 a draft.
23 Q.  Got it.
24 A.  Okay. I decided not to resign.

Edward F. Kimball, Jr. - Vol. II
September 09, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 293

1  take Regina Ryan's report and you can go maybe
2  publish it for a romance novel for somebody, because
3  what I told her and what she put on the paper are
4  two different things.
5  Q.  Did you tell -- I'm just going to ask you
6  what you told Stacie Callahan.
7      Did you tell Stacie Callahan that Deirdre
8  Hall --
9  A.  I answered this already.  I said "no."
10 Q.  Different question.  This is a different
11 question.
12     Did you tell --
13 A.  Okay.
14 Q.  Did you tell Stacie Callahan that Deirdre
15 Hall was stalking you?
16 A.  Did I tell Stacie Callahan what?
17 Q.  That Deirdre Hall was stalking you.
18 A.  No.
19 Q.  Okay.  Did you tell Marcy Birmingham that
20 you were fortunate because your relationship with
21 Deirdre Hall was progressing but your wife stepped
22 in and stopped it?
23 A.  No, I did not.  I didn't tell any of the
24 women.

Page 294

1      And as I told you before, I didn't tell
2  anybody, not even my best friend.  And I regret that
3  I took the advice of town counsel and told my fellow
4  board members, okay?  Because all they did was use
5  this to push blame on me, because none of them had
6  any wherewithal to figure anything out.  Okay?
7      None of them had the integrity or the moral
8  capacity to even bring anything to somebody when
9  something was reported to them.  Okay?  They all
10 stuck their heads in the sand, and I'm the guy who's
11 being singled out because I reported it.  And I was
12 on the verge at that time of whether it was even a
13 whistleblower effect because I brought something
14 forward.  Okay?
15 Q.  Mr. Kimball --
16 A.  When you keep saying, "What did you do?
17 Why did you do this?"  I did what I thought was
18 right.  I thought what I did was -- in my heart was
19 the best interest for the town, and I still stand by
20 that.
21     Now, what I was told at that time, I was
22 told that Mr. Chiocca had, in fact, only gotten a
23 blow job.  He wanted help getting himself out of the
24 situation he got himself into.

Page 295

1      And Mr. Clifford, being a long-time friend
2  of Mr. Chiocca, aided in that by A, not putting him
3  on paid leave right away; B, letting him take
4  vacation time.  And then, as we all heard, he
5  referred him directly to Mr. Shafran; which
6  Mr. Clifford didn't tell me who to hire for an
7  attorney.
8      So when you start to think and add up all
9  these pieces, I really don't know where this is
10 going with you.
11 Q.  Did you tell Deli Flipp -- did you tell
12 Deli Flipp that you had nothing more than an
13 emotional relationship with Deirdre Hall?
14 A.  At the time I did, yes.  We kept it between
15 myself and my wife and the Halls.
16 Q.  You told --
17 A.  I told you that before.
18     And I had also said the same thing to
19 Mr. Chiocca, I believe on May 4th.
20     But unbeknownst to me, Ms. Hall had
21 already, I -- I guess, based on the report -- if the
22 report is true -- in fact told Allan that.
23     Okay?
24 Q.  Did you ever turn anything over to a DA or

Page 296

1  the police?
2  A.  No.  Regina Ryan never asked for anything
3  from me.  Regina Ryan was more concerned with what
4  kind/type of sex acts she was doing.
5      You asked me that, what she was more
6  concerned with.  I can't say anything more about
7  that.  I have no video of it.
8  Q.  I switched subjects.
9      I'm asking you did you ever go to law
10 enforcement, a district attorney or the police
11 department or --
12 A.  I went -- I went to the police department,
13 okay, to have my second interview out of town hall.
14 Okay?
15 Q.  Oh, I'm sorry.  That's not what I asked
16 you.
17 A.  Now you asked me if I went to the police?
18 No.
19     I had previously told you I discussed the
20 gaps in the videotape with our police chief, John
21 Llewellyn, who went on to be the interim town
22 administrator shortly thereafter.
23 Q.  To DAs, no --
24 A.  And also there was a rumor at the time that

  

**Dawn**

Kimball Exhibit

1

9/8/21  AKL  Chocca v Town of Rockland, et al

iMessage
Tue  May 1, 6:5x PM

I know what happened. You make me sick

Tue, May 1 at 6x PM

Yes this is Dawn

Did you really think I wouldn't find out? Your a disgusting human being. The both of you are disgusting

I'm not about threatening anyone just so you know. But I haven't decided how I'm going to handle this. 35 years of marriage now means nothing and I have you two to thank for that

Text Message
Wed  May 2  x x x PM

I know you don't care that I am suffering. Most people like you

         





Dawn

I know you don't care that I am suffering. Most people like you don't.

I'm not threatening you but I feel it's only fair that your husband

knows the truth also. I am giving you the opportunity to tell him

yourself. I feel bad for your husband because I know what am going

through right now and it's not pretty. But if I dont get a phone call

in the next 24 hours from your husband, then I will have no choice but

to tell him myself. This is a courtesy to him not you.

Okay. He is in class this evening.















27

DK

Dawn

Sat, May 5, 3:31 PM

You can contact Ed via text or email for BOS purposes. If a phone call is essential then so be it. But nothing personal and nothing to do with your campaign. He is done helping you with that.  Don't make Chris and i regret trusting you two to be professionals at all times and respect our families that you had no regard for before. This is huge for me and I'm not one bit happy that you have to be in such close contact. Ed will continue to meet up after meetings provided others will be there so as not to give way to rumors. I don't know how you two will be able to work together but it's what we need to do. I will not be showing up to things to check on you two because I dont want to suddenly be at things I would never go to. Red flags, you know.  The first test will be next week.











**Gargiulo / Rudnick**, LLP

Attorneys at Law

**Boston**

170 Milk Street, 4th Floor
Boston, MA 02109

www.grglaw.com
t 617 742 3833
f 617 523 7834

**Cape Cod**

786 Falmouth Rd., Unit A-6
Mashpee, MA 02649

www.grglaw.com
t 508 477 6400
f 508 477 0455

Elise R. Marshall
erm@grglaw.com

*Please direct correspondence to the Mashpee office.*

January 25, 2019

Kimball Exhibit
**3**
9/9/21 AKL  Chiocca v Town of Rockland, et al

Attn:   Tania Taveras, Administrative Assistant
Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place – 6ᵗʰ Floor, Room 601
Boston, MA 02108

Re:    Allan Chiocca v. Town of Rockland, et al
MCAD, Docket No: 18BEM03326

Dear Ms. Taveras:

Enclosed you will find a copy of the Respondent, Edward Kimball's Position
Statement in connection with the above captioned matter.

Pursuant to the Commission's regulations, this document has been submitted
electronically to bospositionstmts@state.ma.us and a printed copy is being provided to the
Complainant and Co-Respondents with a copy of this correspondence. We are retaining the
original document in our file.

Thank you for your attention to this matter.

Very truly yours,

Elise R. Marshall/mlr

Elise R. Marshall

ERM/mlr

Enclosures

cc:    Adam J. Shafran, Esq. (via electronic mail & first-class mail)
Cindy Cieslak, Esq. (via electronic mail & first-class mail)
John J. Davis, Esq./Jason W. Crotty, Esq. (via electronic mail & first-class mail)
Brian Palmucci, Esq. (via electronic mail & first-class mail)
Edward Kimball (via electronic mail & first-class mail)
Glatfelter – Claim No. MAPF218060140 (via electronic mail & first-class mail)

P:\KIMBALL, EDWARD\ECR Revised letter to MCAD 190125.doc

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

MCAD DOCKET NO: 18BEM03326

| | |
|---|---|
| ALLAN CHIOCCA,<br>Complainant, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF ROCKLAND, DIERDRE | ) |
| HALL, EDWARD KIMBALL, LARRY | ) |
| RYAN, MICHAEL MULLEN, JR., | ) |
| MICHAEL O'LOUGHLIN, RICHARD | ) |
| PENNEY and KARA NYMAN, | ) |
| Respondents | ) |

## RESPONDENT EDWARD KIMBALL'S POSITION STATEMENT

### Introduction

Now comes Respondent, Edward Kimball ("Mr. Kimball") and hereby submits his

Position Statement in response to the Complainant, Allan Chiocca's ("Mr. Chiocca") First

Amended Charge of Discrimination dated December 10, 2018. In so responding, Mr. Kimball

denies he engaged in conduct violative of M.G.L. c. 151B, §4(4), M.G.L. c. 151B, §4(4A),

and/or M.G.L. c. 151B, §4(5) as alleged, and respectfully moves the MCAD to enter a finding of

no probable cause because Mr. Chiocca has failed to establish a *prima facie* case against him.

### Background

Mr. Kimball was elected to the Board of Selectmen for the Town of Rockland,

Massachusetts ("BOS") in April of 2010 and was elected Chairman in 2012. Mr. Kimball acted

as Chairman of the BOS until July 10, 2018. Mr. Kimball resigned from the BOS on July 31,

2018.

The Town of Rockland ("the Town") is governed by a five-member board, with each member elected to a three (3) year term. The duties and responsibilities of the BOS are governed by Article II, § C-2.02 of the Rockland Town Charter and the Rockland Town Bylaws. see Ch. 139, §139-1.  The BOS oversees the general direction and management of the property and affairs of the Town. The BOS acts by majority vote unless otherwise required by law and/or the Rockland Town Charter. See Article II, §C-2.02.

The BOS by affirmative vote of at least four (4) members appoints a Town Administrator for a one-year probationary term. Subsequent terms of up to three years may be made following the probationary term. See Article II, §C-2.17. The Town Administrator is an administrative officer of the Town and reports to the BOS. Id. Upon information and belief Mr. Chiocca was appointed Town Administrator in 2008.

For the period of May 1, 2018 to July 31, 2018, the BOS consisted of the following members:

Edward Kimball[1] – Chairman
Deidre Hall[2] ("Mrs. Hall") – Vice-Chair
Larry Ryan ("Mr. Ryan") – Selectman
Michael Mullen ("Mr. Mullen") – Selectman
Michael O'Loughlin ("Mr. O'Loughlin") – Selectman

Upon information and belief, on or about November 6, 2018, the two seats vacated by Mr. Kimball and Ms. Hall were filled by Respondents, Richard Penney ("Mr. Penney") and Kara Nyman ("Ms. Nyman").

The BOS conducts their meetings on the 1st and 3rd Tuesday of each month.

### The Incident

---

[1] Mr. Kimball was Chairman until July 10, 2018. On July 10, 2018, Mr. Ryan was voted Chairman. Mr. Kimball resigned from the BOS on July 31, 2018.
[2] Upon information and belief, Ms. Hall resigned from the BOS on or about July 12, 2018.

It is alleged that during the late evening / early morning hours of May 1ˢᵗ and May 2ⁿᵈ, 2018 an incident occurred between Mr. Chiocca and Mrs. Hall at the Rockland Town Hall. More specifically, following the May 1, 2018 BOS meeting at around 7:30p.m., Mr. Chiocca and Mrs. Hall went to the Rockland Bar and Grill ("RGB") for dinner and drinks. At approximately 10:45p.m., the two returned to the Town Hall, and allegedly engaged in sexual activity in Mr. Chiocca's office. At approximately 2:13a.m., Mr. Chiocca and Mrs. Hall exited the Town Hall, and returned to the RBG so that Mrs. Hall could retrieve her vehicle. Thereafter the two parted ways.

## Subsequent Events

On the morning of May 17, 2018, Mrs. Hall telephoned Mr. Kimball and told him "something happened" at the Town Hall on the night of May 1, 2018 between she and Mr. Chiocca[3] after they had been out at the RBG for drinks. Mr. Kimball pressed Mrs. Hall for details. However, Mrs. Hall told Mr. Kimball she could not remember the details. Mrs. Hall further told Mr. Kimball that she believed her husband may have some information about the incident and that she would have her husband call Mr. Kimball. Mr. Kimball felt as though Mrs. Hall was asking him for help.

Immediately thereafter, and knowing the Town Hall has surveillance cameras, Mr. Kimball contacted Eric Hart, the IT Director, and asked him to pull the surveillance footage from the evening of May 1, 2018. A cursory review of the surveillance footage showed Mr. Chiocca and Mrs. Hall entering the Town Hall after hours[4].

Later that evening (May 17ᵗʰ, 2018), Mr. Kimball returned a missed call from Mrs. Hall's husband. During the conversation, Mr. Hall told Mr. Kimball that when his wife arrived home on

---

[3] For a 6-week period during March and April 2018, Mr. Kimball and Mrs. Hall had been involved in an extramarital affair. Mr. Kimball ended the affair with Mrs. Hall the last week in April 2018.
[4] Mr. Kimball subsequently reviewed the complete surveillance footage from May 1ˢᵗ and May 2ⁿᵈ, 2018.

May 1st / May 2nd, 2018, she told Mr. Hall about a conversation that occurred earlier that evening between she and Mr. Chiocca. More specifically, Mr. Hall told Mr. Kimball that Mr. Chiocca had stated to his wife, "the way we do things is I ask you for a contract. You give me a blowjob and I get a contract".

Alarmed by what Mr. Hall had relayed to him, Mr. Kimball text Mr. Chiocca and asked if he was free to talk. Mr. Chiocca then called Mr. Kimball. During this conversation, Mr. Kimball told Mr. Chiocca he "received a very interesting phone call from a fellow Board member's husband". Mr. Kimball did not provide any other details to Mr. Chiocca. Mr. Chiocca immediately replied, "oh fuck, the tapes at RBG". Mr. Kimball and Mr. Chiocca then agreed to meet in the morning to continue the discussion.

The following morning on May 18, 2018, Mr. Kimball contacted John Clifford, Esq., Town Counsel, to seek advice regarding his conversations with Mr. and Mrs. Hall the previous day. As a result of that communication, Mr. Kimball and Attorney Clifford agreed to meet at the Town Hall to inquire of Mr. Chiocca.

When Mr. Kimball arrived at Town Hall, Attorney Clifford was already there. Mr. Kimball and Attorney Clifford went into Mr. Chiocca's office. Mr. Kimball then stated the following, "this is very hard for me to say, but I got a phone call from a fellow Board member's husband that you requested blowjobs during contract negotiations".  Mr. Chiocca immediately admitted to receiving oral sex from Mrs. Hall but denied any conversation about blowjobs for contracts. Mr. Chiocca then stated the following: "I just want this to go away". He offered to "retire, take leave, or do whatever". "I just want to be paid until July 2018, so I can make my ten (10) year anniversary date". Mr. Chiocca then stated, "I want to be able to go to the meeting on June 5, 2018; thank the Board; and leave quietly". Attorney Clifford suggested that Mr. Chiocca

be placed on voluntary leave, and that he could take vacation time until this was sorted out. Mr. Chiocca was asked by Attorney Clifford if he would be willing to enter into a non-disclosure agreement with the Town, to which he agreed.  Mr. Kimball was then asked by Attorney Clifford to contact Mrs. Hall and inquire as to whether she would be willing to enter into such an agreement. Later that day, Mr. Kimball contacted Mrs. Hall who relayed she would be willing to enter into a non-disclosure agreement.

Upon information and belief, over the following days, and while a non-disclosure agreement was in the works, Fox 25 News broke the story on May 23, 2018.

During the May 29, 2018, BOS meeting, Mr. Kimball, in his capacity as then Chairman of the BOS, together with his fellow Board members, voted to place Mr. Chiocca on paid administrative leave, pending the outcome of an investigation into the incident. The BOS, including Mr. Kimball, further voted to retain Regina Ryan, Esq. of Discrimination and Harassment Solutions, LLC to conduct an independent investigation.

During the first week of June 2018, the BOS met to conduct its usual business.

On or about June 12, 2018, Mr. Kimball was contacted by Mrs. Hall's former counsel, Brian Hughes, Esq. Attorney Hughes asked Mr. Kimball if he would be willing to sign an affidavit in support of Mrs. Hall's attempt to prohibit disclosure of the Town Hall surveillance tapes to the public, until the investigation was completed. Mr. Kimball agreed. Thereafter, Attorney Hughes drafted an affidavit, and emailed it to Mr. Kimball for signature. Mr. Kimball signed the affidavit and returned it to Attorney Hughes. At the time Mr. Kimball executed the affidavit drafted by Attorney Hughes, he reasonably believed the subject surveillance footage may have contained missing segments, and thus, warranted further investigation. Two days later, on June 15, 2018, Mrs. Hall's Complaint for a TRO was withdrawn.

During the June 19, 2018 BOS meeting Mr. Kimball made a motion to the Board to turn the investigation over to the Rockland Police Department. There was no action on the motion. Rather, a quarrel ensued between Mr. Kimball and his fellow Board members, over Mr. Kimball's failure to be truthful about the extent of his brief extramarital affair with Mrs. Hall. During the meeting, Mr. Kimball was defensive and frustrated. He felt his former affair had become the focus of the investigation, rather than the incident of May 1st / May 2nd, 2018.

On July 2, 2018, Attorney Ryan issued her report and findings. On July 10, 2018, the BOS voted to accept the full investigative report by Discrimination and Harassment Solutions, LLC. Mr. Kimball abstained from voting. On the same night, Mr. Kimball was voted out as Chairman of the BOS. Mr. Ryan was voted in as new Chairman.

On July 31, 2018, Mr. Kimball resigned from the BOS amid criticism from fellow Board members and the public, that he failed to be truthful about the extent of his six-week extramarital affair with Mrs. Hall during March and April of 2018.

After his resignation on July 31, 2018, Mr. Kimball did not attend or participate in further BOS meetings.

Argument

After receiving Mrs. Hall's May 17, 2018 telephone call, Mr. Kimball had a legal and ethical responsibility to both Mrs. Hall and the Town to investigate what he was told. Much to his disbelief, when Mr. Kimball inquired of Mr. Chiocca on May 18, 2018, Mr. Chiocca immediately admitted to receiving oral sex from Mrs. Hall on the evening of May 1, 2018. At no time did Mr. Chiocca indicate to Mr. Kimball that the sexual act was unwanted, unwelcomed, or the product of a quid pro quo claim. Despite loosely referring to Mrs. Hall as "a predator", Mr. Chiocca made no attempt to inform Mr. Kimball that he was the "victim". Nor did he share his

belated claim that Mrs. Hall had allegedly used her superior position to threaten his contract and raise if he did not succumb to her sexual requests. Importantly, during the May 18, 2018 meeting, Mr. Chiocca affirmatively denied "any talk of blowjobs for contracts" between he and Mrs. Hall on May 1st / May 2nd, 2018.

At no time during the telephone conversation of May 17, 2018, and/or the meeting of May 18, 2018, did Mr. Chiocca inform Mr. Kimball of Mrs. Hall's alleged inappropriate sexual conduct or that he objected to the indiscretion between he and Mrs. Hall on the night of the incident. Similarly, upon information and belief, Mr. Chiocca did not report or complain to any Board member about Mrs. Hall's alleged "predatory" behavior. If Mr. Chiocca raised any issue of alleged inappropriate conduct, or informed Mr. Kimball that he in fact, objected to the events that occurred on the night of the incident, Mr. Kimball would have taken every necessary step to investigate Mr. Chiocca's allegations.

Instead, after being exposed by Mr. Kimball on May 17, 2018, Mr. Chiocca's biggest concern was that someone would see "the tapes at the RBG". This coupled with Mr. Chiocca's repeated plea to "make it go away" would lead a reasonable person to infer that he did not object to the subject incident. The fact that Mr. Chiocca offered to retire from the Town Administrator position if the Town allowed him to reach his ten (10) year anniversary on June 5, 2018; attend the meeting; thank the Board; and leave quietly, support the proposition that Mr. Chiocca has not been subject to unlawful discrimination.

Thus, the facts do not support claims against Mr. Kimball arising out of M.G.L. c. 151B, §4(4), M.G.L. c. 151B, §4(4A), and/or M.G.L. c. 151B, §4(5).

Massachusetts General Laws c. 151B § 4(4) prohibits retaliation by any person against someone who has filed a complaint with the MCAD, assisted in such a complaint, or who has

engaged in other protected activity, including opposing practices forbidden by M.G.L. c. 151B. The statute makes it unlawful "for any person, [or] employer... to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five." See Kelley v. Plymouth County Sheriff's Department, et al., 22 MDLR 208, 215 (2000) citing Bain v. City of Springfield, 424 Mass. 758, 765 (1997).

Retaliation is a separate and independent claim of discrimination, "motivated, at least in part, by a distinct intent to punish or rid the workplace of someone who complains about an unlawful employment practice." Kelley, supra. at 215 quoting Ruffino v. State Street Bank and Trust Co., 908 F. Supp. 1019, 1040 (D. Mass. 1995).

In order to prove a claim of retaliation, Complainant must state a *prima facie* case consisting of the following elements: (1) that he engaged in protected activity; (2) that his employer knew of the activity and subjected Complainant to an adverse employment action; and (3) there is a causal connection between the adverse action and the protected activity. See MacCormack v. Boston Edison Co., 423 Mass. 652, 662-6 (1996).

In the present case, there is no evidence to suggest Mr. Kimball retaliated against Mr. Chiocca in any fashion. On May 29, 2018, the BOS (including Mr. Kimball) voted to place Mr. Chiocca on paid administrative leave. The BOS further voted to retain Discrimination and Harassment Solutions, LLC to perform an independent investigation into the events of May 1st / May 2nd, 2018. These actions do not give rise to a claim of retaliation under the circumstances.

M.G.L. 151B, §4(4A) states it is an unlawful practice for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right protected under this chapter"... Similarly, M.G.L. c. 151B, §4(5) makes it unlawful for any

person to "aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter or attempt to do so". These provisions apply to claims of sexual harassment. Beaupre v. Cliff Smith & Associates, 50 Mass. App. Ct. 480 (2000).

At no point did Mr. Kimball engage in acts that would give rise to a violation under either section of the statute.

Mr. Kimball did execute an affidavit prepared by Mrs. Hall's former attorney Brian Hughes on or about June 13, 2018. Mr. Kimball understood the purpose of the affidavit was to assist Mrs. Hall in her request to prohibit the release of the Town Hall video surveillance until after the investigation was completed. At the time Mr. Kimball executed the affidavit he reasonably believed the video surveillance may have been altered in some fashion and that an investigation was warranted into that question. Two days later, on June 15, 2018, Attorney Hughes withdrew Mrs. Hall's Complaint and motion for a TRO.

Mr. Kimball also denies Mr. Chiocca's claim that he attempted to interfere with the independence of the Town's Investigation. After reviewing the surveillance footage more than a dozen times, and with a reasonable belief that the footage may have been altered, he motioned the BOS during the June 19, 2018 meeting to hand the investigation over to the Rockland Police Department. No action was taken on Mr. Kimball's motion.

The quarrel that followed during the June 19, 2018 BOS meeting between Mr. Kimball and his fellow Board members related to the Board's frustration with Mr. Kimball for being untruthful about the extent of his brief extramarital affair Mrs. Hall.

It is clear from the evidence that Attorney Ryan completed her investigation on July 2, 2018, without any "interference" from Mr. Kimball. Thus, Mr. Kimball's actions in no way amount to actionable conduct under the relevant statutes.

## The Parties

1. Complainant Mr. Chiocca is a resident of Bridgewater, Massachusetts and has served as the Town Administrator for the Town for the Town of Rockland since 2008.

   **Response**: Admitted.

2. Respondent the Town of Rockland is a municipality located in Plymouth County. The Town is governed by a five-member Board of Selectmen.

   **Response**: Admitted.

3. Respondent Mrs. Hall is a resident of Rockland, Massachusetts, and a former member and former Vice Chairman of the BOS.

   **Response**: Admitted.

4. Respondent Mr. Kimball is a resident of Rockland, Massachusetts, and a former member and former Chairman of the BOS.

   **Response**: Admitted.

5. Respondent Mr. Ryan is a resident of Rockland, Massachusetts, and a current member and current Chairman of the BOS.

   **Response**: Admitted.

6. Respondent Michael Mullen Jr. ("Mr. Mullen") is a resident of Rockland, Massachusetts, and a current member of the BOS.

   **Response**: Admitted.

7. Respondent Michael O'Loughlin ("Mr. O'Loughlin") is a resident of Rockland, Massachusetts, and a current member and current Vice Chairman of the BOS.

   **Response**: Admitted.

8.  Respondent Richard Penney ("Mr. Penney") is a resident of Rockland, Massachusetts, and a current member of the BOS.

    **Response:** Admitted.

9.  Respondent Kara Nyman ("Ms. Nyman") is a resident of Rockland, Massachusetts, and a current member of the BOS.

    **Response:** Admitted.

### Substantive Allegations

10. On January 5, 2016, Mr. Chiocca entered into a three-year contract ("the Contract") with the Town to serve as Town Administrator through June 30, 2019.

    **Response:** Admitted.

11. In or about spring 2018, Mr. Chiocca began discussing a raise and contract extension with the BOS.

    **Response:** Admitted.

12. Indeed, he did so because over the course of Mr. Chiocca's 10-year employment with the Town, Town counsel John Clifford ("Attorney Clifford") and others repeatedly advised him to begin negotiation a contract extension with the Town whenever his contract had slightly over one year remaining in the term.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

13. This contract extension and raise was the first one for Mr. Chiocca considered by the BOS since Mrs. Hall was elected to the BOS.

    **Response:** Admitted.

14. As a member of the BOS, Mrs. Hall was one of Mr. Chiocca's supervisors.

11

**Response:** Admitted.

15. In or about spring 2018, Mrs. Hall confided in Delshaune Flipp ("Ms. Flipp") (the Town's Board of Health Senior Assistant) and Stacia Callahan ("Ms. Callahan") (the Town's Human Resource Coordinator), that "marriage is difficult", and that Mrs. Hall found it hard to be with one person even though she loves her husband.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

16. At or around this same time, Mrs. Hall declared her candidacy for State Representative, and Mr. Kimball worked with Mrs. Hall on her campaign.

    **Response:** Admitted.

17. During this time (i.e. March and April 2018), Mrs. Hall and Mr. Kimball were involved in an intense physical and emotional affaire, at which time Mrs. Hall professed her love for Mr. Kimball.

    **Response:** Mr. Kimball admits to having an affair with Mrs. Hall in March and April 2018. The remainder of the allegations are denied.

18. Mr. Kimball's wife, Dawn Kimball ("Mrs. Kimball"), believed Mr. Kimball's relationship with Mrs. Hall had been going on for at least a year but confirmed her suspicion on April 28, 2018.

    **Response:** Denied.

19. On May 1, 2018, Mr. Kimball did not attend the scheduled BOS meeting because, after learning of the affair, Mrs. Kimball "was feeling vulnerable and betrayed."

    **Response:** Admitted.

20. Mrs. Kimball first confronted Mrs. Hall about the affair through a text message sent to Mrs. Hall while Mrs. Hall was chairing the May 1, 2018 BOS meeting (because of Mr. Kimball's absence).

    **Response:** Admitted.

21. At 6:58 p.m., Mrs. Kimball texted Mrs. Hall, "I know what happened.  You make me sick."

    **Response:** Admitted.

22. The May 1, 2018 BOS meeting concluded at approximately 7:30 p.m. and the members briefly stood on Town Hall plaza chatting when Mr. Chiocca stated that he was going to the Rockland Bar and Grill ("RBG").

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

23. Indeed, it was common for BOS members and other individuals to go to the RBG after BOS meetings, and individuals would frequently head over to the RBG without knowing who else intended to go.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

24. Nonetheless, Mrs. Hall stated on the plaza that she intended to go to the RBG.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

25. Mr. Chiocca and Mrs. Hall separately drove to the RBG, and ultimately nobody else joined them.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

26. Mr. Chiocca and Mrs. Hall each arrived at the RBG at approximately 8:00 p.m.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

27. When they arrived, Mrs. Hall ordered a glass of wine and Mr. Chiocca ordered a beer.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

28. At approximately 8:33 p.m., Mrs. Kimball texted Mrs. Hall and stated, "Yes this is Dawn. Did you really think I wouldn't find out? You're a disgusting human being. The both of you are disgusting. I'm not about threatening anyone just so you know. But I haven't decided how I am going to handle this. 35 years of marriage now means nothing and I have you to thank for that."

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

29. Mrs. Hall did not respond to Mrs. Kimball's texts.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

30. However, after receiving the texts from Mrs. Kimball, Mrs. Hall became concerned about the impact the news of the affair would have on her candidacy for State Representative should Mrs. Kimball post it on social media.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

31. Mrs. Hall was not concerned that her husband would find out about her affair with Mr. Kimball.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

32. While at RBG with Mr. Chiocca, Mrs. Hall received a call from Mr. Kimball who assured her that Mrs. Kimball would not post news of the affair on social media.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

33. Mrs. Hall then asked Mr. Chiocca if she could use his cell phone because she wanted to check social media to see if Mrs. Kimball posted anything.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

34. Mr. Chiocca asked Mrs. Hall why she wanted to use his phone and Mrs. Hall explained that Mr. Chiocca's phone had access to a Facebook page that hers did not and she wanted to check for a specific posting.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

35. During this explanation, Mrs. Hall divulged to Mr. Chiocca that she was in love with Mr. Kimball and had been having an affair with him since March 2018. Mrs. Hall further explained that Mrs. Kimball, who recently became aware of the affair, had forbidden Mr. Kimball from communicating with her.

    **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

15

36. Prior to Mrs. Hall telling this to Mr. Chiocca had no knowledge that Mrs. Hall and Mr. Kimball were having an affair.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

37. During their conversation, Mrs. Hall explained to Mr. Chiocca that she was upset that her relationship with Mr. Kimball was ending, and she complained that she felt restricted in her marriage and no longer wanted to be monogamous.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

38. Mrs. Hall and Mr. Chiocca remained at RBG for approximately two hours, during which time they engaged in conversation about different subjects, including Mrs. Hall's relationship with Mr. Kimball, Mrs. Hall's desire to not be monogamous even though she loved her husband, and Mrs. Kimball's response to learning of the affair. Mrs. Hall and Mr. Chiocca also discussed the BOS meeting, Mrs. Hall's performance as the acting chairperson, and whether Mrs. Hall preferred being called madam "chairperson" or "chairwoman" and other topics.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

39. After her second glass of wine Mrs. Hall began to make sexually suggestive comments to Mr. Chiocca and began to rub his leg and touch his arm. She reiterated she wanted to step out of her marriage and felt restricted. Mrs. Hall told Mr. Chiocca that she "just wanted some cock."

      **Response:** Mr. Kimball is without sufficient information to form a belief as to the

      truth of the allegations contained therein. On that basis, the allegations are denied.

40. Mr. Chiocca immediately rebuffed Mrs. Hall's inappropriate demand by alluding to a

      medical condition he has and repeatedly stated, "I'm not your guy, even if I wanted

      to, I'm not your guy."

      **Response:** Mr. Kimball is without sufficient information to form a belief as to the

      truth of the allegations contained therein. On that basis, the allegations are denied.

41. Notwithstanding Mr. Chiocca's rebuffs, Mrs. Hall continued to aggressively pursue

      him.  Mrs. Hall stated that she didn't understand why people have to be with only one

      person, and that her husband was OK with an open marriage.

      **Response:** Mr. Kimball is without sufficient information to form a belief as to the

      truth of the allegations contained therein. On that basis, the allegations are denied.

42. Mrs. Hall again stated that she "just wanted some cock," and Mr. Chiocca repeatedly

      told her no and that even if he wanted to, that he was incapable on Tuesdays.

      **Response:** Mr. Kimball is without sufficient information to form a belief as to the

      truth of the allegations contained therein. On that basis, the allegations are denied.

43. After Mr. Chiocca finished his third beer, he told Mrs. Hall he wanted to leave.

      **Response:** Mr. Kimball is without sufficient information to form a belief as to the

      truth of the allegations contained therein. On that basis, the allegations are denied.

44. However, Mrs. Hall asked Mr. Chiocca to stay, and Mr. Chiocca felt compelled to do

      so because Mrs. Hall was his supervisor and would be voting on his raise and

      extension.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

45. At approximately 9:45 p.m. Mrs. Hall texted her husband, "Be ready for me. Cause I am going to want you."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

46. At 9:56 p.m. Mr. Chiocca paid the bill at RBG, after Mrs. Hall asked if they could go for a ride in his truck before they went home.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

47. Again, feeling obligated to satisfy his supervisor, Mr. Chiocca agreed and they drove around town for 20-30 minutes.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

48. Tired of driving to no specific destination for over 20 minutes, Mr. Chiocca pulled into a parking space next to the Banner Pub where the two continued to talk.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

49. While they were parked, Mrs. Hall reached over and began rubbing Mr. Chiocca's leg and arm.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

50. Mr. Chiocca again stated, "I'm not your guy" and tried to reject Mrs. Hall's advances.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

51. Despite Mr. Chiocca's attempt to reject her, Mrs. Hall responded and again stated that she "just want[ed] some cock," and stated Mr. Chiocca that she was his boss and would be voting on his contract extension.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

52. Mr. Chiocca then told Mrs. Hall that she was "acting like a predator," and again stated, "I'm not your guy," but was concerned that if he thwarted her advances, she would not vote in favor of his contract extension and raise.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

53. Before leaving the Banner Pub parking space, Mrs. Hall stated that she had to go to the bathroom but that she did not want to use the facilities at the Banner Pub because she felt that they were not clean.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

54. Because it was nearby, Mr. Chiocca offered to take Mrs. Hall to Rockland Town Hall so that she could use the bathroom there.  Mrs. Hall agreed that would be fine.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

55. Mr. Chiocca and Mrs. Hall arrived at Town Hall at approximately 10:45 p.m.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

56. Mrs. Hall, who was wearing high heel shoes, was able to traverse the walkway and stairs from the lower lot to town Hall without any assistance from Mr. Chiocca. At some points on their way into Town Hall, Mr. Chiocca walked in front of Mrs. Hall, and at other points Mrs. Hall walked in front of Mr. Chiocca.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

57. When Mrs. Hall and Mr. Chiocca entered Town Hall they each walked directly to the bathrooms.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

58. Mr. Chiocca exited the bathroom first and waited in the hallway for Mrs. Hall.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

59. After Mrs. Hall exited the bathroom, she approached Mr. Chiocca and told him that she did not want to go home.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

60. Nonetheless, the two then exited Town Hall and started to walk across the plaza towards the stairs leading down to the parking lot where Mr. Chiocca's truck was parked.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

61. As the two arrived at the top of the stairs that lead down to the parking lot, Mrs. Hall who was walking ahead of Mr. Chiocca, stopped, turned to face him, and placed her body in front of his, preventing Mr. Chiocca from accessing the stairs.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

62. Mrs. Hall and Mr. Chiocca then engaged in conversation at the top of the staircase for approximately seven minutes.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

63. During this conversation Mrs. Hall again continued to pressure Mr. Chiocca and aggressively stated that she "want[ed] to suck his cock," and reiterated that she was his supervisor who would be voting on his contract and raise.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

64. Feeling pressure to oblige, Mr. Chiocca finally acquiesced to Mrs. Hall's advance and the two returned to Town Hall.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

65. After they entered the building, the two went to Mr. Chiocca's office and closed the door.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

66. Shortly after entering the office, Mr. Chiocca realized that he left his phone in his truck, and Mrs. Hall realized she left her purse in the bathroom.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

67. Mrs. Hall asked Mr. Chiocca to retrieve her purse, after which Mr. Chiocca first went to his truck and retrieved his cell phone, and then went to the bathroom and retrieved Mrs. Hall's purse.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

68. Mr. Chiocca returned to his office and sat down in a chair next to the conference table in the office.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

69. Mrs. Hall then asked Mrs. Chiocca to open the bottle of wine sitting on the refrigerator in Mr. Chiocca's office that was given to him that day by Marcy Birmingham ("Ms. Birmingham") (then a Project Coordinator for the Town) as an early birthday present.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

70. As Mr. Chiocca opened the bottle and poured two small cups of wine, Mrs. Hall pulled up the chair she was sitting in so that she was directly next to Mr. Chiocca.

22

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

71. Mr. Chiocca finished pouring the wine, after which one of the cups spilled.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

72. Mrs. Hall and Mr. Chiocca did not consume any of the alcohol, because immediately after Mr. Chiocca finished pouring the wine, Mrs. Hall spread her legs open, grabbed Mr. Chiocca's hand, and placed it over the front of her panties.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

73. Mr. Chiocca stated, "please don't do this, I can't even if I wanted to."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

74. After making Mr. Chiocca rub her vagina, Mrs. Hall stood up and took off her panties, instructed Mr. Chiocca to stand up, and told him that she could "make it hard."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

75. Mrs. Hall then pulled down Mr. Chiocca's pants and performed oral sex on him.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

76. After Mrs. Hall completed oral sex on Mr. Chiocca, Mrs. Hall told Mr. Chiocca that she wanted him to perform oral sex on her.

   **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

77. Mr. Chiocca briefly obliged for no more than a few seconds but stopped because he did not want to continue.

   **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

78. Mrs. Hall then demanded that Mr. Chiocca please her with his hands, and Mr. Chiocca complied.

   **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

79. At or around 2:00 a.m., after attempting to satisfy Mrs. Hall with his hands, Mr. Chiocca stopped and stated, "it's 2:00 a.m., please let me go home."

   **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

80. Mrs. Hall finally agreed to leave and at approximately 2:13 a.m., Mrs. Hall and Mr. Chiocca exited Mr. Chiocca's office.

   **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

81. Mr. Chiocca and Mrs. Hall then walked across the plaza to the lower parking lot at a casual pace with no obvious signs of intoxication or distress.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

82. After leaving Town Hall, Mr. Chiocca drove Mrs. Hall back to RBG so that she could get her vehicle.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

83. Upon arriving at RBG, Mr. Chiocca watched as Mrs. Hall got into her vehicle and drove away without incident.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

84. Mrs. Hall arrived home at approximately 2:20 a.m.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

85. Mr. Hall was in bed at the time, but he walked downstairs when he heard Mrs. Hall arrive home.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

86. While downstairs, Mr. Hall observed Mrs. Hall's car in the driveway backed into the assigned spot, and then observed Mrs. Hall in the bathroom texting.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

87. At 2:25a.m., Mrs. Hall texted her husband, "I love you, it gonna be a tough ride the next couple of weeks ttyl."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

88. Mr. Hall then asked Mrs. Hall how things went that night and Mrs. Hall explained that at Mrs. Kimball's request, that Mr. Kimball did not attend the BOS meeting and that she served as the acting Chair and moved through the agenda quickly.  Following the meeting she explained that she went to RBG for drinks.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

89. Mrs. Hall also told her husband that Mrs. Kimball texted her while she was at RBG that she was disgusting, and that she texted Mrs. Kimball back that she was sorry.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

90. Mrs. Hall then explained to her husband that she had been having an emotional but not sexual relationship with Mr. Kimball.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

91. Mrs. Hall then raised the issue of Mr. Chiocca's contract extension and began concocting her fabricated version of events.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

92. Specifically, Mrs. Hall lied to her husband by stating that Mr. Chiocca told her, "normally how this works is I ask for a raise, you give me a blowjob."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

93. During this conversation, Mrs. Hall never complained of being upset or uncomfortable with how the night went or of any inappropriate behavior by Mr. Chiocca.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

94. The Halls then discussed an appointment that was scheduled for that morning and Mrs. Hall agreed to attend the appointment.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

95. Also, because Mrs. Hall was so late arriving home that evening, Mr. Hall contacted his employer and called out sick for the day.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

96. After approximately 30-45 minutes of talking downstairs, the Halls went upstairs to their bedroom.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

97. At that time, Mrs. Hall confessed to her husband that her relationship with Mr. Kimball was more than emotional and that they had been involved in a physical relationship as well.

Response: Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

98. Mr. Hall asked Mrs. Hall if the relationship was over and Mrs. Hall stated that it was.

Response: Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

99. Mr. Hall indicated to Mrs. Hall that he was not happy about her having an affair with Mr. Kimball. The two discussed this for 15-20 minutes and then went to bed at approximately 3:30 a.m.

Response: Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

100.    Later that morning Mr. Chiocca arrived at Town Hall so that he could clean up his office. Mr. Chiocca poured out what was left in the wine bottle.

Response: Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

101.    At 8:02 a.m., Mrs. Hall emailed Mr. Chiocca to ask if they could talk for 15 minutes before her 9:00 a.m. meeting. At 8:05 a.m. Mr. Chiocca responded in the affirmative.

Response: Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

102.    When the two met in Mr. Chiocca's office at 8:55 a.m., Mrs. Hall asked Mr.

Chiocca for "discretion" about what happened and they both agreed they would not

tell anyone.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

103.    During their discussion, Mrs. Hall never told Mr. Chiocca she was upset with

what happened earlier that morning or the night before, nor did she inquire of him as

to what had taken place.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

104.    During their discussion, Mr. Chiocca referred to Mrs. Hall as a "predator" and

"the aggressor." Mrs. Hall later contended that these comments caused her to first

have an "inkling" that she engaged in sexual relations with Mr. Chiocca, despite the

fabricated story she told Mr. Hall the morning of May 2nd.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

105.    Later that day Mr. Kimball spoke with Mr. Chiocca and confided in Mr. Chiocca

that he did not go to the BOS meeting the prior evening because he had been involved

in an affair with Mrs. Hall and that his wife had just learned of it and "was on the

warpath."

**Response:** Mr. Kimball admits a meeting took place between he and Mr. Chiocca,

wherein the subject of an affair with Mrs. Hall took place. Mr. Kimball denies the

date referenced in paragraph 5 as well as the quoted language.

106.   As a result, Mr. Kimball told Mr. Chiocca, he was going to take a "less active role on the BOS."

**Response:** Admitted.

107.   Mr. Chiocca recommended that Mr. Kimball step down from the BOS or give up the Chair position.

**Response:** Admitted.

108.   After May 1st, Mr. Chiocca told Ms. Birmingham and Ms. Callahan that he did not want to be left alone in his office with Mrs. Hall, and to make sure that his office door stayed open when she came to Town Hall.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

109.   Mr. Chiocca specifically told Ms. Birmingham that because Susan Ide ("Md. Ide"), the Executive Assistant to the BOS who sits right outside Mr. Chiocca's office, was on vacation the second week in May, that if he called Ms. Birmingham up to his office (who worked on the floor below), that she was to come right away because it meant that Mrs. Hall was there and Mr. Chiocca did not want to be along with her.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

110.   On May 4, 2018 at 7:07 a.m., Mrs. Hall emailed Mr. Chiocca and again requested an opportunity to meet with Mr. Chiocca.  Mr. Chiocca agreed.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

111.    When the two met, they again discussed the evening of May 1st, and again Mr.

Chiocca told Mrs. Hall that she was a "predator" and "the aggressor". At this

meeting, Mrs. Hall did not complain of a lack of memory of her May 1st encounter

with Mr. Chiocca or that she had been suffering from diminished capacity.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

112.    In neither conversation between Mrs. Hall and Mr. Chiocca on May 1st or May 4th

did Mrs. Hall ever tell Mr. Chiocca that she blacked out or that she did not consent to

any sexual acts.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

113.    Following these conversations, Mrs. Hall clearly understood that she had engaged

in sexual activities with Mr. Chiocca (even though the truth is that she has always

know the entire time).

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

114.    Despite this clear understanding, Mrs. Hall never made any complaints, nor did

she report any concerns about her interactions with Mr. Chiocca to anyone.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

115.    On May 4, 2018, Mr. Hall and Mrs. Kimball met to discuss their spouses'

extramarital relationship with each other. They both agreed that Mrs. Hall and Mr.

Kimball could go to BOS meetings and events together and Mrs. Kimball would not

show up because she did not want to set off "red flags" and draw attention to her

husband's relationship with Mrs. Hall.  Indeed, it was most important to Mrs. Kimball

to not let the public know about the affair.

**Response:** Mr. Kimball admits his wife spoke with Mr. Hall, but denies they met in

person. The remainder of the allegation is admitted.

116.    The following week was filled with usual communications regarding Town

business, both in person and by email, between Mr. Chiocca and Mrs. Hall, and they

did not discuss the May 1st encounter.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

117.    The annual Town Meeting was held on May 7, 2018 and Mr. Chiocca, Mrs.

Kimball, Mrs. Hall and others went out for drinks to China Plaza without incident.

**Response:** Admitted.

118.    On May 11, 2018, Attorney Clifford sent an email to the BOS members regarding

Mr. Chiocca's contract, suggesting that before they decided on whether to grant the

contract extension at the BOS meeting on May 15, 2018, they have a candid

discussion with him about any concerns they had with his job performance.

**Response:** Admitted.

119.    During the week of May 14, 2018, Mrs. Hall came into Town Hall to see Mr.

Chiocca more frequently than she ever had in the past.  In fact, she was present more

than any BOS member, but Mr. Chiocca avoided all interaction with her.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

120.   At this time, Mr. Chiocca began to apply for jobs outside of the Town because he

did not think he could work with Mrs. Hall after what happened on the evening of

May 1st.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

121.   In fact, on May 15, 2018, Mr. Chiocca learned that he had been granted an

interview for the Town of Marblehead Town Administrator position, which was

scheduled for May 21, 2018.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

122.   On May 14, 2018, Mr. Chiocca and Ms. Birmingham had planned to attend a

ceremony at the State House for recognition for a grant that the Town received.  Than

morning Mrs. Hall announced that she would join them, and for this reason Mr.

Chiocca opted out.  Instead, Ms. Birmingham and Ms. Hall went to the event without

Mr. Chiocca.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

123.   The May 15, 2018 BOS meeting was very contentious.  Just prior to the meeting

at 4:12 p.m., Mr. Kimball sent an email to the BOS members and announced that

Mrs. Hall was named the school liaison, a position for which Mr. O'Loughlin was

told by Mr. Kimball he would be selected.

**Response:** Mr. Kimball denies the characterization that the May 15, 2018 BOS meeting was "contentious". Further, Mr. Kimball denies he told Mr. O'Loughlin that Mr. O'Loughlin would be selected for the school liaison position. The remainder of the allegation is admitted.

124.    Also, at the BOS meeting, Mr. Ryan and Mr. O'Loughlin were blindsided by communications that Mrs. Hall had with the School Superintendent.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

125.    The BOS also discussed Mr. Chiocca's contract in Executive Session.

**Response:** Admitted.

126.    The following day, May 16, 2018, Mr. Ryan sent an email at approximately 12:42 p.m. to the BOS members expressing his frustration with the meeting the evening prior and he was critical of Mrs. Hall.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

127.    That same day, Mr. Ryan also went to Town Hall and asked Mr. Chiocca what was going on with the BOS and why was he blindsided at the meeting the evening prior.  Mrs. Hall was in the room when Mr. Ryan asked this question.  At that time, Mr. Chiocca asked Mr. Ryan if he wanted to go to lunch and talk but he declined.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

128.    Mrs. Hall then called Mr. Mullen and told him that after the May 1st BOS meeting she went to RBG with Mr. Chiocca and they had a lot to drink.  Mrs. Hall went on to

tell Mr. Mullen that she didn't remember much but thinks she got into Mr. Chiocca's truck and drove around for a while and thinks they went to Town Hall. Mrs. Hall then expressed concerns that this would be on video. Mrs. Hall was not upset or crying but was matter of fact in telling Mr. Mullen this. She then described Mr. Chiocca as evil, though she never mentioned anything about a concern that Mr. Chiocca may have engaged in inappropriate sexual behavior with her without her consent.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

129.    Later in the evening of May 16, 2018, at approximately 8:45 p.m., Mrs. Hall went to RBG. Upon seeing Mr. Chiocca at a table with two other males who had been involved in a meeting at Town Hall earlier that evening she walked over and sat next to Mr. Chiocca.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

130.    The four individuals remained seated together until 9:13 p.m. when Mr. Chiocca left the RBG, leaving Mrs. Hall with the two males.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

131.    Mrs. Hall and the two males exited the RBG 48 minutes later.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

132.     The following day, on May 17, 2018 there was an MAPC meeting which was held

in Rockland.  Mr. Chiocca was planning on attending the event with Ms. Birmingham

because it was a great public relations opportunity for him and the Town.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

133.     Mrs. Hall announced that morning that she was going to join them at the MAPC

event and Mr. Chiocca again decided not to attend.  No other selectman attended the

meeting.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

134.     That same day at 11:03 a.m., Mr. Ryan sent another email to the members of the

BOS that included the following comments: "Ms. Hall is making her own deals with

the school committee", "maybe we should revisit the VC and liaison positions at our

next meeting", "Ms. Hall yells when she has no back up data but doesn't supply any

when she is in charge.  This was a board dividing move and we should correct it."

**Response:** Mr. Ryan's email is a document that speaks for itself.

135.     At about that time, Mrs. Hall contacted Mr. Kimball and she told him that

something happened on May 1, 2018 after the BOS meeting with Mr. Chiocca.  Mrs.

Hall then proceeded to lie and told Mr. Kimball that she had two drinks and then

there was a void and the next day he said thank you for the birthday present, but she

had not given him a present.

**Response:** Mr. Kimball admits that Mrs. Hall contacted him and told him that

something happened on May 1, 2018 after the BOS meeting with Mr. Chiocca. As to

the remainder of the allegations contained therein, Mr. Kimball is without sufficient information to either admit or deny the allegations. On that basis, the allegations are denied.

136.    Mrs. Hall has admitted that she never would have told this to Mr. Kimball if she knew that Mr. Chiocca would have kept the May 1st incident a secret.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

137.    After Mrs. Hall told Mr. Kimball about the May 1st incident with Mr. Chiocca, Mr. Kimball was furious and kept repeating that he needed to process what she had told him.

**Response:** Denied.

138.    Mr. Kimball then went to Town Hall and met with the Town Accountant/IT Director Eric Hart ("Mr. Hart") and asked Mr. Hart to pull the security video from May 1, 2018.  Mr. Kimball and Mr. Hart then watched the video together and saw the view from the lobby with Mrs. Hall and Mr. Chiocca entering Town Hall.

**Response:** Admitted.

139.    That afternoon Mr. Kimball asked Mrs. Hall to meet him and they went for a 40 minute walk on the rail trail.  Mr. Kimball was so angry at Mrs. Hall that Mrs. Hall was afraid he might hurt her.  Mrs. Hall was also upset because she felt that she had disappointed Mr. Kimball.  Mr. Kimball explained that he viewed the tapes from Town Hall security and saw Mrs. Hall and Mr. Chiocca at Town Hall on May 1st. Mrs. Hall was embarrassed, and Mr. Kimball was furious with Mrs. Hall, and told her that he felt like he was being played by her.

**Response:** Mr. Kimball admits to meeting with Mrs. Hall on said date. The remainder of the allegation is denied.

140.    Mrs. Hall was upset because she did not want anyone to know about what happened on May 1, 2018 because she thought she would be perceived as a "whore and a drunk."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

141.    Later that night Mr. Kimball texted Mrs. Hall and told her that he was going to approach Mr. Chiocca the following day and Mrs. Hall asked him not to. Mrs. Hall replied, "please call we should not be putting this in writing." In response Mr. Kimball insisted that he be told the whole truth and that he did not want to be played. Mrs. Hall texted Mr. Kimball back and told him that she would tell him but not through text messages. Mr. Kimball and Mrs. Hall then had a phone conversation during which Mrs. Hall allegedly did not divulge any new details about the May 1st incident with Mr. Chiocca.

**Response:** Admitted.

142.    Mr. Kimball then spoke with Mr. Hall, who reiterated to Mr. Kimball that when Mrs. Hall arrived home after being out for drinks with Mr. Chiocca on May 1st, that she told him that Mr. Chiocca stated, "the way we do things around her is I ask for a contract, you give me a blowjob and I get the contract."

**Response:** Admitted.

143.   That evening Mr. Kimball called and spoke with Mr. Chiocca.   Mr. Kimball informed Mr. Chiocca that Mr. Hall wanted to know if the Town Administrator gets a blowjob with his raise and then told Mr. Chiocca that they would talk in the morning.

**Response:** Admitted but for the fact that Mr. Chiocca called Mr. Kimball after Mr. Kimball text him.

144.   The next morning, May 18, 2018, Mr. Kimball contacted Attorney Clifford and told him that Mr. Chiocca had stated to Mrs. Hall on May 1st that it is standard operating procedure to give the obligatory blowjob to the Town Administrator during contract negotiations.   Mr. Kimball expressed concern for the safety of the town employees who were in contract negotiations.   Mr. Kimball then told Attorney Clifford that Mrs. Hall alleged that Mr. Chiocca did something inappropriate to her on May 1, 2018 at Town Hall.

**Response:** Admitted.

145.   As a result, Attorney Clifford and Mr. Kimball met with Mr. Chiocca and he admitted to having engaged in sexual activities with Mrs. Hall at Town Hall on the evening of May 1st but denied any conversation about blowjobs for contracts.

**Response:** Admitted.

146.   Mr. Chiocca then insisted to Attorney Clifford and Mr. Kimball that Mrs. Hall was a "predator and the aggressor."

**Response:** Mr. Kimball denies Mr. Chiocca called Mrs. Hall "the aggressor" but admits the remainder of the allegation.

147.    At that time, Mr. Kimball "strongly suggested" that Mr. Chiocca take vacation

time and encouraged him to resign from his employment.  Mr. Chiocca agreed to take

vacation time.

**Response:** Denied other than Mr. Chiocca agreed to take vacation time.

148.    Mr. Kimball then met with Mrs. Hall to see if she would enter into a

nondisclosure agreement and sign a release with the town, and Mrs. Hall agreed to

comply with this request.

**Response:** Admitted.

149.    The following day, May 19, 2018, Mrs. Hall, Mr. Hall, Mr. Kimball and Mrs.

Kimball met at Reeds Pond to discuss the allegations against Mr. Chiocca and they all

agreed to keep Mrs. Hall and Mr. Kimball's relationship a secret.  Mrs. Kimball

reiterated the conversation she had with Mr. Kimball on May 4, 2018 that they could

not let their relationship be leaked to the public.  Mr. and Mrs. Kimball did not want

their family's reputation to be ruined and Mrs. Hall was concerned about her

candidacy for State Representative and knew if would ruin her chances of winning.

**Response:** Denied. The meeting occurred on May 18, 2018. Notwithstanding, Mr.

Kimball denies the alleged substance of the conversation that took place during the

meeting.

150.    Mr. Chiocca took the next week off as vacation.

**Response:** Admitted.

151.    On or about May 23, 2018, the news media learned of May 1st encounter between

Mr. Chiocca and Mrs. Hall.

**Response:** Admitted.

152.    On May 29, 2018, Mr. Chiocca was places on administrative leave per a letter

from Mr. Kimball.  In relevant part, the letter reads:

> Please allow this letter to serve as formal notice that you
> have been placed on paid administrative leave pending the
> outcome of an investigation <u>effective immediately</u>.  The
> matter under investigation included allegations of improper conduct
> toward a member of the Town of Rockland Board of Selectmen.
>
> . . . .
>
> Throughout the duration of this administrative leave, you
> Are directed and ordered to not visit Town Hall or any other
> Buildings or property owned [sic] the Town of Rockland
> And are directed and ordered to refrain from the
> Performance of any of your duties and responsibilities as
> Town Administrator for the Town until such time as you
> Are scheduled to return to work or are otherwise notified.

**Response:** Mr. Kimball admits the letter is signed by him. The letter was written

on behalf of the BOS.

153.    On May 30, 2018, Mr. Chiocca's counsel Adam Shafran ("Attorney Shafran")

wrote to Attorney Clifford regarding the Town's decision to place Mr. Chiocca on

administrative leave.  In relevant part, Attorney Shafran wrote:

> I am in receipt of Mr. Kimble's [sic] letter to Mr. Chiocca
> dated May 29, 2018 confirming that the Town of Rockland
> has placed Mr. Chiocca on paid administrative leave
> effective immediately.  Please be advised that Mr. Chiocca
> considers his placement on administrative leave to be a
> Suspension in violation of his procedural due process rights
> Under Section 2.18 of the Town of Rockland Charter.
>
> Mr. Kimble's [sic] letter makes clear that Mr. Chiocca's
> placement on administrative leave is in fact a suspension
> because Mr. Chiocca is not permitted to "perform[]. . .any
> of [his] duties and responsibilities as Town Administrator
> for the Town until such time as [he] is scheduled to return
> to work or otherwise notified." . . . .The Town's failure to
> comply with these procedural requirements and placement
> of Mr. Chiocca on immediate suspension, has damages,

41

and will continue to damage his reputation.

> **Response:** Mr. Kimball is without sufficient information to form a belief as to the
> truth of the allegations contained therein. On that basis, the allegations are denied.

154.   The same day, Mrs. Hall announced publicly on her Facebook page "Committee
to Elect Deirdre Hall" that BOS voted to initiate an investigation into her allegations
of inappropriate behavior towards her by Mr. Chiocca.

> **Response:** Mr. Kimball is without sufficient information to form a belief as to the
> truth of the allegations contained therein. On that basis, the allegations are denied.

155.   Specifically, Mrs. Hall's statement read in relevant part:

> Last evening, **at my request**, the Rockland Board of
> Selectmen initiated an internal investigation involving an
> allegation **of inappropriate behavior by the Town
> Administrator towards me**.  Soon after the incident, I
> reported this matter to two members of the Board of
> Selectmen.  I am cooperating fully with this process and I
> Hope to see a thorough and fair investigation by the Board.

> **Response:** Mr. Kimball is without sufficient information to form a belief as to the
> truth of the allegations contained therein. On that basis, the allegations are denied.

156.   On May 31, 2018, Attorney Clifford responded to Attorney Shafran's May 30,
2018 letter.

> **Response:** Mr. Kimball is without sufficient information to form a belief as to the
> truth of the allegations contained therein. On that basis, the allegations are denied.

157.   Per Attorney Clifford's letter and in violation of the Town Charter, the BOS
refused to provide Mr. Chiocca with a written resolution setting forth the specific
reasons for his suspension, inappropriately placed the burden on Mr. Chiocca to
declare the BOS's actions toward him a suspension (even though no such burden I

places upon him by the Charter, and despite the fact that Mr. Chiocca had already

taken the position that the BOS suspended him per Attorney Shafran's May 30, 2018

letter) and falsely asserted that Mr. Chiocca admitted to engaging in conduct that

impaired his ability serve as Town Administrator (even though Mr. Chiocca had

never remotely made any such admissions).

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

158.    In relevant part, Attorney Clifford wrote:

> If you wish to consider the Board's action a suspension,
> you are free to request a public hearing under the Charter.  I
> will request that the Board provide him with a notice
> detailing the allegations against him, and then convene a
> public hearing to provide him with the procedural due
> process you feel he has neem denied.
>
> [Mr. Chiocca} has admitted to conduct [sic] significantly
> impairs his ability to function as Town Administrators,
> leaving the Town with no alternative but to place him on
> paid administrative leave while an investigation is performed.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

159.    Five days later, on June 5, 2018, and after Mr. Chiocca was no longer permitted at

Town Hall, Mrs. Hall reiterated her allegations at the publicly televised BOS meeting.

In relevant part she stated:

> I recently reported an incident of **inappropriate behavior
> by the Town Administrator**, and since the weeks that
> those allegations have emerged it has been very challenging
> for me and my family.  False rumors and gossip have
> spread, particularly on social media, about me, about the
> devotion to my spouse, my husband Chris, and our children
> and our town.  Indeed, I no longer feel that my children, my

son, is comfortable taking the bus, and I feel that my kids often times are not safe or comfortable participating in some community activities. And this is a deeply disappointing consequence of **my decision** to stand up for myself in a situation where **I believe I was treated improperly.**

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

160. At this same time (i.e. early June 2018), Attorney Ryan of Discrimination and Harassment Solutions LLC began her investigation.

**Response:** Admitted.

161. Upon information and belief, on or about June 7, 2018, the Town received public record requests for copies of Town Hall video surveillance from the evening on May 1, 2018.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

162. On June 13, 2018, while Attorney Ryan was in the midst of her investigation, Mrs. Hall files suit in Plymouth County Superior Court against the Town of Rockland and related parties to block the Town from releasing the surveillance footage.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, the allegations are denied.

163. Mrs. Hall's complaint made numerous knowingly false and defamatory statements and insinuations about Mr. Chiocca, and was supported by a surreptitiously obtained and knowingly false affidavit submitted by Mr. Kimball.

**Response:** Mr. Kimball admits to submitting an affidavit on behalf of Mrs. Hall but denies the remainder of the allegations.

164.   Mr. Kimball's affidavit insinuated that Mr. Chiocca and/or Mr. Hart tampered

with the May 1, 2018 Town Hall video surveillance footage, and asserted that his

prior review of the surveillance footage "revealed critical missing segments of

activities, including a minute long gap when Hall made active attempts to leave the

premises after stating unequivocally on camera that '[she] needed to go home,'"

**Response:** Mr. Kimball admits to the quoted language but denies the remainder of the

allegations.

165.   Just two days later, on June 15, 2018, knowing that it was frivolous Mrs. Hall

voluntarily dismissed her complaint.

**Response:** Mr. Kimball admits the lawsuit was dismissed.

166.   Later that day, Attorney Clifford issued a press release at the behest of the BOS.

**Response:** Admitted.

167.   In relevant part, Attorney Clifford stated:

> [T]he following statement is being issued at the behest of
> the Board of Selectmen.
>
> On May 17th, a member of the Board of Selectmen was
> made aware of potentially serious misconduct by two high
> ranking Town officials.  Due to the seriousness of the
> allegations, the Town engaged an independent investigator
> to interview witnesses and review any evidence related to
> the alleged misconduct.  The investigation is ongoing.
>
> . . . .
>
> Unfortunately, there has been a steady stream of
> information improperly disseminated during the
> investigation, much of which was false.  **The release of
> false and/or misleading information has only served to
> hamper our efforts to get this investigation done.**
>
> On Wednesday, June 13th, a motion for an emergency
> restraining order was filed on behalf of Ms. Hall.  Much of

the information contained in that filing was **misleading, based on conjecture, or just false**. It was my intention to appear in Brockton Superior Court this afternoon and make it clear that the facts and legal conclusions contained in that filing **were not only wrong, but obtained in an improper manner**. The circumstances surrounding the filing [sic] this motion are troubling from a legal perspective, and even though the matter was voluntarily dismissed by the plaintiff, the Town will be reviewing all of its options and may take further action in response to the filing of that motion.

It is the Board's position that the surveillance video from the night of the incident is a public record, and would be released in response to a valid public records request . . . Unfortunately, the documents filed in Brockton Superior Court on Wednesday contain assertions that the video was Tampered with or altered in some way.

. . . .

At this time, there is no credible evidence that the video has Been tampered with or edited in some fashion.

   **Response:** The press release speaks for itself.

168.   On June 19, 2018, while Attorney Ryan's investigation was still ongoing, the

BOS held a regularly scheduled meeting.

   **Response:** Admitted.

169.   Without providing the legally required notice, and in an attempt to undermine the

Town's investigation, Mr. Kimball knowingly and intentionally violated the

Massachusetts Open Meeting Law (G.L. c.30A, §20(b)) by speaking on topics related

to the ongoing investigation that were not on the agenda.

   **Response:** Mr. Kimball admits he spoke on topics related to the ongoing

investigation that were not on the agenda. The remainder of the allegations are

denied.

170.   As Mr. Kimball began to speak on issues related to the investigation, Attorney

Clifford expressly advised him that he was "discussing something that was not on the

agenda that impacts the rights of others involved."

**Response:** Admitted.

171.   In response, Mr. Kimball stated, "I can discuss what I like," and instructed

Attorney Clifford to "hold his words."

**Response:** Admitted.

172.   Mr. Kimball then proceeded to bring a motion to refer the Town's investigation to

the Rockland Police Department and repeatedly berated the other Board Members

who were present to vote on his motion, and stated that he is going on the record "that

the three other members of the Board do not want to go through and have an

investigation."

**Response:** Mr. Kimball admits the allegations in paragraph 171 with the exception

that he berated other Board Members.

173.   Mr. Kimball then stated that the Town's investigation was a "sham," suggested

that Mr. Chiocca engaged in criminal conduct, including evidence tampering and

sexual assault, and repeatedly stated that he stands by the "after-David" [sic] that he

submitted with Mrs. Hall's complaint.

**Response:** Mr. Kimball admits to stating the Town's investigation was a "sham". Mr.

Kimball admits to saying he stands by the "after-david" [sic] The remainder of the

allegations are denied.

174.   Mr. Kimball engaged in this conduct while knowing that all parties impacted by

his statements were not present, were not given notice that he would be making such

comments, and with the intent of hinder Attorney Ryan's ongoing investigation

because he knew that the investigation was uncovering his affair with Mrs. Hall.

**Response:** Denied.

175.   As a result of Mr. Kimball's egregious conduct, Mr. Ryan stated at the BOS

meeting that Mr. Kimball committed a "fatal mistake" and called for Mr. Kimball to

resign from the BOS.

**Response:** Mr. Kimball denies his conduct was "egregious". The remainder of the

allegations are admitted.

176.   When Mr. Kimball refused, Mr. Ryan stormed out of the meeting and stated that

Kimball "should own up to what he did and resign.

**Response:** Admitted.

177.   On June 21, 2018, Mr. Chiocca filed an open meeting law complaint against Mr.

Kimball and the BOS with the Massachusetts Attorney General's Office ("AG").

**Response:** Mr. Kimball admits an OML complaint was filed against the BOS

following the June 19, 2018 meeting.

178.   On July 2, 2018, Attorney Clifford, wrote to the AG on behalf of the BOS and

requested an extension to July 21, 2018 to respond.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

179.   Also on July 2, 2018, Attorney Ryan concluded her investigation.

**Response:** Admitted.

180.   Attorney Ryan's investigation was incredibly thorough and included interviews

with Mrs. Hall, Mr. Chiocca.  Ms. Ide, Ms. Birmingham, Ms. Callahan, Ms. Flipp,

Mary Jane Martin (Assistant Town Accountant), Mr. Kimball, Mr. Hart, Mr. Mullen.

Mr. Hall, Mr. Ryan and Mr. O'Loughlin, and her review of 20 exhibits, including the

Rockland Charter, the Rockland Sexual Harassment Policy, text messages between

Ms. Hall and Ms. Kimball, text messages between Ms. Hall and Mr. Kimball, emails

from Ms. Hall to Mr. Chiocca, texts between Ms. Hall and Mr. Chiocca, May 1, 2018

video of Town Hall, May 16, 2018 video of RBG, email regarding Mr. Chiocca's

interview in Marblehead, May 15, 2018, BOS Executive Session meeting minutes,

affidavit of Paul Jacobson, Affidavit of Mr. Kimball, May 11, 2018 email from

Attorney Clifford to the BOS, texts between Ms. Hall and Mr. Hall, Affidavit of

Steven Verronneau, email regarding video  tampering, receipt from RBG, Mr.

Chiocca's administrative leave, and Committee to Elect Deirdre Hall Facebook page.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

181.   After making Findings of Fact that are substantially set forth above, Attorney

Ryan made the following Conclusions:

- It is **undisputed** based on what Ms. Hall reported to her
  Husband and what was reported by Mr. Chiocca, that
  During that evening there was a conversation between
  Mr. Chiocca and Ms. Hall about his contract and there
  Was a reference to sexual activities.

- It is **undisputed** that the BOS had been discussing Mr.
  Chiocca's contract for weeks prior to May 1, 2018 and
  Continued after May 1, 2018.  Mr. Chiocca was asking
  For a contract extension and a raise and Ms. Hall would
  Be one of the five votes that would decide this.

- Mr. Chiocca **did not want to have a sexual encounter
  with Ms. Hall. . . .Regardless, she persisted**

- Both while driving in Mr. Chiocca's truck and while

49

standing on the Town Hall plaza, Ms. Hall made comments to Mr. Chiocca about engaging in sexual activities while reminding him that she was his supervisor and would be voting on his contract and raise. **As a result,** Mr. Chiocca agreed to engage in sexual activities in his office. **But for the fact that Ms. Hall was his supervisor and would be voting on his Contract, Mr. Chiocca would not have agreed to this.**

- Although Ms. Hall did not make any requests for sexual Relations after the Incident, she demonstrated a similar pattern of trying to position herself in Mr. Chiocca's space. To the contrary, Mr. Chiocca exhibited behavior of trying to avoid Ms. Hall and this was corroborated by other Town employees following the Incident.

- Accordingly, I find by a preponderance of the evidence That Ms. Hall was Mr. Chiocca's supervisor and she sought sexual relations in exchange for her vote on his contract extension and raise. As such, **Ms. Hall sexually harassed Mr. Chiocca in violation of the Town's Sexual Harassment Policy on the night of the incident.**

- After reviewing the video of her at Town Hall, Ms. Hall is seen walking without assistance and talking to Mr. Chiocca. She appears to be aware of the circumstances that she is in and appears to be in control of her activities.

- When considering her interactions and communications before she went to Town Hall, she could communicate with Mr. Chiocca about his contract with the Town, her affair with Mr. Kimball, her desire to have relationships outside her marriage and the BOS meeting that she chaired earlier in the evening. Further, when she arrived home within minutes of leaving Mr. Chiocca, she never expressed concern about the fact that she had sexual relations with him and did not exhibit any signs to her husband of being upset. Further, Ms. Hall was capable of engaging in coherent discussions with her husband for approximately one hour when she got home and the subject that they covered that evening spanned from her extramarital affair with Mr. Kimball, their son's neurological appointment, her husband calling in sick from work and other topics. In addition, she could drive

50

her motor vehicle home and back it into a parking spot with another motor vehicle beside it without incident. She was also capable of texting her husband at 9:45 PM, "Be ready for me when I get home because I'm going to want you' and then at 2:25 AM 'love you, it gonna be a tough ride the next couple of weeks ttyl.'"

- Moreover, the following day Ms. Hall went to Mr. Chiocca's office and asked for "discretion" and asked that he agree not to tell anyone. During this conversation, she never mentions to Mr. Chiocca that she had no memory of the Incident and never tells him she did not consent.

- Accordingly, I find by a preponderance of the evidence, that Ms. Hall was capable of consenting to sexual relations during the Incident, and she did consent, and I also find that Mr. Chiocca believed that she was capable of consenting.

- Accordingly, I find by a preponderance of the evidence, that **Mr. Chiocca did not violate the Town's Sexual Harassment Policy** in that he did not engage in any unwelcomed touching of Ms. Hall during the Incident.

    **Response:** Attorney Ryan's report speaks for itself.

182.   Based on the Conclusions set forth above, Attorney Ryan then made the following

Recommendations:

- Based on the fact that Ms. Hall is an elected official,

    she cannot be disciplined by the Town nor can corrective action be issued for violations of the Sexual Harassment Policy. Accordingly, I recommend that the [sic] she and the other members of the BOS receive training on preventing discrimination and harassment in the workplace.

- With regard to Mr. Chiocca, I recommend that he be **removed from administrative leave and returned to the position of Town Administrator for the Town** and that he be reminded that any retaliation in the workplace for reporting harassment will not be

tolerated.

> **Response:** Attorney Ryan's report speaks for itself.

183.   On July 10, 2018, the BOS held a meeting to, *inter alia,* disclose the results of Attorney Ryan's investigation.

> **Response:** Admitted.

184.   Given the anticipated public turnout, the meeting was moved from its regular Town Hall location to the Rockland High Scholl auditorium.  Hundreds of citizens attended the meeting.

> **Response:** Admitted.

185.   At the beginning of the meeting and during open session, Mr. Kimball stated in relevant part:

> In 2018, this Board has turned an allegation of sexual
> assault into a spectacle.  That's my ruling as Chair, you can
> overrule me, and continue with a majority vote.

> **Response:** Admitted.

186.   The Board then voted in favor of removing Mr. Kimball as Chair and in favor of making Mr. Ryan the new Chair.

> **Response:** Admitted.

187.   The Board then voted to go into Executive Session.

> **Response:** Admitted.

188.   At the beginning of the Executive Session, Mr. Ryan stated to Mr. Kimball:

> The report does speak for itself, but I would just like
> to mention that, as you accused us all of covering up
> everything and then, quite frankly, the only person who
> covered anything up was you, your affair with Ms. Hall,
> your – when you come to the meeting, your – when you

heard that something happened. She didn't report that. You
did, according to the report that I read. And, quite frankly,
we don't need you anymore.

I think you should resign, quite frankly, and save the town
the embarrassment because everybody in town hall has been on
edge since this happened.

**Response:** Admitted.

189.     Mr. Ryan then asked Attorney Ryan how she assessed Mr. Kimball's credibility,
and Attorney Ryan responded as follows:

So I interviewed Mr. Kimball two times in person and one
time over the telephone. During the first interview that I
had with him, he told me that he had been untruthful to the
members of the Board of Selectmen, to the women at town
hall and to his wife. He said that he was untruthful about
the extend of the relationship that he had with Deirdre Hall.

I observed other inconsistencies during the examination of
Mr. Kimball from Day One to Day Two. So, for instance,
on his first day of testimony, he told me that he told John
Clifford that he had called ...Allan Chiocca the night
before the 18th. So on the 17th, he called Allan Chiocca and
said, you know, a board member's husband called me
tonight and said, you know, something about blowjobs
and contracts.

And on the first day, he said, no –I said, you never told
that to Attorney Clifford before you met with him on the
18th to go in and speak to Mr. Chiocca, and he said, no.
And then on the second interview, he said, I told Mr.
Clifford that morning that I had, in fact, talked to Allan
Chiocca the night before. And I thought that was important,
and I thought that was a credibility flaw because I did
weigh some -- I did find it concerning on the first day
that he had not told legal counsel that he already disclosed to
Allan Chiocca that there was an allegation against him.

. . . .

The other issue is Mr. Hall had, and I found her credible,
saying that she never said to Mr. Kimball that anyone had
engaged in inappropriate behavior. Those were his words
and that was the word –those were the words that we used

on the leave of absence.  And she said she only used those
words because he had put them on the leave of absence.

**Response**: The substance of the executive session transcript speaks for itself.

190.    After hearing Attorney Ryan's response, Mr. Ryan then stated to Mr. Kimball:

So, quite frankly, it looks like you started an investigation
without having probable cause.  I mean, if she didn't tell
you that something happened, why did you start an
investigation?  You went down and saw the movies.  You
went down and said, you know, there's pieces missing.  You
went down and said all these things, and **none of them are
true.  Just covering up –everything for everybody.**

From the day you started that affair with that woman and
you slept with her. . . .

That's the issue. [Mr. Kimball] lied to the Board of
Selectmen consistently, so there you go.  So as far as I'm
concerned, I got no more news for you.  So you can do
Whatever you want to do, but that's where I'm standing
right now.  As far as I'm concerned, the town owns you.

**Response**: The substance of the executive session transcript speaks for itself.

191.    Following Mr. Ryan's statement, Attorney Clifford and Mr. Kimball's attorney

Brian Palmucci ("Attorney Palmucci") engaged in a lengthy back and forth

discussion.  During the discussion, Attorney Clifford stated in relevant part:

[Your] client was untruthful, all right, from the beginning
of this investigation all the way through.  Those are the
allegations . . . . It's in the report.

. . . .

[Mr. Kimball] lied.  **Is there any dispute, material
dispute, on that**?  He lied to me.  He lied to his fellow board
members.  He lied to the women in town hall.

. . . .

**It is very relevant** how this investigation started, all right,
With an untruthful statement by your client.  It's very

> relevant that he misled all the parties involved all the way through this investigation, and then he accused these two gentlemen and his fellow board members, Mike O'Loughlin, of a coverup.  **He went on TV and made that statement.** All right?  When all the while, he was the one being untruthful.

**Response:** The substance of the executive session transcript speaks for itself.

192.     Then, following his discussion of Mr. Kimball's credibility, and without

providing any detail whatsoever and in direct contradiction to Attorney Ryan's report,

Attorney Clifford recommended that the Board vote to convene a meeting to

discipline Mr. Chiocca for misconduct.  Specifically, Attorney Clifford, stated:

> Mr. Chairman, I'm going to recommend that the board vote to convene a meeting next week to take disciplinary action against Mr. Chiocca for conduct beyond the town's discriminatory harassment policy for serious misconduct.

**Response:** The substance of the executive session transcript speaks for itself.

193.     The Board then voted in favor of the proposed motion.

**Response:** Admitted.

194.     Following the Board's vote, and knowing that Mr. Chiocca and his counsel were

not present, Mrs. Hall's attorney Jack McGlone ("Attorney McGlone") asked the

Board to refrain from disclosing Attorney Ryan's full report to the public, and in

doing so conceded that Mrs. Hall should have already resigned from her position on

the Board ("[S]he should have resigned a long time ago, Larry").

**Response:** The substance of the executive session transcript speaks for itself.

195.     Following Attorney McGlone's request, and again without providing any detail

and in contradiction to Attorney Ryan's report, Attorney Clifford stated that Mr.

Chiocca would be disciplined for "misconduct" and would not be allowed to return to

work.  Specifically, Attorney Clifford stated:

I don't think it's the sentiment of this board that they want to – people
to leave this meeting thinking that Allan is going to be brought back
to work . . . That is not the board's intention.

    **Response:** The substance of the executive session transcript speaks for itself.


196.    Mr. Kimballl then correctly observed and asked:

In the report, the executive summary that Ms. Ryan had wrote
regarding Mr. Chiocca, he be reminded that any retaliation in the
workplace, report of harassment not be tolerated and should be
reported by him.  Any action against Mr. Chiocca, is that going
to be considered retaliation by this board?

    **Response:** The substance of the executive session transcript speaks for itself.

197.    The conversation returned to Attorney McGlone's request to not release the full

report, during which Attorney McGlone effectively acknowledged that Mrs. Hall's

complaint seeking an injunction to prevent the release of the video tapes was

frivolous.  Specifically, Attorney McGlone stated:

The last thing I want to do is file an injuction.  That was
absolutely ridiculous.  And she was listening to the wrong
people, and she was listening to certain members.

    **Response:** The substance of the executive session transcript speaks for itself.

198.    The parties then continued a lengthy discussion about releasing a substantially

shortened summary of the report to public in exchange for Mrs. Hall's resignation

from the BOS.

    **Response:** The substance of the executive session transcript speaks for itself.

199.   Without Mr. Chiocca present, the parties ultimately agreed to the foregoing, but

before doing so, the BOS voted in favor of accepting Attorney Ryan's full report.

> **Response:** Mr. Kimball abstained from the vote. The substance of the executive
>
> session transcript speaks for itself.

200.   Accordingly, the BOS does not dispute any of Attorney Ryan's Factual Findings,

Conclusions or Recommendations.

> **Response:** Mr. Kimball abstained from the subject vote, and thus is without
>
> information to admit or deny the allegations in paragraph 200.

201.   The BOS concluded the Executive Session by voting to acknowledge that is

violated the Open Meeting Law at the June 19, 2018 BOS meeting.

> **Response:** The substance of the executive session transcript speaks for itself.

202.   The BOS then closed Executive Session and returned to the Open Session.

> **Response:** Admitted.

203.   When they returned to the Open Session, Attorney Ryan read only two findings to

the public.  She stated:

> I do not substantiate Ms. Hall's allegation that if she
> engaged in sexual activities with Mr. Chiocca on May 1st
> and 2nd , 2018, it was non-consensual as she was incapable
> of consenting due to her level of intoxication.
>
> I substantiate Mr. Chiocca's allegation that on May 1st and 2nd. 2018,
> **Ms. Hall used her position as member of the Board of Selectmen,**
> **Who was actively reviewing and would soon be voting on his**
> **request for contract extension and salary increase to pressure**
> **him into engaging in sexual activities with her.**

> **Response:** Admitted.

204.   Attorney Clifford then, without providing the public with any detail, stated:

Pursuant to a board vote in executive session, it is

important for the public to understand that while Mr.
Chiocca was found not to have violated the Town's
discriminatory harassment policy, other serious misconduct
was identified in the investigation.  The board has voted to
convene a meeting next Tuesday July 17th to consider what
actions should be taken against Mr. Chiocca for other
midconduct.

**Response:** Admitted.

205.    One week later, on July 17, 2018, the BOS held another meeting that primarily

consisted of an Executive Session to discuss the potential discipline of Mr. Chiocca.

**Response:** Mr. Kimball did not attend the July 17, 2018 BOS meeting.

206.    Only three BOS members attended this meeting (Mr. Ryan, Mr. Mullen and Mr.

O'Loughlin) as Mrs. Hall had resigned and Mr. Kimball was not present.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, the allegations are denied.

207.    The Executive Session began with Attorney Clifford falsely stating to the BOS

that Attorney Ryan's investigation "raised serious concerns as to other potential

misconduct [that Mr. Chiocca engaged in] that may not have been a violation of [the

Town's discriminatory harassment policy] but may have been a violation of other

policies."

**Response:** Mr. Kimball is without sufficient information to admit or deny the

allegations contained therein. On that basis, those allegations are denied.

208.    Attorney Clifford then noted that the BOS could not terminate Mr. Chiocca's

employment as the BOS did not have the requisite four votes as required by the Town

Charter.

**Response:** Mr. Kimball is without sufficient information to admit or deny the allegations contained therein. On that basis, those allegations are denied.

209.    Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Attorney Clifford and Attorney Jason Crotty ("Attorney Crotty") (counsel assigned to the Town by the Town's insurer) then engaged in a lengthy discussion regarding how to handle any potential discipline towards Mr. Chiocca.

**Response:** Mr. Kimball is without sufficient information to admit or deny the allegations contained therein. On that basis, those allegations are denied.

210.    During this discussion, and again without articulating any specific misconduct that Mr. Chiocca engaged in, Mr. Ryan stated that the three present BOS members were unanimously in agreement to terminate Mr. Chiocca's employment.

**Response:** Mr. Kimball is without sufficient information to admit or deny the allegations contained therein. On that basis, those allegations are denied.

211.    Attorney Clifford then again advised Mr. Ryan that the BOS could not terminate Mr. Chiocca's employment at that point with only three members because it would increase the Town's liability to Mr. Chiocca even further.  In doing so, Attorney Clifford expressly acknowledged that the Town already had serous liability to Mr. Chiocca.  Specifically, Attorney Clifford stated:

Based on [Attorney Ryan's] report, I think that the town
Potentially has serious exposure already.

**Response:** Mr. Kimball is without sufficient information to admit or deny the allegations contained therein. On that basis, those allegations are denied.

212.    Mr. O'Loughlin then stated and correctly as follows:

In that investigation, it was determined that **every act –
every action that [Mr. Chiocca took that night was out**

<u>of concern that she was threatening his contract.</u> So all
of that got lumped in, so, in a sense, <u>the report exonerated
every action that he took that night</u> . . .

> **Response:** Mr. Kimball is without sufficient information to admit or deny the
>
> allegations contained therein. On that basis, those allegations are denied.

213.    In response, Mr. Ryan acknowledged the findings in Attorney Ryan's report

("The paper says that he did not pursue her.  That she pursued him"), but then falsely

stated that Mr. Chiocca was "drunk on the job . . . [t]his is the second time he has

been caught in Rockland drunk on the job," and that"it has to do with . . . him being

in [Town Hall]."

> **Response:** Mr. Kimball is without sufficient information to admit or deny the
>
> allegations contained therein. On that basis, those allegations are denied.

214.    Nowhere in Attorney Ryan's report did she find that Mr. Chiocca was drunk on

the evening of May 1, 2018/early morning of May 2, 2018.

> **Response:** Attorney Ryan's report speaks for itself.

215.    Attorney Ryan's report further found that Mr. Chiocca returned to Town hall with

Mrs. Hall based on her threat about his contract and raise.

> **Response:** Attorney Ryan's report speaks for itself.

216.    Attorney Ryan's report did not identify any misconduct that Mr. Chiocca engaged

in.

> **Response:** Attorney Ryan's report speaks for itself.

217.    After expressing his unlawful, retaliatory opinion, Mr. Ryan then stated that the

Town should propose a resolution to Mr. Chiocca, and that if he did not agree to it, as

as soon as there are four voting members on the BOS, "it's AMF"; i.e. adios mother fucker.

> **Response:** Mr. Kimball is without sufficient information to admit or deny the allegations contained therein. On that basis, those allegations are denied.

218.   Following Mr. Ryan's statement, the BOS discussed a few other matters, and the meeting ended.

> **Response:** Mr. Kimball is without sufficient information to admit or deny the allegations contained therein. On that basis, those allegations are denied.

219.   After the meeting ended, and without regard to its retaliatory nature, Mr. Ryan stated publicly to the press that the BOS unanimously agreed to terminate Mr. Chiocca's employment but could not do so until the BOS had at least four members.

> **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

220.   The following day, July 18, 2018, Attorney Clifford wrote to Attorney Shafran to respond to Mr. Chiocca's Open Meeting Law Complaint.

> **Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

221.   Attorney Clifford acknowledged that Mr. Kimball's conduct at the June 19, 2018 BOS meeting was a violation of the Open Meeting Law, and that the BOS would, *inter alia*, "at its next schedule meeting . . . read a statement that include[s]. . . [a]n admission that the statements made by then Chairman Edward Kimball regarding an

investigation at the June 19, 2018 meeting were a violation of the Open Meeting Law, as that matter was not on the agenda for that meeting."

**Response:** Mr. Kimball is without sufficient information to admit or deny the allegations contained therein. On that basis, those allegations are denied.

222. Attorney Clifford's letter further acknowledged that the BOS could not compel Mr. Kimball individually to take any of the remedial actions sought by Mr. Chiocca in his Open Meeting Law complaint.

**Response:** Admitted.

223. The same day, July 18, 2018, Mr. O'Loughlin publicly libeled Mr. Chiocca on a Facebook page routinely frequented by Rockland citizens (i.e. the "Rockland Hub Facebook page").

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

224. Specifically, Mr. O'Loughlin accused Mr. Chiocca of lying during the investigation when he falsely wrote on the Facebook page, "It's important to keep in mind that this was caused by 3 parties that weren't being truthful from the start."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

225. At no point did Mr. Chiocca lie to anyone about any of the events that occurred between him and Mrs. Hall on the evening of May 1, 2018, and Attorney Ryan specifically found that Mr. Chiocca was honest and credible.

> **Response:** Mr. Kimball is without sufficient information to form a belief as to the
>
> truth of the allegations contained therein. On that basis, those allegations are
>
> denied.

226.   Following this comment and the BOS's decision to keep Mr. Chiocca on

administrative leave, on July 19, 2018, Attorney Shafran wrote to Attorney Clifford

regarding the status of Mr. Chiocca's employment.  In relevant part, Attorney Shafran

wrote as follows:

> Per our call yesterday, and in light of recent public
> statements made by members of the Rockland Board of
> Selectmen, I write to again inform you that the Town is in
> continuing breach of it own Charter.
>
> As you know, on May 29, 2018, Mr. Chiocca was informed
> via letter from then-BOS Chairman Edward Kimball that he
> was being "placed on administrative leave pending the
> outcome of an investigation, effectively immediately."
>
> . . . .
>
> On May 30, 2018, I wrote to you to inform you that the
> Town's placement of Mr. Chiocca on "paid administrative
> leave" was a de facto suspension in violation of Section
> 2.18 of the Town Charter.
>
> . . . .
>
> On May 31, 2018, you replied to my letter and stated that
> Mr. Chiocca's placement on paid administrative leave was
> not a suspension.  This assertion is incorrect per decisions
> from both the SJC and U.S. District Court of
> Massachusetts.  In Campatelli v. Chief Justice of the Trial
> Court, 468 Mass. 455, 457 n.2 (2014) the SJC expressly
> stated, "[w]e see no legally cognizable difference between
> suspension with pay and paid administrative leave, and
> used the terms interchangeably in this opinion.
>
> . . . .
>
> Based on the foregoing, the Board's initial decision to place

Mr. Chiocca on paid administrative leave was a suspension. In that regard, Mr. Chiocca was and still is entitled to know whether this decision was put to a vote, what the result of the vote was, as well as the "**specific reason**" for the suspension. Moreover, in your May 31 letter you first noted that if Mr. Chiocca "wish[es] to consider the Board's action a suspension, [that he is] free to request a public hearing under the Charter," and that you would request that the Board provide him with a notice detailing the allegations Against him, and then convene a public hearing to provide Him with the procedural due process . . . " Per the portion of the Charter quoted above, it is neither Mr. Chiocca's obligation to determine whether the Town's action constitutes a suspension, nor does he have to request a public hearing in order to be entitled to receive written notice detailing the "specific reason" for this suspension. While we certainly think it is clear that Mr. Chioccoa has been suspended, that is a conclusion for the Town to make. If the Town continues to feel otherwise, I suggest it is not only wrong, but also causing further damage to Mr. Chiocca. If the Town correctly concludes that Mr. Chiocca has been suspended, that it has a legal obligation to provide him with the "specific reasons" for his suspension.

. . . .

Moreover, and as quoted above, Mr. Kimball's May 29, 2018 letter expressly states that Mr. Chiocca's placement on "paid administrative leave" was "pending the outcome of an investigation," and that Mr. Chiocca would be notified "[i]f further disciplinary action up to and including termination is found to be warranted according to the results of th[e] investigation." As you know, the investigation is now complete, and it is our understanding that Mr. Chiocca remains on "paid administrative leave." For reasons set forth above, this constitutes a Suspension beyond the term that was originally imposed. As such Mr. Chiocca was and still is entitled to know whether this decision was put to a vote, what the results of the vote was, as well as the "**specific reason**" for the suspension. This is particularly important given the fact that following the issuance of the investigator's report, you made an ambiguous and defamatory statement that the investigation identified "other serious misconduct." Please provide us with a detailed explanation of the exact misconduct that this statement was based upon.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

227.    Neither Attorney Clifford nor anyone else acting on behalf of the Town has responded to Attorney Shafran's July 19, 2018 letter as of the date of this filing.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

228.    As of the date of this filing, the Town had still yet to inform Mr. Chiocca of the specific misconduct he engaged in.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

229.    On July 31, 2018, Mr. Kimball resigned from his position on the BOS.

**Response:** Admitted.

230.    Shortly thereafter the BOS scheduled a special election for November 6, 2018, to fill the two vacant seats on the BOS.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

231.    Mr. Chiocca has remained suspended on paid administrative leave to date, but the existing BOS members have since doubled down on their retaliatory intent to terminate Mr. Chiocca's employment.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

232.    In or about October 2018, Mr. Ryan state to MassLive report Jacqueline Tempera
        ("Ms. Tempera"):

> I already told everybody as far as I was concerned there is
> no way – no possible way—[Mr. Chiocca will] walk
> through the Town Hall doors in the town of Rockland
> again.  He'll cause trouble again.  That guy is an annoyance
> that is going to end soon."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the
truth of the allegations contained therein. On that basis, those allegations are
denied.

233.    Mr. Ryan then continued with his ambiguous, defamatory statements regarding
        Mr. Chiocca when he stated to Ms. Tempera:

> He's not an innocent bystander.  You can infer what you
> want from that.
>
> [Mr. Chiocca will be] taken care of

**Response:** Mr. Kimball is without sufficient information to form a belief as to the
truth of the allegations contained therein. On that basis, those allegations are
denied.

234.    On November 6, 2018, Richard Penney and Kara Nyman were elected as the two
        new members of the BOS.

**Response:** Admitted.

235.    On November 8, 2018, the BOS held their first meeting following the November
        6, 2018 election.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

236.    At that meeting, Mr. O'Loughlin referred to the Town Administrator position as "vacant", and Mr. Ryan referred to Mr. Chiocca as a "former employee' on several occasions, and defamatorily reassured the town citizens that the Bos is "paving the way for this Town to get up and running again and get rid of the dead wood."

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

237.    Mr. Ryan and the BOS's defamatory and retaliatory statements regarding Mr. Chiocca coupled with the BOS's continued, unjustified suspension of Mr. Chiocca (stripping Mr. Chiocca of all Town Administrator responsibilities) in direct contradiction to Attorney Ryan's report (and in violation of Mr. Chiocca's contract and the Town Charter) have rendered the working conditions objectively intolerable, and as a result have constructively discharged Mr. Chiocca from employment with the Town in violation of the Town Charter, Mr. Chiocca's contract and multiple statutory, common law, and constitutional protections.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

238.    On November 20, 2018, Mr. Chiocca filed his initial Charge of Discrimation with the Commission.

**Response:** Admitted.

239.    Shortly after the Charge was filed, Attorney Shafran emailed a copy of the Charge

to counsel for the Respondents.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, those allegations are

denied.

240.    Later that same evening, the BOS held another Selectmen's meeting.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, those allegations are

denied.

241.    At that meeting, which occurred within hours of the BOS receiving Mr. Chiocca's

Charge, the BOS voted unanimously to keep Mr. Chiocca on paid administrative

leave through June 30, 2019 and to not renew his contract thereafter.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the

truth of the allegations contained therein. On that basis, those allegations are

denied.

242.    The BOS's vote to keep Mr. Chiocca on paid administrative leave constitutes a

retaliation against Mr. Chiocca in violation of M.G.L. c. 151 *et seq*.

**Response**: Mr. was resigned at this point.

243.    The BOS's vote to not renew Mr. Chiocca's contract is express confirmation of

the Town's previous constructive discharge of Mr. Chiocca and further retaliation

against Mr. Chiocca in violation of M.G.L. c. 151 *et seq*.

**Response:** Mr. Kimball was resigned at this point.

244.    Following the aforementioned votes, Mr. Ryan read a prepared statement.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

245.    In relevant part, Mr. Ryan stated, "[s]ince this controversy is likely to take months or years to litigate, <u>we would very likely **have been required**</u> to pay the remaining balance of Mr. Chiocca's contract, which ends of June 30, 2019.

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

246.    Mr. Ryan then proceeded to further defame Mr. Chiocca by stating that "all of [his] claims [are] without any merit," despite also stating that the Town's "independent investigator . . . determined that Ms. Hall had violated the Town's harassment policy in her role as Mr. Chiocca's supervisor . . . "

**Response:** Mr. Kimball is without sufficient information to form a belief as to the truth of the allegations contained therein. On that basis, those allegations are denied.

## CAUSES OF ACTION

## COUNT 1

(Violation of Mass. Gen. Laws c. 141B, §4(1) and 4(16A)- Quid Pro Quo Sexual Harassment Hostile Work environment, Unlawful Suspension, Constructive Discharge, and Wrongful Termination)

247.    Count 1 refers to persons or entities other than this answering Respondent.

248.    <u>See</u> Response 247.

249.   See Response 247.

## COUNT 2

(Violation of M.G.L. c. 151B, §4(4) Retaliation, Unlawful Suspension, Constructive Discharge and Wrongful termination)
(Against all Respondents)

250.   Mr. Kimball denies the allegations in paragraph 250.

251.   Mr. Kimball denies the allegations in paragraph 251

252.   Mr. Kimball denies the allegations in paragraph 252

## COUNT 3

(Violation of M.G.L. c. 151B, §4(4A) Retaliation, Unlawful Suspension, Constructive Discharge and Wrongful termination)
(Against all Respondents)

253.   Mr. Kimball denies the allegations in paragraph 253.

254.   Mr. Kimball denies the allegations in paragraph 254.

255.   Mr. Kimball denies the allegations in paragraph 255.

## COUNT 4

(Violation of M.G.L. c. 151B, §4(5) -(Aiding and abetting Constructive Discharge and Wrongful termination)
(Against all Respondents)

256.   Mr. Kimball denies the allegations in paragraph 256.

257.   Mr. Kimball denies the allegations in paragraph 257.

258.   Mr. Kimball denies the allegations in paragraph 258.

## COUNT 5

(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et seq. – Quid Pro Quo Sexual Harassment, Hostile Work Environment, Unlawful Suspension, Constructive Discharge and Wrongful Termination)
(Against the Town of Rockland)

259.   Count 5 refers to persons or entities other than this answering Respondent.

260.   See response 258.

261.   See response 258.

## Conclusion

Mr. Kimball denies he engaged in conduct violative of M.G.L. c. 151B, §4(4), M.G.L. c.

151B, §4(4A), and/or M.G.L. c. 151B, §4(5) as alleged, and respectfully moves the MCAD to

enter a finding of no probable cause and dismiss Mr. Chiocca's First Amended Charge of

Discrimination as he has failed to establish a *prima facie* case against him.

Respectfully Submitted,
Respondent,
Edward Kimball,
By his attorneys,

*Elise R. Marshall/mlr*

Edward R. Gargiulo
B.B.O. 185720
Marielise Kelly
B.B.O. 559565
Elise R. Marshall
B.B.O. 665474
Gargiulo / Rudnick, LLP
766 Falmouth Road Suite A6
Mashpee, MA 02649
508-477-6400
erg@grglaw.com
mlk@grglaw.com
erm@grglaw.com

Dated: January 25, 2019

<u>VERIFICATION</u>

I, Edward Kimball, on oath, depose and state the facts contained within Respondent Edward Kimball's Position Paper are true and accurate to the best of my knowledge.

Edward Kimball

Dated: _____ January 25, 2019

## CERTIFICATE OF SERVICE

I, Elise R. Marshall, Esq., hereby certify that I have served a true and accurate copy of the following document by electronic mail as pdf and postage paid, US first-class mail:

1. Respondent Edward Kimball's Position Statement

On:

Adam J. Shafran, Esq.
Rudolph Friedmann, LLP
92 State Street
Boston, MA  02109
ashafran@rflawyers.com

Cindy Cieslak, Esq.
Rose Kallor, LLP
750 N. Main Street
Hartford, CT 06117
ccieslak@rosekallor.com

John J. Davis, Esq.
Jason W. Crotty, Esq.
Pierce, Davis & Perritano, LLP
10 Post Office Square, Suite 1100N
Boston, MA  02109-4603
jdavis@piercedavis.com
jcrotty@piercedavis.com

John J. Clifford, Esq.
Clifford & Kenny, LLP
31 Schoosett Street, Unit 405
Pembroke, MA  02359
john@cliffordkennylaw.com

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 25th DAY OF JANUARY, 2019.

Elise R. Marshall/mlr

Elise R. Marshall, Esq.

Kimball Exhibit

**5**

9/8/21  AKL  Chiocca v Town of Rockland, et al

I want you to know I am meeting with Allan tomorrow to try to get to the bottom of this

No no no please call me

I'll call you after I collect all the facts tomorrow

No please call me now

I need to know what you are going to say.

I have not decided what to say, I have to sleep on it

Please just give me one more day to talk to you and reason with you. I have been looking at the texts I got that night and have a better idea when I started to not remember

Please call us should not be putting



Please just give me one more day to talk to you and reason with you. I have been looking at the texts I got that night and have a better idea when I started to not remember

Please call we should not be putting this in writing

Tell me what you remember and it better be the whole truth

Ok

Not in writing



I don't like being played

I am not playing you

I would not do that to you

Are you going to call so I can talk to you?

I'll call but my wife is beside me

Is that a problem for her?

No, I just wanted you to be aware

That's ok

Sorry to bother you I just wanted you to know in advance that I have an appointment with Mary Jane and Eric tomorrow at noon to review the school payroll procedures. Not sure how this fits into your time table. You have my word that I will not speak to Allan while I am there. If you think you will be in tomorrow before noon to talk to him please let me know, so I can be prepared.

I understand your concern for our employees and appreciate the

Sorry to bother you I just wanted you to know in advance that I have an appointment with Mary Jane and Eric tomorrow at noon to review the school payroll procedures. Not sure how this fits into your time table. You have my word that I will not speak to Allan while I am there. If you think you will be in tomorrow before noon to talk to him please let me know, so I can be prepared.

I understand your concern for our employees and appreciate the tough spot you are in. Thank you for protecting them during a time when I have compromised myself too much to do so.
Goodnight

I talked to your husband Chris this morning, pursuant to our

I talked to your husband Chris this morning, pursuant to our conversation last night I remind you to not talk to Allan until I do, I will let you both know the outcome once that has occurred

I am not going to to talk to him. Please call me

I am at a job site and can not talk

Ok can you call me when you can please? I have my kids till about 745. After that I can talk

Sorry, I can't talk right now.

Ok



Sorry, I can't talk right now.











Does this jog your memory?

Payroll has not come over from the
school yet. I have Jill following up
with schools to anticipate if they will

Payroll has not come over from the school yet. I have Jill following up with schools to anticipate if they will need more time.

Schools say it will be 12. So that's when I will be there.

K

Please touch base with me one last time before you head over there?

Do I need to pull out of the state rep race?

You need help

I have an appointment

Do I need to pull out of the race

I have left TH

You need help

I have an appointment

Do I need to pull out of the race

I have left TH

Please send a copy of the Paid Administrative Leave Letter to my lawyer.

Ty

I contacted the police chief today.

Kimball, Vol II Exhibit

**13**

9/9/21  AKL  Chiocca v Town of Rockland



The "REAL" Rockland (semi-censored)----the good, the bad, & the ugly.

**Massachusetts Conservative Movement**

Jun 15 at 9:25pm · 🌐

Word on the Rockland streets is that Town Administrator Allan Chiocca wasn't the only one having sex with Selectman Deirdre Hall. Selectman Edward Kimball was sleeping with her too! That would explain why he went the extra mile in filing an affidavit for his side piece Deirdre Hall. What the hell is going on in Rockland? Time to elect some new "officials"

👍😮😡 13            8 Comments

👍 Like            💬 Comment

Donna McLaughlin McCreary and 25 others



Like · Reply · 14m

**Corey Del** And it seems like it's about to get better... ll these people invol  ed need to go and maybe more that have not  en exposed

Like · Reply · 10m

**Tricia Gallagher** It's time to end this circus and get rid of  me of these clowns....

Like · Reply · 7m

**Joe Quigley** 👋 me thinks Ed Kimball protests just a bit too m  th What is he trying to hide?

Like · Reply · 1m · Edited

**Ni   Galotti** Stay tuned, there might be a new boo  there for you

Like

Reply · 1m

**Mary A** ost the document showing the



www.facebook.com/groups/749656765093830/

...d (semi-censored) — the good, the ba...

**Dan Ryan**
June 19 at 9:29 PM

Ed Kimball has no integrity. He's an embarrassment to our town, what makes him think he's any better than the other two. Own your mistake and move on.

👍 Like                    💬 Comment

46

View 13 more comments

**Jerry Blake** He had to have known the police could not do anything about it unless the original 2 filed a complaint which has still not happened because there was no crime and somebody knows it. Was that an attempt to make it look like the police were compromised too??

Like · Reply · 4h

↳ 🦅 Ralph Bennett replied · 2 Replies · 3 hrs

**Judith Walling** If Ed Kimball is some how involved in this mess, he too should step away until it gets settled. If he's not involved anyway, then he shouldn't be discussing it. I like Ed. I really think he has done a good job for Rockland. Everything was fine until... See More



**Taxed 2 Death n Mass** @Taxed2Deth · Jun 1

Replying to @HowieCarrShow

Howie, stop by Rockland and we'll give you an exclusive on the shady ongoing crap in this cesspool! Ask the BOS chairman for his text messages between him and Deidre Hall and about his marriage counseling. She's toxic!

♡    ♺    ♡ 2    ☑

AC02079