## In The Matter Of:

*Allan Chiocca vs.*
*The Town of Rockland, et al.*

---

*Deirdre Hall*
*Vol. I*
*July 22, 2021*
*Video Deposition*

---



## DORIS O. WONG ASSOCIATES, INC.

C O U R T   R E P O R T E R S

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File Hall_Deirdre.txt*
*Min-U-Script® with Word Index*

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

11:02:43-11:03:05

Page 37

1    lawyers?
2    Q.  No, before they were produced to opposing
3    counsel.
4    A.  No.
5    Q.  You understand you are under oath today,
6    correct?
7    A.  Yes.
8    Q.  You know what that means?
9    A.  Yes.
10   Q.  As an officer of the court, do you take
11   that oath seriously?
12   A.  I do.
13        MS. ZUCKER: Objection.
14   Q.  And every response you have given me today
15   has been the truth?
16   A.  To the best of my knowledge today, yes.
17   Q.  Every response you submitted through an
18   interrogatory, has that been the truth?
19   A.  Yes.
20   Q.  And every -- when you filled out the
21   Position Statement and you signed the verification
22   to the Mass. Commission Against Discrimination, were
23   you swearing that that was the truth as well?
24   A.  Yes.

1:03:22-11:03:54

Page 38

1    Q.  And your answer in this case, when you
2    admitted and denied, that was the truth?
3    A.  Yes.
4        MS. ZUCKER: Objection.  That's not a
5    Verified Complaint, so her counsel admitted and
6    denied on her behalf.  Let's be careful.
7    Q.  Did you review the answer and the
8    counterclaim before your attorney submitted it?
9    A.  I did.
10   Q.  Do you think anything in it was untrue?
11   A.  No.
12   Q.  Do you stand by your counterclaim in this
13   case?
14        MS. ZUCKER: Objection.
15   A.  I think there might be some drafting things
16   that could be cleaned up, but I think it's good.
17   Q.  But the allegations you believe, sitting
18   here today, are true?
19   A.  Yes.
20   Q.  What are the drafting issues?
21        MS. ZUCKER: Objection.
22   A.  I would have to look at it.  I don't know
23   off the top of my head.
.4   Q.  We will go through it.

11:04:11-11:04:42

Page 39

1        Did you tell the truth to the investigator
2    in this case, Regina Ryan?
3    A.  I did.
4    Q.  All three times you met with her?
5    A.  Yes.
6    Q.  Do you believe that two individuals can
7    describe the same events differently but both are
8    telling the truth?
9        MS. ZUCKER: Objection.
10       MR. COOPER: Objection.
11   A.  I have seen witnesses describe the same
12   incident and think that they were telling the truth
13   and have it be different.  Yes, I have seen that
14   happen.
15   Q.  You understand when you deny something in
16   an answer or a Position Statement, you are saying it
17   did not happen, correct?
18       MS. ZUCKER: Objection.
19       MR. COOPER: Objection.
20   A.  Yes.
21   Q.  The Position Statement in this case, you
22   signed the verification, correct?
23   A.  I did.
24   Q.  So when you denied something in the

11:04:54-11:05:23

Page 40

1    Position Statement, you are saying it did not
2    happen, correct?
3        MS. ZUCKER: Objection.
4        MR. COOPER: Objection.
5    A.  I believe that's what I was saying, yes.
6    Q.  You further understand that when you admit
7    something in an answer or a Position Statement, you
8    are saying that it's true?
9        MS. ZUCKER: Objection.
10   Q.  Correct?
11   A.  Yes.
12   Q.  And when you say you have insufficient
13   knowledge about something, you are saying that you
14   do not know at the time or never knew that it
15   happened, correct?
16       MS. ZUCKER: Objection.
17   A.  I didn't know at the time or never knew?
18   Q.  Yes.
19   A.  What do you mean?
20   Q.  So when you say you have insufficient
21   knowledge to admit or deny something, what do you
22   think you are saying, as a lawyer?
23       MS. ZUCKER: Objection.
24   A.  I'm saying I don't have the information to

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

11:05:37-11:06:03

Page 41

1   answer that question.
2       Q.   Is there a way you could get the
3   information, or are you saying there's no way you
4   can get that information?
5           MS. ZUCKER: Objection.
6       A.   I'm saying at that time I don't have the
7   information.
8       Q.   Have you ever made an effort to amend any
9   of your insufficient knowledge responses in this case?
10          MS. ZUCKER: Objection.
11      A.   I don't believe that we filed, like, an
12  amended response.
13      Q.   Are you currently employed?
14      A.   I am.
15      Q.   Where?
16      A.   I work at Shaw's, the morning shift.
17      Q.   What do you do?
18      A.   I work on a drive-up-and-go program.
19      Q.   What's that?
20      A.   It's like a food delivery.  I work 6:00 to
21  2:00.
22      Q.   6:00 a.m. to 2:00 p.m.?
23      A.   Uh-huh.
24      Q.   What does that mean, food delivery?  Are

11:06:23-11:06:52

Page 42

1   you delivering food or are you --
2       A.   We shop it, and people come to pick it up.
3       Q.   So someone submits an order to Shaw's,
4   eggs, milk, whatever, and you gather it?
5       A.   (Witness nods)
6       Q.   And then they come and get it?
7       A.   Yes.
8       Q.   And how long have you been in that job?
9       A.   I don't know, three months, four months.
10      Q.   What was your job before immediately that?
11      A.   I worked the early morning shift at Fedex.
12      Q.   When you say "early morning," what time was
13  that?
14      A.   3:00 in the morning.
15      Q.   Until?
16      A.   8:00 or 9:00.
17      Q.   Are these both full-time jobs?
18      A.   The Shaw's one I work, like, 35 hours a
19  week.  The Fedex one was maybe 25 hours a week.
20      Q.   The Fedex one, why did you leave?
21      A.   The hours.  My son is getting older and
22  wants to stay out later with his friends, and it was
23  hard for me to pick him up late at night, like at
24  9:00 or 10:00, and still get to sleep and get to

11:07:13-11:08:02

Page 43

1   work the next day.  It just wasn't enough sleep.
2       Q.   So you quit?
3       A.   Yes.
4       Q.   How long were you at Fedex?
5       A.   I started in July, and I left in April.
6       Q.   What is the job that you had prior to Fedex?
7       A.   I worked at the City of Quincy.
8       Q.   That was the last time you were employed --
9       A.   Actually, no.  A friend of my owns a coffee
10  shop.  I worked a few months for her, in between.
11      Q.   After you left Quincy?
12      A.   Correct.
13      Q.   Prior to being elected to the Board of
14  Selectmen or after?
15      A.   During.
16      Q.   During, okay.  So what time period was that?
17      A.   I'm going to say it's going to be the fall
18  of '18 -- no -- the fall of '17, into the winter
19  of -- up to maybe March of '18.
20      Q.   Why did you leave that position?
21      A.   I just started to run for office, so I
22  wanted to have more time to run for office.
23      Q.   What office are you referring to?
24      A.   State Rep.

11:08:21-11:08:47

Page 44

1       Q.   When did you make that decision?
2       A.   Privately with my family or publicly?
3       Q.   Why don't you give me both.  Privately with
4   your family.
5       A.   Around Christmastime.
6       Q.   And publicly when did you announce it?
7       A.   January.
8       Q.   So prior to working in the coffee shop, you
9   were employed by the Town of Quincy; is that right?
10      A.   City.
11      Q.   Thank you.  The City of Quincy?
12      A.   Yes.
13      Q.   For how long?
14      A.   Almost eight years.
15      Q.   And what was your -- you had more than one
16  position while you were there?
17      A.   Yes.
18      Q.   Can you walk me through the different
19  positions.
20      A.   Sure.  So I was hired as an Assistant City
21  Solicitor.  That was my first legal job after law
22  school.  I worked in that position for, I'm going to
23  say, somewhere between 2012 to 2014.  I don't know
24  when I made the transition to just do legal counsel

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

11:12:26-11:12:53

Page 49

1   you know, I just work at his pleasure.
2       Like I said, I had some concern about the
3   length of the suspension, but I do understand that I
4   created the appearance of an impropriety, and so I
5   understood that some discipline was warranted.
6   Q.   The accident that you were in, was anyone
7   injured?
8   A.   I believe he wasn't.  I believe he got
9   medical treatment, yes.
10  Q.   Was there a lawsuit that resulted from your
11  car accident?
12  A.   I believe so, yes.
13  Q.   Were you found to be liable?
14  A.   I don't know what the result of it was.
15  Q.   What about the police report?  Did the
16  police find you to be at fault?
17      MS. ZUCKER: Objection.
18  A.   Yes, not yielding the left turn.
19  Q.   What time of day was the accident?
20  A.   I believe it was at, like, 3:00 in the
21  afternoon.
22  Q.   What do you mean when you say that it
23  created -- that your having the personal
24  paraphernalia in your car created an impression of

11:13:12-11:13:45

Page 50

1   impropriety?
2   A.   It made it look like I was doing
3   something -- using my vehicle to do campaign work,
4   personal work.
5   Q.   Were you?
6   A.   No.
7   Q.   So how did it end up in your car?
8   A.   So when I took the work car, I emptied out
9   all my belongings from my personal car into my work
10  car because my personal car stayed in the DPW yard
11  for two days, and in my backpack, which is one of
12  the things I removed from my personal car into my
13  work car, was my palm cards, and that's how they
14  were there.
15  Q.   Why would the car seat be in the car if you
16  weren't transporting a child?
17  A.   The car seat had been in the car for a year
18  because sometimes I'm on the road, and my daughter
19  at that time was, you know, in the age that she
20  still needed a booster seat, and if I had an
21  emergency, I wanted to be able to get her.
22  Q.   Did you use the City of Quincy's car to
23  pick up your child?
24  A.   No.

11:14:06-11:15:08

Page 51

1   Q.   So you just had a car seat there just in case?
2   A.   Yes.
3   Q.   What time of day was the car accident?
4   A.   3:00 in the afternoon I believe.
5   Q.   Had you been drinking?
6   A.   No.
7   Q.   Did anyone find that you had been drinking?
8   A.   No.
9       MS. HALEM: Jason, we're going to hold your
10  exhibits separately.
11      Can you mark that as 1.
12      (Document marked as Hall
13      Exhibit 1 for identification)
14  Q.   Do you recognize this document?
15  A.   (Examines document) I do.
16  Q.   What is it?
17  A.   It is the suspension letter issued by Mayor
18  Tom Koch to me.
19  Q.   Do you disagree with his findings in this
20  letter?
21      MS. ZUCKER: Objection.  Asked and answered.
22  A.   I did have personal material in the
23  vehicle.  That's what he's saying, that I placed in
24  the vehicle for personal use at the time of the

11:15:39-11:16:03

Page 52

1   accident.  So the car seat and the personal
2   belongings were not for City of Quincy purposes.
3   Q.   Did you resign from the City of Quincy
4   shortly after this?
5   A.   I resigned maybe -- this was April, right?
6   So April, May, June, July...  Four months later.
7   Q.   And was it in any way connected to your
8   suspension?
9   A.   No.
10  Q.   Was your resignation in any way connected
11  to other discipline?
12  A.   No.
13  Q.   Any other issue at work that was connected
14  to your resignation?
15      MS. ZUCKER: Objection.
16  A.   My boss was retiring.
17  Q.   And why did you need to leave because your
18  boss was retiring?
19  A.   I enjoyed working under him.  I, you know,
20  really wasn't sure I wanted to stay and having to
21  get used to another boss, especially since I was
22  thinking of -- wanting to do something part-time
23  anyways.
24  Q.   When did you decide to run for the Board of

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

11:16:29-11:16:57
Page 53

1  Selectmen?
2  A. Maybe -- I don't remember the exact date.
3  Winter between 2016 and 2017, does that sound right?
4  Q. I don't know.
5  A. I think that sounds right, winter between
6  '16 and '17.
7  Q. And you were elected in April of 2017; is
8  that correct?
9  A. Yes.
10  Q. Do you know the exact date?
11  A. I don't know.
12  Q. The beginning of the month, end of the month?
13  A. Beginning, beginning of the month.
14  Q. Around the time you were suspended?
15  A. Yes.
16  Q. Was there some issue in your campaign that
17  you were suspended from your job?
18  A. No. This didn't break until after I got
19  elected.
20  Q. Were you anticipating it being an issue in
21  your State Rep race?
22  A. It was something I would need to explain.
23  Q. Did you have communications with people
24  about how to address that issue?

1:17:19-11:17:48
Page 54

1  A. Sure, people in my campaign.
2  Q. And how were you going to present it to the
3  press?
4  A. That I was suspended after a motor vehicle
5  accident and that I had personal material in the
6  public truck.
7  Q. Did you choose to run for vice chair of the
8  Board of Selectmen?
9  MS. ZUCKER: Objection.
10  A. I did not.
11  Q. How did you become vice chair?
12  A. Mike Mullen approached me and asked --
13  actually suggested that I do it.
14  Q. How did you ascend to that position? Is
15  there a vote amongst the Board of Selectmen? How
16  did that work?
17  MS. ZUCKER: Objection.
18  A. There was a vote.
19  Q. Amongst?
20  A. The Board of Selectmen.
21  Q. So did you throw your hat in the race, so
22  to speak?
23  A. I guess, but it was at the, you know -- it
4  wasn't initially my idea. Someone just presented it

11:18:05-11:18:29
Page 55

1  to me, thought it was a good idea. So I was like,
2  "Yeah, I'll do that."
3  Q. And that was Mike Mullen?
4  A. Yes, Mike Mullen.
5  Q. Did he nominate you?
6  MS. ZUCKER: Objection.
7  A. I don't know if it was a nomination
8  process. I don't think so. I can't recall.
9  Q. Well, tell me, does it happen at a meeting
10  at the Board of Selectmen?
11  A. The vote does.
12  Q. So how does that get presented as an issue
13  that's going to be voted on?
14  A. It gets on the agenda.
15  Q. Who put it on the agenda?
16  A. I don't know.
17  Q. Does anyone other than Ed Kimball put
18  things on the agenda?
19  A. We can ask for things to go on the agenda.
20  Q. Did you ask for that to be put on the agenda?
21  A. Not that I recall.
22  Q. Do you know who put it on the agenda?
23  A. No.
24  Q. Did Ed Kimball support your elevation to

11:18:44-11:19:18
Page 56

1  vice chair?
2  A. I believe so, yes.
3  Q. And did Larry Ryan?
4  A. He voted in favor, yes.
5  Q. And Mike O'Loughlin?
6  A. He also voted in favor.
7  Q. And you became the vice chair in April of
8  2018?
9  A. It might have been March or April, but,
10  yes, around that time.
11  Q. So it was unanimous, the vote?
12  A. It was.
13  Q. No one ran against you for that position?
14  MS. ZUCKER: Objection.
15  A. Not that I recall.
16  Q. Do you think people were surprised when you
17  became the vice chair?
18  MS. ZUCKER: Objection.
19  A. I was surprised when Mullen suggested it to
20  me, so yes, maybe people were surprised that I was
21  interested.
22  Q. Had other members on the BOS served longer
23  than you?
24  A. Yes.

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

---

11:19:38-11:20:10                                                    Page 57

1    Q.  Who?

2    A.  Larry, Ed, Mike Mullen.

3    Q.  So not Mike O'Loughlin?

4    A.  Me and Mike O'Loughlin were elected at the

5    same time.

6    Q.  When did you withdraw from the State Rep

7    race?

8    A.  I don't remember the exact date.  It was

9    the end of May, because I think there was a June 1

10   deadline to withdraw.

11   Q.  Did you withdraw on time?

12   A.  I did.  I think it may have been the day

13   before.

14   Q.  So May 31st, do you think?

15   A.  That's what I -- yes, I think.

16   Q.  Is there documentation that supports that?

17   A.  Sure, yes.  I had to submit a piece of

18   paper that says that I withdrew.

19   Q.  Submit to who?

20   A.  The Secretary of State I believe.

21   Q.  Why did you want to be a State Rep?

22   A.  I enjoyed being a Selectman, and I wanted

23   to make sure that we had a better representative

24   from our district.  Dave DeCoste was the current

---

11:20:45-11:21:24                                                    Page 58

1    representative in the district, and he really wasn't

2    responsive to a lot of the local needs.  And I was

3    approached by some people.  They suggested I run.

4    Then considering I was off from work, you know, I

5    had the time to do the work that it took to run and

6    do well, so I figured I'd go for it.

7    Q.  Who were the people who approached you to

8    run?

9    A.  Members of the Rockland Democratic Town

10   Committee and members of the Norwell Democratic Town

11   Committee.

12   Q.  Can you be specific.  Can you give me names?

13   A.  Amanda Metzger.  What's the other woman's

14   name... She's a doctor over in Norwell.  There's

15   another woman.  Natalia, and I can't remember her

16   last name right now.  Then there were people in the

17   Rockland Democratic Town Committee, Jeanne Bargout

18   and a few others, so.

19   Q.  Can you give me the few others?

20   A.  Just members of the Committee.

21   Q.  What were their names?

22   A.  I can't recall right now.

23   Q.  Anybody from the BOS?

24   A.  Maybe after I mentioned it to them.  They

---

11:21:44-11:22:10                                                    Page 59

1    may have been supportive, but I don't think anyone

2    approached me from the BOS.

3    Q.  And you said they may have been supportive

4    of it.  Can you be more specific as to who was

5    supportive of your State Rep --

6    A.  Ed and Mike Mullen.

7    Q.  Anyone else?

8    A.  Larry came to my kickoff.

9    Q.  Did he support you?

10   A.  I would think so.  He came to my kickoff.

11   Q.  Did he endorse you?

12   A.  No.  I wasn't really in the race long

13   enough to get multiple endorsements or anything.

14   Q.  You did get several endorsements, didn't you?

15   A.  I got some.

16   Q.  Did you get them from other members of the

17   BOS?

18   A.  Yes.  I think Mullen gave me one.

19   Q.  Anyone else?

20   A.  No.

21   Q.  Ed Kimball didn't endorse you?

22   A.  No.

23   Q.  Did you want to be a politician?

24       MS. ZUCKER:  Objection.

---

11:22:25-11:23:10                                                    Page 60

1    A.  Sure.

2    Q.  You were hoping to advance in state politics?

3    A.  Maybe.  I was hoping to get my feet wet and

4    see if I liked it.

5    Q.  Being a State Rep is a pretty high level

6    position compared to the BOS, right?

7    A.  I guess so.

8    Q.  What was your political dream at the time?

9    A.  At that point it was just to run for Rep.

10   Q.  That's it?  No higher aspirations?

11   A.  No.

12   Q.  What was your relationship like with

13   Mr. Chiocca before May 1st, 2018?

14   A.  It was -- I wouldn't say rocky, but we

15   disagreed sometimes.  I knew he had a hard job, and

16   I appreciated the work he did, but we disagreed

17   sometimes on different matters.

18   Q.  What types of matters?

19   A.  Different policies, decisions he was making

20   necessarily for the Town.  A lot of it was

21   decisions -- things he wasn't doing as opposed to

22   things he was doing.

23   Q.  What did you think he should be doing that

24   he wasn't doing?

---

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

11:23:32-11:24:03                                                                Page 61

1    A.  I know one of the things we talked about on
2  the Board is trying to get more input from
3  department heads at the meetings, and that idea was
4  sort of poo-pooed a lot.
5    Q.  Poo-pooed by Allan?
6    A.  Yes.
7    Q.  How so?  Can you be more specific.
8    A.  Just he would say that it was hard to get
9  the department heads to come afterwards, that, you
10  know, they are working during the day and it's hard
11  for him to get them to come in after hours because
12  it's outside their normal work schedule.  So it was
13  more difficult for him to get the department heads
14  to respond.
15    Q.  Did that seem unreasonable to you?
16    A.  What do you mean by "unreasonable"?
17    Q.  That he was saying the department heads
18  didn't want to come in after their long workdays.
19    A.  I didn't think -- I don't think the request
20  to the department heads would have been unreasonable
21  because we would have them coming in once every six
22  months.  You know, because there are multiple
23  department heads, we only met every other week.  So
24  it wasn't like someone would be there, you know, two

1:24:22-11:24:51                                                                Page 62

1  nights a month or anything.
2    Q.  So did you push back on him?
3    A.  Yes.  I would say we asked again.  We've
4  asked multiple times.
5    Q.  We or you?
6    A.  We.
7    Q.  So who else was asking?
8    A.  Mullen.
9    Q.  Anyone else?
10    A.  No.  I think just Mullen.
11    MS. CIESLAK:  Samantha, within five or so
12  minutes, I will need a restroom break.
13    MS. HALEM:  Sure.
14    MS. CIESLAK:  Thank you.
15    Q.  Did you consider yourself to be one of
16  Allan Chiocca's supervisors?
17    A.  He was a member of the Board and the Board
18  was his supervisor, so I was...
19    Q.  One of his supervisors?
20    A.  The Board is who he reports to and I'm a
21  member of the Board, so yes.
22    MR. CROTTY:  I object to the last question.
23    MS. HALEM:  Sorry?
24    MR. CROTTY:  I just object to the last

11:25:12-11:25:48                                                                Page 63

1  question.  I didn't want to talk over her.
2    MS. HALEM:  Okay.  Thank you.
3    Q.  Is Ed Kimball one of Allan Chiocca's
4  bosses, or was he one of Allan Chiocca's bosses on
5  May 1st, 2018?
6    A.  Yes, for the same --
7    MR. COOPER:  Objection.
8    This is no longer green (indicating).  It's
9  red.  So I don't know.
10    THE COURT REPORTER:  That's why it's hard
11  to hear.  Can you press it to green.
12    MR. COOPER:  I assume that it turned red
13  because it needs a battery.
14    MS. HALEM:  Just be loud.
15    THE COURT REPORTER:  Keep it near you as
16  opposed to in the middle of the table.
17    MR. COOPER:  Okay.
18    Q.  So what were -- you were saying as to my
19  question about was Ed Kimball one of Allan Chiocca's
20  supervisors on the Board of Selectmen?
21    MS. ZUCKER:  Objection.
22    MR. COOPER:  There was kind of two parts to
23  the question.
24    MR. CROTTY:  Let me object as well.

11:26:02-11:26:36                                                                Page 64

1    MR. COOPER:  But go ahead.  Do you have the
2  question?
3    THE WITNESS:  Yes, I have the question.
4    A.  I would say for the same reason I said yes
5  to the last question, that's why.  He's a member of
6  the Board, and the Board is the supervisory
7  authority over Allan, yes.
8    Q.  Was Ed Kimball his more senior boss because
9  he was the chair of the Board?
10    MS. ZUCKER:  Objection.
11    MR. CROTTY:  Objection.
12    A.  We all have an equal vote.
13    Q.  What powers does Ed Kimball have that the
14  other members of the Board don't have who are not
15  the chair?
16    MS. ZUCKER:  Objection.
17    MR. CROTTY:  Objection.
18    A.  He chairs the meetings.
19    Q.  Anything else?  Just that?
20    A.  I don't think there's anything official.
21    Q.  Did people come to him with issues
22  regarding the Board of Selectmen more because he was
23  the chair?
24    MS. ZUCKER:  Objection.

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

11:27:04-11:27:36                                                  Page 65

1    A.  I don't think they came to him because he
2    was the chair.  I think they came to him because he
3    was the most experienced member of the Board and had
4    the most time to really effect any real change in
5    the Town.  So if you had some particular issue that
6    you wanted addressed, even though Larry had been on
7    the Board for as long as Ed, Larry didn't have
8    really the time during the day that Ed did to sort
9    out the answers.
10        So I wouldn't say it was because he was chair.
11   Q.  So he had more influence in town goings-on
12   and politics, Ed Kimball?
13       MS. ZUCKER:  Objection.
14   Q.  In your opinion.
15       MR. CROTTY:  Objection.
16       MS. ZUCKER:  Objection.
17   A.  I don't know if he had more influence, but
18   he had more opportunity.
19   Q.  I said, "in your opinion."
20   A.  And I'm going to say I don't know if he had
21   more influence.
22   Q.  You don't know what your opinion is on
23   whether Ed Kimball had more influence than the other
24   members of the Board of Selectmen?

11:27:54-11:50:39                                                  Page 66

1    A.  I would say that we all had the equal
2    votes, so we all should have the same influence.
3        MS. CIESLAK:  Can we break within, like,
4    ten seconds?
5        MS. HALEM:  Yes, we can break.
6        Off the record.
7        THE VIDEOGRAPHER:  The time is now 11:27,
8    and we are off the record.
9        (Recess at 11:27 a.m.)
10       THE VIDEOGRAPHER:  The time is now 11:49.
11   We are back on the record.
12       BY MS. HALEM:  (11:49 a.m.)
13   Q.  Welcome back.  I just want to go over a
14   couple of quick things that we covered earlier.
15       When you -- did you read your interrogatory
16   responses before you signed them?
17   A.  I read them, yes.
18   Q.  Sitting here today, you believe everything
19   you said in your interrogatory responses you swear
20   is true?
21   A.  At the time I signed them, yes.
22   Q.  Are they now not true?
23   A.  No.  I believe they are accurate.
24   Q.  Did you read the written responses in the

11:50:59-11:51:37                                                  Page 67

1    documents -- your attorney's written responses to
2    our document requests that were submitted in this
3    case?  Did you follow that?
4    A.  No, I didn't.
5    Q.  Okay.  You understand that we -- that the
6    Plaintiff, submitted document requests to you, correct?
7    A.  Yes.
8    Q.  And that your attorneys drafted responses
9    on your behalf, correct?
10   A.  Correct.
11   Q.  Did you read them before they were
12   submitted to the other parties?
13       MS. ZUCKER:  Objection.
14   A.  I don't recall.  I can't recall.
15   Q.  Do you know what your attorney produced to
16   us document-wise?
17       MS. ZUCKER:  Objection.  Asked and answered.
18   A.  I have given them everything that I had.
19   So I don't --
20   Q.  That's not what I asked you.
21   A.  I don't know what they've produced.
22   Q.  And I apologize for not saying this at the
23   beginning.  Ken has asked me to say to you that I
24   should not talk over you and you should not talk

11:51:55-11:52:29                                                  Page 68

1    over me, and you should pause after my questions so
2    people can object, okay?
3    A.  Yes.
4    Q.  What I asked you was, do you know what your
5    attorneys produced to us?  Did you review those
6    documents?
7        MS. ZUCKER:  Objection.  Asked and answered.
8    Q.  Prior to today.
9    A.  I don't know what documentation that they
10   specifically produced to you, no.
11   Q.  Did you testify earlier that your old cell
12   phone, the one that you gave to your daughter, that
13   the data for that was transferred to your new cell
14   phone?
15   A.  Yes.
16   Q.  Who did the data transfer?
17   A.  The person at the T-Mobile store.
18   Q.  Did everything seem to make it over to the
19   new phone?
20   A.  I think so.
21   Q.  Did you check?
22   A.  I didn't check for everything that was on
23   the phone, but as --
24   Q.  I understand, but the texts that you had

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

11:52:46-11:53:21                                          Page 69

1  the day before with your husband, were they still
2  there the next day?
3       MS. ZUCKER: Objection.
4    A.  As of right now, I haven't found anything
5  that's missing.
6    Q.  Prior to May 1st, 2018, had Allan Chiocca
7  ever done anything that made you afraid of him?
8    A.  Prior to what date?
9    Q.  May 1st, 2018.
10   A.  Fearful, no.
11   Q.  Had you in fact gone to -- invited him to
12 dinner to discuss your State Rep race?
13   A.  No. I never invited him to dinner.
14   Q.  Did you go to dinner with him or lunch with
15 him to discuss your running for State Rep?
16      MS. ZUCKER: Objection.
17   A.  We had a lunch together, but we didn't
18 discuss me running for State Rep.
19   Q.  When was that?
20   A.  The lunch? It was while I was working at
21 the coffee shop. Because I paid with all ones and
22 he laughed at me.
23   Q.  When was that?
24   A.  I answered the question, at the coffee

1:53:45-11:54:13                                          Page 70

1  shop. It was sometime in -- between November of '17
2  and March of '18.
3    Q.  Did you invite him to lunch?
4    A.  Yes, I asked him to lunch.
5    Q.  And it's your testimony that you did not
6  discuss your potential run for State Rep?
7    A.  I don't recall discussing it at that lunch,
8  no.
9    Q.  Have you ever heard about Allan Chiocca
10 being physically violent with anyone?
11      MS. ZUCKER: Objection. You mean apart
12 from May 1? Are you asking about --
13      MS. HALEM: I asked the question, Ellen.
14      MS. ZUCKER: Are you asking prior to May 1?
15      MS. HALEM: I am asking the question.
16   A.  So what's the time period?
17   Q.  There is no time period. Have you ever
18 heard about him being physically violent with anyone?
19      MS. ZUCKER: Objection.
20   A.  Prior to anything happening with me, no.
21   Q.  Had he ever been physical with you prior to
22 May 1st, 2018?
23      MS. ZUCKER: Objection.
24   A.  No. No, I don't believe so.

11:54:34-11:55:14                                          Page 71

1    Q.  Had he ever sexually propositioned you
2  prior to May 1st, 2018?
3    A.  No.
4    Q.  Had he ever flirted with you prior to
5  May 1st, 2018?
6    A.  I wouldn't call it flirting, but he often
7  talked about other women that he saw in his career.
8    Q.  Any women --
9    A.  Other women that he had run into at some
10 point in his career, at bars, just women he sort of
11 socialized with.
12   Q.  How is that flirting with you?
13   A.  I said I don't think that's necessarily
14 flirting, but it's not appropriate. It's probably
15 about as far as it would go.
16   Q.  He talked about what in regards to these
17 other women?
18   A.  For instance, he's told a story about when
19 he was traveling, I don't know doing what, but he
20 was traveling for work. There was a woman at the
21 bar, and there was another man at the bar that was
22 also flirting with this woman, and this woman went
23 with him instead of a younger, more attractive man
24 that was flirting with her.

11:55:41-11:56:22                                          Page 72

1    Q.  And when did he tell you this story?
2    A.  In the spring maybe, spring of '18.
3    Q.  Spring, pre May 1st, 2018?
4    A.  Could be before or after, but he would say
5  things like that, stories like that regularly.
6    Q.  Give me some other examples.
7    A.  There were always just women that he would
8  meet while he was traveling. I don't know if he was
9  talking about the same woman every time or if it's
10 multiple instances, but he would -- he said that to
11 me on least three occasions, possibly four.
12   Q.  Did he travel as Town Manager for work?
13   A.  No, it wouldn't have been that. I think he
14 stayed the night somewhere when he went, but I don't
15 think he traveled far. I think it might have been
16 in Boston.
17   Q.  Traveled far for what, the stories he's
18 telling you? Did it occur in Boston?
19   A.  I don't know. I don't know where the
20 stories he's telling me occurred.
21   Q.  Do you know the time frame of the story
22 he's telling you?
23   A.  I do not.
24   Q.  Did you think he was interested in you

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

12:12:05-12:13:14                                        Page 77

1    Q. Did you find anything in there that you
2    disagreed with?
3    A. Just a few factual things.
4    Q. Let me know what you disagreed with.
5    A. When I was with the City of Quincy in 2017,
6    I held a different title.
7    Q. What paragraph is that?
8    A. 5.
9    Q. What title did you hold with the City of
10   Quincy?
11   A. The last year I was there, I was compliance
12   manager.
13        Sorry, I didn't get to mark what I already
14   went through, so I have to go back through it again
15   briefly.
16        (Examines document) Paragraph 18.
17   Q. What about it?
18   A. We have the receipt now, so I know how much
19   wine I consumed.
20   Q. Okay.
21   A. So that's five glasses.
22   Q. Do you know that you consumed five, or is
23   that based on the receipt?
24   A. Based on the receipt.

2:13:32-12:19:03                                        Page 78

1    Q. Sitting here today, do you have a memory of
2    consuming five glasses of wine?
3    A. No, but Allan did tell me in his office
4    that I had five glasses of wine.
5    Q. That wasn't my question.
6    A. Well, that's the other reason.
7    Q. Do you have a memory sitting here today of
8    drinking five glasses of wine?
9    A. At the bar, no.
10        (Examines document) 28, I don't have a
11   memory of realizing that my purse was in the restroom.
12   Q. Okay.
13   A. (Examines document) Paragraph 79, I
14   believe my attorney verbally said I was going to
15   resign, but I didn't submit my resignation letter
16   until, like, the next week, the letter itself.
17        (Examines document) That's it.
18   Q. Everything else is 100 percent accurate?
19        MS. ZUCKER: Objection.
20   Q. Correct?
21   A. Like I said, I reviewed it, and it seems to
22   be a fair representation of what happened.
23   Q. You've now read it twice, correct?
24   A. Yes.

12:19:17-12:20:14                                        Page 79

1    Q. Sitting here today?
2    A. Yes.
3    Q. And there's nothing else you want to
4    correct on the record?
5    A. I specifically corrected those things which
6    are things I noticed today.
7    Q. Was there anything you noticed on other
8    days that was incorrect when you reviewed the document?
9    A. I can only say what I noticed today. I
10   don't remember what I noticed on other days.
11   Q. But today you stand behind this document,
12   correct?
13        MS. ZUCKER: Objection.
14   A. This is my counterclaim. Yes.
15   Q. What do you recall telling Mr. Chiocca
16   that -- never mind. Strike that.
17        Paragraph 10, where we started, "In the
18   course of their discussions, certain Board members
19   expressed dissatisfaction with Mr. Chiocca's job
20   performance," do you see that?
21   A. Yes.
22   Q. Who were those?
23        MS. ZUCKER: Objection.
24   Q. What Board members are you referring to?

12:20:36-12:21:08                                        Page 80

1        MS. ZUCKER: Objection.
2    A. I can't tell whether this was the meeting
3    of the Board when we discussed the contract or if
4    this is just general dissatisfaction that I have
5    heard from other people like outside of the meeting.
6    Q. So if you read Paragraph 9, it says, "In or
7    around the spring of 2018."
8    A. When it says, "In the course of their
9    discussions," does that mean in the course of the
10   Board's discussions, formal discussions?
11   Q. No. I mean, you wrote this, right?
12        MS. ZUCKER: No. Actually, she didn't
13   write it.
14   Q. Well, this is your representation to the
15   Court of things that happened.
16        MS. ZUCKER: Objection.
17   Q. When you said, "In the course of their
18   discussions, certain Board members expressed
19   dissatisfaction," who were you referring to?
20        MS. ZUCKER: Objection. She did not write
21   this document.
22        MS. HALEM: She just said it's true.
23   Q. Go ahead.
24        MS. ZUCKER: That doesn't mean she wrote

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

---

**12:34:59-12:35:47**                                    Page 93

1   when you made those comments.
2       A.  I have given you some specific instances.
3       Q.  Did you tell me when those happened and who
4   was present and what you said?
5       A.  The plumbing inspector was probably in
6   April of '18.  The Esten School issue with
7   procurement, I don't know when that was.  And we
8   also had the issues with the school payroll.  There
9   was a problem with the school meeting payroll on
10  time, and the board was -- and I was -- upset with
11  how it was being handled at Town Hall.
12      Q.  By Eric Hart?
13      A.  Again, it was being handled by Eric Hart,
14  but he oversees Eric.
15      Q.  But would you agree with me that you were
16  critiquing what Eric Hart was doing regarding the
17  payroll issue?
18          MS. ZUCKER:  Objection.
19      A.  As I said, Eric was the one who was
20  handling it, but ultimately he reports to Allan.  So
21  if we need Eric to do something, we go through Allan
22  to get that done.
23      Q.  Moving on to where it says in that same
24  Paragraph 12, "In light of her municipal experience,

---

**2:36:13-12:37:02**                                    Page 94

1   Mr. Chiocca was concerned that - unless politically
2   marginalized or removed from office -- her oversight
3   of the Town could pose a challenge to the relatively
4   unfettered authority he had historically enjoyed as
5   Town Administrator," did I read that accurately?
6       A.  Yes.
7       Q.  What's the basis for that allegation?
8          MS. ZUCKER:  Objection.
9       A.  I worked many years for the City of Quincy
10  and gained some knowledge about how municipalities
11  operate and kind of the guidelines within which they
12  operate, and I would -- I think it bothered him that
13  I would make critiques on something that we were
14  doing, that it may not be consistent with the rules
15  or regulations associated with municipal management.
16      Q.  But what's your basis of your allegation
17  that he wanted you politically marginalized or
18  removed from office?
19      A.  Off the Board.
20      Q.  What's the basis of that?
21      A.  I think he wanted to continue to operate
22  the way he was operating, that there was a culture
23  in Town Hall that was -- you know, they gave him
24  some unfettered authority that allowed him to sort

---

**12:37:37-12:38:11**                                    Page 95

1   of manage day to day without any sort of check, and
2   I think that I was kind of coming in and questioning
3   that and pushing, you know, challenging the status
4   quo a little bit.
5       Q.  What did he do that gave you that
6   impression that he wanted you removed from the
7   Board?  What did he say or do?
8       A.  We argued a lot.
9       Q.  That's not what I asked you.  What did he
10  say or do specifically that made you form the
11  conclusion that he wanted you removed from the Board?
12      A.  We argued a lot.  I don't think he was
13  happy with me on the Board.
14      Q.  Okay.  And did he actually take any, to
15  your knowledge, efforts to remove you from the Board
16  or express that to someone prior to May 1st, 2018?
17          MS. ZUCKER:  Objection.
18      A.  I don't know what he expressed.
19      Q.  Did he ever tell you he didn't want you on
20  the Board?
21      A.  He made it clear that, you know, he
22  didn't -- that I was kind of a pain in the ass.
23      Q.  And how did he make that clear to you?
24      A.  Because anytime I would bring up anything,

---

**12:38:37-12:39:07**                                    Page 96

1   it would immediately get -- he would get a little
2   bit combative, and we couldn't have a discussion
3   where we just disagreed on things.  It would get --
4   it would be raised to like a combative level
5   instantaneously.
6       Q.  Do you allege that the conduct you allege
7   he engaged in on May 1st, 2018 was to accomplish
8   that goal, get you removed from the Board?
9          MR. COOPER:  Objection.
10         MS. ZUCKER:  Objection.
11      A.  I think that was in his mind, yes.
12      Q.  So he was trying to get you removed from
13  the Board?
14      A.  I think so.
15      Q.  How would that have operated?  How would
16  that get you removed from the Board?
17          MS. ZUCKER:  Objection.
18      A.  Technically they started a recall after all
19  this happened.  I could have been recalled publicly.
20      Q.  Are there any actions you believe that
21  Allan took to accomplish the goal of getting you
22  removed from the Board?
23          MS. ZUCKER:  Objection.
24      A.  Say that again.

---

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

---

12:39:34-12:40:11                                                    Page 97

1   Q.  Sure.  Were there any specific actions that
2   you are alleging that Allan took to get you removed
3   from the Board?
4   A.  Sure.  He released that report.
5   Q.  Anything else?
6   A.  I believe that he spoke about the incident
7   at a time when we were protecting confidentiality
8   and that that potentially blew up in our face.
9   Q.  Did you speak about the incident at the
10  time you were protecting confidentiality?
11  A.  Only to my husband, my attorney, and I
12  mentioned to two close friends that something
13  happened but didn't say anything else about it.
14  Q.  You told them something happened?
15  A.  Yes.  I told them I was working on
16  something --
17  Q.  Did you tell your family?
18      MR. COOPER:  Would you please let her finish.
19      MS. HALEM:  Sorry.
20  A.  I did not tell my family at that point, no.
21  Q.  You didn't tell your sister, brothers and
22  father?
23  A.  Not at that point, no.
24  Q.  When did you first tell them?

---

12:40:32-12:41:08                                                    Page 98

1   A.  After Fox News called Town Hall.
2   Q.  So if your interrogatories have a different
3   date on that, they would be wrong?
4   A.  The Town got a call from Fox News.  I was
5   told that Fox News called Town Hall.  Then within
6   the next couple of hours, I called my brothers and
7   my sister and my father.
8   Q.  What was the date on that?  Was it before
9   May 23rd?
10  A.  It may have been May 23rd.
11  Q.  But not before?
12  A.  No.  It was the day that Fox News called
13  Town Hall.
14  Q.  Did Allan Chiocca support your candidacy
15  for State Rep?
16      MS. ZUCKER:  Objection.
17  A.  I don't know.  I think he said some
18  supportive things about it, and other times he told
19  me I was making a big mistake, so.
20  Q.  When did your affair with Ed Kimball begin?
21  A.  Middle of March of 2018.
22      MS. ZUCKER:  Objection.
23  Q.  How did it begin?
24  A.  Ed and I --

---

12:41:34-12:42:03                                                    Page 99

1       MS. ZUCKER:  I am going to allow a certain
2   amount of questioning on this, but I am going to cut
3   it off at some point.  It is -- this area is the
4   subject of a motion to compel.  So you can ask --
5       MS. HALEM:  No.
6       MS. ZUCKER:  Yes.
7       MS. HALEM:  If you want to instruct her not
8   to answer, you can do that and we can take it up
9   with the judge, but no.
10  Q.  We are going to talk about the affair you
11  had with the affair.
12      MR. COOPER:  No, you are not.  It's not at
13  issue in this case other than the fact that it
14  happened and when it happened, and if you intend to
15  do something to embarrass and humiliate the Witness,
16  or my client, then I am going to urge Ms. Zucker to
17  instruct her client not to answer.
18      MR. SHAFRAN:  Then we are certainly going
19  to end up in court.
20      MR. COOPER:  Okay, but we are not going to
21  do something --
22      MS. HALEM:  You can put your objection on
23  the record.  Let's continue.
24      MR. COOPER:  -- that is solely geared

---

12:42:14-12:42:49                                                   Page 100

1   towards embarrassing and humiliating the Witness.
2       MR. SHAFRAN:  We are not trying to
3   embarrass anybody here.  These are two people that
4   were on the Board, undisputed, and we want to know
5   the scope of it.  So we are going to ask questions
6   about it.
7       MS. ZUCKER:  Well, we will give you --
8       MR. COOPER:  We will go on a
9   question-by-question basis.
10      MR. SHAFRAN:  Okay.  Go ahead.
11  Q.  When -- how did your affair with Ed Kimball
12  begin?
13  A.  We had become friends after being on the
14  Board and started spending more time together at the
15  beginning of 2018, and then the relationship became
16  intimate in mid-March.
17  Q.  Who made the first move?
18      MS. ZUCKER:  Objection.
19      I'm not going to let you answer that question.
20      MR. COOPER:  I don't even know what that
21  means.  Do you mean sexually?
22      MS. HALEM:  Yes, I mean sexually.
23      MR. COOPER:  Okay.  I urge you to instruct
24  the Witness not to answer.

---

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

12:42:59-12:43:34                                    Page 101

1        MS. ZUCKER: I instruct the Witness not to
2   answer.
3        Q.   Were you the aggressor in your relationship
4   with Ed Kimball?
5        MS. ZUCKER: I instruct the Witness not to
6   answer that question.
7        MR. SHAFRAN: Just keeping answering --
8   asking every question on the record.
9        MR. COOPER: Go right ahead.
10       Q.   When did your relationship with Ed Kimball
11  end?
12       A.   In the end of April 2018.
13       Q.   And did it end because Ed Kimball broke it
14  off?
15       A.   Yes.
16       Q.   During that time period, did anyone know
17  you were having an affair with Ed Kimball other than
18  you and Ed Kimball?
19       MS. ZUCKER: Objection.
20       A.   No.
21       Q.   How often were you seeing each other during
22  that time period?
23       MS. ZUCKER: I instruct you not to answer.
24  I don't know what seeing him means but --

.2:43:51-12:44:22                                    Page 102

1        MS. HALEM: Having an affair.
2        MS. ZUCKER: I'm instructing you not to
3   answer that.
4        A.   I've been instructed not to answer.
5        Q.   How much time were you spending with Ed
6   Kimball during the time you were having an affair
7   with him?
8        MS. ZUCKER: Objection. I don't understand
9   the question. There may be a question in there that
10  I will not instruct her not to answer. Can you
11  rephrase that.
12       Q.   How much time were you spending with Ed
13  Kimball between the middle of March and the end of
14  April 2018?
15       MS. ZUCKER: For any purposes whatsoever?
16       MS. HALEM: Any purposes whatsoever.
17       MS. ZUCKER: You can answer that question.
18       A.   We went to Board meetings a lot together.
19  We would socialize after Board meetings.
20       Q.   Alone or with other people?
21       A.   Sometimes with other people, sometimes alone.
22       Q.   When you socialized with him alone, were
23  you at his house?
24       MS. ZUCKER: Objection. I'm going to

12:44:39-12:45:06                                    Page 103

1   instruct you not to answer.
2        Q.   Did you ever take Ed Kimball to your house?
3        MS. ZUCKER: Objection. I'm going to
4   instruct you not to answer.
5        Q.   Did you tell Regina Ryan that your affair
6   mostly occurred at your house?
7        MS. ZUCKER: Objection. I am going to
8   instruct you not to answer.
9        Q.   Did you ever travel with Ed Kimball
10  anywhere while you were having an affair with him?
11       MS. ZUCKER: Objection. I instruct you not
12  to answer.
13       Q.   Did you talk with Ed Kimball regularly on
14  the phone during that time period?
15       A.   Yes.
16       Q.   Would you have long conversations with him
17  during that time period --
18       MS. ZUCKER: Objection.
19       Q.   -- on the telephone?
20       MS. ZUCKER: If you can answer what "long"
21  means, you can have that answer.
22       A.   We had a couple of conversations that I
23  would consider long, but I would say we spoke
24  frequently but not necessarily at great length.

12:45:27-12:46:03                                    Page 104

1        Q.   Did you text with Ed Kimball during that
2   time period?
3        A.   Yes.
4        Q.   What's your understanding of why Ed Kimball
5   cut off the affair with you? Why did he end it?
6        MS. ZUCKER: Objection. You can answer.
7        A.   He had to tell his wife.
8        Q.   And you wanted to continue on with the
9   affair, correct?
10       A.   At the time I -- yes, I wanted to stay in
11  the intimate relationship with him, yes.
12       Q.   And you remained close to him after the
13  affair -- the sexual part of the affair ended; is
14  that correct?
15       A.   Yes, we still spoke.
16       Q.   I asked if you remained close with him.
17       A.   What's close?
18       Q.   Did you see each other regularly, speak
19  regularly, text regularly?
20       MS. ZUCKER: Objection. You can answer as
21  you see fit.
22       A.   We didn't text much. We spoke sometimes.
23  We emailed.
24       Q.   How often did you speak to him?

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

12:46:29-12:47:00                                              Page 105

1         MS. ZUCKER: Objection.  Time frame?
2    Q.  Immediately after the relationship ended.
3         MS. ZUCKER: Objection.
4         MR. COOPER: Objection.
5    A.  At that time all of our communications were
6    related to Town business.
7    Q.  All of them?
8    A.  When we spoke, yes.  Most of the time, yes.
9    Q.  So would they be fairly short phone
10   conversations?
11   A.  Some of them.
12   Q.  Were any of them lengthy?
13   A.  Possibly.
14   Q.  But they were always about Town business?
15   A.  I would say the majority of them were, yes.
16   Q.  Was his wife monitoring your contact with him?
17        MS. ZUCKER: Objection.
18   Q.  If you know.
19   A.  Yes, she was.
20   Q.  Why did you want the relationship with Ed
21   Kimball to continue?
22   A.  I really cared a lot about Ed, and the
23   relationship brought a lot to my life.  You know, I
24   felt very safe around him.  I was able to let my

12:47:31-12:48:03                                              Page 106

1    guard down.  And it was not just when I was with
2    him.  Just having him kind of in my circle kept me
3    more at ease in my day-to-day life.
4    Q.  Other than when you were here for the
5    depositions, have you been in Ed Kimball's presence,
6    physical presence since you resigned from the Board?
7    A.  Maybe, yes.  Yes, I have.
8    Q.  Frequently?
9    A.  No.
10   Q.  How many times?
11        MS. ZUCKER: Objections.
12   A.  Maybe four.
13   Q.  Were you alone with him?
14   A.  We were in public places.
15   Q.  That's not what I asked.  Were there any
16   members of your family or his family present?
17   A.  No, I don't believe so.
18   Q.  Were any friends or associates with you?
19        MS. ZUCKER: I'm going to stop this line of
20   questioning.
21        MS. HALEM: Are you instructing her not to
22   answer?
23        MS. ZUCKER: I am.
24        MR. SHAFRAN: As Plaintiff we are not

12:48:13-12:48:37                                              Page 107

1    allowed to know if she was present with Ed after the
2    lawsuit was filed?
3         MR. COOPER: She already answered that.
4         MS. ZUCKER: What is the possible relevance
5    of that?
6         MS. HALEM: It's not an objection, Ellen.
7         MR. COOPER: If you are asking about
8    whether they had sex --
9         MR. SHAFRAN: No, we're not asking that.
10   Did we ask that?
11        MR. COOPER: Okay.  Well, it certainly
12   contained --
13        MR. SHAFRAN: We stated a claim for a
14   conspiracy between him and Mr. Kimball.  We are
15   entitled to know if they were in each other's
16   presence after the lawsuit was filed, after she
17   filed the counterclaim, where they were, what they
18   were doing.  We are entitled to know that.
19        MS. ZUCKER: Because you say the conspiracy
20   has to do with the two of them talking to one
21   another after all of this is --
22        MS. HALEM: We are not going to argue all
23   day.
24        MR. SHAFRAN: Sure.  They could be talking

12:48:50-12:49:19                                              Page 108

1    about what they are going to say at these depositions.
2         MR. COOPER: Well, why don't you ask that.
3         MS. ZUCKER: Why don't you ask that question.
4         MR. SHAFRAN: We're trying.
5         MS. ZUCKER: No, you're not.  Then ask a
6    relevant question.
7         MR. SHAFRAN: She asked, was Deirdre in the
8    presence of Ed, and from there you objected and
9    said, "I'm not allowing this line of questioning."
10   So let us ask it.
11        MS. ZUCKER: Okay.  So let's see what the
12   next question is.
13   Q.  When was the first time after you resigned
14   from the Board of Selectmen that you were in the
15   presence of Ed Kimball?
16   A.  I don't really remember the order of the
17   times.  Like, I wouldn't know which was first.  I
18   just know the times that we -- like, what we did
19   when we were together.
20   Q.  Tell me what you know what you did when you
21   were together.
22        MS. ZUCKER: I am going to object and
23   instruct her not to answer.  You have to ask a
24   question that is more tightly connected to the case.

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

12:49:39-12:50:03
Page 109

1       MS. HALEM: She's telling me that she
2 doesn't have the answer.
3   Q. Where were you when you met with Ed Kimball?
4   A. We got coffee once at a place in Hanover.
5   Q. Called?
6   A. I don't know what it's called. It's on the
7 corner of 139 and 53.
8   Q. And what were you two discussing?
9   A. We talked about his son.
10   Q. Did you talk about anything else?
11   A. All I remember is we talked about his son.
12   Q. Do you remember talking about this case?
13   A. I don't recall.
14   Q. Do you remember talking about Allan Chiocca?
15   A. I don't recall.
16   Q. What were you talking about regarding his
17 son?
18       MS. ZUCKER: Objection. I'm going to
19 instruct you not to answer.
20       MS. HALEM: I just want to find what it's
21 about. It's not crossing the line.
22       MS. ZUCKER: Well, it did.
23       MR. COOPER: If it has anything to do with
24 health information, I would ask that she be

12:50:17-12:50:42
Page 110

1 instructed not to answer.
2       MS. ZUCKER: I will instruct her not to
3 answer.
4       MS. HALEM: If it has to do with health
5 information.
6   A. I'm not going to answer.
7   Q. Is it because it's about health information?
8   A. I've been instructed --
9       MS. HALEM: She has to answer.
10       MR. COOPER: She can answer that yes or no.
11   A. Yes.
12   Q. The next time you remember -- when was that
13 meeting?
14   A. It was in the fall.
15   Q. Of?
16   A. 2018.
17   Q. The next time you remember meeting with Ed
18 Kimball?
19   A. I met with him at this local place in
20 Abington. It's like a roast beef place I think.
21   Q. Going back to the first meeting -- and we
22 will get to the one you just mentioned -- how long
23 was that meeting?
24   A. I don't recall.

12:51:01-12:51:28
Page 111

1   Q. Was it longer than a half hour?
2   A. Yes.
3   Q. Longer than an hour?
4   A. Yes.
5   Q. Longer than two hours?
6   A. Probably two hours.
7   Q. Did you touch each other during that meeting?
8       MS. ZUCKER: Objection. I'm going to
9 instruct her not to answer.
10   Q. The second meeting you mentioned, you said
11 it was at a roast beef place?
12   A. A roast beef place, yes.
13   Q. Where was that?
14   A. In Abington.
15   Q. And when was that?
16   A. Again, at the fall of '18, but I can't
17 place the month.
18   Q. Do you know which one occurred first or
19 second?
20   A. I don't.
21   Q. In close proximity to each other?
22   A. I don't know what "close" would be.
23   Q. Well, fall is roughly, would you agree with
24 me, three months?

12:51:43-12:52:21
Page 112

1   A. Okay, yes.
2   Q. So both meetings occurred within that
3 three-month period?
4   A. Yes.
5   Q. And anyone else present for that meeting?
6   A. No.
7   Q. Did your spouses know you were meeting both
8 times?
9       MS. ZUCKER: Objection. To the extent that
10 that question asks you to reveal any spousal
11 communications that you had, you are instructed not
12 to answer.
13       MR. SHAFRAN: No, it doesn't.
14       MS. HALEM: It doesn't.
15       MS. ZUCKER: If it does.
16   A. Then, I won't answer.
17   Q. Do you have an understanding of whether Ed
18 Kimball's wife was aware you were meeting with Ed
19 Kimball for two hours on one day and -- how long was
20 the second meeting?
21   A. I don't know, 40 minutes.
22   Q. Was Ed Kimball's wife to your knowledge
23 aware of those meetings?
24   A. I don't know.

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. 1
July 22, 2021

12:52:38-12:53:03                                    Page 113

1    Q.  Did he tell you?
2    A.  Not that I know of, not that I recall.
3    Q.  Are you aware of whether your husband was
4    aware you were meeting with Ed Kimball?
5        MS. ZUCKER: Objection.  To the extent that
6    your awareness -- your communications with your
7    husband rely on your spousal communications, I
8    instruct you not to answer.
9        MR. SHAFRAN: I'm just going to say for the
10   record that is not the scope of the privilege.  The
11   scope is regarding --
12       MR. COOPER: That's exactly what you guys
13   asserted.
14       MR. SHAFRAN: No.  You asked about content.
15   We're asking about knowledge.
16       MR. COOPER: Go back and read the
17   transcript.  That's exactly the instruction you gave.
18   A.  I'm not going to answer.
19       MS. ZUCKER: I'm instructing her not to
20   answer.
21   Q.  Did you text with your husband that you
22   were with Ed Kimball that day?
23   A.  I don't believe I texted, no.
24   Q.  Do you normally tell your husband where you

12:53:22-12:54:06                                    Page 114

1    are?
2    A.  Yes.
3        MS. ZUCKER: Objection.
4        Give me time to object.
5        Spousal communications.
6    Q.  When was the next time you met with Ed
7    Kimball?
8    A.  I think he was going to get pizza for his kid.
9    Q.  You ran into him?
10   A.  No.  We met.  I met him there.
11   Q.  Going back to the second conversation, did
12   you discuss this lawsuit with him at that time?
13   A.  I don't recall.
14   Q.  What do you recall of that discussion at
15   the roast beef place?
16   A.  Nothing -- I don't recall anything from the
17   discussion.  I don't remember what we talked about.
18   Q.  How did you coordinate these meetings with
19   Ed Kimball?
20       MS. ZUCKER: Objection.
21   A.  I don't remember.
22   Q.  Did you text each other?
23   A.  I don't think we would be texting, no.
24   Q.  Did you call each other?

12:54:26-12:54:56                                    Page 115

1    A.  Possibly.
2    Q.  You said before that you communicated with
3    Ed Kimball via email; is that correct?
4    A.  Yes.
5    Q.  During the period of May 1st, 2018 through
6    the time you resigned from the Board; is that true?
7    A.  Yes.
8    Q.  Did you delete any of those emails?
9    A.  No.
10   Q.  You kept all of them?
11   A.  All of them.
12   Q.  And did you turn them over to your attorneys?
13   A.  I did.
14   Q.  The third meeting that you had he was
15   picking up pizza for his son; is that what you said?
16   A.  Yes.
17   Q.  So you arranged to meet him at that pizza
18   place?
19   A.  I didn't arrange anything, no.
20   Q.  Who arranged -- you said it was not that
21   you just ran into him, it was planned, correct?
22   A.  Yes.  I think he may have told me he was
23   going to be there.
24   Q.  Did he know you were coming?

12:55:15-12:55:50                                    Page 116

1    A.  Yes.
2    Q.  So it was a planned meeting?
3    A.  I guess, yes.
4    Q.  And how did you plan that?
5    A.  I don't remember.  I'm sorry.  I don't
6    remember.
7    Q.  How long was that meeting?
8    A.  It was short, maybe 20 minutes.
9    Q.  What was the purpose of the meeting?
10   A.  We were just chatting, just seeing each
11   other.  He asked me to look up something at the law
12   library for him.
13   Q.  Is that why you met, so he could ask you to
14   look up something at the law library?
15   A.  No.  He asked -- I had already done it.
16   Q.  What was the purpose of the other two
17   meetings?
18       MS. ZUCKER: Objection.
19   A.  There was no purpose.
20   Q.  Just friendly getting together?
21   A.  Yes.
22   Q.  What did you look up at the law library for
23   him?
24       MR. COOPER: Well, to the extent that he

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

12:56:08-12:56:43                                        Page 117

1    was seeking legal advice, I object on privilege
2    grounds.
3        Q.   Are you Ed Kimball's attorney?
4        A.   No.
5        Q.   What were you looking up for him at the law
6    library?
7            MR. COOPER: To the extent that he asked
8    you to do something that drew upon your legal
9    expertise and he has a privilege, I instruct you not
10   to answer.
11       A.   I'm not going to answer.
12       Q.   Do you represent in any way, shape or
13   fashion anyone in a legal capacity?
14           MR. COOPER: Did she ever represent anyone
15   in a legal capacity?
16       Q.   Right now sitting here today, are you
17   someone's attorney?
18           MR. COOPER: Why is that relevant?
19           MS. HALEM: I'm just asking the question.
20   Relevancy is not an objection.  Thank you.
21           MR. COOPER: Well, when it comes to a
22   privilege, yes.
23           MS. HALEM: It is not a privilege.  I'm
24   asking is she's someone's attorney.

2:56:57-12:57:19                                        Page 118

1        Q.   Are you an attorney -- are you representing
2    anyone today as an attorney?
3        A.   I have appearances in for a couple of
4    friends in some District Court cases, yes.
5        Q.   So you do work as an attorney today?
6        A.   I don't get paid.  They are just friends.
7    I do it for them.
8        Q.   What types of cases?
9        A.   Well, they are debt collection cases.
10       Q.   Did you ever understand yourself to be Ed
11   Kimball's attorney?
12           MS. ZUCKER: Objection.  I'm going to
13   instruct you --
14           MS. HALEM: You cannot.  That's his privilege.
15           MR. COOPER: No, no.  If you would like to
16   go off the record so I can drill down and find out
17   what this is about and whether I should be asserting
18   a privilege, I'm happy to do that.
19           MS. HALEM: Whether or not someone
20   represents another person --
21           MR. SHAFRAN: So let's go off the record.
22           (Discussion off the record)
23           (Recess at 12:57 p.m.)
4            THE VIDEOGRAPHER: The time is 1:01.  We

13:02:11-13:02:42                                       Page 119

1    are back on the record.
2            MR. CROTTY: (1:01 p.m.)  Folks, can I ask
3    you, what is your intention in terms of how long you
4    are going to go before we have lunch?
5            MS. HALEM: Just give me a half hour, maybe
6    less, hopefully less.  Let's see how quickly we can
7    get through it without objections.  That would help.
8    But I'm not going to stop you.
9            MS. ZUCKER: Thank you.
10           MS. HALEM: But that causes delays.
11       BY MS. HALEM:
12       Q.   Did either you or Ed Kimball -- did you
13   discuss with Ed Kimball whether or not it was
14   appropriate for two members of the Board of
15   Selectmen to have an affair with each?
16       A.   I don't think we discussed that, no.
17       Q.   Did we exhaust all the meetings you had
18   with Ed Kimball, or were there more than three?
19           MS. ZUCKER: Objection.
20       A.   I believe there were three.
21       Q.   Any others that you remember?
22       A.   Not that I can recall right now.
23       Q.   And the third one, did that also occur in
24   the fall of 2018?

13:02:59-13:03:35                                      Page 120

1        A.   They were all in the fall.
2        Q.   Of 2018?
3        A.   Yes, of 2018.
4        Q.   And you don't have any other time alone in
5    Ed Kimball's presence between 2018 and today,
6    November -- well, excuse me -- the fall of 2018 and
7    today?
8        A.   Correct.
9        Q.   Do you think it was appropriate for two
10   members of the Board of Selectmen to have an affair
11   with each other?
12       A.   I guess I didn't think about it in terms
13   of -- I guess I didn't think about it in terms of
14   that.  It just wasn't something I thought about.
15       Q.   Were you concerned it was a conflict of
16   interest?
17           MS. ZUCKER: Objection.
18       A.   I didn't think it influenced or had any
19   effect on what votes I would be taking on the Board,
20   no.
21       Q.   As an attorney, could you see how someone
22   might think it would be a conflict of interest?
23           MR. COOPER: Objection.
24           MS. ZUCKER: Objection.

Allan Chiocca vs.
The Town of Rockland, et al.

**Video Deposition**

Deirdre Hall - Vol. I
July 22, 2021

---

13:03:51-13:04:27                                                      Page 121

1    A.   As I said, I don't think that it impacted
2    any votes I took on the Board.
3        Q.   That wasn't the question.  As an attorney,
4    do you see how someone would have thought it was a
5    conflict of interest that two members of the Board
6    of Selectmen were having a sexual affair with each
7    other?
8            MR. COOPER:  Objection.
9            MS. ZUCKER:  Objection.  She is not here as
10   an expert.  She is here as a person.
11           MR. CROTTY:  Objection.
12           MS. HALEM:  That's your opinion.
13   A.   I don't know.  I get -- I don't know.
14   Q.   Did it create an appearance of impropriety?
15           MS. ZUCKER:  Objection.
16   A.   I think it's possible that people may have
17   thought that it could, but I don't think it did.
18   Q.   Do you think the other members of the Board
19   of Selectmen had a right to know that you were in a
20   sexual relationship with the chairman of the Board
21   of Selectmen while on the Board?
22           MS. ZUCKER:  Objection.
23   A.   I don't think that the Board of Selectmen
24   have a right to know who I am in a relationship

---

13:04:48-13:05:25                                                      Page 122

1    with, no.  I think that's private and personal.
2    Q.   You don't think Mike Mullen, O'Loughlin or
3    Larry Ryan had a right to know you were having a
4    sexual relationship with the chairman of the Board?
5            MS. ZUCKER:  Objection.
6    A.   Our relationship was private and personal,
7    and I don't believe it was any other Board member's
8    business.
9    Q.   You did not consider disclosing it to them,
10   did you?
11   A.   I did not consider disclosing it to anyone.
12   Q.   Do you think the people of the Town of
13   Rockland had a right to know that you were having --
14   that two members OF the Board of Selectmen were
15   having an affair?
16           MS. ZUCKER:  Objection.
17   A.   Again, I think it's private and personal
18   and it's not open for public view.
19   Q.   Did Ed Kimball work on your campaign after
20   your affair ended?
21           MS. ZUCKER:  Objection.
22   A.   I think he -- I dropped some turf off to
23   him, and he would help me identify people in the
24   town that I was going to be knocking on doors on.

---

13:06:02-13:06:26                                                      Page 123

1    Q.   What is -- did you say "turf"?
2    A.   Turf.  So like turf lists.  So lists of
3    houses that I'm going to go door knock.
4            THE COURT REPORTER:  Would you repeat that.
5            THE WITNESS:  Sure.
6    A.   So lists of homes that I would door knock
7    as part of my campaign, and he may be able to say,
8    "Oh, this person is a police officer, and this
9    person is on the fire department, and this person is
10   the dog catcher," or whatever.  Because I don't know
11   every single person that works for the Town.  So it
12   was helpful for me to know whose door I was knocking
13   on before I knocked it.
14   Q.   When did your husband first learn that you
15   were having an affair with Ed Kimball?
16           MS. ZUCKER:  I'm going to object and
17   instruct you not to answer to the extent that an
18   answer would require you to reveal marital
19   communications.
20   A.   I'm not going to answer.
21   Q.   If your relationship with Ed Kimball was
22   private and personal, why did you tell Allan Chiocca?
23           MS. ZUCKER:  Objection.
24   A.   I think that evening I had too much to

---

13:06:57-13:07:24                                                      Page 124

1    drink, and I said something that ordinarily I would
2    have kept private.
3    Q.   Did you not say it at the beginning of the
4    evening when you first got to the bar?
5    A.   No, I didn't say it at the beginning of the
6    evening.
7    Q.   When did you say it?  How far in the
8    evening were you?
9            MS. ZUCKER:  Objection.
10   A.   I don't recall.  I don't have a memory of
11   saying it.
12   Q.   Sitting here today, you don't remember
13   telling him you were having an affair with Ed
14   Kimball at the bar that evening?
15   A.   Correct.
16   Q.   Do you deny you told him?
17   A.   Based upon other things I remember, I
18   assume that I told him.  It can be inferred that I
19   told him.
20   Q.   You have no present memory of ever
21   discussing your affair with Ed Kimball with Allan
22   Chiocca?
23           MS. ZUCKER:  Objection.
24           MR. COOPER:  That evening?

---

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

13:07:46-13:08:10                                                           Page 125

1           MS. HALEM: That evening.  Thank you.
2      A.  No.
3      Q.  Do you think it was appropriate to tell
4  Allan Chiocca you were having an affair with Ed
5  Kimball?
6           MS. ZUCKER: Objection.
7      A.  I don't think it was appropriate for me to
8  have told him, but I also don't think it was
9  appropriate for me to have been in the condition I
10  was in when I told him.
11     Q.  How do you know what condition you were in
12  when you told him?  You don't remember when you told
13  him.
14     A.  That's how I know I was not in a good
15  condition.
16     Q.  So you wouldn't have told him, in your
17  opinion, if you hadn't had too much to drink?
18          MR. COOPER: I object to the form of the
19  question.
20          MS. ZUCKER: Objection.
21     A.  Correct.
22     Q.  How do you know that?
23     A.  Because I hadn't told anybody.
24     Q.  You hadn't told anyone that you were having

13:08:26-13:08:56                                                          Page 126

1  an affair with Ed Kimball?
2      A.  Correct.
3      Q.  And at that point in the evening, Dawn
4  Kimball had texted you, correct?
5           MS. ZUCKER: Objection.
6      A.  Yes.
7      Q.  Did you tell Allan Chiocca or do you
8  remember if you told Allan Chiocca after the first
9  text?
10     A.  I didn't tell him after the first text, no.
11     Q.  Do you think you told him after the second
12  text?
13          MS. ZUCKER: Objection.
14     A.  I believe the text came in one at one point
15  in time and then three.  The next time there were,
16  like, three.
17     Q.  In close proximity?
18     A.  Yes.
19     Q.  Do you think you told him after the three?
20          MS. ZUCKER: Objection.  To the extent you
21  have a memory.
22     A.  I don't recall when I told him.
23     Q.  Do you recall having a conversation with Ed
24  Kimball that night at the bar?

13:09:09-13:09:52                                                          Page 127

1      A.  Yes.  I recall having a conversation with
2  him on the phone.
3      Q.  You remember that conversation?
4      A.  Yes.
5      Q.  What did you say during that conversation?
6      A.  He called me on the phone at about ten past
7  8:00, and I took the call outside.  He told me that
8  he had told his wife that we had had a physical
9  relationship, that we were intimate; and I told him
10  I was concerned, and he generally said that I didn't
11  need to be concerned.
12     Q.  Did he say why you didn't need to be
13  concerned?
14     A.  No.  The call was short.  It was only,
15  like, three or four minutes.
16     Q.  And it was on your cell phone?
17     A.  Yes.
18     Q.  Did you come back and tell Allan Chiocca
19  anything about that phone call?
20     A.  I came back in and told him that -- well,
21  before I left, I told him Ed was on the phone.  So
22  he knew before I went outside to take the call that
23  it was Ed.  Then I came back in and said that he was
24  okay but that I was concerned.

13:10:20-13:10:51                                                          Page 128

1      Q.  And you don't remember if you thereafter
2  told him that you had a relationship with Ed Kimball?
3           MS. ZUCKER: Objection.  Asked and answered.
4      A.  No, I don't remember telling him that.
5      Q.  Did he ask you why you were concerned?
6      A.  I believe so, yes.
7      Q.  What was your demeanor like when you told
8  your husband you were having AN affair with Ed
9  Kimball?
10     A.  My demeanor?
11          MS. ZUCKER: Objection.
12     Q.  Yes.
13          MS. ZUCKER: Objection.
14     Q.  Were you upset?  Were you --
15     A.  I don't remember.
16          MR. COOPER: How is that not asking for a
17  spousal communication?
18          MS. HALEM: I didn't ask for the actual
19  communication.
20          MR. COOPER: Sure you did.
21          MS. HALEM: I did not.
22          MR. COOPER: Yes, you did.
23          MS. HALEM: You can instruct her, if that's
24  what's going on.

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

13:14:56-13:16:15                                    Page 133

1   Q.  Did you abide by her request?
2   A.  I did.
3   Q.  Did Mr. Kimball?
4   A.  I don't know what requests she made of him.
5   Q.  As you understood it, when you were allowed
6   to speak to each other only about BOS business,
7   things like that, did he comply with that?
8       MS. ZUCKER: Objection.
9   A.  I don't know.  Like I said, I don't know
10  what the parameters were for him.
11      MS. ZUCKER: Before you get into another
12  line, when are we going to take a lunch break?
13      MS. HALEM: When we're done with this one.
14          (Document marked as Hall
15          Exhibit 4 for identification)
16  Q.  Do you recognize these documents?  You can
17  just flip through them for now.
18  A.  (Examines document)
19      MS. ZUCKER: Are you okay?
20      THE WITNESS: Yes, I'm fine.  I'm just
21  making sure what they are.
22      MR. CROTTY: Samantha, could you identify
23  those for the record.
24      MS. HALEM: Oh, I'm so sorry.  These are

13:16:43-13:17:25                                    Page 134

1   text messages between Dawn Kimball and Deirdre Hall
2   starting on May 1st, 2018 -- I assume 2018 --
3   through May 5th, it looks like.
4       MR. CROTTY: Are they Bates stamped?
5       MS. HALEM: They are not.
6       MS. ZUCKER: Could we be in the habit
7   please of using Bates stamped documents, just so we
8   all know that they have actually been produced in
9   this matter.
10      MS. HALEM: Sure.
11      MS. ZUCKER: Okay.  That would be great.
12  Q.  Ms. Hall, do you recognize these documents?
13  A.  I do.
14  Q.  Were these texts from Dawn Kimball to you?
15  A.  Well, we texted each other.
16  Q.  Fair enough.  Do you have any reason to
17  believe these are not the texts between you and Dawn
18  Kimball?
19  A.  They appear to be the texts between me and
20  Dawn Kimball.
21  Q.  The first text on May 1st at 6:58 p.m., was
22  that while you were chairing the BOS meeting that
23  night?
24  A.  Yes.  I believe it came in while I was out

13:17:46-13:18:20                                    Page 135

1   chairing the meeting.
2   Q.  Did you see it at that time?
3   A.  I didn't see it before I went out for the
4   meeting, no.
5   Q.  Did you see it after the meeting?
6   A.  I saw it after the meeting.
7   Q.  When do you recall seeing it for the first
8   time?
9   A.  When I went back into the office after the
10  meeting.
11  Q.  What office?
12  A.  Allan's office.  Usually -- after the
13  meeting, we'd usually step down and go into his
14  office and exit through his office.
15  Q.  Were the other BOS members with you?
16  A.  They were probably in the room, yes.
17  Q.  Prior to this text, did you know that Dawn
18  Kimball was aware of the affair?
19  A.  I knew that she was aware that Ed had told
20  her that our relationship had been -- whether we had
21  an emotional relationship, but I just wasn't sure if
22  he had gone beyond that.
23  Q.  What does that mean, "an emotional
24  relationship"?

13:18:50-13:19:29                                    Page 136

1       MS. ZUCKER: Objection.
2   A.  Well, what I consider it to be is just
3   being caring about someone, sharing an affection.
4   Q.  So you knew that Ed had told Dawn that --
5   Dawn Kimball, his wife -- that you were having a
6   emotional relationship.  So something more than
7   friendship?
8       MS. ZUCKER: Objection.
9   A.  From what he told me that he told her --
10      MS. ZUCKER: I'm going to object.  Be
11  careful with --
12      MS. HALEM: No.
13      MS. ZUCKER: -- regard to the marital
14  disqualification.
15      MS. HALEM: No, no.  She's going to testify
16  as to what other people told her.
17  A.  I just know that he told her that he was
18  having -- that the relationship was emotional in
19  nature.
20  Q.  And did he explain to you what that meant?
21  A.  He didn't explain it to me, no.
22  Q.  So this was the first time you knew that
23  Dawn Kimball was upset with you, this first text,
24  correct?

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

13:19:56-13:20:27
Page 137

1    MS. ZUCKER: Objection.
2    A.  Yes, this was the first time I knew that
3    Dawn was upset.
4    Q.  And reading it for the record, "I know what
5    happened.  You make me sick," did I read that
6    accurately?
7    A.  That's what it says.
8    Q.  And the next text -- so in between your
9    receiving this text, did you decide to go to RBG
10   that night?
11   A.  After the meeting I decided to go to RBG.
12   Q.  And you already read this text, correct?
13   A.  That text, yes.
14   Q.  Had you received this next text chain, the
15   three that you mentioned before?  It looks like it
16   came in at 8:33.  You had not received those yet,
17   correct?
18   A.  Correct.
19   Q.  So you were at RBG when you received the
20   text that reads, "Yes this is Dawn.  Did you think I
21   really wouldn't find out?  Your a disgusting human
22   being.  The both of you are disgusting.  I am not
23   about threatening anyone just so you know.  But I
24   haven't decided how I'm going to handle this.

13:20:54-13:21:31
Page 138

1    35 years of marriage now means nothing and I have
2    you two to thank for that," did I read that accurately?
3    A.  I believe so.
4    Q.  How did you feel when you got this text?
5    A.  I felt horrible.
6    Q.  Why?
7    A.  I felt really bad.  I didn't -- it was
8    never my intention to hurt anybody.  Obviously it
9    was extremely meaningful to her, and it was, you
10   know, partially my fault.
11   Q.  Did you think she had a right to know that
12   you were having an affair with her husband?
13       MS. ZUCKER: Objection.
14   A.  I think that's Ed's decision.
15   Q.  So you don't think she had a right to know?
16       MS. ZUCKER: Objection.  Asked and answered.
17       MS. HALEM: No, she did not answer the
18   question.
19       MR. COOPER: Well, not to mention that it's
20   a question ultimately without purpose other than to
21   try to humiliate the Witness.  So I object on that
22   ground.
23   Q.  Go ahead.  Answer the question.
24   A.  Like I said, I believe it was Ed's decision

13:21:52-13:22:19
Page 139

1    on whether or not she needed to know.
2    Q.  So you wouldn't have told her?
3        MS. ZUCKER: Objection.  Okay, I'm going to
4    end this line of questioning.  There's absolutely no
5    purpose to this in this lawsuit.
6        MS. HALEM: I'm sorry, did you ask a number
7    of questions about -- from our client about his
8    personal private life?
9        MS. ZUCKER: I asked --
10       MR. COOPER: All related to --
11       MS. ZUCKER: All related to what he decided
12   he would tell a subordinate before anything else
13   happened.
14       MS. HALEM: I disagree fundamentally.
15       So are you instructing the Witness not to
16   answer whether she thought Ed Kimball's wife had a
17   right to know if she was sleeping with her husband.
18       MS. ZUCKER: I think you've gotten into
19   simple harassment, so yes.
20       MS. HALEM: Okay.  So yes, you are
21   instructing not to answer?  Yes?  I didn't hear your
22   answer, Ellen.
23       MS. ZUCKER: I am.
24   Q.  On May 2nd, she texted you again; is that

13:22:49-13:23:19
Page 140

1    correct?
2    A.  I received a text from her on May 2nd
3    again, yes.
4    Q.  Did you attempt to communicate with her in
5    any manner in response to her text to you?
6    A.  No, I didn't text her back that night.  No.
7    Q.  Did you call her?
8    A.  I did not.
9    Q.  So the only person you spoke to that
10   night -- and I'm assuming you talked to Ed
11   Kimball -- tell me if I'm wrong -- after the 8:33
12   text string?
13   A.  I did not.
14   Q.  You talked to him before the text string?
15   A.  Correct.
16   Q.  And at that point in time, did he inform
17   you that he had told his wife it was more than
18   emotional but was intimate?
19       MS. ZUCKER: Objection.  You can answer that.
20   A.  He told me that he had told her that we had
21   a physically intimate relationship, yes.
22   Q.  But he told you you didn't need to worry
23   about anything, correct?
24   A.  I was concerned because I got that text

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

**13:23:47-13:24:25** Page 141

1 from her, and I was not sure, you know, how angry
2 she was and what she might do.
3    Q.  What were you worried she was going to do?
4    A.  I was worried she might take it to social
5 media.
6    Q.  Why did that concern you?
7    A.  I wanted the chance to tell my husband, but
8 I wasn't ready to tell my husband.  You know, I
9 wasn't ready to deal with the hurt that it was going
10 to cause my husband.
11         Sorry, were you going to say something?
12    Q.  Oh, no.  Go ahead.  You finish.  My bad.
13    A.  My husband monitored the Rockland social
14 media pages for me so I didn't have to, so I was
15 concerned that he may find out through social media
16 rather than from me.
17    Q.  Did you tell Regina Ryan you weren't
18 concerned about your husband finding out but were
19 concerned about how it would affect you politically?
20         MS. ZUCKER: Objection.
21    A.  I told Regina Ryan that my concern wasn't
22 that my husband would leave me.  Not that I wasn't
23 concerned that he would find out, that I was pretty
24 confident that he wouldn't leave me.

**3:24:49-13:25:28** Page 142

1    Q.  Why were you confident of that?  Without
2 disclosing any communications that your husband had
3 with you.
4    A.  I can't answer that.
5         MS. ZUCKER: I'm going to instruct you not
6 to answer.
7    Q.  The next line of texts is from Dawn Kimball
8 to you on May 2nd at 4:34 p.m.  Is that the time?
9 Did I read that correctly?
10    A.  I'm sorry, where is it?
11    Q.  The next page, Page 2.
12    A.  Oh, okay.
13    Q.  In between the night -- the morning of
14 May 2nd to that time period, 4:34, did you talk to
15 Ed Kimball?
16    A.  I don't recall.
17    Q.  She writes, "I know you don't care that I
18 am suffering.  Most people like you don't.  I'm not
19 threatening you but I feel it's only fair that your
20 husband knows the truth also.  I am giving you the
21 opportunity to tell him yourself.  I feel bad for
22 your husband because I know what am going through
23 right now and it's not pretty.  But if I don't get a
24 phone call in the next 24 hours from your husband,

**13:25:55-13:26:30** Page 143

1 then I will have no choice but to tell him myself.
2 This is a courtesy to him not you," did I read that
3 accurately?
4    A.  Yes.
5    Q.  At that point in time, was your husband
6 aware that you were having an affair with Ed Kimball?
7    A.  He was.
8    Q.  So you didn't need the threat from her,
9 correct?
10         MS. ZUCKER: Objection.
11    A.  I didn't need the threat from her, no.
12    Q.  You respond, "Okay.  He is in class this
13 evening, and then works tomorrow during the day.  I
14 need time to talk with him without the children
15 around.  That could be tonight, or possibly tomorrow
16 night.  Could you give me until Friday evening?
17 That way I will definitely have the opportunity to
18 talk with him," did I read that accurately.
19    A.  Yes.
20    Q.  That wasn't a true statement because you
21 had already told him, right?
22         MS. ZUCKER: Objection.
23    A.  I'm not going to answer that.
24    Q.  She didn't instruct you not to answer.

**13:26:47-13:27:33** Page 144

1         MS. ZUCKER: I'm about to instruct you not
2 to answer.  Please do not answer that question.
3    Q.  Is this true what you wrote here, that you
4 needed time before you could talk to him?
5         MS. ZUCKER: Objection.
6         MS. HALEM: About needing time?
7    Q.  Go ahead.
8         MS. ZUCKER: You can answer whether it's
9 true or not that you wanted more time to talk to him.
10    A.  I wanted more time to talk to him, yes.
11 That's all I'm going to say on that.
12    Q.  So everything you wrote here is true, that
13 you wanted to wait until he was not in class and the
14 children weren't around?
15         MS. ZUCKER: Objection.
16    A.  That's true, yes.
17    Q.  She then writes, "Fine.  Thank you.  I hope
18 you know what you two have done to our families.
19 It's only a matter of time before this small town
20 knows everything.  And I am physically ill thinking
21 about that"; is that accurate?
22    A.  Yes.
23    Q.  She's telling that everyone you is going to
24 find out.  Did you agree with her?

Allan Chiocca vs.
The Town of Rockland, et al.

**Video Deposition**

Deirdre Hall - Vol. I
July 22, 2021

13:27:50-13:28:36                                                    Page 145

1      MS. ZUCKER: Objection.
2    A.  Did I --
3    Q.  Did you agree with her that people were
4  going to find out about your affair?
5    A.  I wasn't -- I don't know.  I...
6      MS. ZUCKER: Answer as best you can.
7    A.  I don't know if people were going to find
8  out about our affair.  At that point in time it was
9  still -- as far as I knew, it was still quiet.
10   Q.  Did you take this as a threat from her?
11   A.  No.  I didn't think she was threatening to
12 tell anyone, no.
13   Q.  At this point in time, Allan Chiocca has
14 been told by two people that you two are having an
15 affair, correct?
16   A.  I don't know what Ed told him.
17   Q.  But you now know that Ed told him that
18 morning, correct?
19   A.  What I know that Ed told him was that he
20 was having an emotional relationship with me.
21 Whether he said any more, I don't know.
22   Q.  Is that what -- you know that because
23 that's what Ed you?
24   A.  I believe so, yes.

13:28:53-13:29:29                                                    Page 146

1    Q.  When did Ed tell you that's what he told
2  Allan Chiocca?
3    A.  I don't know.
4    Q.  Contemporaneous, way after?
5      MS. ZUCKER: Objection.
6    A.  No.  I didn't know at the time, so I think
7  it was probably -- it was definitely after.
8    Q.  After what, the investigation?
9    A.  Yes, possibly.
10   Q.  But maybe not?
11   A.  I don't know.
12   Q.  So Ed Kimball didn't tell you that he told
13 Allan Chiocca at the time that -- May 1st, 2nd, 3rd,
14 in that time period; he did not tell you?
15   A.  Correct, he did not tell me.
16   Q.  He kept that from you?
17   A.  He did.
18     MS. ZUCKER: Objection.
19   Q.  He had disclosed your private relationship
20 to the Town Manager and did not tell you he had done
21 that?
22   A.  He did not tell me he did that, no.
23   Q.  Were you upset when you found out that he
24 had done that?

13:29:49-13:30:13                                                    Page 147

1      MS. ZUCKER: Objection.
2    A.  Not really because by that point I already
3  knew I had disclosed it to him, so it really was
4  moot.
5    Q.  When did you learn that you had disclosed
6  it to him?
7    A.  On May 2nd.
8    Q.  And how did you learn that on May 2nd?
9    A.  I asked Allan.
10   Q.  You said what to Allan?
11   A.  "Did I tell you about me and Ed?"
12   Q.  That's how you worded it?
13   A.  Yes.
14   Q.  And he said?
15   A.  He nodded.
16   Q.  How did you know that you had told him it
17 was sexual?
18   A.  I assumed that that's what happened.
19   Q.  How?  Why would you make that assumption?
20   A.  That's what I got from the conversation.
21   Q.  How?  What gave you that impression?  Tell
22 me how you formed that belief.
23   A.  The way he answered it I guess.
24   Q.  You said he nodded.

13:30:31-13:31:16                                                    Page 148

1    A.  Yes, he nodded.
2    Q.  How did that give you the impression that
3  he knew you were in a sexual relationship with Ed
4  Kimball?
5      MS. ZUCKER: Objection.
6    A.  That's just what I got from the conversation.
7    Q.  Skipping ahead --
8      MS. ZUCKER: Can we break?
9      MS. HALEM: We're almost done.  I promise.
10 I promise.  I know we're on our time constraints here.
11   Q.  Skipping to the 5th, which is the second to
12 last page of this exhibit.
13     MR. COOPER: You are not going to read the
14 3rd?
15     MS. HALEM: No.  I'm skipping around,
16 trying to move us forward.
17   Q.  She writes to you, "You can contact Ed via
18 text or email for BOS purposes.  If a phone call is
19 essential then so be it.  But nothing personal and
20 nothing to do with your campaign.  He is done
21 helping you with that.  Don't make Chris and I
22 regret trusting you two" -- I have to skip to the
23 next page and then find it -- "to be professionals
24 at all times and respect our families that you had

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

**13:31:48-13:32:37** Page 149

1 no regard for before. This is huge for me and I'm
2 not one bit happy that you have to be in such close
3 contact. Ed will continue to meet up after meetings
4 provided others will be there so as not to give way
5 to rumors. I don't know how you two will be able to
6 work together but it's what we need to do. I will
7 not be showing up to things to check on you two
8 because I don't want to suddenly be at things I
9 would never go to. Red flags, you know. The first
10 test will be next week."
11     Did you abide by these rules that Dawn set
12 up for you?
13     MS. ZUCKER: Objection.
14 A. We communicated mostly via text and --
15 Q. It's a yes or no question.
16     MS. ZUCKER: If you can the answer yes or
17 no. You can answer the question as you see fit.
18 A. We communicated via text and email. We did
19 speak -- normally I would text or email him if I
20 needed to talk to him. And he did -- I did drop off
21 turf to him, but I don't know if he ever gave it
22 back to me.
23 Q. Did you ever communicate with him after
24 May 5th about anything that wasn't BOS business?

**3:32:51-13:33:27** Page 150

1     MS. ZUCKER: During what period of time?
2     MS. HALEM: From the time she got this text
3 to today.
4 A. It's possible, yes.
5     MS. ZUCKER: Apart from the three meetings
6 she's already discussed?
7     MS. HALEM: No, including those.
8 A. Yes, it's possible. I'm sure we talked --
9 I already said I talked about his son.
10 Q. So you didn't abide by Dawn Kimball's
11 requirements of you, correct?
12     MS. ZUCKER: Objection.
13 A. We talked about things outside of
14 professional business, but.
15 Q. Okay. In the, let's say, one-month period
16 after Dawn Kimball sets forth these guidelines, do
17 you think you complied with it during that time
18 period?
19     MS. ZUCKER: Actually, I'm going to let you
20 have this one question, and then we are done with
21 this line of questioning.
22     MS. HALEM: You are so nice.
23     MS. ZUCKER: Because at some point --
24 please don't roll your eyes. I'm trying to explain

**13:33:48-13:34:16** Page 151

1 my position respectfully. But we are not going to
2 let you just harass her about things that are beyond
3 the scope of this case and simply intrusive and
4 harassing.
5     MS. HALEM: They are not beyond the scope
6 of this case.
7     MS. ZUCKER: They certainly are.
8     MR. COOPER: I join in the objection.
9     MS. ZUCKER: You can have this one
10 question, and then we are done with this.
11 A. I'm sorry, what was the time period again?
12 Q. The one-month period after May 1st, 2018.
13 A. And what was the question?
14 Q. Did you talk about things in violation of
15 Dawn Kimball's request to you to abide by?
16     MR. COOPER: I object.
17     MS. ZUCKER: I object.
18 Q. Go ahead.
19     MS. ZUCKER: You can answer this one.
20 A. We talked about many things. We talked
21 about public things. We talked about more personal
22 things. We talked about many things.
23 Q. You didn't just talk about BOS business?
24 A. We talked about many things.

**13:34:22-13:34:59** Page 152

1 Q. Yes or no. Did you only talk about BOS
2 business?
3     MS. ZUCKER: Objection. She answered your
4 question.
5     You can answer it as you see fit.
6 A. We talked about many things.
7 Q. Were some of those things not BOS business?
8 A. As I said, we talked about a variety of
9 different things, including BOS business and not
10 including BOS business.
11 Q. Did you love Ed Kimball?
12     MS. ZUCKER: I'm going to instruct you not
13 to answer that question. You have given an answer
14 as to that relationship, and that's enough.
15 Q. Did you tell Regina Ryan that you loved Ed
16 Kimball?
17     MS. ZUCKER: I'm sorry, one more time.
18 Q. Did you tell Regina Ryan that you loved Ed
19 Kimball?
20     MS. ZUCKER: I am going --
21     MS. HALEM: That's the investigation in
22 this case.
23     MS. ZUCKER: It is.
24     MS. HALEM: Yes.

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

---

13:35:19-13:35:30                                      Page 153

1    Q.  Did you tell Regina Ryan that you loved Ed
2    Kimball?
3            MS. ZUCKER: If you remember what said to
4    Regina Ryan.
5            A.  When Regina Ryan asked me if I loved Ed
6    Kimball, I said I did.
7            MS. CIESLAK: Samantha, I think you said
8    you were going to stop after the texts.
9            MS. HALEM: Yes, yes, yes.  You are right.
10   One second.  (Examines documents)  Yes, we can break.
11           THE VIDEOGRAPHER: The time is now 1:34,
12   and we are off the record.
13           (Recessed for lunch at 1:34 p.m.)
14
15
16
17
18
19
20
21
22
23
24

---

14:24:54-14:25:36                                      Page 154

1            AFTERNOON SESSION  (2:24 p.m.)
2            DEIRDRE HALL, Resumed
3            THE VIDEOGRAPHER: The time is now 2:24.
4    We are back on the record.
5    BY MS. HALEM:
6    Q.  Good afternoon.  So the night of May 1,
7    2018, you chaired the BOS meeting.
8            MR. COOPER: I'm sorry to do this.  Can I
9    just put on the record what you asked me?
10           MR. SHAFRAN: Sure.
11           MR. COOPER: First, I appreciate the
12   opportunity to consult with my client about the
13   privilege issue that I raised, and on behalf of
14   Mr. Kimball, I do stand on the objection.
15           There is a privilege, based upon his
16   belief, that he had asked Ms. Hall to do something
17   legally related and give him some advice.
18           So I stand on the objection.  Go ahead.
19   Q.  Back to the questioning.  You chaired the
20   BOS meeting the night of May 1st, 2018; is that
21   correct?
22   A.  Yes.
23   Q.  Did you know that you were going to be the
24   person chairing that meeting that night?

---

14:25:55-14:26:25                                      Page 155

1            MS. ZUCKER: Objection.  When?
2    A.  I didn't know that I was chairing that
3    meeting that night until about five minutes before
4    the meeting started.
5    Q.  Were you surprised when Mr. Kimball did not
6    appear?
7            MS. ZUCKER: Objection.
8    A.  Yes.  He usually comes, so I was pretty
9    surprised.
10   Q.  Did he warn you that he was not going to
11   come?  He didn't give you notice?
12           MS. ZUCKER: Objection.
13   A.  The first I heard that he wasn't coming is
14   when Allan told me he wasn't coming.
15   Q.  And that was five minutes before the
16   meeting began, correct?
17           MS. ZUCKER: Objection.
18   A.  Maybe even less.  Because I got there about
19   five minutes before the meeting started, so it could
20   have been even less.
21   Q.  Did you speak with Ed Kimball earlier in
22   the day before the BOS meeting?
23   A.  I don't recall.
24   Q.  Is it possible you did?

---

14:26:40-14:27:18                                      Page 156

1            MS. ZUCKER: Objection.
2    A.  It's possible.
3    Q.  Do you remember chairing the BOS meeting
4    that night?
5    A.  Yes, I remember chairing the BOS meeting.
6    Q.  What is your next memory after chairing the
7    BOS meeting that night?
8    A.  Leaving.
9    Q.  Leaving?
10   A.  The meeting.
11   Q.  And doing what?
12   A.  We all left the meeting, and we -- like I
13   said, we'd normally exit through Allan's office and
14   then out into the hall.
15   Q.  Do you remember doing that?
16   A.  I entered into the office, yes.
17   Q.  Describe for me all of your memory in
18   order, if you can, from May 1st, 2018, from the time
19   you finished chairing the BOS meeting until you
20   arrived at RBG.
21   A.  Sure.  So I came into the office, and I
22   grabbed my belongings, my purse.  They were around
23   the table.  I saw the message from Dawn.  It kind of
24   made me anxious because it was very unexpected.

---

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

---

14:27:51-14:28:32                                                Page 157

1     Then Allan asked if I was going to go up to
2   RBG for drinks while I was in his office.
3     Q.   What did you respond?
4     A.   I said yes, I was.
5     Q.   Was there any further discussion about
6   going for drinks at RBG?
7     A.   Not in the office.  I left after that point
8   and went out onto the front plaza.
9     Q.   Was that typical to go out socially after
10  BOS meetings?
11         MS. ZUCKER:  Objection.
12    A.   Typical for some of us, yes.
13    Q.   For whom?
14    A.   I usually went.  Allan usually went.  Ed
15  usually went.  Sometimes we were joined by John
16  Clifford or one of the other members of the Board of
17  Selectmen.
18    Q.   Did members of the community who were
19  presenting that night or there, did they sometimes
20  come as well?
21         MS. ZUCKER:  Objection.
22    A.   Yes, but more infrequently.
23    Q.   How about Mike Mullen, did he ever come?
24    A.   Sure.

---

14:28:53-14:29:22                                                Page 158

1     Q.   Did you say Larry Ryan?  Did Larry Ryan come?
2     A.   I don't know if Larry Ryan ever came while
3   I was there.  I mean, I've been out with Larry Ryan
4   before, but I don't think it was after a meeting.
5     Q.   But you would socialize with Larry Ryan at
6   bars as well?
7     A.   Normally other Town events.  So I was with
8   Larry Ryan after the annual meeting, the Town
9   meeting, and then I was with Larry Ryan when we had,
10  like, an opening related to the Reimagine Rockland
11  efforts.
12    Q.   How did you get to RBG that night?
13    A.   I drove my vehicle.
14    Q.   Do you remember driving your vehicle?
15    A.   Yes, I remember driving my car.
16    Q.   Do you remember arriving at RBG?
17    A.   I do.
18    Q.   Do you remember where you sat when you came
19  inside?
20    A.   Sure.  It was either the -- it might have
21  been the second high top table.
22    Q.   Do you remember what happened next?  What's
23  the next memory that you have?
24    A.   After I arrived?

---

14:29:46-14:30:29                                                Page 159

1     Q.   Sure.
2     A.   Well, when I got there, Allan was already
3   there.  He was drinking, and he had ordered me a
4   glass of wine.  So I sat down, and I had that.
5          Then at some point I was concerned about Ed
6   having missed the meeting.  I was expressing
7   concern.  Allan had said he had gotten a phone call
8   from Ed and that everything was fine.
9     Q.   Why were you concerned that Ed missed the
10  meeting?  Did you already know at that point his
11  wife had discovered he was having an affair with you?
12         MS. ZUCKER:  Objection.
13    A.   I knew that Dawn said, "I know what
14  happened.  You make me sick."
15    Q.   How did you interpret that?
16    A.   That she knew something, but I don't know
17  the extent of everything she knew.
18    Q.   Did you interpret that at the time that she
19  had discovered you were having an affair with her
20  husband?
21    A.   I interpreted this that she knew that I was
22  involved with her husband in some way, yes.
23    Q.   Had you ever gotten a text from Dawn
24  Kimball before that night?

---

14:30:52-14:31:28                                                Page 160

1     A.   Not that I can think of, no.
2     Q.   She announces who she is on the text, right?
3     A.   She did on this one.  I don't know if she
4   does on all.
5     Q.   No.  On the second text to you, she says,
6   "This is Dawn," correct?
7     A.   Uh-huh.
8     Q.   What is your next memory of what happens
9   that night?
10    A.   I believe I asked if I could look at
11  Allan's phone.
12    Q.   Why did you do that?
13    A.   Because I wanted to see if Dawn had posted
14  anything about whatever she knew, which I didn't
15  know what she knew at this point, on social media.
16    Q.   Why didn't you look on your own phone?
17    A.   I wanted to look on, like, specific
18  Rockland groups, and I had withdrawn myself from
19  those groups a few weeks prior.  Just because of my
20  State Rep race, there were a lot of people posting
21  things about me, and it was just making me anxious
22  being able to read them.  So my husband monitored
23  those groups for me.
24    Q.   You said when you were at Town Hall, you

---

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

14:31:44-14:32:08                                           Page 161

1   were anxious after you received Dawn Kimball's text;
2   is that correct?
3   A. Yes.
4   Q. Did you take any medication after feeling
5   anxious?
6   A. Not that I recall.
7   Q. So you arrive at RBG. You start drinking a
8   glass of wine; is that correct?
9   A. Yes.
10  Q. You check Allan's phone. Did you see
11  anything that caused you concern on Allan's phone?
12  A. No.
13  Q. What happens next?
14  A. My phone rang.
15  Q. Who is calling you?
16  A. I didn't know initially. I didn't
17  recognize the number.
18  Q. Okay. Who does it turn out to be?
19  A. It was Ed.
20  Q. What number was he using?
21  A. I don't know. I don't know whose number it
22  was.
23  Q. So it's not his wife's number; is that right?
24  A. I don't know. I wouldn't know what his

14:32:27-14:33:00                                           Page 162

1   wife's number was at that time because I only got
2   these three texts. I wouldn't have recognized it as
3   his wife's number.
4   Q. So it's possible it was her number?
5   A. You would have to check his records.
6   Q. Okay. So he's calling you from an
7   undisclosed number?
8   A. He's calling me from some other number, yes.
9   Q. So you answered the phone even though you
10  didn't recognize who was calling you?
11  A. Yes, I answered it.
12  Q. Did you know it was Ed?
13  A. No.
14  Q. He hadn't texted you to tell you he was
15  calling or anything?
16  A. No, he had not.
17  Q. So you answer the phone. You take this
18  call, I believe you said, outside?
19  A. Yes, I answered it, and I said it was Ed.
20  I excused myself from the table and went out and
21  took the call outside.
22  Q. How long was the call?
23  A. I believe it was four minutes.
24  Q. Can you tell me -- how do you know the

14:33:16-14:33:57                                           Page 163

1   precise amount of time?
2   A. Because I think I looked at my phone
3   records and it was four minutes.
4   Q. Okay. What do you remember that he told
5   you during that time?
6   A. He had told me that he had disclosed to his
7   wife that we were having a physically intimate
8   relationship, and that, you know, she was
9   understandably upset, and that he was working, you
10  know, to deal with her at that point; and I
11  expressed my concern that she may put something on
12  social media, and he indicated that she was not
13  going to do that.
14  Q. Did you say anything else to him other than
15  your concern about social media?
16  A. I wanted to make sure he was okay. He said
17  he was okay.
18  Q. Do you remember anything else about what
19  you said to him?
20  A. Not that I recall right now.
21  Q. Do you remember anything else about what he
22  said to you?
23  A. No.
24  Q. What did you do next?

14:34:13-14:34:39                                           Page 164

1   A. I went back inside the bar.
2   Q. And what did you do?
3   A. I sat down across from Allan.
4   Q. And what happens next?
5   A. I had another drink brought to me. I think
6   that was the third drink, so I must have had another
7   in between those.
8   Q. When you say brought to you, are you saying
9   you didn't order those drinks?
10  A. No. I ordered it, but I think I ordered
11  it, went outside, took the call, and when I came
12  back in, it was being brought to the table.
13  Q. So you said when you got there, there was a
14  glass of wine waiting for you?
15  A. Yes.
16  Q. You didn't order that?
17  A. No, I didn't.
18  Q. Did you tell Allan to order it for you?
19  A. No.
20  Q. After you drink that, do you order the next
21  two yourself?
22  A. I think I did, yes.
23  Q. So the third drink was brought to you by
24  the time you finished the call with Ed?

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

14:35:02-14:35:44
Page 165

1   A.  Yes.
2   Q.  What do you remember next?
3   A.  Allan had known it was Ed because I told
4   him it was Ed when he called, and he asked me if
5   everything was all right.  I said, "Yes, everything
6   is fine" but I was concerned.  He asked me why I was
7   concerned, and I told him that it was a private matter.
8   Q.  That's all you said about it?
9   A.  Yes.
10  Q.  And did he press you on that?
11  A.  No, not initially.  No.
12  Q.  Did he at some point press you?
13  A.  At some point we had a conversation about
14  how -- where he indicated that Dawn can get that way
15  because Ed spends a lot of time on Town business at
16  the expense of his family and his own business.
17  Q.  Dawn can get what way?
18  A.  I must have told him that Dawn was texting
19  me.
20  Q.  So you did tell him more?
21  A.  I don't recall telling him that, but I
22  remember him telling me that Dawn can get that way.
23  Q.  Okay.  So you have a gap of whether or not
24  you told him something about Dawn Kimball, but you

4:36:09-14:36:47
Page 166

1   do recall -- you can't remember that; is that right?
2   A.  I think he might have already been aware
3   that the wife -- his wife was keeping him home.
4   That's why he didn't come to the meeting.  He may
5   have already been aware of that but not for the
6   reason why.
7   Q.  Because he had talked to Ed?
8   A.  Or he had communicated in some way.
9   Q.  What is the next thing you remember?
10  A.  We did talk at some point about the
11  meeting.  We talked about what I prefer to be called
12  when I am addressed, like Chairwoman, Madam
13  Chairperson.  It just was kind of an awkward
14  conversation, but.  Then we talked about the Dog
15  Dash and about how Mike Johnson went on for
16  25 minutes about something that could have been
17  three minutes long.
18  Q.  Anything else?
19  A.  Nothing else that I recall.
20  Q.  You don't remember anything else that
21  happened at RBG that night?
22  A.  I have a memory of sending a text and
23  looking up after sending the text, and Allan was
24  still sitting across from me, and he was kind of

14:37:11-14:37:51
Page 167

1   sitting back in his chair a little bit.  He was
2   drinking, and it looked like he was watching the
3   televisions that were over my left side.
4   Q.  Who did you send the text to?
5   A.  My husband.
6   Q.  Anything else you remember from RBG that
7   night?
8   A.  Nothing.
9   Q.  And any of those memories that you have
10  given me today, did you remember them on May 2nd, or
11  did any of them you recover over time?
12      MS. ZUCKER:  Objection.
13  A.  Those memories I believe I've had.
14  Q.  So have you recovered any memory since
15  your -- since May 2nd about what happened at RBG, or
16  all of those are just the memories you've always had?
17  A.  I believe the memories at RBG were ones
18  I've always had.
19  Q.  The text that you sent to your husband, do
20  you remember what you said?
21  A.  "I'll talk to you later.  I'm having drinks
22  with Allan.  Be ready for me because I'm going to
23  want you."
24  Q.  What did that mean?

14:38:18-14:39:05
Page 168

1   A.  I think I was expressing, you know, wanting
2   to be physically intimate with my husband.
3   Q.  Why were you expressing that at that point?
4   A.  I think I was upset about my relationship
5   with Ed having ended.  I was obviously concerned
6   that his wife now knew and what the potential impact
7   would be for my family and for his family, and it
8   made me feel very insecure and very exposed, and I
9   was looking for closeness and security from my husband.
10  Q.  So you were looking for physical intimacy
11  with someone?
12  A.  With my husband.
13  Q.  So is it fair to say that you were looking
14  for sexual activity with someone that night?
15      MS. ZUCKER:  Objection.
16  A.  I was looking to feel safe and secure.
17  Q.  Were you looking to have sexual relations
18  with someone that night?
19      MS. ZUCKER:  Objection.
20  A.  I just said I was looking to feel safe and
21  secure and I reached out to my husband.
22  Q.  And propositioned him for sex?
23  A.  No.  I reached out to my husband for
24  physical intimacy.

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

14:39:23-14:39:51                                          Page 169

1    Q.  Did you say, "Be ready for me"?
2    A.  Yes.  I said, "Be ready for me. I'll be
3  home."
4    Q.  Was the implication that you were planning
5  on having sexual relations with your husband?
6       MS. ZUCKER: Objection.
7    A.  As I said, I was looking for physical
8  intimacy with my husband.
9    Q.  Sex with your husband; is that correct?
10      MS. ZUCKER: Objection.
11    A.  It could be sex.  It could lead up to sex,
12  but definitely physical intimacy.
13    Q.  Was your husband -- did he respond that he
14  was open to that?
15    A.  Yes, he did.
16    Q.  And did you then go home and have sex with
17  your husband?
18      MS. ZUCKER: Objection.
19    A.  I don't have any memory of what happened
20  when I got home.
21    Q.  Is it possible you had sex with your
22  husband that night?
23      MS. ZUCKER: Objection.
24      (Witness confers with counsel)

14:41:32-14:41:59                                          Page 171

1  not any question about your husband.
2      MR. FRIEDMANN: With no one else present.
3      MS. HALEM: Right.
4      MR. FRIEDMANN: Well, if there's a third
5  party present --
6      MR. COOPER: While they were having sex?
7      MS. HALEM: That's not what we were talking
8  about.
9      MS. ZUCKER: If it is a private
10  communication with your husband, you may not reveal
11  it. So just say, "I can't answer."
12      THE WITNESS: Okay.
13    Q.  Because of.  You need to tell me why.
14      MS. ZUCKER: No, actually you don't. You
15  can just say, "I can't answer."
16      And please stop rolling your yes. It is so
17  not useful.
18      MS. HALEM: This is not true.
19    Q.  So what is the next thing you remember
20  after leaving RBG? Or do you remember leaving RBG?
21    A.  I do not remember leaving RBG.
22    Q.  What is the next thing you remember sitting
23  here today?
24    A.  I have a memory of being at The Banner in

14:42:23-14:43:10                                          Page 172

1  the parking lot in Allan's truck.
2    Q.  What do you remember from that?
3    A.  We were parked against the building, and he
4  was trying get me to go into The Banner.
5    Q.  What did he say?
6    A.  He asked me to go in for drinks, and I
7  indicated consistently over that I didn't want to go
8  in there.
9    Q.  Did you have that memory on May 2nd?
10    A.  I did not have that memory on May 2nd.
11    Q.  Tell me how you recovered that memory.
12    A.  I remembered that when I went to pick up
13  some gift certificates for my kid's soccer coach at
14  RBG. I walked into -- it was in June of '19, I
15  believe -- I walked into RBG, and the bartender was
16  not right at the table, so I waited for a while, and
17  I was just thinking about what had happened at RBG.
18  Then I recalled being -- I had that memory. I
19  recalled being in the parking lot at The Banner.
20    Q.  Prior to June 2019, did you have any memory
21  of leaving RBG?
22    A.  No.
23    Q.  Prior to June of 2019, did you have any
24  memory of being in Allan Chiocca's car that night?

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

14:43:28-14:43:57

Page 173

1    A.  No.
2    Q.  Prior to June 2019, did you have any memory
3    of being at The Banner?
4    A.  No.
5    Q.  In the parking lot?
6    A.  No.
7    Q.  Did you ever talk to someone about why you
8    didn't have those memories, any medical provider of
9    any kind?
10        MS. CIESLAK: Before you answer that, if
11   we're going to get into the medical --
12        MS. HALEM: No.  I'm not showing the
13   records yet.  Don't worry.  We're just asking
14   questions.
15        MS. CIESLAK: But the contents of the
16   medical records --
17        MS. HALEM: Oh, sure.  Go ahead.  Put it on.
18        MS. CIESLAK: So just for the record,
19   counsel for the parties have discussed how to handle
20   Ms. Hall's medical records that have been marked
21   Confidential, Litigation Counsel, Litigation Counsel
22   Eyes Only.  We have agreed that Ms. Hall can testify
23   to the contents of these records today.  We have
24   agreed that copies of the records will not leave

4:44:28-14:45:17

Page 174

1    this room.  Copies of the records will not be
2    provided to parties or our clients; and that the
3    content of the records, what it testified here about
4    the records, will not leave this room, meaning that
5    both parties and individuals in this room, including
6    clients, will not discuss the contents of those
7    records outside of those discussions they have with
8    their attorney.  So it won't leave this room.  It
9    won't go anywhere.
10        To the extent the contents of the
11   deposition transcript relating to these records and
12   the contents of those records need to be used in
13   proceedings, in court, the parties and their counsel
14   will discuss the best way to do that, whether that's
15   by a motion to seal or a redaction, and will not
16   file anything until an agreement has been reached or
17   a motion has been filed with Judge Young.
18        MR. SHAFRAN: We agree in full, only you
19   said copies of those records can't leave the room.
20        MS. CIESLAK: Right.
21        MR. SHAFRAN: They can obviously be in the
22   possession of counsel consistent with everything you
23   just said.
24        MS. CIESLAK: Copies aren't provided to

Pages 173 - 176 (44)

Doris O. Wong Associates, Inc.

Min-U-Script®

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

14:47:12-14:47:42                                          Page 177

1    A.  I probably talked about it.
2    Q.  What was the combination of things that you
3  just talked about?
4         MS. ZUCKER: Objection.
5    A.  I think it has to do with my diagnoses, the
6  fact that I had been drinking, the fact that I take
7  medication, the fact that I was emotionally distraught.
8    Q.  You have used the phrase "blackout" in this
9  case; is that correct?
10   A.  Yes.
11   Q.  Do you believe you were blacked out that
12 night?
13   A.  For portions of the night, yes.
14   Q.  Have you talked about that with your
15 medical providers?
16   A.  Yes.
17   Q.  Do they agree with you that you were in a
18 blackout?
19        MS. ZUCKER: Objection.
20   A.  It's in the notes.  I don't know if that
21 means they agree with me or not.
22   Q.  But that's what you presented to them, that
23 you were in a blackout phase?
24   A.  Yes.

14:48:07-14:48:43                                          Page 178

1    Q.  Which portions of the evening were blacked
2  out?
3    A.  So initially I only remembered what I told
4  you about RBG, and I remember Allan saying to me
5  that I give a good blow job, and I remember getting
6  Dawn's texts.
7    Q.  I'm asking you which portions you don't
8  remember.
9    A.  All I can tell you is what I remember.  I
10 can't tell you everything I don't remember because I
11 don't know what happened.
12   Q.  When you -- prior to June of 2019, had you
13 blacked out the memory being in The Banner, in your
14 opinion?
15   A.  I'm sorry, what date?
16   Q.  Prior to June 2019, when you say you
17 remembered what happened -- you remember sitting in
18 Allan's car at The Banner, correct?
19   A.  Yes.
20   Q.  Prior to that, had you blacked that memory
21 out?  How would you describe what that was?
22   A.  I didn't have that memory.
23   Q.  It was gone?
24   A.  I didn't have it.  It was not gone.  I

14:48:58-14:49:29                                          Page 179

1  never had it.
2    Q.  You never had it.  But how did you get it
3  back?
4    A.  I told you.  That's when it came back to
5  me, when I was at the bar getting gifts certificates
6  for my daughter's soccer coach.
7    Q.  And what parts of it came back, just that
8  memory of being in the car?
9         MS. ZUCKER: Objection.
10   A.  It starts with images.  Then the images,
11 you know, just like any other memory, lead to other
12 things you remember from within the image.
13   Q.  Are you -- have you talked about memory
14 retrieval with your medical providers?
15   A.  No.
16   Q.  Have you tried to facilitate memory
17 retrieval in any way?
18        MS. ZUCKER: Objection.
19   A.  No.
20   Q.  No?
21   A.  No.
22   Q.  Are these memories when they come back to
23 you traumatizing at all?
24   A.  Some were, yes.

14:49:53-14:50:30                                          Page 180

1    Q.  Was that one, the one regarding being in
2  Allan's car?
3    A.  I don't think so, no.
4    Q.  The thing that -- I'm using the word
5  "trigger."  Is that a correct word to use -- that
6  triggers the memory retrieval of being at RBG that
7  night, is that what triggered it?
8    A.  "Triggered" is normally a negative thing, but.
9    Q.  What word would you use?
10   A.  Just caused.
11   Q.  So what caused the memory to come back was
12 you being at RBG during the day?  Was that during
13 the day?
14   A.  Probably the day, yes.
15   Q.  And you are just standing at the bar
16 waiting for the bartender to come?
17   A.  Yes, just thinking what I remembered from RBG.
18   Q.  But you didn't come back with a memory
19 about RBG.  You came back with a memory of being in
20 a parking lot at The Banner, right?
21   A.  Correct.
22   Q.  And the memory about being in the car prior
23 to June 19, you didn't even know you were in his
24 car; is that correct?

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

---

14:50:49-14:51:30                                    Page 181

1    A.  That's correct.
2    Q.  Do you remember anything about how you got
3  to Town Hall that night?
4    A.  No.
5    Q.  You don't remember how you got from The
6  Banner to Town Hall that night?
7    A.  I don't have a recollection of being in his
8  vehicle while he was driving there, no.
9    Q.  Have you told me everything about the
10  memory that came back to you in June 2019 about
11  being in Allan's car in front of The Banner?
12    A.  Yes.  I didn't want to go into The Banner.
13    Q.  Anything else that you remember?
14    A.  That he suggested that he had wine at Town
15  Hall and we should go to Town Hall.
16    Q.  And what did you say in response to that?
17    A.  I said that was fine because I just didn't
18  want to go in The Banner.
19    Q.  Do you remember -- have you ever been in
20  The Banner before?
21    A.  Maybe two or three times.
22    Q.  Have you ever used the bathroom in The
23  Banner before?
24    A.  Yes.

---

4:51:43-14:52:21                                     Page 182

1    Q.  Do you have an opinion about the bathroom
2  in The Banner?
3    A.  The whole place is kind of filthy.
4    Q.  Do you think the bathrooms are filthy?
5    A.  The whole establishment is, so yes, the
6  bathrooms would qualify as well.
7    Q.  At that point in time, you had several
8  glasses of wine.  You remember three; is that right?
9    A.  I remember drinking two but ordering three.
10    Q.  Did you have to urinate at that point?
11    A.  I don't recall.
12    Q.  Do you remember urinating at RBG before you
13  left?
14        MS. ZUCKER: Objection.
15    A.  I don't recall.
16    Q.  So you don't recall if you asked to go to
17  use a restroom that night?
18    A.  Correct, I don't recall.
19    Q.  Is it possible you did?
20    A.  From the memory I have, I don't have a
21  memory of needing to use the facilities, no.
22    Q.  But in the car that night, is your memory
23  complete?
24    A.  No.

---

14:52:40-14:53:12                                    Page 183

1    Q.  So would you agree with me that it was spotty?
2        MS. ZUCKER: Objection.
3    A.  I just remember the portion that I told you.
4    Q.  And there are portions you don't remember
5  but you know they happened, correct?
6        MS. ZUCKER: Objection.
7    A.  I assume they happened.
8    Q.  Would you estimate how much time period you
9  have memories of from being in the car?  Like, what
10  would you say the length of time that you have
11  memories are?
12    A.  I don't know.  It's really hard for me.
13  Sometimes I don't even have the order, never mind
14  the duration.
15    Q.  Explain that to me.  Tell me how they
16  appear in your head.
17    A.  Sometimes I'll have a memory but I don't
18  know where it fits in, like, chronologically with
19  others.
20    Q.  How do you know these memories are reliable?
21    A.  They are just like any other memory I have.
22    Q.  Okay, but is it possible that these
23  memories are unreliable?
24    A.  I don't know.  They feel just as real as

---

14:53:36-14:54:09                                    Page 184

1  any other memory I have.
2    Q.  Well, they are different from regular
3  memories, correct?  They are memories that you
4  didn't have then come back; isn't that correct?
5        MS. ZUCKER: Objection.
6    A.  They are memories I have recovered, yes.
7    Q.  And unlike, you know, what you had for
8  lunch today, these memories aren't complete, correct?
9    A.  I don't even know if my memory for lunch is
10  complete, but.
11    Q.  I would try to come up with a better
12  example, but I can't.  Do you know what you had for
13  lunch today?
14    A.  I had a salad.
15    Q.  And that's a complete memory.  You remember
16  having a salad for lunch?
17    A.  Yes.
18    Q.  Would you agree with me that these memories
19  are different in that they are not complete.  There
20  are parts that you are pretty sure something else
21  happened; you just don't know what it is?
22    A.  There are just portions chronologically
23  that I don't have.
24    Q.  What does that mean?  Can you be a little

---

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

14:54:30-14:55:06                                    Page 185

1    more specific.
2        A.   So the memory of sitting in the truck
3    outside The Banner is a full memory, but it's just a
4    certain period of time.  I just don't remember
5    everything before it or everything after it.
6        Q.   So do you remember everything sitting in
7    the truck, everything Allan said and everything you
8    said sitting in the truck?
9        A.   Well, I don't remember it verbatim, but I
10   have an idea.
11       Q.   But you have that whole time period of
12   being in the truck in front of The Banner?
13       A.   From whenever the memory -- I don't
14   remember pulling in.  I just remember being in a
15   parking space in front of -- like, pulled in so the
16   front end of his truck was facing the building.
17       Q.   I'm asking you, any parts of the time you
18   were parked in front of The Banner, you have a
19   complete linear memory?
20       MR. COOPER:  Objection.  Other than what
21   she testified to.
22       A.   From the point I begin -- I told you.  To
23   the point it ended that I told you, that's what I
24   can remember.

---

14:55:22-14:55:50                                    Page 186

1        Q.   Okay.  So tell me the point it begins.
2        MS. ZUCKER:  Objection.  Asked and answered.
3        A.   We are parked in front of The Banner -- we
4    are parked in the parking space near The Banner, and
5    that's when it starts.  I don't know how long we may
6    have been in that parking space, but that's where it
7    starts.
8        Q.   Okay.  And what happens next after you park?
9        MS. ZUCKER:  Objection.  Asked and answered.
10       A.   Allan asked me to go into The Banner.
11       Q.   What happens next?
12       A.   I decline.
13       Q.   Next?
14       A.   He asked again.
15       Q.   And you are sure these are all in a row?
16       A.   Yes.  He's asking me to go in.
17       Q.   Because you said before that sometimes they
18   don't come back in linear fashion.  This one came
19   back in linear fashion?
20       MS. ZUCKER:  Objection.
21       A.   This is the extent of the memory.
22       Q.   I'm asking you, are there any holes in that
23   memory that you are aware of?
24       A.   No.

---

14:56:03-14:56:33                                    Page 187

1        Q.   Is it possible that it's not a complete
2    memory?
3        MS. ZUCKER:  Objection.
4        MR. COOPER:  Objection.
5        A.   I would say the memory from the beginning
6    to the end of what I told you is linear.
7        Q.   Linear.  And how long was that memory?
8        A.   I told you it's -- I can't judge the duration.
9        Q.   Why not?  You can remember the beginning
10   and the end and everything that happened in between.
11   How do you not know how long that is?
12       MS. ZUCKER:  Objection.
13       A.   I mean, I would just be estimating, a few
14   minutes.
15       Q.   A few minutes.  So you remember being
16   parked at The Banner for only a few minutes?
17       MS. ZUCKER:  Objection.
18       A.   I would say yes.  I mean, I would be
19   guesstimating to say a few minutes.
20       Q.   And describe the events that are at the end
21   of that memory.  How does it end?
22       A.   He asked me -- he tells me that he has wine
23   at Town Hall and asked me if I want to go back and
24   have some.

---

14:56:53-14:58:19                                    Page 188

1        Q.   And what did you say?
2        A.   I said, "Yes," because I didn't want to go
3    in The Banner.
4        Q.   How about going home?
5        A.   I had expressed wanting to go home when I
6    texted my husband, but I at that point just didn't
7    want to go in The Banner.
8        Q.   You texted your husband that you wanted to
9    go home?
10       A.   I texted him -- I think I showed intention
11   that I wanted to be able to go home and see him, yes.
12       Q.   I'm sorry, didn't your husband offer to
13   pick you up multiple times that night, in texts?
14       MS. ZUCKER:  Objection.
15       A.   He did send me a text, but I think it was
16   later.  I don't remember when it was.
17       Q.   Why don't we look at that.
18            (Document marked as Hall
19            Exhibit 5 for identification)
20       Q.   Ms. Hall, do you recognize these documents?
21   You can start on Page 2.
22       A.   (Examines documents)  Uh-huh.
23       Q.   Are these your text messages with your
24   husband from May 1st?

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

14:58:53-14:59:34                                    Page 189

1    A.  They are.
2    Q.  And they go into May 2nd, it looks like; is
3  that right?
4    A.  Yes.
5    Q.  And did your husband produce these?
6    A.  I don't know if it was him or me.
7    Q.  Well, looking at the first page, it looks
8  like your husband gave them to Jack McGlone?
9    A.  Yes.  So my husband must have produced them.
10   Q.  Jack McGlone was your original attorney?
11   A.  Yes.  During the investigation, yes.
12   Q.  So these were given on June 19, 2018; is
13  that accurate?
14   A.  That's what the email says.
15   Q.  Was it in furtherance of the investigation?
16       MS. ZUCKER: Objection.
17   A.  I think they were requested as part of the
18  investigation, yes.
19   Q.  Okay.  So skipping to May 1, 2018 at --
20  wait, wait.  We are going to skip through further.
21       MS. HALEM: I'm sorry, guys.
22   Q.  Let's look at May 1, 2018 at 9:01 p.m.  He
23  texts you, "Kids in bed."
24       You respond, "I am having a couple of

5:00:02-15:00:32                                    Page 190

1  drinks with Allan.  I will talk to you later.  Be
2  ready for me.  That's what you testified about
3  before," correct?
4    A.  Yes.
5    Q.  "Cause I'm going to want," you write
6  "tough," but then you say "you."
7    A.  Yes.
8    Q.  It's a typo, right?
9    A.  Sure.
10   Q.  Sure or yes?
11   A.  Yes, it was a typo.
12   Q.  And he responds, "I'll be ready for you,"
13  winky face.  It's an emoji.  "Let me know if you
14  need a ride please"; is that correct?
15   A.  Yes.
16   Q.  Did you ever let your husband know you
17  needed a ride?
18   A.  No.  I didn't call him.
19   Q.  You respond, "I will I love you!," correct?
20   A.  Yes.
21   Q.  He then responds with what I would describe
22  as an emoji with a kissy face, yes?
23   A.  Yes.
24   Q.  Is that an accurate description on my part?

15:00:51-15:01:28                                    Page 191

1    A.  Yes.
2    Q.  He then responds at 11:26 p.m., "Waiting
3  for you," heart eye emoji.  "Do you have a safe way
4  home."  Do you remember getting that text?
5    A.  No.
6    Q.  And then on May 2nd of 2018 at 1:22 a.m.,
7  you must still not be home; is that correct?
8    A.  I assume so.
9    Q.  You don't have a memory of whether you were
10  home at 1:22 a.m.?
11   A.  I don't have a memory of being at home, so.
12   Q.  "I'm going up to bed.  Love you.  Please
13  call me if you need a ride"; is that correct?
14   A.  Yes.
15   Q.  So he asked you three times if you needed a
16  ride home; is that right?
17       MS. ZUCKER: Objection.
18   A.  It appears that he asked me a few times if
19  I needed a ride, yes.
20   Q.  And you did not ask him for a ride?
21   A.  I don't recall getting any of these texts.
22   Q.  You don't recalling getting any?
23   A.  I don't recall getting -- I recall sending
24  the "I'm having a couple of drinks with Allan."  I

15:01:54-15:02:34                                    Page 192

1  don't recall getting.  I don't even recall sending,
2  "I will I love you."
3    Q.  But you did?
4    A.  I did, but I don't recall sending that, no.
5    Q.  So does your memory stop before 9:00 p.m.?
6    A.  I actually checked my records on the timing
7  of when I sent this text, and it was at, like, 9:40
8  something.  So even though my husband sent one to me
9  at 9:01, "Kids in bed, my response was delayed.
10   Q.  So the "I'm going to want you" is at 9:40?
11   A.  At 9:40, 9:50, yes, that time.
12   Q.  And the "I love you" is at what time?
13   A.  I didn't check on that.
14   Q.  Do you have a way to check on that?  What
15  did you check to check for the times?
16   A.  My phone.
17   Q.  Your phone.  Do you have your phone here
18  today?
19   A.  Yes.
20   Q.  Can you check for that on that for me.
21   A.  It's going to take a while to scroll back
22  to 2018.
23       MS. ZUCKER: We can do that at a break.
24       MR. SHAFRAN: Why?

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

15:02:49-15:03:21                                    Page 193

1          MS. ZUCKER: Because I'm not going to have
2   her go through the phone and -- we can do it a
3   break. Move on.
4          MR. SHAFRAN: Why?
5          MS. HALEM: Why?
6          MR. SHAFRAN: She spent a half an hour
7   reading the counterclaim. She can scroll on her
8   phone for 10 seconds.
9          THE WITNESS: It's going to take a lot
10  longer than 10 seconds.
11         MS. ZUCKER: Do you need to make faces?
12         MR. SHAFRAN: What's the basis for that,
13  other than you don't want her to?
14         MS. ZUCKER: The basis is that I need to
15  check with counsel in terms of where things are, and
16  I don't want her going through her basically
17  original documents sitting here during the
18  deposition. We can do that.
19         The only reason she brought in her phone is
20  because she thought we were doing scheduling. So we
21  are not doing demonstrative exercises here.
22         MR. SHAFRAN: It's your call, Samantha.
23     Q.  Did you produce all your text messages with
24  your husband from May 1st to May, I don't know, the

15:03:43-15:04:39                                    Page 194

1   month of May 2018?
2      A.  I provided all my text messages with my
3   husband to my lawyers.
4      Q.  All of them?
5      A.  All of them going back to whenever my phone
6   started keeping them.
7      Q.  So how did you do that? How did you do
8   your entire text history with your husband?
9      A.  I was provided my texts. I just downloaded
10  them and provided them.
11     Q.  How do you download texts?
12     A.  I don't know. There's an app to use.
13     Q.  So you used an app. You must have created
14  a very long document.
15         MS. ZUCKER: I'm going to object because I
16  think some of this process was done by counsel. I
17  wasn't involved at this point.
18         MS. CIESLAK: Deirdre, you can answer to
19  the extent that it doesn't disclose any direction
20  that your attorney gave you.
21     A.  Then, I can't answer it.
22     Q.  Okay. This document doesn't list the
23  times, right?
24     A.  It's a screenshot. It lists some times,

15:05:01-15:05:37                                    Page 195

1   but not all times.
2      Q.  So what did you look at on your phone to
3   figure out the time?
4      A.  You just pull it to the side.
5      Q.  And it gives the time?
6      A.  (Witness nods)
7          MS. HALEM: Okay, that's probably something
8   we are going to need in this case. We'll clear that
9   up lawyer to lawyer, okay?
10     Q.  What is the next -- do you have a memory of
11  driving away from The Banner?
12     A.  No.
13     Q.  Do you have a memory of arriving at Town Hall?
14     A.  The first time, no.
15     Q.  What do you mean "the first time"?
16     A.  I mean when we go back in I do, but when we
17  first get there, no.
18     Q.  So from the time -- I think you told me the
19  last memory you have is saying yes to getting wine
20  at Town Hall, correct?
21     A.  (Witness nods)
22     Q.  And then it goes dark again? You have no
23  memory of --
24     A.  Yes. Sorry.

15:05:59-15:06:28                                    Page 196

1      Q.  Thank you. You have no memory of anything
2   that happens after the word "yes" to when?
3      A.  Until I'm in the bathroom.
4      Q.  In the bathroom. So that would be -- you
5   will agree with me --
6      A.  Actually, no. I remember -- one of my
7   original memories from the night was being in the
8   foyer. So I have a memory of being in the foyer
9   when Allan hit the alarm code.
10     Q.  To get in?
11     A.  To get in, yes.
12     Q.  Are you in the foyer then or are you
13  outside it?
14     A.  I'm in it.
15     Q.  So you can enter the foyer of Town Hall
16  without a code?
17     A.  You need a key.
18     Q.  So do you remember him putting a key in the
19  door?
20     A.  No.
21     Q.  But based on your knowledge of Town Hall --
22  because you had a key, correct?
23     A.  Yes, but I didn't really use it.
24     Q.  But you had one, correct?

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

15:06:45-15:07:05                                    Page 197

1    A. Yes.
2    Q. And you had an alarm code, correct?
3    A. Yes. The only time I used it I set it off,
4    so.
5    Q. I think I have that text.
6    A. Yes.
7    Q. Where you told Allan you set off the alarm;
8    is that right?
9    A. Yes.
10   Q. But you have keys and the code, all of that?
11   A. Yes.
12   Q. So you had a basic understanding of how it
13   worked, right?
14   A. Yes.
15   Q. So Allan -- well, you don't know. Somehow
16   the doors open and you are in the foyer. Because
17   you have no memory of how you get into the foyer,
18   correct?
19   A. Correct.
20   Q. And then you remember him punching the code
21   in?
22   A. (Witness nods)
23   Q. And what's the next memory you have?
24   A. Being in the bathroom.

5:07:25-15:07:48                                     Page 198

1    Q. Tell me about that.
2    A. I was in the handicap stall, and I hung my
3    purse on -- there's like a coat hanger. I hung it
4    there. I lifted my skirt, pulled down my underwear,
5    went to the bathroom, stood up, you know, pulled my
6    underwear back up, and then I fell when I pulled my
7    underwear back up, on my knees.
8    Q. On your knees?
9    A. I fell there forward.
10   Q. You fell forward?
11   A. Yes, forward. I was bending forward, and I
12   fell forward.
13   Q. But your knees hit the ground?
14   A. Yes.
15   Q. Is that what you told Regina Ryan?
16   A. I said, "I fell forward."
17   Q. Did you tell her you hit your head on the
18   door?
19   A. I bumped it on the door.
20   Q. On the door to what?
21   A. The door that goes in and out of the stall.
22   Q. So where your purse was?
23   A. No. The hook is on the stall. It's not on
24   the door.

15:08:07-15:08:30                                    Page 199

1    Q. Ahh, okay. So the purse is, like, on your
2    left?
3    A. Yes.
4    Q. So you fell forward, and you hit your head
5    on the door?
6    A. Yes.
7    Q. How tall are you?
8    A. 5'11", 5'11" and a half.
9    Q. Almost 6 feet?
10   A. Yes.
11   Q. Were you wearing heels that night?
12   A. Yes.
13   Q. How high were the heels?
14   A. 3 inches maybe.
15   Q. Pretty high heels?
16       MS. ZUCKER: Objection.
17   A. I usually wear 3- or 4-inch heels.
18   Q. Do you wear heels regularly?
19   A. Not in the past couple of years, but I did
20   when I worked, yes.
21   Q. Did any of us wear them during the Pandemic?
22       So you wore heels on a regular basis?
23   A. Uh-huh.
24   Q. Had you been wearing heels earlier that

15:08:46-15:09:07                                    Page 200

1    day? I think you -- there's documents that say you
2    were walking or you were canvassing. What would you
3    call it?
4    A. Canvassing.
5    Q. You were canvassing earlier in that day?
6    A. I was.
7    Q. Were you wearing heels?
8    A. No. I changed before the meeting.
9    Q. You dressed up?
10   A. Yes.
11   Q. And you put heels on?
12   A. Yes.
13   Q. So that night in the handicap stall -- and
14   the handicap stall is big, right?
15       MS. ZUCKER: Objection.
16   A. Yes. It's bigger than the other stalls.
17   Q. Right. To accommodate the wheelchair
18   coming in?
19   A. I would think.
20   Q. And when you fell, you had just pulled up
21   your underpants?
22   A. Yes.
23   Q. So did you fall directly in front of the
24   toilet?

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

---

15:09:22-15:10:01                                        Page 201

1      MS. ZUCKER: Objection.
2      A.  I may have stumbled forward a little bit
3   before I fell, but it was basically in front of the
4   toilet.
5      Q.  Was that a memory you had on May 2nd?
6      A.  No.
7      Q.  When did that memory appear?
8      A.  Sometime in the fall of '18, summer or fall
9   of '18, but I don't have, like, a date.  I didn't
10  write it down.
11     Q.  How did you retrieve that memory, or when
12  did you retrieve that memory?
13     A.  I don't recall.  I don't recall what caused
14  that memory to -- for me to remember it.  I don't know.
15     Q.  Do you recall when you knew that that had
16  happened?
17     A.  Yes, sometime in, like I said, end of the
18  summer/beginning of the fall.
19     Q.  Did you think that memory changed anything
20  about your understanding of what happened on May 1st?
21     MS. ZUCKER: Objection.
22     A.  I realized that I was -- the memory allowed
23  me to realize that I was pretty intoxicated.
24     Q.  Why?  What about it?

---

15:10:19-15:11:00                                        Page 202

1      A.  I was really dizzy.
2      Q.  Dizzy from the fall or dizzy from the alcohol?
3      MS. ZUCKER: Objection.
4      A.  Dizzy from the alcohol.
5      Q.  And was that part of the memory that you
6   got back?
7      MS. ZUCKER: Objection.
8      A.  That I was dizzy, yes.
9      Q.  So you were dizzy prior to the fall?
10     A.  I was dizzy when I got up off the toilet.
11     Q.  And that's why you fell?
12     A.  (Witness nods)
13     Q.  But you have an actual memory of being
14  dizzy, correct?
15     A.  Yes.  It's more pronounced after I -- the
16  dizzy memory is more pronounced after I leave the
17  bathroom.  The bathroom stall, I should say.
18     MS. ZUCKER: Objection.
19     Q.  So any other memories that you got back at
20  that same time, other than falling and hitting your
21  head?
22     MS. ZUCKER: Objection.
23     A.  So after I came out of the stall, I went to
24  wash my hands.  I was staring at myself in the

---

15:11:18-15:11:49                                        Page 203

1   mirror, and everything around me was spinning.
2      Q.  Do you remember that?
3      A.  Yes.
4      Q.  Did you tell Regina Ryan that at some point?
5      A.  The second or the -- during the
6   supplemental interview, yes.
7      Q.  You told her everything was spinning?
8      A.  Yes.
9      Q.  And that you looked at yourself in the mirror?
10     A.  Yes.
11     Q.  What's the next thing you remember?
12     A.  While I was looking at my myself in the
13  mirror and I was really disoriented, I realized I
14  needed to go home.
15     Q.  When you went into the bathroom, you had
16  your phone, correct?
17     A.  If it was in my pocketbook.  I don't know.
18     Q.  Was it in your pocketbook?
19     A.  I don't know.
20     Q.  When you got home that night, did you have
21  your phone?
22     A.  I don't know.  I don't remember anything of
23  when I got home that night.
24     Q.  When you woke up in the morning, you had

---

15:12:07-15:12:31                                        Page 204

1   your purse with you, and you had your phone in it,
2   right?
3      A.  I don't know -- I definitely had my phone.
4   I don't know whether it was in my purse.
5      Q.  You told Regina Ryan it was in your purse.
6   Do you have any reason to doubt your accuracy of
7   when you said that?
8      A.  I think I told her my keys were in my
9   purse, not my phone.
10     Q.  So you don't know where your phone was?
11     A.  It could have been on the counter when I
12  woke up.  I have no idea.
13     Q.  Well, I'm asking you -- you had your phone
14  with you in RBG, correct?
15     A.  Yes.
16     Q.  And you had your phone with you at Town
17  Hall, correct?
18     MS. ZUCKER: Objection.
19     A.  I don't recall.
20     Q.  You don't recall if you had your phone with
21  you at Town Hall?
22     A.  Correct.
23     Q.  How did your phone get from RBG to your house?
24     MS. ZUCKER: Objection.

---

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

15:12:49-15:13:18                                    Page 205

1    A. I assume it was on my person, but I don't
2    have a memory of having my phone on me.
3    Q. Do you have any reason to believe it wasn't
4    on you?
5    A. I don't know.
6    Q. Where else could it have been? You weren't
7    in your car. You didn't leave it at RBG; is that
8    right?
9        MS. ZUCKER: Objection.
10   A. No, I didn't leave it at RBG, but, I mean,
11   I think -- like I said, it could have been in my
12   purse. It could have been on my person. I don't know.
13   Q. Did you have pockets that night?
14   A. No, no pockets.
15   Q. So it was either in your purse or holding
16   it in your hand?
17   A. Correct.
18   Q. If you were holding it in your hand, would
19   we have seen it in the video?
20       MS. ZUCKER: Objection.
21   A. I would assume you would have seen it on
22   the video.
23   Q. So would you agree with me it was most
24   likely in your purse, right?

5:13:37-15:14:13                                     Page 206

1    A. It likely was in my purse.
2    Q. Okay. So let me ask you this. Between
3    going in and going to -- the number is being punched
4    in, and then you remember being in the bathroom and
5    being a little dizzy and falling, then being at the
6    mirror -- you tell me I have anything wrong --
7    what's your next memory?
8    A. When I left the bathroom, I was unsteady
9    and leaned into the wall on the right side to brace
10   myself as I walked out of the bathroom.
11   Q. Is that a memory or something you saw on
12   the video?
13       MS. ZUCKER: Objection.
14   A. That's a memory.
15   Q. Was that a memory you always had?
16   A. No. Like, that memory came to me around
17   the same time as the bathroom memories. It was all
18   sort of one.
19   Q. It was part of that memory, or was it
20   around the same time but a different memory?
21       MS. ZUCKER: Objection.
22   A. I would say it was part of it.
23   Q. So when you got that -- he memory of the
24   falling in the bathroom, you also got the leaning on

15:14:30-15:15:16                                    Page 207

1    the wall, correct?
2        MS. ZUCKER: Objection.
3    A. Yes.
4    Q. Would you say that's a linear period of
5    time you got that?
6        MS. ZUCKER: Objection.
7    Q. Continuously? You remember being in the
8    bathroom, falling in the bathroom, using the sink in
9    the bathroom, and then leaning against the wall.
10   There's no breaks in that memory?
11       MS. ZUCKER: Objection.
12   A. From how I remember it, it seems linear.
13   Q. Okay. What is your next memory?
14   A. Being in front of Allan's office saying
15   that I wanted to go home.
16   Q. Is that, again, a memory you got from the
17   video or is that a memory that you actually have?
18       MS. ZUCKER: Objection.
19   A. It's a memory I actually have.
20   Q. Did you have that memory on May 2nd?
21   A. No.
22   Q. When did that memory come back to you?
23   A. Sometime in the winter or spring of '19.
24   Q. The winter or spring of '19. So a

15:15:41-15:16:22                                    Page 208

1    different one?
2        MS. ZUCKER: Objection.
3    A. Yes.
4    Q. I'm sorry, of 2019?
5    A. I want to make sure I have the dates right.
6    Q. I want you to make sure too.
7    A. Yes, of --
8        MS. ZUCKER: If you are unsure at this
9    point because it's been a long day for you, just say
10   you are unsure.
11       MR. SHAFRAN: She's answering.
12   A. I'm trying to remember. I would say spring
13   of '19.
14   Q. Before or after you talked to Regina Ryan
15   for the third time?
16   A. That's what I was trying to figure out. I
17   can't recall whether it was before or after Regina
18   Ryan right now.
19   Q. Is it possible it was after?
20   A. Could be.
21   Q. Do you remember telling it to Regina Ryan?
22   A. I don't recall if I told her or not.
23   Q. Going back to the memory of leaning against
24   the wall and that linear path that we talked about,

Case 1:19-cv-10482-WGY   Document 175-5   Filed 11/15/21   Page 38 of 178

Allan Chiocca vs.
The Town of Rockland, et al.

**Video Deposition**

Deirdre Hall - Vol. I
July 22, 2021

15:17:00-15:17:57                                    Page 209

1   you had no memory of that on May 2nd, correct?

2   **A.  Correct.**

3   Q.  Do you blame alcohol for that?

4       **MS. ZUCKER:** Objection.

5   **A.  Like I said, I think it's a combination of**

6   **multiple things from that night that caused me to**

7   **lose my memory.**

8   Q.  If I remember correctly, in your Position

9   Statement you say that your loss of memory is due to

10  alcohol and a private medical condition.  Does that

11  sound familiar to you?

12      **MS. ZUCKER:** Objection.

13  **A.  It doesn't sound familiar to me, but it**

14  **could be what it says.**

15  Q.  Okay.  Let's look at that for a second.

16          (Document marked as Hall

17          Exhibit 6 for identification)

18      **MS. ZUCKER:** Is this a good time to take a

19  break?

20          (Discussion off the record)

21          (Recess at 3:17 p.m.)

22      **THE VIDEOGRAPHER:** The time is now 3:28,

23  and we are back on the record.

24

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

15:33:40-15:34:11                                    Page 213

1  Q. Who did you say that to?
2  A. To Allan.
3  Q. And you have a memory, sitting here today,
4  that you said that?
5  A. Yes.
6  Q. Remind me when -- but you did not have that
7  memory May 2nd, May 3rd of 2018, correct?
8  A. That's correct.
9  Q. You did not have that memory when you spoke
10 to Regina Ryan at any of the times you spoke to her?
11 A. I can't recall right now whether I got that
12 memory -- it was right around the same time of when
13 I interviewed with Regina. I don't remember if it
14 was before or after.
15 Q. So in June of 2018?
16 A. No.
17 Q. The third time?
18 A. Yes.
19 Q. So that would have been March 2019?
20 A. Yes.
21 Q. And was there something that caused that
22 memory to come back?
23 A. I had just kind of a -- I was home, and I
24 had sort of an uncomfortable feeling while I was at

5:34:40-15:35:25                                    Page 214

1  home, and that feeling was familiar to me. It was
2  the same feeling I felt when I was in that hallway.
3  Q. What was that feeling?
4  A. Just discomfort, feeling a little
5  disgusted, a sense of just uneasiness.
6  Q. The memory of saying to Allan, "I want to
7  go home," or was it a feeling that came back to you?
8  A. It was a feeling that came back to me, and
9  then I remembered that memory.
10 Q. When you were at home and retrieved this
11 memory, did you -- that feeling made you want to go
12 home? I'm not following what you are saying.
13 A. I'm not understanding your question.
14 Q. Yes. It was bad.
15    So you are at home, and -- I'm sorry --
16 what were you doing when this feeling came over you?
17 A. I was talking on the phone.
18 Q. To whom?
19 A. I was talking with Ed.
20 Q. You were talking to Ed?
21 A. Yes.
22 Q. And this was you think in the March of 2019
23 time period, spring of 2019?
24 A. Possibly.

15:35:46-15:36:26                                    Page 215

1  Q. What are the other possibilities?
2  A. It was around the time I spoke with Regina.
3  Q. Was it before you spoke to Regina?
4  A. I can't recall that right now.
5  Q. How often were you speaking to Ed Kimball
6  in the spring of 2019?
7  A. I don't recall.
8  Q. Were you and Ed Kimball discussing the
9  night in question when the memory came back to you?
10 A. No.
11 Q. So what triggered it, if you know? What
12 brought it up? You didn't like the word "triggered."
13 A. Ed made a reference to something from our
14 intimate relationship, and since our intimate
15 relationship had ended, his comment made me feel a
16 little bit uncomfortable and --
17 Q. What was the comment he said?
18 A. It was sexual in nature, and it made me
19 uncomfortable.
20 Q. Was he saying something to you sexually,
21 like he was propositioning you in some way?
22    MS. ZUCKER: Objection.
23 A. He was saying something that he was hoping
24 would provoke a sexual response from me.

15:36:54-15:37:38                                    Page 216

1  Q. So he was, for lack of a better term,
2  coming on to you? Is that how you would
3  characterize it?
4     MS. ZUCKER: Objection.
5  A. No. I think he was kind of just teasing me.
6  Q. What exactly did he say?
7  A. He just made a reference to what I would
8  title, like, a book or something if I wrote
9  something about us.
10 Q. "Us" being you and Ed Kimball?
11 A. Yes.
12 Q. Did you answer that question?
13 A. No, I didn't.
14 Q. Did you tell him it was inappropriate?
15 A. No. I think I sort of laughed and moved
16 forward, but it made me uneasy and uncomfortable.
17 Q. What led up to that question to you?
18    MS. ZUCKER: Objection.
19 A. I really don't recall.
20 Q. Tell me about the rest of that
21 conversation. What do you recall from that
22 conversation?
23 A. That's the only thing I recall from that
24 conversation. That's the only thing that stuck with

Allan Chiocca vs.
The Town of Rockland, et al.

**Video Deposition**

Deirdre Hall - Vol. I
July 22, 2021

15:37:52-15:38:18                                      Page 217

1  me.
2  Q.  How long a conversation was that?
3  A.  I don't remember.
4  Q.  Any other witnesses on the phone other than
5  the two of you?
6  A.  No.  It was just us.
7  Q.  Where were you standing in your house?
8  A.  I think I was in my living room.
9  Q.  Did you tell him while he was on the phone
10  that you had this memory come back?
11  A.  No.
12  Q.  Did you tell anyone that you had this
13  memory come back?
14      MS. CIESLAK: Objection.
15  Q.  Other than counsel.
16      MS. ZUCKER: Or your husband.
17  A.  I can't answer that.
18  Q.  Because it would be either counsel or your
19  husband?
20  A.  Correct.
21  Q.  Did you ever tell Ed Kimball?
22  A.  I may have.
23  Q.  You don't remember?
24  A.  I don't recall.

15:38:36-15:39:17                                      Page 218

1  Q.  And you don't remember if you told Regina
2  Ryan, correct?
3  A.  If it was before I spoke with her, I told
4  her, but I can't recall if it was before or after
5  because it was right about contemporaneous to the time.
6  Q.  Was there anything traumatic about that
7  memory?
8  A.  No.  It was just icky.  It made me feel
9  uncomfortable.
10  Q.  It made you feel uncomfortable that you
11  told Allan Chiocca that you wanted to go home?
12  A.  No.  I think I was feeling uncomfortable
13  when I said it, not that -- I don't think me saying
14  it caused the uncomfortable feeling.  I think I was
15  just uncomfortable with whatever was happening at
16  the time.
17  Q.  And -- so you are in the hallway.  Is
18  this what you think we saw in the video as well?
19      MS. ZUCKER: Objection.
20  Q.  You got a memory back of the thing that was
21  on the video where you were putting your hands on
22  your face; is that right?
23  A.  I'm saying something in the video, yes.
24  Q.  That something in the video you had

15:39:32-15:40:10                                      Page 219

1  previously even before you got the memory back
2  opined that you were saying that you wanted to go
3  home?
4  A.  Uh-huh.
5  Q.  How did you form that belief?  Was it just
6  from watching the video?
7  A.  It was just from watching the video.  It
8  appears that I'm saying, "I want to go home," yes.
9  Q.  Did you talk to any expert in language or
10  video imagery?  I don't know.  Did you?
11      MS. ZUCKER: Objection.
12      MR. COOPER: I object.
13  A.  No.
14  Q.  You just watched it yourself a number of
15  times and came to the conclusion that you were
16  saying, "I want to go home," correct?
17  A.  Yes.
18  Q.  Did you see yourself saying any word other
19  that the word "home" in the video?
20  A.  I think I saw myself saying "I am" at one
21  point, but -- and then that I wanted to go home.
22  Q.  Did you see yourself saying the words, "I
23  want to go home" or just the word "home"?
24  A.  I think I said, "I want to go home."

15:40:36-15:41:15                                      Page 220

1  Q.  That's what you saw?
2  A.  Yes.  I also saw myself say "I am" to
3  something.
4  Q.  Okay.  And then -- but at the time that
5  didn't trigger a memory that you had said that?
6  A.  No.  That memory was triggered by emotions,
7  by how I felt.
8  Q.  So almost a year later, then it comes back
9  to you, correct?
10  A.  When I felt that same emotional state, yes,
11  that's when it came back to me.
12  Q.  Would you agree with me, then, that memory
13  that came back to you in the spring of 2019
14  confirmed your belief from what you saw in the video?
15  A.  I don't know if it confirmed it, but that's
16  what I remember.
17  Q.  But it's in accord with what you had
18  previously thought you had seen in the video, correct?
19      MS. ZUCKER: Objection.
20  A.  I don't have -- when I remembered what I
21  said, I didn't actually remember saying "I am."  So
22  it doesn't confirm everything that I believe I saw.
23  Q.  It confirms that "I want to go home"?
24  A.  Yes.

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

15:41:42-15:42:17                                                    Page 221

1    Q.  Okay.  What is your next memory of what
2    happened that night?
3    A.  **My next memory is when we are out at the**
4    **top of the stairs.**
5    Q.  You have seen all the different video
6    angles, correct?
7    A.  I believe so, yes.
8    Q.  You have watched them, I'm guessing,
9    multiple times at this point, correct?
10   A.  Yes.
11   Q.  And you actually watched it with us last
12   week again, correct?
13   A.  I think it was only one angle, but yes.
14   Q.  Did you see -- so you tell me if I have
15   this right.  Based on the video at least, you go
16   into Town Hall.  You use the restroom.  Then you
17   come out of Town Hall.  Is that accurate?
18        MS. ZUCKER:  Objection.
19   A.  I'm sorry.  I lost you.  Can you go again.
20   Q.  That's okay.
21   A.  Thank you.
22   Q.  Based on what you've seen in the video, you
23   go into Town Hall with Allan Chiocca.  You use the
24   bathroom.  You come out of Town Hall.  Is that correct?

5:42:44-15:43:11                                                     Page 222

1    A.  **I followed him into Town Hall.  Then when I**
2    **left, I believe I was following him again, yes.**
3    Q.  So you went into Town Hall.  You use the
4    bathroom.  You came out of Town Hall, correct?
5        MS. ZUCKER:  Objection.
6    Q.  I didn't ask you who was in front.
7        MS. ZUCKER:  Are you asking her what she
8    sees in the video?
9        MS. HALEM:  Yes.
10       MS. ZUCKER:  I'm lost.
11       MS. HALEM:  Yes.
12   A.  **So what I see in the video is I follow him**
13   **into Town Hall, I use the bathroom, and then I**
14   **follow him out of Town Hall.**
15   Q.  Do you remember him punching the alarm back
16   on when you are leaving?
17   A.  No.
18   Q.  Did you see that in the video?
19   A.  I don't think so.
20   Q.  Before you left Town Hall after using the
21   bathroom, did you go into his office?
22   A.  No.
23   Q.  Did you drink any wine?
24   A.  No.

15:43:32-15:44:01                                                   Page 223

1    Q.  Did he offer you any wine?
2        MS. ZUCKER:  Objection.
3    A.  Not that I recall.
4    Q.  So the next thing you remember is standing
5    at the top of those stairs?
6    A.  Yes.
7    Q.  Watching the video, would you agree with me
8    that you're in front of Allan when you get to the
9    top of the stairs?
10   A.  **He kind of puts his hand on my back and**
11   **moves me in front, yes.**
12   Q.  Do you turn around and stand in front of
13   him at the top of the stairs?
14       MS. ZUCKER:  Objection.
15   A.  **I turn around and lean against the railing.**
16   Q.  Are you standing in front of him?
17   A.  **I am, but I'm leaning against the railing.**
18   Q.  That's not what I asked you.  Are you
19   standing in front of him?
20       MR. COOPER:  Objection.
21       MS. ZUCKER:  Objection.  She can answer it
22   as she sees fit.  You are asking her what she's --
23   she just answered it.
24       MS. HALEM:  Ellen...

15:44:19-15:44:44                                                   Page 224

1    Q.  Is your back to the stairs?
2    A.  **No, my back is not to the stairs.  My back**
3    **is facing the outside -- my back is not to the**
4    **stairs.  If my back was to the stairs, I would be**
5    **facing Union Street, and I'm not facing Union Street.**
6    Q.  Okay.  Are you at the top of the stairs?
7    A.  **I'm in the landing at the top of the**
8    **stairs, yes.**
9    Q.  Can Allan get to the stairs without getting
10   past you?
11   A.  Yes.
12       MR. COOPER:  Well, let me just object.
13   There's a video of this.
14       MS. HALEM:  I know.  I'm asking her what
15   she saw on the video.
16       MR. COOPER:  So you are asking the Witness --
17       MS. HALEM:  Hey, they are my questions.  If
18   you don't like them, you can ask different questions.
19       MR. COOPER:  Well, I think that they're --
20       MS. HALEM:  Howard, it's not a proper
21   objection.  Stop.
22       MS. ZUCKER:  Please.
23       MR. COOPER:  I object.
24       MS. HALEM:  Good.

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

15:45:03-15:45:26                                          Page 225

1          MS. ZUCKER: You can ask her, certainly,
2    whatever you want to ask her, but let's be clear
3    that all you are asking her is what she remembers a
4    video may have shown.
5          MS. HALEM: Yes. Got it.
6          MS. ZUCKER: Good luck. Objection.
7    Q.    You are at the top of the stairs, and you
8    have a conversation with Allan; is that correct?
9    A.    Yes.
10         MS. ZUCKER: Objection. In terms of what
11   the video shows, is that what you're doing?
12         MS. HALEM: No. I'm asking her -- she says
13   she remembers the conversation.
14         MS. ZUCKER: Well, if you are going to
15   toggle back and forth, at least make it clear.
16         MS. HALEM: I will try.
17         MS. ZUCKER: That would be great.
18         MR. COOPER: That was the basis of my
19   objection. As long as you make it clear, it's fine.
20   A.    So what am I answering?
21   Q.    Was that your next memory, that you were at
22   the top of the stairs?
23   A.    My next memory was that I was at the top of
24   the stairs, yes.

15:45:54-15:46:38                                          Page 226

1    Q.    Tell me what you remember about that.
2    A.    I remember being nervous and anxious,
3    panicky. I was kind of cold too. I remember
4    telling Mr. Chiocca that I didn't want him to tell
5    Larry Ryan about me and Ed.
6    Q.    So you do remember telling Allan about you
7    and Ed?
8    A.    No. I remember I said that at the top of
9    the stairs, but I don't remember actually telling him.
10   Q.    But at the top of the stairs, you would
11   agree with me that you had an understanding that you
12   had told Allan Chiocca about your intimate
13   relationship with Ed Kimball?
14         MS. ZUCKER: Objection.
15   A.    Based on what I can infer from what I said
16   about Larry, yes.
17   Q.    When you spoke to Regina Ryan the first and
18   second time, did you have a memory of anything that
19   happened between the time that you were at RBG and
20   you woke up the next morning?
21   A.    When I spoke with her -- I'm sorry, when?
22   Q.    When you spoke to Regina Ryan in June of
23   2018, did you have a memory of anything that
24   happened between being at RBG and then the next

15:47:01-15:47:44                                          Page 227

1    morning when you wake up?
2    A.    Yes.
3    Q.    Was it only being in the foyer?
4    A.    No. I also remembered that Allan said to
5    me that I give a good blow job.
6    Q.    You told that to Regina Ryan?
7    A.    I didn't tell Regina Ryan, but I had that
8    memory.
9    Q.    Why didn't you tell Regina Ryan that?
10   A.    Because it was revolting to me and disgusting.
11   Q.    So you chose not to tell the independent
12   investigator that Mr. Chiocca had said that to you
13   in the summer of 2018?
14   A.    I was sort of in denial. Yes.
15   Q.    Had you told anyone, other than your
16   counsel or your husband, that he had said that to you?
17   A.    At that time, no.
18   Q.    But you remembered it at that time?
19   A.    Yes.
20   Q.    And you had that memory on May 2nd?
21   A.    Yes.
22   Q.    So you are standing at the top of the
23   stairs. You have -- according to the video, it's
24   seven minutes. Does that sound accurate, the

15:48:11-15:48:52                                          Page 228

1    conversation with Allan Chiocca?
2    A.    I don't know -- the way that video
3    operates, I'm not sure that's actually accurate
4    because of the way it only takes time when you move
5    in and all that stuff.
6    Q.    Was it a long conversation?
7    A.    It appeared to be somewhat lengthy.
8    Q.    Tell me everything you remember about that
9    conversation at the top of the stairs.
10   A.    I just remember repeating myself, you know,
11   saying that I didn't want him to tell Larry, that
12   Larry wouldn't be able to keep it to himself, he
13   couldn't help himself, and it could potentially, you
14   know, have disastrous impacts for Ed's family and my
15   family, and I didn't want that for either of us.
16   Q.    Why did you raise Larry Ryan in that moment?
17   A.    I don't know.
18   Q.    Do you remember anything Allan said to you
19   in that conversation?
20   A.    No. I just remember begging him, pleading
21   him not to say anything.
22   Q.    Why did you think he was going to tell
23   Larry Ryan?
24         MS. ZUCKER: Objection.

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

1    A.  I don't know.  I just at that time knew
2  that's what was happening.
3    Q.  So you don't have a present memory of him
4  saying anything about Larry Ryan.  You just have a
5  present memory of you saying, "Don't tell Larry
6  Ryan," or words to that effect?
7    A.  Correct.
8    Q.  Is there anything else you remember about
9  being at the top of the stairs?
10   A.  Just when we walked back in.
11   Q.  Let's stick with the top of the stairs.
12  When did that memory come back to you?
13   A.  In the summer maybe of 2019.
14   Q.  Of 2019?
15   A.  Uh-huh.
16   Q.  So -- and I apologize for jumping -- you
17  did not have a memory of that on May 2nd?
18   A.  Correct.
19   Q.  So the summer of 2019, you already talked
20  to Regina Ryan three times by this point, correct?
21   A.  Yes.
22   Q.  What is the next memory you have?
23   A.  Walking back into Town Hall.
24   Q.  And do you remember why you walked back

1  into Town Hall?
2    A.  I was following Allan.
3    Q.  I didn't ask you what you saw.  I'm asking
4  you, do you know why you went --
5    A.  Like I said, the reason I walked into Town
6  Hall was because I felt like I had to follow Allan.
7    Q.  Why did you feel like you had to follow Allan?
8    A.  I don't know.  I just felt like I had to
9  follow Allan.  I felt like I was panicky, and I was,
10  you know, scared and just very anxious.  I just had
11  to follow him.  He was so far ahead of me, I thought
12  I'd never catch up to him.
13   Q.  So your -- when did this memory come back?
14   A.  In the fall of 2018.
15   Q.  How did that memory come back?
16   A.  We visited Town Hall.
17   Q.  Who is "we"?
18   A.  Me and my husband.
19   Q.  So your husband and you go to Town Hall in
20  the fall of 2018 why?
21   A.  To try to see if I can remember anything,
22  to try to see if anything came back to me.
23   Q.  So you went back to the scene of that night
24  for what purpose?

1    A.  Just to see it at night.  We went at night
2  so we could try to see, you know, if it allowed me
3  to remember anything.  Like I said, I just
4  remembered that panicky feeling when I was walking
5  back in.
6    Q.  What inspired you to do that?
7    A.  I don't recall.
8    Q.  Why did you want the memory back?  Why did
9  you want to jog your memory?
10      MS. ZUCKER:  Objection.
11   A.  Honestly, that's been a huge issue in this
12  whole lawsuit.  Like, I don't want to remember any
13  of this.  I don't want to remember a frigging thing,
14  but --
15   Q.  So why did you go back to Town Hall?
16      MR. COOPER:  Well, let her finish.
17      MS. HALEM:  Sorry.
18   A.  -- but I have to because I have to defend
19  myself in this suit, and I need to remember
20  everything I possibly can from that night.
21      So that's been a huge issue for me
22  throughout this whole thing, is this push and pull
23  between needing to remember but not wanting to
24  remember, but needing to remember and not wanting to

1  remember, and it's been really hard, and I'm still
2  dealing with it every single day.
3    Q.  Why don't you want to remember?
4    A.  Because it's upsetting and revolting.  I
5  feel like I've been violated.
6    Q.  Is there a memory you had on May 2nd that
7  made you feel violated?
8    A.  A memory I had about May 2nd or on May 2nd?
9    Q.  On May 2nd.
10   A.  When he told me I give a good blow job,
11  that made me feel pretty violated.  It made me feel
12  pretty disgusting and pretty revolting, and it made
13  me feel like just incredibly shameful, like horrible.
14   Q.  What caused you to remember being at the
15  top of the stairs?  I think you said you got that
16  back in the summer of 2019.
17   A.  I don't recall.
18   Q.  You just know in the summer of 2019 you
19  remembered that?
20   A.  Yes.  I don't recall.
21   Q.  And you go to Town Hall with your
22  husband -- how many times did you go to Town Hall
23  with your husband to try and fix the gaps in your
24  memory?

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

Page 233

15:53:01-15:53:35

1    A.  Once.
2    Q.  Just once?
3    A.  Just once.
4    Q.  Did you ever go during the day?
5    A.  I've been to Town Hall during the day just
6    for doing business, but not for any other purpose
7    other than doing business.
8    Q.  Since May 1st-2nd?  Well, I guess since you
9    resigned from the Board.
10        MS. CIESLAK: I'm going to insert an
11   objection.  To the extent it has to do with any of
12   our conversations, I don't want you to answer.
13       A.  So I have to pay my taxes.  I need to pay
14   my excise tax, my water bill.  So yes, I go and do
15   business in and out of Town Hall.
16       Q.  Do you do those in person?
17       A.  Sometimes if I'm kind of running late on
18   the deadline, yes, I will go in in person and do it.
19       Q.  You can't pay online?
20       A.  They charge you, like, a $5 fee, and I kind
21   of think that that's ridiculous because it's easy
22   for them to do it on online, but yet they still
23   charge you a fee.  So sometimes I go in person, yes.
24       Q.  But the only time you went to Town Hall for

Page 234

15:53:57-15:54:25

1    memory retrieval purposes was that time in the fall
2    of 2018 with your husband at night?
3    A.  As far as I know, yes.  As far as I can
4    remember.
5    Q.  Did you ask to meet with Regina Ryan at
6    Town Hall?
7    A.  I did.
8    Q.  Why?
9        MS. CIESLAK: Objection.
10   Q.  Why?  You can answer.
11       MS. CIESLAK: This is getting into her
12   discussion she had with me, and that communication
13   with Regina Ryan was with me.
14       MR. SHAFRAN: That's not privileged.  You
15   are --
16       MS. HALEM: Okay.  I'll rephrase the question
17   for you.
18       MS. CIESLAK: If the center of that
19   communication is a privileged communication between
20   us, she's not answering.
21       MR. SHAFRAN: Not if it's with Regina it
22   isn't.
23       MS. HALEM: Agree.  I'm just going to ask
24   her if she had a reason to want to meet Regina Ryan

Page 235

15:54:48-15:55:19

1    at Town Hall as opposed to another place.
2    A.  When I have my memories about what happened
3    the evening of May 1st when I'm in the office, they
4    are very spatial, and so it's helpful for me to
5    describe the positions and the locations of the room
6    that we're in by using the conference table as a
7    clock, and so I thought it would be more effective
8    to explain to Regina my memories in that space so
9    that she could have a better idea of why where I was
10   and what I remember.
11       Q.  Did you think about just drawing a diagram
12   for Regina Ryan?
13       MS. ZUCKER: Objection.
14       A.  I think we drew a diagram and were in the
15   space.  I think we ended up drawing a diagram
16   anyways too.
17       Q.  Was it at a regular rectangular table?
18       A.  No.  It's oval.  So I would use 12 o'clock,
19   6 o'clock, 3:00, whatever, to explain the locations
20   of things.
21       Q.  Did any memories come back to you while you
22   were in the room that day?
23       A.  No.
24       Q.  Going back now to the last memory you have

Page 236

15:55:53-15:56:36

1    of that night, so now we have you trying to catch up
2    to Allan; is that right?
3    A.  Yes.
4    Q.  You don't know why you went back in; is
5    that accurate?
6    A.  That's correct, I don't know why I was
7    going back in.
8    Q.  Do you remember actually following him?
9    A.  Yes.
10   Q.  Do you remember him entering the code a
11   second time?
12   A.  No.
13   Q.  What is your next memory?
14   A.  My next memory is being inside Allan's
15   office at the 6 o'clock spot on the table.  So if
16   his desk was 12 o'clock, I was at 6 o'clock opposite
17   his spot.  I was tired, and I put my head down on
18   the desk and put my arms out, and the table was
19   cold.  I just started repeating over and over again,
20   "What's going to happen when people find out I'm
21   fucking the chairman?"
22   Q.  Were you upset?
23   A.  I was in distress.  Yes.
24   Q.  Were you concerned -- it sounds like you

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

15:56:58-15:57:30                                        Page 237

1  were concerned that people were going to think badly
2  of you?
3      A.  Actually, at that time I was thinking
4  specifically of people in Town Hall, and I was more
5  concerned with Ed's family than I was with mine at
6  that point in time.
7      Q.  Why weren't you concerned about your family?
8      A.  Like I said, in my mind at that time Ed's
9  family was the one I was thinking about.
10     Q.  Were you concerned about how it was going
11  to affect your race for the Legislature?
12     A.  At this point I wasn't -- it wasn't even in
13  my mind.
14     Q.  What else do you remember -- and how many
15  times did you say, "What are people going to think
16  when they find out I'm fucking the chairman?"
17     A.  Multiple times.
18     Q.  More than five?
19     A.  Probably.
20     Q.  More than ten?
21     A.  I don't recall.
22     Q.  And you are saying this to Allan?
23     A.  I'm just saying it out loud.
24     Q.  Was there anyone in the room other than Allan?

15:57:48-15:58:21                                        Page 238

1      A.  Allan actually left the room while I was
2  saying it.
3      Q.  You have a memory that he left the room
4  while you were saying it?
5      A.  I was alone, yes, and I continued to say it.
6      Q.  Where was Allan?
7      A.  I don't know.
8      Q.  How long do you think you were sitting at
9  the table saying this?
10     A.  I don't know the duration of time.  I can't
11  tell you that.
12     Q.  Did you take any of your medication at that
13  point?
14     A.  I don't recall.
15     Q.  Do you remember taking any medication that
16  night?
17     A.  I don't remember taking any medication that
18  night, but I did chair the meeting, so it's possible
19  that I could have taken probably propranolol before
20  the meeting.
21     Q.  You told us before you that you found out
22  that you were chairing the meeting five minutes
23  before the meeting.
24     A.  Yes.  I keep it in my bag.

15:58:37-15:59:08                                        Page 239

1      Q.  Would that have been enough time for it to
2  have an effect?
3      A.  It probably takes a half an hour.
4      Q.  And you take that for anxiety, correct?
5      A.  I do.
6      Q.  And was it for anxiety of chairing the
7  meeting or -- not relating to Dawn Kimball, right?
8          MS. ZUCKER:  Objection.
9      A.  Yes.  It was the anxiety relating to
10  chairing the meeting.  I'd take propranolol before
11  all my hearings and everything when I was practicing
12  law.  That's what I do.
13     Q.  Does that affect your judgment in any way,
14  shape or form?
15     A.  Propranolol?
16     Q.  Yes.
17     A.  It's contraindicated with alcohol, but on
18  its own it doesn't impact your judgment.
19     Q.  What is your next memory?  Oh, let me ask
20  you this.  When did you retrieve the memory of
21  saying -- or did you have it on May 2nd -- "What are
22  people going to say when they find out I'm fucking
23  the chairman?"
24     A.  In, like, the summer to fall of '18.

15:59:33-16:00:03                                        Page 240

1      Q.  That's when you got that back?
2      A.  Uh-huh.
3      Q.  After you spoke to Regina Ryan?
4      A.  The first time.
5      Q.  The first and second time?
6      A.  Yes.
7      Q.  What triggered or -- I'm sorry.  I keep
8  using that word.  What prompted that memory to come
9  back, if you know?
10     A.  I don't recall.  I wasn't keeping notes of
11  what was causing my memories to come back.
12     Q.  Did you tell someone, other than your
13  husband or your attorney, that the memory had come
14  back?
15          MS. ZUCKER:  Other than.
16          MS. HALEM:  I said that.
17          MS. ZUCKER:  Yes, I know.
18          MS. HALEM:  Are we good?
19     A.  No.  I don't think I told anyone.
20     Q.  Have you ever had alcohol after taking --
21     A.  Actually, can we go back to your last
22  question?
23     Q.  Sure.
24     A.  I may have told Linda Cook.

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

---

16:00:20-16:00:52                                                    Page 241

1   Q.  That you got that memory back?
2   A.  Yes.
3   Q.  And who is Linda Cook?
4   A.  She's a good friend of mine.
5   Q.  I think you testified before that you told
6   a good friend that you were having an affair with Ed
7   Kimball prior to the story coming out, and that was
8   Linda Cook?
9   A.  No.  Which story?  Can I ask which story
10  coming out?
11  Q.  Sorry.  The incident that occurred at Town
12  Hall.
13  A.  When it first broke in the media on the 23rd?
14  Q.  Yes.  You told us you had told two friends
15  before that.
16  A.  I didn't tell any friends that I was having
17  an affair with Ed Kimball before that broke.
18  Q.  What did you tell them?
19  MR. COOPER: Objection.  Asked and answered.
20  MS. ZUCKER: Objection.
21  A.  I didn't tell anyone other than Allan.
22  Q.  You told Linda Cook and another person that
23  there was an incident at Town Hall with you and
24  Allan Chiocca.  Is that what you told Linda Cook?

---

16:01:15-16:02:02                                                    Page 242

1   A.  Linda Cook, yes.
2   Q.  And who is the other person?
3   A.  Scott McAllen.
4   Q.  Scott McAllen.  Is he also a friend of yours?
5   A.  He is.
6   Q.  You think you may have told Linda Cook in
7   the summer of 2018 that you got a memory back of
8   sitting at the table; is that correct?
9   A.  Yes.
10  Q.  What's the next memory you have of that night?
11  A.  The next memory I have is Allan sitting at,
12  like, 9 o'clock, 10 o'clock area around the table,
13  and I'm still at 6 o'clock, and he said that, "My
14  day in the Legislature we would have taken care of
15  this with a blow job and a contract."
16  Q.  Taking care of what?
17  A.  I assume he was talking about my concern of
18  keeping quiet.
19  Q.  Why did you form that assumption?
20  A.  Because that's what I was worried about
21  when I was -- had my head on the table, and that's
22  what I was worried about at the top of the stairs
23  with Larry Ryan.
24  Q.  Were you also worried that Dawn King was

---

16:02:28-16:02:59                                                   Page 243

1   going to -- Kimball was going to tell people?
2   MS. ZUCKER: Objection.
3   A.  I was earlier in the evening, but I
4   wasn't -- Dawn telling people at that time was not
5   on my mind.
6   Q.  How do you know?
7   A.  Because I know what I was worried about at
8   the time, and it was about Allan telling Larry.
9   Q.  How do you know that's what you were
10  worried about at the time?
11  A.  Because that's what I remember thinking.
12  Q.  When did you recall that memory?
13  A.  When I was at the top of the stairs.  We
14  talked about this one.
15  Q.  Okay, but how do you know if at some other
16  point in the night you weren't concerned about Dawn
17  Kimball telling people?
18  A.  I can only tell you what I was concerned of
19  when I remember what I was concerned about.
20  Q.  And you would agree with me that you still
21  have significant gaps in time during that night,
22  May 1st to May 2nd, 2018; is that correct?
23  A.  Yes, there are still gaps in time.
24  Q.  So the next memory you have is Allan making

---

16:03:25-16:04:02                                                   Page 244

1   that comment to you.  When did you recover that memory?
2   A.  Around the same time as the head on the table.
3   Q.  Was this after Regina Ryan's report comes out?
4   A.  Yes.
5   Q.  So is the first time you get a memory back
6   after Regina Ryan's report comes out?
7   MS. ZUCKER: Objection.
8   A.  The first time I got a memory back was the
9   end of July.
10  Q.  So after the report comes out?
11  A.  Uh-huh.
12  Q.  Yes?
13  A.  Yes.  I'm sorry.  Yes.
14  Q.  So what's the next -- and, again, you
15  didn't have that memory of Allan making that comment
16  on -- after the -- on May 2nd or May 3rd, correct?
17  A.  I'm sorry, I missed the question.
18  Q.  The comment about the contract and a blow
19  job, you didn't have that memory until after the
20  report comes out, correct?
21  A.  Correct.
22  Q.  What's the next memory you get back?  Or
23  what's the next thing you remember about that night?
24  A.  The next thing I remember is that I'm

---

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

16:04:17-16:04:52                                                Page 245

1  hearing crunching in my ears.
2     Q.  So do you remember how you go to the
3  crunching in your ears?
4     A.  No.
5     Q.  So the next thing you remember is giving
6  him oral sex; is that correct?
7     A.  I remember crunching in my ears first and
8  pressure on my face from my eyeglasses.  They were
9  pushed up against my face.
10    Q.  What's pushing -- if you remember, what's
11 pushing against your eyeglasses?
12    A.  Initially I didn't know, but it was his body.
13    Q.  And that's another memory that comes back
14 at a different time?
15    A.  Than what?
16    Q.  Than the crunching.
17    A.  No.  That was all at one time.
18    Q.  Tell me that whole memory, if you would.
19    A.  So I feel crunching -- oh, I hear
20 crunching, you know, going on in my ears.  It's,
21 like, the frame.  I had to have, like, statement
22 glasses, so the frames of my glasses are being kind
23 of pushed, and the tightness is making like a
24 cracking or crunching noise that I can hear real

16:05:19-16:06:25                                                Page 246

1  loudly in my ears.  And then my glasses are pushed
2  up against my face, so I'm feeling pressure like
3  under here (indicating), under my eyes and kind of
4  around my eyebrows.  And then I realize that I had
5  his penis in my mouth.  Then I remember trying to
6  pull my head off him, and I couldn't pull my head
7  off of him.  I wanted to stop, and I couldn't make
8  it stop.  It was just -- I couldn't pull my head
9  off.  And then he -- then I remember it ending, and
10 I remember then falling onto my hands and rolling
11 onto my left side on the floor and him pulling up
12 his pants and his belt buckle jingling.
13    Q.  And this memory came back to you all at once?
14    A.  That memory did, yes.
15    Q.  Is it a complete linear memory?
16    A.  It wasn't because I had other memories
17 after that that fit in gaps in that memory.
18    Q.  Okay.  So I guess let's take it piece by
19 piece here.  That memory came back to you when?
20    A.  In the fall of 2018.
21    Q.  And what prompted that memory to come back,
22 if you know?
23    A.  I don't know.
24    Q.  Just all of a sudden you remember the

16:06:44-16:07:20                                                Page 247

1  cracking of the eyeglasses and you remember having
2  his penis in your mouth?
3     A.  Yes.
4     Q.  Did you have a memory of how his penis got
5  in your mouth?
6     A.  No.
7     Q.  And was this -- you don't remember anything
8  that happened that made that memory come back?
9     A.  Correct.
10    Q.  Do you remember where you were when the
11 memory came back?
12    A.  No.
13    Q.  And you said you had other memories come
14 back that fill in the holes.  That was after the
15 cracking?
16    A.  Yes.
17    Q.  Tell me about those memories.
18    A.  So I had a memory of -- during the act, I
19 remember him -- I remember tasting him and feeling
20 relieved because I thought it was going to end, and
21 then it didn't end and it didn't end.  And then I
22 remember tasting him again and thinking that it was
23 going to end, and it didn't end.  Then I -- that led
24 me into the memory of it ending.

16:07:58-16:08:27                                                Page 248

1          So that sort of piece there I didn't
2  remember the first time, but I did have that memory
3  come back to me as well.
4     Q.  Are these three separate memory retrievals
5  or two?  I'm not clear.
6        MS. ZUCKER:  Objection.
7     A.  I'm not clear with your question either.
8     Q.  So you told me about the eyeglass cracking.
9     A.  Uh-huh.
10    Q.  And now you are telling me about tasting him.
11    A.  Uh-huh.
12    Q.  Is that tasting memory, the one you just
13 relayed, is that one memory retrieval or two?  Did
14 that happen over two periods of time or just once?
15    A.  The one I just -- the second one I relayed?
16    Q.  Yes.
17    A.  That was one.
18    Q.  One.  And when was that?
19    A.  That was in October of 2018.
20    Q.  And what, if you know, prompted that to
21 come back?
22    A.  I was watching "Leaving Las Vegas," and
23 Nicholas Cage had just -- there's something with his
24 teeth.  It was just making me feel gross as I was

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

16:08:59-16:09:23                                          Page 249

1  watching him. I was starting to fall asleep, and
2  then I remembered that memory, and it's because
3  Nicholas Cage's teeth reminds me of Allan's teeth.
4    Q. When you say gross as you were falling
5  asleep, I don't understand. So you were watching
6  the movie, and you were falling asleep at the same
7  time?
8    A. Yes.
9    Q. And if I remember from some of the stuff
10 you filed, this was in Maine?
11   A. No.
12   Q. No. Was this in your house in Rockland?
13   A. Yes.
14   Q. And you were watching the movie with your
15 family?
16   A. I was alone.
17   Q. Did you at one point say something about
18 putting your children to bed after you had the
19 memory come back?
20   A. Yes, because I wanted to tell my husband.
21 So yes, my husband was there.
22   Q. So where were your children?
23   A. I think they must have been going to bed
24 because I wanted to tell my husband --

16:09:37-16:10:02                                          Page 250

1          MS. ZUCKER: Let's just stop about what
2  you --
3          MS. HALEM: I'm not asking that.
4          MS. ZUCKER: She's not asking that.
5          MS. HALEM: I'm talking about the children.
6    A. Yes, we put the kids to bed.
7    Q. So the children weren't watching "Leaving
8  Las Vegas" with you?
9    A. No.
10   Q. You were watching it alone?
11   A. I think my husband was with me.
12   Q. Where were your children?
13   A. My children are older. They could have
14 been upstairs playing video games or something.
15   Q. Okay. This was, again, when? October of
16 2018?
17   A. October.
18   Q. Of 2018?
19   A. Yes.
20   Q. And did you tell anyone about that memory,
21 other than your husband or your attorney?
22          MS. HALEM: I'm getting good, Ellen.
23   A. Regina.
24   Q. Regina. That would have been in March of

16:10:20-16:10:54                                          Page 251

1  2019?
2    A. Yes.
3    Q. Anyone else?
4    A. I probably told Linda.
5    Q. Did you tell Ed Kimball?
6    A. I may have.
7    Q. Any of these other memory retrievals did
8  you tell Ed Kimball?
9    A. It's possible.
10   Q. Do you have any memory sitting here today
11 that you did?
12   A. I don't have a specific memory of telling
13 him, no.
14   Q. Did you tell any other members of your
15 family other than your husband?
16   A. No.
17   Q. What's the next memory that you get back in
18 this linear order that we are going in? Actually,
19 strike that. I'm sorry.
20        You said that that second memory filled in
21 the gaps in the first memory. So is it now a
22 complete linear memory?
23          MS. ZUCKER: Objection.
24   A. No.

16:11:12-16:11:46                                          Page 252

1    Q. There's still gaps in it?
2    A. Yes.
3    Q. And you said you remembered being on the
4  floor. You rolled onto the floor afterwards?
5    A. I fell onto my knees. Then I rolled onto
6  my left side. I was really tired.
7    Q. You were tired?
8    A. I was really tired.
9    Q. It was late at night, wasn't it?
10   A. I was tired. I wanted to just go to sleep.
11 I was tired.
12   Q. Okay. Were you -- was Allan standing up
13 while you were performing oral sex or was he sitting
14 down?
15   A. He was sitting down.
16   Q. And you were on your knees then?
17   A. I recall being on my knees, yes.
18   Q. When did you recall being on your knees?
19   A. When I fell, I was already on my knees,
20 when I fell down on my hands.
21   Q. No, no. I mean did you have that memory
22 before October 2018, when you got the memory back of
23 performing oral sex?
24   A. I'm confused by your question.

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

1  Q.  Yes.  It wasn't great.
2       The first time you remember actually
3  performing oral sex on Allan Chiocca is October of
4  2018; is that right?
5  **A.  I don't really like calling it "performing**
6  **oral sex," but.**
7  Q.  What term would you like me to use?
8  **A.  I don't know.**
9       **MR. COOPER:** Sexual assault.
10      **MS. ZUCKER:** How about that?
11      **MR. SHAFRAN:** That's totally inappropriate.
12      **MR. COOPER:** No, it isn't.
13      **MS. HALEM:** Guys...
14      **MR. COOPER:** So is the term --
15      **THE WITNESS:** How about to say --
16      **MS. ZUCKER:** It's not performing oral sex.
17  Q.  Whatever term you want, Ms. Hall, I'm happy
18  to use it.
19  **A.  You can say when his penis was in my mouth.**
20  **We can say that.**
21  Q.  When was the first time you remembered his
22  penis in your mouth?
23  **A.  In the summer or the fall of '18.**
24  Q.  You had no memory of it prior to that?

1  **A.  Correct.**
2  Q.  So you remember then being on your side,
3  right, on the ground?
4  **A.  Subsequent to being on my hands and knees,**
5  **yes.**
6  Q.  At this point in time, how long had you
7  been in Allan's office?
8  **A.  I don't know.**
9  Q.  You don't know.  Do you know how long you
10  were on the floor?
11  **A.  I don't know.**
12  Q.  Do you remember if you spoke to Allan
13  before putting his -- his penis being in your mouth,
14  you realizing that his penis was in your mouth?
15      **MS. ZUCKER:** Objection.
16  **A.  That I spoke to him?**
17  Q.  Yes, while in the office.
18  **A.  He was speaking to me when he made that**
19  **comment to me, but I don't recall any more**
20  **conversation after that before that memory, no.**
21  Q.  So those snippets of time that you
22  described, can you estimate for me how long those
23  memories last if you add them all together?
24  **A.  I can't.**

1  Q.  At all?
2  **A.  I have no idea.**
3  Q.  So would you agree with me when Allan makes
4  that comment to you, that would have been a very
5  quick comment, correct?
6  **A.  Yes.**
7  Q.  Do you remember how long -- or what is the
8  duration of memory that you have of his penis being
9  in your mouth?
10  **A.  Too long.**
11  Q.  Can you give me an actual answer.
12      **MS. ZUCKER:** Objection.
13  **A.  I don't know.  I can't tell you how long.**
14  Q.  Can you estimate if it's more than five
15  minutes, more than ten minutes, anything like that?
16  **A.  No.**
17  Q.  No idea?
18  **A.  No.**
19  Q.  Can you estimate for me how long you were
20  on the floor?
21  **A.  No, because I don't remember getting off**
22  **the floor.**
23  Q.  What is your next memory that happens?
24  What is your next thing that you have?

1  **A.  My next memory that I remembered**
2  **chronologically --**
3  Q.  Sure.
4  **A.  -- or the next memory of things that night?**
5  Q.  I think they are the same so I'm not quite
6  sure, but I'll ask anyway.  What happens next?
7  **A.  So I had another smaller memory of having**
8  **his penis in my mouth from when I was on the floor.**
9  **I remembered that when he ejaculated, that I could**
10  **feel the contractions in his body in my mouth.  And**
11  **that's new.  I didn't have that the first time I**
12  **remembered.**
13  Q.  So I got a little confused there.  You
14  didn't remember that that night?
15  **A.  No.**
16  Q.  You remembered that after the October
17  memory, correct?
18  **A.  Yes.**
19  Q.  Memory coming back.  So we have now a third
20  memory of his penis being -- something happening
21  while his penis is in your mouth that you get back;
22  is that right?
23  **A.  Yes.**
24  Q.  Three segments, correct?

Allan Chiocca vs.
The Town of Rockland, et al.

Video Deposition

Deirdre Hall - Vol. I
July 22, 2021

16:15:54-16:16:29                                    Page 257

1    A.  Correct.
2    Q.  And that third one happens when?
3    A.  I'm sorry?
4    Q.  When do you get that third one back?  I'm
5    sorry.
6        MS. ZUCKER:  Objection.
7    A.  Around the same -- I believe it was around
8    the same time.
9    Q.  Which was?
10   A.  In the fall of 2018.
11   Q.  So is it fair to say not at the same time,
12   not on the same day, but during the fall of 2018,
13   you have three memories come back about that night?
14   A.  Yes.
15   Q.  And other than the "Leaving Las Vegas"
16   memory retrieval process, is there any other thing
17   that you can remember prompting a memory coming back?
18   A.  Not that I can recall.
19       MS. ZUCKER:  We are at 4:16, so --
20       MS. HALEM:  I'm in a line of questions.
21       MS. ZUCKER:  I know, but we had an agreement.
22       MS. HALEM:  I know.  I'm not --
23       MS. ZUCKER:  So I don't mean to interrupt,
24   but if you can wrap it up in five.

16:17:05-16:17:47                                    Page 258

1        MS. HALEM:  Just yell when I hit five, okay?
2        MS. ZUCKER:  Okay.
3    Q.  So what's your next memory that you get back?
4    A.  My next memory that I get back... I'm
5    trying to remember.  Well, I remember him -- after
6    being on the floor, I remember him pulling his pants
7    up and his belt buckle jingling, but I also remember
8    after that being seated back at 6 o'clock at the
9    table and he's standing behind his desk.
10   Q.  You don't remember how either of you got in
11   those positions; is that right?
12   A.  Correct.
13   Q.  But that's a new memory retrieval?
14   A.  It was around the same time.
15   Q.  So four memories in the -- is it October,
16   November?
17       MS. ZUCKER:  Objection.
18   A.  This memory came around the same time as
19   like the eye crunching memory.
20   Q.  So October 2018?
21   A.  That was after.
22   Q.  Are you telling me these in -- I think I
23   now know what you were asking.  Are you telling how
24   you get these back chronologically?  You're telling

16:18:08-16:18:41                                    Page 259

1    me how they happened chronologically.  You
2    re-ordered them; is that right?
3        MR. COOPER:  Objection.
4    A.  I just told you --
5    Q.  You are telling me chronologically from the
6    night of May 1st-2nd, right?  That's what I'm
7    asking, so I'm thinking that's what you're telling me.
8    A.  Yes.
9    Q.  But the memory retrievals are not
10   chronological; is that correct?
11   A.  Correct.
12   Q.  So can you sort of order them for me?
13       MS. ZUCKER:  Objection.
14   A.  I'm ordering them the best I can.
15   Q.  No, no, no.  I haven't asked you to do this
16   before.  So if they happened one, two, three, four
17   in a row chronologically on the night of May 1st-2nd,
18   when do they come back to you, though, in order?
19   Like, does the eyeglass one predate being on the
20   floor, predate being at Position 6?
21       MS. ZUCKER:  Objection.
22   A.  The eyeglass one, the -- so when I could
23   taste his pre-ejaculate fluid and when I could feel
24   his body contract, those -- I remembered those after

16:19:16-16:20:00                                    Page 260

1    everything else.  Everything else in that segment is
2    one.
3    Q.  And then the floor memory comes back a
4    different time?
5    A.  No.  That's with the eye crunching.
6    Q.  The eye crunching, okay.
7        What's the next thing you remember
8    chronologically on the night of May 1st-2nd?
9    A.  Again, he's standing behind his desk, and
10   his tie is loose, but not, like, looped like it was
11   in the video.  It was just loose.
12   Q.  And what's the next one after that?
13   A.  This was all one.  He brings me a water.
14   Then he takes his tie off.  That's when he tells me
15   that I give a good blow job.
16   Q.  And when did you remember that?  That's all --
17   A.  That's all with the eyeglasses.
18   Q.  And when is the next memory?
19   A.  I'm trying to think.  The next memory is
20   when I'm leaving Town Hall and he tells me that --
21   I'm a little unsteady on my feet, and he tells me
22   that I need to get my shit together.
23   Q.  Okay.  And when did you remember that?
24       MS. HALEM:  I'm almost done.  I promise.

Deirdre Hall - Vol. I
July 22, 2021

Video Deposition

Allan Chiocca vs.
The Town of Rockland, et al.

16:20:21-16:20:48                                          Page 261

1    A.  I can't recall right now when I remembered
2    that.
3    Q.  Did you remember it before Regina Ryan's
4    report came out?
5    A.  The first one?
6    Q.  Yes.
7    A.  No.
8    Q.  Did you remember it before you talked to
9    her the third time?
10   A.  I can't recall right now.
11        MS. ZUCKER: Why don't we stop here.
12        MS. HALEM: Let me just finish the night
13   because I think that will help.
14        MS. CIESLAK: It's past five minutes.
15        MS. HALEM: Sorry.  One more.
16   Q.  Is that the last thing you remember at Town
17   Hall?
18   A.  I remember then coming -- walking out of
19   the office and stumbling again a little bit and him
20   saying, "That's not holding your shit together."
21   Q.  Is that -- that's not a memory I've read
22   before.  When did you --
23        MS. ZUCKER: Objection.
24   Q.  When did you get that back?

16:21:05-16:21:18                                          Page 262

1    A.  The same one where he told me to hold my
2    shit together.
3    Q.  And you don't remember when you got that
4    back; is that right?
5    A.  Today I don't remember when I got that
6    back, no.  Not at this moment, no.
7    Q.  And if you --
8        MS. ZUCKER: Can we please.  This is --
9        MS. HALEM: Sure.  I'm trying.
10       MS. ZUCKER: I know.  So am I.  I'm trying
11   to be cooperative.
12       MR. SHAFRAN: All right, we are going to
13   file a joint motion.
14       MS. HALEM: One second.
15   We're suspended, not ending.
16       MS. ZUCKER: We are suspending today's
17   deposition.
18       MS. HALEM: Off the record.
19   (Discussion off the record)
20        (Whereupon the deposition
21         was suspended at 4:21 p.m.)
22
23
24

Page 263

1         C E R T I F I C A T E
2     I, DEIRDRE HALL, do hereby certify that I have
3    read the foregoing transcript of my testimony, and
4    further certify under the pains and penalties of
5    perjury that said transcript (with/without)
6    suggested corrections is a true and accurate record
7    of said testimony.
8      Dated at _____, this _____ day of _____,
9    2021.
10
11                    _____
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 264

1         SUGGESTED CORRECTIONS
2    RE:  Allan Chiocca vs. The Town of Rockland, et al.
3    WITNESS:  Deirdre Hall, Vol. I
4    The above-named witness wishes to make the following
     changes to the testimony as originally given:
5
6    PAGE  LINE      SHOULD READ          REASON
7    ____  ____  _____  _____
8    ____  ____  _____  _____
9    ____  ____  _____  _____
10   ____  ____  _____  _____
11   ____  ____  _____  _____
12   ____  ____  _____  _____
13   ____  ____  _____  _____
14   ____  ____  _____  _____
15   ____  ____  _____  _____
16   ____  ____  _____  _____
17   ____  ____  _____  _____
18   ____  ____  _____  _____
19   ____  ____  _____  _____
20   ____  ____  _____  _____
21   ____  ____  _____  _____
22   ____  ____  _____  _____
23   ____  ____  _____  _____
24   ____  ____  _____  _____

# In The Matter Of:

*Allan Chiocca vs.*
*The Town of Rockland, et al.*

---

*Deirdre Hall*
*Vol. II*
*October 4, 2021*

---



**DORIS O. WONG**
**ASSOCIATES, INC.**

C O U R T   R E P O R T E R S

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File Hall_Deirdre_Vol2.v1*
Min-U-Script® with Word Index

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 9

1  space, it's hard.  It's takes, like, three or four
2  points to get out of the space.
3  Q.  Okay.
4  A.  So there's cars behind me.
5  Q.  Got it.  Did you speak to anyone at the
6  doctor's appointment that morning?
7  A.  Well, the staff that checked me in, the
8  nurse, the doctor.
9  Q.  Anything unusual about those communications?
10  A.  No.
11  Q.  Anything unusual about your drive to the
12  doctor's office?
13      MS. ZUCKER: Objection.
14  A.  I don't really recall the specifics of the
15  drive to the doctor's office.
16  Q.  You said you felt tired.  Anything else?
17  How did you feel that morning other than tired?
18  A.  I felt kind of lousy.  I felt hung over.
19  Q.  What is the characterization you would have
20  of hung over?
21      MS. ZUCKER: Objection.
22  A.  I get a slight headache.  Sometimes I feel
23  nauseous.
24  Q.  Did you feel that way that morning?

Page 10

1  A.  Yes, I had a slight headache.  Yes, I was
2  not feeling great.
3  Q.  Did you feel nauseous?
4  A.  I don't recall, but I was not feeling great.
5  Q.  Okay.  Did you email Allan Chiocca from the
6  doctor's office?
7  A.  I did.
8  Q.  What did you say, if you recall?
9      MS. ZUCKER: Objection.
10  A.  I asked him if he could get a minute, or
11  whatever, to speak with me that morning.
12  Q.  Why did you want to speak with him?
13  A.  Because I didn't remember what had happened
14  the night before.  I didn't remember how I got home,
15  but I knew I had been with him.
16  Q.  So what were you hoping to learn on that
17  email?
18  A.  From the email?
19  Q.  Yes.
20  A.  I was not expecting to learn anything from
21  the email.  I was just expecting him to say either
22  he was available or he was not available.
23  Q.  So you wanted to see him in person?
24  A.  I was going to Town Hall anyway that day.

Page 11

1  I wanted to talk to him before -- I had to do
2  something at 9 o'clock that day, so I was hoping to
3  speak with him before that 9 o'clock thing that I
4  had to do.
5  Q.  You wanted to see him in person?
6  A.  No.  I just wanted to talk to him.  I
7  didn't want to put all this information about I
8  didn't remember what happened, I didn't remember how
9  I got home in an email that would be a public
10  record.  I didn't want to put that in writing
11  because I didn't want it to be a public record, but
12  I did want to speak to him.
13  Q.  In person?
14  A.  I could have spoke to him on the phone, but
15  I happened to be going to Town Hall that day at 9:00.
16  Q.  Did you in fact meet with him that morning?
17  A.  Very briefly, yes.
18  Q.  Can you tell me what happened during that
19  meeting?
20  A.  I told him that I didn't recall much from
21  the night before, that I didn't remember how I got
22  home.  I asked him if I had told him about my
23  relationship with Ed because I remember having been
24  worried about Ed the night before.  He nodded

Page 12

1  affirmatively that I did, and then I asked him for
2  discretion because it was still kind of fresh now
3  knowing that Dawn had found out about the
4  relationship, and Ed and I hadn't really decided
5  what we were going to do about that yet.
6  Q.  Did you ask Allan Chiocca what had happened
7  the night before?
8  A.  No, I didn't.  I didn't have much time.  I
9  just sort of said I didn't remember.
10  Q.  You told him you didn't remember?
11  A.  I told him that I didn't remember much of
12  what had happened after -- sorry -- that I didn't
13  remember much of what had happened from when we were
14  at the bar, and I didn't remember how I got home.
15  Q.  Did you ask him what happened?
16  A.  I may have, but I didn't have enough time
17  to really sit in there to discuss it with him
18  because I thought that, like...
19  Q.  So how long was that conversation?
20  A.  I would say I was in his office for five
21  minutes.
22  Q.  What, if anything, did he say back to you?
23  What do you remember him saying to you?
24  A.  Well, when I asked him about the thing

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 13

1  about Ed, he nodded. He didn't say anything. He
2  just nodded. He did say that we were at Rockland
3  Bar & Grill and that I seemed fine drive home, and,
4  you know, then I asked him if I had said anything
5  about Ed.
6  Q.  What prompted him to say that you seemed
7  fine to drive home?
8  A.  Because I couldn't remember how I got home.
9  I probably asked if I drove home.
10 Q.  Do you remember him telling you that you
11 were a predator and aggressive?
12     MS. ZUCKER: Objection.
13 A.  I don't recall him saying that in the
14 meeting on the next day, but I do recall him using
15 phrases like, "You were like a predator" at least on
16 the second time I talked to him. The way he said
17 it, it didn't really -- he didn't seem upset by it
18 or concerned by it. It was more like he was saying
19 it like it was something he was proud of, like I
20 really wanted him.
21 Q.  You don't recall him saying it on May 2nd?
22 A.  Not today. I don't recall it today.
23 Q.  So if you admitted it in the Position
24 Statement, did you recall it then?

Page 14

1  A.  Like I said, I can't recall whether -- it
2  definitely happened that week. Today I seem to
3  think it happened on Thursday, but I don't recall
4  him saying it on the 2nd.
5  Q.  You told Regina Ryan that his comments to
6  you that morning gave you an inkling that something
7  sexual had happened?
8     MS. ZUCKER: Objection.
9  A.  Yes.
10 Q.  Prior to that statement, his statement
11 about an aggressor or predator, or whatever words it
12 was, did you have no memory that something sexual
13 had happened?
14 A.  It was not from that statement. When I
15 left that day, he thanked me for the birthday
16 present. That's what made me think that something
17 sexual had happened. It wasn't from the statement
18 that I was acting like a predator. It was from the
19 statement that he thanked for the birthday present
20 as I was getting up to leave.
21 Q.  That's what you wrote in your Position
22 Statement as well, that it was the thank you for the
23 birthday present that gave you the inkling?
24 A.  I would have to see the Position Statement.

Page 15

1  Q.  Okay. But if it said that, if you
2  testified before, you stand behind your Position
3  Statement, correct?
4  A.  I would have to look at the Position
5  Statement.
6     MS. CIESLAK: Sorry. I didn't hear Ellen's
7  objection, but I saw that she attempted to make an
8  objection.
9     MS. ZUCKER: Yes. Objection.
10    MS. HALEM: I will try and slow down.
11 Sorry about that.
12 Q.  Had you previously given Allan Chiocca any
13 gifts at all, ever?
14    MS. ZUCKER: Objection.
15 A.  At Christmastime I gave a book and a bottle
16 of wine.
17 Q.  Did you know if you had given him a gift
18 the night before?
19 A.  I did not give him a gift the night before.
20 Q.  How do you know?
21 A.  Because I don't recall giving him a gift
22 the night before, and I don't recall purchasing a
23 gift for him that I could have given him the night
24 before.

Page 16

1  Q.  Did you tell Allan that you were drunk the
2  night before?
3  A.  I may have told him that I was drunk. I
4  told him I didn't remember, and I told him that I
5  didn't remember how I got home.
6  Q.  Why did you go home rather than going to --
7  why did you go to RBG rather than going home after
8  the Selectmen's meeting on May 1st?
9  A.  We usually went out after the meetings, but
10 this particular night I was not ready to go home to
11 talk to my husband yet to tell him about my
12 relationship with Ed. I felt like I needed more time.
13 Q.  Is it fair to say you were dreading that
14 conversation with your husband?
15    MS. ZUCKER: Objection.
16 A.  "Dreading" isn't the right word. I was
17 just concerned about it.
18 Q.  Why?
19 A.  Because I knew it would hurt his feelings.
20 Q.  Anything else?
21 A.  I just knew it would hurt him significantly.
22 Q.  Did you ever tell people, anybody who
23 worked at Rockland Town Hall, that marriage is
24 difficult?

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

**Page 17**

1  A.  I don't recall saying that, but I could
2  have said that.
3  Q.  Do you believe that marriage is difficult?
4  A.  I believe, yes, marriage at times is
5  difficult.  It takes work, especially if you want to
6  have a good one, so.
7  Q.  Do you remember telling anyone that work at
8  Rockland Town Hall that you find it hard to be with
9  just one person?
10  A.  No, I don't recall saying that.
11  Q.  If they say that you did say that, could it
12  have happened?
13      MS. ZUCKER: Objection.
14  A.  I don't recall saying that.  There's no
15  reason for me to have ever said that, so.  Unless
16  they are misconstruing something I said, I don't
17  recall saying that, no.
18  Q.  So if two people told this to Regina Ryan,
19  do you think they are lying?
20      MS. ZUCKER: Objection.  There's no basis
21  for that statement.
22  A.  Like I said, they may be just misconstruing
23  something I said, but I didn't say that, no.
24  Q.  Were you bored in your marriage?

**Page 18**

1      MS. ZUCKER: Objection.
2  A.  Bored?  Did you say bored?
3  Q.  Yes.
4  A.  No, I was not bored in my marriage.  No.
5  Q.  Did you ever tell people you were?
6  A.  No.
7  Q.  Did you tell people you had an open marriage?
8  A.  No.
9  Q.  Are you surprised that several people say
10  you did tell them that?
11      MS. ZUCKER: Objection.  Assumes facts not
12  in evidence.
13  A.  I would be very surprised if people said I
14  told them that, yes.
15  Q.  Did you tell multiple people that your
16  husband was not upset about you having an affair
17  with Ed Kimball?
18      MS. ZUCKER: Objection.
19  A.  Did I tell multiple people that he was not
20  upset about me having an affair with Ed Kimball?
21  Q.  Yes.
22  A.  No, I don't think I said that to multiple
23  people.
24  Q.  Did you tell that to anyone?

**Page 19**

**Page 20**

1  Q.  Did you make any suggestive comments to
2  him, sexual comments to him?
3  A.  I don't recall making any suggestive
4  comments to him, no.
5  Q.  Do you remember Allan Chiocca telling you
6  that he's not your guy?
7  A.  I don't remember him saying that, no.
8  Q.  Do you remember if he told you that you
9  were acting like a predator that night, on May 1st?
10  A.  I don't recall him saying that that night,
11  no.
12  Q.  Did you tell Allan Chiocca that you just
13  wanted some cock that night?
14  A.  No.
15  Q.  Do you not recall it or did you not say it?
16  A.  I don't recall it, and no.
17  Q.  How do you have both of those answers?
18  A.  I just -- no.  I just don't recall saying
19  it, no.
20  Q.  So you don't know if you said it; you might
21  have said it?
22      MS. ZUCKER: Objection.
23  A.  It's highly improbable that I said it.
24  Q.  In your counterclaim, you say that after

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

**Page 21**

1  you declined to go into The Banner, Allan Chiocca
2  told you he needed to stop by Town Hall before
3  taking you home. Is that correct?
4      MS. ZUCKER: Objection.
5  A. I would have to see the counterclaim. I
6  don't know what it says.
7  Q. Is that what he said to you that night?
8  A. I know that we went to Town Hall. I don't
9  know exactly what he said to me that night.
10 Q. Do you remember if he said anything about
11 going to Town Hall, relating to going to Town Hall?
12 A. I know that after I didn't want to go in
13 The Banner, he suggested that we go back to Town Hall.
14 Q. You don't know why he suggested going back
15 to Town Hall or if he said anything about that?
16 A. I just know he suggested we go back.
17 Q. There was a memory that is listed in your
18 interrogatory responses that I don't think we
19 covered in the last deposition. Do you remember the
20 opening of a bottle of wine that night at Town Hall?
21 A. I remember the wine spilling, but the
22 memory is very sensory. I kind of remember hearing
23 it, not necessarily seeing it.
24 Q. Could you describe that to me.

**Page 22**

1  A. I just remember the sound of it spilling.
2  It sounded like it was a double spill, like on the
3  table and then on the floor.
4  Q. Do you have any visual memory of that, or
5  is it just a sound memory?
6  A. It's a sound memory.
7  Q. When did you regain that? Did you not have
8  that on May 2nd?
9  A. On May 2nd, no, I don't have that.
10 Q. So when did that memory come back to you?
11 A. I definitely had a -- I think it may have
12 come in the fall. But I had another situation in
13 the winter where I was pouring rice at my house, and
14 it kind did one of those -- in a measuring cup, and
15 it kind of did one of those fall on the counter and
16 then fall on the floor. That caused like a
17 spontaneous ability for me to remember that. Like,
18 I immediately thought of the wine spilling on the
19 floor.
20 Q. Have you told me everything you remember
21 about that memory?
22     MS. ZUCKER: Objection.
23 A. Which memory?
4  Q. The wine spilling, just the sound of wine

**Page 23**

1  spilling.
2  A. I just remember that wine spilled on the
3  floor.
4  Q. Help me out. How do you know it's the
5  floor if it's just a sound?
6  A. Because it had like a double spilling
7  sound, like it was dripping.
8  Q. Do you remember -- is there any visual
9  connected to it, like, falling over, someone
10 knocking it, anything?
11 A. I don't recall.
12 Q. What brought on that memory for you other
13 than the rice spilling? Just that?
14 A. That's what I recall, yes.
15     MS. ZUCKER: Objection.
16 Q. Do you remember when that occurred, that
17 memory coming back?
18 A. That incident was in the winter.
19 Q. You signed in your Position Statement that
20 you didn't remember if the wine spilled that night,
21 which would have been in January of 2019. Did you
22 not have that memory in January of 2019?
23 A. That's the winter. So the memory happened
24 in the winter. I don't know whether it happened

**Page 24**

1  after or before the Position Statement, but both
2  occurred in the winter.
3  Q. Because in your interrogatory, you said it
4  was the fall of 2018. Is that incorrect?
5  A. The spilling of the rice happened in the
6  winter.
7  Q. So not the fall of 2018?
8  A. No. It happened in the winter.
9  Q. So it could have been December, January,
10 February, that time frame?
11 A. Yes, it could have been.
12 Q. Any other months it could have been?
13 A. December, January, February. That's what I
14 consider the winter.
15 Q. Okay. In your interrogatory responses, you
16 wrote that you recovered memories largely --
17 "several focused on disgust, fear and discomfort,
18 she felt as Mr. Chiocca required that she service
19 him." You also recovered memories of his cool and
20 satisfied demeanor during the assault. Are those
21 feelings or are those actual memories of something
22 that happened?
23     MS. ZUCKER: Objection.
24 A. Those would be memories based on my

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 25

1  observations -- well, some of them are feelings.
2  The disgust I felt -- the things I felt are
3  feelings. The things I observed of him are
4  observations of him.
5  Q.  So do you have any concrete memories
6  related to the disgust or fear or any of that, or is
7  that just a feeling that you recall coming back to you?
8      MS. ZUCKER: Objection.
9  A.  No.  I have concrete memories of being afraid.
10 Q.  Of being afraid?
11 A.  Of being disgusted.  Yes, fear, being afraid.
12 Q.  Why were you afraid?
13 A.  Because I really didn't realize what was
14 happening right away.  As I said before, the memory
15 came back to me with like pressure on my face, with
16 my glasses, and a lot of loud noise in my ears.  I
17 really didn't understand what was happening at the
18 moment until I realized what was happening.  It was
19 not immediate.  It took time.  Then I was afraid
20 because I really didn't understand how I got to
21 where I was.  I didn't know what to do to get out.
22 I felt trapped, and I was afraid.
23 Q.  Do you have any memories that returned to
24 you after you filled out the interrogatories in this

Page 26

1  case?
2  A.  Possibly.
3  Q.  Sitting here today, can you remember what
4  they were?
5  A.  I can't remember off the top of my head
6  which ones were after the interrogatories and which
7  ones were included in the interrogatories.
8  Q.  Are you going to go back and correct your
9  interrogatories to add in additional memories?
10 A.  I don't know.
11 Q.  Is there anything that you developed in the
12 last year, any memories that have come to you in the
13 last year?
14 A.  The last year?
15 Q.  Yes.
16 A.  No.
17 Q.  The last two years?
18     MS. ZUCKER: Objection.
19 Q.  A good way to do this is since the pandemic
20 started.
21 A.  No.
22 Q.  Do you have any memories of Allan Chiocca
23 touching you sexually that night?
24 A.  I recall him having his hands on my breasts

Page 27

1  but outside my shirt.
2  Q.  Is that the basis of any of your recovered
3  memories?
4      MS. ZUCKER: Objection.
5  Q.  Is that one of your recovered memories?  I
6  said that totally wrong.  I'm sorry.  Is that one of
7  your recovered memories?
8  A.  Yes.
9  Q.  When did that come back to you?
10 A.  In the winter of I think -- I don't
11 remember the year, whether it was '18 or '19, but it
12 was while I was engaged in intimacy with my husband.
13 Q.  Tell me how that came back to you.
14 A.  I was engaged in intimacy with my husband.
15 He was touching my breasts, and I remembered it.
16 Q.  Did you tell anyone about that?
17 A.  I eventually told my husband, but obviously
18 not during that moment.
19 Q.  You don't need to tell me anything you told
20 your husband, as your lawyer will tell you.
21     Did you tell Regina Ryan that?
22 A.  Yes.
23 Q.  Is that one of the reasons you requested
24 the investigation be reopened?

Page 28

1      MS. CIESLAK: Objection.
2  A.  I didn't request that the investigation be
3  reopened.
4  Q.  Who requested it?
5  A.  As far as I know, the Town requested it.
6  Q.  Did you tell anyone associated with the
7  Town that you had new memories?
8  A.  No.
9  Q.  How did the Town find out that you had new
10 memories?
11 A.  I don't know.
12 Q.  Did you tell Ed Kimball?
13 A.  Some of them, yes.
14 Q.  Do you remember sitting here today which ones?
15 A.  Probably the ones that occurred in the fall
16 of 2018 just because we were talking about that
17 point, but once we stopped communicating, obviously
18 I didn't tell him anything.
19 Q.  So after the fall of 2018 you stopped
20 communicating with him?
21 A.  No.  It was definitely in, like, the fall
22 time, but I don't remember whether it was '18 or
23 '19.  I don't recall.
24 Q.  You don't recall?

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 33

1  A.  Sure.
2  Q.  Yet you can't sit here today and tell me
3  anything about it that you disagreed it?
4      MS. ZUCKER: Objection.
5  A.  Well, I can tell you that there was one
6  particular paragraph that said I thought Ed was
7  going to hit me, and that's not true. I
8  specifically said to her twice -- she asked me if I
9  thought he was going to hit me, and I said twice to
10  her, "No. He would never hurt me," twice. I --
11  Q.  Did you tell her -- I'm sorry.
12  A.  Go ahead.
13  Q.  No, no. You go ahead.
14  A.  I know that that's incorrect. I know that
15  she said I parked my car perfectly. I know that's
16  incorrect. I think she -- I don't know. I would
17  have to see the report. I would have to see the
18  report to be certain.
19  Q.  Did you tell her that Ed Kimball was mad at
20  you that night, when you told him?
21      MS. ZUCKER: Objection.
22  Q.  Actually, let me rephrase that. The whole
23  thing was wrong.
24      Did you tell Ed Kimball when you were with

Page 34

1  him on the Rail Trail -- did you tell her that Ed
2  Kimball was mad at you when you were with him on the
3  Rail Trail?
4      MS. ZUCKER: Objection. Are you asking --
5  you just asked two different questions.
6      MS. HALEM: I know. I screwed up the
7  question before it. Would you like me to start over?
8      MS. ZUCKER: Please.
9  Q.  When you were with Ed Kimball on the Rail
10  Trail after you had told him something had happened
11  with Allan Chiocca, did you tell Regina Ryan that he
12  was mad at you that day?
13  A.  I said that he seemed angry, but that I
14  also felt very disappointed, that I felt that he was
15  disappointed in me because, you know, I had had too
16  much to drink and was involved in this mess, and now
17  he was -- you know, felt like he needed to try to
18  get involved to make sure everything was, you know,
19  okay. He was worried about me, and he was worried
20  about the women at Town Hall. So, yes, I felt like
21  he was a little bit angry.
22  Q.  Did you tell her you were afraid of him?
23  A.  No, I did not tell her that.
24  Q.  Did you tell Regina Ryan that your -- and

Page 35

1  I'm sorry that I'm going to mess up this word --
2  that your perineum was sore?
3  A.  Yes, I told her that.
4  Q.  What was the purpose of telling her that?
5      MS. ZUCKER: Objection.
6  A.  She asked me if I had any soreness or
7  bruising or anything like that. It was a response
8  to her question.
9  Q.  Was it true?
10  A.  Yes.
11  Q.  Did you attribute it to something that had
12  happened on the night of May 1st?
13  A.  At that point I just knew that it hurt. I
14  didn't attribute it to anything. By the time I was
15  interviewing with Regina, I knew that something had
16  occurred, so I thought that could possibly be from
17  that evening, yes.
18  Q.  Do you have any memory of Allan Chiocca
19  touching you there?
20  A.  No.
21  Q.  Did you tell Regina Ryan you took a picture
22  of that part of your body?
23  A.  I took a picture of my thigh where I had
24  some bruising.

Page 36

1  Q.  Not your perineum?
2  A.  No.
3  Q.  So if Regina Ryan believes that you told
4  her that you took a photo of that, she's mistaken?
5      MS. ZUCKER: Objection. What is the
6  "that"? There are two different "thats" you are
7  talking about.
8      MS. HALEM: The perineum.
9  A.  No, I did not take a picture of my
10  perineum.
11  Q.  You took a picture of your thigh?
12  A.  Yes.
13  Q.  Did you tell Regina Ryan you deleted it?
14  A.  I eventually deleted it, like, within -- I
15  don't know if it was immediate or within a day or
16  two, but it was soon thereafter.
17  Q.  Why did you delete it?
18  A.  I took it while sitting on the toilet, so
19  it was kind of a private picture of me. My kids
20  grab my phone all the time, and I just didn't want
21  it on there.
22  Q.  Was it a picture of just a bruise on your
23  thigh?
24  A.  It was a picture of my thigh.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 37

1 Q. Is there something about that bruise that
2 you attribute to the night of May 1st?
3 A. Initially when I took the photo, I was not
4 really sure, but after I learned more about what
5 happened, yes. The bruising, there was really small
6 bruises. They looked like fingertips. There were
7 only three, though.
8 Q. And you deleted this photo?
9 A. (Witness nods)
10 Q. Sorry?
11 A. Yes, I deleted the photo.
12 Q. Remind me again. You are an attorney,
13 correct?
14 A. Yes.
15 Q. At that point that you deleted the photo,
16 had you already complained to Ed Kimball?
17 A. No.
18 Q. Had you already -- did you know that
19 something had happened that night?
20 A. I felt like something had happened, but I
21 was sort of in denial that something could have
22 happened, yes.
23 Q. Did you then go into your deleted photos
24 and delete it from your deleted photos?

Page 38

1 A. No.
2 Q. So it's still on your phone?
3 A. No, it's not on my phone.
4 Q. How do you know?
5 A. I have tried looking for it.
6 Q. When you drove home the night of May 2nd,
7 what time of day was that? Do you recall what time
8 you got home?
9 A. Sorry. When I drove him from, like, early
10 in the morning?
11 Q. Yes.
12 A. I don't remember what time I got home, no.
13 Q. Do you recall texting your husband when you
14 got home?
15 A. I don't recall texting my husband when I
16 got home, no.
17 Q. Have you seen that text to your husband
18 when you got home?
19 A. I have.
20 Q. Was it after -- was it around 2:25 in the
21 morning?
22 A. It was.
23     MS. ZUCKER: Objection.
24 Q. Do you remember if you did it upon arriving

Page 39

1 home, or how long after?
2 A. I have no memory of sending that text. No.
3 Q. Did you text Ed Kimball that night as well?
4 From your house. I'm sorry.
5 A. No, not that I recall.
6 Q. Would you agree with me that you got home
7 after 2:00 in the morning, based on the camera
8 footage as well?
9 A. Yes, it was probably after 2:00 in the
10 morning.
11 Q. When was the last drink you had that night?
12     MS. ZUCKER: Objection.
13 A. That night I was drinking Riesling, so I
14 remember drinking my third glass of Riesling.
15 Q. When was the last drink you had?
16     MS. ZUCKER: I'm going to object and ask
17 you, Sam, there's obviously information that Deirdre
18 has obtained through this litigation process. If
19 you are asking her separate from what she learned
20 either through this litigation or just what she
21 remembers, you can ask that. I just don't want the
22 record to be confused with regard to that. I think
23 she's answering --
24     MS. HALEM: Lovely job of coaching.

Page 40

1     MS. ZUCKER: It's not coaching.
2     MS. HALEM: I got it. We're good.
3 Q. Ms. Hall, when do you recall having your
4 last drink that night?
5 A. As I said, the last drink I recall having
6 that night was a third glass of wine at the Rockland
7 Bar & Grill.
8 Q. At what time?
9 A. I don't know the exact time. It was after
10 the call with Ed, which was at about ten past 8:00.
11 So it was after ten past 8:00.
12 Q. Do you have any memory of drinking alcohol
13 after leaving the Rockland Bar & Grill that night?
14 A. No.
15 Q. Do you have any memory of drinking wine at
16 Town Hall that night?
17 A. No.
18 Q. Did you vomit that night?
19 A. Not that I recall.
20 Q. Did you lose consciousness that night?
21 A. Not that I recall.
22 Q. Did you tell Regina Ryan that you had
23 "blacked out" that night?
24 A. Yes.

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 41

1 Q.  What did that mean to you?
2 A.  It means I don't remember what happened,
3   that there's like a void in space.
4 Q.  Did you tell Regina Ryan you hadn't blacked
5   out since you were in your twenties?
6 A.  That's what her notes say, yes, but that's
7   not accurate.
8 Q.  You had blacked out between your twenties
9   and that night?
10 A.  Yes.  In my twenties I actually didn't
11   drink that much.  I drank, like, at the beginning of
12   college.  Then I sort of stopped my sophomore year.
13   Then I went to law school, and I was pregnant for
14   three years and nursing, and so I really didn't
15   drink then either.  It would have been probably in
16   my early thirties.
17 Q.  What were the other incidents where you
18   blacked out?
19 A.  I'm sorry?
20 Q.  Were there instances in your twenties when
21   you blacked out?
22 A.  When I was younger.  I think I remember
23   going to Montreal with my husband at the time, and I
24   had too much to drink.  I was probably 19 or 20.

Page 42

1 Q.  Your current husband?
2 A.  Yes, my current husband.
3 Q.  You said "my husband at the time."  I was
4   not quite sure what you meant.
5 A.  Sorry.
6 Q.  I just want to make sure that was correct.
7     That's the only other time you remember
8   blacking out up until May 1st of 2018?
9 A.  No.  I have had some blackouts in my
10   thirties.  I mean, like I said, I would say in my
11   early thirties.
12     I went to see a show with a friend of mine,
13   and I had blacked out then.  I was in New Orleans.
14   I went out for the night, went back to my hotel
15   room.  I don't really remember that.
16     I'm getting an echo now.
17 Q.  That's okay.  It seems to have fixed itself.
18     The Montreal one, was that related to
19   alcohol, or can you attribute it to anything else?
20 A.  It was probably just alcohol.
21 Q.  Do you have any memory of -- how many
22   drinks did you have that night?
23 A.  That was a long time ago.  I don't remember.
24 Q.  Can you ballpark it?

Page 43

1 A.  I can't.
2     MS. ZUCKER:  Objection.
3 A.  It was over 20 years ago.  I can't remember.
4 Q.  The concert that you went to that you
5   blacked out at, can you tell me what happened that
6   night.
7 A.  Sure.  I had two glasses of wine before I
8   got to the House of Blues.  Then I had a glass of
9   wine at the bar.  Then my friend got me two shots of
10   Fireball.  That's five.  Then I had another drink.
11   We had the ability to -- she had, like, VIP Room
12   access.  Then I got another drink there.  So I had
13   six drinks there.
14 Q.  Six drinks, three of which were hard
15   alcohol and three of which were wine?
16 A.  Two of which were hard alcohol.
17 Q.  What was the one you had in the VIP Room?
18 A.  Oh, maybe it was.  It wasn't a shot,
19   though.  It was, like, a mixed drink.
20 Q.  And you recall drinking all these drinks?
21 A.  Yes.
22 Q.  So when is the blackout period?
23 A.  Later on in the show.
24 Q.  So at some point you remember the show, and

Page 44

1   at some point you don't?
2 A.  Correct.
3 Q.  Do you recall how you left the club that
4   night?
5 A.  A little, yes.  I recall kind of being
6   brought down the stairs and getting into an Uber.
7 Q.  Alone?
8 A.  No.  My friend was with me.
9 Q.  Do you recall coming home that night, going
10   to sleep, anything like that?
11 A.  I don't recall being in the Uber.  When we
12   got back to the house -- my friend was staying with
13   me -- my husband helped us inside.  I have a little
14   bit of recollection of that.  I fell off the chair.
15   Then I went to bed.  I fell asleep with my contacts
16   in.  I remember that.  That was awful.
17 Q.  The gaps in your memory from these two
18   occasions, did they ever come back to you?
19 A.  No.
20 Q.  When was the next incident where you had a
21   "blackout"?
22 A.  I'm trying to think.  There was a time
23   after this event -- oh, you want before?
24 Q.  No.  You can keep going forward.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 45

1 A.  So there was a time after this event where
2 I was socializing with friends at my house. That
3 evening later on after everyone left, I sort of
4 don't have a recollection of going to bed.
5 Q.  Sorry. I actually meant -- I'm sorry. It
6 was my lack of specificity. I meant between these
7 early -- the Montreal concert and May 1st, were
8 there any other times when you blacked out?
9 A.  Oh, sure. So I was on a trip -- I think I
10 said this -- to New Orleans. I probably had five
11 drinks that night. I came home -- well, the hotel,
12 not home -- and I went to bed. When I woke up the
13 next day, I had pulled out all the drawers of all
14 the bureaus and stuff. It looked like I was looking
15 for something. I don't recall doing that, so.
16 Q.  Is that the only thing unusual about that
17 night?
18 A.  Yes.
19 Q.  So your only lack of memory is what
20 happened after you went -- so you remember going
21 into your hotel room?
22 A.  Yes.
23 Q.  Do you recall going to bed?
24 A.  No. I just remember going into my hotel

Page 46

1 room, coming home, getting in the elevator, going
2 up, going in the room.
3 Q.  Then you woke up the next morning, and the
4 drawers were on the floor?
5 A.  Yes.
6 Q.  Did anyone come to that hotel room that night?
7 A.  No, not that I recall. I was alone.
8 Q.  Who were you with in New Orleans?
9 A.  It was a work trip, so I was alone.
10 Q.  You weren't traveling with anyone?
11 A.  I wasn't traveling with anyone.
12 Q.  Who were you there to see?
13 A.  It was related to storm water work, storm
14 water and sewer work. It's like a -- there was a
15 trade show. There's a lot of trainings that go on.
16 I was there for the particular event.
17 Q.  Was John Sullivan with you?
18 A.  No.
19 Q.  Anyone from the Town of Quincy or from any
20 other contractors that service the Town of Quincy?
21 A.  Yes. There were people from all the
22 contractors. They go too. They would have gone,
23 from Weston & Sampson, Tighe & Bond, Woodard &
24 Curran. I saw them there. I socialized with them.

Page 47

1 Q.  Did you socialize with those individuals?
2 A.  I did.
3 Q.  Who specifically were you socializing with
4 that night?
5 A.  That night? Zach Henderson and his firm,
6 and Eva, but I don't remember her last name. She
7 works for the Home Builders Association.
8 Q.  Anyone else?
9 A.  No.
10 Q.  Did anyone help you back to your hotel room
11 that night?
12 A.  No. Zach went home first. I walked Eva to
13 where she was staying. Then I walked myself home.
14 Q.  Has any other memory come back to you from
15 that night?
16 A.  No.
17 Q.  Do you remember if Allan drank after you
18 left RBG on May 1st?
19 A.  No.
20 Q.  Up until -- between the Montreal event and
21 May 1st, 2018, any other instances of blackouts as
22 you've described them?
23 A.  Not that I recall right now.
24 Q.  Would you agree with me that all of these

Page 48

1 events were alcohol related?
2 A.  Yes. Those ones were, yes.
3 Q.  Do you remember anything about driving home
4 the night of May 2nd? The morning of May 2nd. Sorry.
5 A.  No.
6 Q.  Your husband was awake when you got home?
7 A.  I don't recall.
8 Q.  Do you have any memory of seeing your
9 husband that night?
10 A.  No, I don't remember when I got home.
11 Q.  That's not what I asked you. Do you
12 remember seeing and speaking to your husband on the
13 morning of May 2nd, when you arrived home? I just
14 want to be very specific because this leads into the
15 next day.
16 A.  No.
17 Q.  Do you have any memory of having a
18 conversation with your husband in the early morning
19 hours of May 2nd, 2018?
20 A.  No.
21 Q.  Is your entire version of the events that
22 happened when you got home from what your husband
23 has told you?
24    (Witness confers with counsel)

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 49

1   MS. ZUCKER: Objection.
2 A. I can't answer that.
3 Q. When you told the recitation of facts in
4   your Position Statement about what happened in the
5   early morning hours of May 2, 2018, were you relying
6   on your husband for that?
7   MS. ZUCKER: Objection. The Position
8   Statement was drafted by counsel, and her
9   verification was to the extent of her knowledge.
10  There are obviously places where counsel could
11  have --
12  MS. HALEM: I'm fine with that.
13 Q. Do you recall your husband finding you
14  texting in the bathroom in the early morning hours
15  of May 2nd?
16 A. No.
17 Q. Have you read that text you sent him?
18 A. Yes.
19 Q. So it says, "Love you. It's going to be a
20  tough ride the next couple of weeks. DTYL," does
21  that sound familiar?
22 A. I don't have the text in front of me, but
23  it sounds like that could be what it is.
24 Q. Do you know what that means, what you meant

Page 50

1   by "it's going to be a tough ride"?
2 A. No.
3 Q. Did you think it was going to be a tough
4   ride?
5 A. No.
6 Q. Do you remember how long your conversation
7   with your husband was that night?
8 A. No.
9 Q. In the Position Statement, there's a
10  statement that you spoke to your husband for a
11  shorter period of time than was in the Charge. Was
12  that based on your memory that that was fixed, or
13  something else?
14  MS. ZUCKER: Objection.
15 A. I'm confused by the question.
16 Q. It was not a great question. I'll give you
17  that. One second.
18  After May 1st, did Allan Chiocca ever
19  initiate contact with you?
20 A. I don't recall.
21 Q. Do you have any memory sitting here today
22  that he did?
23 A. I just don't know.
24 Q. Did he ever ask to meet with you?

Page 51

1 A. No.
2 Q. Did he ever voluntarily come to a place
3   where you were?
4 A. No, not that I know of.
5 Q. You texted Allan Chiocca several times
6   after May 1st, 2018, correct?
7   MS. ZUCKER: Objection.
8 A. I don't know whether it's several.
9 Q. Did you text and email him a few times?
10 A. I would text and email him regularly, yes,
11  just doing Town business.
12 Q. Were all these texts and emails related to
13  Town business after May 1st?
14  MS. ZUCKER: Objection.
15 A. As far as I recall, there was one text and
16  one email that was not related to Town business.
17  Actually, can I go back to the question of
18  did he reach out to me. He sent me an email on
19  chicken, a recipe that his wife made on chicken. He
20  sent that to me via email I think on the 3rd.
21 Q. On the 3rd?
22 A. Yes.
23 Q. You are sure that's what that email was?
24 A. Yes, I'm pretty sure. It was on chicken,

Page 52

1   some recipe for chicken.
2 Q. It was not about something else?
3 A. No.
4 Q. It wasn't about a gubernatorial debate?
5 A. He sent something on the gubernatorial
6   debate, but he also sent me something on chicken. I
7   remember getting a recipe on chicken.
8 Q. Did you produce that?
9 A. I should have. I produced all my emails
10  with him.
11 Q. Did you come into places where you knew
12  Allan Chiocca would be after May 1, 2018?
13  MS. ZUCKER: Objection.
14 A. Not purposefully.
15 Q. You didn't ask to meet with him twice?
16  MS. ZUCKER: Objection.
17 A. There was an email and a text that asked to
18  meet with him twice, but other than that, I didn't
19  purposefully go to where he was to meet with him or
20  see him, no.
21 Q. Did you ask to speak to Allan again on
22  May 4th?
23 A. I did.
24 Q. Why?

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 53

1  A.  My husband was concerned about how I had
2  gotten home that night.
3  Q.  What did you think you were going to get
4  from that conversation other than the fact that you
5  got home that night?
6  A.  I was going to ask how I got home that night.
7  Q.  And what did you learn from Allan?
8  A.  That I drove myself home that night.
9  Q.  Did you ask Allan any other questions about
10  that night?
11  A.  Yes.  I asked him sort of what happened,
12  like, the whole night, and he said that we closed
13  the bar at Rockland Bar & Grill.  He said that I
14  wanted to go for a ride, so we took a ride in his
15  truck.  Then he said I wanted to go parking.  Then I
16  sort of said, "Are you sure I used that word?"  I
17  wouldn't use the word "parking."  That's kind of an
18  old word.  Then he said we went Back to Town hall,
19  and I drove myself home.
20  Q.  Did you tell Allan that you didn't remember
21  anything that happened that night?
22  A.  I did.
23  Q.  Sorry?
24  A.  I did.

Page 54

1  Q.  Did you tell him that you blacked out?
2  A.  I did.
3  Q.  Did you use those words?
4  A.  I may have just said, "I don't remember
5  anything."  I don't know if I used the term "black
6  out."
7  Q.  By May 4th, did you know you had engaged in
8  sex acts with Allan Chiocca on the night of May 1st?
9      MS. ZUCKER: Objection.
10  A.  I didn't know it to a certainty, no.
11  Q.  You told Regina Ryan that after the two
12  conversations you had with Allan Chiocca, you
13  clearly understood you had engaged in sexual
14  activities with Allan Chiocca.  Is that correct?
15      MS. ZUCKER: Objection.
16  A.  I don't think I clearly understood it.  I
17  think I was starting to realize it.  I was having a
18  lot of emotional difficulty dealing with it as I was
19  starting to realize it.  I was sort of a little bit
20  in denial.
21  Q.  Did you ever ask him?
22  A.  No.
23  Q.  Why not?
24  A.  It was not a conversation I was comfortable

Page 55

1  having.
2  Q.  Did you tell Regina Ryan that you felt you
3  might have been too drunk to consent?
4  A.  Yes, I told her that.
5  Q.  What was the basis of that statement?
6  A.  I could not remember anything.
7  Q.  Just that?
8  A.  I literally could not remember anything.  I
9  think that is a level of intoxication that puts me
10  in a place where I can't make decisions for myself.
11  Q.  But are you sure that you were toxicated
12  that night?
13  A.  Yes.
14  Q.  What is the basis for your belief?
15  A.  I was intoxicated that night.  I remember
16  being in the bathroom at Town Hall.  I'm getting an
17  echo again.
18  Q.  Don't worry.  Keep going.
19  A.  All right.  I remember being in the
20  bathroom at Town Hall.  I remember everything
21  spinning while I was looking in the mirror.  I
22  remember being stumbly.  I remember having
23  difficulty with my balance.  There were things I
24  remember.  Not at the time I -- a lot of those I

Page 56

1  didn't have at the time I interviewed with Regina,
2  but I since remember those.  So, yes, I was
3  intoxicated night.
4      I also have -- you know, I've had
5  conversations with -- I don't want to say what we
6  talked about, but enough to make me realize that I
7  was intoxicated that night.
8  Q.  Back up for a second.  So you did not have
9  those memories when you spoke to Regina and told her
10  that you were intoxicated, though, correct?
11  A.  Correct.
12  Q.  You said you were -- what did you just say
13  about there were people you told that you didn't
14  want to get into?
15  A.  No.  I'm not going to talk about the
16  conversations I had with my husband.  I had
17  conversations with my husband.
18  Q.  Okay.  And that led you to believe that you
19  were intoxicated that night?
20  A.  Yes.
21  Q.  When you saw your husband four hours after
22  your last drink?
23      MS. ZUCKER: Objection.
24  Q.  Correct?

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 57

1  A.  Yes, yes.  Well, let me take that back.  I
2  don't know when the last drink was.  At least at the
3  time I saw my husband -- and now it was probably
4  around 2:00 -- I was still intoxicated.
5  Q.  How do you know that?  I'm sorry?
6      MS. ZUCKER: Objection.  Apart from any
7  communications you had with your spouse.
8      MS. HALEM: I believe she already testified
9  to it, Ellen.
10  A.  Like I said, I can't answer that.
11  Q.  Did you tell Regina Ryan you think that
12  Allan Chiocca may have had a misjudgment about your
13  level of consent?
14      MS. ZUCKER: Objection.
15  A.  I said that is possible that maybe he
16  could not tell I was not able to consent, but now
17  that I have seen the videos and now that I know how
18  much I drank, I think that's less likely.
19  Q.  What in the video makes you think that you
20  couldn't consent?
21  A.  I had difficulty walking.  I almost fell.
22  When I'm standing still, I'm swaying back and forth.
23  I clearly was having difficulty just standing.
24  Q.  Anything else?

Page 58

1  A.  When I'm talking to him in the hallway, I
2  have my hands, like, on my hair and my face.  Like,
3  I can't even make eye contact.  I'm all over the place.
4  Q.  You were very upset that night, correct?
5  A.  For a portion of the night that I recall I
6  was upset, yes.
7  Q.  Because your affair with your boyfriend had
8  just been discovered by your boyfriend's wife, correct?
9      MS. ZUCKER: Objection to the
10  characterization.
11  A.  Yes.  Dawn had found out about it, yes.
12  Q.  Did you tell Regina Ryan that you never
13  said that Allan Chiocca sexually assaulted you?
14  A.  That was probably in response to who I --
15  what I told to specific people, and I never used
16  those words to specific people, like, before my
17  interview with Regina, correct.
18  Q.  On May 7th there was an annual town
19  meeting, correct?
20  A.  Yes.
21  Q.  Did everyone go for drinks at China Plaza
22  afterwards?
23  A.  A lot of people did, but not everyone.
24  Q.  Who went?

Page 59

1  A.  From our board it was me, Ed, Larry Ryan.
2  Larry Ryan's wife was there.  Mike O'Loughlin I
3  don't think was there.  Mike Mullen definitely
4  wasn't there because he went to The Banner and he
5  texted me.
6      Then there were people from other boards,
7  Jared Valanzola was there.  Allan was there.  One of
8  the cannabis industry people that we associate with
9  was there.  There might have been a few others, but
10  I can't remember right now.
11  Q.  Do you remember how long Allan Chiocca stayed?
12  A.  Until the end.  He left when I left.
13  Q.  Are you sure about that?
14  A.  Yes, because we walked out into the parking
15  lot, and I suggested that he drive the cannabis
16  industry man home because he was intoxicated, and
17  Allan said that he was a big boy and he could take
18  care of himself.
19  Q.  Did you then drive the man home?
20  A.  No.  He had been kind of touching me during
21  the night, and I was not comfortable given his level
22  of intoxication being in the car with him.
23  Q.  Did you arrange for him to get a ride home?
24  A.  Not at that point, no.

Page 60

1  Q.  On May 8th, did you ask to meet with Allan
2  Chiocca again?
3  A.  No.
4  Q.  Did you send him a text saying, "I'm on my
5  way" that morning?
6  A.  Yes.
7  Q.  Why would you do that if you weren't
8  planning on seeing him?
9      MS. ZUCKER: Objection.
10  A.  Ed asked me to go in to see him.
11  Q.  So you were planning to see Allan Chiocca
12  the morning of May 8th?
13  A.  It was to talk about the school payroll issue.
14  Q.  Did you in fact meet with him?
15  A.  Yes.
16  Q.  Was anyone else present at this meeting?
17  A.  Eric Hart.
18  Q.  Anyone else?
19  A.  No.  I think it was just us three.
20  Q.  Did you ever have a private meeting with
21  Allan Chiocca after May 8th?
22  A.  After Eric Hart left, he shut the door and
23  closed the blinds and talked to me.
24  Q.  Did you at that time tell him your husband

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 61

1 just wants you to be happy?
2 A. He asked me if he was going to have
3 problems with my husband.
4 Q. I think the question was, did you tell him
5 that your husband just wants you to be happy?
6 MS. ZUCKER: Objection.
7 A. Yes, I told him that my husband wants me to
8 be happy.
9 Q. On that same day, May 8th, did you email Ed
10 Kimball, "Just so you know, apparently O'Loughlin is
11 a little upset because I was asked to handle the
12 school issue today"?
13 A. I don't recall if I sent a text.
14 Q. Do you remember O'Loughlin being mad at you?
15 A. I don't think he was necessarily mad at me.
16 I think he was mad at the situation, upset about the
17 situation.
18 Q. What about the situation was he upset about?
19 A. I think it was something that he wanted to
20 handle.
21 Q. On May 14th, did you again go to Town Hall
22 to see Allan Chiocca?
23 A. I don't think I went to see him. I
24 probably went there for business.

Page 62

1 Q. You sent him a text on that morning again,
2 correct?
3 A. I don't recall.
4 Q. He didn't respond to you, does that sound
5 familiar?
6 A. No.
7 Q. Did you tell him you set the alarm off at
8 Town Hall? Does that help refresh your memory?
9 A. Oh, yes. Thank you. I went to pick up
10 something or drop off something in the mail, and it
11 was before 8 o'clock. I think it was at 7:00 or --
12 it was after I dropped my kids off at school. It
13 was around the 7 o'clock hour. Town Hall was
14 locked. I had never used my pass code to get into
15 Town Hall. I tried to do it. I set off the alarm.
16 I know that Allan gets a text or something when the
17 alarm goes off, so I sent him a message saying, "I
18 set off the alarm." I also called the police
19 department because I know they also get notified
20 when the alarm goes off. I told them that it was
21 just me and they didn't have to worry about it, that
22 I just don't know to get into the building.
23 Q. Did you get into the building that morning?
24 A. I don't recall if I got into the building

Page 63

1 that morning.
2 Q. You have the code, correct?
3 A. I do, but I don't know if I actually opened
4 the door. I think I may have come back at another
5 hour once people were there.
6 Q. Do you remember if Allan Chiocca was
7 scheduled to attend an event on May 14th at the
8 State House?
9 A. I don't know whether he was planning to
10 attend, no. I didn't know at the time.
11 Q. Did you decide last minute to attend that
12 event?
13 MS. ZUCKER: Objection.
14 A. No. I had had conversations with Mike
15 Mullen during the week, and he really recommended
16 that I go because it was involved with one of the
17 subcommittees that I was working on for Reimagine
18 Rockland. This was one of my deliverables or one of
19 the committee's deliverables for the Utilities
20 Subcommittee for Reimagine Rockland. So he
21 suggested I go. I talked to Marcy and told her that
22 I was planning to go. But I don't think it was last
23 minute.
24 Q. Did you tell Marcy before May 14th that you

Page 64

1 were going to go?
2 A. I don't know. I may have.
3 Q. Do you know if Allan Chiocca had any reason
4 to know if you were going to go before May 14, 2018?
5 A. I don't think I told him.
6 Q. Did he cancel going?
7 A. I don't know what he did.
8 Q. Do you remember him being there?
9 A. He didn't come, but I don't know whether he
10 canceled or if something came up. I have no idea.
11 Q. Do you remember Marcy telling you that he
12 was canceling?
13 A. I remember Marcy saying he was not going to
14 come.
15 Q. Would you agree with me that you were doing
16 nothing to avoid seeing Allan Chiocca during this
17 time period?
18 A. I was going about regular business at Town
19 Hall.
20 Q. If people stated you were at Town Hall more
21 that week, would you disagree with them?
22 A. I would disagree with them. I was there
23 for regular business. But, you know, I don't work
24 during the day -- I didn't at the time -- so I was

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 65

1  able to do Town business during the day while a lot
2  of the other selectmen did it after work in the
3  evenings.  My work was during the day while the kids
4  were at school, so I would from time to time be there.
5  Q.  On May 16th, did you know that Larry Ryan
6  was mad at you?
7  A.  At some point he sent an email.  I don't
8  know whether it was May 16th, but at some point he
9  sent an email where he said or he expressed that he
10  was upset with me, yes.
11  Q.  Why was he upset with you?
12       MS. ZUCKER: Objection.
13  A.  It appears as though he thought I was
14  acting unilaterally on a particular issue.
15  Q.  Were you?
16  A.  No.
17  Q.  Did he have any reason to be mad at you?
18       MR. CROTTY: Objection.
19  A.  Once I talked to him and explained to him
20  that -- he wanted there to be more conversation as a
21  board.  Once I talked to him and told him that I had
22  sent around this document to the chairs of both the
23  boards and to counsel for both the boards and
24  counsel was concerned about open meeting law

Page 66

1  violations, which is why we didn't have any further
2  discussion on the matter, he understood why we
3  didn't have any further discussion on the matter;
4  but prior to me having a conversation with him, he
5  was unaware that open meeting violations were a
6  concern.
7  Q.  Did you contact Ed Kimball after getting
8  Larry Ryan's first email and ask to speak to him?
9  A.  I think I emailed him and asked him to call
10  me about Larry's email.
11  Q.  That's what I meant to say.  I apologize.
12  And then did you speak to Ed Kimball about it?
13  A.  I don't recall if I did.
14  Q.  Did Larry Ryan then send out another email
15  that was also indicating he was upset with you, a
16  second email?
17       (Witness and counsel exit Zoom screen at
18       11:23 a.m.)
19       MS. HALEM: What just happened?  What's
20  going on?
21       MR. SHAFRAN: What is going on?
22       MS. HALEM: Can the record reflect that the
23  Witness just went off camera, and we can't see
24  either her or her counsel all of a sudden.

Page 67

1  Ken, would you mark the time, please.
2  Cindy, can you find out what is going on.
3  (Discussion off the record)
4  (Pause)
5       MS. ZUCKER: (11:25 a.m.)  Sorry.  There's
6  a glitch in the system.  It's telling us we need a
7  break.  Why don't you finish your line, and then we
8  can take five minutes.
9  Q.  Did you get a second email from Larry Ryan
10  after you spoke with Ed Kimball indicating that he
11  was still mad at you?
12  A.  Yes.
13  Q.  What did you do in response to that?  Is
14  that when you had the conversation with Larry Ryan?
15  A.  Yes.
16  Q.  Later that day did you -- or at the
17  earlier -- I'm not sure of the time, but at some
18  point that day, did you also come to Town Hall, and
19  were you in Allan Chiocca's office?
20  A.  You have to remember Allan Chiocca's office
21  is the Selectmen's office.  We share an office.
22  It's not like I'm going in his particular office for
23  any reason other than to do Selectmen business.  I
24  was probably there to sign warrants or something.

Page 68

1  Q.  That's not my question.  Were you in
2  Allan's office on May 16th?
3  A.  I don't recall whether it was the 16th, but
4  around the time of Larry's email, I think I was
5  there to sign warrants.
6  Q.  Was Larry Ryan also there?
7  A.  I do recall being there once when Larry was
8  there, yes.
9  Q.  Did you overhear a conversation between
10  Larry Ryan and Allan Chiocca that day?
11  A.  All I heard was Allan asking Larry to go to
12  lunch and Larry declining, and I thought it was kind
13  of strange because it was only, like, 10:30 in the
14  morning.  It was kind of a weird time to ask for
15  lunch.  It was relatively early.
16  Q.  Did that upset you in some way?
17  A.  No.
18  Q.  Were you concerned that Allan Chiocca was
19  asking Larry Ryan to lunch?
20  A.  Not at all.
21  Q.  Did you consider Mike Mullen to be your
22  ally on the BOS?
23       MS. ZUCKER: Objection.
24  A.  He was a friend.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 69

1  Q.  You texted with him regularly?
2  A.  Yes.
3  Q.  Many times a day often?
4  A.  Yes.
5  Q.  Did you have that kind of relationship with
6  Larry Ryan?
7  A.  No.
8  Q.  Mike O'Loughlin?
9  A.  Less so with Mike O'Loughlin, more with
10 Larry.  Larry and I had done some -- we had gone out
11 and walked some grounds up over at the airbase
12 together when we were working on that project
13 together.  Larry and I also worked on the nip
14 project together, nips like as in the alcoholic
15 nips.  So Larry and I actually did work together on
16 some projects.  I had a better relationship with
17 Larry than I did with Mike O'Loughlin.
18 Q.  That wasn't the question.  The question
19 was, did you have the same kind of friendly
20 relationship you had with Mike Mullen with either of
21 those two gentlemen?
22      MS. ZUCKER:  Objection.  She answered the
23 question.
24 A.  No.  I was much friendlier with Mike Mullen.

Page 70

1  Q.  On May 16th, did you reach out to Mike
2  Mullen about Allan Chiocca?
3  A.  I don't know whether I reached out to him,
4  but we were talking.  I don't know whether I called
5  him or he called me, but we were talking.
6  Q.  What did you say to him about Allan Chiocca
7  that day?
8  A.  We were talking about the meeting the night
9  before, I think.  We were talking about Allan and
10 his contract and how difficult it would be to bring
11 somebody else in, and, you know, we were talking a
12 little bit about what goals and objectives we
13 thought would be appropriate.  Then I sort of
14 said -- I was questioning Allan's character.  Then I
15 told him that --
16 Q.  Did you --
17 A.  I'm sorry?
18 Q.  No.  Go ahead.  Sorry.
19 A.  And he asked why.  I told him that on the
20 night of the 1st, I went out for drinks with Allan
21 and that I probably drank too much because I don't
22 remember what happened, but I ended up back at Town
23 Hall that night with him, and that I really didn't
24 have much I have a recollection of what happened.

Page 71

1  Q.  Did you tell Mike Mullen why you thought
2  that was a character flaw of Allan Chiocca?
3  A.  I sort of said, "Who would do that?  Who
4  would bring a drunk person back to Town Hall?"
5  That's how I questioned his character.  I thought it
6  was inappropriate for him to have brought me there.
7  Q.  Anything else?
8  A.  Like I said, that's how it was.  Mike
9  Mullen said he was sorry that that happened.  I
10 asked Mike not to tell anyone.
11 Q.  Did you say to Mike Mullen that anything
12 sexual had happened between and you Allan Chiocca
13 that evening?
14 A.  I told him I didn't remember at all what
15 happened.
16 Q.  Did you tell him that you did not trust
17 Allan Chiocca?
18 A.  Yes.  I think I did, trust and character,
19 yes.
20 Q.  Did you say, "He's not a good person"?
21 A.  Probably, yes.
22 Q.  Did you say to Mike Mullen anything -- I'm
23 sorry.  Go ahead.
24 A.  I think I said he was evil.

Page 72

1  Q.  Why would you have said that?
2  A.  Because I just thought at that point --
3  everything that I had learned from my condition that
4  night and everything that had transpired, it just
5  shouldn't have happened.  It should not have
6  happened.  He should have been more appropriate with
7  me.  He should have -- there was just so many ways
8  for this to be avoided, and there were so many
9  things that could have been done, and they were
10 weren't.
11 Q.  Should he have taken you home that night?
12 A.  That would have been one option.
13 Q.  Do you remember telling him repeatedly that
14 you did not want to go home?
15 A.  I don't recall that at all, no.
16 Q.  Did you tell Mike Mullen about your affair
17 with Ed Kimball on the 16th?
18      MS. ZUCKER:  Objection.
19 A.  No.
20 Q.  Did you think Mike Mullen had a right to
21 know that you were having an affair with Ed Kimball?
22      MS. ZUCKER:  Objection.
23 A.  No.
24 Q.  Did you tell Mike Mullen that you had had a

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 73

1   lot to drink on the night of May 1st?
2   A.   Yes.
3   Q.   Were you upset when you spoke to Mike Mullen?
4   A.   Yes.
5   Q.   Did you cry?
6   A.   No.
7   Q.   So Mike Mullen says you were not upset when
8   he spoke to you.  Is he lying?
9   A.   I just don't think he remembers it
10   appropriately.
11       MS. ZUCKER: Objection.
12   Q.   So he's wrong?
13   A.   I think he's wrong, yes.
14   Q.   Do you remember crying?
15   A.   No.
16   Q.   Do you remember telling Mike Mullen that
17   you were concerned that your being at Town Hall was
18   on video?
19   A.   No.
20   Q.   So he's lying about that as well?
21   A.   I never thought about the video until much
22   later.
23   Q.   So if Mike Mullen told Regina Ryan you said
24   that, he's lying?

Page 74

1   A.   I'm saying I didn't tell him that and he's
2   mistaken, yes.
3   Q.   Did you tell Mike Mullen that you had
4   driven around in Allan Chiocca's truck that night?
5   A.   It's possible I told him that, but that's
6   from what Allan told me.
7   Q.   Did you ask Mike Mullen not to tell anyone?
8   A.   I did ask Mike Mullen not to tell anyone.
9   Q.   Why?
10   A.   Because I still hadn't decided what I was
11   going to do with this information, whether I was
12   going to -- I knew I could potentially make a
13   complaint, and I wasn't sure if I was going to at
14   that point.
15   Q.   Why did you tell Mike Mullen then?
16   A.   I think I was looking for some advice,
17   maybe looking for what I think -- what he thought I
18   should do.  I didn't ask the board yet, but I think
19   I was starting to go there, to ask people what I
20   should do.
21   Q.   Did you ask him for advice on what to do?
22   A.   No, but this was the first person I had
23   spoken to, and so I was just starting to open the
24   door there.  I hadn't gotten to the point of asking,

Page 75

1   but that's what I was thinking that's where I was
2   needing myself to go.
3   Q.   This was the first person you spoke with
4   outside of your husband, correct?
5   A.   Correct.
6   Q.   Did you tell him you were sexually harassed?
7   A.   No.
8   Q.   Did you tell him you thought something
9   sexual happened?
10   A.   No.
11   Q.   Did you tell him you had no memory from the
12   time you left the bar until you got home?
13   A.   Yes.
14   Q.   That you had no memory until you woke up
15   the next morning?
16   A.   I told him I didn't remember anything.
17   Q.   Between that time period?
18   A.   Correct.
19   Q.   Leaving the bar and waking up the next
20   morning?
21   A.   Correct.  Other than being in the foyer at
22   Town Hall because I did remember going back to Town
23   Hall.
24       MS. HALEM: We can take a break now.  It's

Page 76

1   11:34.  Is 11:45 okay?  Is that enough time?
2       MS. ZUCKER: Perfect.
3       MS. HALEM: I just want to state we are
4   going to have lunch, unlike at Sue Ide's deposition.
5   If at any point in time someone is starving, please
6   just let me know.
7       (Discussion off the record)
8       (Recess at 11:34 a.m.)
9   BY MS. HALEM:  (11:52 a.m.)
10   Q.   Ms. Hall, can you confirm for me, if your
11   medical records showed that you weighed 194 pounds
12   on May 21, 2018, does that sound accurate?
13   A.   Sure, that sounds accurate.
14   Q.   On the night of May 16th, did you again go
15   to RBG?
16   A.   Yes.  I was leaving coffee in Norwell, and
17   I stopped by RBG on my way home.
18   Q.   Did you see Allan Chiocca's car in the
19   parking lot?
20   A.   The RBG doesn't have a parking lot.  It's
21   all on street parking, and I didn't see his car, no.
22   Q.   Did you go into RBG that night?
23   A.   I did.
24   Q.   Did you sit at his table?

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 77

1  A.  Yes.  He was sitting with the membership
2  from the cannabis industry, the same guy that we
3  were with after the annual meeting.  They saw me
4  when I came in and sort of said hello and waved me
5  over.
6  Q.  Why did you go to RBG that night?
7  A.  I had some emails that I had to return,
8  text messages that had come in during the coffee.  I
9  wanted to get those done.  I was hoping I maybe
10  would run into Ed.
11  Q.  At RBG that night?
12  A.  Uh-huh.
13  Q.  Why did you think he would be there that
14  night?
15  A.  I knew he was meeting with the cannabis
16  people that night.
17  Q.  Was he at that table?
18  A.  No, he wasn't.
19  Q.  Did you leave when you saw Ed Kimball
20  wasn't there?
21  A.  No.  Like I said, I had emails to return
22  and texts to return.  I had some stuff I had to do.
23  Q.  Did you find a quiet table to do that at?
24  A.  No.  Like I said, I was waved over, and so

Page 78

1  I sat down at the table with Allan and the two
2  cannabis men.
3  Q.  Did Allan Chiocca then get up and leave a
4  few minutes after you sat down?
5  A.  I don't think it was a few minutes.  Did he
6  go to the bathroom?  He may have gone to the
7  bathroom a few minutes after I sat down.  He stayed
8  for some time.  I don't know how long, but for some
9  time.
10  Q.  More than ten minutes?
11  A.  I don't know.  I don't know how long he
12  stayed.
13  Q.  Could it have been ten minutes or less?
14  A.  I don't know how long he stayed.
15  Q.  Did you stay for a while after he left?
16  A.  Yes.  I didn't think it was long, but I
17  think the video said I stayed for, like, 40 minutes.
18  Q.  And who waved you over to the table?
19  A.  They all kind of saw me and said hello and
20  waved me over.
21  Q.  Who is "they"?
22  A.  The cannabis guys and Allan.
23  Q.  Allan waved you over?
24  A.  Yes.  They all did.  They were chatting.

Page 79

1  They said hello.  I came in.  It was kind of empty.
2  The bar was kind of empty that night because it was
3  kind of middle of the week.  So I went over to sit
4  with them when they waved me over, yes.
5  Q.  All three men lifted their arms up and
6  waved you over?
7  A.  They all socially said, "Hey, how are you
8  doing," you know, so I walked over and sat down.
9  Q.  Had you been to RBG in between May 1st and
10  May 16th?
11  A.  I may have gone after one of the meetings,
12  like, on the 15th or something.  I may have.  I
13  really don't recall.  It's possible.
14  Q.  Did you drink that evening?
15  A.  I did.  Oh, the night I saw the cannabis guys?
16  Q.  Yes.
17  A.  Yes.
18  Q.  How many drinks?
19  A.  Two.
20  Q.  Did you pay for them yourself?
21  A.  One of the drinks was bought by Tom Mills,
22  a School Committee member.  He was sitting at the
23  bar, and he bought a round for everybody.  I believe
24  the cannabis industry men picked up the tab.

Page 80

1  Q.  You told Regina Ryan you left ten minutes
2  after Allan Chiocca left.  Was that true?
3  A.  I thought I left shortly after Allan left,
4  but the video shows I left, like, 40 minutes after
5  he left.
6  Q.  Did you intentionally lie to Regina Ryan or
7  did you just not remember?
8  MS. ZUCKER:  Objection.
9  A.  I didn't realize it was 40 minutes.  I
10  thought it was 20 minutes.
11  Q.  You told Regina Ryan it was 10 minutes,
12  though.
13  A.  No.  I think I might have said 10 to 20
14  minutes.
15  Q.  On May 17th, there was an MAPC meeting in
16  Rockland that day; is that correct?
17  A.  There was an event.  MAPC has meetings, but
18  this was more of an event.
19  Q.  Tell me about that event.
20  A.  They were going to -- they went to the
21  Senior Center.  They were going to walk the Rail
22  Trail, and then just do something at The Artist Loft.
23  Q.  Was Allan supposed to go to that with
24  Ms. Birmingham?

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 81

1  A.  I don't know whether he was supposed to go.
2  He really didn't do much with MAPC in the past.  I
3  had gone to a bunch of meetings.  He had never been
4  at any of the meetings I had been at.
5  Q.  Did you announce that morning you were
6  going to go to that event?
7  A.  I actually didn't because I had another
8  event scheduled that was on the Housing Choice Plan.
9  It was being put on by the Massachusetts Lawyers
10  Association in Town.  I hadn't decided whether I
11  was -- they were at the same time.  In the morning I
12  hadn't decided whether I was going to go to the
13  thing in Rockland or whether I was going to go to
14  the thing in Town.
15  Q.  But you decided to go to the thing in
16  Rockland?
17  A.  Yes, because I wasn't feeling well that
18  day.  I was feeling kind of sick.
19  Q.  Who did you tell you were going to go?
20  A.  I think I texted Marcy that I was going to
21  go, but I was late getting there.  She texted me
22  like, "Aren't you coming?"  I said like, "Oh, I'm
23  running late."
24  Q.  Because she thought you were going to be

Page 82

1  there on time?
2  A.  She did.
3  Q.  And did Allan Chiocca come to that?
4  A.  I only did the Rail Trail.  He wasn't on
5  the Rail Trail.
6  Q.  Did you know he was supposed to attend and
7  he changed his mind about going when he heard you
8  were coming?
9  A.  I did not.  I did not know that at the
10  time, no.
11  MS. ZUCKER: Objection.
12  Q.  Do you know it now?
13  A.  From this litigation, that's what he has
14  said, yes.
15  Q.  Did other Select people go to that event?
16  A.  There was a selectwoman from Hull who was
17  there with me.  It was during the day.  Because
18  other selectmen from Hull also didn't work during
19  the day, so we were both there together.  She comes
20  to a lot of the other meetings too.  She's now the
21  Assistant Town Administrator in Rockland.
22  Q.  So on May 17th, you went to Ed Kimball and
23  claimed that something had happened with Allan
24  Chiocca that night; is that correct?

Page 83

1  MS. ZUCKER: Objection.
2  A.  I didn't go to Ed Kimball.  We were having
3  a phone conversation when I said it.
4  Q.  So tell me what prompted you to have that
5  conversation.  You were talking about something else
6  first?
7  A.  Yes.
8  MS. ZUCKER: Objection.
9  A.  Yes, we were talking about something else.
10  Then he had said to me, "What's going on?  Allan
11  trying to get me to kind of break away some time
12  from the board, and he wants me to appoint one of
13  the weaker members" -- that's what he called them --
14  "as the chair."  I was the vice chair.  I guess if
15  Ed were to step back, I would be the one to fill
16  that role.  So he was asking me is there any reason
17  that he would want to marginalize me, was there any
18  reason I would think that Allan would want to
19  marginalize me.  Then I told him what happened on
20  the 1st.
21  Q.  What did you tell him had happened on the
22  1st?
23  A.  I told him that I thought something had
24  happened, that I had gone out for drinks with Allan

Page 84

1  after the meeting, and that I don't remember much of
2  what happened, and that then I ended up back at Town
3  Hall.
4  Q.  Did you elaborate at all on "something had
5  happened"?
6  A.  No.
7  Q.  Did you tell him that you were sexually
8  harassed?
9  A.  No.
10  Q.  Did you tell him that Allan Chiocca was
11  sexually intimate with you?
12  A.  No.
13  Q.  Did you tell him that there was -- that you
14  had any inkling that something sexual had happened?
15  A.  I told him that I went back to Town Hall
16  and it was the middle of the night, and so it was
17  probably something inappropriate.
18  Q.  How did you know that something
19  inappropriate happened?
20  A.  I said I was at Town Hall in the middle of
21  the night, and so I didn't think it had to do with
22  Town business.
23  Q.  Was Allan Chiocca also at Town Hall in the
24  middle of the night?

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 85

1 A.  Yes.
2 Q.  Was there any difference in your memory
3 between your being there and his being there?
4 A.  I don't understand the question.
5 Q.  It wasn't a great question.
6     Allan Chiocca had also been drinking at RBG
7 that night, correct?
8 A.  Yes.
9 Q.  And he was also at Town Hall that night?
10 A.  Yes.
11 Q.  Did you give Ed Kimball any detail besides
12 the fact that both of you had been drinking at RBG
13 and both of you ended all at Town Hall that night?
14 A.  Not that I recall, no.
15 Q.  Did Ed Kimball assume that you were
16 accusing Allan Chiocca of sexual activity?
17     MS. ZUCKER: Objection.
18 A.  I don't know what Ed Kimball did.
19 Q.  Did you use the word "inappropriate
20 conduct" to refer to Allan Chiocca?
21 A.  The phrase "inappropriate conduct"? It's
22 two words.
23 Q.  Yes. Sorry.
24 A.  No, I didn't use that phrase.

Page 86

1 Q.  Did you say anything about that he had
2 engaged in any inappropriate behavior, or words to
3 that effect?
4 A.  I said that being there at night, what
5 happened likely was inappropriate.
6 Q.  But you didn't tell him what that was?
7 A.  Correct.
8 Q.  Or if anything happened at all?
9 A.  Correct.
10     MS. ZUCKER: Objection.
11 Q.  Did you later agree to meet with Ed Kimball
12 in person that day?
13 A.  He phoned me and asked me to meet him on
14 the Rail Trail, yes.
15 Q.  Were you surprised that he did that?
16 A.  I don't know. I guess I wasn't surprised, no.
17 Q.  When you first told Ed Kimball about being
18 at Town Hall on the night of May 1st, what did you
19 expect him to do with that information?
20     MS. ZUCKER: Objection.
21 A.  I don't know. I guess I was kind of
22 telling him the same way I told Mullen, that I was
23 looking for some advice on what I should do.
24 Q.  Did you say, "What should I do" to him, or

Page 87

1 words that effect?
2 A.  No. After I told him what happened, he
3 said he needed time to process it and we would talk
4 again.
5 Q.  Did you use words to the effect with Mike
6 Mullen the day before, "What should I do about this?"
7 A.  No.
8     MS. ZUCKER: Objection.
9 A.  Not yet. I had not gotten there yet.
10 Q.  So Ed Kimball hangs up the phone with you,
11 and you didn't expect him to do anything at that point?
12     MS. ZUCKER: Objection.
13 Q.  Other than process it.
14     MS. ZUCKER: Objection.
15 A.  I don't know. I didn't have any
16 expectation for it.
17 Q.  What happens next?
18 A.  I went home. Because I was in the car when
19 I talked to him. I ended up knocking doors. I
20 remember texting Marcy while I was knocking doors in
21 Hanover. So I knocked some doors. Then I think
22 that's the same day as the thing -- is that the same
23 day as -- yes, that's the same day as the Rail Trail
24 walk. Eventually I ended up back at Town Hall to do

Page 88

1 the Rail Trail walk.
2     Then I had a meeting I think in the Finance
3 Department. I went to Finance for some time. At
4 some point, I don't know whether it was on the Rail
5 Trail or while I was in Finance, that's when I got
6 the call that Ed wanted to meet with me at the Rail
7 Trail at 4:30.
8 Q.  You went about your day fairly normally,
9 correct?
10     MS. ZUCKER: Objection.
11 A.  Yes. I mean, I did what was on my calendar
12 that day, like I did when I ran for office. I had a
13 pretty tight calendar. I just did whatever was next
14 in the sequence of events.
15 Q.  Prior to telling Ed Kimball about being at
16 Town Hall on the night of May 1st, you had told Mike
17 Mullen. Anyone else other than your husband?
18 A.  No.
19 Q.  Did you tell Regina Ryan that you were
20 worried that people were going to perceive you as a
21 whore and a drunk?
22 A.  No. I used those words in regards to the
23 video, that I was afraid it would look like on the
24 video that I was a whore or a drunk. That was

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 89

1   particularly pertaining to the videos.
2   Q.  Did you ever tell Ed Kimball you were
3   worried people would think you were a whore and a
4   drunk?
5   A.  Not that I recall.
6   Q.  Are you an alcoholic?
7       MS. ZUCKER: Objection.
8   A.  I got this question on the first day.
9       MS. ZUCKER: Yes.  We are not going to do a
10  lot of this.
11      MS. HALEM: Sorry.  I forgot.
12      MS. ZUCKER: Then why don't you just move on.
13      MS. HALEM: Why don't I just get the answer
14  if she knows it.
15  A.  It's fine.  No, I don't believe I'm an
16  alcoholic.  There are periods I go without drinking
17  for weeks, days, but there have been times I've had
18  problems with alcohol on a particular day of
19  consumption.
20  Q.  Binging?
21  A.  Yes.  I guess binging is not necessarily as
22  much for me as it is for other people.  I think
23  that's part of the problem.  My tolerance is
24  relatively low.

Page 90

1   Q.  So what is binging for you?
2       MS. ZUCKER: Objection.
3   A.  Four or five drinks would be binging for me.
4   Q.  How often do you have four or five drinks
5   at a time?
6       MS. ZUCKER: Objection.
7   A.  Infrequent.
8   Q.  In your lifetime, have you done it more
9   than ten times?
10      MS. ZUCKER: Objection.  This will be the
11  last question on this.
12  A.  Probably, yes.
13  Q.  More than 20 times?
14  A.  Probably not.
15  Q.  That day on the Rail Trail with Ed Kimball,
16  was he mad at you or was he mad at Allan Chiocca?
17  A.  I think he was just upset about the
18  situation in general.  Like I said, I had really
19  felt like I had disappointed him, and, you know, I
20  think, you know, obviously I had known at that point
21  that I disclosed information about my relationship
22  with him to Allan, and I felt like I had really let
23  him down.  I think he was more upset of the
24  situation than he was necessarily at any particular

Page 91

1   person.
2   Q.  Did you tell Ed Kimball that you had told
3   Allan Chiocca about your affair with him?
4   A.  At some point I did, but I don't recall
5   when I did.
6   Q.  Did he know on the Rail Trail that day?
7   A.  I don't know.
8   Q.  Do you recall, when he asked you if there
9   was any reason that Allan would want him to not be
10  the chair anymore, did you respond with, "Well, I
11  told him we were having an affair," anything like that?
12  A.  No, I did not say that.
13  Q.  Did you during that conversation discuss
14  the fact that Allan knew that the two of you were
15  having an affair?
16  A.  During that conversation on the 17th?
17  Q.  Yes.
18  A.  The one in my car?
19  Q.  Yes.
20  A.  No, I didn't have that.  That wasn't part
21  of the conversation.
22  Q.  Had Ed Kimball told you by then that he had
23  told Allan Chiocca that you two were having an affair?
24  A.  No, but Allan Chiocca told me.

Page 92

1   Q.  That Ed had told him?
2   A.  Yes.
3   Q.  Had you confronted Ed about that?
4   A.  No.
5   Q.  Why not?
6   A.  Because it's his right to tell who he wants.
7   Q.  So is it your testimony today that you knew
8   that both of you had separately told Allan Chiocca
9   that you two were having an affair, but you two did
10  not have a conversation about the fact that Allan
11  Chiocca knew that you guys had an affair?
12  A.  What Allan told me was that Ed had come in
13  and said that his wife said -- that Ed had come in
14  and said that Dawn thought Ed was having an
15  emotional affair with me, but that he didn't tell
16  him that it was a physical affair.
17  Q.  That was not my question.  Did the two of
18  you --
19  A.  Yes, that's what he told me.
20  Q.  Let me finish.  Sorry.  By May 17th or on
21  May 17th, did the two of you ever discuss the fact
22  that Allan Chiocca knew you two were having an affair?
23      MS. ZUCKER: Objection.
24  A.  I don't recall.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 93

1  Q.  Did you tell Regina Ryan you never would
2  have told Ed Kimball about May 1st if you knew that
3  Allan Chiocca would keep it a secret?
4  A.  No.  What I told Regina Ryan is I never
5  would have told Ed Kimball about May 1st if he had
6  never prompted me with the question, "Is there a
7  reason that Allan would want to marginalize you?"
8  Because when I spoke to him that morning, I had no
9  intention of telling him what happened until he
10  asked me that question.
11  Q.  Why would Allan Chiocca have wanted to
12  marginalize you?
13  A.  I don't know.
14      MS. ZUCKER: Objection.  Marginalize who?
15      MS. HALEM: She.  I was taking her quote.
16  A.  So as part of that conversation, Ed asked
17  me if Allan was trying to -- why he was trying to
18  marginalize me in the sense of why would he be
19  looking to appoint somebody else to be the chair if
20  Ed steps back.  That's what I mean by marginalize.
21  Q.  And the only thing you could think of was
22  the night of May 1st, not the affair that you were
23  having with Ed Kimball?
24  A.  No, and I think it was fresh in my mind

Page 94

1  because I had had the conversation with Mullen the
2  day before.
3  Q.  Did you ever tell Ed Kimball that Allan
4  Chiocca told you that he gets a contract and a blow
5  job?
6      MS. ZUCKER: Objection.
7  A.  I'm sorry?  Can you repeat that question.
8  Q.  Did you ever say that to Ed Kimball, the
9  line about the blow job and the contract?
10      MS. ZUCKER: Objection.
11  A.  No.  Well, when?  Like, around May 16th,
12  May 17th, this time?
13  Q.  Yes.
14  A.  No.
15  Q.  Do you remember him saying that to you?  On
16  the morning of May 2nd, did you have a memory of that?
17  A.  No.  By "he," you mean Allan?
18  Q.  Yes.
19  A.  Right.  No.
20  Q.  You didn't have that memory?
21  A.  No.
22  Q.  Did you ever get that memory back?
23      MS. ZUCKER: Objection.
24  A.  Yes.

Page 95

1  Q.  When?
2  A.  It may have been the fall of -- I don't
3  recall when.  It may have been the fall.  I don't
4  recall when.  Sorry.
5  Q.  But your husband told Ed Kimball that you
6  had used that line on the night of May 2nd, correct,
7  the morning of May 2nd?
8      MS. ZUCKER: Objection.
9  A.  I don't know what my husband told Ed.
10  Q.  Did Ed Kimball tell you that your husband
11  had said that to him?
12  A.  Yes.
13      MS. ZUCKER: Objection.
14  A.  Ed told me he had gotten a call from my
15  husband and that my husband told him something about
16  that.
17  Q.  So in this theoretical world, you
18  remembered it early morning on May 2nd, then forgot
19  it again, and then remembered it again; is that
20  correct?
21      MS. ZUCKER: Objection.
22  A.  Me coming home on May 2nd and saying
23  something, I remembered it at that point, yes.
24  Otherwise, obviously I wouldn't have said something.

Page 96

1  Q.  And then you forgot it?
2      MS. ZUCKER: Objection.
3  A.  Yes.
4  Q.  And then you remembered it again, correct?
5  A.  Yes.
6      MS. ZUCKER: Objection.
7  Q.  Did you tell Regina Ryan that Ed Kimball
8  was protective of you?
9  A.  Yes, I think I said that.
10  Q.  What is the basis for that?
11  A.  He helps me navigate around some of the
12  relationships at Town Hall.  He would let me know
13  who, you know -- how to approach certain people,
14  what things that might work if you were trying to
15  cooperate with another department head to get
16  something done.  He was helpful in, like, navigating
17  Town Hall.
18  Q.  You also told her that he had a lot of
19  power in the Town?
20  A.  Yes.  He had been the chair for many years.
21  Q.  Do you think it's appropriate to tell your
22  subordinate that you're having an affair with
23  another one of his managers?
24      MS. ZUCKER: Objection.

Case 1:19-cv-10482-WGY   Document 175-5   Filed 11/15/21   Page 75 of 178

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 101

1  Q.  Did you tell him that in connection with
2  what happened on the night of May 1st?
3  A.  I told him, but it was much later.
4  Q.  After you had already been interviewed by
5  Regina Ryan?
6  A.  Possibly.
7  Q.  After he had been interviewed by Regina Ryan?
8  A.  Possibly.
9  Q.  Is it possible it was before that?
10  A.  It definitely wasn't until -- like, it
11  wasn't on the Rail Trail.  Like, it was not then.
12  It was later than that.
13  Q.  But you had a lot of conversations with Ed
14  Kimball about May 1st/May 2nd between May 17th and
15  when you spoke to Regina Ryan, correct?
16      MS. ZUCKER:  Objection.
17  A.  Sorry.  Repeat that.
18  Q.  That was a long one.  You had several
19  conversations with Ed Kimball between May 17th and
20  when you met with Regina Ryan about what happened on
21  May 1st, correct?
22      MS. ZUCKER:  Objection.  What does the
23  "about what happened on May 1st" mean?
24      MS. HALEM:  I think she knows.

Page 102

1      MS. ZUCKER:  No.  I don't.
2      MS. HALEM:  You don't what happened on
3  May 1st?
4      MS. ZUCKER:  No, no.  That's not a fair --
5      MS. HALEM:  Would it help you if I
6  described the incident?
7      MS. ZUCKER:  Are you talking -- you said --
8  are you saying that the conversations with Ed about
9  May 1st or the conversations with Regina Ryan about
10  May 1st?  It's the way you asked the question.
11      MS. HALEM:  I don't think it was unfair.  I
12  was talking about --
13  Q.  Did you talk -- let me start from the
14  beginning.
15      You had several conversations with Ed
16  Kimball between May 17th and when you spoke to
17  Regina Ryan about what happened on May 1st?
18  A.  Yes.
19      MS. ZUCKER:  I still don't know what that
20  means.  Sorry.
21  Q.  When you told Ed Kimball that you had
22  bruising on your inner thigh, did you expect him to
23  tie that to Allan Chiocca touching you?
4      MS. ZUCKER:  Objection.

Page 103

1  A.  I told him that I had the bruising but that
2  I didn't -- I don't know.  I don't remember where it
3  came from.
4  Q.  And you were not implying anything with
5  that?
6  A.  No.  I was telling him the existence of it.
7  When I noticed it, it was in the first week of May,
8  and I didn't want to make the connection either.  I
9  still didn't want to even think about it.
10  Q.  Sitting here today, do you have any memory
11  of Allan Chiocca touching you anywhere other than
12  your breast on the night of May 1st?
13  A.  No.
14  Q.  Later that night of the 17th, there were a
15  series of texts between you and Ed Kimball, correct?
16  A.  Correct.
17  Q.  Because you sat through all the depositions
18  in the case, and you saw those text messages, right?
19  A.  Yes.
20  Q.  So you remember them, correct?
21  A.  I remember them to a point, yes.
22  Q.  Do you remember telling him that you didn't
23  want to put any of this stuff in writing?
24  A.  Yes.

Page 104

1  Q.  Why did you say that?
2  A.  Because we were talking about an employee
3  and something that could potentially affect their
4  employment situation, and I didn't think it was
5  appropriate to be putting it into something that
6  could be potentially a public record.
7  Q.  Your text messages between you and Ed Kimball?
8  A.  As long as it's about Town stuff, it's a
9  public record.
10  Q.  So who are you protecting there, Allan
11  Chiocca?
12  A.  Yes.
13  Q.  Not yourself?
14  A.  No.
15  Q.  Did you tell him that you had gotten
16  memories back in that text message?
17  A.  No.
18  Q.  Did you tell him that you had a better idea?
19  A.  Of when I have I started to forget at the
20  bar, yes, but that wasn't new memories.
21  Q.  Did you give him any other information that
22  night that you hadn't given him at the Rail Trail or
23  when you talked to him from your car?
24  A.  No.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 117

1 A. No.
2 Q. Why did you want to enter into the agreement?
3 A. Because I didn't want any of this to be
4 public.
5 MS. HALEM: We are going to mark this.
6 This is going to be Exhibit 8, and it's identified
7 as NN.
8 (Document marked as Hall
9 Exhibit 8 for identification)
10 Q. Can you see this?
11 A. Not yet.
12 Q. Let me know. They are fuzzy.
13 A. (Examines document) Yes.
14 Q. Do you recognize the document?
15 A. Yes.
16 Q. What is the document?
17 A. I believe they are texts between me and Ed.
18 Q. You recognize that the reason we have such
19 bad copies of these is because you and Ed Kimball
20 deleted the texts between the two of yourselves,
21 correct?
22 MS. ZUCKER: Objection.
23 MS. DUNN: Objection.
24 A. The quality of the document has nothing to

Page 118

1 do with the fact that I deleted my texts. The
2 quality of the document has nothing to do with that.
3 Q. This document was given to Regina Ryan,
4 correct?
5 A. Yes.
6 Q. So somebody printed it out for her. Was
7 that you?
8 A. No. I provided electronic screen shots of
9 it to my counsel.
10 Q. But the reason we don't have pristine
11 copies of this is because they don't exist anymore,
12 correct?
13 MS. ZUCKER: Objection.
14 A. The quality has decreased as they have been
15 blown up, but you can see them on the side. You can
16 still read them perfectly fine. They are small.
17 Q. So you can read them, yes?
18 A. Yes.
19 Q. And these are the texts between you and Ed
20 Kimball between what time frame? When were they sent?
21 A. I would have to go back to the top.
22 Q. It won't help you.
23 A. No, just so I know where --
24 Q. Oh, okay.

Page 119

1 A. I believe these were Thursday night.
2 Q. Is that May 17th?
3 A. If May 17th was a Thursday, that Thursday
4 night.
5 Q. And they continue on through Friday, May 18th?
6 A. I don't know. Let me see where they go.
7 Q. Keep scrolling.
8 A. I'll keep scrolling. (Examines document)
9 Q. Are you still reading?
10 A. Yes. We're scrolling. I'm confused. I
11 thought those pictures were sent to me on Thursday
12 night.
13 Q. Are you seeing something that changes your
14 testimony?
15 A. No. I got those pictures on Thursday night.
16 Q. Not on Friday?
17 A. Wait. No. It was Friday night. I got
18 them Friday night. I'm getting my days confused.
19 Thursday was the day I came home and talked to
20 Chris, then the next day. So Friday night. Sorry.
21 Friday night.
22 Q. Okay.
23 A. I'm just getting the days confused in my
24 head. I apologize.

Page 120

1 Q. I understand. No problem. Going to Page 4
2 of this document, there's a text where you say to Ed
3 Kimball, "Sorry to bother you. I just wanted you to
4 know in advance that I have an appointment with Mary
5 Jane and Eric tomorrow at noon to review the school
6 payroll procedures. Not sure how this ties into
7 your timetable. You have my word that I will not
8 speak to Allan while I am there."
9 Let me stop there. Why doesn't Ed Kimball
10 want you to talk to Allan? What is your notion of
11 that?
12 A. I don't know.
13 Q. Did you ask him, "Why can't I talk to Allan?"
14 A. No.
15 Q. You just followed his command?
16 MS. ZUCKER: Objection.
17 A. He just asked me not to talk to Allan.
18 Q. Did you agree with him that you shouldn't
19 talk to Allan?
20 A. No. I didn't necessarily know why he
21 didn't want me talking to Allan. He just asked me
22 not to, so I said, "Okay, I won't talk to him."
23 Q. So you did what he asked you to do?
24 A. I did.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 133

1  A.  I think that he knew I was upset, and he
2  was telling me I probably need to, you know, deal
3  with that.
4  Q.  Do you think that was a supportive comment?
5     MS. ZUCKER: Objection.
6  A.  It didn't feel supportive at the time.
7  Q.  Did it seem kind of mean?
8     MS. ZUCKER: Objection.
9  A.  At the time it didn't feel supportive.
10 Q.  Did it feel mean?
11    MS. ZUCKER: Objection.
12 A.  I don't know if it felt mean, but it
13 definitely didn't feel supportive.
14 Q.  Did it upset you?
15 A.  No, I don't think it upset me.
16 Q.  You then respond, "I have an appointment.
17 Do I need to pull out of the race?" So you are
18 still looking for his advice on this?
19 A.  Sure.
20 Q.  Did you engage in conduct that you think
21 was unbecoming of a person that was running for
22 State Rep?
23 A.  I mean, I drank too much, which probably --
24 you know, in my own town, which probably isn't

Page 134

1  appropriate. At that point, that's what I was aware
2  of.
3  Q.  So you were concerned if that came out, it
4  would hurt your campaign?
5  A.  Or even the accusation, that if I
6  potentially made an accusation of sexual harassment,
7  that coming out, that could still hurt my campaign.
8  Q.  How about the fact that you were having an
9  affair with Ed Kimball?
10 A.  That could hurt my campaign.
11 Q.  Did he ever tell you whether you should
12 pull out of the race?
13 A.  No, not that I recall.
14 Q.  The next text we see from a different day,
15 from May 29th. Do you see that? I know it's very
16 foggy.
17 A.  (Examines document) Yes.
18 Q.  "Please send a copy of the paid
19 administrative leave letter to my lawyer"?
20 A.  Yes.
21 Q.  How did you know that there was a paid
22 administrative leave letter?
23 A.  I don't know. I think I may have gotten --
4  I think I may have known that they were meeting

Page 135

1  because I got notice that -- I don't know if I got
2  notice because I was a member of the Board of
3  Selectmen at that point that it was on the agenda to
4  put him on leave, but I think it may have been
5  because I was still a member of the board that I got
6  notice of the agenda.
7  Q.  Are agenda items for executive sessions
8  sent to people?
9  A.  I don't know. That's a good question.
10 Q.  So probably not. You think Ed Kimball told
11 you that he was being put on administrative leave?
12    MS. DUNN: Objection.
13 A.  I don't know. I don't know.
14 Q.  Did you get a copy of the paid
15 administrative leave letter?
16 A.  Not from him. I think my counsel just got
17 it in the course of business.
18 Q.  Did you think it was appropriate to ask Ed
19 Kimball for a copy of the paid administrative leave
20 letter?
21 A.  I thought it was appropriate to get a copy.
22 Q.  Did you think it was appropriate for you,
23 one of the participants in this investigation, to
24 ask for a copy of that letter?

Page 136

1  A.  I just wanted to make sure I got a copy.
2  Q.  And then you said thank you to him, and
3  your testimony is he did not send it to you?
4  A.  Correct. I don't believe he sent it to me.
5  Q.  Then why did you thank him?
6     MS. ZUCKER: Objection.
7  A.  I don't know, but I don't believe he sent
8  it to me.
9  Q.  In your next text you tell him you have
10 spoken -- I cannot see the date. It just says,
11 "Monday." "I contacted the police chief today"?
12 A.  Yes.
13 Q.  Do you remember when that was?
14 A.  No.
15 Q.  Why were you contacting the police chief?
16 A.  It could have been for a variety of
17 reasons. I had a lot of people harassing me. It
18 could have been related to that. It probably was
19 related to that.
20 Q.  Did you ever contact him regarding Allan
21 Chiocca?
22 A.  The chief?
23 Q.  Yes.
24 A.  Not that I recall.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 157

1  116 minutes?
2  A.  Where's that?  I'm sorry.
3  Q.  May 23rd at 6:47 a.m.
4  A.  (Examines document)  Long call.  Yes.
5  Q.  Do you remember anything about that call?
6  A.  No.
7  Q.  At this point in time, the Fox news story
8  had not yet broken, right?
9  A.  I don't know whether it was the 22nd or the
10  23rd.
11  Q.  Most of the testimony in the case was it
12  was on the 23rd.  Does that refresh your memory?
13  A.  If that's what it is, yes.
14  Q.  So at 6:47 in the morning, you were unaware
15  of that, right?
16  A.  I would assume so, yes.
17  Q.  Unless you were involved in it somehow?
18      MS. ZUCKER: Objection.
19  A.  No.  Gosh, no.
20  Q.  Just asking.  So do you have any idea what
21  you spoke to Ed Kimball about for 116 minutes that
22  morning?
23  A.  No.
24  Q.  In the days leading up to it, you are

Page 158

1  speaking to Pilgrim Strategies, right?
2  A.  I'm speaking to Jim Quigley.  I'm friends
3  with Jim Quigley.
4  Q.  So were you getting advice from him?
5  A.  I was asking him how to deal with the
6  nondisclosure.
7  Q.  How so?
8  A.  Just I was wondering if there was enough
9  out there if it was going to impact my campaign or
10  not, if there was, like, enough noise floating around.
11  Q.  What noise would have been floating around
12  at that point?
13  A.  I don't know, but a lot of people knew a
14  lot of stuff at that point.  There was a lot on
15  social media.  There was a lot of just chatter about
16  what was going on.
17  Q.  Can you give me some examples of that
18  chatter on May 22nd?
19  A.  You will have to check the social media posts.
20  Q.  Well, I'm asking you sitting here what you
21  remember on May 22nd, when you first had phone
22  calls with --
23  A.  I can't remember specifically what it was,
24  but there was a lot of chatter.

Page 159

1  Q.  Was there any chatter that you had been
2  having an affair with Ed Kimball at that point?
3  A.  I'm not sure.  I don't think so.  Possibly.
4  Q.  Was the chatter about what had happened
5  with you and Allan Chiocca?
6  A.  Yes.
7  Q.  So do you remember what you specifically
8  asked Jim to opine upon for you?
9  A.  Initially I approached him to see whether
10  or not the chatter was so great that I couldn't stay
11  in the race even with the nondisclosure agreement,
12  whether I would still have to pull out of the race.
13  Q.  What did he tell you?
14  A.  By the 23rd he said everybody knew
15  everything and there was no reason for me to stay in
16  the race.
17  Q.  How about by the 22nd?  You spoke to him
18  three times on the 22nd.
19  A.  Yes.  I don't know.  I don't think they
20  were long calls, were they?
21  Q.  One of them was 32 minutes.
22  A.  I don't know.  We just talked about it.
23  But I know that by the 23rd -- before the story
24  broke, I talked to him, and he said that it was so

Page 160

1  public the nondisclosure agreement was still -- that
2  I would still have to pull out of the race.
3  Q.  So you spoke to him five times on that day?
4  A.  Yes.
5  Q.  Do you remember telling him that you had
6  had an affair with Ed Kimball?
7  A.  I may have.  No.  Actually, no, I don't
8  think I did.  I don't think I did.  I think I may
9  have said that I was spending some time with him,
10  but I don't think I -- because he was helping me
11  with some of my campaign stuff too, but I don't
12  think I told him about it, no.
13  Q.  Jim was working on your campaign?
14  A.  No.  Ed was.
15  Q.  So I don't understand.  What did you tell
16  Jim about Ed?
17  A.  Well, he knew that Ed was involved in
18  bringing this allegation forward to Allan.
19  Q.  And Jim was also representing Ed?
20  A.  No, I don't think so.  Jim doesn't really
21  know Ed.
22  Q.  Was Ed also working with Pilgrim Strategies?
23  A.  He may have been.  I don't know.
24  Q.  So you came to Jim completely separate from

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 161

1   Ed Kimball working with Pilgrim Strategies?
2   A.   Yes.  Jim was a volunteer soccer coach for
3   me when I ran the Youth 5H Directors Program, and I
4   knew his mom from Quincy.
5   Q.   And on May 23rd, you have a lot of phone
6   calls with Jim, right?  If you scroll down.
7   A.   May 23rd, we are not there yet.
8   Q.   On, two... Nine.
9   A.   (Examines document)  Voice mail and then a
10  call, yes.  Yes, that's when we were speaking.
11  Q.   And do you remember the substance of those
12  conversations?
13  A.   Like I told you, in one of these
14  conversations he told me that I needed to pull out
15  of the race.
16  Q.   On May 23rd?
17  A.   I don't know whether it was the 22nd or the
18  23rd, but in one of these conversations, that's what
19  he said.  There was just too much chatter around.
20  Q.   Okay.  And you don't remember what chatter
21  he was talking about?
22  A.   No, not specifically.
23  Q.   You told Regina Ryan that you never told
24  Mike Mullen or Ed Kimball that Allan Chiocca

Page 162

1   sexually assaulted you, correct?
2   A.   Correct.
3   Q.   Do you have any memory sitting here today
4   of when Fox News dropped the story?
5   A.   Yes.  I was on the phone with Ed.  We were
6   talking.  Marcy Birmingham beeped in and said, "Fox
7   News just called me on the" -- so he beeped over to
8   talk to Marcy.  That's when -- I think it was Marcy.
9   That's when she said that, "Fox News is here asking
10  to find out why they put the Town administrator on
11  leave for having received a blow job."  Then Ed
12  flipped back over to me and said, "Oh, my god.  This
13  is what's happening at Town Hall right now.  I need
14  to go deal with it."
15  Q.   What time was that?
16  A.   2:00 or 3:00 in the afternoon.
17  Q.   So was it one of these phone calls?
18  A.   It could have been, probably was.
19  Q.   So there's a phone call between you and Ed
20  on the 23rd at 3:31?
21  A.   It could have been that one.  It could have
22  been at 3:31.
23  Q.   So is it possible you were on that
24  39-minute phone call and then -- I mean, it appears

Page 163

1   likely that you were on that 39-minute phone call.
2   He gets a beep in, and then he calls you back at
3   4:11?
4   A.   Possibly.
5   Q.   Do you remember what he told you at 4:11
6   about what the story was?
7   A.   I don't remember.  I don't know if he went
8   down there or if he just told Marcy how to handle
9   it.  I really don't recall.
10  Q.   Because it looks like to me -- and you can
11  tell me if I am right or wrong -- you then called
12  your husband right after at 4:20?
13  A.   Yes.
14  Q.   And then you called the strategist, the
15  public relations person, Jim?
16  A.   Yes.
17  Q.   Does that refresh your memory of when Jim
18  told you to pull out of the race?
19  A.   No.  He told me before the thing hit the
20  media.
21  Q.   Oh, he did.  Before?
22  A.   Yes.
23  Q.   Because too many people knew before it hit
24  the media?

Page 164

1   A.   Correct.
2   Q.   Okay.  At that point in time, who had you
3   told that you were in Town Hall on the night of the
4   1st?
5       MS. ZUCKER:  Objection.
6   A.   My best friend Linda Cook and briefly my
7   friend Scott McAllen, my husband, my brothers, my
8   sister.  That's it.
9   Q.   Got it.
10  A.   Although I didn't tell my brothers --
11  actually, I didn't tell me brothers and my sister
12  until I -- I probably called them in this line of
13  calling because I needed to tell them before they
14  heard about it on the media.  So I probably didn't
15  tell them -- in fact, I know I didn't tell them
16  until after I knew that it was coming out in the
17  media.  So prior to me knowing it was coming out in
18  the media, the only person I had spoken to was Linda
19  Cook and Scott McAllen, and Chris.
20  Q.   Can you scroll down to May 29th for me.
21  A.   Yes.  See 990 -- these are my brothers.
22  May 23rd, 617 930-3189, that's my brother David.
23  May 23rd, 617 990-2181, that's my sister.  May 23rd,
24  5:46, 617 930-3189, that's my other brother.  So

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 169

1  members of the BOS that he was in daily contact with
2  you, sometimes for hours on end?
3      MS. ZUCKER: Objection.
4  A.  I don't know what he told the Board of
5  Selectmen members.
6  Q.  Did he ever tell you whether he told John
7  Clifford he was in daily contact with you sometimes
8  for hours on end?
9      MS. ZUCKER: Objection.
10 A.  I don't remember what said to John
11 Clifford -- or I don't know what he said to John
12 Clifford.
13 Q.  Did you tell Regina Ryan that you were in
14 daily contact with Ed Kimball sometimes for hours on
15 end?
16 A.  I think I told her we spoke.
17 Q.  Did you tell her you spoke regularly and
18 for hours on end?
19     MS. ZUCKER: Objection.
20 A.  I don't think I characterized it like that,
21 no.
22 Q.  How did you characterize it?
23 A.  I don't know, but I definitely told her
24 that we spoke.

Page 170

1  Q.  On June 2nd, did you send an email
2  to Ed Kimball asking to discuss Agenda Item 12? You
3  would have seen it at Ed Kimball's deposition.
4  A.  Yes.  The school payroll thing, yes.
5  Q.  Do you remember the email?
6  A.  I don't remember sending it, but I have
7  seen the email, yes.
8  Q.  Why wasn't it provided to us as part of
9  discovery, if you know?
10     MS. ZUCKER: Objection.
11 Q.  By you.
12 A.  I don't know.  I have given all my emails.
13 Q.  Did you delete that one?
14     MS. ZUCKER: Objection.
15 A.  No.
16 Q.  In that email, do you remember saying that
17 you didn't want this conversation with you and Ed
18 Kimball to also be in writing?
19     MS. ZUCKER: Objection.
20 A.  I would have to see the email.
21 Q.  We can show you the email if you would
22 like. (Examines documents)  Sorry.  I'll just ask
23 you a few questions about it.  I will find it if I
24 need to.  Do you remember telling him during that

Page 171

1  email that you needed to be transparent?
2  A.  I believe so.
3  Q.  Okay.  Do you think it's transparent to say
4  that you don't want to put things in writing?
5      MS. ZUCKER: Objection.
6  A.  My concern about putting things in writing
7  is because our Town counsel had concerns about the
8  meeting law violations around this issue.  That's
9  why we never had a subsequent meeting with the
10 School Board after our first meeting.  It's because
11 John Clifford was specifically concerned about the
12 meeting law violations.  This is why I did not want
13 a whole bunch of discussion on this issue in writing.
14 Q.  You did tell him the Town was in turmoil.
15 What was the Town in turmoil about on June 2nd?
16 A.  There was a lot going on in Town on
17 June 2nd.  There was this issue involving me and
18 Allan.  There was the school payroll issue, which is
19 the issue we were talking about right then.
20 Q.  And you told him, "The Town needs you to
21 lead.  Do it"?
22 A.  Yes.
23 Q.  Were you being nice?
24 A.  I was upset.

Page 172

1  Q.  Why were you upset?
2  A.  I was upset because he had asked me to work
3  on this issue in his absence.  I had done some work
4  on it.  Then he kind of dropped the ball on getting
5  it on the agenda and doing all that sort of stuff.
6  I was a little bit aggravated with that.
7  Q.  You had an agreement with Dawn Kimball
8  about how you were going to communicate with her
9  after your affair; is that right?
10     MS. ZUCKER: You can answer that yes or no.
11 The rest of these question are off limits.  The
12 Judge has made it abundantly clear that their prior
13 relationship is not the center of this case.
14 Whatever the private agreements were between these
15 two families are beyond the pale here.
16     You can answer yes or no, but I'm
17 instructing you not to answer any questions beyond
18 that.
19 A.  The answer is no, I didn't have an
20 agreement with Dawn Kimball.
21 Q.  Okay.  Did you make a public statement on
22 June 5th at the BOS meeting?
23 A.  I don't know whether it was June 5th, but I
24 definitely made a public statement.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 173

1  Q.  Tell me about that.
2  A.  I drafted the statement. I read it during
3   the Selectmen's comments.
4  Q.  And in that statement, did you say that
5   Allan Chiocca had engaged in inappropriate behavior?
6  A.  I mean, the statement is recorded. I said
7   what I said. I don't remember what it is I said,
8   but if that's what I said, then that's what I said.
9  Q.  Do you remember on June 5th what
10  inappropriate behavior you knew Allan Chiocca had
11  engaged in?
12  A.  He had already admitted to engaging in
13  behavior with me that was inappropriate. I think
14  just drinking in Town Hall, going back there and
15  drinking in Town Hall, being in Town Hall at night,
16  all that is inappropriate.
17  Q.  Did he admit --
18      MS. ZUCKER: Excuse me. Before you go on,
19  I do want to note on the record that for about the
20  second or third time, you suggested that there's an
21  email or document that Ms. Hall's counsel declined
22  to produce. The number of the last email you say we
23  didn't produce, which we did produce, is called 1984
24  to 1986. Before you make accusations on the record

Page 174

1   imbedded in your question, please make sure you are
2   accurate.
3      MS. HALEM: All right. I will check that.
4   It's possible it slipped past me.
5      MS. CIESLAK: And I will add that the
6   chicken email that was discussed was also produced.
7   You said it wasn't --
8      MS. HALEM: I didn't say that. I said I
9   didn't have any memory of it.
10     MS. ZUCKER: Well, try to ask questions
11  that have some factual foundation. That would be
12  helpful.
13     MS. HALEM: I will do my best. Thanks for
14  the snide remark. That was helpful.
15  Q.  Did you discuss with Ed Kimball his taking
16  a leave of absence from the BOS on June 5th?
17  A.  His taking a leave of absence or me?
18  Q.  Him.
19  A.  No, not on June 5th.
20  Q.  Did you talk with him on that day about you
21  taking a leave of absence?
22  A.  We just had a discussion -- I don't know
23  what day it was -- that he thought it would be a
24  good idea for me to take a temporary leave from the

Page 175

1   board.
2  Q.  And why did he tell you you should do that?
3  A.  Just while this investigation was going on,
4   he thinks it would be easier for the board to deal
5   with the investigation and easier for the board to
6   do their day-to-day work in the Town.
7  Q.  How were you impeding the board's
8   day-to-day work?
9  A.  I think it was just causing additional
10  disagreement -- not disagreement, but additional
11  difficulty for the board since I was involved still
12  and there was this other investigation going on,
13  around.
14  Q.  Did you agree with him?
15  A.  I agreed with him. I thought the board
16  could be more effective if I took some time off, yes.
17  Q.  On June 5th, the day before you met Regina
18  Ryan, going back to that exhibit that we had with
19  the phone records -- well, do you see that? Let's
20  scroll down to June 5th. Do you see phone calls
21  between you and Ed Kimball? There's one at
22  6:56 a.m., for 34 minutes, do you see that?
23  A.  Yes.
24  Q.  And then there's another call between you

Page 176

1   at 10:00, and then another call at 3:30 for
2   13 minutes, then another call at 10:00 p.m., for
3   5 minutes?
4  A.  Yes.
5  Q.  These were all the day before you met with
6   Regina Ryan; is that right?
7  A.  If I met with her on the 5th, then it's the
8   day before I met with Regina Ryan.
9  Q.  You met with her on the 6th.
10  A.  Well, the 6th. I don't remember what day I
11  met with her.
12  Q.  And on the 6th, the morning before you meet
13  her, at 6:59 a.m., because you tend to speak to him
14  very early in the morning, you spoke to him for
15  71 minutes.
16     THE WITNESS: Scroll down.
17  A.  (Examines document) Okay, yes.
18  Q.  Do you remember what you were talking with
19  him about the morning before you met with Regina
20  Ryan for 71 minutes?
21  A.  No.
22  Q.  Did you try to get Mike Mullen to speak to
23  you again during this time period?
24  A.  I think I reached out to him once.

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 189

1 A. I don't know if that's what he said. I
2 think his bigger issue was that there were missing
3 portions of the tape, we didn't know why they were
4 missing, and there were only two people that had
5 access to the tape.
6 Q. Did you think that Mr. Kimball was not
7 insinuating that somebody had tampered with the tape?
8 A. I think he considered it a possibility.
9 Q. And did he write an affidavit stating that
10 he believed that the tapes might have been tampered
11 with?
12     MS. ZUCKER: Objection.
13 A. I don't believe that he stated that they
14 may have been tampered with, but I could be wrong.
15 Q. How is it useful to you if the tapes -- why
16 was that useful to your lawsuit, an affidavit saying
17 that the tapes might have been tampered with?
18     MS. ZUCKER: Objection.
19 A. I think there were just portions of the
20 tape where -- for instance, when I was going down
21 the outside stairs and then it cuts out, and then
22 all of a sudden I'm back at the top of the stairs
23 again. So I don't know what happened, how far I got
24 down the stairs, where I was headed. There were

Page 190

1 just some pieces that are missing.
2 Q. Sitting here today, do you know why the
3 camera didn't pick you up when you were at the
4 bottom of the stairs?
5 A. I wasn't at the bottom of the stairs. I
6 was just on my way down from the top of the stairs.
7 I was probably only, like, four steps down from the
8 top.
9    I know that the cameras are motion
10 activated, but the question is where does the motion
11 have to be in the frame. Because sometimes it picks
12 it up and the video records the people that are in
13 that space, and sometimes it doesn't. So it has to
14 be a motion in a certain area of the frame.
15 Q. So sitting here today, do you still -- do
16 you have any thoughts that the tapes have been
17 tampered with?
18 A. All I know is that there are gaps on the
19 tapes and that the tapes are motion activated.
20 Whether or not all the gaps are because of motion
21 activation, I don't know.
22 Q. In your interrogatory responses, you did
23 state that you had talked to Mr. Kimball prior to
24 his filing the affidavit, do you remember that now?

Page 191

1 A. At some point, but I don't know whether it
2 was specifically for the purpose of talking about
3 the affidavit or if we just talked about something
4 else.
5 Q. Sitting here today, do you have a memory of
6 having spoken to Ed Kimball prior to his filing the
7 affidavit about his drafting an affidavit?
8 A. I could have. I don't recall. I could have.
9 Q. Did you read the affidavit before it was
10 filed in your lawsuit?
11 A. I probably did, yes.
12 Q. Did you agree with what he had written?
13 A. It's not really my place to agree or
14 disagree. I'm not the person who knows this stuff.
15 I'm not the person who heard this.
16 Q. Did you not want the tape to come out?
17 A. I wanted to wait until the end of the
18 investigation.
19 Q. Was that being transparent?
20 A. Yes. I think it was balancing the
21 interests, still transparent, and protecting my
22 privacy as well as Allan's privacy.
23 Q. Why did you ultimately dismiss the lawsuit?
24 A. Because my husband had been interviewing

Page 192

1 with Regina on Saturday, and Regina said that she
2 had told the Town that she was not going to allow
3 them to release the tapes until after the
4 investigation.
5 Q. Did you come to the conclusion at some
6 point that there was no basis for your lawsuit?
7 A. No. I just realized that there was no
8 point to keep moving forward if the tapes were going
9 to be withheld until the investigation ends.
10 Q. Did you believe that Regina Ryan had that
11 power?
12 A. I believe, yes, that she was involved --
13 she was running the investigation, and she was
14 saying that the tapes wouldn't be released until
15 after the investigation was over.
16 Q. Did you ever form a belief as to what you
17 think Allan Chiocca may have edited out of the video?
18 A. Like I said, there are potions that are
19 missing. Those are the only things I can point to.
20 Q. Did you read the affidavit from the
21 person -- the IT expert that reviewed the -- the
22 forensic expert -- excuse me -- that reviewed the tape?
23 A. I did.
24 Q. Do you have any basis for disagreeing with

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 193

1  anything he wrote?
2  A.  It appears as though he only looked at one
3  file, which would be one camera view.  It also
4  appears as though he looked at just a copy of the
5  file, not the actual file itself.  So those things
6  both question -- at least raise a question in my
7  mind whether his opinion can be transferred to the
8  actual footage itself from the computer.
9  Q.  What is the basis of your forming that
10  understanding?  Who told you that?
11       MS. ZUCKER: Objection.
12  A.  I'm not an IT expert.  Just based on what I
13  know, that is my opinion.
14  Q.  No, no.  I asked you, who told you that the
15  forensics person only looked at one view and only a
16  copy of it?
17  A.  It's in the affidavit itself.  He said he
18  looked at an exe file for one particular file.  If
19  you read his affidavit, it's clear that he looked at
20  the one file and it was an exe file.  It wasn't the
21  actual original file from the computer.
22  Q.  Did you make sexual advances towards Eric
23  Hart?
24  A.  No.

Page 194

1  Q.  Did you ever touch Eric Hart?
2  A.  When we were at the bar, I was going to sit
3  down on a stool, and I moved my legs with my hands,
4  and I accidentally touched him on the leg.  I
5  apologized immediately thereafter.
6  Q.  Did he then leave that night?
7  A.  No.  He said, "That's the most action I've
8  gotten in a month."  That's what he said, and we
9  both laughed about it.
10  Q.  And then he left?
11  A.  Not right away, but later in the evening, yes.
12  Q.  Do you remember when that was?
13  A.  This happened probably back in 2017.  I
14  don't know when, but 2017 probably.
15  Q.  That night did you ask him to stay longer
16  and drink more?
17  A.  No.
18  Q.  Was Eric Hart avoiding you after that?
19  A.  Not that I know of.
20  Q.  Did you ask to meet with him to discuss
21  municipal finance?
22  A.  Yes.  I asked to look at specifically
23  retirement benefits because that's something that
24  David Post brought up a lot in his debates when he

Page 195

1  debated other people in the district when he ran.  I
2  wanted to know more about our retirement situation
3  in Town.
4  Q.  Did he somehow avoid having to have those
5  meetings with you?
6  A.  No.  We scheduled it for sometime in April
7  or May.  I asked him whether he wanted to have it in
8  his office or if he wanted to meet somewhere else
9  because we were meeting after hours, and he said in
10  his office, and I met him in his office.
11  Q.  Was he alone with you?
12  A.  Yes.  There was another time where he asked
13  me to meet him at a restaurant.  We had lunch.  He
14  was talking to me about the school payroll issue,
15  and that was at his request.  And I met with him.
16  Q.  Did you tell Regina Ryan that if you knew
17  Allan Chiocca was not going to report you, you
18  wouldn't have reported him?
19  A.  No.  I think what I said to Regina is that
20  if I knew that we could keep this thing quiet and
21  make it all go away, I would have never made a
22  public, you know, accusation.  I think it was in all
23  of our interests to keep this quiet.
24  Q.  Was it your understanding that when the

Allan Chiocca vs.
The Town of Rockland, et al.

Deirdre Hall - Vol. II
October 4, 2021

Page 241

1   Q.   I understand.  What did they want you to
2   apologize for?
3   A.   My drinking I think more than anything
4   else, but I hadn't at that point known how much I
5   drank, so I was uncomfortable making an apology at
6   that point.
7   Q.   That's the only reason, because you didn't
8   know how much you drank?
9   A.   Yes.  As far as I was concerned, I drank
10   three drinks.  I didn't think that was a lot,
11   although I blacked out, which is not good either.
12   That's why I was not comfortable putting in the
13   apology, because I wasn't sure how much I actually
14   drank.
15   Q.   Is there anything untrue in this first
16   statement, the one that did not get used?
17   A.   I don't know.  Like I said, I don't even
18   know if I wrote it.  If things are taken out of it,
19   then there was a reason why they were taken out of
20   it, so.
21   Q.   Were you the one who took them out?
22   A.   I don't recall.
23   Q.   I am going to go on another screen.  I
24   apologize.  My computer is a little discombobulated

Page 242

1   right now.
2        Okay.  I'm going to make a few statements.
3   I just want you to tell me if they are true or they
4   are false, okay?
5   A.   Okay.
6   Q.   Mr. Chiocca wanted you out as a
7   selectperson because you presented a challenge to
8   his authority.
9   A.   I think that's true.
10   Q.   What is the basis for that belief?
11   A.   I think I was a pain in his ass and made
12   his job difficult.
13   Q.   You think he was maneuvering to get you
14   removed from your position?
15   A.   Or marginalize me or make it so I didn't
16   have any real say on the board, yes, whether that's,
17   you know, trying to take out my legs by dealing with
18   my alliances, or whatever, as he was trying to get
19   involved in that, yes, to make it more difficult for
20   me.
21   Q.   And did you have this belief prior to
22   May 1st, 2018?
23   A.   Yes.
24        MS. ZUCKER:  Objection.

Page 243

1   Q.   So then on the night of May 1st, 2018, you
2   gave him a real gift when you told him you were
3   having an affair with his other boss, right?
4        MS. ZUCKER:  Objection.
5   A.   I don't know if it was a gift.
6   Q.   He could use that to discredit you,
7   couldn't he?
8        MS. ZUCKER:  Objection.
9   A.   He could have.
10   Q.   The next statement that I want to know if
11   you think is true or false:  Allan purposely --
12   Mr. Chiocca purposely got you drunk on the evening
13   of May 1st because he intended to take advantage of
14   you.
15   A.   I don't know if he purposely got me drunk.
16   I definitely drank myself.
17        I think that he made decisions later in the
18   night that could have been more appropriate.  You
19   know, he could have made a call to my husband.  He
20   could have brought me home.  There are other things
21   that could have happened that would have been more
22   appropriate.
23        But I know I drank.  I was the one that
24   drank the first three drinks, and I have a clear

Page 244

1   memory of it, so.
2   Q.   And I think we talked before about the fact
3   that your husband was texting you repeatedly during
4   the night that he wanted to come pick you up, and
5   you did not --
6   A.   I don't think it was repeatedly.  I think
7   it was maybe twice.  I was not able -- I don't think
8   I was able to get -- it doesn't look like I
9   responded to him, you know, in a timely manner.  I
10   don't know if I got those texts as he sent them.
11   Q.   You didn't read them; it doesn't mean you
12   didn't get them, correct?
13   A.   Correct, correct.  I may not have read them.
14   Q.   Another statement:  Mr. Chiocca was aware of
15   the cameras in Town Hall, so he purposely tried to
16   conceal the corkscrew he was holding.
17   A.   I think that's true.
18   Q.   But he knew there were cameras in Town Hall
19   when he brought you there.
20   A.   Yes.
21   Q.   How do you reconcile that?
22        MS. ZUCKER:  Objection.
23   A.   He knew where they were.
24   Q.   Why did he bring you there if he knew there

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 245

1  were cameras there?
2  A.  I don't know.  You will have to ask him.
3  Q.  Okay.  And how do you know it was a corkscrew?
4  A.  That's what it looks like to me.
5  Q.  Is that the whole reason you know it's a
6  corkscrew?
7  A.  Yes, because that's what it looks like to me.
8  Q.  Is this statement true:  You consciously
9  repressed the incident between you and Mr. Chiocca?
10  A.  Consciously suppressed?  I don't think it's
11  something I did consciously.
12  Q.  Did you try to avoid it?
13  A.  I think that I was in denial, but I don't
14  think I consciously repressed the memory.  I don't
15  think you can even do that.
16  Q.  But you successfully did repress the memory?
17  A.  I don't think it's something I was
18  successful or unsuccessful at.  I think it's just
19  something that occurred.  It's unconscious.  It's
20  not something I have any control over.
21  Q.  To try to avoid remembering it at any point
22  in time?
23  A.  I think, like I said, I was in denial about
24  what was going on.  I can only remember what I can

Page 246

1  remember.
2  Q.  Is this statement true:  Mr. Chiocca's
3  darkly violent plan worked?
4  A.  Yes.  I think his plan worked.  I think he
5  brought me to Town Hall purposely for his own desire.
6  Q.  How did he know you were going to forget
7  what happened?
8  A.  I don't know.  I don't know.  Obviously he
9  didn't know I was going to forget.
10  Q.  Okay.  What was the darkly violent plan?
11  MS. ZUCKER:  Objection.
12  A.  I think bringing me back in the condition I
13  was in for his own desires at that point.
14  Q.  And what is the basis of that belief?
15  MS. ZUCKER:  Objection.
16  A.  He brought me back to Town Hall when I
17  wasn't in really a condition to make a decision for
18  myself and engaged in sexual activity with me.
19  Q.  To refresh your memory, you come in to Town
20  Hall with Mr. Chiocca on the night of May 1st.  You
21  use the restroom, and then you leave.  Is that correct?
22  A.  Yes.
23  Q.  Then you come back in to Town Hall, and
24  that's when the incident occurs, correct?

Page 247

1  A.  Yes.
2  Q.  How was him leaving the first time part of
3  that darkly violent plan?
4  A.  I wanted to go home, but somehow we went
5  back in the building.  I felt like I needed to
6  follow him into the building.
7  Q.  Do you have a memory of actually -- any of
8  that statement that you just said, or are those just
9  feelings that you have now?
10  A.  No.  I have a memory of him being way ahead
11  of me and feeling like I couldn't catch up with him
12  because I was so far back and I was stumbling, but I
13  had felt like I had to follow him.
14  Q.  Did he tell you -- do have a memory of him
15  telling you you had to follow him?
16  A.  No.  I just felt like I had to.
17  Q.  Didn't you tell Regina Ryan it's because
18  you don't like to be out alone at night?
19  A.  I told her that that's one thing I don't
20  like to be.  I don't like to be alone and out at
21  night.  I don't know if that's why I felt the need
22  to follow him.
23  Q.  Didn't you tell her that's why you felt the
24  need to follow him, because you don't like to be out

Page 248

1  alone at night in the dark?
2  A.  That's not what I told her, no.
3  Q.  Okay.  What did you tell her?
4  A.  I just told her that I felt the need to
5  follow him.  She was like, "Why?"  I said, "I don't
6  know."  She said, "What do you mean you don't know?"
7  I said, "Well, there's a lot of reasons why I might
8  have felt that way.  One is I don't like to be alone
9  at night, but there's many other reasons why I could
10  have felt that way as well."
11  Q.  Is this a true statement:  Clifford was
12  intentionally bias towards Mr. Chiocca in the
13  investigation?
14  A.  I think so, yes.
15  Q.  Based on what?
16  A.  Just based on the fact that Clifford knew
17  more than he brought to the table during the
18  investigation.
19  Q.  I don't understand what that means.
20  A.  He was in the room with Allan and Ed when
21  Allan said that he just wanted it all to go away, he
22  just wanted to retire.  He was there, and he didn't
23  offer that information during the investigation.  I
24  thought that that was bias.

Min-U-Script®

Deirdre Hall - Vol. II
October 4, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 253

1 Q. And you think that your attorney conveyed
2 to Regina Ryan that that would be a useful line of
3 inquiry?
4     MS. ZUCKER: Objection.
5 A. I don't know what my attorney conveyed.
6 Q. Do you believe that Regina Ryan conspired
7 with the Town because the Town wanted you out?
8     MS. ZUCKER: Objection.
9 A. I don't know what Regina's agreements were
10 with the Town.
11 Q. Do you think that Regina Ryan was doing
12 something to help the Town in her report?
13     MS. ZUCKER: Objection.
14 A. Legally I don't think she helped the Town.
15     MS. HALEM: I'm going to take five minutes
16 and see if I'm done, okay?
17     MS. ZUCKER: The answer is yes, that is
18 okay.
19     (Recess at 4:43 p.m.)
20     BY MS. HALEM: (4:51 p.m.)
21 Q. On July 10, 2018, the results of the
22 investigation were read in summary fashion by Regina
23 Ryan at the Selectmen's meeting; is that correct?
24 A. I don't know. I've never watched that

Page 254

1 meeting.
2 Q. Are you aware sitting here today that they
3 announced that you were found to have sexually
4 harassed Allan Chiocca at that meeting?
5 A. I believe that's what the minutes state, yes.
6 Q. And this was prior to the report being --
7 the redacted report being released; is that correct?
8     MS. ZUCKER: Objection.
9 A. Minutes prior, but yes.
10 Q. At the time of the July 10, 2018 meeting,
11 was your affair with Ed Kimball known to people in
12 the Town?
13     MS. ZUCKER: Objection.
14 A. I don't really know.
15 Q. Let me rephrase that. It was bad.
16     On social media. Was it out on social media?
17 A. I think there was some stuff talked about
18 on social media, but that's not everybody. People
19 want to think it's everybody, but it might be 3,000
20 people in a particular group, you know, 20,000 people.
21 Q. So 3,000, at least, people knew?
22     MS. ZUCKER: Objection.
23 A. That's assuming that they live in Rockland.
24 We don't know that either. I know that, for

Page 255

1 instance, Michael Connolly is in those groups, the
2 guy with the harassment order, and he does not live
3 in Rockland. So any of those groups.
4 Q. I didn't mean to limit it to the people of
5 Rockland. It was just generally well know in the
6 community?
7     MS. ZUCKER: Objection.
8 A. The community is Rockland, right? That's
9 the community. Are we identifying the community as
10 something other than Rockland?
11 Q. Let's just say the public community. It
12 could be beyond Rockland.
13     MS. ZUCKER: Objection.
14 A. I don't know. I have no idea how far it
15 was disseminated, none at all, none.
16 Q. But you know that it was on social media at
17 that point?
18     MS. ZUCKER: Objection.
19 A. I had seen that there was some talk on
20 social media that I had been having an affair with
21 Ed, yes.
22 Q. And you believe that that -- at least one
23 of those message floors has approximately 3,000
24 members?

Page 256

1     MS. ZUCKER: Objection. You can answer if
2 you know.
3 A. I don't know. I'm not even in the group
4 myself, so I couldn't even verify it to make sure.
5 Q. Where did you come up with that number a
6 few minutes ago?
7 A. It's based upon --
8     MS. ZUCKER: Don't guess.
9     MS. HALEM: Ellen, stop coaching.
10     MS. ZUCKER: It's 4:53. You are asking
11 some of the toughest questions you have asked all
12 day. She is tired. I'm allowed to tell her to
13 please don't guess.
14     MS. HALEM: That's not what you are doing.
15     MR. SHAFRAN: Let's just get this done.
16 A. I can answer the question. I printed out
17 some of the pages that Michael Connolly was
18 harassing me on that my husband had access to. I
19 know that some of those groups have at least 3,000
20 people. So if the talk was in the same group, which
21 I do not know if it was in the same group, then
22 there could have been 3,000 members.
23     MS. HALEM: I have nothing further. I am
24 suspending.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

Allan Chiocca,                                )
                                              )
        Plaintiff                             )
                                              )
v.                                            )
                                              )
The Town of Rockland, Deirdre Hall,           )      C.A. No. 1:19-cv-10482-WGY
Edward Kimball, Larry Ryan,                    )
Michael Mullen Jr., Michael O'Loughlin,       )
Richard Penney and Kara Nyman,                )
                                              )
        Defendants                            )

## DEFENDANT DEIRDRE HALL'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Deirdre Hall ("Defendant Hall") files her Answer to Plaintiff's Complaint as follows:

## THE PARTIES

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      It is denied that Larry Ryan is the current Chairman of the BOS. The remainder of Paragraph 5 is admitted.

6.      Admitted.

7.      It is denied that Michael O'Loughlin is the current Vice Chairman of the BOS. The remainder of Paragraph 7 is admitted.

8.      Admitted.

9.      Admitted.

1

## JURISDICTION AND VENUE

10.  Paragraph 10 contains a conclusion of law to which no response is required by Defendant
     Hall.

11.  Paragraph 11 contains a conclusion of law of law to which no response is required by
     Defendant Hall.

12.  Paragraph 12 contains a conclusion of law to which no response is required by Defendant
     Hall.

13.  Paragraph 13 contains a conclusion of law to which no response is required by Defendant
     Hall.

## SUBSTANTIVE ALLEGATIONS

14.  Admitted.

15.  Paragraph 15 references a written document that speaks for itself.

16.  Paragraph 16 references a written document that speaks for itself.

17.  Paragraph 17 references a written document that speaks for itself.

18.  Paragraph 18 references a written document that speaks for itself.

19.  Admitted.

20.  Defendant Hall has insufficient knowledge or information upon which to form a belief
     and therefore leaves the Plaintiff to his proof.

21.  Defendant Hall has insufficient knowledge or information upon which to form a belief
     and therefore leaves the Plaintiff to his proof.

22.  Admitted.

23.  Denied.

24.  Admitted.

25.  Denied.

3

26.    It is denied that Defendant Hall declared her candidacy for State Representative in Spring 2018. The remainder of Paragraph 26 is admitted.

27.    It is denied that Defendant Hall "professed" her love for Mr. Kimball. The remainder of Paragraph 27 is admitted.

28.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

29.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

30.    Admitted.

31.    It is admitted that at 6:58 p.m., Mrs. Kimball texted Defendant Hall. The remainder of Paragraph 31 references a written document which speaks for itself.

32.    It is admitted that the May 1, 2018 BOS meeting concluded at approximately 7:30 p.m. The remainder of Paragraph 32 is denied.

33.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

34.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

35.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

36.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

37.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

4

38.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

39.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

40.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

41.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

42.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

43.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

44.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

45.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

46.   Denied.

47.   Admitted.

48.   Denied.

49.   Denied.

50.   It is admitted that at 8:33 p.m. on May 1, 2018, Mrs. Kimball texted Defendant Hall. The remainder of Paragraph 50 references a written document which speaks for itself.

51.   Admitted.

52.   Denied.

53.   Admitted.

54.   It is admitted that Defendant Hall asked Mr. Chiocca if she could use his cell phone because she wanted to check social media to see if Mrs. Kimball posted anything. The remainder of Paragraph 54 is denied.

55.   Admitted.

56.   It is admitted that Defendant Hall divulged to Mr. Chiocca that she had been having a relationship with Mr. Kimball. The remainder of Paragraph 56 is denied.

57.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

58.   Denied.

59.   Denied.

60.   It is admitted that Defendant Hall and Mr. Chiocca discussed the BOS meeting, Defendant Hall's performance as the acting chairperson, whether Defendant Hall preferred to be called madam "chairperson" or "chairwoman," Defendant Hall's relationship with Mr. Kimball, and Mrs. Kimball's response to learning of the relationship. The remainder of Paragraph 60 is denied.

61.   Denied.

62.   Denied.

63.   Denied.

64.   Denied.

65.   Denied.

66.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

67.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

68.    It is admitted that at 9:45 p.m., Defendant Hall texted her husband. The remainder of Paragraph 68 references a written document which speaks for itself.

69.    It is admitted that Mr. Chiocca paid the bill at RBG. It is denied that he paid the bill at 9:56 p.m. As to the remainder of Paragraph 69, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

78.    Denied.

79.    Denied.

80.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

81.    Denied.

82.    Admitted.

83.  Admitted.

84.  Denied.

85.  It is admitted that the two exited Town Hall and started to walk across the plaza towards the stairs leading down to the parking lot where Mr. Chiocca's truck was parked.  The remainder of Paragraph 85 is denied.

86.  It is admitted that Defendant Hall was walking ahead of Mr. Chiocca.  The remainder of Paragraph 86 is denied.

87.  Admitted.

88.  Denied.

89.  It is admitted that the two returned to Town Hall.  The remainder of Paragraph 89 is denied.

90.  It is admitted they went to Mr. Chiocca's office.  It is denied that Defendant Hall closed the door; however, it is admitted that Mr. Chiocca closed the door.

91.  Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

92.  Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

93.  Admitted.

94.  Denied.

95.  Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

96.  Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

8

97. Deirdre Hall has insufficient knowledge or information upon which to form a belief as to whether she and Mr. Chiocca consumed alcohol and therefore leaves the Plaintiff to his proof. The remainder of Paragraph 97 is denied.

98. Denied.

99. Denied.

100. Denied.

101. It is admitted, with clarification, that Mr. Chiocca penetrated Deirdre Hall's mouth with his penis. The remainder of Paragraph 101 is denied.

102. Denied.

103. Denied.

104. Denied.

105. Denied.

106. It is admitted that Defendant Hall and Mr. Chiocca exited Mr. Chiocca's office at 2:13 a.m. The remainder of Paragraph 106 is denied.

107. Denied.

108. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

109. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

110. Admitted.

111. Admitted.

112. It is admitted that Mr. Hall observed Defendant Hall in the bathroom texting. The remainder of Paragraph 112 is denied.

113.   It is admitted that at 2:25 a.m., Defendant Hall texted her husband.   The remainder of Paragraph 113 references a written document which speaks for itself.

114.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 114 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

115.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 115 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

116.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 116 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

117.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 117 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

118.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 118 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

119.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 119 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

120.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 120 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

121.   It is admitted that Mr. Hall called out sick. The remainder of Paragraph 121 is denied.

122.   Defendant Hall objects to the portion of Paragraph 122 which states, "[a]fter approximately 30-45 minutes of talking downstairs," because this allegation contains marital communications, and thus, no response is required based upon the marital disqualification rule. The remainder of Paragraph 122 is admitted.

123.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 123 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

124.   Admitted. Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 124 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

125.   Defendant Hall objects to the allegations contained in this Paragraph. The allegations contained in Paragraph 125 contain marital communications, and thus, no response is required based upon the marital disqualification rule.

126.   Admitted.

127.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

128.   It is admitted that at 8:02 a.m., Defendant Hall emailed Mr. Chiocca, and at 8:05 a.m., Mr. Chiocca responded. The remainder of Paragraph 128 references a written document which speaks for itself.

129.   It is admitted that Defendant Hall asked Mr. Chiocca for "discretion" about what happened, although Defendant Hall denies Mr. Chiocca's version of events as to what happened. The remainder of Paragraph 129 is denied.

130.   Denied.

131.   Defendant Hall objects to the portion of Paragraph 131 which states, "despite the fact that she lied and told her husband just a few hours earlier that Mr. Chiocca stated, 'normally how this works is I ask for a raise, you give me a blowjob'" because this allegation contains marital communications, and thus, no response is required based upon the marital disqualification rule. The first sentence of Paragraph 131 is admitted. The remainder of Paragraph 131 is denied.

132.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

133.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

134.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

135.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

136.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

137.   It is admitted that on May 4, 2018, Defendant Hall emailed Mr. Chiocca. The remainder of Paragraph 137 references a written document which speaks for itself.

138.   The first sentence of Paragraph 138 is admitted. The second sentence of Paragraph 138 is denied.

139.   Denied.

140.   Denied.

141.   Denied.

142.   It is denied that the parties met in person.  As to whether it was most important to Mrs. Kimball to not let the public know about the relationship, Deirdre Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.  The remainder of Paragraph 142 is admitted.

143.   Denied.

144.   It is admitted that the annual Town Meeting was held on May 7, 2018, and Mr. Chiocca, Mr. Kimball, Defendant Hall and others went out for drinks to China Plaza.  The remainder of Paragraph 144 is denied.

145.   Deirdre Hall objects to Paragraph 145 on the basis that a response would constitute a disclosure of a communication protected by the attorney-client privilege made at the time she was a BOS member.  Subject to and notwithstanding this objection, Paragraph 145 references a written document that speaks for itself.

146.   Denied.

147.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

148.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

149.   It is admitted that on May 14, 2018, Ms. Birmingham and Defendant Hall went to the ceremony at the State House for recognition for a grant the Town received.  It is further admitted that Mr. Chiocca did not attend that event.  As to the remainder of Paragraph 149, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

150.   Defendant Hall has insufficient knowledge or information upon which to form a belief as to whether the May 15, 2018 BOS meeting was very contentious and therefore leaves the Plaintiff to his proof. The remainder of Paragraph 150 references a written document which speaks for itself.

151.   It is denied that Defendant Hall had the alleged communications with the School Superintendent.  As to the remainder of Paragraph 151, Deirdre Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

152.   Admitted.

153.   It is admitted that on May 16, 2018, Mr. Ryan sent an email at approximately 12:41 p.m. to the BOS members.  The remainder of Paragraph 153 references a written document which speaks for itself.

154.   It is admitted that Mr. Ryan declined to go to lunch with Mr. Chiocca.  As to the remainder of Paragraph 154, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

155.   It is admitted that Deirdre Hall called Mr. Mullen on May 16, 2018.  It is admitted that Defendant Hall told Mr. Mullen that she and Mr. Chiocca went to Town Hall after the May 1st BOS meeting, and that she didn't remember.  It is admitted that Defendant Hall described Mr. Chiocca was evil.  The remainder of Paragraph 155 is denied.

156.   It is admitted that on May 16, 2018, at approximately 8:45p.m., Defendant Hall went to the RBG and sat next to Mr. Chiocca.  The remainder of Paragraph 156 is denied.

157.   Admitted.

158.   Admitted.

14

159.   It is admitted that on May 17, 2018 there was an MAPC meeting which was held in Rockland.   As to the remainder of Paragraph 159, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

160.   Denied.

161.   It is admitted that at 11:03 a.m., Mr. Ryan sent an email to the members of the BOS. The remainder of Paragraph 161 references a written document that speaks for itself.

162.   The portion of Paragraph 162 which states "at about that time" is denied. The portion of Paragraph 162 which characterizes Defendant Hall's statements as lies is denied.  The remainder of Paragraph 162 is admitted.

163.   Denied.

164.   It is denied that Mr. Kimball was furious.  The remainder of Paragraph 164 is admitted.

165.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

166.   It is admitted that Defendant Kimball asked Defendant Hall to meet him, and they went for a walk on the rail trail.  As to the portion of Paragraph 166 which states "40-minute," Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.  It is further admitted that Defendant Hall felt that she had disappointed Mr. Kimball.  The remainder of Paragraph 166 is denied.

167.   Denied.

168.   It is admitted that Mr. Kimball texted Defendant Hall. The last sentence of Paragraph 168 is admitted. The remainder of Paragraph 168 references a written document which speaks for itself.

169.   It is admitted that Mr. Kimball spoke with Mr. Hall, and Mr. Hall told Mr. Kimball that Defendant Hall arrived home she told him that Mr. Chiocca stated, "the way we do things around here is I ask for a raise, you give me a blowjob, and I get my contract." The remainder of Paragraph 169 is denied.

170.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

171.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

172.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

173.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

174.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

175.   It is denied that there was a meeting.  The remainder of Paragraph 175 is admitted.

176.   It is admitted that Deirdre Hall, Mr. Hall, Mr. Kimball and Mrs. Kimball met at Reeds Pond to discuss the allegations against Mr. Chiocca.  It is denied that this meeting occurred on May 19, 2018. As to whether Mrs. Kimball reiterated the conversation she had with Mr. Kimball on May 4, 2018 that they could not let their relationship be leaked to the public, Deirdre Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. As to whether Mr. and Mrs. Kimball did not want their family's reputation to be ruined, Deirdre Hall has insufficient knowledge or

information upon which to form a belief and therefore leaves the Plaintiff to his proof. The remainder of Paragraph 176 is denied.

177.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

178.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

179.    It is admitted that Mr. Chiocca was placed on administrative leave.  The remainder of Paragraph 179 references a document which speaks for itself.

180.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.  Furthermore, Paragraph 180 references a document which speaks for itself.

181.    Admitted; however, Paragraph 181 references a written document which speaks for itself.

182.    Paragraph 182 references a written document which speaks for itself.

183.    Denied.

184.    Denied.

185.    Denied.

186.    Denied.

187.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

188.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof; however, Paragraph 188 references a written document which speaks for itself.

189. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof; however, Paragraph 188 references a written document which speaks for itself.

190. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

191. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

192. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

193. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

194. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

195. Admitted.

196. Denied.

197. Denied.

198. Denied.

199. Denied.

200. Admitted.

201. Admitted.

202. It is admitted that on June 13, 2018 Defendant Hall filed suit in Plymouth County Superior Court against the Town of Rockland and related parties. It is further admitted that the suit

was filed during Attorney Ryan's investigation.   The remainder of Paragraph 202 references a written document which speaks for itself.

203.   Denied.

204.   Admitted.

205.   Admitted.

206.   Paragraph 206 references a written document which speaks for itself.

207.   Denied.

208.   Denied.

209.   Paragraph 209 references a written document which speaks for itself.

210.   The portion of Paragraph 210 which states, "knowing that it was frivolous" is denied.   The remainder of Paragraph 210 is admitted.

211.   Admitted.

212.   Paragraph 212 references a written document which speaks for itself.

213.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

214.   Denied.

215.   Denied.

216.   Denied.

217.   Admitted.

218.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

219.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

220.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

221.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

222.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

223.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

224.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

225.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

226.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

227.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

228.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

229.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

230.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

231.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

232.    Defendant Hall denies that Attorney Ryan's investigation and Report was incredibly thorough. As to the remainder of Paragraph 232, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. Further, Paragraph 232 references a written document which speaks for itself.

233.    Defendant Hall objects to the portion of Paragraph 233 which states, "based on what Ms. Hall reported to her husband and what was reported by Mr. Chiocca," as well as the portion which states, "Further, when she arrived home within minutes of leaving Mr. Chiocca, she never expressed concern about the fact that she had sexual relations with him and did not exhibit any signs to her husband of being upset. Further, Ms. Hall was capable of engaging in coherent discussions with her husband for approximately one hour when she got home and the subjects that they covered that evening spanned from her extramarital affair with Mr. Kimball, their son's neurological appointment, her husband calling in sick from work and other topics" because these allegations contain marital communications, and thus, no response is required based upon the marital disqualification rule. As to the remainder of Paragraph 233, the written investigation report speaks for itself; however, Defendant Hall denies many of its factual findings, as well as the conclusions reached within the report which finds that Mr. Chiocca did not engage in inappropriate conduct and that Deirdre Hall engaged in inappropriate conduct.

234.    The written investigation report speaks for itself; however, Defendant Hall denies many of its factual findings, as well as the conclusions reached within the report which finds that

Mr. Chiocca did not engage in inappropriate conduct and that Deirdre Hall engaged in inappropriate conduct.

235.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

236.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

237.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

238.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

239.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

240.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

241.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

242.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

243.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

244.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

245. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

246. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

247. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

248. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

249. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

250. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

251. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

252. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

253. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

254. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

255. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

256.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

257.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

258.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

259.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

260.   It is admitted that Defendant Hall had resigned from the BOS. As to the remainder of Paragraph 260, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

261.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

262.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

263.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

264.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

265.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

266.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

267.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

268.   Deirdre Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. Further, Paragraph 268 references a document which speaks for itself.

269.   The written investigation report speaks for itself; however, Defendant Hall denies many of its factual findings, as well as the conclusions reached within the report which finds that Mr. Chiocca did not engage in inappropriate conduct and that Deirdre Hall engaged in inappropriate conduct.

270.   The written investigation report speaks for itself; however, Defendant Hall denies many of its factual findings, as well as the conclusions reached within the report which finds that Mr. Chiocca did not engage in inappropriate conduct and that Deirdre Hall engaged in inappropriate conduct.

271.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

272.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

273.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

274.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. Furthermore, Paragraph 274 references a document which speaks for itself.

275. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. Furthermore, Paragraph 275 references a document which speaks for itself.

276. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. Furthermore, Paragraph 276 references a document which speaks for itself.

277. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

278. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

279. As to whether Attorney Ryan found that Mr. Chiocca was honest and credible, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. The remainder of Paragraph 279 is denied.

280. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

281. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

282. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

283. Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof. Furthermore, Paragraph 283 references a written document which speaks for itself.

284.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

285.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

286.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

287.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

288.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

289.    Denied.

290.    It is denied that Mr. Chiocca was an innocent victim.  As to the remainder of Paragraph 290, Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

291.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

292.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

293.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

294.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

295.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

296.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

297.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

298.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

299.   Denied.

300.   Admitted.

301.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

302.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

303.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

304.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

305.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

306.   Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

307.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

308.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

309.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

310.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

311.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

312.    Paragraph 312 references a written document which speaks for itself.

313.    Paragraph 313 references a written document which speaks for itself.

314.    Paragraph 314 references a written document which speaks for itself.

315.    Defendant Hall has insufficient knowledge or information upon which to form a belief and therefore leaves the Plaintiff to his proof.

316.    Admitted.

317.    Paragraph 317 references a written document which speaks for itself.

318.    Denied.

319.    Denied.

## CAUSES OF ACTION

### COUNT 1
(Violation of Mass. Gen. Laws c. 151B, § 4(1) and 4(16A) – Quid Pro Quo Sexual
Harassment, Hostile work Environment, Unlawful Suspension,
Constructive Discharge and Wrongful Termination)
(Against the Town of Rockland and Deirdre Hall individually)

320.    Defendant Hall incorporates her responses to Paragraphs 1-319 as stated above as if fully
set forth herein.

321.    Denied.

322.    Denied.

### COUNT 2
(Violation of Mass. Gen. Laws c. 151B, § 4(4) – Retaliation, Unlawful Suspension,
Constructive Discharge and Wrongful Termination
(Against all Defendants)

323.    Defendant Hall incorporates her responses to Paragraphs 1-322 as stated above as if fully
set forth herein.

324.    Denied.

325.    Denied.

### COUNT 3
(Violation of Mass. Gen. Laws c. 151B, § 4(4A) – Coercion or Interference with 151B,
Rights, Unlawful Suspension, Constructive Discharge, and Wrongful Termination)
(Against all individual Defendants)

326.    Defendant Hall incorporates her responses to Paragraphs 1-325 as stated above as if fully
set forth herein.

327.    Denied.

328.    Denied.

### COUNT 4
(Violation of Mass. Gen. Laws c. 151B, § 4(5) – (Aiding and Abetting, Constructive
Discharge and Wrongful Termination)
(Against all Defendants)

329.    Defendant Hall incorporates her responses to Paragraphs 1-328 as stated above as if fully
set forth herein.

330.    Denied.

331.    Denied.

## COUNT 5
(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. — Quid
Pro Quo Sexual Harassment, Hostile Work Environment,
Unlawful Suspension, Constructive Discharge, and Wrongful Termination)
(Against the Town of Rockland)

332.   Defendant Hall incorporates her responses to Paragraphs 1-331 as stated above.

333.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

334.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

## COUNT 6
(42 U.S.C. § 1983 – Sexual Harassment in Violation of the Equal Protection Clause)
(Against Mrs. Hall)

335.   Defendant Hall incorporates her responses to Paragraphs 1-334 as stated above as if fully

set forth herein.

336.   Denied.

337.   Denied.

## COUNT 7
(42 U.S.C. § 1983 – Post-Investigation Retaliation in violation of
The Equal Protection Clause)
(Against Mr. Kimball, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney
and Ms. Nyman)

338.   Defendant Hall incorporates her responses to Paragraphs 1-337 as stated above as if fully

set forth herein.

339.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

340.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

341.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

## COUNT 8
(42 U.S.C. § 1983 – Post-Investigation Retaliation in violation of
The Equal Protection Clause
(Against the Town of Rockland)

342.   Defendant Hall incorporates her responses to Paragraphs 1-341 as stated above as if fully

set forth herein.

343.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

344.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

345.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

346.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is

necessary.

## COUNT 9
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Property Interest – Continued
Employment/Lost Raise – Constructive Discharge
(Against Mrs. Hall, Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin)

347.   Defendant Hall incorporates her responses to Paragraphs 1-346 as stated above as if fully

set forth herein.

348.   Denied.

349.   Denied.

350.   Denied.

## COUNT 10
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Property Interest – Continued
Employment/Lost Raise – Constructive Discharge

(Against the Town of Rockland)

351.   Defendant Hall incorporates her responses to Paragraphs 1-350 as stated above as if fully set forth herein.

352.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

353.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

354.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

355.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

**COUNT 11**
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Liberty Interest – Reputation)
(Against all Individual Defendants)

356.   Defendant Hall incorporates her responses to Paragraphs 1-355 as stated above as if fully set forth herein.

357.   Denied.

358.   Denied.

359.   Denied.

360.   Denied.

**COUNT 12**
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Liberty Interest – Reputation)
(Against the Town of Rockland)

361.   Defendant Hall incorporates her responses to Paragraphs 1-360 as stated above as if fully set forth herein.

362.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

363.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

364.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

365.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall necessary.

366.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

### COUNT 13
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Pre-Investigation Suspension without Notice and Hearing
(Against Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin)

367.   Defendant Hall incorporates her responses to Paragraphs 1-366 as stated above as if fully set forth herein.

368.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

369.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

370.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

### COUNT 14
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Pre-Investigation Suspension without Notice and Hearing
(Against the Town of Rockland)

371.   Defendant Hall incorporates her responses to Paragraphs 1-370 as stated above as if fully set forth herein.

372.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

373.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

374.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

375.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 15
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Post-Investigation Termination via Constructive Discharge without Notice and Hearing (Against Mrs. Hall, Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin)

376.   Defendant Hall incorporates her responses to Paragraphs 1-375 as stated above as if fully set forth herein.

377.   Denied.

378.   Denied.

379.   Denied.

## COUNT 16
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Post-Investigation Termination via Constructive Discharge without Notice and Hearing (Against the Town of Rockland)

380.   Defendant Hall incorporates her responses to Paragraphs 1-379 as stated above as if fully set forth herein.

381.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

382.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

383.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

384.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 17
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Final Suspension without Notice and Hearing
(Against Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman)

385.   Defendant Hall incorporates her responses to Paragraphs 1-384 as stated above as if fully set forth herein.

386.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

387.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

388.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 18
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Final Suspension without Notice and Hearing
(Against the Town of Rockland)

389.   Defendant Hall incorporates her responses to Paragraphs 1-388 as stated above as if fully set forth herein.

390.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

391.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

392.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

393.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 19
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Liberty Interest – Reputation)
(Against all Individual Defendants)

394.   Defendant Hall incorporates her responses to Paragraphs 1-393 as stated above as if fully set forth herein.

395.   Denied.

396.   Denied.

397.   Denied.

398.   Denied.

399.   Denied.

## COUNT 20
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Liberty Interest – Reputation)
(Against the Town of Rockland)

37

400.   Defendant Hall incorporates her responses to Paragraphs 1-399 as stated above as if fully set forth herein.

401.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

402.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

403.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

404.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

405.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

406.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 21
(42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights)
(Against Mrs. Hall and Mr. Kimball)

407.   Defendant Hall incorporates her responses to Paragraphs 1-406 as stated above as if fully set forth herein.

408.   Denied.

409.   Denied.

410.   Denied.

## COUNT 22
(42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights)
(Against Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Mrs. Nyman)

411. Defendant Hall incorporates her responses to Paragraphs 1-410 as stated above as if fully set forth herein.

412. Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

413. Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

414. Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 23
### (42 U.S.C. § 1986 – Failure to Prevent 1985 Conspiracy)
### (Against all Individual Defendants)

415. Defendant Hall incorporates her responses to Paragraphs 1-414 as stated above as if fully set forth herein.

416. Denied.

417. Denied.

418. Denied.

419. Denied.

420. Denied.

## COUNT 24
### (Breach of Contract – Suspension in Violation of Contract/Town Charter)
### (Against the Town of Rockland)

421. Defendant Hall incorporates her responses to Paragraphs 1-420 as stated above as if fully set forth herein.

422. Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

423.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

424.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 25
(Breach of Contract – Constructive Discharge/Termination in Violation of
Contract/Town Charter)
(Against the Town of Rockland)

425.   Defendant Hall incorporates her responses to Paragraphs 1-424 as stated above as if fully set forth herein.

426.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

427.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

428.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 26
(Breach of Implied Covenant of Good Faith and Fair Dealing)
(Against the Town of Rockland)

429.   Defendant Hall incorporates her responses to Paragraphs 1-428 as stated above as if fully set forth herein.

430.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

431.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

432.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 27
### (Libel)
### (Against Mrs. Hall)

433.   Defendant Hall incorporates her responses to Paragraphs 1-432 as stated above as if fully set forth herein.

434.   Denied.

435.   Denied.

## COUNT 28
### (Slander)
### (Against Mrs. Hall)

436.   Defendant Hall incorporates her responses to Paragraphs 1-435 as stated above as if fully set forth herein.

437.   Denied.

438.   Denied.

## COUNT 29
### (Libel)
### (Against Mr. O'Loughlin)

439.   Defendant Hall incorporates her responses to Paragraphs 1-438 as stated above as if fully set forth herein.

440.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

441.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 30
(Libel)
(Against Mr. Ryan)

442.   Defendant Hall incorporates her responses to Paragraphs 1-441 as stated above as if fully
set forth herein.

443.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is
necessary.

444.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is
necessary.

## COUNT 31
(Battery)
(Against Mrs. Hall)

445.   Defendant Hall incorporates her responses to Paragraphs 1-444 as stated above as if fully
set forth herein.

446.   Denied.

447.   Denied.

## COUNT 32
(Malicious Prosecution)
(Against Mrs. Hall)

448.   Defendant Hall incorporates her responses to Paragraphs 1-447 as stated above as if fully
set forth herein.

449.   Denied.

450.   Denied.

## COUNT 33
(Intentional Infliction of Emotional Distress)
(Against Mrs. Hall)

451.   Defendant Hall incorporates her responses to Paragraphs 1-450 as stated above as if fully
set forth herein.

42

452.   Denied.

453.   Denied.

## COUNT 34
### (Intentional Infliction of Emotional Distress)
### (Against Mr. Kimball)

454.   Defendant Hall incorporates her responses to Paragraphs 1-453 as stated above as if fully set forth herein.

455.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

456.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 35
### (Intentional Infliction of Emotional Distress)
### (Against Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman)

457.   Defendant Hall incorporates her responses to Paragraphs 1-456 as stated above as if fully set forth herein.

458.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

459.   Because this Count is not pled against Defendant Hall, no answer by Defendant Hall is necessary.

## COUNT 36
### (Intentional Interference with Contractual Relations)
### (Against all Individual Defendants)

460.   Defendant Hall incorporates her responses to Paragraphs 1-459 as stated above as if fully set forth herein.

461.   Denied.

462.   Denied.

## COUNT 37
### (Intentional Interference with Advantageous Relations)
### (Against all Individual Defendants)

463. Defendant Hall incorporates her responses to Paragraphs 1-462 as stated above as if fully set forth herein.

464. Denied.

465. Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

With respect to each and every claim made against Defendant Hall, the Plaintiff fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

The Plaintiff's claims are barred, in whole or in part, by the doctrine of qualified immunity.

### Third Affirmative Defense

Defendant Hall is protected from liability under the First Amendment to the United States Constitution, Part 1, Art. XVI of the Massachusetts Constitution and/or Part 1, Art. XIX of the Massachusetts Constitution.

### Fourth Affirmative Defense

The Plaintiff's claims are barred by the doctrine of unclean hands.

### Fifth Affirmative Defense

The Plaintiff's claims are barred by the doctrine(s) of waiver, accord and satisfaction, payment, and/or expiration of contract.

Sixth Affirmative Defense

The Plaintiff is not entitled to punitive damage because Defendant Hall did not act with malice or with reckless indifference required to sustain an award of punitive damages.

Seventh Affirmative Defense

If the Plaintiff suffered injuries or damages as alleged, which Defendant Hall denies, such injuries or damages were caused by someone for whose conduct Defendant Hall cannot be held responsible.

Eighth Affirmative Defense

Plaintiff's claim against Defendant Hall fail, in whole or in part, because Defendant Hall was neither a decisionmaker nor involved in the decisions regarding Plaintiff's alleged adverse employment action during certain material times.

Ninth Affirmative Defense

Plaintiff fails to state a prima facie case of sexual harassment.

Tenth Affirmative Defense

Plaintiff fails to state a prima facie case of retaliation.

Eleventh Affirmative Defense

Plaintiff did not engage in protected conduct, and therefore, he cannot recover for retaliation.

Twelfth Affirmative Defense

No causal connection existed between Plaintiff's protected conduct (if any) and any alleged adverse employment action by Defendant Hall, and thus, the Plaintiff cannot recover for retaliation.

## Thirteenth Affirmative Defense

The Plaintiff cannot establish any underlying violations of Mass. Gen. Laws c. 151B; accordingly, Plaintiff's aiding and abetting claim fails.

## Fourteenth Affirmative Defense

The Plaintiff was not deprived of any rights protected under any federal or state constitution or statute, and thus, is not entitled to recovery.

## Fifteenth Affirmative Defense

The Plaintiff fails to allege a conspiracy with adequate specificity, and thus, is not entitled to recovery.

## Sixteenth Affirmative Defense

If the Plaintiff was deprived of any rights (which Defendant Hall denies), the Plaintiff had adequate post-deprivation remedies and, therefore, cannot recover.

## Seventeenth Affirmative Defense

Defendant Hall is protected from liability under doctrines of absolute privilege, conditional privilege, or qualified privilege.

## Eighteenth Affirmative Defense

Defendant Hall is protected from liability for defamation under the fair report privilege.

## Nineteenth Affirmative Defense

Defendant Hall's statements were and continue to be true.

## Twentieth Affirmative Defense

Defendant Hall's statements were matter of opinion or fair comment on a matter of public interest.

## Twenty-first Affirmative Defense

The Plaintiff was a public figure/official who cannot prove that Defendant Hall's statement(s) were published with actual malice, nor can he prove, by clear and convincing evidence, that the Defendant Hall knowingly or recklessly published the alleged defamatory statement(s).

## Twenty-second Affirmative Defense

Defendant Hall's actions, conduct and statements were protected by law and/or legal process, and thus, Plaintiff cannot recover.

## Twenty-third Affirmative Defense

Defendant Hall's actions, conduct and statements were protected by any applicable legislative privilege, deliberative process privilege and/or other governmental privileges or immunities.

## Twenty-fourth Affirmative Defense

Defendant Hall's alleged interference with Plaintiff's contract (if any) was not guided by improper motives or means, and therefore, Plaintiff cannot recover.

## Twenty-fifth Affirmative Defense

At certain material times, Defendant Hall was a member of the Rockland Board of Selectmen and thus would be indistinguishable from Plaintiff's employer and/or supervisor, and therefore, could not be held liable for tortious interference with Plaintiff's contract.

## Twenty-sixth Affirmative Defense

Plaintiff fails to identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently and, therefore, cannot recover under the Equal Protection Clause.

Twenty-seventh Affirmative Defense

      Plaintiff fails to adequately allege a liberty interest.

Twenty-eighth Affirmative Defense

      Plaintiff fails to allege conduct on the part of Defendants that shocks the conscience and, therefore, cannot establish a Substantive Due Process violation.

Twenty-ninth Affirmative Defense

      Plaintiff's claims under 42 U.S.C. §§ 1985 and 1986 fail because Plaintiff cannot prove that Defendant Hall's conduct was motivated by a protected class.

Thirtieth Affirmative Defense

      Defendant Hall's actions, conduct and statements were not sufficiently stigmatizing.

Thirty-first Affirmative Defense

      Plaintiff has failed to mitigate his damages.

Thirty-second Affirmative Defense

      Plaintiff was acting beyond the scope of his duties as Town Administrator as provided in Article II § C-2.19 of the Town Charter.

Thirty-third Affirmative Defense

      Plaintiff's Complaint fails to contain a short and plain statement of Plaintiff's claims for relief within the meaning of Fed. R. Civ. P. 8(a)(2). Therefore, Plaintiff's Complaint should be dismissed under Fed. R. Civ. P. 41(b).

      WHEREFORE, Defendant, Deirdre Hall, respectfully requests that Plaintiff's Complaint be dismissed, with prejudice, and the Court award such other and further relief, at law or in equity.

**JURY DEMAND**

Defendant, Deirdre Hall, demands a trial by jury.

DEFENDANT,
DEIRDRE HALL

By_____/s/ Cindy M. Cieslak
   Cindy M. Cieslak
   B.B.O. # 685498
   Rose Kallor, LLP
   750 Main Street, Suite 1108-3
   Hartford, CT  06103
   (860) 361-7999
   (860) 270-0710 (fax)
   ccieslak@rosekallor.com

## CLAIMS IN COUNTER-CLAIM BY COUNTER-CLAIM PLAINTIFF DEIRDRE HALL AGAINST COUNTER-CLAIM DEFENDANT ALLAN CHIOCCA

### I.   PARTIES

1.   Counter-Claim Plaintiff Deirdre Hall ("Ms. Hall") is a resident of Rockland, Massachusetts. She was an elected member of the Rockland, Massachusetts Board of Selectmen from approximately April 2017 – July 2018.

2.   Counter-Claim Defendant Allan Chiocca ("Mr. Chiocca") is a resident of Bridgewater, Massachusetts. He served as the Town Administrator for the Town of Rockland, Massachusetts from approximately June 2008 – June 2019.

### II.   JURISDICTION

3.   The Court has supplemental jurisdiction over these state law counter-claims pursuant to 28 U.S.C. §1367.

### III.   RELEVANT FACTS

4.   Mr. Chiocca was hired as the Rockland, Massachusetts Town Administrator in or around March 2008. His current contract was for a three-year term which ended June 30, 2019.

5.   Ms. Hall graduated Summa Cum Laude from the University of Massachusetts Boston in 2004. She graduated from the New England School of Law in 2008. From 2010 to 2017, she served as Assistant City Solicitor and Legal Counsel for the city of Quincy, Massachusetts. During the course of her legal career, Ms. Hall gained significant experience in municipal and administrative law as well as a keen familiarity with the day-to-day operations of municipalities.

6.      In 2017, Ms. Hall ran for a seat on the Board of Selectmen ("the Board") in the Town of Rockland, Massachusetts ("the Town"), where she resides. She was elected and assumed her seat as a Selectwoman on the Board in April of 2017.

7.      The Board typically has five members. From April of 2017 to June of 2018, the Board members were Edward Kimball, Chairman ("Mr. Kimball"); Ms. Hall, Vice Chairman; Larry Ryan ("Mr. Ryan"); Michael Mullen, Jr. ("Mr. Mullen"); and Michael O'Loughlin ("Mr. O'Loughlin"). In or around April of 2018, Ms. Hall was elected by the Board to serve as its Vice Chair.

8.      In her position as a Selectwoman, Ms. Hall engaged in meaningful oversight of the Town's operations, as was her obligation. On occasion, this approach to her duties required her to examine critically the practices of the Town's personnel, including the decisions made and oversight exercised by the Town Administrator Mr. Chiocca.

9.      In or around the spring of 2018, Mr. Chiocca and the Board began discussing a potential raise and contract extension on Mr. Chiocca's contract. The extension of Mr. Chiocca's contract required at least a majority vote of the Board.

10.     In the course of their discussions, certain Board members expressed dissatisfaction with Mr. Chiocca's job performance, including without limitation, his tendency to overstep his authority and make policy decisions that were appropriately within the purview of the Board, as well as his failure to demonstrate appropriate oversight on various matters involving the Town's finances and the payment of wages to various municipal employees.

11.     During the course of Board discussions regarding Mr. Chiocca's performance in April of 2018, Ms. Hall proposed that the Board review his past performance and provide him with guidance regarding policy priorities that was to guide his work going forward.

12.   On information and belief, Mr. Chiocca was aware that Ms. Hall had concerns about his performance and the Board's ability to direct his activities appropriately going forward. In light of her municipal experience, Mr. Chiocca was concerned that – unless politically marginalized or removed from office – her oversight of the Town could pose a challenge to the relatively unfettered authority he had historically enjoyed as Town Administrator.

13.   On May 1, 2018, the Board conducted its monthly meeting.

14.   Ms. Hall and Mr. Chiocca were both in attendance.

15.   Ms. Hall chaired the meeting, after which Mr. Chiocca asked Ms. Hall to join him for a drink at a local pub, the Rockland Bar & Grill, where Town employees as well as Board members often gathered.

16.   During the meeting, Ms. Hall had received personally devastating news that might be difficult for her family. The news involved her private, intimate relationship with the Chair of the Board of Selectman, which she learned had just been discovered by his wife, who threatened to make that relationship public. Ms. Hall decided to go to the pub prior to confronting her family situation at home.

17.   When Ms. Hall arrived at the pub, Mr. Chiocca had already arrived and a glass of wine awaited her.

18.   The two spoke about matters personal and matters involving the Town over the course of a few hours, with Ms. Hall consuming wine (around three to five glasses) as they sat together.

On information and belief, they left at about 11pm. Also, on information and belief, Mr. Chiocca was well aware, at the time they left the pub, that Ms. Hall was too inebriated to drive herself home. He offered to take her, to which Ms. Hall agreed.

52

19.   Yet once Ms. Hall was in Mr. Chiocca's vehicle, he did not take her home.   Instead, on information and belief, he stopped at another bar and suggested that they go in for more drinks.   When Ms. Hall declined and expressed a preference for going home, Mr. Chiocca informed her that he needed to stop by Town Hall before taking her home.

20.   On information and belief, although Mr. Chiocca would later claim that it was his intention simply to use the facilities at Town Hall prior to going home, that was not his intent.

21.   On information and belief, well aware that Ms. Hall was highly intoxicated, Mr. Chiocca led her into Town Hall in the hope of getting her into a compromising situation, taking advantage of her disoriented state and then setting her up so that he could use that circumstance to secure his employment situation.

22.   Ms. Hall followed Mr. Chiocca towards Town Hall.  Her gait was uneven as she walked and, reflecting her inebriated state, she stumbled on the way.  Mr. Chiocca used his own key and personal alarm code to enter Town Hall.

23.   Once in the building, Ms. Hall herself went into the restroom and then fell, dizzy from the consumption of alcohol during the evening.   She was slightly disoriented and distressed when she left the restroom.

24.   Ms. Hall then told Mr. Chiocca twice that she needed to go home.

25.   Initially, Mr. Chiocca appeared to relent to Ms. Hall's wishes. He exited the building with a shaky Ms. Hall but then, as she headed to his vehicle, he called her back into the building. Mr. Chiocca stood at the door, holding it open, calling to her and waiting for her return. Slightly disoriented, Ms. Hall obliged.

26.   Mr. Chiocca led Ms. Hall to his office.

27. On information and belief, he intended to get Ms. Hall even more intoxicated so that he could take advantage of her.

28. After arriving in Mr. Chiocca's office, Ms. Hall put her head on the table. She was exhausted, distressed and intoxicated. She realized that she had left her purse in the restroom.

29. Mr. Chiocca left the office, then went out to his vehicle where he retrieved what he needed to execute on his plan: a cork screw to open up the bottle of wine. Only then did he retrieve her purse.

30. Mr. Chiocca was well aware of the placement of video cameras around Town Hall.

31. Although unsuccessful, he tried to tuck the cork screw up his sleeve so that it would not be captured on video. He also knew full well that there were no cameras in his office.

32. Yet video does capture some of what occurred that evening: The images confirm that Ms. Hall was in a disoriented state, and asked to return home.

33. The images also confirm that it was Mr. Chiocca who called Ms. Hall back into Town Hall.

34. The images capture Mr. Chiocca's leaving Town Hall with Ms. Hall in his office, his heading out to his vehicle and his returning to his office with a cork screw in his hand.

35. Once back in office, Mr. Chiocca pulled out a bottle of wine from a personal stash and poured a glass of wine for Ms. Hall. The wine spilled.

36. Mr. Chiocca then told Ms. Hall something along the lines of, "When I was a State Representative, we would have taken care of this with a blow job and contract."

37. Mr. Chiocca then asked Ms. Hall if she "wanted to suck his cock." Although quite inebriated, she told him "no" and did not consent to what happened next.

38. Mr. Chiocca ignored her protests.

39. Mr. Chiocca grabbed Ms. Hall's head and forcibly put her face in his crotch, inserting his penis in her mouth. She stopped resisting him at this point.

40. While Mr. Chiocca has claimed that he serviced Ms. Hall sexually, that is false.

41. After Ms. Hall was forced to sexually service Mr. Chiocca, he told her that they needed to leave. Mindful of the cameras located in Town Hall, before they left the room, Mr. Chiocca barked at Ms. Hall that she needed "to pull her shit together."

42. Ms. Hall left Mr. Chiocca's office in a distressed state, unstable on her feet. Given what had occurred, she tried to drink some water to clean herself up. She was shaken. Mr. Chiocca then directs her out of Town Hall and back to his vehicle.

43. From the time Mr. Chiocca exited his vehicle at Town Hall to the time he directed Ms. Hall back into that vehicle, Mr. Chiocca himself was not intoxicated.

44. Images capturing his movement show a person in control. He is alert and stable on his feet. As he directed Ms. Hall back into his vehicle, there is no indication of distress or uncertainty.

45. Despite Ms. Hall's inebriated state, rather than taking her home, Mr. Chiocca deposited her back at the pub where the two had initially met.

46. He then left her to get herself home.

47. Ms. Hall does not remember driving herself home, although she must have.

48. After Mr. Chiocca's final comments to her at Town Hall, her next memory is waking up around 6:30am at home the next morning.

49. On the morning of May 2, 2018, Ms. Hall had a sense that something had happened the night before that she was blocking from her memory.

50.  Ms. Hall is a survivor of sexual assault.  While abroad in college, she was sexually assaulted by a stranger and testified against her assailant at trial.  The trauma to her was significant and has resulted in long-term anxiety, panic attacks and post-traumatic stress disorder.  As a result of that experience and the trauma it caused, Ms. Hall initially repressed memories of the May 1, 2018 event.

51.  In the morning of May 2, 2018, Ms. Hall reached out to speak with Mr. Chiocca prior to a election recount she had at Town Hall.

52.  When they met, Ms. Hall was focused on whether or not she had informed Mr. Chiocca of her intimate relationship with Mr. Kimball.  She asked Mr. Chiocca whether she had told him about the relationship with Mr. Kimball.  He indicated that she had and he agreed to be discrete about the news.  At this time, Ms. Hall had repressed her memories of much of what had happened the night before.

53.  Ms. Hall also told Mr. Chiocca that she remembered that they had gone to Town Hall because she had a memory of his punching in the security code that would disable the building alarm.  He then began talking about the night before, referring to Ms. Hall as "the aggressor."  Ms. Hall strained to remember what had occurred and, over time, has done so.  As he spoke, she began to remember what had occurred.  She was shaken, embarrassed and traumatized by the memories as they began to return.  As she was walking out of the office, Mr. Chiocca said "thank you for the birthday present," with a smirk on his face.

54.  On information and belief, Mr. Chiocca recognized that he could use the events of the night before to put himself back in the driver's seat, marginalize those who had been calling for closer scrutiny of the operations at Town Hall and secure his ongoing employment.

55.     On May 2, 2018, for instance, he used personal information about the Town's Board Chair
to recommend that the Chair step down from his position on the Board of Selectmen. As
for Ms. Hall, although he in fact continued to work with Ms. Hall, he began setting the
stage for a bogus complaint against her, hoping that her memory failure would permit him
with total impunity to make false and defamatory statements to others about what had
occurred.

56.     To set this up, Mr. Chiocca cynically began spinning tales to colleagues about his purported
hesitation about working directly with Ms. Hall although his conduct did not reflect
discomfort at all.

57.     On or around May 4, 2018, Mr. Chiocca and Ms. Hall met once again. Again, Mr. Chiocca
spoke of events on May 1, 2018. Again, he mockingly suggested that Ms. Hall was the
aggressor, and specifically referenced a sexual encounter. Ms. Hall denied his allegations
and initiating any sexual contact with him. She was shaken by his mocking tone and clear
desire to use his description of events to embarrass her and exert control over her.

58.     Still, in light of her past, she tried simply to move past that evening without delving deeply
into her memory of what had occurred.

59.     For the next week or so, Ms. Hall was troubled about events that had occurred, but tried to
move past them and go about her usual activities, including conducting Town business. In
light of the upcoming annual Town Meeting, Ms. Hall's duties took her to Town Hall
frequently.

60.     On May 7, 2018, the Board convened the Annual Town Meeting, after which Ms. Hall and
Mr. Chiocca joined others for drinks. Mr. Chiocca did nothing to avoid contact with Ms.
Hall at that time.

61.     The next day, after a meeting with another Town employee, Mr. Chiocca met privately with Ms. Hall. He made certain the door was shut and the blinds were down. He then proceeded to ask Ms. Hall a litany of personal questions. Ms. Hall was intimidated by his posture and his closeness to her and she tried to leave the office as quickly as possible after this strange interaction.

62.     On or around May 11, 2018, Town Counsel, John Clifford, communicated with the Board of Selectmen regarding the potential extension of Mr. Chiocca's contract. He recommended that the Board discuss its concerns regarding Mr. Chiocca's performance and the priorities of various Board members for the Town Administrator prior to making a decision.

63.     Ms. Hall continued to fulfill her obligations as a Selectwoman including routine communications with Mr. Chiocca and Mr. Kimball.

64.     On or around May 15, 2018, the Board held a scheduled meeting. As occurred from time to time, various selectmen disagreed on matters of public concern. The Board went into Executive Session to discuss Mr. Chiocca's job performance and the Board's expectations and view of his role, should the Board extend his contract.

65.     The proposed contract extension was not subject to a vote on that evening although contract negotiations did take place during Executive Session.

66.     During this time, Ms. Hall had begun to think further about what had actually occurred on the night of May 1, 2018. She spoke with Mr. Mullen, and then Mr. Kimball, about her concerns generally about what occurred that evening, although she continued to repress her memory as to much of the evening.

73. The Town Counsel was also a witness to certain key meetings and privy to certain key conversations regarding Mr. Chiocca's allegations against Ms. Hall.

74. Mr. Chiocca intentionally made repeated false statements of fact in the context of the investigation, hoping to secure his position and damage Ms. Hall.

75. During the course of the investigation, Town Counsel and Mr. Chiocca continued to meet each other socially, including playing golf.

76. The purported investigation — directed by Mr. Clifford — resulted in a report issued in July of 2018. The report was partial, skewed and conducted in violation of the most fundamental privileges under Massachusetts law, showing either a woeful ignorance on the part of the investigator or intentional malfeasance. It failed to take into account in any way the impact that Ms. Hall's prior sexual assault would have had — and did have — on the repression of her memory of events on May 1-2, 2018.

77. Upon reading the report, the false statements made by Mr. Chiocca and accepted by the investigator, Ms. Hall became deeply distressed. She was hospitalized.

78. Her counsel attended the Board meeting of July 10, 2018 in her stead.

79. During the Executive Session, Ms. Hall, through her attorney, tendered her resignation as a Selectman.

80. Mr. Chiocca's darkly violent plan had worked. He was cleared of sexual harassment, and Ms. Hall – solely – was blamed for the events of May 1 and May 2, 2018.

81. The Board then voted to release a brief two-line summary of the Ryan Report - aware of its obligation to balance individuals' rights to privacy against the public's right to disclosure. All participants in the meeting, understanding that the Ryan Report contained

highly sensitive, personal information about Ms. Hall and others that were unnecessary to the disposition of the matter, agreed to hold the full report in confidence.

82.     Yet within an hour of that agreement in Executive Session, Mr. Chiocca, through his counsel, released the full Ryan Report to the media. The released report made Mr. Chiocca's intention in providing to the press clear: Private information relating to Mr. Chiocca had been redacted, while highly sensitive information regarding Ms. Hall – and her family – was available for public consumption.

83.     The release of the report, as Mr. Chiocca on information and belief anticipated, had a devastating impact on Ms. Hall and her family. The unwanted attention and harassment of her family has significantly increased her emotional distress, which she continues to suffer.

84.     It has compounded the damage done to Ms. Hall by the assault itself and had contributed to her fear of men in particular, and, as a safety measure, she has had cameras installed in her home.

85.     Since the release of the report, Mr. Chiocca has repeated directly and through his counsel defamatory and malicious statements about Ms. Hall.

86.     Ms. Hall has suffered and continues to suffer significant emotional distress, physical harm and harm to her reputation based upon Mr. Chiocca's conduct and statements which have additionally caused her and will continue to cause her significant economic harm.

**COUNT I**
**Sexual Harassment**
**M.G.L. c. 214, § 1C**

87.     Counter-Claim Plaintiff Deirdre Hall incorporates all other allegations in paragraphs 1 through 86 by reference as if realleged herein.

88.   Counter-Claim Defendant Allan Chiocca's unwelcomed sexual assault of Deirdre Hall constituted sexual harassment. His conduct after the assault, defaming her in sexualized terms, has continued the severe and pervasive harassment.

89.   M.G.L. c. 214, §1C provides that a person shall have the right to be free from sexual harassment, as defined in M.G.L. c. 151B and M.G.L. c.151C.

90.   M.G.L. c. c. 214, §1C further provides that the Superior Court shall have jurisdiction in equity to enforce this right and to award damages.

91.   Mr. Chiocca, through his conduct the night of May 1, 2019 and into the early hours of May 2, 2019, as enumerated above, has violated M.G.L. c. 214, §1C.

92.   Ms. Hall has suffered substantial damages as a result of Mr. Chiocca's conduct.

## COUNT II
### Assault & Battery

93.   Counter-Claim Plaintiff Deirdre Hall incorporates all other allegations in paragraphs 1 through 92 by reference as if realleged herein.

94.   Mr. Chiocca intentionally caused offensive contact with Ms. Hall through his sexual assault of her the night of May 1, and into the early hour of May 2, 2018, as enumerated above.

95.   Ms. Hall has suffered substantial damages as a result of Mr. Chiocca's conduct.

## COUNT III
### Invasion of Privacy
### M.G.L. c. 214, §1B/Public Disclosure of Private Facts

96.   Counter-Claim Plaintiff Deirdre Hall incorporates all other allegations in paragraphs 1 through 95 by reference as if realleged herein.

97.   Through his publication of private facts about Ms. Hall, her personal relationship with Mr. Kimball and her family, including without limitation his intentional disclosure of the investigative report to the media, intentionally revealing highly personal facts about Ms.

Hall and her family while redacting his own, Mr. Chiocca unreasonably, substantially and seriously interfered with Ms. Hall's privacy rights.

98. Ms. Hall has suffered substantial damages as result of Mr. Chiocca's disclosure.

## COUNT IV
### Defamation

99. Defendant and Plaintiff in Counterclaim Deirdre Hall incorporates all other allegations in paragraphs 1 through 98 by reference as if realleged herein.

100. As described herein, Mr. Chiocca has caused the publication of false, disparaging, defamatory and materially misleading statements about Ms. Hall with the intent of damaging her professional and personal reputations by disclosing the Ryan Report to the media.

101. He also caused the publication of false, disparaging, defamatory and materially misleading statements about Ms. Hall including statements about her alleged role in the sexual contact he in fact forced upon her on the evening of May 1, 2018, as well as statements made to others regarding her thereafter about her professional integrity, stating falsely that it was she who conditioned his contract extension upon her servicing him, which she did not do.

102. Consequently, Ms. Hall has suffered, and continues to suffer damages arising from Mr. Chiocca's deliberate and reckless disregard for the statements' truth or falsity, including, but not limited to, her loss of professional opportunities, loss of personal and professional reputation, pain and suffering and severe emotional distress.

## COUNT V
### Tortious Interference with Advantageous Relations

103. Counter-Claim Plaintiff Deirdre Hall incorporates all other allegations in paragraphs 1 through 102 by reference as if realleged herein.

104.   Ms. Hall had an advantageous relationship with the Town of Rockland.

105.   By his above-described conduct, Mr. Chiocca did knowingly, improperly, and malevolently, and without lawful justification, interfere with Ms. Hall's advantageous relations with the Town of Rockland and her constituents.

106.   Mr. Chiocca's intentional interference caused Ms. Hall to suffer damages including but not limited loss of professional opportunities, loss of personal and professional reputation, pain and suffering and severe emotional distress.

## COUNT VI
### Intentional Infliction of Emotional Distress

107.   Counter-Claim Plaintiff Deirdre Hall incorporates all other allegations in paragraphs 1 through 106 by reference as if realleged herein.

108.   Mr. Chiocca's actions in deliberately and intentionally setting Ms. Hall up, assaulting her while she was in a highly inebriated and distressed state, making false statements about her thereafter, designed to damage her emotionally and then publishing what he knew to be a false and partial investigative report to the media in a fashion designed to cause Ms. Hall pain and suffering and severe emotional distress.

109.   Ms. Hall has been subject to harassment, ridicule, and fear for herself and her family.

110.   Mr. Chiocca's conduct was extreme and outrageous and was intended to cause Ms. Hall distress and to cause her mental and emotional anguish.

111.   As a result, Ms. Hall has been and continues to be harmed and suffer damages.

## PRAYER FOR RELIEF

Wherefore, Defendant and Plaintiff in Counterclaim Deirdre Hall seeks damages for economic losses, emotional distress, loss of reputation and other consequential damages, as well as attorneys' fees and as costs, on all claims where such relief is allowable. She further requests that this Court order all such other legal and equitable relief as just and proper.

Deirdre Hall,
By her attorney,

/s/ Ellen J. Zucker
Ellen J. Zucker, BBO# 568051
ezucker@burnslev.com
Neerja Sharma, BBO# 654762
nsharma@burnslev.com
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110
(617) 345-3000

## CERTIFICATION

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on August 30, 2019.

Adam J. Shafran, Esq.
Jonathon D. Friedmann, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109

John Davis, Esq.
Jason W. Crotty, Esq.
Pierce, Davis & Perritano, LLP
10 Post Office Square
Suite 1100N
Boston, MA 02109

Ellen J. Zucker, Esq.
Neerja Sharma, Esq.
Burns & Levinson LLP
125 High Street
Boston, MA 02110

Howard Cooper, Esq.
Suzanne Elovecky, Esq.
Todd & Weld LLP
One Federal Street
Boston, MA 02110

/s/ Cindy M. Cieslak
Cindy M. Cieslak





**Dawn**





iMessage
Tue, May 1, 6:58 PM

I know what happened. You make me sick

Tue, May 1, 8:33 PM

Yes this is Dawn

Did you really think I wouldn't find out? Your a disgusting human being. The both of you are disgusting

I'm not about threatening anyone just so you know. But I haven't decided how I'm going to handle this. 35 years of marriage now means nothing and I have you two to thank for that

Text Message
Wed, May 2, 4:34 PM

I know you don't care that I am suffering. Most people like you

       





**Dawn**

Text Message
Wed, May 2, 4:34 PM

I know you don't care that I am suffering. Most people like you don't.

I'm not threatening you but I feel it's only fair that your husband

knows the truth also. I am giving you the opportunity to tell him

yourself. I feel bad for your husband because I know what am going

through right now and it's not pretty. But if I dont get a phone call

in the next 24 hours from your husband, then I will have no choice but

to tell him myself. This is a courtesy to him not you.











 

**Dawn**

iMessage

Okay. He is in class this evening, and then works tomorrow during the day. I need time to talk with him without the children around. That could be tonight, or possibly tomorrow night. Could you give me until Friday evening? That way I will definitely have the opportunity to talk with him.

Fine. Thank you. I hope you know what you 2 have done to our families. It's only a matter of time before this small town knows everything. And I am physically ill thinking about that

Thu, May 3, 7:48 PM

Are you going to be at the zoning meeting? I'm sending Ed up there hoping that he can meet with you and discuss containment of our mutual problem

        




DK

Dawn

Thu, May 3, 7:48 PM

Are you going to be at the zoning meeting? I'm sending Ed up there hoping that he can meet with you and discuss containment of our mutual problem

Yes I am here. TY

Ok

Thu, May 3, 11:26 PM

Dawn, Thank you for allowing us to sit down and discuss strategies on moving forward with containing the impact of this situation. We were able to come up with a few ideas on how to move forward.

As you can imagine my husband too is not happy, and is anxious about talking to you. However I have been and will continue to encourage him to do so. He gets out of work
















**Dawn**

Thu, May 3, 11:26 PM

Dawn, Thank you for allowing us to sit down and discuss strategies on moving forward with containing the impact of this situation. We were able to come up with a few ideas on how to move forward.

As you can imagine my husband too is not happy, and is anxious about talking to you. However I have been and will continue to encourage him to do so. He gets out of work around 230-3 then had an hour of professional development. I will suggest he call you on his way home from work around 330-4.

I cannot imagine what you are feeling right now. It was never my intention to hurt you or my husband. My behavior was unacceptable and inexcusable. Although this may not mean much to you now, which I completely

Subject









I talked to Chris and had a very productive conversation. He will fill you in on what WE have decided you and Ed will do.

The both of you are very luck to have the spouses that you have.

Meaning you and Ed

Thank you for speaking with him. And you are correct Ed and I are both very lucky to have supportive and understanding spouses who are willing to remain supportive and understanding even when they are placed without their consent in the worst of circumstances. The resilience you are both showing





**Dawn**

Thank you for speaking with him. And you are correct Ed and I are both very lucky to have supportive and understanding spouses who are willing to remain supportive and understanding even when they are placed without their consent in the worst of circumstances. The resiliency you are both showing is admirable and impressive. Something I will never forget especially when we acted in complete disregard of your feelings and well being. For that I am truly sorry. Thank you for your understanding.

Sat, May 5, 3:31 PM

You can contact Ed via text or email for BOS purposes. If a phone call is essential then so be it. But nothing personal and nothing to do with your campaign. He is done helping you with that. Don't make Chris and i regret trusting you two to be















**Dawn**

Sat, May 5, 3:31 PM

You can contact Ed via text or email for BOS purposes. If a phone call is essential then so be it. But nothing personal and nothing to do with your campaign. He is done helping you with that.  Don't make Chris and i regret trusting you two to be professionals at all times and respect our families that you had no regard for before. This is huge for me and I'm not one bit happy that you have to be in such close contact. Ed will continue to meet up after meetings provided others will be there so as not to give way to rumors. I don't know how you two will be able to work together but it's what we need to do. I will not be showing up to things to check on you two because I dont want to suddenly be at things I would never go to. Red flags, you know.  The first test will be next week.















Dawn

I regret trusting you two to be professionals at all times and respect our families that you had no regard for before. This is huge for me and I'm not one bit happy that you have to be in such close contact. Ed will continue to meet up after meetings provided others will be there so as not to give way to rumors. I don't know how you two will be able to work together but it's what we need to do. I will not be showing up to things to check on you two because I dont want to suddenly be at things I would never go to. Red flags, you know.  The first test will be next week.

Okay. Thank you for your consideration on this matter. I am sure it has been incredibly difficult...actually I couldn't even imagine how difficult it has been. Thank you.

Delivered











**Patricia Martino**

| | |
|---|---|
| **From:** | Jack McGlone |
| **Sent:** | Tuesday, June 19, 2018 2:42 PM |
| **To:** | Patricia Martino |
| **Subject:** | FW: text screen shots |
| **Attachments:** | Deirdre texts 4.png; Deirdre texts 3.png; Deirdre texts 2.png; Deirdre texts 1.png |

**From:** Christopher Hall [mailto:
**Sent:** Monday, June 18, 2018 9:09 PM
**To:** Jack McGlone
**Subject:** text screen shots

Hello again Jack,

Here are the text messages between Deirdre and I on the night of May1st into May 2nd.

Thank you,
Chris

1

To:  Deirdre Jacobs Hall

Details

5/1/18, 9:01 AM



Wow pricey. I think 2000 are 250

5/1/18, 2:50 PM

I am at TH signing warrants

Cool

Zachary wanted me to tell you that we have verified that the town seal is on the sign

Awesome.

On my way home

Perfect. About to start my class.  Pizza in oven.

You look nice!  Make sure to plug in your phone

I think you look nice

5/1/18, 5:46 PM

Jared told Ed I was a formidable opponent.

Captain obvious told me that

Lol

You are the game changer



re Jacobs Hall



os look huge in that bottom pic

To:  Deirdre Jacobs Hall

Details



Hope everything is ok. Sorry to hear about that. If you are going to go home let me know I have the bean at scouts

I am headed out for a little bit then I need to talk to you

K

5/1/18, 9:01 PM

Kids in bed

I am having a couple drinks with Allen. I will talk to you later. Be ready for me.

Cause I am going to want tough

You

I'll be ready . Let me know if you need a ride please

I willl I love you!



5/1/18, 11:26 PM

Waiting for you 

Do you have a safe way home

5/2/18, 1:22 AM

I'm going up to bed. Love you. Please call me if you need a ride

5/2/18, 2:25 AM

Love you.it gonna be a tough ride the next few weeks ttyl

5/2/18, 8:45 AM

To:  Deirdre Jacobs Hall

Details

5/2/18, 2:25 AM

Love you.it gonna be a tough ride the next few weeks ttyl

5/2/18, 8:45 AM

Kids have release today

Yeppers

Ok

I'll pick them up. Gotta bring bean to library for books for eom

Ok

Love you sweetie. I'm gonna try to get a little more sleep

K love you

I have the recount for Dr Small this morning



Hope she wins

I'll be home to throw on a little make up then I am off

Sounds good. Love ya

5/2/18, 10:19 AM

You want to grab an early lunch?

?

I would love to but just getting up.

K how about 1130 epicurean kitchen?

Sounds great!

Employee Personal Interview Statement

**U.S. Department of Labor**
Wage and Hour Division

This report is authorized by Section 11 of the Fair Labor Standards Act and other Wage-Hour laws. While you are not required to respond, your cooperation is needed for the Wage Hour Division to make a determination of compliance under the applicable Act(s). Your identity will be kept confidential to the maximum extent possible under existing law.

I, **Thomas** _____ **Sambito,** _____

742 Mason Road _____

**Jefferson** . **MA** . **01522**

years of age, (was/have been) employed by

**New Bedford** **MA** _____ phone: **508-868-5263**

for the approximate period from _____ to **Present**

as **Outside Sales (Leominster store)** _____

_____ **7/19/2021**
_____ Telephone

of _____

**Plumbers' Supply**

Statement:

I have worked for Plumbers' Supply about 8 years doing outside and inside sales. I sell plumbing, heating & HVAC equipment, primarily to contractors, not homeowners. I mainly sell HVAC equipment. The prices are pre-set in the computer but I can vary them. On a typical week, my time is split about 50/50 between traveling to the client's place of business and time spent in the office. The sales transaction is usually finalized over the phone but some times the client comes to our store (Leominster MA). Lately, I have been on the road more often, about 60% of the time and 40% at the office. I am the only person who does this type of work at this location.

I also work at the counter once in a while, mainly to fill in if someone's out or they are short-handed. I do not supervise any workers.

I am paid a salary of $2,115 per week and it is always the same amount every week. I normally work Monday thru Friday from 7 am to 5 pm and occasional Saturdays (about 4 or 5 per year) from 8 am to noon. I take a lunch at times, it varies a lot. Some times I take the client to lunch.

There are no workers under age 18. (We do have Two Part-Time ) ~~the~~
                                        Kids under 18

_____ Signature _____ 7/23/21 / Date

Please review the statement you
provided to me; sign, date and
return in the envelope provided.
Initial any changes. Thank you.

Date: 7/20/2021 10:12:04 AM          Case ID  1936764          Form WH-31
                                                                B - 1          Page 1



HALL, VOLUME II
**EXHIBIT 8**
KAD 10/4/21 Chiocca vs. The Town of Rockland, et al.

I want you to know I am meeting with Allan tomorrow to try to get to the bottom of this

No no no please call me

I'll call you after I collect all the facts tomorrow

No please call me now

I need to know what you are going to say.

I have not decided what to say, I have to sleep on it

Please just give me one more day to talk to you and reason with you. I have been looking at the texts I got that night and have a better idea when I started to not remember

Please just give me one more day to talk to you and reason with you. I have been looking at the texts I got that night and have a better idea when I started to not remember

Please call we should not be putting this in writing

Tell me what you remember and it better be the whole truth

Ok

Not in writing

I don't like being played

I am not playing you

I would not do that to you

Are you going to call so I can talk to you?

I'll call but my wife is beside me

Is that a problem for her?

No, I just wanted you to be aware

That's ok

Fri, May 18, 12:16 AM

Sorry to bother you I just wanted you to know in advance that I have an appointment with Mary Jane and Eric tomorrow at noon to review the school payroll procedures. Not sure how this fits into your time table. You have my word that I will not speak to Allan while I am there. If you think you will be in tomorrow before noon to talk to him please let me know, so I can be prepared.

I understand your concern for our employees and appreciate the tough spot you are in. Thank you for

Sorry to bother you I just wanted you to know in advance that I have an appointment with Mary Jane and Eric tomorrow at noon to review the school payroll procedures. Not sure how this fits into your time table. You have my word that I will not speak to Allan while I am there. If you think you will be in tomorrow before noon to talk to him please let me know, so I can be prepared.

I understand your concern for our employees and appreciate the tough spot you are in. Thank you for protecting them during a time when I have compromised myself too much to do so.
Goodnight

Fri, May 18, 8:07 AM

I talked to your husband Chris this morning, pursuant to our

Fri, May 18, 6:07 AM

I talked to your husband Chris this morning, pursuant to our conversation last night I remind you to not talk to Allan until I do, I will let you both know the outcome once that has occurred

I am not going to to talk to him. Please call me

I am at a job site and can not talk.

Ok can you call me when you can please? I have my kids till about 745. After that I can talk

Fri, May 18, 8:40 AM

Sorry, I can't talk right now.



Sorry, I can't talk right now.

Ok









Does this jog your memory?

Fri, May 18, 17:04 PM

Payroll has not come over from the school yet. I have Jill following up with schools to anticipate if they will

Subject

Payroll has not come over from the school yet. I have Jill following up with schools to anticipate if they will need more time.

Schools say it will be 12. So that's when I will be there.

K

Please touch base with me one last time before you head over there?

Do I need to pull out of the state rep race?

You need help

I have an appointment

Do I need to pull out of the race

I have left TH

Subject

You need help

I have an appointment

Do I need to pull out of the race

I have left TH

Delivered

Tue, May 29, 8:15 PM

Please send a copy of the Paid Administrative Leave Letter to my lawyer.

Sent as Text Message

Text Message



Message
Monday 2:25 PM

I contacted the police chief today.

Sent as Text Message

Subject

