## In The Matter Of:

*Allan Chiocca vs.*
*The Town of Rockland, et al.*

---

*Larry J. Ryan*
*Vol. I*
*January 6, 2021*
*Contains Confidential Portions*

---



# DORIS O. WONG
# ASSOCIATES, INC.

C O U R T   R E P O R T E R S

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File Ryan_Larry.txt*

Allan Chiocca vs.
The Town of Rockland, et al.

**Contains Confidential Portions**

Larry J. Ryan - Vol. I
January 6, 2021

Page 25

1   Q.  Okay.  Have you held any other positions in
2   municipal government other than the ones you have
3   described?
4       A.  The Finance Committee.
5       Q.  For Rockland?
6       A.  The Rockland Finance Committee somewhere
7   around 2005.  After I was off the Board of
8   Selectmen, I went on the FinComm for maybe one or
9   two years.  Then I was on the Capital Planning
10  Committee for about a year sometime prior
11  to -- maybe 2017 to 2018.
12      Q.  We will talk about this a little more in a
13  little bit, but obviously the incident with Allan we
14  all know about happened in May of 2018.  Is it your
15  recollection that you were only a selectman for
16  about two years in your second stint at that time?
17      A.  Yes.  I was elected in 2016.  Is that the
18  right date?  Let's see, this is my second term.  I'm
19  up in '22.  So six years from '22 is 2016.  Yes, I
20  guess.
21      Q.  Over the course of the time that you've
22  been on the Board of Selectmen, have you been
23  involved in hiring town administrators?
24      A.  Yes.

Page 26

1   Q.  Can you recall how many total town
2   administrators that you've been involved in the
3   hiring of?
4       A.  Maybe one, two.  Two at the most.  Bradley
5   Plante.  I believe Allan came after him.  I didn't
6   hire Allan.
7       Q.  So Bradley Plante was before Allan?
8       A.  Yes.
9       Q.  You were also involved in the hiring of the
10  town administrator that came after him, right?
11      A.  Yes.
12      Q.  What is his name?
13      A.  Doug Lapp.
14      Q.  Are there particular traits that you look
15  for, that you have looked for in the two times that
16  you hired -- let me rephrase that.
17         Are there particular traits that you look
18  for or have looked for when you hire a town
19  administrator?
20      A.  Yes.
21         MS. ZUCKER: Objection.  Sorry.
22      Q.  What are those?
23      A.  Oh, I don't know.  Appearance, how they
24  present themselves, how they -- their knowledge, how

Page 27

1   they present their ideas or their presentation to
2   the board.  You look at their resume and see where
3   they come from and what schooling they have had and
4   where they have held jobs.  You may call the former
5   selectmen from their town, or somebody who they put
6   as references.
7          There's multiple reasons.  I mean, there
8   isn't just one.
9       Q.  What qualities did Mr. Lapp possess that
10  caused you to vote for him to become the town
11  administrator?
12      A.  When Mr. Lapp interviewed, it was very
13  apparent that he knew the position.  He had come to
14  the Town and visited it on his own.  Prior to being
15  interviewed, he did his homework.  He had a good
16  resume, and he was obviously the pick of the
17  candidates that were presented to us that we
18  interviewed in public.
19      Q.  Do you believe he's done a good job so far?
20      A.  I believe he's done an excellent job.
21      Q.  What has he done, if anything, that causes
22  you to believe that he's done an excellent job?
23      A.  He is on top of every aspect within his
24  jurisdiction, and he can separate and accommodate

Page 28

1   all that he's doing.  He's very well organized, and
2   he's very knowledgeable, and he came with a lot of
3   experience.
4       Q.  Do you know how much experience he had?
5       A.  I would say ten years as an assistant town
6   administrator in Sandwich, I believe, or somewhere
7   around that many years.  I don't remember specifically.
8       Q.  I'm sorry, what was the name of the
9   gentleman you said -- the first town administrator
10  you were involved in the hiring of?
11      A.  Bradley Plante.
12      Q.  Do you recall how long he served as the
13  Rockland town administrator?
14      A.  I can't recall total.  Probably five years,
15  maybe.
16      Q.  Do you know why his time as the town
17  administrator ended?
18      A.  I believe he had some personal issues and
19  he wanted to move on.
20      Q.  What do you mean when you say, "personal
21  issues"?
22      A.  I believe he was going through a divorce at
23  the time.
24      Q.  You were involved in his initial hiring,

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 29

1  though?
2  **A.  Yes.**
3     Q.  Do you recall, was his contract ever
4  extended during his period of time as town
5  administrator?
6  **A.  I can only assume that it may have been,**
7  **but I don't remember.**
8     Q.  Why do you make that assumption?
9  **A.  I don't remember.  I mean, you know...**
10    Q.  Sorry, were you going to say something?
11 **A.  No.**
12    Q.  Is the Board of Selectmen the Town of
13 Rockland's highest governing body?
14 **A.  Yes.**
15    Q.  When the Board of Selectmen makes
16 decisions, is it your understanding that it's doing
17 so on behalf of the Town?
18    **MR. CROTTY:** Objection.
19 **A.  (No response)**
20    Q.  Excuse me, Larry?
21 **A.  Yes.**
22    Q.  That is your understanding?
23 **A.  Yes.**
24    Q.  Do you have any familiarity with the Town's

Page 30

1  governing documents?  By that I mean the Town
2  Charter, bylaws?  Do you have any familiarity with
3  those documents?
4  **A.  Somewhat.  I've read them.  I don't have**
5  **them in front of me.  I couldn't remember**
6  **specifically where and what's in it all except for**
7  **on a general basis.**
8     Q.  But you have had occasions over the years
9  in your capacity as a member of the board to read
10 various portions of the Town Charter?
11 **A.  Yes.**
12    Q.  And also the Town bylaws?
13 **A.  Yes.**
14    Q.  Is it fair to say that those documents set
15 forth the procedures that the Town is to follow as
16 it relates to the governance of the Town?
17 **A.  Generally, yes.**
18    Q.  How long have you known Allan Chiocca?
19 **A.  Prior to my getting reelected in 2016, I**
20 **probably talked to him a couple of times.**
21    Q.  I just want to see if perhaps we can --
22 maybe this is wrong, but I want to try to refresh
23 your recollection as to the time period that you
24 served as a selectman.  I'm going to paste a link

Page 31

1  here in the Chat bar.  Do you see that?
2  **A.  (Examines document)**
3     Q.  Do you see that, Larry?
4  **A.  Yes.**
5     **MR. SHAFRAN:** Does everyone see that?
6     Q.  Can you click that, please.
7  **A.  I don't see it now.**
8     **MR. SHAFRAN:** Jason, can you see it?  And
9  would you mind helping him?
10    **MR. CROTTY:** Yes.  Give me one second.
11    (Discussion off the record)
12 **A.  (Examines document)  I got it.**
13    Q.  Can you see the document now?
14 **A.  Yes.**
15    **MR. SHAFRAN:** So we are going to mark this
16 as Exhibit 1.
17       (Document marked as Ryan
18       Exhibit 1 for identification)
19    Q.  I'm showing you a document that's been
20 marked as Exhibit 1, entitled, "Amendment to the
21 Employment Contract between Allan R. Chiocca and the
22 Town of Rockland."  You see it says in the first
23 line there that it's entered into on June 17, 2013?
24 **A.  Yes, and I see my name there.  Obviously I**

Page 32

1  was a selectman at that point.
2     **MR. CROTTY:** Let him ask the questions.
3     Q.  Right.  That's your signature on the last
4  page there?
5  **A.  It is.**
6     Q.  And you see that that's dated June 17, 2013?
7  **A.  I do.**
8     Q.  Maybe you can rethink, if you could, the
9  time frames that you served on the board.
10 **A.  I left in 2005.  Maybe I had six years off.**
11 **Let me think.  Yes.  I guess I had six years off.**
12 **Then I got reelected.  My timeline must be off.**
13    Q.  So let's try to get it as accurate as
14 possible.  I'm sure we can pin it down ultimately.
15 You were first elected in 1996, correct?
16 **A.  Yes.**
17    Q.  And you believe that that first stint went
18 until 2005?
19 **A.  Yes, three terms.**
20    Q.  And you went back -- you were back on the
21 Select board at least in June of 2013, right?
22 **A.  Yes.**
23    Q.  When is the election typically?
24 **A.  April 1st -- the first Saturday in April.**

Allan Chiocca vs.
The Town of Rockland, et al.

Contains Confidential Portions

Larry J. Ryan - Vol. I
January 6, 2021

Page 33

1  Q.  Does this help your recollection?  Do you
2  believe that you would have been reelected in April
3  of 2013, or perhaps even in April of the year prior
4  to that?
5     A.  It might have been -- let's see.  Yes, it
6  would have been 2012.
7     Q.  1996 to 2005, and 2012 to the present?
8     A.  Yes.
9     Q.  Now I just want to return to the question I
10 had a moment ago.  How long have you known Mr. Chiocca?
11    A.  Since prior to my reelection in 2012, I
12 believe I met him a couple of times.
13    Q.  What were the circumstances under which you
14 believe you first met him?
15    A.  The time that I remember meeting him the
16 most was at a highway retirement party for Betty
17 Parker.  It could have been a time before that at
18 Town Hall, but I don't remember.
19    Q.  So you were on the board for approximately
20 six years that overlapped with his service as town
21 administrator; is that about correct?
22    A.  If I was elected in 2012, yes, that would
23 be correct.
24    Q.  Did you get to know Mr. Chiocca better over

Page 34

1  those years?
2     A.  Yes.
3     Q.  Up until May of 2018, how would you
4  describe your relationship with Mr. Chiocca?
5     A.  A working relationship.  You know, we went
6  out to lunch on rare occasions, shoot the bull about
7  life in general I guess and some town stuff.  I
8  don't know.  Is there anything specific you want to
9  know?
10    Q.  I just want you to describe to me how you
11 viewed your relationship with Mr. Chiocca over the
12 period of time you were both in Rockland government
13 prior to May of 2018.
14    A.  When I was reelected and I came up to my
15 first meeting, we were to appoint -- we had a list
16 of people to appoint, and one of them was the
17 parking clerk, and the parking clerk was someone who
18 had had issues with money in the past, and she, from
19 my understanding, she was never to handle cash or
20 money within the Town Hall.  I asked Mr. Chiocca,
21 "Does she handle money, and does she handle checks?"
22 His answer was, "No, she does not."
23       I went over to the treasurer, John, and I
24 asked him the same question.  He showed me

Page 35

1  documentation that stated that she indeed collected
2  cash and checks.
3        I told Mr. Chiocca at that meeting I
4  wouldn't approve her, and I put that one on hold.
5  We had a conversation, and I told him, "If you ever
6  lie to me again, we're done.  I don't care what the
7  truth is, tell me the truth.  If you lie to me, I
8  have no use for you."
9     Q.  What did he say in response?
10    A.  That was the first meeting, I believe, or
11 maybe the second meeting, but when we went to make
12 appointments and I told him, he lied directly to my
13 face that day.  That started us off on the wrong
14 footing.  However, you know, on we went.
15    Q.  How did he respond to your statement?
16    A.  He was contrite.
17    Q.  And so over the next several years, how
18 would you describe your working relationship with him?
19    A.  Reasonable.
20    Q.  What causes you to describe it as reasonable?
21    A.  We got along.  We didn't have a lot of
22 fighting over policies or Town issues.  He had some
23 issues with contract issues with certain unions
24 within the Town where there was harassing phone

Page 36

1  calls it appears from both sides, and, you know, I
2  think we spoke as a group about how we wanted to
3  approach the union issue.  You know, being tough and
4  holding positions is different than using your mouth
5  to -- and, I mean, everybody at that particular
6  point.  I can't specifically remember incidents, but
7  with the Fire Department, I know that Mr. Chiocca
8  had some issues with them and words were exchanged.
9  I think we discussed at that time that it would be
10 better if we didn't fight and that we just stated
11 our position and let them deal with that.
12    Q.  Did you agree with Mr. Chiocca's position?
13    A.  Not always.
14    Q.  No.  I mean as to the specific example that
15 you are talking about right now.
16    A.  No.
17    Q.  As it relates to the Fire Department.
18    A.  No, I didn't agree with him at the time,
19 that I can remember.  My wife works for the Fire
20 Department, so I listen to her tell her side of the
21 story of her work issues.  You know, that's our
22 private conversation.  It has nothing to do with
23 Mr. Chiocca or anything, but it's just general
24 knowledge.

Allan Chiocca vs.
The Town of Rockland, et al.

**Contains Confidential Portions**

Larry J. Ryan - Vol. I
January 6, 2021

Page 49

1  Q.  Did you say records or recollection?
2  **A.  You asked if I had a record.**
3  Q.  No.  Sorry.  The question was, do you have
4  any recollection -- maybe I misspoke.  Do you have
5  any recollection of the board reviewing Mr. Chiocca's
6  performance over the term of this agreement?
7  **A.  No, I don't have any recollection of it.  I**
8  **just know that at times it was talked about, but I**
9  **can't specifically relate it to this contract or**
10  **which contract.**
11  Q.  You have recollections, though, of the
12  board talking about his performance over some period
13  of time?
14  **A.  I believe so, but, again, I don't recall**
15  **specifics.**
16  Q.  If you could look on Page 3.  Do you see
17  where it says, "Section 4.  A. Suspension"?
18  **A.  Yes.**
19  Q.  It says, "Employer may suspend the Employee
20  for good cause, with pay and benefits, at any time
21  during the term of this agreement in accordance with
22  Section 2.18.(a) of the Rockland Town Charter (as
23  amended by Chapter 58 of the Acts of 2005)," do you
24  see that?

Page 50

1  **A.  Yes.**
2  Q.  Is it your understanding that those
3  documents set forth the procedure if the Town wants
4  to suspend Mr. Chiocca?
5  **A.  Yes.**
6  Q.  Over your tenure as a selectman, are you
7  aware of any other employees of the Town being
8  suspended?
9  **A.  In general?  Anybody within the Town?**
10  Q.  Any Town employee.
11  **A.  Let's see...  Yes, I guess.  Yes.**
12  Q.  When a Town employee is suspended, are
13  there certain things that they are prohibited from
14  doing during their suspension?
15  MR. CROTTY:  Objection.
16  **A.  I don't know.**
17  *Q.  If a Town employee is suspended, in your
18  experience are they prohibited from going on Town
19  property?
20  MR. CROTTY:  Objection.
21  **A.  I've never had experience prior to**
22  **Mr. Chiocca.**
23  Q.  Sorry, say that again.
24  MR. CROTTY:  Ken, if I object, can you hear

Page 51

1  me?  The only reason I ask is because I have my
2  computer muted not just on Zoom but the computer
3  audio just to cut back on the feedback.
4  (Discussion off the record)
5  *(Question read)
6  **A.  I would say yes, they have been forbidden**
7  **to go into Town Hall.**
8  Q.  After an employee is suspended?
9  **A.  When an employee is suspended.**
10  Q.  And when an employee is suspended, are they
11  prohibited from performing their job for the Town?
12  **A.  I believe so, but I believe each individual**
13  **case would have its own merit.**
14  Q.  Have you heard the term "administrative
15  leave"?
16  **A.  Yes.**
17  Q.  Do you have any understanding of what the
18  difference is between an administrative leave versus
19  a suspension?
20  **A.  No.**
21  Q.  You have no understanding of any difference
22  between the two terms?
23  **A.  I listen to the lawyer's advice on all**
24  **these matters.**

Page 52

1  Q.  Don't tell me about your lawyer's advice.
2  Just tell me if you have any understanding of the
3  difference between a suspension and an
4  administrative leave.
5  **A.  I don't know the technical aspects of each,**
6  **but one would be -- an administrative leave is**
7  **different than a suspension, I would imagine.**
8  Q.  Right.  My question for you is, do you have
9  any understanding of what the differences are?
10  **A.  Not specifically.**
11  Q.  Generally?
12  **A.  No.**
13  Q.  I'm going to show you another document.
14  And, Larry, if you need a break, you can
15  just tell me.
16  **A.  I'm good.**
17  Q.  Do you see the link I just put in this?
18  **A.  (Examines document)  Yes, I do.**
19  MR. SHAFRAN:  Ken, can you please mark that
20  as Exhibit 4.
21  (Document marked as Ryan
22  Exhibit 4 for identification)
23  Q.  Larry, I'm showing you the document marked
24  as Exhibit 4.  Do you recognize this document?

Allan Chiocca vs.
The Town of Rockland, et al.

**Contains Confidential Portions**

Larry J. Ryan - Vol. I
January 6, 2021

Page 65

1    Q.  Larry, I'm showing you a document marked as
2  Exhibit 6.  Do you recognize this document?
3    **A.  Yes.  It's from a meeting I believe.  Yes,**
4  **executive session.**
5    Q.  These are executive session minutes from
6  March 20, 2018, correct?
7    **A.  Yes.**
8    Q.  Are these minutes kept in the regular
9  course of the Town's business?
10   **A.  Excuse me?**
11   Q.  Are these minutes kept in the regular
12 course of the Town's business?
13   **A.  Yes.**
14   Q.  Did you have an opportunity to read this
15 document?
16   **A.  Yes.**
17   Q.  Do you have any reason to believe that
18 anything in this document is not accurate?
19   **A.  No.**
20   Q.  At the bottom of the first page, it says
21 that Mr. Chiocca expressed an interest in
22 negotiating a new three-year contract, correct?
23   **A.  Yes.**
24   Q.  And that's consistent with your

Page 66

1  recollection of what Mr. Chiocca wanted at that
2  time, correct?
3    **A.  He had bantered about two or three years at**
4  **one point.  At one point I remember.  I think I**
5  **remember, but I can't specifically remember.**
6    Q.  It says that Mr. Chiocca discussed some of
7  the projects which had been completed over his
8  tenure and some of the ongoing projects still in
9  process, right?
10   **A.  That's what it says.**
11   Q.  Do you believe personally that Mr. Chiocca
12 had any significant accomplishments over the course
13 of his tenure with the Town?
14   **A.  Yes.**
15   Q.  Like what?
16   **A.  He hired Marcy Birmingham.**
17   Q.  What else?
18   **A.  Maybe the solar project up at the landfill.**
19   Q.  What do you mean by that?
20   **A.  Well, he allegedly, according to him, got**
21 **some sort of deal with the electric company to have**
22 **solar panels up at the landfill, and they would get**
23 **so much and we would get so much.**
24   Q.  Any understanding of what happened to the

Page 67

1  Town's credit rating over the course of his
2  employment with the Town?
3    **A.  No.**
4    Q.  You have no understanding?
5    **A.  I have no recollection of the numbers.**
6    Q.  Do you have any recollection of whether the
7  Town's credit rating improved over the course of his
8  employment with the Town?
9    **A.  I know that the credit rating has improved,**
10 **but I can't specifically say when that started or a**
11 **date to that.**
12   Q.  Did Mr. Chiocca play any role in finishing
13 the Rail Trail?
14   **A.  Yes.**
15   Q.  What role did he play?
16   **A.  I don't know the specifics of what he**
17 **actually did.  I just know that it was his project**
18 **and he got it done.**
19   Q.  So we talked earlier that over a roughly
20 six-year period or so, you voted to extend
21 Mr. Chiocca's contract on three separate occasions.
22 Can you think of any other accomplishments over that
23 time period that you would credit him with?
24   **A.  Not specifically.**

Page 68

1    Q.  If you go to the top of Page 2, do you see
2  it says, "Board members discussed the general
3  openness to considering the contract extension
4  request made by Mr. Chiocca"?
5    **A.  Yes.**
6    Q.  Is that consistent with your recollection
7  of how the board felt?
8    **A.  Yes.**
9    Q.  When you read the term "general openness,"
10 what do you take at that to mean?
11   **A.  That we were willing to listen to his offer.**
12   Q.  I'm going to show you another document
13 here.  Take a look at that document, if you don't
14 mind.
15   **A.  (Examines document)**
16   Q.  Do you see it, Larry?
17   **A.  I do.**
18      **MR. SHAFRAN:** Ken, would you mark that as
19 Exhibit 7, please.
20         (Document marked as Ryan
21          Exhibit 7 for identification)
22      **MS. CIESLAK:** Adam, this is Cindy.  Can you
23 give me the Bates number of the document you are
24 looking at.

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 77

1   A. Yes.
2   Q. Yes, you believe that allegation is true?
3   A. Yes, again.
4   Q. Thank you. I'm going to show you another
5   document. You can open that when you have a minute
6   or right now.
7   A. (Examines document) Okay.
8        MR. SHAFRAN: Ken, we can mark that as
9   Exhibit No. 9.
10            (Document marked as Ryan
11             Exhibit 9 for identification)
12   Q. Larry, I'm showing you a document marked
13   now as Exhibit 9, entitled, "Defendants, Town of
14   Rockland, Larry Ryan, Michael Mullen, Jr., Michael
15   O'Loughlin, Richard Penney and Kara Nyman's
16   Supplemental Answers to Plaintiffs' First Set of
17   Interrogatories," do you see that?
18   A. I do.
19   Q. And do you recognize this document? Have
20   you seen it before?
21   A. Yes.
22   Q. These are the questions that Mr. Chiocca
23   asked the Town of Rockland and the individual
24   Defendants listed in the caption, correct?

Page 78

1   A. Yes.
2   Q. If could you scroll to Page 16, which if
3   you don't have page numbers, it's the fifth one from
4   the bottom.
5   A. Okay, and what am I looking at?
6   Q. Do you see, hopefully, your signature? Do
7   you see that?
8   A. (Examines document) My signature?
9   Q. Well, tell me what you are looking at right
10   now.
11   A. "Signed under the pains and penalties of
12   perjury on this 10th Day of February, 2020, Larry J.
13   Ryan."
14   Q. That's your signature?
15   A. It is.
16   Q. You understood that you signed this under
17   the pains and penalties of perjury?
18   A. Yes.
19   Q. And presumably you would not have answered
20   any question in here in a manner that you thought
21   was not accurate, correct?
22   A. I believe so.
23   Q. If you could go to Page 9, which is
24   Interrogatory 16.

Page 79

1   A. (Examines document) Okay.
2   Q. I'm getting an echo again. Do you see
3   where it says, "Answer No. 16"?
4   A. Yes.
5   Q. Do you see the paragraph that begins,
6   "Mr. Chiocca's employment was not renewed"?
7   A. Yes.
8   Q. Do you see the sentence there that begins,
9   "In late April"?
10   A. Yes.
11   Q. I'll just read it. It says, "In late April
12   and early May 2018, prior to learning about the
13   events of May 1-2, a majority of the Board
14   individually expressed ambivalence about even
15   considering an extension of his contract."
16   Now, is it your contention that the board
17   was both generally open to extending Mr. Chiocca's
18   contract, as the executive minutes state, and
19   ambivalent at the exact same time?
20   A. Everything hinged upon whether or not
21   Mr. Chiocca agreed with the conditions for his
22   employment.
23   Q. Were you ambivalent about whether or not to
24   consider a contract extension for Mr. Chiocca?

Page 80

1   A. I don't recollect exactly how I felt at the
2   time because we were in the process of discussing
3   the terms of his employment. And ambivalence maybe
4   just meant we were not -- it was not something that
5   was on the top page I guess.
6   Q. That's your understanding of what you meant
7   by "ambivalence," that it was not front and center?
8   A. It could mean a number of things anyway, so
9   I don't...
10   Q. Let me ask you this. What did you intend
11   it to mean here in your answer?
12   A. In my answer, it would have been that I
13   didn't care whether or not -- that we discussed his
14   contract, that we made a plan of development, and
15   that's the stage that we were in at the time that
16   the incident occurred.
17   Q. The next sentence says, "Furthermore,
18   Mr. Chiocca had shown poor decision-making and poor
19   judgment and a lack of trust between the parties had
20   developed," correct?
21   A. Yes.
22   Q. We can look at it again if we need to, but
23   in the Position Statement that you signed under the
24   pains and penalties of perjury -- and I'll read it

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 85

```
 1   said no, I didn't.
 2   Q.  Do you recall when you first met Ms. Hall?
 3   A.  Yes.
 4   Q.  Describe that to me.
 5   A.  I believe we were at a campaign night for
 6   the candidates at the high school.
 7   Q.  Do you recall approximately when that was?
 8   A.  Prior to her election.
 9   Q.  And do you recall when that was?
10   A.  No.
11   Q.  You had the opportunity to interact with
12   her for the first time then?
13   A.  I spoke briefly with her that night.
14   Q.  Do you recall what about?
15   A.  Campaign strategy.
16   Q.  What specifically about campaign strategy?
17   A.  I don't recall the specifics.
18   Q.  Did you support her candidacy at that time?
19   A.  No.  I believe I was ambivalent to that, if
20   that's the word to use.  I don't believe I was in
21   support of her at all at that particular point.
22   Q.  Eventually she was elected to the board,
23   though, right?
24   A.  Yes.
```

Page 86

```
 1   Q.  How would you describe your working
 2   relationship with her over the course of your tenure
 3   together?
 4   A.  Amicable.
 5   Q.  Does anything else come to mind?
 6   A.  No.
 7   Q.  I'm going to show you another document.
 8   You can take a look at that, Larry.
 9   A.  (Examines document)
10   Q.  Do you see that, Larry?
11   A.  Yes.
12       MR. SHAFRAN:  Ken, can you mark that as
13   Exhibit 10.
14       (Document marked as Ryan
15       Exhibit 10 for identification)
16   Q.  Larry, I'm showing you some documents
17   marked as Exhibit 10.  This is email correspondence,
18   do you see that?
19   A.  (Examines document)  I do.
20   Q.  Can you go to Page 2.  There's an email it
21   appears that you wrote on Thursday, May 17th at
22   11:03 a.m.?
23   A.  Yes.
24   Q.  Can you just take a minute to read that to
```

Page 87

```
 1   yourself.
 2   A.  Okay.
 3   Q.  You can read the entire document.  Just let
 4   me know when you are done.
 5   A.  (Examines document)  Okay.
 6   Q.  What prompted you to write that email?
 7   A.  The open meeting of the prior evening.
 8   Q.  What about it?
 9   A.  We had a Selectmen's meeting where we met
10   with members of the School Committee, and they were
11   voting on the document that I didn't vote for.
12   There was no vote taken by the board.
13   Q.  Did that bother you?
14   A.  Yes, because we have to vote to approve
15   what our decision was when we were going to write
16   the School Committee.  We had a document that we
17   were working on as a board, and we were supposed to
18   meet again with the School Committee in executive
19   session to iron out the details.
20   Q.  What is it exactly that occurred that
21   troubled you?
22   A.  The document that we were working on as a
23   board was presented by the chairman that night, and
24   she intimated that it was all ready for the School
```

Page 88

```
 1   Committee and us to sign, or to vote on and sign.  I
 2   was never privy to any knowledge that this vote was
 3   going to be taken this night.
 4   Q.  Then you say at the bottom here, "Ms. Hall
 5   yells when she has no back up data but doesn't
 6   supply any when she is in charge."  Why did you say
 7   that?
 8   A.  Because we had no backup data to support
 9   her decision to present our document to the School
10   Committee.
11   Q.  Does that sentence summarize how you felt?
12   A.  Yes.
13   Q.  If you can scroll up to Page 1.  You wrote
14   an email the day prior, you see that, at 12:42?
15   A.  Yes.
16   Q.  Just take a second to read it, if you don't
17   mind.
18   A.  (Examines document)  Okay.
19   Q.  What prompted you to write that?
20   A.  At that particular time, I knew there was
21   communication between the chairman sitting at the
22   table and members of the School Board talking on the
23   phone, or people were talking on the phone at that
24   particular time.  I had no idea what they were
```

Allan Chiocca vs.
The Town of Rockland, et al.

Contains Confidential Portions

Larry J. Ryan - Vol. I
January 6, 2021

Page 89

1  talking about, and I had no idea that this vote was
2  coming up.
3      Q.  And you wrote that email at 12:42 on
4  May 16, 2018, right?
5      A.  That's what it says.
6      Q.  I'm going to show you another document
7  here.  Take a look at that document.
8      A.  (Examines document)
9      Q.  Do you see it, Larry?
10     A.  I do.
11         MR. SHAFRAN: That will be Exhibit 11.
12         (Document marked as Ryan
13         Exhibit 11 for identification)
14     Q.  Larry, I'm showing you a document marked as
15  Exhibit 11, which appears to be an email from
16  Deirdre to Ed Kimball.  Do you see that this email
17  was written May 16, 2018 at 12:56 p.m.?
18     A.  Okay.
19     Q.  This email was written 14 minutes after the
20  email we just looked at a moment ago that you wrote,
21  right?
22     A.  Yes.
23     Q.  Is it fair to say that -- or do you read
24  this email to be Deirdre asking Mr. Kimball to talk

Page 90

1  to her about your email that you wrote 14 minutes
2  earlier?
3         MS. ZUCKER: Objection.
4         MR. CROTTY: Objection.
5      A.  This is the first time I heard this.
6         MR. CROTTY: I'm sorry, can repeat the
7  question.
8      Q.  Do you think it's reasonable to conclude
9  given that this email was written 14 minutes after
10  your email that we just looked at and it says "Give
11  me a call about Larry's email," that she was talking
12  about the email that you, Larry, wrote 14 minutes ago?
13        MR. CROTTY: Objection.
14        MS. ZUCKER: Objection.
15     A.  I have no direct knowledge of what her
16  intent was.
17     Q.  That was not my question.  Do you think
18  it's a reasonable conclusion that this email is
19  referring to the email you had just wrote?
20        MS. ZUCKER: Objection.
21        MR. CROTTY: Objection.
22     A.  Again, I can only assume.  I cannot say yes
23  or no because I didn't write it, nor do I have any
24  knowledge of it.

Page 91

1      Q.  So let's assume that it is referring to
2  that email.
3      A.  Okay.
4      *Q.  Would you believe that individual
5  conversations like that are appropriate between
6  board members?
7         MS. ZUCKER: Objection.
8         MR. CROTTY: Objection.
9      A.  No.  (Audio distortion)
10        (Discussion off the record)
11        *(Question read)
12     A.  No.
13     Q.  Do you recall the day that you became aware
14  of the allegations from Ms. Hall about the May 1st,
15  2018 events?
16     A.  The day after the meeting I went into Town
17  Hall and I -- Ms. Hall was there talking to the
18  financial team.  Mr. Chiocca was there.  I went in
19  and asked them, "I'm going to find out what's going
20  on.  If there's something going on here, I'm going
21  to find it out."
22         Mr. Chiocca turned to me and asked if I
23  would be willing to go to lunch with him.  At that
24  time Ms. Hall got up and was done with her business

Page 92

1  and left.  I said, "I will let you know," and I
2  walked out the door.  That was the last time I spoke
3  to him.
4      Q.  And I'm sorry, you said --
5      *A.  So then either that afternoon, late
6  afternoon or the next day, Ed Kimball called me up
7  and said that Deirdre Hall spoke to him and said
8  that she believed that something that Allan may
9  have -- I can't remember the exact words, but
10  mishandled her, or whatever, during when they were
11  together at some point in time.  I don't believe the
12  date was actually brought up at that particular time.
13        MR. CROTTY: Larry, take the question one
14  step at a time.  Let him finish.  Then pause.  You
15  are starting to overlap each other.  So just wait
16  for the question.
17     A.  Go ahead.
18        MR. SHAFRAN: Jason, I just want to make
19  you aware of -- what you just told him is obviously
20  fine, but I can hear what you are saying to him
21  through his speaker.  I would just caution you to be
22  careful with that.  I know you are just giving a
23  basic instruction.
24        MR. CROTTY: I appreciate that.

Allan Chiocca vs.
The Town of Rockland, et al.

Contains Confidential Portions

Larry J. Ryan - Vol. I
January 6, 2021

Page 105

1    knew it -- at what point who knew what.
2    Q.  At some point the board ultimately made the
3    decision to hire Regina Ryan of Discrimination and
4    Harassment Solutions to conduct an investigation,
5    correct?
6    A.  Yes.
7    Q.  I'm going to show you a document in a
8    second.  So I'm going to show you this.  Take a look
9    at that, please, Larry.
10   A.  (Examines document)  Okay.
11       MR. SHAFRAN:  Ken, can you mark it as our
12   next exhibit.
13       (Document marked as Ryan
14       Exhibit 13 for identification)
15   Q.  Larry, I'm showing you a document marked as
16   Exhibit 13 dated June 4, 2018.  Feel free to read
17   the document if you need to, but is it fair to say
18   that this document is an engagement letter between
19   the Town and Discrimination and Harassment Solutions?
20   A.  (Examines document)  Yes.
21   Q.  And this is the letter, the engagement
22   letter, pursuant to which the Town hired
23   Discrimination and Harassment Solutions to conduct
24   an investigation for the Town, correct?

Page 106

1    A.  Yes.
2    Q.  Can you just read Paragraph 1 to yourself
3    where it says, "Description of Services."
4    A.  (Examines document)  Okay.
5    Q.  What is your understanding of what the
6    purpose of -- and I'll just say "DHS" instead of
7    saying the full name of the entity every time.  What
8    is your understanding of what the Town hired DHS to
9    do?
10   A.  It was hired to find out the truth of the
11   incident.
12   Q.  Is it your understanding that DHS would
13   prepare a report concerning the investigation?
14   A.  Yes.
15   Q.  Did you have that understanding at the time
16   the Town entered into this agreement?
17   A.  Yes.
18   Q.  Is it your understanding that that report
19   would contain DHS's findings and conclusions
20   concerning the investigation?
21   A.  Yes.
22   Q.  Did you have that understanding in June of
23   2018, when the Town entered into this agreement?
24   A.  Yes.

Page 107

1    Q.  And you understood that the Town was paying
2    DHS for these services, correct?
3    A.  Yes.
4    Q.  And you understood that part of what the
5    Town was paying for was the investigative report
6    from DHS, correct?
7    A.  Yes.
8    Q.  Such that the report would become property
9    of the Town, correct?
10       MR. CROTTY:  Objection.
11       MS. ZUCKER:  Objection.
12   A.  I guess, yes.
13   Q.  Now, specifically what is your
14   understanding of what was to be investigated?
15   A.  What happened on the night of the incident.
16   Q.  Is it your understanding that DHS was going
17   to investigate the allegations made by both Deirdre
18   and Mr. Chiocca?
19       MS. ZUCKER:  Objection.
20   A.  That was my assumption.
21   Q.  And that's what the first sentence of
22   Paragraph 1 says, correct?
23   A.  Yes, it does.
24       MS. ZUCKER:  Objection to asking him to

Page 108

1    just recite what the contract says.  I mean, did we
2    establish that he actually saw this contract at the
3    time?
4        MR. SHAFRAN:  I don't know.
5    Q.  Larry, why, if you know, did the board
6    choose Regina Ryan to conduct the investigation?
7    A.  There were several names recommended by
8    Town counsel, and Regina Ryan was chosen.
9    Q.  Did the board look into her credentials?
10       MS. ZUCKER:  Objection.
11   A.  I am not aware that we formally interviewed
12   them or not.
13   Q.  Did you feel that she was qualified to
14   conduct the investigation?
15   A.  I don't really know what her qualifications
16   are for that job.  It's only because she was hired
17   to do it that I assumed that she knows what she's
18   doing and she's qualified.
19   Q.  You had no reason to believe that she was
20   not qualified, did you?
21       MS. ZUCKER:  Objection.
22   A.  No.
23   Q.  As you sit here today, do have any reason
24   to believe she was not qualified to conduct the

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 109

```
1    investigation?
2         MS. ZUCKER: Objection.
3         MR. CROTTY: Objection.
4    A.  No.
5    Q.  Did the board place any restrictions on the
6    manner in which she was to conduct the investigation?
7    A.  Not to my knowledge.
8    Q.  Did you believe she had any biases towards
9    any party going into the investigation?
10        MS. ZUCKER: Objection.
11   A.  No.
12   Q.  She's not related to you, right?
13   A.  Not that I'm aware of.
14   Q.  Did you feel confident that she was capable
15   of conducting a thorough investigation at the time
16   the board retained her?
17        MR. CROTTY: Objection.
18   A.  All I knew is that this was the firm that
19   was hired.  I didn't reserve or make any judgments
20   on her at all, to be honest with you, other than
21   someone that could do the job and they did it.
22   Q.  Was it your understanding that she would
23   independently determine the facts that she believed
24   occurred?
```

Page 110

```
1         MS. ZUCKER: Objection.
2         MR. CROTTY: Objection.
3    A.  I wasn't privy to that conversation, but I
4    assume that that's what it was going to be.
5    Q.  Was it your understanding that after
6    determining the facts that she believed occurred,
7    that she would make recommendations to the board?
8         MS. ZUCKER: Objection.
9    A.  I knew that she would make her report.  I
10   didn't know if there would be recommendations or
11   what was going to be in the report until I read it.
12   Q.  At the time that the investigation began,
13   did you believe that Mr. Chiocca's employment status
14   with the Town hinged on the outcome of the
15   investigation?
16        MS. ZUCKER: Objection.
17   A.  No, not on just the investigation.
18   Q.  What do you mean by that?
19   A.  That there are other factors to be
20   considered besides the -- well, the information on
21   the investigation showed that aside from a sexual
22   contact, there were other -- drinking in Town Hall,
23   being in the Town Hall at midnight on a relationship
24   and not town business, things like that.
```

Page 111

```
1    Q.  Is it your contention that the report found
2    that Mr. Chiocca was drinking in Town Hall?
3    A.  The report stated that there was a bottle
4    of alcohol opened.
5    Q.  My question, though, is, is it your
6    contention that the report states that Mr. Chiocca
7    drank alcohol at Town Hall?
8         MS. ZUCKER: Objection.
9    A.  No, the report didn't state whether -- the
10   report stated that they both denied having any
11   alcohol at the Town Hall.
12   Q.  Do you have any reason to believe or any
13   knowledge to prove that they did?
14        MS. ZUCKER: Objection.
15   A.  No.  All I know is that if you are caught
16   with an open bottle in your car, you are assumed to
17   be drinking.
18   Q.  Do you know how Mr. Chiocca came to acquire
19   the bottle of wine that was in his office?
20   A.  No.
21   Q.  Do you know if it was a birthday present
22   given to him by Marcy Birmingham?
23   A.  I already said no.  I don't know where it
24   came from.
```

Page 112

```
1    Q.  If in fact it was a birthday present from
2    Marcy Birmingham, would that change your belief as
3    to whether it was appropriate or not for him to have
4    a bottle of alcohol in his office?
5         MR. CROTTY: Objection.
6         MS. ZUCKER: Objection.
7    A.  I'm not speculating on maybes.
8    Q.  So, again, it was your understanding that
9    the investigation was to investigate both Deirdre's
10   and Allan's allegations, correct?
11        MR. CROTTY: Objection.
12        MS. ZUCKER: Objection.
13   A.  I believe that Ms. Ryan was going to do an
14   investigation and give us a report.
15   Q.  Did you ever object to the Town's retention
16   of Regina or DHS as the investigator?
17   A.  Not to my knowledge.
18   Q.  Do you know if any of the other Selectmen
19   at the time objected to her retention?
20   A.  Not to my knowledge.
21   Q.  I'm going to show you another document.  Do
22   you see the document?
23   A.  I have a blank screen here.  Is it 46?
24   Q.  Yes.
```

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 125

1  is that it was because the camera doesn't run all
2  the time and stops and starts at different points
3  when motion enters into its thing.  Again, I stood
4  back from that and let it play out by itself.
5      Q.  If we could go back to the press release we
6  were looking at.
7      A.  Okay.
8      Q.  Do you see where it says -- the paragraph
9  that begins, "The Board has sought"?
10     A.  Am I in the right one here?
11     Q.  The press release.
12     A.  The press release?
13     Q.  Yes.
14     A.  Wait a minute now.  Which one do you want
15  me to look at now?
16     Q.  Do you see the paragraph that begins, "The
17  Board has sought"?
18     A.  And which document am I looking at?
19     Q.  The last one, No. 47.
20     A.  The Board's position?
21     Q.  Where it says, "The Board has sought."
22     A.  (Examines document)  Okay, I have it.
23     Q.  Do you see where it says, "there has been a
24  steady stream of information improperly disseminated

Page 126

1  during the investigation, much of which was false"?
2      A.  Yes.
3      Q.  Do you know what that is referring to?
4          MS. ZUCKER:  Objection.
5      A.  I don't know.  It could be a number of
6  things.  I imagine that the affidavit was one of them.
7      Q.  When you say "a number of things," do you
8  have other things in mind?
9          MR. CROTTY:  Objection.
10         MS. ZUCKER:  Objection.
11     A.  No.
12     Q.  Then you say, "The release of false and/or
13  misleading information has only served to hamper our
14  efforts to get this investigation done."  How did it
15  hamper the investigation?
16         MS. ZUCKER:  Objection.
17         MS. CIESLAK:  Objection.
18         MR. CROTTY:  Objection.
19     A.  Could you repeat the question.
20     Q.  It says, "The release of false and/or
21  misleading information has only served to hamper our
22  efforts to get this investigation done."  Do you
23  have any understanding of how the release of
24  information served to hamper the efforts to get the

Page 127

1  investigation done?
2          MS. ZUCKER:  Objection.
3          MR. CROTTY:  Objection.
4      A.  No.
5      Q.  You have no understanding?
6      A.  No.
7      Q.  I'm going to share my screen with you now.
8  I'm going to show you a video.  Can you see the
9  video on my screen at the moment?
10     A.  (Examines document)  I can.
11     Q.  The Board of Selectmen has regularly
12  scheduled board meetings, correct?
13     A.  Yes.
14     Q.  Those are broadcast on TV in Rockland?
15     A.  Yes, they are.
16     Q.  And a recording of those are made, correct?
17     A.  I believe so.
18     Q.  Then those recordings are -- it's a regular
19  practice to make those recordings available online
20  to the public?
21     A.  Yes.
22     Q.  Do you see here where it says, "June 19,
23  2018"?
24     A.  Yes, I can.

Page 128

1      Q.  I'm going to play this for you.  If you
2  have a problem hearing it, let me know, okay?
3      A.  Yes.
4          MR. SHAFRAN:  The court reporter can just
5  indicate that a video is being played.
6          MR. CROTTY:  Do you mind if we take a few
7  minutes first?
8          MR. SHAFRAN:  Sure.
9          (Recess at 2:17 p.m.)
10         BY MR. SHAFRAN: (2:23 p.m.)
11     Q.  Larry, again, can you see the video?
12     A.  I can.
13     Q.  I'm going to play a clip for you.  If you
14  can't hear it, please let me know.  Otherwise, you
15  can just listen.
16         (Video clip played)
17     Q.  Larry, did you know at the time
18  Mr. Kimball read that statement that he was going to
19  do that?
20         MS. DUNN:  Objection.
21     A.  I don't believe so, but I don't remember
22  specifically.
23     Q.  Is it your understanding that at this time,
24  Mr. Kimball wanted the investigation handed over to

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 133

1    Q.   And instead the board voted to have DHS do
2 the investigation, correct?
3       MS. DUNN: Objection.
4    A.   I don't know. I can't answer to that until
5 I see evidence of it.
6    Q.   Well, the board voted to have DHS conduct
7 an investigation, correct?
8    A.   I understand that, but was that prior to
9 this or after this? I can't remember the timeline.
10    Q.   Okay. That's fine. Let's keep listening.
11       (Video clip resumed)
12    Q.   So why, Larry, did you say to Mr. Kimball
13 that you don't support him?
14       MS. DUNN: Objection.
15    A.   His actions weren't consistent with what
16 happened.
17    Q.   What do you mean by that?
18    A.   Mr. Kimball was involved in the whole
19 problem. The rest of us were not. When he spoke
20 against us three trying to say that we're guilty of
21 something, I take objection.
22    Q.   I'm going to move forward a little bit here
23 so that we don't watch the entire thing.
24       (Video clip played)

Page 134

1    Q.   So you said that Mr. Kimball made mistakes
2 one right after another, correct?
3       MS. DUNN: Objection.
4       MS. ZUCKER: Objection.
5    Q.   Is that what you said?
6    A.   Yes.
7    Q.   Can you tell me, what are the mistakes that
8 you believe Mr. Kimball made?
9       MS. DUNN: Objection.
10       MS. ZUCKER: Objection.
11    A.   Mr. Kimball spoke one falsehood after another.
12    Q.   Can you give me some examples.
13    A.   Prior to this night, I mean, he told us he
14 was not involved, he didn't have an affair, he was
15 only emotionally involved. It turns out that he was
16 physically involved. And they were making decisions
17 for the two of them on the board, as far as I was
18 concerned. And you know something? The Town is
19 paramount.
20       (Video clip resumed)
21    Q.   What is the fatal mistake that you think
22 Mr. Kimball made?
23    A.   He lied to us.
24       (Video clip resumed)

Page 135

1    Q.   Do you believe the investigation was a sham?
2       MS. DUNN: Objection.
3       MR. CROTTY: Objection.
4    A.   No, I don't believe it was a sham.
5    Q.   Why not?
6    A.   Regina Ryan's investigation?
7    Q.   Yes.
8    A.   I have no reason to believe it was a sham.
9    Q.   Did Mr. Kimball ever tell you why he
10 believed it was a sham?
11    A.   Mr. Kimball and I didn't have any useful
12 conversation after this point. He never expressed
13 this to me.
14    Q.   I'm going to jump forward ahead a little
15 bit again here.
16       (Video clip played)
17    Q.   Did you hear the last part?
18    A.   Yes.
19    Q.   What did you mean when you said that the
20 town administrator would be taken care of?
21       MR. CROTTY: Objection.
22       MS. DUNN: Objection.
23    A.   At that time it was his problem, and his
24 involvement would be dealt with separately than what

Page 136

1 we were dealing with tonight, on this night.
2    Q.   And what is your understanding of what you
3 were dealing with that night?
4    A.   Ed Kimball had agreed to resign. At the
5 very last minute he hardened his heart and did not
6 resign, then came out into this meeting and
7 displayed all that we have witnessed here.
8       What more do you want me to say?
9    Q.   Nothing. Did you form a believe as to what
10 should happen to Mr. Chiocca's employment status
11 before the investigation ended?
12       MR. CROTTY: Objection.
13    A.   At some point after I became aware of --
14 when Mr. Kimball called, and Mr. Chiocca-- all he
15 wanted from the Town was, "How can I make this go
16 away?" He didn't say, you know, "Larry, can I call
17 you up and tell you what happened?" He didn't say
18 anything to the board as to anything about it. We
19 were left in the dark about the whole issue, and
20 when I said we were going to deal with him later,
21 his case would have to be heard.
22    Q.   I don't totally understand that. The
23 investigation began in early June of 2018. My
24 question is, did you form a belief as to what should

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 141

1  allegations against Ms. Hall, that that's one of the
2  reasons he should have resigned?
3      MR. CROTTY: Objection.
4      MS. ZUCKER: Objection.
5      **A. I'm just saying that Mr. Chiocca wasn't**
6  **truthful with the Board of Selectmen.**
7      Q. Because he didn't describe what happened
8  between him and Ms. Hall earlier?
9      MR. CROTTY: Objection.
10     **A. Right.**
11     Q. That's your testimony?
12     **A. That is.**
13     Q. And that's why you believe he should have
14  resigned?
15     MR. CROTTY: Objection.
16     **A. Yes.**
17     Q. Are there any other reasons that you
18  believe he should have resigned?
19     **A. Not that I can think of at this moment.**
20     Q. When was it that you came to this
21  determination that Mr. Chiocca should have resigned?
22     **A. I don't know the exact date, but it was**
23  **sometime during probably the first week after**
24  **finding out about the incident when all that**

Page 142

1  **Mr. Chiocca wanted to do was how to make it go away.**
2  **All I heard from anybody at Town Hall was they just**
3  **wanted it to go away, "How can we make it go away?"**
4  **There was no talk of anything else.**
5      Q. So you believe Mr. Chiocca should have
6  resigned before the investigation even started?
7      **A. Probably not, no.**
8      Q. Well, that's what you just said.
9      **A. Well, I did say that at the time, but you**
10  **know something?**
11     Q. You just said it right now.
12     MR. CROTTY: Objection. Don't argue with
13  him, please.
14     MR. SHAFRAN: I'm not arguing with him.
15  I'm just asking if that's what he said.
16     **A. Yes, I said it.**
17     Q. That's right. So as you sit here today, is
18  it your belief that Mr. Chiocca should have resigned
19  before the investigation started?
20     **A. Yes.**
21     Q. I'm going to show you another document.
22  Well, let me ask you this first. Do you believe a
23  man can be a victim of sexual assault?
24     MR. CROTTY: Objection.

Page 143

1      MS. ZUCKER: Objection.
2      **A. Yes.**
3      Q. You do. Do you believe a man can be a
4  victim of sexual harassment?
5      MR. CROTTY: Objection.
6      **A. Yes.**
7      Q. Other than Mr. Chiocca's allegations, have
8  you ever had another man tell you that he was a
9  victim of sexual assault or sexual harassment in
10  your lifetime?
11     MS. ZUCKER: Objection.
12     **A. Not that I can remember or recall.**
13     Q. Do you believe it's easier for a man to
14  reject unwanted sexual advances than it is for a
15  woman?
16     MR. CROTTY: Objection.
17     **A. I don't have an opinion.**
18     Q. You don't have an opinion on that?
19     **A. No.**
20     Q. No?
21     **A. No.**
22     Q. Do you believe it's easier for a male to
23  reject unwanted sexual advances from a supervisor at
24  work than it is for a woman?

Page 144

1      MR. CROTTY: Objection.
2      MS. ZUCKER: Objection.
3      **A. I have no knowledge of any supervisors at**
4  **work doing that. If you are talking about Ms. Hall**
5  **being a supervisor, she's one member of the Board of**
6  **Selectmen, which is a supervisory board.**
7      Q. I'm just talking about your personal beliefs.
8      **A. No.**
9      Q. Let me stop the Share Screen for a moment
10  here. Can you take a look at that document. It's
11  Document 53.
12     MR. SHAFRAN: We mark it, Ken, as Exhibit
13  No. 17.
14         (Document marked as Ryan
15         Exhibit 17 for identification)
16     Q. Do you see this article, Larry?
17     **A. Patriot Ledger article?**
18     Q. Yes. Do you see the date on the article
19  there on the first page?
20     **A. June 19th.**
21     Q. Of 2018, right?
22     **A. Yes. Well, what date are you talking**
23  **about? There's 11/14/19; is that what you are**
24  **talking about now?**

Larry J. Ryan - Vol. I
January 6, 2021

Contains Confidential Portions

Allan Chiocca vs.
The Town of Rockland, et al.

Page 149

1    aggressor.
2    Q.  It accuses or it finds?
3         MS. ZUCKER: Objection.
4         MR. CROTTY: Objection.
5    A.  It finds that she harassed Mr. Chiocca.
6    Q.  Did you come to this understanding when you
7    first read this document?
8         MS. ZUCKER: Objection.
9         MR. CROTTY: Objection.
10   A.  Well, to my understanding -- I read the
11   article, and I completed the article, and it speaks
12   for itself.
13        You know, I don't -- it was a one-sided
14   investigation.  I mean, I don't know.  I just -- I
15   don't know what to say about it, to be honest with you.
16   Q.  Do you possess any documents that would
17   contradict the finding in Paragraph 9?
18   A.  No.
19   Q.  Do you possess any information that would
20   contradict the finding in Paragraph 9?
21        MS. ZUCKER: Objection.
22        MS. CIESLAK: Objection.
23   A.  I would have to say no.
24   Q.  Did you ever tell anyone that you disagreed

Page 150

1    with that finding?
2         MR. CROTTY: Objection.
3    A.  I can't remember whether I did or not.
4    Q.  Do you disagree with that finding?
5    A.  I questioned the report's entirety due to
6    the one-sided nature of the exchange.
7         In my relationship with Mr. Chiocca, I have
8    never known Mr. Chiocca to be intimidated by anyone,
9    so I have a hard time equating the two.  It's
10   just -- that's it.
11   Q.  Is that your personal view?
12   A.  That's my personal view.  Mr. Chiocca has
13   never, ever shown that he's been intimidated or has
14   been intimidated by anyone.  You know, in the
15   opposite, he often used to tell me and others --
16   well, I can't testify to the others -- that he was a
17   puppet master and he pulled the strings on the Board
18   of Selectmen.
19   Q.  Did you conclude that Ms. Hall did not seek
20   sexual relations in exchange for her vote on his
21   contract extension and raise?
22        MS. CIESLAK: Objection.
23   A.  No.  I didn't say that.
24   Q.  You did not come to that conclusion?

Page 151

1         MR. CROTTY: Objection.
2    Q.  Correct?
3         MR. CROTTY: Objection.
4    A.  I thought I said no to that, didn't I?
5    Q.  You said Mr. Chiocca told you that he was a
6    "puppet master"?
7    A.  Yes.
8    Q.  Who was present for that conversation?
9    A.  I can't recollect.
10   Q.  Do you recall if there was anyone there
11   other than you?
12   A.  No, I can't recall whether there was anyone
13   else there but me.
14   Q.  Do you recall when he said it?
15   A.  More than once in private conversations we
16   had when I was in the office.
17   Q.  Do you recall what the context was?
18   A.  No.
19   Q.  You have no recollection of the context
20   that he said that?
21   A.  It had to do with a lot of different
22   aspects of what we were doing at Town.  He was
23   basically saying that he pulled the strings and he
24   ran the Town.  I didn't disagree with him.  I just

Page 152

1    listened to him.
2    Q.  Are you saying that based on those
3    statements, that you believed it wasn't possible for
4    Mr. Chiocca to be harassed by Ms. Hall?
5    A.  No, I am not.
6    Q.  You are not saying that?
7    A.  I'm not saying that -- it's not impossible.
8    Q.  Are you saying based on those statements,
9    that you don't believe this finding?
10   A.  No.  I'm saying that I have a hard time
11   understanding that it happened the way it happened
12   due to Mr. Chiocca's conversations with me prior to
13   this that he doesn't get intimidated.
14   Q.  You have a hard time understanding the
15   finding?
16   A.  I just don't dispute them.  I just don't --
17   I have a hard time understanding it.
18   Q.  Did you accept DHS's finding?
19        MR. CROTTY: Objection.
20   A.  The board voted to accept her report as
21   written.
22   Q.  Were you one of the individuals that voted
23   in favor of that?
24   A.  Yes.  I believe it was unanimous.

Allan Chiocca vs.
The Town of Rockland, et al.

Contains Confidential Portions

Larry J. Ryan - Vol. I
January 6, 2021

Page 169

1   Q.  Can you go to Page 37, please.
2   A.  (Examines document)
3   Q.  Are you there?
4   A.  I believe so.
5   Q.  Scrolling up a little bit, do you see
6   Mr. Clifford speaking at the bottom of Page 36?
7   A.  Yes.
8   Q.  He says, "But we're forced into this
9   situation.  And even if Ms. Hall had come forward a
10  day ago, two days ago, a week ago, there might have
11  been an opportunity to do something.  But we find
12  ourselves here because there's a public demand to
13  find out what happened on May 1st and May 2nd."
14      Do you agree with that, that there was a
15  public demand to find out what happened on May 1st
16  and May 2nd?
17      MR. CROTTY:  Objection.
18      MS. CIESLAK:  Objection.
19  A.  I'm not sure what I believed at that
20  particular time.
21  Q.  Why did the board meeting that night take
22  place at the high school?
23  A.  In order for the public to attend.
24  Q.  And where in the high school was it held?

Page 170

1   A.  In the auditorium.
2   Q.  Is there a reason why the high school
3   auditorium was chosen?
4   A.  Adequate seating for any who wished to attend.
5   Q.  Did the board expect a decent turnout from
6   the public that evening?
7   A.  Yes.
8   Q.  So do you believe there was a public demand
9   to find out what happened on May 1st and May 2nd?
10  A.  Yes.
11  Q.  Do you believe that the citizens of
12  Rockland had the right to know what happened on
13  May 1st and May 2nd?
14  A.  Yes.
15  Q.  Why do you believe that?
16  A.  Because we rely on the public trust.
17  Q.  So that's why you believe the citizens of
18  Rockland have the right to know?
19  A.  Yes.
20  Q.  Can you go to Page 48, please.  Let me know
21  when you are there.
22  A.  48?
23  Q.  That's correct.
24  A.  (Examines document)  I'm here.

Page 171

1   Q.  Do you see kind of in the middle there
2   where you speak?  It says, "Certainly would have."
3   A.  Wait a minute.  "Certainly would have,"
4   yes, I see it.
5   Q.  So you see that.  So a couple of sentences
6   down, you say, "The town wants to put this behind
7   them.  The town wants to bury this, get it over
8   with.  Everybody who is involved, fess up and go, I
9   guess.  It's up to them."
10      Who were you referring to when you say,
11  "Everybody who is involved, fess up and go"?
12  A.  Mr. Chiocca, Ed Kimball, and Deirdre.
13  Q.  Why did you believe Ed Kimball should
14  resign at that time?
15  A.  He didn't tell us the truth.
16  Q.  Why did you believe Deirdre should resign
17  at that time?
18  A.  She never told the board the truth either.
19  Q.  What do you believe Deirdre did not tell
20  the Board the truth about?
21  A.  The incident itself.
22  Q.  What do you mean more specifically by that?
23  A.  She had on May 1st, or whatever date, she
24  went to Mr. Kimball to express her disappointment,

Page 172

1   to state her claims, or whatever.  I mean, she's a
2   lawyer, and I thought she should have an
3   understanding of how to take care of legal business.
4   Q.  So this executive session and board meeting
5   was the night that the board released the results of
6   the investigation in summary form.  Is it fair to
7   say that you had an opportunity to read the report
8   we looked at earlier before it was released in
9   summary form to the public?
10  A.  Yes.
11  Q.  You testified earlier that you believe
12  Mr. Chiocca should have resigned before the
13  investigation started, correct?
14  A.  Yes.
15  Q.  And so after receiving and reviewing the
16  report, you continued to hold that belief?
17  A.  Yes.
18  Q.  Why did you continue to hold that belief
19  after having the opportunity to review the report?
20  A.  There was more than just the sexual contact
21  that happened on that particular night.  There was
22  drinking, the opening of wine.  Whether or not they
23  drank it or not, I don't know, but an open bottle.
24  And they spilled it on the floor.  You know, if it



RYAN EXHIBIT

**6**

KAD 1/6/21 CHIOCCA V. THE TOWN OF ROCKLAND, ET



## TOWN OF ROCKLAND

**Board of Selectmen**
Town Hall
242 Union Street
Rockland, Massachusetts 02370

*Chairman:*
Edward F. Kimball
*Vice Chairman:*
Michael P. Mullen, Jr.

*Selectmen:*
Larry J. Ryan
Deirdre Hall
Michael P. O'Loughlin

*Town Administrator:*
Allan R. Chiocca

*Executive Assistant:*
Susan M. Ide

Telephone:   781-871-1874
Fax:            781-871-0386

# BOS Executive Session Minutes of March 20, 2018

### SELECTMEN'S MEETING
### Tuesday, March 20, 2018 @ 7 p.m.

## H. BERNARD MONAHAN MEMORIAL ROOM
## TOWN HALL, 242 UNION STREET
## ROCKLAND, MASSACHUSETTS

**31. EXECUTIVE SESSION** for: Contract Negotiations with Town Administrator

> ~MOTION to go into Executive Session for contract negotiations with the Town Administrator not to reconvene by Mr. Mullen, 2ⁿᵈ by Mr. O'Loughlin, passed by Roll Call Vote 5-0.

**The Chairman called the Session to order.**

**Town Administrator Chiocca indicated an interest in negotiating a new 3-year contract. He discussed some of the projects which have been completed during his tenure and some of the ongoing projects still in process. He outlined salaries of the area Managers and Administrators and asked the BOS to consider his request.**

TOWNS RESP TO RPDS 014541

Board members discussed a general openness to considering the contract extension request made by Mr. Chiocca, and discussed their particular views in terms of comparable salaries of town administrators in surrounding South Shore communities. Members of the Board also discussed the importance of re-establishing goals for the Town Administrator as part of Mr. Chiocca's extension request.

There was a discussion of various goals important to individual members of the Board of Selectmen. Mr. Kimball asked that members be ready to discuss specific goals at the next meeting.

MOTION made by Mr. O'Loughlin, 2nd by Mr. Mullen, and approved to recess the meeting and to reconvene at an upcoming date to be determined by Chairman Kimball.

The Board recessed its meeting at 9:55 p.m.


Allan R. Chiocca
Town Administrator

Michael P. Mullen, Vice-Chairman
for the Rockland Board of Selectman


The listings of matters are those reasonably anticipated by the Chair which may be discussed at the meeting. Not all items listed may in fact be discussed and other items not listed may also be brought up for discussion to the extent permitted by law.

TOWNS RESP TO RPDS 014542



RYAN EXHIBIT

**9**

KAD 1/8/21 CHIOCCA V. THE TOWN OF ROCKLAND, ET

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALLAN CHIOCCA,
     Plaintiff,

VS.

TOWN OF ROCKLAND, DEIRDRE
HALL, EDWARD KIMBALL, LARRY
RYAN, MICHAEL MULLEN, JR.,
MICHAEL O'LOUGHLILN, RICHARD
PENNY and KARA NYMAN,
     Defendants

C.A. NO. 1:19-cv-10482-WGY

**DEFENDANTS, TOWN OF ROCKLAND, LARRY RYAN, MICHAEL MULLEN, JR.,
MICHAEL O'LOUGHLIN, RICHARD PENNEY AND KARA NYMAN'S
SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

The Defendants, Town of Rockland and Selectmen Larry Ryan, Michael Mullen, Jr.,

Michael O'Loughlin, Richard Penny and Kara Nyman, hereby respond to the Plaintiff's First Set

of Interrogatories as follows:

**GENERAL OBJECTIONS**

The Defendants object to the Plaintiff's First Set of Interrogatories to the extent that they
include the following:

1.     Materials prepared in anticipation of litigation or for trial by or for the Defendants;

2.     Materials containing mental impressions of the Defendants and their
representatives, including their attorneys;

3.     Materials protected by the attorney-client privilege; and

4.     Materials protected by Rule 26(b)(4) of the Federal Rules of Civil Procedure.

The Defendants also object to the Plaintiff's First Set of Interrogatories to the extent that
they are over broad, unduly burdensome, vague, irrelevant, and not calculated to lead to the
discovery of admissible evidence. The Defendants also object to the extent that said Interrogatories
seek the discovery of information out of proportion to the needs of this case and impose obligations
beyond the obligations imposed by the Federal Rules of Civil Procedure and relevant case law.
The individual Defendants also object on the grounds that their decisions and votes, and the

grounds and rationale therefor, are immaterial and inadmissible in this matter. Without waiving these or any additional objections, the Defendants respond to Plaintiff's First Set of Interrogatories as follows:

## INTERROGATORIES

### Interrogatory No. 1

Identify all persons who the Town Defendants intend to call as a witness at the trial of this action and describe their expected testimony.

### Answer No. 1

The Town Defendants have not yet made a determination as to whom they expect to call as witnesses at the trial of this matter.

### Interrogatory No. 2

Identify any social media platform (i.e. Facebook, Twitter, Instagram, etc.) the Town utilized during the period of January 1, 2018 to the present, and specifically identify the name of any Facebook page administered by the Town or other social media user name or handle administered by the Town.

### Answer No. 2

The Town of Rockland created a "Town of Rockland, MA" Facebook page, but the account had not been used. On December 3, 2019 the Town began using its Facebook page.

The Town created a Twitter account on August 29, 2019: @rocklandtown.

### Interrogatory No. 3

Identify any modes of communication (and the number, address, user name and/or handle associated therewith) used by the individual Town Defendants (i.e. all Town Defendants other than the Town itself), including home landline phones, cellular phones, electronic mail accounts, direct messaging applications (i.e. WhatsApp, Confide, etc.), and social media platforms (i.e. Facebook, Twitter, Instagram, etc.) during the time period of January 1, 2018 to the present, including but not limited to any modes of communications used in a personal capacity, work capacity or in the capacity as a member of the Town Board of Selectmen.

### Answer No. 3

The Town Defendants object to this Interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, seeks the discovery of information out of proportion to the needs of this case, and because it is invasive of the privacy of the individual defendants. Without waiving the foregoing, the Town Defendants state:

Larry Ryan-              Facebook "Larry Ryan"
                         zone859@verizon.net
                         lryan@rockland-ma.gov

Michael O'Loughlin- Facebook- "Mike O'Loughlin" and "Selectman Mike O'Loughlin"
                         moloughlin@rockland-ma.gov
                         mikeoselectman@gmail.com

Michael Mullen          Facebook- "MPMullen" & "Michael Mullen, JR. Rockland Selectman"
                         Twitter- @mpmullenjr
                         mmullen@rockland-ma.gov
                         mpmullen@gmail.com
                         mmullen02370@gmail.com

Kara Nyman-             Facebook- "Committee to elect Kara Nyman"
                         Twitter- @karanyman
                         Instagram- "Kara Nyman" & "Vote_Nyman"
                         knyman@rockland-ma.gov
                         karalnyman@gmail.com

Richard Penney-         Facebook- "Richard Penney"
                         rpenny@rockland-ma.gov

## Supplemental Answer to Interrogatory No. 3

The Town Board of Selectmen members use the following cellular telephone numbers:

Larry Ryan- (617) 827-9076

Michael O'Loughlin- (617) 529-4912

Michael Mullen- (781) 724-9043

Kara Nyman- (781) 974-4464

Richard Penney- (508) 726-2257

## Interrogatory No. 4

Describe any Communication(s) that each individual Town Defendant had from January 1, 2018 to the present, with each other, with the Plaintiff, or with any other party concerning the allegations in the Complaint. For the avoidance of doubt, each Town Defendant is to identify all Communication(s) concerning:

1) a raise and/or extension of the Plaintiffs contract;
2) the Incident;
3) the Investigation;
4) the Ryan Report; and
5) the Supplemental Report, including in your answer your best recollection as to when any such communication(s) took place (specifying the date and time of any such conversation to the greatest extent possible), who was present for the communication(s), and what was said and by whom. This interrogatory is intended to include any verbal or written communication(s).

### Answer No. 4

The Town Defendants object to this Interrogatory as overbroad and unduly burdensome. The Town Defendants further object on the grounds that this Interrogatory seeks the discovery of information out of proportion to the needs of this case. Without waiving the foregoing, the Town Defendants state that Mr. Ryan, Mr. Mullen and Mr. O'Loughlin were members of the Rockland Board of Selectmen when the incident which gives rise to Plaintiff's Complaint occurred. As such, they had several discussions about the Plaintiff's employment contract, the incident, the investigation and the Ryan reports at posted meetings of the Board of Selectmen. Mr. Penny and Ms. Nyman were elected to the Rockland Board of Selectmen on November 6, 2018. Therefore, their communications about the aforementioned topics was less involved. The individual defendants communicated both orally with each other at posted meetings of the Board of Selectmen, and in writing with counsel and with staff, but cannot recall the dates of the communications at issue. Please refer to the e-mail communications produced in response to the Plaintiff's document production requests.

### Interrogatory No. 5

Describe in detail any misconduct or violations of any Town policies that any Town Defendants contend the Plaintiff committed and/or engaged in, from January 1, 2018 to the present (related to his position with the Town), identifying in Your answer which Town Defendants contend the Plaintiff committed and/or engaged in misconduct or violation of Town policies, when the Plaintiff engaged in such misconduct or committed such a violation (specifying the date and time of such misconduct or violation to the greatest extent possible), and how any of the Town Defendants identified specifically learned of such misconduct or violation. The term "misconduct" in this interrogatory is intended to mean whatever each Town Defendant subjectively believes constitutes misconduct related to the Plaintiffs position with the Town.

### Answer No. 5

Mr. Chiocca consumed and/or served alcohol in Rockland Town Hall, after hours, on the night of the incident with Ms. Hall. Mr. Chiocca entered Town Hall after having consumed several alcoholic beverages at a bar. Mr. Chiocca had previously been arrested on an operating under the influence charge after leaving the Town Christmas party in 2011. The individual defendants

learned about the incident at various points after the evening of May 1, 2018-morning of May 2, 2018. Furthermore, depending upon what actually transpired between Mr. Chiocca and Ms. Hall on the night of the incident, which will be the subject of discovery in this litigation, other potential misconduct and/or violations of Town policies may have occurred.

## Interrogatory No. 6

Describe in detail any misconduct or violations of any Town policies that any Town Defendants contend that Deirdre Hall committed and/or engaged in, from January 1, 2018 to the present (related to her position with the Town), identifying in Your answer which Town Defendants contend Deirdre Hall committed and/or engaged in misconduct or violation of Town policies, when Deirdre Hall engaged in such misconduct or committed such a violation (specifying the date and time of such misconduct or violation to the greatest extent possible), and how any of the Town Defendants identified specifically learned of such misconduct or violation. The term "misconduct" in this interrogatory is intended to mean whatever each Town Defendant subjectively believes constitutes misconduct related to Deirdre Hall's position with the, Town.

## Answer No. 6

Ms. Hall and Mr. Kimball had an extramarital affair while serving on the Rockland Board of Selectmen and kept that relationship secret from other members of the Board. The individual defendants learned about the relationship at various points after the evening of May 1, 2018-morning of May 2, 2018. Furthermore, Ms. Hall may have consumed alcohol at Town Hall on the evening of May 1-morning of May 2, 2018.

Furthermore, depending upon what actually transpired between Mr. Chiocca and Ms. Hall on the night of the incident, which will be the subject of discovery in this litigation, other potential misconduct and/or violations of Town policies may have occurred.

## Interrogatory No. 7

Describe in detail any misconduct or violations of any Town policies that any Town Defendants contend that Edward Kimball committed and/or engaged in, from January 1, 2018 to the present (related to his position with the Town), identifying in Your answer which Town Defendant(s) contend Edward Kimball committed and/or engaged in misconduct or violation of Town policies, when Edward Kimball engaged in such misconduct or committed such a violation (specifying the date and time of such misconduct or violation to the greatest extent possible), and how any of the Town Defendants identified specifically learned of such misconduct or violation. The term "misconduct" in this interrogatory is intended to mean whatever each Town Defendant subjectively believes constitutes misconduct related to Edward Kimball's position with the Town.

## Answer No. 7

Ms. Hall and Mr. Kimball had an extramarital affair while serving on the Rockland Board of

Selectmen and kept that relationship secret from other members of the Board. The individual defendants learned about the relationship at various points after the evening of May 1, 2018- morning of May 2, 2018.  Mr. Kimball also intentionally misled fellow members of the Board of Selectmen regarding his relationship with Ms. Hall, including during the early stages of the investigation into the incident that occurred on the evening of May 1, 2018- morning of May 2, 2018. His participation in the investigation was improper because of his relationship with Ms. Hall. Otherwise, discovery is ongoing.

### Interrogatory No. 8

On June 15, 2018, Town counsel John Clifford "at the behest of the Board of Selectmen" issued the press release attached hereto as Exhibit A. In the press release Attorney Clifford made the following statements:

> 1) "[T]here has been a steady stream of information improperly disseminated during the investigation, much of which was false";
> 2)   The release of false and/or misleading information has only served to hamper our efforts to get this investigation done";
> 3) "Much of the information contained in that filing was misleading, based on conjecture, or just false"; and
> 4) "It was my intention to appear in Brockton Superior Court this afternoon and make it clear that the facts and legal conclusions contained in that filing were not only wrong but obtained in an improper manner."
> Describe in detail:

> a.  The information that was improperly disseminated during the investigation, who disseminated it, and what information was false;
> b.  How the release of false and/or misleading information served to hamper the Town's efforts to "get th[e] investigation done";
> c.  What information contained in the filing referred to in the press  release was misleading, based on conjecture, or just false; and
> d.  Which facts and legal conclusions contained in the filing (referred to in the press release) were wrong, and how were facts in the filing obtained in an improper manner.

### Answer No. 8

a.  Mr. Kimball provided a sworn affidavit in a complaint filed by Ms. Hall to suppress release of the video recordings from the evening of May 1, 2018- morning of May 2, 2018. That affidavit contains false statements about the video having "critical missing segments..." At all relevant dates prior to the release of this document, Mr. Kimball had full access to confidential information relating to the investigation and legal strategy relating to the events of the evening of May 1, 2018- morning of May 2, 2018. The complaint contained

false statements regarding the Massachusetts Public Records Laws, and whether the video files had been tampered with. Otherwise, discovery is ongoing.

b. The information contained in the sworn affidavit and accompanying suit forced the Town to defend against the allegations and address specific allegations publicly. Mr. Kimball was privy to information relating to legal strategy and the investigation itself, in his capacity as Chairman of the Board of Selectmen. Mr. Kimball's undisclosed collaboration with Ms. Hall, a subject of the investigation, presented a threat to the integrity of the investigation and compromised confidential discussions of the Board regarding legal strategy. Otherwise, discovery is ongoing.

c. The false information is described in paragraph (a) above. The misleading statements or statements based on conjecture include a statement in the affidavit attributing specific comments to Ms. Hall in the video, even though there is no audio on these recordings. The Town also objected on the basis it was inappropriate for counsel for Ms. Hall to have spoken directly with Mr. Kimball when he was represented by counsel for the Town. Otherwise, discovery is ongoing.

## Supplemental Answer to Interrogatory No. 8

d. See answers to sections a-c, above.

## Interrogatory No. 9

During executive session at the July 17, 2018 Board of Selectmen meeting, Attorney John Clifford stated in relevant part: "Based on the report, I think that the town potentially has serious exposure already." *See* transcript attached hereto as Exhibit B at p. 8. State in detail all facts that support the statement, "I think the town potentially has serious exposure already."

## Answer No. 9

The DHS report concluded that Ms. Hall had violated the Town's Sexual Harassment Policy in her interactions with Mr. Chiocca in May, 2018. The DHS report further included discussion of inappropriate conduct by Mr. Kimball during the investigation. Finally, there remained a possibility that Mr. Chiocca could be found to have engaged in inappropriate behavior with Ms. Hall during that same period. None of the three (3) individuals named in the DHS Report were acting in their official capacity with respect to their alleged misconduct, however, Ms. Hall and Mr. Kimball were members of the Board of Selectmen, and Mr. Chiocca was the Town Administrator at that time. Given their official positions with the Town, their alleged misconduct could result in significant exposure if the matter(s) were litigated. Otherwise, discovery is ongoing.

## Interrogatory No. 10

State in detail all facts that support the Town Defendants' denial of paragraph 252 of Plaintiffs complaint, and specifically identify each Town Defendant who disputes any portion of the Ryan Report and state the specific reason for each portion of the Ryan Report disputed by each Town Defendant.

### Answer No. 10

The Town Defendants deny that voting to accept Attorney Ryan's Report is tantamount to failing to dispute or contest her findings, conclusions and recommendations.  As set forth in her Report, Attorney Ryan was constrained to reach the conclusions she did.  This was not a case of "he said/she said."  More accurately, it was case of "he said/she can't remember."  Upon information and belief, Ms. Hall now disputes Mr. Chiocca's version of events.  Nonetheless, the Town Defendants are unpersuaded that Mr. Chiocca was, indeed, a victim.  More likely, Mr. Chiocca and Ms. Hall – both of whom were drinking – returned to Town Hall late that night, then engaged in inappropriate, but consensual, sexual behavior. That opinion is supported by Town Hall video recordings from the evening of May 1, 2018-morning of May 2, 2018.

### Interrogatory No. 11

Identify each Town Defendant who disputes any portion of the Supplemental Report and state the specific reason for each portion of the Supplemental Report disputed by each Town Defendant.

### Answer No. 11

Please see answer to Interrogatory number 10, above.

### Interrogatory No. 12

Describe in detail the basis for the Town's decisions to renew the Plaintiff's contract each time it did so over the course of the Plaintiff's employment with the Town.

### Answer No. 12

In response to requests to negotiate from Mr. Chiocca, his contract had been renewed during his tenure because he was meeting minimum performance standards and was working for what the Town felt was a fair rate of compensation. Contract renewals were negotiated during posted executive session meetings of the Board of Selectmen, in response to specific proposals being presented to the entire Board by Mr. Chiocca.

### Interrogatory No. 13

If any of the Town Defendants contend that Mr. Chiocca was drunk on the evening of May 1, 2018/early morning of May 2, 2018, state which Town Defendants so contend, and identify the specific sentences in the Ryan Report, Supplemental Report, or any materials other than the Ryan Report or Supplemental Report that supports the contention of any of the Town Defendants identified.

### Answer No. 13

Mr. Chiocca had consumed alcohol on the night of the incident at Rockland Bar and Grill and

possibly at Town Hall.  Whether he was "drunk" or otherwise under the influence of alcohol is unknown at present.  Discovery is ongoing.

## Supplemental Answer to Interrogatory No. 13

The Town defendants have no personal knowledge of whether or not Mr. Chiocca was "drunk" or otherwise under the influence of alcohol.  Discovery is ongoing.

## Interrogatory No. 14

State the basis for the Town Defendants' denial of paragraph 279 of Plaintiff's complaint, and specifically state in Your answer any lie that any Town Defendants contend Mr. Chiocca told any individual about any of the events that occurred between him and Mrs. Hall on the evening of May 1- morning of May 2, 2018, including but not limited to Attorney Ryan.

## Answer No. 14

Mr. Chiocca lied to Michael O'Loughlin about his knowledge of the Hall-Kimball affair, which was disclosed to Mr. Chiocca on the night of the incident.  Furthermore, whether Mr. Chiocca lied about what transpired between himself and Ms. Hall on the evening in question remains to be determined, as both parties are telling drastically different versions of what occurred.  Discovery is ongoing.

## Interrogatory No. 15

Attached hereto as Exhibit C is a copy of the Rockland Board of Selectmen open session minutes for November 20, 2018. The minutes contain a statement read by Larry Ryan which states in relevant part: "Since this controversy is likely to take months or years to litigate, we would very likely have been required to pay the remaining balance of Mr. Chiocca's contract, which ends on June 30, 2019." State the basis and describe all facts that support the statement that the Town "would very likely have been required to pay the remaining balance of Mr. Chiocca's contract . . . "

## Answer No. 15

Mr. Ryan made the attributed statement.  He was attempting to express his belief that neither termination proceedings initiated by the Board of Selectmen against Mr. Chiocca nor the instant litigation would be resolved prior to the expiration of Mr. Chiocca's employment contract. The Board had also been informed that the Town's insurance policy would not cover wages due under the employment contract.

## Interrogatory No. 16

State the basis for the Town's decision to place the Plaintiff on administrative leave through June 30, 2019, and to not renew the Plaintiffs employment contract, and specifically state when the decision was made, who made the decision, and all facts upon which the decision was

based.

## Answer No. 16

Mr. Chiocca was placed on paid administrative leave so that the Town could investigate the events which occurred on the evening of May 1, 2018- morning of May 2, 2018. That is standard practice for employees accused of serious misconduct.

Mr. Chiocca's employment contract was not renewed because, in the opinion of a majority of the Board of Selectmen, it was not in the best interests of the Town of Rockland to do so. Mr. Chiocca had informally discussed a $30,000 pay raise with some members of the Board, but had never presented a formal proposal for a contract extension. In late April and early May, 2018, prior to learning about the events of May 1-2, a majority of the Board individually expressed ambivalence about even considering an extension of his contract. Furthermore, Mr. Chiocca had shown poor decision-making and poor judgment and a lack of trust between the parties had developed.

The decision to place the Plaintiff on paid administrative leave and not renew his employment contract was made by the Board of Selectmen on May 29, 2018. The Town Defendants do not recall the exact date of the decision not to renew his employment agreement.

## Interrogatory No. 17

Describe the manner in which the Town provided Plaintiff with notice and/or opportunity to rebut any allegations against him of misconduct or allegations of violating Town policies, including in your answer, the date and time of any such notice to Plaintiff, the manner in which any such notice was provided to Plaintiff, the date and time of any such opportunity for Plaintiff to be heard, and any documents concerning or evidencing the notice, opportunity, or the timing thereof.

## Answer No. 17

Mr. Chiocca was invited to attend  the May 29, 2018, July 10, 2018 and July 17, 2018 Board of Selectmen meetings to discuss what had occurred on the evening of May 1, 2018- morning of May 2, 2018 and he declined to do so.  Notice of these meetings was sent by email to counsel for Mr. Chiocca.

## Interrogatory No. 18

Describe any allegations of misconduct or inappropriate behavior, whether formal or informal, that the Town Defendants received from any individual regarding Dierdre Hall, Edward Kimball, Larry Ryan, Michael Mullen Jr., Michael O'Loughlin, Richard Penney, or Kara Nyman, including:

<ol type="a">
<li>the date and manner in which the complaint was received;</li>
<li>the action taken by the Town as a result of said complaint; and</li>
</ol>

c.  a general description of the facts relevant to the complaint, including the date and nature of the incident, and the persons involved.

## Answer No. 18

The Town Defendants are not aware of any such allegations, other than the conduct of Ms. Hall and Mr. Kimball described in answers to Interrogatories number 6 & 7, above.

## Interrogatory No. 19

During executive session at the July 17, 2018 Board of Selectmen meeting, L. Ryan stated in relevant part: [Q]uite frankly, if it had been handled properly in the beginning, we wouldn't be sitting here right now so, why are we even meeting then until we get the fourth person? And then we'll fire him." *See* transcript attached hereto as Exhibit B at p.6.

As to the foregoing statement, state: 1) what L. Ryan believed was not "handled properly in the beginning" and all facts supporting his belief; 2) whether, as of the July 17, 2018 Board of Selectmen meeting, L. Ryan, Mullen, and O'Loughlin were in favor of, or not in favor of, terminating the Plaintiffs employment; and 3) after Richard Penney and Kara Nyman were elected to the Board, whether L. Ryan, Mullen and O'Loughlin were in favor of, or not in favor of, terminating the Plaintiffs employment and state the reason for their position.

## Answer No. 19

1) Mr. Ryan believed that, if Mr. Kimball suspected Mr. Chiocca had acted improperly towards Ms. Hall, he should have disclosed such suspicions to the entire Board of Selectmen and immediately recused himself because of his personal relationship with Ms. Hall.

2) Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin had made no such determinations at the July 17, 2018 Board of Selectmen meeting.

3) After Ms. Nyman and Mr. Penney were elected, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin decided not to renew Mr. Chiocca's employment contract. Furthermore, please see answer to Interrogatory number 16, above.

## Interrogatory No. 20

State why L. Ryan called for Kimball to resign at the June 19, 2018 Board of Selectmen meeting and specifically state all reasons why L. Ryan felt Kimball should have resigned.

## Answer No. 20

In Mr. Ryan's opinion, Mr. Kimball exercised poor judgment in having an undisclosed extramarital affair with another member of the Board of Selectmen (Ms. Hall) and had been untruthful about same. He also violated the Open Meeting Law at the June 19, 2018 meeting by

discussing matters not on the posted agenda.

**Interrogatory No. 21**

During Executive Session at the July 17, 2018 Board of Selectmen meeting, L. Ryan stated in relevant part:

> You can mediate, can't you? Here's the deal we're offering you. Take this or the next time, as soon as you have four people, it's AMF.

*See* Exhibit B at p. 13.

As to the foregoing statement, state what L. Ryan meant by the letters AMF and what L. Ryan meant by the entire statement, "[T]ake this or the next time, as soon as you have four people, it's AMF."

**Answer No. 21**

Mr. Ryan does not, at present, recall the statement contained in the Minutes or what he may have meant by it. As used by Mr. Ryan, "AMF" stands for "Adios my friend."

**Interrogatory No. 22**

State whether, as of November 8, 2018, L. Ryan believed the Plaintiff was a former employee of the Town, and if L. Ryan believes the Plaintiff was a former employee at that time, state all facts that supported his belief.

**Answer No. 22**

Mr. Ryan did not believe that Mr. Chiocca was a former employee of the Town of Rockland as of November 8, 2018.

**Interrogatory No. 23**

State whether, on July 18, 2018, O'Loughlin wrote the following statement on Facebook:

"One party retained a lawyer almost immediately. He then advised the other to seek counsel. He did his job. It's important to keep in mind that this was caused by 3 parties that weren't being truthful from the start."

If the answer is yes and O'Loughlin acknowledges he wrote the foregoing statement, identify the "three parties" his statement was referring to, and state what each of the parties were not truthful about from the start, specifically stating in the answer any lie or false statement that O'Loughlin contends was made by any of the three parties he identifies.

**Answer No. 23**

Mr. O'Loughlin acknowledges he wrote the quoted statement on Facebook.  The three people to whom he was refereeing are Mr. Chiocca, Mrs. Hall and Mr. Kimball.  Mrs. Hall and Mr. Kimball had an extramarital affair and lied about it.  Mr. Chiocca knew about the Hall- Kimball affair and lied to Mr. O'Loughlin about it.

**Interrogatory No. 24**

Identify to the best of Penney's and Nyman's recollection, what written materials, including but not limited to the Ryan Report, Supplemental Report, news stories, email correspondence, and text messages concerning the Incident, that they read prior to their election to the Board of Selectmen, including in their answer a general summary of the contents of the written materials they read.

**Answer No. 24**

To the best of Ms. Nyman and Mr. Penny's recollections, they reviewed the Ryan report and various news articles about the matter which gave rise to this litigation prior to their election to the Board of Selectmen. Ms. Nyman and Mr. Penny do not recall specifically which publications they read and, therefore, cannot summarize same. As to the Ryan report, it is a written document which speaks to itself.

**Interrogatory No. 25**

Identify to the best of Penney's and Nyman's recollection, what written materials, including but not limited to the Ryan Report, Supplemental Report, news stories, email correspondence, and text messages concerning the Incident that they read after their election to the Board of Selectmen, including in their answer a general summary of the contents of the written materials they read.

**Answer No. 25**

To the best of Ms. Nyman and Mr. Penny's recollections, they reviewed the supplemental Ryan report and various news articles about the matter which gave rise to this litigation after their election to the Board of Selectmen. Ms. Nyman and Mr. Penny do not recall specifically which publications they read and, therefore, cannot summarize same.  As to the supplemental Ryan report, it is a written document which speaks to itself.

The undersigned deposes and says that he is the Town Administrator of the Town of Rockland, named defendant in the above-captioned action, and that he signs the answers to the interrogatories for and on behalf of the Town of Rockland and is authorized to do so; that the matters stated in the foregoing answers are not all within his personal knowledge and that he is informed that there is no officer or employee of said Town of Rockland who has personal knowledge of all such matters; that such facts are as stated in said answers which are not within the personal knowledge of the deponent have been assembled by authorized agents, employees and counsel of said defendant; and the deponent is informed and believes that the facts stated in said answers are true and so states under the pains and penalties of perjury.

_____
Town of Rockland

Signed under the pains and penalties of perjury on this 7th day of February, 2020.

Kara Nyman
_____
Kara Nyman

Signed under the pains and penalties of perjury on this _10_ day of February, 2020.

Larry Ryan

Signed under the pains and penalties of perjury on this /// day of February, 2020.

Richard Penney

Signed under the pains and penalties of perjury on this $\underline{10}^{th}$ day of February, 2020.

Michael Mullen Jr.

Signed under the pains and penalties of perjury on this _10th_ day of February, 2020.

Michael O'Loughlin

AS TO OBJECTIONS:

Defendants,
TOWN OF ROCKLAND, LARRY RYAN,
MICHAEL MULLEN, JR., MICHAEL O'LOUGHLIN, RICHARD PENNEY
AND KARA NYMAN,

PIERCE DAVIS & PERRITANO LLP

John J. Davis, BBO #115890
Jason W. Crotty, BBO #656313
10 Post Office Square, Suite 1100N
Boston, MA 02109
(617) 350-0950
jdavis@piercedavis.com
jcrotty@piercedavis.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21 day of February 2020, I served the foregoing by first-class mail, postage prepaid, upon the following attorney of record.

Adam J. Shafran, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109

Ellen J. Zucker, Esq.
Neerja Sharma, Esq.
Burns & Levinson LLP
125 High Street
Boston, MA  02110

Cindy Cieslak, Esq.
Rose Kallor, LLP
750 Main Street – Suite 11008-3
Hartford, CT 06117

Howard M. Cooper, Esq.
Todd & Weld
One Federal Street, 27th Floor
Boston, MA  02110

Cheryl A. Hazeltine, Esq.
Marshall Halem
27 Mica Lane, Suite 102
Wellesley, MA  02481

Jason W. Crotty

 

## Fwd: Liaisons

**Ed Kimball** <efkmag@aol.com>                                                    Tue, May 15, 2018 at 4:12 PM
To: Deirdre Hall <deirdrejhall03@gmail.com>, mpmullen@gmail.com, mikeoselectman@gmail.com, Larry Ryan
<zone859@verizon.net>
Cc: Allan Chiocca <achiocca@rockland-ma.gov>, John@cliffordkennylaw.com

Good afternoon fellow board members,  please see attached new liaison assignments

Sent from my iPad

Begin forwarded message:

> **From:** Boston Builders <bostonbuild@aol.com>
> **Date:** May 15, 2018 at 7:52:02 AM EDT
> **To:** EFKMAG@aol.com
> **Subject: Liaisons**
>
> See attached.
>
>
>
> *Edward Kimball, President*
> *Boston Builders, Inc.*
> *8 Magnolia Drive*
> *Rockland, MA  02370*
> *781-681-3573 / 781-681-3573 (fax)*
> *bostonbuild@aol.com*

 **Liaisons_20180515080311.pdf**
30K

**Larry Ryan** <zone859@verizon.net>                                          Wed, May 16, 2018 at 12:42 PM
To: Ed Kimball <efkmag@aol.com>, Deirdre Hall <deirdrejhall03@gmail.com>, mpmullen@gmail.com,
mikeoselectman@gmail.com
Cc: Allan Chiocca <achiocca@rockland-ma.gov>, John@cliffordkennylaw.com

I for one did not feel like I was a member of any board when I walked out of that meeting last night. Because
WE as a board never discussed voting for what Deirdre presented, nor was there any info in my book about it.
Speaking only for myself, the chairman of the School Committee then bad mouthed me as one who doesn't

D-HALL 00003232

want to help. WE are a 5 member board and I am not going to stand by and watch one person "take over". If I am not needed, please feel free to let me know and I can step out of the way.

**From:** Ed Kimball [mailto:efkmag@aol.com]
**Sent:** Tuesday, May 15, 2018 4:12 PM
**To:** Deirdre Hall; mpmullen@gmail.com; mikeoselectman@gmail.com; Larry Ryan
**Cc:** Allan Chiocca; John@cliffordkennylaw.com
**Subject:** Fwd: Liaisons

[Quoted text hidden]

Larry Ryan <zone859@verizon.net>                                              Thu, May 17, 2018 at 11:03 AM
To: Ed Kimball <efkmag@aol.com>, Deirdre Hall <deirdrejhall03@gmail.com>, mpmullen@gmail.com,
mikeoselectman@gmail.com
Cc: Allan Chiocca <achiocca@rockland-ma.gov>, John@cliffordkennylaw.com

It comes to my attention that the vice-chair is making her own deals with the school committee promising votes on items not discussed in our board. There were an awful lot of OML violations also. Ms Hall should be speaking with our board before speaking in OUR name to another board. Maybe we should revisit the VC and liaison positions at our next meeting. We the BOS make the decisions not one member. The school committee chair was told that I was against this so called "living document". How was I supposed to be against something I knew nothing about! Ms Hall yells when she has no back up data but doesn't supply any when she is in charge. This was a board dividing move and we should correct it.

**From:** Larry Ryan [mailto:zone859@verizon.net]
**Sent:** Wednesday, May 16, 2018 12:42 PM
**To:** 'Ed Kimball'; 'Deirdre Hall'; 'mpmullen@gmail.com'; 'mikeoselectman@gmail.com'
**Cc:** 'Allan Chiocca'; 'John@cliffordkennylaw.com'
**Subject:** RE: Liaisons

I for one did not feel like I was a member of any board when I walked out of that meeting last night. Because WE as a board never discussed voting for what Deirdre presented, nor was there any info in my book about it. Speaking only for myself, the chairman of the School Committee then bad mouthed me as one who doesn't want to help. WE are a 5 member board and I am not going to stand by and watch one person "take over". If I am not needed, please feel free to let me know and I can step out of the way.

**From:** Ed Kimball [mailto:efkmag@aol.com]
**Sent:** Tuesday, May 15, 2018 4:12 PM
**To:** Deirdre Hall; mpmullen@gmail.com; mikeoselectman@gmail.com; Larry Ryan
**Cc:** Allan Chiocca; John@cliffordkennylaw.com
**Subject:** Fwd: Liaisons

D-HALL_00003233

Good afternoon fellow board members, please see attached new liaison assignments

[Quoted text hidden]

**John Clifford** <john@cliffordkennylaw.com>                                    Thu, May 17, 2018 at 11:11 AM
To: Larry Ryan <zone859@verizon.net>, Ed Kimball <efkmag@aol.com>, Deirdre Hall <deirdrejhall03@gmail.com>,
"mpmullen@gmail.com" <mpmullen@gmail.com>, "mikeoselectman@gmail.com" <mikeoselectman@gmail.com>
Cc: Allan Chiocca <achiocca@rockland-ma.gov>

A general note of caution to all: communication like this could be perceived to be a board discussion or
deliberation outside of a posted meeting, even if no one responds to an individual board member's
email. If one of you would like to have a board discussion about any topic, I recommend
communicating that to the Chair, who can then decide whether or not to put the issue on a future
agenda.

Just trying to avoid an OML complaint, not to stifle any discussion.

John J. Clifford, Esq.

Clifford and Kenny, LLP

31 Schoosett Street, Unit 405

Pembroke, MA 02359

Phone (781)924-5796

Fax (781)924-5798

Check us out at:

Www.cliffordkennylaw.com

The documents and content included with this electronic mail transmission contain information from the law office of
Clifford and Kenny, LLP which is confidential and may be protected from disclosure under the Attorney/Client privilege.
The content may also be protected as Executive Session material under the Massachusetts Open Meeting Law. This
information is intended to be for the use of the addressee only. Note that any disclosure, printing, photocopying,
distribution or use of the contents of this e-mailed information by persons other than the addressee or an agent of the
addressee, is unauthorized and prohibited. If you have received this electronic mail in error, please notify us via
electronic mail reply to the sender or by telephone (781-924-5796) immediately.

D-HALL 00003234

**From:** Larry Ryan <zone859@verizon.net>
**Date:** Thursday, May 17, 2018 at 11:03 AM
**To:** Ed Kimball <efkmag@aol.com>, 'Deirdre Hall' <deirdrejhall03@gmail.com>, "Michael Mullen Jr." <mpmullen@gmail.com>, "mikeoselectman@gmail.com" <mikeoselectman@gmail.com>
**Cc:** "achiocca@rockland-ma.gov" <achiocca@rockland-ma.gov>, John Clifford <john@cliffordkennylaw.com>
**Subject:** RE: Liaisons

[Quoted text hidden]

---

**Larry Ryan** <zone859@verizon.net>                                    Thu, May 17, 2018 at 11:13 AM
To: John Clifford <john@cliffordkennylaw.com>, Ed Kimball <efkmag@aol.com>, Deirdre Hall <deirdrejhall03@gmail.com>, mpmullen@gmail.com, mikeoselectman@gmail.com
Cc: Allan Chiocca <achiocca@rockland-ma.gov>


You are correct of course. I will deal with the chair.



**From:** John Clifford [mailto:john@cliffordkennylaw.com]
**Sent:** Thursday, May 17, 2018 11:11 AM
**To:** Larry Ryan; 'Ed Kimball'; 'Deirdre Hall'; mpmullen@gmail.com; mikeoselectman@gmail.com
**Cc:** 'Allan Chiocca'
**Subject:** Re: Liaisons

[Quoted text hidden]