# In The Matter Of:
*Allan Chiocca vs.*
*The Town of Rockland, et al.*

*Michael P. O'Loughlin*
*Vol. I*
*August 31, 2021*



**DORIS O. WONG ASSOCIATES, INC.**
COURT REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File O'Loughlin_Michael.txt*

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 2 of 10

Michael P. O'Loughlin - Vol. I
August 31, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 21

1 selectmen.
2 Q. Okay. So five years, approximately, you
3 were on the finance committee?
4 A. Correct.
5 Q. Okay. And what were your primary
6 responsibilities as a member of the finance
7 committee?
8 A. The first year I was a member of the
9 finance committee, our job is to review town budgets
10 for town meeting and prepare the warrant to submit
11 to the town leadership.
12 Q. What prompted you to want to join the
13 finance committee?
14 A. I wanted to get involved in the town that I
15 grew up in, and I had done some budgeting at work,
16 and I found that I had an aptitude for it, and I
17 enjoyed it. And I wanted to get involved and see
18 the numbers that drove the town.
19 Q. Okay. Fair to say, at least from the time
20 that you started on the finance committee through
21 the present, you have a pretty good understanding of
22 the town's finances generally?
23 A. I do.
24 Q. Did you have any -- do you have any

Page 22

1 understanding of the town's financial condition
2 prior to joining the finance committee?
3 A. No, I didn't.
4 Q. No, you have no idea of the financial
5 status of the town prior to 2012?
6 A. I had none.
7 Q. Okay. Did you gain an understanding of
8 what the town's financial status was prior to 2012
9 after you joined the finance committee?
10 A. I did.
11 Q. Okay. And what was your understanding of
12 what the town's financial status was prior to 2012?
13 A. That we had gone through some -- many tough
14 years as far as a town, years that we were, you
15 know, potentially in debt, actually in debt, and
16 that we had turned -- turned the corner and had come
17 out of it, and we were in a much better financial
18 position.
19 Q. And when you say --
20    I'm sorry. What were you going to say?
21 What were you going to say?
22 A. We were starting -- we were starting to
23 come out. We were transitioning out of it at that
24 time.

Page 23

1 Q. And approximately when would you say, as
2 you described it, the town started to turn the
3 corner financially and come out of it?
4 A. I would say that the town started turning
5 the corner financially when Allan Chiocca started as
6 town administrator.
7 Q. So that would be around 2008?
8 A. I would say so, yeah.
9 Q. So you were on the financial committee for
10 five years, and then I'm correct that you were
11 elected to the board of selectmen in 2017.
12    Is that right?
13 A. Correct.
14    I was -- I was chairman of the finance
15 committee for the last three years, and then I ran
16 for selectman in 2017.
17 Q. Okay. And have you -- are you still on the
18 board of selectmen?
19 A. Yes. I'm currently the chairman.
20 Q. Okay. And when is your current tenure
21 through, at least?
22 A. Let's see.
23    2022. 2023. Sorry, '23.
24 Q. Do you know when approximately in 2023?

Page 24

1 A. April of '23.
2 Q. Is when it ends?
3 A. Is when it ends.
4 Q. And you -- as you sit here today, you plan
5 to at least see this term through?
6 A. Yes, I do.
7 Q. Do you have any intention to run again
8 after that?
9 A. I probably do.
10 Q. You probably intend to do that?
11 A. I probably intend to run again, yeah.
12 Q. Okay.
13 A. My mind isn't made up.
14 Q. Fair enough.
15    So you've been on the board of selectmen
16 for a little less than four and a half years; is
17 that right?
18 A. A little less than four and a half,
19 correct.
20 Q. Okay. And the board of selectmen is the
21 town's highest governing body, correct?
22 A. It is.
23 Q. Okay. And the board makes decisions for
24 the town through the collective vote of its members,

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 3 of 10

Allan Chiocca vs.
The Town of Rockland, et al.

Michael P. O'Loughlin - Vol. I
August 31, 2021

Page 105

1  Q. Okay. You recall the board meeting in June
2  of 2019, when tempers flared between Mr. Ryan and
3  Mr. Kimball?
4  A. Yeah, a little bit.
5  Q. You recall telling Mr. Kimball, "You voted
6  for this, too; it was unanimous"?
7  A. Yes.
8  Q. Okay. The town has a discriminatory
9  harassment policy, right?
10 A. Correct.
11 Q. And it had one at the time the board
12 authorized Attorney Ryan's investigation, right?
13 A. Correct.
14 Q. And that policy, as you understand it,
15 requires the town to conduct an investigation when
16 it becomes aware of sexual harassment allegations,
17 correct?
18 A. Correct.
19 Q. That's the practice of the town, correct?
20 A. Correct.
21 Q. To investigate any sexual harassment
22 allegations and determine if it was a violation of
23 the town's policy, correct?
24 A. Correct.

Page 106

1  Q. Okay. And so the board ultimately voted to
2  hire Regina Ryan of Discrimination and Harassment
3  Solutions to conduct the investigation, right?
4  A. Correct.
5  Q. And you voted in favor of that, right?
6  A. I did.
7  Q. And when you voted in favor of that, did
8  you have any basis to believe she wasn't qualified
9  to conduct the investigation?
10 A. No.
11 Q. As you sit here today, do you have any
12 basis to believe she was not qualified to conduct
13 the investigation?
14 A. No.
15 Q. And when you voted in favor of the town
16 retaining Regina Ryan, you also had no basis to
17 believe that she was or would be biased towards any
18 party, correct?
19 A. Correct.
20 Q. And you still don't have any basis to
21 believe that she was biased towards any party,
22 correct?
23 A. Correct.
24 Q. You understood that she was going to

Page 107

1  investigate the allegations brought by both Ms. Hall
2  and Mr. Chiocca, correct?
3  A. I did. I do.
4  Q. Okay. And back when you voted in favor of
5  retaining her to conduct the investigation, what did
6  you understand that Ms. Hall was alleging?
7  A. That she was alleging a sexual assault
8  occurred in the office.
9  Q. Okay. And what did you understand that
10 Mr. Chiocca was alleging at the time?
11 A. That -- that he was -- I think it was that
12 he was set up or that, you know, anything that
13 happened was mutual. That it was consenting between
14 the two of them.
15 Q. It was your understanding at the time you
16 voted to retain Regina Ryan that Allan's position
17 about what happened that night was that it was a
18 consensual interaction?
19 A. Was that -- his position was that he was
20 set up and that it was consented to. And that he
21 felt as though his contract had been threatened in
22 some manner during that, that conversation with
23 them.
24 Q. Okay. I'm just trying to understand why

Page 108

1  are -- explain to me what you mean by the term
2  "consented to" in the context of what you're saying.
3  A. In response to the -- to the allegations,
4  that -- that both -- that she was at least -- it was
5  that she was a willing participant; that it wasn't a
6  situation -- it wasn't an assault in any manner.
7  Q. You understood that Allan was alleging that
8  he engaged in the conduct based on the threats that
9  Ms. Hall -- alleged Ms. Hall made?
10 A. That's what he had alleged, yes.
11 Q. Right.
12 You understood at the time you voted for
13 Regina Ryan that that's what he was alleging, right?
14 A. My point was that he was alleging that she
15 had consented. In rebuttal to her saying it was a
16 sexual assault, he was saying, no, it was definitely
17 consented to on her part.
18 Q. And when you voted to retain Attorney Ryan,
19 you understood she was going to prepare a report
20 that contained her findings and recommendations,
21 correct?
22 A. Correct.
23 Q. Why did you want Regina Ryan to make
24 recommendations to the board?

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 4 of 10

Michael P. O'Loughlin - Vol. I
August 31, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 109

1  A.  It was uncharted territory for all of us.
2  None of us had ever been in -- in a situation like
3  this. And, you know, the recommendations, they're
4  obviously recommendations for us to consider.
5  Q.  Right.
6      Because you testified earlier, at least as
7  to you, you have no experience conducting workplace
8  investigations, right?
9  A.  Correct.
10 Q.  So you felt that it was important to have
11 somebody who was to make that -- to conduct that
12 investigation, right?
13 A.  Correct.
14 Q.  And someone who had that experience to give
15 recommendations to the board as to how to handle the
16 situation, correct?
17 A.  Correct.
18 Q.  And in your experience when you worked at
19 Stop & Shop, you would bring concerns, allegations
20 to human resources, right?
21 A.  Correct.
22 Q.  And then human resources would conduct an
23 investigation, right?
24 A.  Yes.

Page 110

1  Q.  And that investigation would dictate how
2  Stop & Shop would handle the situation, correct?
3  A.  Correct.
4  Q.  Okay. And so that's what Attorney Ryan --
5  the board authorized Attorney Ryan to do, to conduct
6  the investigation, make findings, and make
7  recommendations, correct?
8  A.  Correct.
9  Q.  Did the board place any restrictions on how
10 Attorney Ryan was to conduct her investigation?
11 A.  I don't -- I don't recall.
12 Q.  Well, do you recall the board ever saying
13 to Attorney Ryan, "Don't ask particular questions"?
14 A.  I don't -- I don't recall that at all.
15 Q.  Do you recall the board ever instructing
16 Attorney Ryan who she should or should not speak
17 with?
18 A.  I -- not -- not that I recall at all. I
19 wasn't privy to that.
20 Q.  Okay. When the board voted to retain her,
21 do you recall any selectmen expressing any
22 reservations about hiring her?
23 A.  I don't recall.
24 Q.  Okay. I mean, you were at the executive

Page 111

1  session --
2  A.  I was.
3  Q.  -- when the board voted to retain her,
4  right?
5  A.  Yes, I was.
6  Q.  And so --
7      Sorry. Go ahead.
8  A.  It was presented to us. Again, none of us
9  had been in this situation before. And, you know,
10 we relied on -- on the recommendation from town
11 counsel. And her resumé spoke -- spoke well and
12 looked as though she was qualified, and I believe
13 she still is qualified to do so, to carry out the
14 investigation. I don't recall anybody specifically
15 having any kind of reservation.
16 Q.  Okay. And Attorney Ryan, she conducted the
17 investigation, right?
18 A.  Correct.
19 Q.  And she issued a report, right?
20 A.  Correct.
21 Q.  The town paid her for that, right?
22 A.  Correct.
23 Q.  And she delivered the report to the town,
24 correct?

Page 112

1  A.  Correct.
2  Q.  Do you know how much in total the town paid
3  her for the report and the investigation?
4  A.  I don't recall off the top of my head.
5  Maybe 30,000, if that sounds right. I don't recall.
6  Q.  Okay. And sometime after Attorney Ryan
7  issued her first report, she reopened the
8  investigation, correct?
9  A.  Correct.
10 Q.  And that was at the town's request, right?
11 A.  Correct.
12 Q.  And you supported that, right?
13 A.  I did.
14 Q.  Why?
15 A.  So I felt as though the initial report
16 was -- was lacking some information. There were
17 claims that Ms. Hall had some issues remembering and
18 blocked some of it out, and then we had heard that
19 she had somewhat -- some of the memories were coming
20 back, and we asked that she -- Ms. Regina Ryan
21 approach Ms. Hall and see if she'd like to go on
22 record with whatever these memories were.
23 Q.  You wanted to make sure every party had the
24 opportunity to tell whatever they remembered to

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 5 of 10

Michael P. O'Loughlin - Vol. I
August 31, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 117

1  ask again, you recall attending the board of
2  selectmen's meeting in June -- on June 19th of 2018
3  when tempers flared between Mr. Kimball and
4  Mr. Ryan, correct?
5  A. Correct.
6  Q. You found Mr. Kimball's behavior to be
7  inappropriate, correct?
8     MS. ZUCKER: Objection.
9  A. Correct.
10 Q. Why did you feel that way?
11 A. Prior to the meeting I had spoken with Ed,
12 and I felt as though we had a good conversation, and
13 he was going to resign that night. And he had
14 complained to me about, you know, the affair with --
15 with Deirdre, and had mentioned that, you know, he
16 felt -- I conveyed to him that I thought it was
17 probably best for him because he had served the town
18 well for nine years and I felt as though him
19 stepping aside, as opposed to the residents finding
20 out, you know, everything that -- that went on, that
21 it would spare his -- his image, and his reputation,
22 and his legacy, I guess.
23 Q. And so what about -- what about his
24 behavior at the board meeting did you find

Page 118

1  inappropriate?
2  A. I thought it was -- I thought it was
3  aggressive, obviously. I thought it's not the way
4  that I like to conduct business. I thought
5  obviously the affidavit that was filed was filed
6  without speaking to the other members of the board
7  on his own, and I felt as though him being a part of
8  the investigation at that point, he should have
9  stepped aside at that point.
10 Q. Well, do you recall him calling the
11 investigation a "sham" that evening?
12 A. I do.
13 Q. And you didn't find that appropriate,
14 either, did you?
15 A. I wasn't --
16    MS. ZUCKER: Objection.
17 Q. I'm sorry. What?
18 A. I didn't think it was appropriate. We had
19 voted as a board for the investigation to occur. We
20 had selected Regina Ryan to run the investigation,
21 and, you know, we were waiting for the results. The
22 investigation was in process, you know. It's -- I
23 didn't think that was appropriate and correct.
24 Q. Okay. You recall at that meeting that

Page 119

1  Larry Ryan actually made a motion to reorganize the
2  board?
3  A. I do.
4  Q. And you seconded -- you seconded that
5  motion, didn't you?
6  A. I did.
7  Q. But it was tabled because it wasn't on the
8  agenda, right?
9  A. Correct.
10 Q. But nonetheless, at least as of June 19th
11 of 2018, you were taking the position publicly that
12 Mr. Kimball should be removed as the chair, correct?
13 A. Correct.
14 Q. Okay. And at that time, in June, why did
15 you believe he should be removed -- be removed as
16 chair?
17 A. I felt that Ed violated the trust of the
18 other members of the board by not disclosing to us
19 about his affair with Deirdre at the time.
20 Q. Uh-huh.
21 A. And having lied to me when I had asked him
22 directly. Prior to that, he had admitted to having
23 an emotional affair, but didn't speak to -- to the
24 extent of their affair.

Page 120

1  Q. So at least as of June 19th, you knew --
2  or, excuse me -- you had been told by Ed that there
3  was an affair that he had had in some capacity with
4  Deirdre, correct?
5  A. Correct.
6  Q. And describe to me the context of that
7  conversation.
8  A. I expressed disappointment with Ed. I had
9  a lot of respect for Ed, and he was a good chairman.
10 He -- he was always good to me. So I thought,
11 having seen, you know, some of the text messages.
12 But he was -- I felt as though it was too bad that,
13 you know, all of a sudden these decisions that we
14 talked about, these different positions that I
15 wasn't -- I wasn't put into, kind of made sense to
16 me and I was disappointed. I was disappointed more
17 than anything.
18 Q. Why did it make sense to you as of -- as of
19 June 19th?
20 A. Well, it just felt as though, you know, my
21 not being made the vice-chairman, or my not being
22 the school committee liaison, based on my
23 conversations earlier in those days with Ed, it
24 sounded as though those things were going to occur,

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 6 of 10

Allan Chiocca vs.
The Town of Rockland, et al.

Michael P. O'Loughlin - Vol. I
August 31, 2021

Page 145

1  do before May 1st, right?
2  A.  Correct.
3  Q.  And it's your testimony that now, today,
4  through this lawsuit, is when Allan has an
5  opportunity to address the allegations that Marcy
6  and Sue were making unrelated to the events of
7  May 1st?
8  A.  Correct.
9  Q.  Okay.  So when Attorney Ryan issued her
10 initial report, you read it, right?
11 A.  Right.
12 Q.  Why did you read it?
13 A.  Why did I read?
14 Q.  Uh-huh.
15 A.  Because it's my job to read it.  It was an
16 investigation that -- that we asked her to look
17 into.  I was -- I wanted to see the results of what
18 we spent the taxpayers' money on.
19 Q.  And when you read it, did you form an
20 understanding of what Attorney Ryan concluded as to
21 Ms. Hall's allegations?
22 A.  That -- that there was -- I formed the
23 understanding that Ms. Hall's allegations were
24 somewhat inconclusive based on the lack of

Page 146

1  information that was given to Attorney Ryan at the
2  time.
3  Q.  And when you voted in favor of retaining
4  Attorney Ryan -- I want to make sure I understand --
5  you -- you understood that Ms. Hall was alleging
6  that Mr. Chiocca had engaged in inappropriate
7  behavior towards her, correct?
8  A.  Correct.
9  Q.  At that time you -- you had no
10 understanding that there was an allegation of sexual
11 assault, correct?
12 A.  Not at that time, correct.
13 Q.  When you retained Regina Ryan, right?
14 A.  If I recall, yep.
15 Q.  Okay.  And what is your understanding of
16 what the investigator concluded as to Allan's
17 allegations?
18 A.  Allan's allegations were that -- that he
19 was threatened, his contract extensions, if he did
20 not do everything that Ms. Hall asked him to do that
21 night.
22 Q.  And what's your understanding, after you
23 read the report for the first time, what Attorney
24 Ryan concluded as to that allegation?

Page 147

1  A.  She concluded that that -- that Allan was
2  the victim of quid pro quo sexual harassment by his
3  supervisor, Ms. Hall.
4  Q.  And when you read the report for the first
5  time, did you form an understanding of what Attorney
6  Ryan recommended the town do as to Mr. Chiocca's
7  status on administrative leave?
8  A.  Yeah.  It was to return him to his -- his
9  duties as town administrator.
10 Q.  And you understood -- and you understood
11 that when you read the report, right?
12 A.  I did.  Correct.
13 Q.  When you read -- when you finished reading
14 the report for the first time, do you recall whether
15 you had any questions you wanted to ask Attorney
16 Ryan?
17 A.  Not specifically, no.  I don't recall.
18 Q.  But if you had any, you could have reached
19 out and had those questions answered, right?
20 A.  I could have, sure.
21 Q.  Nothing prevented you from doing that,
22 right?
23 A.  Correct.
24 Q.  Okay.  Now, you recall there was the board

Page 148

1  meeting on July 10th at the high school that you
2  ultimately were not able to attend, right?
3  A.  Correct.
4  Q.  You recall it occurred, and you
5  subsequently watched a video of it, right?
6  A.  Correct.
7  Q.  Okay.  Why weren't you able to make it that
8  evening?  Just curious.
9  A.  I was -- my manager was on vacation, and
10 there was no other managers in the store.  And we
11 had a transformer explode behind the store and we
12 had no power, so...
13 Q.  Okay.  Fair enough.
14    Do you recall, prior to that meeting,
15 e-mailing Mr. Kimball -- excuse me -- and telling
16 him that you wanted reorganization of the board
17 placed on the agenda for that meeting?
18 A.  I did.
19 Q.  And by "reorganization of the board" you
20 meant removing Mr. Kimball as the chair, correct?
21 A.  Correct.
22 Q.  And essentially you were following up on
23 the attempt that you and Mr. Ryan made at making
24 that happen in the previous meeting, correct --

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 7 of 10

Allan Chiocca vs.
The Town of Rockland, et al.

Michael P. O'Loughlin - Vol. I
August 31, 2021

Page 177

1  outcome of the investigation was, you were going to
2  support it?
3  A. We were going to support the investigation,
4  yeah, I do.
5  Q. No, no, no. Not that you were going to
6  support the investigation, but while the
7  investigation was pending do you recall saying you
8  were going to support the outcome of the
9  investigation?
10 A. Correct.
11    And then the women at town hall came
12 forward and added more things to what was put out
13 there, because I think they might have even seen my
14 post and they started getting nervous about the fact
15 that there's a chance that he's coming back into the
16 building, and now we've got to start telling
17 people -- you know, the selectmen, what was going on
18 the whole time that we weren't made aware of.
19 Q. So but for these three women coming forward
20 you would have voted to reinstate Allan from the
21 administrative leave after having read the report?
22    MS. CIESLAK: Objection.
23 A. I don't -- I don't know. It's -- I don't
24 recall what my thoughts were, and I can't -- I can't

Page 178

1  talk on hypothetical in the sense of, you know,
2  those -- those did come forward before the end of
3  the investigation.
4  Q. Can you go back to the Facebook post, if
5  you're not there?
6  A. Yep.
7  Q. Are you there?
8  A. Okay. I am.
9  Q. Can you go to Page 41?
10    Are you there?
11 A. I am.
12 Q. Do you see the post that you made at the
13 bottom of the page?
14    It says:
15    "Linda O'Donnell Cook, you are
16    correct."
17 A. I don't see it.
18 Q. You're on the Bates stamp at the bottom of
19 the page? It should say "Towns Resp to RDPS."
20 A. I got it.
21 Q. Do you see it?
22 A. I do.
23 Q. About three -- about, I don't know, a
24 little more than halfway down do you see it says:

Page 179

1    "... I await the results of the
2    investigation..."
3  A. Uh-huh.
4  Q. Fair to say you made the post while the
5  investigation was pending?
6  A. What was the date?
7  Q. I mean, it only says "one year," but you
8  said:
9    "... I await the results of the
10   investigation..."
11 A. Yep. Fair enough.
12 Q. Okay. And that -- so you made this post
13 after you understood what the investigation -- what
14 Allan had alleged, correct?
15 A. Correct.
16 Q. You made this post after all of the things
17 that you testified just a moment ago about Allan's
18 character, everything you were aware of, right?
19 A. Correct.
20 Q. Then you said:
21   "I have no comment on this
22   investigation and will support whatever the
23   outcome may be," correct?
24 A. Correct.

Page 180

1    What's the initial question, where I
2    responded, "You are correct"?
3  Q. So let me just keep asking.
4  A. Oh, here it is. Here's the initial
5    comment:
6    "It's well known that selectmen go out
7    after meetings. He may not" ever join --
8    "he may not join ever (sic) time, but I
9    believe your husband was there in April."
10   And I wrote:
11   "You are correct," and then I went on
12   to explain what I was there -- why I was
13   there.
14 Q. Uh-huh. Yeah. You were telling her why
15 you were at the RBG, and then you offered --
16 A. Correct.
17 Q. And then you offered some more information,
18 right?
19 A. I did.
20 Q. And you said you're going to await the
21 results of the investigation, right?
22 A. Correct.
23 Q. And that you would support whatever the
24 outcome may be, right?

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 8 of 10

Michael P. O'Loughlin - Vol. I
August 31, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 181

1  A. Correct.
2  Q. And you understood, as you testified
3  earlier, that the recommendation that Ms. Ryan made
4  was to reinstate Allan to his job, correct?
5  A. Correct.
6  Q. And you did not support that, right?
7  A. I agreed with the -- with the investigation
8  and the results. But the recommendations, you know,
9  I didn't support necessarily her recommendation.
10 Q. Okay.
11 A. I felt --
12 Q. Sorry.
13 A. I felt that the entire incident, you know,
14 and the stuff that came out in the report that --
15 you know, that we talked about earlier about going
16 back to town hall and drinking alcohol, I felt like
17 some of those were character things that Allan would
18 not be able to be successful in that position going
19 forward.
20 Q. So you -- you're saying you agree with
21 everything in the investigation other than Regina's
22 recommendation?
23        MR. CROTTY: Objection.
24 Q. Is that what you're saying?

Page 182

1  A. Correct.
2     I mean, I agree -- I mean, I haven't looked
3  at it for a few weeks, but I agree with the
4  investigation. I agree with -- I agree with most of
5  the findings, but I felt as though the -- the
6  investigation was very one-sided and incomplete
7  because only one person actually provided testimony
8  to Ms. Ryan at the time, as Ms. Hall was having, you
9  know, amnesia from the events.
10    So I felt like the -- you know, I think I
11 made some of these comments. You know, we were
12 expecting a full report, and we didn't get a full
13 report. We got a very one-sided report.
14 Q. You initially had a conversation with Ed
15 about what Deirdre was alleging, right? Very
16 beginning, before the investigation was even
17 commissioned, right?
18 A. Yeah. Ed had called me to inform me at the
19 very beginning both parties were looking to have
20 a -- a nondisclosure agreement filed.
21 Q. No, no. But I'm -- after that was over --
22 A. Okay.
23 Q. -- you had a conversation with Ed where he
24 talked to you about what Deirdre had relayed to him,

Page 183

1  right?
2  A. He had said to me that -- that -- he
3  said -- he said that she's alleging misconduct --
4  Q. Uh-huh.
5  A. -- by Mr. Chiocca, and that there was
6  conversation that Mr. Hall had called Mr. Kimball
7  and said, "So is this how it works in Rockland? You
8  get a contract and a blow job," or something like
9  that, to that effect.
10    And then he said that something happened in
11 the office that Deirdre was alleging was sexual
12 misconduct, and that's what I recall.
13 Q. And he also -- didn't he also tell you that
14 that was the full scope of what Deirdre described to
15 him; that she had no memory to describe it any
16 further?
17      MS. DUNN: Objection.
18 A. I don't recall if he mentioned that she had
19 no memory or that she just hadn't described it any
20 further. It's been a while since.
21    But I do recall that we made the decision
22 to vote it and launch the investigation, and we took
23 that into consideration that maybe she would
24 remember.

Page 184

1     I mean, if I recall, everybody -- you know,
2  they got lawyers pretty quickly, and that was kind
3  of the point that I had made a little while back
4  that we were -- with ceasing contact with them, so
5  anything that -- that Ed would bring to us, you
6  know, that wasn't being brought to us by town
7  counsel, you know, making us aware of where the
8  investigation was, in the sense of, you know, Regina
9  Ryan, you know, being a person that might be capable
10 of doing this investigation, you know.
11 Q. Okay. Now, the week after the July 10th
12 meeting, there was another meeting on the 17th,
13 right?
14 A. Uh-huh.
15 Q. And that was just predominantly held in
16 executive session, right?
17 A. Correct.
18 Q. And the purpose of that meeting, right, was
19 to discuss Allan's employment, right?
20 A. Correct.
21 Q. And how the town was going to handle that,
22 right?
23 A. Yeah. I don't recall. I haven't looked at
24 the executive session meeting notes for some time.

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 9 of 10

Michael P. O'Loughlin - Vol. I
August 31, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 213

1  the time that he let us in, it was very early. It
2  was just letting us know that they were going to be
3  looking into it, or that they had talked to Allan
4  and that they had asked him to take some personal
5  time over the next few days and that -- you know,
6  something was alleged.
7     And he said "alleged" a lot. So he kept --
8  he kept saying that, "It's alleged," you know, "that
9  sexual misconduct, something happened in the office
10 at town hall on this" -- "this night." And then I
11 think he -- I think he had already looked at a
12 videotape and he said something to the effect, "If
13 you look at the tape in one manner, it's" -- "you
14 see one thing. If you look at it from another
15 perspective, you can see another thing."
16    And I said, "I haven't seen it, and I'll
17 just wait till I look at the tape myself."
18 Q. Did he describe to you what he meant by
19 that?
20 A. He just said he saw people -- he saw them
21 walking in. He didn't get into details of what he
22 meant, but he said, you know, he saw them walking
23 in.
24    He said Allan goes over to the alarm. They

Page 214

1  walk into the town hall, they go into the restroom,
2  go into his office, and then it's a few hours later
3  they come out.
4  Q. Did you ask him any questions?
5  A. I think I was honestly -- I think I was --
6  I was just kind of shocked and a little bit numb to
7  it.
8     And, you know, he said that he was -- he
9  had called possibly Larry Ryan already. I wasn't
10 sure if he said he called Mike Mullen yet. He got
11 off the phone and said he was going to make another
12 phone call, and then I just kind of sat and digested
13 it and contemplated what I should do next, you know.
14 Q. He didn't disclose his relationship with
15 Deirdre to you at that time, did he?
16 A. No, he did not.
17 Q. Okay. Does that trouble you in retrospect?
18 A. Yes.
19    MS. DUNN: Objection.
20 Q. Why?
21 A. Well, so what I said on that -- on that
22 Facebook post that, you know, if I had known that he
23 was the -- the, I guess, you know, former lover of
24 the vice-chairman, or they were having an affair,

Page 215

1  then I would have asked him to probably recuse
2  himself from the very beginning and step down from
3  the chairmanship.
4  Q. Okay. You were interviewed by Regina Ryan,
5  as we talked about briefly earlier, right?
6  A. Of course, yep.
7  Q. She asked you a number of questions, right?
8  A. Uh-huh.
9  Q. You answered all of her questions as
10 honestly as you could, right?
11 A. Correct.
12    MR. SHAFRAN: Okay. I want to show you --
13 I'm going to paste it here, Attorney --
14    Can you mark that as Exhibit 4, please,
15 Alex? Attorney Ryan's notes from her interview with
16 you.
17    (Document marked as O'Loughlin
18 Exhibit 4 for identification)
19 BY MR. SHAFRAN:
20 Q. Let me know when you have that up.
21 A. I do.
22 Q. It's a lot.
23 A. Yep.
24 Q. Go on the bottom right. You'll see Bates

Page 216

1  numbering to Page 2627.
2  A. Mine only stops at 19.
3     MR. CROTTY: He's looking at the Bates
4  stamps.
5  Q. It's Page 18 of 19. It's not a 2600-page
6  document.
7  A. Okay. Got you.
8  Q. Do you see that it says your name at the
9  top?
10 A. Yep.
11 Q. So you recall Regina was taking some notes
12 as she was talking to you?
13 A. I do.
14 Q. On her computer she had with her, right?
15 A. Yep.
16 Q. Okay. So the second paragraph it says:
17    "Friday night on the 18th -- got a
18 call from EK -- he got a call from DH
19 saying that AC did something
20 inappropriate/awful. DH couldn't pinpoint
21 anything -- but knew it was May 1st."
22 Do you see what I just read there?
23 A. I got you. I'm reading with you.
24 Q. So you -- you articulated to Regina Ryan

Case 1:19-cv-10482-WGY   Document 175-8   Filed 11/15/21   Page 10 of 10

Michael P. O'Loughlin - Vol. I
August 31, 2021

Allan Chiocca vs.
The Town of Rockland, et al.

Page 237

1  (Audio started and stopped)
2  MR. SHAFRAN: Let me just ask you one more
3  question before I do that:
4  Q. Have you learned anything since the second
5  report came out that adds to your analysis of either
6  party's claims?
7  A. No.
8  MR. SHAFRAN: Okay. All right. Let me
9  go --
10  All right.
11  (Video played)
12  (Video stopped)
13  BY MR. SHAFRAN:
14  Q. Can you see that, Mike?
15  A. I got you, yep.
16  MR. SHAFRAN: All right.
17  I'm going to play you this for a second and
18  then I'll just have some questions for you.
19  Hold on.
20  (Video played)
21  (Video stopped)
22  MR. SHAFRAN: All right.
23  Q. Did you hear that, Mike?
24  A. I did. I did.

Page 238

1  Q. So the first thing you said was that
2  Mr. Chiocca -- you further notified that he be no
3  longer permitted to exercise any function as town
4  administrator, right?
5  A. Correct.
6  Q. So you said "is no longer," but it's true
7  that he had not been permitted to exercise any
8  function as town administrator well prior to this,
9  right?
10  A. Right.
11  Q. He had not been permitted to exercise any
12  function as town administrator since he was placed
13  on administrative leave in May of 2018, right?
14  A. Correct.
15  Q. Okay. And then you say that Mr. Chiocca is
16  going to continue on paid administrative leave
17  through June 30th, 2019, subject to any subsequent
18  vote to suspend or terminate him for misconduct,
19  right?
20  A. Correct.
21  Q. So what, if anything, was Mr. Chiocca
22  permitted to do as it relates to his job while on
23  administrative leave that he would not have been
24  permitted to do if he was suspended?

Page 239

1  A. Get paid.
2  Q. I'm sorry?
3  A. Get paid.
4  Q. So how about in terms of his job, aspects
5  of his job?
6  A. There's, you know, no real difference, no.
7  Q. There -- other than paid or not paid, there
8  is no difference in terms of what Mr. Chiocca would
9  not be allowed to do on administrative leave versus
10  suspension?
11  A. Correct.
12  Q. Okay. Are you aware that Mr. Chiocca's
13  contract contemplates a situation where he can be
14  suspended with pay?
15  A. I -- I might have been at one point. I
16  don't recall.
17  Q. Do you have any understanding of what the
18  difference between being suspended with pay and
19  being on administrative leave with pay is?
20  A. I assume administrative leave is the
21  ability to bring him back at some point.
22  I don't know. No, I don't.
23  Q. You don't know? Okay.
24  So you said also that -- the second motion

Page 240

1  you made was that he would remain on administrative
2  leave through the expiration of his contract,
3  subject to the caveat that he could be suspended or
4  terminated for misconduct, right?
5  A. Correct.
6  Q. Okay. Now, if -- is it your contention
7  that Mr. Chiocca engaged in misconduct sufficient to
8  justify keeping him on administration leave?
9  MR. CROTTY: Objection.
10  A. Yeah. Yes.
11  Q. It was. So if the motion you made was with
12  the caveat that he could be suspended or terminated
13  for misconduct, then why wasn't he just suspended or
14  terminated?
15  A. I -- I don't know. I don't know what the
16  stipulation in his contract necessarily was. It was
17  a prepared statement by -- by legal counsel that I
18  read and felt that it was the best course of action
19  for the board to take. And we took that into
20  consideration and voted in that manner.
21  Q. Well, I assume you wouldn't read a
22  statement to the public if you didn't agree with it,
23  right?
24  A. Of course.