# In the Matter of:

*Allan Chiocca vs*

*Town of Rockland, et al.*

---

*John Clifford, Esq.*

*September 15, 2021*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Allan Chiocca vs
Town of Rockland, et al.

John Clifford, Esq.
September 15, 2021

Page 33

1       MR. FRIEDMANN: Objection.
2    A.  No.
3    Q.  Did you think it was unusual?
4    A.  You know, I'd say it was somewhat consistent
5  with his -- you know, his overall -- the character he
6  liked to portray to keep as, you know, being a party
7  guy, kind of being the big shot, et cetera.
8    Q.  So, on your -- based on your observations,
9  you observed him to be someone who thought he was a
10  big shot; is that right?
11   A.  Yeah.  Yes.
12   Q.  Have you ever seen mist -- or strike that.
13  Withdrawn.
14       In that regard, did Mr. Chiocca, to your
15  observation, ever suggest to you that he was the
16  puppet master of the board in Rockland?
17   A.  I don't think he ever expressed it in those
18  term -- in those terms.  But I think he -- he felt
19  like he could certainly heavily influence some members
20  of the board.
21   Q.  All right.  Let me take the words, "puppet
22  master."
23       Did Mr. Chiocca express to you that he felt
24  that he could influence certain members of the board

Page 34

1  while he was town administrator?
2       MR. FRIEDMANN: Objection.
3    A.  Yes.
4    Q.  And which members of the board did you
5  understand he was referring to?
6    A.  At that time, I think he felt like he had a
7  lot of influence over Michael Mullen, who was on the
8  board, Larry Ryan and Mike O'Loughlin.  He had
9  expressed a -- a number of times he had expressed
10  concerns about Deirdre Hall and disagreements with
11  her.  And -- and I don't think he ever thought that he
12  had that much control or influence over Mr. Kimball.
13   Q.  What would he say about the members of the
14  board of selectpersons that he believed he had
15  influence over?
16       MR. FRIEDMANN: Objection.
17   A.  He would say things to the effect that he
18  really believed that, you know, he could push through
19  whatever he considered important to him.  And I think,
20  at that time, that was probably one of the bigger
21  problems; that it became much more about Allan's
22  agenda than the board's agenda.
23   Q.  Did you ever observe anyone push Allan
24  Chiocca around?

Page 35

1    A.  No.
2    Q.  Is he the type of person, to your
3  observation, that anyone can push around?
4    A.  No.
5    Q.  Now, you mentioned that he expressed some
6  level of hostility towards Deirdre Hall.
7       Could you explain what you were referring to,
8  please?
9       MR. FRIEDMANN: Objection.
10   A.  Ms. Hall had only recently come on the board.
11  And I think she had certainly -- and I think the term
12  is -- is misused in a lot of cases; she had an agenda
13  coming in, I think.  And that's what -- elected
14  officials should have an agenda.  They should have
15  things that they're seeking to accomplish.
16       But she came in and she was pretty
17  strong-willed.  And she had worked in government
18  before, but she had things she wanted to see done.
19  And she also had concerns that people had expressed to
20  her that they had possibly -- possibly had been
21  mistreated by Mr. Chiocca.  So she came in with some
22  pretty clear objectives and some things that she
23  wanted to accomplish.  And Allan was at odds with her
24  almost right from the beginning.

Page 36

1    Q.  So let's talk about prior to May 1, 2018.
2       Based upon your interactions with Ms. Hall,
3  you understood her to have very real concerns about
4  Mr. Chiocca; is that right?
5       MR. FRIEDMANN: Objection.
6    A.  That's correct.
7    Q.  And based upon your observations of
8  Mr. Chiocca, in your communications with him, he
9  didn't much care for Ms. Hall; is that fair?
10   A.  That's correct.
11   Q.  And the reason that he didn't much care for
12  Ms. Hall, as expressed to you, was that he didn't like
13  the fact that he couldn't manipulate her; is that --
14       MR. FRIEDMANN: Objection.
15       BY MR. COOPER:
16   Q.  -- right?
17       MR. FRIEDMANN: Objection.
18   A.  He didn't like the fact that he couldn't
19  control her, that she had her own ideas, that she had
20  some specific things that she wanted addressed, and --
21  and he disagreed with those.
22   Q.  So I'd like to direct your attention to the
23  morning of May 1st, 2018.
24       As of that moment in time, could you have

Allan Chiocca vs
Town of Rockland, et al.

John Clifford, Esq.
September 15, 2021

Page 49

1   A.   No, he did not.
2   Q.   Did he ever say to you and Mr. Kimball
3   anything about Ms. Hall somehow sexually harassing
4   him?
5   A.   No, he did not.
6   Q.   Did he use any words that even remotely
7   suggested such a thing?
8   A.   He made comments to the effect that -- that
9   she was very aggressive, sexually.
10   Q.   And how did you understand those comments to
11   mean -- what did you understand those comments to
12   mean?
13   A.   That -- that she was probably somewhat
14   assertive, sexually.  But, I mean, I will tell you, I
15   did not really -- I wasn't making any -- drawing any
16   conclusions one way or the other.  One of the things
17   I've learned, having done this for a long time, is
18   you know, the only thing -- the only rational step to
19   take, at that point, is to do an investigation --
20   Q.   We'll --
21   A.   -- which is what happened.
22   Q.   -- I -- I promise you we'll get to that,
23   Mr. Clifford.
24   A.   Mm-hmm.

Page 50

1   Q.   At some point, did Mr. Chiocca -- and I'm not
2   limiting it to this meeting -- brag to you that he had
3   finished?
4   A.   He did.
5   Q.   And what did you understand that to mean?
6   A.   That he had completed the sexual act, that he
7   had ejaculated.
8   Q.   While Ms. Hall was giving him a blow job?
9   A.   That's correct.
10   Q.   And he was actually bragging about that to
11   you; is that right?
12   A.   In -- in the context of what we were talking
13   about, I -- I couldn't come up with any other
14   explanation why he would say that, except to brag.
15   Q.   Did he suggest to you, in substance, that
16   Ms. Hall had wanted him?
17   A.   Yes.
18   Q.   And was that consistent with some of the
19   comments you had heard him make about young women in
20   the past?
21   A.   I would say yes, it was.
22   Q.   Okay.  Now, let me also ask you; did you take
23   any notes at this meeting?
24   A.   No, I did not.

Page 51

1   Q.   Did you observe whether Mr. Chiocca made any
2   notes at the meeting?
3   A.   I don't believe he did.
4   Q.   Or Mr. Kimball?
5   A.   I don't believe he did either.
6   Q.   Okay.  Now, tell us, as best you can from
7   your memory, who said what to whom during the meeting.
8   And let's just take it beginning to end.
9   A.   I -- I believe I initiated the conversation
10   by saying that Ms. Hall had reported to Mr. Kimball
11   that there had been some sort of inappropriate sexual
12   conduct in town hall between her and Mr. Chiocca.  And
13   -- and I didn't have to get that far and he admitted
14   that it had, in fact, taken -- it had, in fact, taken
15   place.
16      He immediately -- his biggest concern was
17   that his wife, his family, would find out.  He just
18   wanted the whole thing to go away.  That was really
19   his overarching concern.  All -- that was really the
20   -- the brunt of his settle -- his sentiment during
21   this period; that he wanted this thing to go away,
22   that he was embarrassed by it, and he was afraid his
23   family was going to find out.
24   Q.   And he actually said that?

Page 52

1   A.   Yes, sir.
2   Q.   And have you completed your answer as to what
3   you recall being said at the meeting?
4   A.   He indicated that he wanted the whole thing
5   to go away.  And I said that -- you know, and he -- he
6   -- I think he talked about continuing to work, and I
7   said that that wouldn't be an option, that he -- that
8   he would have to probably go on paid administrative
9   leave.
10      But to put him on paid administrative leave,
11   we would have to convene a board -- a meeting of the
12   board of selectmen.  He said -- I think it was his
13   suggestion that if he took time off, if he took
14   vacation.  But he really -- he didn't push back on the
15   idea of getting out of there, but it was agreed that
16   he would take vacation and that -- until we decided
17   whether or not we were going forward with the -- an
18   investigation.
19      But it was made clear that the process for
20   any kind of an allegation like this was; we were going
21   to have to do an investigation.
22   Q.   Now, what, if anything, did Mr. Kimball say,
23   to your recollection?
24   A.   I don't -- I don't recall that -- that he

Allan Chiocca vs
Town of Rockland, et al.

John Clifford, Esq.
September 15, 2021

Page 53

1  said much.

2  Q.  So he let you take the lead?

3  A.  Yes, sir.

4  Q.  Do you recall -- or -- strike that.

5       Have you now exhausted your memory of the

6  conversation?

7  A.  We finished the conversation.  He said he was

8  going to go home.  He was going to take vacation

9  leave.  And I -- and I said, you know, we were going

10 to consult with the board and we'd be in touch.

11 Q.  And have you now finished?

12 A.  Yes.

13 Q.  I'm sorry.  Have you now exhausted your

14 memory of the conversation?

15 A.  Yes.  I -- I think I mentioned before, he did

16 make comments that she had been -- that she was

17 sexually aggressive.  I think he threw that in a

18 couple of times, but that's pretty much the brunt of

19 it.

20 Q.  Now, from that meeting, at the time of its

21 conclusion, did you understand that Mr. Chiocca had

22 confessed to doing something inappropriate and,

23 essentially, was looking for a way out so that his

24 wife wouldn't find out?

Page 54

1       MR. FRIEDMANN:  Objection.

2  A.  Yes.  That was my understanding.

3  Q.  And is that a fair summary of the meeting?

4  A.  Yes.

5       MR. COOPER:  Madam Reporter, I know you

6  need to take a break.  Why don't we pause here for

7  five or ten minutes and give you your break.

8       MADAM COURT REPORTER:  Thank so much,

9  sir.  I really appreciate it.

10      (Off the record at 10:06 a.m.)

11      (Recess taken.)

12      (Back on the record at 10:31 a.m.)

13      BY MR. COOPER:

14 Q.  Good morning again, Mr. Clifford -- Attorney

15 Clifford.

16      Going back to the meeting that took place

17 between you and Mr. Kimball and Mr. Chiocca in

18 Mr. Chiocca's office at town hall, do you recollect

19 that, before the meeting broke, there was discussion

20 of a way to keep everything confidential and

21 nonpublic?

22 A.  I don't --

23 Q.  Let me see if --

24 A.  -- I don't --

Page 55

1  Q.  -- let me see if I can --

2  A.  -- I don't recall that discussion.

3  Q.  Do you recall a discussion coming up about a

4  nondisclosure agreement?

5  A.  Before the meeting with Mr. Chiocca, no.

6  Q.  No, no, during the meeting with Mr. Chiocca.

7  A.  I don't recall that specifically discussed,

8  no.

9  Q.  Okay.  Do you recall it coming up at some

10 point that there would be a nondisclosure agreement?

11 A.  There was a lot of discussions about that

12 between the various attorneys.

13 Q.  And, at one point, was Mr. Kimball tasked to

14 inquire of Ms. Hall and her husband whether they would

15 be agreeable to that?

16 A.  I don't recall, specifically, that being

17 discussed.  At that point, everyone was represented by

18 counsel, so I don't believe that to be the case.

19 Q.  Okay.  Now, I'm going to read from -- you a

20 brief excerpt of Mr. Chiocca's deposition testimony in

21 this case given on July 12th of 2021.

22      MR. COOPER:  Counsel, it is at Page 242,

23 and I'm going to begin at Line 4 and read through

24 Line 8.

Page 56

1       BY MR. COOPER:

2  Q.  And, Mr. Clifford, I will represent to you

3  that the lawyer doing the questioning at this point

4  was Deirdre Hall's lawyer, Ellen Zucker, and she was

5  asking Mr. Chiocca about the same meeting I've just

6  asked you about.

7       So the question is by Ms. Zucker.  Question:

8  The first time you spoke without -- with -- with John

9  Clifford, did you tell him that she -- referring to

10 Deirdre Hall -- had threatened your contract?  Yes or

11 no?

12      Mr. Chiocca's answer:  Yes.

13      Was Mr. Chiocca being truthful in that

14 answer?

15      MR. FRIEDMANN:  Objection.

16 A.  I don't -- I don't recall that being said at

17 the meeting.  And -- and if it was said, I wouldn't

18 have believed it.

19 Q.  Well, you have no memory of that being said,

20 correct?

21 A.  No, sir.  No, sir.

22 Q.  And can you think of any basis, based upon

23 your participation in the meeting, that Mr. Chiocca

24 would swear to that under oath?

Allan Chiocca vs
Town of Rockland, et al.

John Clifford, Esq.
September 15, 2021

Page 101

1 nothing wrong with him having an agenda, correct?
2         MR. COOPER: Objection.
3     A. That is correct.
4     Q. Just like there's nothing wrong with any of
5 the selectpeople having agendas?
6         MS. ZUCKER: Objection.
7         MR. COOPER: Objection.
8     A. Correct.
9     Q. You indicated in questioning from Attorney
10 Cooper that Deirdre Hall had a concern about how Allan
11 treated women prior to May 1, 2018.
12        Do you recall that?
13    A. I'm not sure if I specifically said women. I
14 think she had a concern about how he specifically
15 treated people, in general, in town hall.
16    Q. Okay. Maybe I misheard you. I thought the
17 question was about how he treated women.
18        Did you ever believe that Deirdre Hall had a
19 concern about how Allan Chiocca treated women?
20    A. That was never expressed to me.
21    Q. Never expressed to you by Deirdre Hall?
22    A. By Deirdre Hall, that's correct.
23    Q. Okay. Prior to May 1st, 2018, was it ever
24 expressed to you by anybody that there was a problem

Page 102

1 with the way Allan Chiocca treated women?
2     A. No.
3     Q. Did you, personally, find it offensive
4 way you observed Allan Chiocca treat women prior to
5 May 1st, 2018?
6         MS. ZUCKER: Objection.
7     A. I had never observed him treating women
8 inappropriately. Certainly, not town employees. It
9 was reported to me on one occasion that he treated a
10 woman very disrespectfully.
11    Q. Who reported that to you?
12    A. My partner, Jaime Kenny.
13    Q. And when did she report that to you?
14    A. Shortly after we went into partnership.
15 Probably in 2013 or 2014.
16    Q. Okay. Other than that one incident, are you
17 aware of anybody saying that Allan Chiocca mistreated
18 women in any way?
19        MR. COOPER: Through today?
20        MR. FRIEDMANN: No. Prior --
21 pre-May 1, 2018.
22        MR. COOPER: Thank you.
23    A. Could you repeat the question, sir?
24    Q. Sure. Prior to May 1, 2018, other than the

Page 103

1 one report you've mentioned from your partner, are you
2 aware of any incident whereby somebody alleged that
3 Allan Chiocca mistreated a woman?
4     A. No. No, I was not aware of any.
5     Q. Okay. The complaints you indicate that
6 Ms. Hall reflected on, prior to May 1, 2018, that
7 Allan was not treating people respectfully, did she
8 provide you any specific instances?
9     A. I don't believe so, no.
10    Q. So how did she communicate this to you?
11    A. I think the general sense that she had was
12 that Allan was being tough on people, particularly
13 those people he didn't think agreed with him, that he
14 was really just not treating people respectfully or
15 fairly if they weren't part of his -- his camp, I
16 guess.
17    Q. Did she cite a specific instance to you of
18 what she was relying on for that conclusion?
19    A. I don't believe so, no.
20    Q. If she had provided you with a specific
21 instance of such behavior, would you have investigated
22 it?
23        MS. ZUCKER: Objection.
24    A. Not necessarily. I think it would've been a

Page 104

1 matter to bring to the board.
2     Q. Oh, okay.
3     A. Just to put all of this in context, I don't
4 interact, necessarily, with the board on a regular
5 basis and -- and I had started interacting with the
6 board. There was litigation that I had to meet with
7 the board about in April 2018.
8         I was aware that Mr. Kimball and Mr. Chiocca
9 had some general discussion about extending his
10 contract, and I was hearing from Mr. Kimball and
11 others that board members were not completely
12 satisfied. And I actually suggested that the board,
13 prior to moving forward with that, that they decide if
14 they really wanted to.
15        And I sent that out in an e-mail, that the
16 board needed -- if there were concerns with
17 Mr. Chiocca, they needed to address them and then go
18 forward from there. There was actually a meeting
19 where that discussion took place.
20    Q. When was that meeting?
21    A. I'm not sure if it was late April or early
22 May 2018.
23    Q. Prior to -- to May 18, 2018?
24    A. Yes, sir.

Allan Chiocca vs
Town of Rockland, et al.

John Clifford, Esq.
September 15, 2021

Page 109

1 had spoken to Mr. Chiocca about this subject matter
2 previously?
3    A.  No.
4    Q.  Is that your memory?
5         MS. CIESLAK:  Objection.
6         MADAM COURT REPORTER:  I'm sorry, I
7 didn't hear the answer.
8         Could you please repeat it, Attorney
9 Clifford?
10    A.  Could you repeat the question, sir?
11    Q.  Yeah.  The question was whether he disclosed
12 to you on the May 18, 2018, call at approximately
13 11 a.m. that he had had a discussion with Mr. Chiocca
14 about this -- this incident prior to calling you?
15    A.  He did not disclose that, no.
16    Q.  Do you think that would've been important to
17 you to know?
18    A.  Yes.
19    Q.  Do you think it would've been important to
20 you to know that Mr. Kimball was having a relationship
21 with Ms. Hall?
22    A.  Yes.
23         MR. COOPER:  Objection.
24

Page 110

1         BY MR. FRIEDMANN:
2    Q.  Do you think that Mr. Kimball's relationship
3 with Ms. Hall, in any way, affected his thought
4 process regarding the incident with Mr. Chiocca?
5         MR. COOPER:  Objection.
6         MS. CIESLAK:  Objection.
7         MS. ZUCKER:  Objection.
8    A.  I -- I couldn't say how it affected it or if
9 it did.
10    Q.  I wasn't asking you how it affected it or if
11 it did.  I -- that was not --
12    A.  Could you repeat question again?
13    Q.  Sure.  Sure.
14    A.  Okay.
15    Q.  Do you think -- strike that.
16         You had described Mr. Kimball as being a very
17 calm, sort of reasoned individual.
18         Is that a fair assessment of him?
19         MR. COOPER:  Objection.
20    A.  Yes.
21         MS. ZUCKER:  Objection.
22         BY MR. FRIEDMANN:
23    Q.  Okay.  As a selectmen?
24    A.  Yes.

Page 111

1    Q.  Was he agitated or calm and cool when he
2 called you?
3         MS. ZUCKER:  Objection.
4    A.  He was agitated.
5    Q.  And when you say, "he was agitated," can you
6 tell me what it was or what he was doing that led you
7 to that conclusion?
8    A.  I mean, he was very clearly upset by having
9 learned of this incident, and he was really convinced
10 -- his general sentiment expressed to me was that
11 something needed -- action needed to be taken with
12 regard to Mr. Chiocca.
13    Q.  Was he saying that because Mr. Chiocca was a
14 paramour also of Ms. Hall's --
15         MS. ZUCKER:  Objection.
16         BY MR. FRIEDMANN:
17    Q.  -- or was he saying it because it was
18 inappropriate behavior?
19         MS. ZUCKER:  Objection.
20    A.  It was both.  I don't know why --
21         MR. COOPER:  Objection.
22    A.  I don't know why he was saying it.
23    Q.  Okay.  Now, do you recall during the meeting
24 on May 18th between yourself, Mr. Kimball and

Page 112

1 Mr. Chiocca, a -- any discussion of Mr. Chiocca saying
2 that he was a predator, and that he was hunting his
3 prey and that Ms. Hall was his prey?
4         MS. ZUCKER:  Objection.
5    A.  That was never stated.
6    Q.  Was there a discussion of who was the
7 predator and who was the aggressor during that
8 May 18th meeting?
9         MS. CIESLAK:  Objection.
10    A.  Mr. Chiocca did use the word, "aggressor," or
11 that Ms. Hall was aggressive towards him, sexually.
12    Q.  All right.  And he told you, later on, that
13 he had told her that, I'm not your guy, that I need
14 Cialis, right?
15         MR. COOPER:  Objection.
16    A.  He did tell me that at some point, yes.
17    Q.  Yeah.  Do you recall him saying that, in the
18 May 18th meeting, that he had told her that he was not
19 the guy for her, but that she was the aggressor?
20         MS. ZUCKER:  Objection.
21    A.  I don't recall getting into that level of
22 sexual detail in that meeting, no.
23    Q.  What level of sexual detail do you recall
24 going into during that meeting?

Allan Chiocca vs
Town of Rockland, et al.

John Clifford, Esq.
September 15, 2021

Page 129

1  with the events occurring?
2       MR. COOPER: Objection.
3  A.  I don't know.
4  Q.  You don't know if that happens, as town
5  counsel?
6       MR. CROTTY: Objection.
7  A.  I don't know the filing practices of the
8  people who do that work for the Town of Rockland.
9  Q.  Do you know if the town has any policies on
10  that regarding personnel actions and the inclusion of
11  the information in their personnel files?
12  A.  I believe the town does have a personnel
13  handbook, and employee files are part of that
14  personnel handbook.
15  Q.  All right.
16  A.  I don't know what the specific policy is.
17  Q.  So, if the July 6, 2018, report was going to
18  be included with Mr. Chiocca's employee file, it
19  should've been put in there by now.
20     Is that a fair statement?
21       MR. CROTTY: Objection.
22  A.  If -- if it was going to be part of the file,
23  it should've been put in by now, that's correct.
24  Q.  On -- on what basis have you kept it from

Page 130

1  being included as part of his file?
2       MR. CROTTY: Objection.
3       MR. COOPER: Objection.
4       MS. ZUCKER: Objection.
5  A.  I don't -- I don't know that it has been.
6  Q.  Oh, so you don't know one way or the other?
7  A.  That's correct.
8  Q.  Okay.  What is your understanding, as of
9  today, of whether it is included or not included in
10  Mr. Chiocca's personnel file?
11       MR. CROTTY: Objection.
12       MR. COOPER: Objection.
13  A.  I don't know.
14  Q.  When was the last time you checked the
15  personnel file?
16  A.  I've never checked the personnel file.
17  Q.  You're aware that a demand for his personnel
18  file was made to you, back at or about the time that
19  the report was issued, correct?
20  A.  Correct.
21  Q.  Okay.  And when you responded with his
22  personnel file at the time these events were
23  occurring, was it included in his personnel file at
24  that time?

Page 131

1  A.  I don't recall.
2  Q.  Do you recall whether you objected to
3  producing it?
4  A.  No.  We did not object.
5     (Pause.)
6  BY MR. FRIEDMANN:
7  Q.  Okay.  With regard to the July 6, 2018
8  report, how did you determine what redactions to be
9  made to the report?
10       MR. COOPER: Objection as to the date.
11       MR. FRIEDMANN: I'm sorry, July 2nd.  I
12  apologize.
13  A.  We had a lot of discussion here at the firm
14  about trying to prevent further dissemination of
15  information that never should've seen light of day.
16  And we tried to redact specific information regarding
17  the sex acts.  In the event we tried to redact a
18  reference to a health issue with Ms. Hall's child.
19  But we tried to make it -- try to respect the privacy
20  of everyone involved.
21  Q.  Who was it -- when you say, we at the firm
22  discussed this, who was it, specifically, that the
23  discussions were between?
24  A.  I think it was my partner, Jaime Kenny, and

Page 132

1  Christopher Kenny, who is an associate here at the
2  firm.  The three of us discussed it.
3  Q.  You mentioned that there -- the attempt was
4  to prevent further dissemination of information.
5     What are you referring to at that -- by that?
6  A.  May 23rd, the -- you had the media find out
7  about the whole thing.  That turned into a circus.
8  There had been a lot of dissemination of the
9  allegations between May 18th and May 23rd.
10     Then we had the complaint filed by counsel
11  for Ms. Hall on June 13th.  That put more of it out
12  there in the public domain.  We went to extraordinary
13  lengths -- I will say that the -- the three members of
14  the board of selectmen, Mr. O'Loughlin, Mr. Mullen and
15  Mr. Ryan went to extraordinary lengths, along with
16  this firm, to try to keep this private, and we were
17  frustrated at pretty much every turn.
18  Q.  When you say you were frustrated at every
19  turn, what are you referring to?
20  A.  Because more and more information was leaked,
21  disseminated by the principals, and it just obviously
22  made the matter that much worse.
23  Q.  When you say "discriminated by the
24  principals," who are you referring to?

Allan Chiocca vs
Town of Rockland, et al.

John Clifford, Esq.
September 15, 2021

Page 133

1    A.   Mr. Chiocca and Ms. Hall.  Not necessarily
2  Mr. Kimball, I guess at that point, but...
3    Q.   Many of the statements that were going on in
4  the selectmen's meetings were also regarding
5  Mr. Kimball and his relationship with Ms. Hall,
6  correct?
7           MR. COOPER:  Objection.
8    A.   There was -- there was one meeting where that
9  took place; June 19th, 2018.
10   Q.   Okay.  And that was before the draft report
11 obviously, correct?
12   A.   That's correct.
13   Q.   What's your memory of what took place at that
14 meeting?
15   A.   I had been in discussion with counsel.  By
16 that point, Ms. Hall was represented by Jack McGlone.
17 I had been in a lot of discussion with Attorney
18 McGlone and Attorney Shafran.  And there was also
19 recall drives, involving Mr. Kimball, recall
20 petitions.  I had assured counsel that the entire
21 matter was not on the board of selectmen's agenda for
22 June 19th, that it wasn't going to be discussed.  And
23 on June 19th, Mr. Kimball did raise the issue.
24   Q.   When you say Mr. Kimball raised the issue,

Page 134

1  what are you referring to?
2    A.   Mr. Kimball brought it up in an open
3  selectmen's meeting and insisted that there was a
4  cover up and demanded that there be a police
5  investigation of this issue.
6    Q.   At that point in time, were you aware of the
7  relationship between Mr. Kimball and Ms. Hall?
8    A.   Yes.
9    Q.   Was that publicly known around town?
10          MS. ZUCKER:  Objection.
11   A.   No.
12   Q.   I'm sorry.  I didn't hear you.
13          MR. COOPER:  I'm sorry.  I missed the
14 answer.
15   A.   No.  I don't believe it was publicly known at
16 that point.
17   Q.   Who do you think knew about it at that point?
18          MR. COOPER:  Objection.
19   A.   I have no idea.
20   Q.   Did you think that the members of the board
21 of selectmen knew about it?
22   A.   Yes, they did.
23   Q.   Okay.  Were you aware of any online --
24 whether it was Turtleboy or any other online sources

Page 135

1  at that point in time that were commenting on the
2  relationship between Ms. Hall and -- and Mr. Kimball?
3    A.   At some point, Turtleboy was running stories
4  about Mr. Kimball's involvement.  I don't recall
5  specifically when that -- when that happened.
6    Q.   Did you believe -- or do you believe that
7  Mr. Kimball, when he called for the police
8  investigation and called Ms. Ryan's investigation a
9  sham, that he then made everything much more public
10 than it had been before?
11          MR. COOPER:  Objection.
12   A.   I -- I don't know.
13   Q.   Was that meeting televised?
14   A.   Yes.
15   Q.   Are there any statistics that show how many
16 people were viewing -- that you're aware of any
17 statistics that show how many people were viewing the
18 selectmen's meeting that night?
19   A.   As I understand it, the -- the YouTube
20 recording of that meeting has had several thousand
21 views at this point.
22   Q.   Do you know, though, at the time the
23 selectmen's meeting was being broadcast -- it's
24 broadcast live also, isn't it?

Page 136

1    A.   Right.
2    Q.   Yeah.  Do you know, at the time it was being
3  broadcast, the number of people that were watching the
4  broadcast from any demographic or statistical
5  materials?
6           MS. ZUCKER:  Objection.
7    A.   I don't know.
8    Q.   You're not aware of that?
9    A.   No.
10   Q.   Okay.  What is the station on which it is
11 broadcast live?
12   A.   I'm not sure of the channel number.  It's
13 WRPS is the -- the organization that runs local access
14 cable in Marshfield.  I don't know that they have any
15 ability to track how many viewers they have at any
16 moment.
17   Q.   Okay.  You were asked some questions by
18 Mr. Crotty a few moments ago.
19          Do you recall that?
20   A.   Yes.
21   Q.   Okay.  Do you recall Mr. Crotty asking you if
22 you had ever heard of Ms. Hall calling Ms. Hall
23 "dike" or "the dike"?  Do you recall that?
24   A.   I -- I don't recall if he asked me if I -- if



# DISCRIMINATION AND HARASSMENT SOLUTIONS LLC

July 2, 2018



**EXHIBIT**

Exhibit 2 - Clifford - 9/15/2021

### INVESTIGATION OF COMPLAINTS AGAINST DEIRDRE HALL

### AND ALLAN CHIOCCA

### FINDINGS OF FACT, CONCLUSIONS AND RECOMMENDATIONS

## I.    SCOPE OF INVESTIGATION

I was tasked with investigating an allegation, raised by Edward Kimball (hereinafter "Mr. Kimball"), Chairman of the Town of Rockland (hereinafter, "Town") Board of Selectmen (hereinafter "BOS"), of "inappropriate behavior"[1] by the Town Administrator, Allan Chiocca (hereinafter "Mr. Chiocca") towards Deirdre Hall (hereinafter "Ms. Hall"), Vice Chair of the BOS (hereinafter, "Hall Allegation"). In addition, I was tasked with investigating an allegation of "quid pro quo" sexual harassment brought by Mr. Chiocca against Ms. Hall (hereinafter, "Chiocca Allegation", and collectively with the Hall Allegation, the "Allegations"). Both Allegations arise out of the same incident, which took place during the evening of May 1, 2018 and the early morning hours of May 2, 2018 (hereinafter, the "Incident").

---

[1] While the allegation reported by Mr. Kimball refers only to "inappropriate behavior" by Mr. Chiocca, through an interview of Ms. Hall, during this investigation, it was confirmed that the only inappropriate behavior, complained of by Ms. Hall, related to sexual conduct by Mr. Chiocca. The allegation relates to the Incident (as hereinafter defined), of which she has no memory, and which she claims had to have occurred without her consent because she was incapable of such consent due to her level of intoxication.

www.dhsworks.com   781-910-0820   rryan@dhsworks.com

Neither complaint was reduced to writing but the Town has retained Discrimination and Harassment Solutions to investigate the Allegations and determine whether the Town's Sexual Harassment Policy was violated by either party. [2]

Accordingly, this investigation addresses whether (1) Mr. Chiocca violated the Town's Sexual Harassment Policy by engaging in non-consensual sexual activities with Ms. Hall during the Incident, and if so what discipline is recommended; and (2) whether Ms. Hall, as a supervisor of Mr. Chiocca, violated the Town's Sexual Harassment Policy, by requesting sexual favors during the Incident in exchange for actual or promised job benefits[3].

## II.   SUMMARY OF THE ALLEGATIONS

1.     Hall Allegation

Ms. Hall alleges that if Mr. Chiocca engaged in sexual activities with her during the Incident, it was non-consensual as she was incapable of consenting due to the level of her intoxication.

2.     Chiocca Allegation

Mr. Chiocca alleges that during the Incident, Ms. Hall used her position as a member of the BOS, who was actively reviewing and would soon be voting on his request for a contract extension and a $30,000 salary increase, to pressure him into engaging in sexual activities with her.

---

[2] Whether Mr. Chiocca violated other Rules and Regulations, or Policies and Procedures of the Town on May 1, 2018 is beyond the scope of this investigation.

[3] Because Ms. Hall is not an employee of the Town, but rather an elected official, she is not subject to discipline pursuant to the Town's Policies and Procedures. The Town's Sexual Harassment Policy provides that it strives to provide a workplace free of harassment and it investigates all allegations against employees and non-employees. As such, this investigation addresses whether Ms. Hall violated the Sexual Harassment Policy during the Incident even though no disciplinary action can be taken against her.

### III.   WITNESSES INTERVIEWED

Deirdre Hall – Vice Chair of the BOS

Allen Chiocca – Town Administrator for the Town

Susan Ide – Executive Assistant to the BOS

Marcy Birmingham – Project Coordinator

Stacia Callahan - Human Resources Coordinator

Delshaune Flipp – Board of Health Senior Assistant

Mary Jane Martin – Assistant Town Accountant

Edward Kimball – Chairman of the BOS

Eric Hart – Town Accountant

Michael Mullen Jr. – Town Selectman

Christopher Hall – Husband of Deirdre Hall

Lawrence Ryan – Town Selectman

Michael O'Loughlin – Town Selectman

### IV.   DOCUMENTS RELIED UPON

Exhibit 1 – Town of Rockland Charter

Exhibit 2 – Town of Rockland Sexual Harassment Policy

Exhibit 3 – Texts between Ms. Hall and Ms. Kimball

Exhibit 4 – Texts between Ms. Hall and Mr. Kimball

Exhibit 5 - Emails from Ms. Hall to Mr. Chiocca

Exhibit 6- Texts between Ms. Hall and Mr. Chiocca

Exhibit 7- Video of Town Hall - May 1, 2018

Exhibit 8 - Video of RBG - May 16, 2018; Mr. Chiocca leaving

Confidential Personnel Record representing Allen Chiocca, Esq. to Aidan Shafran, Esq. not to be released or distributed without the permission of the Rockland and Board of Selectmen

Exhibit 9 - Video of RBG - May 16, 2018; Ms. Hall leaving

Exhibit 10-Email regarding Mr. Chiocca's interview in Marblehead

Exhibit 11- Minutes - May 15, 2018 BOS Executive Session

Exhibit 12 -Affidavit of Paul Jacobson

Exhibit 13 -Affidavit of Mr. Kimball

Exhibit 14 -E from Attorney John Clifford to the BOS - May 11, 2018

Exhibit 15- Texts between Ms. Hall and Mr. Hall

Exhibit 16- Affidavit of Steven Verronneau

Exhibit 17-Email regarding video tampering

Exhibit 18- Receipt from RBG

Exhibit 19 - Mr. Chiocca administrative leave

Exhibit 20 - Committee to Elect Deirdre Hall Facebook page

## V.   FINDINGS OF FACT

Having considered all the evidence and testimony and giving the appropriate weight

thereto, and based on the applicable stand of proof, a preponderance of the evidence, I

make the following findings of fact:

1.Ms. Hall was elected to the BOS for the Town in April 2017 and was elected Vice Chair

by the BOS in April 2018.  She held this position until she took a leave of absence on June

4, 2018.

2.Mr. Chiocca is the Town Administrator for the Town and has held this position for

approximately ten years.

3.   Susan Ide (hereinafter, "Ms. Ide") is the Executive Assistant to the BOS and has held this position for 3.5 years.

4.   Marcy Birmingham (hereinafter, "Ms. Birmingham") is the Project Coordinator for the Town and was hired in July 2015.

5.   Stacia Callahan (hereinafter, "Ms. Callahan") is the Human Resources Coordinator for the Town.

6.   Delshaune Flipp (hereinafter, "Ms. Flipp") is the Board of Health Senior Assistant and was first hired by the Town on August 22, 2005.

7.   Mary Jane Martin (hereinafter, "Ms. Martin") is the Assistant Town Accountant and has been employed in this capacity by the Town since June 2011.

8.   Mr. Kimball is the Chairman of the BOS and has held this position for the past 8 years and has been a member of the BOS for nine years.

9.   Eric Hart (hereinafter, "Mr. Hart") is the Town Accountant and IT Director and has held this position since 2004.

10. Christopher Hall (hereinafter, "Mr. Hall") is Ms. Hall's husband and they have been married for approximately 16 years.

11. The BOS appoints the town administrator and can extend his/her contract for up to 3 years at a time (see Town Charter.)

12. The BOS is a five-member board presently consisting of Mr. Kimball, Ms. Hall, Michael Mullen Jr. (hereinafter "Mr. Mullen"), Lawrence Ryan (hereinafter "Mr. Ryan") and Michael O'Loughlin (hereinafter "Mr. O'Loughlin").  Each member has one vote and majority rules.

13. In response to a request for a contract extension and a $30,000 increase in compensation by Mr. Chiocca, the BOS had been discussing Mr. Chiocca's contract for weeks leading up to May 1, 2018. This was the first contract extension and compensation increase considered by the BOS since she was elected to the BOS (interview of Ms. Hall and Mr. Chiocca.)

14. As a Selectwoman, Ms. Hall is considered one of Mr. Chiocca's five supervisors.

15. Ms. Hall and Mr. Chiocca shared a mutual distrust for each other and on many occasions, could be heard arguing in Mr. Chiocca's office (interview of Ms. Ide, Ms. Birmingham, Ms. Callahan and Ms. Flipp.) It was not uncommon for each to make disparaging comments about the other to other Town employees (interview of Ms. Birmingham.)

16. Shortly after Ms. Hall joined the BOS, Mr. Chiocca made it clear to his colleagues that he did not want to be alone in his office when Ms. Hall would come into Town Hall and on many occasions, could be seen leaving his office to go to a different department to avoid interaction with Ms. Hall when she visited Town Hall (interview of Ms. Ide.)

17. Ms. Hall confided in her husband Christopher Hall (hereinafter "Mr. Hall") her dislike for Mr. Chiocca. Mr. Hall sent texts to Ms. Hall reminding her that Mr. Chiocca was "not nice" and "a bully" and to stay away from him (interview of Mr. Hall.)

18. Mr. Chiocca has been married to his wife for 39 years (interview of Mr. Chiocca.)

19. In the spring of 2018, Ms. Hall confided in Ms. Flipp and Ms. Callahan that "marriage is difficult", and she finds it hard to be with one person even though she loves her husband of sixteen years (interview of Ms. Flipp and Ms. Callahan.)

20. Also, during this time, Ms. Hall declared her candidacy for State Representative.

21.Mr. Kimball worked with Ms. Hall on her campaign, as did Mr. Mullen (interview
of Ms. Hall.)

22.Mr. Kimball and Ms. Hall were involved in an "intense physical" and emotional affair
during the months of March and April 2018, at which time Ms. Hall professed her love for
Mr. Kimball (interview of Mr. Kimball.)  Mr. Kimball's wife, Dawn Kimball (hereinafter,
"Ms. Kimball") believed the relationship had been going on for at least a year but
confirmed her suspicion on April 28, 2018 (interview of Ms. Hall.)

23.On May 1, 2018 Mr. Kimball, did not attend the scheduled BOS meeting because, after
learning of the affair, his wife "was feeling vulnerable and betrayed" (interview of Mr.
Kimball.)

24.Ms. Kimball first confronted Ms. Hall about the affair through a text message sent to
Ms. Hall, while she was chairing the BOS meeting on May 1, 2018. At 6:58 PM Ms.
Kimball texted Ms. Hall, "I know what happened.  You make me sick" (exhibit 3.)

25.The BOS meeting concluded at approximately 7:30 PM and the members stood
on Town Hall plaza chatting when Mr. Chiocca stated that he was going to the Rockland
Bar & Grill (hereinafter, "RBG") for a drink. [4] Ms. Hall stated that she was going to join
him.  They drove separately and no one else joined them.  They arrived at approximately
8:00 PM and Ms. Hall ordered a glass of wine and Mr. Chiocca ordered a beer (interviews
of Mr. Chiocca and Ms. Hall.)

26.At approximately 8:33 PM, Ms. Kimball again texted Ms. Hall stating, "Yes this is
Dawn.  Did you really think I wouldn't find out?  You're a disgusting human being.  The

---

[4] It was common for members of the BOS to go for drinks at the RBG after meetings.  Ms. Hall, Mr. Chiocca
and Mr. Kimball would go and other people from Town Hall would often join them.

both of you are disgusting. I'm not about threatening anyone just so you know. But I haven't decided how I'm going to handle this. 35 years of marriage now means nothing and I have you to thank for that" (see Exhibit 3.)  Ms. Hall did not respond to the texts that evening (interview of Ms. Hall.) Upon receipt of the texts from Ms. Kimball, Ms. Hall was not concerned that her husband would find out about her affair with Mr. Kimball, but rather the impact the news of the affair would have on her candidacy for State Representative should Ms. Kimball post it on social media (Id.)

27. While at RBG with Mr. Chiocca, Ms. Hall received a call from Mr. Kimball, who assured her that Ms. Kimball would not post news of the affair on social media (interview of Ms. Hall.)

28. Ms. Hall then asked Mr. Chiocca if she could use his cell phone because she wanted to check social media to see if Ms. Kimball posted anything (Id.)  He inquired as to why she wanted to use his phone and she explained that his phone had access to a Facebook page that hers did not and she wanted to check for a specific posting.  During this explanation, Ms. Hall divulged to Mr. Chiocca that she was in love with Mr. Kimball and had been having an affair with him since March 2018. She further explained that Ms. Kimball, who recently became aware of it, had forbidden Mr. Kimball from communicating with her (Id.)  Mr. Chiocca had no idea that they were having an affair (interview of Mr. Chiocca.)

29. During this conversation, Ms. Hall explained to Mr. Chiocca that she was upset that the relationship was ending. She went on to complain that she felt restricted by her marriage and no longer wanted to be monogamous (Id.)

30. Ms. Hall and Mr. Chiocca remained at RBG for two hours, during which they engaged in conversation about different subjects, including her relationship with Mr. Kimball, her desire not to be monogamous even though she loved her husband, and Ms. Kimball and her response to learning of the affair.  In addition, they discussed the content of the BOS meeting, her performance as the acting chairperson of the BOS, and whether she preferred being called madam "chairperson" or "chairwoman" and other topics (interview of Mr. Chiocca.)

31. After her second glass of wine Ms. Hall began to make sexually suggestive comments to Mr. Chiocca and began to rub his leg and touch his arm. She reiterated that she wanted to step out of her marriage and felt restricted.



32. At approximately 9:45 PM Ms. Hall texted her husband, "Be ready for me.  Cause I am going to want you" (exhibit 15.) At 9:56 PM, Mr. Chiocca paid the bill at the RBG and they left (interview of Mr. Chiocca and Exhibit 18.)

33. During the two hours that they remained at the RBG, Ms. Hall believes she consumed two to three glasses of wine, but Mr. Chiocca believes she consumed four glasses of wine[5] . Mr. Chiocca consumed four beers. Mr. Chiocca wanted

---

[5] Typically, Ms. Hall has 2-3 glasses of wine a night but in the recent past, she has on occasion consumed four glasses of wine (interview of Mr. Hall.)

to leave after his third beer, but Ms. Hall asked him to stay.  Because she is his supervisor

he felt compelled to stay (interview of Mr. Chiocca.)

34. Ms. Hall then asked if they could go for a ride in his truck. Again, feeling obliged to

satisfy his supervisor, Mr. Chiocca agreed, and they drove around Town for 20-30

minutes before stopping in the parking lot of the Banner Pub where they talked some

more.  At this time, Ms. Hall, who continued to pressure Mr. Chiocca to have sex with

her, reminded him that she was his boss and would be voting on his

contract extension.  Although not inclined to accept Ms. Hall's advances

Mr. Chiocca was concerned that if he thwarted her advances, she would not vote in

favor of his contract extension and his increase in compensation (interview of

Mr. Chiocca.)

35. Ms. Hall then stated that she had to go to the bathroom but did not want to use the

facilities at the Banner Pub because they are not clean.  Mr. Chiocca recommended, and

Ms. Hall agreed that they go to Town Hall, so she could use the bathroom facility there.

(interview of Mr. Chiocca.)

36.The surveillance video at Town Hall has five separate camera views from the evening

of May 1, 2018[6].  In the video, Ms. Hall and Mr. Chiocca can be seen walking from the

lower parking lot, across the plaza and into Town Hall. Ms. Hall, who is wearing high heel

shoes, appears to stumble on occasion but is able to traverse the walkway and stairs

from the lower lot to Town Hall without assistance.  At some points Mr. Chiocca walks in

front of Ms. Hall and at other points she leads (exhibit 7.)

---

[6] Mr. Kimball and Ms. Hall allege that the video has been tampered with however after an expert analysis, this is
found to be untrue (see Exhibit 16 and 17.)

37. They arrive at Town Hall at approximately 10:45 PM and walk directly to the bathrooms. Although there is no audio on the video, after exiting the bathroom Ms. Hall appears to say the word "home" and Mr. Chiocca and she exit Town Hall in the direction of Mr. Chiocca's truck (exhibit 7.)

38. As the two arrive at the top of the stairs that leads to the parking lot where Mr. Chiocca's truck is parked, Ms. Hall, who is walking ahead of Mr. Chiocca, stops and turns to face him preventing him from accessing the stairs. They engage in a conversation that lasts approximately seven minutes. During this conversation, again Ms. Hall continues to pressure Mr. Chiocca about allowing her to ████████████ while reminding him that she is his supervisor and will be voting on his contract and raise. Feeling pressure to oblige, Mr. Chiocca acquiesces to Ms. Hall's advances and they to return to Town Hall. They go directly to Mr. Chiocca's office and close the door (interview of Mr. Chiocca and exhibit 8.)

39. Shortly after entering his office, Mr. Chiocca realizes that he left his phone in his truck and Ms. Hall realizes that she left her purse in the bathroom, so he leaves and retrieves both (interview of Mr. Chiocca.)

40. When he returns to his office, he opens a bottle of wine that was given to him that day by Ms. Birmingham as an early birthday present. He pours two small cups of wine for them to drink. One of the cups spills (interview of Mr. Chiocca.)

41. While in his office, Mr. Chiocca and Ms. Hall engage in sexual acts. ████████████
████████████████████████████████████████
████████████

42. During the evening, Ms. Hall was conscious, and alert and she never vomited, tripped, fell or expressed concerns about her level of intoxication. Further, she never objected to engaging in the sexual activities with Mr. Chiocca (interview of Mr. Chiocca.)

43. At approximately 2:13 AM, the surveillance video shows Ms. Hall and Mr. Chiocca exiting his office with Ms. Hall, who can be seen drinking a bottled water.  They promptly leave Town Hall and walk across the plaza to the lower lot.  Both appear to be alert as they are walking at a casual pace and exhibit no obvious signs of intoxication or distress. (Exhibit 8.)

44. After leaving Town Hall, Mr. Chiocca drove Ms. Hall to RBG. Ms. Chiocca watched as Ms. Hall got into her motor vehicle and drove away (interview of Mr. Chiocca.)

45. Ms. Hall arrived home at approximately 2:20 AM.  Mr. Hall was in bed but when he heard his wife arrive home, he walked downstairs.  He observed her car in the driveway backed into the assigned spot.  He then observed Ms. Hall in the bathroom texting. At 2:25 AM she texted her husband: "love you, it gonna be a tough ride the next couple of weeks ttyl" (see Exhibit 15)

46. Her husband asked her how things went that night and she explained that at his wife's request, Mr. Kimball did not attend the BOS meeting and that she served as the acting Chair of the BOS meeting, moving through the agenda quickly. Following the meeting she explained that she went to RBG for drinks (interview of Mr. Hall.)

47. Ms. Hall also told her husband that Ms. Kimball texted her while she was at the RBG that she was disgusting and that she texted her back that she was sorry. (interview of Mr. Hall.)  She then went on to explain to her husband that she had been

having an emotional but not sexual relationship with Mr. Kimball (interview of Ms.

Hall and Mr. Hall.)

48. Ms. Hall then raised the issue of Mr. Chiocca's contract extension.  She informed Mr.

Hall that Mr. Chiocca told her, "normally how this works is I ask for a raise, you ███

███████████████ (interview of Mr. Hall.)  ████████████████

███████████████

49. During this conversation with her husband, Ms. Hall never complained of being upset

or uncomfortable with how the night went or any inappropriate behavior by

Mr. Chiocca (interview of Mr. Hall.)

50. Mr. and Ms. Hall then discussed ████████████ appointment scheduled for the

next morning and Ms. Hall agreed to attend the appointment.  Also, because she was so

late arriving home that evening, Mr. Hall contacted his employer and called out sick for

the next day.  Ms. Hall was apologetic to her husband that had to call out sick because of

her (interview of Mr. Hall.)

51. After approximately 30 – 45 minutes of talking downstairs, they went upstairs to their

bedroom.  At that time, Ms. Hall confessed to her husband that her relationship with Mr.

Kimball was more than emotional and that they had been involved in physical relationship

as well.  Mr. Hall then asked if the relationship was over and she advised that it was.  He

indicated to her that he was not happy about her having an affair with Mr. Kimball.  They

discussed this for 15 to 20 minutes and then went to bed at approximately 3:30 (Id.)

52. Ms. Hall asserts that she has no memory of the evening from the time she

talked with Mr. Kimball at approximately 9:00 PM with the exception of a visual

of Mr. Chiocca typing in the security code at Town Hall and a conversation with her

husband about Mr. Kimball when she arrived home at 2:20 AM (interview of Ms.

Hall.) She cannot explain why she has no memory, although she acknowledges that

she does not have a medical condition that causes her to blackout or lose

memory and despite drinking regularly, and consuming as many as 3 to 4 drinks in an

evening, she has not suffered memory loss after drinking since she was in

her early 20's (Id.)

53. Ms. Hall woke up that morning at 6:30 AM so she could take ███████████████

appointment (interview of Ms. Hall.)

54. Mr. Chiocca arrived at Town Hall early that morning, so he could clean up his office

as some wine had spilled while Ms. Hall was on the table earlier that morning. Mr.

Chiocca poured out what was left in the bottle (interview of Mr. Chiocca.)  At 8:02 AM on

May 2, 2018 Ms. Hall emailed Mr. Chiocca and asked if they could talk for 15 minutes

before her 9:00 AM meeting and at 8:05 he responded in the affirmative (interview of Ms.

Hall and Exhibit 49 page 11.)

55. They met at 8:55AM and she asked for "discretion" about what happened the night

before and they both agreed that they would not tell anyone.  It is notable that Ms. Hall

asked for discretion from Mr. Chiocca yet claims that she has no memory of anything

inappropriate taking place with Mr. Chiocca earlier that morning or the evening

prior.  Ms. Hall acknowledges that during this discussion with Mr. Chiocca she never told

him that she was upset with what happened earlier that morning or the night before nor

did she inquire of him as to what had taken place. (interview of Ms. Hall.)

56. During this conversation, Mr. Chiocca referred to Ms. Hall as a "predator" and "the aggressor". Ms. Hall claims that these comments caused her to first have an "inkling" that she engaged in sexual relations with Mr. Chiocca (interview of Ms. Hall.)

57. Later that day, Mr. Kimball confided in Mr. Chiocca that he did not go to the BOS meeting the evening prior because he had been involved in an affair with Ms. Hall and that his wife had just learned of it and "was on the warpath". As a result, he was going to be taking a "less active role on the BOS". Mr. Chiocca then recommended he step down from the BOS or give up the Chair position (interview of Mr. Chiocca and Mr. Kimball.).

58. After May 1st, Mr. Chiocca told Ms. Birmingham and Ms. Callahan that he did not want to be left alone in his office with Ms. Hall and to make sure his door stayed open when she came to Town Hall (interviews of Ms. Birmingham and Ms. Callahan.) More specially, because Ms. Ide was on vacation the second week in May and she sits right outside his office, Mr. Chiocca told Ms. Birmingham, who worked on the floor below, that if he called her up to his office, to come right away because it meant that Ms. Hall was there, and he did not want to be alone with her. She never got called up to his office (interview of Ms. Birmingham.)

59. On May 4, 2018 at 7:07 AM, by email to Mr. Chiocca, Ms. Hall again, requested an opportunity to meet with Mr. Chiocca and he agreed. They discussed the evening of May 1st and again he told her that she was a "predator" and "the aggressor". Once again, Ms. Hall never complained of a lack of memory as to her encounter with Mr. Chiocca or that she had been suffering from diminished capacity. (interviews of Mr. Chiocca and Ms. Hall.)

60. In neither the conversation between Ms. Hall and Mr. Chiocca on May 1st or May 4th, did Ms. Hall ever tell Mr. Chiocca that she blacked out or did not consent to any sexual acts (interview of Mr. Chiocca.)  Ms. Hall acknowledges that, following these conversations with Mr. Chiocca, she clearly understood that she had engaged in sexual activities with Mr. Chiocca (interview of Ms. Hall.)

61. Despite this clear understanding, Ms. Hall never made any complaints, nor did she report any concerns about her interactions with Mr. Chiocca during the Incident to anyone (interview of Ms. Hall.)

62. On May 4, 2018 Mr. Hall and Ms. Kimball met to discuss their spouses' extramarital relationship with each other.  They both agreed that Ms. Hall and Mr. Kimball could go to BOS meetings and events together and Ms. Kimball would not show up because she did not want to set off "red flags" and draw attention to her husband's relationship with Ms. Hall.  It was most important to her to not let the public know about the affair (exhibit 4 and interview of Mr. Hall.)

63. The next week was filled with usual communications regarding Town business, both in person and by email, between Mr. Chiocca and Ms. Hall and they did not discuss the Incident (interview of Ms. Hall and Mr. Chiocca.)  The annual Town Meeting was held on May 7, 2018 and Mr. Chiocca, Mr. Kimball, Ms. Hall and others went out for drinks to China Plaza, without incident (interview of Ms. Hall, Mr. Chiocca and Mr. Kimball.)

64. On May 11, 2018 Town Counsel John Clifford (hereinafter "Attorney Clifford") sent an email to the BOS members regarding Mr. Chiocca's contract, suggesting that before they decided on whether to grant the contract extension at the BOS meeting on May 15,

2018, they have a candid discussion with him about any concerns they had with his job

performance (exhibit 14.)

65.During the week of May 14, 2018, Ms. Hall was coming into Town Hall to

see Mr. Chiocca more frequently than she ever had (interview of Ms. Ide.)  In fact, she

was present more than any other selectperson, but Mr. Chiocca was

avoiding all interaction with her (Id.)

66.At this time, Mr. Chiocca began to apply for jobs outside of Town because he did not

think he could work with Ms. Hall after what happened during the

Incident.  In fact, on May 15, 2018 he learned that he had been granted an interview for

the Town of ████████ Town Administrator position, which interview was scheduled for

May 21, 2018 (see Exhibit 10 email from ████████ to Mr. Chiocca.)

67.On May 14, 2018 Mr. Chiocca and Ms. Birmingham had planned to attend a ceremony

at the State House for recognition for a grant that the Town received.  That morning Ms.

Hall announced that she would join them, and for this reason Mr. Chiocca opted

out. Instead, Ms. Birmingham and Ms. Hall went to the event without Mr.

Chiocca (interview of Ms. Birmingham.)

68.The May 15, 2018 BOS meeting was very contentious.  Just prior to the meeting at

4:12 PM, Mr. Kimball sent an email to the BOS members and announced that Ms. Hall

was named the school liaison, a position for which Mr. O'Loughlin was told by Mr.

Kimball he would be selected (interview of Mr. O'Loughlin.)  Also, at the BOS meeting

Mr. Ryan and Mr. O'Loughlin were blindsided by communications that Ms. Hall had with

the School Superintendent (interviews of Mr. O'Loughlin and Mr. Mullen.)  The BOS

also discussed Mr. Chiocca's contract in Executive Session (see Exhibit 11 BOS minutes.)

69. The following day Mr. Ryan sent an email at approximately 12:42 PM to the BOS members expressing his frustration with the meeting the evening prior and he was critical of Ms. Hall (interview of Mr. O'Loughlin and Mr. Ryan.)

70. That same day, Mr. Ryan also went to Town Hall and asked Mr. Chiocca what was going on with the BOS and why was he blindsided at the meeting the evening prior. Ms. Hall was in the room when he asked this question. At that time, Mr. Chiocca asked him if he wanted to go to lunch and talk but he declined (interview of Mr. Ryan.)

71. Ms. Hall then called Mr. Mullen and she confided in him that after the May 1st BOS meeting she went to the RBG with Mr. Chiocca and they had a lot to drink. She went on to tell him that she didn't remember much but thinks she got into his truck and drove around for a while and thinks they went to Town Hall. She then expressed concerns that it would be on video. [7] She was not upset or crying but was matter of fact in telling him this. She then described Mr. Chiocca as evil, though she never mentioned anything about a concern that Mr. Chiocca may have engaged in inappropriate sexual behavior with her without her consent (interview of Mr. Mullen.)

72. Later that evening at approximately 8:45 PM Ms. Hall went to the RBG. Upon seeing Mr. Chiocca at a table with two other males who had been involved in a meeting at Town Hall earlier that evening she walked over and sat next to Mr. Chiocca (interviews of Mr. Chiocca and Ms. Hall.)   The four individuals remained seated together until 9:13 PM

---

[7] Ms. Hall denies that she has a memory of driving around town with Mr. Chiocca and denies that she was concerned about being on camera at Town Hall.

when Mr. Chiocca left the RBG, leaving Ms. Hall with the two males (Id.)  At 9:55 PM,

Ms. Hall and the two males exited the RBG (exhibit 9 and 12.)[8]  Realizing she had left her

purse behind, Ms. Hall returned to the RBG to retrieve it. (interview of Ms. Hall.)

73.The following day, on May 17, 2018 there was an MAPC meeting which was held in

Rockland.  Mr. Chiocca was planning on attending the event with Ms.

Birmingham because it is a great public relations opportunity for him.  Ms.

Hall announced that morning that she was going to join them at the MAPC

event and Mr. Chiocca again decided not to attend.  No other selectman attended the

meeting (interview of Mr. Chiocca and Ms. Birmingham.)

74.That same day at 11:03 AM, Mr. Ryan sent another email to the members of the BOS

that included the following comments: "Ms. Hall is making her own deals with the school

committee", "maybe we should revisit the VC and liaison positions at our next meeting",

"Ms. Hall yells when she has no back up data but doesn't supply any when she is in

charge. This was a board dividing move and we should correct it" (interview of Mr.

O'Loughlin and Mr. Ryan.)

75. At about that time, Ms. Hall contacted Mr. Kimball and she told him that something

happened on May 1, 2018 after the meeting on May1ˢᵗ with Mr. Chiocca.  She told

him she had two drinks and then there was a void and the next day he said thank you for

the birthday present, but she had not given him a present. Ms. Hall admits that she never

would have told this to Mr. Kimball if she knew that Mr. Chiocca would have kept it a

secret (interview of Ms. Hall.)

---

[8] Notably, Ms. Hall stated that she left 10 minutes after Mr. Chiocca but as seen on the video, she remained at the RBG for 48 minutes.

76. Mr. Kimball was furious and kept repeating that he needed to process what she had told him (id.)

77. Mr. Kimball then went to Town Hall and met with the head of IT Director, Eric Hart and asked him to pull the security video from May 1, 2018. Mr. Kimball and Mr. Hart watched it together and saw the view from the lobby with Ms. Hall and Mr. Chiocca entering Town Hall (see Exhibit 7 and interview of Mr. Kimball.)

78. That afternoon Mr. Kimball asked Ms. Hall to meet him and they went for a 40-minute walk on the rail trail. Mr. Kimball was so angry at Ms. Hall, she was afraid he might hurt her. Ms. Hall was also upset because she felt that she had disappointed Mr. Kimball (interview of Ms. Hall.) Mr. Kimball explained that he viewed the tapes from Town Hall security and saw Ms. Hall and Mr. Chiocca at Town Hall on May 1st (interview of Mr. Chiocca.) Ms. Hall was embarrassed (interview of Ms. Hall.) Mr. Kimball was furious with Ms. Hall, telling her he felt like he was being played by her (interview of Ms. Hall and exhibit 3.) Ms. Hall was upset because she did not want anyone to know about what happened on May 1, 2018 because she thought she would be perceived as a "whore and a drunk" (interview of Ms. Hall.)

79. Later that night Mr. Kimball texted Ms. Hall and told her that he was going to approach Mr. Chiocca the following day and Ms. Hall asked him not to (exhibit 4.) Ms. Hall replied; "please call we should not be putting this in writing". In response Mr. Kimball insisted that he be told the whole truth and that he did not want to be played. Ms. Hall texted back that she would tell him but not through text messages. Mr. Kimball and Ms. Hall then had a phone conversation during which both claim that Ms. Hall divulged no new details of the Incident (interviews of Ms. Hall and Mr. Kimball.)

80. Mr. Kimball then spoke with Mr. Hall, who reiterated to Mr. Kimball that when Ms.

Hall arrived home after being out for drinks with Mr. Chiocca on May 1st, she told him

that Mr. Chiocca stated, "the way we do things around here is I ask for a contract, you

████████████ and I get the contract" (interview of Mr. Hall.)

81. That evening Mr. Kimball called and spoke with Mr. Chiocca.  He informed Mr.

Chiocca that Ms. Hall's husband wanted to know if the town administrator█████████

with his raise and then told Mr. Chiocca that they would talk in the morning (interview of

Mr. Chiocca.)

82. The next morning, May 18, 2018 Mr. Kimball contacted Attorney Clifford and told

him that Mr. Chiocca had stated to Ms. Hall on May 1st that it is standard operating

procedure to give the obligatory ████████ to the town administrator during contract

negotiations.  Mr. Kimball expressed concern for the safety of the town employees who

were in contract negotiations.[9]  Mr. Kimball then told Attorney Clifford that Ms. Hall

alleged that Mr. Chiocca did something inappropriate to her on May 1, 2018 at Town

Hall (interview of Mr. Kimball.)

83. As a result, Attorney Clifford and Mr. Kimball met with Mr. Chiocca and he admitted

to having engaged in sexual activities with Ms. Hall at Town Hall during the Incident but

denied any conversation about ████████ for contracts  Mr. Chiocca insisted to Attorney

Clifford and Mr. Kimball that Ms. Hall had initiated and pursued the sexual encounter that

evening and that Ms. Hall was a "predator and the aggressor" (interview of

Mr. Chiocca.)

---

[9] At this time, Ms. Birmingham, Ms. Ide and Ms. Callahan were in contract negotiations with the Town.  At their interviews, all deny that Mr. Chiocca ever made sexual advances or comments with regard to their contracts.

84. At that time, Mr. Kimball "strongly suggested" that Mr. Chiocca take vacation time and encouraged him to resign from his employment to which he agreed (interview of Mr. Kimball and exhibit 13 affidavit of Mr. Kimball.) Mr. Kimball then agreed to meet with Ms. Hall to see if she would enter into a nondisclosure agreement and sign a release with the town, which he did, and Ms. Hall agreed to comply with this request (interview of Mr. Kimball.)

85. The following day, May 19, 2018, Ms. Hall, Mr. Hall, Mr. Kimball and Ms. Kimball met at Reeds Pond to discuss the allegations against Mr. Chiocca and they all agreed to keep Ms. Hall and Mr. Kimball's relationship a secret.[10] Ms. Kimball reiterated the conversation that she had with Mr. Kimball on May 4, 2018 that they could not let their relationship be leaked to the public. Mr. and Mrs. Kimball did not want their family's reputation to be ruined and Ms. Hall was concerned about her candidacy for State Representative and knew it would ruin her chances of winning (interview of Mr. Hall.)

86. Mr. Chiocca took the next week off as vacation time (interview of Mr. Chiocca.)

87. It is believed that the news media learned of the Incident on or about May 23, 2018 which caused the settlement discussions with Mr. Chiocca and Ms. Hall to cease (interview of Ms. Hall and Mr. Chiocca.)

---

[10] Mr. Kimball concedes that he was dishonest with the women at Town Hall when he told them that he had to back away from Ms. Hall when she hit on him. He was also dishonest with the members of the BOS when he told them he had an emotional relationship with Ms. Hall (interview of Mr. Kimball.)

88. On May 29, 2018 Mr. Chiocca was placed on administrative leave for engaging in inappropriate behavior toward a member of the BOS on May 1, 2018.  The letter was signed by Mr. Kimball (exhibit 19.)

89. The next day, Ms. Hall announced on her Facebook page that she requested that the BOS initiate an investigation involving an allegation of inappropriate behavior by Mr. Chiocca towards her (exhibit 20 Deirdre Hall's Committed to elect Facebook page.)  She asserts that if she engaged in sexual relations with Mr. Chiocca, but due to her intoxication could not have consented (interview of Ms. Hall.)

90. As the Human Resources Coordinator, Ms. Callahan never received any complaints by employees against Mr. Chiocca for sexual harassment nor has she observed such behavior by him.  Nor has she received any complaints against Ms. Hall (interview of Ms. Callahan.)

91. Neither Ms. Hall nor Mr. Chiocca reported any concerns to Ms. Callahan regarding the Incident (interview of Ms. Callahan.)

92. The Town has a Sexual Harassment Policy in effect that prohibits any unwelcomed touching or sexual harassment by an employee (see Exhibit 2.)  Mr. Chiocca received a copy of this policy and it applies to him (interview of Mr. Chiocca.)

93. Ms. Hall is not an employee of the Town and is not subject to the policies and procedures of the Town but instead is an elected official serving at the direction of the citizens (interview of Ms. Hall.)

94. If an employee of the Town alleges he/she is a victim of sexual harassment by an employee or a third party non-employee, the Town has a duty to investigate because employees are entitled to a workplace free of harassment (exhibit 2.)

## VI.        Conclusions

**Did Ms. Hall violate the Town's Sexual Harassment Policy[11]?**

1. The Town's Sexual Harassment Policy prohibits any sexual harassment or sexual advances, requests for sexual favors, and other verbal or physical conduct, which the submission or rejection thereof become the basis for employment decisions or a term or condition of employment (exhibit 2.)

2. Specifically, the policy provides that direct or implied requests by a supervisor for sexual favors in exchange for actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits or continued employment constitutes sexual harassment (Id.)

3. Ms. Hall and Mr. Chiocca engaged in sexual activities at Town Hall on May 1, 2018. It is undisputed based on what Ms. Hall reported to her husband and what was reported by Mr. Chiocca, that during that evening there was a conversation between Mr. Chiocca and Ms. Hall about his contract and there was a reference to sexual activities.

4. It is undisputed that the BOS had been discussing Mr. Chiocca's contract for weeks prior to May 1, 2018 and continued after May 1, 2018. Mr. Chiocca was asking for a

---

[11] Again, although Ms. Hall is not an employee of the Town and therefore is not subject to the Town's Sexual Harassment Policy, the Town in its policy states that all claims will be investigated whether the allegation is against an employees or not.

contract extension and a raise and Ms. Hall would be one of the five votes that would

decide this (see Exhibits 1 and 14.)

5.   Mr. Chiocca did not want to have a sexual encounter with Ms. Hall ██████████████

██████████████████████████████████████████████████ Regardless

she persisted ███████████████████████████████

███████

6.   Both while driving in Mr. Chiocca's truck and later while standing on the Town Hall

plaza, Ms. Hall made comments to Mr. Chiocca about engaging in sexual activities while

reminding him that she was his supervisor and would be voting on his contract and raise.

As a result, Mr. Chiocca agreed to engage in sexual activities in his office.  But for the

fact that Ms. Hall was his supervisor and would be voting on his contract, Mr. Chiocca

would not have agreed to this.

7.   Although Ms. Hall did not make any requests for sexual relations after the Incident,

she demonstrated a similar pattern of trying to position herself in Mr. Chiocca's space.  To

the contrary, Mr. Chiocca exhibited behavior of trying to avoid Ms. Hall and this was

corroborated by other Town employees following the Incident.

8.   Specifically, Mr. Chiocca applied for a job in the Town of ████████ days after the

Incident because he knew he could not work with her; when he could, he would avoid

meetings that she would be attending, and he put Ms. Birmingham and Ms. Callahan on

notice that he did not want to be alone with her.  With regard to Ms. Hall's actions, she

requested to meet with him on May 2nd and May 4th to discuss the evening, she went to

Town Hall more than she previously had been going, and she went into the RBG and sat

beside him the night before she made this allegation against him.   This evidence

corroborates Mr. Chiocca's allegations that he was concerned that Ms. Hall was making advances to him and he felt compelled to respond.

9.   Accordingly, I find by a preponderance of the evidence that Ms. Hall was Mr. Chiocca's supervisor and she sought sexual relations in exchange for her vote on his contract extension and raise.  As such, Ms. Hall sexually harassed Mr. Chiocca in violation of the Town's Sexual Harassment Policy on the night of the Incident.

**Did Mr. Chiocca violate the Town's Sexual Harassment Policy?**

10. Ms. Hall alleges that if she engaged in sexual relations with Mr. Chiocca, she did not do so voluntarily and could not consent due to her level of intoxication.

11.  It is undisputed that Ms. Hall and Mr. Chiocca were in Town Hall during the Incident.  Mr. Chiocca voluntarily admitted that they engaged in sexual relations; Ms. Hall has no memory.

12. The Town's Sexual Harassment Policy provides that employees of the Town cannot engage in unwelcomed physical conduct of a sexual nature in the workplace.

13. The Town's Sexual Harassment Policy does not define or address "consent" or "lack of consent". Although this investigation does not make a finding as to whether or not criminal activity occurred on May 1st, for reference, the standard of lack of consent standard applied in a criminal matter is considered.   In a rape case in which lack of consent due to intoxication is an issue, the prosecution must prove not only intoxication, but 1) that the intoxication rendered the complainant incapable of consent and 2) that the defendant knew or should have known that the condition rendered the complainant incapable of consenting.  Commonwealth v. Blache 450 Mass. 593.

14. Ms. Hall had between two and four glasses of wine on the evening of May 1, 2018. This amount of alcohol is consistent with the amount she regularly drinks when she goes out at night.

15. After reviewing the video of her at Town Hall, Ms. Hall is seen walking without assistance and talking to Mr. Chiocca. She appears to be aware of the circumstances that she is in and appears to be in control of her activities.

16. As Mr. Chiocca and Ms. Hall walk towards his truck after leaving Town Hall the first time, she stops, and they stay at the top of the stairs and talk for approximately seven minutes. The video then shows Mr. Chiocca walking up the stairs with Ms. Hall following as they walk into Town Hall. She appears alert and oriented (exhibit 8.)

17. When considering her interactions and communications before she went to Town Hall, she could communicate with Mr. Chiocca about his contract with the Town, her affair with Mr. Kimball, her desire to have relationships outside her marriage and the BOS meeting that she chaired earlier in the evening. Further, when she arrived home within minutes of leaving Mr. Chiocca she never expressed concern about the fact that she had sexual relations with him and did not exhibit any signs to her husband of being upset. Further, Ms. Hall was capable of engaging in coherent discussions with her husband for approximately one hour when she got home and the subjects that they covered that evening spanned from her extramarital affair with Mr. Kimball, their son's neurological appointment, her husband calling in sick from work and other topics. In addition, she could drive her motor vehicle home and back it into a parking spot with another motor vehicle beside it without incident. She was also capable of texting her husband at 9:45 PM, ""Be ready for me when I get home because I'm going

to want you" and then at 2:25 AM "love you. it gonna be a tough ride the next couple of weeks ttyl".

18. Moreover, the following day Ms. Hall went to Mr. Chiocca's office and asked for "discretion" and asked that he agree not to tell anyone.  During this conversation, she never mentions to Mr. Chiocca that she had no memory of the Incident and never tells him she did not consent.

19. Accordingly, I find by preponderance of the evidence, that Ms. Hall was capable of consenting to sexual relations during the Incident and she did consent, and I also find that Mr. Chiocca believed that she was capable of consenting.

20. Accordingly, I find by a preponderance of the evidence that Mr. Chiocca did not violate the Town's Sexual Harassment Policy in that he did not engage in any unwelcomed touching of Ms. Hall during the Incident.

## VI.    Recommendations

Based on the fact that Ms. Hall is an elected official, she cannot be disciplined by the Town nor can corrective action be issued for violations of the Sexual Harassment Policy.  Accordingly, I recommend that the she and the other member of the BOS receive training on preventing discrimination and harassment in the workplace.

With regard to Mr. Chiocca, I recommend that he be removed from administrative leave and returned to the position of Town Administrator for the Town and that he be reminded that any retaliation in the workplace for reporting harassment will not be tolerated.

If I may provide you with any additional information, please feel free to contact me.

Very truly yours,

*Regina M.Ryan*

Regina M. Ryan

Confidential Personnel Record
to Adam Shafran, Esq.
representing Allan Chiocca,
not to be released or distributed without the permission of
the Rockland Board of Selectmen