**Condensed Transcript**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
ALLAN CHIOCCA,                    )
                                  )
            Plaintiff             )
                                  )
vs.                               )   C.A. No. 1:19-CV-10482-WGY
                                  )
THE TOWN OF ROCKLAND, DEIDRE HALL,)
EDWARD KIMBALL, LARRY RYAN, MICHAEL)
MULLEN, JR., MICHAEL O'LOUGHLIN,  )
RICHARD PENNEY AND KARA NYMAN,    )
                                  )
            Defendants            )
                                  )
```

DAY 1

VIDEOTAPED DEPOSITION OF ALLAN R. CHIOCCA

MONDAY, JULY 12, 2021

10:19 a.m. - 4:51 p.m.

BURNS & LEVINSON LLP

Reported by:  Sandra A. Deschaine, CSR, RPR,

CLR, CRA

Job No. 33185

**EcoScribe Solutions**
www.EcoScribeSolutions.com
888.651.0505



Page 14

1  counties. I was on the energy committee.
2  Q. And you bring this claim today
3  under the state's Civil Rights Act, 151B,
4  among other things; is that right, sir?
5  A. I have counsel, we brought.
6  Q. Do you understand yourself to have
7  brought a claim under 151B?
8  A. 151B is what?
9  Q. The state's anti-discrimination
10 statute.
11 A. I believe I have.
12 Q. Okay. And do you remember, when
13 you were in the legislature, taking a vote
14 denying the protection of 151B to gay and
15 lesbian members of the Commonwealth?
16 A. I do not.
17 Q. Are you telling me today that you
18 did not vote against extending workplace
19 protections to gays and lesbians in the
20 workplace?
21 A. I do not recall all of my votes at
22 the time. There were different votes at
23 different times. I do know that even my own
24 views have evolved.
25 Q. Okay. And do you recall voting

Page 15

1  against any gun control during that time?
2  A. I believe I did.
3  Q. And what, if any, legislative
4  action did you take ever to afford the civil
5  rights protections to anyone?
6  A. You're talking 40 years ago. I
7  don't remember. 35 years ago.
8  Q. Do you -- there was a lot going on
9  during that time, sir.
10 A. There was.
11 Q. And there was a lot of people
12 asking for the protection of the civil rights
13 laws, particularly in the workplace.
14     What efforts did you make
15 affirmatively to make sure that workplace
16 equality laws, safety in the workplace, was
17 extended to people who didn't look like
18 you?
19     MS. HALEM: Objection.
20 A. I do not recall.
21 BY MS. ZUCKER:
22 Q. Do you remember doing anything?
23 A. I do not recall my legislative
24 record.
25 Q. Do you remember, sitting here

Page 16

1  today, whether you did anything to assure
2  that citizens of the Commonwealth would enjoy
3  the protection of the state's
4  anti-discrimination laws?
5     MS. HALEM: Objection.
6  A. I am not sure that I fully
7  understand that question in the manner in
8  which you asked, however --
9  BY MS. ZUCKER:
10 Q. Let me -- let me do that again
11 then.
12 A. Okay.
13 Q. When you served as a member of the
14 state's legislative body --
15 A. Yes.
16 Q. -- did you take any steps to help
17 extend the protection of our Commonwealth's
18 anti-discrimination laws to people who do not
19 look like you?
20     MS. HALEM: Objection.
21 A. I don't --
22 BY MS. ZUCKER:
23 Q. Yes or no? Do you remember taking
24 any steps?
25 A. I don't know that that's a

Page 17

1  yes-or-no question.
2  Q. Okay. How would you like to
3  answer it?
4  A. I would have believed at the time,
5  and if I go back to my legislative time, that
6  I did receive some issues, inquiries on that,
7  but I don't recall my legislative voting
8  record 35 years later.
9  Q. Okay.
10 A. I do know I was a young man and
11 that many of my views certainly evolved to
12 different positions than I had when I was in
13 my 20s.
14 Q. All right. Now, you have a social
15 media presence; do you not?
16 A. Minor.
17 Q. And has it been roughly consistent
18 over the last, let's call it, 15 years?
19     MS. HALEM: Objection.
20 A. Yes.
21 BY MS. ZUCKER:
22 Q. And so tell me, if you would,
23 let's start with any Facebook accounts that
24 you have had anytime from, let's just say,
25 2005 to today?

Page 18

1  A. The only Facebook account that I
2  believe I've used in that time frame is one
3  is what I've called an alter ego, so to
4  speak, but Vinny Blutarsky.
5  Q. Okay.
6  A. And that is --
7  Q. Done?
8  A. No. Primarily just because it's a
9  small number of people.
10  Q. Have you provided the -- your
11  Facebook postings from Vinny Blutarsky to
12  your counsel?
13      MS. HALEM: Objection.
14  A. I do not recall doing that.
15  BY MS. ZUCKER:
16  Q. Okay. Have you, in answering
17  interrogatories about your presence on social
18  media, have you confessed that you call
19  yourself Vinny Blutarsky on Facebook?
20      MS. HALEM: Objection.
21  A. In answering what?
22  BY MS. ZUCKER:
23  Q. In answering interrogatories.
24  Asking about your social media accounts, have
25  you --

Page 19

1  A. I have never kept it a secret.
2  Q. Okay. Who is -- what is
3  Blutarsky?
4  A. It's a made up name probably going
5  back to a poster I had in college.
6  Q. And it references Animal House,
7  right?
8  A. Yes.
9  Q. Okay. And who in Animal House
10  does it reference, this alter ego of yours?
11  A. It's a poster that we had on the
12  wall at my -- if you want to call it man
13  cave, of the lead character in that -- what
14  was his name, Bluto.
15  Q. Bluto. Yeah. So you have an
16  alter ego Facebook page that's driven from a
17  person you had in a man cave when you were
18  younger; is that right? Do I understand that
19  correctly?
20  A. Yes.
21  Q. Okay. And if I understand it
22  correctly, you've got posts there on that,
23  among others, of you standing -- of you
24  sitting shirtless at a reception desk. Do
25  you remember that post?

Page 20

1  A. I don't, but it's possible. It's
2  my home.
3  Q. Okay. And the post with you
4  sitting shirtless at a reception desk has
5  some rum and Coke and your hand raised; is
6  that possible?
7  A. Sure.
8  Q. Because that's your alter ego?
9  A. No, it's because it's a bar in the
10  basement.
11  Q. Okay. So you have a bar in the
12  basement, so you posted on Facebook yourself
13  shirtless with some rum and some Coke holding
14  up a drink?
15  A. Very possible.
16  Q. What about a picture --
17  A. I don't know if I posted that or
18  if somebody else did.
19  Q. Okay. And what about a picture of
20  two women scantily clad with only pasties on
21  their breasts.
22     Do you remember that picture?
23     MS. HALEM: Objection.
24  A. No.
25  /

Page 21

1  BY MS. ZUCKER:
2  Q. You don't remember that picture,
3  okay.
4     What about a picture of a young
5  woman on a bed?
6  A. No.
7  Q. But you -- that's your alter ego
8  Facebook account, right?
9     MS. HALEM: Objection.
10  BY MS. ZUCKER:
11  Q. Vinny Blutarsky?
12  A. Vinny Blutarsky is a name I use on
13  Facebook with family and friends.
14  Q. Okay. Do you remember writing
15  about searching for the Fountain of Youth in
16  your alter ego Facebook account?
17  A. No.
18  Q. Speaking of the Fountain of Youth,
19  you do not have any diagnosed medical
20  condition that requires Cialis, do you?
21  A. I told my doctor there was an
22  issue, and my doctor prescribed Cialis.
23  Q. You don't ever list it in any of
24  your medical records, from 2015 to today, as
25  a medical condition, do you?

Page 134

1  someplace, they're closing at 9, you say I'm
2  going to have a beer and you go someplace
3  else.
4      Q.  Yeah, understood.  Understood.
5          MS. ZUCKER:  I am mindful of the
6  time and it is 1 o'clock.  And before I
7  launch into the next section, I also
8  don't want to starve people.  So do we
9  want to take a half hour for a lunch
10  break?
11         MS. HALEM:  Sure.
12         MR. SHAFRAN:  Sure.
13         MS. HALEM:  You think a half hour
14  is enough?
15         MR. SHAFRAN:  1:30?
16         MS. HALEM:  Yeah.
17         MS. ZUCKER:  1:30, sure.
18         THE VIDEOGRAPHER:  Going off the
19  record.  The time is 12:54.
20  (Recess taken at 12:54 p.m. to 1:56 p.m.)
21         THE VIDEOGRAPHER:  We're back on
22  the record.  The time is 1:56.
23         MS. ZUCKER:  Thank you.
24  BY MS. ZUCKER:
25     Q.  Good afternoon, Mr. Chiocca.

Page 135

1          Now, we've been talking around
2  May 1st, and we started to talk about that.
3          But before we get to it, your
4  contract, your first contract, was 2008, if
5  I'm -- if I've got it right, correct?
6      A.  I believe so.
7      Q.  And that was a probationary year,
8  correct?
9      A.  By Charter.
10     Q.  And then it was a three-year
11  contract, correct?
12     A.  Yes.
13     Q.  So now we're 2009 to 2012, around
14  that?
15     A.  Plus or minus, yeah.
16     Q.  Okay.  And then 2012 we go around
17  2015; is that right?
18     A.  Yeah.  You know, there were a
19  couple of shifts in -- I'm not -- if I work
20  my way through it, but...
21     Q.  And your contract was due to
22  expire in or around June of 2019.  Isn't that
23  right?  Your last contract.
24     A.  I think I was in the last year of
25  my contract, yeah.

Page 136

1      Q.  Okay.
2      A.  I think so.
3      Q.  So in the -- in the early spring
4  of 2018, you were entering into the last year
5  of your contract.  And during that time, you
6  started to have discussions about whether or
7  not you would remain; is that right?
8      A.  Yes.
9      Q.  And if you would remain, at what
10  salary; is that right?
11     A.  Yes.
12     Q.  And because these are contract
13  discussions, tell me if I've got this right,
14  you feel strongly that they should be had
15  with the board, the full board, all at the
16  same time?
17         MS. HALEM:  Objection.
18     A.  You know, obviously, you get a
19  feeling for the board.  So, you know, I'm
20  sure I mentioned it to different members that
21  I was interested in continuing it, but
22  because of the open meeting laws, you have to
23  have it at a meeting.
24     Q.  Okay.  But apart from the
25  requirements of open meeting laws to bring,

Page 137

1  you know, a potential contract up for
2  discussion in a formal way, was it your
3  practice, sir, to speak individually with
4  selectpersons about your desires?
5          MS. HALEM:  Objection.  About the
6  contract?
7          MS. ZUCKER:  Yeah.
8      A.  I don't know that it was a
9  practice, but, you know --
10  BY MS. ZUCKER:
11     Q.  Is that what you did?
12     A.  Here and there -- I -- you know, I
13  would -- I would say I want to put this on
14  the agenda.  I'd want to talk about it.  I'd
15  talk to Ed.
16     Q.  But you didn't just talk to Ed.
17  You had one-on-one communications with
18  different counselors to line them up, right?
19     A.  Well, I would try.
20     Q.  Yeah, because you know your votes.
21  You need three, right?
22     A.  Yeah.
23     Q.  So you actually reached out and
24  were having substantive communications one by
25  one by one with the counselors, weren't you?

Page 234

```
 1    A.  No.
 2    Q.  Okay.
 3        MS. HALEM:  Objection as to time
 4    frame.
 5  BY MS. ZUCKER:
 6    Q.  Now --
 7        MS. ZUCKER:  Thank you.
 8  BY MS. ZUCKER:
 9    Q.  Now, in terms of your ability to
10  get an erection and climax, you were able to
11  do that staring at pornography without Cialis
12  in or around 2018; isn't that right?
13    A.  Yes.
14    Q.  And you were able to do that while
15  masturbating without Cialis; isn't that
16  right?
17    A.  Yes.
18    Q.  Okay.  Now, you and Ms. Hall are
19  in your office.
20        Where did you keep the corkscrew
21  in your office?
22    A.  There is a knife, could still be
23  there, in the top drawer that's a jackknife
24  with a couple of blades on it, and it's got a
25  corkscrew attachment.
```

Page 235

```
 1    Q.  Now, do you have a refrigerator in
 2  your office?
 3    A.  I had a -- I had what most people
 4  refer to as a college refrigerator --
 5    Q.  Okay.
 6    A.  -- water and, you know, my lunch
 7  for the day.
 8    Q.  Okay.  And you had a habit of
 9  having alcohol in there, right?
10    A.  No.
11    Q.  You didn't?
12    A.  No.
13    Q.  Never did?
14    A.  Never alcohol in there.  I
15  received the bottle of wine in question as a
16  gift, I believe, maybe even that day.  Marcy
17  had gone to Vermont, I think, over the
18  weekend and knows I like to have a Riesling
19  every once in a while.  That bottle, I
20  believe, was warm on top of the refrigerator,
21  and I had, leaving the office that day, not
22  taken it.
23    Q.  Okay.  So then you're in there and
24  you pour not only Ms. Hall another drink but
25  yourself too?
```

Page 236

```
 1    A.  I think we were having Dixie cups.
 2    Q.  Okay.  So both of you were having
 3  some -- something to drink.  You remember
 4  that wine.  The wine spilled.  You don't
 5  remember who spilled it?
 6    A.  Right.
 7    Q.  Okay.  The light --
 8    A.  I remember pouring two; one
 9  spilled.
10    Q.  Okay.  And you darkened the room,
11  didn't you?
12    A.  I darkened the room?
13    Q.  Well, the light wasn't on, right,
14  at some point?
15    A.  I don't think so.  I think the
16  light was on.
17    Q.  Do you remember, really, one way
18  or the other?
19    A.  No.  I think the light was on.
20    Q.  Okay.  And at some point you
21  lowered your drawers, right?
22    A.  At some point, she undid my belt
23  and unzippered my fly and pulled my pants
24  down.
25    Q.  At that time -- so you say she
```

Page 237

```
 1  came up to you, managed to undo your buckle,
 2  unzip your pants, and pull your pants down?
 3    A.  She was -- we were both -- I have
 4  a stand-up desk back here, so the chairs were
 5  on the side.  There were two chairs.  We were
 6  sitting in these two chairs off to the side.
 7  Whatever --
 8    Q.  So you're seated when she does
 9  this?
10    A.  She told me stand up.
11    Q.  Oh, and you just kind of stood up?
12    A.  Well, first she had pulled her
13  skirt up and took my hand and put it on her
14  vagina.  She had panties, and then she took
15  her panties off and...
16    Q.  Okay.  And at that time -- you got
17  your phone.  You just went out and got your
18  phone.  Did you call anybody?  Holy-moly this
19  is getting this is --
20        THE REPORTER:  I'm sorry, Counsel,
21  I had a glitch.
22        MS. ZUCKER:  Sure.  No worries.
23        THE REPORTER:  At that time you?
24  BY MS. ZUCKER:
25    Q.  At that time you had gone out and
```

Page 246

1 the office. What happens next?
2   A. At some point, I -- we went to the
3 truck. I drove her to RB&G. She wanted to
4 get a little kissy-face, I guess, for lack of
5 a better term. I wanted to get out of there
6 and, you know, she went to her car and drove
7 home.
8   Q. Okay. Did you think of driving
9 her home?
10   A. I know you keep playing on that.
11 No, she was not impaired.
12   Q. Okay. So your view was that she
13 was distraught but not impaired?
14   A. Yes.
15   Q. Okay. Now -- now, at any time
16 during the evening did you commend her and
17 tell her she gives a good blow job?
18   A. I do not remember saying that to
19 her.
20   Q. Well, I'm not --
21   A. No.
22   Q. Are you sure that you did not say
23 that?
24   A. I didn't want to be there,
25 Counsel --

Page 247

1   Q. Well, I'm -- I'm --
2   A. -- so I don't think I said that.
3   Q. You don't think so?
4   A. No.
5   Q. But you can't say 100 percent, can
6 you?
7   A. I didn't tell her the Mets were
8 going to win the World Series either.
9       I just -- I do not remember saying
10 that.
11   Q. Huh. Do you think the Mets are
12 going to win the World Series next year?
13   A. They might this year.
14   Q. I don't know.
15       So do you really think that the
16 question I'm asking you is like the Mets
17 winning the World Series?
18   A. No, I don't.
19   Q. Okay.
20   A. But I think you've asked the same
21 question --
22   Q. No --
23   A. -- and I've answered.
24   Q. I've asked you, do you remember
25 telling her that she gives a good blow job?

Page 248

1   A. And I remember telling you, I said
2 I don't remember saying that.
3   Q. Okay. All right. That's the best
4 we got. Is you just don't have a memory one
5 way or the other, right?
6   A. Regarding that statement?
7   Q. Yes.
8   A. I do not.
9   Q. Now -- do you remember ever
10 putting your hand around her shoulder or
11 around her waist?
12       MS. HALEM: Objection. Time
13   frame.
14 BY MS. ZUCKER:
15   Q. At any time as you were going in
16 or out of the building at town hall.
17   A. The film shows --
18   Q. I'm not -- no, no. I'm
19 actually --
20   A. Do I remember --
21   Q. Yes.
22   A. -- no.
23   Q. All right. Because you'll agree
24 with me that putting your hand around
25 someone's shoulder is an endearing action?

Page 249

1   A. I know -- I think I had my hand on
2 her back, according to the film, not
3 necessarily around her shoulder.
4   Q. Okay.
5   A. So -- opening the door or
6 whatever. Just been raised that way, so.
7   Q. Do you have a habit of putting
8 your hand on the shoulder or back of someone
9 you're afraid of?
10   A. A habit?
11   Q. Yeah.
12   A. I don't think that's a habit, no.
13   Q. The fact is you were not afraid of
14 Deirdre Hall that evening, were you?
15   A. I was certainly afraid of whether
16 or not my contract was going to be renewed.
17   Q. Okay. And given your long tenure
18 in the town of Rockland, you were afraid that
19 this young, new board of selectwoman, who
20 everybody thought was pushy and who annoyed
21 people, could, with her one vote,
22 single-handedly keep you from getting your
23 contract?
24   A. You had asked me --
25   Q. Yes or no? Is that -- was that

Page 258

1   Q.  Okay.
2   A.  I mean -- and none of that stuff
3   is -- you know, it's not going to be good.
4   Q.  Now, at some point, around about
5   May 18th, do you remember calling a number of
6   the women on your staff, on Friday, May 18th,
7   to tell them that they were going to hear
8   some things about you, but it was really
9   Deirdre's fault, that she was the aggressor?
10  A.  I remember calling the three --
11  there were three woman that worked
12  specifically for me or under me or however
13  you want to say, my secretary, executive
14  secretary, Sue Ide; human resources, Stacy
15  Callahan and Marcy.
16      On Friday afternoon -- I mean, on
17  Friday morning I was, lack of a better word,
18  asked to go on vacation, I guess. At that
19  point in time they didn't -- if I was such a
20  threat, they didn't -- well, John Clifford
21  and Ed didn't walk me out of town hall then.
22      Basically, I spent the rest of the
23  day trying to clear up loose ends. I think I
24  finished minutes. I think I did my job. I
25  actually performed the wedding services. The

Page 259

1   town clerk wasn't in the office, and I have
2   one of those California licenses and filled
3   in for somebody getting married.
4       I did everything I was supposed to
5   do. I knew I wasn't coming back. I was
6   going on vacation. But I called them and I
7   was certainly upset over the allegations that
8   I was inappropriate.
9   Q.  Now, as of May 18th --
10  A.  Right.
11  Q.  -- there had not been press
12  attention to this event, had there been?
13  A.  No.
14  Q.  Okay. And do -- tell me everyone
15  you remember calling and telling them that
16  they were going hear some bad things, but it
17  was Deirdre Hall; you were the victim?
18  A.  I would say it was the three
19  women. I can remember Marcy saying, you
20  know, she would pray for me. I think I saw
21  Stacy. I called Sue, who had been on
22  vacation, so that when she came back -- I
23  know that Eric knew because Ed had gone to
24  Eric to, I guess, initiate the investigation.
25      I know that Ed had told me that

Page 260

1   Deli Flipp knew about --
2       THE REPORTER:  That what?
3       THE WITNESS:  That Deli, Deli
4   Flipp knew about him. There were a
5   number of people that already knew.
6   BY MS. ZUCKER:
7   Q.  Okay. Do you remember being drunk
8   when you called any of these people?
9   A.  I don't believe I was drunk, but I
10  know I was emotional. I -- I still can get
11  emotional on occasion with this, as I go
12  through and say what the hell happened.
13  Q.  Okay.
14  A.  But I was not drunk --
15  Q.  So your testimony is, is that you
16  were not -- you had not been drinking at all?
17  A.  No. I know that prior to all of
18  this I was planning on meeting Pat Foley and
19  Tom Foley, which was something I quite often
20  did for a couple of -- I would have two,
21  three beers sometimes. That's -- sometimes
22  one or none at all if we didn't go out.
23  Q.  Could you answer my question, sir?
24  A.  But I would meet them once or two.
25  It was a Friday.

Page 261

1   Q.  Yeah. So that Friday, did you
2   meet the two of them?
3   A.  I met the two of them.
4   Q.  And you told them about this, too?
5   A.  I don't believe I did.
6   Q.  Okay. You don't -- you don't know
7   one way or the other for sure, do you?
8   A.  I would say I did not. If you
9   know --
10  Q.  You would say --
11  A.  -- Pat Foley -- well, if you're
12  asking --
13  Q.  Do you know one way or the other?
14  A.  I did not tell Pat Foley. I would
15  not tell Pat Foley.
16  Q.  Okay.
17  A.  It's not something I would want.
18  Q.  Okay. And you had drinks with
19  them, correct?
20  A.  Yes, and I think --
21  Q.  After those drinks, you called
22  Marcy?
23  A.  -- I think Brian White, the guy
24  who tagged me with Ooga, had come up. I had
25  stuck around the office a little later

Page 282

1  A. Brian White would have been, in my
2  best guess, and that's probably why he was in
3  the office two weeks later, still looking for
4  the money that Mike Mullen had promised him.
5  And I don't know what the event was, but --
6  Q. Okay.
7  A. -- there must have been some
8  event.
9  Q. All right. So do you remember
10 meeting with Ms. Hall in your office?
11 A. Yes.
12 Q. Do you remember that Ms. Hall was
13 shaken and asked if she had told you about
14 her relationship with Mr. Kimball?
15 A. Oh, she knew she told my about it.
16 Q. Do you remember her asking if she
17 had --
18 A. No.
19 Q. You don't.
20    Do you remember her asking you to
21 be discreet about your knowledge of her
22 relationship with Ed Kimball?
23 A. I remember her asking to be
24 discreet about the events of the night before
25 and/or Ed. I mean, I wasn't telling anyone

Page 283

1  anything.
2  Q. You remember her telling you to be
3  discreet about the events the night before
4  and/or Ed. Is that what you just said?
5  A. I don't remember specifically her
6  saying be discreet about Ed, but...
7  Q. Could have been?
8     THE REPORTER: I don't remember
9  specifically what?
10    THE WITNESS: Her asking me to be
11 discreet about her and Ed.
12 BY MS. ZUCKER:
13 Q. But it could have been, correct?
14 A. She -- she might have. But it
15 would have been unnecessary.
16 Q. I'm not asking what was necessary.
17 I'm asking --
18 A. Right.
19 Q. -- you what you remember one way
20 or the other about what she --
21 A. No.
22 Q. -- asked you?
23 A. I do not --
24 Q. Okay.
25 A. -- remember that.

Page 284

1  Q. Okay.
2     Now, do you recall her sounding --
3  do you recall her not being able to remember
4  the details of the night before?
5  A. No.
6  Q. Do you recall thanking her for the
7  birthday present she had given you?
8  A. No.
9  Q. When, by the way, is your
10 birthday?
11 A. May 3rd.
12 Q. Would she have any reason to do
13 that before May 2nd?
14 A. Sure.
15 Q. How?
16 A. Everybody knows.
17 Q. Why did everybody --
18 A. I mean, I'm around --
19 Q. -- know your birthday?
20 A. Well, you know, it's around town
21 hall. I'm there. Marcy had bought the
22 bottle of wine for mine as a birthday
23 present, and I would say, you know --
24 Q. But Marcy had been your employee
25 for a long -- a much longer time, right?

Page 285

1  A. Right. But, you know, certainly,
2  I celebrated my -- you know, I knew when my
3  birthday was, and other people knew when my
4  birthday was. It wasn't a well --
5  Q. Do you know whether she knew when
6  your birthday was?
7  A. I don't know what she knows. I
8  know it wasn't a secret.
9  Q. Okay.
10 A. I probably had cards already.
11 Q. All right. And so you said "Thank
12 you for the birthday present"?
13 A. No, I did not.
14 Q. You don't remember saying that?
15 A. I do not remember saying that.
16 Q. Okay. You were 100 percent sure
17 that you didn't?
18 A. From the beginning, that has been
19 an allegation. I never remember ever saying
20 that. It's was not something I would do. I
21 was not happy with the evening. I --
22 Q. Okay. You say you know you didn't
23 because it's not something you, quote, "would
24 do," right?
25 A. I did not say that.

Page 286

1  Q. Okay. All right. Now, who's Seth
2  Jacobson?
3  A. Seth, I think, is one of the local
4  reporters. I -- in fact, I know he's a local
5  reporter. I'm not sure what -- they've got a
6  couple of those small-town -- Townsmen,
7  Mariner or --
8  Q. Okay. Those little local papers?
9  A. Those little local papers.
10 Q. Okay.
11 A. Yeah, what do they --
12 Q. And you talked to him --
13 A. There's some other --
14 Q. -- you talked to him about the
15 tabs -- or the other --
16 A. Yeah, what day --
17 Q. -- that things like that, right.
18     THE REPORTER: Hold on. One at a
19 time.
20     THE WITNESS: I apologize.
21     THE REPORTER: One at a time.
22 BY MS. ZUCKER:
23 Q. On May 2nd, at 9:20, do you
24 remember talking with Seth Jacobson?
25 A. I don't remember specifically 9:20

Page 287

1  at -- on that date, but it's not unusual for
2  me to talk to Seth.
3  Q. Now, at some point on May 2nd, do
4  you remember talking to Ms. Birmingham?
5  A. Probably. She worked --
6  Q. Okay.
7  A. -- at town hall.
8  Q. And at no time did you tell her,
9  oh, my God, something terrible happened. You
10 got to keep that woman away from me or
11 anything like that, did you?
12 A. I know that I asked Marcy not to
13 leave me alone in the office, or if I called,
14 to come up.
15 Q. And when did you say you said
16 that?
17 A. I do not know the exact date and
18 time.
19 Q. Do you remember -- I know it was
20 in that --
21     MS. HALEM: Let him finish.
22 A. -- very quick time frame.
23 BY MS. ZUCKER:
24 Q. Okay. So you said to her, do not
25 let me be alone with --

Page 288

1  A. If I call you, please come up.
2  Q. Okay. If I call you, please come
3  up. Because you understood that trick,
4  right, that if somebody --
5  A. Her office --
6  Q. Hold on. That if somebody -- if
7  there's an awkward circumstance that you're
8  in, it's a good political trick. If person X
9  comes up, you need to call me away, right?
10 That's what you were doing with Marcy, right?
11 A. It had not been a problem before
12 this.
13 Q. Okay. So -- and you also did this
14 with Sue Callahan?
15 A. Stacy.
16 Q. Stacy. I'm sorry. Thank you.
17     Stacy Callahan, you told her as
18 well?
19 A. Yeah.
20 Q. What about -- anybody else?
21 Ms. Ide?
22     THE REPORTER: Who?
23     MS. ZUCKER: Ide, I-d-e.
24 A. I think Sue was on vacation or had
25 been going on vacation. No, Sue was -- I --

Page 289

1  it's been a while, but, you know, those are
2  the three that I normally worked with the
3  most.
4  BY MS. ZUCKER:
5  Q. Okay. And, by the way, with
6  respect to those three --
7  A. And/or Eric Hart.
8  Q. Okay. We'll get to Eric in a
9  moment.
10     But you made sure that each one of
11 those three women knew that you were their
12 boss, and you could get rid of them, right?
13     MS. HALEM: Objection.
14 A. I don't have that kind of
15 authority. They were hired. There were
16 rules. There were things in place, but I've
17 never threatened them --
18 BY MS. ZUCKER:
19 Q. You've never --
20 A. -- they were great employees. I
21 worked, you know, very hard and diligently
22 to, honestly, bring them along.
23     When Sue Ide took over the job as
24 executive secretary, I think she actually
25 does more than the other two. There were two

Page 290

other executive secretaries in town. She came over for a smaller salary, but I had told her, I said, as you learn this position, I'll get you up to the scale of the other two.

Stacy Callahan, who didn't have the credentials you would normally have in a human resource person, she didn't have all the background and/or degrees and knowledge, but she'd been doing a good part of the job in the treasurer's office. I advocated to get somebody for Human Resources, put -- hired Stacy for the position. I think I recommended her and the selectmen agreed.

Put her in the position and then strongly advocated with the idea that she was probably amongst the lowest paid human resource individuals in the town. And if you -- and I don't want to bore you, but to get to where she had to go, you still have to go through the advisory board; you still have to go through the selectmen; you still have to go through town meeting.

So I worked hard and told her that I would fight hard as this progressed so that

Page 291

within four or five years she would be up to where she had to be. I also connected her with other human resource individuals; if you have any question -- I think Patty Vinchesi -- I hate to do that to you -- was one of people -- can Stacy call your human resource person? She's learning the position. But trying to promote her.

Marcy, we had to come up with a title for her, but I worked hard to improve her pay and her resumé. And same thing, she came into this position without prior knowledge for the position that she wanted.

One of the things Rockland does is pay the least. And so sometimes you get this entry-level person that you have to try and bring along, or one of the things we would do -- I would do in working with the board -- is get it before the finance committee. Get a position in there with the idea that we can grow the position.

It's not always easy to get that first position, and I have to tell you, you know, it was a long haul. Those were positions that in talking with the board,

Page 292

that I felt we needed, and the board was supportive and approved.

Q. Okay. And --

A. So -- sorry to go on a dissertation.

Q. No, no. No, that's fine.

Now, when did you tell Eric Hart about your version of what occurred on May 1st?

A. Ed had gone in, when he started his investigation, I guess on Friday, and asked for copies of the tapes. Eric came in -- and Ed apparently had been talking to Eric Hart about everything, and Eric came in and said, basically, what the hell, I assume, and told me that Ed wanted him to burn him a copy of all the town hall video.

So at that point Eric already knew. I asked him for a copy of the town hall video so I could have one.

Q. Did you go to Mr. Kimball and tell him that you had asked for -- that you had conferred with Mr. Hart on this subject?

A. Certainly not. At that point, Ed was forcing me into vacation. This was after

Page 293

I had met with Mr. Kimball and Mr. Clifford.

Q. Okay. So after you met with -- well, strike that.

Let me -- let me see if I understand it. Did you talk with Eric Hart before or after you'd had a meeting -- your first meeting with Mr. Kimball and Mr. Clifford?

A. Well after.

Q. Okay. So Mr. Hart didn't talk to you about this before?

A. Ed had gone in whenever he got the tapes.

Q. Okay.

A. When Ed got the tapes --

THE REPORTER: I'm sorry. Did you say, "Ed had gone in whenever he had got the tapes"?

THE WITNESS: Ed had gone -- Ed had gone in to see Eric and review the videos. When he went in to review the videos, which I have to assume was that Friday, and wanted a copy, I asked Eric for a copy as well.

/

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - -

ALLAN CHIOCCA,

    Plaintiff,

v.                      C.A. No.: 1:19-CV-10482-WGY

THE TOWN OF ROCKLAND, DEIRDRE HALL, EDWARD KIMBALL, LARRY RYAN, MICHAEL MULLEN, JR., MICHAEL O'LOUGHLIN, RICHARD PENNEY AND KARA NYMAN,

    Defendants.

**CERTIFIED COPY**

- - - - - - - - - - - - - - - - - - - - - - -

DAY THREE

VIDEOTAPED DEPOSITION OF ALLAN CHIOCCA

Tuesday, September 28, 2021

Commencing at 1:05 p.m.

Job #33855

Christine M. Ferraro

Court Reporter and Notary Public



EcoScribe Solutions
www.EcoScribeSolutions.com
888.651.0505

ALLAN CHIOCCA vs TOWN OF ROCKLAND
Allan Chiocca September 28, 2021

Job 33855
Pages 22..25

Page 22
1  erection unless you took Cialis or Viagra or
2  another pill like it?
3  A.  I don't know if I said "incapable," it's high
4      unlikely or less frequent or much more
5      difficult.
6  Q.  You didn't tell her you were incapable?
7  A.  I don't remember what I told her exactly.
8  Q.  Well, I'm asking you whether in substance you
9      told her that you were incapable of achieving
10     an erection without taking one of those pills
11     and that you didn't have any of those pills on
12     the evening of the incident with Ms. Hall?  Did
13     you tell her that in substance?
14 A.  I know I didn't have any.  Yes, in substance.
15 Q.  Did you tell her that you had nevertheless
16     achieved an erection and climaxed with
17     Ms. Hall?
18 A.  I think I told her it was -- and here we go
19     getting -- getting unfortunately into greater
20     detail -- and I apologize -- than we want, but
21     that I did not achieve a good erection.  Yes, I
22     did climax with Ms. Hall.
23 Q.  My question is whether you told Ms. Ryan that
24     you nevertheless had achieved an erection and

Page 23
1  climaxed with Ms. Hall, yes or no?
2  A.  I think I told her "never got really hard."
3      And "Yes, I achieved climax."
4  Q.  So you think you told her that you achieved
5      climax?
6  A.  Yes.
7  Q.  Now, how many times did you speak with
8      Ms. Hall -- excuse me -- speak with Ms. Ryan?
9  A.  I know I spoke with her at least twice.  The
10     first time, I believe, once they reopened the
11     investigation.
12 Q.  Did you have counsel with you when you spoke
13     with her on each of those occasions?
14 A.  Yes.
15 Q.  Which lawyer was with you?
16 A.  Attorney Shafran.
17 Q.  Were those two interviews recorded, to your
18     knowledge?
19 A.  I don't believe they were recorded.  I think
20     she was taking notes.
21 Q.  Did you tell Ms. Ryan that you were the "de
22     facto chairman" of the board of select persons?
23 A.  I don't believe so.
24 Q.  Do you -- did you tell Ms. Ryan that you were

Page 24
1  depicted on the video as holding a corkscrew in
2  your hand?
3  A.  There was some question about whether or not I
4      had a corkscrew in my hand.
5  Q.  Did you tell her that you thought it was
6      possible that you had a corkscrew in your hand,
7      yes or no?
8  A.  No.  I told her, "No."
9  Q.  By the way, we've talked about this previously,
10     about the bottle of wine in your office that
11     was opened when you and Ms. Hall were in there.
12     Do you recall, generally, talking about that
13     subject matter?
14 A.  Yes.
15 Q.  Now, you threw that bottle of wine out the next
16     morning, didn't you?
17 A.  Yeah.
18 Q.  Did you understand that -- well, strike that.
19     Withdrawn.
20         Why did you throw it out?
21 A.  I think the next day, that an open bottle of
22     wine, it had been opened, it didn't smell good,
23     you know, there was no -- it was just -- at
24     that point, it was just rubbish.

Page 25
1  Q.  You didn't think it was evidence at all.  Never
2      crossed your mind?
3  A.  I didn't know anyone was making a claim.  Never
4      crossed my mind.  I know stories have changed.
5  Q.  Now, did you dump the bott- -- strike that.
6         When you threw the wine out, was there
7      any liquid in it?
8  A.  I believe there was.  I think I emptied it in
9      the bathroom sink, what was remaining, and just
10     put the bottle in the trash that gets emptied
11     every day.
12 Q.  And was the bathroom sink in your office or
13     somewhere else?
14 A.  The men's room sink at town hall.  No, that's
15     not in my office.
16 Q.  So that would require you leaving your office
17     with the bottle of wine and going to the men's
18     room, correct?
19 A.  Yes.
20 Q.  And that's something that would be captured on
21     video at the town hall, correct?
22 A.  I would imagine because -- that's a good
23     question.  I would imagine that it would have
24     been.  I don't know if anybody's ever checked

ALLAN CHIOCCA vs TOWN OF ROCKLAND
Allan Chiocca September 28, 2021

Job 33855
Pages 34..37

Page 34

1 colleague. And just so it's clear, you now
2 recall telling Ms. Birmingham that anything she
3 heard couldn't be true because you couldn't get
4 an erection without taking a pill; is that
5 right?
6 A. I don't recall. I'm not saying I didn't.
7 Q. What about Ms. Ide, did you say that to her?
8 A. Same answer. I don't recall. I'm not saying I
9 didn't. I don't recall saying that to her.
10 Q. Did you want to get that story out there, that
11 you couldn't have done anything sexually
12 because you needed a pill in order to achieve
13 an erection? Was that your intent?
14 A. I don't know that I wanted to get that story
15 out there but I think I had been accused of
16 something after about two weeks of working in
17 town hall and trying to avoid Ms. Hall and she
18 was trying to get a story about me, but I don't
19 know that my intention was to get out a story
20 other than to say, I'm being falsely accused.
21 Q. And that the reason that you were being falsely
22 accused is because you wanted people to know
23 you couldn't get an erection without taking a
24 pill, right?

Page 35

1 A. I don't know that I wanted anybody to know
2 that.
3 Q. Well, but that's what you were telling them so
4 they wouldn't believe Ms. Hall, right?
5 A. I -- I -- I told you I don't recall those
6 conversations specifically.
7 Q. And did you think it was appropriate -- or
8 strike that. Withdrawn.
9 Ms. Birmingham worked for you,
10 correct?
11 A. Yes, for a number of years.
12 Q. Ms. Ide worked for you, correct?
13 A. For a number of years.
14 Q. Did you think it was appropriate to tell two
15 employees who worked for you about your sexual
16 limitations?
17 A. I know that both of those people and I have had
18 many conversations that were regarding family,
19 children, spouses, arguments, this, that, the
20 other thing. I considered them both friends.
21 Some things that, you know, you can
22 paint as appropriate or inappropriate work
23 discussions that might have been amongst
24 friends. This was not a discussion regarding

Page 36

1 Cialis that I had had with either one of them
2 at any time, at least prior to this.
3 Q. So it's okay for you to talk about intimate
4 details of your sexual abilities with two women
5 who work for you because they were your
6 friends; is that your testimony?
7 A. I think that we had had numerous personal
8 conversations about each one of their lives, as
9 well as mine, over the years. I considered
10 them friends. But this was not something that
11 I would have shared prior to this.
12 Q. I'm just saying that -- am I understanding you
13 correctly that you felt this was okay to do
14 because they were your friends?
15 A. I felt I could confide in my friends that I was
16 being falsely accused.
17 Q. Did you see Regina Ryan's report before
18 Mr. Shafran released it to the media?
19 A. I believe I did.
20 Q. And I take it from your answer that you, then,
21 noticed that it was stamped as a confidential
22 personal record not to be released or
23 distributed without the permission of the
24 Rockland Board of Selectmen, right?

Page 37

1 A. I would have noticed that.
2 Q. And the Rockland Board of Selectmen was your
3 boss, correct?
4 A. Correct.
5 Q. Including on the day that Mr. Shafran, at your
6 instruction, released the report, correct?
7 A. Correct.
8 Q. Mr. Chiocca, do you believe that your comments
9 to Ms. Birmingham and Ms. Ide made them feel
10 uncomfortable?
11 A. I do not know.
12 Q. You don't know, is that what you said?
13 A. I do not know.
14 Q. Did you ever make any comments of a sexual
15 nature to any of the women working at town hall
16 that you understood made them feel
17 uncomfortable?
18 A. No.
19 Q. Were you friendly with Michael O'Loughlin's
20 stepfather and mother?
21 A. Yes.
22 Q. Were you close friends?
23 A. Yes.
24 Q. Do you remain close friends?

EcoScribe Solutions   888.651.0505