UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALLAN CHIOCCA,<br>    Plaintiff,<br>v.<br><br>TOWN OF ROCKLAND et al.<br>    Defendants. | C.A. NO. 1:19-cv-10482-WGY |

**TOWN OF ROCKLAND'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

### I.   INTRODUCTION

The Plaintiff Alan Chiocca ("Chiocca") has moved for summary judgment against the Town of Rockland (the "Town") on two counts: first, Chiocca argues that the Board of Selectmen (the "Board") effectively admitted that Diedre Hall ("Hall") engaged in *quid pro quo* sexual harassment—despite contrary deposition testimony and other pleadings on record—(Count 1) and, second, that the Town breached the terms of Chiocca's employment contract by placing him on paid administrative leave without affording him certain contractual protections applicable to suspensions and terminations (Count 24). These arguments—which have only the thinnest veneer of legitimacy—should be rejected out of hand because they are not supported by the summary judgment record or by well-established law in Massachusetts and this Circuit. The Motion should be denied.

### II.   STANDARD OF REVIEW

Summary Judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. "[A] fact is 'material' only if it potentially affects the outcome of the suit and a dispute over it is 'genuine.'" Internl.

Assn. of Machinists & Aero. Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996). "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); accord Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014) ("We may neither evaluate the credibility of witnesses nor weigh the evidence."); Andrade v. Jamestown Housing Auth., 82 F.3d 1179, 1186 (1st Cir. 1986) ("The court, however, must not consider the credibility of the witnesses, resolve the conflicts in testimony, or evaluate the weight of the evidence") (internal citation and quotation marks omitted). Moreover, "'even if the facts are undisputed, summary judgment may not be granted where there is disagreement over inferences that can be reasonably be drawn from those facts.'" Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.), 346 F. Supp. 3d 174, 189 (D. Mass. 2018) (quoting In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 (3rd Cir. 1996)).

### III.   ARGUMENT

**A. Plaintiff's Counsel Was Advised at the Initial Status Conference that A Dispositive Motion Against the Town Would Be All But Futile.**

The Parties appeared before the Court on July 8, 2019 for a hearing on the Town's Motion to Dismiss. Discussions next turned to preliminary scheduling, at which time Plaintiff's counsel indicated—before conducting any discovery—that he intended to affirmatively file a dispositive motion against the Town. This Court advised him in no uncertain terms that filing a dispositive motion in this case would be borderline futile:

| | |
|---|---|
| THE COURT: | Well I'm trying to save you money and, um, we're going to -- and this is it. So I'll give you two weeks to file a joint proposed case-management schedule. |
| | But let's start with the plaintiffs. When do you want to go to trial? |
| MR. SHAFRAN: | About a year, roughly. |
| THE COURT: | A year, um, so all the way to September 2020? |
| MR. SHAFRAN: | There's going to likely be a significant amount of discovery, we'll certainly be filing a dispositive motion. |
| THE COURT: | I'm not -- yeah. |
| | You'll file a dispositive motion? |
| MR. SHAFRAN: | Well we'd file a motion for summary judgment, yes, your Honor. |
| THE COURT: | **How could you possibly win it?** |
| MR. SHAFRAN: | Well we think we could win a dispositive motion because the investigator that the raise this motion at the initial conference. Town hired issued a 30-page investigative report that found that my client, Mr. Chiocca, was in fact a victim of quid pro quo sexual harassment, and we think based on the evidence, that they -- |
| THE COURT: | **How do you get around, um, the -- you bear the burden of proof here, so the factfinder might disbelieve it.** |
| MR. SHAFRAN: | True but -- |
| THE COURT: | Even though it may well be admissible as a government report? |
| MR. SHAFRAN: | That's absolutely true. And in our summary judgment they would have to disavow their own report. |
| THE COURT: | Oh, you think so? |
| MR. SHAFRAN: | I think that to some extent that we could establish enough through discovery that based on that report we could move for summary judgment. |
| THE COURT: | **Let's take a deep breath and deal with reality. You're going to have a very long road to hoe if you think you can win this case in whole or in part on summary judgment where you bear the burden of proof and the reason is a factfinder may disagree – may disbelieve the facts that you proffer.** Just saying it. So it looks to me like this is a trial. So -- but I'm not pressing. |

3

[See Exhibit 7, Transcript of July 8, 2019 Hearing at 6-7] (emphasis added). For the very reasons this Court identified at the July 8, 2019 hearing, and discussed in more detail below, Plaintiff's Motion should be denied.

**B. There Remain Genuine Disputes of Material Fact as to Whether Chiocca Sexually Assault and/or Raped Dierdre Hall, or Whether Deirdre Hall engaged in *Quid Pro Quo* Sexual Harassment.**

Chiocca argues that he is entitled to summary judgment on his claim for *quid pro quo* sexual harassment based on stitched-together comments, taken out of context, made by various Board members at distinct times and in varied circumstances. In particular, Chiocca argues that the Town effectively admitted that Hall engaged in sexual harassment based on: (1) the Board's vote to accept Attorney Ryan's Confidential Report; (2) statements Selectman Ryan, Selectman O'Loughlin, and former Selectman Mullen made in 2018; and (3) incomplete and deceptive citations to certain deposition testimony. He makes this argument *despite* clear and repeated testimony that disputes his version of events on May 1-2, and that both the Town and the Board disagreed with the factual findings, conclusions, and recommendations contained in the Confidential Ryan Report.[1] Although it should go without saying, the Town has vigorously disputed Chiocca's allegation that he was subjected to *quid pro quo* sexual harassment. [See, e.g., Doc. No. 38 at ¶¶ 320-367; Doc. No. 159 at 3]. Chiocca and Hall fundamentally disagree about what occurred during the May 1-2 incident. Chiocca alleges that Hall threatened to vote against renewing his contract unless he permitted her to perform oral sex on him. [Doc. No. 160 at ¶ 4].

---

[1] At best, Chiocca can claim that the deposition testimony of Selectman Ryan, Selectman O'Loughlin, and former Selectman Mullen is inconsistent as to whether they believed and/or adopted Attorney Ryan's finding/conclusion that Chiocca was sexually harassed. But of course, "[a] party's inconsistent testimony may render [them] an easily impeachable witness: it does not mean that summary judgment is warranted." Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 216-217 (1st Cir. 2016). Rather, inconsistent testimony—to the extent it exists—goes to the credibility and the weight of the evidence, not a ground for granting summary judgment. See, e.g., Ahmed, 752 F.3d at 495.

In direct and stark contrast, Hall alleges that Chiocca sexually assaulted and/or raped her by engaging in sexual conduct while knowing that she was too intoxicated to consent. [Doc. 160 at ¶ 5]. And Chiocca does not quibble with this dispute. Rather, he attempts to conjure up admissions by the Town that would bypass the dispute and hold the Town strictly liable for the underlying event. Chiocca's attempt to fabricate an acceptance/admission of liability as to sexual harassment should be rejected out of hand.

Chiocca first argues that the Town admitted liability on sexual harassment because the Board "voted to accept the [Confidential] Ryan Report in full without any qualifications." [Doc. No. 172 at 13]. But in making this bold assertion, Chiocca neglects to inform the Court that two[2] of the three Board members who took this vote—Selectman Ryan and former Selectman Mullen—testified at their depositions that the vote to accept the Confidential Ryan Report was **not** a vote to adopt the findings, conclusions, and/or recommendations contained therein. [Doc. 160 at ¶¶ 45-47]. There is no contrary testimony or documentary evidence in the summary judgment record. To infer that the Board's vote to accept the Confidential Ryan Report was actually a vote to adopt all findings, conclusions, and recommendations therein—despite directly contrary deposition testimony—would violate the fundamental precept that all reasonable inferences are drawn in the Town's favor at the summary judgment stage. See, e.g., Taite v. Bridgewater State Univ., Bd. of Trustees, 999 F.3d 86, 92 (1st Cir. 2021); see also Students for Fair Admissions, Inc., 346 F. Supp. 3d at 189.

Moreover, all three Board members testified at their depositions that they disagreed with the Confidential Ryan Report. [See Doc. No. at ¶ 63; Town's Response to Doc. No. 179 at ¶ 149].

---

[2] Unlike Selectman Ryan and former Selectman Mullen, Selectman O'Loughlin was not directly asked to explain his understanding of the vote.

5

Selectman Ryan testified that he "questioned the [Confidential Ryan] report's entirety due to the one-sided nature of the exchange," and because Selectman Ryan never knew Chiocca to be intimidated by anyone over the long time they knew each over. [Doc. No. 160 at ¶ 63]. Former Selectman Mullen testified that he did not agree with all the findings and recommendations contained in the Confidential Ryan Report. [Town's Response to Doc. No. 179 at ¶¶ 149, 161-162, 172, 175, 183-184]. Selectman O'Loughlin testified that he "felt as though the -- the investigation was very one-sided because only one person actually provided testimony to [Attorney] Ryan at the time. . . ." [Id.]. To further gild the lily, at no point did Chiocca's counsel ask the obvious line of follow-up questions, such as: what findings did the Board believe/adopt, what findings did the Board not believe/adopt, and/or whether the Board believed that Chiocca was subjected to *quid pro quo* sexual harassment. Any ambiguity created by the incomplete questioning of the three Board members must inure in the Town's favor. See Taite, 999 F.3d at 92; Xiaoyan Tang, 821 F.3d at 216-217; Students for Fair Admissions, Inc., 346 F. Supp. 3d at 189.

Finally, Chiocca cites to certain testimony from the Town's Rule 30(b)(6) deposition that—taken entirely out of context and ignoring the clear and unambiguous objections of counsel—ostensibly shows that the Town has no evidence to contradict the Confidential Ryan Report's conclusions. But of course, a close reading of the Town's depositions makes clear this was not so. The full exchange occurred as follows:

> Q: As of that time, July 2018, when it read the report, did the town possess any information to contradict this conclusion?
>
> MR. AMOS: Objection. Beyond the scope of the notice. You can answer, if you know.
>
> A. I'm not sure.
>
> Q. Okay. As you sit here today, does the town possess any information to contradict that conclusion?
>
> MR. AMOS: Objection. It's beyond the scope of the notice. It also gets dangerously close to mental impressions of counsel and litigation

| | |
|---|---|
| | strategy. So Doug, if you know, if you have personal knowledge, you can answer. |
| A. | No. I'm not sure. |
| Q. | Okay. Does the town possess any facts that causes it not to believe the conclusion set forth in Paragraph 9? |
| MR. AMOS: | Objection. It's beyond the scope of the notice. Doug, you can answer to the extent you have personal knowledge. |
| A. | I don't have personal knowledge. |
| Q. | Okay. And again, I just want to ask, does the town have any -- is the town aware of any facts that causes it to not believe the conclusion in Paragraph 9? |
| MR. AMOS: | Well, object to the form. And I'll object, it's beyond the scope of the notice. So Doug, answer to the extent you have personal knowledge. |
| A. | I am not sure. |

[Exhibit 1 at 187:7-24, 188:1-17]. At no time since the deposition took place on October 26, 2021 has Chiocca moved to compel or to challenge the instructions for the deponent to testify only as to his personal knowledge. But even if that instruction was in error, the deponent testified that he was "not sure" whether the Town possessed any facts to contradict the conclusion contained in the Confidential Ryan Report. This is a far cry from an admission of liability given the substantial disputes of fact itemized above. Where the Court is confronted "two versions of events, and the[] differing narratives demonstrate a disputed issue of material fact," summary judgment is inappropriate. Wilson v. Entergy Nuclear Operations, Inc., 2019 WL 4417771, at *5 (D. Mass. Sept. 16, 2019) (Burroughs, J.). Chiocca cannot point to any concrete testimony that bears out that the Board as a whole (or at the very minimum a majority of the Board) admitted that Chiocca was subjected to *quid pro quo* sexual harassment. The Motion should be denied.

C. **The Town Did Not Breach Any Term of Chiocca's Employment Contract.**

Chiocca next argues that his placement on paid administrative leave on May 29, 2018 was effectively a suspension, which triggered certain notice protections contained in his employment contract and the Town's Charter. [Doc. No. 172 at 16-18]. In support of this position, he cites to a

line of Massachusetts and First Circuit cases that have analogized paid administrative leave and paid suspension. As a matter of first principles, there is a clear factual distinction between placing an employee on paid administrative leave pending an investigation into alleged wrongdoing and suspending an employee; it is not simple nomenclature. As relevant here, this distinction is rooted not only in the source of authority but also in the purposes of the discrete actions. Additionally, the cases Chiocca relies upon arise in distinct procedural postures, discuss the issue in dicta, and engage in no meaningful analysis of the similarities and/or differences between the two employment statuses.

    1. <u>Paid Administrative Leave is Distinct from a Suspension or a Termination</u>.

Chiocca's employment contract addresses only two categories of employment actions: suspension and termination. If the Town had sought to suspend or terminate Chiocca in connection with the May 1-2 incident, he would be entitled to certain notice and the Town would be required to submit a written resolution to the town clerk. However, neither Chiocca's employment contract nor the Town Charter contemplate paid administrative leave, let alone restrict when and under what circumstances the Town may place Chiocca on paid administrative leave. Rather, paid administrative leave is a tool contemplated under the Town's then-existing Discriminatory Harassment Policy (hereinafter "Harassment Policy"), which provides:

> During the course of the investigation, the investigator may determine it is necessary or advisable to take interim measures to separate the alleged harasser from the complainant. . . . Interim measures may include; placing the alleged harasser on administrative leave, placing the complainant on administrative leave if requested, transferring the harasser or the complainant, if requested, to a different area or shift, instructing the harasser to stop the conduct, and eliminating supervisory authority over the complainant.

[<u>Doc. No. 161-18 at 13</u>]. It should be noted that the Harassment Policy was created at Chiocca's direction. As Stacia Callahan testified at her deposition, the Harassment Policy "was included in the policies and procedures manual which [her] boss, Alan Chiocca, at the time had [her] work on

with town counsel so that [the Town] could have a policies and procedures manual for all town employees." [Exhibit 8, Deposition of Stacia Callahan at 9-13]. By its terms, the Harassment Policy represents "Town policies, practices and benefits as they pertain to" Town "employee[s]." [Doc. No. 161-18 at 8]. The Harassment Policy exempts five (5) categories of individuals, none of which include the Town Administrator.³ As such, the Town's authority to place Chiocca on paid administrative leave arose under the Harassment Policy—which does not require 30 days' notice or a written resolution.

Additionally, paid administrative leave serves an entirely distinct function from a suspension. As the Town testified at its deposition:

> [P]aid administrative leave is an action that happens when something is being investigated, when something happened that there needs to be a fact-finding and investigations to determine exactly what occurred. So people are put on paid administrative leave, one of the reasons of which is to protect that individual from any types of retaliation. Suspension is something that's an affirmative action taken by the town, which is essentially a form of discipline, where there's a process. In this case, there's a process through the Rockland Town Charter for how that occurs. So someone that is put on paid administrative leave could possibly be suspended in the future or not. They're two – they're two separate – they're just two separate things. One is -- again, the suspension is more discipline where it would be documented; whereas paid administrative leave is separating that person from the organization while an investigation is being conducted. . . .
>
> [A] suspension is really a -- like a permanent mark on someone's record that they, you know had been -- that there was a determination made and that there was a finding and that there was discipline that was put in place. So that's something that's different from paid administrative leave."

[Exhibit 1 at 120:20-24, 121:1-17, 122:15-22]. There is no contrary testimony in the summary judgment record. Instead, Chiocca deceptively asserts that "Selectmen Ryan testified that he has

---

³ Those exempted individuals are: (1) "All elective officers and persons appointed to fill vacancies in elective officers"; (2) "Members of boards, commissions, committees and authorities"; (3) "Employees under the jurisdiction of the School Committee"; (4) "Employees exempted by the Board of Selectmen"; and (5) "Volunteer personnel, and personnel appointed to serve without pay." [Doc. No. 161-18 at 6].

9

no understanding of any difference between administrative leave and suspension." [Doc. No. 172 at 18]. But Chiocca fails to inform the Court that Selectman Ryan also testified that, while he does not "know the technical aspects of each . . . an administrative leave is different than a suspension, [he] would imagine." [Exhibit 4 at 52:5-7]. That Selectman Ryan may not understand the technical or legal distinction between paid administrative leave and suspension does not mean the Town or the Board have admitted the two employment statuses are one and the same. Likewise, Chiocca's citation to Selectman O'Loughlin's testimony is taken completely out of context. The exact progression of testimony occurred as follows:

> Q. So what, if anything, was Mr. Chiocca *permitted to do as it relates to his job while on administrative leave that he would not have been permitted to do if he was suspended*?
> A. Get paid.
> Q. I'm sorry?
> A. Get paid.
> Q. So how about *in terms of his job, aspects of his job*?
> A. There's, you know, no real difference, no.
> Q. There -- other than paid or not paid, there is no difference in terms of what Mr. Chiocca *would not be allowed to do on an administrative leave versus suspension*?
> A. Correct.

[Exhibit 3 at 238:21-24, 239:1-11] (emphasis added). As the full context of the questioning bears out, Selectman O'Loughlin was not testifying—nor was he asked—about the similarities and differences between paid administrative leave and suspension writ large. Rather, the questions were pointedly in connection with what *job functions* Chiocca could exercise while on paid administrative leave as opposed to suspension.

Finally, the Board necessarily understood the distinction between paid administrative leave and suspension based on how the November 20, 2018 vote was taken. During the course of the Board's meeting on November 20, 2018, the Board voted to continue "Mr. Chiocca's status on paid administrative leave through June 30, 2019, *subject to any subsequent vote to suspend or*

10

*terminate* Mr. Chiocca for misconduct as permitted under his employment agreement and the Town Charter." [Doc. No. 160 at ¶ 55; Doc. No. 176-13 at pg. 2] (emphasis added). If, as Chiocca argues, paid administrative leave is legally tantamount to a suspension, there would have been no need for the Board to reserve the right to take a further vote to suspend or terminate him.

Because paid administrative leave is distinct from suspension, neither Chiocca's employment contract nor the Town Charter required the Board to provide Chiocca notice or a statement of reasons prior to placing him on paid administrative leave. As such, there was no breach of Chiocca's employment contract, and this Motion should be denied.

### 2. The Cases Cited by Chiocca Arise from Procedurally Distinct Situations, Are Dicta, and Engaged in No Analysis of the Distinction.

Without providing any context, Chiocca claims that the SJC broadly and unambiguously held that there is no legally cognizable difference between suspension and paid administrative leave, citing to Campatelli v. Chief Justice of The Trial Court, 468 Mass. 455 (2014). But, of course, Campatelli arose in a starkly distinct procedural posture. There, the issue on appeal was whether certain administrators[4] could suspend the register of probate, or whether "the authority to take such action [rested] solely in" the SJC pursuant to M.G.L. c. 211, § 4. Id. at 460. In passing reference in a footnote, the SJC indicated that it saw "no legally cognizable difference between suspension with pay and paid administrative leave, and use[d] the terms interchangeably in [the] opinion." Id. at 457 n. 2. Importantly, the appellee in Campatelli appears to have conceded, as a factual matter, that there was no distinction between paid administrative leave in that case: "acknowledging Patricia Campatelli's concerns over the negative connotations of the word 'suspension,' the Trial Court agreed to refer to Campatelli's status as 'paid administrative leave.'"

---

[4] The Chief Justice of the Probate and Family Court Department, the Chief Justice of the Trial Court, and the Court Administrator.

Id. at 459 n.2. This is in stark contrast to the present case, where the Town considered paid administrative leave to be a distinct employment status from suspension. Moreover, it is far from clear—given the lack of analysis—that this statement by the SJC was a pronouncement that all paid administrative leave is legally indistinguishable from suspension with pay in any and all circumstances, including public employment contracts that are not controlled by Chapter 211. Nothing in Campatelli indicates that the case rose or fell on a distinction between paid administrative leave and suspension with pay. This Court should decline to expand Massachusetts law based on nothing more than a single sentence of dicta located in a footnote.

Similarly, Chiocca's reliance on U.S. ex rel. Herman v. Coloplast Corp., 295 F.Supp.3d 37 (D. Mass. 2018) is unavailing. There, Judge Zobel did nothing more than acknowledge—without making a finding or legal conclusion—that some "[c]ourts have referred to such a situation interchangeably as a 'suspension' and 'paid administrative leave.'" Id. at 39 n.1. Likewise, Scott v. Metropolitan Health Corp., is inapposite. In Scott, the Sixth Circuit noted that, under circuit precedent, "a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." 234 Fed. Appx. 341, 348 (6th Cir. 2007) (emphasis in original). Much like Campatelli, the holdings in Herman and Scott were not predicated on a distinction between paid administrative leave and suspension with pay, and neither case engaged in any meaningful analysis of the similarities or differences between the two.

In contrast, numerous decisions from the First Circuit have considered employment claims where an individual was both placed on paid administrative leave and subsequently suspended, which undercuts any conclusion that the two employment actions are legally indistinct. See, e.g., Gutwill v. City of Framingham, 995 F.3d 6, 11 (1st Cir. 2021) (discussing a period of paid administrative leave separate from a subsequent five-day unpaid suspension); Slattery v. Town of

Framingham, No. 17-CV-11187-IT, 2020 WL 6566553, at *5 (D. Mass. Nov. 9, 2020) (Talwani, J.) (discussing a period of paid administrative leave separate from a subsequent two-day unpaid suspension); Yourga v. City of Northampton, 474 F. Supp. 3d 408, 423 (D. Mass. 2020) (Mastroianni, J.) (employee first placed on paid leave, then suspended without pay once it became clear criminal charges would be filed against the employee); Ballinger v. Town of Kingston, No. CV 18-11187-FDS, 2019 WL 6726689, at *13 (D. Mass. Dec. 10, 2019) (Saylor, J.) ("While plaintiff appealed his three-day suspension in 2016 to an arbitrator, there is no indication that he took similar action over his paid administrative leave and involuntary retirement."); Murphy v. City of Newton, No. CV 15-12964, 2017 WL 6329614, at *3 (D. Mass. Dec. 11, 2017) (Casper, J.) (police officer placed on paid administrative leave pending a disciplinary hearing and separately disciplined with a two-day suspension following the hearing).[5]

## V. CONCLUSION

**WHEREFORE**, the defendant, Town of Rockland, respectfully requests that this Honorable Court **DENY** Chiocca's Partial Motion for Summary Judgment (Doc. No. 172).

---

[5] And more specifically, several decisions by administrative judges and the Merit Systems Protection Board have concluded that paid administrative leave is not effectively a suspension. See Rosario-Fabregas v. Dept. of Army, No. NY-0752-13-0167-I-1, 2015 WL 631411 (M.S.P.B. Feb. 13, 2015), aff'd sub nom. Rosario–Fabregas v. Merit Sys. Prot. Bd., 833 F.3d 1342 (Fed. Cir. 2016) (placement on paid administrative leave "end[ed] the period of an possible constructive suspension); LaMell v. Armed Forces Ret. Home, No. AT-3443-06-0657-I1, 2007 WL 137896 (M.S.P.B. Jan. 12, 2007) (paid administrative leave is not a "constructive suspension" for the purposes of invoking Board's jurisdiction); Wolf, Steven Fast v. Doi, No. DE-3443-15-0260-I-1, 2015 WL 1785850 (Apr. 17, 2015) (Brooks, A.J.) ("paid administrative leave is not a suspension"). The Town acknowledges that these decisions are under federal civil service law, not state contract law, but provide some useful guidance.

Respectfully submitted,

Defendants,

TOWN OF ROCKLAND

By its Attorneys,

**PIERCE DAVIS & PERRITANO LLP**

*/s/ Jason W. Crotty*

Jason W. Crotty, BBO #656313
Justin L. Amos, BBO #697232
10 Post Office Square, Suite 1100
Boston, MA 02109
(617) 350-0950
jcrotty@piercedavis.com
jamos@piercedavis.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on December 6, 2021.

*/s/ Justin L. Amos*

Justin L. Amos, Esq.