# EXHIBIT A

AO88  (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

DISTRICT OF _____ Massachusetts

Allan Chiocca

V.

The Town of Rockland, et al

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  1:19-CV-10482-WGY

TO:  Casey Sherman

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION    Todd & Weld, LLP, One Federal Street, Boston, MA 02110 | DATE AND TIME  2/17/2022 10:00 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attachment A.

| PLACE        Todd & Weld, LLP, One Federal Street, Boston, MA 02110 | DATE AND TIME  2/11/2022 9:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE  1/21/2022 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Tara D. Dunn, Esq., Todd & Weld, One Federal St., Boston, MA 02110

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance,
(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)  subjects a person to undue burden.

(B) If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## SCHEDULE A

### Instructions

1.      Fed. R. Civ. P. 45 requires that you produce the documents requested herein as they are kept in the ordinary course of business, or you must organize and label them to correspond to the categories contained herein.

2.      If you object to any of the below requests, the reasons for objection shall be stated.

3.      If a document requested herein cannot be produced in full, produce it to the extent possible, identify any portion(s) that cannot be so produced and specify the reasons for your inability to produce said portion(s).

4.      If you claim that any pertinent document responsive to any Request herein is privileged, such document should be identified by providing a description stating the following:

     (i)     the nature of the privilege claimed;

     (ii)    the identity of the client and/or attorney claiming privilege;

     (iii)   the general nature of the document;

     (iii)   the date of the document;

     (iv)   the location of the document;

     (v)    the author or authors of the document;

     (vi)   the addressee, if any, of the document;

     (vii)  the title, if any, of the document; and

     (viii) to the extent not privileged, the substance of the document.

4.      If any of the documents requested below have been destroyed or otherwise discarded, identify the document destroyed or discarded in the same manner as identification is requested for "privileged documents."

5.      If all the information furnished in response to all or part of any document request is not within your personal knowledge, identify each person to whom all or part of the information furnished is a matter of personal knowledge and each person who communicated to the affiant any part of the information furnished.

6.      A request for any document shall be deemed to include a request for any and all drafts, revisions and modifications thereto, in addition to the document itself.

7.      Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, the following Requests are continuing in nature and if any other documents are hereinafter discovered or obtained by you which are responsive to such Requests, we demand that such documents be produced immediately. Failure to provide the requested documents shall constitute a representation by you that no such documents exist.

8.      Any request for documents made herein includes a request for documents or communications in any form, whether notes, texts, emails, paper or otherwise, and whether retained on corporate, personal or private electronic devices or accounts (including email accounts), files or otherwise.

9.      Unless otherwise specified the relevant time period to which these documents refer is January 1, 2017 to the present.

## **<u>DEFINITIONS</u>**

**"Attorney Shafran"** refers to Adam Shafran who is a partner at Rudolph Friedmann LLP, located at 92 State Street, Boston, Massachusetts, 02109, and counsel for Plaintiff Allan

Chiocca, and refers to their agents, representatives, and all persons acting or purported to act on his behalf.

**"Attorney Friedmann"** refers to Jon Friedmann who is a partner at Rudolph Friedmann LLP, located at 92 State Street, Boston, Massachusetts, 02109, and counsel for Plaintiff Allan Chiocca, and refers to his agents, representatives, and all persons acting or purported to act on his behalf.

**"Complaint"** refers to the Complaint and Jury Demand that Chiocca filed in this matter, which is attached hereto as **Exhibit A**.

**"Chiocca"** refers to Plaintiff Allan Chiocca and his agents, representatives, and all persons acting or purported to act on his behalf.

**"Defendant Town"** refers to Town of Rockland and its agents, representatives, and all persons acting or purported to act on its behalf.

**"Kimball"** refers to Edward Kimball, Defendant and Plaintiff in Counterclaim, his agents, representatives, and all persons acting or purporting to act on his behalf.

**"Hall"** refers to Deirdre Hall, Defendant and Plaintiff in Counterclaim, her agents, representatives, and all persons acting or purporting to act on her behalf.

**"Defendant Ryan"** refers to Larry Ryan and his agents, representatives, and all persons acting or purporting to act on his behalf.

**"Defendant Mullen"** refers to Michael Mullen, Jr. and his agents, representatives, and all persons acting or purporting to act on his behalf.

**"Defendant O'Loughlin"** refers to Michael O'Loughlin and his agents, representatives, and all persons acting or purporting to act on his behalf.

"**Defendant Penney**" refers to Richard Penney and his agents, representatives, and all persons acting or purporting to act on his behalf.

"**Defendant Nyman**" refers to Kara Nyman and her agents, representatives, and all persons acting or purporting to act on her behalf.

"**May 1, 2018 Matter**" refers to any of the allegations referenced in Plaintiff Allan Chiocca's Complaint, attached hereto at Exhibit A.

"**Media**" refers to any person, journalist, reporter or writer affiliated with a news outlet, publishing company, podcast, or any free-lance news reporting entity or person.

"**Ryan Report**" refers to Attorney Regina Ryan's Investigation of Complaint Against Deirdre Hall and Allan Chiocca Findings of Fact, Conclusions and Recommendations documents, dated July 2, 2018. The cover page of the investigative report is attached as **Exhibit B**, attached hereto.

"**You**" refers to Casey Sherman, the subject of this subpoena, a publicist that was engaged by Allan Chiocca, Attorney Adam Shafran, or Jon Friedmann or Rudolph Friedmann LLP, and is indicated in the "From" line of the email attached hereto as **Exhibit C**.

The term "document" is defined to be synonymous in meaning and equal in scope to the usage of that term in Rule 34(a) of the Federal Rules of Civil Procedure and specifically refers to any designated document or electronically stored including, without limitation, writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

The term "communications" is defined to be synonymous in meaning and equal in scope to the usage of that term in Rule 26.5(c) of the Local Rules of the United States District Court for the District of Massachusetts and specifically includes, without limitation, any verbal or written transmittal of information (in the form of facts, ideas, inquiries, or otherwise) between two or more persons including, without limitation, correspondence, messages, telephone conversations, other conversations, discussions, meetings, conferences and other such activities or occurrences whereby thoughts, opinions, or data are transmitted between two or more persons.

The terms "concern" or "concerning" are defined to be synonymous in meaning and equal in scope to the usage of that term in Rule 26.5(c) of the Local Rules of the United States District Court for the District of Massachusetts and specifically includes, without limitation, referring to, describing, evidencing or constituting.

Use of the singular includes the plural and use of the plural includes the singular.

As used herein, the term "and" shall mean "and" as well as "or."

As used herein, the term "or" shall mean "or" as well as "and."

## REQUESTS

### REQUEST NO. 1

All documents related to any services you provided related to Allan Chiocca.

### REQUEST NO. 2

All documents reflecting communications between you and any reporter or editor concerning the Ryan Report.

### REQUEST NO. 3

All documents concerning your work for Attorneys Shafran and Friedmann or their law firm including, without limitation, all communications between you, on the one hand, and any of Attorney Shafran, Attorney Friedmann, their law firm or Allan Chiocca, on the other.

**REQUEST NO. 4**

Your engagement letter(s) with respect to any matter related to Allan Chiocca and documents sufficient to show the manner and amount you were paid.

**REQUEST NO. 5**

All communications with the media related to Allan Chiocca.

**REQUEST NO. 6**

All handwritten notes, texts, emails, and Internet postings related to any work concerning Allan Chiocca.

**REQUEST NO. 7**

All documents reflecting communications between you and individuals in the "To" line, "cc" line or "bcc" line or the Media in the attached email in Exhibit C.

**REQUEST NO. 8**

Documents sufficient to show the identity of all recipients of Exhibit C.

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Allan Chiocca,**

        **Plaintiff**

        **v.**                          **Civ. A. No.:**

**The Town of Rockland, Deirdre Hall,**
**Edward Kimball, Larry Ryan,**
**Michael Mullen Jr., Michael O'Loughlin,**
**Richard Penney, and Kara Nyman**

        **Defendants**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>COMPLAINT</u>

Plaintiff, Allan Chiocca, brings this action against the Town of Rockland, Deirdre Hall, Edward Kimball, Larry Ryan, Michael Mullen Jr., Michael O'Loughlin, Richard Penney, and Kara Nyman upon information and belief, except as to his own actions, the investigation of his counsel, and facts that are a matter of public record as follows:

## <u>THE PARTIES</u>

1. Plaintiff, Allan Chiocca, ("Mr. Chiocca") is a resident of Bridgewater, Massachusetts and has served as the Town Administrator for the Town of Rockland since 2008.

2. Defendant, the Town of Rockland, ("the Town") is a municipality located in Plymouth County. The Town is governed by a five-member Board of Selectmen ("BOS").

3. Defendant, Deirdre Hall, ("Mrs. Hall") is a resident of Rockland, Massachusetts and a former member and former Vice Chairman of the BOS.

4.  Defendant, Edward Kimball, ("Mr. Kimball") is a resident of Rockland, Massachusetts and a former member and former Chairman of the BOS.

5.  Defendant, Larry Ryan, ("Mr. Ryan") is a resident of Rockland, Massachusetts and a current member and current Chairman of the BOS.

6.  Defendant, Michael Mullen Jr., ("Mr. Mullen") is a resident of Rockland, Massachusetts and a current member of the BOS.

7.  Defendant, Michael O'Loughlin, ("Mr. O'Loughlin") is a resident of Rockland, Massachusetts and a current member and current Vice Chairman of the BOS.

8.  Defendant, Richard Penney, ("Mr. Penney") is a resident of Rockland, Massachusetts and a current member of the BOS.

9.  Defendant, Kara Nyman, ("Ms. Nyman") is a resident of Rockland, Massachusetts and a current member of the BOS.

## JURISDICTION AND VENUE

10.  With respect to Mr. Chiocca's claim under Title VII, this Court has original jurisdiction pursuant to 42 U.S.C. § 2000e *et seq* and 28 U.S.C. § 1331.

11.  With respect to Mr. Chiocca's claims under 42 U.S.C. §§ 1983 and 1985, this Court has jurisdiction pursuant to 28 U.S.C. 1343.

12.  With respect to Mr. Chiocca's state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

13.  Venue is appropriate in this Court, as the violations of Mr. Chiocca's rights were committed within the Commonwealth of Massachusetts, Plymouth County.

## SUBSTANTIVE ALLEGATIONS

14. On January 5, 2016, Mr. Chiocca entered into a three-year contract ("the Contract")

    with the Town to serve as Town Administrator through June 30, 2019.

15. Section 4(A) of the Contract states:

> Employer may suspend the Employee for good cause, with
> pay and benefits, at any time during the term of this
> agreement, in accordance with Section 2.18.(a) of the
> Rockland Town Charter (as amended by Chapter 58 of the
> Acts of 2005).

16. Section 4(B) of the Contract states:

> The Employer may terminate the service of the Employee
> at any time for malfeasance. The provisions of Section
> 2.18.(a) [sic] Rockland Town Charter (as amended by
> Chapter 58 of the Acts of 2005) shall apply to such
> termination. Upon termination for malfeasance under the
> provisions of this paragraph all obligations of the parties
> hereto shall cease and this Agreement shall be void and
> without recourse to the parties. For the purposes of this
> agreement "malfeasance" is defined as criminal
> misconduct, whether or not such acts are committed in the
> course of the Employee's employment with the Town.

17. Section 4(C) on the Contract states:

> The Employee may be terminated by the Employer,
> pursuant to Section 2.18.(a) of the Rockland Town Charter,
> for failure to meet performance goals established pursuant
> to Sections 1 and Section 5 hereof, before expiration of
> aforesaid term of employment, [sic] In that event,
> Employer agrees to pay Employee a lump sum cash
> payment of three months salary. Additionally, upon such
> termination the Employee shall be paid a lump sum cash
> payment in lieu of all accumulated vacation. Further, the
> Employer agrees to permit the Employee to remain enrolled
> in the Employer's insurance plans for three months,
> provided the Employee pays his share of premiums
> attributable to his membership to the same extent as if he
> were still employed by the Employer.

18. Section 2.18.(a) of the Rockland Town Charter states:

The board of selectmen by affirmative vote of at least 4
members may suspend or remove the town administrator
from office. If the board of selectmen affirmatively votes to
suspend or remove the town's administrator, the board shall
give at least 60 days notice as to the effective date of his
suspension or termination, or provide 60 days of severance
pay, or a combination of both notice and severance pay
equivalent to at least 60 days. At least 30 days before the
proposed suspension or termination becomes effective the
board of selectmen shall file a preliminary written
resolution with the town clerk setting forth in detail the
specific reason for the proposed suspension or termination.
A copy of the resolution shall be delivered to the town
administrator. The town administrator may within 10 days
of service of the resolution, reply in writing to the
resolution and may request a public hearing. If the town
administrator so requests, the board of selectmen shall hold
a public hearing not earlier than 20 days nor later than 30
days after the filing of the request. After the public hearing,
if any, otherwise at the expiration of 30 days following the
filing of the preliminary resolution, the selectmen may
suspend or terminate the town administrator from duty. In
the event the town administrator is charged with a criminal
act, alleged to have been perpetrated while performing his
job, suspension without pay is immediate and if the town
administrator is not exonerated of the charges, termination
is immediate and no notice or severance shall be provided.
Nothing contained herein shall limit the authority of the
board of selectmen to suspend or terminate the town
administrator as provided by state, federal or local law.

19. In or about Spring 2018, Mr. Chiocca began discussing a raise and contract

extension with the BOS. The BOS's members at the time were Mrs. Hall, Mr.

Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin.

20. Over the course of Mr. Chiocca's employment with the Town, Town counsel John

Clifford ("Attorney Clifford") advised Mr. Chiocca to begin negotiating a contract

extension with the Town whenever his contract had slightly over one year remaining

in the term.

21. Other individuals, including town administrators from other towns, similarly advised Mr. Chiocca.

22. This contract extension and raise was the first one for Mr. Chiocca considered by the BOS since Mrs. Hall was elected to the BOS.

23. Prior to May 1, 2018, the BOS had expressed to Mr. Chiocca that it was going to vote in favor of giving him a raise on his current contract and a contract extension.

24. As a member of the BOS, Mrs. Hall was one of Mr. Chiocca's supervisors.

25. In or about Spring 2018, Mrs. Hall confided in Delshaune Flipp ("Ms. Flipp") (the Town's Board of Health Senior Assistant) and Stacia Callahan ("Ms. Callahan") (the Town's Human Resource Coordinator), that "marriage is difficult," and that Mrs. Hall found it hard to be with one person even though she loves her husband.

26. At or around this same time, Mrs. Hall declared her candidacy for State Representative, and Mr. Kimball worked with Mrs. Hall on her campaign.

27. During this time (i.e., March and April 2018), Mrs. Hall and Mr. Kimball were involved in an intense physical and emotional affair, during which time Mrs. Hall professed her love for Mr. Kimball.

28. Mr. Kimball's wife, Dawn Kimball ("Mrs. Kimball"), believed Mr. Kimball's relationship with Mrs. Hall had been going on for at least a year but confirmed her suspicion on April 28, 2018.

29. On May 1, 2018, Mr. Kimball did not attend the scheduled BOS meeting because, after learning of the affair, Mrs. Kimball "was feeling vulnerable and betrayed."

30. Mrs. Kimball first confronted Mrs. Hall about the affair through a text message sent to Mrs. Hall while Mrs. Hall was chairing the May 1, 2018, BOS meeting.

31. At 6:58 p.m., Mrs. Kimball texted Mrs. Hall, "I know what happened. You make me sick."

32. The May 1, 2018, BOS meeting concluded at approximately 7:30 p.m. and the members stood on Town Hall plaza chatting when Mr. Chiocca stated that he was going to the Rockland Bar and Grill ("the RBG").

33. It was not uncommon for members of the BOS to go for drinks at the RBG after meetings.

34. Mrs. Hall, Mr. Chiocca, and Mr. Kimball would often go to the RBG, and other people from Town Hall would often join them.

35. Upon information and belief, Mr. Ryan has gone to the RBG and consumed alcoholic beverages on at least one occasion after a BOS meeting.

36. Upon information and belief, Mr. Mullen has gone to the RBG and consumed alcoholic beverages on at least one occasion after a BOS meeting.

37. Upon information and belief, Mr. O'Loughlin has gone to the RBG and consumed alcoholic beverages on at least one occasion after a BOS meeting.

38. Upon information and belief, Mr. Ryan has consumed at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

39. Upon information and belief, Mr. Ryan has driven a vehicle from the RBG after consuming at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

40. Upon information and belief, Mr. Mullen has consumed at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

41. Upon information and belief, Mr. Mullen has driven a vehicle from the RBG after consuming at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

42. Upon information and belief, Mr. O'Loughlin has consumed at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

43. Upon information and belief, Mr. O'Loughlin has driven a vehicle from the RBG after consuming at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

44. Upon information and belief, Attorney Clifford has consumed at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

45. Upon information and belief, Attorney Clifford has driven a vehicle from the RBG after consuming at least three alcoholic beverages on at least one occasion when he went to the RBG after a BOS meeting.

46. Mrs. Hall stated that she was going to join Mr. Chiocca at the RBG following the May 1, 2018, BOS meeting.

47. Mr. Chiocca and Mrs. Hall drove separately to the RBG, and nobody else joined them.

48. Mr. Chiocca and Mrs. Hall each arrived at the RBG at approximately 8:00 p.m.

49. After they arrived, Mrs. Hall ordered a glass of wine, and Mr. Chiocca ordered a beer.

50. At approximately 8:33 p.m. on May 1, 2018, Mrs. Kimball texted Mrs. Hall and stated, "Yes this is Dawn. Did you really think I wouldn't find out? You're a disgusting human being. The both of you are disgusting. I'm not about threatening

anyone just so you know. But I haven't decided how I am going to handle this. 35
years of marriage now means nothing and I have you to thank for that."

51. Mrs. Hall did not respond to Mrs. Kimball's texts that evening.

52. Upon receipt of the texts from Mrs. Kimball, Mrs. Hall was not concerned that her
husband would find out about her affair with Mr. Kimball, but rather was concerned
about the impact the news of the affair would have on her candidacy for State
Representative should Mrs. Kimball post it on social media.

53. While at the RBG with Mr. Chiocca, Mrs. Hall received a call from Mr. Kimball
who assured her that Mrs. Kimball would not post news of the affair on social media.

54. Mrs. Hall then asked Mr. Chiocca if she could use his cell phone because she wanted
to check social media to see if Mrs. Kimball posted anything.

55. Mr. Chiocca inquired as to why she wanted to use his phone, and Mrs. Hall
explained that Mr. Chiocca's phone had access to a Facebook page that hers did not,
and she wanted to check for a specific posting.

56. During this explanation, Mrs. Hall divulged to Mr. Chiocca that she was in love with
Mr. Kimball and had been having an affair with him since March 2018. Mrs. Hall
further explained that Mrs. Kimball, who recently became aware of the affair, had
forbidden Mr. Kimball from communicating with her.

57. Mr. Chiocca had no idea that Mr. Kimball and Mrs. Hall were having an affair prior
to this discussion.

58. During their conversation, Mrs. Hall explained to Mr. Chiocca that she was upset
that her relationship with Mr. Kimball was ending. Mrs. Hall went on to complain
that she felt restricted by her marriage and no longer wanted to be monogamous.

59. Upon information and belief, Mrs. Hall has engaged in extramarital relationships with individuals other than Mr. Kimball over the course of her marriage.

60. Mrs. Hall and Mr. Chiocca remained at the RBG for approximately two hours, during which time they engaged in conversation about different subjects, including Mrs. Hall's relationship with Mr. Kimball, Mrs. Hall's desire to not be monogamous even though she loved her husband, and Mrs. Kimball's response to learning of the affair. Mrs. Hall and Mr. Chiocca also discussed the content of that night's BOS meeting, Mrs. Hall's performance as the acting chairperson, whether Mrs. Hall preferred being called madam "chairperson" or "chairwoman" and other topics.

61. After her second glass of wine, Mrs. Hall began to make sexually suggestive comments to Mr. Chiocca and began to rub his leg and touch his arm. She reiterated she wanted to step out of her marriage and felt restricted.

62. Mrs. Hall told Mr. Chiocca that she "just wanted some cock."

63. Mr. Chiocca immediately rebuffed Mrs. Hall's inappropriate demand by alluding to a medical condition he has and repeatedly stating, "I'm not your guy, even if I wanted to, I'm not your guy."

64. Notwithstanding Mr. Chiocca's rebuffs, Mrs. Hall continued to pursue him aggressively. Mrs. Hall stated that she didn't understand why people have to be with only one person and that her husband was OK with an open marriage.

65. Mrs. Hall again stated that she "just wanted some cock," and Mr. Chiocca repeatedly told her no, and that even if he wanted to, that he was incapable on Tuesdays.

66. After Mr. Chiocca finished his third beer, he told Mrs. Hall he wanted to leave.

67. However, Mrs. Hall asked Mr. Chiocca to stay, and Mr. Chiocca felt compelled to do so because Mrs. Hall was his supervisor.

68. At approximately 9:45 p.m., Mrs. Hall texted her husband, "Be ready for me. Cause I am going to want you."

69. At 9:56 p.m., Mr. Chiocca paid the bill at the RBG. After, Mrs. Hall asked if they could go for a ride in his truck before they went home because she did not want to go home.

70. Feeling obliged to satisfy his supervisor, Mr. Chiocca agreed, and they drove around town for 20–30 minutes before stopping in the parking lot of the Banner Pub where they talked some more.

71. At this time, Mrs. Hall, who continued to pressure Mr. Chiocca to have sex with her, reminded him that she was his boss and would be voting on his contract extension.

72. Mr. Chiocca again stated, "I'm not your guy" and tried to reject Mrs. Hall's advances.

73. Despite Mr. Chiocca's attempt to reject her, Mrs. Hall responded and again stated that she "just want[ed] some cock," and stated to Mr. Chiocca that she was his boss and would be voting on his contract extension.

74. Mr. Chiocca then told Mrs. Hall that she was "acting like a predator," and again stated, "I'm not your guy," but was concerned that if he thwarted her advances, she would not vote in favor of his contract extension and his increase in compensation.

75. Mrs. Hall then stated that she had to go to the bathroom but that she did not want to use the facilities at the Banner Pub because she felt that they were not clean.

76. Because it was nearby, Mr. Chiocca offered to take Mrs. Hall to Rockland Town Hall so that she could use the bathroom there.

77. Mrs. Hall agreed that would be fine.

78. Mr. Chiocca and Mrs. Hall arrived at Town Hall at approximately 10:45 p.m.

79. There is surveillance video at Town Hall with five separate camera views from the evening of May 1, 2018.

80. The Town later retained an expert who determined that none of the surveillance footage from the evening of May 1, 2018/early morning of May 2, 2018, was tampered with in any way.

81. In the surveillance video, Mrs. Hall and Mr. Chiocca can be seen walking from the lower parking lot, across the plaza, and into Town Hall. Mrs. Hall, who was wearing high heel shoes, appears to stumble on occasion but was able to traverse the walkway and stairs from the lower lot to Town Hall without any assistance. At some points, Mr. Chiocca walked in front of Mrs. Hall, and at other points, she leads.

82. When Mrs. Hall and Mr. Chiocca entered Town Hall they each walked directly to the bathrooms.

83. Mr. Chiocca exited the bathroom first and waited in the hallway for Mrs. Hall.

84. After Mrs. Hall exited the bathroom, she approached Mr. Chiocca and told him that she did not want to go home.

85. Nonetheless, the two then exited Town Hall in the direction of Mr. Chiocca's truck.

86. As the two arrived at the top of the stairs that led down to the parking lot, Mrs. Hall, who was walking ahead of Mr. Chiocca, stopped, turned to face him, and prevented Mr. Chiocca from accessing the stairs.

87. Mrs. Hall and Mr. Chiocca then engaged in conversation at the top of the staircase for approximately seven minutes.

88. During this conversation, Mrs. Hall again continued to pressure Mr. Chiocca about allowing her to "to suck his cock," while reminding him that she was his supervisor who would be voting on his contract and raise.

89. Feeling pressure to oblige, Mr. Chiocca finally acquiesced to Mrs. Hall's advances, and the two returned to Town Hall.

90. They went directly to Mr. Chiocca's office and closed the door.

91. Shortly after entering his office, Mr. Chiocca realized that he left his phone in his truck, and Mrs. Hall realized she left her purse in the bathroom.

92. Mrs. Hall asked Mr. Chiocca to retrieve her purse, after which Mr. Chiocca first went to his truck and retrieved his cell phone, and then went to the bathroom and retrieved Mrs. Hall's purse.

93. Mr. Chiocca returned to his office and sat down in a chair next to the conference table in the office.

94. Mrs. Hall then asked Mr. Chiocca to open the bottle of wine sitting on the refrigerator in Mr. Chiocca's office that was given to him that day by Marcy Birmingham ("Ms. Birmingham") (then a Project Coordinator for the Town) as an early birthday present.

95. As Mr. Chiocca opened the bottle and poured two small cups of wine, Mrs. Hall pulled up the chair she was sitting in so that she was directly next to Mr. Chiocca.

96. Mr. Chiocca finished pouring the wine, after which one of the cups spilled.

97. Mrs. Hall and Mr. Chiocca did not consume any of the alcohol, because immediately after Mr. Chiocca finished pouring the wine, Mrs. Hall spread her legs open, grabbed Mr. Chiocca's hand, and placed it over the front of her panties.

98. Mrs. Hall was conscious and alert, and she never vomited, tripped, fell, or expressed concerned about her level of intoxication.

99. Mr. Chiocca stated, "please don't do this, I can't even if I wanted to."

100. After making Mr. Chiocca rub her vagina, Mrs. Hall stood up and took off her panties, instructed Mr. Chiocca to stand up, and told him that she could "make it hard."

101. Mrs. Hall then pulled down Mr. Chiocca's pants and performed oral sex on him.

102. After Mrs. Hall completed oral sex on Mr. Chiocca, Mrs. Hall told Mr. Chiocca that she wanted him to perform oral sex on her.

103. Mr. Chiocca briefly obliged for no more than a few seconds but stopped because he did not want to continue.

104. Mrs. Hall then demanded that Mr. Chiocca please her with his hands, and Mr. Chiocca complied.

105. At or around 2:00 a.m., after attempting to satisfy Mrs. Hall with his hands, Mr. Chiocca stopped and stated, "it's 2:00 a.m., please let me go home."

106. Mrs. Hall finally agreed to leave, and at approximately 2:13 a.m., Mrs. Hall and Mr. Chiocca exited Mr. Chiocca's office.

107. Mr. Chiocca and Mrs. Hall then walked across the plaza to the lower parking lot at a casual pace with no obvious signs of intoxication or distress.

108.   After leaving Town Hall, Mr. Chiocca drove Mrs. Hall back to the RBG so that she could get her vehicle.

109.   Upon arriving at the RBG, Mr. Chiocca watched as Mrs. Hall got into her vehicle and drove away without incident.

110.   Mrs. Hall arrived home at approximately 2:20 a.m.

111.   Mr. Hall was in bed at the time, but he walked downstairs when he heard Mrs. Hall arrive home.

112.   While downstairs, Mr. Hall observed Mrs. Hall's car in the driveway backed into the assigned spot and then observed Mrs. Hall in the bathroom texting.

113.   At 2:25 a.m., Mrs. Hall texted her husband, "love you, it gonna be a tough ride the next couple of weeks ttyl."

114.   Mr. Hall then asked Mrs. Hall how things went that night, and Mrs. Hall explained that at Mrs. Kimball's request, Mr. Kimball did not attend the BOS meeting and that Mrs. Hall served as the acting Chair and moved through the agenda quickly. She further explained that following the meeting she went to the RBG for drinks.

115.   Mrs. Hall also told her husband that Mrs. Kimball texted her while she was at the RBG that she was disgusting and that she texted Mrs. Kimball back that she was sorry.

116.   Mrs. Hall then explained to her husband that she had been having an emotional but not sexual relationship with Mr. Kimball.

117.   Mrs. Hall then raised the issue of Mr. Chiocca's contract extension and began concocting her fabricated version of events.

118.   Specifically, Mrs. Hall lied to her husband, stating that Mr. Chiocca told her, "normally how this works is I ask for a raise, you give me a blowjob."

119.   During this conversation, Mrs. Hall never complained of being upset or uncomfortable with how the night went or of any inappropriate behavior by Mr. Chiocca.

120.   The Halls then discussed an appointment that was scheduled for that morning, and Mrs. Hall agreed to attend the appointment.

121.   Also, because Mrs. Hall was so late arriving home that evening, Mr. Hall contacted his employer and called out sick for the day.

122.   After approximately 30–45 minutes of talking downstairs, the Halls went upstairs to their bedroom.

123.   At that time, Mrs. Hall confessed to her husband that her relationship with Mr. Kimball was more than emotional and that they had been involved in a physical relationship as well.

124.   Mr. Hall asked Mrs. Hall if the relationship was over, and Mrs. Hall stated that it was.

125.   Mr. Hall indicated to Mrs. Hall that he was not happy about her having an affair with Mr. Kimball. The two discussed this for 15–20 minutes and then went to bed at approximately 3:30 a.m.

126.   Mrs. Hall woke up at 6:30 a.m. that morning.

127.   Later that morning, Mr. Chiocca arrived at Town Hall so that he could clean up his office. Mr. Chiocca poured out what was left in the wine bottle.

128.   At 8:02 a.m., Mrs. Hall emailed Mr. Chiocca to ask if they could talk for 15 minutes before her 9:00 a.m. meeting. At 8:05 a.m., Mr. Chiocca responded in the affirmative.

129.   When the two met in Mr. Chiocca's office at 8:55 a.m., Mrs. Hall asked Mr. Chiocca for "discretion" about what happened, and they both agreed they would not tell anyone.

130.   During their discussion, Mrs. Hall never told Mr. Chiocca she was upset with what happened earlier that morning or the night before, nor did she inquire of him as to what had taken place.

131.   During their discussion, Mr. Chiocca referred to Mrs. Hall as a "predator" and "the aggressor." Mrs. Hall later contended that these comments caused her first to have an "inkling" that she engaged in sexual relations with Mr. Chiocca, despite the fact that she lied and told her husband just a few hours earlier that Mr. Chiocca stated, "normally how this works is I ask for a raise, you give me a blowjob."

132.   Later that day Mr. Kimball spoke with Mr. Chiocca and confided in Mr. Chiocca that he did not go to the BOS meeting the prior evening because he had been involved in an affair with Mrs. Hall and that his wife had just learned of it and "was on the warpath."

133.   As a result, Mr. Kimball told Mr. Chiocca he was going to take a "less active role on the BOS."

134.   Mr. Chiocca recommended that Mr. Kimball step down from the BOS or give up the Chair position.

135.   After May 1st, Mr. Chiocca told Ms. Birmingham and Ms. Callahan that he did not want to be left alone in his office with Mrs. Hall and to make sure that his office door stayed open when she came to Town Hall.

136.   Mr. Chiocca specifically told Ms. Birmingham that because Susan Ide ("Ms. Ide"), the Executive Assistant to the BOS who sits right outside Mr. Chiocca's office, was on vacation the second week of May, that if he called Ms. Birmingham up to his office (who worked on the floor below), that she was to come right away because it meant that Mrs. Hall was there, and Mr. Chiocca did not want to be alone with her.

137.   On May 4, 2018, at 7:07 a.m., Mrs. Hall emailed Mr. Chiocca and again requested an opportunity to meet with Mr. Chiocca. Mr. Chiocca agreed.

138.   When the two met, they again discussed the evening of May 1st, and again Mr. Chiocca told Mrs. Hall that she was a "predator" and "the aggressor." At this meeting, Mrs. Hall did not complain of a lack of memory of her May 1st encounter with Mr. Chiocca or that she had been suffering from diminished capacity.

139.   In neither conversation between Mrs. Hall and Mr. Chiocca on May 1st or May 4th did Mrs. Hall ever tell Mr. Chiocca that she blacked out or that she did not consent to any sexual acts.

140.   Following these conversations, Mrs. Hall clearly understood that she had engaged in sexual activities with Mr. Chiocca (even though the truth is that she has always known the entire time).

141.   Despite this clear understanding, Mrs. Hall never made any complaints, nor did she report any concerns about her interactions with Mr. Chiocca to anyone.

142.   On May 4, 2018, Mr. Hall and Mrs. Kimball met to discuss their spouses' extramarital relationship with each other. They both agreed that Mrs. Hall and Mr. Kimball could go to BOS meetings and events together and Mrs. Kimball would not show up because she did not want to set off "red flags" and draw attention to her husband's relationship with Mrs. Hall. Indeed, it was most important to Mrs. Kimball not to let the public know about the affair.

143.   The following week was filled with usual communications regarding Town business, both in person and by email, between Mr. Chiocca and Mrs. Hall, and they did not discuss the May 1st encounter.

144.   The annual Town Meeting was held on May 7, 2018, and Mr. Chiocca, Mr. Kimball, Mrs. Hall, and others went out for drinks to China Plaza after the meeting without incident.

145.   On May 11, 2018, Attorney Clifford sent an email to the BOS members regarding Mr. Chiocca's contract, suggesting that before they decided on whether to grant the contract extension at the BOS meeting on May 15, 2018, they have a candid discussion with him about any concerns they had with his job performance.

146.   During the week of May 14, 2018, Mrs. Hall came into Town Hall to see Mr. Chiocca more frequently than she ever had in the past. In fact, she was present more than any BOS member, but Mr. Chiocca avoided all interaction with her.

147.   At this time, Mr. Chiocca began to apply for jobs outside of the Town because he did not think he could work with Mrs. Hall after what happened on the evening of May 1st.

148.  In fact, on May 15, 2018, Mr. Chiocca learned that he had been granted an interview for the Town of Marblehead Town Administrator position, which was scheduled for May 21, 2018.

149.  On May 14, 2018, Mr. Chiocca and Ms. Birmingham had planned to attend a ceremony at the State House for recognition for a grant that the Town received. That morning Mrs. Hall announced that she would join them, and for this reason, Mr. Chiocca opted out of the event. Instead, Ms. Birmingham and Mrs. Hall went to the event without Mr. Chiocca.

150.  The May 15, 2018, BOS meeting was very contentious. Just prior to the meeting at 4:12 p.m., Mr. Kimball sent an email to the BOS members and announced that Mrs. Hall was being named the school liaison, a position for which Mr. O'Loughlin was previously told by Mr. Kimball he would be selected.

151.  Also, at the BOS meeting, Mr. Ryan and Mr. O'Loughlin were blindsided by communications that Mrs. Hall had with the School Superintendent.

152.  The BOS also discussed Mr. Chiocca's contract in Executive Session.

153.  The following day, May 16, 2018, Mr. Ryan sent an email at approximately 12:42 p.m. to the BOS members expressing his frustration with the meeting the evening prior, and he was critical of Mrs. Hall.

154.  That same day, Mr. Ryan also went to Town Hall and asked Mr. Chiocca what was going on with the BOS and why was he blindsided at the meeting the evening prior. Mrs. Hall was in the room when Mr. Ryan asked this question. At that time, Mr. Chiocca asked Mr. Ryan if he wanted to go to lunch and talk, but he declined.

155.   Mrs. Hall then called Mr. Mullen and told him that after the May 1st BOS meeting, she went to the RBG with Mr. Chiocca, and they had a lot to drink. Mrs. Hall went on to tell Mr. Mullen that she didn't remember much but thinks she got into Mr. Chiocca's truck and drove around for a while and thinks they went to Town Hall. Mrs. Hall then expressed concerns that this would be on video. Mrs. Hall was not upset or crying but was matter of fact in telling Mr. Mullen this. She then described Mr. Chiocca as evil, though she never mentioned anything about a concern that Mr. Chiocca may have engaged in inappropriate sexual behavior with her without her consent.

156.   Later in the evening of May 16, 2018, at approximately 8:45 p.m., Mrs. Hall went to the RBG. Upon seeing Mr. Chiocca at a table with two other males who had been involved in a meeting at Town Hall earlier that evening, she walked over and sat next to Mr. Chiocca.

157.   The four individuals remained seated together until 9:13 p.m., when Mr. Chiocca left the RBG, leaving Mrs. Hall with the two males.

158.   Mrs. Hall and the two males exited the RBG 48 minutes later.

159.   The following day, on May 17, 2018, there was a MAPC meeting which was held in Rockland. Mr. Chiocca was planning on attending the event with Ms. Birmingham because it was a great public relations opportunity for him and the Town.

160.   Mrs. Hall announced that morning that she was going to join them at the MAPC event, and Mr. Chiocca again decided not to attend. No other selectman attended the meeting.

161.   That same day at 11:03 a.m., Mr. Ryan sent another email to the members of the BOS that included the following comments: "Ms. Hall is making her own deals with the school committee," "maybe we should revisit the VC and liaison positions at our next meeting," "Ms. Hall yells when she has no back up data but doesn't supply any when she is in charge. This was a board dividing move, and we should correct it."

162.   At about that time, Mrs. Hall contacted Mr. Kimball, and she told him that something happened on May 1, 2018, after the BOS meeting with Mr. Chiocca. Mrs. Hall then proceeded to lie and told Mr. Kimball that she had two drinks and then there was a void and the next day he said thank you for the birthday present, but she had not given him a present.

163.   Mrs. Hall has admitted that she would never have told this to Mr. Kimball if she knew that Mr. Chiocca would have kept the May 1st incident a secret.

164.   After Mrs. Hall told Mr. Kimball about the May 1st incident with Mr. Chiocca, Mr. Kimball was furious and kept repeating that he needed to process what she had told him.

165.   Mr. Kimball then went to Town Hall and met with the Town Accountant/IT Director Eric Hart ("Mr. Hart") and asked Mr. Hart to pull the security video from May 1, 2018. Mr. Kimball and Mr. Hart then watched the video together and saw the view from the lobby with Mrs. Hall and Mr. Chiocca entering Town Hall.

166.   That afternoon Mr. Kimball asked Mrs. Hall to meet him, and they went for a 40-minute walk on the rail trail. Mr. Kimball was so angry at Mrs. Hall that Mrs. Hall was afraid he might hurt her. Mrs. Hall was also upset because she felt that she had disappointed Mr. Kimball. Mr. Kimball explained that he viewed the tapes from

Town Hall security and saw Mrs. Hall and Mr. Chiocca at Town Hall on May 1st. Mrs. Hall was embarrassed, and Mr. Kimball was furious with Mrs. Hall and told her that he felt like he was being played by her.

167. Mrs. Hall was upset because she did not want anyone to know about what happened on May 1, 2018, because she thought she would be perceived as a "whore and a drunk."

168. Later that night Mr. Kimball texted Mrs. Hall and told her that he was going to approach Mr. Chiocca the following day, and Mrs. Hall asked him not to. Mrs. Hall replied, "please call we should not be putting this in writing." In response, Mr. Kimball insisted that he be told the whole truth and that he did not want to be played. Mrs. Hall texted Mr. Kimball back and told him that she would tell him but not through text messages. Mr. Kimball and Mrs. Hall then had a phone conversation during which Mrs. Hall allegedly did not divulge any new details about the May 1st incident with Mr. Chiocca.

169. Mr. Kimball then spoke with Mr. Hall, who reiterated to Mr. Kimball that when Mrs. Hall arrived home after being out for drinks with Mr. Chiocca on May 1st, that she told him that Mr. Chiocca stated, "the way we do things around here is I ask for a contract, you give me a blowjob, and I get the contract."

170. That evening, Mr. Kimball called and spoke with Mr. Chiocca. Mr. Kimball informed Mr. Chiocca that Mr. Hall wanted to know if the Town Administrator gets a blowjob with his raise and then told Mr. Chiocca that they would talk in the morning.

171.   The next morning, May 18, 2018, Mr. Kimball contacted Attorney Clifford and told him that Mr. Chiocca had stated to Mrs. Hall on May 1st that it is standard operating procedure to give the obligatory blowjob to the Town Administrator during contract negotiations. Mr. Kimball expressed concern for the safety of the town employees who were in contract negotiations. Mr. Kimball then told Attorney Clifford that Mrs. Hall alleged that Mr. Chiocca did something inappropriate to her on May 1, 2018, at Town Hall.

172.   As a result, Attorney Clifford and Mr. Kimball met with Mr. Chiocca, and he admitted to having engaged in sexual activities with Mrs. Hall at Town Hall on the evening of May 1st but denied any conversation about blowjobs for contracts.

173.   Mr. Chiocca then insisted to Attorney Clifford and Mr. Kimball that Mrs. Hall had initiated and pursued the sexual encounter that evening and that Mrs. Hall was a "predator and the aggressor."

174.   At that time, Mr. Kimball "strongly suggested" that Mr. Chiocca take vacation time and encouraged him to resign from his employment. Mr. Chiocca agreed to take vacation time.

175.   Mr. Kimball then met with Mrs. Hall to see if she would enter into a nondisclosure agreement and sign a release with the town, and Mrs. Hall agreed to comply with this request.

176.   The following day, May 19, 2018, Mrs. Hall, Mr. Hall, Mr. Kimball, and Mrs. Kimball met at Reeds Pond to discuss the allegations against Mr. Chiocca, and they all agreed to keep Mrs. Hall and Mr. Kimball's relationship a secret. Mrs. Kimball reiterated the conversation she had with Mr. Kimball on May 4, 2018, that they

could not let their relationship be leaked to the public. Mr. and Mrs. Kimball did not want their family's reputation to be ruined, and Mrs. Hall was concerned about her candidacy for State Representative and knew it would ruin her chances of winning.

177.   Mr. Chiocca took the next week off as vacation time.

178.   On or about May 23, 2018, the news media learned of May 1st encounter between Mr. Chiocca and Mrs. Hall.

179.   On May 29, 2018, Mr. Chiocca was placed on administrative leave per a letter from Mr. Kimball. In relevant part, the letter reads:

> Please allow this letter to serve as formal notice that you have been placed on paid administrative leave pending the outcome of an investigation <u>effective immediately</u>. The matters under investigation include allegations of improper conduct toward a member of the Town of Rockland Board of Selectmen. . . .

> Throughout the duration of this administrative leave, you are directed and ordered to not visit Town Hall or any other buildings or property owned [sic] the Town of Rockland and are directed and ordered to refrain from the performance of any of your duties and responsibilities as Town Administrator for the Town until such time as you are scheduled to return to work or are otherwise notified.

180.   On May 30, 2018, Mr. Chiocca's counsel, Adam Shafran ("Attorney Shafran"), wrote to Attorney Clifford regarding the Town's decision to place Mr. Chiocca on administrative leave. In relevant part, Attorney Shafran wrote:

> I am in receipt of Mr. Kimble's [sic] letter to Mr. Chiocca dated May 29, 2018, confirming that the Town of Rockland has placed Mr. Chiocca on paid administrative leave effective immediately. Please be advised that Mr. Chiocca considers his placement on administrative leave to be a suspension in violation of his procedural due process rights under Section 2.18 of the Town of Rockland Charter. . . .

> Mr. Kimble's [sic] letter makes clear that Mr. Chiocca's placement on administrative leave is in fact a suspension because Mr. Chiocca is not permitted to "perform[] . . . any of [his] duties and responsibilities as Town Administrator for the Town until such time as [he] is scheduled to return to work or otherwise notified." . . . . The Town's failure to comply with these procedural requirements and placement of Mr. Chiocca on immediate suspension, has damaged, and will continue to damage his reputation.

181. On May 30, 2018, Mrs. Hall announced publicly on her Facebook page, "Committee to Elect Deirdre Hall," that BOS voted to initiate an investigation into her allegations of inappropriate behavior towards her by Mr. Chiocca.

182. Specifically, Mrs. Hall's statement read in relevant part:

> Last evening, **at my request**, the Rockland Board of Selectmen initiated an internal investigation involving an allegation of **inappropriate behavior by the Town Administrator towards me**. Soon after the incident, I reported this matter to two members of the Board of Selectmen. I am cooperating fully with this process and I hope to see a thorough and fair investigation by the Board.

183. At no point did Mr. Chiocca ever engage in inappropriate behavior towards Mrs. Hall.

184. At the time Mrs. Hall published the statement set forth above, she knew that Mr. Chiocca did not engage in inappropriate behavior towards her and that she had in fact sexually harassed Mr. Chiocca.

185. Mrs. Hall's written statement that Mr. Chiocca engaged in inappropriate behavior towards her has caused enormous damage to Mr. Chiocca's reputation.

186. Mrs. Hall's statement constitutes libel, prejudiced Mr. Chiocca's profession, and was tantamount to accusing Mr. Chiocca of a crime.

187.  On May 31, 2018, Attorney Clifford responded to Attorney Shafran's May 30, 2018 letter.

188.  In relevant part, Attorney Clifford wrote:

> If you wish to consider the Board's action a suspension, you are free to request a public hearing under the Charter. I will request that the Board provide him with a notice detailing the allegations against him, and then convene a public hearing to provide him with the procedural due process you feel he has been denied. . . .

> [Mr. Chiocca] has admitted to conduct [sic] significantly impairs his ability to function as Town Administrator, leaving the Town with no alternative but to place him on paid administrative leave while an investigation is performed.

189.  As quoted above, Attorney Clifford's letter informed Mr. Chiocca that it was up to him to declare the BOS's action a suspension, and only then would Attorney Clifford request the BOS to provide Mr. Chiocca with notice detailing the allegations against him.

190.  The BOS did not file a preliminary written resolution with the town clerk setting forth in detail the specific reason for its decision to place Mr. Chiocca on what it has termed "paid administrative leave" at least 30 days before the paid administrative leave became effective.

191.  Because the BOS did not file a preliminary written resolution with the town clerk setting forth in detail the specific reason for its decision to place Mr. Chiocca on what it has termed "paid administrative leave" at least 30 days before the paid administrative leave became effective, a copy of the resolution was not delivered to Mr. Chiocca.

192.   Because the BOS did not file a preliminary written resolution with the town clerk setting forth in detail the specific reason for its decision to place Mr. Chiocca on what it has termed "paid administrative leave" at least 30 days before the paid administrative leave became effective, and because a copy of the resolution was not delivered to Mr. Chiocca, Mr. Chiocca was deprived of the opportunity to reply in writing to the resolution or request a public hearing.

193.   Contrary to Attorney Clifford's letter, Mr. Chiocca did not admit to any conduct that significantly impaired his ability to function as Town Administrator.

194.   Upon information and belief, the conduct Attorney Clifford's letter is referring to is Mr. Chiocca having three or more alcoholic beverages at the RBG following a BOS meeting and then driving a vehicle from the RBG following consumption of said beverages.

195.   Five days later, on June 5, 2018, and after Mr. Chiocca was no longer permitted at Town Hall, Mrs. Hall reiterated her allegations at the publicly televised BOS meeting. In relevant part she stated:

> I recently reported an incident of **inappropriate behavior by the Town Administrator**, and since the weeks that those allegations have emerged it has been very challenging for me and my family. False rumors and gossip have spread, particularly on social media, about me, about the devotion to my spouse, my husband Chris, and our children and our town. Indeed, I no longer feel that my children, my son, is comfortable taking the bus, and I feel that my kids often times are not safe or comfortable participating in some community activities. And this is a deeply disappointing consequence of **my decision** to stand up for myself in a situation where **I believe I was treated improperly**.

196. At no point did Mr. Chiocca ever engage in inappropriate behavior towards Mrs. Hall.

197. At the time Mrs. Hall made the statement set forth above, she knew that Mr. Chiocca did not engage in inappropriate behavior towards her and that she had in fact sexually harassed Mr. Chiocca.

198. Mrs. Hall's statement that Mr. Chiocca engaged in inappropriate behavior towards her has caused enormous damage to Mr. Chiocca's reputation.

199. Mrs. Hall's statement constitutes slander, prejudiced Mr. Chiocca's profession, and was tantamount to accusing Mr. Chiocca of a crime.

200. At this same time (i.e., early June 2018), Attorney Ryan of Discrimination and Harassment Solutions LLC began her investigation.

201. Upon information and belief, on or about June 7, 2018, the Town received public record requests for copies of Town Hall video surveillance from the evening on May 1, 2018.

202. On June 13, 2018, while Attorney Ryan was in the midst of her investigation, Mrs. Hall filed suit in Plymouth County Superior Court against the Town of Rockland and related parties to block the Town from releasing the surveillance footage.

203. Mrs. Hall's complaint was supported by a surreptitiously obtained and knowingly false affidavit submitted by Mr. Kimball.

204. At this time Mr. Kimball provided his affidavit, Mrs. Hall was and had been an attorney licensed in the Commonwealth of Massachusetts. Her Board of Bar Overseers number is 673550.

205. At the time Mr. Kimball provided his affidavit, Mr. Kimball was still the Chairman of the BOS, and Mrs. Hall knew that Attorney Ryan's investigation was ongoing.

206. Massachusetts Rule of Professional Conduct 4.2 prohibits a lawyer when representing a client from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

207. Mrs. Hall knew or should have known that any statements made in an affidavit by Mr. Kimball related to the ongoing investigation (including the events that were being investigated) were matters for which Mr. Kimball was represented by counsel (Attorney Clifford) in his capacity as Chairman of the BOS.

208. Upon information and belief, Mrs. Hall obtained Mr. Kimball's affidavit by knowingly facilitating communications between Mr. Kimball and her then counsel Brian Hughes without obtaining consent from Attorney Clifford.

209. Mr. Kimball's affidavit insinuated that Mr. Chiocca and/or Mr. Hart tampered with the May 1, 2018 Town Hall video surveillance footage and asserted that his prior review of the surveillance footage "revealed critical missing segments of activities, including a minute-long gap when Hall made active attempts to leave the premises after stating unequivocally on camera that '[she] needed to go home.'"

210. Just two days later, on June 15, 2018, knowing that it was frivolous, Mrs. Hall voluntarily dismissed her complaint.

211. Later that day, Attorney Clifford issued a press release at the behest of the BOS.

212. In relevant part, Attorney Clifford stated:

> [T]he following statement is being issued at the behest of the Board of Selectmen.
>
> On May 17th, a member of the Board of Selectmen was made aware of potentially serious misconduct by two high ranking Town officials. Due to the seriousness of the allegations, the Town engaged an independent investigator to interview witnesses and review any evidence related to the alleged misconduct. The investigation is ongoing. . . .
>
> Unfortunately, there has been a steady stream of information improperly disseminated during the investigation, much of which was false. **The release of false and/or misleading information has only served to hamper our efforts to get this investigation done**.
>
> On Wednesday, June 13th, a motion for an emergency restraining order was filed on behalf of Ms. Hall. Much of the information contained in that filing was **misleading, based on conjecture, or just false**. It was my intention to appear in Brockton Superior Court this afternoon and make it clear that the facts and legal conclusions contained in that filing **were not only wrong, but obtained in an improper manner**. The circumstances surrounding the filing [sic] this motion are troubling from a legal perspective, and even though the matter was voluntarily dismissed by the plaintiff, the Town will be reviewing all of its options and may take further action in response to the filing of that motion.
>
> It is the Board's position that the surveillance video from the night of the incident is a public record, and would be released in response to a valid public records request. . . . Unfortunately, the documents filed in Brockton Superior Court on Wednesday contain assertions that the video was tampered with or altered in some way. . . .
>
> At this time, there is no credible evidence that the video has been tampered with or edited in some fashion.

213. Upon information and belief, the BOS authorized Attorney Clifford's statement.

214. Per Attorney Clifford's statement, Mrs. Hall objectively lacked probable cause to file suit.

215. Per Attorney Clifford's statement, Mrs. Hall's lawsuit was filed to hamper the Town's investigation efforts.

216. Mrs. Hall's lawsuit caused further damage to Mr. Chiocca's reputation and caused him additional damages, including but not limited to the incurring of attorneys' fees.

217. On June 19, 2018, while Attorney Ryan's investigation was still ongoing, the BOS held a regularly scheduled meeting.

218. Without providing the legally required notice, and in an attempt to undermine the Town's investigation, Mr. Kimball knowingly and intentionally violated the Massachusetts Open Meeting Law (G.L. c. 30A, § 20(b)) by speaking on topics related to the ongoing investigation that were not on the agenda.

219. As Mr. Kimball began to speak on issues related to the investigation, Attorney Clifford expressly advised him that he was "discussing something that was not on the agenda that impacts the rights of others involved."

220. In response, Mr. Kimball stated, "I can discuss what I like," and instructed Attorney Clifford to "hold his words."

221. Mr. Kimball then proceeded to bring a motion to refer the Town's investigation to the Rockland Police Department and repeatedly berated the other Board Members who were present to vote on his motion and stated that he is going on the record "that the three other members of the Board do not want to go through and have an investigation."

222.   Mr. Kimball further stated that the BOS could "reorganize the Board, but [he would] continue to be the voice here."

223.   Mr. Kimball then stated that the Town's investigation was a "sham," suggested that Mr. Chiocca engaged in criminal conduct, including evidence tampering and sexual assault, and repeatedly stated that he stands by the "after-David"[1] [sic] that he submitted with Mrs. Hall's complaint.

224.   Mr. Kimball engaged in this conduct knowing that all parties impacted by his statements were not present and were not given notice that he would be making such comments.

225.   Mr. Kimball's statements were made to undermine and/or stop Attorney Ryan's ongoing investigation because at the time he made them, he knew that the investigation was uncovering his affair with Mrs. Hall.

226.   As a result of Mr. Kimball's egregious conduct, Mr. Ryan stated at the BOS meeting that Mr. Kimball committed a "fatal mistake" and called for Mr. Kimball to resign from the BOS.

227.   With Attorney Ryan's investigation still pending (and without BOS yet having the benefit of her findings and recommendations), Mr. Ryan further stated, "the only person I have to worry about is the Town Administrator. He's our charge. He will be taken care of."

228.   Ultimately when Mr. Kimball refused to resign, Mr. Ryan stormed out of the meeting and stated that Kimball "should own up to what he did and resign."

---

[1] I.e., his affidavit.

229.   On June 21, 2018, Mr. Chiocca filed an open meeting law complaint against Mr. Kimball and the BOS with the Massachusetts Attorney General's Office ("AG").

230.   On July 2, 2018, Attorney Clifford, wrote to the AG on behalf of the BOS and requested an extension to July 21, 2018, to respond.

231.   Also on July 2, 2018, Attorney Ryan concluded her investigation her issued her report titled, "Investigation of Complaints against Deirdre Hall and Allan Chiocca – Findings of Fact, Conclusions, and Recommendations" ("Report").

232.   Attorney Ryan's investigation and Report was incredibly thorough and included interviews with Mrs. Hall, Mr. Chiocca. Ms. Ide, Ms. Birmingham, Ms. Callahan, Ms. Flipp, Mary Jane Martin (Assistant Town Accountant), Mr. Kimball, Mr. Hart, Mr. Mullen, Mr. Hall, Mr. Ryan and Mr. O'Loughlin, and her review of 20 exhibits, including the Rockland Charter, the Rockland Sexual Harassment Policy, text messages between Mrs. Hall and Mrs. Kimball, text messages between Mrs. Hall and Mr. Kimball, emails from Mrs. Hall to Mr. Chiocca, texts between Mrs. Hall and Mr. Chiocca, May 1, 2018 video of Town Hall, May 16, 2018 video of the RBG, email regarding Mr. Chiocca's interview in Marblehead, May 15, 2018, BOS Executive Session meeting minutes, affidavit of Paul Jacobson, Affidavit of Mr. Kimball, May 11, 2018 email from Attorney Clifford to the BOS, texts between Mrs. Hall and Mr. Hall, affidavit of Steven Verronneau, email regarding video tampering, receipt from the RBG, Mr. Chiocca's administrative leave, and Committee to Elect Deirdre Hall Facebook page.

233.   After making Findings of Fact that are substantially set forth above, Attorney Ryan made the following Conclusions in her Report:

- It is **undisputed** based on what Ms. Hall reported to her husband and what was reported by Mr. Chiocca, that during that evening there was a conversation between Mr. Chiocca and Ms. Hall about his contract and there was a reference to sexual activities.

- It is **undisputed** that the BOS had been discussing Mr. Chiocca's contract for weeks prior to May 1, 2018, and continued after May 1, 2018. Mr. Chiocca was asking for a contract extension, and a raise and Ms. Hall would be one of the five votes that would decide this.

- Mr. Chiocca **did not want to have a sexual encounter with Ms. Hall . . . . Regardless, she persisted**.

- Both while driving in Mr. Chiocca's truck and while standing on the Town Hall Plaza, Ms. Hall made comments to Mr. Chiocca about engaging in sexual activities while reminding him that she was his supervisor and would be voting on his contract and raise. **As a result**, Mr. Chiocca agreed to engage in sexual activities in his office. **But for the fact that Ms. Hall was his supervisor and would be voting on his contract, Mr. Chiocca would not have agreed to this**.

- Although Ms. Hall did not make any requests for sexual relations after the Incident, she demonstrated a similar pattern of trying to position herself in Mr. Chiocca's space. To the contrary, Mr. Chiocca exhibited behavior of trying to avoid Ms. Hall, and this was corroborated by other Town employees following the Incident.

- Accordingly, I find by a preponderance of the evidence that Ms. Hall was Mr. Chiocca's supervisor and she sought sexual relations in exchange for her vote on his contract extension and raise. As such, **Ms. Hall sexually harassed Mr. Chiocca in violation of the Town's Sexual Harassment Policy on the night of the Incident.**

- After reviewing the video of her at Town Hall, Ms. Hall is seen walking without assistance and talking to Mr. Chiocca. She appears to be aware of the circumstances that she is in and appears to be in control of her activities.

34

- When considering her interactions and communications before she went to Town Hall, she could communicate with Mr. Chiocca about his contract with the Town, her affair with Mr. Kimball, her desire to have relationships outside her marriage and the BOS meeting that she chaired earlier in the evening. Further, when she arrived home within minutes of leaving Mr. Chiocca, she never expressed concern about the fact that she had sexual relations with him and did not exhibit any signs to her husband of being upset. Further, Ms. Hall was capable of engaging in coherent discussions with her husband for approximately one hour when she got home and the subjects that they covered that evening spanned from her Mr. Kimball, their son's neurological appointment, her husband calling in sick from work and other topics. In addition, she could drive her motor vehicle home and back it into a parking spot with another motor vehicle beside it without incident. She was also capable of texting her husband at 9:45 PM, "'Be ready for me when I get home because I'm going to want you' and then at 2:25 AM 'love you, it gonna be a tough ride the next couple of weeks ttyl.'"

- Moreover, the following day Ms. Hall went to Mr. Chiocca's office and asked for "discretion" and asked that he agree not to tell anyone. During this conversation, she never mentions to Mr. Chiocca that she had no memory of the Incident and never tells him she did not consent.

- Accordingly, I find by a preponderance of the evidence, that Ms. Hall was capable of consenting to sexual relations during the Incident, and she did consent, and I also find that Mr. Chiocca believed that she was capable of consenting.

- Accordingly, I find by a preponderance of the evidence, that **Mr. Chiocca did not violate the Town's Sexual Harassment Policy** in that he did not engage in any unwelcomed touching of Ms. Hall during the Incident.

234. Based on the Conclusions set forth above, Attorney Ryan made the following

Recommendations in her Report:

- Based on the fact that Ms. Hall is an elected official, she cannot be disciplined by the Town nor can corrective action be issued for violations of the Sexual Harassment Policy. Accordingly, I recommend that the [sic] she and the other members of the BOS receive training on preventing discrimination and harassment in the workplace.

- With regard to Mr. Chiocca, I recommend that he be **removed from administrative leave and returned to the position of Town Administrator for the Town** and that he be reminded that any retaliation in the workplace for reporting harassment will not be tolerated.

235. On July 10, 2018, the BOS held a meeting to, *inter alia*, disclose the results of Attorney Ryan's investigation/Report.

236. Given the anticipated public turnout, the meeting was moved from its regular Town Hall location to the Rockland High School auditorium. Hundreds of citizens attended the meeting.

237. At the beginning of the meeting and during open session, Mr. Kimball stated in relevant part:

> In 2018, this Board has turned an allegation of sexual assault into a spectacle. That's my ruling as Chair, you can overrule me, and continue with a majority vote.

238. The Board then voted in favor of removing Mr. Kimball as Chair and in favor of making Mr. Ryan the new Chair.

239. The Board then voted to go into Executive Session.

240. At the beginning of the Executive Session, Mr. Ryan stated to Mr. Kimball:

> The report does speak for itself, but I would just like to mention that, as you accused us all of covering up everything and then, quite frankly, the only person who covered anything up was you, your affair with Ms. Hall, your – when you came to the meeting, your – when you

heard that something happened. She didn't report that. You did, according to the report that I read. And, quite frankly, we don't need you anymore.

I think you should resign, quite frankly, and save the town the embarrassment because everybody in town hall been on edge since this happened.

241.   Mr. Ryan then asked Attorney Ryan how she assessed Mr. Kimball's credibility,

and Attorney Ryan responded as follows:

So I interviewed Mr. Kimball two times in person and one time over the telephone. During the first interview that I had with him, he told me that he had been untruthful to the members of the Board of Selectmen, to the women at town hall and to his wife. He said that he was untruthful about the extent of the relationship that he had with Deirdre Hall.

I observed other inconsistencies during the examination of Mr. Kimball from Day One to Day Two. So, for instance, on his first day of testimony, he told me that he told John Clifford that he had called . . . Allan Chiocca the night before the 18th. So on the 17th, he called Allan Chiocca and said, you know, a board member's husband called me tonight and said, you know, something about blowjobs and contracts.

And so the first day, he said, no -- I said, you never told that to Attorney Clifford before you met with him on the 18th to go in and speak to Mr. Chiocca, and he said, no. And then on the second interview, he said, I told Mr. Clifford that morning that I had, in fact, talked to Allan Chiocca the night before. And I thought that was important, and I thought that was a credibility flaw because I did weigh some – I did find it concerning on the first day that he had not told legal counsel that he already disclosed to Allan Chiocca that there was an allegation against him. . . .

The other issue is Ms. Hall had, and I found her credible, saying that she never said to Mr. Kimball that anyone had engaged in inappropriate behavior. Those were his words, and that was the word -- those were the words that we used on the leave of absence. And she said she only used those words because he had put them on the leave of absence.

242.    After hearing Attorney Ryan's response, Mr. Ryan then stated to Mr. Kimball:

> So, quite frankly, it looks like you started an investigation without having probable cause. I mean, if she didn't tell you that something happened, why did you start an investigation? You went down and saw the movies. You went down and said, you know, there's pieces missing. You went down and said all these things, and **none of them are true. Just covering up -- everything for everybody**.
>
> From the day you started that affair with that woman and you slept with her . . . .
>
> That's the issue. [Mr. Kimball] lied to the Board of Selectmen consistently, so there you go. So as far as I'm concerned, I got no more news for you. So you can do whatever you want to do, but that's where I'm standing right now. As far as I'm concerned, the town owns you.

243.    Following Mr. Ryan's statement, Attorney Clifford and Mr. Kimball's attorney

Brian Palmucci ("Attorney Palmucci") engaged in a lengthy back and forth

discussion. During the discussion, Attorney Clifford stated in relevant part:

> [Y]our client was untruthful, all right, from the beginning of this investigation all the way through. Those are the allegations. . . . It's in the report. . . .
>
> [Mr. Kimball] lied. **Is there any dispute, material dispute, on that?** He lied to me. He lied to his fellow board members. He lied to the women in town hall. . . .
>
> **It is very relevant** how this investigation started, all right, with an untruthful statement by your client. It's very relevant that he misled all the parties involved all the way through this investigation, and then he accused these two gentlemen and his fellow board member, Mike O'Loughlin, of a coverup. **He went on TV and made that statement**. All right? When all the while, he was the one being untruthful.

244.    Then, following his discussion of Mr. Kimball's credibility, and without

providing any detail whatsoever and in direct contradiction to Attorney Ryan's

Report, Attorney Clifford recommended that the Board vote to convene a meeting to discipline Mr. Chiocca for misconduct. Specifically, Attorney Clifford stated:

> Mr. Chairman, I'm going to recommend that the board vote to convene a meeting next week to take disciplinary action against Mr. Chiocca for conduct beyond the town's discriminatory harassment policy for serious misconduct.

245.   The Board then voted in favor of the proposed motion.

246.   Following the Board's vote, and knowing that Mr. Chiocca and his counsel were not present, Mrs. Hall's attorney, Jack McGlone ("Attorney McGlone"), asked the Board to refrain from disclosing Attorney Ryan's full Report to the public, and in doing so conceded that Mrs. Hall should have already resigned from her position on the Board ("[S]he should have resigned a long time ago, Larry").

247.   Following Attorney McGlone's request, and again without providing any detail and in contradiction to Attorney Ryan's Report, Attorney Clifford stated that Mr. Chiocca would be disciplined for "misconduct" and would not be allowed to return to work. Specifically, Attorney Clifford stated:

> I don't think it's the sentiment of this board that they want to -- people to leave this meeting thinking that Allan is going to be brought back to work . . . . That is not the board's intention.

248.   Mr. Kimball then correctly observed and asked:

> In the report, the executive summary that Ms. Ryan had wrote regarding Mr. Chiocca, he be reminded that any retaliation in the workplace, report of harassment not be tolerated and should be reported by him. Any action against Mr. Chiocca, is that going to be considered retaliation by this board?

249.   The conversation then returned to Attorney McGlone's request to not release the full Report, during which Attorney McGlone effectively acknowledged that Mrs.

Hall's complaint seeking an injunction to prevent the release of the videotapes was frivolous. Specifically, Attorney McGlone stated:

> The last thing I want to do is file an injunction. That was absolutely ridiculous. And she was listening to the wrong people, and she was listening to certain members.

250. The parties then continued a lengthy discussion about releasing a substantially shortened summary of the Report to the public in exchange for Mrs. Hall's resignation from the BOS.

251. Without Mr. Chiocca present, the parties ultimately agreed to the foregoing, but before doing so, the BOS voted in favor of accepting Attorney Ryan's full Report.

252. When it voted in favor of accepting Attorney Ryan's Report, the BOS did not dispute any of Attorney Ryan's Factual Findings, Conclusions, or Recommendations.

253. Upon information and belief, to the extent the BOS now disputes any of Attorney Ryan's Factual Findings, Conclusions, or Recommendations in the Report, it only formed any such disputes after it learned that Mrs. Hall filed a complaint with the Massachusetts State Police regarding the events of May 1st/2nd.

254. The BOS concluded the Executive Session by voting to acknowledge that it violated the Open Meeting Law at the June 19, 2018, BOS meeting.

255. The BOS then closed the Executive Session and returned to the Open Session.

256. When they returned to the Open Session, Attorney Ryan read only two findings to the public. She stated:

> I do not substantiate Ms. Hall's allegation that if she engaged in sexual activities with Mr. Chiocca on May 1st and 2nd, 2018, it was non-consensual as she was incapable of consenting due to her level of intoxication.

I substantiate Mr. Chiocca's allegation that on May 1st and 2nd, 2018, **Ms. Hall used her position as member of the Board of Selectmen, who was actively reviewing and would soon be voting on his request for contract extension and salary increase to pressure him into engaging in sexual activities with her.**

257.   Attorney Clifford then, without providing the public with any detail, stated:

> Pursuant to a board vote in executive session, it is important for the public to understand that while Mr. Chiocca was found not to have violated the Town's discriminatory harassment policy, other serious misconduct was identified in the investigation. The board has voted to convene a meeting next Tuesday July 17th to consider what actions should be taken against Mr. Chiocca for other misconduct.

258.   When Attorney Clifford stated, "other serious misconduct was identified in the investigation," he was authorized by and speaking on behalf of the BOS.

259.   One week later, on July 17, 2018, the BOS held another meeting that primarily consisted of an Executive Session to discuss the potential discipline of Mr. Chiocca.

260.   Only three BOS members attended this meeting (Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin), as Mrs. Hall had resigned, and Mr. Kimball was not present.

261.   The Executive Session began with Attorney Clifford falsely stating to the BOS that Attorney Ryan's investigation "raised serious concerns as to other potential misconduct [that Mr. Chiocca engaged in] that may not have been a violation of [the Town's discriminatory harassment policy] but may have been a violation of other policies."

262.   Attorney Clifford then noted that the BOS could not terminate Mr. Chiocca's employment as the BOS did not have the requisite four votes as required by the Town Charter.

263.   Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Attorney Clifford, and Attorney Jason Crotty ("Attorney Crotty") (counsel assigned to the Town by the Town's insurer) then engaged in a lengthy discussion regarding how to handle any potential discipline towards Mr. Chiocca.

264.   During this discussion, and again without articulating any specific misconduct that Mr. Chiocca engaged in, Mr. Ryan stated that the three present BOS members were unanimously in agreement to terminate Mr. Chiocca's employment.

265.   Attorney Clifford then again advised Mr. Ryan that the BOS could not terminate Mr. Chiocca's employment at that point with only three members because it would increase the Town's liability to Mr. Chiocca even further. In doing so, Attorney Clifford expressly acknowledged that the Town already had serious liability to Mr. Chiocca. Specifically, Attorney Clifford stated:

> Based on [Attorney Ryan's] report, I think that the town potentially has serious exposure already.

266.   Mr. O'Loughlin then stated and correctly observed as follows:

> In that investigation, it was determined that **every act** – **every action that [Mr. Chiocca] took that night was out of concern that she was threatening his contract**. So all of that got lumped in, so, in a sense, **the report exonerated every action that he took that night** . . . .

267.   In response, Mr. Ryan acknowledged the findings in Attorney Ryan's report ("The paper says that he did not pursue her. That she pursued him"), but then falsely stated that Mr. Chiocca was "drunk on the job . . . [t]his is the second time he has been caught in Rockland drunk on the job," and that "it has to do with . . . him being in [Town Hall]."

Case 1:19-cv-10482-WGY Document 265-1 Filed 03/14/2022 Page 53 of 185

268.   Nowhere in Attorney Ryan's report did she find that Mr. Chiocca was drunk on the evening of May 1, 2018/early morning of May 2, 2018.

269.   Attorney Ryan's report further found that Mr. Chiocca returned to Town Hall with Mrs. Hall based on her threats about his contract and raise.

270.   Attorney Ryan's report did not identify any misconduct that Mr. Chiocca engaged in.

271.   After expressing his unlawful, retaliatory opinion, Mr. Ryan then stated that the Town should propose a resolution to Mr. Chiocca and that if he did not agree to it, as soon as there are four voting members on the BOS, "it's AMF"; i.e., "adios mother fucker."

272.   Following Mr. Ryan's statement, the BOS discussed a few other matters, and the meeting ended.

273.   After the meeting ended, Mr. Ryan stated publicly to the press that the BOS unanimously agreed to terminate Mr. Chiocca's employment but could not do so until the BOS had at least four members.

274.   The following day, July 18, 2018, Attorney Clifford wrote to Attorney Shafran to respond to Mr. Chiocca's Open Meeting Law Complaint.

275.   Attorney Clifford acknowledged that Mr. Kimball's conduct at the June 19, 2018, BOS meeting was a violation of the Open Meeting Law and that the BOS would, *inter alia*, "at its next scheduled meeting . . . read a statement that include[s] . . . [a]n admission that the statements made by then Chairman Edward Kimball regarding an investigation at the June 19, 2018 meeting were a violation of the Open Meeting Law, as that matter was not on the agenda for that meeting."

276.   Attorney Clifford's letter further acknowledged that the BOS could not compel
Mr. Kimball individually to take any of the remedial actions sought by Mr. Chiocca
in his Open Meeting Law complaint.

277.   The same day, July 18, 2018, Mr. O'Loughlin publicly libeled Mr. Chiocca on a
Facebook page routinely frequented by Rockland citizens (i.e., the "Rockland Hub
Facebook page").

278.   Specifically, Mr. O'Loughlin accused Mr. Chiocca of lying during the
investigation when he falsely wrote on the Facebook page, "It's important to keep in
mind that this was caused by 3 parties that weren't being truthful from the start."

279.   At no point did Mr. Chiocca lie to anyone about any of the events that occurred
between him and Mrs. Hall on the evening of May 1, 2018, and Attorney Ryan did
not identify a single matter that Mr. Chiocca was untruthful about in her report.

280.   At the time Mr. O'Loughlin published the statement set forth above, he knew that
Mr. Chiocca had not been untruthful.

281.   Mr. O'Loughlin's written statement that Mr. Chiocca was not truthful from the
start caused further damage to Mr. Chiocca's reputation in the community.

282.   Mr. O'Loughlin's statement constitutes libel and prejudiced Mr. Chiocca's
profession.

283.   Following this comment and the BOS's decision to keep Mr. Chiocca on
administrative leave, on July 19, 2018, Attorney Shafran wrote to Attorney Clifford
regarding the status of Mr. Chiocca's employment. In relevant part, Attorney
Shafran wrote as follows:

> Per our call yesterday, and in light of recent public
> statements made by members of the Rockland Board of

Selectmen, I write to again inform you that the Town is in continuing breach of its own Charter.

As you know, on May 29, 2018, Mr. Chiocca was informed via letter from then-BOS Chairman Edward Kimball that he was being "placed on administrative leave pending the outcome of an investigation, effectively immediately.". . .

On May 30, 2018, I wrote to you to inform you that the Town's placement of Mr. Chiocca on "paid administrative leave" was a de facto suspension in violation of Section 2.18 of the Town Charter. . . .

On May 31, 2018, you replied to my letter and stated that Mr. Chiocca's placement on paid administrative leave was not a suspension. This assertion is incorrect per decisions from both the SJC and U.S. District Court of Massachusetts. In Campatelli v. Chief Justice of the Trial Court, 468 Mass. 455, 457 n. 2 (2014) the SJC expressly stated, "[w]e see no legally cognizable difference between suspension with pay and paid administrative leave, and used the terms interchangeably in this opinion.". . .

Based on the foregoing, the Board's initial decision to place Mr. Chiocca on paid administrative leave was a suspension. In that regard, Mr. Chiocca was and still is entitled to know whether this decision was put to a vote, what the result of the vote was, as well as the "**specific reason**" for the suspension. Moreover, in your May 31 letter you first noted that if Mr. Chiocca "wish[es] to consider the Board's action a suspension, [that he is] free to request a public hearing under the Charter," and that you would "request that the Board provide him with a notice detailing the allegations against him, and then convene a public hearing to provide him with the procedural due process . . . ." Per the portion of the Charter quoted above, it is neither Mr. Chiocca's obligation to determine whether the Town's action constitutes a suspension, nor does he have to request a public hearing in order to be entitled to receive written notice detailing the "specific reason" for his suspension. While we certainly think it is clear that Mr. Chiocca has been suspended, that is a conclusion for the Town to make. If the Town continues to feel otherwise, I suggest it is not only wrong, but also causing further damage to Mr. Chiocca. If the Town correctly concludes that Mr. Chiocca

has been suspended, that it has a legal obligation to provide him with the "specific reasons" for his suspension. . . .

Moreover, and as quoted above, Mr. Kimball's May 29, 2018 letter expressly states that Mr. Chiocca's placement on "paid administrative leave" was "pending the outcome of an investigation," and that Mr. Chiocca would be notified "[i]f further disciplinary action up to and including termination is found to be warranted according to the results of th[e] investigation." As you know, the investigation is now complete, and it is our understanding that Mr. Chiocca remains on "paid administrative leave." For the reasons set forth above, this constitutes a suspension beyond the term that was originally imposed. As such, Mr. Chiocca was and still is entitled to know whether this decision was put to a vote, what the result of the vote was, as well as the "**specific reason**" for the suspension. This is particularly important given the fact that following the issuance of the investigator's report, you made an ambiguous and defamatory statement that the investigation identified "other serious misconduct." Please provide us with a detailed explanation of the exact misconduct that this statement was based upon.

284.    Neither Attorney Clifford nor anyone else acting on behalf of the Town has

responded to Attorney Shafran's July 19, 2018 letter as of the date of this filing.

285.    On July 31, 2018, Mr. Kimball resigned from his position on the BOS.

286.    Shortly thereafter the BOS scheduled a special election for November 6, 2018, to

fill the two vacant seats on the BOS.

287.    In or about October 2018, Mr. Ryan stated to MassLive reporter Jacqueline

Tempera ("Ms. Tempera"):

I already told everybody as far as I was concerned there is no way -- no possible way – [Mr. Chiocca will] walk through the Town Hall doors in the town of Rockland again. He'll cause trouble again. That guy is an annoyance that is going to end soon."

288.   Mr. Ryan then continued with his ambiguous, defamatory statements regarding

Mr. Chiocca when he stated to Ms. Tempera:

> He's not an innocent bystander. You can infer what you
> want from that.
>
> [Mr. Chiocca will be] taken care of.

289.   Per Attorney Ryan's report, Mr. Chiocca was a victim of Mrs. Hall's conduct.

290.   At the time Mr. Ryan made the statement set forth above, he had read Attorney

Ryan's report and knew that Mr. Chiocca was an innocent victim.

291.   Mr. Ryan's statement that Mr. Chiocca was not an innocent victim has caused

damage to Mr. Chiocca's reputation.

292.   Mr. Ryan's statement constitutes libel and has prejudiced Mr. Chiocca's

profession.

293.   In or about October 2018 and just shortly before he was elected, Mr. Penney

stated to Ms. Tempera that "there must be something existing board members know;

something town residents don't" — referring to the then constituted BOS's vague

statements regarding Mr. Chiocca engaging in misconduct and not being an

"innocent bystander."

294.   At the time Mr. Penney made this statement, Attorney Ryan's Report had been

released publicly for several months.

295.   On November 6, 2018, Mr. Penney and Ms. Nyman were elected as the two new

members of the BOS.

296.   Upon information and belief, following their election, Mr. Penney and Ms.

Nyman were not presented with any additional relevant information that was not

already publicly available regarding Mr. Chiocca through the previous release of
Attorney Ryan's report (because there was no additional information at the time).

297.  On November 8, 2018, the BOS held their first meeting following the November
6, 2018 election.

298.  At the meeting, Mr. O'Loughlin referred to the Town Administrator position as
"vacant," and Mr. Ryan referred to Mr. Chiocca as a "former employee" on several
occasions and continued to purposefully harm Mr. Chiocca's reputation by stating
that the BOS is "paving the way for this Town to get up and running again and get
rid of the dead wood."

299.  Mr. Ryan's, Mr. O'Loughlin's, and the BOS's defamatory and retaliatory
statements regarding Mr. Chiocca coupled with the BOS's continued, unjustified
suspension of Mr. Chiocca (stripping Mr. Chiocca of all Town Administrator
responsibilities) in direct contradiction to Attorney Ryan's report (and in violation of
Mr. Chiocca's contract and the Town Charter) have destroyed Mr. Chiocca's
reputation and rendered the working conditions objectively intolerable, and as a
result have constructively discharged Mr. Chiocca from employment with the Town.

300.  On November 20, 2018, Mr. Chiocca filed his initial Charge of Discrimination
with the Commission.

301.  Shortly after the Charge was filed, Attorney Shafran emailed a copy of the Charge
to counsel for the Respondents.

302.  Later that same evening, the BOS held another Selectmen's meeting.

303.    At the meeting, which occurred within hours of the BOS receiving Mr. Chiocca's

Charge, the BOS voted unanimously to keep Mr. Chiocca on paid administrative

leave through June 30, 2019, and not to renew his contract thereafter.

304.    Upon information and belief, both Mr. Penney and Ms. Nyman read Attorney

Ryan's Report prior to voting to keep Mr. Chiocca on paid administrative leave

through June 30, 2019, and to not renew his contract thereafter.

305.    The BOS's vote to keep Mr. Chiocca on paid administrative leave constitutes a

retaliatory suspension.

306.    The BOS has also retaliated against Mr. Chiocca by not raising his salary through

June 30, 2019, as it initially planned to do.

307.    The BOS's vote to not renew Mr. Chiocca's contract is express confirmation of

the Town's previous constructive discharge of Mr. Chiocca and further retaliation

against Mr. Chiocca.

308.    Following the aforementioned votes, Mr. Ryan read a prepared statement.

309.    In relevant part, Mr. Ryan stated, "[s]ince this controversy is likely to take months

or years to litigate, **we would very likely have been required** to pay the remaining

balance of Mr. Chiocca's contract, which ends on June 30, 2019.

310.    Mr. Ryan then stated that "all of Mr. Chiocca's claims [are] without any merit,"

despite also stating that the Town's "independent investigator . . . determined that

Ms. Hall had violated the Town's harassment policy in her role as Mr. Chiocca's

supervisor . . . ."

311. On January 22, 2019, the Town, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney, and Ms. Nyman filed their Position Statement in response to Mr. Chiocca's MCAD Charge of Discrimination.

312. In their Position Statement, the Town, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney, and Ms. Nyman disavowed Attorney Ryan's Report and stated that they are "unpersuaded that Mr. Chiocca was, indeed, a victim."

313. Following the aforementioned assertion, the Town, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney, and Ms. Nyman then stated in their Position Statement that they are of the belief that based on allegedly newly recalled memories, that Mrs. Hall "recently filed a complaint with the Massachusetts State Police regarding the events of May 1-2, and the matter is currently being investigated by the District Attorney's office."

314. The Town, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney, and Ms. Nyman then stated in their Position Statement: "In light of Ms. Hall's recent disclosures to the Massachusetts State Police, Attorney Ryan agreed to reopen her investigation into the events of May 1-2, 2018. As part of her investigation, Attorney Ryan will determine whether new evidence has any effect on her previous findings of fact, conclusions, and recommendations. If so, Attorney Ryan will prepare a revised or supplemental report for submission to the Board of Selectmen."

315. Upon information and belief, as of the date of this filing, Attorney Ryan has not reopened her investigation and does not have any further interviews scheduled with Mrs. Hall.

316.   On January 31, 2019, Mrs. Hall filed her Position Statement in response to Mr.

Chiocca's MCAD Charge of Discrimination.

317.   In Mrs. Hall's Position Statement she stated that she "recently recovered some

memories that confirm the sexual conduct was unwelcome by [her]."

318.   Upon information and belief, Mrs. Hall disclosed her alleged "recovered

memories" to the Massachusetts State Police, but she has not disclosed them to

Attorney Ryan.

319.   Any assertion by Mrs. Hall that she had "recovered memories" related to the

incident with Mr. Chiocca is a knowingly false attempt by Mrs. Hall to defame

further, disparage and retaliate against Mr. Chiocca to conceal her own knowingly

unlawful conduct.

## CAUSES OF ACTION

### COUNT 1
(Violation of Mass. Gen. Laws c. 151B, § 4(1) and 4(16A) – Quid Pro Quo Sexual
Harassment, Hostile Work Environment, Unlawful Suspension,
Constructive Discharge and Wrongful Termination)
(Against the Town of Rockland and Deirdre Hall individually)

320.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-319 above

as if fully set forth herein.

321.   Based on the conduct set forth above, the Town of Rockland and Mrs. Hall have

violated M.G.L. c. 151B, § 4(1) and 4(16A).

322.   Mr. Chiocca has suffered damages as a result of the Town of Rockland's and Mrs.

Hall's conduct.

## COUNT 2
(Violation of Mass. Gen. Laws c. 151B, § 4(4) – Retaliation, Unlawful Suspension,
Constructive Discharge, and Wrongful Termination)
(Against all Defendants)

323.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-322 above

as if fully set forth herein.

324.   Based on the conduct set forth above, the Defendants have violated M.G.L. c.

151B, § 4(4).

325.   Mr. Chiocca has suffered damages as a result of the Defendants' conduct.

## COUNT 3
(Violation of Mass. Gen. Laws c. 151B, § 4(4A) – Coercion or Interference with 151B
Rights, Unlawful Suspension, Constructive Discharge, and Wrongful Termination)
(Against all individual Defendants)

326.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-325 above

as if fully set forth herein.

327.   Based on the conduct set forth above, the individual Defendants have violated

M.G.L. c. 151B, § 4(4A).

328.   Mr. Chiocca has suffered damages as a result of the individual Defendants'

conduct.

## COUNT 4
(Violation of Mass. Gen. Laws c. 151B, § 4(5) – (Aiding and Abetting, Constructive
Discharge and Wrongful Termination)
(Against all Defendants)

329.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-328 above

as if fully set forth herein.

330.   Based on the conduct set forth above, the Defendants have violated M.G.L. c.

151B, § 4(5).

331.   Mr. Chiocca has suffered damages as a result of the Defendants' conduct.

## COUNT 5
(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. – Quid
Pro Quo Sexual Harassment, Hostile Work Environment,
Unlawful Suspension, Constructive Discharge, and Wrongful Termination)
(Against the Town of Rockland)

332.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-331 above

as if fully set forth herein.

333.   Based on the conduct set forth above, the Town of Rockland has violated Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq

334.   Mr. Chiocca has suffered damages as a result of the Town of Rockland's conduct

## COUNT 6
(42 U.S.C. § 1983 – Sexual Harassment in violation of the Equal Protection Clause)
(Against Mrs. Hall)

335.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-334 above

as if fully set forth herein.

336.   Based on the conduct set forth above, Mrs. Hall violated Mr. Chiocca's civil

rights under color of state law in violation of the Equal Protection Clause.

337.   Mr. Chiocca has suffered damages as a result of Mrs. Hall's conduct.

## COUNT 7
(42 U.S.C. § 1983 – Post-Investigation Retaliation in violation of
the Equal Protection Clause)
(Against Mr. Kimball, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney,
and Ms. Nyman)

338.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-337 above

as if fully set forth herein.

339.   Mr. Kimball, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms.

Nyman intentionally discriminated against Mr. Chiocca on the basis of his sex by

suspending, constructively discharging and/or not renewing his contract following

their receipt of Attorney Ryan's Report, and did so based on their unlawful perceptions towards a male victim of sexual harassment.

340. Based on the conduct set forth above, Mr. Kimball, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman violated Mr. Chiocca's civil rights under color of state law in violation of the Equal Protection Claim.

341. Mr. Chiocca has suffered damages as a result of Mr. Kimball's Mr. Ryan's, Mr. Mullen's, Mr. O'Loughlin's, Mr. Penney's and Ms. Nyman's conduct.

**COUNT 8**
(42 U.S.C. § 1983 – Post-Investigation Retaliation against violation of
the Equal Protection Clause
(Against the Town Rockland)

342. Mr. Chiocca incorporates by reference the averments in paragraphs 1-341 above as if fully set forth herein.

343. The Town intentionally discriminated against Mr. Chiocca on the basis of his sex by suspending, constructively discharging and/or not renewing his contract through the actions of the BOS following its receipt of Attorney Ryan's Report, and did so based on its unlawful perceptions towards a male victim of sexual harassment.

344. The BOS engaged in this unlawful conduct as the Town's municipal policy and decision makers.

345. Based on the conduct set forth above, the Town violated Mr. Chiocca's civil rights under color of state law in violation of the Equal Protection Claim.

346. Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 9
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Property Interest – Continued
Employment/Lost Raise-Constructive Discharge
(Against Mrs. Hall, Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin)

347.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-346 above
as if fully set forth herein.

348.   Mr. Chiocca possessed a property interest in continued employment.

349.   Based on the conduct set forth above, Mrs. Hall, Mr. Kimball, Mr. Ryan, Mr.
Mullen and Mr. O'Loughlin engaged in conscience-shocking behavior that
constructively discharged Mr. Chiocca, including but not limited to, sexually
assaulting Mr. Chiocca, fabricating claims of sexual assault against Mr. Chiocca,
knowingly and purposefully rejecting Attorney Ryan's recommendations by
manufacturing disciplinary issues against Mr. Chiocca they themselves had engaged
in, and by repeatedly defaming Mr. Chiocca both orally and in writing instead of
acknowledging that he was a victim of sexual harassment.

350.   Mr. Chiocca has suffered damages as a result of Mrs. Hall's, Mr. Kimball's, Mr.
Ryan's, Mr. Mullen's and Mr. O'Loughlin's conduct.

## COUNT 10
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Property Interest – Continued
Employment/Lost Raise-Constructive Discharge)
(Against the Town of Rockland)

351.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-350 above
as if fully set forth herein.

352.   Mr. Chiocca possessed a property interest in continued employment.

353.   Based on the conduct set forth above, Mrs. Hall, Mr. Kimball, Mr. Ryan, Mr.
Mullen and Mr. O'Loughlin engaged in conscience-shocking behavior that

constructively discharged Mr. Chiocca, including but not limited to, sexually assaulting Mr. Chiocca, fabricating claims of sexual assault against Mr. Chiocca, knowingly and purposefully rejecting Attorney Ryan's recommendations by manufacturing disciplinary issues against Mr. Chiocca they themselves had engaged in, and by repeatedly defaming Mr. Chiocca both orally and in writing instead of acknowledging that he was a victim of sexual harassment.

354. These individuals were the Town's municipal policy and decision makers at all times relevant hereto, and so the Town is liable for their conduct.

355. Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 11
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Liberty Interest - Reputation (Against all Individual Defendants)

356. Mr. Chiocca incorporates by reference the averments in paragraphs 1-355 above as if fully set forth herein.

357. Mr. Chiocca possessed a liberty interest in his reputation.

358. Based on the conduct set forth above, the individual Defendants deprived Mr. Chiocca of his liberty interest in his reputation by stigmatizing him through conscience-shocking behavior by fabricating claims of sexual assault against Mr. Chiocca, knowingly and purposefully rejecting Attorney Ryan's recommendations by manufacturing disciplinary issues against Mr. Chiocca they themselves had engaged in, and by repeatedly defaming Mr. Chiocca both orally and in writing instead of acknowledging that he was a victim of sexual harassment.

359. The individual Defendants' conduct seriously damaged Mr. Chiocca's standing and associations in his community and irreparably damaged his good name, reputation, honor, and integrity.

360. Mr. Chiocca has suffered damages as a result of the individual Defendants' conduct.

**COUNT 12**
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Liberty Interest – Reputation)
(Against the Town of Rockland)

361. Mr. Chiocca incorporates by reference the averments in paragraphs 1-360 above as if fully set forth herein.

362. Mr. Chiocca possessed a liberty interest in his reputation.

363. Based on the conduct set forth above, the individual Defendants deprived Mr. Chiocca of his liberty interest in his reputation by stigmatizing him through conscience-shocking behavior by fabricating claims of sexual assault against Mr. Chiocca, knowingly and purposefully rejecting Attorney Ryan's recommendations by manufacturing disciplinary issues against Mr. Chiocca they themselves had engaged in, and by repeatedly defaming Mr. Chiocca both orally and in writing instead of acknowledging that he was a victim of sexual harassment.

364. These individuals were the Town's municipal policy and decision makers at all times relevant hereto, and so the Town is liable for their conduct.

365. The Town's conduct seriously damaged Mr. Chiocca's standing and associations in his community and irreparably damaged his good name, reputation, honor, and integrity.

366. Mr. Chiocca has suffered damages as a result of the Town's conduct.

**COUNT 13**

(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Pre-
Investigation Suspension without Notice and Hearing
(Against Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin)

367.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-366 above

as if fully set forth herein.

368.   Pursuant to his Contract and M.G.L. c. 41, § 108N, Mr. Chiocca had a reasonable

expectation of continued employment consistent with and subject to the provisions

of the Rockland Town Charter.

369.   Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin voted to suspend Mr.

Chiocca without affording him sufficient procedural due process.

370.   Mr. Chiocca has suffered damages as a result of Mr. Kimball's, Mr. Ryan's, Mr.

Mullen's and Mr. O'Loughlin's conduct.

**COUNT 14**

(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Pre-
Investigation Suspension without Notice and Hearing
(Against the Town of Rockland)

371.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-370 above

as if fully set forth herein.

372.   Pursuant to his Contract and M.G.L. c. 41, § 108N, Mr. Chiocca had a reasonable

expectation of continued employment consistent with and subject to the provisions

of the Rockland Town Charter.

373.   The Town suspended Mr. Chiocca without affording him sufficient procedural

due process.

374. The individual Defendants who failed to afford Mr. Chiocca with sufficient procedural due process were Town's municipal policy and decision makers at all times relevant hereto, and so the Town is liable for their conduct.

375. Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 15
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Post-Investigation Termination via Constructive Discharge without Notice and Hearing) (Against Mrs. Hall, Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin)

376. Mr. Chiocca incorporates by reference the averments in paragraphs 1-375 above as if fully set forth herein.

377. Pursuant to his Contract and M.G.L. c. 41, § 108N, Mr. Chiocca had a reasonable expectation of continued employment consistent with and subject to the provisions of the Rockland Town Charter.

378. By their conduct as set forth above, Mrs. Hall, Mr. Kimball, Mr. Ryan, Mr. Mullen, and Mr. O'Loughlin constructively discharged Mr. Chiocca's employment, and therefore terminated his employment without affording him sufficient procedural due process.

379. Mr. Chiocca has suffered damages as a result of Mrs. Hall's, Mr. Kimball's, Mr. Ryan's, Mr. Mullen's and Mr. O'Loughlin's conduct.

## COUNT 16
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Post-Investigation Termination via Constructive Discharge without Notice and Hearing) (Against the Town of Rockland)

380. Mr. Chiocca incorporates by reference the averments in paragraphs 1-379 above as if fully set forth herein.

381.   Pursuant to his Contract and M.G.L. c. 41, § 108N, Mr. Chiocca had a reasonable expectation of continued employment consistent with and subject to the provisions of the Rockland Town Charter.

382.   The Town constructively discharged and therefore terminated Mr. Chiocca's employment without affording him sufficient procedural due process.

383.   The individual Defendants who failed to afford Mr. Chiocca with sufficient procedural due process were Town's municipal policy and decision makers at all times relevant hereto, and so the Town is liable for their conduct.

384.   Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 17
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Final Suspension without Notice and Hearing)
(Against Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman)

385.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-384 above as if fully set forth herein.

386.   Pursuant to his Contract and M.G.L. c. 41, § 108N, Mr. Chiocca had a reasonable expectation of continued employment consistent with and subject to the provisions of the Rockland Town Charter.

387.   Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman voted to suspend Mr. Chiocca without affording him sufficient procedural due process.

388.   Mr. Chiocca has suffered damages as a result of Mr. Ryan's, Mr. Mullen's, Mr. O'Loughlin's, Mr. Penney's and Ms. Nyman's conduct.

## COUNT 18
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Property Interest – Final Suspension Discharge without Notice and Hearing)
(Against the Town of Rockland)

389.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-388 above as if fully set forth herein.

390.   Pursuant to his Contract and M.G.L. c. 41, § 108N, Mr. Chiocca had a reasonable expectation of continued employment consistent with and subject to the provisions of the Rockland Town Charter.

391.   The Town suspended Mr. Chiocca without affording him sufficient procedural due process.

392.   The individual Defendants who failed to afford Mr. Chiocca with sufficient procedural due process were Town's municipal policy and decision makers at all times relevant hereto, and so the Town is liable for their conduct.

393.   Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 19
(42 U.S.C. § 1983 – Deprivation of Procedural Due Process (Liberty Interest - Reputation)
(Against all individual Defendants)

394.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-393 above as if fully set forth herein.

395.   Mr. Chiocca possessed a liberty interest in his reputation.

396.   Based on the conduct set forth above, the individual Defendants deprived Mr. Chiocca of his liberty interest in his reputation by stigmatizing him through conscience-shocking behavior by fabricating claims of sexual assault against Mr. Chiocca, knowingly and purposefully rejecting Attorney Ryan's recommendations

by manufacturing disciplinary issues against Mr. Chiocca they themselves had engaged in, and by repeatedly defaming Mr. Chiocca both orally and in writing instead of acknowledging that he was a victim of sexual harassment.

397. The individual Defendants' deprived Mr. Chiocca of his liberty interest in his reputation without affording him sufficient procedural due process.

398. The individual Defendants' conduct seriously damaged Mr. Chiocca's standing and associations in his community and irreparably damaged his good name, reputation, honor, and integrity.

399. Mr. Chiocca has suffered damages as a result of the individual Defendants' conduct.

## **COUNT 20**
(42 U.S.C. § 1983 – Violation of Substantive Due Process (Liberty Interest – Reputation)
(Against the Town of Rockland)

400. Mr. Chiocca incorporates by reference the averments in paragraphs 1-399 above as if fully set forth herein.

401. Mr. Chiocca possessed a liberty interest in his reputation.

402. Based on the conduct set forth above, the Town deprived Mr. Chiocca of his liberty interest in his reputation by stigmatizing him through conscience-shocking behavior by fabricating claims of sexual assault against Mr. Chiocca, knowingly and purposefully rejecting Attorney Ryan's recommendations by manufacturing disciplinary issues against Mr. Chiocca they themselves had engaged in, and by repeatedly defaming Mr. Chiocca both orally and in writing instead of acknowledging that he was a victim of sexual harassment.

403.   The Town deprived Mr. Chiocca of his liberty interest in his reputation without afford him sufficient procedural due process.

404.   These individuals who deprived Mr. Chiocca of his liberty interest in his reputation without affording him sufficient procedural due process were the Town's municipal policy and decision makers at all times relevant hereto and so the Town is liable for their conduct.

405.   The Town's conduct seriously damaged Mr. Chiocca's standing and associations in his community and irreparably damaged his good name, reputation, honor, and integrity.

406.   Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 21
(42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights)
(Against Mrs. Hall and Mr. Kimball)

407.   Mr. Chiocca incorporates by reference the averments in paragraphs 1-406 above as if fully set forth herein.

408.   Based on the conduct set forth above, Mrs. Hall and Mr. Kimball conspired to deprive Mr. Chiocca of equal protection of the law intentionally.

409.   Based on the conduct set forth above, Mrs. Hall and Mr. Kimball engaged in conduct in furtherance of their conspiracy.

410.   Mr. Chiocca has suffered damages as a result of Mrs. Hall's and Mr. Kimball's conduct.

## COUNT 22
### (42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights)
### (Against Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman)

411. Mr. Chiocca incorporates by reference the averments in paragraphs 1-410 above as if fully set forth herein.

412. Based on the conduct set forth above, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman conspired to deprive Mr. Chiocca of equal protection of the law intentionally.

413. Based on the conduct set forth above, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman engaged in conduct in furtherance of their conspiracy.

414. Mr. Chiocca has suffered damages as a result of Mr. Ryan's, Mr. Mullen's, Mr. O'Loughlin's, Mr. Penney's and Ms. Nyman's conduct.

## COUNT 23
### (42 U.S.C. § 1986 – Failure to Prevent 1985 Conspiracy)
### (Against all Individual Defendants)

415. Mr. Chiocca incorporates by reference the averments in paragraphs 1-414 above as if fully set forth herein.

416. Based on the conduct set forth above, Mrs. Hall and Mr. Kimball had knowledge of their conspiracy to intentionally deprive Mr. Chiocca of equal protection of the law.

417. Mrs. Hall and Mr. Kimball neglected and/or refused to prevent the foregoing 1985 conspiracy.

418. Based on the conduct set forth above, Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman had knowledge of their conspiracy to intentionally deprive Mr. Chiocca of equal protection of the law.

419.  Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman neglected and/or refused to prevent the foregoing 1985 conspiracy.

420.  Mr. Chiocca has suffered damages as a result of the individual Defendants' conduct.

## COUNT 24
(Breach of Contract – Suspension in Violation of Contract/Town Charter)
(Against the Town of Rockland)

421.  Mr. Chiocca incorporates by reference the averments in paragraphs 1-420 above as if fully set forth herein.

422.  As set forth above, Mr. Chiocca's Contract guaranteed him certain procedural rights through the Town's Charter in the event the Town sought to suspend him.

423.  The Town suspended Mr. Chiocca in violation of the Town Charter and as a result, breached Mr. Chiocca's Contract.

424.  Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 25
(Breach of Contract – Constructive Discharge/Termination in Violation of
Contract/Town Charter)
(Against the Town of Rockland)

425.  Mr. Chiocca incorporates by reference the averments in paragraphs 1- 424 above as if fully set forth herein.

426.  As set forth above, Mr. Chiocca's Contract guaranteed him certain procedural rights through the Town's Charter in the event the Town sought to terminate his employment.

427.  The Town constructively discharged Mr. Chiocca and therefore terminated his employment in violation of the Town Charter and as a result, breached Mr. Chiocca's Contract.

428. Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 26
(Breach of the Implied Covenant of Good Faith and Fair Dealing)
(Against the Town of Rockland)

429. Mr. Chiocca incorporates by reference the averments in paragraphs 1- 428 above as if fully set forth herein.

430. As set forth above, Mr. Chiocca's Contract guaranteed him certain procedural rights through the Town's Charter in the event the Town sought to suspend Mr. Chiocca or terminate his employment.

431. The Town did not act in good faith when it deprived Mr. Chiocca of his rights under his Contract, thereby depriving Mr. Chiocca of the benefits of his Contract.

432. Mr. Chiocca has suffered damages as a result of the Town's conduct.

## COUNT 27
(Libel)
(Against Mrs. Hall)

433. Mr. Chiocca incorporates by reference the averments in paragraphs 1-432 above as if fully set forth herein.

434. Based on the facts set forth above, Mrs. Hall libeled Mr. Chiocca.

435. Mr. Chiocca has suffered damages as a result of Mrs. Hall's conduct.

## COUNT 28
(Slander)
(Against Mrs. Hall)

436. Mr. Chiocca incorporates by reference the averments in paragraphs 1-435 above as if fully set forth herein.

437. Based on the facts set forth above, Mrs. Hall slandered Mr. Chiocca.

438. Mr. Chiocca has suffered damages as a result of Mrs. Hall's conduct.

## COUNT 29
(Libel)
(Against Mr. O'Loughlin)

439. Mr. Chiocca incorporates by reference the averments in paragraphs 1-438 above as if fully set forth herein.

440. Based on the facts set forth above, Mr. O'Loughlin libeled Mr. Chiocca.

441. Mr. Chiocca has suffered damages as a result of Mr. O'Loughlin's conduct.

## COUNT 30
(Libel)
(Against Mr. Ryan)

442. Mr. Chiocca incorporates by reference the averments in paragraph 1-441 above as it set forth fully herein.

443. Based on the facts set forth above, Mr. Ryan libeled Mr. Chiocca.

444. Mr. Chiocca has suffered damages as a result of Mr. Ryan's conduct.

## COUNT 31
(Battery)
(Against Mrs. Hall)

445. Mr. Chiocca incorporates by reference the averments in paragraphs 1-444 above as if fully set forth herein.

446. Based on the facts set forth above, Mrs. Hall acted with the intent to cause offensive contact with Mr. Chiocca and offensive contacted resulted.

447. Mr. Chiocca has suffered damages as a result of Mrs. Hall's conduct.

## COUNT 32
(Malicious Prosecution)
(Against Mrs. Hall)

448. Mr. Chiocca incorporates by reference the averments in paragraphs 1-447 above as if fully set forth herein.

449. Based on the facts set forth above, the suit that Mrs. Hall filed on June 13, 2018 (that included Mr. Chiocca has a defendant) was done without probable cause and with malice, and the action terminated in Mr. Chiocca's favor.

450. Mr. Chiocca has suffered damages as a result of Mrs. Hall's conduct.

## COUNT 33
(Intentional Infliction of Emotional Distress)
(Against Mrs. Hall)

451. Mr. Chiocca incorporates by reference the averments in paragraphs 1-450 above as if fully set forth herein.

452. Based on the conduct set forth above (i.e., Mrs. Hall sexually assaulting Mr. Chiocca and then knowingly fabricating allegations of sexual assault/harassment by Mr. Chiocca), Mrs. Hall intended to inflict emotional distress or knew or should have known that emotional distress was likely to result of her conduct, her conduct was extreme and outrageous and beyond all bounds of decency and was utterly intolerable in a civilized community, and Mrs. Hall's actions caused Mr. Chiocca to sustain severe emotional distress.

453. Mr. Chiocca has suffered damages as a result of Mrs. Hall's conduct.

## COUNT 34
(Intentional Infliction of Emotional Distress)
(Against Mr. Kimball)

454. Mr. Chiocca incorporates by reference the averments in paragraphs 1-453 above as if fully set forth herein.

455. Based on the conduct set forth above (i.e., Mr. Kimball conspiring with Mrs. Hall to fabricate allegations of sexual assault/harassment against Mr. Chiocca), Mr. Kimball intended to inflict emotional distress or knew or should have known that

emotional distress was likely to result of his conduct, his conduct was extreme and outrageous and beyond all bounds of decency and was utterly intolerable in a civilized community, and Mr. Kimball's actions caused Mr. Chiocca to sustain severe emotional distress.

456. Mr. Chiocca has suffered damages as a result of Mr. Kimball's conduct.

**COUNT 35**
(Intentional Infliction of Emotional Distress)
(Against Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman)

457. Mr. Chiocca incorporates by reference the averments in paragraphs 1-456 above as if fully set forth herein.

458. Based on the conduct set forth above (i.e., Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman intentionally retaliating and defaming a victim of sexual assault/harassment), Mr. Ryan, Mr. Mullen, Mr. O'Loughlin, Mr. Penney and Ms. Nyman intended to inflict emotional distress or knew or should have known that emotional distress was likely to result from their conduct, their conduct was extreme and outrageous and beyond all bounds of decency and was utterly intolerable in a civilized community, and their actions caused Mr. Chiocca to sustain severe emotional distress.

459. Mr. Chiocca has suffered damages as a result of Mr. Ryan's, Mr. Mullen's, Mr. O'Loughlin's, Mr. Penney's and Ms. Nyman's conduct.

**COUNT 36**
(Intentional Interference with Contractual Relations)
(Against all Individual Defendants)

460. Mr. Chiocca incorporates by reference the averments in paragraphs 1-459 above as if fully set forth herein.

461.   Based on the facts set forth above, Mr. Chiocca had a Contract with the Town and

the individual Defendants knowingly and with malice induced the Town to break the

Contract.

462.   Mr. Chiocca has suffered damages as a result of the individual Defendants'

conduct.

**COUNT 37**
(Intentional Interference with Advantageous Relations)
(Against all Individual Defendants)

463.   Mr. Chiocca incorporates by reference the averments in paragraphs 1- 462 above

as if fully set forth herein.

464.   Based on the facts set forth above, Mr. Chiocca had a prospective contractual

relationship with the Town and the individual Defendants knowingly and with

malice induced the Town to not enter into the prospective contractual relationship

with Mr. Chiocca

465.   Mr. Chiocca has suffered damages as a result of the individual Defendants'

conduct.

   **WHEREFORE**, Mr. Chiocca prays for judgment against the Defendants as

follows:

   A.   A judgment against the Defendants and in favor of Mr. Chiocca on each of the

   causes of action set forth above;

   B.   A judgment and order awarding Mr. Chiocca compensatory damages,

   including but not limited to back pay and benefits, front pay and benefits, lost

   raises, lost vacation time, lost retirement benefits, emotional distress damages,

   pain and suffering, reputational damages, as well as punitive damages;

C. A judgment and order awarding Mr. Chiocca his reasonable attorneys' fees and the costs of this action;

D. A judgment and order awarding Mr. Chiocca all legally permissible interest; and

E. Such other relief as this Court may deem just and proper.

## **JURY DEMAND**

Mr. Chiocca demands a trial by jury on all causes of action so triable.

Respectfully submitted
Allan Chiocca

By his attorneys,

/s/ Adam J. Shafran
Adam J. Shafran, BBO#670460
ashafran@rflawyers.com
Jonathon D. Friedmann, BBO#180130
jfriedmann@rflawyers.com
Nicholas J. Schneider, BBO#688498
nschneider@rflawyers.com
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
617-723-7700
617-227-0313 (fax)

# EXHIBIT B



# DISCRIMINATION AND HARASSMENT SOLUTIONS LLC

July 2, 2018

## INVESTIGATION OF COMPLAINTS AGAINST DEIRDRE HALL

## AND ALLAN CHIOCCA

## FINDINGS OF FACT, CONCLUSIONS AND RECOMMENDATIONS

I. **SCOPE OF INVESTIGATION**

I was tasked with investigating an allegation, raised by Edward Kimball (hereinafter "Mr. Kimball"), Chairman of the Town of Rockland (hereinafter, "Town") Board of Selectmen (hereinafter "BOS"), of "inappropriate behavior" by the Town Administrator, Allan Chiocca (hereinafter "Mr. Chiocca") towards Deirdre Hall (hereinafter "Ms. Hall"), Vice Chair of the BOS (hereinafter, "Hall Allegation"). In addition, I was tasked with investigating an allegation of "quid pro quo" sexual harassment brought by Mr. Chiocca against Ms. Hall (hereinafter, "Chiocca Allegation", and collectively with the Hall Allegation, the "Allegations"). Both Allegations arise out of the same incident, which took place during the evening of May 1, 2018 and the early morning hours of May 2, 2018 (hereinafter, the "Incident").[1]

---

[1] While the allegation reported by Mr. Kimball refers only to "inappropriate behavior" by Mr. Chiocca, through an interview of Ms. Hall, during this investigation, it was confirmed that the only inappropriate behavior, complained of by Ms. Hall, related to sexual conduct by Mr. Chiocca. The allegation relates to the Incident (as hereinafter defined), of which she has no memory, and which she claims had to have occurred without her consent because she was incapable of such consent due to her level of intoxication.

www.dhsworks.com   781-910-0820   rryan@dhsworks.com

AC00462

# EXHIBIT C

| | |
|---|---|
| **From:** | casey sherman |
| **Subject:** | *URGENT* Rockland Selectman Full Sexual Harassment Report and Executive Summary |
| **Date:** | Wednesday, July 11, 2018 12:01:33 PM |
| **Attachments:** | Rockland Report.pdf |

Attention reporters and editors.

In response to the Town of Rockland's decision to release the surveillance video of the May 1st incident involving Selectman Deirdre Hall and Town Administrator Allan Chiocca without proper context, Mr. Chiocca's attorney Adam Shafran has decided to release the full 29 page investigation to provide that missing context.

Mr. Chiocca has not entered into any confidentiality agreement and is free and clear to share the results of the investigation as the media is free and clear to use the report in broadcast or print. This was confirmed by Ms. Hall's attorney in a letter received yesterday in which he confirmed that the parties did not enter into any confidentiality agreement regardless of water marking.

We have notified Rockland Town Counsel of our decision to release the report and received no objection.

The copy of the attached report was slightly redacted by the investigator and not by Mr. Chiocca's attorney. This is the copy that was given to Mr. Chiocca's legal counsel.

Regards, Casey Sherman
781 588 8816

AC003371