# EXHIBIT A

```
                                                              1

                    SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION, HUNTERDON COUNTY
                    DOCKET NO. HNT-L-584-02
                    A.D. # A
         ----------------------------------
         MARY FERRANTE,              )
                                     )
                   Plaintiff,        )
                                     )
              VS.                    ) STENOGRAPHIC TRANSCRIPT
                                     )           OF
         THOMAS J. SCIARETTA and the ) MOTION IN LIMINE RE
         BOROUGH OF BERNARDSVILLE, a )      TESTIMONY OF
         municipal corporation, et als, ) DR. LOUISE F. FITZGERALD
                                     )
                                     )
                   Defendants.       )
         ----------------------------------
              PLACE:   Hunterdon County Justice Complex
                       65 Park Avenue
                       Flemington, New Jersey 08822

              DATE:    March 31, 2003

         BEFORE:

              THE HONORABLE EDMUND R. BERNHARD, J.S.C.
                    AND A JURY

         TRANSCRIPT ORDERED BY:

              LISA MANSHEL, ESQ. (Francis & Manshel, LLC)

         APPEARANCES:

              LISA MANSHEL, ESQ., (Francis & Manshel, LLC)
              Attorney for the Plaintiff.

              DENNIS A. CIPRIANO, ESQ., (DENNIS A. CIPRIANO, ESQ.)
              Attorney for the Defendant Sciaretta.

              TIMOTHY P. BECK, ESQ.
              (DiFrancesco, Bateman, Coley, et al)
              Attorney for Bernardsville Defendants.



                         JANICE M. SMITH, C.S.R., C.R.R.
                         Post Office Box 3000
                         Department 214
                         Somerville, New Jersey 08876
```

2

INDEX

Colloquy                                        Page 3
Court's Decision                                Page 16

3

Colloquy on Motion

(Outside the presence of the jury.)

THE COURT: All right. Everyone ready to proceed?

MS. MANSHEL: Yes, your Honor.

THE COURT: All right. Counsel had advised me and indicated they were making <u>in limine</u> motions with regard to the testimony of Dr. Fitzgerald. Mr. Beck had advised me that his <u>in limine</u> motion was pointed out in one paragraph in his March 3rd letter. Mr. Cipriano had sent me a brief on March 14th which Mr. Beck indicated he concurred. Miss Manshel had provided me with additional information in her March 6th response to the motions <u>in limine</u>.

Counsel had on several occasions referred to the necessity to hold a Rule 104 hearing. I indicated to them -- or rather I asked what the purpose of the Rule 104 hearing would be when I had their arguments.

I've had an opportunity to read the reports. Counsel concurred on Friday, as I recall, that it would not be necessary to have a Rule 104 hearing, and the testimony of Dr. Fitzgerald could be dealt with at oral argument.

Does that accurately reflect the procedural posture of where we're at?

4

Colloquy on Motion

1  MS. MANSHEL: As far as I can recall, your
2  Honor, yes.
3  MR. BECK: Yes.
4  MR. CIPRIANO: Yes, sir.
5  THE COURT: All right. Which of you wants
6  to go first? Mr. Beck?
7  MR. CIPRIANO: Mr. Beck.
8  MR. BECK: Certainly, Judge.
9  The purpose of the Rule 104 hearing is
10 that, although there may be concerning the second
11 report perhaps no contest concerning an evaluation that
12 Dr. Fitzgerald did of Ms. Ferrante --
13 THE COURT: The second report being the
14 psychological report?
15 MR. BECK: Yes. Because that was done in
16 person, and I am sure we are going to be able to
17 testify -- question her about the protocol and that
18 type of thing -- the first report, however, was done in
19 the background where Dr. Fitzgerald had never met Mary
20 Ferrante, had read over a number of documents
21 concerning Mary Ferrante, and testifies generally about
22 sexual harassment and the environment that creates
23 sexual harassment response of a particular -- shouldn't
24 say that -- the response, in general, of women to
25 sexual harassment. And the purpose of my motion in

5

Colloquy on Motion

1  limine was that I believe that Dr. Fitzgerald, among
2  other things, is not going to offer this jury on that
3  particular -- on that discrete issue anything that
4  would be of value to them.
5  Among other things, the literature in, even
6  cited by Dr. Fitzgerald concerning responses of victims
7  to alleged sexual harassment is a general set of
8  statistical analysis where sexual harassment, in fact,
9  is not defined. For example, in Dr. Fitzgerald's
10 deposition, I had asked her about a set of studies
11 conducted by I believe it was a Barbara Gutek,
12 G-U-T-E-K. Now, that appears on -- in my deposition at
13 about page 236. And one of the issues at that point
14 was what was considered sexual harassment when this
15 expert was going to be testifying about whether or
16 not -- or whether victims report sexual harassment, for
17 example, to coworkers, what their likelihood is to
18 report it, to go through formal complaint procedures,
19 things along those lines.
20 On page 236 I asked Dr. Fitzgerald,
21 starting on line 2:
22 "According to some literature that I have,
23 one of the studies that you at least based some
24 reliance on is the Gutek, G-U-T-E-K, study.
25 "Yes -- well, she has done a --

1  A.  Yes -- well, yes. She has done a number of them.
2  I don't know which one --
3  Q.  1985?
4  A.  Okay.
5  Q.  Who responds about certain things. One of
6  the list items asked was whether the person -- " in
7  this study -- "was being expected to socialize as part
8  of the job. Do you believe that being asked to
9  socialize, asking any woman to socialize as part of the
10 job, constitutes --"
11        And then the Doctor interjects:
12        "I take no responsibility for Barbara
13 Gutek."
14        And the question then continues:
15 "Q  -- constitutes sexual harassment?
16 A.  No, I think it probably could, but it's never a
17 question that I would ask on a sexual harassment
18 inventory. I think that's just not --"
19        And then the question is:
20 Q.  "But certainly some of the literature that
21 has relied upon Gutek's findings necessarily then has
22 to have incorporated that type of listing?"
23        And then the Doctor goes on.
24 A.  "Well, actually you're oversimplifying it a bit.
25 What I mean, I don't necessarily want to get into

1  Barbara's work, but she had a brief list of items that
2  she developed very early on."
3        And then it continues.
4        But what the problem that I have at this
5  point is that the Doctor incorporates studies and
6  references studies in her report where she doesn't even
7  agree with the definition of sexual harassment that's
8  used.
9        In this particular case, one has to -- one
10 has to question seriously the value of this expert
11 being able to say to statistics where the definition of
12 sexual harassment is -- changes from study to study.
13 And I think it just is going to end up confusing the
14 jury because we're going to have to go through so much
15 to define, for example, whether the responses in the
16 Gutek study are at all representative of anything that
17 would be relevant to this case. I mean, that people
18 are complaining about having to socialize on the job.
19 That certainly is not one of the questions here, and I
20 think at this time skews the statistics used by
21 Dr. Fitzgerald.
22        That's the essence of the argument. I
23 think the Court has had the opportunity to read over
24 Dr. Fitzgerald's reports, and the issue that I have is
25 just the relevance of this particular set of statistics

```
                                                        8
                         Colloquy on Motion
 1   to a particular -- to this particular case; that when
 2   Dr. Fitzgerald, for example, testifies that -- and she
 3   does testify at some point -- that personality, for
 4   example, has something to do with -- let's see if I can
 5   find that --
 6            THE COURT:  It would have been helpful if
 7   you had called these deposition pages to my attention.
 8            MR. BECK:  Yes.  Yes.
 9            THE COURT:  Because I spent a lot of time
10   in here Saturday morning.  Go ahead.
11            MR. BECK:  Okay.  So, the issue that I
12   think, that I think is probably the most prevalent in
13   this case is whether a set of generic statistics are
14   going to have any relevance to this particular case
15   under the circumstances that the report was written;
16   that is, without the Doctor actually having met Mary
17   Ferrante at that time, done any kind of evaluation of
18   Mary Ferrante at that time, and without knowing
19   anything about Mary Ferrante or knowing anything about
20   the Borough of Bernardsville as well.  The fact that if
21   she did not know the size of the employer, how many
22   people were employed, that type of thing.
23            THE COURT:  Wouldn't that be an area of
24   cross-examination?
25            MR. BECK:  I think that latter part would
```

```
                                                        9
                         Colloquy on Motion
 1   be an area of cross-examination, about the policy.  But
 2   as far as the testimony about whether Mary Ferrante's
 3   conduct was consistent with a particular set of
 4   statistics, that I think is not subject to
 5   cross-examination.  That is the actual subject upon
 6   which this expert has been retained.
 7            So, I don't think that it, under the
 8   circumstances of this case as well as the documentation
 9   or the data that's used in Dr. Fitzgerald's report, I
10   don't think it lends anything to this case.  And,
11   therefore, I think it's going to just simply lead to
12   confusion of the jury, and for that reason it should
13   not be allowed.
14            THE COURT:  Mr. Cipriano?
15            MR. CIPRIANO:  Basically I say two things,
16   your Honor.  Number one, I agree with Mr. Beck that the
17   term "sexual harassment" has not been adequately
18   defined by Dr. Fitzgerald, and I think this is
19   extremely important because we've been here now more
20   than three weeks and I think I can fairly say that
21   sexual harassment to Terry Tangorra is very different
22   from sexual harassment to a person who attends R-rated
23   movies and doesn't think that Playboy Magazine is lewd
24   and indecent.  So, I think what is sexual harassment to
25   one person may be acceptable, if not indulged in
```

Colloquy on Motion 10

1  behavior, by another. And, therefore, all of the
2  opinions concerning sexual harassment --
3         THE COURT: Did you make that argument in
4  your brief?
5         MR. CIPRIANO: No.
6         THE COURT: I read that. I read every one
7  of the cases that you've cited to me. All right. Go
8  ahead.
9         MR. CIPRIANO: The other point -- and I'll
10 say this, Judge, just generally, your Honor -- I think
11 the statements made by Dr. Fitzgerald seek to claim
12 scientific certitude, and I do not believe that they
13 are scientifically acceptable. And even if they could
14 be scientifically acceptable, Dr. Fitzgerald's report
15 does not demonstrate the basis on which she
16 inferentially concludes that they are.
17        THE COURT: Miss Manshel?
18        MS. MANSHEL: Yes, your Honor. First of
19 all, I just -- I want to be clear. I think what the
20 scope of the motion is -- because Mr. Beck has talked
21 about the size of the employer and things that I think
22 are not cognizable in the motion --
23        THE COURT: I think if I understand it,
24 what both Mr. Beck and Mr. Cipriano are talking about
25 are essentially what you've called social framework

Colloquy on Motion 11

1  opinions in dealing with the background of the social
2  framework opinions. They've been a little bit more
3  specific in using it, but I think generally and
4  categorically that's what they're directing their
5  attention to.
6         MS. MANSHEL: Yes. I became confused
7  because Mr. Beck seemed to be indicating he had a
8  problem on her testimony, whether the policies and
9  procedures of Bernardsville are adequate. But I don't
10 understand that to be the motion, so I am going to
11 address --
12        THE COURT: I don't understand that to be
13 part of the motion either.
14        MS. MANSHEL: Okay. As to scientific
15 reliability, plaintiff is not seeking to qualify
16 Barbara Gutek to testify as an expert in this case.
17 Professor Fitzgerald has cited dozens and dozens and
18 dozens of peer-reviewed pieces of research in the
19 literature on sexual harassment that she testified are
20 scientifically reliable and validated by internal
21 testing measures. Barbara Gutek's report, study, can
22 be the subject of cross-examination if defense counsel
23 believes she relied in tiny, minute part on one study
24 that had an assumption she questions. She also --
25        THE COURT: You mean, for example, the

Colloquy on Motion 12

1  Gutek study.
2      MS. MANSHEL: Only the Gutek study. As I
3  understand that, it's the only specific example defense
4  counsel has.
5      The testimony at deposition was really a
6  different issue than I think was represented by Mr.
7  Beck. He was seeking to determine whether you're only
8  sexually harassed if you are asked to go out with your
9  boss, and I think Professor Fitzgerald explained that
10 was an early study in the early days of what's been a
11 field that has been evolving over the years. And I
12 hardly think the fact that Barbara Gutek's study might
13 not be the state of the art in 2003 doesn't mean Louise
14 Fitzgerald isn't qualified to come here and testify.
15     As to her scientific methodology, Mr.
16 Cipriano argues that she hasn't demonstrated it's a
17 sufficiently reliable field. I would -- I think that
18 would be a reason to have a Rule 104 Hearing. That
19 argument was not made in the motion papers submitted by
20 defense counsel, and I don't think I would have agreed
21 that a 104 Hearing wasn't necessary if I understood
22 they were going to attack her methodology in a way that
23 she would need to rebut by testimony in a 104 Hearing.
24     But she did testify -- I won't give you the
25 pages because, you know, you've already prepared -- but

Colloquy on Motion 13

1  in numerous places in her deposition. For example, she
2  teaches scientific methodology. She teaches sampling
3  theory. She teaches it to graduate students. She
4  explained in detail how survey methodology is created,
5  why it's reliable. She explained in detail why
6  psychological testing is reliable and the methodology
7  used. You know, I can give you page numbers. I don't
8  know that that's relevant.
9      She created something called the Sexual
10 Experiences Questionnaire. Wasn't specifically used in
11 this case, but defense counsel became aware of it
12 somehow. They questioned her in detail about the
13 structures of the SEQ and why that is reliable, random
14 sampling, traditional statistical techniques, clinical
15 analysis under reliable and valid authorities. She
16 explained the social framework approach. She explained
17 why it is not part of that methodology to do an
18 evaluation of the plaintiff.
19     In this particular testimony, she is not
20 offering opinion about Mary Ferrante's emotional
21 distress or her personality. And if Mr. Beck wants to
22 cross --
23     THE COURT: You mean in the social
24 framework.
25     MS. MANSHEL: Exactly. There is an

14

Colloquy on Motion

evaluation. That's a discrete segment of her testimony. She is only explaining the scientific evidence that she has testified is comprised of over 1,000 peer-reviewed, reliable scientific studies as well as books and other kinds of articles and literature, much of which she has contributed to with her own original research. That forms a reliable body of research about how victims of harassment respond. The New Jersey Supreme Court recognized it in Lehman. The New Jersey Supreme Court recognized it in the matter of Seaman.

Mr. Beck argues it's not going to be helpful to this jury; it's going to confuse them. Well, this helpfulness, in her report she talks about common misconceptions and myths about victims of sexual harassment. The overarching misconception may be the umbrella misconception is that if you are subject to sexual harassment you're going to report it. That is an important misconception that needs to be cleared up to this jury.

The defendants' whole argument in this case is that if this had really happened, Mary Ferrante would have reported it. She concocted this because her nephew didn't get a job, but she danced with Chief Sciaretta. She sent cards to Chief Sciaretta. She

15

Colloquy on Motion

didn't confide in Valentine. She didn't confide in Sorgie. She didn't tell Sandra Jones. She is fabricating this because she didn't report when they think she had opportunities. Clearly, the plaintiff is entitled to meet these proofs and neutralize.

The battered women's line of cases, State v. Kelly, State v. Frost, recognizes the identical kind of social framework evidence to rebut the identical kind of misconception about why, about women who are subject to battering, the misconception if they were really being battered they would report. It's directly analogous, and I think it provides clear guidance that this testimony is appropriate.

In addition, Mr. Cipriano's own brief argues it's such common sense that a woman would be too afraid to report that we don't need the testimony of this overqualified expert to explain that. Well, the fact that in his own brief he could argue direct common sense is directly common sense as to what this scientifically reliable and valid body of research shows in itself demonstrates why it's so critical that plaintiff be entitled to clear up this misconception that even Mr. Cipriano has and urges on this Court as a reason to exclude the testimony.

I think I have nothing further, your Honor.

Court's Decision

16

1 THE COURT: Mr. Beck, do you want to
2 respond?
3 MR. BECK: No, Judge.
4 THE COURT: Mr. Cipriano, do you want to
5 respond?
6 MR. CIPRIANO: No.
7 THE COURT: All right. This hearing deals
8 with essentially the ability of Dr. Fitzgerald or
9 permitting Dr. Fitzgerald to testify. And I think the
10 parties take no issue with her psychological
11 evaluation, testifying about the area called social
12 framework and the matters relating to that.
13 First of all, Rule 702 states, "If
14 scientific, technical, or other specialized knowledge
15 will assist the trier of fact to understand the
16 evidence or to determine a fact in issue, a witness
17 qualified as an expert by knowledge, skill, experience,
18 training, or education may testify thereto in the form
19 of opinion or otherwise."
20 "The facts --" Rule 703 says, "The facts or
21 data in the particular case upon which the expert bases
22 an opinion or inference may be those perceived by or
23 made known to the expert at or before the hearing. If
24 of a type reasonably relied upon by experts in the
25 particular field in forming opinions or inferences upon

Court's Decision

17

1 the subject, the facts or data need not be admissible
2 in evidence."
3 The material attached to the report of
4 Dr. Fitzgerald indicates the deposition testimony, the
5 interrogatory testimony, and details and facts on which
6 she based her opinions and her conclusions and the
7 material that she had available.
8 Defendant in their brief argue that her
9 opinion is a net opinion, lacking in scientific
10 opinion, and cite Buckelew versus Grossbard, at 87 New
11 Jersey. In looking at that case, net opinion is
12 defined as, "The net opinion rule appears to be a mere
13 restatement of the established rule that an expert's
14 bare conclusions, unsupported by factual evidence, is
15 inadmissible. It frequently focuses, as in Parker
16 versus Goldstein, supra, on the failure of the expert
17 to explain a causal connection between the act or
18 incident complained of and the injury or damage
19 allegedly resulting therefrom. Evidence Rule
20 56(2)(a) --" which I believe was 702 before the
21 recodification -- "further provides that the testimony
22 must be based primarily on facts, data, or other expert
23 opinion established by evidence at the trial.
24 "Although Dr. Tuby's opinion might be
25 vulnerable as a net opinion were it offered solely as

18

Court's Decision

direct evidence of defendant's negligence in this case, we think it can and should be read as forming an integral part of the foundation for the rule of res ipsa loquitur." That was a certain medical malpractice case.

"We have earlier averted to the rule that an expert's opinion must be based on all the facts relevant to the inquiry."

The rule has changed, so it no longer is necessary that there be facts adduced during the course of the trial.

Here there is not a net opinion. Dr. Fitzgerald's opinions are based upon facts and information gained from the depositions, from pleadings, from interrogatories, and other information that was provided both in detail.

New Jersey advocates the two schools of thought with regard to expert testimony. The Frye case, there are three ways under the Frye case the proponent of scientific evidence can prove his general acceptance and reliability: 1) by expert testimony as to the general acceptance among those in the profession in which the proffered expert witness based his or her analysis; 2) by authoritative scientific and legal writings indicating that the scientific community

19

Court's Decision

accepts the premises underlying the proffered testimony; and (3) by judicial opinions that indicate the expert's premises have generally been accepted.

As was said in State versus Kelly, "The difficulty with expert's testimony is that it sounds as if an expert is giving knowledge to a jury about something the jury knows as well as anyone else, namely, the reasonableness of a person's fear of imminent serious danger." Kelly happened to deal with the Battered Woman Syndrome. "That is not at all, however, what the testimony is directly aimed at. It is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge." Cited on page 206.

It is necessary to consider the expert's testimony whether it satisfies the limitation placed on expert testimony under Rule 702 and 703. These rules provide that an expert may testify as to matters requiring scientific, technical, or other specialized knowledge if such testimony will assist the triers of

Court's Decision
20

the fact to understand the evidence or determine the facts in issue.

In effect, this Rule imposes three basic requirements for the admission of expert testimony: The intended testimony must concern a subject matter that is beyond the ken of the average juror. Much like here, much like the cases of Kelly and Frost and the Battered Woman Syndrome, I find that to be so. 2) The field testified to must be at a state of the art such as the expert testimony would be sufficiently reliable. I have reviewed through the number of treatises set forth in the CV of Dr. Fitzgerald's testimony. The shear number and volume of treatises dealing with this indicating it appears to me that it is such a state of art. And the witness must have sufficient expertise to offer the intended testimony. Again, looking through her CV, granted it is a doctor, Dr. Fitzgerald's CV, but just the shear volume of materials that she has published, her background in dealing in research in this area, I find that she has sufficient expertise.

The primary justification for permitting expert testimony is the average juror is relatively helpless in dealing with the subject matter is not a matter of common knowledge. I find that to be so. In discussing expert testimony in the Kelly case, it said

Court's Decision
21

at page 209: "As previously discussed, a battering relationship embodies psychological and societal features that are not well understood by lay observers. Indeed, these features are subject to a large group of misstereotypes. It is clear that this subject is beyond the ken of the average juror, thus is suitable for explanation through expert testimony." I find the same to be true here.

The second requirement that must be met before the expert testimony is permitted is showing that the proposed expert testimony would be reliable. To meet the requirement, the expert's testimony must be sufficiently reliable. Counsel must show that the testimony satisfied the New Jersey standard for acceptance of scientific evidence. That's why I recited to the Frye test just a moment ago, also State versus Cavallo, as a barometer for this particular issue.

The technique or motive analysis used by the expert must have a sufficiently scientific basis to produce uniform and reasonable reliable results so as to contribute materially to the as ascertainment of the truth. From the material provided to me and the background of Dr. Fitzgerald, I find that to be true.

There are three ways a proponent of

Court's Decision   22

scientific evidence can prove its general scientific acceptance and thereby its reliability: 1) By the expert testimony as to the general acceptance among those in the profession of the premises which offer the expert witness based his or her analysis. Again the litany of expert -- the litany of material that has been produced in this field, there are several pages which Dr. Fitzgerald has provided to me in her CV.

2) By authoritative scientific and legal writings indicating the scientific community accepts the premises underlying the proffered testimony. Again, I find this by the material provided to me.

3) By judicial opinions that indicate the expert's premises have gained general acceptance. I'll get to that in a minute.

In the Kelly case there was a question of whether judicial opinions concurred on the scientific acceptability. Quoting from the Court, "On the other hand, Dr. Veronen, the proffered expert, testified that the Battered Woman's Syndrome is acknowledged and accepted by practitioners and professors in the field of psychology and psychiatry. Dr. Veronen also brought to the Court's attention the findings of several researchers who have published reports confirming the presence of the Battered Woman's Syndrome." There is a

Court's Decision   23

volume of research which has been produced to this Court.

Continuing again in the Kelly case. "Thus, the record before us reveals that the Battered Woman's Syndrome has a sufficient scientific basis to produce uniform and reasonably reliable results." I find by sufficient literature provided to me and the nature of the research described by Dr. Fitzgerald in her CV that that likewise has been satisfied.

"Finally, before expert testimony may be presented, there must be a showing the proffered expert witness has sufficient expertise to offer the intended testimony." The Court quoted to Dr. Veronen again, the expert who testified in Kelly. "In this case, it appears that Dr. Veronen is qualified to testify as an expert. She has a Ph.D. in clinical psychology, as well as an M.A. from North Texas State. She is a member of four professional associations. As of 1980, when she was offered as witness in Ms. Kelly's trial, Dr. Veronen had been assistant professor in the medical school of the University of South Carolina for three years. Twenty percent of her time at the university was spent teaching, some of it on topics related to Battered Woman's Syndrome, and eighty percent of her time was spent conducting research, most of it on the

Court's Decision

24

psychological reaction of women who are victims of violent assaults." In reading through Dr. Fitzgerald's CV, I find that she is much more qualified than Dr. Veronen was in this particular case.

State v. Frost, 242 New Jersey Super, 601, the Court again talked about the issue of credibility dealing with expert witnesses in this social framework background. The Court said at page 610, "One issue on this appeal is the admissibility of the Battered Woman Syndrome evidence to bolster the victim's credibility in prosecution of a defendant on an assault charge." Frost was a criminal case.

"In his first point, defendant argues that the use of Battered Woman's Syndrome evidence was inappropriate here because it allowed the State to bolster impermissibly the victim's credibility by providing the jury with justification for her conduct on the date of the incident." The Court went on. "Nevertheless, there is nothing about the testimony itself which makes it inappropriate for admission as part of the State's case in chief where the woman eventually asserts herself and reports her abuser to authorities before she becomes the defendant on trial for committing murder." In that case, it was the State who dealt with the Battered Woman's Syndrome.

Court's Decision

25

The Court then referred to Rule 20, which is now Rule 607 which we've dealt with several times during the course of this trial. "Except as otherwise provided by Rules 22 and 47, for the purpose of appearing and supporting the credibility of a witness, any party, including the party calling him, may examine him and introduce extrinsic evidence relevant to the issue of credibility."

"Thus, the credibility of a witness does not have to have been the subject of attack before it can be bolstered as was traditionally required in the past." Expert testimony can now be used to support the witness's credibility.

Our own Superior Court -- our own Supreme Court has discussed the issues of the nonreporting phenomena rather than dealing with it which is part of the social framework opinion in the case of -- rather, in the matter of Judge Edward Seaman, 133 New Jersey 67 at page 90, 1993 case. Quoting from that particular page: "Complainant's failure to notify others of respondent's harassing behavior; her continuing to serve as respondent's clerk even though he was allegedly subjecting her to degrading remarks and unwanted physical contact; her apparently pleasant demeanor toward respondent, including bringing

respondent small gifts and offering social invitations -- are all aspects of the larger phenomenon of nonreporting. In understanding complaint's failure to report respondent's misconduct, we note that the E.E.O.C. has found that, 'the fact that an employee has not promptly reported the sexual advances is not dispositive of the issue of whether or not the advances were unwelcome.' In sexual harassment litigation, courts and agencies have admitted expert testimony that reticence about complaining is common in cases of sexual harassment." And cites in particular Robinson versus Jacksonville Shipyards, Inc., 760 F. Supp. 1486, a Florida case in 1991, admitting and crediting consultant's testimony that women may not complain about sexual harassment because of fear, embarrassment, and feelings of futility.

In Robinson, the expert testified as to the existence of a sexually hostile work environment at the Jackson Shipyards, Inc. Dr. Fiske is the person who testified in that case. Quoting from that opinion:

"Dr. Fiske's testimony provided a sound, credible theoretical framework from which to conclude that the presence of pictures of nude and partially nude women, sexual comments, sexual joking, and other behaviors previously described creates and contributes

to a sexually hostile work environment. Moreover, this framework provides an evidentiary basis for concluding that a sexualized working environment is abusive to a woman because of her sex."

"Ms. K. C. Wagner appeared as an expert witness on plaintiff's behalf to testify on common patterns and responses to sexual harassment an remedial steps. Ms. Wagner's testimony concerning prevention of harassment at Jacksonville Shipyards, Inc. is discussed infra on the matter of appropriate remedies. Ms. Wagner is a self-employed consultant in the area of issues regarding women in work environment, with particular emphasis on the prevention of sexual harassment on the job."

"Her expertise and experience concerning women in a nontraditional employment settings is impressive. The Court accepted Ms. Wagner, over the objection of defendants, as an expert on common patterns and responses to sexual harassment and accepted her, without opinion, as an expert in education and training relative to sexual harassment."

"Ms. Wagner expressed her expert opinion that sexually harassing conditions for female employees exist at Jacksonville Shipyards, Inc. Her conclusion rests on the presence of indicators of sexually

28
Court's Decision

1 harassing behaviors and of a sexually hostile work
2 environment."
3          Counsel have also called the Court's
4 attention to other cases where social framework
5 testimony and other testimony about the adequacy of
6 sexual harassment policy, particularly in the United
7 States Supreme Court in Price Waterhouse versus
8 Hopkins. It happened to be a different factual
9 scenario in the hiring or elevating, rather, a partner
10 in a major accounting firm. In that case, quoting from
11 the Court, "Dr. Susan Fiske, a social psychologist and
12 Associate Professor of Psychology at Carnegie-Mellon
13 University, testified at trial that the partnership
14 selection process at Price Waterhouse was likely
15 influenced by sex stereotyping. Her testimony focused
16 not only on the overtly sexed-based comments of
17 partners but on gender-neutral remarks, made by
18 partners who knew Hopkins only slightly, that were
19 intensely critical of her."
20          "According to Dr. Fiske, Hopkins'
21 uniqueness (as the only women in a pool of candidates)
22 and the subjectivity of evaluations made it likely that
23 sharply critical remarks such as these were the product
24 of sex stereotyping -- although Dr. Fiske admitted that
25 she could not say with certainty whether any particular

29
Court's Decision

1 comment was the result of stereotyping. Dr. Fiske
2 based her opinion on a review of the submitted
3 comments, explaining it was commonly accepted practice
4 for social psychologists to reach this kind of
5 conclusion without having met any of the people
6 involved in the decision-making process."
7          "In finding that some of the partners'
8 comments reflected sex stereotyping, the District
9 Court" -- again reciting from the United States Supreme
10 Court -- "relied in part on Dr. Fiske's expert
11 testimony. Without directly impugning Dr. Fiske's
12 credentials or qualifications. At trial, counsel for
13 Price Waterhouse twice assured the Court that he did
14 not question Dr. Fiske's expertise and failed to
15 challenge the" -- testimony.
16          Also, the Court has -- rather, counsel has
17 brought to the Court's attention the case of Shrout
18 versus Black Clawson, which is Southern District of
19 Ohio, 689 F. Supp 774. Again, the human resources
20 expert was again qualified and testified on the social
21 framework evidence. This claim was -- the Court said
22 in that case -- that at page 777: This claim was
23 authoritatively rebutted by Ms. Mary Belfry rebutting
24 that it was common knowledge that the plaintiff would
25 have complained or in other words done something about

Court's Decision
30

the conduct. Again quoting: "This claim was authoritatively rebutted by Ms. Mary Belfry, a human resources consultant qualified as an expert on corporate policy and procedure concerning sexual harassment. Ms. Belfry concluded that defendant had no policy regarding sexual harassment. She specifically expressed the opinion that the open-door policy did not qualify as a sexual harassment policy because it was too broad, it was not adequately communicated to the employees, it did not specifically mention sexual harassment, it did not."

Although the factual scenario shown in Black Clawson may be somewhat different than here, the point that I make is that the Court permitted an expert in the field to testify.

I find from the information that I have, from the arguments made, that I am going to permit Dr. Fitzgerald to testify on the area generally referred to as the social framework issue. Of course, she'll be subject to cross-examination on the issues such as those that counsel brought up today.

(Conclusion of motion and decision.)

Court's Decision
31

C E R T I F I C A T I O N

I, Janice M. Smith, C.S.R., License Number XI 00569, an Official Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript to the best of my knowledge and ability.

*Janice M Smith* (signature)

JANICE M. SMITH, C.S.R., C.R.R.
Somerset County Courthouse
Date: December 31, 2003