# EXHIBIT 1

# JUDGES TELL:



## What I Wish I Had Known Before I Presided in an Adult Victim Sexual Assault Case



**NJEP** National Judicial Education Program*

*A project of Legal Momentum in cooperation with the National Association of Women Judges

© 2010 National Judicial Education Program

# The National Judicial Education Program*

**Lynn Hecht Schafran, Esq.**
**Director**

**Claudia J. Bayliff, Esq.**
**Project Attorney**

**Tracy Vris**
**Program Associate**

**Jillian Weinberger**
**Program Associate**

**Gemma Striker**
**Fellow**

**Rachel Goot**
**Intern**

**Lauren Jamiolkowski**
**Intern**

**Laurel Sisler**
**Intern**

*This project was supported by Grant No. 2008-TA-AX-K051, awarded by the Office on Violence Against Women, U.S. Department of Justice. The opinions, findings, conclusions and recommendations expressed in this publication/program/exhibition are those of the author(s) and do not necessarily reflect the views of the Department of Justice, Office on Violence Against Women.*

*A project of Legal Momentum in cooperation with the National Association of Women Judges

© 2011 National Judicial Education Program

## JUDGES TELL:
## WHAT I WISH I HAD KNOWN <u>BEFORE</u> I PRESIDED IN AN ADULT VICTIM SEXUAL ASSAULT CASE
### by the
### National Judicial Education Program[*]

**"They are crimes like no other."**

> Hon. J. Richard Couzens & Hon. Tricia Sun Bigelow,
> California Benchbook: The Adjudication of Sex Crimes (2006).

**"Sex offense trials are "more difficult…to preside [over] from a legal and technical standpoint, a personal and emotional viewpoint, and a public scrutiny and public pressure perspective."**

> Kurt M. Bumby & Marc C. Maddox, *Judges' Knowledge About Sexual Offenders, Difficulties Presiding Over Sexual Offense Cases, and Opinions on Sentencing, Treatment and Legislation*, 11 Sexual Abuse: A Journal Of Research and Treatment 305 (1999).

Sexual assault cases present a unique challenge for the judiciary. They are unique in that they are beset with a myriad of deeply held stereotypes and misconceptions that can undermine the judicial process. Since 1980, the National Judicial Education Program (NJEP) has created and presented judicial education programming about adult victim sexual assault cases, focused on providing the accurate factual information judges need to conduct a fair process and suggesting procedures to minimize victim retraumatization without undermining defendants' rights. To assist new judges, NJEP canvassed judges across the country who had attended NJEP programs to ask what these judges wished they had known <u>before</u> they presided in an adult victim sexual assault case, or a case of co-perpetrated sexual abuse and domestic violence. These judges' twenty-five points are listed below followed by commentary and sources.

1. **The widespread misconception that rape is about sexual desire – rather than power and control – colors every aspect of the justice system's response to sexual assault.**

2. **Sexual assault, including marital/intimate partner rape and male victim rape, is far more prevalent than the general public believes.**

3. **The vast majority of sexual assaults are committed by someone the victim knows.**

4. **Sexual assault co-perpetrated with domestic violence is a significant problem and a key factor for risk assessments of all kinds.**

5. **Few rapes are ever reported to law enforcement.**

6. **The absence of serious, observable physical injuries is not inconsistent with a sexual assault.**

---

[*] A project of Legal Momentum in association with the National Association of Women Judges

7. Victims of stranger and nonstranger rape almost always sustain profound, long-lasting psychological injury.

8. Marital and intimate partner rape victims suffer particularly severe psychological injury because of the betrayal of trust by the person they should most be able to trust, and the fact that the rapes are usually repeated.

9. Victim behaviors that are commonplace during and after a rape (not physically resisting, delayed reporting, post-assault contact, etc.) appear counterintuitive to those not knowledgeable about sexual assault.

10. Expert witness testimony is often essential to enable jurors to understand a sexual assault case.

11. Traumatic memories are developed, stored and retrieved differently than non-traumatic memories.

12. It is common for a sexual assault victim to display a flat affect while testifying.

13. On occasion a sexual assault victim, female or male, will have a physical response during the attack, but this is not a sexual response in the sense of desire and mutuality.

14. The widespread belief in rampant false allegations of rape is erroneous.

15. The typical rapist is neither a brutal stranger nor a "good guy" who had a bit too much to drink one night. Rather, he knows his victims, premeditates and uses little overt violence.

16. Like stranger rapists, most nonstranger rapists are serial offenders.

17. Most sex offenders are crossover offenders, committing a variety of sex crimes as well as other interpersonal offenses against adults and children.

18. When evaluating sex offender risk, actuarial assessments are more accurate than clinical assessments.

19. Sex offender treatment is rigorous and specialized. Traditional outpatient psychotherapy is NOT appropriate for these types of offenders.

20. Because of the high incidence of child and adult sexual victimization among women and men in the population at large, sexual assault case jury pools will almost always include victims – often a surprising number – and require special treatment.

21. A thorough *voir dire* that includes questions about the rape myths relevant to the case at bar is essential to seating an impartial jury.

22. Do not let counsel equate the Rape Shield Law and Prior Bad Acts evidence.

23. Scheduling and continuance decisions in rape cases can have a significant impact on victims' recovery.

24. Be prepared for the rape case defendant who demands to appear *pro se*.

25. Always expect the unexpected – these cases can be fraught with peril for the trial judge.

*The Challenges of Adult Victim Sexual Assault Cases*
National Judicial Education Program, Legal Momentum
© 2011 National Judicial Education Program

## COMMENTARY AND SOURCES

Below are commentary and sources for each of the 25 points on the previous pages. The sources cited below that are provided in full on the *Challenges of Adult Victim Sexual Assault Cases* Resources CD are listed in **bold.**[*]

**1. The widespread misconception that rape is about sexual desire – rather than power and control – colors every aspect of the justice system's response to sexual assault.**

Justice Richard Andrias, in his article *Rape Myths: A Persistent Problem in Defining and Prosecuting Rape,* provided on the Resources CD, writes, "Rape myths are false and stereotyped views about rape, rape victims and offenders. Among the most common…is that [r]ape is an expression of sexual (albeit misplaced) desire." Viewing this crime through this mistaken lens has produced deeply flawed police investigations, prosecutions, jury deliberations, media reporting and public response. Although written in 1992, Justice Andrias' article is in no way dated.

Source: **Hon. Richard T. Andrias, *Rape Myths: A Persistent Problem in Defining and Prosecuting Rape*, CRIMINAL JUSTICE, Summer 1992 at 2.**

**2. Sexual assault, including marital/intimate partner rape and male victim rape, is far more prevalent than the general public believes.**

According to the National Intimate Partner and Sexual Violence Survey: 2010 Summary Report, published by the National Center for Injury Prevention and Control of the Centers for Disease Control, "[n]early 1 in 5 women (18.3%) and 1 in 71 men (1.46%) in the United States have been raped at some time in their lives, including completed forced penetration, attempted forced penetration, or alcohol/drug facilitated completed penetration." "Nearly 1 in 10 women in the United States (9.4%) has been raped by an intimate partner in her lifetime, and an estimated 16.9% of women and 8.0% of men have experienced sexual violence other than rape by an intimate partner at some point in their lifetime." The incidence figure for the 12 months preceding the survey was 1.27 million women raped.

These data match those documented in prior research. According to the most highly-regarded researchers in this field – Dr. Dean Kilpatrick and his team at the Crime Victims Research and Treatment Center at the Medical University of South Carolina – 18% (20 million) of U.S. women have been raped at least once in their lifetime. Kilpatrick's study concluded that in 2006,

---

[*] This document is designed to be distributed along with the Resources CD for the *Challenges of Adult Victim Sexual Assault Cases: Materials for New Judges* judicial education module. The Resources CD is not just a bibliography. It contains an Annotated Table of Contents with hyperlinks to the full text of each resource. We encourage you to burn a copy of the Resources CD for yourself and to distribute copies to your colleagues. If you obtained this document without a copy of the Resources CD, we encourage you to visit the National Judicial Education Program's website www.njep.org (click on "Sexual Assault Resources") where the Annotated Table of Contents and the full content for the Resources CD can be downloaded for free. On the Sexual Assault Resources page, click on the "Resources Available for Download" link which will direct you to the registration and login page for NJEP's materials for in-person education. Registration is free and open to all.

1.4 million women over 18 were subjected to 800,000 forcible rapes, 300,000 drug-facilitated rapes, and 300,000 incapacitated rapes, meaning rapes perpetrated when the victim was unable to give consent because of voluntarily ingesting drugs or alcohol. Some of the drug-facilitated and incapacitated rapes also involved force.

Sources:
Michele C. Black, et al., National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, THE NATIONAL INTIMATE PARTNER AND SEXUAL VIOLENCE SURVEY (NISVS): 2010 SUMMARY REPORT at
http://www.cdc.gov/ViolencePrevention/pdf/NISVS_Report2010-a.pdf.;

Dean Kilpatrick et al., DRUG-FACILITATED, INCAPACITATED AND FORCIBLE RAPE: A NATIONAL STUDY (2007) at 2, http://www.ncjrs.gov/pdffiles1/nij/grants/219181.pdf;

National Judicial Education Program, Web Course/Resource: *Intimate Partner Sexual Abuse: Adjudicating This Hidden Dimension of Domestic Violence Cases: Module 1: Defining Intimate Partner Sexual Abuse and Assessing its Prevalence*, (2008), www.njep-ipsacourse.org

**Note**: The National Judicial Education Program's web course/resource, *Intimate Partner Sexual Abuse: Adjudicating This Hidden Dimension of Domestic Violence Cases* was funded by the State Justice Institute and the Office on Violence Against Women. Registration at www.njep-ipsacourse.org is free and open to all.

## 3. The vast majority of sexual assaults are committed by someone the victim knows.

The stereotyped image of rape involves a stranger jumping from the bushes. The reality is far different. Dr. Kilpatrick and his team found that 89% of forcible rapes and 81% of drug-facilitated and incapacitated rapes of women over 18 were perpetrated by someone known to the victim. The relationship of offender to victim was as follows:

|                      | Forcible | Drug Facilitated & Incapacitated Rapes |
|----------------------|----------|----------------------------------------|
| **(Ex) Husband**     | 10%      | 3%                                     |
| **(Step) Father**    | 11%      | 1%                                     |
| **Boyfriend**        | 14%      | 13%                                    |
| **Other Relative**   | 18%      | 4%                                     |
| **Friend**           | 12%      | 31%                                    |
| **Classmate**        | 2%       | 6%                                     |
| **Other Nonrelative**| 22%      | 21%                                    |
| **Stranger**         | 11%      | 19%                                    |

4

Source: Dean Kilpatrick et al., DRUG-FACILITATED, INCAPACITATED AND FORCIBLE RAPE: A NATIONAL STUDY, 30 (2007), http://www.ncjrs.gov/pdffiles1/nij/grants/219181.pdf.

**4. Sexual assault co-perpetrated with domestic violence is a significant problem and a key factor for risk assessments of all kinds.**

Until recently, intimate partner sexual abuse in the context of domestic violence was nearly invisible. Recent studies with battered women and battering men document a widespread problem that presages escalating violence and potential lethality. Studies of domestic violence murders, attempted murders and potentially fatal assaults document an extremely high incidence of rape along with the physical violence. Taking all risk factors into account, a batterer who subjects his partner to forced sex in addition to physical violence is twice as likely to kill her as the batterer who subjects his partner to physical violence only. Sexual assault of a mother poses an elevated risk to her children's safety and should be considered in custody/visitation determinations.

Sources: National Judicial Education Program, Web Course/Resource: *Intimate Partner Sexual Abuse: Adjudicating This Hidden Dimension of Domestic Violence Cases Module 1: Defining Intimate Partner Sexual Abuse and Assessing its Prevalence and Module 3: Risk Assessment* (2008), www.njep-ipsacourse.org; Jacquelyn Campbell et al, *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study,* 93 AMERICAN J. OF PUBLIC HEALTH 1089 (2003); DAVID ADAMS, WHY DO THEY KILL? MEN WHO MURDER THEIR INTIMATE PARTNER, 171-172 (2007)

**5. Few rapes are ever reported to law enforcement.**

Dr. Kilpatrick's study found that in 2006 only 18% of forcible rape victims and 10% of drug-facilitated/incapacitated rape victims reported the crime to law enforcement.

Source: Dean Kilpatrick et al., DRUG-FACILITATED, INCAPACITATED AND FORCIBLE RAPE: A NATIONAL STUDY, 43 (2007), http://www.ncjrs.gov/pdffiles1/nij/grants/219181.pdf.

**6. The absence of serious, observable physical injuries is not inconsistent with a sexual assault.**

Another rape myth holds that "real" rape victims sustain serious physical injuries, especially in the genital area. In fact, observable physical injuries are uncommon. According to Dr. Kilpatrick's national study:

- 70% of drug-facilitated/incapacitated and 48% of forcible rape victims reported <u>no injuries</u>;
- 23% of drug-facilitated/incapacitated and 34% of forcible rape victims reported <u>minor injuries</u>; and
- 6% of drug-facilitated/incapacitated and 16% of forcible rape victims reported <u>serious injuries</u>.

*The Challenges of Adult Victim Sexual Assault Cases*
National Judicial Education Program, Legal Momentum
© 2011 National Judicial Education Program

There are few observable serious physical injuries because most rapists use instrumental violence, which means they use only the threats and level of physical violence necessary to compel acquiescence and many victims do not physically resist, as explained in #9, below.

<u>Source</u>: Dean Kilpatrick et al., DRUG-FACILITATED, INCAPACITATED AND FORCIBLE RAPE: A NATIONAL STUDY, 31-32 (2007), http://www.ncjrs.gov/pdffiles1/nij/grants/219181.pdf.

### 7. Victims of stranger and nonstranger rape almost always sustain profound, long-lasting psychological injury.

Almost every rape victim, female or male, suffers severe psychological injury and a high percentage suffers from long-term Posttraumatic Stress Disorder (PTSD). Rape victims have far higher rates of contemplated and attempted suicide than do nonvictims. Many turn to alcohol and drugs to self-medicate their trauma.

Clinical studies document that victims raped by someone they know often have a more difficult psychological recovery than victims of stranger rape. Nonstranger rape victims are less likely to report the crime, more likely to blame themselves and be blamed by others, and less likely to believe themselves deserving of sympathy or professional help. Nonstranger rape victims often have difficulty forming relationships because, according to one clinical study, they have strong doubts about their ability to discern who is truly trustworthy. They tend to isolate themselves socially.

As a victim raped by a former boyfriend related, "Every time I walk into my bedroom I see him standing over me and telling me to take off my clothes and not to say a word. I can't get it out of my head. It's as if it's happening right now."

<u>Sources</u>: Dean Kilpatrick et al., DRUG-FACILITATED, INCAPACITATED AND FORCIBLE RAPE: A NATIONAL STUDY (2007) at 4, http://www.ncjrs.gov/pdffiles1/nij/grants/219181.pdf; Michelle Davies, *Male Sexual Assault Victims: A Selective Review of the Literature and Implications for Services*, 7 AGGRESSION AND VIOLENT BEHAVIOR (2002) at 203l; **Lynn Hecht Schafran, *Maiming the Soul: Judges, Sentencing and the Myth of the Nonviolent Rapist*, 20 FORDHAM URBAN LAW JOURNAL 439 (1993)**; CRIME VICTIMS RESEARCH AND TREATMENT CENTER, RAPE IN AMERICA 7-8 (1992); Sally Bowie, et al, *Blitz and Confidence Rape: Implications for Clinical Intervention,* 44 AM. J. PSYCHOTHERAPY 180 (1990); Case records of Veronica Reed Ryback, Director, Beth Israel Hospital Rape Crisis Intervention Center, Boston (1992-1994).

### 8.  Marital and intimate partner rape victims suffer particularly severe psychological injury because of the betrayal of trust by the person they should most be able to trust, and the fact that the rapes are usually repeated.

There is a myth that intimate partner rape victims are not harmed because they are used to having consensual sex with the perpetrator. Extensive research with marital and intimate partner rape victims documents that this is completely untrue. The harm is profound.

A woman whose husband subjected her to physical violence and death threats in addition to rape stated:

"He was sexually abusive, and I think of all of it that was probably the most painful, and still probably, the hardest to get past. [Y]ou know, when you're in a relationship with somebody that you love and they use sex forcefully, it's devastating…"

Sources:  National Judicial Education Program, Web course/Resource: *Intimate Partner Sexual Abuse: Adjudicating the Hidden Dimension of Domestic Violence Cases: Module I: Victims and Offenders,* (2008), www.njep-ipsacourse.org; RAQUEL BERGEN, WIFE RAPE (1996); DAVID FINKELHOR & KERSTI YLLO, LICENSE TO RAPE (1985). Quotation drawn from U.S. Dept. of Justice, Office for Victims of Crime, VICTIM IMPACT: LISTEN AND LEARN (2005) DVD.

**9. Victim behaviors that are commonplace during and after a rape appear counterintuitive to those not knowledgeable about sexual assault.**

*Not physically resisting:*

At one time rape law required victims to prove they physically resisted the rapist.  Although the law no longer requires resistance, the public, including jurors, still consider physical resistance and injuries as the hallmarks of "real" rape. This mindset seriously undermines the judicial process because it is commonplace for rape victims to not offer physical resistance.

There are several reasons why victims do not physically resist.  Many victims freeze with fright, known as "tonic immobility."  Some retreat into a mental state called dissociation in which it feels to them as if the rape is happening in a dream, as if they are standing outside their own bodies and observing the assault. Dissociation produces extreme passivity.  Other victims make a strategic decision not to resist in order to avoid physical injury or death, or because they are protecting someone else, for example, a sleeping child in another room, or a family member the rapist has threatened to rape if the victim does not comply.  Acquiescence out of fear is not consent.

Source:  **David Lisak, *The Neurobiology of Trauma* reprinted in** NATIONAL JUDICIAL EDUCATION PROGRAM, UNDERSTANDING SEXUAL VIOLENCE: PROSECUTING ADULT RAPE AND SEXUAL ASSAULT CASES **(2000); Lynn Hecht Schafran, *Writing and Reading About Rape: A Primer*, 66** ST. JOHN'S L. REV. **979 (1993) at 988.**

*Delayed reporting:*

Among the few victims who do report, victims of stranger rape tend to report very close to the time of assault whereas victims of nonstranger rape tend to delay. There are many reasons for this delay including:
- Not immediately recognizing the assault as rape (especially in the case of nonstranger rape)
- Fear of retaliation
- Fear of being disbelieved or blamed
- Fear of loss of privacy
- Fear of the criminal justice system
- Denial/Suppression

- Psychogenic Amnesia (i.e., loss of memory of part or all of an assault)

Below is a victim's explanation of why she delayed reporting:

> "I can't believe this happened to me. It still doesn't seem real. It's taken me a week to report it to the police – I can't remember the exact details of what happened. I guess I'm afraid that people won't believe me." –*Maria, a high school senior, raped by a classmate with whom she was studying for final exams*

Sources: Dean Kilpatrick et al., DRUG-FACILITATED, INCAPACITATED AND FORCIBLE RAPE: A NATIONAL STUDY, 48 (2007), http://www.ncjrs.gov/pdffiles1/nij/grants/219181.pdf; Crime Victims Research and Treatment Center, RAPE IN AMERICA: A REPORT TO THE NATION 5 (1992); **Lynn Hecht Schafran, *Writing and Reading About Rape: A Primer*, 66 ST. JOHN'S L. REV. 979, 1013 (1993)**; Mary P. Koss et al., *Stranger and Acquaintance Rape*, 12 PSYCHOL. OF WOMEN QUART. 1 (1988); Quotation drawn from the case records of Veronica Reed Ryback, Director, Beth Israel Hospital Rape Crisis Intervention Center, Boston (1992-1994).

### *Post-Assault Contact with Attacker:*

Another misconception is that "real" victims would never initiate contact with their attacker after the assault. In fact, in nonstranger cases post-assault contact between the victim and offender is not unusual. Victims who make post-assault contact with the offender are seeking a way to understand exactly what happened – "how could someone I thought was a friend turn on me?" – and as a way to take control and normalize the assault.

### 10. Expert witness testimony is often essential to enable jurors to understand a sexual assault case.

Jurors often have profound misconceptions about rape victims, offenders, and rape itself. Expert witness testimony may be needed to explain that, for example, absence of injury and delayed report are not inconsistent with sexual assault. Expert testimony may be essential to challenge rape myths in the courtroom and uphold fairness for the victim.

Experts qualified to testify in sexual assault cases include both those with academic credentials and those with extensive direct experience with victims, such as police officers or professionals at victim advocacy organizations.

Judges need accurate factual information about sexual assault in order to evaluate the qualifications of experts and the soundness of their proposed testimony.

**Note:** Experts may <u>not</u> testify that they believe there was a sexual assault. They may testify as to the common behaviors of victims with whom they have worked and as described in the literature.

Source: **Hon. Richard T. Andrias, *Rape Myths: A Persistent Problem in Defining and Prosecuting Rape*, CRIMINAL JUSTICE, Summer 1992 at 2.**

**11. Traumatic memories are developed, stored and retrieved differently than non-traumatic memories.**

Just as brain chemistry dictates the "frozen fright" response to a traumatic event described in #9 above, it also dicates the way traumatic memories are laid down and recalled. People assume that a person subjected to a traumatic event will remember every detail and be able to recount it perfectly on demand. However, because of the effects of trauma on brain chemistry, many victims forget all or parts of the assault or recount the assault differently at different times. Traumatic memories are actually developed, stored and retrieved differently than non-traumatic memories. The fact that a victim recounts the assault somewhat differently from one retelling to the next should **not** be assumed to mean she is lying.

Source: **David Lisak, *The Neurobiology of Trauma*, reprinted in NATIONAL JUDICIAL EDUCATION PROGRAM, UNDERSTANDING SEXUAL VIOLENCE: PROSECUTING ADULT RAPE AND SEXUAL ASSAULT CASES (2000).**

**12. It is not unusual for a sexual assault victim to display a flat affect while testifying.**

Many people assume that a "real" rape victim will display a certain type of behavior while testifying. She must not cry too much lest she be labeled hysterical. But if she displays a flat affect, others may assume that nothing happened to her. Victims' behavior during trial varies widely according to their personality, stage of recovery, life circumstances and other factors. Some testify in a "controlled style," which means they hide their feelings and appear calm or emotionless. Others testify in an "expressive" style in which they cry, sob, smile, act restless and tense. Some victims display anger which is a good thing from a recovery point of view but juries do not like it. Flat affect often results from the fact that the victim has had to repeat her account to so many people. Some victims rein in their emotions because they do not want the perpetrator to have the satisfaction of knowing how much he has harmed them. An expert witness may be necessary to help the jury understand that flat affect is not inconsistent with a sexual assault.

Source: **Lynn Hecht Schafran, *Maiming the Soul: Judges, Sentencing and the Myth of the Nonviolent Rapist*, 20 FORDHAM URBAN LAW JOURNAL 439, 450-451 (1993).**

**13. On occasion a sexual assault victim, female or male, will have a physical response during the attack, but this is not a sexual response in the sense of desire and mutuality.**

Victims who have a physical response during a rape are likely to have their assault perceived as being either consensual or merely "bad sex." To the contrary, this response does not in any way signify enjoyment or consent. Rather, it is an entirely physiological response. The human genital system is designed to respond to friction, no matter the source. This automatic response is true for male as well as female victims.

<u>Sources</u>: TIMOTHY BENNEKE, MEN WHO RAPE 133-34 (1982); Michelle Davies, *Male Sexual Assault Victims: A Selective Review of the Literature and Implications for Services*, 7 AGGRESSION AND VIOLENT BEHAVIOR 203 (2002); Roy J. Levin & Will Van Berlo, *Sexual Arousal and Orgasm in Subjects Who Experience Forced or Non-Consensual Sexual Stimulation – A Review*, 11 JOURNAL OF CLINICAL FORENSIC MEDICINE, 82-88 (2004).

**14. The widespread belief in rampant false allegations of rape is erroneous.**

It is widely and erroneously believed that many if not most sexual assault allegations are false. In an article in the journal *Violence Against Women*, Dr. David Lisak and his colleagues review the six most methodologically sound studies of false allegations and detail the results of their own new study of sexual assaults reported over ten years at a major northeastern university. The findings of these six studies ranged from 2.1% to 10.9% reported false allegations. The new study found that 5.9% of the cases were false allegations.

<u>Source</u>: **David Lisak, et al, *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases*, 16, VIOLENCE AGAINST WOMEN 1318 (December 2010) and FALSE ALLEGATIONS OF RAPE: FACT SHEET (2010).**

## OFFENDERS

**15. The typical rapist is neither a brutal stranger nor a "good guy" who had a bit too much to drink one night. Rather, he knows his victims, premeditates, uses little overt violence and is a serial offender.**

The misconceptions about rape that can undermine the judicial process include two equally false stereotypes about who typically commits rape:  The Brutal Stranger and the Nice-Guy-Who-Drank-Too-Much.

Until recently it was believed that rapists were overtly violent men who attacked strangers, used weapons, and inflicted brutal injuries.  As awareness of the nonstranger rapist grew, and the trivializing terms "date rape" and "acquaintance rape" became popular, the stereotype evolved of a "nice guy" who drank too much, had some miscommunication with his date, did not premeditate a rape, and would not do it again. Moreover, the myth evolved that victims of nonstranger rape were not as harmed as victims of stranger rape.

We now have extensive research with incarcerated stranger and nonstranger rapists, as well as men in the general population who freely acknowledge committing acts that meet a conservative definition of rape and attempted rape – all against women they knew. Most of these rapes were never reported. These men feel free to acknowledge their acts because they do not consider themselves rapists -- they are not violent men in ski masks.

It is clear that these undetected nonstranger rapists comprise the vast majority of rapists and they have typical characteristics. As Dr. David Lisak, an internationally known researcher in this field writes in a short paper on the Resources CD, ***Understanding the Predatory Nature of Sexual Violence***:

"In the course of 20 years of interviewing these undetected rapists, in both research and forensic settings, it has been possible for me to distill some of the common characteristics of the modus operandi of these sex offenders. These undetected rapists:

- are extremely adept at identifying "likely" victims, and testing prospective victims' boundaries;
- plan and premeditate their attacks, using sophisticated strategies to groom their victims for attack, and to isolate them physically;
- use "instrumental" not gratuitous violence; they exhibit strong impulse control and use only as much violence as is needed to terrify and coerce their victims into submission;
- use psychological weapons – power, control, manipulation, and threats – backed up by physical force, and almost never resort to weapons such as knives or guns;
- use alcohol deliberately to render victims more vulnerable to attack, or completely unconscious;
- are as likely to be serial and multi-faceted offenders as are incarcerated rapists."

As a consequence of these rapists' *modus operandi*, the strategies they use to groom their victims and make them vulnerable often look like ordinary social interactions. It is only by looking carefully at the way these offenders operate, for example strategically and repeatedly maneuvering their victims into an isolated situation where no one will intervene, that the pattern and premeditation become clear.

Sources: **David Lisak, *Understanding the Predatory Nature of Sexual Violence* (2008)**; David Lisak & Paul M. Miller, *Repeat Rape and Multiple Offending Among Undetected Rapists*, 17 VIOLENCE AND VICTIMS 73 (2002).

**16. Like stranger rapists, most nonstranger rapists are serial offenders.**

With respect to serial offending, in 1987 Dr. Gene G. Abel and his colleagues published a landmark study in which 561 nonincarcerated, self-reported adult male sex offenders were given complete immunity to disclose all their offenses to researchers. The offenders who perpetrated adult victim rape disclosed an average of 7.2 completed rapes each.

Dr. David Lisak and his colleagues have conducted several studies of what he calls "the undetected rapist," described in Point 15, above. Their findings on the serial nature of nonstranger rape perpetration are captured in the following paragraph:

"In a study of 1,882 university men conducted in the Boston area, 120 rapists were identified. These 120 undetected rapists were responsible for 483 rapes. Of the 120 rapists, 44 had committed a single rape, while 76 (63% of them) were serial rapists who accounted for 439 of the 483 rapes."

The researchers calculated the percentage of rapes documented in this study and concluded that 91% were committed by serial rapists.

The Abel and Lisak findings were most recently corroborated in a study of newly enlisted male Navy personnel. The researchers surveyed 1,146 men. Thirteen percent (13%) had committed a completed or attempted rape since the age of 14. Of the rapes documented in this study, 95% were committed by serial rapists.

Sources: Gene Abel, et al, *Self-reported Sex Crimes of Non-Incarcerated Paraphiliacs*, 2 JOURNAL OF INTERPERSONAL VIOLENCE 3 (1987); **David Lisak, *Understanding the Predatory Nature of Sexual Violence* (2008)**; David Lisak & Paul M. Miller, *Repeat Rape and Multiple Offending Among Undetected Rapists*, 17 VIOLENCE AND VICTIMS 73 (2002); Stephanie K. McWhorter, et al, *Reports of Rape Reperpetration by Newly Enlisted Male Navy Personnel*, 24 VIOLENCE AND VICTIMS 2004 (2009).

**17. Most sex offenders are crossover offenders, committing a variety of sex crimes as well as other interpersonal offenses against adults and children.**

"Crossover" denotes sexual offending or interests outside the parameters of the offense for which an offender was arrested or came to the attention of authorities or researchers. It was once thought that sex offenders specialized in sex crimes only, and within that category, committed only one type of sex crime, e.g., voyeurs were thought not to commit rape. It is now known that sex offenders tend to commit a spectrum of sex crimes and other interpersonal offenses against related and unrelated adults and children.

The Abel study cited in Point 16 above that gave immunity for full disclosure to 561 nonincarcerated adult males, found a high percentage of crossover sexual offenses:

> "Specifically, 66% of intrafamilial child molesters concurrently sexually assaulted children outside the home. Twenty-three percent of child molesters who were convicted of sexually molesting female children also sexually molested male children, and 63% of child molesters who sexually molested males also admitted to sexually molesting females. Forty percent of child molesters admitted to sexually assaulting an adult, and 50% of rapists admitted to molesting a child."

The Lisak/Miller study cited in Points 15 and 16 above found that:

> "These 76 serial rapists [who had committed 439 rapes] had also committed more than 1,000 other crimes of violence, from nonpenetrating acts of sexual assault, to physical and sexual abuse of children, to battery of domestic partners."

With respect to sex offenders' battery of domestic partners, as discussed in Point 4 above, there is a high incidence of sexual abuse and assault in domestic violence cases, with important implications for risk assessment.

Many of the undetected crimes committed by sex offenders have been discovered through polygraph testing, the most effective way to obtain admissions respecting repeat and crossover sex offenses. In one study of crossover offending utilizing polygraphs "On average, offenders revealed three additional categories of sexual assault types that had not been identified in official records." Polygraph testing reveals that sex offenders are most often repeat sexual offenders who have a variety of prior sexual offenses that may or may not have been reported. These studies demonstrate that the more previous sex offenses someone has committed, the more likely the person will commit another offense in the future.

The findings about crossover offending are extremely important in considering the risk to children of a sex offending parent. It cannot be assumed that offenders arrested for incest are not a danger to the community, or that offenders arrested for the rape of adult victims or the molestation of unrelated children are not a danger to their own children.

Sources: Gene Abel, et al, *Self-Reported Sex Crimes of Non-Incarcerated Paraphiliacs*, 2 JOURNAL OF INTERPERSONAL VIOLENCE 3, 14 (1987); David Lisak & Paul M. Miller, *Repeat Rape and Multiple Offending Among Undetected Rapists*, 17 VIOLENCE AND VICTIMS 73 (2002); National Judicial Education Program, Web Course/Resource: *Intimate Partner Sexual Abuse: Adjudicating the Hidden Dimension of Domestic Violence Cases*, www. njep-ipsacourse.org; Peggy Heil, Sean Ahlmeyer & Dominique Simons, *Crossover Sexual Offenses*, 15 SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT 5 (2003); Daniel T. Wilcox & Daniel E. Sosnowski, *Polygraph examination of British sexual offenders: A pilot study on sexual history disclosure testing*; 11 JOURNAL OF SOCIAL AGGRESSION 3 (2005).

**18. When evaluating sex offender risk, actuarial assessments are more accurate than clinical assessments.**

It was once believed that the most effective way to assess sex offenders' risk was to ask the clinicians working with them in sex offender treatment. We now know this belief to be erroneous. Much more accurate are actuarial assessments that evaluate offenders based on objective factors independent of clinical judgment. These factors include the offender's age when the present offense was committed, the sex and age of the victim, and the number, sex and age of prior victims. These data are placed on a grid and scored by specialists trained to utilize these instruments.

A difficulty with all current assessment instruments is that they are normed on offenders who were reported and adjudicated. Given that only a small fraction of rapes are reported and adjudicated, it is likely that when a previously undetected nonstranger rapist is adjudicated and assessed, he will appear less dangerous on conventional instruments because the static factors, such as previous convictions, do not apply as well to this population.

For a detailed discussion of actuarial instruments now in use, their limitations and suggestions for how to evaluate an evaluator's report, see **David Lisak, *A Judge's Guide to Evaluation Instruments* (2010)**, on the Resources CD.

**19. Sex offender treatment is rigorous and specialized. Traditional outpatient psychotherapy is NOT appropriate for these types of offenders.**

It is essential that judges imposing treatment as a sentencing condition require specialized, rigorous sex offender treatment. Optimally, this treatment should be coupled with incarceration. Traditional, individual, insight-oriented counseling is never appropriate for sex offenders. This type of therapy aims to make individuals feel good about themselves. The therapist is used to dealing with people who want to change and may be unaccustomed to the capacity for total denial and manipulation that characterizes sex offenders. The result is that sex offenders treated with traditional psychotherapy by nonspecialists emerge even more rooted in denial and other thinking errors than when they began. Nonspecialized treatment does not create victim empathy or teach the offender to understand his own cycle of deviance and how to stop himself when he begins to relapse into that pattern.

Psychopaths should never be considered for any kind of treatment as it only makes them more skilled at offending.

The effectiveness of specialized sex offender treatment is a subject of much debate. Current research indicates that it may reduce recidivism in the motivated offender. However, since very few rapes are reported, this data must always be questioned.

**Source: Kurt Bumby, Center for Sex Offender Management, UNDERSTANDING TREATMENT FOR ADULTS AND JUVENILES WHO HAVE COMMITTED SEX OFFENSES (2006), available at** http://www.csom.org/pubs/treatment_brief.pdf

## JURIES

**20. Because of the high incidence of child and adult sexual victimization among women and men in the population at large, sexual assault case jury pools will almost always include victims – often a surprising number – and require special treatment.**

- Call for a larger jury pool than usual to allow for high attrition and challenges for cause. Individuals who have been sexually victimized, or whose family members or close friends have been victimized, often feel they cannot be impartial in a sexual assault case. Even victims willing to serve are usually presumed by counsel to be incapable of impartiality and are challenged for cause.
- Use confidential questionnaires and private interviews in chambers to identify victims and discuss their possible service with maximum privacy and minimum retraumatization. [**Note:** Observe your jurisdiction's practice for protecting juror confidentiality. Some jurisdictions use juror numbers and some jurisdictions seal the questionnaires entirely.]
- Be able to direct individuals who disclose victimization to counseling services. Some of those who disclose have never told anyone before and the disclosure is traumatizing. Even survivors who have disclosed in the past may be deeply upset by confronting this again.
- Be sure potential jurors understand that a sexual victimization counts for purposes of jury selection even if it was never reported. A Wisconsin sexual assault case had to be retried because during deliberations a juror said she believed the victim because something similar

14

happened to her.  When asked to explain why she did not disclose this during *voir dire*, she said it was never reported and so she thought it did not count as a crime.

- Jury questionnaires should also be crafted to identify those who have perpetrated or been accused of perpetrating sexual assault.

On the Resources CD there are two examples of jury questionnaires:

- **Hon. William Hughes,** *Jury Questionnaire*, NATIONAL JUDICIAL EDUCATION PROGRAM, UNDERSTANDING SEXUAL VIOLENCE: THE JUDICIAL RESPONSE TO STRANGER AND NONSTRANGER RAPE AND SEXUAL ASSAULT (2005).

- **Hon. Richard J. Couzens & Hon. Tricia Bigelow,** *Jury Questionnaire*, CALIFORNIA BENCHBOOK: THE ADJUDICATION OF SEX CRIMES 122-124 (2006).

When Judge Hughes began using a questionnaire the number of potential jurors self-identifying as victims of child or adult sexual violence rose by 20.3%.

**21. A thorough *voir dire* that includes questions about the rape myths relevant to the case at bar is essential to seating an impartial jury.**

> "The more participants endorsed rape myths, the less credible…and more blameworthy…they found the [victim]."

Source: Sarah Ben-David and Ofra Schneider. "Rape Perceptions, Gender Roles Attitudes, and Victim-Perpetrator Acquaintance." 53 SEX ROLES 385, 399 (Sept. 2005).

Seating an impartial jury in a sexual assault case is a challenge.  Large-scale research with rape case jurors has repeatedly shown that they often ignore the facts and law and decide cases based on their beliefs about how "real" victims should behave, their assessments of victims' lifestyle and character and their own psychological needs to deny their own vulnerability or past offending. A study involving 90 minute interviews with 331 individual rape case jurors found they were less likely to believe in the defendant's guilt when the victim knew the defendant, reportedly drank or used drugs, or engaged in sex outside marriage. Many jurors define rape in terms of what they perceive as the victim's assumption of risk.  For example, a Colorado juror speaking at a judicial education program about sexual assault in his state explained the "not guilty" verdict in the case on which he sat this way:

> "The fact that she testified that she was a lesbian who did not have sex with men was not relevant.  She willingly consented to go to their apartment.  Having placed herself in this situation, she [sic] was guilty of something."  And, "When she got in their truck she gave consent."

Thanks to the "CSI" effect, jurors expect DNA evidence even in cases where the victim and defendant were closely acquainted or married.  Misconceptions regarding victim behavior during trial frequently come into play.  Another Colorado rape case juror said of the victim, "She did not show the emotion a victim should show."  With respect to the public from which rape case

jurors are drawn, opinion polls and research have documented adherence to rape myths, "assumption of risk," and ideas such as "A man has the right to have sexual intercourse against the women's consent if they are married."

To try to identify potential jurors who cannot listen and deliberate impartially, some judges permit the prosecution and defense an expanded *voir dire*. Some judges, if they believe key questions are not being asked, will direct counsel to ask them or will pose them themselves. Arizona Judge Ron Reinstein observes:

> "Note that many potential jurors will be reluctant to talk about their sexual history or views as it may pertain to sexual assault, such as the victim 'invited' the assault, that the word 'no' invites the perpetrator to be more aggressive because the victim 'really wants it' (even where violence is used—this has been seen in both male and female jurors)— So it's often useful to use a short questionnaire dealing with accusations of uninvited sexual contact and the like—follow-up questions based on their answers should be done in chambers when you sense a potential juror may have issues one way or another."

Sources: **Hon. Richard T. Andrias, *Rape Myths: A Persistent Problem in Defining and Prosecuting Rape*, CRIMINAL JUSTICE, Summer 1992 at 2**; Gary La Free, RAPE AND CRIMINAL JUSTICE: THE SOCIAL CONSTRUCTION OF SEXUAL ASSAULT (l989), at 217-218, 222; Harry Kalven & Hans Zeisel, THE AMERICAN JURY 254 (1966); National Judicial Education Program, Understanding Sexual Violence Program for Colorado Judges (1997).

## EVIDENCE:

### 22. Do not let counsel equate the Rape Shield Law and Prior Bad Acts evidence.
In cases where the defense wants evidence admitted under an exception to the Rape Shield Law and the prosecution wants to admit Prior Bad Acts evidence, defense attorneys often assert that these rules of evidence are related, arguing that if the Rape Shield Law evidence does not come in, the Prior Bad Acts evidence may not be introduced. Not so. These evidentiary rules are independent of one another.

Rape Shield Laws:

Rape shield laws bar questioning victims about their prior, consensual sexual history apart from specified exceptions. While these laws vary from state to state, all allow judges discretion to admit aspects of a complainant's sexual history, such as evidence that someone other than the defendant is the source of an injury. The defendant must make an offer of proof demonstrating why this evidence is relevant and necessary to a fair trial and the prosecution must have the opportunity to challenge that claim.

Rape Shield Laws came into existence nationwide beginning in the l970s because evidence that should have been excluded as irrelevant was routinely admitted, turning rape trials into a character assassination for the victims, making convictions all but impossible and persuading other victims that it would be folly to report and engage with the criminal justice system. In most rape cases the issue is whether the complainant consented to sex with a specific person on a specific occasion. Who she had consensual sex with on prior occasions does not answer that

question. In the past, courts assumed that a woman who had said "yes" to any man other than her husband after their marriage would say "yes" to every man at any time, thus it was appropriate to cross-examine an alleged rape victim about her entire sexual history. This 1955 holding by the Georgia Supreme Court was typical.

> "In prosecutions for rape, the defense may introduce evidence tending to prove the previous unchaste character of the female; this evidence is admissible for two purposes: one, to discredit her as a witness, and the other to disprove the charge that the intercourse was forcible and against her consent." *Frady v. State*, 90 S.E. 2d 664, 665 (Ga. 1955).

Rape shield laws were enacted to provide sex offense victims with heightened protection against surprise, harassment and unnecessary invasions of privacy, and to encourage victims to participate in legal proceedings to hold offenders accountable.

Prior Bad Acts Evidence:

Defendants must be convicted on the evidence respecting the particular crime with which they are charged, not on their propensity to commit this type of crime as evidenced by their criminal history. Thus, the circumstances under which defendants' "prior bad acts" may be admitted are limited.

Despite law reform efforts, rape complainants are still viewed with unique skepticism, making it difficult to secure a conviction on the testimony of one victim alone. Recognizing that, Congress, as part of the 1994 Violence Against Women Act, amended the Federal Rules of Evidence to provide that, "In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant." (FRE 413). Many states have followed these changes in the Federal Rules and become more open to admitting evidence of prior sexual assaults, whether or not the victim reported to the police, if the judge is satisfied that the claims are credible and admitting the evidence would be "more probative than prejudicial." If a state does not have a rule of evidence analogous to FRE 413, prior bad acts evidence may be admitted to show common scheme or plan and to refute defenses of consent or lack of intent. In deciding whether to admit Prior Bad Acts evidence it is essential to make clear in the record that this evidence is being admitted for a permissible purpose, not to allow the jury to make the prohibited inference that because the defendant did it before, he did it this time, too.

Careful Analysis is Necessary with Respect to Admitting Both Rape Shield Law Evidence and Prior Bad Acts Evidence:

In determining whether to admit either Rape Shield Law or Prior Bad Acts evidence, careful analysis of the offer of proof is necessary. For example, if the defense claims that someone other than the defendant is the source of injury, consider the age of the victim, the nature of the injury, and when the defense claims that the injury for which the defendant is blamed actually happened. Both consensual and non-consensual intercourse can result in small, internal genital tears, but in

a young woman tears of that kind heal quickly. Is the defense wanting to admit evidence that she had intercourse with her boyfriend the morning of the alleged assault or two weeks before?

With respect to Prior Bad Acts, note the commentary from Dr. David Lisak in #15, above. Nonstranger rapists' common scheme and plan often look like ordinary social activity, and it is only by taking the proffered prior bad acts apart bit by bit and seeing the *modus operandi* repeated that the premeditation and intent emerge.  For example, a fraternity party at which a woman drinks too much and ends up in bed with someone seems, on the face of it, unexceptional.  But when investigation reveals that each week the defendant joins his fraternity brothers in scouting the campus for naïve young women to invite to their weekend parties, and that at these parties the men get these women drunk as fast as possible with sweet-tasting punch and then take them to designated rooms stripped of all identifiable furnishings, the intent, motive and/or common scheme and plan emerge.

Sources:  Harriet Galvin, *Shielding rape victims in state and federal courts: a proposal for the second decade,* 70 MINN. L. REV. 763 (1986); National Judicial Education Program, *Understanding Sexual Violence: The Judge's Role in Stranger and Nonstranger Rape and Sexual Assault Cases*, DVD, Prior Bad Acts Unit, available at http://www.legalmomentum.org/our-work/njep/njep-sexual-assault.html.

## PROCEDURES:

### 23. Scheduling and continuance decisions in rape cases can have a significant impact on victims' recovery.

As the Illinois Task Force on Gender Bias in the Courts observed, "[c]ontact with the criminal justice system acts as a reminder of the sexual assault during the recovery process and reliving the event can cause emotional turmoil for the victim. The protracted [trial] process and repeated continuances are a primary reason why victims fail to follow through."  The longer a trial date is postponed, the greater the emotional distress for the victim. Testifying in court reawakens painful feelings associated with the trauma and increases symptoms of Posttraumatic Stress Disorder.  Delays persuade the victim that she is better off dropping out of the justice system.  A rape victim whipsawed by the constant scheduling and rescheduling of her case said,

> "I finally went crazy…I called the victim witness office out of the D.A.'s office and I said, 'I'm not coming in. You can send a police car for me.  I'm not coming in….I was under control for the attack, but the system made me crazy."

Sources:  1990 REPORT OF THE ILLINOIS TASK FORCE ON GENDER BIAS IN THE COURTS 120 (1990); Case records of Veronica Reed Ryback, Director, Beth Israel Hospital Rape Crisis Intervention Center, Boston (1992-1994).

### 24. Be prepared for the rape case defendant who demands to appear *pro se*.

Some rape case defendants choose to represent themselves in an attempt to cross-examine and intimidate the victim.  To contain this but retain balance, set strict guidelines for both sides, such

as requiring that all questions be asked from a counsel table or a podium rather than allowing counsel for either side to have the run of the courtroom. Advise the defendant in advance that he will not be allowed to have his standby attorney take over the case after the cross-examination, which *pro se* defendants in these cases typically try to do. British courts have a rule prohibiting *pro se* counsel in a sexual assault case from cross-examining the victim. At least one U.S. state legislator has submitted a bill to establish a similar rule in his jurisdiction. Consider permitting the defendant to submit questions to the standby counsel to pose, thereby preventing a direct encounter between the defendant and the victim.

**25. Always expect the unexpected – these cases can be fraught with peril for the trial judge.**

- A judge needs to be clearly in control of the potential for misconduct by anyone and everyone.
- If court personnel are new to sexual assault cases, take time to prepare them and remind them of the need for impartiality and good conduct, e.g., watch your body language.
- Don't assume jurors have a grasp of the terminology used (e.g., cunnilingus, fellatio).
- Let the attorneys know their boundaries when asking permission to approach a witness.
- Judge and court staff should closely monitor the defendant, his friends and family for any hostile or intimidating looks or gestures.
- Some jurors will have a difficult time hearing the details of a sensitive case. The court should offer jurors resources for post-verdict counseling.
- At sentencing, be prepared for a victim too overcome to express herself. Allow a victim advocate, friend or relative to read a written victim impact statement while standing next to the victim.

## SUGGESTIONS FROM JUDGES NATIONWIDE:

1. Among the items on the Resources CD is **NATIONAL JUDICIAL EDUCATION PROGRAM, UNDERSTANDING SEXUAL VIOLENCE: THE JUDICIAL RESPONSE TO STRANGER AND NONSTRANGER RAPE AND SEXUAL ASSAULT - *Participating Judge's Recommendations.*** These suggestions were developed by judges from more than twenty-five states who attended National Judicial Education Program's two-day *Understanding Sexual Violence* program. During these programs, judges were asked how they would incorporate the material they explored with the expert faculty into their role as judges in the pre-trial, trial and sentencing phases of an adult victim sexual assault trial, and as leaders in the criminal justice system and the community. Their responses are summarized in this *Recommendations* document. See also on the Resources CD, **Lynn Hecht Schafran, *Writing and Reading about Rape: A Primer*, 66 ST. JOHN'S LAW REVIEW 979, 1026 *et seq* (1993).**