UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Allan Chiocca,

    Plaintiff

    v.    Civ. A. No.: 1:19–cv–10482–WGY

The Town of Rockland, Deirdre Hall,
Edward Kimball, Larry Ryan,
Michael Mullen Jr., Michael O'Loughlin,
Richard Penney, and Kara Nyman

    Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF/COUNTERCLAIM DEFENDANT ALLAN CHIOCCA'S SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON DEFENDANT DEIRDRE HALL'S AND EDWARD KIMBALL'S COUNTERCLAIMS AND IN CONNECTION WITH CASE STATED HEARING**

    In advance of the May 23, 2022 case-stated hearing, Plaintiff/Counterclaim Defendant Allan Chiocca ("Chiocca") submits the following Supplemental Reply Memorandum in support of Chiocca's Motion for Summary Judgment and in connection with the Case Stated Hearing based solely on the recent deposition testimony and document production of Casey Sherman.[1]

    Defendant Kimball subpoenaed Mr. Sherman for a deposition that was taken after summary judgment motions were filed and after all parties agreed to have their cross motions for Summary Judgment on Hall and Kimball's Invasion of Privacy Claim against Plaintiff/Counterclaim Defendant Chiocca determined at a case stated hearing. At his deposition, Mr. Sherman testified about facts highly relevant to the Invasion of Privacy claim. Specifically,

---

[1] Chiocca also wishes to clarify that he assents to the court resolving count 24 of his complaint against the Defendant Town of Rockland as to liability only.

he was asked questions about whether the love affair between Defendant Deirdre Hall and Defendant Edward Kimball (the "Affair") was known in the Rockland community prior to the Plaintiff's release of Attorney Regina Ryan's Report ("Ryan Report") to the public. As the Court knows, Defendants Hall and Kimball base their Invasion of Privacy claim on the release of the Report, asserting that it improperly made the Affair public. Prior to Mr. Sherman's testimony, there had been no testimony from any witness about the general knowledge in the community about the Affair.[2] There, was however, ample documentary and other evidence (including video of a person yelling about the Affair at a public meeting), that the Affair was well known to the community prior to the release of the Ryan Report. Now, we have both firsthand testimony from Mr. Sherman, who was monitoring the "story" as Chiocca's counsel's public relations expert during the relevant time prior to the release of the Ryan Report as well as the documentary evidence. Together, they conclusively show that the Hall/Kimball Affair was public information long before the release of the Report on July 11, 2018.[3]

---

[2] Defendants claim that witnesses testified that individuals in the Town became aware of Ms. Hall and Mr. Kimball's Affair for the first time after the release of the Report. *See* Defendant/Counterclaim Plaintiffs Deirdre Hall and Edward Kimball's Statement Of Additional Material Facts In Opposition To Counterclaim Defendant's Motion For Summary Judgment, ¶ 130.   However, their bold statement is not backed up by the citations they provided. Rather, the three witnesses testified as follows. (1) Richard Penney: was asked what he understood the scope of the investigation to be. He answered that he thought that the investigation scope was "the details of that night … the night Mr. Chiocca and Ms. Hall were together." He did not testify about whether he or anyone else had knowledge of the Affair.  (2) Marcia Birmingham testified that she recalls Mr. Kimball stating that Ms. Hall had been flirting with him and that his wife was upset. When asked if Mr. Kimball told her he had an Affair with Ms. Hall, she said no. She was not asked if she was aware of the Affair. (3) Stacy Callahan was asked in her deposition whether Mr. Kimball himself had told her about his Affair and she testified that he had not. In summary, neither Penney, Birmingham nor Callahan testified to the fact that "people in Rockland were not aware of the Affair." None of them testified that the Affair was not well known in town; in fact, none of them were asked or testified that they themselves were not aware of the Affair before the Report was published.  *See* Plaintiff/Counterclaim Defendant Allan Chiocca's Responses To Defendant/Counterclaim Plaintiffs Deirdre Hall And Edward Kimball's Statement Of Additional Material Facts In Opposition To Counterclaim Defendant's Motion For Summary Judgment Pursuant To Local Rule 56.1 at  ¶130.

[3] Even if it still were not, the invasion of privacy counterclaims still fail for the reasons described in Chiocca's summary judgment briefing.

Accordingly, Plaintiff requests that the Court consider this new evidence when ruling on the parties' cross motions.

## I. MR. SHERMAN TESTIFIED THAT THE AFFAIR BETWEEN KIMBALL AND HALL WAS WELL KNOWN PRIOR TO THE RELEASE OF THE REPORT.

Mr. Sherman was hired by counsel for Chiocca to serve as a public relations expert. He advised Chiocca's counsel regarding how to address the public allegations against Chiocca. At the time, both Ms. Hall and Mr. Kimball had made several public statements about Mr. Chiocca. Ms. Hall had referred to Chiocca's conduct toward her as "inappropriate," said that she had made "allegations" against Chiocca, and, at a June 19th public Board of Selectman meeting, Kimball accused Chiocca of engaging in criminal conduct towards Ms. Hall. Declaration of Samantha C. Halem ("Nov. Halem Decl.") Exhibit U at 3:06 – 13:38.[4] The entire public narrative consisted of a one-sided story against Chiocca as put forth by Kimball and Hall, who remained elected public officials with access to public forums, such as Board of Selectman meetings (which Chiocca was barred from attending), that they used to concoct their side of the story. Mr. Sherman was hired to advise Mr. Chiocca in relation to that lopsided landscape. Declaration of Samantha C. Halem filed May 18, 2022 ("May Halem Decl.") Exhibit A, Deposition of Casey Sherman ("Sherman Dep."), April 8, 2022, at 39-40.

Mr. Sherman was asked repeatedly by three different attorneys representing Hall and Kimball whether the Affair was known in the community. Try as they might to show that the Affair was not known prior to the Ryan Report's release, Mr. Sherman repeatedly testified that "The horse was already out of the barn and people were talking about it…." May Halem Decl. Ex. A (Sherman Dep.) at 247.  Specifically, he testified as follows about the Affair:

---

[4] A video recording of the June 19, 2018 Rockland Board of Selectmen meeting is available at https://www.youtube.com/watch?v=pIafB-ztN88&t=5s

1. Mr. Sherman testified that he was charged with monitoring what "the townspeople themselves were talking about", and he saw that someone on June 4, 2018 was trying to expose the Hall/Kimball affair.[5]  May Halem Decl. Ex. A (Sherman Dep.) at 94.

2. When asked if Chiocca and his attorneys made a decision to make the "Kimball-Hall relationship" "part of the narrative" around June 6, 2018, Mr. Sherman testified, "it was already out there in public consumption, … it wasn't a recommendation that I had."  May Halem Decl. Ex. A (Sherman Dep.) at 101.

3. Mr. Sherman jokingly referred to the Affair as "a little-kept secret in the Town of – of Rockland for sure."  May Halem Decl. Ex. A (Sherman Dep.) at 102.

4. Mr. Sherman testified about the Affair: "That's what people were talking about on social media, for sure."  May Halem Decl. Ex. A (Sherman Dep.) at 105.

5. Mr. Sherman testified that the Affair became known to the mainstream media through social media and because of statements made at town meetings in June and July.[6]  "That's when it became public.  We had nothing to do with that."  May Halem Decl. Ex. A (Sherman Dep.) at 105.

6. Mr. Sherman testified that the Affair was, by June 19, 2018, "already an open discussion in a town hall meeting."  He said he doesn't remember if it was picked up by the print media or "mainstream" media as Kimball's attorney called them, but

---

[5] Mr. Sherman testified that part of his role for the Chiocca team was to monitor what people were saying on social media platforms and local press.  May Halem Decl. Ex. A (Sherman Dep.) at 85.

[6] Mr. Chiocca and his attorneys were not present at any of those meetings. Nov. Halem Decl. Ex. K, Minutes from June 5, 2018 Rockland BOS meeting; Nov. Halem Decl. Ex. U, Video recording of June 19, 2018 Rockland BOS meeting, available at: https://www.youtube.com/watch?v=pIafB-ztN88&t=5s; Nov. Halem Decl. Ex. BB, Minutes from June 19, 2018 BOS meeting; Nov. Halem Decl. Ex. DD, Minutes from July 10, 2018 Rockland BOS meeting; Nov. Halem Decl. Ex. KK, Minutes from July 31, 2018 Rockland BOS meeting; Nov. Halem Decl. Ex. QQ, Video recording of July 10, 2018 Rockland BOS meeting, available at https://www.youtube.com/watch?v=aq1E9qNYMag&list=PLH12n7SsKux-3JFMM22qHA2Uv3krGX08V&index=100

"some of the social media sites and alternative media were aggressively pursuing that story angle." May Halem Decl. Ex. A (Sherman Dep.) at 127. He theorized that print publications would have been working the story from behind the scenes at that point. May Halem Decl. Ex. A (Sherman Dep.) at 127-28; *see also* Sherman Dep. at 135-36 (for similar statements that this was "certainly something that everyone in town was talking about with regard to these three individuals").

7. Mr. Sherman testified that no one from Mr. Chiocca's team made any statement or sent any information about the Affair to prompt the discussions on social media about the Affair in June 2018, and yet "that was what was out there in social media, yes." May Halem Decl. Ex. A (Sherman Dep.) at 131.

8. Mr. Sherman also produced an email attaching a screen shot from Twitter dated June 1, 2018, where someone tweeted to journalist Howie Carr, a popular radio talk show host and Boston Herald columnist: "Howie, stop by Rockland and we'll give you an exclusive on the shady ongoing crap in this cesspool! Ask the BOS chairman [Kimball] for his text messages between him and Deirdre Hall and about his marriage counseling. She's toxic." May Halem Decl. Ex. B.

9. Mr. Sherman testified that someone from the mainstream print media reached out to him prior to June 21, 2018 about the Affair, "they were trying to track down information with regard to what the allegations were." May Halem Decl. Ex. A (Sherman Dep.) at 136. He doesn't remember who called him "But the story was well tread in –online and certainly now, part of the conversations that a lot of different people were having with regard to this case." May Halem Decl. Ex. A (Sherman Dep.) at 137. "Anybody that watched the debacle that was that town hall

meeting would certainly be willing -- be ready to talk about that. But I'm just giving you from what I heard. I can't remember who exactly was socializing that narrative at the time, but it was --it was out there for sure." May Halem Decl. Ex. A (Sherman Dep.) at 137. It may not have been printed in a printed publication yet, but, certainly, something that, I'm sure if I was a journalist working on this case, I would've absolutely unearthed that information." May Halem Decl. Ex. A (Sherman Dep.) at 137.

10. When Mr. Sherman was asked specifically, "Is it also your recollection that, at least in the social media that covered and was read in the Town of Rockland, the affair between Ms. Hall and Mr. Kimball, was it already widely spread [prior to the Report being released]? He responded, **"Yes."** May Halem Decl. Ex. A (Sherman Dep.) at 246. Mr. Sherman then elaborated on that testimony saying:

> What I can say is that, given these public meetings and hearings where allegations were thrown back and forth by some of the parties involved and others weighing in on it, it was a story that was already galvanizing a community before we did anything, or before we really sent out any statements on -- on Adam Shafran's behalf. The horse was already out of the barn and people were talking about it. Everybody had a --seemed, according to social media, if you recall those back-and-forths with people, you know, they knew --they know these folks, and they had their opinions and they were willing to share them." May Halem Decl. Ex. A (Sherman Dep.) at 247-248.

He then clarified that all of this was before the Report was released. May Halem Decl. Ex. A (Sherman Dep.) at 247-48.

In an attempt to try and save their Invasion of Privacy claim, Mr. Kimball's attorney tried to get Mr. Sherman to testify that only a few people, "a minority", saw the social media threads. Mr. Sherman denied that this was accurate and when asked how many people would have seen the posts about the Affair, stated, "quite a bit." May Halem Decl. Ex. A (Sherman Dep.) at 249.

Still hoping, that Mr. Sherman would support their argument that the Affair, was not widely known, Mr. Kimball's attorney tried again:

He asked:

**Q: "And Mr. Kimball was not someone who was putting his affair with Ms. Hall in the public, correct?...**

A.   Ahh, no, I don't -- I don't think that's correct.  I think the –

**Q.   Well, Ms. Hall wasn't putting her affair in the public domain, correct?...**

A.   The town -- the town hall meeting brought this out to the public….

**Q: It was you and Mr. Shafran and Mr. Friedmann and Mr. Chiocca who broadcast that affair well beyond the borders of the Town of Rockland to whoever you could get to pick it up and broadcast it or write about it, correct? …**

A.   No.  I -- I would say no.  TV stations were already monitoring the town meeting because of the situation at hand, so they were doing that on their own accord….   Yeah, they were watching -- I believe it was Fox -- Boston Fox was already on this story reporting outside of town hall.  It had nothing to do with written communications [about the Report]. May Halem Decl. Ex. A (Sherman Dep.) at 253-54.

Mr. Sherman's testimony makes irrefutably clear that the Affair was public knowledge in the community prior to the release of the Ryan Report. As noted in Chiocca's earlier briefs on this subject, the distribution of information that was not in any way private, cannot be the basis for an Invasion of Privacy claim.[7] *See Jones v. Taibbi*, 400 Mass. 786, 801 (1987) (Information "open to the public view" is no longer private and cannot form the basis of an invasion of privacy claim).

Kimball/Hall argue that even if many people were aware of the affair and it was discussed openly on social media and online blogs, the release of the Report to local media outlets was broader than all the earlier releases and therefore constituted an invasion of privacy.

---

[7] Hall and Kimball argue in their Partial Motion for Summary Judgment that the Affair only became "a topic of discussion after Mr. Shafran, on his client's behalf, had released the Report." Hall Kimball Motion for Partial SJ at 14.  Although there was copious evidence prior to Mr. Sherman's deposition that this was demonstrably false, Mr. Sherman's testimony confirms the documentary evidence previously provided to the Court. The Affair was public knowledge well before the Report was released.

Hall/Kimball Memorandum of Law in Support of Partial Motion for Summary Judgment, filed November 13, 2018, at 14.  There is no legal basis for this assertion. To the contrary, courts have held that "where the information is already public, one is 'not liable merely for giving further publicity to that information.'" *Mullen v. Silva*, 2001 Mass. Super. LEXIS 665, *9-10 (Mass. Super. Ct. 2001) (citing *Peckham v. Boston Herald, Inc.*, 48 Mass. App. Ct. 282, 285-86 (1999)).

In *Peckham v. Boston Herald*, the Boston Herald, argued, in part, that the Plaintiff had forfeited his right to privacy by disclosing the "private facts" at issue to his daughter and two of his close friends. 48 Mass. App. Ct. at 285-86. The Massachusetts Appeals Court noted that no Massachusetts appellate courts have had an "occasion to consider the extent to which one forfeits the privacy of personal facts by discussing them with one's close friends and family." The Court opined that "[i]t is not unreasonable to argue that it should be deemed a factual question whether a given person, due to the particular circumstances and manner of disclosure, has relinquished an expectation of privacy" when disclosing private facts to close family and friends.  The court further opined that because the record in the *Peckham* case did not include the "place, manner, and confidentiality of the discussions between Peckham and the others", there might be a genuine issue of fact as to whether the disclosure to the daughter and two close friends was sufficient to foreclose an invasion of privacy claim. Ultimately, the court decided it did not need to decide that issue because the topic of the disclosure, a supervisor having an affair with a subordinate and then firing the subordinate, was sufficiently newsworthy to preclude an invasion of privacy claim. This is also true here.

But in addition to the Affair being a matter "of legitimate public concern",[8] we also know that Hall and Kimball admitted that their individual disclosures of the Affair were quite broad and not just to close family and friends. Both Hall and Kimball independently disclosed it to Chiocca,[9] even though Hall admitted at her deposition, that it was not appropriate for a manager to tell her subordinate about her affair with his other manager. May Halem Decl. Ex. A (Sherman Dep.) at 96-97. Kimball admitted he had also told all the members of the Board of Selectman. They both also told the independent investigator. The Affair was discussed openly in public town/regional forums on social media and on news blogs available on the internet. This was not "private" information. As Mr. Sherman testified, even if the print media had not formally run a story about the Affair yet, they were aware of the Affair before the Report was issued.

The *Peckham* court also cited the Supreme Judicial Court holding in *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 521 (1991) that "a person may relinquish a privacy right by engaging in certain activities, or by placing himself in certain contexts where his legitimate expectation of privacy is reduced." Here, Hall and Kimball were public officials who told numerous people, including people who were not their friends or confidantes, about their affair. They testified that these admissions led to one of the selectmen, Larry Ryan, running around telling everyone about the Affair. The horse had left the barn long before the Report was released.

---

[8] Hall herself testified that the Affair was relevant to the investigation that she initiated against Chiocca and publicly spoke about in public forums related to her campaign for state representative. May Halem Decl. Ex. B (Deposition of Deirdre Hall ("Hall Dep."), Vol. II) at 145.

[9] Notably, Hall herself considered it inevitable that the truth had or would shortly come out to a large group of people. When she was at the Town Hall with Chiocca on May 1-2, 2018, she testified that she said, over and over, "What's going to happen when people find out I'm fucking the chairman?" Hall Dep. Vol. I at 236; see Nov. Halem Decl. Ex. E.

## II. SHERMAN'S TESTIMONY ALSO SHOWS THAT THE RELEASE OF THE RYAN REPORT AND ASSOCIATED STATEMENTS WERE PROTECTED BY THE LITIGATION PRIVILEGE.

Mr. Sherman was also asked who wrote the words that were included in the email he sent to media outlets about the investigation, the Ryan Report, and attaching the Ryan Report. Mr. Sherman testified that the words he was disseminating were written by Attorney Shafran, not him. May Halem Decl. Ex. A (Sherman Dep.) at 134-35, 149-50. Therefore, as stated in Plaintiff/Counterclaim Defendant Chiocca's Motion for Summary Judgment, the litigation privilege protects such a communication made preliminary to and in the course of litigation. *The Patriot Group, LLC v. Edmands*, 96 Mass. App. Ct. 478, 483-85 (2019); see also *Correllas v. Viveiros*, 410 Mass. 314, 320 (1991) (When the litigation privilege applies, all covered statements "are absolutely privileged even if uttered maliciously or in bad faith"); *Rich v Rich*, 2011 Mass. Super. LEXIS 148, *23 (holding that the litigation privilege applies with equal force to invasion of privacy claims).

## CONCLUSION

For the reasons stated above, Counterclaim Defendant Allan Chiocca respectfully requests that this Court include the deposition testimony of Casey Sherman and analysis related thereto in its case stated" consideration of Counterclaim Defendant Allan Chiocca's, motion for summary judgment.

Respectfully Submitted,

**ALLAN CHIOCCA**,

By his attorneys,

/s/ *Samantha C. Halem*
Samantha C. Halem, Esq. (BBO 649624)
shalem@marshallhalem.com
Sarah E. Ruter, Esq. (BBO 708447)
*sruter@marshallhalem.com*
Marshall Halem LLC
27 Mica Lane, Suite 102
Wellesley, MA  02481
(781) 235-4855



/s/ *Adam J. Shafran*
Adam J. Shafran, Esq. (BBO 670460)
*ashafran@rflawyers.com*
Jonathon D. Friedmann, Esq. (BBO 180130)
*jfriedmann@rflawyers.com*
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
(617) 723–7700

Dated: May 18, 2022

## CERTIFICATE OF SERVICE

I, Samantha C. Halem, do hereby certify that this document filed through the ECF system shall be sent electronically to the registered participants as identified on the Notice of Electronic Filing on May 18, 2022.

/s/ Samantha C. Halem

Samantha C. Halem