# EXHIBIT A

In the Matter of:

*Allan Chiocca vs*

*Town of Rockland, et al.*

Casey Sherman

April 08, 2022

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



O&L O'BRIEN & LEVINE COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

Page 37

1  Q. Okay. But Mr. Chiocca appeared agitated.
2  Is that what you're saying?
3  A. From what I call recall, yes. That was the
4  -- I would say, you know, the -- the mood or the, you
5  know, behavior he was projecting at the time.
6  Q. Did he tell you, during the first meeting,
7  how many drinks he had poured for Ms. Hall during the
8  events in question?
9  A. How many drinks he had poured for Ms. Hall?
10  I don't remember him providing that information, no.
11  Q. Or did he tell you how many drinks Ms. Hall
12  had had?
13  A. He said that they had both been out drinking,
14  from what I remember of the conversation, but there
15  wasn't any specifics.
16  Q. So he didn't tell you that she'd had five
17  drinks?
18  A. I don't -- I don't recall that, Howard.
19  Q. What else, if anything, do you recall him
20  saying?
21  A. I do recall him saying that, you know, she
22  was technically his boss, and that he felt -- and
23  again, I'm paraphrasing here, so I don't remember the
24  exact language he used, but "pressured." And I

Page 38

1  remember the potential use of the word "violated." He
2  also felt deep regret in -- in terms of being, you
3  know, put into that situation.
4  Q. Anything else that you can recall?
5  A. That -- that's about the crux of it, quite
6  frankly. I haven't -- I really can't recall, you
7  know, the details of that -- of that conversation.
8  But, you know, from what I gathered, you know, with
9  regard to that, you know, here's somebody that felt
10  like he was, again, pressured into a situation that
11  was -- that he was powerless to stop.
12  Q. And what did any of the lawyers from Rudolph
13  Friedmann say?
14  A. They -- from what I recall, and I don't -- I
15  can't -- I don't remember the conversations verbatim,
16  Howard. But, you know, they felt, as -- as did Allan,
17  that he had been, you know, violated, and then --
18  Q. Do you know whether anybody had done any
19  independent investigation as of that point?
20  A. I don't know if anybody had done any ind --
21  independent investigation at that point, no.
22  Q. Did you do any investigation?
23  A. Not at -- not at -- at that point. I was
24  listening to Allan's story and -- like we do for all

Page 39

1  clients, and going -- from starting at that point. So
2  this is -- or -- hold on. This is before the Regina
3  Ryan report that obviously, you know, corroborated
4  Allan Chiocca's details of that event.
5  Q. We'll get to that.
6  A. Okay.
7  Q. I'm simply asking, so in your position, is it
8  fair to say that it's your job to listen to your
9  clients' concern and then try to help them?
10  A. That is fair to say.
11  Q. Okay. And that's what you did with
12  Mr. Chiocca?
13  A. Correct.
14     MR. WALZ: Objection.
15     BY MR. COOPER:
16  Q. It's not your job to be a neutral arbiter and
17  go interview everybody and make a judgment?
18  A. That is not my job.
19  Q. Your job is to engage in media relations as
20  an advocate for your client, correct?
21     MR. WALZ: Objection.
22  A. That -- that is correct.
23  Q. Now, one of the things that you were tasked
24  with doing was to formulate a strategy, correct?

Page 40

1  A. Correct.
2  Q. And if we look at Exhibit 1 in the first
3  paragraph of your e-mail, it says, "Please send me
4  those witness statements so that I can begin to
5  formulate a strategy here."
6     Do you see that?
7  A. (Deponent viewing exhibit.) I do, yeah.
8  Q. What witness statements were you referring
9  to?
10  A. That, I do not recall. I do remember that
11  they believed they had some eyewitnesses to the event.
12  And I think -- and I'm going back in time here,
13  Howard, so give me a moment, okay?
14     I think there were mentioned in that
15  conversation that there was a waitress or a bartender
16  at the restaurant that Ms. Hall and Mr. Chiocca were,
17  you know, drinking at beforehand. So I think that was
18  -- I know that was one. I don't -- I can't recall who
19  else they may have come up with during that
20  conversation.
21  Q. Did you ever get any witness statements --
22  A. I did not.
23  Q. -- from Rudolph Friedmann -- I just have to
24  finish --

Page 85

1 recommended media narrative that you were suggesting
2 as of that time, right?
3   A.  No, but I do recall some social media chatter
4 with regard to that relationship.
5   Q.  We'll get there.
6   A.  Hold on, Howard.  Part of my job was to
7 monitor the social media discussions just to see where
8 public opinion was at the time.  So I can't give you a
9 date on when I -- when I -- when that, you know,
10 started to socialize on social media, but with regard
11 to the Shafran statement on that particular day, no.
12   Q.  My job, Mr. Sherman, is to try to get at the
13 facts and the truth, and that's all I'm trying to do
14 is what -- get at what you were told and what you
15 weren't told and when.
16   A.  Understood.
17   Q.  So --
18   A.  Thank you.
19   Q.  So you're engaged to deal with this crisis in
20 Mr. Chiocca's life, correct?
21   A.  Correct.
22   Q.  And you devote attention to it over a
23 weekend, correct?
24   A.  Correct.

Page 86

1   Q.  This is something that people hire you to do,
2 in terms of crisis management with the media, right?
3   A.  Correct.
4   Q.  And in terms of everything that was told to
5 you and what Mr. Chiocca and his legal team ultimately
6 approved to go out to the media, there was no mention
7 of the relationship between Ms. Hall and
8 Mr. Kimball --
9       MR. WALZ:  Objection.
10      BY MR. COOPER:
11  Q.  -- as of the -- as of June 4th, correct?
12      MR. WALZ:  Objection.
13  A.  From what I recall, that's the case.  I don't
14 -- but, again, I can't -- I don't remember when that
15 name came into the conversation.
16  Q.  Okay.  And just so it's clear, you have no
17 memory of Mr. Chiocca mentioning Mr. Kimball in the
18 in-person meeting that took place, right?
19  A.  I don't recall that.
20      MR. COOPER:  Now, if we could put the
21 next document up, please, which is a June 4th 2018,
22 11:26 a.m., e-mail from you.
23      THE DEPONENT:  Mm-hmm.
24      (Exhibit 4 marked for identification.)

Page 87

1       BY MR. COOPER:
2   Q.  You report back at that date and time to
3 Mr. Shafran, Mr. Friedmann, Mr. Chiocca, copied to
4 your colleagues, that statement has been distributed?
5       MR. WALZ:  I object to this document as a
6 privileged communication.
7   A.  What am I answering, Howard?  I'm sorry.
8   Q.  I'm just asking you, you were reporting back
9 that you had distributed the statement, correct?
10  A.  Correct.
11  Q.  And then you write, "We've been monitoring
12 social media."
13      Do you see that?
14  A.  (Deponent viewing exhibit.)  Yes.
15  Q.  And who is the "we"?
16  A.  Meaning Regan Communications, so
17 predominantly me for Regan Communications --
18  Q.  Who else --
19  A.  -- when I say --
20  Q.  I'm sorry.
21  A.  -- "we."
22  Q.  Were you referring to anyone other than
23 yourself in terms of who at Regan Communications were
24 monitoring social media?

Page 88

1   A.  No.  I was referring to myself.
2   Q.  And does part of your job include having
3 people make comments on social media that are
4 advantageous to your clients?
5   A.  No.
6   Q.  Do you know whether that was done by anybody
7 in this case?
8   A.  Not to my knowledge, it was done.  That's not
9 the way I work, so I would not -- I know that there
10 are some communication strategies that point to that,
11 especially in politics, but in this case, in the work
12 that I was doing on behalf of Shafran, Friedmann and
13 Chiocca, was seeing what the dialogue was out in
14 social media land.
15  Q.  Did any of them report to you they were
16 planting comments in social media?
17  A.  No.
18  Q.  You say here -- you refer to a comment that
19 you found on Ms. Hall's official Facebook page.  It
20 says, "I've reached out to Mikey Connolly and am
21 waiting it hear back."
22      Do you see that?
23  A.  (Deponent viewing exhibit.)  Yup.
24  Q.  Did you connect with Mikey Connolly?

Page 93

1  you're giving --
2       MR. COOPER: Well, let me get it up on
3  the screen first.
4       THE DEPONENT: Sure.
5       (Exhibit 5 marked for identification.)
6       MR. WALZ: I will object to this document
7  as privileged.
8       BY MR. COOPER:
9   Q.  So this is a little later in the day, and
10  you're giving a further update on your monitoring of
11  the response to the statement; is that fair?
12  A.  (Deponent viewing exhibit.) That's fair.
13  Q.  And you write, "Hello all -- We culled this
14  from Howie Carr's Twitter feed. Looks like someone is
15  trying to expose Hall's previous relationship as
16  well."
17      Do you see that?
18  A.  (Deponent viewing exhibit.) I do.
19  Q.  Can you see it, Mr. Sherman?
20  A.  (Deponent viewing exhibit.) I can. I can.
21  I see that. I don't --
22      Have you tried to open the attachment yet?
23  Q.  I'm going to get to that in one second. I
24  just wanted --

Page 94

1   A.  (Deponent viewing exhibit.) I do see that.
2   Yes, I do.
3   Q.  And as of June 4th, 2018, at 2:14 p.m., were
4   you trying to expose Ms. Hall's relationship with
5   Mr. Kimball?
6       MR. WALZ: Objection.
7   A.  No, I wasn't -- I don't believe so. What we
8   were doing is monitoring social media posts to see
9   what was out there, what the townpeople themselves
10  were talking about. So there was no clear directive
11  in terms of discovering information with regard to
12  Hall's relationship with Kimball, at least not at that
13  point.
14  Q.  Are you done?
15  A.  I am, yeah.
16  Q.  Okay. Do you know whether Mr. Shafran,
17  Mr. Friedmann and Mr. Chiocca, any of them were trying
18  to expose Ms. Hall's relationship with Mr. Kimball?
19  A.  Not that I recall.
20  Q.  Well, why did you use the words "as well"?
21  See where it says, trying to expose Hall's previous
22  relationship as well? As well as who?
23  A.  (Deponent viewing exhibit.) Not as well as
24  whom, as well as the previous social media post. So

Page 95

1   there -- there wasn't -- in reference to any
2   particular person, it was giving an update on what
3   people were talking about.
4   Q.  And if you could open the attachment, please.
5   Now -- whoop. One second.
6       This is, at least in terms of what was
7   produced to us, the attachment.
8   A.  (Deponent viewing exhibit.) Yup.
9   Q.  And someone using the moniker Taxed 2 Death
10  in Mass, writes, and it says, June 1, replying to at
11  Howie Carr Show.
12      Do you see that?
13  A.  (Deponent viewing exhibit.) I do.
14  Q.  Can you explain to me how someone could make
15  a comment on June 1 that was in response to your
16  release of an official statement?
17  A.  That -- that wasn't in response to my release
18  of an official statement. I was doing social media
19  monitoring of not who was picking up the statement,
20  but the story itself. So if that predates the
21  statement, that was just something that I found on
22  Howie Carr's Twitter feed.
23  Q.  Had you sent the statement to Howie Carr?
24  A.  I don't think so. No. I -- let me go on the

Page 96

1   record here, no, I did not send anything to Howie
2   Carr. He and I do not have a good relationship.
3   Q.  Do you know whether the Herald had shared
4   whatever you sent to him with Mr. Carr?
5   A.  I don't know. I couldn't tell you that.
6       MR. COOPER: Okay. Could we go to this
7   (indicating)?
8       I'm going to put up as the next exhibit in
9   order a June 5, 2018, 4:04 p.m. e-mail between you and
10  Mr. Chiocca copied to your colleagues.
11      THE DEPONENT: Okay.
12      (Exhibit 6 marked for identification.)
13      MR. WALZ: And I'll object to the
14  introduction and questioning as to this document as
15  privileged.
16      BY MR. COOPER:
17  Q.  Well, there aren't any lawyers copied on this
18  document, are there?
19      MR. WALZ: I -- that means nothing, but
20  you're right.
21      MR. COOPER: That was a question to
22  Mr. Sherman.
23  A.  (Deponent viewing exhibit.) That is correct,
24  yes.

Page 97

1  Q. Is there a reason you were limiting the
2  communication to just Mr. Chiocca, Mr. Cole and
3  Ms. Boiardi?
4      A. No reason at all.
5  Q. You write, "Just met with Allan and he shared
6  texts with Selectman Hall the morning after the
7  incident and for another two weeks, FYI, good for
8  you" --
9      A. Us to --
10  Q. -- "us to have."
11      A. Yeah, correct.
12  Q. And, with that correction, have I read it
13  correctly?
14      A. (Deponent viewing exhibit.) Yes, you have.
15  Q. Okay. And you had met with Mr. Chiocca in
16  person on June 5th, 2018, correct?
17      A. Correct.
18  Q. And where was that meeting?
19      A. That -- I believe that was meeting was at the
20  law office, Friedmann on -- Rudolph Friedmann on State
21  Street in Boston.
22  Q. And who attended that meeting?
23      A. From what I would imagine, it would've been
24  -- and, again, I can't -- Allan clearly was there, but

Page 98

1  I'm sure it was at least one of the representing
2  attorneys, either Shafran or Friedmann or both. I
3  don't recall.
4  Q. Anybody else?
5      A. I don't think so, no.
6  Q. How long did that meeting last?
7      A. I do not recall, Howard, but probably --
8  again, you know, half hour, 45 minutes maybe.
9  Q. Did you -- strike that.
10      What was the purpose of the meeting?
11      A. Just following up on communications and what
12  was going on, on the legal front, keeping me abreast
13  of next steps for -- in terms of hearings and things
14  like that from -- from what I recall of that -- of
15  that meeting.
16  Q. And why was it important to physically get
17  together rather than talk by e-mail or have a
18  telephone call?
19      A. I don't recall why that was important, but we
20  were all in the city. I think that Allan was visiting
21  his attorneys for some reason, and it made sense for
22  me to be there.
23  Q. And did you take notes?
24      A. No. I -- we were just talking about the

Page 99

1  statement that went out, and with this -- with regard
2  to this particular e-mail, it was, Allan wanted to
3  show me texts that he, I believe, had received from
4  Ms. Hall in the hours maybe post-encounter. So those
5  images are me taking a photo of Mr. Chiocca's phone
6  with my own phone at the time. Those e-mails were --
7  those text were never shared with me.
8  Q. Now, what -- strike that.
9      When you do take notes, do you take
10  handwritten notes, or do you type into a computer?
11      A. When I take notes? It depends. You know, I
12  haven't really -- on something like this, absorb it,
13  figure out, you know -- listen to what the lawyers
14  have to say. And, again, my job really was to sharpen
15  any public statements that were going out, provide
16  those to the media. But when I say "sharpen," every
17  single statement that went out was vetted, approved,
18  if not written by the attorneys representing
19  Mr. Chiocca.
20  Q. Okay. Now, tell us, please, what you recall
21  was said during the meeting at Rudolph Friedmann that
22  day.
23      A. I -- I can't be specific on that, Howard. It
24  was -- that's, you know, several years ago and, you

Page 100

1  know, when you're juggling five or six clients
2  simultaneously, I don't remember, but I do remem --
3  the only thing I remember from that meeting was him
4  sharing those text messages.
5  Q. So you have no memory of him mentioning
6  Mr. Kimball?
7      A. It could've been the time that Kimball's name
8  started to be socialized, you know, within the -- the
9  group. That could've -- that could've been the day,
10  sure.
11  Q. Well, are you guessing?
12      A. I am guessing, but it makes sense that that
13  would've been the day.
14  Q. What do you mean by Kimball's name would've
15  been socialized within the group?
16      A. Well, there was -- you know, a time where --
17  and I'm -- I don't recall who brought this up, whether
18  it was Allan or the attorneys -- that there were, you
19  know, allegations with regard to the relationship
20  between Kimball and Ms. Hall. And, at that point, I
21  was urged to watch a public meeting that was aired on
22  some website -- you know, the Town of Rockland website
23  where this was brought up in the open by, I believe it
24  was one other town selectman, which I thought was

Page 101

1  pretty fascinating.
2  Q. Have you finished your answer?
3  A. I have.
4  Q. As of Wednesday, June 6, 2018, you had been
5  engaged for about five days --
6  A. That sounds --
7  Q. -- is that fair?
8  A. Sorry. That sounds correct.
9  Q. And did you make a determination by
10 Wednesday, June 6, 2018, that it would be important
11 for the Kimball-Hall relationship to become part of
12 the narrative?
13    A. That would prob -- I mean, it was already out
14 there in public consumption, so that's -- it wasn't a
15 recommendation that I had. It was something that I
16 think was collectively decided upon. Again, I didn't
17 know who this guy Ed Kimball was or --
18    Q. Collective -- I'm sorry.
19    A. Yeah.
20    Q. Collectively decided upon by whom?
21    A. Well, the only parties involved in
22 discussions about Allan Chiocca were myself, Allan
23 Chiocca, Shafran and Friedmann.
24    Q. Did you, Mr. Chiocca, Mr. Shafran and

Page 102

1  Mr. Friedmann discuss a plan to shift the focus away
2  from Mr. Chiocca's transgression to that of Hall and
3  Kimball?
4       MR. WALZ: Objection.
5  A. I don't recall using that type of language,
6  but, certainly, there was, you know, an agreement or
7  at least the recommendation to tell the entire story
8  from Allan's point of view. And I know that Allan,
9  you know, at that point, was discussing what he knew
10 about their relationship. Clearly, he wasn't the only
11 one, you know, going back to that -- that public
12 hearing which was one of the most outrageous things I
13 had seen. This was a -- a little-kept secret in the
14 town of -- of Rockland for sure.
15    Q. Okay. Let -- let me get you to focus very
16 specifically on my question.
17       As of the first week -- actually, let me take
18 it without dates.
19       At any point in time, did you, Adam Shafran,
20 Jon Friedmann and Allan Chiocca agree to pursue a
21 strategy that would shift the focus away from
22 Mr. Chiocca's transgression to that of Hall and
23 Kimball? Yes or no.
24       MR. WALZ: Objection.

Page 103

1  A. From what I can recall, I'm not sure that was
2  the language used, but we were bringing in every piece
3  of information regarding this case that we could, and
4  that included information regarding Ms. Hall's other
5  relationships.
6       MR. COOPER: Okay. Let's put up the next
7  exhibit in order on the screen, please, which is a
8  Wednesday, June 6, 2018, at 11:56 a.m. --
9       THE DEPONENT: Mm-hmm.
10      MR. COOPER: -- e-mail.
11      (Exhibit 7 marked for identification.)
12 BY MR. COOPER:
13    Q. You sent that e-mail --
14      MR. WALZ: I will object to this e-mail
15 as privileged and questions about this as privileged.
16 BY MR. COOPER:
17    Q. You sent this e-mail at that date and time to
18 Mr. Chiocca, Mr. Friedmann and Mr. Shafran copied to
19 your colleagues at Regan Communications, correct?
20    A. (Deponent viewing exhibit.) Correct.
21    Q. And I want to go a little bit more than half
22 way down the substance of the e-mail, although you're
23 welcome to read the whole thing. You write, "I agree
24 with the strategy for Friday's recommending that Allan

Page 104

1  ask Regina Ryan to explore other relationships
2  impacting town business (primarily Kimball/Hall)."
3       Have I read that correctly?
4  A. (Deponent viewing exhibit.) Yes.
5  Q. And then you go on, it says, "Once this
6  becomes part of the narrative (and eventually it
7  will), it will support Allan's case and shift the
8  focus away from his transgression to that of Hall &
9  Kimball."
10      Have I read that correctly?
11 A. (Deponent viewing exhibit.) That's correct.
12    Q. Those are the words that you chose to
13 communicate that day, correct?
14 A. Yes.
15    Q. And you were referring to Mr. Chiocca's
16 transgression, correct?
17 A. Yeah.
18      MR. WALZ: Objection.
19 BY MR. COOPER:
20    Q. Right?
21 A. Yeah. That word was used, yeah.
22    Q. And you would agree with me that, at least as
23 you understood it, the Kimball/Hall relationship was
24 not yet part of the narrative, right?

Page 105

1       MR. WALZ: Objection.
2    A. I did -- no, I wouldn't say that was not part
3  of narrative. That's what people were talking about
4  on social media, for sure.
5    Q. Well, why did you say, quote, Once this
6  becomes part of the narrative, referring to
7  Ms. Hall's other relationships, and then you use the
8  words, "and eventually it will," why did you choose
9  those words?
10   A. Probably I was referring to mainstream media.
11   Q. Okay. So it was part of a local social media
12 narrative, but wasn't in the mainstream media.
13      Is that what you meant?
14   A. Yeah. Probably, yeah.
15   Q. And --
16   A. But, again -- hold on, Howard. Let me -- let
17 me go back on that.
18      When it became part of the mainstream
19 narrative was when some of their dirty laundry was
20 aired at a town meeting. That's when it became
21 public. We had nothing to do with that. That is --
22   Q. Well --
23   A. Yeah.
24   Q. -- we'll let the jury make that

Page 106

1  determination.
2    A. Oh.
3    Q. I just want to focus on the words that you
4  used.
5    A. Yeah.
6    Q. You wrote, "Once this becomes about part of
7  the narrative (and eventually it will)" --
8       You were being accurate, right?
9    A. (Deponent viewing exhibit.) Yeah, part of
10 the mainstream narrative.
11   Q. It will support Allan's case.
12   A. Sure.
13   Q. That was your view, right?
14   A. Yeah.
15   Q. Because it would show Ms. Hall as some kind
16 of slut?
17      MR. WALZ: Objection.
18      BY MR. COOPER:
19   Q. Is that what you were getting at?
20      MR. WALZ: Objection.
21   A. You used those words, Howard. I wouldn't use
22 those words. But, certainly, if there was other
23 relationships that Ms. Hall was having outside of her
24 marriage, you make that determination. I'm not going

Page 107

1  to.
2    Q. And then you write, "and shift the focus away
3  from his transgression to that of Hall & Kimball,"
4  right? You chose those words?
5    A. Sure.
6    Q. And that was something that you were being
7  paid to do, right?
8    A. That was something that I was being paid to
9  do, to advise two town officials that were allegedly
10 having a sexual relationship is certainly something
11 that is newsworthy.
12   Q. And it would shift the focus away from
13 Mr. Chiocca's transgression, right?
14      MR. WALZ: Objection.
15   A. In my mind -- and again, and I -- you know,
16 the u -- the word "transgression" is having sexual
17 relations on property, which, to me, is a
18 transgression.
19      Is that not, to you, a transgression, Howard?
20   Q. Well, I'm not answering questions here
21 today --
22   A. Okay.
23   Q. -- and we can have that conversation off the
24 record.

Page 108

1    A. Sure.
2    Q. By the way, have you read Mr. Chiocca's
3  deposition transcript in this case?
4    A. I have not been privy to any of that, no.
5    Q. Have you had any communications with the
6  lawyers at Rudolph Friedmann in the past year?
7    A. I have --
8    Q. Okay.
9    A. -- based on this deposition.
10   Q. Okay. And did you meet with them in
11 anticipation of answering questions here today?
12   A. I did not meet with them, no.
13   Q. Did you speak with them?
14   A. I spoke with Adam Shafran on March -- I think
15 it was the 28th.
16   Q. By phone?
17   A. By phone.
18   Q. Was it Zoom or just telephone?
19   A. Just telephone.
20   Q. And was anyone else participating in that
21 communication?
22   A. No, just Adam and myself.
23   Q. How long did that telephone call last?
24   A. Eight minutes maybe.

Page 125

1  (Pause.)
2       MR. COOPER: Okay. I'd like to mark as
3  the next exhibit in order, which will be 11, a
4  June 19th, 2018, 11:48 a.m. e-mail from you.
5       THE DEPONENT: Okay.
6       (Exhibit 11 marked for identification.)
7       MR. WALZ: I'll object to this e-mail as
8  being privileged and questions about this e-mail as
9  being privileged.
10      BY MR. COOPER:
11  Q. You have that up in front of you,
12  Mr. Sherman?
13  A. (Deponent viewing exhibit.) Yes.
14  Q. And can you just confirm, please, that you
15  sent it on the date and time it bears?
16  A. (Deponent viewing exhibit.) Yes.
17  Q. And, in this, there is what is referred to as
18  a holding statement?
19  A. (Deponent viewing exhibit.) Correct.
20  Q. It's a holding statement that would be issued
21  in the event that Mr. Kimball resigned and there was
22  press asking for a quote?
23  A. Correct.
24  Q. Was this statement that -- something that you

Page 126

1  drafted?
2  A. Yes.
3  Q. And was it released?
4  A. I don't think it was released. I -- I don't
5  recall that being released.
6       When we put together holding statements, we
7  have to account for every potential scenario in a --
8  in a case like this. So it's being proactive in case
9  something does happen, but I do not recall that
10  statement being released.
11  Q. Okay. And in that statement that you drafted
12  -- (sneezes) excuse me. Sorry.
13      In the statement that you drafted, you write
14  in the first sentence, "The abrupt decision by Edward
15  Kimball to resign from his position as Chairman of the
16  Board of Selectmen for the Town of Rockland raises
17  serious ethical questions as to the true nature of his
18  relationship with Selectman Deirdre Hall."
19      Have I read that correctly?
20  A. (Deponent viewing exhibit.) Yes.
21  Q. Now, as of this date, June 19th, 2018, you
22  are aware that there was nothing in the mainstream
23  media about Mr. Kimball's relationship with Ms. Hall,
24  correct?

Page 127

1       MR. WALZ: Objection.
2  A. I was aware, and I believe at this point,
3  that this is a -- already an open discussion in a town
4  hall meeting.
5  Q. That's not what I'm asking you.
6  A. I --
7  Q. I'm asking you --
8  A. I don't recall whether or not Kimball was
9  mentioned in, quote/unquote, the mainstream media at
10 the time.
11 Q. Was -- did you inves -- did you investigate
12 that at the time?
13 A. I don't re -- I don't -- I don't remember. I
14 don't recall.
15 Q. Okay. Can you think of any mainstream media
16 outlet that had published, prior to June 19th, 2018,
17 that there had been a relationship between Mr. Kimball
18 and Ms. Hall?
19 A. I don't -- I don't recall. I do believe that
20 some of the social media sites and alternative media
21 were aggressively pursuing that story angle.
22 Q. My question is the mainstream media.
23 A. How would you describe the mainstream media,
24 Howard?

Page 128

1  Q. The way you described it earlier.
2  A. I don't know if reporters were working on
3  that narrative. It -- nothing had been published.
4  That doesn't mean that stories weren't being worked on
5  behind the scenes.
6  Q. Well, my question was, what had been
7  published in the mainstream media, and you know, based
8  on your memory, that as of June 19th, 2018, that you
9  -- when you prepared this statement, there was nothing
10 in the mainstream media, correct?
11     MR. WALZ: Objection.
12 A. I will take your word for it, Howard. That,
13 I don't recall, but sure.
14 Q. And what you were calling for here was a
15 investigation, essentially, into their relationship,
16 right?
17 A. Sure. Yes.
18 Q. And was this statement -- I understand your
19 testimony that you say that it wasn't released, but
20 was it approved by Attorneys Rudolph -- excuse me --
21 Attorneys Friedmann and Shafran and Mr. Chiocca?
22 A. I would -- I don't recall whether or not it
23 was approved. If it went out to the media, then it
24 would've been approved by the attorneys.

## Page 133

1   MS. BELOSTOCK: (Complied.)
2   MR. COOPER: Okay. Let's stop there.
3   MS. BELOSTOCK: (Complied.)
4   MR. COOPER: I'm sorry, you gotta go back
5   the other way.
6   MS. BELOSTOCK: Oh.
7   (Complied.)
8   MR. COOPER: Right there.
9   BY MR. COOPER:
10  Q. Okay. So, did you send this e-mail on
11  June 21, 2018, at 9:53 a.m.?
12  A. (Deponent viewing exhibit.) I did.
13  Q. And, again, it's to the group of media
14  outlets that you've testified to already?
15  A. (Deponent viewing exhibit.) That is correct.
16  Q. Had you made any efforts to expand that group
17  by this date?
18  A. I'm not -- I -- I don't recall. I don't
19  think so.
20  Q. Okay. And, again, a number of the media
21  outlets you were forwarding this to included
22  mainstream media outlets, correct?
23  A. Correct. Yup.
24  Q. Now, I want to go -- if we could scroll

## Page 134

1   towards the bottom, there is a bottom paragraph that
2   begins, "Mr. Chiocca strongly believes that Chairman
3   Kimball has not taken his complaint against Hall
4   seriously because of Kimball's close relationship with
5   Hall, which we expect the ongoing investigation to
6   uncover."
7       Have I read that correctly?
8   A. (Deponent viewing exhibit.) Yes.
9   Q. So it was you -- or strike that.
10      Did you write those words?
11  A. (Deponent viewing exhibit.) No. I did not
12  write those words.
13  Q. Who -- who wrote those words?
14  A. It would have had to come from the attorney.
15  Q. And I note that this -- if you go all the way
16  to the bottom, is a statement attributed to Adam
17  Shafran --
18  A. (Deponent viewing exhibit.) Yes.
19  Q. -- right?
20  A. Yup.
21  Q. What causes you to believe that one of the
22  attorneys wrote those words?
23  A. Because I did not write those words. I
24  didn't have that intel -- institutional knowledge.

## Page 135

1   This was a statement that was drafted by Shafran and
2   distributed to the media by me.
3   Q. Whose decision was it to alert the mainstream
4   media of Kimball's close relationship with Hall?
5   A. That would've been the attorney.
6   Q. Mr. Shafran?
7   A. Yes.
8   Q. Do you know why he made the decision to do
9   that on June 1, 2018?
10  A. I think it has to do with Allan Chiocca's
11  open meeting law complaint.
12  Q. And he wanted it to be part of the narrative
13  that there was a close relationship between
14  Mr. Kimball and Mr. [sic] Hall that should be subject
15  to the investigation; is that fair?
16      MR. WALZ: Objection.
17  A. I think that would be fair.
18  Q. Did you agree or disagree with that strategy?
19  A. I agreed with it, because it was already in
20  the open forum at town meeting and the -- certainly
21  something that everyone in town was talking about with
22  regard to these three individuals.
23  Q. Okay. But I'm talking about raising this to
24  the level of providing it to the mainstream media.

## Page 136

1   A. It was already raised to the level to provide
2   that to the mainstream media because these town
3   meetings were videotaped and circulated, so the media
4   already knew or was alerted to whatever was going on
5   between these two parties well before Adam Shafran
6   released or ordered me to release that statement.
7   Q. Oh, well, we'll get there.
8   A. Okay.
9   Q. Who in the mainstream media told you that
10  they were aware of a sexual relationship between
11  Mr. Kimball and Mr. [sic] Hall on June 21, 2018, or
12  any prior day?
13  A. I think I had a conversation with one person
14  in the media at least on this, and they were trying to
15  track down information with regard to what the
16  allegations were.
17  Q. Who was that person?
18  A. I certainly -- I -- I don't recall, and nor
19  would I give up a source like that.
20  Q. Okay. Well, was -- a person in the media
21  would be a source for you?
22  A. Sure. Yeah, that's -- that's the bread and
23  butter of what we do, Howard.
24  Q. Okay. Well you don't recall who it is

Page 129

1  Q. Okay. Well, let me --
2  A. Nothing -- let me -- let me reit --
3  reiterate. Nothing that ever went out to the media
4  with regard to this case had not had prior approval
5  from the attorneys.
6  Q. So I take it by your answer that you don't
7  know whether that -- the statement that we're looking
8  at went out to the media or not.
9  A. Yeah, I don't -- I don't know. I don't
10  really recall.
11       (Pause.)
12       MR. COOPER: Okay. Can you bring this up
13  and we'll mark as the next exhibit in order?
14       MS. BELOSTOCK: Mm-hmm.
15       (Exhibit 12 marked for identification.)
16       BY MR. COOPER:
17  Q. I'm showing you what has now been marked as
18  Exhibit 12 --
19       MR. COOPER: That's right, Laurie?
20       MADAM COURT REPORTER: That's correct.
21       MR. COOPER: Thank you.
22  A. (Deponent viewing exhibit.) Okay.
23  Q. -- an e-mail from you to Mr. Shafran,
24  Mr. Friedmann and Mr. Chiocca dated July -- excuse me

Page 130

1  -- June 21, 2018, at 10:15 a.m.
2       MS. BELOSTOCK: That's the wrong one.
3       MR. COOPER: Sorry. Switching gears to
4  get the right one up on the screen.
5       MS. BELOSTOCK: Is it this one? No,
6  June 21, 10:15. Okay. Let's see. Sorry about that.
7  Let me see. Oh. Got it. Yup.
8       MR. COOPER: That's it.
9       MS. BELOSTOCK: I'll just share it.
10       BY MR. COOPER:
11  Q. I'm showing you what's been marked as
12  Exhibit 12, it's the June 21, 2018, 10:15 a.m. e-mail
13  that you sent to Mr. Shafran, Friedmann and Chiocca.
14       Can you confirm that you sent this?
15  A. (Deponent viewing exhibit.) Yes.
16  Q. And you write, So --
17       MR. WALZ: I object to this document and
18  questions about it as privileged.
19       BY MR. COOPER:
20  Q. You write, So far, so good.
21       Do you see that?
22  A. (Deponent viewing exhibit.) I do, yeah.
23  Q. And you attach some commentary, some
24  postings, correct?

Page 131

1  A. (Deponent viewing exhibit.) Mm-hmm.
2  Q. Right?
3  A. (Deponent viewing exhibit.) Ahh, that is
4  correct.
5  Q. And one of them says, "me thinks Ed Kimball
6  protests just a bit too much. What is he trying to
7  hide?
8       Do you see that?
9  A. (Deponent viewing exhibit.) I do.
10  Q. Does this refresh your recollection that you
11  sent the statement that we just looked at, out to the
12  media?
13  A. (Deponent viewing exhibit.) This has nothing
14  to do with the statement that went out to the media --
15  this is -- I'm not sure what this -- I don't recall
16  what this posting was -- was about at the time, but --
17  okay, trying to -- let's see, these people involved in
18  better, okay, yes, the Town might get, okay, no.
19  Yeah. I'm not sure how they coincide with each other,
20  but those were the -- that was what was out there on
21  social media, yes.
22  Q. And -- and you're telling us that you hadn't
23  sent a statement to the media?
24  A. I -- I don't know. I'm not telling you I

Page 132

1  hadn't sent it. I -- I don't recall doing that.
2  Q. I'm just -- the way this works is, I'm
3  showing you something, and I'm just asking you if it
4  refreshes your memory --
5  A. Yeah.
6  Q. -- as to whether that happened.
7       So that document doesn't refresh your memory?
8  A. No, it does not.
9       MR. COOPER: All right. Let's mark the
10  next one, which is June 21, 2018, at 9:53 a.m., which
11  is 22 minutes or so before the e-mail that we just
12  showed -- I just showed you as Exhibit 12.
13       THE DEPONENT: Okay.
14       MR. COOPER: And I apologize for marking
15  these out of order. It would've been easier for you
16  if I had marked this one first, but this will be
17  Exhibit 13.
18       (Exhibit 13 marked for identification.)
19       BY MR. COOPER:
20  Q. I'm showing you what's been marked as
21  Exhibit 13.
22       MR. COOPER: I need you to scroll it.
23       MS. BELOSTOCK: (Complied.)
24       MR. COOPER: Keep going.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 137

1   anyway, right?
2   A.  No, I don't recall who it is anyways.  But
3   the story was well tread in -- online and certainly,
4   you know, part of the conversations that a lot of
5   different people were having with regard to this case.
6   Q.  Okay.  Name some.
7   A.  I'm -- I'm -- I can't, but I -- but I --
8   Q.  Well, you just said a lot of different
9   people.
10  A.  Well --
11  Q.  I'm just asking you for --
12  A.  Anybody that --
13  Q.  -- just one name.
14  A.  Anybody that watched the debacle that was
15  that town hall meeting would certainly be willing --
16  be ready to talk about that.  But I'm just giving you
17  from what I heard.  I can't remember who exactly was
18  socializing that narrative at the time, but it was --
19  it was out there for sure.
20  Q.  But not in the mainstream media publications,
21  correct?
22  A.  Not printed, but, certainly, something that,
23  I'm sure if I was a journalist working on this case, I
24  would've absolutely unearthed that information.  I can

Page 138

1   ima --
2   Q.  And --
3   A.  Hold on.  I can imagine that my colleagues
4   would be doing the same.
5   Q.  Okay.  Well, I don't want you to imagine.
6   A.  I'm just --
7   Q.  I'm only interested in facts here.
8   A.  Okay.
9   Q.  Name for me a single mainstream reporter who
10  you were aware was working on a story about a sexual
11  relationship between Ms. Hall and Mr. Kimball as of
12  June 21, 2018.  Just give me a name.
13  A.  I'm not -- I can't confirm an individual
14  reporter to you, no.
15      MR. COOPER:  Okay.  Let's skip ahead to
16  July 6, 2018 --
17      THE DEPONENT:  Okay.
18      MR. COOPER:  -- and we'll put it up on
19  the screen.  This is an e-mail at 12:09 p.m.
20      MS. BELOSTOCK:  12:09 p.m.?
21      MR. COOPER:  12:09 p.m.
22      Do you have it?
23      MS. BELOSTOCK:  Yeah.
24      MR. COOPER:  Okay.

Page 139

1       (Exhibit 14 marked for identification.)
2       BY MR. COOPER:
3   Q.  Mr. Shafran writes to Mr. Chiocca, to you and
4   Mr. Friedmann and he says, "Gentlemen, Attached hereto
5   is the final report.  I have not read it all yet, but
6   it is most definitely good for Allan."
7       Do you see that?
8   A.  (Deponent viewing exhibit.)  I do.
9       MR. WALZ:  I'm going to --
10      BY MR. COOPER:
11  Q.  And then --
12      MR. WALZ:  -- object to any further
13  questioning about this document as privileged and to
14  the document as privileged.
15      BY MR. COOPER:
16  Q.  Then two paragraphs below he writes, "A
17  reminder, do not" -- and under the words don't are in
18  capital letters -- "share this report with anyone."
19      Do you see that?
20  A.  (Deponent viewing exhibit.)  I do.
21  Q.  And that was the instruction that Mr. Shafran
22  gave you and his client, Mr. Chiocca, or your mutual
23  client, Mr. Chiocca, that you were not to share the
24  report with anyone, right?

Page 140

1   A.  Right.  At the moment, yes.
2   Q.  And he told you that the report was
3   confidential, correct?
4   A.  At that moment, yes.
5   Q.  In fact, it said it on the report that it was
6   confidential, correct?
7   A.  Yes.
8   Q.  And you know that the report also said that
9   it could not be disseminated without the permission of
10  the board of selectpersons in the Town of Rockland,
11  correct?
12  A.  I don't recall that, no.
13  Q.  You -- you don't remember ever seeing that?
14  A.  I'm -- I'm saying I don't recall, no.
15  Q.  I -- I'm -- I just want to be clear, did you
16  ever physically see the report?
17  A.  I did, yes.
18  Q.  And is it your testimony that you don't
19  recall whether there was a logo on every page stating
20  that it could not be released without the permission
21  of the board of selectpersons of the Town of Rockland?
22  A.  Ult -- I -- I haven't viewed that report in
23  three years, Howard, so I don't know.  But I'm -- that
24  -- that -- if that's the case, then that's the case.

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com

Pages 137–140

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 149

1 says.
2  But you would agree with me that, in the
3 second paragraph, it talks about, quote, the
4 disturbing conspiracy of lies conducted by Hall and
5 Kimball to smear the reputation of Mr. Chiocca for
6 their own personal and political benefit, closed
7 quote.
8  Have I read that correctly?
9  A.  (Deponent viewing exhibit.) You have read
10 that correctly.
11  Q.  And you're telling me that Mr. Shafran wrote
12 that?
13  A.  I did not write that.
14  Q.  Do you know who did?
15  A.  I -- it must have been Mr. Shafran. It's his
16 quote.
17  Q.  And do you know whether the report, in fact,
18 lays out a disturbing conspiracy of lies conducted by
19 Hall and Kimball?
20  MR. WALZ:  Objection.
21  A.  Those are -- those are Adam Shafran's words,
22 not mine.
23  Q.  Okay. Let's go down to the fourth paragraph,
24 which purports to quote from the report about, quote,

Page 150

1 an intense physical and emotional affair between
2 herself and Kimball during the months of March and
3 April 2018, at which time Hall professed her love for
4 Kimball, and it goes on.
5  Do you see that?
6  A.  (Deponent viewing exhibit.) Yes.
7  Q.  And did you have any role in writing anything
8 in this paragraph?
9  A.  I did not.
10  Q.  And then, in the last paragraph above the
11 statement, it says, as a result, "Mr. Chiocca urges
12 the Board of Selectmen to make the full 25 [sic] page
13 investigative report public so that the residents of
14 Rockland are given all the facts regarding this case,"
15 and it goes on, but I'm going to stop there.
16  A.  (Deponent viewing exhibit.) Okay.
17  Q.  Have I read that correctly?
18  A.  (Deponent viewing exhibit.) Yes.
19  Q.  When you were talking to Mr. Shafran about
20 this statement and whether it should be released, did
21 he tell you that he recognized that the board of
22 selectmen had to vote to make the full 29-page report
23 public?
24  A.  I don't recall what that conversation was.

Page 151

1 Again, this was -- the only re -- memory I have of
2 that entire event was that Friedmann and Shafran had
3 concluded that Chiocca was not a party to that, and
4 that's why --
5  Q.  So --
6  A.  -- the statement was --
7  Q.  -- the --
8  A.  -- drafted by Shafran.
9  Q.  -- the reason that I'm asking, Mr. Sherman,
10 is, I want to know the timing of when they concluded
11 that and expressed it to you.
12  Because, here, Mr. Chiocca is -- Mr. Shafran
13 on behalf of Mr. Chiocca is urging the board to vote
14 to make the full 29-page investigative report public,
15 right?
16  A.  Yes.
17  Q.  And is it fair to say that it wasn't until
18 after that vote was taken and it was decided that the
19 report should remain private, the full report should
20 remain private, that that is when you were informed by
21 Mr. Shafran and Mr. Friedmann that they were going to
22 release it anyway?
23  A.  I don't rem -- recall the specific series of
24 events in the timeline there, Howard.

Page 152

1  Q.  Okay. Is it fair to say that they, at least,
2 wanted you to publish something urging the board to
3 take a vote to make the full report public?
4  A.  I think that was fair to say, given the
5 statement that we both just read.
6  MR. COOPER:  Now, I'm going to ask to
7 mark as the next exhibit in order, Exhibit 16 --
8  MADAM COURT REPORTER:  Seventeen.
9  MR. COOPER:  Seventeen, sorry.
10  -- Exhibit 17, a July 10, 2018, 3:46 p.m.
11 from you to Shafran, Friedmann and Chiocca.
12  (Exhibit 17 marked for identification.)
13  BY MR. COOPER:
14  Q.  And did you send that e-mail five minutes
15 after receiving -- excuse me -- five minutes after
16 sending the e-mail that we just looked at that is
17 Exhibit 16?
18  MR. WALZ:  I'll object to this document
19 as well as being privileged.
20  A.  (Deponent viewing exhibit.)  I -- if the --
21 if the timeline is -- is that, then -- then, yes.
22  Q.  And you write, "Just tweaked to identify Hall
23 and Kimball in first para."
24  Do you see that?

Page 245

1    MADAM COURT REPORTER: Excuse me. This
2 is the court reporter. I just want Ellen to know, the
3 last thing she just said, I could not hear it. I just
4 want to make you aware. I don't know if --
5    MS. ZUCKER: I -- you can keep going.
6    MADAM COURT REPORTER: Okay.
7    BY MR. WALZ:
8  Q. Okay. Mr. Sherman --
9  A. Yes.
10 Q. -- a couple other questions.
11    Ms. -- or Attorney Zucker had asked you a
12 little bit about your text messages and e-mails and
13 what you did to provide in those documents to -- to
14 produce those documents in this matter.
15    Do you recall that testimony?
16 A. I do.
17 Q. Have you deleted -- intentionally deleted any
18 e-mails or other messages about this case?
19 A. No.
20 Q. Okay. One last piece here is, earlier today,
21 Attorney Howard [sic] had asked you a number of
22 questions about releasing the report on or around
23 July 10th of 2018.
24    Do you recall those -- that testimony?

Page 246

1  A. I do.
2  Q. At the time that you -- that this e-mail was
3 sent on July 10th, is it your recollection that the
4 allegations of sexual assault or sexual harassment by
5 Ms. Hall were already in the mainstream media?
6  A. Yes.
7    MS. ZUCKER: Objection.
8    BY MR. WALZ:
9  Q. Is it also your recollection that, at least
10 in the social media that covered and was read in the
11 Town of Rockland, the affair between Ms. Hall and
12 Mr. Kimball, was it already widely spread?
13 A. Yes.
14    MR. COOPER: Objection.
15    BY MR. WALZ:
16 Q. So, to the extent that there's anything
17 private in the report, other than the affair or the
18 sexual harassment allegations, do you have any reason
19 to believe that any of that information had not
20 already been made public?
21    MR. COOPER: Objection.
22 A. I'm not sure. I -- I'm not sure I can answer
23 that, Eric. You know, can you repeat the question? I
24 mean, you know, were there any details in that report

Page 247

1 that hadn't been made public prior to that? I don't
2 know. I can't -- I can't answer that.
3    What I can say is that, given these public
4 meetings and hearings where allegations were thrown
5 back and forth by some of the parties involved and
6 others weighing in on it, it was a story that was
7 already galvanizing a community before we did
8 anything, or before we really sent out any statements
9 on -- on Adam Shafran's behalf.
10    The horse was already out of the barn and
11 people were talking about it. Everybody had a --
12 seemed, according to social media, if you recall those
13 back-and-forths with people, you know, they knew --
14 they know these folks, and they had their opinions and
15 they were willing to share them.
16 Q. All right. So it's your -- it is your
17 understanding that, at the time the report was
18 released, the affair was already out --
19    MR. COOPER: Objection.
20    BY MR. WALZ:
21 Q. -- amongst the people of Rockland?
22    MS. ZUCKER: Objection.
23 A. According to -- according to what I read on
24 social media, yeah --

Page 248

1  Q. Okay.
2  A. -- and what I saw at the public -- public
3 hearing video that I watched, yes.
4    MR. WALZ: Okay. I have no further
5 questions.
6    MR. COOPER: Mr. Sherman, subject to an
7 order from the Court --
8    MS. ZUCKER: Howard? Howard?
9    MR. COOPER: Go -- go ahead.
10    MS. ZUCKER: Let me follow up for a
11 second.
12
13    RECROSS EXAMINATION
14    BY MS. ZUCKER:
15 Q. You were just asked about what you knew was
16 out.
17    It's fair to say, Mr. Sherman, that you
18 didn't canvas every resident of Rockland --
19 A. No, you're --
20 Q. -- did you?
21 A. -- absolutely right, Ellen.
22 Q. And you didn't -- and so when you say
23 "everyone knew," that's a -- that's a -- that's a
24 phrase that we use -- and all of us, I'm not faulting

Page 249

1  you -- that we all use rather loosely.
2      You have no idea what the preponderance the
3  good citizens of Rockland had any awareness of, right?
4      A.  That is correct, yes.
5      Q.  So a minority -- it's going to be -- I mean,
6  do you know how many people were following those
7  threads on social media?
8      A.  Quite a bit.
9      Q.  It -- but it wasn't the majority of the Town,
10 was it?
11     A.  Well -- but I would say, you know, you split
12 that with the people that were focused on town meeting
13 and watching the conversations by elected officials
14 focusing on their personal lives.
15     Q.  But you -- you -- you know, don't you, from
16 all your years of engaging in -- in political matters,
17 that it is often a great minority of people who can
18 create, both positively and negatively, some noise
19 within any municipality or any political subdivision,
20 and many of the people won't know anything about it
21 until it shows up on the nightly news, right?
22         MR. WALZ:  Objection.
23     A.  I would say the majority of young people in
24 the United States don't know that --

Page 250

1      Q.  I'm not asking about --
2      A.  -- (inaudible).
3      Q.  -- young people.
4      A.  I'm just telling you.  It -- it's, you know
5  --
6      Q.  I'm not --
7      A.  -- basically --
8      Q.  Rockland's a little, small town.
9      A.  It's a -- it's a cultural question you just
10 asked me, Ellen.  So --
11     Q.  It's a data --
12     A.  -- small town, obviously -- go ahead.  Sorry.
13 I didn't want to interrupt you.
14     Q.  I'm sorry.  It's a data question.
15         You know --
16     A.  Okay.
17     Q.  You know, don't you, that the social media
18 sites you canvassed, and even the -- the meeting
19 cannot, does not, allow you to testify as to the
20 awareness of the --- of most of the members of the
21 Rockland community, let alone everyone, right?
22     A.  No, I cannot say that.  You're right.
23         MS. ZUCKER:  Okay.  Thank you.
24         MR. COOPER:  Let me just quickly follow

Page 251

1  that up, Mr. Sherman.
2
3             REDIRECT EXAMINATION
4  BY MR. COOPER:
5      Q.  The Patriot Ledger publishes way beyond the
6  Town of Rockland, doesn't it?
7      A.  Yes.
8      Q.  And the television stations who you sent the
9  report to in Boston, they publish throughout Eastern
10 Massachusetts, correct?
11     A.  Correct.
12     Q.  And that's true about the radio stations and
13 other media outlets that you sent it to, they all go
14 way beyond the Town of Rockland, right?
15     A.  That is correct.
16     Q.  And is it fair to say that the -- you do
17 recognize that the media efforts you made took
18 whatever was a local story, known by whatever
19 percentage of people in the Town of Rockland, and
20 broadcasted it by a multi -- to multiple -- to a much
21 broader community?
22         MR. WALZ:  Objection.
23     A.  I wouldn't say that, Howard.  What I can say
24 is, now, Ms. Hall was doing her very best to get her

Page 252

1  side of the story out there to the public.  So I think
2  a combination of -- of all of that.  Any time you
3  throw in the ingredients of what happened and occurred
4  at the Town of Rockland, it's a story that is already
5  sensational on its face.
6          So you have a lot of interested parties
7  already engaged in that story in one shape or -- one
8  way, shape or form.  All I was doing was providing
9  Mr. Shafran's statements, and under his guidance and
10 direction, information to the media, as deemed by the
11 attorneys.
12     Q.  Well, you know that Mr. Kimball wasn't
13 engaged in the media campaign, correct?
14         MR. WALZ:  Objection.
15     A.  Do I know?  I don't know that.  No, I don't.
16     Q.  You never saw one, correct?
17     A.  No.  No.  I never -- I never saw one.  But --
18     Q.  And to -- and to the --
19     A.  No.  Let me -- let me respond to that,
20 Howard, because you're absolutely right here, and
21 there is -- there is a distinction.  When the
22 conversation spilled over to the public forum at town
23 meeting, then it was for public consumption.
24     Q.  That's not my question.

Page 253

1 My question was, Mr. Kimball, to your
2 knowledge, was not releasing statements or making
3 statements to the media or using a PR firm to try to
4 create a narrative, correct?
5 A. I don't know that. I mean, to my knowledge
6 --
7 Q. I'm only asking -- but you were monitoring
8 this.
9 You never saw anything like that, did you?
10 A. I never saw a statement from Kimball, no.
11 Q. And Mr. Kimball was not someone who was
12 putting his affair with Ms. Hall in the public,
13 correct?
14 MR. WALZ: Objection.
15 A. Ahh, no, I don't -- I don't think that's
16 correct. I think the --
17 Q. Well, Ms. Hall wasn't putting her affair in
18 the public domain, correct?
19 MR. WALZ: Objection.
20 A. The town -- the town hall meeting brought
21 this out to the public.
22 Q. That's not my question.
23 A. Well, no, I'm answering your question.
24 Q. I don't think so.

Page 254

1 A. You -- you said "correct" and I'm saying no
2 and I'm explaining to you what --
3 Q. It was you and Mr. Shafran and Mr. Friedmann
4 and Mr. Chiocca who broadcast that affair well beyond
5 the borders of the Town of Rockland to whoever you
6 could get to pick it up and broadcast it or write
7 about it, correct?
8 MR. WALZ: Objection.
9 A. No. I -- I would say no. TV stations were
10 already monitoring the town meeting because of the
11 situation at hand, so they were doing that on their
12 own accord.
13 Q. There were TV stations broadcasting the town
14 meeting beyond the local cable.
15 Is that what you're saying?
16 A. Yeah, they were watching -- I believe it was
17 Fox -- Boston Fox was already on this story reporting
18 outside of town hall. It had nothing to do with
19 written communications. I wish we could --
20 Q. If they were outside of town hall, how -- how
21 were they broadcasting what was going on inside of
22 town hall?
23 A. It -- you know what a live shot is, right,
24 Howard?

Page 255

1 Q. Okay.
2 A. Okay.
3 MR. COOPER: Subject to further ruling of
4 the Court, I think that we will be done here for
5 today. Thank you.
6 THE DEPONENT: Thanks, everybody. Have a
7 great weekend.
8 MADAM COURT REPORTER: And please don't
9 hang up yet. This is Laurie Berg, the court reporter.
10 I just have to do the orders quick.
11 If the attorneys -- please let me know if you
12 want to order the same format that you received the
13 last time, if you need anything special like a rough
14 draft or you need it expedited sooner than ten
15 business days, please just let me know.
16 And I'll start with Attorney Belostock,
17 because I know Howard left.
18 THE DEPONENT: Court Reporter, I would
19 also like a copy of that sent to my e-mail, along with
20 a recording of this Zoom, please.
21 MS. ZUCKER: We didn't record the Zoom, I
22 don't think.
23 THE DEPONENT: We don't record -- why
24 don't we record the deposition? Did anybody ask?

Page 256

1 MS. ZUCKER: We don't -- we -- it's a
2 whole different process, and that wasn't done, so
3 you'll get -- you'll get the transcript.
4 THE DEPONENT: Okay. And what is the
5 timeline on that, Court Reporter?
6 MADAM COURT REPORTER: It's ten business
7 days.
8 THE DEPONENT: Okay.
9 MS. ZUCKER: And just off the -- we don't
10 need to do this on the record.
11 (Off the record at 3:50 p.m.)
12 (Discussion off the record.)
13 (Back on the record at 3:50 p.m.)
14 MS. BELOSTOCK: Laurie, was there
15 anything that you needed from our office? I couldn't
16 hear you before.
17 MADAM COURT REPORTER: Sorry. Sorry
18 about that.
19 What -- is the ten-day turnaround time okay
20 and do you need anything special like a rough? And
21 we'll just keep it the same format as before; is that
22 okay?
23 MS. BELOSTOCK: Yeah.
24 MADAM COURT REPORTER: Do you need -- is

## Finan, Jessica

| | |
|---|---|
| **From:** | casey sherman <pcaseysherman@gmail.com> |
| **Sent:** | Thursday, April 7, 2022 4:09 PM |
| **To:** | Cooper, Howard; to: Eric Walz; Robin Kallor; Cindy Cieslak; Dunn, Tara D.; Ellen J. Zucker; Jason Crotty; Michael Rose; Justin Amos; Samantha Halem; Friedmann, Jon; Neerja Sharma; Belostock, Lorraine; Sarah Ruter; pcaseysherman@gmail.com; Stern, Max D.; cc: Vicky Pilon; Adam Shafran |
| **Subject:** | Fwd: Social Media update |
| **Attachments:** | 20180604_141018.jpg |

---------- Forwarded message ---------
From: **casey sherman** <pcaseysherman@gmail.com>
Date: Mon, Jun 4, 2018 at 2:14 PM
Subject: Social Media update
To: Allan Chiocca <arc3535@msn.com>, Adam Shafran <ashafran@rflawyers.com>, Friedmann, Jon <jfriedmann@rflawyers.com>
Cc: Tom Cole <tcole@regancomm.com>, Ashley Boiardi <aboiardi@regancomm.com>


Hello all - We culled this from Howie Carr's Twitter feed. Looks like someone is trying to expose Hall's previous relationship as well.

-Casey



1



**Taxed 2 Death n Mass** @Taxed2Deth · Jun 1

Replying to @HowieCarrShow

Howie, stop by Rockland and we'll give you an exclusive on the shady ongoing crap in this cesspool! Ask the BOS chairman for his text messages between him and Deidre Hall and about his marriage counseling. She's toxic!

◯   ⟲ 2