# **EXHIBIT A**

**In the Matter of:**

*Allan Chiocca vs*

*Town of Rockland, et al.*

---

*Casey Sherman*

*April 08, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 13

1 communications should be returned or destroyed by
2 defendants' counsel.
3      Mr. Chiocca did not consent to the production
4 of any privileged or protected communications and does
5 not agree to waive privilege or any evidentiary
6 productions. Mr. Chiocca does not consent to
7 Mr. Sherman's testimony, to the extent that his
8 testimony would reveal attorney-client communications
9 or communications otherwise protected from discovery.
10     As Mr. Sherman said just a moment ago, he's
11 not represented today by counsel. Had he been, we
12 would be -- have been in discussions with that counsel
13 about protecting Mr. Chiocca's privileged
14 communications.
15     So, as it stands, we understand that defense
16 counsel is in possession of documents that we contend
17 are protected from the Federal Rules, and that they
18 are not able to introduce them or question Mr. Sherman
19 about them because of that privilege.
20     So, as we see and as I suggested yesterday,
21 there were two options: One is to suspend today's
22 deposition, which I understand will not be occurring,
23 with -- despite the privilege objections; or two, to
24 proceed with the understanding that I'm going to

Page 14

1 object to documents that we believe are privileged or
2 questions about communications or those documents that
3 we believe are privileged or would require the --
4 Mr. Sherman to reveal privileged communications.
5      Rather than objecting to every question or
6 document that we believe would reveal privileged
7 information, I would ask whether the parties would
8 agree that objections -- either I'm going to object
9 and say "objection; privileged" or that there will be
10 a standing objection that would cover any question
11 that is asked or any document that is int -- that is
12 presented to Mr. Sherman today, which, at a later
13 date, we could address with Judge Young if we believe
14 that there is a privilege concern that remains.
15     MR. COOPER: Well, on behalf of
16 Mr. Kimball, you can certainly have a standing
17 objection so that we don't clutter the record and we
18 get this done for Mr. Sherman's benefit, if nothing
19 else, as quickly as possible. Obviously, my client
20 and I completely disagree that there is any objection.
21 And I would just note very briefly that the request
22 for documents to Mr. Sherman has been outstanding
23 pursuant to a subpoena for months, and no action was
24 taken at all.

Page 15

1      So my suggestion -- and other counsel may
2 want to weigh in here, but after you do, I'd really
3 like to proceed.
4      MR. AMOS: Behalf of the Town, we have no
5 problem with the standing objection as to the
6 privilege.
7      MS. CIESLAK: On behalf of Ms. Hall's
8 defense, would there be any problem with Mr. Walz
9 identif -- like, when the document is introduced, just
10 saying "objection; privileged" and we can proceed, but
11 at least we know which documents he's going to claim
12 privilege to?
13     MR. WALZ: That -- so from my
14 perspective, that's up to, you know, Howard. If he's
15 -- wants me to object to those documents, fine. If --
16 I don't exactly know what the difference would be with
17 objecting to those documents versus questions about
18 those documents that I would consider to be revealing
19 privileged communications, too. So I think it still
20 could be a little bit confusing, but...
21     MR. COOPER: Okay.
22     MS. CIESLAK: I just want to know today
23 which -- to the extent documents are introduced, as it
24 relates to the documents, which documents you're

Page 16

1 claiming privilege to so we have a record of that. As
2 it relates to the questions, I don't mind the standing
3 objection on the questions, but I don't want to get
4 out of this deposition and you claim all the documents
5 are privileged because of your standing objection.
6      MR. COOPER: Eric, why don't you just say
7 "objection; privileged" to the documents that are of
8 concern to you.
9      MR. WALZ: Okay. So if -- I just want to
10 make sure that the record is clear. So I will object
11 -- I will say "objection; privilege" when we believe
12 that a document that is introduced is covered by the
13 attorney-client privilege and should not have been
14 produced. As to questions that Mr. -- that any
15 counsel asks today about communications with
16 Mr. Sherman between Mr. Chiocca or Rudolph Friedmann
17 or other counsel for him, those communications, there
18 will be a standing objection as to those --
19     MR. COOPER: Yes.
20     MR. WALZ: -- questions.
21     MR. COOPER: Does anyone contest that?
22     MS. ZUCKER: I have -- I think that that
23 is fine as a way of proceeding.
24     I do want to just put on the record that

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 17

1 there was a motion to quash this deposition, and that
2 motion was denied. And I don't want our good witness,
3 who is spending time away from his family, to
4 misunderstand that the Court has ordered this
5 deposition, and it's ordered it to go forward and it
6 hasn't put limitations on the questions, despite
7 Mr. Chiocca's counsel's efforts for them to quash the
8 thing entirely and despite the assertions of privilege
9 that were made in your motion.
10        And so I -- I find this a little bit unsavory
11 because we've done -- we've been around this Mulberry
12 bush, and these are decided issues in this case. The
13 result will be no different next time. And so I -- I
14 think we should proceed, but I don't want Mr. Regan or
15 Mr. Sherman to misunderstand the status at play, which
16 is that these issues were fully vetted from the Court,
17 not once but twice, also in terms of Mr. Shafran's
18 deposition and the documents requested from him. And
19 the Court looked at it, looked at the relationships,
20 looked at the arguments vigorously made, and made a
21 decision. So the case is clear on this and -- and I'd
22 like us just to proceed. Thanks.
23        MR. WALZ: Okay. Thank you, everybody.
24

Page 18

1        BY MR. COOPER:
2    Q. Good morning, again, Mr. Sherman.
3    A. Good morning.
4    Q. Would you just tell the jury, please, your
5 full name and where you live?
6    A. Paul Casey Sherman. I live in Marshfield,
7 Massachusetts.
8    Q. And, Mr. Sherman, are you willing to state
9 your street address, in case we need to subpoena you
10 for trial?
11   A. Sure. 3 Proprietors Drive, Unit 7,
12 Marshfield, Mass., 02050.
13   Q. Thank you.
14        Have you ever had your deposition taken
15 before?
16   A. No.
17   Q. So let me just give you some very neutral,
18 basic ground rules. First, if you need a break, this
19 is not meant to be an inquisition, you tell us and
20 we'll take a break.
21   A. Okay.
22   Q. Generally speaking, if there's a question
23 pending, I may ask you to answer it before we take a
24 break, but other than that, we want to accommodate

Page 19

1 you.
2    A. (Deponent nods head.)
3    Q. Secondly is, Laurie Berg, the reporter,
4 mentioned before we went on the record, it's very
5 difficult for her to take things down if you and I are
6 talking at the same time. It's natural, just in the
7 normal back-and-forth between people, to inadvertently
8 interrupt each other. I don't mean anything by it.
9 But let's just try to do our best to wait to until
10 each one of us is finished before we go on.
11   A. Certainly.
12   Q. And then, lastly, while I try, sometimes my
13 questions are not comprehensible for one reason or
14 other. So if you don't understand something, I invite
15 you to let me know and I'll try to rephrase it,
16 otherwise, I'm going to assume that you've understood
17 what I asked. Okay?
18   A. Okay.
19   Q. Mr. Sherman, could you tell us, please, just
20 briefly, your educational background? And let's take
21 it post-high school.
22   A. Okay. Graduated from Boston University
23 in 1993 with a degree in journalism.
24   Q. And after graduating from Boston University

Page 20

1 with a degree in journalism, did you have any other
2 formal education?
3    A. No.
4    Q. And, by that, I take it you must have gone to
5 work?
6    A. I did, yes.
7    Q. Tell us, please, your post-college
8 professional background.
9    A. I've spent 25 years as a professional
10 journalist in Boston and for national publications,
11 and I also work as the Director of Crisis
12 Communications as an SVP for Regan Communications
13 located in Boston.
14   Q. Before we get to your association with Regan
15 Communications, could you tell us, please, some of the
16 media outlets that you've worked with, since you
17 graduated from college?
18   A. Sure. From 1995 to 2007, I worked at CBS
19 Boston, WBZ television, as a news producer for the six
20 o'clock news. I also write and am a contributing
21 writer for Boston Magazine. I had a weekly featured
22 column for the Boston Herald. I've written pieces for
23 Time Magazine, Esquire, the Washington Post,
24 et cetera.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

**Page 21**

1    Q.  And when you say that you've "written pieces
2 for," does that mean you were freelancing and you
3 submitted material?
4    A.  Yeah.  Howard, I've also written 15 books and
5 am pretty well-known in that space, so my background
6 is really crime writing and working as a investigative
7 journalist.  So, oftentimes, I've been asked to write
8 op-eds based on some of the investigations that I've
9 been involved in.
10    Q.  And the crime writing that you do, is it
11 fiction or nonfiction?
12    A.  Nonfiction.
13    Q.  And do you have a -- a business name that you
14 use or -- or an entity that you use to do that work?
15    A.  No.  It's just a sole proprietor, Casey
16 Sherman.
17    Q.  And are you currently working on another
18 crime-related book?
19    A.  I am.
20    Q.  Anything to do with this case?
21    A.  Not at all.
22    Q.  Now, Mr. Sherman, you mentioned that you also
23 had been employed, post-college, at Regan
24 Communications.

---

**Page 22**

1        And would you tell us, again, please, your
2 title at Regan Communications?
3    A.  Yes.  My title is Director of Crisis
4 Communications and Senior Vice President at Regan
5 Communications.
6    Q.  Is that a full-time job?
7    A.  Yes, it is.
8    Q.  And for how long have you been with Regan
9 Communications?
10    A.  I've been with Regan Communications for
11 about 11 years.
12    Q.  And fair to say that you were with Regan
13 Communications in 2018 through the present?
14    A.  Correct.
15    Q.  And what are your job responsibilities as the
16 Director of Crisis Communications?
17    A.  Some of the job responsibilities are working
18 with the client with regard to media relations, making
19 sure that the client's, you know, side of the story
20 that they may be involved in is presented to media
21 outlets that are covering the case.
22    Q.  And how often do you work with attorneys in
23 that role?
24    A.  Quite often, especially when it comes to --

---

**Page 23**

1 to crisis.
2    Q.  Before I go on, could you tell us, please,
3 what e-mail addresses you used beginning in January 1,
4 2018, through the present for business-related
5 matters?
6    A.  E-mail would be the Regan e-mail, which is
7 csherman@regancomm.com, and my personal e-mail, which
8 is pkcsherman@gmail.com.
9    Q.  And is there any rule of thumb as to which of
10 those e-mails you would use in connection with a
11 particular matter?
12    A.  No.
13    Q.  Did you use both of those e-mail addresses in
14 connection with your work for the Rudolph Friedmann
15 firm?
16    A.  Yes.
17    Q.  In producing documents to us, did you search
18 both of those e-mail addresses?
19    A.  I did.
20    Q.  Could you tell us, please, what cell phone
21 numbers you have had, going back to January 1, 2018,
22 through the present, that you've used for business?
23    A.  781-588-8816.
24    Q.  And I take it -- do you use that as well for

---

**Page 24**

1 personal calls?
2    A.  Mm-hmm.
3    Q.  In other words, you have only one cell phone?
4    A.  Yes.
5    Q.  Is that a Regan Communications-supplied cell
6 phone?
7    A.  No.  That is a personal cell phone.
8    Q.  And so that's the cell phone you would've
9 used to communicate with anybody about this -- the
10 matter that brings us here today?
11    A.  Yes.  And let me stipulate that I do have a
12 Regan cell phone.  It's an Apple phone.  I don't use
13 it.  I'm not an Apple user.  It's more frustrating for
14 me to use an Apple phone, so I do all communications
15 through my personal phone, which is a Samsung.
16    Q.  I take it from your testimony, thus far, that
17 you don't have any legal training; is that fair?
18    A.  That is fair.
19    Q.  And just so that it's clear, you've never
20 acted as a paralegal at a law firm, for example?
21    A.  No.
22    Q.  The -- well, let me ask, when did you first
23 do work for the Rudolph Friedmann law firm?
24    A.  You know, I don't really have the dates, but

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 25

1 I think we've done maybe one or two projects with
2 Rudolph prior to the Chiocca case.
3   Q.  And which lawyers did you work with at
4 Rudolph Friedmann prior to the Chiocca case?
5   A.  I worked with both Adam Shafran and Jon
6 Friedmann.
7   Q.  And in the role that you performed, were you
8 working independently, or was that a Regan
9 Communications engagement?
10   A.  Always a Regan Communications --
11   Q.  And --
12   A.  -- project.
13   Q.  I'm sorry, Casey.  Go ahead.
14   A.  It's all right.  I was going to say, always
15 -- they've been always Regan Communications projects
16 with Rudolph Friedmann.
17   Q.  Including this one for Mr. Chiocca, correct?
18   A.  Correct.
19   Q.  Now, when you have a new matter at Regan
20 Communications for a client, is there a process for
21 opening up the matter, formally, within the firm?
22   A.  The process is, we would sit down with the
23 attorneys and the clients, whom the attorneys
24 represent, get an understanding of what their

---

Page 26

1 challenges are and how we could potentially help them
2 with those challenges.
3   Q.  I meant more, I guess, of the documentation
4 process.
5       So, for example, would there be an engagement
6 letter that is created?
7   A.  There is -- yes, there -- and because Rudolph
8 Friedmann has had a long-standing relationship with
9 Regan Communications, it was merely, I believe, a
10 contract.  And I don't deal with contracts.  That's
11 somebody else in the company.
12   Q.  Well, you've anticipated my next question,
13 which is, do you know whether there was a contract
14 signed for the Regan Communications engagement with
15 respect to Mr. Chiocca?
16   A.  I believe there was, and I produced a scope
17 of work on what that would look like.  And so there
18 must have been a contract signed at -- at that time.
19   Q.  Okay.  Now --
20   A.  I did not sign it myself, no.
21   Q.  In response to the subpoena that we sent you,
22 you understand that you haven't produced that contract
23 or scope of work to us, correct?
24   A.  It -- I did produce it yesterday, Howard.

---

Page 27

1 You have that scope of work.  It was -- it was an
2 e-mail exchange.  It was not a formal documentation.
3 Because of, again, the long-standing relationship
4 between Friedmann and Regan, it was more informal, I
5 would say, than the, you know, way we normally go
6 about putting contracts together for clients.
7   Q.  Fair enough.  We'll take a look.  I may have
8 misunderstood how you used the term "scope of work."
9       But can we agree that you didn't produce the
10 contract?
11   A.  I've never seen the contract, so it's never
12 come across my -- it's not in my wheelhouse.  And I
13 don't even know if there was a contract ever signed,
14 to be quite honest.
15       MR. REGAN:  There is no contract.
16       THE DEPONENT:  There's no contract,
17 George?  I'm sorry.
18       MR. COOPER:  George, I appreciate your
19 wanting to be helpful here.
20       BY MR. COOPER:
21   Q.  But let me just ask, if there was a contract,
22 you're telling us it would reside at -- reside at
23 Regan Communications and not with you?
24   A.  That's correct, if there was.  And as I said,

---

Page 28

1 I have no idea whether or not that was a formal
2 contract or a, you know, handshake agreement, so to
3 speak.
4   Q.  Prior to being engaged by the Rudolph
5 Friedmann firm, in connection with the Chiocca matter,
6 did you have any type of nonbusiness relationship with
7 any of the lawyers at that firm?
8   A.  No.
9   Q.  No socializing or anything like that?
10   A.  No.
11   Q.  Same question with regard to Mr. Chiocca, did
12 you know him before the engagement with the Rudolph
13 Friedmann firm?
14   A.  I did not.  I did live in the Town of
15 Rockland between 1998 and 2003, but I don't know any
16 of the parties involved in this case, or I have never
17 met them prior to --
18   Q.  Did you know --
19   A.  -- that.
20   Q.  Did you know anybody at town hall?
21   A.  No.
22   Q.  Did you know anybody in the municipal
23 government of Rockland?
24   A.  I did not.

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 29

1    Q.  Now, why don't you tell us, please, how the
2  matter involving Mr. Chiocca was brought to your
3  attention.
4    A.  And, again, this -- from what I can recall,
5  Howard, is that Rudolph Friedmann contacted Regan
6  Communications, then we -- I was alerted to the case
7  itself via George Regan, and we set up a meeting at
8  the offices of Rudolph Friedmann with Jon Friedmann,
9  Adam Shafran and their client, Allan Chiocca.
10   Q.  Let's just unpack that a little bit.
11   A.  Sure.
12   Q.  It sounds like the first you heard of this
13  was when you got a call from George Regan; is that
14  fair?
15   A.  Yes.
16   Q.  And he would've reached out to you because
17  this was within your role as the leader of the crisis
18  communications team; is that fair?
19   A.  Correct.  And I think it's also fair to say
20  that, you know, we had done work for the law firm in
21  the past, so I had some institutional knowledge of --
22  of the firm, but certainly didn't know anything about
23  this case.
24   Q.  And did Mr. Regan reach out to you by phone

Page 30

1  or e-mail or text, can you recall?
2    A.  I can't.  -- honestly, I can't recall.
3  Probably by phone.
4    Q.  And what is your best memory, Mr. Sherman, of
5  what Mr. Regan said to you and you said to him?
6    A.  Very brief, from what I recall.  It was,
7  we've got another project for Jim Rudolph and his law
8  firm, and we're setting up a -- a meeting.  And that's
9  -- I don't think George had any more information than
10  that, and we proceeded from there.
11   Q.  Do you have any way of knowing whether it was
12  a weekday or a weekend that you got that call?
13   A.  I would imagine it would be a weekday, but I
14  don't -- I can't recall.
15   Q.  Are -- you'd be guessing?
16   A.  I'd be guessing there, yeah.
17   Q.  If at any time, my question causes you to
18  guess at an answer, you're welcome to say that,
19  because it's important that you answer based upon a
20  memory rather than speculation.
21   A.  I -- understood.
22   Q.  Is the next event that happened after the
23  call from Mr. Regan the meeting that you just
24  testified to?

Page 31

1    A.  Yes.
2    Q.  And do you have a memory as to the date that
3  that meeting took place?
4    A.  I do not.
5    Q.  Do you recall whether it was a weekend or a
6  weekday?
7    A.  I believe it was a weekday.
8    Q.  And I think you said it took place at the
9  Rudolph Friedmann firm?
10   A.  That is correct, yes.
11   Q.  And was there any anyone from Regan
12  Communications at that meeting other than you?
13   A.  Yes, George Regan.
14   Q.  What about Tom Cole or Ashley Boiardi?
15   A.  I believe Tom Cole could've been there, from
16  -- from what I remember.  But, again, I know that
17  George was there.  But, again, this would be vague
18  speculation on my point, Howard.  I'm not sure.
19   Q.  And Mr. Chiocca was there?
20   A.  Correct.
21   Q.  And what other individuals from Rudolph
22  Friedmann were there?
23   A.  Adam Shafran and Jon Friedmann.
24   Q.  And how long, to your recollection, did the

Page 32

1  meeting last?
2    A.  To my recollection, I would say about a -- a
3  little over an hour.
4    Q.  Did you take notes?
5    A.  I did not.  At the time, I was just there to
6  listen and observe what was being said.
7    Q.  Is this the first time you'd ever met
8  Mr. Chiocca?
9    A.  Yes.
10   Q.  Was it the first time that you'd ever spoken
11  to him?
12   A.  Yes.
13   Q.  Prior to the meeting, had you had any
14  communications with any of his lawyers at Rudolph
15  Friedmann?
16   A.  Prior to the meeting, I don't believe so.
17       MR. COOPER:  I'm going to mark as the
18  first exhibit -- and we'll put it up on the screen so
19  you can see it, but it is your June 1, 2018, e-mail to
20  a number of people at 12:04 p.m.
21       THE DEPONENT:  Okay.
22       (Exhibit 1 marked for identification.)
23  BY MR. COOPER:
24   Q.  And, Mr. Sherman, I don't know whether you

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 33

1 have hard copies in front of you, but if you do, and
2 it's easier for you to look at that one document --
3    A.  Mm-hmm.
4    Q.  -- you're welcome to do so, or look on the
5 screen.
6    A.  (Deponent viewing exhibit.)  Okay.  I'm
7 looking at that.
8          MR. WALZ:  I'll object to this document
9 as privileged.
10          BY MR. COOPER:
11    Q.  Now, Mr. Sherman, this is an e-mail that you
12 produced to us --
13    A.  Mm-hmm.
14    Q.  -- within the last 48 hours, correct?
15    A.  (Deponent viewing exhibit.)  Correct.
16    Q.  And just so it's clear for the jury and
17 there's no confusion, the top part of this e-mail
18 represents you forwarding this to the lawyers involved
19 in this case yesterday, April 7th, correct?
20    A.  (Deponent viewing exhibit.)  Correct.
21    Q.  And none of that is part of the original
22 e-mail, correct?
23    A.  (Deponent viewing exhibit.)  What -- I'm
24 unsure what you're asking, Howard.

Page 34

1    Q.  Yeah, I just want to make is clear for the
2 jury --
3    A.  Oh.
4    Q.  -- that what we -- what transpired yesterday
5 is not part of what happened in 2018.
6    A.  Understood.  Yes.
7    Q.  And all of the documents that we're going to
8 look at this morning are going to have the same
9 communication line of your production, either Thursday
10 or Wednesday, and that's because you forwarded these
11 e-mails to us, correct?
12    A.  Correct.
13    Q.  All right.  So let's take a look at the
14 June 1, 2018, 12:04 p.m. e-mail.  And I'm just going
15 to read it for the record.  It says, good afternoon
16 guys -- I worked with you both on the Allied Waste
17 settlement so it's good to work with you again.
18 Please send me those witness statements so that I can
19 begin to formulate a strategy here.  I will draft a
20 statement on behalf of Allan for your review today.
21          Have I read that correctly?
22    A.  (Deponent viewing exhibit.)  You have.
23    Q.  Now, does this refresh -- refresh your
24 recollection as to the date of the meeting that you

Page 35

1 described?
2    A.  It must have been the morning of -- it was
3 either the morning of Friday, June 1st, or potentially
4 the last day of May.  I'm -- yeah, I'm honestly not
5 sure.
6    Q.  So the meeting had already taken place after
7 -- excuse me, strike that.
8          The meeting had already taken place before
9 you sent this e-mail?
10    A.  I believe so.  I really can't recall, but I
11 believe so.
12    Q.  In that case, could you tell us, please, what
13 you recall anyone said during the meeting at Rudolph
14 Friedmann?
15    A.  I can speak to my conversation with Allan
16 Chiocca.  He was someone who came in and relayed this
17 incident that he was involved with at town hall in
18 Rockland.
19          He said -- and he used these words, that he
20 had been pressured into a compromising situation.
21 "Pressured" is -- is the word he used.  I'm -- I'm --
22 I'm not saying he used "compromised situation," but
23 the word "pressured," I remember him using.  That he
24 was pressured into performing sexual acts with

Page 36

1 Ms. Hall on town property, and he was very agitated.
2          And, you know, I have done a lot of crime
3 writing in 20 years and I've interviewed a lot of
4 victims of -- of abuse and sexual harassment.  And,
5 you know, the tone and tenor of his voice and what he
6 relayed to me, from what I can recall, was consistent
7 with some of the other people that I'd spoken to in my
8 career.
9    Q.  Well, you've never spoken to Ms. Hall, have
10 you?
11    A.  I have not.
12    Q.  Have you ever been in the same room as her?
13    A.  I have not.
14    Q.  And when you do crime writing, you generally
15 try to interview everybody you can, before you make a
16 judgment about who the victim is, correct?
17    A.  Yes, I do.
18    Q.  Okay.  So, when you arrived at the meeting,
19 was Mr. Chiocca already there with his lawyers?
20    A.  Yes.
21    Q.  Do you know how much time they had spent
22 preparing for your meeting before Mr. Chiocca said
23 anything to you?
24    A.  I have no idea.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

**Page 37**

1   Q.   Okay.  But Mr. Chiocca appeared agitated.
2        Is that what you're saying?
3   A.   From what I call recall, yes.  That was the
4   -- I would say, you know, the -- the mood or the, you
5   know, behavior he was projecting at the time.
6   Q.   Did he tell you, during the first meeting,
7   how many drinks he had poured for Ms. Hall during the
8   events in question?
9   A.   How many drinks he had poured for Ms. Hall?
10  I don't remember him providing that information, no.
11  Q.   Or did he tell you how many drinks Ms. Hall
12  had had?
13  A.   He said that they had both been out drinking,
14  from what I remember of the conversation, but there
15  wasn't any specifics.
16  Q.   So he didn't tell you that she'd had five
17  drinks?
18  A.   I don't -- I don't recall that, Howard.
19  Q.   What else, if anything, do you recall him
20  saying?
21  A.   I do recall him saying that, you know, she
22  was technically his boss, and that he felt -- and
23  again, I'm paraphrasing here, so I don't remember the
24  exact language he used, but "pressured."  And I

---

**Page 38**

1   remember the potential use of the word "violated."  He
2   also felt deep regret in -- in terms of being, you
3   know, put into that situation.
4   Q.   Anything else that you can recall?
5   A.   That -- that's about the crux of it, quite
6   frankly.  I haven't -- I really can't recall, you
7   know, the details of that -- of that conversation.
8   But, you know, from what I gathered, you know, with
9   regard to that, you know, here's somebody that felt
10  like he was, again, pressured into a situation that
11  was -- that he was powerless to stop.
12  Q.   And what did any of the lawyers from Rudolph
13  Friedmann say?
14  A.   They -- from what I recall, and I don't -- I
15  can't -- I don't remember the conversations verbatim,
16  Howard.  But, you know, they felt, as -- as did Allan,
17  that he had been, you know, violated, and then --
18  Q.   Do you know whether anybody had done any
19  independent investigation as of that point?
20  A.   I don't know if anybody had done any ind --
21  independent investigation at that point, no.
22  Q.   Did you do any investigation?
23  A.   Not at -- not at -- at that point.  I was
24  listening to Allan's story and -- like we do for all

---

**Page 39**

1   clients, and going -- from starting at that point.  So
2   this is -- or -- hold on.  This is before the Regina
3   Ryan report that obviously, you know, corroborated
4   Allan Chiocca's details of that event.
5   Q.   We'll get to that.
6   A.   Okay.
7   Q.   I'm simply asking, so in your position, is it
8   fair to say that it's your job to listen to your
9   clients' concern and then try to help them?
10  A.   That is fair to say.
11  Q.   Okay.  And that's what you did with
12  Mr. Chiocca?
13  A.   Correct.
14       MR. WALZ:  Objection.
15       BY MR. COOPER:
16  Q.   It's not your job to be a neutral arbiter and
17  go interview everybody and make a judgment?
18  A.   That is not my job.
19  Q.   Your job is to engage in media relations as
20  an advocate for your client, correct?
21       MR. WALZ:  Objection.
22  A.   That -- that is correct.
23  Q.   Now, one of the things that you were tasked
24  with doing was to formulate a strategy, correct?

---

**Page 40**

1   A.   Correct.
2   Q.   And if we look at Exhibit 1 in the first
3   paragraph of your e-mail, it says, "Please send me
4   those witness statements so that I can begin to
5   formulate a strategy here."
6        Do you see that?
7   A.   (Deponent viewing exhibit.) I do, yeah.
8   Q.   What witness statements were you referring
9   to?
10  A.   That, I do not recall.  I do remember that
11  they believed they had some eyewitnesses to the event.
12  And I think -- and I'm going back in time here,
13  Howard, so give me a moment, okay?
14       I think there were mentioned in that
15  conversation that there was a waitress or a bartender
16  at the restaurant that Ms. Hall and Mr. Chiocca were,
17  you know, drinking at beforehand.  So I think that was
18  -- I know that was one.  I don't -- I can't recall who
19  else they may have come up with during that
20  conversation.
21  Q.   Did you ever get any witness statements --
22  A.   I did not.
23  Q.   -- from Rudolph Friedmann -- I just have to
24  finish --

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 41

1    A.  Okay.

2    Q.  -- Mr. Sherman.

3        Did you ever get any witness statements from
4 Rudolph Friedmann, to your memory?

5    A.  I don't believe I ever did.

6    Q.  Okay.  So is it fair to say that you, then,
7 began to formulate your strategy for Mr. Chiocca?

8    A.  Yes.

9    Q.  And you did so based simply on what he had
10 told you, correct?

11   A.  Yes.

12   Q.  And can you tell me, please, what role Tom
13 Cole was playing in all of this?

14   A.  Tom Cole was the business facilitator between
15 Regan and the client.

16   Q.  And what is the -- role of a business --

17   A.  That --

18   Q.  -- facilitator?

19   A.  -- that would be the person who signs off on
20 the, you know, informal agreement between the agency
21 and the law firm.

22   Q.  And what about the role of Ashley Boiardi, if
23 I'm saying her name correctly?

24   A.  Ashley Boiardi is George Regan's Chief of

---

Page 42

1 Staff and just -- at that time, she was keeping
2 George's schedule.

3    Q.  So were they involved at all, either of those
4 individuals, in formulating the narrative you were
5 creating?

6    A.  They were not.  They were just being a --
7 kept up to speed on -- on the work product on behalf
8 of the client.

9    Q.  And was Mr. Regan involved at all in
10 formulating the narrative on behalf of Mr. Chiocca?

11   A.  George Regan was at the original meeting, and
12 you know, we both came out of that meeting, you know,
13 with the consensus that, you know, this person -- and,
14 again, I'm going to give you a little background here.
15 You know, this was at the height of the Me Too
16 movement, and this was really somebody that was coming
17 out as a -- as a male who had been allegedly harassed
18 by a female.  And the fact that, you know, even these
19 allegations weren't being taken seriously at the time,
20 was, to us, a major problem with -- with the media,
21 quite frankly.

22   Q.  How do you know the allegations weren't being
23 taken seriously at the time?

24   A.  Because this -- this story should've been on

---

Page 43

1 the front page of the Boston Globe, Howard.  It
2 should've been -- it should've been taken much more
3 seriously than it was.  If Allan were female, and
4 Deirdre were male, and the roles were re -- were
5 reversed, you would've seen an outcry of media support
6 on behalf of Chiocca.

7    Q.  And you felt somehow that was unfair?

8    A.  I did, yeah.

9    Q.  Okay.  And that was just your personal bias?

10   A.  Well, I wouldn't call it "bias."  It's --
11 it's an observation working 25 years in journalism.

12   Q.  Now, were you aware that there was an
13 internal investigation going on at the time?

14   A.  I was.

15   Q.  And you felt that it -- things needed to be
16 in the media, even though there was an internal
17 investigation going on?

18   A.  I didn't feel that.  The attorneys felt that,
19 which is why they hired Regan Communications.

20   Q.  The attorneys wanted it in the media?

21       MR. WALZ:  Objection.

22   A.  Correct.  The -- the attorneys, which is why
23 we were hired, the attorneys wanted Allan's side of
24 the story to be presented to the media.  Because I do

---

Page 44

1 believe that the media had already been reporting on
2 the story, at least on a hyperlocal level.

3    Q.  And they wanted it to go beyond the
4 hyperlocal level?

5       MR. WALZ:  Objection.

6    A.  No, they wanted Allan's version of events to
7 be articulated in the media, as well as any other
8 parties involved in this case.

9    Q.  Okay.  And just so it's clear, after the
10 initial meeting, which you think may have been either
11 on the last day of May or the first day of June, you
12 set out to create a narrative for Mr. Chiocca,
13 correct?

14   A.  Based on Mr. Chiocca's narrative that he
15 provided to Regan Communications at that meeting,
16 yeah.

17   Q.  Okay.  But it was your job to create a
18 narrative to present to the media?

19   A.  It was my job to -- I don't want to use the
20 word "create," the narrative was already there.  It
21 was my job to present Allan Chiocca's narrative to the
22 media, not create.

23   Q.  Let's make sure that we use our words
24 precisely.

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 45

1   A.  Sure.

2   Q.  It was your job to get that narrative out to
3   the media?

4   A.  Correct.

5   Q.  And is it your testimony that you weren't the
6   one creating the narrative in any way?

7   A.  Was I -- I was -- that question's
8   interesting, because the narrative had been presented
9   to us by the alleged victim in this case, Allan
10  Chiocca.  So that narrative had already been supplied
11  to Regan Communications.

12       What we did at that time was make sure that
13  we were representing the attorneys and making sure
14  that their statements on behalf of their client were
15  presented to the media.  And that's really kind of the
16  work that we did, making sure that when Mr. Shafran
17  had a statement to provide to the media, that he -- we
18  were the gateway to get that to the media outlets that
19  were covering the case.

20  Q.  Well, let me just say, would you agree that
21  you -- and by "you," I mean Regan Communications and
22  you, personally -- were the ones who developed and
23  came up with the approach to the media?

24  A.  I wouldn't -- I would -- I would not say

---

Page 46

1   that's the case.

2   Q.  Okay.  Were you the ones who determined
3   certain words to be used?

4   A.  There was recommendation about certain words
5   to be used, I -- I -- I -- from what I recall, yeah.

6   Q.  Were you the ones who determined what
7   specific matters to focus on?

8   A.  I wouldn't say we were the ones to determine.
9   I think that was a collective conversation between
10  Regan Communications, Allan Chiocca and his
11  representatives at Rudolph Friedmann.

12  Q.  Were you the ones who introduced the strategy
13  so that it could be discussed and approved in terms of
14  what --

15       Let me just finish.

16  A.  Yeah.

17  Q.  -- what topics to focus on?

18  A.  We didn't -- I -- that was a -- again, that
19  was a -- that was a collective dialogue.

20       But I will say that, you know, the most
21  important thing, again, the guidance that we provided
22  the -- the client, which they had basically provided
23  us, and we just said the -- you know, the biggest
24  issue here is -- is the sexual harassment issue.  And

---

Page 47

1   we understood the editorial climate of the time
2   focused on allegations of powerful people or people in
3   positions of power taking advantage of those positions
4   against their subordinates.  And Allan's narrative fit
5   that theme.

6   Q.  Did you investigate at all who was actually
7   in a position of power between Deirdre Hall and
8   Mr. Chiocca?

9   A.  Just based on their po -- just based on their
10  titles.

11  Q.  Okay.  So not on -- not in this terms of the
12  practical day-to-day reality?

13  A.  Not in term -- no.  No.  That's not my job.

14  Q.  Understood.  Did you make a recommendation at
15  any point in time that the media narrative focus on
16  the relationship between Ed Kimball and Ms. Hall?

17  A.  That was a collective conversation.  I didn't
18  know who Ed Kimball even was until there were
19  discussions, not only in -- you know, most of those
20  discussions were in a public forum at these town hall
21  hearings that I was able to observe on the links
22  afterwards.  So, knowing that that was a -- a theme to
23  this case, I wanted to make sure that, you know, the
24  media was well versed in, you know, everything that

---

Page 48

1   was going on behind the scenes in the Town of
2   Rockland.

3   Q.  Okay.  Well, you started that answer by
4   saying "there was a collective," and you either said
5   "discussion" or "decision" --

6   A.  Yeah, there was a collective discussion with
7   --

8   Q.  I'm sorry.  I have to finish the question.

9   A.  Yeah, go ahead.  I'm sorry.

10  Q.  It's -- you started your answer by saying
11  there was a collective discussion about focusing the
12  media narrative on the relationship between
13  Mr. Kimball and Ms. Hall.

14       Who participated in that collective
15  discussion?

16  A.  That would be Mr. Chiocca and his attorneys.

17  Q.  Mr. Friedmann and Mr. --

18  A.  Howard, let me --

19  Q.  -- Shafran?

20  A.  How -- how -- yes.  Howard, let me reiterate,
21  because you say -- you keep using the word "focus."
22  That is -- that word was really kind of never used, at
23  least to my recollection.  It was making sure the
24  entire story was being shared, and not just pockets of

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 49

1  that story.

2  **Q.  All right.  Well, we'll take a look at the**

3  **words that were actually used.**

4  A.  Okay.  I'm just giving you my recollection of

5  that, Howard, so I want to make sure that that's --

6  **Q.  Understood.  Is it fair to say that you were**

7  **in regular e-mail communication with the lawyers at**

8  **Rudolph Friedmann and Mr. Chiocca during the month of**

9  **June of 2018?**

10        MR. WALZ:  Objection.

11  A.  The -- yeah, that's accurate.

12  **Q.  And your title is Head of Crisis**

13  **Communications.**

14        **So, I take it the consensus was, this was a**

15  **crisis?**

16        MR. WALZ:  Objection.

17  A.  Well, this was -- you know, we would --

18  again, I think that you're asking, we work with a lot

19  of attorneys and, yeah, I would say that this -- this

20  was a -- you know, as far as Allan Chiocca was

21  concerned, it was certainly a crisis in his life.

22        MR. COOPER:  Now, let's put up and mark

23  as the next exhibit in order, your June 3rd, 2018,

24  e-mail at 1:06 p.m.

Page 50

1        (Exhibit 2 marked for identification.)

2        MR. WALZ:  We'll object to this document

3  as privileged and questions about it as privileged.

4        BY MR. COOPER:

5  **Q.  Mr. Sherman, do you have Exhibit 2 in front**

6  **of you?**

7  A.  (Deponent viewing exhibit.)  I do, yeah.

8  **Q.  Okay.  And you sent this e-mail to Rudolph**

9  **Friedmann and your colleagues at Regan Communications**

10  **on the date and time that it bears, correct?**

11  A.  (Deponent viewing exhibit.)  Yes.

12  **Q.  And would you agree with me that your written**

13  **communications are the best source of evidence as to**

14  **what was actually being said and communicated by you**

15  **at the time?**

16        MR. WALZ:  Objection.

17  A.  I would say that's fair, from what I recall,

18  Howard.

19  **Q.  And can you tell me why, if they were not**

20  **having any substantive role in assisting with the**

21  **strategy, Mr. Cole and Mr. Boiardi continue to be**

22  **copied?**

23  A.  Because they were -- needed to be abreast of

24  -- of the work product and what the -- what work was

Page 51

1  being done on behalf of the client.

2        Ms. -- George Regan doesn't use e-mail, so

3  Ashley was on these e-mail threads to provide George

4  insight into how the case was going and what work we

5  were doing on behalf of Mr. Chiocca.

6  **Q.  And I understand that you didn't see the**

7  **contract, but do you know what the financial**

8  **arrangement was for the engagement?**

9  A.  I believe it was a one-time $5,000 project

10  fee.

11  **Q.  And was that actually paid?**

12  A.  I believe it was paid.  I don't know,

13  otherwise.

14  **Q.  Now, let -- let --**

15  A.  (Inaudible) --

16        MADAM COURT REPORTER:  Can you please

17  repeat --

18        BY MR. COOPER:

19  **Q.  Let's take a look --**

20        MADAM COURT REPORTER:  I didn't hear what

21  he said, Howard.  Sorry.

22        Can you please just repeat what you just

23  said, sir?

24  A.  Yeah.  I -- I believe it was paid, that's

Page 52

1  what I said, from my recollection, yeah.

2  **Q.  Now, let's take a look at your e-mail.**

3  A.  Sure.

4  **Q.  There is a statement attributed to Allan**

5  **Chiocca, Rockland Town Administrator, that begins, "I**

6  **am in full support of an independent investigation**

7  **into this matter."**

8        **Do you see that?**

9  A.  (Deponent viewing exhibit.)  I do.

10  **Q.  And it goes on.  I am not going to read the**

11  **whole thing, but you are welcome to.**

12        **But in -- who drafted that statement?**

13  A.  I drafted that statement on behalf of

14  Mr. Chiocca.

15  **Q.  Okay.  And was it based upon your**

16  **communications with Mr. Chiocca up to that point in**

17  **time --**

18  A.  It was.

19  **Q.  -- that is, June 3rd, 2018, at 1:06 p.m.?**

20  A.  Yes, it was.

21  **Q.  Okay.  And I note in this statement that it**

22  **doesn't say anywhere that Mr. Chiocca himself had**

23  **called for an investigation, correct?**

24  A.  I'm not aware of that.  I know that, you

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 53

1 know, prior to -- in our meeting with Mr. Chiocca, he
2 certainly relayed the -- the need for an independent
3 investigation into this matter because he felt like he
4 would be cleared and vin -- vindicated.
5   Q.  Okay.  My question is a little bit different,
6 Mr. Sherman.
7      The statement that you drafted for him
8 doesn't say that he was someone who had called for an
9 independent investigation, does it?
10  A.  (Deponent viewing exhibit.)  It does not.
11  Q.  And that's because Mr. Chiocca had not said
12 that to you up to this point in time, correct?
13     MR. WALZ:  Objection.
14  A.  I'm not sure what you're getting at.
15 Mr. Chiocca did say, from my recollection of that
16 initial meeting, that he believed any independent
17 review of this situation would end up in his favor,
18 and as we know, it did.
19  Q.  Okay.  So my question's different.
20     My question is, Mr. Chiocca didn't tell you
21 that he had publicly called for an investigation prior
22 to his retaining you?
23     MR. WALZ:  Objection.
24  A.  He nev -- he never said that to me.  He did

Page 54

1 say that any independent investigation -- and, again,
2 I'm paraphrasing here.  I don't have the exact
3 language that Mr. Chiocca used during that meeting.
4 But I do remember him being confident that any
5 independent investigation into this matter would
6 vindicate his actions that night.
7   Q.  My question is solely that he never said to
8 you that he, personally, had called for an independent
9 investigation, correct?
10     MR. WALZ:  Objection.
11  A.  I -- I don't recall, Howard.  I'm not sure
12 what the -- what the language was that he used in our
13 -- in our meeting.
14  Q.  Okay.  Well, you didn't include it in his
15 draft statement, correct?
16  A.  I didn't include it in this, no.
17  Q.  Now, let's read on.
18     You then give your feedback about Ms. Hall's
19 public statement --
20  A.  (Deponent viewing exhibit.)  Mm-hmm.
21  Q.  -- right?
22  A.  Yup.
23  Q.  And you say, quote, Hall is setting herself
24 up as the victim here, close quote --

Page 55

1  A.  (Deponent viewing exhibit.)  Correct.
2  Q.  -- right.
3  A.  Yeah.
4  Q.  And that was a concern to you, that she was
5 portraying herself as a victim, right?
6  A.  It was an absolute concern to me.
7  Q.  Because -- well -- and just to be clear, you,
8 personally, have no idea who the victim here was,
9 right?
10     MR. WALZ:  Objection.
11  A.  Do I know who the victim -- at that time?
12 Now I do, Howard.  Do I know at that time?
13  Q.  At any point in time.
14  A.  Based on -- based on -- and, again, you know,
15 my job is to recommend media strategies for the client
16 working with his counsel.  According to Allan
17 Chiocca's narrative, it was absolutely diametrically
18 opposed to what Ms. Hall was saying in the press at
19 the time.
20  Q.  And that concerned you because she was being
21 portrayed, based on her statements, as a victim,
22 right?
23  A.  Correct.
24  Q.  And you wanted to portray Mr. Chiocca as a

Page 56

1 victim, correct?
2  A.  I wanted to make sure that Mr. Chiocca, who
3 believed he was the victim, got his story out there to
4 the press.  So, his narrative, I wanted to make sure
5 that, you know, the -- the media was balancing both
6 statements, sure.
7   Q.  Now, it goes -- you go on here to write, The
8 key language used by Ms. Hall -- by Hall in her public
9 statement is, quote, an allegation of inappropriate
10 behavior by the town administrator towards me, close
11 quote.
12     And you underline and italicize "towards me,"
13 right?
14  A.  (Deponent viewing exhibit.)  Yeah.
15  Q.  That's the statement that concerned you?
16  A.  That was the statement that concerned me
17 because I believed that Ms. Hall was portraying
18 herself as the -- a victim of unconsensual sexual
19 acts.
20  Q.  And you go on to write, Hall is setting
21 herself up as the victim here, which I've asked you
22 about.
23  A.  Yeah.
24  Q.  What she should've said more accurately was

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 57

1 that there was an allegation of inappropriate behavior
2 between the town administrator and myself - this is
3 true. Both engaged in appropriate behavior. But Hall
4 has established herself as the victim here, close
5 quote.
6    Have I read that correctly?
7    A. (Deponent viewing exhibit.) You've read that
8 correctly, yeah.
9    Q. Okay. What did you mean by "both engaged in
10 appropriate behavior" is —
11    A. It wasn't. There was a misspelling. Not
12 appropriate behavior, Howard. That --
13    Q. And so — I'm sorry. Go ahead.
14    A. Can I finish? Thank you.
15    Q. Yes.
16    A. That was -- that was a misspelling. It
17 wasn't appropriate behavior, it was inappropriate
18 behavior. Any --
19    Q. And --
20    A. -- time -- hold on. Please let me finish.
21    Q. Yeah.
22    A. Any time you can perform any type of sexual
23 activity, especially in the workplace, would that be
24 considered inappropriate behavior? Yes, in my

Page 58

1 estimation.
2    Q. Are you done?
3    A. I am, yeah.
4    Q. Okay. You then write -- and it should be
5 with the correction -- that both engaged in
6 inappropriate behavior.
7    And did Mr. Chiocca concede that to you, they
8 both had engaged in inappropriate behavior?
9    A. Mr. Chiocca was embarrassed that he had been
10 pressured into -- and I'm using his words -- pressured
11 into performing these acts.
12    Q. Okay. My question --
13    A. And recognize -- can I -- please, I'm just
14 giving you my --
15    Q. Go ahead. Go right ahead. I thought you
16 were done.
17    A. Thank you, Howard. I appreciate that.
18    But he did feel, you know, remorse for his
19 family, I think, more so than anything else, that he'd
20 been pressured into this situation. I remember him
21 talking about, you know, violating the sanctity of his
22 marriage and the fact that he had grandchildren. So,
23 you know, there was personal embarrassment there.
24    Q. You write, quote, This is true. And then you

Page 59

1 write, Both engaged in inappropriate behavior.
2    Was that something that Mr. Chiocca conceded
3 to you that he, too, had engaged in inappropriate
4 behavior? Yes or no.
5    A. I would say no. I think I'm -- I'm using my
6 view of -- of what I'd learned or heard from
7 Mr. Chiocca. That was a -- that was a personal
8 statement, as opposed to regurgitating something that
9 Mr. Chiocca told me.
10    Q. Did Mr. Chiocca tell you, up to this point in
11 time, that he couldn't have had sex with Ms. Hall
12 because he had medical problems?
13    A. I recall him saying something about a
14 performance issue. I don't remember the exact
15 language he -- he used, Howard, quite frankly.
16    Q. Did he -- you don't mention anything in -- in
17 this e-mail about that.
18    Is it your testimony that he had said
19 something like that to you, as of January 3rd, 2018,
20 at 1:06 p.m.?
21    A. I would -- again, my recollection is, he did
22 -- that was something that -- that he had shared with
23 us. You know, I remember him saying something about a
24 little blue pill, and that was the extent of it. I

Page 60

1 didn't really want to hear anymore, quite frankly, on
2 that.
3    Q. Let's go to two paragraphs down, you write,
4 quote, We need to change the narrative, close quote.
5    Have I read that correctly?
6    A. (Deponent viewing exhibit.) You -- well, you
7 -- you have.
8    Can I --
9    Q. That's all I'm asking is if I read it
10 correctly.
11    A. Yes.
12    Q. Okay. And was that your assessment, as of
13 June 3rd, 2018, at 1:06 p.m., that Mr. Chiocca and his
14 team needed to change the narrative?
15    A. That was my assessment after reading all of
16 the responses to Ms. Hall's -- I believe it was a
17 Facebook post at the time --
18    Q. Is that --
19    A. -- and that language is it.
20    Q. Is that what you set about to do, to change
21 the narrative?
22    A. Yeah, absolutely.
23    Q. And is that what Mr. Friedmann and
24 Mr. Shafran told you they wanted you to do?

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 61

1          MR. WALZ: Objection.

2    A.   To change -- I would say change the narrative

3 in a way that corrects the narrative.

4    Q.   Okay.  Well --

5    A.   It's just -- I'm telling you --

6    Q.   Okay.  Corrects the narrative, in your

7 opinion, based upon what Mr. Chiocca told you?

8    A.   That is correct.

9    Q.   Okay.  You would agree with me, Mr. Sherman,

10 that neither you or I were at town hall when

11 Mr. Chiocca and Ms. Hall did whatever they did or

12 didn't do, right?

13   A.   Well, I was not there, but I, you know, later

14 viewed the surveillance video, as I am sure everybody

15 at -- on this Zoom has, and I have read the executive

16 summary and the report of an independent investigator

17 into this case, yes.

18   Q.   So, Mr. Sherman, we're on June 3rd, 2018,

19 right?

20   A.   Yeah.

21   Q.   And I understand that you are a fierce

22 warrior in the media for your clients.

23        But you have no personal knowledge,

24 whatsoever, of what took place off camera in

Page 62

1 Mr. Chiocca's office in May of 2018, correct?

2    A.   Only what Mr. Chiocca relayed to me in our

3 meeting, yes.

4    Q.   Now, as of June 3rd, 2018, at 1:06 p.m.,

5 during this crisis, did Mr. Chiocca and his lawyers

6 agree with you that you needed to change the

7 narrative?

8          MR. WALZ: Objection.

9    A.   They agreed that we had to change, slash,

10 correct the narrative and make sure that Mr. Chiocca's

11 story was out there, because Ms. Hall had already gone

12 public to present herself as a victim in this case,

13 yes.

14   Q.   And did you tell them that it was your

15 preference that Mr. Chiocca should be portrayed as the

16 victim that he said he truly is?

17   A.   Yeah.

18   Q.   And that the message should get out there

19 that sexual harassment is about power, and that Hall

20 had power over Chiocca in this situation?

21   A.   That is correct.

22   Q.   And did you instruct them that they should

23 avoid using the word "consensual" in any messaging?

24   A.   I did.

Page 63

1    Q.   Okay.  So you were literally telling them

2 what words they should and shouldn't use, correct?

3    A.   That -- that is my job, Howard, yeah, as I

4 said --

5    Q.   Mr. Sherman --

6    A.   -- correct.

7    Q.   -- I express no personal view here.  I'm very

8 fond of Mr. Regan, who I've known for years.  I

9 understand the job that you're doing.  That's all I'm

10 trying to do, is to get the facts.

11   A.   Okay.  Yes.  Then yes --

12   Q.   And --

13   A.   -- that would be --

14   Q.   -- so --

15   A.   -- correct.

16   Q.   -- and did -- did Mr. Chiocca and his lawyers

17 agree that they would not use the word "consensual"?

18   A.   I'm not sure where that landed, Howard, to be

19 quite honest.  I don't know what they ended up

20 agreeing or not agreeing to.  I don't recall that.

21   Q.   And, you then write, "A female harassment

22 victim may consent to a sexual act under either

23 physical or professional pressure, but that does not

24 make her a willing participant.  We must approach this

Page 64

1 case the same way."

2        Do you see that?

3    A.   (Deponent viewing exhibit.)  Yes.

4    Q.   And so, you were recommending an approach,

5 right?

6    A.   I was recommending an approach based on Allan

7 Chiocca's version of events, yes.

8    Q.   And did they -- did Mr. Shafran,

9 Mr. Friedmann and Mr. Chiocca agree to go along with

10 your approach?

11          MR. WALZ: Objection.

12   A.   I would say, Howard, it was a collective

13 approach.  So I was articulating what the media's

14 focus was, in terms of these, quote/unquote, Me Too

15 cases, and giving them my professional advice in terms

16 of how to, again, present, you know, Allan's

17 narrative.

18   Q.   Did Mr. Friedmann, Mr. Shafran and

19 Mr. Chiocca agree with your professional advice, to

20 your understanding?

21   A.   To my understanding, I believe they did,

22 yeah.

23   Q.   And, thereafter, everybody worked to put in

24 effect a plan to achieve what you had recommended,

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 65

1 correct?

2        MR. WALZ: Objection.

3    A.  Not correct, because it wasn't -- this again,

4 was a -- was a -- a media recommendation based on

5 Allan Chiocca's version of events and based on the

6 reason that Regan Communications was hired in this

7 case to begin with, which was --

8    Q.  I'm --

9    A.  Hold on.

10       -- which was to present Allan Chiocca's

11 version of events as someone who was a victim of

12 sexual harassment.

13   Q.  I'm simply asking you that, after everybody

14 agreed to follow your advice, did you all then set

15 about to put that advice in practice?

16   A.  Sure.

17       MR. WALZ: Objection.

18   BY MR. COOPER:

19   Q.  Now, if you flip the -- go to the next --

20 actually, you have it.  At the bottom it says, "Please

21 review the statement and respond when possible.  If we

22 have approval today, I can distribute to print news

23 outlets so that it will hit Monday's newspaper cycle

24 instead of Tuesday's."

Page 66

1        Have I read that correctly?

2    A.  (Deponent viewing exhibit.)  Yes, you have.

3    Q.  And what access did you have with print news

4 outlets as of that date?

5    A.  Prior -- in -- for this case?

6    Q.  What were you referring to here?  What print

7 news outlets?

8    A.  I was referring to all the print news outlets

9 that were covering this case, predominantly the South

10 Shore media.  Again, you know, part of my job, Howard,

11 is to, you know, cultivate and leverage relationships

12 with media outlets on behalf of my client, so, yes.

13   Q.  And what media outlets were you referring to

14 here?

15   A.  I believe I was referring to -- and I've

16 given this information to you guys -- all of the

17 television stations in Boston, WATD radio in

18 Marshfield, Patriot Ledger in Marshfield.  That is --

19 I would say that's the crux of it, I believe, if I can

20 recall.

21   Q.  What about the Boston Globe?

22   A.  They were probably on that list.  I don't

23 remember them writing about this case as of yet, but I

24 knew that they would be.  So, of course, Boston Globe

Page 67

1 would be, you know, front and center on that list.

2    Q.  And the Boston Herald as well?

3    A.  As well, yes.

4    Q.  And you have contacts at all of these places,

5 correct?

6    A.  I do.  Yeah.

7    Q.  Well, that's one of the things you bring to

8 your job is 25 years worth of media contacts in the

9 Boston area, right?

10   A.  I would say 25 years worth of media contacts

11 and experience as a journalist in -- in the market,

12 yeah.

13   Q.  How many -- or strike that.

14       Was the statement circulated in accordance

15 with what you wanted to do in this e-mail?

16   A.  I don't bel -- I don't know if it was,

17 because it would've had to have been approved by the

18 -- the legal team.  So I'm not sure if that statement

19 made its way to the media.  I'm --

20   Q.  Well -- go ahead.

21   A.  I'm just saying -- I'm giving you a

22 recollection here, Howard.

23       So the -- oftentimes, the work we do for

24 clients is putting together what we call holding

Page 68

1 statements, and these holding statements summarize

2 discussions that we've had with our clients and the

3 legal team, that -- then that goes through the legal

4 strainer, they change any language that they feel

5 appropriate, or they say it's not, you know, the right

6 time to release a statement like this.

7        So, honestly, I'm not sure where we netted on

8 that original statement, quite frankly.

9        MR. COOPER:  Well, let me see if I can

10 refresh your recollection by putting up the next

11 exhibit, which will be three.  And this is June 4,

12 2018, at 9:29 a.m.

13   BY MR. COOPER:

14   Q.  Do you see that, Mr. Sherman?

15   A.  (Deponent viewing computer.)  I don't see it,

16 no.  It's not on my --

17   Q.  It's coming.

18       (Exhibit 3 marked for identification.)

19   A.  (Deponent viewing exhibit.)  Yup.  Okay.

20   Q.  Do you have it on your screen?

21   A.  I do.  Yeah.

22   Q.  And this is an e-mail the next day, on

23 Monday, correct?

24   A.  (Deponent viewing exhibit.)  I believe -- was

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 69

1 that -- was that -- okay. I don't know, was the
2 previous e-mail circulated that Sunday, or was that on
3 a Friday?
4   Q.  **This e-mail was Sunday, June 3rd --**
5   A.  Okay.
6   Q.  **-- 2018.**
7   A.  Okay. Yeah, then that is what we distributed
8 to the press, and that was a statement that was
9 provided in terms of -- and I would say approved by
10 the attorney.
11   Q.  **Which attorney?**
12   A.  Mr. Shafran.
13   Q.  **Of the two attorneys, Mr. Friedmann and**
14 **Mr. Shafran, did one of them take the lead in dealing**
15 **with the media issues?**
16   A.  That would be Mr. Shafran, yeah. Yeah, he is
17 the spokesperson on all quotes that came from Allan's
18 representative during this case.
19   Q.  **And how was that decided?**
20   A.  I don't know. I -- I was not a part of that.
21   Q.  **Now, I want to ask you a number of questions**
22 **about this particular e-mail.**
23      But would you agree with me that it went out
24 less than 24 hours after your Sunday e-mail, which was

Page 70

1 at about one o'clock in the afternoon?
2   A.  (Deponent viewing exhibit.) Yeah, that would
3 be the case. Sure.
4   Q.  **Do you remember any back-and-forth with**
5 **anybody, between your e-mail on Sunday afternoon and**
6 **the sending of this e-mail, which is Exhibit 3?**
7   A.  I don't recall any back-and-forth. I know
8 that Mr. Shafran would've had to approve that
9 statement before it was released to the press.
10   Q.  **And you've anticipated my question, which is,**
11 **this was all subject to Mr. Shafran -- Shafran**
12 **approving the precise words that were going to be**
13 **used, correct?**
14      MR. WALZ:  Objection.
15   A.  That is correct. And -- that is correct, and
16 there was at no time during our work in this case that
17 any communiques to the media were not directed and
18 approved by Mr. Shafran, yes.
19   Q.  **And do you recall any specific changes that**
20 **Mr. Shafran made, prior to your e-mailing the**
21 **statement in Exhibit 3 to the media?**
22   A.  I don't recall, you know, how he wordsmithed
23 that, no. I don't -- I don't -- I don't remember, you
24 know, what the edits were on that particular

Page 71

1 statement.
2   Q.  **Do you recall any edits that Mr. Chiocca**
3 **made?**
4   A.  I don't recall that either.
5   Q.  **Okay. Now, in your e-mail, it says Casey**
6 **Sherman as the From, and the To is blank.**
7      **Do you see that?**
8   A.  (Deponent viewing exhibit.) I do. Well, the
9 To is a -- every media outlet is blind CC'd. It's a
10 customary way that we do things in the communications
11 department. We want to make sure that we're being
12 respectful and sensitive to media outlets and not
13 having them, you know, competing with each other on
14 the story.
15      So we would -- I would never put -- send out
16 an e-mail to so-and-so at the Boston Globe or -- or
17 information at the Boston Globe, and then directly
18 next to that, put the Herald in there as well. Just
19 -- that's the standing operating procedure in our
20 business.
21   Q.  **Is it fair to say that this is something**
22 **that's referred to as an e-mail blast to the media?**
23      MR. WALZ:  Objection.
24   A.  I wouldn't say it was a blast. It was

Page 72

1 sending out a statement. Yes, and -- I mean, if you
2 want -- it was sending out a statement to media
3 outlets that either were reporting on this case or
4 would be about to report on this case, yes.
5   Q.  **Now, how many media outlets was this sent to?**
6   A.  If I recall, that media -- there was probably
7 sent to maybe eight media outlets, and I -- I think
8 I've listed them all prior to that -- this.
9   Q.  **Okay. So that would include the Patriot**
10 **Ledger --**
11   A.  Yeah.
12   Q.  **-- Lenny Rowe?**
13      **Is he someone you know?**
14   A.  He is a reporter at the Ledger. No, he's a
15 -- I don't -- I think he's WATD. I don't think he was
16 covering it for the Ledger at the time.
17   Q.  **Okay. And then there's WATD, correct?**
18   A.  Yes, which is a radio station based in
19 Marshfield, and they cover South Shore news and
20 events, yes.
21   Q.  **And then there's Turtleboy Sports?**
22   A.  Yeah.
23   Q.  **We'll come back to that.**
24      **There's CMG Boston?**

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 73

1    A.  CMG Boston?  Oh, that was -- that was
2 Boston 25.  That's the -- that was the --
3    Q.  That's Fox?
4    A.  -- that's the news.  Yeah, they don't call
5 themselves Fox anymore, so.
6    Q.  And, in particular, you sent it to Peter
7 Wilson --
8    A.  Yeah.
9    Q.  -- at Boston 25?
10      Someone you know?
11    A.  Somebody I worked with during my years at
12 WBZ-TV, correct.  And he has a -- he has a news
13 managerial position at that station.
14    Q.  Okay.  But he's someone who you have a
15 personal, professional relationship with, correct?
16    A.  Sure.
17    Q.  And WBZ radio?
18    A.  Mm-hmm.
19    Q.  You have to say yes or no.
20    A.  Yes.
21    Q.  Do you think it went to the Globe and the
22 Herald as well?
23    A.  I'm not sure about that one.  I would imagine
24 I would've sent it to the Globe and the Herald,

Page 74

1 although, I don't think they were actively reporting
2 on it at the time, so I'm not sure if I would've sent
3 it to them, because I wouldn't have had anybody at the
4 time to send it to.  Normally, you're targeting a
5 reporter that's already been covering the story, so I
6 -- my best guesstimate would be that I most likely did
7 send it to the Globe and Herald.  I just don't recall.
8    Q.  Did you, separate and aside from e-mailing
9 this to the collective group of media outlets,
10 personally reach out to anybody?
11    A.  Not for this, no.  I don't -- I think this
12 was a blasted e-mail to see what the response would
13 be, and to see what the public consumption on the
14 story was.  So I wasn't, again, best recollection,
15 reaching out personally, to any reporter at that
16 time --
17    Q.  And so --
18    A.  -- working on it, unless they responded to
19 this -- to this statement.
20    Q.  At any point in time, did you reach out,
21 personally, to a member of the media?
22    A.  Prob -- I would say yes.
23    Q.  And when did you do that, and to whom did you
24 reach out?

Page 75

1    A.  I had had, I think, some conversations with
2 -- you mentioned Lenny Rowe, just to keep him abreast
3 of what the hearing schedule was.  And there was a
4 back-and-forth with, I believe, the Patriot Ledger
5 reporter because of a misspelling in
6 Attorney Shafran's name when they printed the quote
7 that was provided to them by me via the -- the
8 attorneys.
9    Q.  Do you know whether anyone else at Regan
10 Communications reached out to a particular person or
11 media outlet?
12    A.  I -- I don't know that, no.
13    Q.  Was the story offered to any media outlet as
14 an exclusive at any point in time?
15    A.  I -- I don't think so.  And I think that
16 there was some discussion about providing an exclusive
17 opportunity to talk to Allan Chiocca, but I don't --
18 that didn't go anywhere.
19    Q.  Now, let's go back to Turtleboy Sports --
20    A.  Yeah.
21    Q.  -- as of June of 2018.
22      What did you know about Turtleboy Sports?
23    A.  Very influential social media news site.  A
24 bit edgy.  A bit geared toward, you know, a younger

Page 76

1 demographic.  Very similar to, I would say, your
2 Barstool Sports.
3      And, you know, in the media landscape in 2018
4 not only are we, you know, we tasked with maintaining
5 relationships with the, quote/unquote, mainstream
6 media, but we also have to build relationships with
7 your alternative media would, be the best way to
8 describe that.
9    Q.  And did you do that in this case?
10    A.  With Turtleboy, I sent that statement to him,
11 and I believe he was already on the story.
12    Q.  And, by "him," who are you referring to?
13    A.  I don't even know who he is.
14    Q.  Just Turtleboy?
15    A.  Yeah.  This -- I have no clue who -- who runs
16 that site, but they do hyperlocal reporting that's a
17 bit snarky.  I don't have any edit -- editorial
18 influence in, particularly, that website, but there
19 was somebody certainly that was -- at the time, I
20 think, was focused on this case in some way, shape or
21 form.
22    Q.  Had you communicated with Turtleboy prior to
23 June 4th, 2018, at 9:29 a.m., about this matter?
24    A.  I don't think so.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

**Page 77**

1    Q.   Do you recollect clearly that you did or you
2  didn't, or are you guessing?
3    A.   Well, I -- I mean, I'm -- I'm recall -- I
4  can't recall.  That's it.  So I don't remember,
5  Howard.  And as --
6    Q.   Now --
7    A.   -- I said, I don't -- I don't think I did.
8    Q.   Now, the statement -- let's take it look at
9  it -- it says, "Here is their official statement."
10      Can you explain to me what was official about
11 this statement?
12    A.   (Deponent viewing exhibit.)  Official, being
13 that it was the only statement of -- of its kind
14 coming from Mr. Chiocca's representatives.
15    Q.   Okay.  You didn't mean to suggest that it was
16 any type of legal --
17    A.   No.  No.  No.  By "official," it was just,
18 this was the -- I was working as a representative of
19 the law firm that was working as a representative of
20 Mr. Chiocca.
21    Q.   By the way, did you understand whether
22 Mr. Chiocca remained employed at the Town of Rockland,
23 as of June 4th, 2018?
24    A.   I believe he told me that he had been put on

**Page 78**

1  administrative leave.
2    Q.   Okay.  Did he nevertheless tell you he had
3  remained an employee --
4    A.   Yeah.
5    Q.   -- while on administrative leave?
6    A.   Yes, he did.
7    Q.   All right.  So you understood, at the very
8  least, that he remained an employee while this was
9  going on?
10      MR. WALZ:  Objection.
11    A.   Mm-hmm.
12    Q.   You have to say yes or no.
13    A.   From what I recall, yes.
14    Q.   Now, let's take a look at the statement.  It
15 says, Mr. Chiocca is in full support of an independent
16 investigation into this matter, and requested the
17 Rockland Board of Selectmen conduct an independent
18 investigation prior to its decision to do so.
19      Have I read that correctly?
20    A.   (Deponent viewing exhibit.)  Yes.
21    Q.   Okay.  Are you aware that the second clause
22 of that statement, suggesting that Mr. Chiocca
23 requested that the Rockland Board of Selectmen conduct
24 an independent investigation prior to its decision to

**Page 79**

1  do so, is false?
2        MR. WALZ:  Objection.
3    A.   I am not aware of that.  That came from his
4  attorney, not from me.
5    Q.   Okay.  Do you know where his attorney got
6  that from?
7    A.   I have no idea.
8    Q.   Did you ever hear Mr. Chiocca say that?
9    A.   I wasn't privy to a -- a conversation that
10 specifically said that.  My job in this case, Howard,
11 was to disseminate the statement by Mr. Shafran, not
12 to editorialize it, not to change any of his wording.
13    Q.   I -- I -- how many times do you think you had
14 spoken to Mr. Chiocca by June 4th, 2018, at 9:29 a.m.?
15    A.   I mean, at least, I would say, probably five
16 times.
17    Q.   And, in that, did he ever personally tell you
18 that he had called -- excuse me -- he had requested
19 that the Rockland Board of Selectmen conduct an
20 independent investigation?
21    A.   I don't -- I don't recall him using that --
22 that language.  He may have, but I don't recall that.
23    Q.   Then it goes on to say, "We are confident
24 that such an investigation will reveal that he never

**Page 80**

1  acted inappropriately towards Ms. Hall."
2      Who chose those words?
3    A.   That was the attorney.
4    Q.   Mr. Shafran?
5    A.   Correct.
6    Q.   Given what you had written previously, did
7  you agree with that?
8    A.   It was not up to me to agree or not to agree
9  with that statement.  This was a statement that was
10 written by the attorney, and my job as working as the
11 media facilitator was to present that statement to the
12 press, ba -- via --
13    Q.   I -- I want you to know I understand that you
14 were doing your job.
15      What I'm asking you for is whether you have a
16 recollection, at the time you saw that language
17 written by Mr. Shafran, of being uncomfortable with
18 it, given what you had written before?
19      MR. WALZ:  Objection.
20    A.   I don't re -- I don't recall that, no.
21    Q.   Do you deny that?
22    A.   I'm not denying it.  I don't recall it.
23    Q.   Okay.  Would you agree with me that you had
24 written, just the day before, that both Ms. Hall and

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 81

1 Mr. Chiocca had engaged in inappropriate behavior?

2   A.   That was my assessment, and I did write that,

3 but I have not been privy to all of the conversations

4 between the attorney and Mr. Chiocca.  And again --

5   Q.   And --

6   A.   Oh, let me -- let me finish, Howard.

7   Q.   Yeah, go ahead.

8   A.   That was -- I was putting my personal feeling

9 based on, as I said, the guilt that Chiocca presented

10 to me toward his family.

11     So, when I say "inappropriate," any time you

12 engage in any type of behavior like that, at the

13 workplace, you know, if it walks like a duck, it's a

14 duck; isn't it, Howard?  So that's a -- that would be

15 inappropriate in my estimation.

16   Q.   Do you recall expressing to either

17 Mr. Chiocca or his lawyers that they should not make

18 that particular statement?

19   A.   I do not recall that.

20        MR. COOPER:  Laurie, why don't we give

21 you your break for a few minutes.

22        MADAM COURT REPORTER:  Thank you.

23        MR. COOPER:  Let's go off the record.

24        (Off the record at 11:30 a.m.)

---

Page 82

1        (Recess taken.)

2        (Back on the record at 11:38 a.m.)

3        BY MR. COOPER:

4   Q.   Mr. Sherman, the way this works is, even

5 though we take a break, you remain under oath.  I hope

6 you understand that.

7   A.   Correct.

8   Q.   Now, we've looked at -- and I've asked you

9 about a series of e-mails and at least one in-person

10 meeting and some telephone calls that took place

11 during the first few days of your involvement in this

12 matter as Regan's head of crisis communications; fair?

13   A.   Fair.

14   Q.   In everything that you've told us thus far,

15 it seems that there was no mention whatsoever of my

16 client, Ed Kimball, fair?

17        MR. WALZ:  Objection.

18   A.   I can't recall -- in terms of -- can you re

19 -- rephrase that question --

20   Q.   Sure.

21   A.   -- Howard?

22   Q.   Sure.  In terms of your reciting to the jury

23 so far this morning, your memory of discussions with

24 any of the lawyers at Rudolph Friedmann, with

---

Page 83

1 Mr. Chiocca himself, with George Regan, with the other

2 Regan Communications individuals who had some

3 involvement and your e-mails, nothing has been said

4 about Ed Kimball, correct?

5        MR. WALZ:  Objection.

6   A.   Nothing has -- there -- that name came up.  I

7 don't know if it was the first meeting.  You know, I

8 know I had least one other face-to-face meeting with

9 Allan Chiocca, and I believe Kimball's name came up at

10 that time.

11   Q.   Okay.  Was that before or after you sent out

12 this statement -- the official statement on June 4th,

13 2018?

14   A.   That was probably after.

15   Q.   Okay.  So, for the moment, I'm on June 4th,

16 2018.

17   A.   Okay.

18   Q.   You've had your one-hour meeting, you've

19 heard from Mr. Chiocca, you've talked to his lawyers,

20 you've consulted to the extent you wanted to with

21 George Regan, and you've discussed the narrative that

22 you wanted to get out, and Mr. Kimball's name didn't

23 come up, correct?

24        MR. WALZ:  Objection.

---

Page 84

1   A.   Correct.

2   Q.   Okay.

3   A.   From --

4   Q.   And --

5   A.   -- what I recall, Howard -- sorry.  From what

6 I recall, yes.

7   Q.   And the statement -- the official statement

8 that was put out on behalf of Mr. Chiocca nowhere

9 mentions Mr. Kimball, correct?

10   A.   That's correct.

11   Q.   And it nowhere mentions any relationship

12 between Mr. Hall -- Ms. Hall and Mr. Kimball, correct?

13   A.   That is correct.

14   Q.   And there are no accusations that Ms. Hall

15 and Mr. Kimball were somehow conspiring to harm

16 Mr. Chiocca, correct?

17        MR. WALZ:  Objection.

18   A.   Not in that statement, no.

19   Q.   And Mr. Chiocca hadn't told you any of those

20 things as of June 4th, 2018, correct?

21        MR. WALZ:  Objection.

22   A.   To my rec -- to my recollection, I had not

23 heard that part of the story yet.

24   Q.   Now -- and it certainly wasn't part of any

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 85

1 recommended media narrative that you were suggesting
2 as of that time, right?
3    A.   No, but I do recall some social media chatter
4 with regard to that relationship.
5    Q.   We'll get there.
6    A.   Hold on, Howard.  Part of my job was to
7 monitor the social media discussions just to see where
8 public opinion was at the time.  So I can't give you a
9 date on when I -- when I -- when that, you know,
10 started to socialize on social media, but with regard
11 to the Shafran statement on that particular day, no.
12    Q.   My job, Mr. Sherman, is to try to get at the
13 facts and the truth, and that's all I'm trying to do
14 is what -- get at what you were told and what you
15 weren't told and when.
16    A.   Understood.
17    Q.   So --
18    A.   Thank you.
19    Q.   So you're engaged to deal with this crisis in
20 Mr. Chiocca's life, correct?
21    A.   Correct.
22    Q.   And you devote attention to it over a
23 weekend, correct?
24    A.   Correct.

Page 86

1    Q.   This is something that people hire you to do,
2 in terms of crisis management with the media, right?
3    A.   Correct.
4    Q.   And in terms of everything that was told to
5 you and what Mr. Chiocca and his legal team ultimately
6 approved to go out to the media, there was no mention
7 of the relationship between Ms. Hall and
8 Mr. Kimball --
9         MR. WALZ:  Objection.
10    BY MR. COOPER:
11    Q.   -- as of the -- as of June 4th, correct?
12         MR. WALZ:  Objection.
13    A.   From what I recall, that's the case.  I don't
14 -- but, again, I can't -- I don't remember when that
15 name came into the conversation.
16    Q.   Okay.  And just so it's clear, you have no
17 memory of Mr. Chiocca mentioning Mr. Kimball in the
18 in-person meeting that took place, right?
19    A.   I don't recall that.
20         MR. COOPER:  Now, if we could put the
21 next document up, please, which is a June 4th 2018,
22 11:26 a.m., e-mail from you.
23         THE DEPONENT:  Mm-hmm.
24         (Exhibit 4 marked for identification.)

Page 87

1    BY MR. COOPER:
2    Q.   You report back at that date and time to
3 Mr. Shafran, Mr. Friedmann, Mr. Chiocca, copied to
4 your colleagues, that statement has been distributed?
5         MR. WALZ:  I object to this document as a
6 privileged communication.
7    A.   What am I answering, Howard?  I'm sorry.
8    Q.   I'm just asking you, you were reporting back
9 that you had distributed the statement, correct?
10    A.   Correct.
11    Q.   And then you write, "We've been monitoring
12 social media."
13         Do you see that?
14    A.   (Deponent viewing exhibit.)  Yes.
15    Q.   And who is the "we"?
16    A.   Meaning Regan Communications, so
17 predominantly me for Regan Communications --
18    Q.   Who else --
19    A.   -- when I say --
20    Q.   I'm sorry.
21    A.   -- "we."
22    Q.   Were you referring to anyone other than
23 yourself in terms of who at Regan Communications were
24 monitoring social media?

Page 88

1    A.   No.  I was referring to myself.
2    Q.   And does part of your job include having
3 people make comments on social media that are
4 advantageous to your clients?
5    A.   No.
6    Q.   Do you know whether that was done by anybody
7 in this case?
8    A.   Not to my knowledge, it was done.  That's not
9 the way I work, so I would not -- I know that there
10 are some communication strategies that point to that,
11 especially in politics, but in this case, in the work
12 that I was doing on behalf of Shafran, Friedmann and
13 Chiocca, was seeing what the dialogue was out in
14 social media land.
15    Q.   Did any of them report to you they were
16 planting comments in social media?
17    A.   No.
18    Q.   You say here -- you refer to a comment that
19 you found on Ms. Hall's official Facebook page.  It
20 says, "I've reached out to Mikey Connolly and am
21 waiting it hear back."
22         Do you see that?
23    A.   (Deponent viewing exhibit.)  Yup.
24    Q.   Did you connect with Mikey Connolly?

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 89

1    A.   I don't think I ever did, no.
2    Q.   All right.  Did you -- you never spoke to
3  him?
4    A.   I don't believe so, no.
5    Q.   And you asked Mr. Chiocca if he's familiar
6  with him and whether he's a friend of Mr. Chiocca's.
7        Do you see that?
8    A.   (Deponent viewing exhibit.)  I do.  Yeah.
9    Q.   Did you get any answer to that question?
10   A.   I don't recall whether Chiocca knew this guy
11  or not.  I don't -- I don't think so.
12   Q.   Okay.  Well, let me just ask it so it's
13  clear.
14   A.   Sure.
15   Q.   Did you have any understanding that
16  Mr. Chiocca was using a friend, or friends, to plant
17  comments on social media?
18   A.   No.  Absolutely not.
19   Q.   Do you know one way or the other whether that
20  happened?
21   A.   I don't know one way or the other, but I was
22  not at -- privy to it.
23   Q.   Do you know who Michael -- Mikey Connolly is?
24   A.   I -- I don't.  He was somebody that, I

Page 90

1  believe, had a comment regarding -- and I'm -- I'm
2  going way back in my head here, are -- because I don't
3  remember -- I don't even remember what that comment
4  was, but it was something regarding Ms. Hall, I
5  believe.  And I don't -- I can't remember what that
6  comment was.
7    Q.   Well, there's an attachment here I'm going to
8  open.
9    A.   Oh, okay.  Perfect.
10   Q.   And do you see where it says, from Mikey
11  Connolly, "Was there inappropriate behavior when you
12  two were having drinks early in the evening at Banner
13  Pub?"
14   A.   (Deponent viewing computer.)  I can't see --
15  if you're opening an attachment, Howard, I cannot see
16  that.
17   Q.   I'm ahead of my colleague here.  Give me one
18  second.
19   A.   (Deponent laughs.)
20        (Deponent viewing exhibit.)  Yup.  I do see
21  that, yup.
22   Q.   And you understand this is the attachment
23  that you were forwarding?
24   A.   Exactly.

Page 91

1    Q.   And there was something here -- it says
2  something about inappropriate behavior when you two
3  were having drinks early in the evening at Banner Pub.
4        Did you question Mr. Chiocca about what that
5  meant?
6    A.   I don't know if I questioned -- I think I was
7  asking in that e-mail, is the -- do you know this guy,
8  because this -- that comment was part of that,
9  you know, response thread, and you know, if -- if he
10  did know him -- know him, can we get in -- in touch
11  with him and get his side of the story if he had any
12  knowledge with regard to this case.  And I don't
13  believe I was ever -- ever able to make contact with
14  him.  I'm not -- that -- I don't recall that.
15   Q.   And my question is whether you learned from
16  Mr. Chiocca at any point in time about inappropriate
17  behavior while he and Ms. Hall were having drinks
18  early in the evening at Banner Pub?
19   A.   I did not have conversations with Mr. Chiocca
20  with regard to that.
21   Q.   What about with his lawyers?
22   A.   No.  From what I gathered, when Chiocca did
23  explain that -- that meeting, he said that there were
24  other, either town officials or, you know, friends of

Page 92

1  -- of Rockland at that table, but didn't get into
2  specifics on what was talked about or what the
3  behaviors were.
4    Q.   Then there's an entry or -- or a post that
5  says, "Deirdre's track record is a little bit sketchy
6  and there's rumors of inappropriate behavior at City
7  of Quincy water and sewer department.  She resigned
8  for these reasons.  She's not truthful enough for
9  positions in government."
10       Do you see that?
11   A.   (Deponent viewing exhibit.)  I do.
12   Q.   And what, if anything, did you do to follow
13  up on that comment?
14   A.   I was -- the only person that had knowledge
15  to, you know, that rumor was probably this guy, so I
16  can -- I never confirmed or -- you know, we don't
17  really deal with hearsay unless people come forward
18  and -- and are willing to go on the record or at least
19  give us background.  And that was never anything that
20  we seriously attempted to track down.
21   Q.   Now, let's go to another e-mail on June 4th,
22  2018.  This one is at 2:14 p.m.?
23   A.   Okay.
24   Q.   And this is just a couple hours later, and

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 93

1  you're giving --

2       MR. COOPER:  Well, let me get it up on

3  the screen first.

4       THE DEPONENT:  Sure.

5       (Exhibit 5 marked for identification.)

6       MR. WALZ:  I will object to this document

7  as privileged.

8       BY MR. COOPER:

9   Q.  So this is a little later in the day, and

10  you're giving a further update on your monitoring of

11  the response to the statement; is that fair?

12   A.  (Deponent viewing exhibit.)  That's fair.

13   Q.  And you write, "Hello all -- We culled this

14  from Howie Carr's Twitter feed.  Looks like someone is

15  trying to expose Hall's previous relationship as

16  well."

17       Do you see that?

18   A.  (Deponent viewing exhibit.)  I do.

19   Q.  Can you see it, Mr. Sherman?

20   A.  (Deponent viewing exhibit.)  I can.  I can.

21  I see that.  I don't --

22       Have you tried to open the attachment yet?

23   Q.  I'm going to get to that in one second.  I

24  just wanted --

---

Page 94

1   A.  (Deponent viewing exhibit.)  I do see that.

2  Yes, I do.

3   Q.  And as of June 4th, 2018, at 2:14 p.m., were

4  you trying to expose Ms. Hall's relationship with

5  Mr. Kimball?

6       MR. WALZ:  Objection.

7   A.  No, I wasn't -- I don't believe so.  What we

8  were doing is monitoring social media posts to see

9  what was out there, what the townpeople themselves

10  were talking about.  So there was no clear directive

11  in terms of discovering information with regard to

12  Hall's relationship with Kimball, at least not at that

13  point.

14   Q.  Are you done?

15   A.  I am, yeah.

16   Q.  Okay.  Do you know whether Mr. Shafran,

17  Mr. Friedmann and Mr. Chiocca, any of them were trying

18  to expose Ms. Hall's relationship with Mr. Kimball?

19   A.  Not that I recall.

20   Q.  Well, why did you use the words "as well"?

21  See where it says, trying to expose Hall's previous

22  relationship as well?  As well as who?

23   A.  (Deponent viewing exhibit.)  Not as well as

24  whom, as well as the previous social media post.  So

---

Page 95

1  there -- there wasn't -- in reference to any

2  particular person, it was giving an update on what

3  people were talking about.

4   Q.  And if you could open the attachment, please.

5  Now -- whoop.  One second.

6       This is, at least in terms of what was

7  produced to us, the attachment.

8   A.  (Deponent viewing exhibit.)  Yup.

9   Q.  And someone using the moniker Taxed 2 Death

10  in Mass, writes, and it says, June 1, replying to at

11  Howie Carr Show.

12       Do you see that?

13   A.  (Deponent viewing exhibit.)  I do.

14   Q.  Can you explain to me how someone could make

15  a comment on June 1 that was in response to your

16  release of an official statement?

17   A.  That -- that wasn't in response to my release

18  of an official statement.  I was doing social media

19  monitoring of not who was picking up the statement,

20  but the story itself.  So if that predates the

21  statement, that was just something that I found on

22  Howie Carr's Twitter feed.

23   Q.  Had you sent the statement to Howie Carr?

24   A.  I don't think so.  No.  I -- let me go on the

---

Page 96

1  record here, no, I did not send anything to Howie

2  Carr.  He and I do not have a good relationship.

3   Q.  Do you know whether the Herald had shared

4  whatever you sent to him with Mr. Carr?

5   A.  I don't know.  I couldn't tell you that.

6       MR. COOPER:  Okay.  Could we go to this

7  (indicating)?

8       I'm going to put up as the next exhibit in

9  order a June 5, 2018, 4:04 p.m. e-mail between you and

10  Mr. Chiocca copied to your colleagues.

11       THE DEPONENT:  Okay.

12       (Exhibit 6 marked for identification.)

13       MR. WALZ:  And I'll object to the

14  introduction and questioning as to this document as

15  privileged.

16       BY MR. COOPER:

17   Q.  Well, there aren't any lawyers copied on this

18  document, are there?

19       MR. WALZ:  I -- that means nothing, but

20  you're right.

21       MR. COOPER:  That was a question to

22  Mr. Sherman.

23   A.  (Deponent viewing exhibit.)  That is correct,

24  yes.

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 97

1    Q.   Is there a reason you were limiting the
2  communication to just Mr. Chiocca, Mr. Cole and
3  Ms. Boiardi?
4    A.   No reason at all.
5    Q.   You write, "Just met with Allan and he shared
6  texts with Selectman Hall the morning after the
7  incident and for another two weeks, FYI, good for
8  you" --
9    A.   Us to --
10   Q.   -- "us to have."
11   A.   Yeah, correct.
12   Q.   And, with that correction, have I read it
13 correctly?
14   A.   (Deponent viewing exhibit.)  Yes, you have.
15   Q.   Okay.  And you had met with Mr. Chiocca in
16 person on June 5th, 2018, correct?
17   A.   Correct.
18   Q.   And where was that meeting?
19   A.   That -- I believe that was meeting was at the
20 law office, Friedmann on -- Rudolph Friedmann on State
21 Street in Boston.
22   Q.   And who attended that meeting?
23   A.   From what I would imagine, it would've been
24 -- and, again, I can't -- Allan clearly was there, but

---

Page 98

1  I'm sure it was at least one of the representing
2  attorneys, either Shafran or Friedmann or both.  I
3  don't recall.
4    Q.   Anybody else?
5    A.   I don't think so, no.
6    Q.   How long did that meeting last?
7    A.   I do not recall, Howard, but probably --
8  again, you know, half hour, 45 minutes maybe.
9    Q.   Did you -- strike that.
10        What was the purpose of the meeting?
11   A.   Just following up on communications and what
12 was going on, on the legal front, keeping me abreast
13 of next steps for -- in terms of hearings and things
14 like that from -- from what I recall of that -- of
15 that meeting.
16   Q.   And why was it important to physically get
17 together rather than talk by e-mail or have a
18 telephone call?
19   A.   I don't recall why that was important, but we
20 were all in the city.  I think that Allan was visiting
21 his attorneys for some reason, and it made sense for
22 me to be there.
23   Q.   And did you take notes?
24   A.   No.  I -- we were just talking about the

---

Page 99

1  statement that went out, and with this -- with regard
2  to this particular e-mail, it was, Allan wanted to
3  show me texts that he, I believe, had received from
4  Ms. Hall in the hours maybe post-encounter.  So those
5  images are me taking a photo of Mr. Chiocca's phone
6  with my own phone at the time.  Those e-mails were --
7  those text were never shared with me.
8    Q.   Now, what -- strike that.
9        When you do take notes, do you take
10 handwritten notes, or do you type into a computer?
11   A.   When I take notes?  It depends.  You know, I
12 haven't really -- on something like this, absorb it,
13 figure out, you know -- listen to what the lawyers
14 have to say.  And, again, my job really was to sharpen
15 any public statements that were going out, provide
16 those to the media.  But when I say "sharpen," every
17 single statement that went out was vetted, approved,
18 if not written by the attorneys representing
19 Mr. Chiocca.
20   Q.   Okay.  Now, tell us, please, what you recall
21 was said during the meeting at Rudolph Friedmann that
22 day.
23   A.   I -- I can't be specific on that, Howard.  It
24 was -- that's, you know, several years ago and, you

---

Page 100

1  know, when you're juggling five or six clients
2  simultaneously, I don't remember, but I do remem --
3  the only thing I remember from that meeting was him
4  sharing those text messages.
5    Q.   So you have no memory of him mentioning
6  Mr. Kimball?
7    A.   It could've been the time that Kimball's name
8  started to be socialized, you know, within the -- the
9  group.  That could've -- that could've been the day,
10 sure.
11   Q.   Well, are you guessing?
12   A.   I am guessing, but it makes sense that that
13 would've been the day.
14   Q.   What do you mean by Kimball's name would've
15 been socialized within the group?
16   A.   Well, there was -- you know, a time where --
17 and I'm -- I don't recall who brought this up, whether
18 it was Allan or the attorneys -- that there were, you
19 know, allegations with regard to the relationship
20 between Kimball and Ms. Hall.  And, at that point, I
21 was urged to watch a public meeting that was aired on
22 some website -- you know, the Town of Rockland website
23 where this was brought up in the open by, I believe it
24 was one other town selectman, which I thought was

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 101

1  pretty fascinating.
2  **Q.  Have you finished your answer?**
3  A.  I have.
4  **Q.  As of Wednesday, June 6, 2018, you had been**
5  **engaged for about five days --**
6  A.  That sounds --
7  **Q.  -- is that fair?**
8  A.  Sorry.  That sounds correct.
9  **Q.  And did you make a determination by**
10 **Wednesday, June 6, 2018, that it would be important**
11 **for the Kimball-Hall relationship to become part of**
12 **the narrative?**
13 A.  That would prob -- I mean, it was already out
14 there in public consumption, so that's -- it wasn't a
15 recommendation that I had.  It was something that I
16 think was collectively decided upon.  Again, I didn't
17 know who this guy Ed Kimball was or --
18 **Q.  Collective -- I'm sorry.**
19 A.  Yeah.
20 **Q.  Collectively decided upon by whom?**
21 A.  Well, the only parties involved in
22 discussions about Allan Chiocca were myself, Allan
23 Chiocca, Shafran and Friedmann.
24 **Q.  Did you, Mr. Chiocca, Mr. Shafran and**

Page 102

1  **Mr. Friedmann discuss a plan to shift the focus away**
2  **from Mr. Chiocca's transgression to that of Hall and**
3  **Kimball?**
4      MR. WALZ:  Objection.
5  A.  I don't recall using that type of language,
6  but, certainly, there was, you know, an agreement or
7  at least the recommendation to tell the entire story
8  from Allan's point of view.  And I know that Allan,
9  you know, at that point, was discussing what he knew
10 about their relationship.  Clearly, he wasn't the only
11 one, you know, going back to that -- that public
12 hearing which was one of the most outrageous things I
13 had seen.  This was a -- a little-kept secret in the
14 town of -- of Rockland for sure.
15 **Q.  Okay.  Let -- let me get you to focus very**
16 **specifically on my question.**
17     As of the first week -- actually, let me take
18 it without dates.
19     At any point in time, did you, Adam Shafran,
20 **Jon Friedmann and Allan Chiocca agree to pursue a**
21 **strategy that would shift the focus away from**
22 **Mr. Chiocca's transgression to that of Hall and**
23 **Kimball?  Yes or no.**
24     MR. WALZ:  Objection.

Page 103

1  A.  From what I can recall, I'm not sure that was
2  the language used, but we were bringing in every piece
3  of information regarding this case that we could, and
4  that included information regarding Ms. Hall's other
5  relationships.
6      MR. COOPER:  Okay.  Let's put up the next
7  exhibit in order on the screen, please, which is a
8  Wednesday, June 6, 2018, at 11:56 a.m. --
9      THE DEPONENT:  Mm-hmm.
10     MR. COOPER:  -- e-mail.
11     (Exhibit 7 marked for identification.)
12 BY MR. COOPER:
13 **Q.  You sent that e-mail --**
14     MR. WALZ:  I will object to this e-mail
15 as privileged and questions about this as privileged.
16 BY MR. COOPER:
17 **Q.  You sent this e-mail at that date and time to**
18 **Mr. Chiocca, Mr. Friedmann and Mr. Shafran copied to**
19 **your colleagues at Regan Communications, correct?**
20 A.  (Deponent viewing exhibit.)  Correct.
21 **Q.  And I want to go a little bit more than half**
22 **way down the substance of the e-mail, although you're**
23 **welcome to read the whole thing.  You write, "I agree**
24 **with the strategy for Friday's recommending that Allan**

Page 104

1  **ask Regina Ryan to explore other relationships**
2  **impacting town business (primarily Kimball/Hall)."**
3      **Have I read that correctly?**
4  A.  (Deponent viewing exhibit.)  Yes.
5  **Q.  And then you go on, it says, "Once this**
6  **becomes part of the narrative (and eventually it**
7  **will), it will support Allan's case and shift the**
8  **focus away from his transgression to that of Hall &**
9  **Kimball."**
10     Have I read that correctly?
11 A.  (Deponent viewing exhibit.)  That's correct.
12 **Q.  Those are the words that you chose to**
13 **communicate that day, correct?**
14 A.  Yes.
15 **Q.  And you were referring to Mr. Chiocca's**
16 **transgression, correct?**
17 A.  Yeah.
18     MR. WALZ:  Objection.
19 BY MR. COOPER:
20 **Q.  Right?**
21 A.  Yeah.  That word was used, yeah.
22 **Q.  And you would agree with me that, at least as**
23 **you understood it, the Kimball/Hall relationship was**
24 **not yet part of the narrative, right?**

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 117

1 reporter's question later.  If it was released, you
2 know, by Ms. Hall's attorney and was, you know,
3 characterized in a way that would support her
4 allegations.
5    Q.  Is this what is referred to sometimes in your
6 profession as getting out in front of the story?
7    A.  Ab -- yes, absolutely.
8    Q.  And I don't mean this in a pejorative way,
9 but it's part of your job to spin the available facts,
10 correct?
11    A.  I don't like to -- I've never used the word
12 "spin the available facts."  It is, you know, develop
13 a narrative that supports my client's version of
14 events.
15        MR. COOPER:  So let's go to the next
16 exhibit in order, which is a Wednesday, June 13, 2018
17 e-mail from you to Mr. Shafran, Mr. Friedmann,
18 Mr. Chiocca, copied to your colleagues at Regan
19 Communications at 11:26 a.m.
20        (Exhibit 9 marked for identification.)
21        BY MR. COOPER:
22    Q.  And would you just confirm that you sent that
23 -- this e-mail?
24    A.  (Deponent viewing exhibit.)  Confirmed.

Page 118

1    Q.  And you drafts -- drafted a statement?
2        MR. WALZ:  I'm objecting to questions
3 about this document as privileged.
4        BY MR. COOPER:
5    Q.  You drafted a statement for the recipient's
6 consideration --
7    A.  Mm-hmm.
8    Q.  -- about the video, correct?
9    A.  (Deponent viewing exhibit.)  Yes.
10    Q.  And it says, quote, We applaud the Town of
11 Rockland for its decision to release video
12 surveillance of the incident that occurred on the
13 evening of May 1 2018 at town hall involving my
14 client, Allan Chiocca, Rockland town administrator,
15 and Selectman Deirdre Hall.  This video clearly shows,
16 through express concern -- through -- clearly shows,
17 through Ms. Hall's action -- actions, that at no time
18 did she express concern to Mr. Chiocca about his
19 alleged, quote, inappropriate behavior, close quote.
20        Have I read that correctly?
21    A.  (Deponent viewing exhibit.)  Yes, you have.
22    Q.  And it goes on to say, What the video does
23 show however is the moment that Mr. Chiocca attempted
24 to leave the parking lot and return to his vehicle but

Page 119

1 was coerced back inside the building by Ms. Hall who
2 placed her body in front of his.  During this
3 exchange, Ms. Hall harassed Mr. Chiocca by reminding
4 him that she, as a selectman, voted on his contract.
5 Ms. Hall then demanded that Mr. -- that Chiocca
6 accompany her back inside town hall.  We are glad that
7 the truth is coming out -- into -- coming into light
8 regarding this situation and will continue to work
9 with the independent investigator toward a fair
10 outcome, close quote.
11        Have I read that correctly, other than my
12 stumbling?
13    A.  (Deponent viewing exhibit.)  You have.
14    Q.  Who wrote that?
15    A.  Who wrote that?
16    Q.  Yes.
17    A.  I wrote that based on my viewing of the
18 videotape.  And in what we do, again, going back to
19 articulating what our -- what our job is for the
20 client, write a statement that is either going to be
21 objected to by the client or approved by the client.
22 Normally, there are several drafts of statements that
23 are back -- going back and forth until ultimately the
24 attorneys representing the client decide what

Page 120

1 statement is ultimately going to go to the press.
2    Q.  Understood.  I just want to ask you, though,
3 in the second paragraph, which begins with, "What the
4 video does show, however," where you got that Ms. Hall
5 harassed Mr. Chiocca by reminding him that she, as a
6 selectman, voted on his contract.
7        Where does that appear on the video?
8    A.  That was according to Allan Chiocca, and that
9 was ultimately -- I don't even think we released that
10 statement.
11    Q.  I -- I understand.  I'm just asking you --
12    A.  Yeah.
13    Q.  -- where these things come from.
14        So that's what Mr. Chiocca told you?
15    A.  Yes.
16    Q.  And then it says, "Ms. Hall then demanded
17 that Chiocca accompany her back inside town hall."
18        Where did that come from?
19    A.  Mr. Chiocca.
20    Q.  And then -- well, and do you recall
21 discussing this statement, other than by e-mail, with
22 any of the recipients?
23    A.  I don't recall discussing it other -- other
24 than by e-mail.  I don't recall.

Allan Chiocca vs
Town of Rockland, et al.

Page 121

1    Q.  Did you agree, based upon your own
2  observations of the video, with these statements that
3  Mr. Chiocca made that I've just asked you about?
4    A.  The video aligned with his version of the
5  events, in my opinion.
6    Q.  Okay.  Is there any way to look at that video
7  and determine that Ms. Hall harassed Mr. Chiocca by
8  reminding him that she, as a selectman, voted on his
9  contract?
10       MR. WALZ:  Objection.
11    A.  That was probably poor wordsmithing by me.
12  And again, these are drafts that go back and forth,
13  and I'm sure the attorneys would've flagged that.  But
14  again, this is Allan Chiocca's version of events.  And
15  ultimately, the spokesperson for Allan Chiocca is his
16  attorney.
17    Q.  And did someone tell you that you had it all
18  wrong and they didn't want it to go out?
19       MR. WALZ:  Objection.
20    A.  Honestly, I don't remember.  I don't recall
21  how that statement either was -- how that statement
22  evolved or developed or whether it even -- it went
23  out.
24    Q.  So you don't know --

Page 122

1    A.  I don't know.
2    Q.  I'm sorry.  You don't know one way or the
3  other whether it went out; is that fair?
4    A.  Ahh, from -- yeah, that's fair.  From my
5  recollection, that's correct, Howard.
6    Q.  And do you have any memory of either
7  Mr. Chiocca, Mr. Shafran or Mr. Friedmann telling you
8  that anything about this statement was wrong?
9    A.  There must have been a -- a discussion of
10  some kind, in order to decide what to do with it, and
11  it probably was -- normally, those conversations
12  occurred between myself and Mr. Shafran.
13       MR. COOPER:  Well, let's take a look at
14  the next exhibit, which is a June 14th at 4:14 p.m.
15  e-mail from you.
16       THE DEPONENT:  Okay.
17       (Exhibit 10 marked for identification.)
18       MR. COOPER:  And I believe this is
19  Exhibit 10, Laurie?
20       MADAM COURT REPORTER:  It is, sir.
21  BY MR. COOPER:
22    Q.  Okay.  And, Mr. Sherman, did you send this
23  e-mail on the date and time it bears?
24    A.  (Deponent viewing exhibit.)  Yes.

Page 123

1    Q.  And the To is blank here again.
2       And I assume it's the same recipients --
3    A.  Correct.
4    Q.  -- that you named before, but you just don't
5  want them to see each other, correct?
6    A.  That is -- that is correct, yeah.
7    Q.  And this is -- the subject matter is Rockland
8  Scandal -- Allan Chiocca statement for new lawsuit to
9  block the surveillance video, urgent.
10       Have I read that correctly?
11    A.  (Deponent viewing exhibit.)  That is correct.
12    Q.  And does this refresh your recollection that,
13  in fact, the statement went out?
14    A.  It must have, yeah.
15    Q.  And if you look at the fifth paragraph, it
16  says, "To the contrary, the video shows that," and
17  then it goes on.
18       Do you see that?
19    A.  (Deponent viewing exhibit.)  Mm-hmm.
20    Q.  You have to say yes or no.
21    A.  Yes.
22    Q.  And it includes what we just looked at that,
23  "During this exchange, Hall threatened Chiocca by
24  stating that she votes on his raise, which Mr. Chiocca

Page 124

1  and the board were in the process of actively
2  negotiating."
3       Have I read that correctly?
4    A.  (Deponent viewing exhibit.)  Correct.
5    Q.  And that line has some edits from what you
6  had proposed in your preceding e-mail, correct?
7    A.  Correct.
8    Q.  Who made those changes?
9    A.  It would've -- it would've had to have been
10  the -- the attorney.
11    Q.  Mr. Shafran?
12    A.  I believe so, yeah.
13    Q.  Let's keep going.
14       And you'd -- you'd agree with me, to state
15  the obvious, that in this release, there was nothing
16  about Mr. Kimball and Ms. Hall's relationship,
17  correct?
18       MR. WALZ:  Objection.
19    A.  I -- I didn't see the -- yeah, I don't think
20  so.
21       (Pause.)
22       MR. COOPER:  When you see me taking some
23  time and flipping papers, it means that the
24  deposition's going to be shorter rather than longer.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

**Page 125**

1    (Pause.)
2    MR. COOPER:  Okay.  I'd like to mark as
3 the next exhibit in order, which will be 11, a
4 June 19th, 2018, 11:48 a.m. e-mail from you.
5    THE DEPONENT:  Okay.
6    (Exhibit 11 marked for identification.)
7    MR. WALZ:  I'll object to this e-mail as
8 being privileged and questions about this e-mail
9 being privileged.
10    BY MR. COOPER:
11   **Q.  You have that up in front of you,**
12 **Mr. Sherman?**
13   A.  (Deponent viewing exhibit.)  Yes.
14   **Q.  And can you just confirm, please, that you**
15 **sent it on the date and time it bears?**
16   A.  (Deponent viewing exhibit.)  Yes.
17   **Q.  And, in this, there is what is referred to as**
18 **a holding statement?**
19   A.  (Deponent viewing exhibit.)  Correct.
20   **Q.  It's a holding statement that would be issued**
21 **in the event that Mr. Kimball resigned and there was**
22 **press asking for a quote?**
23   A.  Correct.
24   **Q.  Was this statement that -- something that you**

---

**Page 126**

1 **drafted?**
2   A.  Yes.
3   **Q.  And was it released?**
4   A.  I don't think it was released.  I -- I don't
5 recall that being released.
6    When we put together holding statements, we
7 have to account for every potential scenario in a --
8 in a case like this.  So it's being proactive in case
9 something does happen, but I do not recall that
10 statement being released.
11   **Q.  Okay.  And in that statement that you drafted**
12 **-- (sneezes) excuse me.  Sorry.**
13    In the statement that you drafted, you write
14 in the first sentence, "The abrupt decision by Edward
15 Kimball to resign from his position as Chairman of the
16 Board of Selectmen for the Town of Rockland raises
17 serious ethical questions as to the true nature of his
18 relationship with Selectman Deirdre Hall."
19    Have I read that correctly?
20   A.  (Deponent viewing exhibit.)  Yes.
21   **Q.  Now, as of this date, June 19th, 2018, you**
22 **are aware that there was nothing in the mainstream**
23 **media about Mr. Kimball's relationship with Ms. Hall,**
24 **correct?**

---

**Page 127**

1    MR. WALZ:  Objection.
2   A.  I was aware, and I believe at this point,
3 that this is a -- already an open discussion in a town
4 hall meeting.
5   **Q.  That's not what I'm asking you.**
6   A.  I --
7   **Q.  I'm asking you --**
8   A.  I don't recall whether or not Kimball was
9 mentioned in, quote/unquote, the mainstream media at
10 the time.
11   **Q.  Was -- did you inves -- did you investigate**
12 **that at the time?**
13   A.  I don't re -- I don't -- I don't remember.  I
14 don't recall.
15   **Q.  Okay.  Can you think of any mainstream media**
16 **outlet that had published, prior to June 19th, 2018,**
17 **that there had been a relationship between Mr. Kimball**
18 **and Ms. Hall?**
19   A.  I don't -- I don't recall.  I do believe that
20 some of the social media sites and alternative media
21 were aggressively pursuing that story angle.
22   **Q.  My question is the mainstream media.**
23   A.  How would you describe the mainstream media,
24 Howard?

---

**Page 128**

1   **Q.  The way you described it earlier.**
2   A.  I don't know if reporters were working on
3 that narrative.  It -- nothing had been published.
4 That doesn't mean that stories weren't being worked on
5 behind the scenes.
6   **Q.  Well, my question was, what had been**
7 **published in the mainstream media, and you know, based**
8 **on your memory, that as of June 19th, 2018, that you**
9 **-- when you prepared this statement, there was nothing**
10 **in the mainstream media, correct?**
11    MR. WALZ:  Objection.
12   A.  I will take your word for it, Howard.  That,
13 I don't recall, but sure.
14   **Q.  And what you were calling for here was a**
15 **investigation, essentially, into their relationship,**
16 **right?**
17   A.  Sure.  Yes.
18   **Q.  And was this statement -- I understand your**
19 **testimony that you say that it wasn't released, but**
20 **was it approved by Attorneys Rudolph -- excuse me --**
21 **Attorneys Friedmann and Shafran and Mr. Chiocca?**
22   A.  I would -- I don't recall whether or not it
23 was approved.  If it went out to the media, then it
24 would've been approved by the attorneys.

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 133

1     MS. BELOSTOCK: (Complied.)
2     MR. COOPER: Okay. Let's stop there.
3     MS. BELOSTOCK: (Complied.)
4     MR. COOPER: I'm sorry, you gotta go back
5  the other way.
6     MS. BELOSTOCK: Oh.
7     (Complied.)
8     MR. COOPER: Right there.
9  BY MR. COOPER:
10    Q.  Okay. So, did you send this e-mail on
11 June 21, 2018, at 9:53 a.m.?
12    A.  (Deponent viewing exhibit.) I did.
13    Q.  And, again, it's to the group of media
14 outlets that you've testified to already?
15    A.  (Deponent viewing exhibit.) That is correct.
16    Q.  Had you made any efforts to expand that group
17 by this date?
18    A.  I'm not -- I -- I don't recall. I don't
19 think so.
20    Q.  Okay. And, again, a number of the media
21 outlets you were forwarding this to included
22 mainstream media outlets, correct?
23    A.  Correct. Yup.
24    Q.  Now, I want to go -- if we could scroll

Page 134

1  towards the bottom, there is a bottom paragraph that
2  begins, "Mr. Chiocca strongly believes that Chairman
3  Kimball has not taken his complaint against Hall
4  seriously because of Kimball's close relationship with
5  Hall, which we expect the ongoing investigation to
6  uncover."
7     Have I read that correctly?
8     A.  (Deponent viewing exhibit.) Yes.
9     Q.  So it was you -- or strike that.
10    Did you write those words?
11    A.  (Deponent viewing exhibit.) No. I did not
12 write those words.
13    Q.  Who -- who wrote those words?
14    A.  It would have had to come from the attorney.
15    Q.  And I note that this -- if you go all the way
16 to the bottom, is a statement attributed to Adam
17 Shafran --
18    A.  (Deponent viewing exhibit.) Yes.
19    Q.  -- right?
20    A.  Yup.
21    Q.  What causes you to believe that one of the
22 attorneys wrote those words?
23    A.  Because I did not write those words. I
24 didn't have that intel -- institutional knowledge.

Page 135

1  This was a statement that was drafted by Shafran and
2  distributed to the media by me.
3     Q.  Whose decision was it to alert the mainstream
4  media of Kimball's close relationship with Hall?
5     A.  That would've been the attorney.
6     Q.  Mr. Shafran?
7     A.  Yes.
8     Q.  Do you know why he made the decision to do
9  that on June 1, 2018?
10    A.  I think it has to do with Allan Chiocca's
11 open meeting law complaint.
12    Q.  And he wanted it to be part of the narrative
13 that there was a close relationship between
14 Mr. Kimball and Mr. [sic] Hall that should be subject
15 to the investigation; is that fair?
16       MR. WALZ: Objection.
17    A.  I think that would be fair.
18    Q.  Did you agree or disagree with that strategy?
19    A.  I agreed with it, because it was already in
20 the open forum at town meeting and the -- certainly
21 something that everyone in town was talking about with
22 regard to these three individuals.
23    Q.  Okay. But I'm talking about raising this to
24 the level of providing it to the mainstream media.

Page 136

1     A.  It was already raised to the level to provide
2  that to the mainstream media because these town
3  meetings were videotaped and circulated, so the media
4  already knew or was alerted to whatever was going on
5  between these two parties well before Adam Shafran
6  released or ordered me to release that statement.
7     Q.  Oh, well, we'll get there.
8     A.  Okay.
9     Q.  Who in the mainstream media told you that
10 they were aware of a sexual relationship between
11 Mr. Kimball and Mr. [sic] Hall on June 21, 2018, or
12 any prior day?
13    A.  I think I had a conversation with one person
14 in the media at least on this, and they were trying to
15 track down information with regard to what the
16 allegations were.
17    Q.  Who was that person?
18    A.  I certainly -- I -- I don't recall, and nor
19 would I give up a source like that.
20    Q.  Okay. Well, was -- a person in the media
21 would be a source for you?
22    A.  Sure. Yeah, that's -- that's the bread and
23 butter of what we do, Howard.
24    Q.  Okay. Well you don't recall who it is

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 137

1  anyway, right?

2      A.  No, I don't recall who it is anyways.  But

3  the story was well tread in -- online and certainly,

4  you know, part of the conversations that a lot of

5  different people were having with regard to this case.

6      Q.  Okay.  Name some.

7      A.  I'm -- I'm -- I can't, but I -- but I --

8      Q.  Well, you just said a lot of different

9  people.

10     A.  Well --

11     Q.  I'm just asking you for --

12     A.  Anybody that --

13     Q.  -- just one name.

14     A.  Anybody that watched the debacle that was

15  that town hall meeting would certainly be willing --

16  be ready to talk about that.  But I'm just giving you

17  from what I heard.  I can't remember who exactly was

18  socializing that narrative at the time, but it was --

19  it was out there for sure.

20     Q.  But not in the mainstream media publications,

21  correct?

22     A.  Not printed, but, certainly, something that,

23  I'm sure if I was a journalist working on this case, I

24  would've absolutely unearthed that information.  I can

Page 138

1  ima --

2      Q.  And --

3      A.  Hold on.  I can imagine that my colleagues

4  would be doing the same.

5      Q.  Okay.  Well, I don't want you to imagine.

6      A.  I'm just --

7      Q.  I'm only interested in facts here.

8      A.  Okay.

9      Q.  Name for me a single mainstream reporter who

10  you were aware was working on a story about a sexual

11  relationship between Ms. Hall and Mr. Kimball as of

12  June 21, 2018.  Just give me a name.

13     A.  I'm not -- I can't confirm an individual

14  reporter to you, no.

15     MR. COOPER:  Okay.  Let's skip ahead to

16  July 6, 2018 --

17     THE DEPONENT:  Okay.

18     MR. COOPER:  -- and we'll put it up on

19  the screen.  This is an e-mail at 12:09 p.m.

20     MS. BELOSTOCK:  12:09 p.m.?

21     MR. COOPER:  12:09 p.m.

22     Do you have it?

23     MS. BELOSTOCK:  Yeah.

24     MR. COOPER:  Okay.

Page 139

1      (Exhibit 14 marked for identification.)

2  BY MR. COOPER:

3      Q.  Mr. Shafran writes to Mr. Chiocca, to you and

4  Mr. Friedmann and he says, "Gentlemen, Attached hereto

5  is the final report.  I have not read it all yet, but

6  it is most definitely good for Allan."

7      Do you see that?

8      A.  (Deponent viewing exhibit.)  I do.

9      MR. WALZ:  I'm going to –

10  BY MR. COOPER:

11     Q.  And then --

12     MR. WALZ:  -- object to any further

13  questioning about this document as privileged and to

14  the document as privileged.

15     BY MR. COOPER:

16     Q.  Then two paragraphs below he writes, "A

17  reminder, do not" -- and under the words don't are in

18  capital letters -- "share this report with anyone."

19     Do you see that?

20     A.  (Deponent viewing exhibit.)  I do.

21     Q.  And that was the instruction that Mr. Shafran

22  gave you and his client, Mr. Chiocca, or your mutual

23  client, Mr. Chiocca, that you were not to share the

24  report with anyone, right?

Page 140

1      A.  Right.  At the moment, yes.

2      Q.  And he told you that the report was

3  confidential, correct?

4      A.  At that moment, yes.

5      Q.  In fact, it said it on the report that it was

6  confidential, correct?

7      A.  Yes.

8      Q.  And you know that the report also said that

9  it could not be disseminated without the permission of

10  the board of selectpersons in the Town of Rockland,

11  correct?

12     A.  I don't recall that, no.

13     Q.  You -- you don't remember ever seeing that?

14     A.  I'm -- I'm saying I don't recall, no.

15     Q.  I -- I'm -- I just want to be clear, did you

16  ever physically see the report?

17     A.  I did, yes.

18     Q.  And is it your testimony that you don't

19  recall whether there was a logo on every page stating

20  that it could not be released without the permission

21  of the board of selectpersons of the Town of Rockland?

22     A.  Ult -- I -- I haven't viewed that report in

23  three years, Howard, so I don't know.  But I'm -- that

24  -- that -- if that's the case, then that's the case.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 145

1 Summary, right?

2   A.  Mm-hmm.

3   Q.  I'm going to open the attachment.

4       MR. COOPER:  And could you make it a
5 little smaller?

6       MS. BELOSTOCK:  (Complied.)

7       BY MR. COOPER:

8   Q.  And you're welcome to read it, Mr. Sherman.

9       But you did see the executive summary,
10 correct?

11   A.  (Deponent viewing exhibit.)  I -- I did see
12 that, correct.

13   Q.  And it was written by Regina Ryan, whose name
14 appears on the last page along with her signature --

15   A.  (Deponent viewing exhibit.)  Yes.

16   Q.  -- right?

17       And you know that Mr. Kimball's not mentioned
18 in this executive summary, correct?

19   A.  Correct.

20   Q.  And nothing is mentioned about any
21 relationship between Mr. Kimball and Ms. Hall,
22 correct?

23   A.  In the executive summary, correct.

24       MR. COOPER:  Now, let's scroll forward to

Page 146

1 an e-mail dated the July 10th, 2018, at 3:41 p.m.,

2 which is the same day but later in the day.

3       (Exhibit 16 marked for identification.)

4       BY MR. COOPER:

5   Q.  And did you send the e-mail that is comprised
6 in this exhibit -- comprised as this exhibit, which I
7 believe will be 16 --

8       MADAM COURT REPORTER:  Correct.

9       BY MR. COOPER:

10   Q.  -- on July 10th, 2018, at 3:41 p.m.?

11       MR. WALZ:  I'm going to object to the
12 questioning of this document as well, as privileged.

13       THE DEPONENT:  (Viewing exhibit.)  Can
14 you scroll up, please, on that?

15       MS. BELOSTOCK:  (Complied.)

16   A.  (Deponent viewing exhibit.)  Yeah, that --
17 this statement was developed by Attorney Shafran.

18   Q.  Okay.  So you didn't write it?

19   A.  Correct.

20   Q.  But for some reason you're forwarding it to
21 him?

22   A.  No, I -- I forwarded to say, is this final?

23   Q.  Okay.

24   A.  This was his e-mail to me, so I wanted to

Page 147

1 make sure that there wasn't any additional edits or

2 addendums to the statement that Shafran had developed.

3   Q.  Okay.  Well, just so you know, I only have an
4 e-mail from you to him.

5   A.  Okay.  Well, I'll see if I can track down
6 that other one, Howard.  I gave you everything that I
7 could find, so --

8   Q.  Okay.

9   A.  -- you'll have to --

10   Q.  I just want --

11   A.  Yeah.

12   Q.  -- the record -- I'm sorry.  Go ahead.

13   A.  Go on the record, sure.  Tell me what you're
14 going to say here.

15   Q.  I just want the record to be clear that
16 you're testifying that there's an e-mail from Adam
17 Shafran to you forwarding the statement that he wrote.

18   A.  Yes, because I did not -- I did not write
19 this.

20   Q.  Any part of it?

21   A.  (Deponent viewing exhibit.)  I'm looking.  I
22 don't recognize my language at all on this statement.

23   Q.  Okay.  So you do ask, in your e-mail, for
24 them to let you know if this is final and that you'd

Page 148

1 send it to the media immediately after the vote?

2   A.  (Deponent viewing exhibit.)  Yes, based upon
3 the agreement and the guidance and direction of
4 Shafran and -- and Friedmann.

5   Q.  Okay.  And you didn't do any independent
6 investigation or get any personal guidance from anyone
7 but them?

8   A.  They're the clients, so that -- I would only
9 be directed via the client.

10   Q.  But just to be clear, you didn't consult with
11 anyone at Regan Communications about the propriety of
12 releasing the report; is that fair?

13   A.  I don't recall what conversations we had.  I
14 -- all as I remember is this particular statement from
15 -- from Shafran and their decision that Allan was not
16 a party to that agreement.

17   Q.  Did you consult with a lawyer, other than
18 Mr. Shafran and Mr. Friedmann?

19   A.  We -- we did not, no.

20   Q.  Do you recall talking to George Regan about
21 the release of the report?

22   A.  I don't recall talking to George.  I don't
23 know if there was a conversation or not, you know.

24   Q.  Now, the e-mail, as they say, says what it

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 149

1  says.
2       But you would agree with me that, in the
3  second paragraph, it talks about, quote, the
4  disturbing conspiracy of lies conducted by Hall and
5  Kimball to smear the reputation of Mr. Chiocca for
6  their own personal and political benefit, closed
7  quote.
8       Have I read that correctly?
9  A.  (Deponent viewing exhibit.)  You have read
10 that correctly.
11 Q.  And you're telling me that Mr. Shafran wrote
12 that?
13 A.  I did not write that.
14 Q.  Do you know who did?
15 A.  I -- it must have been Mr. Shafran.  It's his
16 quote.
17 Q.  And do you know whether the report, in fact,
18 lays out a disturbing conspiracy of lies conducted by
19 Hall and Kimball?
20       MR. WALZ:  Objection.
21 A.  Those are -- those are Adam Shafran's words,
22 not mine.
23 Q.  Okay.  Let's go down to the fourth paragraph,
24 which purports to quote from the report about, quote,

Page 150

1  an intense physical and emotional affair between
2  herself and Kimball during the months of March and
3  April 2018, at which time Hall professed her love for
4  Kimball, and it goes on.
5       Do you see that?
6  A.  (Deponent viewing exhibit.)  Yes.
7  Q.  And did you have any role in writing anything
8  in this paragraph?
9  A.  I did not.
10 Q.  And then, in the last paragraph above the
11 statement, it says, as a result, "Mr. Chiocca urges
12 the Board of Selectmen to make the full 25 [sic] page
13 investigative report public so that the residents of
14 Rockland are given all the facts regarding this case,"
15 and it goes on, but I'm going to stop there.
16 A.  (Deponent viewing exhibit.)  Okay.
17 Q.  Have I read that correctly?
18 A.  (Deponent viewing exhibit.)  Yes.
19 Q.  When you were talking to Mr. Shafran about
20 this statement and whether it should be released, did
21 he tell you that he recognized that the board of
22 selectmen had to vote to make the full 29-page report
23 public?
24 A.  I don't recall what that conversation was.

Page 151

1  Again, this was -- the only re -- memory I have of
2  that entire event was that Friedmann and Shafran had
3  concluded that Chiocca was not a party to that, and
4  that's why --
5  Q.  So --
6  A.  -- the statement was --
7  Q.  -- the --
8  A.  -- drafted by Shafran.
9  Q.  -- the reason that I'm asking, Mr. Sherman,
10 is, I want to know the timing of when they concluded
11 that and expressed it to you.
12       Because, here, Mr. Chiocca is -- Mr. Shafran
13 on behalf of Mr. Chiocca is urging the board to vote
14 to make the full 29-page investigative report public,
15 right?
16 A.  Yes.
17 Q.  And is it fair to say that it wasn't until
18 after that vote was taken and it was decided that the
19 report should remain private, the full report should
20 remain private, that that is when you were informed by
21 Mr. Shafran and Mr. Friedmann that they were going to
22 release it anyway?
23 A.  I don't rem -- recall the specific series of
24 events in the timeline there, Howard.

Page 152

1  Q.  Okay.  Is it fair to say that they, at least,
2  wanted you to publish something urging the board to
3  take a vote to make the full report public?
4  A.  I think that was fair to say, given the
5  statement that we both just read.
6       MR. COOPER:  Now, I'm going to ask to
7  mark as the next exhibit in order, Exhibit 16 --
8       MADAM COURT REPORTER:  Seventeen.
9       MR. COOPER:  Seventeen, sorry.
10 -- Exhibit 17, a July 10, 2018, 3:46 p.m.
11 from you to Shafran, Friedmann and Chiocca.
12       (Exhibit 17 marked for identification.)
13 BY MR. COOPER:
14 Q.  And did you send that e-mail five minutes
15 after receiving -- excuse me -- five minutes after
16 sending the e-mail that we just looked at that is
17 Exhibit 16?
18       MR. WALZ:  I'll object to this document
19 as well as being privileged.
20 A.  (Deponent viewing exhibit.)  I -- if the --
21 if the timeline is -- is that, then -- then, yes.
22 Q.  And you write, "Just tweaked to identify Hall
23 and Kimball in first para."
24       Do you see that?

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 153

1    A.  (Deponent viewing exhibit.)  Correct.
2    **Q.  So you edited Mr. Shafran's statement to --**
3    **so that it mentioned Mr. Kimball and Ms. Hall in the**
4    **first paragraph; is --**
5    A.  Yes.
6    **Q.  -- that right?**
7    A.  Yes.
8    **Q.  And why did you do that?**
9    A.  Because if we were going to release that to
10   the public or to the press, then they would -- you
11   know, it would be easily id -- more easily
12   identifiable in that statement that these are the
13   parties that Mr. Chiocca and his attorney were talking
14   about.
15       MR. COOPER:  Okay.  I want to mark as
16   Exhibit 18 an e-mail from five minutes later,
17   July 10th, 2018, at 3:51 p.m.
18       (Exhibit 18 marked for identification.)
19       BY MR. COOPER:
20   **Q.  And did you send this e-mail?**
21   A.  (Deponent viewing exhibit.)  I assume --
22       MR. WALZ:  I'm going to object -- I'm
23   going to object to this document as well as
24   privileged.  Oh, no.  Never mind.  I retract that

Page 154

1    objection.
2        BY MR. COOPER:
3    **Q.  Do you recognize that this is an e-mail that**
4    **you sent at the date and time listed?**
5    A.  (Deponent viewing exhibit.)  Yes.  Yup.
6    **Q.  And, again, this is another one of these**
7    **e-mails to the collective media entities that we've**
8    **discussed previously?**
9    A.  Correct.
10   **Q.  And do you recall whether the list was**
11   **expanded at this point in time?**
12   A.  I don't recall whether it was expanded.  I
13   think it was the same list.  And that e-mail was sent
14   under the direction of Mr. Shafran.
15   **Q.  Because he wanted these media outlets to know**
16   **that he'd have a written statement following that**
17   **evening's vote, right?**
18       MR. WALZ:  Objection.
19   A.  That is correct.
20   **Q.  And do you recall speaking to Mr. Shafran in**
21   **the five minutes between 3:46 p.m. and 3:51 p.m. on**
22   **July 10th, 2018?**
23   A.  Speaking to him, do I recall?
24   **Q.  Yes.**

Page 155

1    A.  No.  But could there have been a phone call?
2    Yes.  But I don't recall having a personal call with
3    him between that time.
4    **Q.  What about Mr. Friedmann or Mr. Chiocca?**
5    A.  It would've all -- you know, my
6    communications, you know, where this was concerned,
7    really focused -- there's -- I -- with Adam Shafran,
8    so with --
9    **Q.  And you --**
10   A.  Yeah.
11   **Q.  And you -- you mentioned that he gave you a**
12   **specific instruction to send the 3:51 p.m. e-mail.**
13       **If it wasn't oral, do you believe he sent you**
14   **an e-mail?**
15   A.  It would've -- it would've been specific
16   instruction via a phone call.
17   **Q.  And do you think that that phone call took**
18   **place in this five-minute interim?**
19   A.  It would've had to have taken place then,
20   yeah.
21   **Q.  And your best memory is that he said to you,**
22   **I want to you to alert all of the media that I'm going to**
23   **have a statement following tonight's vote?**
24       MR. WALZ:  Objection.

Page 156

1    A.  That was the direction from the attorney.
2        MR. COOPER:  Let's go to July 11th, 2018,
3    at 12:01 p.m.
4        (Exhibit 19 marked for identification.)
5        BY MR. COOPER:
6    **Q.  Do you recognize this as an e-mail that you**
7    **also sent to the collective media group on the evening**
8    **of July 10th, early morning, I guess, at 12:01 p.m.,**
9    **so one minute into July 11th, 2018?**
10   A.  (Deponent viewing exhibit.)  Yes.
11   **Q.  And do you think that you sent this to the**
12   **same collective media group that you've described**
13   **earlier?**
14   A.  Yes.
15   **Q.  And here it says, "Attention reporters and**
16   **editors, In respon" -- and, by the way, does that**
17   **cause you to believe that you might have expanded the**
18   **group that you were sending this to?**
19   A.  No, because these weren't, for the most part,
20   personal e-mails of reporters.  These were to the
21   general assignment desk people that it -- the
22   expansion of that list never happened.  It was
23   basically whoever was monitoring the, you know, news
24   e-mail chain or system at any given media outlet would

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 161

1  for some reason, but these are --
2      Q.  And if -- and if you could just turn the --
3  well, I'm going to turn the page.
4          MR. COOPER:  If you could scroll up --
5          THE DEPONENT:  Sure.
6          MR. COOPER:  -- to the first page of the
7  report -- actually, we've got to open the attachment
8  first.  One second.
9      (Pause.)
10         MR. COOPER:  And could you scroll up just
11  a little bit so we have the whole logo, or as much as
12  you can get?
13         MS. BELOSTOCK:  Yeah, let me get it
14  there.
15     (Complied.)
16         BY MR. COOPER:
17     Q.  Now, do you see, Mr. Sherman, on the first
18  page of the report, where it says, "Confidential
19  Personal Record to Adam Shafran, Esquire, representing
20  Allan Chiocca, not to be released or distributed
21  without the permission of the Rockland Board of
22  Selectmen?"  Do you see that?
23     A.  (Deponent viewing exhibit.) I do, yeah.
24     Q.  And I'm going to represent to you that that's

Page 162

1  on every page of the report.
2      A.  Understood.
3      Q.  And, at the time, do you -- in July of 2018,
4  do you remember seeing that?
5      A.  Yes.
6      Q.  Did it cause you any concern?
7      A.  It caused me concern, and that's why I did
8  have a conversation with the attorneys representing
9  Chiocca, and they were enthusiastically directing me
10  to -- to release that report, because Chiocca did not
11  agree -- did not engage in any confidentiality
12  agreement, so this was a decision made by the
13  attorneys.
14     Q.  And when you say "the attorneys," I take it
15  that means both Mr. Friedmann and Mr. Shafran, plural?
16     A.  Ye -- yes.
17         MR. WALZ:  Objection.
18         BY MR. COOPER:
19     Q.  Was this a telephone call or a meeting?
20     A.  It was a telephone call, yeah.
21     Q.  And would that telephone call have been on
22  July 11th, 2018?
23     A.  It could've been.  It must have been.  Sure.
24     Q.  And how long of a call was it, to your

Page 163

1  recollection?
2      A.  I don't -- I don't recollect how long that
3  call was, no.
4      Q.  Okay.  And were there -- was there Chiocca
5  participating?
6      A.  I'm not -- I don't recall whether or not he
7  was on that -- that call.
8      Q.  And who do you recall were participating?
9      A.  Ad -- Adam Shafran definitely and I believe
10  that Friedmann was also on that call --
11     Q.  So your --
12     A.  -- from what I recall.
13     Q.  Your best memory is it was the three of you?
14     A.  Correct.
15     Q.  And who placed that call?
16     A.  I don't know who called who.  I would believe
17  that would've been Shafran coordinating that call.
18     Q.  And tell us, please, what you remember was
19  said by whom in that call.
20     A.  What I remember from that call was that they,
21  you know, strung -- they had agreed, as the attorneys
22  of Allan Chiocca, that Allan did not participate in
23  any confidentiality agreement, therefore, they were
24  free and clear to disseminate this report.

Page 164

1      Q.  Did you question them at all?
2      A.  I did, and they said that's our position, and
3  that is the strategy that we were going -- they were
4  going to take.  And I was directed to work on behalf
5  of my client in the way that they directed me to.
6      Q.  And when you hung up from them, what was your
7  feeling, if any?
8      A.  Well, I'm not -- you know, they -- they were
9  the experts in this case, not me.  So I was going to
10  work on behalf of the -- the lawyers that were
11  representing Mr. Chiocca.
12     Q.  Were you concerned at all?
13     A.  I was not concerned because they had asserted
14  their belief that they were free and clear to
15  disseminate the information.
16     Q.  Is there anything else that you can recall
17  about that telephone conversation?
18     A.  There's nothing else I can recall from that.
19     Q.  As of that point in time, did you consult
20  with anybody other than Mr. Shafran and Mr. Friedmann
21  about whether it was appropriate to release the full
22  report?
23     A.  I'm not -- I can't recall if I brought in
24  anybody else into that -- that conversation.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 165

1    Q.   Did you do that at any point in time?
2    A.   I'm not sure that I -- that I -- that did I
3 or -- or not. I don't recall what -- what internal
4 conversations we had or written communications. The
5 only thing I remember from that -- that event was the
6 attorneys at Rudolph Friedmann directing me to release
7 that information to the media.
8    Q.   And is that true through the present, that
9 you haven't discussed or sought advice from anybody
10 beyond what you've already testified to?
11   A.   I believe that's the case, yeah.
12   Q.   Now, had you ever been in a situation like
13 this before?
14   A.   Not representing a client, no.
15   Q.   Had you ever seen a logo instruction like the
16 one that appears on all 29 pages of -- of the report?
17   A.   I had not.
18   Q.   And did you follow the reaction once the
19 report was released?
20   A.   What do you mean?  Can you rephrase that?
21 I'm not sure --
22   Q.   Yeah.
23   A.   -- what you're asking there.
24   Q.   Just like you've been monitoring various

---

Page 166

1 sources and social media, mainstream media, et cetera,
2 in the preceding weeks, did you monitor --
3    A.   Sure.  I would've monitored media from that
4 time forward.
5    Q.   And what was the reaction that you observed?
6    A.   I don't -- I don't quite remember what the
7 reaction was, quite frankly, so I don't know -- I
8 don't recall what, you know, the pick up was or what
9 the reaction was, no.
10   Q.   And is that true through the present?
11   A.   Yes.
12   Q.   And before hitting the button and sending
13 this 29-page report off to the media, did you read it?
14   A.   I did.
15   Q.   Did you note that there was information in
16 the report about Mrs. Kimball?
17   A.   Going back, I think there was, yeah.
18   Q.   And did you ask Mr. Shafran or Mr. Friedmann
19 whether -- whether it was appropriate to release
20 information about Mrs. Kimball?
21   A.   I asked whether it was appropriate to release
22 this information about all parties, and they said yes.
23   Q.   But did the topic of Mrs. Kimball come up in
24 particular?

---

Page 167

1    A.   No.
2    Q.   Did you have any concern about information
3 about Mrs. Kimball being released?
4    A.   Under the guidance of the attorneys, given
5 their expertise, no.
6    Q.   What -- what expertise do you think they had?
7       MR. WALZ:  Objection.
8    A.   They were working on the case representing
9 Chiocca and knew, at least in their estimation, what
10 they could share and what they could not, and they
11 believed that they could share the report, and they
12 directed me to do so.
13   Q.   But did they tell the -- tell you that they
14 were experts in personnel records of municipal
15 employees?
16   A.   They did not.
17   Q.   And do you know whether they are?
18   A.   I do not.
19   Q.   Do you know what impact the release of this
20 report had on Mr. Kimball?
21   A.   I do not.
22   Q.   Do you know what impact the release of this
23 report had on his wife, Mrs. Kimball?
24   A.   I do not.

---

Page 168

1    Q.   Do you know what impact the release of this
2 report had on Mr. Kimball's business?
3    A.   I do not.
4    Q.   Did you care about any of that?
5    A.   I cared about the impact that everyone's
6 collective actions had on my client, Allan Chiocca.
7    Q.   Did Mr. Friedmann or Mr. Shafran or
8 Mr. Chiocca tell you that they cared about any of the
9 impact on Mr. Kimball and his wife?
10   A.   They cared about the impact on Mr. Chiocca,
11 and anyone's decisions and actions have to speak for
12 themselves.
13   Q.   Okay.  So -- so, in your discussions with
14 Mr. Friedmann, Mr. Shafran and Mr. Chiocca about the
15 decision to release this 29-page report, did you hear
16 any of them express concern about the impact that its
17 release would have on Mr. Kimball and his wife?
18   A.   No.  And, again, it's not the release that
19 has an impact on Mr. Kimball and his wife, it's the
20 allegations in the release.  Do you know what I'm --
21      MR. COOPER:  I pass the witness.  Thank
22 you, Mr. Sherman.
23      THE DEPONENT:  Thank you, Mr. Cooper.
24      MR. AMOS:  Is everybody okay if I -- I

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 185

1 Galotti about this case -- about this matter?

2   A.  I don't think so.  You know, I don't think --
3 again, I don't -- I don't recognize Nick, or I would
4 not know what his connection to this case is.

5        I think this was from a -- you know, Real
6 Rockland Facebook page that seemed to be dominated by
7 conversations, especially after, as I said, these
8 public hearings that were more focused on the personal
9 matters betw -- of Ms. Hall, Mr. Kimball and others.
10 So, people had a front-row seat, you --

11   Q.  So I think, here, Nick Galotti references you
12 by name.

13        And so, did you post on this thread?

14   A.  I don't -- I don't know.  I'd have to go back
15 and look, but I don't -- I don't recall posting on a
16 thread.  I might -- I may have.

17   Q.  It would be --

18   A.  You know, what -- what, normally, we would
19 do -- and I'm not -- I don't recall doing that in this
20 case, would be if we -- if Shafran had a statement to
21 release to the press, they would do -- they would also
22 do that on social media.  Whether or not I -- I did
23 post that Shafran's -- one of Shafran's statements on
24 a social media thread, I can't recall.  It's so long

Page 186

1 ago, I wouldn't know.  But it seems that that could be
2 the case.

3   Q.  Let me stop the share here.

4        All right.  So, at some point in this matter,
5 Chiocca claims that he was sexually harassed.

6        Is that accurate to your understanding?

7   A.  The first very first day I -- I met him, that
8 was his claim.

9   Q.  Now, you would agree with me that whether
10 Hall and Kimball had an affair outside of their
11 marriage doesn't make Chiocca's claim of sexual
12 harassment any more or less true, right?

13        MR. WALZ:  Objection.

14   A.  Well, I -- I -- think it --

15   Q.  Well, the -- the question's a yes or no.

16   A.  Well, repeat the question, Cindy.

17   Q.  You'd agree with me that the fact that Hall
18 and Kimball had an extramarital affair does not make
19 Chiocca's claim of sexual harassment any more or less
20 true, correct?

21        MR. WALZ:  Objection.

22   A.  No, I don't agree with that.  I would say it
23 would -- it would make it more true, because there's a
24 pattern there.

Page 187

1        MS. CIESLAK:  All right.  Let me pull up
2 one more e-mail.  I'll find it here.  Bear with me.  I
3 gotta scroll up to find the one that I need.

4        (Pause.)

5   BY MS. CIESLAK:

6   Q.  Okay.  On your screen, do you see an e-mail
7 from Mary Whitfill --

8   A.  (Deponent viewing exhibit.)  Yeah.

9   Q.  -- from the Patriot Ledger to you --

10   A.  (Deponent viewing exhibit.)  Yes, I do.  Yes.

11   Q.  -- dated July 11th, 2018, 12:35?

12   A.  (Deponent viewing exhibit.)  Mm-hmm.

13   Q.  And there is a response from you to
14 Ms. Whitfill, July 11, 2018, at 12:41?

15   A.  (Deponent viewing exhibit.)  Correct.

16   Q.  And you wrote the response at 12:41 p.m.?

17   A.  (Deponent viewing exhibit.)  Yes.

18        MS. CIESLAK:  I'd like to mark this as
19 the exhibit next in line.

20        THE DEPONENT:  Okay.

21        (Exhibit 21 marked for identification.)

22        BY MS. CIESLAK:

23   Q.  All right.  Ms. Whitfill says, "Does the
24 attorney have a response to my question, re:  Does

Page 188

1 Chiocca plan to resign his position?"  You said, "Off
2 the record - Do you mean retire?  Chiocca is exploring
3 all options right now."

4        So you were aware that Chiocca was exploring
5 retirement, correct?

6   A.  That is correct.

7        MR. WALZ:  Objection.

8   A.  Yeah, that's -- yeah, I was aware of that,
9 yeah.

10   Q.  What did Chiocca tell you about exploring his
11 retirement option?

12   A.  Well, just with regard to his age, he wasn't
13 sure how long he would maintain his position in -- in
14 Rockland.  It was a social conversation.  He love --
15 and I know he also said he loved his job.

16        MS. CIESLAK:  All right.  Thank you.  I'm
17 going to stop sharing the screen and let me just check
18 my notes real quick.

19        If I can pull it up, I'm going to go back to
20 an e-mail that's already been discussed here today.
21 Let me share my screen one more time.

22        (Pause.)

23        BY MS. CIESLAK:

24   Q.  Okay.  On your screen, do you see the

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 209

1    A.  -- I never re -- after receiving that
2  response, I never reached out or heard from Adam
3  Shafran again regarding this issue until the subpoena
4  was announced.
5    Q.  Okay.  Fair enough.
6        And so you understood, after your
7  communication with Mr. Shafran in January of 2019,
8  that he had -- that the Town was, you know, doing what
9  the Town was doing, but the investigator had no
10  intention of really reopening the investigation or
11  changing anything about it?
12        MR. WALZ:  Objection.
13    A.  Just based on -- just based on the e-mail
14  from Adam, I wasn't giving it any more thought than
15  that.
16    Q.  Okay.  Now, we talked a bit -- you talked a
17  bit earlier about the media outlets who sent various
18  communications and -- and you had sent on to us a
19  cover that communicated some of those outlets.
20        Just -- just to be clear, the cover that you
21  sent us indicated that you sent -- you sent various
22  media -- media communications to the Patriot Ledger,
23  correct?
24    A.  Mm-hmm.

Page 210

1    Q.  To WATD-FM, correct?
2    A.  Correct.
3    Q.  To Turtleboys, correct?
4    A.  Correct.
5    Q.  To the assignment desk of Channel 7, WHDH,
6  correct?
7    A.  Correct.
8    Q.  To the assignment desk at WBZ, correct?
9    A.  Correct.
10    Q.  You also sent certain -- certain media
11  statements to AP, to the Associated Press, correct?
12    A.  Correct.
13    Q.  And you also sent it to WCVB, correct?
14    A.  Correct.
15    Q.  And you also sent it to New England Cable
16  News, correct?
17    A.  Yes.  Any of the TV stations covering Boston
18  news, yes.  Correct.
19    Q.  Okay.  And to -- and to Fox News, correct?
20    A.  Correct.
21    Q.  And to the assignment desk at the Herald?
22    A.  Correct.
23    Q.  And to the assignment desk at the Globe?
24    A.  That is correct.

Page 211

1    Q.  Okay.  And in addition to that, you sought
2  the attention of Boston Magazine?
3    A.  Sought the attention of Boston Magazine, how
4  so?
5    Q.  Did you send things to Boston Magazine?
6    A.  I don't know if I ever did.  They were
7  working on their own story.  I do a lot of writing for
8  Boston Magazine, but I'm not sure if I ever shared
9  anything with -- with Boston Magazine, because they
10  hadn't assigned a writer to the story yet.  So if --
11  if -- I'm not sure if I did.  I don't think I did,
12  because I have -- I do other things for Boston
13  Magazine and I --
14    Q.  Okay.
15    A.  -- try to separate church and state there.
16    Q.  Understood.
17        (Mr. Crotty now present at deposition
18  proceeding.)
19        MR. AMOS:  I just wanted to let everybody
20  know.  I am headed out.  Jason's in on the call, but I
21  need to get to a medical appointment, so I wanted to
22  let everybody know I wasn't ducking out for reason.
23        (Mr. Amos no longer present at deposition
24  proceeding.)

Page 212

1        BY MS. ZUCKER:
2    Q.  So, in addition to -- to those outlets, did
3  you make any inquiries with the New York Times?
4    A.  I don't think so.  I wouldn't be on the
5  New York Times' radar, so I don't think I did.  I -- I
6  may have.  I can't -- I can't -- I don't think -- I
7  don't think I did, no.
8    Q.  Okay.  What about the Post?  Do you write
9  occasionally for the Post?
10    A.  Yeah.  No, I wouldn't -- I mean, it's not --
11  it's not in the Post either.  They wouldn't care about
12  a small-town sex scandal in Massachusetts, so I
13  wouldn't --
14    Q.  Now, focusing a moment on the Associated
15  Press.
16        The Associated Press -- and this is really
17  just for the record, the Associated Press is a wire
18  service, correct?
19    A.  It is a wire service with departments in
20  satellite offices all around the country.  So
21  Associated Press Boston office would handle
22  Boston-area news, news stories that sometimes that
23  they would take and run with, sometimes they wouldn't,
24  depending on what the reach was for the story itself.

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 213

1 You always do your due diligence and assign -- and
2 attach AP in case the AP is interested in reporting on
3 the case.
4   Q.  Just in case you get -- if you -- if you get
5 a hit on AP, it goes on the wire service, right?
6   A.  Yeah, sure.  Well, sometimes.  Oftentimes, it
7 won't, de -- depending on, you know, the circumstances
8 involving the story, yes.
9   Q.  Right.  But if -- if the Associated Press is
10 interested in a story, it is on a wire service that is
11 available nationally, correct?
12   A.  That is correct, yeah.
13   Q.  Okay.  And so you reached out to the AP to
14 try to get them interested in this story as well,
15 right?
16       MR. WALZ:  Objection.
17   A.  Yeah.
18   Q.  And did AP com -- did AP ultimately do that?
19   A.  I don't -- not to my knowledge.
20   Q.  Okay.  And with whom in AP did you work?
21   A.  I didn't work with anybody.  It's, you know,
22 Bob -- Bob Marc -- I believe Phil Marcelo, I think,
23 was his name, and he was the reporter staffing the
24 one-man Boston office at the time.  So, any time you

Page 214

1 were working on behalf a client, Ellen, and you're
2 sending out information via or, you know, with -- on
3 behalf your clients, you have your -- what we call a
4 media list, and the AP's always on it.  Sometimes the
5 AP will jump on a story.  Oftentimes, those inquiries
6 are ignored.
7   Q.  Now, with respect to -- with respect to AP
8 and -- and I just got a request from the court
9 reporter that we take a break, so I'm going to ask one
10 more question.
11   A.  I'm -- how long is this break?  I've got two
12 sick people at home so I can't --
13   Q.  Oh, no, I -- I appreciate that, Casey.  Let
14 me -- let me try to -- I'm going to try to be quick
15 with you, but we have to respect the break of the
16 court reporter.
17       So, with respect to the Associated Press and
18 all the other media outlets that I just --
19   A.  Okay.
20   Q.  -- just described, and there were others,
21 there was WBUR, there was WBZ radio.
22       You also reached out to all of them and -- to
23 urge them to cover the story, correct?
24   A.  Yeah, I would -- I would do that customarily

Page 215

1 for any client, but for the -- yeah.  Yes.
2   Q.  And -- and you did here, didn't you?
3   A.  From -- from whom?
4   Q.  You reached out --
5   A.  I mean, sometimes you hear from reporters,
6 sometimes you do not, so I can't recall what the
7 response was on this particular case.
8   Q.  No, but -- fair enough.  Fair enough.
9       But what you did was you tr -- you tried to
10 cover the territory --
11   A.  Sure.
12   Q.  -- and send whatever the public statements
13 were out to all of the regional media and -- and even
14 the wire service in the hope that it might get -- get
15 attention nationally, correct?
16   A.  That is correct, yup.  I mean, sure.  Yeah.
17 I mean, you want attention for your client's stories,
18 so it's whether it's hyperlocal, whether it's
19 regional, whether it's national, it's, you know, kind
20 of all the same.
21   Q.  Understood.  Understood.
22       MS. ZUCKER:  Why don't we take just a
23 five-minute break.  I appreciates the pressure's on
24 you, Mr. Sherman, but I need to give the court

Page 216

1 reporter her break.
2       Okay.  We'll take five.
3       (Off the record at 3:01 p.m.)
4       (Recess taken.)
5       (Back on the record at 3:08 p.m.)
6 BY MS. ZUCKER:
7   Q.  When you were asked about your advocating the
8 heightened attention to the relationship between
9 Mr. Kimball and Ms. Hall, if I understood you
10 correctly, but please -- please correct me if I'm
11 wrong, Mr. Sherman, you thought that attention on that
12 would be helpful because it would show a pattern.
13       Was that your testimony?
14   A.  Well, I thought it would be helpful.  It
15 shows a pattern and -- with regard to Ms. Hall's
16 relationships outside of her marriage.  And you're
17 also talking about two elected officials that are --
18 were involved with a relationship, so, yes, it is
19 something that I deemed and others would deem
20 newsworthy at the time, for sure.
21   Q.  Well, I'm not asking whether it's newsworthy
22 at this point.
23       I'm asking how you saw it as helpful to your
24 client to create an image of a, quote, pattern, with

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 225

1 that Mr. Chiocca flirted with young women and -- and
2 that Mr. Chiocca had a very inflated sense of self and
3 thought that young women always thought he was
4 irresistible?
5        MR. WALZ: Objection.
6   A. (Deponent laughs.) I was -- I was not -- I
7 don't mean to laugh, but I was never aware of -- of
8 those comments or concerns. As I said, the person
9 that, you know, I had meetings with, Allan Chiocca --
10   Q. You didn't see that?
11   A. -- at least -- go ahead. I -- I didn't mean
12 to go off a tangent.
13   Q. That's alright. I'm trying to -- I'm just
14 trying to keep this going.
15   A. Yeah. Yeah. Speed it up, please.
16   Q. Were you ever made aware -- ever made aware
17 that Mr. Clifford -- that he didn't say anything about
18 being sexually harassed, but appeared to be bragging
19 to Mr. Clifford about his sexual conquest of
20 Ms. Hall --
21        MR. WALZ: Objection.
22        BY MS. ZUCKER:
23   Q. -- and that that was Mr. Clifford's testimony
24 about how he reacted when he was confronted with what

Page 226

1 happened on May 1?
2   A. I was not aware of that, so I don't know what
3 their -- the extent of their conversation was, no.
4   Q. Okay. And --
5   A. At least I don't recall that, Ellen, no.
6   Q. You'll agree that if, upon being confronted
7 with what happened and -- if what he did do, if what
8 Mr. Clifford is say, hey, it was only a blow
9 job, and brag about the fact that Ms. Hall wanted him,
10 that if that was the tenor of what he did, that's
11 kinda inconsistent with being this poor victim, right?
12        MR. WALZ: Objection.
13   A. Well, I -- I think that -- I -- no. I would
14 say no to that. Because I know, having, you know,
15 written about cases like this in the past, oftentimes
16 victims, you know, downplay -- downplay it originally,
17 because they feel tremendous guilt.
18        The Allan Chiocca that I met at Rudolph
19 Friedmann was a shaken human being, so that was -- and
20 that was my contact with Allan. He was somebody who,
21 again, used those words, pressured and felt tremendous
22 guilt of putting his family through something like
23 this. So I don't think he showed any indication of --
24 that, you know, bravado locker-room person that you're

Page 227

1 ex -- you know, describing now, not to me anyway.
2   Q. All right. Now, I want to ask you a little
3 bit about why -- let me just back up.
4        Regan Communications is a reputable firm,
5 right?
6   A. Yes.
7   Q. And it's -- and it's a firm that takes great
8 pride in its correct -- in all of its collaborations
9 and connections in Massachusetts, right?
10   A. Correct.
11   Q. And it likes to think of itself as very much
12 an above-board firm that deals with -- you know, with
13 the -- the most mighty in the political stratosphere
14 in Massachusetts, correct?
15   A. Yes.
16   Q. And, in fact, over the many years, Regan
17 Communications has handled very sensitive matters for
18 politicians and the like, right?
19   A. Correct.
20   Q. Is it Regan Communications' policy or
21 practice to deal with sites that are deemed so
22 unsavory that they are sanctioned by Twitter, Facebook
23 and removed regularly for disinformation and
24 vulgarity?

Page 228

1   A. I would -- you'd have to re -- explain to me
2 what you're -- what you're referring to.
3   Q. Do -- as a matter of policy --
4   A. No.
5   Q. -- does Regan Communications --
6   A. No. There was no policy toward that.
7 Sometimes you have -- you know, you engage where the
8 most -- you -- you engage where people are engaging.
9 You know, yes, we engage with the New York Times, but
10 also we have to engage with the Barstools of the
11 world, because that's where people are now getting
12 their information, much more so than the New York
13 Times. It's not something that we like to do, but
14 it's a trend in media and we have to be responsive to
15 it.
16   Q. Okay. So when you were communicating with
17 Turtleboys, are you aware that they have been
18 sanctioned and removed from Facebook and Twitter for
19 their vulgarity and disinformation?
20   A. Well, I am aware that they've also broken
21 many stories that were ultimately covered by
22 mainstream media. So I don't -- I don't equate, you
23 know, somebody being removed from Facebook and Twitter
24 with what -- you know, what they are,

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 229

1 journalistically. Turtleboy covered hyperlocal
2 stories. He's got his own cadence, if you will, and
3 it's a low common denominator, for sure, but he also
4 has -- or he or she, I don't even know who the hell it
5 is -- they have their ear to the ground and they break
6 more news than the Boston Globe right now.
7   Q.  Hey, watch yourself.
8   A.  Oh, I'm just being honest. It's what it is.
9   Q.  Now, in terms of that, did you ever find out
10 or even attempt to ascertain whether Allan Chiocca or
11 anyone within his stratosphere had any communications
12 with anyone at Turtleboy?
13   A.  I don't think that Allan had any
14 communications with Turtleboy, no.
15   Q.  Who do you think did?
16   A.  Well, as I said, you know --
17       MR. WALZ:  Objection.
18   A.  -- disseminating -- disseminating media, you
19 know, I've -- I've reached -- I've had communications
20 with Turtleboy, but I don't know who else would.
21   Q.  Okay.
22   A.  But I don't control that. Somebody could
23 reach out to Turtleboy on their own behalf and give
24 them information. And anything I gave to Turtleboy

---

Page 230

1 was information that I gave to Patriot Ledger and
2 Boston Globe. I didn't make a distinction between any
3 info.
4   Q.  Okay. Now, I want to go back to the scope of
5 work --
6   A.  Sure.
7   Q.  -- that -- that you were going to engage in.
8       The first category of the scope of work was
9 case research.
10   A.  Okay.
11   Q.  And if you could just briefly, what, if
12 anything, did you do in the -- in the category of case
13 research?
14   A.  The -- scopes of work are -- are what we plan
15 to do. Ninety percent of the time, the case shifts.
16       So when -- when I would -- first met with the
17 attorneys and -- and Allan Chiocca, I had asked if
18 there were other witnesses that we could reach out to.
19 And it was on their -- it was tasked to them to
20 provide those people to me. And the case elevated so
21 quickly that, you know, I don't think I ever
22 personally had contact with any witnesses in the
23 case.
24       So this is -- much like when you start with a

---

Page 231

1 client, here's what we can do, here's what we want to
2 do, but the -- you know, the net effect of that is
3 what we ended up doing, which was really working to --
4 with Adam Shafran to get statements and information
5 that he deemed appropriate out to the media.
6   Q.  Okay. And -- and I'm going to go through
7 these and ask you just, what did you do or what didn't
8 do you to make it brief?
9   A.  Oh, yeah.
10   Q.  I just want to --
11   A.  Yeah, no problem.
12   Q.  We've talked about holding statement,
13 statement distribution, and we've talked about that,
14 and then the social media mobilization.
15       Is it your testimony today, Mr. Sherman, that
16 you did no social media mobilization at all?
17   A.  No. It's not -- no. There -- there was not
18 the opportunity to do that. We could never really
19 connect -- there was two people that I think we've
20 already made a reference to --
21   Q.  Mm-hmm.
22   A.  -- that had negative efforts about -- I think
23 it was either Ms. Hall or -- or Kimball, and I tried
24 to engage with them to see what information they had

---

Page 232

1 and it never went anywhere. So it was not something
2 that really was effective in our communication
3 strategy for Allan Chiocca.
4   Q.  Okay. I want to -- and I'm jumping around
5 just because I want to get you out of here as quickly
6 as I can.
7       There was a prior discussion of the video
8 that you observed --
9   A.  Mm-hmm.
10   Q.  -- and then the statement that was prepared
11 in response.
12       Do you remember that?
13   A.  Yes.
14   Q.  Okay. When you looked at the video, did you
15 notice who put the code in to go inside?
16   A.  I don't recall. You know, unless -- you
17 know, I haven't screened the video since that time, so
18 I can't be -- I can't -- I can't speak to that. I
19 don't recall the actual moments that took place.
20   Q.  Okay. Fair to say, you didn't draw attention
21 to the fact that Mr. Chiocca --
22   A.  I might have. I just -- it doesn't -- it's
23 not ringing a bell, Ellen.
24   Q.  Did Mr. Chiocca ever tell you that he knew

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

---

Page 245

1  MADAM COURT REPORTER: Excuse me. This
2  is the court reporter. I just want Ellen to know, the
3  last thing she just said, I could not hear it. I just
4  want to make you aware. I don't know if --
5  MS. ZUCKER: I -- you can keep going.
6  MADAM COURT REPORTER: Okay.
7  BY MR. WALZ:
8  Q.  Okay. Mr. Sherman --
9  A.  Yes.
10  Q.  -- a couple other questions.
11  Ms. -- or Attorney Zucker had asked you a
12  little bit about your text messages and e-mails and
13  what you did to provide in those documents to -- to
14  produce those documents in this matter.
15  Do you recall that testimony?
16  A.  I do.
17  Q.  Have you deleted -- intentionally deleted any
18  e-mails or other messages about this case?
19  A.  No.
20  Q.  Okay. One last piece here is, earlier today,
21  Attorney Howard [sic] had asked you a number of
22  questions about releasing the report on or around
23  July 10th of 2018.
24  Do you recall those -- that testimony?

---

Page 246

1  A.  I do.
2  Q.  At the time that you -- that this e-mail was
3  sent on July 10th, is it your recollection that the
4  allegations of sexual assault or sexual harassment by
5  Ms. Hall were already in the mainstream media?
6  A.  Yes.
7  MS. ZUCKER: Objection.
8  BY MR. WALZ:
9  Q.  Is it also your recollection that, at least
10  in the social media that covered and was read in the
11  Town of Rockland, the affair between Ms. Hall and
12  Mr. Kimball, was it already widely spread?
13  A.  Yes.
14  MR. COOPER: Objection.
15  BY MR. WALZ:
16  Q.  So, to the extent that there's anything
17  private in the report, other than the affair or the
18  sexual harassment allegations, do you have any reason
19  to believe that any of that information had not
20  already been made public?
21  MR. COOPER: Objection.
22  A.  I'm not sure. I -- I'm not sure I can answer
23  that, Eric. You know, can you repeat the question? I
24  mean, you know, were there any details in that report

---

Page 247

1  that hadn't been made public prior to that? I don't
2  know. I can't -- I can't answer that.
3  What I can say is that, given these public
4  meetings and hearings where allegations were thrown
5  back and forth by some of the parties involved and
6  others weighing in on it, it was a story that was
7  already galvanizing a community before we did
8  anything, or before we really sent out any statements
9  on -- on Adam Shafran's behalf.
10  The horse was already out of the barn and
11  people were talking about it. Everybody had a --
12  seemed, according to social media, if you recall those
13  back-and-forths with people, you know, they knew --
14  they know these folks, and they had their opinions and
15  they were willing to share them.
16  Q.  All right. So it's your -- it is your
17  understanding that, at the time the report was
18  released, the affair was already out --
19  MR. COOPER: Objection.
20  BY MR. WALZ:
21  Q.  -- amongst the people of Rockland?
22  MS. ZUCKER: Objection.
23  A.  According to -- according to what I read on
24  social media, yeah --

---

Page 248

1  Q.  Okay.
2  A.  -- and what I saw at the public -- public
3  hearing video that I watched, yes.
4  MR. WALZ: Okay. I have no further
5  questions.
6  MR. COOPER: Mr. Sherman, subject to an
7  order from the Court --
8  MS. ZUCKER: Howard? Howard?
9  MR. COOPER: Go -- go ahead.
10  MS. ZUCKER: Let me follow up for a
11  second.
12
13  RECROSS EXAMINATION
14  BY MS. ZUCKER:
15  Q.  You were just asked about what you knew was
16  out.
17  It's fair to say, Mr. Sherman, that you
18  didn't canvas every resident of Rockland --
19  A.  No, you're --
20  Q.  -- did you?
21  A.  -- absolutely right, Ellen.
22  Q.  And you didn't -- and so when you say
23  "everyone knew," that's a -- that's a -- that's a
24  phrase that we use -- and all of us, I'm not faulting

---

Allan Chiocca vs
Town of Rockland, et al.

Casey Sherman
April 08, 2022

Page 249

1  you -- that we all use rather loosely.
2      You have no idea what the preponderance the
3  good citizens of Rockland had any awareness of, right?
4  A.  That is correct, yes.
5  Q.  So a minority -- it's going to be -- I mean,
6  do you know how many people were following those
7  threads on social media?
8  A.  Quite a bit.
9  Q.  It -- but it wasn't the majority of the Town,
10  was it?
11  A.  Well -- but I would say, you know, you split
12  that with the people that were focused on town meeting
13  and watching the conversations by elected officials
14  focusing on their personal lives.
15  Q.  But you -- you know, don't you, from
16  all your years of engaging in -- in political matters,
17  that it is often a great minority of people who can
18  create, both positively and negatively, some noise
19  within any municipality or any political subdivision,
20  and many of the people won't know anything about it
21  until it shows up on the nightly news, right?
22      MR. WALZ:  Objection.
23  A.  I would say the majority of young people in
24  the United States don't know that --

Page 250

1  Q.  I'm not asking about --
2  A.  -- (inaudible).
3  Q.  -- young people.
4  A.  I'm just telling you.  It -- it's, you know
5  --
6  Q.  I'm not --
7  A.  -- basically --
8  Q.  Rockland's a little, small town.
9  A.  It's a -- it's a cultural question you just
10  asked me, Ellen.  So --
11  Q.  It's a data --
12  A.  -- small town, obviously -- go ahead.  Sorry.
13  I didn't want to interrupt you.
14  Q.  I'm sorry.  It's a data question.
15      You know --
16  A.  Okay.
17  Q.  You know, don't you, that the social media
18  sites you canvassed, and even the -- the meeting
19  cannot, does not, allow you to testify as to the
20  awareness of the -– of most of the members of the
21  Rockland community, let alone everyone, right?
22  A.  No, I cannot say that.  You're right.
23      MS. ZUCKER:  Okay.  Thank you.
24      MR. COOPER:  Let me just quickly follow

Page 251

1  that up, Mr. Sherman.
2
3      REDIRECT EXAMINATION
4  BY MR. COOPER:
5  Q.  The Patriot Ledger publishes way beyond the
6  Town of Rockland, doesn't it?
7  A.  Yes.
8  Q.  And the television stations who you sent the
9  report to in Boston, they publish throughout Eastern
10  Massachusetts, correct?
11  A.  Correct.
12  Q.  And that's true about the radio stations and
13  other media outlets that you sent it to, they all go
14  way beyond the Town of Rockland, right?
15  A.  That is correct.
16  Q.  And is it fair to say that the -- you do
17  recognize that the media efforts you made took
18  whatever was a local story, known by whatever
19  percentage of people in the Town of Rockland, and
20  broadcasted it by a multi -- to multiple -- to a much
21  broader community?
22      MR. WALZ:  Objection.
23  A.  I wouldn't say that, Howard.  What I can say
24  is, now, Ms. Hall was doing her very best to get her

Page 252

1  side of the story out there to the public.  So I think
2  a combination of -- of all of that.  Any time you
3  throw in the ingredients of what happened and occurred
4  at the Town of Rockland, it's a story that is already
5  sensational on its face.
6      So you have a lot of interested parties
7  already engaged in that story in one shape or -- one
8  way, shape or form.  All I was doing was providing
9  Mr. Shafran's statements, and under his guidance and
10  direction, information to the media, as deemed by the
11  attorneys.
12  Q.  Well, you know that Mr. Kimball wasn't
13  engaged in the media campaign, correct?
14      MR. WALZ:  Objection.
15  A.  Do I know?  I don't know that.  No, I don't.
16  Q.  You never saw one, correct?
17  A.  No.  No.  I never -- I never saw one.  But --
18  Q.  And to -- and to the --
19  A.  No.  Let me -- let me respond to that,
20  Howard, because you're absolutely right here, and
21  there is -- there is a distinction.  When the
22  conversation spilled over to the public forum at town
23  meeting, then it was for public consumption.
24  Q.  That's not my question.

259

```
 1   COMMONWEALTH OF MASSACHUSETTS
 2   MIDDLESEX, SS.
 3
 4          I, Laurie J. Berg, Certified Court Reporter,
 5   Registered Professional Reporter, Certified Realtime
 6   Reporter, Certified LiveNote Reporter, Certified
 7   eDepoze Reporter and Notary Public, in and for the
 8   Commonwealth of Massachusetts, do hereby certify that
 9   pursuant to appropriate notice of taking deposition,
10   there remotely appeared before me the following named
11   person, to wit:  CASEY SHERMAN, who was by me duly
12   sworn; that he was thereupon examined upon his oath
13   and his examination reduced to writing by me; and that
14   the deposition is a true record of the testimony given
15   by the witness.
16          IN WITNESS WHEREOF, I have hereunto set my
17   hand and seal this 20th day of April, 2022.
18
19   My commission expires:
20   September 14, 2023
21
22
23                          _____
24                               Notary Public
```