# **<u>EXHIBIT J</u>**

## Finan, Jessica

| | |
|---|---|
| **From:** | casey sherman <pcaseysherman@gmail.com> |
| **Sent:** | Wednesday, April 6, 2022 4:17 PM |
| **To:** | Adam Shafran; John Friedmann (jfriedmann@rflawyers.com); Samantha Halem; Ellen J. Zucker - Burns & Levinson LLP (ezucker@burnslev.com); Neerja Sharma; Justin Amos; Jason Crotty; Cindy Cieslak; rkallor@rosekallor.com; Stern, Max D.; mrose@rosekallor.com; Belostock, Lorraine |
| **Subject:** | Fwd: FW: Executive Session Notice - Allan Chiocca |
| **Attachments:** | 201807061011.pdf; 201807061153.pdf |

---------- Forwarded message ---------
From: **Casey Sherman** <csherman@regancomm.com>
Date: Fri, Jul 6, 2018 at 1:25 PM
Subject: Fwd: FW: Executive Session Notice - Allan Chiocca
To: Casey Sherman <pcaseysherman@gmail.com>

---------- Forwarded message ----------
From: **Adam Shafran** <ashafran@rflawyers.com>
Date: Fri, Jul 6, 2018 at 12:09 PM
Subject: FW: Executive Session Notice - Allan Chiocca
To: "Allan Chiocca (arc3535@msn.com)" <arc3535@msn.com>, Casey Sherman <csherman@regancomm.com>, "Friedmann, Jon" <jfriedmann@rflawyers.com>

Gentlemen,

Attached hereto is the final report. I have not read it all yet, but it is most definitely good for Allan.

In relevant part the investigator found that Deirdre sexually harassed Allan, Allan did not sexually harass Deirdre, and Allan should be returned to his Town Administrator position effective immediately.

A reminder, DO NOT share this report with anyone. For now, I also do not think we need a press release, but everyone should review and then let's chat  on Monday.

Thanks and have a nice weekend.

ADAM J. SHAFRAN
RUDOLPH FRIEDMANN LLP
92 STATE STREET
BOSTON, MA  02109
TEL:  617-723-7700
FAX: 617-227-0313
EMAIL: ASHAFRAN@RFLAWYERS.COM

VISIT MY WEBSITE: WWW.BOSTONEMPLOYMENTLAW.NET

**EXHIBIT**

Casey Sherman Exhibit 14  04/08/22

exhibitsticker.com

VISIT THE RUDOLPH FRIEDMANN LLP WEBSITE AT: WWW.RFLAWYERS.COM

CHARTER MEMBER OF THE INTERNATIONAL SOCIETY OF PRIMERUS LAW FIRMS WWW.PRIMERUS.COM

This email, and any attachments to this email, are confidential and/or privileged, and may contain information that is protected from disclosure under G.L. c. 93H and other applicable law. It is to be used by the intended recipient only, and only in compliance with all applicable laws and regulations. The use, retention, dissemination, distribution or copying of the information contained in this email by anyone other than the intended recipient of this email is strictly prohibited. If you are not the intended recipient of this email, please notify the sender immediately and promptly destroy any record of this email.SIGNATURE DISCLAIMER: UNLESS OTHERWISE EXPRESSLY STATED HEREIN, THIS EMAIL (1) DOES NOT INCLUDE AN ELECTRONIC SIGNATURE; (2) SHALL NOT BE DEEMED TO BE AN ELECTRONIC SIGNATURE FOR ANY PURPOSE; (3) SHALL NOT BE DEEMED TO CREATE A BINDING CONTRACT; AND (4) SHALL NOT CONSTITUTE AN OFFER OR ACCEPTANCE

-----Original Message-----
From: John Clifford [mailto:john@cliffordkennylaw.com]
Sent: Friday, July 6, 2018 11:52 AM
To: Adam Shafran <ashafran@rflawyers.com>
Subject: Executive Session Notice - Allan Chiocca

Atty. Shafran

Pursuant to your email from yesterday, I am serving you with written notice of an executive session to be convened on July 10, 2018 at 7:00 p.m. at the Rockland High School Auditorium. Also attached is the document "Investigation of Complaints Against Deirdre Hall and Allan Chiocca – Findings of Fact, Conclusions and Recommendations."  That document is a confidential personnel record and improper release or disclosure of that document may result in an unwarranted invasion of privacy for persons named in the document. It may not be released or distributed without the written permission of the Rockland Board of Selectmen.

I have made certain redactions that reflect medical information, explicit sexual information, children's names, and some other non-material information that should be confidential for other reasons.

If you have any questions or concerns regarding this notice, please contact me.

John J. Clifford, Esq.
Clifford and Kenny, LLP
31 Schoosett Street, Unit 405
Pembroke, MA 02359
Phone (781)924-5796
Fax (781)924-5798

Check us out at:

Www.cliffordkennylaw.com <http://www.cliffordkennylaw.com/>

The documents and content included with this electronic mail transmission contain information from the law office of Clifford and Kenny, LLP which is confidential and may be protected from disclosure under the Attorney/Client privilege.

The content may also be protected as Executive Session material under the Massachusetts Open Meeting Law. This information is intended to be for the use of the addressee only. Note that any disclosure, printing, photocopying, distribution or use of the contents of this e-mailed information by persons other than the addressee or an agent of the addressee, is unauthorized and prohibited. If you have received this electronic mail in error, please notify us via electronic mail reply to the sender or by telephone (781-924-5796) immediately.

On 7/6/18, 10:05 AM, "scanner@cliffordkennylaw.com" <scanner@cliffordkennylaw.com> wrote:

This E-mail was sent from "RNP00267383E28F" (Aficio MP 4002).

Scan Date: 07.06.2018 10:11:56 (-0400)
Queries to: scanner@cliffordkennylaw.com



# DISCRIMINATION AND HARASSMENT SOLUTIONS LLC

July 2, 2018

### INVESTIGATION OF COMPLAINTS AGAINST DEIRDRE HALL

### AND ALLAN CHIOCCA

### FINDINGS OF FACT, CONCLUSIONS AND RECOMMENDATIONS

I.   **SCOPE OF INVESTIGATION**

I was tasked with investigating an allegation, raised by Edward Kimball (hereinafter "Mr. Kimball"), Chairman of the Town of Rockland (hereinafter, "Town") Board of Selectmen (hereinafter "BOS"), of "inappropriate behavior" by the Town Administrator, Allan Chiocca (hereinafter "Mr. Chiocca") towards Deirdre Hall (hereinafter "Ms. Hall"), Vice Chair of the BOS (hereinafter, "Hall Allegation"). In addition, I was tasked with investigating an allegation of "quid pro quo" sexual harassment brought by Mr. Chiocca against Ms. Hall (hereinafter, "Chiocca Allegation", and collectively with the Hall Allegation, the "Allegations"). Both Allegations arise out of the same incident, which took place during the evening of May 1, 2018 and the early morning hours of May 2, 2018 (hereinafter, the "Incident").[1]

---

[1] While the allegation reported by Mr. Kimball refers only to "inappropriate behavior" by Mr. Chiocca, through an interview of Ms. Hall, during this investigation, it was confirmed that the only inappropriate behavior, complained of by Ms. Hall, related to sexual conduct by Mr. Chiocca. The allegation relates to the Incident (as hereinafter defined), of which she has no memory, and which she claims had to have occurred without her consent because she was incapable of such consent due to her level of intoxication.

Neither complaint was reduced to writing but the Town has retained Discrimination and Harassment Solutions to investigate the Allegations and determine whether the Town's Sexual Harassment Policy was violated by either party. [2]

Accordingly, this investigation addresses whether (1) Mr. Chiocca violated the Town's Sexual Harassment Policy by engaging in non-consensual sexual activities with Ms. Hall during the Incident, and if so what discipline is recommended; and (2) whether Ms. Hall, as a supervisor of Mr. Chiocca, violated the Town's Sexual Harassment Policy, by requesting sexual favors during the Incident in exchange for actual or promised job benefits[3].

II.    **SUMMARY OF THE ALLEGATIONS**

1.    Hall Allegation

Ms. Hall alleges that if Mr. Chiocca engaged in sexual activities with her during the Incident, it was non-consensual as she was incapable of consenting due to the level of her intoxication.

2.    Chiocca Allegation

Mr. Chiocca alleges that during the Incident, Ms. Hall used her position as a member of the BOS, who was actively reviewing and would soon be voting on his request for a contract extension and a $30,000 salary increase, to pressure him into engaging in sexual activities with her.

---

[2] Whether Mr. Chiocca violated other Rules and Regulations, or Policies and Procedures of the Town on May 1, 2018 is beyond the scope of this investigation.

[3] Because Ms. Hall is not an employee of the Town, but rather an elected official, she is not subject to discipline pursuant to the Town's Policies and Procedures. The Town's Sexual Harassment Policy provides that it strives to provide a workplace free of harassment and it investigates all allegations against employees and non-employees. As such, this investigation addresses whether Ms. Hall violated the Sexual Harassment Policy during the Incident even though no disciplinary action can be taken against her.

III.   **WITNESSES INTERVIEWED**

Deirdre Hall – Vice Chair of the BOS

Allen Chiocca – Town Administrator for the Town

Susan Ide – Executive Assistant to the BOS

Marcy Birmingham – Project Coordinator

Stacia Callahan - Human Resources Coordinator

Delshaune Flipp – Board of Health Senior Assistant

Mary Jane Martin – Assistant Town Accountant

Edward Kimball – Chairman of the BOS

Eric Hart – Town Accountant

Michael Mullen Jr. – Town Selectman

Christopher Hall – Husband of Deirdre Hall

Lawrence Ryan – Town Selectman

Michael O'Loughlin – Town Selectman

IV.   **DOCUMENTS RELIED UPON**

Exhibit 1 – Town of Rockland Charter

Exhibit 2 – Town of Rockland Sexual Harassment Policy

Exhibit 3 – Texts between Ms. Hall and Ms. Kimball

Exhibit 4 – Texts between Ms. Hall and Mr. Kimball

Exhibit 5 - Emails from Ms. Hall to Mr. Chiocca

Exhibit 6- Texts between Ms. Hall and Mr. Chiocca

Exhibit 7- Video of Town Hall - May 1, 2018

Exhibit 8 - Video of RBG - May 16, 2018; Mr. Chiocca leaving

Exhibit 9 - Video of RBG - May 16, 2018; Ms. Hall leaving

Exhibit 10-Email regarding Mr. Chiocca's interview in Marblehead

Exhibit 11- Minutes - May 15, 2018 BOS Executive Session

Exhibit 12 -Affidavit of Paul Jacobson

Exhibit 13 -Affidavit of Mr. Kimball

Exhibit 14 -E from Attorney John Clifford to the BOS - May 11, 2018

Exhibit 15- Texts between Ms. Hall and Mr. Hall

Exhibit 16- Affidavit of Steven Verronneau

Exhibit 17-Email regarding video tampering

Exhibit 18- Receipt from RBG

Exhibit 19 - Mr. Chiocca administrative leave

Exhibit 20 - Committee to Elect Deirdre Hall Facebook page

## V.   **FINDINGS OF FACT**

Having considered all the evidence and testimony and giving the appropriate weight

thereto, and based on the applicable stand of proof, a preponderance of the evidence, I

make the following findings of fact:

1.Ms. Hall was elected to the BOS for the Town in April 2017 and was elected Vice Chair

by the BOS in April 2018.  She held this position until she took a leave of absence on June

4, 2018.

2.Mr. Chiocca is the Town Administrator for the Town and has held this position for

approximately ten years.

3.  Susan Ide (hereinafter, "Ms. Ide") is the Executive Assistant to the BOS and has held this position for 3.5 years.

4.  Marcy Birmingham (hereinafter, "Ms. Birmingham") is the Project Coordinator for the Town and was hired in July 2015.

5.  Stacia Callahan (hereinafter, "Ms. Callahan") is the Human Resources Coordinator for the Town.

6.  Delshaune Flipp (hereinafter, "Ms. Flipp") is the Board of Health Senior Assistant and was first hired by the Town on August 22, 2005.

7.  Mary Jane Martin (hereinafter, "Ms. Martin") is the Assistant Town Accountant and has been employed in this capacity by the Town since June 2011.

8.  Mr. Kimball is the Chairman of the BOS and has held this position for the past 8 years and has been a member of the BOS for nine years.

9.  Eric Hart (hereinafter, "Mr. Hart") is the Town Accountant and IT Director and has held this position since 2004.

10. Christopher Hall (hereinafter, "Mr. Hall") is Ms. Hall's husband and they have been married for approximately 16 years.

11. The BOS appoints the town administrator and can extend his/her contract for up to 3 years at a time (see Town Charter.)

12. The BOS is a five-member board presently consisting of Mr. Kimball, Ms. Hall, Michael Mullen Jr. (hereinafter "Mr. Mullen"), Lawrence Ryan (hereinafter "Mr. Ryan") and Michael O'Loughlin (hereinafter "Mr. O'Loughlin").  Each member has one vote and majority rules.

13. In response to a request for a contract extension and a $30,000 increase in compensation by Mr. Chiocca, the BOS had been discussing Mr. Chiocca's contract for weeks leading up to May 1, 2018.  This was the first contract extension and compensation increase considered by the BOS since she was elected to the BOS (interview of Ms. Hall and Mr. Chiocca.)

14. As a Selectwoman, Ms. Hall is considered one of Mr. Chiocca's five supervisors.

15. Ms. Hall and Mr. Chiocca shared a mutual distrust for each other and on many occasions, could be heard arguing in Mr. Chiocca's office (interview of Ms. Ide, Ms. Birmingham, Ms. Callahan and Ms. Flipp.) It was not uncommon for each to make disparaging comments about the other to other Town employees (interview of Ms. Birmingham.)

16. Shortly after Ms. Hall joined the BOS, Mr. Chiocca made it clear to his colleagues that he did not want to be alone in his office when Ms. Hall would come into Town Hall and on many occasions, could be seen leaving his office to go to a different department to avoid interaction with Ms. Hall when she visited Town Hall (interview of Ms. Ide.)

17. Ms. Hall confided in her husband Christopher Hall (hereinafter "Mr. Hall") her dislike for Mr. Chiocca.  Mr. Hall sent texts to Ms. Hall reminding her that Mr. Chiocca was "not nice" and "a bully" and to stay away from him (interview of Mr. Hall.)

18. Mr. Chiocca has been married to his wife for 39 years (interview of Mr. Chiocca.)

19. In the spring of 2018, Ms. Hall confided in Ms. Flipp and Ms. Callahan that "marriage is difficult", and she finds it hard to be with one person even though she loves her husband of sixteen years (interview of Ms. Flipp and Ms. Callahan.)

20. Also, during this time, Ms. Hall declared her candidacy for State Representative.

21.Mr. Kimball worked with Ms. Hall on her campaign, as did Mr. Mullen (interview

of Ms. Hall.)

22.Mr. Kimball and Ms. Hall were involved in an "intense physical" and emotional affair

during the months of March and April 2018, at which time Ms. Hall professed her love for

Mr. Kimball (interview of Mr. Kimball.)  Mr. Kimball's wife, Dawn Kimball (hereinafter,

"Ms. Kimball") believed the relationship had been going on for at least a year but

confirmed her suspicion on April 28, 2018 (interview of Ms. Hall.)

23.On May 1, 2018 Mr. Kimball, did not attend the scheduled BOS meeting because, after

learning of the affair, his wife "was feeling vulnerable and betrayed" (interview of Mr.

Kimball.)

24.Ms. Kimball first confronted Ms. Hall about the affair through a text message sent to

Ms. Hall, while she was chairing the BOS meeting on May 1, 2018. At 6:58 PM Ms.

Kimball texted Ms. Hall, "I know what happened.  You make me sick" (exhibit 3.)

25.The BOS meeting concluded at approximately 7:30 PM and the members stood

on Town Hall plaza chatting when Mr. Chiocca stated that he was going to the Rockland

Bar & Grill (hereinafter, "RBG") for a drink. [4] Ms. Hall stated that she was going to join

him.  They drove separately and no one else joined them.  They arrived at approximately

8:00 PM and Ms. Hall ordered a glass of wine and Mr. Chiocca ordered a beer (interviews

of Mr. Chiocca and Ms. Hall.)

26.At approximately 8:33 PM, Ms. Kimball again texted Ms. Hall stating, "Yes this is

Dawn.  Did you really think I wouldn't find out?  You're a disgusting human being.  The

---

[4] It was common for members of the BOS to go for drinks at the RBG after meetings.  Ms. Hall, Mr. Chiocca and Mr. Kimball would go and other people from Town Hall would often join them.

both of you are disgusting. I'm not about threatening anyone just so you know. But I haven't decided how I'm going to handle this. 35 years of marriage now means nothing and I have you to thank for that" (see Exhibit 3.)  Ms. Hall did not respond to the texts that evening (interview of Ms. Hall.) Upon receipt of the texts from Ms. Kimball, Ms. Hall was not concerned that her husband would find out about her affair with Mr. Kimball, but rather the impact the news of the affair would have on her candidacy for State Representative should Ms. Kimball post it on social media (Id.)

27. While at RBG with Mr. Chiocca, Ms. Hall received a call from Mr. Kimball, who assured her that Ms. Kimball would not post news of the affair on social media (interview of Ms. Hall.)

28. Ms. Hall then asked Mr. Chiocca if she could use his cell phone because she wanted to check social media to see if Ms. Kimball posted anything (Id.) He inquired as to why she wanted to use his phone and she explained that his phone had access to a Facebook page that hers did not and she wanted to check for a specific posting.  During this explanation, Ms. Hall divulged to Mr. Chiocca that she was in love with Mr. Kimball and had been having an affair with him since March 2018. She further explained that Ms. Kimball, who recently became aware of it, had forbidden Mr. Kimball from communicating with her (Id.)  Mr. Chiocca had no idea that they were having an affair (interview of Mr. Chiocca.)

29. During this conversation, Ms. Hall explained to Mr. Chiocca that she was upset that the relationship was ending. She went on to complain that she felt restricted by her marriage and no longer wanted to be monogamous (Id.)

30. Ms. Hall and Mr. Chiocca remained at RBG for two hours, during which they engaged in conversation about different subjects, including her relationship with Mr. Kimball, her desire not to be monogamous even though she loved her husband, and Ms. Kimball and her response to learning of the affair.  In addition, they discussed the content of the BOS meeting, her performance as the acting chairperson of the BOS, and whether she preferred being called madam "chairperson" or "chairwoman" and other topics (interview of Mr. Chiocca.)

31. After her second glass of wine Ms. Hall began to make sexually suggestive comments to Mr. Chiocca and began to rub his leg and touch his arm. She reiterated that she wanted to step out of her marriage and felt restricted.



32. At approximately 9:45 PM Ms. Hall texted her husband, "Be ready for me.  Cause I am going to want you" (exhibit 15.) At 9:56 PM, Mr. Chiocca paid the bill at the RBG and they left (interview of Mr. Chiocca and Exhibit 18.)

33. During the two hours that they remained at the RBG, Ms. Hall believes she consumed two to three glasses of wine, but Mr. Chiocca believes she consumed four glasses of wine[5] . Mr. Chiocca consumed four beers. Mr. Chiocca wanted

---

[5] Typically, Ms. Hall has 2-3 glasses of wine a night but in the recent past, she has on occasion consumed four glasses of wine (interview of Mr. Hall.)

to leave after his third beer, but Ms. Hall asked him to stay.  Because she is his supervisor he felt compelled to stay (interview of Mr. Chiocca.)

34. Ms. Hall then asked if they could go for a ride in his truck. Again, feeling obliged to satisfy his supervisor, Mr. Chiocca agreed, and they drove around Town for 20-30 minutes before stopping in the parking lot of the Banner Pub where they talked some more.  At this time, Ms. Hall, who continued to pressure Mr. Chiocca to have sex with her, reminded him that she was his boss and would be voting on his contract extension.  Although not inclined to accept Ms. Hall's advances, Mr. Chiocca was concerned that if he thwarted her advances, she would not vote in favor of his contract extension and his increase in compensation (interview of Mr. Chiocca.)

35. Ms. Hall then stated that she had to go to the bathroom but did not want to use the facilities at the Banner Pub because they are not clean.  Mr. Chiocca recommended, and Ms. Hall agreed that they go to Town Hall, so she could use the bathroom facility there. (interview of Mr. Chiocca.)

36.The surveillance video at Town Hall has five separate camera views from the evening of May 1, 2018[6].  In the video, Ms. Hall and Mr. Chiocca can be seen walking from the lower parking lot, across the plaza and into Town Hall. Ms. Hall, who is wearing high heel shoes, appears to stumble on occasion but is able to traverse the walkway and stairs from the lower lot to Town Hall without assistance.   At some points Mr. Chiocca walks in front of Ms. Hall and at other points she leads (exhibit 7.)

---

[6] Mr. Kimball and Ms. Hall allege that the video has been tampered with however after an expert analysis, this is found to be untrue (see Exhibit 16 and 17.)

37. They arrive at Town Hall at approximately 10:45 PM and walk directly to the bathrooms. Although there is no audio on the video, after exiting the bathroom Ms. Hall appears to say the word "home" and Mr. Chiocca and she exit Town Hall in the direction of Mr. Chiocca's truck (exhibit 7.)

38. As the two arrive at the top of the stairs that leads to the parking lot where Mr. Chiocca's truck is parked, Ms. Hall, who is walking ahead of Mr. Chiocca, stops and turns to face him preventing him from accessing the stairs. They engage in a conversation that lasts approximately seven minutes. During this conversation, again Ms. Hall continues to pressure Mr. Chiocca about allowing her to ▓▓▓▓▓▓▓▓▓▓▓▓▓ while reminding him that she is his supervisor and will be voting on his contract and raise. Feeling pressure to oblige, Mr. Chiocca acquiesces to Ms. Hall's advances and they to return to Town Hall. They go directly to Mr. Chiocca's office and close the door (interview of Mr. Chiocca and exhibit 8.)

39. Shortly after entering his office, Mr. Chiocca realizes that he left his phone in his truck and Ms. Hall realizes that she left her purse in the bathroom, so he leaves and retrieves both (interview of Mr. Chiocca.)

40. When he returns to his office, he opens a bottle of wine that was given to him that day by Ms. Birmingham as an early birthday present. He pours two small cups of wine for them to drink. One of the cups spills (interview of Mr. Chiocca.)

41. While in his office, Mr. Chiocca and Ms. Hall engage in sexual acts. ▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓

42. During the evening, Ms. Hall was conscious, and alert and she never vomited, tripped, fell or expressed concerns about her level of intoxication. Further, she never objected to engaging in the sexual activities with Mr. Chiocca (interview of Mr. Chiocca.)

43. At approximately 2:13 AM, the surveillance video shows Ms. Hall and Mr. Chiocca exiting his office with Ms. Hall, who can be seen drinking a bottled water. They promptly leave Town Hall and walk across the plaza to the lower lot. Both appear to be alert as they are walking at a casual pace and exhibit no obvious signs of intoxication or distress. (Exhibit 8.)

44. After leaving Town Hall, Mr. Chiocca drove Ms. Hall to RBG. Ms. Chiocca watched as Ms. Hall got into her motor vehicle and drove away (interview of Mr. Chiocca.)

45. Ms. Hall arrived home at approximately 2:20 AM. Mr. Hall was in bed but when he heard his wife arrive home, he walked downstairs. He observed her car in the driveway backed into the assigned spot. He then observed Ms. Hall in the bathroom texting. At 2:25 AM she texted her husband: "love you, it gonna be a tough ride the next couple of weeks ttyl" (see Exhibit 15)

46. Her husband asked her how things went that night and she explained that at his wife's request, Mr. Kimball did not attend the BOS meeting and that she served as the acting Chair of the BOS meeting, moving through the agenda quickly. Following the meeting she explained that she went to RBG for drinks (interview of Mr. Hall.)

47. Ms. Hall also told her husband that Ms. Kimball texted her while she was at the RBG that she was disgusting and that she texted her back that she was sorry. (interview of Mr. Hall.) She then went on to explain to her husband that she had been

having an emotional but not sexual relationship with Mr. Kimball (interview of Ms.

Hall and Mr. Hall.)

48. Ms. Hall then raised the issue of Mr. Chiocca's contract extension.  She informed Mr.

Hall that Mr. Chiocca told her, "normally how this works is I ask for a raise, you ███

███████████████████ (interview of Mr. Hall.) ████████████

███████████████

49. During this conversation with her husband, Ms. Hall never complained of being upset

or uncomfortable with how the night went or any inappropriate behavior by

Mr. Chiocca (interview of Mr. Hall.)

50. Mr. and Ms. Hall then discussed ███████████ appointment scheduled for the

next morning and Ms. Hall agreed to attend the appointment.  Also, because she was so

late arriving home that evening, Mr. Hall contacted his employer and called out sick for

the next day.  Ms. Hall was apologetic to her husband that had to call out sick because of

her (interview of Mr. Hall.)

51. After approximately 30 - 45 minutes of talking downstairs, they went upstairs to their

bedroom.  At that time, Ms. Hall confessed to her husband that her relationship with Mr.

Kimball was more than emotional and that they had been involved in physical relationship

as well.  Mr. Hall then asked if the relationship was over and she advised that it was.  He

indicated to her that he was not happy about her having an affair with Mr. Kimball.  They

discussed this for 15 to 20 minutes and then went to bed at approximately 3:30 (Id.)

52. Ms. Hall asserts that she has no memory of the evening from the time she

talked with Mr. Kimball at approximately 9:00 PM with the exception of a visual

of Mr. Chiocca typing in the security code at Town Hall and a conversation with her

husband about Mr. Kimball when she arrived home at 2:20 AM (interview of Ms.

Hall.) She cannot explain why she has no memory, although she acknowledges that

she does not have a medical condition that causes her to blackout or lose

memory and despite drinking regularly, and consuming as many as 3 to 4 drinks in an

evening, she has not suffered memory loss after drinking since she was in

her early 20's (Id.)

53. Ms. Hall woke up that morning at 6:30 AM so she could take ▮▮▮▮▮▮▮▮▮▮▮

appointment (interview of Ms. Hall.)

54.Mr. Chiocca arrived at Town Hall early that morning, so he could clean up his office

as some wine had spilled while Ms. Hall was on the table earlier that morning. Mr.

Chiocca poured out what was left in the bottle (interview of Mr. Chiocca.)  At 8:02 AM on

May 2, 2018 Ms. Hall emailed Mr. Chiocca and asked if they could talk for 15 minutes

before her 9:00 AM meeting and at 8:05 he responded in the affirmative (interview of Ms.

Hall and Exhibit 49 page 11.)

55.They met at 8:55AM and she asked for "discretion" about what happened the night

before and they both agreed that they would not tell anyone.  It is notable that Ms. Hall

asked for discretion from Mr. Chiocca yet claims that she has no memory of anything

inappropriate taking place with Mr. Chiocca earlier that morning or the evening

prior.  Ms. Hall acknowledges that during this discussion with Mr. Chiocca she never told

him that she was upset with what happened earlier that morning or the night before nor

did she inquire of him as to what had taken place. (interview of Ms. Hall.)

56. During this conversation, Mr. Chiocca referred to Ms. Hall as a "predator" and "the

aggressor". Ms. Hall claims that these comments caused her to first have an "inkling" that

she engaged in sexual relations with Mr. Chiocca (interview of Ms. Hall.)

57. Later that day, Mr. Kimball confided in Mr. Chiocca that he did not go to the BOS

meeting the evening prior because he had been involved in an affair with Ms. Hall and that

his wife had just learned of it and "was on the warpath". As a result, he was going to be

taking a "less active role on the BOS". Mr. Chiocca then recommended he step down from

the BOS or give up the Chair position (interview of Mr. Chiocca and Mr. Kimball.).

58. After May 1st, Mr. Chiocca told Ms. Birmingham and Ms. Callahan that he did not want

to be left alone in his office with Ms. Hall and to make sure his door stayed open when she

came to Town Hall (interviews of Ms. Birmingham and Ms. Callahan.) More specially,

because Ms. Ide was on vacation the second week in May and she sits right outside his

office, Mr. Chiocca told Ms. Birmingham, who worked on the floor below, that if he called

her up to his office, to come right away because it meant that Ms. Hall was there, and he

did not want to be alone with her. She never got called up to his office (interview of Ms.

Birmingham.)

59. On May 4, 2018 at 7:07 AM, by email to Mr. Chiocca, Ms. Hall again, requested an

opportunity to meet with Mr. Chiocca and he agreed. They discussed the evening of May

1st and again he told her that she was a "predator" and "the aggressor". Once again, Ms.

Hall never complained of a lack of memory as to her encounter with Mr. Chiocca or that

she had been suffering from diminished capacity. (interviews of Mr. Chiocca and Ms.

Hall.)

60. In neither the conversation between Ms. Hall and Mr. Chiocca on May 1st or May 4th, did Ms. Hall ever tell Mr. Chiocca that she blacked out or did not consent to any sexual acts (interview of Mr. Chiocca.)  Ms. Hall acknowledges that, following these conversations with Mr. Chiocca, she clearly understood that she had engaged in sexual activities with Mr. Chiocca (interview of Ms. Hall.)

61.Despite this clear understanding, Ms. Hall never made any complaints, nor did she report any concerns about her interactions with Mr. Chiocca during the Incident to anyone (interview of Ms. Hall.)

62.On May 4, 2018 Mr. Hall and Ms. Kimball met to discuss their spouses' extramarital relationship with each other.  They both agreed that Ms. Hall and Mr. Kimball could go to BOS meetings and events together and Ms. Kimball would not show up because she did not want to set off "red flags" and draw attention to her husband's relationship with Ms. Hall.  It was most important to her to not let the public know about the affair (exhibit 4 and interview of Mr. Hall.)

63.The next week was filled with usual communications regarding Town business, both in person and by email, between Mr. Chiocca and Ms. Hall and they did not discuss the Incident (interview of Ms. Hall and Mr. Chiocca.)  The annual Town Meeting was held on May 7, 2018 and Mr. Chiocca, Mr. Kimball, Ms. Hall and others went out for drinks to China Plaza, without incident (interview of Ms. Hall, Mr. Chiocca and Mr. Kimball.)

64.On May 11, 2018 Town Counsel John Clifford (hereinafter "Attorney Clifford") sent an email to the BOS members regarding Mr. Chiocca's contract, suggesting that before they decided on whether to grant the contract extension at the BOS meeting on May 15,

2018, they have a candid discussion with him about any concerns they had with his job performance (exhibit 14.)

65. During the week of May 14, 2018, Ms. Hall was coming into Town Hall to see Mr. Chiocca more frequently than she ever had (interview of Ms. Ide.) In fact, she was present more than any other selectperson, but Mr. Chiocca was avoiding all interaction with her (Id.)

66. At this time, Mr. Chiocca began to apply for jobs outside of Town because he did not think he could work with Ms. Hall after what happened during the Incident. In fact, on May 15, 2018 he learned that he had been granted an interview for the Town of ████████ Town Administrator position, which interview was scheduled for May 21, 2018 (see Exhibit 10, email from ████████ to Mr. Chiocca.)

67. On May 14, 2018 Mr. Chiocca and Ms. Birmingham had planned to attend a ceremony at the State House for recognition for a grant that the Town received. That morning Ms. Hall announced that she would join them, and for this reason Mr. Chiocca opted out. Instead, Ms. Birmingham and Ms. Hall went to the event without Mr. Chiocca (interview of Ms. Birmingham.)

68. The May 15, 2018 BOS meeting was very contentious. Just prior to the meeting at 4:12 PM, Mr. Kimball sent an email to the BOS members and announced that Ms. Hall was named the school liaison, a position for which Mr. O'Loughlin was told by Mr. Kimball he would be selected (interview of Mr. O'Loughlin.) Also, at the BOS meeting Mr. Ryan and Mr. O'Loughlin were blindsided by communications that Ms. Hall had with the School Superintendent (interviews of Mr. O'Loughlin and Mr. Mullen.) The BOS

also discussed Mr. Chiocca's contract in Executive Session (see Exhibit 11 BOS
minutes.)

69. The following day Mr. Ryan sent an email at approximately 12:42 PM to the
BOS members expressing his frustration with the meeting the evening prior and he was
critical of Ms. Hall (interview of Mr. O'Loughlin and Mr. Ryan.)

70. That same day, Mr. Ryan also went to Town Hall and asked Mr. Chiocca what was
going on with the BOS and why was he blindsided at the meeting the evening prior.  Ms.
Hall was in the room when he asked this question.  At that time, Mr. Chiocca asked him if
he wanted to go to lunch and talk but he declined (interview of Mr. Ryan.)

71. Ms. Hall then called Mr. Mullen and she confided in him that after the May 1st BOS
meeting she went to the RBG with Mr. Chiocca and they had a lot to drink. She went on to
tell him that she didn't remember much but thinks she got into his truck and drove around
for a while and thinks they went to Town Hall.  She then expressed concerns that it would
be on video. [7]She was not upset or crying but was matter of fact in telling him this.  She
then described Mr. Chiocca as evil, though she never mentioned anything about a concern
that Mr. Chiocca may have engaged in inappropriate sexual behavior with her without her
consent (interview of Mr. Mullen.)

72. Later that evening at approximately 8:45 PM Ms. Hall went to the RBG. Upon seeing
Mr. Chiocca at a table with two other males who had been involved in a meeting at Town
Hall earlier that evening she walked over and sat next to Mr. Chiocca (interviews of
Mr. Chiocca and Ms. Hall.)    The four individuals remained seated together until 9:13 PM

---

[7] Ms. Hall denies that she has a memory of driving around town with Mr. Chiocca and denies that she was
concerned about being on camera at Town Hall.

when Mr. Chiocca left the RBG, leaving Ms. Hall with the two males (Id.)  At 9:55 PM,

Ms. Hall and the two males exited the RBG (exhibit 9 and 12.)[8]  Realizing she had left her

purse behind, Ms. Hall returned to the RBG to retrieve it. (interview of Ms. Hall.)

73. The following day, on May 17, 2018 there was an MAPC meeting which was held in

Rockland.  Mr. Chiocca was planning on attending the event with Ms.

Birmingham because it is a great public relations opportunity for him.  Ms.

Hall announced that morning that she was going to join them at the MAPC

event and Mr. Chiocca again decided not to attend.  No other selectman attended the

meeting (interview of Mr. Chiocca and Ms. Birmingham.)

74. That same day at 11:03 AM, Mr. Ryan sent another email to the members of the BOS

that included the following comments: "Ms. Hall is making her own deals with the school

committee", "maybe we should revisit the VC and liaison positions at our next meeting",

"Ms. Hall yells when she has no back up data but doesn't supply any when she is in

charge. This was a board dividing move and we should correct it" (interview of Mr.

O'Loughlin and Mr. Ryan.)

75. At about that time, Ms. Hall contacted Mr. Kimball and she told him that something

happened on May 1, 2018 after the meeting on May1st with Mr. Chiocca.  She told

him she had two drinks and then there was a void and the next day he said thank you for

the birthday present, but she had not given him a present. Ms. Hall admits that she never

would have told this to Mr. Kimball if she knew that Mr. Chiocca would have kept it a

secret (interview of Ms. Hall.)

---

[8] Notably, Ms. Hall stated that she left 10 minutes after Mr. Chiocca but as seen on the video, she remained at the RBG for 48 minutes.

76. Mr. Kimball was furious and kept repeating that he needed to process what she had told him (id.)

77. Mr. Kimball then went to Town Hall and met with the head of IT Director, Eric Hart and asked him to pull the security video from May 1, 2018. Mr. Kimball and Mr. Hart watched it together and saw the view from the lobby with Ms. Hall and Mr. Chiocca entering Town Hall (see Exhibit 7 and interview of Mr. Kimball.)

78. That afternoon Mr. Kimball asked Ms. Hall to meet him and they went for a 40-minute walk on the rail trail. Mr. Kimball was so angry at Ms. Hall, she was afraid he might hurt her. Ms. Hall was also upset because she felt that she had disappointed Mr. Kimball (interview of Ms. Hall.) Mr. Kimball explained that he viewed the tapes from Town Hall security and saw Ms. Hall and Mr. Chiocca at Town Hall on May 1st (interview of Mr. Chiocca.) Ms. Hall was embarrassed (interview of Ms. Hall.) Mr. Kimball was furious with Ms. Hall, telling her he felt like he was being played by her (interview of Ms. Hall and exhibit 3.) Ms. Hall was upset because she did not want anyone to know about what happened on May 1, 2018 because she thought she would be perceived as a "whore and a drunk" (interview of Ms. Hall.)

79. Later that night Mr. Kimball texted Ms. Hall and told her that he was going to approach Mr. Chiocca the following day and Ms. Hall asked him not to (exhibit 4.) Ms. Hall replied: "please call we should not be putting this in writing". In response Mr. Kimball insisted that he be told the whole truth and that he did not want to be played. Ms. Hall texted back that she would tell him but not through text messages. Mr. Kimball and Ms. Hall then had a phone conversation during which both claim that Ms. Hall divulged no new details of the Incident (interviews of Ms. Hall and Mr. Kimball.)

80. Mr. Kimball then spoke with Mr. Hall, who reiterated to Mr. Kimball that when Ms.

Hall arrived home after being out for drinks with Mr. Chiocca on May 1ˢᵗ, she told him

that Mr. Chiocca stated, "the way we do things around here is I ask for a contract, you

████████████ and I get the contract" (interview of Mr. Hall.)

81. That evening Mr. Kimball called and spoke with Mr. Chiocca. He informed Mr.

Chiocca that Ms. Hall's husband wanted to know if the town administrator████████

with his raise and then told Mr. Chiocca that they would talk in the morning (interview of

Mr. Chiocca.)

82. The next morning, May 18, 2018 Mr. Kimball contacted Attorney Clifford and told

him that Mr. Chiocca had stated to Ms. Hall on May 1ˢᵗ that it is standard operating

procedure to give the obligatory████████to the town administrator during contract

negotiations. Mr. Kimball expressed concern for the safety of the town employees who

were in contract negotiations. [9] Mr. Kimball then told Attorney Clifford that Ms. Hall

alleged that Mr. Chiocca did something inappropriate to her on May 1, 2018 at Town

Hall (interview of Mr. Kimball.)

83. As a result, Attorney Clifford and Mr. Kimball met with Mr. Chiocca and he admitted

to having engaged in sexual activities with Ms. Hall at Town Hall during the Incident but

denied any conversation about████████for contracts  Mr. Chiocca insisted to Attorney

Clifford and Mr. Kimball that Ms. Hall had initiated and pursued the sexual encounter that

evening and that Ms. Hall was a "predator and the aggressor" (interview of

Mr. Chiocca.)

---

[9] At this time, Ms. Birmingham, Ms. Ide and Ms. Callahan were in contract negotiations with the Town. At their interviews, all deny that Mr. Chiocca ever made sexual advances or comments with regard to their contracts.

84. At that time, Mr. Kimball "strongly suggested" that Mr. Chiocca take vacation time and encouraged him to resign from his employment to which he agreed (interview of Mr. Kimball and exhibit 13 affidavit of Mr. Kimball.)  Mr. Kimball then agreed to meet with Ms. Hall to see if she would enter into a nondisclosure agreement and sign a release with the town, which he did, and Ms. Hall agreed to comply with this request (interview of Mr. Kimball.)

85. The following day, May 19, 2018, Ms. Hall, Mr. Hall, Mr. Kimball and Ms. Kimball met at Reeds Pond to discuss the allegations against Mr. Chiocca and they all agreed to keep Ms. Hall and Mr. Kimball's relationship a secret.[10] Ms. Kimball reiterated the conversation that she had with Mr. Kimball on May 4, 2018 that they could not let their relationship be leaked to the public. Mr. and Mrs. Kimball did not want their family's reputation to be ruined and Ms. Hall was concerned about her candidacy for State Representative and knew it would ruin her chances of winning (interview of Mr. Hall.)

86. Mr. Chiocca took the next week off as vacation time (interview of Mr. Chiocca.)

87. It is believed that the news media learned of the Incident on or about May 23, 2018 which caused the settlement discussions with Mr. Chiocca and Ms. Hall to cease (interview of Ms. Hall and Mr. Chiocca.)

---

[10] Mr. Kimball concedes that he was dishonest with the women at Town Hall when he told them that he had to back away from Ms. Hall when she hit on him.  He was also dishonest with the members of the BOS when he told them he had an emotional relationship with Ms. Hall (interview of Mr. Kimball.)

88. On May 29, 2018 Mr. Chiocca was placed on administrative leave for engaging in inappropriate behavior toward a member of the BOS on May 1, 2018.  The letter was signed by Mr. Kimball (exhibit 19.)

89. The next day, Ms. Hall announced on her Facebook page that she requested that the BOS initiate an investigation involving an allegation of inappropriate behavior by Mr. Chiocca towards her (exhibit 20 Deirdre Hall's Committed to elect Facebook page.)  She asserts that if she engaged in sexual relations with Mr. Chiocca, but due to her intoxication could not have consented (interview of Ms. Hall.)

90. As the Human Resources Coordinator, Ms. Callahan never received any complaints by employees against Mr. Chiocca for sexual harassment nor has she observed such behavior by him.  Nor has she received any complaints against Ms. Hall (interview of Ms. Callahan.)

91. Neither Ms. Hall nor Mr. Chiocca reported any concerns to Ms. Callahan regarding the Incident (interview of Ms. Callahan.)

92. The Town has a Sexual Harassment Policy in effect that prohibits any unwelcomed touching or sexual harassment by an employee (see Exhibit 2.)  Mr. Chiocca received a copy of this policy and it applies to him (interview of Mr. Chiocca.)

93. Ms. Hall is not an employee of the Town and is not subject to the policies and procedures of the Town but instead is an elected official serving at the direction of the citizens (interview of Ms. Hall.)

94. If an employee of the Town alleges he/she is a victim of sexual harassment by an employee or a third party non-employee, the Town has a duty to investigate because employees are entitled to a workplace free of harassment (exhibit 2.)

## VI.      Conclusions

### Did Ms. Hall violate the Town's Sexual Harassment Policy[11]?

1. The Town's Sexual Harassment Policy prohibits any sexual harassment or sexual advances, requests for sexual favors, and other verbal or physical conduct, which the submission or rejection thereof become the basis for employment decisions or a term or condition of employment (exhibit 2.)

2. Specifically, the policy provides that direct or implied requests by a supervisor for sexual favors in exchange for actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits or continued employment constitutes sexual harassment (Id.)

3. Ms. Hall and Mr. Chiocca engaged in sexual activities at Town Hall on May 1, 2018. It is undisputed based on what Ms. Hall reported to her husband and what was reported by Mr. Chiocca, that during that evening there was a conversation between Mr. Chiocca and Ms. Hall about his contract and there was a reference to sexual activities.

4. It is undisputed that the BOS had been discussing Mr. Chiocca's contract for weeks prior to May 1, 2018 and continued after May 1, 2018. Mr. Chiocca was asking for a

---

[11] Again, although Ms. Hall is not an employee of the Town and therefore is not subject to the Town's Sexual Harassment Policy, the Town in its policy states that all claims will be investigated whether the allegation is against an employees or not.

contract extension and a raise and Ms. Hall would be one of the five votes that would

decide this (see Exhibits 1 and 14.)

5.  Mr. Chiocca did not want to have a sexual encounter with Ms. Hall ██████ ██████████████████████████████████████████████████ Regardless

she persisted ████████████████████████████████

██████

6.  Both while driving in Mr. Chiocca's truck and later while standing on the Town Hall

plaza, Ms. Hall made comments to Mr. Chiocca about engaging in sexual activities while

reminding him that she was his supervisor and would be voting on his contract and raise.

As a result, Mr. Chiocca agreed to engage in sexual activities in his office.  But for the

fact that Ms. Hall was his supervisor and would be voting on his contract, Mr. Chiocca

would not have agreed to this.

7.  Although Ms. Hall did not make any requests for sexual relations after the Incident,

she demonstrated a similar pattern of trying to position herself in Mr. Chiocca's space.  To

the contrary, Mr. Chiocca exhibited behavior of trying to avoid Ms. Hall and this was

corroborated by other Town employees following the Incident.

8.  Specifically, Mr. Chiocca applied for a job in the Town of █████ days after the

Incident because he knew he could not work with her; when he could, he would avoid

meetings that she would be attending, and he put Ms. Birmingham and Ms. Callahan on

notice that he did not want to be alone with her.  With regard to Ms. Hall's actions, she

requested to meet with him on May 2nd and May 4th to discuss the evening, she went to

Town Hall more than she previously had been going, and she went into the RBG and sat

beside him the night before she made this allegation against him.   This evidence

corroborates Mr. Chiocca's allegations that he was concerned that Ms. Hall was making advances to him and he felt compelled to respond.

9.   Accordingly, I find by a preponderance of the evidence that Ms. Hall was Mr. Chiocca's supervisor and she sought sexual relations in exchange for her vote on his contract extension and raise.  As such, Ms. Hall sexually harassed Mr. Chiocca in violation of the Town's Sexual Harassment Policy on the night of the Incident.

**Did Mr. Chiocca violate the Town's Sexual Harassment Policy?**

10. Ms. Hall alleges that if she engaged in sexual relations with Mr. Chiocca, she did not do so voluntarily and could not consent due to her level of intoxication.

11.  It is undisputed that Ms. Hall and Mr. Chiocca were in Town Hall during the Incident.  Mr. Chiocca voluntarily admitted that they engaged in sexual relations; Ms. Hall has no memory.

12. The Town's Sexual Harassment Policy provides that employees of the Town cannot engage in unwelcomed physical conduct of a sexual nature in the workplace.

13. The Town's Sexual Harassment Policy does not define or address "consent" or "lack of consent". Although this investigation does not make a finding as to whether or not criminal activity occurred on May 1st, for reference, the standard of lack of consent standard applied in a criminal matter is considered.   In a rape case in which lack of consent due to intoxication is an issue, the prosecution must prove not only intoxication, but 1) that the intoxication rendered the complainant incapable of consent and 2) that the defendant knew or should have known that the condition rendered the complainant incapable of consenting.  Commonwealth v. Blache 450 Mass. 593.

14. Ms. Hall had between two and four glasses of wine on the evening of May 1, 2018. This amount of alcohol is consistent with the amount she regularly drinks when she goes out at night.

15. After reviewing the video of her at Town Hall, Ms. Hall is seen walking without assistance and talking to Mr. Chiocca. She appears to be aware of the circumstances that she is in and appears to be in control of her activities.

16. As Mr. Chiocca and Ms. Hall walk towards his truck after leaving Town Hall the first time, she stops, and they stay at the top of the stairs and talk for approximately seven minutes. The video then shows Mr. Chiocca walking up the stairs with Ms. Hall following as they walk into Town Hall. She appears alert and oriented (exhibit 8.)

17. When considering her interactions and communications before she went to Town Hall, she could communicate with Mr. Chiocca about his contract with the Town, her affair with Mr. Kimball, her desire to have relationships outside her marriage and the BOS meeting that she chaired earlier in the evening. Further, when she arrived home within minutes of leaving Mr. Chiocca she never expressed concern about the fact that she had sexual relations with him and did not exhibit any signs to her husband of being upset. Further, Ms. Hall was capable of engaging in coherent discussions with her husband for approximately one hour when she got home and the subjects that they covered that evening spanned from her extramarital affair with Mr. Kimball, their son's neurological appointment, her husband calling in sick from work and other topics. In addition, she could drive her motor vehicle home and back it into a parking spot with another motor vehicle beside it without incident. She was also capable of texting her husband at 9:45 PM, ""Be ready for me when I get home because I'm going

to want you" and then at 2:25 AM "love you. it gonna be a tough ride the next couple of weeks ttyl".

18. Moreover, the following day Ms. Hall went to Mr. Chiocca's office and asked for "discretion" and asked that he agree not to tell anyone.  During this conversation, she never mentions to Mr. Chiocca that she had no memory of the Incident and never tells him she did not consent.

19. Accordingly, I find by preponderance of the evidence, that Ms. Hall was capable of consenting to sexual relations during the Incident and she did consent, and I also find that Mr. Chiocca believed that she was capable of consenting.

20. Accordingly, I find by a preponderance of the evidence that Mr. Chiocca did not violate the Town's Sexual Harassment Policy in that he did not engage in any unwelcomed touching of Ms. Hall during the Incident.

**VI.    Recommendations**

Based on the fact that Ms. Hall is an elected official, she cannot be disciplined by the Town nor can corrective action be issued for violations of the Sexual Harassment Policy.  Accordingly, I recommend that the she and the other member of the BOS receive training on preventing discrimination and harassment in the workplace.

With regard to Mr. Chiocca, I recommend that he be removed from administrative leave and returned to the position of Town Administrator for the Town and that he be reminded that any retaliation in the workplace for reporting harassment will not be tolerated.

If I may provide you with any additional information, please feel free to contact me.

Very truly yours,

*Regina M.Ryan*

Regina M. Ryan

Confidential Personnel Record
to Adam Shafran, Esq.
representing Allan Chiocca,
not to be released or distributed without the permission of
the Rockland Board of Selectmen

July 6, 2018

VIA EMAIL TO ATTY. ADAM SHAFRAN

Allan Chiocca
Town Administrator
Town of Rockland
Rockland, MA 02370

## NOTICE OF EXECUTIVE SESSION

Dear Mr. Chiocca:

The Board of Selectmen will convene a meeting on July 10, 2018 at 7:00 at the Rockland High School Auditorium. The meeting will include the following executive session agenda items:

    **a.** To discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual, to wit:  Town Administrator Allan Chiocca, pursuant to M.G.L. c. 30A, sec.21(a)(1).

    **b.** To discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual, to wit:  Selectwoman Deirdre Hall, pursuant to M.G.L. c. 30A, sec.21(a)(1).

    **c.** To discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual, to wit:  Selectman Edward Kimball, pursuant to M.G.L. c. 30A, sec.21(a)(1).

A copy of the complete posted agenda is included with this notice.

The Board will discuss charges or complaints against you under General Laws, c. 30A, §21(a)(1). A copy of that statute is attached. Pursuant to that statute, you have following rights:

- to be present at such executive session during deliberations which involve that you;

- to have counsel or a representative of your own choosing present and attending for the purpose of advising you and not for the purpose of active participation in the executive session;

- to speak on your own behalf; and

- to cause an independent record to be created of said executive session by audio-recording or transcription, a your expense.

Please refer to the statute for a full list of your rights under General Laws, c. 30A, §21.

The specific issues to be discussed are contained in the document "Investigation of Complaints Against Deirdre Hall and Allan Chiocca – Findings of Fact, Conclusions and Recommendations." A copy of this document is included with this notice. Please be advised that this document is a confidential personnel record and includes information the disclosure of which may constitute an unwarranted invasion of privacy by persons named in the document. This document may not be released or disclosed to any person without the express permission of the Rockland Board of Selectmen.

Your attorney has agreed to accept service of this notice on your behalf.

Sincerely,

John J. Clifford, Esq.
Town Counsel

cc: Board of Selectmen
    Interim Town Administrator

**Part I**      ADMINISTRATION OF THE GOVERNMENT

**Title III**      LAWS RELATING TO STATE OFFICERS

**Chapter 30A**      STATE ADMINISTRATIVE PROCEDURE

**Section 21**      MEETING OF PUBLIC BODY IN EXECUTIVE SESSION

Section 21. (a) A public body may meet in executive session only for the following purposes:

(1) To discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual. The individual to be discussed in such executive session shall be notified in writing by the public body at least 48 hours prior to the proposed executive session; provided, however, that notification may be waived upon written agreement of the parties. A public body shall hold an open session if the individual involved requests that the session be open. If an executive session is held, such individual shall have the following rights:

i. to be present at such executive session during deliberations which involve that individual;

ii. to have counsel or a representative of his own choosing present and attending for the purpose of advising the individual and not for the purpose of active participation in the executive session;

iii. to speak on his own behalf; and

iv. to cause an independent record to be created of said executive session by audio-recording or transcription, at the individual's expense.

The rights of an individual set forth in this paragraph are in addition to the rights that he may have from any other source, including, but not limited to, rights under any laws or collective bargaining agreements and the exercise or non-exercise of the individual rights under this section shall not be construed as a waiver of any rights of the individual.

2. To conduct strategy sessions in preparation for negotiations with nonunion personnel or to conduct collective bargaining sessions or contract negotiations with nonunion personnel;

3. To discuss strategy with respect to collective bargaining or litigation if an open meeting may have a detrimental effect on the bargaining or litigating position of the public body and the chair so declares;

4. To discuss the deployment of security personnel or devices, or strategies with respect thereto;

5. To investigate charges of criminal misconduct or to consider the filing of criminal complaints;

6. To consider the purchase, exchange, lease or value of real property if the chair declares that an open meeting may have a detrimental effect on the negotiating position of the public body;

7. To comply with, or act under the authority of, any general or special law or federal grant-in-aid requirements;

8. To consider or interview applicants for employment or appointment by a preliminary screening committee if the chair declares that an open meeting will have a detrimental effect in obtaining qualified applicants; provided, however, that this clause shall not apply to any meeting, including meetings of a preliminary screening committee, to consider and interview applicants who have passed a prior preliminary screening;

9. To meet or confer with a mediator, as defined in section 23C of chapter 233, with respect to any litigation or decision on any public business within its jurisdiction involving another party, group or entity, provided that:

(i) any decision to participate in mediation shall be made in an open session and the parties, issues involved and purpose of the mediation shall be disclosed; and

(ii) no action shall be taken by any public body with respect to those issues which are the subject of the mediation without deliberation and approval for such action at an open session; or

10. to discuss trade secrets or confidential, competitively-sensitive or other proprietary information provided in the course of activities conducted by a governmental body as an energy supplier under a license granted by the department of public utilities pursuant to section 1F of chapter 164, in the course of activities conducted as a municipal aggregator under section 134 of said chapter 164 or in the course of activities conducted by a cooperative consisting of governmental entities organized pursuant to section 136 of said

chapter 164, when such governmental body, municipal aggregator or cooperative determines that such disclosure will adversely affect its ability to conduct business in relation to other entities making, selling or distributing electric power and energy.

(b) A public body may meet in closed session for 1 or more of the purposes enumerated in subsection (a) provided that:

1. the body has first convened in an open session pursuant to section 21;

2. a majority of members of the body have voted to go into executive session and the vote of each member is recorded by roll call and entered into the minutes;

3. before the executive session, the chair shall state the purpose for the executive session, stating all subjects that may be revealed without compromising the purpose for which the executive session was called;

4. the chair shall publicly announce whether the open session will reconvene at the conclusion of the executive session; and

5. accurate records of the executive session shall be maintained pursuant to section 23.

JUL 6 2018 AM9:05

TOWN CLERK, ROCKLAND,



# TOWN OF ROCKLAND

**Board of Selectmen**
Town Hall
242 Union Street
Rockland, Massachusetts 02370

*Chairman:*
Edward F. Kimball
*Vice Chairman:*
Deirdre Hall

*Selectmen:*
Larry J. Ryan
Michael P. Mullen, Jr.
Michael P. O'Loughlin

*Telephone:* 781-871-1874
*Fax:* 781-871-0386

## SELECTMEN'S MEETING
### Tuesday July 10, 2018 @ 7 p.m.

## ROCKLAND HIGH SCHOOL AUDITORIUM
### 52 MacKINLEY WAY
### ROCKLAND, MASSACHUSETTS

## PLEDGE OF ALLEGIANCE
### MOS

*Good evening and welcome. Please be advised that this open meeting is being broadcast live and recorded by WRPS for playback on Comcast channel 14 and Verizon channel 31. It will also be available for on-line, video on demand viewing at wrpsrockland.com within 24 hours of its conclusion, as are other recently recorded meeting and community events. Please go to wrpsrockland.com for further information.*

1. **Reorganization of Board of Selectmen**

2. **Executive Session for the following purposes:**

   a. To discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual, to wit:  Town Administrator Allan Chiocca, pursuant to M.G.L. c. 30A, sec.21(a)(1).

b. To discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual, to wit: Selectwoman Deirdre Hall, pursuant to M.G.L. c. 30A, sec.21(a)(1).

c. To discuss the reputation, character, physical condition or mental health, rather than professional competence, of an individual, or to discuss the discipline or dismissal of, or complaints or charges brought against, a public officer, employee, staff member or individual, to wit: Selectman Edward Kimball, pursuant to M.G.L. c. 30A, sec.21(a)(1).

d. To discuss strategy with respect to litigation as an open meeting may have a detrimental effect on the litigating position of the public body.

e. Vote to adjourn executive session and return to open meeting.

**RECONVENED OPEN SESSION**

3. Board Discussion - Discrimination and Harassment Solutions, LLC investigation findings as they pertain to Allan Chiocca, Deirdre Hall, and Edward Kimball.

4. Vote to release to the public the executive summary provided by Regina Ryan, Esq., summarizing findings of the investigation performed by Discrimination and Harassment Solutions, LLC.

5. Vote to comply with several outstanding public records requests and release Rockland Town Hall surveillance video from the evening of May 1, 2018 and early morning of May 2, 2018.

a. Vote to release affidavit of Steven Verronneau, independent consultant retained by Discrimination and Harassment Solutions, LLC to analyze Rockland Town Hall surveillance video from the evening of May 1, 2018 and early morning of May 2, 2018.

## 6. MINUTES

      3. a. Open Session Minutes of June 19, 2018
         b. Open Session Minutes of June 23, 2018
         c. Open Session Minutes of June 26, 2018
         d. Executive Session Minutes of June 13, 2018
         e. Executive Session Minutes of June 23, 2018


## AGENDA ITEMS

## SELECTMAN'S COMMENTS

*Comments and opinions expressed by individual members do not necessarily reflect the views of the BOS and are the opinions and comments of only the individual member.*




John Llewellyn
Interim Town Administrator


The listings of matters are those reasonably anticipated by the Chair which may be discussed at the meeting. Not all items listed may in fact be discussed and other items not listed may also be brought up for discussion to the extent permitted by law.