UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )  | |
| ALLAN CHIOCCA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CIVIL ACTION |
| | )  NO. 19-10482-WGY |
| TOWN OF ROCKLAND, DEIRDRE HALL, | ) |
| EDWARD KIMBALL, LARRY RYAN, | ) |
| MICHAEL MULLEN, JR., MICHAEL | ) |
| O'LOUGHLIN, RICHARD PENNEY, and | ) |
| KARA NYMAN, | ) |
| | ) |
| Defendants. | ) |
| _____ )  | |

YOUNG, D.J.                                      October 3, 2022

**MEMORANDUM AND ORDER**

## I.   INTRODUCTION

Allan Chiocca ("Chiocca"), former Town administrator for
the Town of Rockland (the "Town"), sued the Town, Deirdre Hall
("Hall"), Edward Kimball ("Kimball"), and five other current or
former members of the Town Board of Selectmen (the "Board")
after he and Hall had a sexual encounter and each sustained
employment consequences.

This matter is before the Court on Chiocca's, the Town's,
and Hall and Kimball's cross-motions for summary judgment as to
the following claims: count 24 of Chiocca's complaint against
the Town for suspension in breach of his employment contract and
the Town Charter; and count 3 of Hall's counterclaims and count

1 of Kimball's counterclaim against Chiocca for public disclosure of private facts.  At the motion hearing on March 22, 2022, the parties agreed to proceed on a case-stated basis to resolve these cross-motions.  See Electronic Clerk's Notes, ECF No. 277; Order, ECF No. 279.  At the case-stated hearing on May 23, 2022, the Court took the matter under advisement.  Electronic Clerk's Notes, ECF No. 294.

On June 30, 2022, the Town withdrew its consent to proceed case-stated with respect to Chiocca's claim for breach of contract, see Notice Withdrawal Consent Proceed Case Stated Count 24 ("Notice Withdrawal"), ECF No. 310.  Therefore, as to count 24, this Court will not proceed case-stated and will rule on the cross-motions for summary judgment on the summary judgment record only, pursuant to Federal Rule of Civil Procedure 56(a).  With regard to count 3 of Hall's counterclaims and count 1 of Kimball's counterclaim, this Court proceeds on the case-stated record as to liability only, in accordance with the parties' request at hearing.  See Order 1-2.

As to count 24 of Chiocca's complaint, the motions for summary judgment, ECF Nos. 158 & 171, are hereby ALLOWED in Chiocca's favor.  The law does not distinguish suspension with pay from administrative leave, and the Town has failed to identify a genuine difference between these employment actions; thus, in placing Chiocca on administrative leave without proper

process, the Town suspended him in violation of the terms of his employment contract as it operates within the Town Charter.

As to count 3 of Hall's counterclaims and count 1 of Kimball's counterclaim, this Court rules in favor of Chiocca, concluding that he is not liable under Massachusetts General Laws chapter 214, section 1B for public disclosure of private facts.  Although Chiocca's release of an internal investigatory report ordered by the Board disclosed intimate and sensitive information, it did not constitute an invasion of Hall's and Kimball's privacy because: (1) the existence of both their extramarital affair and Chiocca's sexual contact with Hall was already in the public domain; (2) both events were of public interest to voters; (3) both issues were relevant to Chiocca's own privacy; and (4) the disclosure was reasonable, given the serious allegations of sexual harassment and impropriety levelled against Chiocca.

## II.  PROCEDURAL HISTORY

On March 13, 2019, Chiocca filed a complaint against Hall, Kimball, the Town, and five former or current Board members. Compl., ECF No. 1.  He brought thirty-seven counts comprising employment discrimination claims under Massachusetts General Laws chapter 151B, id. ¶¶ 320-331, and Title VII of the Civil Rights Act of 1964, id. ¶¶ 332-334; equal protection claims under 42 U.S.C. § 1983, id. ¶¶ 335-337, 342-46; procedural and

substantive due process claims under 42 U.S.C. § 1983, id. ¶¶ 347-399, 400-406; civil rights conspiracy claims under 42 U.S.C. § 1985, id. 407-420; contract claims, id. 421-432; and tort claims, id. 433-465.

In April 2019, the Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 8.  Defs.' Joint Mot. Dismiss Pursuant Fed. R. Civ. P. 8, ECF No. 27.  At a hearing in July 2019, this Court denied the motion.  Electronic Clerk's Notes, ECF No. 39.

In August 2019, Hall filed counterclaims against Chiocca.  Claims Counter-Claim Pl. Deirdre Hall Against Counter-Claim Def. Allan Chiocca, ECF No. 68.  She brought six counts, including sexual harassment under Massachusetts General Laws chapter 214, section 1C, id. ¶¶ 87-92, at 61-62, and various tort claims, id. ¶¶ 93-111, at 62-64.  Kimball also filed one counterclaim against Chiocca in tort.  See Edward Kimball's Answer Allan Chiocca's Compl. & Counterclaim ¶¶ 68-75, at 53, ECF No. 66.

Following the counterclaims, Chiocca crossclaimed against the Town seeking indemnification.  Pl. Allan Chiocca's Am. Answer Def. Deirdre Hall's Counterclaim & Crossclaim ¶¶ 9-10, at 14, ECF No. 85; Pl. Allan Chiocca's Am. Answer Def. Edward Kimball's Counterclaim & Crossclaim ¶¶ 9-10, at 14, ECF No. 86.

The parties then filed six motions for summary judgment.  See Partial Mot. Summ. J. Defs. Town Rockland, Ryan, Michael

Mullen, Jr., Michael O'Loughlin, Richard Penney & Kara Nyman
("Town & Board's Mot. Summ. J."), ECF No. 158;  Pl. Allan
Chiocca's Mot. Partial Summ. J. ("Pl. Chiocca's Mot. Summ. J."),
ECF No. 171; Counterclaim Def. Allan Chiocca's Mot. Summ. J.
Counterclaim Pl. Deirdre Hall's & Edward Kimball's Counterclaims
("Def. Chiocca's Mot. Summ. J."), ECF No. 177; Mot. Partial
Summ. J. Liability claims Invasion Privacy Brought Counterclaim
Pls. Hall & Kimball ("Pls. Hall & Kimball's Mot. Summ. J."), ECF
No. 189; Def. Deirdre Hall's Mot. Summ. J., ECF No. 180; Def.
Edward Kimball's Mot. Summ. J. 1, ECF No. 163.

Four motions are relevant to the matter presently before
the Court.  First, the Town and members of the Board
(collectively, the "Town and Board") moved for partial summary
judgment as to Counts 1-5 and complete summary judgment as to
Counts 7-8, 10-20, 22-26, 29-30, and 35-37 of Chiocca's
complaint.  Town & Board's Mot. Summ. J. 1-2.  The parties fully
briefed the motion.  See generally Mem. Law Support Mot. Partial
Summary J. Defs. Town Rockland, Ryan, Michael Mullen, Jr.,
Michael O'Loughlin, Richard Penney & Kara Nyman ("Town & Board's
Mem. Summ. J."), ECF No. 159; Pl. Allan Chiocca's Opp'n Mot.
Partial Summ. J. Defs. Town Rockland, Ryan, Michael Mullen, Jr.,
Michael O'Loughlin, Richard Penney & Kara Nyman ("Chiocca's
Opp'n Town & Board's Mot. Summ. J."), ECF No. 214; Reply Mem.
Support Mot. Partial Summ. J. Defs. Town Rockland, Ryan, Michael

Mullen, Jr., Michael O'Loughlin, Richard Penney & Kara Nyman ("Town & Board's Reply"), ECF No. 243.

Second, Chiocca cross-moved for partial summary judgment as to Count 1 and Count 24 of his complaint.  Pl. Chiocca's Mot. Summ. J. 1.  The parties fully briefed this motion.  <u>See generally</u> Pl. Allan Chiocca's Mem. Law Support His Mot. Partial Summ. J. Against Defendant Town Rockland ("Pl. Chiocca's Mem. Summ. J."), ECF No. 172; Def. Town Rockland's Mem. Law Opp'n Pl.'s Partial Mot. Summ. J. ("Town's Opp'n Pl. Chiocca's Mot. Summ. J."), ECF No. 205; Pl. Allan Chiocca's Reply Support Mot. Partial Summ. J. Against Def. Town Rockland ("Pl. Chiocca's Reply"), ECF No. 242.

Third, Chiocca moved for summary judgment on the entirety of Hall and Kimball's counterclaims.  Def. Chiocca's Mot. Summ. J.  The parties fully briefed the motion.  <u>See generally</u> Countercl. Def. Allan Chiocca's Mem. Law Support His Mot. Summary Judgment Counterclaim Pl. Deirdre Hall's Counterclaims & Counterclaim Pl. Edward Kimball's Counterclaim ("Def. Chiocca's Mem. Summ. J."), ECF No. 178; Counterclaim Pls. Hall's & Kimball's Consolidated Mem. Law Opp'n Counterclaim Def. Chiocca's Mot. Summ. J. All Counterclaims ("Pls. Hall & Kimball's Opp'n Def. Chiocca's Mot. Summ. J."), ECF No. 226; Pl./Counterclaim Def. Allan Chiocca's Reply Mem. Support His

Mot. Summ. J. Def. Deirdre Hall's & Edward Kimball's
Counterclaims ("Def. Chiocca's Reply"), ECF No. 238.

Fourth, Hall and Kimball cross-moved for partial summary
judgment as to their counterclaims for invasion of privacy
against Chiocca -- count 3 of Hall's counterclaim and count 1 of
Kimball's counterclaim.  Pls. Hall & Kimball's Mot. Summ. J. 1.
The parties fully briefed the motion.  See generally Mem.
Support Mot. Partial Summ. J. Liability Claims Invasion Privacy
Brought Counterclaim Pls. Hall & Kimball ("Pls. Hall & Kimball's
Mem. Summ. J."), ECF No. 194; Counterclaim Def. Allan Chiocca's
Opp'n Counterclaim Pls. Hall & Kimball's Mot. Summ. J. Their
Invasion Privacy Counterclaims ("Def. Chiocca's Opp'n Pls. Hall
& Kimball's Mot. Summ. J."), ECF No. 220; Counterclaim Pls.
Deirdre Hall's & Edward Kimball's Reply Brief Support Their Mot.
Partial Summ. J. Against Counterclaim Def. Allan Chiocca ("Pls.
Hall & Kimball's Reply"), ECF No. 248.

At a hearing on March 22, 2022, this Court offered the
parties the opportunity to proceed on a case-stated basis to
resolve their cross-motions for summary judgment.  See
Electronic Clerk's Notes, ECF No. 277.  The parties agreed to
allow the Court to treat three matters as a case-stated.  First,
Chiocca and the Town agreed to proceed case-stated on their
cross-motions, ECF Nos. 171 & 158, as to count 24 of Chiocca's
complaint: suspension in breach of the Rockland Town Charter or

his employment contract, brought against the Town.  Order 1.
Second, Chiocca and Hall agreed to proceed case-stated on their
cross-motions, ECF Nos. 177 & 189, as to liability only in count
3 of Hall's counterclaims: invasion of privacy in violation of
Massachusetts General Laws chapter 214, section 1B, Mass. Gen.
Laws ch. 214, § 1B, for the public disclosure of private facts,
brought against Chiocca  Id. 1-2.  Third, Chiocca and Kimball
agreed to proceed case-stated on their cross-motions, ECF Nos.
177 & 189, as to liability only in count 1 of Kimball's
counterclaim: the public disclosure of private facts. Id. 3.
The Court then tentatively ruled on the remaining motions for
summary judgment.  Id. 2-4.

On May 23, 2022, the Court held a case-stated hearing.
Electronic Clerk's Notes, ECF No. 294.  After hearing arguments,
the Court took the matter under advisement.  See id.  On June
29, 2022, the Court ordered that damages as to count 24 would
not be decided through the case-stated proceedings.  Electronic
Clerk's Notes, ECF No. 309.  Subsequently, the Town submitted a
notice of withdrawal of its consent to proceed case-stated as to
count 24.  Notice of Withdrawal.

## III. CHIOCCA'S CLAIM FOR BREACH OF CONTRACT

In Count 24, Chiocca brings a claim against the Town for
breach of contract.  See Compl. ¶¶ 421-424.  The Town moved for
summary judgment as to Count 24, Town & Board's Mot. Summ. J. 1-

2, and Chiocca cross-moved, Pl. Chiocca's Mot. Summ. J. 1. Chiocca's employment contract and the Town Charter require that the Town provide considerable procedural protections in the event of Chiocca's suspension.  Here, the dispute centers on whether, in placing him on "administrative leave," the Town "suspended" Chiocca without furnishing these protections. Massachusetts law does not differentiate between a suspension with pay and paid administrative leave.  The Town, moreover, has failed to specify any practical or analytical distinction between these adverse actions.  Thus, Chiocca's placement on administrative leave constituted a suspension in violation of his employment contract as it operates within the Town Charter. Summary judgment is granted in favor of Chiocca as to Count 24.

### A.   Undisputed Facts[1]

#### 1. The Contract and the Town Charter

Chiocca commenced his employment as the Town Administrator in March 2008.  Town Rockland's Responses Pl./Countercl. Def.

---

[1] After the case-stated hearing on May 23, 2022, Chiocca and the Town, pursuant to the Court's June 10, 2022 order, submitted a joint statement of material facts with respect to count 24. Pl. Chiocca & Def. Town's Joint Statement Material Facts Count 24 Chiocca's Compl. ("Joint Statement Facts"), ECF No. 317.  The Town, however, has withdrawn its consent to proceed on a case-stated basis as to count 24.  See Notice Withdrawal 1; Joint Statement Facts 1 n.1.  The Court will therefore rule on count 24 on the summary judgment record -- that is, on the basis of the undisputed statements of fact provided by each party with regard to the cross-motions for summary judgment.

Allan Chiocca's Statement Material Facts Support His Mot. Partial Summ. J. His Claims ("Town's Response Chiocca's Statement Facts") ¶ 1, ECF No. 205-1.  His contract was renewed first in 2009 and "several times thereafter."  Id. ¶ 2. Chiocca's most recent employment contract (the "Contract") was effective from July 1, 2016, through June 30, 2019, "unless sooner terminated in accordance with the provisions indicated within the Contract."  Id. ¶ 3.  The Contract "sets forth the terms and conditions of [his] employment with the Town."  Id. ¶ 4.

      With respect to the Town's right to suspend Chiocca, the Contract states:

> Employer may suspend the Employee for good cause, with
> pay and benefits, at any time during the term of this
> agreement, in accordance with Section 2.18(a) of the
> Rockland Town Charter (as amended by Chapter 58 of the
> Acts of 2005).

Id. ¶ 6 (emphasis added).  Section 2.18(a) of the Town Charter, as amended by Chapter 48 of the Acts of 2005, states in part:

> The board of selectmen by affirmative vote of at least
> 4 members may suspend or remove the town administrator
> from office.  If the board of selectmen affirmatively
> votes to suspend or remove the town's administrator,
> the board shall give at least 60 days' notice as to
> the effective date of his suspension or termination,
> or provide 60 days of severance pay, or a combination
> of both notice and severance pay equivalent to at
> least 60 days.  At least 30 days before the proposed
> suspension or termination becomes effective the board
> of selectmen shall file a preliminary written
> resolution with the town clerk setting forth in detail
> the specific reason for the proposed suspension or

termination.  A copy of the resolution shall be delivered to the town administrator.  The town administrator may within 10 days of service of the resolution, reply in writing to the resolution and may request a public hearing.  If the town administrator so requests, the board of selectmen shall hold a public hearing not earlier than 20 days nor later than 30 days after the filing of the request.  After the public hearing, if any, otherwise at the expiration of 30 days following the filing of the preliminary resolution, the selectmen may suspend or terminate the town administrator from duty.

Id. ¶ 7.  These rules were in effect at all relevant times. Id. ¶¶ 211, 212, 213.

### 2.  Contract Extension Discussions and the Incident between Chiocca and Hall

As Town Administrator, Chiocca reported to the Board, which was comprised of five elected members, including Kimball and Hall.  Id. ¶¶ 8, 16, 21.  In the spring of 2018, the Board was reviewing Chiocca's request for a contract extension and salary increase.  Id. ¶ 27.

The night of May 1-2, 2018, Chiocca and Hall went for drinks, returned to Town Hall, and engaged in sexual conduct (the "Incident").  Id. ¶¶ 36, 52-53; Pl. Allan Chiocca's Responses Defs.' Town Rockland, Ryan, Michael Mullen, Jr., Michael O'Loughlin, Richard Penney & Kara Nyman Local Rule 56.1 Concise Statement Material Facts & Plaintiff's Statement Additional Material Facts ("Chiocca's Response Town & Board's Facts") ¶¶ 1-2, ECF No. 215; Town Rockland's Responses Pl./Countercl. Def. Allan Chiocca's statement Additional

Material Facts Which There Is No Genuine Issue Tried ("Town's Response Chiocca's Additional Facts") ¶¶ 2, 8, ECF No. 244.  The parties dispute the circumstances of this encounter: Chiocca claims "Hall threatened to withhold her vote to extend his contract unless he permitted her to perform oral sex on him," Chiocca's Response Town & Board's Facts ¶ 4, while Hall alleges "Chiocca took advantage of her sexually while she was too intoxicated to consent," id. ¶ 5.  Following the Incident, Hall claimed to have no memory of the sexual encounter.  Town's Response Chiocca's Statement Facts ¶ 59.

On May 11, 2018, Town Counsel John Clifford ("Attorney Clifford"), not yet knowing of the events of May 1-2, emailed the Board "regarding the need to discuss Mr. Chiocca's contract."  Id. ¶ 69; Chiocca's Response Town & Board's Facts ¶ 10.  On May 15, 2018, the Board held a regular meeting wherein it discussed Chiocca's employment.  Town's Response Chiocca's Statement Facts ¶¶ 71, 73.

On May 18, Kimball told Attorney Clifford about the Incident, and they met with Chiocca to discuss it.  Id. ¶¶ 10-11.  Kimball and Clifford "requested that Chiocca refrain from coming to Town Hall until they learned more about what happened between" Hall and Chiocca.  Town's Response Chiocca's Statement Facts ¶ 95.  To that end, Attorney Clifford told Chiocca he would be placed on paid "administrative leave," which would

[12]

require a vote of the Board.  Chiocca's Response Town & Board's
Facts ¶ 16.  Rather than go on administrative leave, Chiocca
agreed to use vacation time and stay out of the office.  Town's
Response Chiocca's Statement Facts ¶ 95; Chiocca's Response Town
& Board's Facts ¶ 17.  By May 23, 2018, Chiocca and the Town had
agreed that he would temporarily leave his employment, while
continuing to be paid, until September 2018.  Id. ¶ 20.

That day, however, the media learned of the Incident.  Id.
¶ 21.

### 3. The Independent Investigation and Chiocca's Placement on "Administrative Leave"

On May 29, 2018, the Board voted in executive session to
retain Independent Investigator Regina Ryan of Discrimination
and Harassment Solutions Inc. ("Investigator Ryan") "to conduct
an investigation into the events of May 1-2, 2018."  Town's
Response Chiocca's Statement Facts ¶ 101.  She was tasked with
investigating: "whether (1) Mr. Chiocca violated the town's
sexual harassment policy by engaging in nonconsensual sexual
activities with Ms. Hall during the May 1-2 incident and, if so,
what discipline is recommended; and (2) whether Ms. Hall, as a
supervisor of Mr. Chiocca, violated the town's sexual harassment
policy by requesting sexual favors during the May 1-2 incident
in exchange for actual or promises job benefits."  Id. ¶ 102.

During the May 29 executive session, the Board voted to place Chiocca on paid "administrative leave."  Id. ¶ 104.  This status change was "effective immediately."  Id. ¶ 107.  The Town "did not file a written resolution with the town clerk explaining its reasons for" this action.  Id. ¶ 106.  Chiocca was notified of his placement on "administrative leave" by a letter which stated:

> a. He was being investigated for "alleged misconduct", specifically "inappropriate conduct toward a member of the Town of Rockland Board of Selectman"
> b. He was "ordered to attend an investigative interview . . . conducted by the Town's investigator."
> c. He was told "to have a legal representative accompany [him] to this interview."
> d. He was told "further disciplinary action . . . including termination" could be taken.

Town's Response Chiocca's Statement Facts ¶ 107; Chiocca's Response Town & Board's Facts ¶ 30.

The Town claims it placed Chiocca "on paid administrative leave pursuant to its then-existing Discriminatory Harassment Policy."  Chiocca's Response Town & Board's Facts ¶ 22.  The Discriminatory Harassment Policy - to which the Town cites - states that "the investigator may determine it is necessary or advisable to take interim measures . . . [which] may include: placing the alleged harasser on administrative leave."  Index Exhibits, Ex. R, Town of Rockland Employee Handbook ("Def.'s Alleged Discriminatory Harassment Policy") 15, ECF No. 161-18. Chiocca claims this policy submitted by the Town was not

effective on May 29, 2018.  Chiocca's Response Town & Board's
Facts ¶ 22.  The Discriminatory Harassment Policy he claims was
in effect does not reference "administrative leave" as an
interim measure.  Declaration Adam J. Shafran, Ex. H, Town
Rockland's Discriminatory Harassment Policy ("Pl.'s Alleged
Discriminatory Harassment Policy") 2-6, ECF No. 216-9.

    While on "administrative leave," Chiocca received pay but
was (1) "not permitted to perform any of his job
responsibilities," Town's Response Chiocca's Statement Facts ¶¶
108, 109; (2) "not physically allowed on Town property,"
Chiocca's Response Town & Board's Facts ¶ 30; and (3) "required
to return to the Town all Town property in his possession,"
Town's Response Chiocca's Statement Facts ¶¶ 110.  Selectman
Michael O'Loughlin ("O'Loughlin") testified that, besides pay,
"there's . . . no real difference" between administrative leave
and suspension.  Id., Ex. 1, Dep. Michael O'Loughlin 238:21-
239:11, ECF No. 205-2.  The Contract indicates, however, that a
suspension may be paid.  Town's Response Chiocca's Statement
Facts ¶ 6 ("Employer may suspend the Employee for good cause,
with pay and benefits, at any time during the term of this
agreement. . . ." (emphasis added)).

### 4.  Investigator Ryan's Report

    The investigation lasted five to six weeks.  Id. ¶ 32.
Between June 29, 2018, and July 10, 2018, Hall resigned from the

Board and Investigator Ryan submitted a draft of her written report (the "Ryan Report") to Town Counsel John Clifford ("Attorney Clifford").  Id. ¶¶ 36-38.  The Ryan Report found "by a preponderance of the evidence that" (1) Hall had sexually harassed Chiocca by seeking "sexual relations in exchange for her vote on his contract extension," and (2)  Chiocca "did not violate the Town's Sexual Harassment Policy in that he did not engage in any unwelcomed touching of [] Hall."  Town's Response Chiocca's Statement Facts ¶ 149.

On July 10, the Board held a Town Meeting.  Id. ¶ 164. During the executive session, the Board voted to accept the Ryan Report in full -- though the implication of this action is disputed -- and publicly to release a two-sentence summary. Town's Response Chiocca's Statement Facts ¶¶ 176-77; Chiocca's Response Town & Board's Facts ¶ 45.

After Investigator Ryan read a statement summarizing the Ryan Report's legal conclusion, Attorney Clifford stated that even though Chiocca "was found to have not violated the Town's Discriminatory Harassment Policy," he "was found to have violated a number of other [policies]" and that the Board would hold a meeting on July 17, 2018, "to discuss what, if any actions, will be taken against" Chiocca.  Town's Response Chiocca's Statement Facts ¶¶ 177, 179, 181; Town's Response Chiocca's Additional Facts ¶ 22.

[16]

### 5. Subsequent Employment Actions Against Chiocca

On July 17, 2018, the Board held an executive session to discuss Chiocca's employment. Town's Response Chiocca's Statement Facts ¶ 199; Town's Response Chiocca's Additional Facts ¶ 24. During executive session, Attorney Clifford advised the Board that, "in order for the [B]oard to take any action under Section 2.18 of the Charter [against Chiocca], . . . Mr. Chiocca has to receive [sixty] days' notice of suspension or termination[,] . . . [and] you have to file a preliminary resolution with the town clerk and basically give Mr. Chiocca the opportunity for a hearing." Town's Response Chiocca's Statement Facts ¶ 200. Attorney Clifford further advised that administrative leave without pay "is considered a suspension." Id. ¶ 200.

The Board took what it called "no action" against Chiocca's employment at the July 17 executive session. Id. ¶ 203. Given his status on administrative leave, however, Chiocca remained "not permitted to exercise any function or authority as Town Administrator between May 29, 2018, and November 20, 2018." Id. ¶ 204.

At the Board meeting on November 20, 2018, the Board unanimously voted in favor of the following motion:

> I move that the Board vote to notify Allan Chiocca of
> our intent not to renew his employment agreement,
> which expires on June 30, 2019, and that he further be

[17]

> notified that he is no longer permitted to exercise
> any function or exercise any authority as Town
> Administrator from this date until the expiration of
> his employment agreement on June 30, 2019.

Town's Response Chiocca's Statement Facts ¶ 210.  Thus, Chiocca

would remain on administrative leave through the Contract term

and his Contract would not be extended.  Town's Response

Chiocca's Statement Facts ¶¶ 208, 209.  The Town neither filed a

written resolution with the town clerk detailing its reasons for

continuing his administrative leave nor sent Chiocca notice

pursuant to section 2.18 of the Town Charter.  Id. ¶ 214-15.  As

for non-renewal of his employment contract, the parties agree

that neither the Contract nor the Town Charter required (1)

notice to Chiocca or (2) the Board to file a list of reasons.

Chiocca's Response Town & Board's Facts ¶¶ 56, 57, 59, 60.

Chiocca and the Town and Board agree that the votes on

November 20 were based in part on: "Chiocca returning to Town

Hall after hours on non-Town related business," id. ¶ 67;

"Chiocca opening a bottle of alcohol while at Town Hall," id. ¶

69; and "Chiocca's poor judgment, including in operating his

vehicle after drinking on the night of May 1, 2018," id. ¶ 72.

The Town also alleges (and Chiocca disputes) that the votes

on November 20 were based on: "multiple Town employees

expressing discomfort at the prospect of Mr. Chiocca returning

to his position," id. ¶ 68; "the Board's belief that Mr. Chiocca

wasn't able to be an effective leader," id. ¶ 70; "the public's distrust of town government caused by Mr. Chiocca's actions," id. ¶ 71; "reports that Mr. Chiocca had referred to Ms. Hall as a "dyke," id. ¶ 73; "reports that Mr. Chiocca had referred to [] Mullen as a "girl," id. ¶ 74; "Chiocca calling [Town employees] on May 18, 2018 while he was intoxicated," id. ¶ 75; "Chiocca discussing his erectile disfunction with his subordinates," id. ¶ 76; "Chiocca stating to [] O'Loughlin that he would 'climb that mountain' in reference to having sex with Ms. Hall," id. ¶ 77; and "Chiocca's failure to report that the incident had occurred," id. ¶ 78.

In its Position Statement submitted to the Massachusetts Commission Against Discrimination, the Town justified its decision "placing Mr. Chiocca on paid administrative leave and ultimately non-renewing his contract" by citing, inter alia, "his sexual encounter with Ms. Hall in Town hall, serving alcohol in Town Hall[,] and driving around town on the night/early morning hours of May 1-2 after consuming alcohol." Town's Response Chiocca's Additional Facts ¶ 27.

### 6. The Second Ryan Investigation

After Hall claimed to regain some memory of the Incident, the Town asked Investigator Ryan to reopen the investigation. Town's Response Chiocca's Statement Facts ¶ 222.  Based on Investigator Ryan's hourly timesheets, the supplemental

[19]

investigation appears to have begun December 14, 2018, and concluded June 5, 2019.  Declaration Adam J. Shafran, Ex. S, Discrimination and Harassment Solutions Timesheet, ECF No. 216-19.  The findings in the supplemental report are not materially different from the initial.  See Declaration Adam J. Shafran, Ex. V, Supplemental Investigation Compl. Against Deirdre Hall & Allan Chiocca ("Supplemental Report"), ECF No. 216-22.

### B.   Legal Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment.  Id.  In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe."  Id. at 151.  The moving party bears the initial burden of demonstrating that "the nonmoving party has

failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"The [summary judgment pleading standard is] the same where, as here, both parties have moved for summary judgment." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002).  The fact that both parties have moved for summary judgment on the same issues, "neither dilutes nor distorts" the summary judgment standard of review.  See Hartford Fire Ins. Co. v. CNA Ins. Co., 633 F.3d 50, 53 (1st Cir. 2011).  When courts are considering cross-motions for summary judgment, they must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)).  "Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'"  Wells Real Estate Inv. Tr. II, Inc. v. Chardón/Hato

Rey P'ship, 615 F.3d 45, 51 (1st Cir. 2010) (quoting Adria Int'l
Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir.
2001)).  The Court must "in each instance [determine] whether
the moving party has met its burden under Rule 56."  Dan
Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp.
194, 197-98 (D. Mass. 1991) (Caffrey, J.).

    C.   **Analysis**

    Chiocca alleges that by placing him on paid administrative
leave without providing certain procedural protections, the Town
suspended him in violation of his Contract and the Town Charter.
See Compl. ¶¶ 421-424; Pl. Chiocca's Mem. Summ. J. 16-18.  The
Town argues that paid administrative leave is legally distinct
from a suspension with pay; because Chiocca was not suspended,
the Town says, the procedural requirements of the Contract and
Town Charter do not pertain to him.  See Town's Opp'n Pl.
Chiocca's Mot. Summ. J. 8.

    To establish a breach of contract, Chiocca must show "that
there was a valid contract, that the defendant breached its
duties under its contractual agreement, and that the breach
caused the plaintiff damage."  Guckenberger v. Boston Univ., 957
F. Supp. 306, 316 (D. Mass. 1997) (Saris, J.).

        1. **Requirements of the Contract and Town Charter**

    Chiocca's Contract provides that the Town "may suspend the
Employee for good cause, with pay and benefits," so long as it

complies with Section 2.18(a) of the Rockland Town Charter.  Id.
¶ 6.  Section 2.18(a) of the Rockland Town Charter sets forth
detailed procedures -- involving notice and the opportunity to
be heard -- that must be followed prior to suspending an
employee.  Id. ¶ 7.

The Town voted (1) on May 29 to place Chiocca on paid
administrative leave, id. ¶ 104, and (2) on November 20 to keep
Chiocca on administrative leave until his Contract expired, id.
¶ 210.  While on leave, Chiocca could not perform the duties of
his job, id. ¶¶ 108-09, could not physically enter Town
property, Chiocca's Response Town & Board's Facts ¶ 30, and was
required to return Town property he possessed, Town's Response
Chiocca's Statement Facts ¶ 110.  It is undisputed that the Town
did not follow the procedures in Section 2.18(a) of the Town
Charter for either the May 29 or November 20 vote.  Id. ¶¶ 107,
208-209, 214-215.

Thus, if administrative leave is tantamount to a suspension
with pay, the Town breached the terms of the Contract.

## 2. Administrative Leave Versus Paid Suspension

As to this issue, Chiocca prevails.  The Massachusetts
Supreme Judicial Court saw "no legally cognizable difference
between suspension with pay and paid administrative leave" with
respect to the authority to "suspend" a clerk of the court under
Massachusetts law governing Title I courts and judicial

[23]

officers.  See Campatelli v. Chief Justice, 468 Mass. 455, 457
n.2 (2014).  Furthermore, a Massachusetts Superior Court has
held that, "[w]hatever its basis, because [administrative] leave
interrupts the employee's regular work, it should be regarded as
a 'suspension' within the meaning of" Massachusetts civil
service law.  Brooks v. Civil Serv. Comm'n, 17 Mass. L. Rep. 568
(2004).

Additionally, another session of this Court, while
analyzing a retaliation claim under the False Claims Act, noted
that courts refer to "suspension" and "paid administrative
leave" interchangeably.  See United States ex rel. Herman v.
Coloplast Corp., 295 F. Supp. 3d 37, 39 n.1 (D. Mass. 2018)
(Zobel, J.); see also Robinson v. Town of Marshfield, Civil
Action No. 16-12560-NMG, 2019 U.S. Dist. LEXIS 6051, at *20-21
(D. Mass. Jan. 11, 2019) (Gorton, J.) (referring to a town's
placement of an officer on administrative leave as a "temporary
suspension"), vacated in part on other grounds, 2020 U.S. App.
LEXIS 4789 (1st Cir. Mass., Feb. 14, 2020).

The Town cites to several decisions "where an individual
was both placed on paid administrative leave and subsequently
suspended," which it argues "undercuts any conclusion that the
two employment actions are legally indistinct."  Town's Opp'n
Pl. Chiocca's Mot. Summ. J. 12-13.  These cases, however,
involved an employee's initial placement on paid administrative

[24]

leave and the subsequent imposition of an unpaid suspension; the case at bar compares paid administrative leave with paid suspension.  See, e.g., Gutwill v. City of Framingham, 995 F.3d 6, 11 (1st Cir. 2021); Slattery v. Town of Framingham, Civil Action No. 17-cv-11187-IT, 2020 U.S. Dist. LEXIS 209115, at *14 (D. Mass. Nov. 9, 2020) (Talwani, J.); Yourga v. City of Northampton, 474 F. Supp. 3d 408, 420 (D. Mass. 2020) (Mastroianni, J.).  Moreover, were these decisions not readily distinguishable, they would nevertheless be unavailing, as they never concluded that administrative leave was distinct from suspension; in fact, these decisions in large part analyzed leave and suspension together.  See Gutwill, 995 F.3d at 13; Slattery, 2020 U.S. Dist. LEXIS 209115, at *18; Yourga, 474 F. Supp. 3d at 425.

Since caselaw fails to distinguish paid administrative leave from suspension with pay, the Town proposes its own distinctions.

First, the Town asserts that administrative leave and suspension stem from distinct authorities: rather than the Contract or Town Charter, "the authority to place Chiocca on paid administrative leave springs from the then-existing Discriminatory Harassment Policy, which authorizes 'placing the alleged harasser on administrative leave' pending the outcome of any investigation."  Town & Board's Mem. Summ. J. 17.  As

[25]

discussed, see supra section III.A., Chiocca disputes that the
Discriminatory Harassment Policy submitted by the Town was in
effect when he was placed on administrative leave and argues
that the policy actually in place did not provide for
administrative leave.  Chiocca's Response Hall's & Kimball's
Facts ¶ 73.  This Court, however, need not decide which policy
was in effect, as even under the Town's alleged policy, its
argument is unavailing.

The Town's proffered Discriminatory Harassment Policy lists
administrative leave as an "interim measure" that "an
investigator may determine [] is necessary" to take during an
investigation.  Def.'s Alleged Discriminatory Harassment Policy
15 (emphasis added).  The Board's May 29 vote to place Chiocca
on administrative leave took place the same day the Board voted
to retain Investigator Ryan.  Town's Response Chiocca's
Statement Facts ¶¶ 101, 104.  By placing Chiocca on leave at the
start of an investigation, this vote plausibly comported with
the Town's alleged Discriminatory Harassment Policy -- although,
contrary to the policy, it does not appear that Investigator
Ryan was the one to make the determination.

The Board voted again, however, on November 20, to keep
Chiocca on administrative leave for the remainder of his
Contract term.  See Town's Response Chiocca's Statement Facts ¶
210.  By that date, the investigation had been concluded for

more than two months.  Town's Response Chiocca's Statement Facts ¶ 210.  Because the Town's alleged Discriminatory Harassment Policy only authorized an investigator to place an accused person on administrative leave while an investigation was pending, the authority for the November 20 employment action could not have derived from the Town's alleged Discriminatory Harassment Policy.[2]

Second, the Town argues that administrative leave and suspension with pay are functionally distinct.  According to the Town, administrative leave serves to "separate[e] [a] person from the organization while an investigation is being conducted," while suspension is "a form of discipline."  Town's Opp'n Pl. Chiocca's Mot. Summ. J. 9.  Accepting this argument as true, however, simply makes clear that the November 20 vote to keep Chiocca on "administrative leave" was in fact a vote to suspend him.

As discussed, the November 20 vote did not occur while the investigation was being conducted but rather after it

---

[2] Although the Town does not raise this argument in its briefing, it is worth noting that the Town later asked Investigator Ryan to reopen the investigation.  Id. ¶ 222.  Her hourly timesheets indicate the supplemental investigation ran from December 14, 2018, to June 5, 2019.  Discrimination and Harassment Solutions Timesheet.  The Town, however, has adduced no evidence (and has not argued) that the November 20 vote related to this supplemental investigation.  Thus, the Court need not speculate.

terminated.  Moreover, it is undisputed that the Board's
decision to keep Chiocca on administrative leave was based in
part on the fact that Chiocca was present at Town Hall after
hours, consumed alcohol at Town Hall, and exhibited "poor
judgment, including in operating his vehicle after drinking."
Chiocca's Response Town & Board's Facts ¶¶ 67, 69, 72.  The Town
further claims (and Chiocca disputes) that the Board's vote was
also motivated by its belief that Chiocca was a poor leader, had
caused the public to distrust government, routinely used
misogynistic language in the workplace, and had discussed
inappropriate sexual matters with Town employees.[3]  Id. ¶¶ 68,
70, 71, 73-78.  These statements as to the Board's motivations
demonstrate that Chiocca's placement on administrative leave was
disciplinary.  Rather than a neutral procedural mechanism to
separate him from the Town Hall, the record indicates that the
November 20 vote was punitive.  Thus, in making these statements
of fact, the Town has undermined its own argument.[4]

---

[3] Furthermore, its Massachusetts Commission Against
Discrimination Position Statement, the Town justified placing
Chiocca on administrative leave by citing "his sexual encounter
with Ms. Hall in Town hall, serving alcohol in Town Hall and
driving around town on the night/early morning hours of May 1-2
after consuming alcohol."  Town's Response Chiocca's Additional
Facts ¶ 27.

[4] Presumably, the Town made these statements of fact in
order to counter various employment discrimination and
retaliation claims.  But the Town cannot have it both ways.
These facts -- at least those which are undisputed -- are within

In sum, the Town can identify no tangible difference between administrative leave and a suspension with pay.  Thus, Chiocca was suspended with pay in breach of his Contract as it operates within the Town Charter.

## IV.   HALL AND KIMBALL'S COUNTERCLAIMS FOR INVASION OF PRIVACY

Hall and Kimball bring counterclaims against Chiocca for public disclosure of private facts under Massachusetts General Laws chapter 214, section 1B (count 3 of Hall's counterclaims and count 1 of Kimball's).  Chiocca moved for summary judgment on both claims, Def. Chiocca's Mot. Summ. J. 1, and Hall and Kimball cross-moved for summary judgment, Pls. Hall & Kimball's Mot. Summ. J. 1.

This Court concludes that although Chiocca disclosed facts regarding deeply intimate events, this information was already part of the public discourse, was of key interest to voters, and involved Chiocca personally. Moreover, the disclosure, albeit substantial, was reasonable and was intended to clear Chiocca's name after the allegations raised by Kimball and Hall. Accordingly, this Court rules in favor of Chiocca on count 1 of Kimball's and count 3 of Hall's counterclaims.

### A.   Findings of Fact[5]

---

the scope of the record for the cross-motions for summary judgment.

[5] On June 10, 2022, this Court issued an order requesting that the parties provide joint statements of material facts for

The public disclosure of private facts claim centers around
Chiocca's release of the Ryan Report.  The Ryan Report contains
details and sensitive information regarding Hall and Chiocca's
sexual encounter (the Incident) as well as an extramarital
affair Hall had with Kimball -- the Chairman of the Board at the
time.

### 1. Hall and Kimball's Affair

Hall and Kimball, both members of the Board, "carried on a
physical and emotional affair" beginning in March 2018 and
ending in April 2018, although each of them was married.
Countercl. Pls. Hall & Kimball's Resps. Countercl. Def.
Chiocca's Statement Material Facts Supp. Mot. Partial Summ. J.
Claims & Supp. Mot. Summ. J. Def. Hall's & Kimball's Countercls.
("Hall & Kimball's Response Chiocca's Statement Facts") ¶¶ 14,
15, ECF No. 224.  On May 1, 2018, the day of the Incident,
Kimball's wife learned of the affair.  Id. ¶ 34.  As a
consequence, Kimball stayed home with his wife and Hall ran the

---

the counts proceeding case-stated, in light of the many
statements of additional fact submitted by the parties and their
largely duplicative and argumentative contents.  See June 10,
2022 Order, ECF No. 306.  The parties have failed to provide
such a submission for Hall and Kimball's Invasion of Privacy
Claim.  Accordingly, this Court utilizes the most relevant
portions of both the facts submitted By Chiocca, Hall, and
Kimball in their cross-motions for summary judgment and those
submitted in response to this Court's case-stated proceedings.
This Court finds that the facts which follow are either
undisputed or supported by reasonable inferences.  See Moitoso
v. FMR LLC, 451 F. Supp. 3d 189, 199 (D. Mass. 2020).

Board meeting that evening in Kimball's place.  Id. ¶¶ 32, 33,
34.  Kimball's wife texted Hall later that evening: "I know what
happened.  You make me sick."  Id. ¶ 34.

### 2. The Incident

After the meeting, Hall and Chiocca went to the Rockland
Bar & Grill for drinks, a common practice for the Board; no one
else joined them.  Id. ¶ 36.  There, Hall disclosed to Chiocca
that she was intimately involved with Kimball, id. ¶ 42, and
expressed concern that news of the affair would become public,
id. ¶ 40; Pl./Countercl. Def. Chiocca's Resp. Defs./Countercl.
Pls. Hall & Kimball's Statement Material Undisputed ("Chiocca's
Response Hall's & Kimball's Facts") ¶ 21, ECF No. 221.
Throughout the evening, Hall drank four to five glasses of wine,
which Chiocca paid for, whereas Chiocca did not drink much and
remained sober throughout the evening.  Hall & Kimball's
Response Chiocca's Statement Facts ¶¶ 20, 45.

The Incident took place later that evening, when Chiocca
drove Hall to Town Hall, id. ¶ 45; Chiocca's Response Hall's &
Kimball's Facts ¶ 27; went to his office with her, Chiocca's
Response Hall's & Kimball's Facts ¶ 34; opened a bottle of wine
and poured them each a glass, Hall & Kimball's Response
Chiocca's Statement Facts ¶¶ 50, 51; and stayed in his office
with Hall for two hours, id. 52.  At some point that evening,

Hall performed oral sex on Chiocca in his office.  Id.;
Chiocca's Response Hall's & Kimball's Facts ¶ 41.[6]

### 3. Events Following the Incident

In the days that followed the Incident, Chiocca did not
report any sexual misconduct by Hall.  Pl./Countercl. Def.
Chiocca's Resps/ Def./Countercl. Pls. Hall & Kimball's Statement
Additional Material Facts Opp'n Countercl. Def.'s Mot. Summ. J.
("Chiocca's Response Hall's & Kimball's Additional Facts") ¶ 61,
ECF No. 237.  On May 11, Attorney Clifford emailed the Board
regarding Chiocca's contract extension.  Id. ¶ 69.  In the
email, Attorney Clifford indicated "that before the Board
decided on whether to grant the contract extension, they should
have a candid discussion with" Chiocca about "recent issues."
Id. ¶¶ 69-70.

One May 17, Hall discussed the Incident with Kimball, but
she said she had limited memory of the evening, although she
believed something "inappropriate" might have happened.  Id. ¶
86.  Also on May 17, Kimball retrieved the security camera
footage from Town Hall of the Incident and reviewed the tapes.

---

[6] The circumstances of Chiocca and Hall's sexual contact,
including the extent of Hall's intoxication, the use of force or
intimidation by either individual, and their subjective
intentions and motivations are vigorously disputed by the
parties.  This Court need not and does not make any factual
findings with regard to these issues to resolve the claims
before it on the case-stated record.

<u>Id.</u> ¶ 88.  That evening, Kimball and Hall went for a walk and discussed the Incident; Hall still said she had limited memory. <u>Id.</u> ¶ 89.  Kimball testified that he told Hall not to speak with Chiocca until Kimball did.  <u>Id.</u> ¶ 91.

On May 18, Kimball, Chiocca, and Attorney Clifford met, and Chiocca admitted to receiving oral sex from Hall.  <u>Id.</u> ¶ 94.  At the meeting, Chiocca said he wanted it "all to go away" and agreed to use vacation time to stay out of the office.  <u>Id.</u> ¶ 95; Chiocca's Response Hall's & Kimball's Facts ¶ 48.  The parties agreed to keep the matters discussed in confidence. Chiocca's Response Hall's & Kimball's Facts ¶ 52.  According to Attorney Clifford, that same evening Chiocca called him and "bragged" about "climaxing."  Chiocca's Response Hall's & Kimball's Additional Facts ¶ 74.  Chiocca also called three female Town employees that evening and informed them of the allegations that may surface.  Chiocca's Response Hall's & Kimball's Facts ¶¶ 53, 55.

### 4.  Public Knowledge of the Incident

Hall, who was then a candidate for Massachusetts State Representative, testified that after May 18, 2018, she had a sense that chatter began on social media and "a lot of people knew a lot of stuff."  Hall & Kimball's Response Chiocca's Statement Facts ¶ 97.  Hall therefore spoke with an advisor on May 23 about whether she should pull out of the State

Representative race.  Id. ¶ 98.  On May 23, 2018, Fox News,
Channel 25 ran a story about the Incident.  Id. ¶ 100; Chiocca's
Response Hall's & Kimball's Additional Facts ¶ 83.

On May 29, 2018, the Board (excluding Hall but including
Kimball) voted to retain Investigator Ryan "to conduct an
investigation into" the Incident and determine whether Hall or
Chiocca violated the sexual harassment policy.  Hall & Kimball's
Response Chiocca's Statement Facts ¶¶ 101-02.  In the May 29
meeting, the Board (excluding Hall but including Kimball) also
voted to place Chiocca on paid "administrative leave"; Attorney
Clifford announced the vote and the investigation on live
television.  Id. ¶¶ 104, 108, 109, 110, 111, 114-15.

Following these events, media coverage of the Incident
ensued.  Id. ¶ 117.  On May 30 Hall withdrew her candidacy for
State Representative and announced the withdrawal on Facebook.
Id. ¶ 116.   On June 5, at a publicly televised Board meeting,
Hall stated:

> I recently reported an incident of inappropriate
> behavior by the Town Administrator, and since the
> weeks that those allegations have emerged it has been
> very challenging for me and my family.  False rumors
> and gossip have spread, particularly on social media,
> about me, about the devotion to my spouse, my husband
> Chris, and our children and our town.  Indeed, I no
> longer feel that my children, my son, is comfortable
> taking the bus, and I feel that my kids often times
> are not safe or comfortable participating in some
> community activities.  And this is a deeply
> disappointing consequence of my decision to stand up

for myself in a situation where I believe I was
treated improperly.

Id. ¶¶ 121, 122.

On June 13, 2018, Hall filed suit against the Town, members
of the Board, Chiocca, and other Town employees, seeking to
enjoin the release of surveillance tapes -- which showed Chiocca
and Hall in Town Hall on May 1-2.  Id. ¶¶ 128, 130.  Kimball
filed an affidavit in support.  Id. ¶ 129.  Hall eventually
withdrew her suit, but it did garner media coverage.  Id. ¶¶
132, 133.

### 5. Public Knowledge of the Hall & Kimball's Affair

In mid-June, Kimball informed the other Board members of
his affair with Hall.  Id. ¶ 134.  According to Kimball, Larry
Ryan, a member of the Board of Selectmen ("Selectman Ryan"), was
"going around town telling everyone that it was okay for Ed
Kimball to [have sex with] Deirdre Hall but not Allan Chiocca."
Id. ¶¶ 130, 136.

On June 15, someone posted in a Town of Rockland Facebook
group: "Word on the Rockland streets is that the Town
Administrator Allan Chiocca wasn't the only one having sex with
Selectmen Deirdre Hall.  Selectman Edward Kimball was sleeping
with her too!"  Id. ¶ 130 ¶ 135.  Moreover, in the month of
June, two right wing blog articles referenced Kimball's affair
with Hall in lewd terms.  Id. ¶¶ 17, 18.

At the June 19 Board meeting, Kimball announced he had "no intention of leaving of the Board of Selectmen."  Hall & Kimball's Response Chiocca's Statement Facts ¶¶ 138, 139. Kimball then called the investigation into Chiocca's impropriety a "sham," and demanded it be turned over to law enforcement. Id. ¶¶ 140, 143.  During this same meeting, Selectman Ryan complained that Kimball had, "[p]rior to this night," lied about his affair, and indicated that Kimball should resign from the Board. Id. ¶ 144; Id. ¶ 13.  Kimball refused and challenged the voters to recall him.  Defs./Countercl. Pls. Edward Kimball & Deirdre Hall's Responses Pl./Countercl. Def. Allan Chiocca's Additional Statement Material Undisputed Facts ("Hall's & Kimball's Response Chiocca's Additional Facts") ¶14, ECF No. 246.  These events received media coverage.  Hall & Kimball's Response Chiocca's Statement Facts ¶ 145.

On June 21, 2018, Casey Sherman ("Sherman"), a public relations professional retained by Chiocca through Attorney Shafran, posted a statement referring to "Kimball's close relationship with Hall."  Chiocca's Response Hall's & Kimball's Facts ¶¶ 13, 63.  Sherman worked with lawyers to communicate statements sharing Chiocca's perspective about the Incident to media outlets that were covering the Incident.  Pl./Countercl. Def. Chiocca's Resp. Def./Countercl. Pl. Hall's & Kimball's Second Statement Additional Material Facts ¶ 10, ECF No. 293.

Sherman testified at deposition that the goal was to challenge Hall's account of events accusing Chiocca of inappropriate behavior and to expose Hall and Kimball's close relationship. Id. ¶¶ 13-14.

### 6. The Ryan Report

On June 29, 2018, Attorney Clifford emailed a draft confidentiality agreement to attorneys representing Hall, Chiocca, and Kimball.  Id. ¶ 65.  Kimball refused to sign. Hall's & Kimball's Response Chiocca's Additional Facts ¶ 16. On July 6, 2018, Attorney Clifford emailed Adam Shafran ("Attorney Shafran"), Chiocca's attorney, a copy of the Ryan Report with redacted portions and a watermark on each page reading: "Confidential Personnel Record to Adam Shafran, Esq. representing Allan Chiocca, not to be released or distributed without the permission of the Rockland Board of Selectmen." Hall & Kimball's Response Chiocca's Statement Facts ¶ 147; Chiocca's Response Hall's & Kimball's Facts ¶ 68.  The email from Attorney Clifford contained a disclaimer that the Ryan Report "is a confidential personnel record and improper release or disclosure of that document may result in an unwarranted invasion of privacy of persons named in the document.  It may not be released or distributed without the written permission of the Rockland Board of Selectmen."  Affidavit Neerja Sharman Opp'n Pl./Countercl. Def. Allan Chiocca's Mot. Summ. J., Ex. 34,

[37]

July 6, 2018 Email from Attorney Clifford to Attorney Shafran 3,

ECF No. 225-34.

   As to private details about Kimball and Hall and their

families, the Ryan Report contains, <u>inter alia</u>, the following:

- Kimball's wife had forbidden Kimball from communicating
  with Hall.
- Hall professed her love for Kimball, felt "restricted by
  her marriage[,] and no longer wanted to be monogamous."
- Kimball did not attend the May 1, 2018 Board meeting
  because his wife "was feeling vulnerable and betrayed."
- The night of the Incident, Hall texted her husband, "Be
  ready for me. Cause I am going to want you," and "love you.
  It's gonna be a tough ride the next couple of weeks ttyl."
- Hall relays the conversation in which she confessed to her
  husband that she had an intimate relationship with Kimball
  and describes her husband's reaction.  Hall did not want
  anyone to know what happened, as "she thought she would be
  perceived as a 'whore and a drunk.'"

Chiocca's Response Hall's & Kimball's Additional Facts ¶ 116;

Decl. Samantha Halem Supp. Pl./Countercl. Def. Chiocca's

Statement Material Facts Supp. Mot. Partial Summ. J. & Mot.

Summ. J. Countercls., Ex. W., First Investigative Report Regina

Ryan Discrimination & Harassment Solutions ("Ryan Report"), LLC,

ECF No. 175-23.  The Ryan Report also describes the timeline of

the Incident -- although no graphic description of the sexual

acts that ensued on that evening is included.  <u>See generally</u>

Ryan Report.  It further includes information regarding the days

following the Incident and interactions between Hall and Chiocca

-- including the fact that at several moments Hall attempted to

attend events where Chiocca would be present and several times

Chiocca cancelled his appearances at these events so as to avoid Hall.  Id.  Attorney Clifford emailed the Ryan Report to the parties with portions redacted.  Hall & Kimball's Response Chiocca's Statement Facts ¶ 150.

After Investigator Ryan completed the draft Report, "[t]he Board moved the July 10, 2018 Town Meeting to the high school auditorium in response to significant public interest in the results of the investigation."  Hall & Kimball's Response Chiocca's Statement Facts ¶ 165 (emphasis added).  Hall was not present; that same day she had been involuntarily committed to a hospital and placed on suicide watch.  Chiocca's Response Hall's & Kimball's Facts ¶ 101.  Counsel was there in her place.  Hall & Kimball's Response Chiocca's Statement Facts ¶ 167.  During open session, Kimball was voted out as Chairman, id. ¶ 168, and a member of the audience yelled a comment at Kimball criticizing him for cheating on his wife, id. ¶ 187.

During executive session, Attorney Clifford stated that Kimball "lied" to his fellow Board members about his affair and "misled all parties involved."  Id. ¶ 174.  With regard to the Ryan Report, Hall's attorney asked the Board to "consider limiting the information released to the public" due to the consequences the details would have on her family.  Id. ¶ 176; Chiocca's Response Hall's & Kimball's Facts ¶ 73.  The Board voted to "accept" the Ryan Report but "to release to the public

only a two-sentence summary portion of the Ryan Report's findings." Hall & Kimball's Response Chiocca's Statement Facts ¶¶ 175, 177. At the open session broadcast on live television, Investigator Ryan read the statement:

> I do not substantiate Ms. Hall's allegation, that if she engaged in sexual activities with Mr. Chiocca on May 1st and 2nd, 2018, it was non-consensual as she was incapable of consenting due to the level of her intoxication. I substantiate Mr. Chiocca's allegation that on May 1st and 2nd, 2018, Ms. Hall used her position as a member of the Board of Selectmen, who was actively reviewing, and would soon be voting on his request for contract extension and salary increase, to pressure him into engaging in sexual activities with her.

Id. ¶ 179.

Attorney Clifford then announced Hall was resigning from the Board. Id. ¶ 180. After Board members issued statements regarding the Ryan Report's findings, the Board voted to release to the public the video surveillance tapes of Town Hall the night the Incident. Id. ¶ 185. After the July 10 Board meeting, Clifford emailed counsel in this case that the Ryan Report was a "confidential personnel record, not subject to disclosure under G. L. c. 4, § 7(26)(c)." Chiocca's Response Hall's & Kimball's Facts ¶ 81. Later, at 10:06 p.m., Attorney Shafran emailed Boston 25 News a statement disclosing details of the Ryan Report, including the phrase "an intense physical and emotional affair [between Hall and Kimball]." Chiocca's Response Hall's & Kimball's Facts ¶ 82.

[40]

On July 11, 2018, Sherman, the public relations professional retained by Chiocca, released the Ryan Report to certain media outlets.  Hall & Kimball's Response Chiocca's Statement Facts ¶ 193.  The version released was the version Attorney Shafran received from Attorney Clifford which had certain portions redacted.  Id. ¶ 194.  Clifford's email stated that the redactions covered, "medical information, explicit sexual information, children's names, and some other non-material information. . . ."  Id. ¶ 197.  Chiocca did not receive "permission" from the Board to release the Ryan Report, nor did the Town provide Chiocca with a copy of the Ryan Report without the watermark on confidentiality.  Chiocca's Response Hall's & Kimball's Additional Facts ¶ 119.  Some individuals from Rockland testified that they were not aware of Hall and Kimball's affair until after Chiocca released the Ryan Report to media outlets.  Chiocca's Response Hall's & Kimball's Additional Facts ¶ 132.

### 7.  Events After Release of the Ryan Report

On July 11, O'Loughlin, another Board member, posted on Facebook that Kimball "(who accused the other members . . . of a cover up) refused to allow" an "open session discussion" regarding "the investigation results" and "lied" to the Board "about the nature of his relationship with [Hall]."  Hall & Kimball's Response Chiocca's Statement Facts ¶ 188.  O'Loughlin

testified that as of June 19, 2018 "he was taking the position
publicly that Mr. Kimball should be removed as Board chair" for
"violat[ing] the trust of other members of the [B]oard."  Id. ¶¶
190, 191.

On July 12, 2018, Jack Sullivan from CommonWealth magazine
asked Attorney Shafran for a copy of the Ryan Report after
learning Shafran sent the Ryan Report to the Patriot Ledger.
Chiocca's Response Hall's & Kimball's Additional Facts ¶ 128.

For about one year, Hall and Kimball's affair received
negative media coverage, especially on blogs and social media,
and many articles used the language from the Ryan Report about
"an intense physical and emotional affair."  Chiocca's Response
Hall's & Kimball's Facts ¶¶ 90, 91.  In his testimony, Kimball
"noted the range of publication and spread of information due to
the release of the Ryan Report, emphasizing the difference
between" small town coverage and state and national news
coverage.  Chiocca's Response Hall's & Kimball's Facts ¶ 106.
Kimball testified that he has lost several contracts, including
a substantial one involving Boston Logan Airport, because of the
release of the Ryan Report.  Chiocca's Response Hall's &
Kimball's Facts ¶¶ 107, 108.

Later on, Hall began recalling more details from the
evening the Incident, Investigator Ryan reopened the
investigation and produced a Supplemental Report.  Id. ¶¶ 205,

218, 222.  Its findings are not materially different from those
of the first report.  See generally Supplemental Report.  In
June 2019, someone petitioned the Town to release the
Supplemental Report, and the Town denied the petition.  Hall's &
Kimball's Response Chiocca's Additional Facts ¶¶ 22, 23.  The
person appealed to the Public Records Division for the
Commonwealth of Massachusetts, which initially found that under
the Massachusetts Public Records Act, the Town would be
compelled to disclose the Supplemental Report; however, due to
the present civil action, the Supervisor of Records issued a
reconsideration opinion stating that the Division would not
enforce the order pending the resolution of this litigation.
Id. ¶¶ 24, 25.

   **B.  Legal Standard**

   "Case stated hearings provide an efficacious procedural
alternative to cross motions for summary judgment."  Moitoso v.
FMR LLC, 451 F. Supp. 3d 189, 198 (D. Mass. 2020).  "In a case
stated, the parties waive trial and present the case to the
court on the undisputed facts in the pre-trial record."
Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 10-11
(1st Cir. 2012) (internal quotation marks omitted).  Although
the case stated procedural device entitles the court to "engage
in a certain amount of factfinding," id., "case stated hearings
usually involve but a modicum [thereof] -- nothing more than the

drawing of reasonable inferences," <u>Moitoso</u> v. <u>FMR LLC</u>, 451 F. Supp. 3d 189, 199 (D. Mass. 2020).  Unlike at summary judgment, "the Court is relieved of drawing all inferences against each moving party, instead drawing such inferences as are reasonable to resolve the case."  <u>Bunch</u> v. <u>W.R. Grace & Co.</u>, 532 F. Supp. 2d 283, 287 (D. Mass. 2008).

### C.    Rulings of Law

Hall and Kimball  assert that Chiocca invaded their privacy in violation of Massachusetts General Laws chapter 214, section 1B ("chapter 214"), Mass. Gen. Laws ch. 214, § 1B, through the public disclosure of private facts.  Hall's Counterclaims ¶¶ 96-98, at 62-63; Kimball's Counterclaim ¶¶ 68-75.  Hall and Kimball argue that the disclosure was both serious and substantial, and was unreasonable, meeting both prongs of chapter 214's requirements.  Pls. Hall & Kimball's Mem. Summ. J. 16.

Section 1B of Massachusetts General Laws chapter 214 provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."  Mass. Gen. Laws ch. 214 § 1B.  Generally, an action of this nature is anchored in a public disclosure of private facts, as it is here.  <u>Ayash</u> v. <u>Dana-Farber Cancer Inst.</u>, 443 Mass. 367, 382 n. 16 (2005), <u>cert. denied sub. nom.</u> <u>Globe Newspaper Co.</u> v. <u>Ayash</u>, 546 U.S. 927 (2005).  "Despite the disjunctive 'or,' the phrase 'unreasonable, substantial or

serious' is inclusive, as § 1B 'obviously was not intended to prohibit serious or substantial interferences which are reasonable or justified.'" Ayash, 443 Mass. at 382 (quoting Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 517–518 (1991)).

Hall and Kimball assert that issues relating to "a person's sex life" are indisputably serious, as confirmed by the fact that the Board maintained the utmost confidentiality in its investigation of the alleged sexual harassment and by the fact that it prevented the report from being considered a public record. Id. 17. They also asserted that Chiocca's disclosure was substantial, as it was "intense and widespread" -- Chiocca used a public relations agent widely to disseminate the Report to the media; major news outlets across Massachusetts broadcasted the personal details of the report, and the story was picked up by several blogs and other forms of media. Id. 17-18. They allege that, as a consequence, Kimball lost business opportunities and was ultimately forced to resign from the Board, and Hall was hospitalized, forced to resign from the Board, pushed to end her campaign for State Representative, and made to "flee Massachusetts." Id. As to unreasonableness, Hall and Kimball argue that their interest in privacy far outweighed any possible legitimate interest Chiocca had in disclosure. Id. 19. They claim Chiocca could easily have released the

conclusion of the report "which found the accusation against him to be unsubstantiated," without publicizing the sexual affairs of Hall and Kimball or humiliating Hall and Kimball.   Id. 20.

Chiocca opposes on four bases.  First, the facts contained in the report were already well known in the community (were being posted about online) and by Board members, and were being actively discussed at public Board meetings. Def. Chiocca's Opp'n Pls. Hall & Kimball's Mot. Summ. J. 13.  Second, Chiocca counters that the disclosure is fully justified because the information was of "legitimate public concern."  Id. 14.  The fact that both of these individuals were public officials and had accused Chiocca of sexual misconduct made the disclosures of key importance for informing the public and clearing Chiocca of the false allegations.  Id. 15.  Third, Chiocca asserts the report was a public record under Massachusetts General laws chapter 4, section 7(26) ("section 7(26)").  Id. 17.  Fourth, Chiocca argues that release of the information is covered by the litigation privilege.  Id. 19-20.

To these arguments Hall and Kimball riposte: (1) details of Hall and Kimball's involvement were never public even if the affair was; (2) the Report was never a public record under exception (c) of section 7(26); (3) the entirety of the Report was not of legitimate public concern -- the intimate relationship was not relevant to the Board's investigation of

[46]

Chiocca; and (4) the release of the report is not covered by the
litigation privilege because Chiocca had not commenced or
contemplated litigation at the time he released the report.
Pls. Hall & Kimball's Reply 11-19.

The Court considers whether (1) the elements of invasion of
privacy are met; and (2) the disclosure of the record was
further protected by Massachusetts law under section 7(26) or by
the litigation privilege.

### 1. Elements of Invasion of Privacy

Two elements are required to prove an invasion of privacy:
"[t]o sustain a claim for invasion of privacy, the invasion must
be both unreasonable and substantial or serious." Polay v.
McMahon, 468 Mass. 379, 382 (2014) (quoting Nelson v. Salem
State College, 446 Mass. 525, 536 (2006)).  In other words,
"[i]n order for a plaintiff to succeed on an invasion of privacy
claim, he must prove not only that the defendant unreasonably,
substantially and seriously interfered with his privacy by
disclosing facts of highly personal or intimate nature, but also
that it had no legitimate reason for doing so." Martinez v. New
England Med. Ctr. Hosps., Inc., 307 F.Supp.2d 257, 267 (D. Mass.
2004) (Tauro, J.) (citing Schlesinger v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 409 Mass. 514, 518 (Mass. 1991)).
"Generally, whether an intrusion qualifies as unreasonable, as

well as either substantial or serious, presents a question of fact." Polay, 468 Mass. at 383.

This Court concludes that while Chiocca's invasion into Hall and Kimball's privacy was serious in terms of subject matter, it was not substantial given preexisting public knowledge of these facts, Chiocca's First Amendment rights to disclose issues of public interest, and Chiocca's interest in disclosing personal facts about himself.  Furthermore, Chiocca's disclosure was not unreasonable given his interest in providing the public with key exculpatory information.

### a. Serious and Substantial

"To fall under the protection of the statute, the disclosed facts must be of a 'highly personal or intimate nature.'" Taylor v. Swartwout, 445 F.Supp.2d 98, 103 (D. Mass. 2006) (Gorton, J.)(quoting Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 518, (1984)).  A highly salacious report regarding sexual encounters and affairs is indubitably of a highly personal or intimate nature.  "Indeed, commentators and courts have almost universally recognized one's sexual affairs as falling squarely within the sphere of private life."  Bonome v. Kaysen, 032767, 2004 WL 1194731, at *4 (Mass. Super. Mar. 3, 2004) (citing Peckham v. Boston Herald, Inc., 48 Mass. App. Ct. 282, 282-88 (1999)); Prosser, Privacy, 48 Cal. L. Rev. 383, 422-23 (1960);

Restatement (Second) Torts § 652D, comment b ("Sexual relations, for example, are normally entirely private matters")).

Here, the information disclosed concerned both Hall and Kimball's affair and Chiocca and Hall's sexual encounter, as well as many personal conversations between the parties and their spouses, which fall squarely within the highly personal and intimate category -- for example, Hall telling her husband "I am going to want you," and Hall expressing she no longer wanted to be monogamous, see Ryan Report ¶ 32.  Furthermore, the Ryan Report included extensive discussions of individual's fears and motivations -- Kimball's wife feeling vulnerable and betrayed and Hall fearing she would be portrayed as a "whore and a drunk," for instance.  Id. ¶ 77.  Therefore, disclosure of the Ryan Report meets these elements of substantiality and seriousness.  It may, however, be exempted by one of the exceptions for this prong of chapter 214.

The right to privacy is bounded by at least three concepts: individuals do not have a privacy right over (1) issues already in the public domain; (2) issues of public concern; and (3) issues regarding one's own private information.

First, "there can be no invasion of privacy where the facts, though highly personal, are already in the public domain," Taylor, 445 F. Supp. 2d at 103.  Where issues are "already [] the focus of a high degree of public scrutiny and

interest," further disclosure of details, even of information and documents that would normally not be open to public inspection, may be acceptable.   <u>Ayash</u>, 443 Mass. at 384.   Courts have warned that caution ought be exercised in cases where the issues in question are of a "personal or intimate nature."   <u>Id.</u> Nevertheless, an individual does not have a protected privacy interest if "he has never attempted to keep that fact private." <u>Rodrigues</u> v. <u>EG Sys., Inc.</u>, 639 F. Supp. 2d 131, 134 (D. Mass. 2009) (O'Toole, J.).

Here both the fact that Hall and Kimball were having an extramarital affair and the fact that the Incident took place were in the public sphere before Chiocca's disclosure of the Ryan Report -- both Hall and Kimball took steps to inform the Board about the affair, their spouses were aware, and many details were either intentionally exposed to the public or were actively being discussed in the public sphere.   As to Hall and Kimball's affair:

- In mid-June, 2018, Kimball informed the other Board members about his affair with Hall.   Hall & Kimball's Response Chiocca's Statement Facts ¶ 134.
- On June 15, 2018, someone posted about the affair in a Facebook group about the affair.   <u>Id.</u> ¶¶ 130, 135.
- In the month of June two right wing blogs reported about the affair.   <u>Id.</u> ¶¶ 17, 18.
- One June 19, 2018, at a televised Board meeting, Attorney Ryan complained that Kimball had lied about his affair with Hall.   <u>Id.</u> 133.

- On July 10, 2018, at another televised Board meeting, Attorney Clifford stated that Kimball had mislead the Board with respect to the affair with Hall.  Id. ¶ 174.

As to Chiocca and Hall's sexual encounter:

- On May 23, 2018, Fox News Channel 25 ran a story about the Incident.  Id. ¶ 100.
- On May 29, 2018, the Board voted on Public Broadcast to place Chiocca on administrative leave.  Id. ¶¶ 104, 108-11.
- On June 5, 2018, Hall accused Chiocca of inappropriate behavior during a televised Board meeting.  Id. ¶ 121-22.
- On June 13, 2018, Hall tried to enjoin the tapes of Town Hall video surveillance from release which drew additional media attention to the Incident.  Id. ¶¶ 132-33.
- On July 10, during a live television broadcast the Board disclosed the findings of the report -- that Hall's claim of non-consensual sexual contact was not substantiated by the evidence.  Id. ¶ 179.

Chiocca did disclose several details to the public that went beyond the mere existence of an extramarital affair between Kimball and Hall or the occurrence of sexual contact between him and Hall.  These details include personal information about family reactions to affairs, conversations regarding the affairs, the timeline of the Incident, and the aftermath of the Incident.  Although these details provided some additional color as to each of these events, these particulars did not confirm any additional events that were not largely in the public knowledge already.

Second, the constitutional reach of the First Amendment cannot be circumscribed by this state statutory right.  Peckham, 48 Mass. App. Ct. at 286.  "[T]he right to control publication

of one's private affairs is tempered by the constitutionally
protected right of others to publish matters of legitimate
public concern." Bonome v. Kaysen, 032767, 2004 WL 1194731, at
*3 (Mass. Super. Mar. 3, 2004) (internal quotation marks
omitted).

Chiocca is correct in arguing that the public had an
interest in knowing about Kimball and Hall's affair given that
they were both public officials, they both were Chiocca's
supervisors, and they both had a hand in accusing Chiocca of
inappropriate behavior. In fact, Hall and Kimball discussed the
events of May 1 shortly after they took place. Chiocca's
Response Hall's & Kimball's Additional Facts ¶ 86. Kimball was
present during the May 18 meeting where Chiocca admitted that
Hall and he had engaged in sexual contact. Id. ¶ 94.
Furthermore, Kimball took part in the Board votes relevant to
Chiocca before disclosing his involvement with Hall. Hall &
Kimball's Response Chiocca's Statement Facts ¶¶ 104, 108, 109,
110, 111, 114-15. It was of key public interest not only that
an affair took place, but also that Hall and Kimball had an
"intense" emotional connection. The degree of Kimball's loyalty
to Hall and willingness to bend the rules of his role to Hall's
benefit are of central importance -- both for holding Kimball
accountable as a public servant and for Chiocca's attempt to
exculpate himself. Both Kimball and Hall's positions are

[52]

elected seats and these individual's fidelity to their roles and
respect for their public offices are impacted by the Ryan
Report.

Furthermore, the Ryan Report's discussion of the Incident
was also of key public interest.  First, although Investigator
Ryan announced her findings at a public board meeting, the
details of the Ryan Report were relevant to reinstituting public
trust in Chiocca and restoring his reputation.  Second, given
that the Incident was actively in the news and involved
accusations of impropriety that could have reached the level of
criminal liability, the details of the Report were of legitimate
interest to voters.

Third, one has the right to govern the flow of information
about oneself.  Bonome v. Casey, 2004 WL 1194731, at *4.  For
example, in Bonome v. Kasey the Superior Court of Massachusetts
dealt with the disclosure of personal and graphic details of
sexual encounters between two individuals in a book; defendant's
book changed plaintiff's name and occupation, but was largely
autobiographical making its subjects' identities obvious.  2004
WL 1194731, at *2.  The fact that the plaintiff and defendant
had been engaging in an extramarital affair was well known by
plaintiff's friends, family, and colleagues; the aspects and
details of the affair, however, were private -- for example, the
plaintiff detailed one sexual encounter, which she believed was

coercive and had "exceeded the bounds of consensual sexual relations." Id.  The plaintiff suffered severe humiliation and loss of reputation as consequence of the book.  Id.  The Court concluded that while the invasion was serious it was counteracted by defendant's right to govern information about herself:

> Because the First Amendment protects Kaysen's ability to contribute her own personal experiences to the public discourse on important and legitimate issues of public concern, disclosing Bonome's involvement in those experiences is a necessary incident thereto.

Id. at *6.

Here, with the exception of facts regarding Hall's and Kimball's affair, Chiocca disclosed issues mostly having to do with the events of May 1 and its aftermath.  See generally Ryan Report.  The only disclosures regarding Hall and Kimball were relatively minor: (1) the first was the characterization of their relationship as "an 'intense physical' and emotional affair"; and (2) the second was the reaction of Hall and Kimball's spouses.  Ryan Report ¶¶ 22, 46-51.  As to the remainder of the facts, almost all of them regard the Incident, Hall and Chiocca's relationship, and Hall's behavior after the Incident.  See generally Ryan Report.  All of these facts are not only highly relevant to Chiocca, but intimately involve Chiocca and his own privacy.

In sum, Chiocca's disclosure of the Ryan Report possesses elements of a serious and substantial invasion of privacy: it regards highly intimate information and discloses details concerning family reactions to affairs, personal fears, and the Incident.  Nevertheless, there are several countervailing factors that appear to exempt Chiocca's disclosure from meeting this requirement of chapter 214.

First, much of the affair and the Incident was already being discussed by the public -- including the fact that Hall and Kimball were having a relationship, the fact that Chiocca and Hall engaged in sexual contact, and the fact that an investigation was ongoing.

Second, the public had an interest in knowing the details of Kimball and Hall's affair as well as the Incident.  Given the seriousness of the allegations leveled by Hall against Chiocca, and Kimball's deep involvement in the early stages of Chiocca's disciplining and investigation, these issues were relevant to the voters.

Third, Chiocca's own personal involvement in the events of the Incident provided him with an interest in disclosing his own private information.

These factors counsel in favor of this Court's ruling that Chiocca's invasion of Hall and Kimball's privacy was not

substantial.  Nevertheless, the Court considers the
unreasonableness of Chiocca's disclosures.

### b. Unreasonable

The second element of the chapter 214 test is the
unreasonableness of the disclosure.  "In determining whether a
defendant committed an unreasonable intrusion, we balance the
extent to which the defendant violated the plaintiff's privacy
interests against any legitimate purpose the defendant may have
had for the intrusion.  <u>Polay</u>, 468 Mass. at 383.  For example,
in <u>Bonome</u> the Court took into account the fact that defendant
had changed plaintiff's name and balanced the intensity of the
disclosures against the author's expressive interest in
publishing a work of literature.  <u>Bonome</u>, 2004 WL 1194731, at
*7.  The First Circuit has held that an intrusion into one's
privacy is not unreasonable if it serves a legitimate business
purpose.  <u>Squeri</u> v. <u>Mount Ida Coll.</u>, 954 F.3d 56, 69 (1st Cir.
2020).

Chiocca here stresses his interest in protecting his own
reputation and informing the public about Hall and Kimball's
affair.  Furthermore, he also asserts an interest in remedying
his reputation after Hall's accusations.  Hall and Kimball
counter that these interests were already sufficiently served by
Investigator Ryan's public announcement absolving Chiocca.

With regard to his disclosure of the of the affair between Hall and Kimball, Chiocca's and the public's interest in disclosure likely outweighs Hall and Kimball's interest in privacy.  The depth and degree of Hall and Kimball's affair was important to clearing Chiocca's name and apprising the public of issues concerning the legitimacy of the actions taken against Chiocca.

Disclosing the fact that Hall and Kimball had an "intense emotional and physical affair" was necessary to paint a picture of how far Kimball's judgment may have been corrupted and how that (1) could affect his role as Selectman and (2) could have affected Kimball's involvement in Chiocca's investigation for, and possible report of, sexual harassment.

In this regard, Hall and Kimball also took issue with Chiocca's disclosure of personal conversations between Hall and her husband about her affair with Kimball.  These conversations, however, also served a purpose, as they tended to exhibit Hall's lucidity after the events of May 1, and therefore provided additional exculpatory evidence for Chiocca.

Some of the information disclosed was unreasonable to an extent -- at one point the report mentions private details about Hall's son medical appointments, that Mr. Hall called in sick for work because his wife got home extremely late, and that Mrs. Kimball felt vulnerable and betrayed.  See Ryan Report ¶ IV.17.

[57]

These disclosures were not, however, so severe as to constitute a violation of either Hall or Kimball's privacy rights.

Chiocca's disclosure of the events taking place on the night of the Incident, May 1, and thereafter is even more reasonable.  The events tend to show that Chiocca was resistant to Hall's advances on the night of the incident.  They also demonstrate, at the very least, that in the day following the Incident, Chiocca attempted to create space between himself and Hall, whereas Hall sought out opportunities to see Chiocca.  See Ryan Report Conclusions.  While Hall claims that the Report disclosed graphic details of the sexual encounter, the original report that was disclosed is largely devoid of any mention of sex.  It briefly mentions the existence of a sexual encounter but does not go into any further detail.  See Ryan Report ¶ VI. Any details of the sexual encounter were redacted in the copy provided to Chiocca and later disclosed to the media.

Finally, much of the harm that Hall and Kimball allege resulted from Chiocca's disclosure actually predated it. Chiocca released the Report on July 11, Chiocca's Statement Facts ¶ 193, but Hall was forced to withdraw from the race on May 30, Hall & Kimball's Response Chiocca's Statement Facts ¶ 116, she was involuntarily committed for a suicide watch on July 10, Chiocca's Response Hall's & Kimball's Facts ¶ 101, and Kimball was voted out at the July 10 meeting, id. ¶ 187.  While

it is likely that the Report worsened their public image, this is not sufficient to counterbalance Chiocca's interest in disclosure.

Therefore, Chiocca's disclosure of the Ryan Report was neither a substantial nor an unreasonable invasion into Hall's and Kimball's privacy.

### 2. Other Defenses Raised by Chiocca

Beyond the defenses of public disclosure and public interest in the Ryan Report, Chiocca raises two other defenses: (1) he claims the report was a public record under section 7(26); and (2) he argues that the disclosure is covered by the litigation privilege.  Chiocca need not establish either of these defenses to prevail, given that he has not committed a public disclosure of private facts violation.  This Court, however, briefly considers each defense.

### a. Section 7(26)

Chiocca argues that that Ryan Report is a public record pursuant to Massachusetts General Laws chapter 41, section 23B ("section 23B") and that it does not fall under the limited exceptions enumerated by Massachusetts General Laws chapter 4, section 7(26)(c) ("section 7(26)(c)").  Def. Chiocca's Opp'n Pls. Hall & Kimball's Mot. Summ. J. 16-17.  Hall and Kimball rebut that the Ryan Report is not a public record as it falls under the section 7(26)(c) exemption.  Pls. Hall & Kimball's

Reply 11-19.  This Court need not reach this issue, as it can

conclude Chiocca is not liable for invasion of privacy

regardless whether the Ryan Report is deemed to be a public

record.  See Ayash, 443 Mass. at 384.  This Court concludes,

however, that the Ryan Report is a public record.

Section 23B establishes that "[t]he selectmen of any town

may make an investigation into the conduct and operation of any

town department.  Upon completion of such investigation a report

shall be submitted to the town clerk and such report shall be

printed in the annual town report."  Under Section 7(26) a

public record is defined as any "documentary material[] . . .

made or received by any officer or employee" of the state

government.  Mass. Gen. Laws ch. 4, § 7(26).  Thus the Ryan

Report is by default a public record unless it falls under one

of the exemptions enumerated by the act.  The parties agree that

the most relevant exemption is section 7(26)(c), which protects:

> personnel and medical files or information and any other
> materials or data relating to a specifically named
> individual, the disclosure of which may constitute an
> unwarranted invasion of personal privacy; provided,
> however, that this subclause shall not apply to records
> related to a law enforcement misconduct investigation.

Mass. Gen. Laws ch. 4, § 7(26)(c).  This exemption clause "was

amended in 1977 to modify the word 'privacy' by adding before it

the word 'unwarranted.'  This amendment 'in essence broadened the

range of information that might be available as public

records.'" Georgiou v. Comm'r Of Dep't Of Indus. Accidents, 67
Mass. App. Ct. 428, 432 (2006) (quoting Torres v. Attorney Gen.,
391 Mass. 1, 7 (1984)).  The Supreme Judicial Court of
Massachusetts, in People for the Ethical Treatment of Animals,
Inc. v. Department of Agricultural Resources laid out the
following test with regards to section 7(26)(c):

> Exemption (c) requires a balancing test: where the public
> interest in obtaining the requested information
> substantially outweighs the seriousness of any invasion of
> privacy, the private interest in preventing disclosure must
> yield.  On one side of the scale, we have looked to three
> factors to assess the weight of the privacy interest at
> stake: (1) whether disclosure would result in personal
> embarrassment to an individual of normal sensibilities; (2)
> whether the materials sought contain intimate details of a
> highly personal nature; and (3) whether the same
> information is available from other sources.  We have also
> said that "other case-specific relevant factors" may
> influence the calculus.  On the other side of the scale, we
> have said that the public has a recognized interest in
> knowing whether public servants are carrying out their
> duties in a law-abiding and efficient manner.

477 Mass. 280, 291-92 (internal citations omitted).  The
disclosure here could result in personal embarrassment to an
individual of reasonable sensibilities and was of a highly
personal nature, but the information was largely unavailable
from other sources, and was highly relevant to determining
whether civil servants were carrying out their duties according
to the applicable rules and regulations.

Another factor also weighs in favor of concluding that the
Ryan Report is a public record.  Kimball and Hall are both

elected public officials.  See Bos. Globe Media Partners, LLC v. Dep't of Pub. Health, 482 Mass. 427, 442 (2019); PETA, 477 Mass. at 293-294, ("[E]xemption [c] balancing test . . . should account for the different privacy interests . . . held by a public employee versus a private one."); cf. National Archives & Records Admin. v. Favish, 541 U.S. 157, 166 (2004) ("[W]here the subject of the documents 'is a private citizen,' 'the privacy interest . . . is at its apex.'" (quoting U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press, 489 U.S. 749, 780 (1989)).

Therefore, for reasons similar to those outlined above, see supra Section IV.B.1.a., the Ryan Report meets the requirements of a public record.[7]

### b. Litigation Privilege

Finally, Chiocca claims that "[written or oral communications made by a party, witness, or attorney prior to . . . a judicial proceeding involving said party, witness, or attorney are absolutely privileged even if uttered maliciously or in bad faith."  Def. Chiocca's Opp'n Pls. Hall & Kimball's

---

[7] This conclusion comports with the Public Records Division for the Commonwealth of Massachusetts which initially found that under the Public Records Act, the Town would be compelled to disclose the Supplemental Ryan Report, although it later reconsidered this issue in light of the present pending litigation.  Hall's & Kimball's Response Chiocca's Additional Facts ¶¶ 22-25.

Mot. Summ. J. 19 (quoting <u>Rich</u> v. <u>Rich</u>, 2011 Mass. Super. LEXIS 148, *21-24 (2011) (quotations omitted).

"The litigation privilege protects statements made in the institution or conduct of litigation or in conferences and other communications preliminary to litigation." <u>Riverdale Mills Corp.</u> v. <u>Cavatorta N. Am., Inc.</u>, 189 F. Supp. 3d 317, 321 (D. Mass. 2016) (Hillman, J.) (internal quotation marks omitted). Nevertheless, "the privilege may not be exploited as an opportunity to defame with impunity, and it does not protect unnecessary or unreasonable publication to parties outside the litigation . . . ." <u>Id.</u> (internal quotation marks omitted).

While this disclosure was not unnecessary, unreasonable, or defamatory, it is not protected by the litigation privilege. Chiocca was not pursuing legal action at the time of the release of the Ryan Report, nor has he adduced any evidence to show that his release of the document was done in preparation for litigation.  To deem this release covered by the litigation privilege would improperly stretch the temporal scope of the doctrine.  Therefore, this Court concludes that the litigation privilege does not apply to the Ryan Report.  Nevertheless, Chiocca does not need the benefit of this defense, given that he has not improperly invaded Hall or Kimball's privacy.

I.   **CONCLUSION**

[63]

At the close of this case, judgment will enter for Chiocca on count 24 of his complaint, count 3 of Hall's counterclaims, and count 1 of Kimball's counterclaim.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[8]

---

[8] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.